MICHAEL BAILEY
United States Attorney
District of Arizona
KEVIN M. RAPP
Arizona State Bar No. 014249
Email: kevin.rapp@usdoj.gov
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | CR- 19-00898-PHX-DLR(DMF) |
|---|---|
| Plaintiff, | **UNITED STATES' MOTION FOR DETENTION PENDING THE IMPOSITION OF RELEASE CONDITIONS** |
| v. | |
| David Allen Harbour, | |
| Defendant. | |

The United States respectfully seeks the detention of defendant DAVID ALLEN HARBOUR ("HARBOUR") unless and until stringent release conditions are imposed.

As explained below, HARBOUR poses a significant risk of flight based on the nature of the charges: his financial resources; his frequent international and domestic travels (he was arrested returning from a trip to Idaho where he has a vacation home); his possession of a second vacation home in Mexico (Cabo San Lucas) and frequent trips to Mexico (51 since 2010); other international travel (including to the Bahamas and the United Kingdom); his current possession of a passport; his recent transferring large assets into others names; and the use of nominees to conceal his ownership of assets. These factors suggest that HARBOUR could easily flee the United States and

1 use the wealth he has apparently stashed overseas to live out the remainder of his life,

2 in a lavish style, as a fugitive.

3      The United States also has concerns that HARBOUR could, if released without

4 conditions, pose an economic danger to the community.  As alleged in the 22-count

5 indictment, HARBOUR is engaged in an investment fraud that appears to be ongoing.

6 Although the indictment ends in 2015, there is considerable evidence that HARBOUR

7 continues to solicit new investors for yet another investment scheme.

8      On the other hand, the United States also recognizes that HARBOUR is a United

9 States citizen with no prior criminal convictions. Accordingly, the United States

10 believes there are conditions that would likely be sufficient to justify his release from

11 pretrial custody.  Specifically, to ameliorate the risk of flight, HARBOUR should be

12 required to relinquish his passport, submit to electronic monitoring, post a sizeable

13 bond from sources that are *not* subject to forfeiture, provide a complete accounting of

14 his financial holdings, and be precluded from engaging in any financial transactions

15 without prior Court and government approval.  Additionally, to ameliorate any danger

16 to the community, HARBOUR should be precluded from taking any steps to solicit

17 investors for any new investment opportunity. However, unless and until such

18 conditions are imposed, HARBOUR should remain in custody.

19

20 **ARGUMENT**

21 **A.    Legal Standard**

22      As the Court is no doubt aware, "[t]he Bail Reform Act . . . requires a district court

23 to order a defendant detained pending trial if 'no condition or combination of conditions

24 will reasonably assure the appearance of the person as required.'" *United States v. Gentry*,

25 455 F. Supp. 2d 1018, 1019-20 (D. Ariz. 2006) (quoting 18 U.S.C. § 3142(e)).  This

26 analysis involves a "two-step inquiry." *Id.*  First, the Court must make a finding as to

27 whether the defendant presents a "serious risk that such person will flee" if not detained.

28 *Id.* at 1020 (quoting 18 U.S.C. § 3142(f) (2) (A)).  The government bears the burden of

1    proving such risk of flight by a preponderance of the evidence. *Id.* Second, if the defendant

2    is likely to flee, the Court next must determine whether some set of conditions would

3    sufficiently vitiate that risk. *Id.* (citing 18 U.S.C. § 3142(g)). "In making the determination

4    whether conditions exist that would reasonably assure a defendant's appearance, Section

5    3142(g) requires the district court to take into account four statutory factors: (1) the nature

6    and circumstances of the offense charged; (2) the weight of the evidence against the person;

7    (3) the history and characteristics of the person, including his character, physical and

8    mental condition, family ties, employment, financial resources, length of residence in the

9    community, community ties, past conduct, history relating to drug or alcohol abuse,

10    criminal history, and record concerning appearance at court proceedings; and (4) the nature

11    and seriousness of the danger to any person or community that would be posed by the

12    person's release." *Id.*

13       In addition to seeking detention based on the risk of flight, the United States also

14    may seek detention on the ground that the defendant poses a risk of danger to the

15    community. Danger to the community includes economic danger. *See United States v.*

16    *Reynolds*, 956 F.2d 192, 192-193 (9th Cir. 1992). The government bears the burden of

17    proving such danger by clear and convincing evidence. *United States v. Hir*, 517 F.3d

18    1081, 1086 (9th Cir. 2008) ("A finding that a defendant is a danger to any other person or

19    the community must be supported by 'clear and convincing evidence.'") (quoting 18

20    U.S.C. § 3142(f)(2)(B)).

21    **B.**      **Flight Risk**

22       The Court should find, for several reasons, that releasing HARBOUR without

23    stringent conditions would create a significant risk of flight.

