# Exhibit A

**Declaration of Special Agent Brandon Lopez**

I, Special Agent Brandon Lopez, declare:

1. I have been employed as a Special Agent of Internal Revenue Service, Criminal Investigation (IRS-CI) since July 2009.  I obtained a Bachelor of Science Degree in Criminal Justice from Arizona State University. As an IRS-CI Special Agent, my responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws, (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code), and related offenses.

2. During the course of my employment as an IRS-CI Special Agent, I have attended and graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have also graduated from the Special Agent Investigative Techniques Training course given by the National Criminal Investigator Training Academy in Glynco, Georgia.  These courses included approximately 1,040 hours of instruction including federal law, federal court procedures, search warrant procedures, money laundering statutes, and numerous other law enforcement topics.  I have continued to receive training from the United States Attorney's Office and The National White Collar Crime Center in the areas of trial discovery, money laundering and mortgage fraud.

3. I have gained experience in conducting such investigations through formal training and on-the-job training, as well as consultation with more experienced agents.  During the course of my career, I have participated in the execution of numerous search warrants, seizure warrants, arrests and trials of individuals for violations of federal law.  I, along with Special Agent Taylor Hannah of the Federal Bureau of Investigation (FBI) have participated extensively in the investigation leading up to the indictment in United States v. David Allen Harbour.

4. This declaration is submitted in support of the government's request for pretrial detention of defendant David Allen Harbour (Harbour).  If called upon, I could competently testify as set forth below:

5. The following is information based on my personal observations, the observations of other federal and state law enforcement agents, a review of records and evidence during the

course of the investigation and evidence obtained through witness statements and subpoenas.

**Background of Investigation**

6.  Harbour has been involved in organizing and heading investment groups since at least 2010 through the present. In or about 2011, Harbour devised an investment scheme in which he promised an approximate 20% return on investment through the funding of the debt relief organization KSQ Management (KSQ). KSQ was investigated by the Federal Trade Commission (FTC), in addition to the FBI and IRS Criminal Investigation. KSQ's owner, J.T. was eventually indicted by the United States Attorney's Office.

7.  After the KSQ ended, Harbour began a new investment scheme involving loans to a tribal-owned entity known as Green Circle. Green Circle was owned by the Wakpamni tribe, with the purpose of providing consumer loans. Harbour possessed exclusivity with Green Circle to be the only investment vehicle to fund the entity. Harbour was to be paid $25,000 for every $1 Million invested, in addition to 80% of revenue.

8.  The Securities and Exchange Commission (SEC) investigated Harbour and Green Circle. On July 31, 2018, the SEC filed a Complaint against Harbour. According to paragraph 4 of the Complaint:

    a.  "This matter is based on misrepresentations by Defendant David A. Harbour ("Harbour") concerning the use of investor funds in connection with his fundraising activities. Between July 2014 and August 2016, Harbour, through various entities he managed and controlled, raised money from his friends and business acquaintances by representing to them that their funds would be used to finance various businesses, including an American Indian business entity engaged in high-interest installment lending to consumers. Instead of directing the money to revenue-generating businesses that could achieve the high returns he promised, Harbour used substantial portions of the invested funds to finance his personal lifestyle and pay off his personal debts. Harbour ultimately used $1,535,000 of the $2,450,000 that he raised from four investors to pay his personal expenses and pay off his debts". This case was also settled.

9. During 2018, Princeton Alternative Income Fund (PAIF) was one of the largest investor groups obtained by Harbour for the purpose of investing in Green Circle. PAIF discovered the SEC investigation and soon thereafter learned of the FTC investigation and Harbour's involvement. PAIF decided to call the promissory note with Harbour and Green Circle. Harbour did not pay the funds back to PAIF and the Green Circle entity was turned over to PAIF by the tribe.

10. Burgess had his company dig deeper into the loan portfolio with Green Circle. It was soon identified that fraudulent statements had been sent by Harbour or Harbour-related employees to PAIF in order to obtain funds.

