MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: kevin.rapp@usdoj.gov
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona  85004
Telephone:  602-514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>David Allen Harbour,<br><br>Defendant. | No. CR-19-00898-PHX-DLR<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FORFEITURE COUNT AS IT RELATES TO ALLEGED INVESTOR-VICTIM "R.G." (Doc. 98)** |

The United States, through undersigned counsel, files this Response in Opposition to Defendant's Motion to Dismiss the Forfeiture Count as it Relates to Alleged Investor-Victim "R.G." (Doc. 98.) and respectfully requests that the Court deny the motion without a hearing.

**SUMMARY OF ARGUMENT**

David Allen Harbour's ("Harbour") motion to dismiss is unavailing and should be denied for several reasons. *First*, despite allegations of an attempt "to smuggle an impermissible and unrelated fraud claim into the indictment," the government's inclusion of R.G.'s transaction in the forfeiture claim is proper because the funds are involved with the claims alleged in the indictment. *Second*, because R.G. has been

both directly and proximately harmed by the scheme charged in the Indictment, R.G. is a "victim" entitled to restitution through a process known as remission and restoration. *Third and importantly*, Harbour's scheme to defraud R.G. is within the five-year statute of limitations because he engaged in additional instances of wire fraud with "lulling" text messages late into 2015. Bottom line, no government impropriety has occurred in this situation, and the Court should reject Harbour's claims.

## RELEVANT FACTS

### A. Harbour Defrauds R.G.

Harbour is being charged with wire fraud in violation of 18 U.S.C. § 1343 in Counts 1-3 and transactional money laundering in violation of 18 U.S.C. § 1957 in Counts 4-22 as a part of a larger investment fraud scheme. (Doc. 3 at 6-7.) The overarching scheme involved setting up LLC's with victims to facilitate payday loan investments and gross misrepresentations of material facts to his investors. (Doc. 3 at 4).

In January of 2010, during a time of financial difficulty for R.G., Harbour was introduced to R.G. as a person who could solve her financial problems. (Def.'s Mot. to Dismiss, Ex. 1 at 3.)[1] In a February 2015 meeting, Harbour assured R.G. that he could help her through investments, investment protection, negotiations, and strategizing. (Def.'s Mot. to Dismiss, Ex. 1 at 4.) In March, Harbour and R.G. officially began doing business together. (Ex. A at 2.) Harbour promised to provide "services" to R.G., including designing a legal entity for her (such as an LLC), assisting with financial products, and providing cash flow investments. (Ex. A at 3.) Subsequently, R.G. signed over a $1,001,242.67 check from her late husband's life insurance proceeds to Harbour's company, High Point Capital Group, LLC. (Ex. A at

---

[1] Ex. 1 attached to Harbour's motion was a timeline prepared by R.G. that detailed interaction with Harbour during the course of the fraud. It was prepared for a civil case filed by R.G. against Harbour. *See R.G. v. David Harbour, et. al.*, CV2018-054740 (Maricopa County Superior Court).

2.)

Sadly, Harbour would not fulfill his promises and return R.G.'s money. From the time the check was signed over to Harbour through October of 2016, Harbour frequently misled R.G. about her funds. Often, when R.G. requested money from her funds, he told her it was inaccessible because it could not be attained from whatever investment it was in at the time. (Def.'s Mot. to Dismiss, Ex. 1 at 30, 38, 43.) Frequently, Harbour indicated that R.G.'s funds were involved with his overarching investment scheme. On August 20, 2012, Harbour confirmed with R.G. that her money was set aside in one of his investments. (Def.'s Mot. to Dismiss, Ex. 1 at 30.) Again, on July 9, 2015, Harbour indicated R.G.'s money was involved in his scheme in a text message saying, "Sounds good. I'm boarding a plane. One of my investors is also in the same deal you are."[2] On September 3, 2015, Harbour tells R.G. that her money is "off shore" and that he is doing the same thing with her money that he does to help protect "other clients" from creditors. (Def.'s Mot. to Dismiss, Ex. 1 at 39.) Additionally, on January 14, 2016, Harbour again indicated that R.G.'s funds were "commingled" with other investors deals and that he would "get a line of credit" on the investments to provide R.G. with money. (Def.'s Mot. to Dismiss, Ex. 1 at 43.) Harbour also left R.G. several voicemails confirming appointments. The sad truth is that Harbour consistently had the funds to repay R.G., which is evident by his $7,257,601.67 of AMEX payments from 2010 to 2016.[3]

**B. Additional Victims**

Following Harbour's arrest and indictment in August of 2019, additional victims have come forward claiming that Harbour made certain promises about the nature of their investment with him. Among other things, further investigation has

---

[2] R.G.'s phone was examined by federal investigators and numerous text messages and voicemails from Harbour related to the subject funds were extracted.

