**BASKIN RICHARDS PLC**
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone No. 602-812-7979
Facsímile 602-595-7800
E-mail: alan@baskinrichards.com
         mmilovic@baskinrichards.com
Name and State Bar No.:   Alan Baskin #013155
                          Mladen Milovic #035560
*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>                              Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>                              Defendant. | Case No.  CR-19-00898-PHX-DLR(DMF)<br><br>**REPLY IN SUPPORT OF DEFENDANT'S FIRST MOTION TO DISMISS FORFEITURE COUNT AS IT RELATES TO ALLEGED INVESTOR-VICTIM "R.G."** |

**I.   Introduction.**

To keep the R.G. transaction in the Indictment, the government concedes it must show that the funds from that transaction are related to the charged fraud scheme. [Doc. 108 at 4.] The Response fails to make that showing or otherwise justify keeping the R.G. transaction in the Indictment.

First, the government cannot point to any allegations in the Indictment, and cannot provide a shred of evidence, that the March 2010 R.G. transaction is related or traceable to the 2014-2015 Green Circle payday lending scheme alleged in the Indictment. For good reason – there is no substantive or temporal relation between the two. Lacking anything to link the two

alleged schemes, the government now asserts that all acts committed by Mr. Harbour between 2010 and 2019 are related to some general scheme to enrich himself. That is not the scheme charged in the Indictment. The government is bound by the allegations in the Indictment, which can only be amended by the grand jury. *See Stirone v. United States*, 361 U.S. 212, 215-16 (1960).

Second, even if the Court allows the government to indict Mr. Harbour with a superseding indictment at this late stage, any such count related to R.G. would be barred by the statute of limitations.

Third, the government's attempt to disclose Rule 16 material eight months after its deadline to do so, and two years after having reasonable access to such materials, violates the Court's complex case scheduling order and prejudices Mr. Harbour's ability to fairly contest the charges against him.

**II.  No Factual Nexus Exists Between the Payday Lending Scheme Alleged in the Indictment and the March 2010 Transaction Between R.G. and Mr. Harbour.**

The government cannot connect Mr. Harbour's payday lending scheme to R.G. The transaction with R.G. was completed in March 2010, over four years before Green Circle was formed. On or around May 21, 2018, eight years after her loan, over 14 months before Mr. Harbour was indicted and now over two years ago, R.G. contacted the government and provided miscellaneous documents related to her dealings with Mr. Harbour. [*See* Exhibit 1, June 19, 2018 FD-302.] On or around June 5, 2018, R.G. provided additional documents to the government, including a $1 million promissory note [*See* Exhibit 2, March 1, 2013 Promissory Note.] and notes regarding her communications with Mr. Harbour. [Doc. 98 at Ex. 1.] On July 30, 2019, the government indicted Mr. Harbour. [Doc. 3.]

According to the Indictment, Mr. Harbour represented to investors that "their funds would be invested in short term, high interest rate loans to small and start-up businesses, also known as payday loans" and that he was making 20% returns for his clients. [Doc. 3 at ¶ 3.] In contrast, R.G.'s three-year promissory note contains a modest interest rate of five percent –

2

a far cry from a loan involved in a "high-yield investment fraud scheme." [*See* Exhibit 2.][1] R.G.'s "narrative summary" makes no mention of Green Circle, any investment in a payday lending entity, or that the proceeds from a payday lending activity would repay her. [*See generally*, Doc. 98 at Ex. 1.] None of the documents produced by the government connect R.G. to Green Circle.

The government's argument that the R.G. transaction is related is mere sleight of hand. The government does not argue, as it is required to, that the R.G. transaction funds are "traceable" to the charged offense or "obtained 'as the result of the commission of the offense'" giving rise to forfeiture. *See* 18 U.S.C. § 981(a)(1)(C); *United States v. Lo*, 839 F.3d 777, 793 (9th Cir. 2016). Instead, the government states that R.G.'s funds are "related" and subject to forfeiture because Mr. Harbour allegedly told R.G. he could not pay her back when requested as her funds were commingled with other investor money. But that does not resolve the central issue of whether R.G.'s funds are traceable to the offense charged, and the government offers or identifies no evidence that any of R.G.'s money was commingled with money from an alleged payday scheme that occurred years after her loan.

