MICHAEL BAILEY
United States Attorney
District of Arizona
KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN SCHOCH
Georgia State Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Attorneys for Plaintiff

**REDACTED FOR PUBLIC DISCLOSURE**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          vs.<br><br>David Allen Harbour,<br><br>                    Defendant. | No. CR-19-0898-PHX-DLR<br><br>**S U P E R S E D I N G   I N D I C T M E N T**<br><br>VIO:   18 U.S.C. § 1343<br>        Wire Fraud<br>        (Counts 1-10)<br><br>        18 U.S.C. § 1341<br>        Mail Fraud<br>        (Counts 11-12)<br><br>        18 U.S.C. § 1957<br>        Transactional Money Laundering<br>        (Counts 13-23)<br><br>        26 U.S.C. § 7201<br>        Tax Evasion<br>        (Count 24)<br><br>        26 U.S.C. § 7206(1)<br>        False Statement<br>        (Count 25)<br><br>        26 U.S.C. § 7212(a)<br>        Obstruction<br>        (Count 26)<br><br>        18 U.S.C. § 981(a)(1)(C)<br>        18 U.S.C. § 982(a)(1)<br>        28 U.S.C. § 2461(c)<br>        Forfeiture Allegations |

FILED ___ LODGED
___ RECEIVED ___ COPY

NOV 2 4 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ M DEPUTY

THE GRAND JURY CHARGES:

At all times material to this Superseding Indictment, within the District of Arizona and elsewhere:

### INTRODUCTION

1.     Beginning on or about January 2010 and continuing through July 2019, DAVID ALLEN HARBOUR ("HARBOUR") defrauded investor-victims out of approximately $4,382,864.01 by promoting and selling fraudulent high-yield investments, in most cases involving investments in high rate loans to consumers and start-up businesses. These loans are also known as "payday loans." HARBOUR induced investors to provide funds by making materially false statements and omissions, orally during in-person meetings or in written solicitations, in promissory notes, self-styled contracts, engagement letters, commercial security agreements, operating agreements, and other documents. HARBOUR then used the investment funds for purposes other than what was promised to investor-victims, such as for personal living expenses to support his family's lavish lifestyle to include, but not limited to, private golf resort membership fees, substantial personal credit card payments, extravagant parties, mortgage payments, an expensive power boat, private chartered jets, and other business ventures. In some instances, HARBOUR made *Ponzi* payments with funds received from later investor-victims to make payments to earlier investor-victims.

2.     HARBOUR orchestrated the fraud scheme through numerous entities, including Highpointe Capital Group, LLC (HPCG); Nautical Holdings, LLC (Nautical Holdings); Pujanza Management, LLC (Pujanza); Milagro Consulting, LLC (Milagro); Oak Tree Management, LLC (Oak Tree); 21020, LLC (21020); DNA Management, LLC (DNA Management); DNA Investments, LLC (DNA Investments); NorthRock, LLC (NorthRock); AJS Management, LLC (AJS Management); and Canyon Road Holdings, LLC (Canyon Road).

- 2 -

### HIGH-YIELD INVESTMENT FRAUD SCHEME

3.      Beginning in 2010, HARBOUR solicited investor-victims by promising excessive returns in short periods of time.  HARBOUR told investors their funds would be invested in short-term, high interest rate loans to consumers and start-up businesses, also known as payday loans.  HARBOUR represented he made 20% returns for his clients and assured investors investing in payday lending was not risky because the small loans were made to a diversity of consumers.  Investors were falsely told their funds would be used only as short-term loans to small consumer and start-up businesses, and that the funds were secured by HARBOUR'S personal guarantees.

a. HARBOUR set up various LLCs, such as Pujanza and NorthRock, with some investor-victims to facilitate investments in payday lending scheme. HARBOUR solicited numerous investors into a payday lending scheme and other unspecified investments known as KSQ.  He concealed from investors that he was paid a 25% origination fee for their investment.  After the collapse of KSQ, HARBOUR blamed the principal of KSQ, J.T. for the loss of investment funds and solicited some of the same KSQ investors and others into a fund known as Green Circle, a Native American lending entity which would finance consumer loans and generate profits. HARBOUR was the consultant and main fund-raiser of Green Circle, and his fees were dependent on the incoming cash flows he raised.  HARBOUR misrepresented to investors that their principal would be paid back before he took a percentage of profits generated through the payday loans.  Most investors were never told they were not in first position to receive returns.  In some cases, HARBOUR convinced investors to lend him money with high rates of return.  HARBOUR never paid the money back and, in some cases, made interest payments with other investors' money (i.e. *Ponzi* payments) and concealed this from investors.

