**BASKIN PLC**
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
Telephone No. 602-812-7977
E-mail: alan@baskin.law
     mmilovic@baskin.law
Name and State Bar No.:   Alan Baskin #013155
                          Mladen Z. Milovic #035560

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>                    Defendant. | Case No.  CR-19-00898-PHX-DLR(DMF)<br><br>**DEFENDANT DAVID ALLEN HARBOUR'S MEMORANDUM IN OPPOSITION TO PETITION REGARDING DEFENDANT'S PRETRIAL RELEASE CONDITIONS** |

**I.      Introduction.**

Based on the present charges against Mr. Harbour, the Court may only detain him if he is deemed a flight risk.  When Mr. Harbour was released from detention on bond, the Court imposed release conditions sufficient to alleviate its concerns that he was a flight risk and ensure his appearance at future court proceedings.  Mr. Harbour has not violated any release conditions, has made all court appearances, has remained in steady contact with his Pretrial Services Officer ("PTS"), has fully cooperated with her requests and engaged in good-faith discussions with her about the application and scope of the release conditions.

The alleged violations in the PTS' Petition [Doc. 163] do not relate to whether Mr.

Harbour is a flight risk, as they involve intrafamily transfers, the proceeds of a many years-old investment and rental property income. The government's memorandum [Doc. 183] also fails to connect the purported violations to the flight risk issue, as it relates to a third party's payment of tax liens on Mr. Harbour's former property that benefitted that third party. Mr. Harbour explained this transaction to PTS, which did not see the necessity of including it in the Petition, again revealing that the release conditions were interpreted differently, here by two different arms of the government. Mr. Harbour is surprised the government is concerned about Mr. Harbour's tax lien being paid off by a wealthy third-party who benefitted greatly from the transaction. Mr. Harbour looks forward to the Court providing guidance to avoid further differences, as no reason exists to revoke his release conditions.

The Court should find that the allegations in the Petition and the government's memorandum are not violations of Mr. Harbour's release conditions and leave those conditions in place. Alternatively, the Court should provide further guidance to the parties to help prevent another Petition.

## II. The Transactions Identified in the Petition and the Government's Memorandum Do Not Constitute Violations of Mr. Harbour's Pretrial Release Conditions.

On May 19, 2020, the Court revised Mr. Harbour's release condition to provide that Mr. Harbour is not to make financial transactions totaling over $1,000 in any month to any person or entity without prior approval of Pretrial Services. [*Id*. at 18:1-4.] The Court also clarified that prior approval of Pretrial Services is not required for preestablished rents, attorney's fees, and reoccurring payments. [*Id*. at 18:5-8.] The Court deleted the condition that any transaction over $1,000 to any person or entity in any month that benefits Mr. Harbour also requires Pretrial Services' approval because the condition proved to be unwieldy. [*Id*. at 18:12-16.] Mr. Harbour has not violated the Court's conditions of release.

### A. The checks from the DSFCU account to Mr. Harbour's spouse were financial support for living expenses.

Mr. Harbour shares an account with his mother at DSFCU. [Doc. 169.] From September

19, 2019 to September 14, 2020, Ms. Harbour received seven checks from that DSFCU account totaling $44,766.80. [*Id.*] PTS alleges that Mr. Harbour violated his pretrial release conditions because he failed to report the checks. [*Id.*] Mr. Harbour did not violate his pretrial release conditions.

The DSFCU account belongs to Mr. Harbour's mother. Mr. Harbour was added to the account in 2007 as a precaution in case his Mother became incapacitated. Mr. Harbour's mother used the account exclusively until after he was indicted, when Mr. Harbour, who had forgotten about the account, was reminded that he was a signer. Since then, he has used the account to either cash his paychecks or deposit them into the account. PTS, however, has never required Mr. Harbour to disclose every time he receives employment income. To the extent the checks from the DSFCU account represented, at least in part, his income, Mr. Harbour reasonably believed he did not have to disclose intrafamily transfers of his income between himself and his wife to pay for bills and other reoccurring expenses.

To the extent the checks from the DSFCU account represented financial support from Mr. Harbour's mother, the transactions did not fall within the ambit of the release conditions. Mr. Harbour did not direct his mother to write the checks; she wrote them to help pay for certain bills and other reoccurring expenses. The Court previously found that these sorts of transactions did not have to be approved by Pretrial Services. [Ex. 1 at 18:5-8.] Mr. Harbour reasonably believed he had no obligation to report, or seek approval for, these transactions.

Last, these transactions were between family members to pay living expenses, and do not implicate whether Mr. Harbour will make his court appearances, which has been the Court's main concern. [Ex. 1 at 16:9-10, 20:22-23.] PTS' report discussing the DSFCU account transactions does not address how the purported violation makes Mr. Harbour a flight risk. Requiring Mr. Harbour to obtain preapproval for transactions from family members is not a reasonable condition that would assure his continued appearance at future court proceedings. Mr. Harbour respectfully requests that the Court clarify his release conditions to allow for intrafamily transactions without Pretrial Services' approval.

