**BASKIN PLC**
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
Telephone No. 602-812-7977
E-mail: alan@baskin.law
  mmilovic@baskin.law
Name and State Bar No.:  Alan Baskin #013155
           Mladen Z. Milovic #035560

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No.  CR-19-00898-PHX-DLR(DMF) |
|---|---|
| Plaintiff, | **MOTION FOR BILL OF PARTICULARS** |
| vs. | |
| David Allen Harbour, | **(Oral Argument Requested)** |
| Defendant. | |

Pursuant to Fed. R. Crim. P. Rule 7(f), Defendant David Allen Harbour moves for a Bill of Particulars. Mr. Harbour lacks essential information regarding the alleged scheme in this case and several wire fraud and mail fraud counts in the November 24, 2020 indictment ("Indictment"). A bill of particulars is necessary to allow Mr. Harbour to prepare an adequate defense and avoid prejudicial surprise at trial.

## INTRODUCTION

The Indictment [Doc. 154] is ambitious in its scope but short on details. The Indictment charges Mr. Harbour with ten counts of wire fraud, two counts of mail fraud, eleven counts of money laundering, one count of tax evasion, one count of false statement, and one count of obstruction, spanning almost ten years and multiple business dealings. The Indictment

presents those charges in nineteen pages, including long recitations of statutory language without sufficiently specific factual support. Although the Indictment vaguely alleges that Mr. Harbour deceived and defrauded investors over the course of ten years, it does so through broad and confusing summaries of misrepresentations instead of identifying each alleged misrepresentation's specific content, date, speaker, and recipient.  As such, the Indictment lacks the material information necessary for Mr. Harbour to adequately defend against the government's charges.  He cannot reasonably prepare to defend a case with this massive of a scope based on nothing more than a nineteen-page, bare-bones Indictment.  The Court should order the government to provide a bill of particulars.

## ARGUMENT

### I. Mr. Harbour has a Constitutional Right to Adequate Notice of the Charges Alleged Against Him.

A person charged with a crime has the right to be adequately informed of the nature of the charges against him.  "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge . . . [These] are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948).  The Sixth Amendment specifically states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation."  U.S. Const., Amend. VI.  Where an indictment fails to provide adequate notice, a bill of particulars is appropriate in order to provide the necessary clarity required to prepare a defense. *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983).  The bill of particulars "is designed to apprise the defendant of the specific charges being presented to minimize danger of surprise at trial, to aid in preparation and to protect against double jeopardy." *Id*.  To determine whether a bill of particulars is necessary, the court looks to see if the defendant has received adequate notice of the charges from the indictment and disclosures by the government. *Id*.

An indictment must set forth the charges in a "plain, concise, and definite written statement" describing "the essential facts constituting the offense charged." *See* Fed. R. Crim. P. 7(c)(1). While the statutory language "may be used in the general description of the offense, it must be accompanied with such a statement of facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974). Fed. R. Crim. P. 7(f) was amended in 1966 to "encourage a more liberal attitude by the courts towards bills of particulars." *See* Advisory Committee Note to 1966 amendment of Fed. R. Crim. P. 7(f). Courts have "very broad discretion" to order a bill of particulars. *Will v. United States*, 389 U.S. 90, 99 (1967).

Several considerations unique to this case impede Mr. Harbour's ability to prepare his defense and weigh in favor of ordering a bill of particulars. First, the government fails to provide adequate information about the charged scheme and fails to connect an alleged investor-victim to the purported scheme. Second, the government fails to identify the alleged fraudulent misrepresentations or omissions at the heart of this case. Third, the government fails to explain how Mr. Harbour controlled the payday lending entity Green Circle to induce an alleged investor-victim to transfer monies to Mr. Harbour's entity by way of Green Circle or how such a transfer was unauthorized or improper. Fourth, the government fails to identify a single *Ponzi* payment, despite alleging the Mr. Harbour made several such payments to investors. Last, the government fails to explain how Mr. Harbour could have committed mail fraud as part of an alleged scheme that had, by the government's own acknowledgment, collapsed almost two years prior.

