MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Arizona Bar No. 014249)
Email: Kevin.Rapp@usdoj.gov
COLEEN P. SCHOCH (Georgia Bar No. 366545)
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-19-00898-PHX-DLR (DMF) |
| Plaintiff, | |
| v. | **UNITED STATES'S RESPONSE TO DEFENDANT'S MOTION FOR A BILL OF PARTICULARS [Doc. 200]** |
| David Allen Harbor, | |
| Defendant. | |

### I. SUMMARY OF ARGUMENT

A year and a half after the Indictment was returned, David Allen Harbour ("Defendant") seeks a Bill of Particulars because he now believes the original Indictment and the Superseding Indictment ("SSI") does not adequately advise him of the charges. Defendant's motion is factually and legally deficient and should be denied.

### II. FACTUAL BACKGROUND

On July 31, 2019, a 11-page Indictment was returned by the Grand Jury, and a 19-page SSI was returned on November 24, 2020. The SSI describes in detail the charges, the entities were used by the defendant, the illegal objects of the schemes to defraud, the means and manner used by the defendant to achieve those illegal ends, and the acts in furtherance of the scheme to defraud. The remainder of the SSI further details specific wire and mail fraud counts, money laundering counts, tax evasion, and a forfeiture

allegation. The SSI alleges a classic investment fraud scheme. Defendant, through various entities, among other things, fraudulently induced victims to "invest" in certain enterprises, with false promises that the victims would shield their assets from government seizure and creditors and/or earn high-yield rates of return by making short-term, high-interest loans to payday lenders. The investor funds were primarily diverted for personal expenditures. When investors demanded an accounting, the defendant provided numerous excuses.

Regarding the payday lending scheme, most of the loans defaulted or were non-performing from the beginning, so the defendant kept the scheme alive by repaying some of the earlier victims of the scheme with funds collected from later victims with what is commonly known as *Ponzi* payments. Throughout this process, the defendant enriched himself by charging victims exorbitant (undisclosed) referral fees on these "investments" or just diverting a substantial portion (unbeknownst to the investor) for his own personal expenses. In some cases, he took advantage of unsophisticated and vulnerable victims who relied on the defendant to act in their best interests as their financial advisor.

In addition to receiving a speaking SSI, the defendant has also received discovery from the two main investigative agencies (FBI, IRS-CI ), collateral litigation proceedings with the FTC and SEC, parallel civil cases filed against the defendant by aggrieved investors, statements from victims and employees, and many other involved third parties. Nearly all the witness statements (including interviews likely not falling within *Jencks*) were produced well in advance of the Court-imposed *Jencks* deadline. To date, the government has disclosed approximately 47,500 documents. In addition, by December 2020, the government had already voluntarily identified and produced approximately 81 trial exhibits and provided a preliminary witness list.

### III. LEGAL STANDARD

**A. The Indictment Must be Plain and Concise – Rule 7(c).**

The Federal Rules of Criminal Procedure do not require the government to provide detailed "speaking" indictments, such as the SSI used in this case. In fact, Rule 7(c)(1) of

the Federal Rules of Criminal Procedure requires only that the indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged" and a citation to the statute the defendant is alleged to have violated. As the Supreme Court has explained: "While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1)." *United States v. Resendiz- Ponce,* 549 U.S. 102, 110 (2007). Thus, it is settled law that an indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charge against which he must defend, and enables him to plead double jeopardy where appropriate. *Resendiz-Ponce,* 549 U.S. at 108; *United States v. Thomas*, 893 F.2d 1066, 1070 (9th Cir. 1990). "To determine whether the indictment sufficiently apprised [the defendant] of the charge against him, we read the indictment in its entirety and construe it according to common sense." *Thomas*, 893 F.2d at 1070. "It is generally sufficient that an indictment set forth the offense in the words of the statute, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citation omitted). The indictment need not describe the government's evidence, plead evidentiary detail, or identify all the facts supporting the allegations. *Wong Tai v. United States*, 273 U.S. 77, 82 (1927) (affirming denial of motion for bill of particulars because the motion "in effect sought a complete discovery of the Government's case . . . [and] called 'for too much details of evidence'"); *Resendiz-Ponce*, 549 U.S. at 108; *United States v. Chenaur*, 552 F.2d 294, 301 (9th Cir. 1977).