24       <u>Nature and Circumstances of Charged Offense</u>. HARBOUR is charged with a

25    total of 22 felony crimes—specifically, three counts of wire fraud, and nineteen counts

26    of transactional money laundering. The wire fraud counts, standing alone, carry a

27    statutory maximum penalty of 20 years in prison. If convicted of all (or even a portion

28    of) these charges, HARBOUR faces the very real possibility of a significant prison

1   sentence. Such exposure creates a powerful incentive to flee. *See, e.g., United States*
2   *v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties
3   possible under the present indictment, the defendants have an even greater incentive
4   to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005)
5   (ordering pretrial detention in white collar case, even though the defendant had no prior
6   felony convictions and "no history of violent criminal activity," in part because "[t]he
7   combined statutory maximum penalties for the federal crimes with which Mr.
8   Anderson is charged is 23 years. . . . At 51 years old, Mr. Anderson potentially could
9   spend most of the remainder of his life in prison if convicted.").

10       Strength of the Evidence. The strength of the evidence also supports a flight-
11   risk finding. As an initial matter, the fact the grand jury has returned an indictment is
12   enough to meet the government's initial burden as to the strength-of-the-evidence
13   factor. *See, e.g., United States v. Hamlin*, 2007 WL 2225868, *1 (E.D. Mich. 2007)
14   ("Under subsection (g)(2), from the a grand jury having passed an Indictment, there is
15   a definite weight of evidence against the Defendant."); *United States v. Bradshaw*,
16   2000 WL 1371517, *4 (D. Kan. 2000) ("[T]he grand jury's indictment, standing alone,
17   establishes probable cause for purposes of the Bail Reform Act.").

18       In addition, the indictment in this case is a speaking indictment that sets forth,
19   in extensive detail, some of the evidence supporting the charges against HARBOUR. In
20   sum, HARBOUR now has a greater motive to flee the United States.

21       Defendant's History and Characteristics. HARBOUR's history and
22   characteristics also support a flight-risk finding. On the one hand, the United States
23   acknowledges that aspects of HARBOUR's background are favorable to him. He is a
24   United States citizen with community and family ties who has never been convicted
25   of a crime.

26       On the other hand, HARBOUR'S finances are largely unknown and he may have
27   access to significant amounts of money, including money in foreign bank accounts. For
28   example, HARBOUR has recently transferred assets into other individuals or entities

names. Indeed, HARBOUR's $2.7 million primary residence is titled in the name of J.S. (*See* Exh. A; Declaration of IRS-CID Special Agent Brandon Lopez ("Decl." ¶ 20.)  In addition, HARBOUR owns a boat and trailer valued at $600,000. Again, title to the boat was recently transferred to J.S. (*Id* at ¶26) and, yet another expensive boat used by HARBOUR was recently titled in the name of T. G. (*Id.* at ¶ 21.)

His recent finances raise questions about his efforts at concealing legitimate income. (*Id.* ¶s 22-29.) HARBOUR is apparently using a credit card as a sub-account holder with the real account holder as someone else. (*Id.*)  The debits on this card exceed $6 million. (*Id.*) HARBOUR is apparently using nominees or others to conceal his ownership of certain assets and accounts (*e.g.*, his Paradise Valley residence, approximately $200,000 flowing through an account in his mother's name, etc.) Harbor has also represented that he placed a $1 million of victim R.G.'s money in an offshore account. (Decl. ¶ 17.)

For all of the reasons, HARBOUR has both the financial ability and apparently has access to foreign bank accounts to allow him to successfully escape prosecution. *See, e.g., Anderson*, 384 F. Supp. 2d at 36 ("Anderson appears to have the ability not only to flee the District of Columbia and the United States without detection, but also to live comfortably and evade capture in foreign jurisdictions.  Mr. Anderson has traveled extensively, has numerous international personal and business contacts, [and] appears to have access to substantial assets overseas.").

HARBOUR also engages in frequent foreign travel. He owns a property in Mexico and has traveled there 51 times in the last nine years. (Decl. ¶ 30.) Moreover, he frequently uses the services of private airplanes. (*Id.* at ¶ 30.) Foreign connections, coupled with access to foreign funds (apparently offshore), suggest an ability "to live comfortably" abroad, a consideration that supports a flight-risk finding. *See, e.g., United States v. Hong Vo*, 978 F.Supp.2d 41, 45 (D.D.C. 2013) ("Vo's access to substantial assets overseas, combined with her experience living in Vietnam for the past two years, . . . demonstrate her ability not only to flee . . . the United States . . . but also to live comfortably and evade capture in foreign jurisdictions.") (internal quotation marks omitted); *United*

1   *States v. Sani*, 557 F. Supp. 2d  97, 98-99 (D.D.C. 2008) ("Defendant's alleged access to

2   funds in foreign bank accounts, and Defendant's alleged purposeful and illegal

3   concealment of that access, is directly relevant to Defendant's flight risk.").