11. PAIF obtained the Green Circle books and records and began analyzing the files. Upon that review, PAIF discovered the following:

    a. The portfolio was worth $2 Million less than what had been previously stated by Harbour,

    b. Green Circle's current cash flow would not support the amount of outstanding funds and could not sustain the business model,

    c. Emails containing fraudulent consumer borrowing base financials were submitted to PAIF up until Green Circle was formerly turned over to PAIF in the fall of 2016. Some of these emails were sent from Harbour's assistant, Laura Purifoy, and

    d. Harbour diverted funds from Green Circle to accounts under control for his personal benefit, including using Green Circle funds to pay his Federal Trade Commission fine.

12. It is believed Harbour is currently organizing an investment venture in a healthcare/hospice care related facility. C.W. was an investor in Harbour's KSQ and Green Circle venture and was subpoenaed for a deposition during the Securities and Exchange Commission investigation. C.W. was deposed on November 30, 2016 and told SEC attorneys that Harbour was putting all the healthcare stuff together and didn't want to disclose details.

13. Agents of the IRS and FBI interviewed J.R.S. on May 29, 2019. J.R.S. told the agents, that at the time of the interview, Harbour was starting up a healthcare related business and investment and J.R.S. believed that Harbour was going to do very well in the new venture.

14. The FBI and IRS-CI became involved in this case when each agency was independently contacted by two victims, M.B and R.G. M.B. met Harbour at the Cabo San Lucas golf resort and Harbour befriended M.B.'s family and eventually the two families were vacation together; including to Harbour's vacation home in Harrison, ID. M.B. invested $1 Million with Harbour for the purpose of investing in Green Circle. M.B. was unaware that of the $1 Million, approximately $600,000 was actually provided to Green Circle and the remaining balance was used at Harbour's direction, including a payment to his personal American Express card of $223,121.88.

15. R.G.'s husband died in November 2009, leaving R.G. responsible for all of their shared finances and business dealings. Soon thereafter, banks began calling R.G. to settle debts. R.G. was introduced to Harbour through a mutual acquaintance. Harbour represented to R.G. that he specialized in helping people in difficult financial situations. R.G. hired Harbour for legal entity design, tax compliance and evaluation, liability and insurance protection, financial product assistance, decision making, income recognition, and cash flow producing investments. Harbour's fee was $10,000 per month for 8 months for the business management services.

16. Harbour knew of the $1 Million life insurance policy R.G. received upon her husband's death. Harbour told R.G. he would invest the money for a guaranteed minimum 3% return and his fee would be to take half of any returns on investment over 3%. On March 22, 2010, R.G. signed over the life insurance proceeds. R.G. never received any statements in regard to her investment.

17. Sometime later, R.G.'s mother became ill and R.G. needed funds to help pay her mother's medical bills and living expenses. When R.G. requested $200,000 of her funds from Harbour, he told R.G. all of her funds were locked up in offshore accounts. Harbour agreed to deposit $5,000 per month into R.G.'s account. Harbour made a $5,000 deposit on June 4, 2013 and another $5,000 on August 23, 2013. Harbour then told R.G. he could no longer make the deposits because he was doing the same thing for another client and the banks back-traced the source of the deposits and found all of the client's funds. Harbour claimed he was protecting R.G.'s funds and her investments were not in her name for this reason. Harbour told R.G. he kept all of his and his

mother's money in offshore accounts.  Harbour later ceased all communications with R.G. and never returned her funds.

**Finances**

18. From 2009 through July 2018, approximately $89 Million has flowed into and out of Harbour's bank accounts.  These amounts include, from October 2011 through May 2014, transfers to KSQ totaling $14.7 Million and funds from KSQ totaling more than $270,000.  In addition, the $89 Million in account activity includes from August 2014 – August 2016, transfers to Green Circle totaling more than $1 Million and funds from Green totaling more than $1.9 Million.  It is important to note that at the end of the KSQ investment, Harbour told his investors that KSQ defrauded them and monies were not returned from KSQ.  During the Green Circle investment, IRS-CI and the FBI subpoenaed numerous bank statements, analyzed those records and interviewed witnesses.  It was found that although Harbour had promised to send 100% of the investment funds to Green Circle, Harbour would keep a significant portion of the investment for his own personal use or at his direction.