[3] See AMEX statements; HARBOUR-023841:HARBOUR-025946 (January 2009 – August 2017).

1   determined that a considerable amount of investors' funds were diverted for Harbour's
2   personal expenses.  Typically, Harbour would be subject to a superseding indictment
3   that would add additional counts and victims.  Unfortunatley, the COVID-19 pandemic
4   has caused the grand juries in the District of Arizona to suspend operation for the
5   foreseeable future.[4]

6                                    **ARGUMENT**

7   **1.      Because R.G.'s Money was involved in Harbour's scheme, the government**
8           **may include R.G.'s transaction in the forfeiture claim.**

9           It is proper for the government to seek forfeiture of property if it has "established
10  the requisite nexus between the property and the offense" charged.  Fed. R. Crim. P.
11  32.2(b)(1)(A).  Here, to establish the requisite nexus, all that must be shown is that
12  Harbour obtained R.G.'s money as a result of his offenses alleged in the indictment.
13  *See* 18 U.S.C. §§ 981(a)(1)(C), (a)(2)(A) (2018); *see also United States v. Lo*, 839 F.3d
14  777, 793 (9th Cir. 2016) ("Because the proceeds from a mail fraud or wire fraud offense
15  include funds obtained 'as the result of the commission of the offense,' and the commission
16  of such a mail fraud or wire fraud offense necessarily includes a fraudulent scheme as a
17  whole, the proceeds of the crime of conviction consist of the funds involved in that
18  fraudulent scheme, including additional executions of the scheme that were not specifically
19  charged or on which the defendant was acquitted.")

20          In short, in the wire fraud offenses charged in Counts 1-3, the requisite nexus is
21  established between the funds that derived from uncharged conduct and the wire fraud
22  scheme if the funds are "involved in [the] fraudulent scheme."  *See Lo*, 839 F.3d at
23  793 (citing *United States v. Capoccia*, 503 F.3d 103, 117-18 (2d Cir. 2007)); (Doc. 3
24  at 6.)

25
26
27  ───────────────────
            [4] *See*  GO 20-27 extending GJ suspension until further notice.
28

a.    Additional instances of Wire Fraud

Since the original indictment, federal investigators have uncovered additional instances of wire fraud committed by Harbour against R.G (and other victims, for that matter). For example, Harbour engaged in the following text messages providing various excuses as to why he has failed to provide R.G. with her requested funds:

- 07/07/2015 (pg. 32): "Ok. Traveling a lot. I'm waiting for funds".
- 07/08/2015 (pg. 33): "I'm on it darling".
- 07/09/2015 (pg. 35): "Waiting on them. Paper work is more detailed with our president ".
- 07/09/2015 (pg. 36): "Sounds good. I'm boarding a plane. One of my big investors is also in the same deal you are".
- 07/13/2015 (pg. 37): "The banks had a wire cut in the middle of the ocean. It's been all over the news. I will send you the email from them".
- 07/24/2015 (pg. 38): "I love you. We have to get the money in the right way so alarms go off".
- 08/02/2015 (pg. 40): "Ok. Your money will come when it is released. It's the nature of the beast. It is protected like you want, but that also means it is a slow process".
- 08/11/2015 (pg. 45): "Hey you, sorry I haven't gotten back to you. I'm deep in this hedge fund. Don't ever worry about us, I love you!!".
- 08/14/2015 (pg. 47): "I'm buried with this hedge fund in NY. Promise I will call you. I have always been there for you. I have to get this deal closed. It's a 25m facility".
- 08/14/2015 (pg. 48): "Don't worry".
- 08/24/2015 (pg. 49): "I called you back Friday. I'm waiting to hear from the banker".
- 09/03/2015 (pg. 53): "Love you too. It will be okay".