The eventual use of the R.G. transaction funds does not change the fact that her funds are "traceable" to the otherwise unrelated R.G. transaction – not the Green Circle payday-loan fraud scheme. There is no substantive count related to the R.G. transaction in the Indictment. Thus, funds "traceable" or resulting from the R.G. transaction are not subject to forfeiture under 18 U.S.C. § 981 or § 982. Even if Mr. Harbour "lulled" R.G. by avoiding her and putting off repaying her, which he did not, there is no substantive wire fraud count in the Indictment to which any such "lulling" is related. And if, as the government alleges without support, some

---

[1] Interestingly, while the three-year promissory note provided by R.G. is dated March 1, 2013 and has an interest rate of five percent, the government's Exhibit A to its Response contains a seven-year repayment schedule beginning in March of 2010 that has an interest rate of a mere three percent. Regardless of which terms the government and R.G. choose to make their case, neither the promissory note nor the repayment schedule approach evidence of a "high-yield investment fraud scheme." Mr. Harbour also disputes the validity of the three-year 2013 promissory note and the seven-year repayment schedule.

3

of R.G.'s funds were "commingled" with funds of other investors, that does not show that the funds came from "conduct [that] was part of the same scheme to defraud" – the specified payday lending scheme. *United States v. Cox*, 851 F.3d 113, 128 (1st Cir. 2017).

The government's statement that "Harbour also indicated that R.G.'s funds were part of his payday lending scheme by telling R.G. that her funds were commingled with three other clients" is both irrelevant and misleading. [Doc. 108 at 8:5-7.] The statement is irrelevant because using funds from one alleged scheme to pay for part of another otherwise unrelated scheme does not change the conclusion. However the funds were used – to buy plane tickets, to invest in a payday lending scheme, or simply commingled with many other fungible assets – does not change the fact that the funds are not "traceable" or "the result of the offense" charged in the Indictment. *See United States v. Riley*, 143 F. 3d 1289, 1292-93 (9th Cir. 1998) (use of fraud scheme proceeds as part of down payment for bank loan does not make unrelated bank loan proceeds related to the fraud scheme).

The government's statement is also misleading because the quoted statement is partially taken from R.G.'s narrative summary, which contains no mention of a payday lending scheme, nor references any particular "client." [Doc. 98 at Ex. 1, p. 42.] The government's conclusion that Mr. Harbour was referring to his alleged payday lending scheme in that communication to R.G. is hopeful speculation – not evidence. If actual, documentary evidence of commingling exists, surely the government would have disclosed it. R.G. and the alleged Green Circle payday lending scheme have no connection. R.G.'s March 2010 transaction and transaction amount should be dismissed and struck from the Indictment.

**III. The Statute of Limitations Has Long Expired for any Wire Fraud Allegation Against Mr. Harbour Related to the 2010 Transaction with R.G.**

As explained in the Motion [Doc. 98 at pp. 5-6.], the statute of limitations has expired for allegations related to the R.G. transaction and the government should not be permitted to evade the limitations period by bundling the R.G. transaction funds in the forfeiture claim. The government argues that Mr. Harbour's "scheme to defraud R.G. is within the five-year statute

of limitations because he engaged in additional instances of wire fraud with 'lulling' text messages late into 2015." [Doc. 108 at 2:3-5.] The government cites to text messages between July 2015 and November 2015 as additional alleged instances of wire fraud by Mr. Harbour. [Doc. 108 at 5:7-28 and at 6:1-12.] The government argues these text messages furthered Mr. Harbour's "fraudulent scheme because they were designed to delay any referral to authorities by providing R.G. with a false sense of security that her funds were safe and available." [Doc. 108 at 6:12-23.] The government is reaching, to say the least.

First, these text messages have not been charged as instances of wire fraud. Second, to fall within the wire fraud statute, wires must be sent ***prior*** to a scheme's completion. *See United States v. Lane*, 474 U.S. 438, 453 (1986). In cases where the defendant obtains all the intended proceeds of the alleged scheme and later uses the wires to avoid detection of the scheme, courts must look at the scope of the scheme *as devised* by the defendant to ascertain whether the wires occurred before or after the scheme's completion. *United States v. Tanke*, 743 F.3d 1296, 1303 (9th Cir. 2014).