b. As a result of the fraudulent investment offerings, between January of 2010 through October of 2016, victim-investors provided at least $4,382,864.01 in investment

funds.

c. HARBOUR personally solicited investors in Arizona and other states. HARBOUR was a member of several private, luxury golf resorts located in Scottsdale, Arizona, Cabo San Lucas, Mexico, Palm Springs, California, and Harrison, Idaho. HARBOUR solicited potential investors at these golf resorts. For several victim investors, HARBOUR invited them to his vacation condominium at Gozzer Ranch Golf and Lake Club in Harrison, Idaho or his condominium in Cabo San Lucas. HARBOUR took potential investors out on his luxury boats and out to fine dining and entertainment. HARBOUR invited investors to his Skybox during Arizona State University football games. He also invited potential investors to his 16th hole Skybox at the Phoenix Waste Management Open.

d. Through operating agreements, contracts, promissory notes, emails, and oral statements, HARBOUR misrepresented virtually every material aspect of the purported investment opportunities, including but not limited to: the backgrounds and experience of the principals, the amount of funds actually going to the represented investment, that the investor principal would be paid back to the investor *before* HARBOUR was compensated, and that HARBOUR had invested his own personal funds into the investment that gave investors the impression that HARBOUR's own money was at risk. HARBOUR further misrepresented the guaranteed rate of return and that interest payments were coming from other investors' money in the form of *Ponzi* payments rather than proceeds from an investment.

**R.G. FRAUD**

4.     HARBOUR began his fraudulent activity with victim R.G. as early as 2010. R.G.'s husband had passed away suddenly in 2009, and R.G. was subsequently provided with a life insurance check. She signed over the insurance check in the amount of $1,001,242.67 to HARBOUR, and he told her that he was going to invest the money and guaranteed a

- 4 -

1    minimum 3% return.

2    5.      At various points  from 2010 to  2016, R.G. wanted access to her funds that were

3    in HARBOUR's possession.  For example, R.G.'s mother was ill, and she needed the funds

4    for medical and housing  expenses.  HARBOUR would not provide the funds to her but

5    instead, would offer numerous excuses why he was unable to meet to discuss the status of

6    her investment.  HARBOUR offered numerous other excuses during in-person meetings,

7    phone conversations, and text message conversations.  HARBOUR maintained R.G.'s trust

8    by  texting her on numerous occasions assuring her that she should not worry and that she

9    would receive a return on her investment. From 2010 to 2019, the only return of funds R.G.

10   received was $62,000 on August 2, 2011, $5,000 on June 4, 2013, and $5,000 on August

11   31, 2013.

12                          **KSQ/J.T. FRAUD SCHEME**

13   6.      Sometime in or around 2011, HARBOUR began an investment partnership with

14   J.T., who was based in Kansas City, MS.  J.T.'s payday lending entity was known as KSQ

15   Management, LLC (KSQ).  HARBOUR solicited victims to invest by promising excessive

16   returns in short periods of time.  HARBOUR told investors their funds would be invested

17   by KSQ in short-term, high-interest rate loans known as payday loans.  The investments

18   were recorded via promissory notes with attached amortization schedules between one of

19   HARBOUR's companies and the investor.   In turn, the funds provided to KSQ were

20   recorded as a promissory note between one of HARBOUR's entities and KSQ.  In many

21   instances, HARBOUR signed the promissory notes with personal guarantees made by him.

22   Although this business arrangement began around 2011 and was not successful,

23   HARBOUR would continue for years to entice investors with personal guarantees,

24   knowing that he did not have the ability to pay on the guarantees.

25   7.      The investors were also not told that HARBOUR had an arrangement with J.T. to

26   receive a 25% finder's fee based upon the amount of the investors' funds he raised and

27   provided to KSQ.  When HARBOUR was unable to provide interest payments to investors,

28

                                    - 5 -

he told the investors that J.T was to blame.  When investors lost their money, HARBOUR claimed  (similar to what he misrepresented to R.G.) that "the change in laws by the President and Operation Chokepoint changed the Automated Clearing House (ACH) laws regarding payday lending."  At this point, HARBOUR had continued to receive his 25% finder's fee received from KSQ while blaming KSQ and J.T. for the lack of investment payments.  Most, if not all, of the promissory notes signed by the victim-investors and HARBOUR were made between the investor and one of HARBOUR's entites, such as NorthRock or Canyon Road.