3

**B.  The deposits from the Gozzer Ranch property into the DSFCU account were rental income that Mr. Harbour did not have to disclose to, or seek preapproval from, Pretrial Services.**

On July 17, 2020, August 7, 2020, and September 11, 2020, wire funds were deposited into the DSFCU account. [Doc. 169.] The total of the three deposits was $137,556.80, and all deposits were from the Gozzer Ranch property. [*Id.*] PTS' report alleges that Mr. Harbour violated his release conditions because he failed to report these deposits to Pretrial Services.

The deposits were rental income from Mr. Harbour's Gozzer Ranch property. Again, Mr. Harbour did not make these transactions. The tenant paid rent according to a rental agreement Gozzer Ranch created, which included the monthly rental price. Mr. Harbour provided the agreement to Pretrial Services. [*See* Ex. 2, December 1, 2020 Email to PTS.] Mr. Harbour reasonably believed that he could receive rental income from the Gozzer Ranch property without seeking PTS approval because he owned the property when he was charged. Requiring Mr. Harbour to parse out which income he must disclose to PTS is unreasonable, as PTS has continually told him that he did not have to disclose his income every time he received a check or deposit. While the parties may need clarity regarding whether Mr. Harbour had to report income from pre-existing sources such as Gozzer Ranch, the rental income does not support a finding by clear and convincing evidence that Mr. Harbour violated his release conditions. *See* 18 U.S.C. § 3148(b)(1)(B).

**C.  The PB Financial wire deposit into the DSFCU account was investment income that Mr. Harbour did not have to have to disclose to, or seek preapproval from, Pretrial Services.**

On August 21, 2020, a company named PB Financial wired $33,386.63 into the DSFCU account. [Doc. 169.] The Petition alleges that Mr. Harbour violated his pretrial release conditions because he did not disclose the deposit to Pretrial Services. This is incorrect, as Mr. Harbour had no obligation to report it.

The deposit was the proceeds of what Mr. Harbour thought was a failed investment made in the mid-2000s – long before any of the allegations in the indictment. After learning that the

4

company had been sold Mr. Harbour redeemed the stock certificates and PB Financial, or its successor in interest, wired $33,386.63 to the DSFCU account. As explained above, Mr. Harbour did not believe he had to disclose income to PTS, and the wire did not violate his release conditions.

> **D. The nearly $1 million payment of tax liens on the Gozzer Ranch property was not directed by Mr. Harbour and was primarily for the benefit of a third-party lienholder.**

The government's memorandum alleges that on or about October 2020, Mr. Harbour directed that nearly $1 million be used to pay tax liens on a property that was subject to forfeiture. [Doc. 183 at 1:27-28.] The government requests the Court consider this transaction in a hearing to determine if Mr. Harbour engaged in financial transactions that violated his release conditions. [Id. at 2:1-2.] The Court need not consider it.

First, Mr. Harbour did not direct this payment, which was made by a third party, D.D., who is worth tens of millions of dollars, and had a first-priority lien on the Gozzer Ranch property. D.D. wanted to foreclose but was aware that the property may have had tax liens. D.D. hired a real estate attorney to handle the foreclosure and sale of the property. Out of an abundance of caution and after consulting with counsel, D.D. chose to pay the estimated amounts of the tax liens so that he could foreclose and sell the property to reduce his first-priority lien, as the sale proceeds far exceeded the tax liens. This transaction primarily benefitted D.D., and not Mr. Harbour. Similar to the SkyBox transaction at issue during the May 19, 2020 hearing, this transaction did not fraudulently deprive D.D. of any property. [Ex. 1 at 12:8-11.] Whether it tangentially benefitted Mr. Harbour is immaterial. The government's attempt to effectively punish Mr. Harbour for a wealthy third-party paying an IRS tax lien for that third-party's substantial benefit is puzzling. The government should encourage – not punish – satisfaction of IRS tax liens.

Second, the government's memorandum does not address how this purported violation makes Mr. Harbour a flight risk. This is because it cannot. The transaction primarily benefitted

a third party who stood to receive more from the foreclosure and sale of the Gozzer Ranch property than the tax liens he paid.

Last, and perhaps most important, Mr. Harbour explained this transaction to PTS, which did not include it in the Petition. The government now attempts to act in PTS' stead and allege that this transaction violated Mr. Harbour's release conditions. The disconnect between the government's and Pretrial Services' evaluation of the transaction shows that its propriety or impropriety in relation to Mr. Harbour's release conditions is ambiguous, which precludes a finding by clear and convincing evidence that Mr. Harbour violated his release conditions.

### III.   Conclusion.

Mr. Harbour requests that the Court find that Mr. Harbour did not violate his pretrial release conditions and leave them in place. Alternatively, Mr. Harbour asks that the Court provide appropriate guidance to ensure that further misunderstandings do not occur.

RESPECTFULLY SUBMITTED this 11th day of January, 2021.

BASKIN PLC

/s/ Alan S. Baskin
Alan Baskin
Mladen Z. Milovic
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing to:

Kevin M. Rapp
Coleen Schoch
U.S. Attorney's Office
40 N. Central Ave., Suite 1800
Phoenix, AZ  85004
*Attorneys for Plaintiff*


 /s/ Cristina McDonald