The government has produced nearly 48,000 pages of documents, which does not include documents in the ongoing productions from the government and audio files, along with hundreds of thousands of items on electronic devices. Courts have long recognized that this volume of discovery weighs heavily in favor of particularization. *See, e.g., United States v. Bortonovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (per curiam) ("mountains of documents" totaling

4,000); *United States v. Feil*, 2010 WL 1525263, at *8 (N.D. Cal. Apr. 15, 2010) ("70,000 pages of discovery"); *United States v. Nachamie*, 91 F.Supp.2d 565, 571 (S.D.N.Y. 2000) ("200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims"); *see also United States v. Bazezew*, 783 F.Supp.2d 160, 168 (D.D.C. 2011) ("[I]t is not sufficient for the government to respond to a motion for a bill of particulars by pointing out the voluminous discovery already provided or by relying on a governmental open file policy.")

Given the volume of material, it is not reasonable to simply assure Mr. Harbour or this Court that the necessary facts are found somewhere in the tens of thousands of pages of discovery materials. *See United States v. Muhammed*, No. CR-12-01793-PHX-DGC, 2013 WL 5200117, at *6 (D. Ariz. Sept. 16, 2013); *see also United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (granting request for particulars about defendant's role in transactions, where defendant had "been provided with 100,000 pages of discovery," a "veritable mountain of documents" that the government would have forced the defendant to "comb through" to "attempt to guess" which transactions, during a six-year period, were allegedly improper). Mr. Harbour's constitutional rights should not be subject to finding the proverbial needle in a haystack in the tens of thousands of documents disclosed by the government.

**II.    The Indictment Fails to Provide Adequate Information About the Charged Scheme and Fails to Connect Alleged Investor-Victims "R.G.," "C.H.," "P.H.," "A.W." and "D.W." to the Purported Scheme.**

A scheme is a "continuing course of conduct, during a discrete period of time." *United States v. O'Brien*, 17 CR 239-1, 2017 WL 5192032, at *4 (N.D. Ill. Nov. 9, 2017), aff'd, 953 F.3d 449 (7th Cir. 2020) (citing *United States v. Berardi*, 675 F.2d 894, 898 (7th Cir. 1982). The government fails to articulate a singular, cohesive scheme Mr. Harbour can address in his defense. Instead, the Indictment lays out a confusing "scheme" that entails three separate courses of conduct over a nearly ten-year period. The Indictment alleges Mr. Harbour solicited investor-victims by promising excessive returns in short periods of time through short-term,

4

high interest rate loans to consumers and startup businesses, also known as payday loans. [Doc. 154 at 3:2-5.] Mr. Harbour allegedly represented to potential investors that he achieved 20% returns for his clients and assured investors that investing in payday lending was not risky. [Doc. 154 at 3:5-6.] Investors were allegedly told their funds would only be used as short-term loans to small consumer and start-up businesses. [Doc. 154 at 3:7-8.] Mr. Harbour then allegedly set up various LLCs to facilitate investors' investments in the purported payday lending scheme. [Doc. 154 at 3: 10-11.] The Indictment then alleges that Mr. Harbour used the investor-victims' investment funds for purposes other than what was promised to them. [Doc. 154 at 2:12-14.]

Within this alleged "high-yield investment fraud scheme" [Doc. 154 at 3:1.] the government refers to an "R.G. fraud" [Doc. 154 at 4:23.], the "KSQ/J.T. fraud scheme" [Doc. 154 at 5:12.], and the "Green Circle fraud" [Doc. 154 at 7:17.], each having separate start and end dates, different facts as to purported representations or omissions by Mr. Harbour, different sets of alleged victim-investors, and vastly different descriptions of the operational mechanics of the three distinct schemes.

For example, the Indictment cannot connect the alleged R.G. fraud to the KSQ/J.T. or Green Circle schemes. First, Mr. Harbour's purported guarantee to R.G. that he would obtain a 3% return on R.G.'s money [Doc. 154 at 4:27 and 5:1.] stands in stark contrast to the government's allegations of a "high-yield" investment scheme in which Mr. Harbour promised potential investors returns of 20%. [Doc. 154 at 3:5.] Second, the words "high-yield," "short term," and "payday" do not appear anywhere in the factual allegations related to R.G. [*See* Doc. 154 at 4:23-27 and 5:1-11.] Accepting the alleged R.G. fraud as part of a purported overarching scheme would extend the already broad wire and mail fraud statutes beyond any reasonably permissible scope, and in this specific case, would make forfeitable any monies that Mr. Harbour ever borrowed from someone and did not pay them back. This cannot possibly be the intent behind the wire fraud, mail fraud, and forfeiture statutes. *See United States v. Louderman*, 576 F.2d 1383, 1388 (9th Cir. 1978) (noting that the mail and wire fraud statutes

should be carefully and strictly construed in order to avoid extension beyond the limits intended by Congress).