### B. Legal Standard for a Bill of Particulars.

A bill of particulars is not appropriate where the indictment provides sufficient details of the charges, and the government provides full discovery pursuant to Rule 16. *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984) (affirming denial of motion for bill of particulars because "the indictment itself provide[d] sufficient details of the charges and the Government provide[d] full discovery to the defense"); *United States v.*

*Marrero*, 904 F.2d 251, 258 (5th Cir. 1990); *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984) ("In the present case the denial of a bill was not an abuse of . . . discretion. The elements of the mail fraud scheme are described in detail in the indictment [and] . . . [e]ach defendant was furnished by way of discovery the insurance files mentioned in the indictment and additional pertinent documents, including brokers' files, Dept. of Motor Vehicle records, and charts that were later introduced by the government. . . . Indeed, every document introduced by the government at trial had been made available for inspection before trial. Thus, despite the involvement of about 150 separate fraud claims specified in the indictment, a reasonably diligent counsel was furnished with all information needed to prepare for trial."). Thus, "[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise a defendant of the specific acts of which he is accused." *United States v. White*, 753 F. Supp. 432, 433 (D. Conn. 1990). The ultimate test is whether the information sought is necessary, not whether it is merely helpful. *United States v. Facciolo*, 753 F. Supp. 449, 450-51 (S.D.N.Y. 1990); *United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988) ("A bill of particulars is not a general investigative tool for the defense, [citation omitted], nor is it a device to compel disclosure of the government's evidence prior to trial. With respect to conspiracy charges in particular, since the government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme, and as the circumstantial proof on which the government usually relies to prove the existence of a scheme often does not reveal such details, the courts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant or confederate.").

What's more, courts have specifically recognized that the type of "speaking SSI" employed in this case provides more than ample notice to a defendant and thus, obviates the need for a bill of particulars. *Wong Tai*, 273 U.S. at 81-82 (concluding that bill of particulars was not necessary where the indictment provided "definiteness and certainty and reasonable particularity as to time and place . . . to commit certain specified

offenses"). *Cf. United States v. Orta- Rosario*, 2009 WL 1578956, *3 (W.D.N.C. 2009) (denying motion for bill of particulars because "[t]he 32-page speaking indictment and the voluminous discovery sufficiently advise Defendant of the charges he must be prepared to defend at trial"); *United States v. Dionisio*, 2008 WL 5427758 (W.D. Wisc. 2008) (denying motion for bill of particulars in part because "the grand jury returned a speaking indictment that, while not exactly *Atlas Shrugged*, adequately and clearly sets forth the government's theory of prosecution so that [the defendant] understands what he is accused of having done in violation of the anti-kickback statute"); *United States v. Black*, 2005 WL 4864408 (W.D. Wisc. 2005) ("Rule 7(c) does not require the government to do more than allege the 'essential facts' constituting the offense, which customarily are thought of as the elements. But the grand jury often returns 'speaking' indictments and no one would suppose that this runs afoul of Rule 7(c); in fact, defense attorneys usually complain that the grand jury doesn't return enough speaking indictments.").

### C. A Bill of Particulars Is Not A Discovery Device.

A bill of particulars cannot be used as a discovery device to acquire evidentiary details about the government's case. *United States v. Giese*, 597 F.2d 1170, 1180-81 (9th Cir. 1979) ("The information available to appellant was actually more than he had a right to demand, for there is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy. . . . Appellant's request for the 'when, where, and how' of every act in furtherance of the conspiracy was equivalent to a request for complete discovery of the government's evidence, which is not a purpose of the bill of particulars."); *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) ("A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation."); *United States v. Matlock,* 675 F.2d 981, 986 (9th Cir. 1982) (affirming denial of motion for bill of particulars and emphasizing that "'[a]cquisition of evidentiary detail is not the function of the bill of particulars'") (citation omitted). In addition, a defendant is not entitled to a bill of particulars where he already has access to the information sought. *United States v. Marrero,* 904 F.2d 251, 257 (5th

Cir. 1990) ("[W]hen the information requested is provided to the defendant in some other form, no bill of particulars is required.").

IV. **ARGUMENT**

          **A. The Indictment More Than Fully Sets Forth the Essential Facts.**

Defendant claims the Indictment "lacks the material information necessary to adequately defend against the government's charges." (Mot. at 2). The defendant decided to wait 18 months before raising this concern.[1] His untimely assertions clearly ignore the descriptive nature of the SSI and greatly overlook the fact that he was charged with schemes to defraud and has received considerable discovery (including *Jencks* Act material well before the government's disclosure obligation) in support of these charges detailed in the SSI.

As noted above, the Grand Jury returned a 19-page "particularized" SSI against the defendant. The first ten pages of the Indictment describe in great detail what entities were used by the defendant, the illegal objects of the schemes to defraud, the means and manner used by the defendant to achieve those illegal ends, and the acts in furtherance of the schemes to defraud.