4       <u>Danger to Community If Released</u>.  The United States also has concerns that

5   HARBOUR could, if released without conditions, pose an economic danger to the

6   community.  The indictment expresses the grand jury's conclusion that HARBOUR

7   contributed to the victimization of investors. Any future effort by HARBOUR to solicit

8   investors would result in further victimization—and, thus, pose an economic danger to

9   the community.

10      <u>Conclusion</u>.  In sum, HARBOUR poses as serious risk of flight due to the severity

11  the charges (and penalties) he faces, his extensive foreign connections and financial

12  resources including a foreign residence), and his intent to conceal assets from the

13  government.  Although HARBOUR will presumably argue that this risk is minimal given

14  his connections to the community that he did not flee despite being exposed to both an

15  Federal Trade Communications and Security and Exchange Commission investigations

16  and possibly knowing that he was under investigation by the FBI in this case, "a pre-

17  indictment investigation and a post-indictment trial are two very different things."

18  *Anderson*, 384 F. Supp. 2d at 40 ("The defense has emphasized . . . that Mr. Anderson has

19  left the country and returned many times during the pendency of the government's

20  investigation into his business and investment activities.  His willingness to remain in and

21  repeatedly return to the United States despite the risk of indictment, the defense argues,

22  indicates that Mr. Anderson wishes to remain here to defend his good name and reputation

23  against attack in the criminal proceeding, even if it means, ultimately, risking his freedom.

24  The Court does not find this argument convincing. . . .  [A] pre-indictment investigation

25  and a post-indictment trial are two very different things.").

26

27

28

**C.     Danger to the Community**

In addition to seeking detention (at least temporarily) based on the risk of flight, the United States also seeks detention on the ground that the HARBOUR could, if released without conditions, pose a danger to the community.  Danger to the community also encompasses economic danger. *United States v. Reynolds,* 956 F.2d 192 (9th Cir. 1992.) In *Reynolds,* the Court held that danger may, at least in some cases, encompass pecuniary or economic harm. *Reynolds* (citing *United States v. Provenzano, \*193* 605 F.2d 85, 95 (3rd Cir.1979) ("danger not limited to physical harm; the concept includes the opportunity to exercise a substantial and corrupting influence within a labor union); *United States v. Parr,* 399 F.Supp. 883, 888 (W.D.Tex.1975) (pecuniary harm). Any post-indictment effort by HARBOUR to solicit investors should obviously be forbidden and ameliorated by other strict conditions (*e.g.,* limits on spending, providing financial accounting of assets, prohibitions against contacting prior investors, etc.). [1]

**D.     Concerns about Abby Harbour**

The United States also has concerns about HARBOUR's wife, Abby, acting as some type of third party custodian. *First,* during the search of the HARBOUR's residence, on August 5, 2019, a binder was located that indicated that certain assets were placed in the name of Nautical Holding LLC. Abby is the sole member of these assets. It is likely that many for these assets were purchased with fraudulently diverted investor funds. *Second,* Abby is responsible for unpaid tax liabilities as the HARBOUR'S file jointly. (*See* Decl. ¶s 32-37.) Abby must be aware that the they are under paying taxes, to put it mildly, as accounts owned jointly with her husband exceed $2 million in deposits that were used for personal expenses. In sum, Abby is

---

[1]  *See also* https://www.fjc.gov/sites/default/files/2014/Benchbook-US-District-Judges-6TH-FJC-MAR-2013.pdf (Sec. D, pp 10-11).

1    not an appropriate third party custodian. In addition, her potential exposure to related

2    charges give *both* the HARBOURS an incentive to flee.

3

4    **E.    Potential Release Conditions and Request for *Nebbia* Hearing**

5           Because HARBOUR poses a serious risk of flight, the remaining question is

6    "whether any condition or combination of conditions" authorized under the Act "will

7    reasonably assure the appearance of [HARBOUR] as required." 18 U.S.C. § 3142(f). The

8    United States believes that a package of suitable conditions could be crafted here. Those

9    conditions should include (1) relinquishing his passport, (2) travel restrictions, (3)

10   electronic monitoring, (4) a sizeable bond based on assets that are not subject to

11   forfeiture, (5) providing a complete accounting of all financial holdings, and (6) being

12   precluded from engaging in any financial transactions (except routine, day-to-day

13   expenditures ) without prior Court and government approval.