19. Harbour used his American Express card to fund his lifestyle.  From November 2011 through July 2017, Harbour's account activity included debits of over $6.5 Million to American Express.  The following examples are summaries of transactions per vendor of American Express activity:

|  |  |  |
|---|---|---|
| a. | Waste Management Phoenix Open | $431,600.66 |
| b. | Clothing - Neiman Marcus, Nordstrom, Saks, Heidi | $374,152.05 |
| c. | Prime Jet LLC Transportation Services | $299,449.57 |
| d. | Hamra Jewelers Scottsdale | $296,172.40 |
| e. | Stephanie's Scottsdale Women's Clothing | $278,437.85 |
| f. | Ticket Exchange Ticket Sales | $236,802.79 |
| g. | Aero Jet Services | $217,054.28 |
| h. | Disney-Related Transactions | $203,659.58 |
| i. | Gozzer Ranch | $194,427.79 |
| j. | Candelaria Design | $180,435.38 |
| k. | Sun Devil Club | $166,384.00 |

|   |   |   |
|---|---|---|
| l. | Stancraft Boat | $162,589.43 |
| m. | Tempus Jets | $125,382.43 |
| n. | Amazon | $ 71,034.99 |
| o. | Arrowhead Cadillac | $ 58,039.39 |
| p. | Bombardier Bus Jet | $ 56,174.17 |

20. Harbour has significant outstanding liabilities. According to public record, Harbour has not paid his federal taxes from various periods from at least 2005, totaling more than $760,000. Harbour's $3 Million condominium in Cabo San Lucas is co-owned with D.D. and has a $3 Million loan balance to D.D. Harbour's condominium in Idaho has a market value of approximately, $3 Million, while he has outstanding liens on the property in the form of personal guarantees that total more than $8 Million to D.D. Harbour and his business/investor M.D. have filed bankruptcy in the Western District of Missouri, listing unsecured claims of $35 Million (the petition also lists over $120 Million is assets in claims against entities that have filed bankruptcy).

21. An IRS Revenue Officer researched Harbour's finances on February 10, 2016 and found the following:

    a. AZ State Tax Lien filed August 11, 2014, in the amount of $14,500 for tax year 2012

    b. A UCC Filing on February 13, 2013 by B.C. LLP on Harbour's entities, Highpointe Capital Group, LLC and HPGC Hospital Investment LLC.

    c. Harbour's monthly payment plan in the amount of $65,707 per month for 96 months pursuant to the second amended Chapter 11 plan, Docket No. 656, filed in United States Bankruptcy Court in the Western District of Missouri.

    d. UCC Filing by investor D.D. on September 6, 2011 for all of debtor's membership interest in Northrock LLC, including income, distributions, management fees, and arbitrage.

    e. UCC Filing by investor NetLend LLC on September 13, 2013 for all assets of any kind, tangible and intangible.

**Nominees & Assets**

22. The aforementioned American Express activity was transacted through the use of the American Express card held under the names of David and Abby Harbour (Abby).

However, the Harbours' credit cards are issued at sub-account card holders and according to American Express, the real account holder is W.Y.  It is believed W.Y. is a nominee for Harbour.  Of the $6.5 Million in American Express debits, only $127,190.18 is attributed to cardholder W.Y., and the remaining balance of transactions were conducted by the Harbours.  In addition, an analysis of known Harbour bank records reflects over $6 Million in payments to American Express from November 2010 through August 2016.

23. Harbour co-owns a $3 Million condominium in Cabo San Lucas, Mexico.  The co-owner of this home is D.D. (see below).  Harbour solely owns the Harrison, ID condominium, valued at $3 Million.