- 09/25/2015 (pg. 56):  "Waiting on them".
- 11/13/2015 (pg. 59):  "I will! Sorry. I'm just juggling the world."
- 11/30/2015 (pg. 61):  "Cool. U will call you abs let's meet when you are back. Don't worry!!". [5]

Finally, according to R.G.'s timeline, on December 17, 2015, she is escorted out of Harbour's office when she demanded the return of her money. ( Doc. 98; Ex. 1 at 3.) On September 23, 2016, R.G. had her last contact with Harbour. (*Id.)*

Here, Harbour continued his fraudulent scheme until September, 2016, long after R.G. provided him with her funds totaling $1 million in 2010.  Specifically, Harbour used his cell phone to leave both text messages and voicemails providing false explanations regarding the status of R.G.'s funds or otherwise furthering his scheme to obtain her money and use it for his own personal expenditures.  These explanations furthered his fraudulent scheme because they  were designed to delay any referral to authorities by providing R.G. with a false sense of security that her funds were safe and available.  *United States v. Lane,* 474 U.S. 438, 451-52, (1986) ("Terry Griffith's assurances of payments that were never forthcoming furthered the scheme by providing Symphonic with a 'false sense of security, thereby postponing any premature interference with the scheme.'").

Lastly, Harbour's use of his telephone within the statute of limitations are additional instances of wire fraud.  *United States v. Oulfield,* 859 F.2d 392, 400 (6th Cir.1988) ("As long as the fraudulent scheme has not been put to ultimate rest, the communication 'will support a conviction even if it follows the defendant's fraudulent acts, or occurs after the schemers have obtained the victim's money or goods.'").

    b.   <u>R.G.'s funds are subject to forfeiture from Harbour.</u>

To show that the funds are involved in the fraudulent scheme, the government need only prove its involvement by the preponderance of the evidence standard.  *See*

---

[5] The text messages were recently extracted from R.G.'s phone and are in the process of being disclosed.

*United States v. Cox*, 851 F.3d 113, 129 (2017) (holding that the preponderance of the evidence standard applies to criminal forfeiture because it is part of the sentence rather than the substantive offense); *see also United States v. Hasson*, 333 F.3d 1264, 1277 (11th Cir. 2003) (holding that criminal forfeiture is a part of sentencing and that the preponderance of the evidence standard applies); *accord Copaccia*, 503 F.3d at 116.

Additionally, despite Harbour's claim that the timing of R.G.'s transaction prohibits the funds' forfeiture, funds related to uncharged conduct can be subject to forfeiture even if the conduct predates the offenses actually charged. *See Capoccia*, 503 F.3d at 115-18. In *Capoccia*, the Second Circuit held that property derived from a defendant's uncharged offenses that occurred prior to to the charged offenses were not subject to forfeiture. *Id.* at 118. It did so because the defendant's crime of conviction was "not for a scheme, conspiracy, or enterprise" and prohibited only "individual instances of transferring stolen money." *Id.* However, the court emphasized that crimes prohibiting "a scheme" can include forfeiture of funds derived from uncharged offenses involved in the scheme because "the overall scheme is thus inherently part of the offenses" that the defendant is charged with. *Id.* at 117. In doing so, the court indicates that as long as the money stemming from uncharged conduct is involved in the overarching scheme of the charged conduct, the timing the conduct occurred is irrelevant, and the requisite nexus for criminal forfeiture is still met.

Here, even though the charged conduct occurred after Harbour obtained R.G.'s money, the preponderance of the evidence clearly establishes that R.G.'s funds were involved in the overarching wire fraud scheme. Counts 1-3 took place from July 30, 2014, to August 11, 2015. The scheme at issue includes Harbour's intent to defraud and obtain money from investor-victims by using materially false and fraudulent representations and by concealing material facts to his clients. The reality is, during the period the conduct alleged in Counts 1-3 occurred, R.G. was making urgent and unsuccessful requests to obtain her money from Harbour. Additionally, Harbour himself implicated R.G.'s money within his scheme multiple times, including in a text

message sent on July 9, 2015, that stated, "Sounds good. I'm boarding a plane. One of my big investors is also *in the same deal* as you are." The reality is this: R.G. repeatedly asked for money for her parents' home during the relevant time period to no avail. In fact, Harbour indicated that he was trying to figure out where to show the money coming from. In another instance, Harbour also indicated that R.G.'s funds were a part of his payday lending scheme by telling R.G. that her funds were commingled with three other clients and that "his buddies have creditors at 900k of [the money]" but that he would get a "line of credit against that money" to get R.G. money that she needed. As Harbour made all these statements, he had the means to provide R.G. with the money that she needed, which is indicated by his substantial AMEX payments from 2010-2016.