To that end, there must be an actual and specific plan to conceal a scheme to defraud – not a generalized one that can be inferred from the mere existence of a fraudulent scheme. *Tanke*, 743 F.3d at 1303; *see also United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009); *United States v. Sampson*, 371 U.S. 75 (1962). It cannot be enough that the scheme included a general desire not to get caught; the government must prove, at a minimum, that the already conceived scheme included a specific plan for evading detection. *Tanke*, 743 F.3d at 1303. The wire must be incident to the execution of the scheme and not part of an after-the-fact transaction that, although foreseeable, was not in furtherance of the defendant's fraudulent scheme. *Lazarenko*, 564 F.3d at 1037. To hold otherwise would extend an already broad statute too far. *Id.* at 1037; *Tanke*, 743 F.3d at 1304. A vital distinction exists between acts of concealment done in furtherance of the main criminal objectives of the crime, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime. *See Grunewald v. United States*, 353 U.S. 391, 405 (1957).

Here, it is undisputed that Mr. Harbour obtained all the intended proceeds from R.G. over five years before texting to allegedly avoid detection of his alleged scheme. The government cannot meet *Tanke's* minimum burden of showing a specific plan by Mr. Harbour to evade detection. Instead, it cites to several brief text messages Mr. Harbour sent to R.G. and summarily concludes that such messages "lulled" R.G. into a false sense of security so that Mr. Harbour could perpetuate his alleged scheme. This is precisely the scenario *Tanke* and *Lazarenko* warn against. According to the government, if Mr. Harbour were to send a text message to R.G. simply saying "do not worry" once a year, Mr. Harbour's alleged scheme would never end. *See Tanke*, 743 F.3d at 1303-1304. Such a theory of "lulling" would be overbroad.

Mr. Harbour's alleged scheme as to R.G. was completed in March 2010 when R.G. transferred funds to him. Under *Tanke* and *Lazarenko*, Mr. Harbour's texts to R.G. following the March 2010 transaction are not additional instances of wire fraud, even if they had been charged. Any wire fraud allegation as to R.G. is outside the five-year statute of limitations. The government thus cannot subject Mr. Harbour to a superseding indictment adding a wire fraud count for the transaction with R.G. Of course, the government knew this when it indicted Mr. Harbour, as it wrongly backdoored the R.G. allegations into the Indictment.

The government relies on *United States v. Oulfield*, 869 F.2d 392 (6th Cir. 1988) but that case illustrates how, unlike here, lulling can sometimes be part of an ongoing fraud scheme. [Doc. 108 at 6:19-23.] There, a defendant sold vehicles with fraudulently altered odometers, and he argued that the fraudulent scheme ended when consumers purchased the automobiles. *Oulfield*, 859 F.2d at 400. The court rejected the defendant's argument not because he attempted to avoid detection after taking the purchase proceeds, but because the scheme was incomplete until the customers received title for the vehicles from the state. *Id*. The full scheme involved not only the exchange of money for vehicles, but also delivery of title to the vehicles.

The situation here is nothing like *Oulfield*. The transaction between Mr. Harbour and R.G. was complete when R.G. transferred funds to Mr. Harbour. Unlike in *Oulfield*, there was

6

no further requirement for the transaction to be legally valid. Any alleged actions Mr. Harbour took to evade detection after the transaction with R.G., such as the texts the government cites, would, at best, be evidence of a mere general desire not to get caught. In the Ninth Circuit, such actions do not rise to the level of "lulling" that the government claims. *Tanke*, 743 F.3d at 1303; *Grunewald*, 353 U.S. at 405. Consequently, the statute of limitations on the R.G. transaction began running long before those text messages existed and expired before the Indictment in this case.

**IV.  The Government Cannot Violate the Court's Scheduling Order by Producing Information After Critical Deadlines Have Passed and After Having Access to the Information for Over Two Years Prior to Disclosure.**

The government's citations to the "lulling" text messages cited to in Section III above contain a footnote stating that the "text messages were recently extracted from R.G.'s phone and are in the process of being disclosed." [Doc. 108 at 6:27-28.] This covert attempt at a last-minute disclosure is inappropriate and flies in the face of the purpose of scheduling orders in complex cases.

The Court designated this case as complex and imposed a well-crafted and reasonable scheduling order. [Doc. 39.] The government disclosed its initial discovery materials on November 6, 2019. Such disclosure included R.G.'s June 2018 summary narrative which listed specific text messages and voicemails. [Doc. 98 at Ex. 1.] ***The government's deadline to disclose Rule 16 materials was on December 17, 2019***. [Doc. 39 at p. 1.] The parties participated in an initial status conference on February 3, 2020. During this status conference, the government represented to the Court that it had disclosed to Mr. Harbour all documents and information related to the pending charges in the Indictment. [*See* Exhibit 3, February 3, 2020 Status Conference Transcript, at 8:20-25.] The government also represented to the Court that it turned over materials for new charges as well. [*Id.* at 9:1-4.]