8.     C.H. was HARBOUR'S employee who invested $81,621.34 with HARBOUR through his entity, NorthRock, on or about December 15, 2012.  C.H. had the funds in her IRA, and HARBOUR directed her to transfer the IRA to Liberty Trust Company located in Texas, and the loan to NorthRock would be serviced through Liberty Trust.  HARBOUR was aware that C.H.'s husband P.H. received an inheritance of $500,000.  HARBOUR told C.H. that he would increase the interest rate on her IRA loan if she and P.H. invested the $500,000.  On February 8, 2013, C.H. and P.H. provided HARBOUR the $500,000 to invest.  HARBOUR invested the money in KSQ but did not disclose the finder's fee he received for providing the money to KSQ.  C.H. repeatedly questioned HARBOUR when she would be paid her funds back, to which HARBOUR responded that C.H. should "go ask J.T. where her money is."  HARBOUR only made minimal payments to P.H. and blamed J.T. even though HARBOUR was listed on the promissory note with P.H. and was ultimately responsible for paying the funds back.

9.     HARBOUR provided funds to KSQ through his entities: DNA Investments, NorthRock, and Canyon Road.  DNA Investments was personally-owned by HARBOUR.  NorthRock was jointly-owned with M.D.  Canyon Road was jointly-owned with another.  HARBOUR received a finder's fee from KSQ no matter which company provided the funds. Due to the losses sustained by KSQ, NorthRock filed bankruptcy on June 13, 2018, listing 25 investor claims totaling $35,830,253.62.

10.   Many of the KSQ investors wanted their money back and threatened to sue HARBOUR or go to the authorities.  In response, HARBOUR assured many of the KSQ investor-victims they would receive a return on their investment by  promising to  pay the investors back through a new business investment he was working on known as Green Circle.  He emailed some of the KSQ investors and provided excuses or told them funds were coming.  These interest payments were not regularly-scheduled payments as dictated in the amortization schedule of the investor's promissory note but were made based on which investor complained the most.

11.   HARBOUR continued his fraud scheme knowing that he did not disclose his finder's fee arrangement with KSQ.  HARBOUR did have the ability to make some payments to the victims but instead, made substantial payments to his American Express credit card while blaming KSQ and J.T. for the failure to provide investors returns.  From 2011 through 2014, at least $14,700,000 was sent to KSQ, and $27,335,141.92 was sent to HARBOUR's bank accounts; that amount included $6.6 million in payments to HARBOUR as a finder's fee.  There were additional funds sent to KSQ either directly from investor-victims or from other HARBOUR accounts.

## GREEN CIRCLE FRAUD

12.   Following the collapse of KSQ in approximately 2014, HARBOUR began a business investment relationship with a Native American-owned entity known as Green Circle.  HARBOUR solicited some of the previous KSQ investors and convinced them to invest in Green Circle.  HARBOUR told some of the investors who had lost money in the KSQ scheme that he would be able to repay them with substantial returns on investments with Green Circle.  Some of these investors, in an effort to recoup their losses from KSQ, decided to invest in Green Circle and sent their investment funds directly to Green Circle bank accounts instead of providing the funds directly to HARBOUR's entities similar to the KSQ venture.

13.   In addition to the KSQ investors, HARBOUR raised funds from new investors for

the Green Circle venture. Similar to the previous investment schemes, HARBOUR utilized promissory notes to record the financial transactions and in some instances, signed personal guarantees. The major difference in HARBOUR's actions between the KSQ scheme and the Green Circle scheme was that he kept a portion of the investor's funds that were invested and only provided a portion of the funds to Green Circle. Unlike KSQ, instead of receiving his finder's fee on the back-end, he took it on the front-end. Again, no investor knew HARBOUR was keeping a large percentage of their investment funds for his own personal compnesation, nor would he have been authorized to do so.