Also, the government's discussion of the Green Circle and KSQ "schemes" highlights the material differences that preclude a finding that the two schemes were both orchestrated and implemented by Mr. Harbour as part of one cohesive scheme. The alleged KSQ scheme was controlled by J.T., and Mr. Harbour allegedly solicited investors in exchange for a finder's fee that he purportedly failed to disclose to investors. [Doc. 154 at 5:13-27.] J.T. controlled KSQ and Mr. Harbour rightfully referred investors to J.T. if they lost money. [Doc. 154 at 5:27 and 6:1.] Green Circle, on the other hand, was a payday lending entity that the government alleges Mr. Harbour controlled to such an extent that he was able to misrepresent Green Circle's financials to obtain financing from PAIF, an alleged investor-victim. [Doc. 154 at 7:18-19 and 9:6-7.] The government also refers to Green Circle and KSQ as two separate schemes, with Mr. Harbour performing different actions in each. [Doc. 154 at 8:3-4.]

The Indictment also includes victim-investors C.H., P.H., A.W., and D.W., apparently alleging they were part of the KSQ/J.T. fraud scheme. [Doc. 154 at 6:9-21 and 10:1-8.] The government alleges these investors provided money to Canyon Road, LLC and NorthRock, LLC, which in turn provided funds to KSQ through DNA Investments. According to government, Harbour purportedly owned these entities along with other individuals. [Doc. 154 at 6:22-24.] The government has provided no explanation of how Mr. Harbour purportedly controlled Canyon Road and NorthRock, and whether and how he had any say in the way the money invested by C.H., A.W., and D.W. was used.

Without this information, Mr. Harbour cannot mount his defense that will refute the government's allegations of the critical control factor as it relates to C.H., A.W., and D.W's. investments. Also, because the government fails to show that the alleged KSQ/J.T. fraud and Green Circle scheme were part of an overarching scheme, Mr. Harbour is confused as to how

6

the government can claim forfeiture for C.H., P.H., A.W., and D.W. if there are no permissible[1] substantive claims related to those individuals or the alleged KSQ/J.T. scheme. *See United States v. Lo*, 839 F.3d 777, 793 (9th Cir. 2016); *United States v. Cox*, 851 F.3d 113, 129 (1st Cir. 2017); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

The Indictment alleges that Mr. Harbour solicited some KSQ investors and convinced them to invest in Green Circle by telling them that they could recover their KSQ losses with substantial returns on investments with Green Circle. [Doc. 154 at 7:20-23.] Tellingly, the government does not name a single alleged KSQ victim-investor who also invested in Green Circle, and Mr. Harbour is left guessing which investor or investors from KSQ he allegedly solicited to invest in Green Circle. The government does not provide facts establishing a connection between any KSQ investor in the Indictment or otherwise, and Green Circle. Without this information, Mr. Harbour cannot adequately prepare his defense.

Accordingly, the government must provide: (1) the complete factual basis for claiming R.G. was part of the alleged high-yield payday investment scheme when her promised returns were a mere 3%, (2) the complete factual basis for claiming Mr. Harbour controlled Canyon Road, LLC and NorthRock, LLC, (3) the names, or initials, of the individuals who lost money with KSQ and who were solicited by Mr. Harbour to invest in Green Circle in order to recoup their losses, (4) when Mr. Harbour made any such solicitations, and (5) the factual basis for alleging the Green Circle and KSQ schemes are part of one, cohesive, overarching scheme by Mr. Harbour when Mr. Harbour, by the government's own rendition of the facts, played a secondary role to J.T. in the alleged KSQ scheme and a primary role in the alleged Green Circle scheme.

**III.    The Indictment Fails to Identify the Fraudulent Misrepresentations or Omissions at the Heart of This Case.**

---

[1] For the reasons stated in Section VII below, Counts 11 and 12 related to A.W. and C.H. are impermissible.