The government's speaking indictment, on its face, obviously exceeds the requirements of Rule 7(c)(1) and clearly informs the defendant of the charges against him. The government has provided full discovery, well beyond what the rules contemplate or require. And to further assist the defendant in his preparation of this case for trial, the government voluntarily started producing its draft exhibit and witness lists more than one year before trial. At present, approximately 87 exhibits have been marked and scanned for trial and identified for the defendant in 2020, months before the scheduled trial in May 2021. The government's liberal and early discovery practices, and the earlier disclosure of the trial exhibits and witnesses, further dilutes the defendant's asserted need or right to a bill of particulars.

---

[1] Rule 7(f) contemplates that a defendant should raise the issue of a bill of particulars, a defendant seeking a bill of particulars must ask permission of the court. Such permission was not sought here.

The SSI provides a very detailed road map of what took place in this case. It contains vast amounts of specificity as to the means and methods used by the defendant to defraud victims. The voluminous discovery—coupled with the government's voluntary production of nearly every witness statement and many of its trial exhibits months in advance of trial—shows the request for a bill of particulars lacks factual and legal support.

Notwithstanding all of this, the defendant contends he is entitled to a bill of particulars because he does not understand the various misrepresentations made to investor-victims.

**B. The Discovery**

The government is not required to identify the relevant statements and documents provided in discovery supporting the allegations in the SSI. Nevertheless, a simple review of disclosed reports and various civil filings advise the defendant of the various misrepresentations and omissions of material facts he employed to obtain funds from the victim-investors and support the various charges in the SSI. Below are several examples of the discovery that supports the allegations in the SSI.

    a.  <u>Victim M. B.</u>

At trial, the government intends to call as witnesses a number of victim-investors. For example, one such investor is M.B. (Counts 2, 4-8) who disclosed in an interview the following:

> M.B. stopped receiving interest payments from Harbour and then later received a call from the SEC. The SEC asked M.B. if he gave permission to Harbour to move his one million dollar investment to other companies.[2]

In short, the defendant diverted $450,000 of M.B.'s $1 million investment for his own personal expenditures without M.B.'s permission.

---

[2] Bates HARBOUR-040376

b. Civil Discovery

As a result of the fraud perpetrated on numerous investors, the defendant has been subject to civil cases including from regulatory agencies like the SEC and FTC. As the Court may recall, the government sought a protective order for the federal criminal discovery as the defendant's counsel was using it in a civil case where he was representing the defendant. (Doc. 119) In short, defense counsel is in a unique position as they represent the defendant in various civil cases arising out his fraudulent schemes. One such case is a complaint filed by the SEC and involved related discovery in that matter. Defense counsel represented the defendant in the SEC action. The complaint, filed in federal court in Phoenix, Arizona, provides a road map of the defendant's fraud. For example, it details his fraud as follows:

> This matter is based on misrepresentations by Defendant David A. Harbour ("Harbour") concerning the use of investor funds in connection with his fundraising activities. Between July 2014 and August 2016, Harbour, through various entities he managed and controlled, raised money from his friends and business acquaintances by representing to them that their funds would be used to finance various businesses, including an American Indian business entity engaged in high-interest installment lending to consumers. Instead of directing the money to revenue-generating businesses that could achieve the high returns he promised, Harbour used substantial portions of the invested funds to finance his personal lifestyle and pay off his personal debts. Harbour ultimately used $1,535,000 of the $2,450,000 that he raised from four investors to pay his personal expenses and pay off his debts.[3]

The SEC civil complaint details what defendant did with investor funds, including *Ponzi* payments. One such investment is described in the complaint as follows:

> Contrary to Harbour's representations, much of the money invested by Investor A never went to Tribal Lending Entity A or any consumer lending business but instead was used by Harbour to pay his personal living expenses and debts. For example, days after receiving the $500,000, *Harbour wired $35,000 to pay an individual who had loaned him money*. Harbour also spent $144,000 to pay his credit card bills. The credit card charges included tens of thousands of dollars of Harbour's personal expenses such as private jets, Disney cruise trips, a visit to Universal Studios, golf tournament tickets, and a roughly $2,300 restaurant bill. Altogether, Harbour used $310,000 of the $500,000

---

[3] Bates HARBOUR-040736

provided by Investor A in ways that were inconsistent with his representations to Investor A.[4] (emphasis added)

The complaint further describes the diversion of funds from another investor as follows:

> Contrary to his representations to Investor D, Harbour used at least $300,000 of Investor D's $450,000 investment for personal purposes, including paying off personal debts. Harbour spent over $80,000 of Investor D's funds to pay off credit card charges. These charges included thousands of dollars in purchases at Neiman Marcus, over $17,000 in payments to a residential architecture firm, thousands of dollars on expenses related to a golf tournament, and payments to a Beverly Hills plastic surgeon, as well as meals at restaurants, groceries, and purchases from Costco, Target, and Amazon. Harbour additionally used Investor D's money to take out a cashier's check for $101,000 that appears unrelated to any business activity. *Harbour also used $50,000 to pay an individual who had invested with him in the past*.[5] (emphasis added)

The defendant was also investigated during a FTC investigation into another party; the Receiver assigned to the case detailed in a filing that the Harbours received over $6 million in proceeds from an individual and was largely spent on personal, lavish expenditures. In a response filing, the Harbours did not dispute that they had received the funds; however, they had spent the money. The Harbours eventually settled with the FTC for $750,000.