14          Courts have recognized that "there is much subjectivity in determining what amount

15   of bail will assure a defendant's appearance, and much of necessity must be left to the

16   discretion of the judicial officer who makes the initial determination." *See Wright, Leipold,*

17   *et al., Fed. Practice & Proc. Crim.* § 776 (4th ed. 2017 update). Congress has also provided

18   significant guidance. Under 18 U.S.C. § 3142(c)(1)(B), some of the statutorily-authorized

19   conditions are third-party custody, restrictions on a defendant's associations and travel

20   (including association with potential witnesses), periodic reporting, curfews, a bond with

21   solvent sureties, and "any other condition that is reasonably necessary to assure the

22   appearance of the person as required and to assure the safety of any other person and the

23   community." The Act also contemplates a focus on the defendant's finances as a relevant

24   consideration. 18 U.S.C. § 3142(g)(3)(A) (person's history and characteristics include

25   "financial resources"); *id.* § 3142(c)(1)(B)(xi) and (xii) (authorizing release subject to

26   financial conditions). For those reasons, courts have routinely determined that release

27   conditions in white collar cases should require the posting of substantial cash or other

28   assets, to be accompanied by a range of other restrictions (such as the surrender of passports

1    and travel limitations). *See, e.g., United States v. Brooks*, 872 F.3d 78, 83-84 (2d Cir. 2017)

2    ("The district court held a hearing and determined that Brooks was a flight risk on the basis

3    of his considerable wealth and the potential for access to foreign accounts if he fled the

4    country. . . . The district court issued a Bail Release Order . . . granting Brooks's motion

5    for pre-trial release.  The Order included such restrictions as home detention monitored by

6    a private security firm, monitored conversations, independent auditing of bank accounts

7    and assets, and a prohibition on liquid assets being held overseas without the approval of

8    the U.S. Attorney's office.  Brooks and his family sureties also provided $48 million in

9    cash as security for the $400 million bond the court ordered."); *United States v. Dreier*,

10   596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) (release conditions included "(1) a $10 million

11   personal recognizance bond that, while not secured by cash, will be co-signed by

12   defendant's son, Spencer Dreier, and his mother, Mildred Dreier; (2) home detention, 24/7,

13   in his East Side apartment, secured not only by electronic monitoring but by on-premises

14   armed security guards, supplied by a company acceptable to the Government but paid for

15   by the defendant's relatives; (3) elimination of computer access, surrender of all travel

16   documents, and screening and searching of pre-approved visitors; (4) strict supervision by

17   Pre–Trial Services; and (5) ongoing cooperation with the court-appointed Receiver in

18   identifying and preserving all assets held directly or indirectly by defendant").

19          The United States also requests, should HARBOUR identify funds or assets that

20   could be used to secure a suitably-large bond, that the Court conduct an inquiry into the

21   source of those funds or assets.  The Bail Reform Act codified a district court's authority

22   to conduct such an inquiry, which is often called a *Nebbia* hearing.  18 U.S.C. § 3142(g)(4)

23   ("[T]he judicial officer . . . shall upon the motion of the Government . . . conduct an inquiry

24   into the source of the property to be designated for potential forfeiture or offered as

25   collateral to secure a bond, and shall decline to accept the designation, or the use as

26   collateral, of property that, because of its source, will not reasonably assure the appearance

27   of the person as required.").

28

1    Here, HARBOUR should not be permitted to use the proceeds of the charged crime

2    to secure his release pending trial. *Cf. United States v. Sharma*, 2012 WL 1902919, *4

3    (E.D. Mich. 2012) (holding that although "there is no iron-clad rule that a defendant must

4    show that collateral to support pre-trial release was lawfully acquired," "the legislative

5    history of the [Bail Reform] Act makes clear that Congress believed, in most cases, the

6    potential loss of the fruits of an alleged crime will not reasonably assure the appearance of

7    the defendant at trial" and that "[a]bsent exceptional circumstances, bail funded in part

8    from alleged criminal activity does not adequately assure the appearance of the defendant;

9    instead, as the Senate Committee found, forfeiture of the proceeds of a crime is simply a

10   business cost of avoiding prosecution, leaving the defendant no worse off than before he

11   engaged in criminal activity, but far better off than if in prison").

12       Finally, to reduce the risk that HARBOUR may be endangering the community, the

13   Court should impose the following conditions: (1) HARBOUR shall not engage directly

14   or indirectly in the solicitation of investors for any type of investment fund or opportunity;

15   (2) any expenditures in excess of $500 must be approved by his assigned pretrial services

16   officer; (3) provide a complete listing of domestic and foreign assets; and (4) HARBOUR

17   should have no contact, direct or indirectly, with any previous investors, regardless of

18   whether they are the victim of the current indictment.

19       Respectfully submitted this 5th day of August 2019.

20

21                                    MICHAEL BAILEY
                                      United States Attorney
22                                    District of Arizona

23

24

25   KEVIN M. RAPP
     Assistant U.S. Attorney

26

27

28

- 10 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of August 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Alan Baskin, Esq., Attorney for Defendant David Allen Harbour

*s/ Angela Schuetta*
U.S. Attorney's Office