24. J.L.S. is believed to be a nominee for Harbour.  J.L.S. is also the nominee for Harbour's personal residence located at 8901 N. Martingale Rd, Paradise Valley, AZ.  According to the Affidavit of Value, J.L.S. purchased 8901 N. Martingale Rd. Paradise Valley, AZ 85253 on or about September 2015 for $2.7 Million in cash.  The Affidavit indicated the residence would be rented to someone other than a family member.  The government acquired the escrow file for Martingale.  Those records revealed that that check #1032 in the amount of $75,000 check with the memo, "Earnest 8901 N Martingale was paid from Harbour's AJS MANAGEMENT LLC US Bank x0603 to Grand Canyon Title on or about September 17, 2015.  An additional $75,000 wire was paid to Grand Canyon Title on or about October 20, 2015 from AJS MANAGEMENT LLC US Bank x0603.  The remaining balance for the purchase of the residence was paid via two wire transfers in the amounts of $1,100,000 and $1,454,422.18 from J.L.S.'s SP MANAGEMENT INC JPMorgan Chase bank account on October 29, 2015.

25. The escrow file reflects the Harbours' communications with the escrow company and real estate individuals in relation to acquiring the Martingale property.  Within the file, the document Nomination Statement, is dated October 29, 2015 and contains J.L.S.'s signature as a Nominee that has been designated by Abby's entity as AJS MANAGEMENT (AJS), as the Nominator.  The property was titled to owner entity, 8901 LLC, with the 100% owner as J.L.S.  The Operating Agreement for 8901 LLC was included in the file and reflects J.L.S.'s Capital Contribution as $2,700,000, which is the same amount as the purchase price for the property.

26. Harbour owns a Stencraft Rival boat in Coeur d' Alene, ID for his benefit when he is at his vacation home. The boat and the accompanying trailer have an approximate value of almost $600,000. According to Stencraft sales and storage, the boat was recently titled from Harbour to J.L.S. Similarly, it has been alleged that Harbour purchased a boat from Harbinone Marina at Coeur d'Alene. Near the end of the transaction, Harbour made the Marina title the lien holder of the boat as his father-in-law, T.G. The government obtained records that reflect Gottschalk as the lienholder of a Masterline vessel, titled in the name of Nautical Holdings.

27. J.L.S. owns Savior Hospice & Palliative Care (SHP). However, since the Green Circle venture, Harbour has told some of his investors that he has transitioned to an investment in the healthcare/hospice care industry. Harbour has stated that he owns the business and that he has a major investor for the business.

28. K. Harbour is Harbour's mother and is believed to be either a nominee or has aided Harbour in the movement of significant assets. Bank records reveal that from March 2015 to May 2015, $100,000 was wired to K.H.'s Desert Schools bank account ending in 9968 from Graywave Capital Management LLC (an entity owned by J.T.). In addition, from May 2015 to July 2015, $282,000 was wired from M.D.'s entity, KC Lending LLC to K.H.'s account 9968. These funds deposited into K.H.'s bank account 9968 were used to pay $237,212.53 to Harbour's American Express card, $30,000 to Gozzer Ranch Golf and Lake Club for member number 0269A, David Harbour, and $160,775 was paid to a combination of Harbour himself or Harbour's entities Highpointe Capital Group or Oak Tree Management.

29. Harbour's financial transactions indicate he and his wife have purchased significant assets that could be sold and transferred to cash. Harbour paid Hamra Jewelers over $400,000 and has paid clothing-type merchants, such Neiman Marcus and Stephanie's Scottsdale over $600,000. It is believed Harbour has Discovery Land Company golf memberships at as many as 4 locations. Members of these resorts have told agents the average cost is $150,000 and the memberships could be refundable if the member cancels their membership.

**Foreign Travel and Transactions**

30. Harbour co-owns with investor D.D. a $3 Million condominium in Cabo San Lucas, Mexico. Harbour has had extensive international trips from at least 2010 through as recent as May 31, 2019. Those trips include 51 trips to Cabo San Lucas, Mexico, 4 trips to the Bahamas, 3 trips to Mexico via Lukeville and 1 trip to London. American Express transactions reveal over $92,000 in credit card transactions occurred while in Mexico and London.