Accordingly, both Harbour's avoidance of R.G. during the relevant time period and R.G.'s funds at issue were most likely involved in Harbour's scheme to defraud his investor-victims for his own personal gain. Thus, the requisite nexus between R.G.'s funds and Counts 1-3 has been met, and Harbour's motion should be denied.

**2.     Contrary to Harbour's argument that including R.G. on the indictment wrongfully punishes him for conduct past the statute of limitations, seeking asset forfeiture for R.G.'s funds simply punishes him for his fraudulent scheme accounted for in Counts 1-3.**

Criminal Asset Forfeiture is an element of sentencing imposed for the conviction of a crime—not a way to circumvent the Statute of Limitations. *See Libretti v. United States*, 516 U.S. 29, 38-39 (1985). It is not a part of the substantive offense; rather, it is punishment for the convicted offense. *See Libretti*, 516 U.S. at 39; *see also Cox*, 851 F.3d at 129. As discussed in depth earlier, a charge of wire fraud includes the scheme in its entirety—not just those charged. *Lo*, 839 F.3d at 793. Consequently, echoing the fact that the scheme likely involved R.G., asset forfeiture is simply part of Harbour's potential sentence for his scheme to defraud others and in no way circumvents his due process rights protected by the statute of limitations.

**3.      Because R.G. was directly and proximately harmed by Harbour's scheme, she is rightfully labeled a "victim" of his alleged crimes.**

A "victim" of a crime involving "a scheme" as an element includes "any person directly harmed by . . . the criminal conduct" done "in the course of the scheme."  18 U.S.C. § 3663(A)(2) (2018).  This occurs when there is a causal link between conduct done in the scheme and the harm inflicted on the individual.  *United States v. Thomsen*, 830 F.3d 1049, 1067 (9th Cir. 2016).

Here, R.G. is clearly a victim of Harbour's alleged crimes.  Harbour's scheme involved blatant misrepentations of all material operations of his company.  During the course of this scheme, Harbour withdrew over $50,000 from "High Point Capital Group LLC," which is where he originally put R.G.'s funds.  *See* (Ecf. No. 3 at 8;) (Def.'s Mot. to Dismiss, Ex. 1 at 5-6.)  At the same time, R.G. unsuccessfully asked Harbour for her money so that she could purchase her parents' home that had been in the family for 100 years.  (Def.'s Mot. to Dismiss, Ex. 1 at 5-6.)  Ultimately, R.G. ended up losing the funds she was promised would be returned.  If not for his scheme, R.G. may have been able to avoid substantial economic hardship and recovered her money from Harbour.  Lastly, it is unclear if Harbour has any money or assets to be forfeited.  Nevertheless, a money jdugement will allow the United States to seek forfeiture of any funds traceable to his fraudulent scheme (or substitute assets) and restore those funds to the victims.[6]

---

[6] A victim may be granted remission of the forfeiture of property if the victim satisfactorily demonstrates that: (1) a pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for the forfeiture, and the loss is supported by documentary evidence including invoices and receipts; (2) the pecuniary loss is the direct result of the illegal acts and is not the result of otherwise lawful acts that were committed in the course of the criminal offense; (3) the victim did not knowingly contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense, or related offense, that was the underlying basis for the forfeiture; (4) the victim has not in fact been compensated for the wrongful loss of the property by the perpetrator or others; and (5) the victim does not have recourse reasonably available to other assets from which to obtain compensation for the wrongful loss of the property.  28 C.F.R. § 9.8(a).

- 9 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

In sum, because R.G.'s funds were involved in Harbour's overarching scheme, R.G. was directly harmed as a result of the scheme, and wire communciations are within the statute of limitations, it is proper to include R.G. in the indictment and to seek forfeiture for R.G.'s funds.  Accordingly, Harbour's motion should be denied without ordering a hearing.

Respectfully submitted this 31st day of July, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of July, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and a copy transmitted to the following CM/ECF registrant:

Alan Baskin, Esq.
*Attorney for Defendant*

*s/ Joy Faraj*
U.S. Attorney's Office