If the Court allows the government to continuously disclose evidence, there is no reason for scheduling orders. According to the government, it can introduce any other evidence it

finds up until the day of trial, despite specific Court-imposed deadlines, even where it has had access to the evidence for years.

The Court should not tolerate this behavior. Defendants like Mr. Harbour ought to be able to rely on court-imposed deadlines in complex cases for several reasons, including trial preparation and counsel's advice as to whether to go to trial in the first place. The government's late disclosure prevents Mr. Harbour from being able to rely on any Court-imposed deadline moving forward. The Court should not allow the government to engage in such unfair and prejudicial tactics.

### V.     The COVID-19 Pandemic did not Prevent the Government From Indicting Mr. Harbour With Wire Fraud Related to the March 2010 Transaction with R.G.

The government also asserts in its Response that, but for COVID-19, it would have superseded the Indictment and added counts related to R.G. [Doc. 108 at 4:2-5.] As detailed in Section II above, R.G. first contacted the government over two years ago in May 2018 and provided her narrative summary of communications with Mr. Harbour in June of 2018. The government then had over a year to obtain information from R.G.'s phone before it indicted Mr. Harbour. Grand juries convened for months after the Indictment. They also convened after the government represented to the Court on February 3, 2020 that it produced all evidence of the allegations in the Indictment and of any possible additional charges. COVID-19 did not prevent grand juries from convening until after March of 2020. The government's election to not include R.G. as the subject of a substantive count proves that it has known all along any such count is time-barred.

### VI.    R.G. Is Not a Victim Because She Was Not Directly or Proximately Harmed as a Result of the Alleged Scheme in the Indictment.

The government correctly states that for a person to be considered a "victim" of a scheme to defraud there must be a causal link between conduct done in the scheme and the harm inflicted on the individual. [Doc. 108 at 9:3-7 (citing *United States v. Thomsen*, 830 F.3d 1049, 1067 (9th Cir. 2016).] As explained in Section II above, no causal link exists between R.G.'s

8

March 2010 transaction with Mr. Harbour and the high-yield payday lending scheme alleged in the Indictment. R.G. cannot be a victim of the scheme alleged in the Indictment, and the government cannot include her transaction in the forfeiture allegation.

**VII. The Government Cannot Seek Forfeiture of the R.G. March 2010 Transaction Amount to Punish Mr. Harbour for the Alleged Fraudulent Scheme Accounted for in Counts 1-3.**

The government correctly states that forfeiture is punishment for convicted offenses. [Doc. 108 at 8:20-23.] As set forth above, there is no count in the Indictment related to R.G. Moreover, R.G.'s transaction is not connected to any other counts, or the scheme alleged in the Indictment. The government cannot bootstrap a disjoined transaction via forfeiture by simply including a victim of a long-ago distant alleged crime in the Indictment. The law requires a nexus – the funds sought must be obtained "as the result of the commission of *the* offense," not just any offense. *See Lo*, 839 F.3d at 793, *citing United States v. Capoccia*, 503 F.3d 103, 117-18 (2d Cir. 2007) (stating that "[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise," the proceeds for purposes of forfeiture include the proceeds of "that scheme, conspiracy, or enterprise.") The government's claim related to R.G. necessarily fails.

**VIII. Conclusion.**

The government repeatedly fails to articulate a legitimate criminal allegation against Mr. Harbour involving R.G. The Indictment makes clear, and the Response reinforces, that R.G.'s March 2010 transaction with Mr. Harbour is entirely separate from the alleged high-yield payday lending scheme involving Green Circle. The Court must dismiss R.G. as an investor-victim, strike any reference to her in the Indictment, and dismiss the amount of $1,001,242.67 from the forfeiture allegation.

RESPECTFULLY SUBMITTED this 7th day of August, 2020.

BASKIN RICHARDS PLC


/s/ Alan Baskin
Alan Baskin
Mladen Z. Milovic
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing to:

Kevin M. Rapp
U.S. Attorney's Office
40 N. Central Ave., Suite 1800
Phoenix, AZ 85004
*Attorneys for Plaintiff*


 /s/ Cristina McDonald

# EXHIBIT 1 – FILED UNDER SEAL

# EXHIBIT 2 – FILED UNDER SEAL

# EXHIBIT 3 – FILED UNDER SEAL