14.    In some instances, HARBOUR continued to randomly make *Ponzi* payments to some of the investors with other investors' funds or from sources that were not from the investment vehicle. Victim M.B., who did not invest in KSQ, was convinced to provide HARBOUR $1 million for investment into Green Circle. HARBOUR only provided $600,000 to Green Circle and used the remaining funds ($400,000) at his disposal to make payments to his American Express credit card and for lavish family vacations, among other personal expenditures. Another investor, Victim R.T., invested $500,000, and only $55,000 went to Green Circle. Similar to M.B.'s funds, R.T.'s funds were used to pay the balance on HARBOUR's American Express credit card and make *Ponzi* payments to other investors. Despite HARBOUR's representations regarding the return on investment, investor R.T. received only minimal interest payments of $64,571.27. For investor M.B.'s $1 million investment, he received only $65,000 in wire transfer payments from HARBOUR's Pujanza Management bank account from June 2015, to January 2017.

15.    During the Green Circle fraud scheme, HARBOUR transitioned from raising individual investor funds to securing a Revolving Credit Promissory Note, executed June 19, 2015, for Green Circle from FinTech Financial, LLC (all of FinTech's interest was assigned to Princeton Alternative Income Fund (PAIF), an investment fund established on June 25, 2015). PAIF provided funds via draw requests to Green Circle for payday loans. The draw requests were submitted by Green Circle employees and were reviewed by PAIF

prior to funding.   Per the agreement, HARBOUR had to provide certain financial information to PAIF for their review that would be material to the funding decision for each draw request.   HARBOUR misrepresented financial projections and Monthly Borrowing Base Certificates regarding the financial condition and operations of Green Circle.  PAIF began funding Green Circle in July 2015.

16.     From the beginning   of the business arrangement with PAIF, HARBOUR manipulated the records to his advantage in order to entice PAIF to fund the draw requests. The records included a "Borrowing Base" spreadsheet that gave a false impression of the lending portfolio and the status of Green Circle.   For example, per the guidelines of funding, customers who were in arrears with the Green Circle payday lending were barred from receiving any new loans.   Instead, HARBOUR directed that borrowers who were about to be in default for payments be issued new loans that absorbed the old loans. HARBOUR misrepresented to PAIF that Green Circle was a functional and profitable portfolio and that the loans were performing and not in a state of default.  PAIF relied on this information for their lending decision and would not have provided funds if the borrowers' loan status was accurately represented.   HARBOUR never disclosed to investors that the loans were non-performing.  HARBOUR's business relationship ended with Green Circle upon PAIF learning of a Securities and Exchange Commission (SEC) investigation into HARBOUR and the raising of investment funds for Green Circle.

## INVESTOR-VICTIMS PAYMENTS TO HARBOUR

17.     The investor-victims made investments of $3,282,864.01 primarily related to loans to small businesses or start-up businesses.  In addition, HARBOUR made unauthorized withdrawals of investor-victim funds in the amount of approximately $1,100,000 from the lending entity Green Circle.

| Name | Account | Amount | Deposit Date (on or about) |
|---|---|---|---|
| R.G. | Highpointe Capital Group | $1,001,242.67 | 03/22/2010 |

| | | | |
|---|---|---|---|
| C.H. | NorthRock | $81,621.34 | 12/15/2012 |
| P.H. | DNA Investments | $500,000.00 | 2/8/2013 |
| A.W. | Canyon Road, LLC | $100,000.00 | 2/18/2014 |
| SNI Fund 1/ R. T. | Oak Tree Management LLC | $500,000.00 | 07/30/2014 |
| M.B. | Pujanza Management LLC | $1,000,000.00 | 12/02/2014 |
| D.W. | Canyon Road, LLC | $100,000.00 | 1/1/2015 |
| PAIF | Oak Tree Management | $1,100,000.00 | 08/11/2015 |
| Total | | $4,382,864.01 | |

## COUNTS 1– 10
## WIRE FRAUD
### (18 U.S.C. § 1343)

18.     The factual allegations in paragraphs 1 through 17 are incorporated by reference and re-alleged as though fully set forth herein.

19.     Beginning at a time unknown to the Grand Jury, but at least as early as in or about January of 2010, and continuing to a time unknown to the Grand Jury, but to at least in or about July of 2019, in the District of Arizona and elsewhere, Defendant HARBOUR, individually and doing business under the entities described above, along with other individuals and entities known and unknown to the Grand Jury, knowingly and willfully devised and intended to devise a scheme and artifice to defraud and to obtain money and property from investor-victims by means of materially false and fraudulent pretenses and representations, and by the concealment and omission of material facts.