7

The Indictment improperly lumps together an unknown number of statements into several broad categories in a poor attempt to describe Mr. Harbour's alleged high-yield investment fraud scheme. [*See* Doc. 154 at 2-9.] For each category, the Indictment fails to specify (1) to whom specifically the statements of this type were made, (2) when these types of statements were made, (3) the actual wording of the statements falling into the category, or (4) the context in which any of the statements were made. The omission of these key details is problematic because the alleged fraudulent scheme is expansive, both temporally and regarding subject matter. The Indictment paraphrases entire groupings of alleged fraudulent representations, but does so in generic terms that do little, if anything, to give content to the alleged fraudulent scheme. In many instances, the government's attempts at paraphrasing raise more questions than they answer.

For example, the government claims Mr. Harbour solicited investors by promising excessive returns in short periods of time through investments in payday loans to consumers and start-up businesses, and representing that he made 20% returns for his clients. [Doc. 154 at 3:2-8.] But later, when discussing the alleged R.G. fraud, the government claims Mr. Harbour guaranteed R.G. a mere 3% return, which would be incongruous with a "high-yield investment scheme." [Doc. 154 at 4:27 and 5:1.] This raises significant questions as to the alleged misrepresentations the government claims Mr. Harbour made regarding any purported scheme.

The Indictment's description of other alleged misrepresentations underlying the alleged scheme to defraud investors is stingy in detail. The Indictment identifies few actual misrepresentations, instead summarizing the scheme as involving broad misrepresentations to unidentified investors that their unidentified funds would be invested in high-yield, short term investments. [Doc. 154 at 5:15-17 and 7:21-26.] The Indictment also provides little detail as to the representations Mr. Harbour allegedly made to investors who lost money with KSQ and whom he solicited to invest in Green Circle. [*See* Doc. 154 at 7:1-27.] Mr. Harbour's alleged representation to former KSQ investors that they would recover their losses through Green

Circle seems to be an all-too-convenient way to tie the alleged KSQ scheme to the alleged Green Circle scheme, without any real substance. The Indictment does not name a single KSQ investor whom Mr. Harbour made this representation to, does not identify a single date for when this representation was made to any investor, and most importantly, does not identify a single investor who invested in both KSQ and Green Circle. The government must provide this information to Mr. Harbour so that he may be able to better understand the alleged scheme and misrepresentations that he will have to prepare a defense for.

To cure this problem, as to Counts 1 through 12 the government should specify every false and fraudulent pretense, representations and/or concealment and omission of material facts alleged to have been made by Mr. Harbour in the course of "soliciting investments" in his alleged scheme. [Doc. 154 at 10:21-24, 12:14-18.] For each, the government must identify: (1) who made the representation, (2) the precise content of the representation, (3) the form of the representations (i.e., oral or written), (4) if written, the specific document making such representation, (5) the date of the representation, (6) to whom the representation is alleged to have been made, and (7) the manner in which the representation is claimed to be false or fraudulent.

The government's approach – loosely paraphrasing allegedly false statements but withholding the statements themselves – is insufficient in complex fraud cases such as Mr. Harbour's. *See United States v. Trumpower*, 546 F.Supp.2d 849, 852 (E.D. Cal. 2008) (although the indictment provided descriptions of the "type of misrepresentations" at issue, the government must provide "the particular false material representations and particular mailings or wire transactions"); *United States v. Sampson*, 448 F.Supp.2d 692, 696 (E.D. Va. 2006) ("[i]n the case of fraud or perjury, it is critical that the government identify in the indictment the dates of the fraudulent conduct, the specific fraudulent documents, and the fraudulent statements within the documents" and ordering bill of particulars setting forth that information); *United States v. Nachamie*, 91 F.Supp.2d 565, 571 (S.D.N.Y. 2000) (ordering identification of particular false statements in health care fraud case where indictment generally described "five

9

ways in which claims were falsified" but did not specify false claims "by defendant, type of falsity, claim number and date"); *United States v. Caine*, 270 F.Supp. 801, 806 (S.D.N.Y. 1967) (ordering government to identify "each pretense, representations and promise claimed to have been falsely fraudulent" in a scheme involving claims in advertisements); *see also United States v. Trie*, 21 F.Supp.2d 7, 21-22 (D.D.C. 1998) (holding that a defendant "faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against . . . when the government knows precisely the statements on which it intends to rely and can easily provide the information," including "exactly what the false statements are" and "what about them is false").

In sum, the Indictment's breadth combined with its dearth of specific factual allegations undermines the core purposes indictments serve under the Constitution. Mr. Harbour cannot prepare his defense without knowing what statements by whom, to whom, and about what the government claims were fraudulent. The government must provide these essential facts concerning the alleged misrepresentations giving rise to Counts 1 through 12.