### c. Defendant's Bookkeeper

L.P. was the defendant's bookkeeper and was employed by him from 2013 to 2015. L.P. kept track of the defendant's financial data via QuickBooks. In that capacity, she was intimately familiar with what the defendant did with investor funds. L.P. was interviewed twice and provided information on the defendant using new investor funds to pay previous investors, diverting investor funds to pay lavish personal expenses, the nonperforming of payday loans that was concealed from PAIF and victim-investors, and the failure to disclose a 25% finder's fee. During an interview, she related the following:

> L.P. witnessed investor funds that came into Harbour bank accounts were used to pay other investors. L.P. described this payment process as whatever investors cried the most about getting paid, ended up getting paid. Investor

---

[4] Bates HARBOUR-040738
[5] Bates HARBOUR-040741

D.W. was one such investor.[6] L.P is unaware of any investor who was successful (principal and Return on Investment paid) with their venture with Harbour in the entire time she has known him. (*Id.*) L.P. does not believe Harbour told any of the investors about the Finder's Fee and how it was directly based upon the amount of money the investor provided to Harbour.[7] L.P. stated some investors were paid with other investor's money. The investors who were paid were generally complaining about the lack of payments made by Harbour.(Id.) L.P. was very concerned about the payment of investor funds. She stated there were times when the investor funds would be used to pay for Harbour's American Express bill. She stated that some of M.B's money could have been provided to Harbour for personal use. L.P. stated that by the time M.B.'s investment came into the picture, Harbour was "scraping the bottom of the barrel" and doing what he could to pay investors.

L.P. describes the Green Circle pay day lending scheme as follows:

> From the very beginning of the Harbour/PAIF/Green Circle relationship, at the review stage, Harbour altered the Borrowing Base spreadsheet. Harbour would never allow any loan to be written-off. Every Borrowing Base spreadsheet that was created or updated by L.P. was changed/manipulated by Harbour prior to being sent to PAIF. Many of the changes made by Harbour altered the write-off amounts, including reducing the amounts owed and the spreadsheet would ultimately reflect what the principals should have been. L.P. believes the alteration of the spreadsheet by Harbour was not because of a conflict of accounting principles or figures but was conducted as a means to convince PAIF to fund the Draw Requests.

PAIF was a hedge fund that the defendant used to fund loans for payday lenders. He provided the fund managers with fraudulent documents to obtain the funds. In a disclosed interview of P.B.—a principal of PAIF—regarding the false information provided to PAIF to receive funds from a credit line, P.B. corroborates L.P. and told agents the following:

> Later, it was learned that Habour provided fraudulent information regarding these consumers. Oak Tree (Harbour's entity) either withheld information regarding the late payments or altered the payment schedule, unbeknownst to P.B.. For example, if a borrower was going to be late for a 3rd time, Oak Tree would forgive the late payment and add the payment to the back end of the loan. This was against the guidelines put in place by PAIF.[8]

---

[6] Bates HARBOUR-040337
[7] Bates HARBOUR-047530—HARBOUR-047536
[8] Bates HARBOUR-040340

Like many of the victim-investors, P.B. was also unaware that the defendant was under investigation by the SEC and the FTC until it was too late. Disclosure of both investigations would have impacted whether PAIF remained in a business relationship with the defendant. Defendant intentionally concealed these material facts from PAIF and victim-investors.

In sum, information about the defendant's misrepresentations to PAIF and victim-investors, *Ponzi* payments, and a diversion of investor funds for personal expenses are easily gleaned from available discovery that support the allegations of fraud in the SSI.

## CONCLUSION

Having been provided a lengthy speaking indictment, discovery far beyond what the rules require, and the government's trial witnesses, exhibits, and other disclosures well before the scheduled trial date, the defendant fails to raise a colorable claim to a bill of particulars.

Respectfully submitted this 17th day of February, 2021.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alan Baskin
Email: alan@baskin.law
*Attorney for defendant David Allen Harbour*

*s/ Joy Faraj*
U.S. Attorney's Office