31. Harbour's financial transactions indicate over $2.4 Million has been paid for airplane/jet transportation services. Harbour made payments for this service from bank accounts and his American Express card to companies such as Prime Jet, Aero Jet, and Bombardier Bus Jet.

**The Harbours' Unpaid Tax Liabilities & Statements Made Under Penalty of Perjury**

32. As noted above, the IRS filed liens with the Maricopa County Recorder and other County Recorders, on Harbour for more than $760,000 in unpaid taxes. Of the tax liens, $165,938 represents the unpaid balance attributable to Harbour and his wife, Abby. Upon research of IRS databases, it was found that Harbour sole unpaid balance is $88,696 for the 2005 tax year; $582,197 for the 2006 tax year; and $72,043 for the 2011 tax year. Abby and Harbour are jointly responsible for an unpaid of $3,744,149 for the 2012 tax year. These tax years where under active IRS Collection activity by an IRS Revenue Officer, while tax years 2013 and 2014 were under audit by an IRS Revenue Agent.

33. As part of the IRS Civil actions, Harbour was represented by Attorney J.B. Attorney J.B. provided numerous records as instructed by the IRS. Harbour signed under penalty of perjury, IRS Forms 433-A, *Collection Information Statement* at various times; with the most recent Form being signed or about April 26, 2017, and re-verified for accuracy by Harbour on June 6, 2018. The Revenue Officer reviewed the form in the presence of J.B. and Harbour during face-to-face meetings on April 26, 2017 and June 6, 2018.

34. On April 20, 2016, the IRS Revenue Officer asked Harbour's Attorney J.B. how Harbour could sustain losing $27,000 per month without filing bankruptcy. Attorney J.B. replied that Harbour is using some investor funds for personal use.

35. On June 6, 2015, the Revenue Officer received information for AJS from J.B, as the entity was previously identified as being used to pay the Harbours' nanny.  The Revenue Officer accessed IRS databases and found that AJS was an entity solely owned by Abby and conveyed the information to J.B. (Note:  Subpoenaed bank records indicate from June 2014 through February 2016, AJS Management US Bank account ending in 0603 had 34 deposits totaling $639,001.69.  Notable deposits include $295,000 from J.T.'s entity, Graywave Capital Management and notable disbursements include $150,000 to Grand Canyon Title for down payment and closing fees for Martingale and $114,804.01 to American Express).

36. On April 26, 2017 the Revenue Officer met with J.B and Harbour at J.B.'s office. Harbour told the Revenue Officer the following information during the meeting:

    a.  Abby could not make the meeting as she was working.  Harbour stated that Abby is a receptionist who makes about $3,000 per month at Highpointe Capital Group. Harbour stated he is paying the payroll company contract that pays his wife through family and friends.

    b.  Harbour was asked what he was currently doing for employment, and he responded that he is not working and that the companies he has were not operating at the present.

    c.  Harbour stated that he had lost everything and that the tribe that owned Green Circle decided not to pay him $3 Million that is due to him.

    d.  Harbour stated he was currently trying to rebuild his life.  His home on Ranch Gate was currently in foreclosure and that the property is on the market and he is trying to short sell the property.

    e.  Harbour stated he currently lives in the Martingale home that is a friend's rental property.  The friend does not charge them rent and Harbour only needs to pay the utilities.  Harbour stated he is managing through family and friends.

    f.  Harbour was asked if his company is not currently operating, why it has an office off of Pima Road where Abby works and how could he afford the rent.  Harbour responded that the office relocated to 4353 E. Shea Blvd. Suite 160, Phoenix, AZ.