20.     On or about the dates listed below, for the purpose of executing and attempting to execute the scheme or artifice to defraud and to obtain money and property, HARBOUR, individually and doing business under the entities described above, knowingly transmitted and caused to be transmitted, by means of wire and radio communications in interstate

- 10 -

commerce, certain writings, pictures, signals, and sounds, to and from the District of
Arizona and elsewhere, as set forth below, with each instance being a separate count of this
indictment:

| Count | Wire Date (On or About) | Sender | Recipient (or Receiving Bank) | Item Sent |
|---|---|---|---|---|
| 1 | 07/30/2014 | SNI Fund 1/R.T. | Oak Tree Management NT 1790 | $500,000.00 |
| 2 | 12/02/2014 | M.B. | Pujanza Management, LLC BMO 5244 | $1,000,000.00 |
| 3 | 08/11/2015 | Green Circle | Oak Tree Management BMO 1964 | $1,100,000.00 |
| 4 | 12/31/2015 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 5 | 04/04/2016 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 6 | 07/19/2016 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 7 | 10/17/2016 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 8 | 01/20/2017 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |

| | | | | $10,942.24 |
|---|---|---|---|---|
| 9 | 03/15/2016 | GC BMO x9606 | R.T./C.I.F. | |
| | | | | $11,062.49 |
| 10 | 06/15/2016 | GC BMO x9606 | R.T./C.I.F. | |

This conduct was in violation of 18, U.S.C. § 1343.

**COUNTS 11-12**
**(Mail Fraud)**
**(18 U.S.C. § 1341)**

21.     The factual allegations in paragraphs 1 through 20 are incorporated by reference and re-alleged as though fully set forth herein.

22.     Beginning at a time unknown to the Grand Jury, but at least as early as in or about January of 2010, and continuing to a time unknown to the Grand Jury, but to at least in or about July of 2019, in the District of Arizona and elsewhere, defendant HARBOUR, individually and doing business under the entities described above, along with others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme or artifice to defraud and to obtain money and property by means of materially false and fraudulent promises, pretenses, and representations, and the concealment of material facts.

23.     On or about the dates listed below, in the District of Arizona and elsewhere, for the purpose of executing and attempting to execute the aforesaid scheme or artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, defendant HARBOUR, along with others known and unknown to the Grand Jury, placed and caused to be placed in a post office and authorized depository for mail matter, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited for delivery by a private and commercial interstate carrier, for delivery by commercial interstate carriers, as shown below for each count, from the District of Arizona, to Texas, each such instance being a separate count of this Indictment:

- 12 -

| Count | Payor Account | Check Date | Posted Date | Item Mailed | Amount |
|---|---|---|---|---|---|
| 11 | Highpointe Capital Group, LLC BMO x7406 | 4/22/2016 | 4/28/2016 | Check # 3231 to Liberty Trust Co. FBO: A.W. in the amount of $7,500. | $7,500.00 |
| 12 | Highpointe Capital Group, LLC BMO x7406 | 5/3/2016 | 5/9/2016 | Check # 3242 IRA Fee TC003721 C.H. in the amount of $255.00 | $255.00 |

This conduct was in violation of 18, U.S.C. § 1341.

## COUNTS 13 – 23
## TRANSACTIONAL MONEY LAUNDERING
## (18 U.S.C. § 1957)

24.     The factual allegations in paragraphs 1 through 23 are incorporated by reference and re-alleged as though fully set forth herein.

25.     On or about the dates listed below, Defendant HARBOUR, individually and doing business under the entities described above, along with other individuals and entities known and unknown to the Grand Jury, knowingly engaged and attempted to engage in the following monetary transactions in the United States in criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely wire fraud in violation of 18 U.S.C. § 1343, with each instance being a separate count under this indictment:

| Count | Date of Transaction (on or about) | Transaction Amount | Financial Institution | Description of Transaction |
|---|---|---|---|---|
| 13 | 08/05/2014 | $34,665.33 | Northern Trust | Check #1238 from DNA Investments LLC NT 9412 to D. S. |
| 14 | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from Oak Tree NT 1790 to DNA Management NT 3388 |