**IV.    The Indictment Fails to Establish Facts Giving Rise to an Alleged Duty to Disclose and Any Material Omissions That are Alleged to Have Violated That Duty.**

The government alleges Mr. Harbour made material omissions during the alleged KSQ/J.T. fraud scheme by not disclosing to investors that he received a 25% finder's fee for providing the investor's money to KSQ. [Doc. 154 at 5:25-26 and 6:16-17.] To the extent the Indictment relies on a fraud-by-omission theory as to the alleged KSQ/J.T. fraud scheme, it fails to allege the source of any duty to disclose or any material omissions that would permit the government to pursue that theory at trial. The government should identify the facts giving rise to the alleged duty to disclose and any material omissions that are alleged to have violated that duty. *See United States v. Tam*, 2017 WL 3782752, at *5 (N.D. Cal. Aug. 31, 2017) (ordering government to "provide additional information as to the material omission and disclosure obligation" of defendant in a bill of particulars). As with the alleged false or fraudulent misrepresentations in Section III above, the government must identify: (1) who made

the alleged omission, (2) precisely what is alleged to have been omitted, (3) the form of the omission (i.e., oral or written), (4) if written, what specific document is alleged to have been omitted, (5) when that omission is alleged to have occurred, (6) the nature of the alleged duty to disclose, (7) to whom that duty allegedly was owed and to whom the omission is alleged to have been directed, and (8) the manner in which the omission is allegedly fraudulent.

**V.   The Government Fails to Explain how Mr. Harbour Controlled the Payday Lending Entity Green Circle to Induce an Alleged Investor-Victim to Transfer Monies to Mr. Harbour's Entity by Way of Green Circle or How Such a Transfer Could be Unauthorized.**

The Indictment alleges that, during the purported Green Circle fraud scheme, Mr. Harbour defrauded an alleged investor-victim, Princeton Alternative Income Fund ("PAIF") by securing a revolving credit line with PAIF and then misrepresenting financial projections and monthly borrowing base certificates regarding the financial condition and operations of Green Circle. [Doc. 154 at 8:22-27 and 9:3-5.]  PAIF provided funds to Green Circle based on draw requests submitted by Green Circle employees and reviewed the draw requests prior to funding to Green Circle.  [8:26-27 and 9:1.]  The Indictment then claims Mr. Harbour misrepresented to PAIF that Green Circle was a functional and profitable portfolio and that the underlying loans were performing and not in default.  [Doc. 154 at 9:13-14.]

These allegations do not provide Mr. Harbour with sufficient information to prepare his defense.  The Indictment does not allege (1) how Mr. Harbour controlled Green Circle or its employees, (2) which Green Circle employees submitted specific draw requests, (3) why Mr. Harbour was tasked with providing financial projections and borrowing base certificates for Green Circle if he was not an employee of Green Circle, (4) how Mr. Harbour's alleged misrepresentations of Green Circle's profitability passed muster if PAIF reviewed all its funding to Green Circle and the Chief Credit officer of PAIF, Alonzo Primus, controlled the Green Circle checking account, (5) who at Green Circle authorized the draw requests, (6) who at PAIF reviewed and approved the draw requests and funding, and (7) how Mr. Harbour's alleged misrepresentations resulted in an unauthorized transfer of $1.1 million from PAIF to

11

one of Mr. Harbour's entities by way of Green Circle, and (8) why the $1.1 million payment for reduction of outstanding debt owed by Green Circle to Mr. Harbour's entity was not a legitimate repayment of a valid debt. The Indictment is instead cryptic and vague regarding Mr. Harbour's purported fraud against PAIF. The government must provide the above information so that Mr. Harbour may know the nature of the alleged fraud the government claims he committed against PAIF, especially considering that it forms the basis of Counts 3, 21, 22, and 23 in the Indictment.