The office building is owned by the same friend who owns the Martingale residence. (Note: this person is J.L.S., who is listed above).

g. The Harbours verified they have 2 personal checking accounts at Chase bank and Harbour has an additional account at BMO Harris. Harbour stated the business account and one of the personal accounts was overdrawn and the other personal account had $1,900. (It should be noted that from January 20, 2017 through June 1, 2017, Harbour's American Express account received payments totaling $336,522.81. It is unclear as to the source of these funds used to pay the American Express bill).

h. The Form 433-A listed a Charles Schwab IRA for Abby with a balance of $503,290. The Revenue Officer asked why Harbour has not made payment of at least the 2012 joint tax liability from those funds. Harbour said he would rather not use the Charles Schwab funds because the money in the account is from Abby's parents, who started the account for her when she was a baby and they are the only ones who deposit funds into the account each year. Harbour stated that neither he, nor Abby have ever deposited funds to that account. (Note: Bank records indicate that during 2012 and 2013, there were 17 transfers, totaling $419,333.31 from Harbour's DNA Investments Northern Trust account ending 9412).

i. Revenue Officer asked Harbour if there is any guaranteed income that he is not disclosing. Harbour replied with a response of no.

37. On June 6, 2018 the Revenue Officer met with J.B and Harbour at J.B.'s office. Harbour told the Revenue Officer the following information during the meeting:

a. Abby is no longer working as daycare costs would exceed her wages.

b. Harbour has been working for the last 8 months for Volente Health Care dba Savior Hospice as a salesman. He is considered a consultant and since he does not have any bank accounts, he is not paid via a paycheck. His employer allows him to use the company credit card for personal purchases and they deduct his income from the total on the card. The Revenue Officer reminded Harbour that

he needs to report this amount of income and wanted income information. (Note: J.B. eventually provided the credit card transactions, stating the card was held by J.L.S. dba Savior Hospice. The totals on the card were $425.11 for the month of October; $1,360.05 for the month of November; $1,536.06 for the month of December; $378.02 for the months of December and January; $652.91 for the months of January and February; $834.28 for the months of February and March; $835.41 for the months of March and April; $2,218.23 for the months of April and May; $1,143.29 for the months of May and June; $1,054.02 for the months of June and July; and $1,371.70 for the months of July and August).

c. Harbour is suing the tribe that owned Green Circle for $3 Million that is due to him.

d. Harbour is still living in the Martingale home under the same arrangement of only paying for the utilities.

e. Harbour reiterated that the Charles Schwab IRA is for Abby, which only her father, T.G. has funded. Harbour further stated the account is in T.G.'s name and Abby has no access to the account at this time.

**Abby Harbour's Bank Activity**

38. Abby has benefited from the funds received through the Harbour investment scheme. During the suit filed by the FTC, the FTC Receiver analyzed the Harbours' bank account and notated the following (Case 4:14-cv-00783-DW):

a. "Abby Harbour was an authorized signer on the DNA bank account. Between 2011 and 2014, Abby Harbour regularly wrote checks to herself for over $100,000 from the DNA bank account. Abby Harbour also wrote checks from the DNA bank account for apparent personal expenses such as one check for 45,000 to a studio with a memo of Bday Deposit".

39. In addition to Abby's AJS banking activity listed above, the government received bank records for Abby's personal Bank of America accounts ending 5472 and 8588, Abby's Mamalicious US Bank account ending 3652 in addition to Abby and Harbour joint Bank

of America account ending 0863.  The following is a summary of the deposits into the respective accounts with account activity notated:

a.  Abby BofA 5472 (Aug. 2011 – Feb. 2016)                    $917,022.65

b.  Abby's AJS US Bank 0603 (June 2014 – Feb. 2016)          $639,001.69

c.  Abby & Harbour BofA 0863 (Aug. 2011 – Jan. 2016)         $401,912.46

d.  Abby BofA 8588 (June 2011 – Jan. 2016)                    $145,504.67

e.  Abby's Mamalicious US Bank (May 2014 – Dec. 2015)        $ 75,000.00

## Conclusion

40. By a preponderance of the evidence, Harbour poses a flight risk and appears to have access to assets outside of the United States. Harbour has become more sophisticated in his fraudulent schemes by utilizing nominees to hide assets from the IRS and victim investors. He is exposed to a significant amount of prison for these charges for which the evidence of guilt is substantial. Harbour has the means and motivation to flee the jurisdiction.


I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.  Executed this 5th day of August 2019 in Phoenix, AZ.


*Bopez*

Special Agent Brandon Lopez
IRS Criminal Investigation