| | | | | |
|---|---|---|---|---|
| 15 | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from DNA Management NT3388 to Highpointe Capital Group, LLC BoA 3354 |
| 16 | 08/08/2014 | $37,500.00 | Bank of America | Transfer from Highpointe Capital Group LLC BoA 3354 to Herrington Park 1, LLC |
| 17 | 08/21/2014 | $12,083.90 | Northern Trust | Check #1542 from 21020 LLC NT 5180 to JRG |
| 18 | 08/27/2014 | $142,785.88 | Northern Trust | ACH Debit Payment from DNA Investments, LLC NT 9412 to HARBOUR's American Express |
| 19 | 08/28/2014 | $13,682.69 | Bank of America | Transfer from Highpointe Capital Group LLC BoA 3354 to Employment Edge |
| 20 | 12/04/2014 | $223,121.88 | Northern Trust | ACH Debit Payment from DNA Management NT 3388 to HARBOUR's American Express |
| 21 | 8/12/2015 | $915,000.00 | BMO Harris | Oak Tree Mn BMO 1964 to Milagro BMO 5236 |
| 22 | 08/13/2015 | $750,000.00 | Bank of America | Milagro BMO 5236 to David HARBOUR BoA 8017 |
| 23 | 09/02/2015 | $500,000.00 | Bank of America | David HARBOUR BoA8017 to FTC Receiver LEC |

This conduct was in violation of 18, U.S.C. § 1957.

**COUNT 24**
**(Tax Evasion)**
**(26 U.S.C. § 7201)**

- 14 -

26.     From in or around February 2016, through in or around June 2018, in the District of Arizona and elsewhere, Defendant HARBOUR, a resident of Maricopa County, AZ, willfully attempted to evade and defeat the payment of income taxes due and owing by him to the United States of America, for the calendar year 2012  by committing the following affirmative acts, among others:

a. On April 14, 2016, HARBOUR provided IRS a  signed Form 433-A and financial documents that intenionally omitted bank records held under his control.

b. On April 26, 2017,  HARBOUR provided IRS  a second signed Form 433-A that contained materially false statements including information regarding stated employment, financial information, and assets and liabilities.  For example, HARBOUR failed to disclose bank records held under his control, ownership positions of his entities and those entities held under the name of his wife and/or entities owned by her.  Furthermore, HARBOUR did not disclose the ownership arrangement of his personal residence, and he did not disclose the possession and use of an American Express credit card held under the name of a nominee.  An analysis of HARBOUR's American Express credit card activity for the period of January 1, 2017, to April 30, 2017, indicated $277,706.49 in payments were made.  In addition, during the following two months (May and June 2017), HARBOUR paid American Express a total of $209,131.36.  None of this information was properly dislcosed on the Form 433-A

c. HARBOUR also falsely listed his position with a company known as Volente on the Form 433-A.  HARBOUR misrepresented to the IRS that he and his wife did not have any bank accounts, and thus, he was paid by Volente via company credit card.  From January 2018, through June 2018, HARBOUR had control over at least 3 accounts with deposits to these accounts totaling over $350,000.

d.   In or around October 2020, HARBOUR received a loan from D.D. to pay a portion

of his outstanding tax due and owing for tax years 2005,2006, and 2011.  The loan

was taken against the collateral of the ALH Spousal Lifetime Access Trust, dated

March 13, 2017, the same trust that was not disclosed to the IRS Revenue

Officer. As of June 8, 2018, the last meeting HARBOUR had with the IRS Revenue

Officer his s tax due and owing, to include penalties and interest, totals $179,012.19

for 2012. As of November 24, 2020, HARBOUR's tax due and owing, to include

penalties and interest, totals $4,232,294.03 for 2012.

This conduct was in violation of 26, U.S.C. § 7201.