**VI.    The Indictment Fails to Identify a Single *Ponzi* Payment, Despite Alleging That Mr. Harbour Made Several Such Payments to Investors and Apparently Charges Mr. Harbour With Wire Fraud for *Ponzi* Payments.**

The Indictment alleges that, in some instances throughout the course of the alleged scheme, Mr. Harbour made *Ponzi* payments with funds received from later investor-victims to make payments to earlier investor victims. [Doc. 154 at 2:17-19, 3:24-25, 4: 19-22, and 8:16-18.] However, the Indictment does not identify a single instance of a *Ponzi* payment from an identified investor to another, earlier identified investor. Without any such pleading, Mr. Harbour does not know which investor or investors the government claims gave money to Mr. Harbour, which was used for *Ponzi* payments, or to which investor *Ponzi* payments were made. The discovery does not show how any payments back to investors were *Ponzi* payments. Mr. Harbour needs this information to prepare his defense, especially considering that Counts 4 through 12 are all transactions to alleged investor victims. But without knowing whether the government considers these transactions *Ponzi* payments, Mr. Harbour cannot adequately prepare to refute these charges against him. The government must identify (1) each transaction the government claims was a *Ponzi* payment, (2) the new investor who invested money, (3) the old investor who was paid some amount from the new investor's money, and (4) how each such payment, if it exists, meets the definition of a *Ponzi* payment.

**VII.   The Indictment Fails to State Facts Supporting Counts 11 and 12 That Indicate a Federal Crime Took Place.**

12

Counts 11 and 12 charge Mr. Harbour with mail fraud related to two transactions in 2016 with alleged victim investors A.W. and C.H. The elements of mail fraud are 1) the existence of a scheme to defraud, and 2) using or causing the use of mails in the furtherance of the scheme. *United States v. Hubbard*, 96 F.3d 1223, 1227-28 (9th Cir. 1996). The Indictment alleges that, on or about December 15, 2012, C.H. invested $81,621.34 in KSQ through NorthRock, an entity related to Mr. Harbour. [Doc. 154 at 6:9-10.] While Mr. Harbour had an ownership interest in NorthRock, he did not control it, was not its manager, and did not have any authority or control of the money invested by C.H. The Indictment also includes A.W. as an alleged investor-victim who purportedly invested $100,000 with Mr. Harbour through Canyon Road, LLC, another one of Mr. Harbour's entities. [Doc. 154 at 10:3-4.] As with NorthRock, Mr. Harbour did not control Canyon Road, was not its manager, and did not have any authority or control of the money invested by A.W.

Tellingly, the government does not discuss A.W. in the factual discussion of the alleged schemes and it is unclear which scheme this investor is alleged to be a part of. Based on the government's mention of Canyon Road, LLC in the KSQ scheme, Mr. Harbour can only guess, but does not know for sure, that the government is trying to tie the mail fraud charge for the A.W. transaction to the KSQ scheme. If it is, the mail fraud charge should fail, because the government alleges the KSQ scheme collapsed in 2014 [Doc. 154 at 7:18.] but then puzzlingly charges Mr. Harbour with two counts of mail fraud for payments in 2016 – one to A.W. for $7,500.00 and the other to C.H. for $255.00 [Doc. 154 at 13:1-9.] The government does not allege that the payments were in furtherance of the alleged mail fraud scheme, likely because the mail fraud scheme concluded almost two years prior. By failing to allege sufficient facts to show how these two payments were in furtherance of an already-completed mail fraud scheme, Mr. Harbour is at a loss as to how to defend these charges.

Accordingly, the government should specify: (1) which entity A.W. and C.H. invested in that was part of Mr. Harbour's alleged fraudulent scheme, (2) how Mr. Harbour controlled any such entity, (3) what materially false and fraudulent promises, pretenses, representations,

or concealments of material facts Mr. Harbour made to each of A.W. and C.H. that gave rise to the mail fraud counts, (4) what connection any monies invested by A.W. and C.H. have to the payments made to them several years later, and (5) how, if at all, the transactions involving A.W. and C.H. in Counts 11 and 12 furthered any alleged scheme by Mr. Harbour.

## CONCLUSION

Mr. Harbour's requests are narrowly drawn to elicit specification of the allegations that must be known to the government and could have readily been disclosed to him but were omitted from the Indictment.  Granting Mr. Harbour's requests for information is necessary to enable him to effectively prepare his defense and avoid surprise at trial.  For the foregoing reasons, the Court should grant Mr. Harbour's motion for a bill of particulars.

RESPECTFULLY SUBMITTED this 1st day of February, 2021.

BASKIN PLC

/s/ Alan S. Baskin
Alan Baskin
Mladen Z. Milovic
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
*Attorney for Defendant*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing to:

Kevin M. Rapp
Coleen Schoch
U.S. Attorney's Office
40 N. Central Ave., Suite 1800
Phoenix, AZ  85004
*Attorneys for Plaintiff*


 /s/ Cristina McDonald