### COUNT 25
### (False Statement)
### (26 U.S.C. § 7206(1))

27.   On or about April 26, 2017, in the District of Arizona, defendant HARBOUR did

willfully make and subscribe an Internal Revenue Service Form 433-A, which was

verified by a written declaration that it was made under the penalties of perjury, which

was filed with the Internal Revenue Service, and which he did not believe to be true and

correct as to every material matter in that the defendant HARBOUR did not disclose on

Form 433-A bank accounts he held at JP Morgan Chase Bank, N.A., nor the existence of

of the ALH Spousal Lifetime Access Trust, dated March 13, 2017, or the ownership of

entities held by the trust, the ownership agreement regarding his personal residence, and

falsely stated that he was unemployed when he was in fact the 50% owner of Volente. The

Form 433-A was updated and re-filed with the IRS Revenue Officer on or about June 6,

2018. HARBOUR submitted false statements again in regard to his employment as a

- 16 -

salesperson, the ownership status of his primary residence, and  his control of bank

accounts.  HARBOUR failed to disclose on the form 433-A that he and his wife had bank

accounts at BMO Harris, JP Morgan Chase Bank, N.A., and Desert Financial Credit Union.

Lastly, HARBOUR failed to disclose various items of jewelry, a  JP Morgan Chase Bank,

N.A., and  the existence of th ALH  Spousal Lifetime Access Trust,

This conduct was  in violation of Title 26, U.S.C. § 7206(1).

### COUNT 26
### (Obstruction)
### (26 U.S.C. § 7212(a))

28.     From in or around March 2017, through in or around June 2018, in the

District of Arizona, defendant HARBOUR did corruptly endeavor or attempt to endeavor

to obstruct and impede the due administration of the Internal Revenue laws by providing

the following false or misleading information to a representative of the Internal Revenue

Service: (1) HARBOUR provided two Form 433-As, which contained false information;

(2) HARBOUR misrepresented his wife's employment; (3) HARBOUR misrepresented

his own employment status; and  (4) HARBOUR misrepresented his ownership status of

his residence.

This conduct was  in violation of  26, U.S.C.  §7212(a).

### FORFEITURE ALLEGATIONS

29.     The Grand Jury realleges and incorporates the allegations of Counts 1 through 23

of this Superseding Indictment, which are incorporated by reference as though fully set

forth herein.

30.     Pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United

States Code, Section 853 and Title 28, United States Code, Section 2461(c) and upon

conviction of one or more of the offenses alleged in Counts 1 through 23 of this

Superseding Indictment, the defendant(s) shall forfeit to the United States of America all

right, title, and interest in any and all property, real or personal, involved in such offense(s), or any property traceable to such property involved in the offense(s), or conspiracy to commit such offense(s), including the following: (a) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of a statute listed in Title 18, United States Code, Section 982; (b) all other property constituting proceeds obtained as a result of those violations; and (c) all property used in any manner or part  to commit or to facilitate the commission of those violations including, but not limited to the sum of money representing the amount of money involved in the offense(s) and the property named below.

    a.  A sum of money equal to at least $4,382,864.01 in United States currency, representing the amount of money involved in the offenses.

    b.  All right, title, and interest in any and all personal property, involved in or traceable to any transaction set forth in Counts 1 through 23 of this Superseding Indictment.  Such property includes, but is not limited to, the following personal property:

        1.  18 Karat White Gold Diamond Cuff Bracelet

        2.  18 Karat Yellow and White Gold Custom Kansas University Jayhawk Pendant and Cable Chain

        3.  Scott Kay Engraved Platinum Classic Band Stamped PT950

        4.  Hamra Jewelers Engraved Custom Platinum Diamond Ring

        5.  Patek Philippe Stainless Steel Nautilus Watch and Steel Bracelet with Serial Number A384EAP

        6.  Engraved Custom Platinum Eternity Band

        7.  Rolex Day-Date Pearlmaster Watch with Serial Number G527156 and Masterpiece Bracelet

        8.  Stainless Navitimer Gents Breitling Watch with Serial Number 422425 and Polished Navitimer Heritage Bracelet

9.   Cartier Pasha Seatimer Chronograph Watch with Serial Number 604011MX and Black Rubber Bracelet

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence,

(2) has been transferred or sold to, or deposited with, a third party,

(3) has been placed beyond the jurisdiction of the court,

(4) has been substantially diminished in value, or

(5) has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States to seek forfeiture of any other property of said defendant up to the value of the above-described forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

All in accordance with Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, Title 28, United States Code, Section 2461(c), and Rule 32.2, Federal Rules of Criminal Procedure.

A TRUE BILL

S/
FOREPERSON OF THE GRAND JURY
Date:  November 24, 2020

MICHAEL BAILEY
United States Attorney
District of Arizona

S/
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

- 19 -