**BASKIN PLC**
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
Telephone No. 602-812-7977
E-mail: alan@baskin.law
         mmilovic@baskin.law
Name and State Bar No.:   Alan Baskin #013155
                          Mladen Milovic #035560
*Attorneys for Defendant*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. CR-19-00898-PHX-DLR(DMF) |
|---|---|
| Plaintiff, | **DEFENDANT DAVID ALLEN HARBOUR'S MOTION TO CONTINUE TRIAL DATE AND ALL REMAINING PRE-TRIAL DEADLINES** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | **(Expedited Ruling Requested)** |

Defendant David Allen Harbour moves to continue the trial date currently set for May 18, 2021 and all remaining pre-trial deadlines.

**I.      INTRODUCTION.**

If the existing trial date of May 18 stands, Mr. Harbour will be deprived of his constitutional right to effective assistance of counsel. He needs additional time to review third-party discovery because he has only received a handful of documents pursuant to several subpoenas the Court issued beginning on July 23, 2020 and expects to receive tens of thousands of additional documents in the coming months. In the absence of discovery supporting new allegations in the superseding indictment ("SSI"), Mr. Harbour must also seek additional third-party subpoenas related to those allegations, which will yield even more

documents.

Ordinarily, Mr. Harbour would have sought a continuance until September 2021. The assigned Assistant U.S. Attorney, however, is the lead prosecutor in *United States v. Michael Lacey, et al.*, CR-18000422-001-PHX-SMB , which is set for what is expected to be a three-month long trial starting on August 23, 2021.[1]  Mr. Harbour requests the Court to continue the trial to no earlier than January 19, 2022, approximately two months after the scheduled completion of the *Lacey* trial.  A two-month gap between the Lacey trial and Mr. Harbour's trial will likely be warranted to give the government time to shift its attention to this case and avoid scheduling conflicts around the holidays.

## II.   RELEVANT BACKGROUND.

Over seven months ago, on July 17, 2020, Mr. Harbour filed a Fed. R. Crim. P. 17(c) motion for the issuance of subpoenas duces tecum related to Green Circle, the payday lending entity central to Mr. Harbour's indictment.  On July 23, 2020, the Court granted the motion. [Doc. 107.]  The Witnesses refused to produce any documents in response to the subpoenas. After meeting and conferring several times in September and October 2020, counsel for Mr. Harbour and the Witnesses could not reach an agreement as to which documents should be produced, and the Witnesses continued their refusal to produce any.

On November 9, 2020, Mr. Harbour filed a motion to compel ("MTC") compliance with the subpoenas. [Doc. 167.]  After oral argument, the Court granted the MTC in part and ordered the Witnesses to produce several categories of documents and communications by March 1, 2021.  [Doc. 198.]  On February 25, 2021, the Witnesses' counsel filed a motion to extend the deadline to produce the relevant documents until April 1, 2021.  [Doc. 217.]  The motion to extend explained some of the unexpected obstacles the Witnesses have faced in gathering the documents, and stated that they could be "produced on a rolling basis should the collection and identification process necessitate [such] a . . . production," making it apparent

---

[1] That case is also known as the Backpage prosecution and has been pending trial since April 2018.

2

that the production will not be complete on April 1 and providing no ultimate deadline for completion. [Doc. 217.] On March 1, 2021, the Court granted the motion to extend. [Doc. 219.] The Court ordered the Witnesses to produce responsive documents by April 1 and the parties to agree on any additional responsive documents to be produced thereafter. [*Id.*]

## III.   ARGUMENT.

A continuance is warranted to preserve Mr. Harbour's right to have effective assistance of counsel and protect the public interest in preventing the further spread of COVID-19.

### A.   Continuing the Trial Will Protect Mr. Harbour's Right to Effective Assistance of Counsel.

Defendants enjoy a right to the assistance of counsel at all critical stages of a criminal proceeding, including trial and the period between indictment and trial. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *Kirby v. Illinois*, 406 U.S. 682, 688 (1972). Where the effective performance of counsel is so unlikely as to amount to the functional equivalent of a complete denial of counsel, automatic reversal is merited. *See United States v. Chronic*, 466 U.S. 648, 659 (1984). Mr. Harbour's right to effective assistance of counsel includes preparation for trial between the time of indictment and the trial, which the pandemic and third parties have impaired. *See Maine v. Moulton*, 474 U.S. 159, 170 (1985). Trial under the current circumstances and scheduling would impermissibly interfere with Mr. Harbour's right to counsel for several reasons.

### i.   Mr. Harbour, his counsel, and his expert witness(es) will not have sufficient time in advance of trial to analyze the information received from the Witnesses.

The SSI alleges that Mr. Harbour "misrepresented financial projections and Monthly Borrowing Base Certificates regarding the financial condition and operation of Green Circle" and "manipulated the records to his advantage in order to entice PAIF to fund [Green Circle's] draw requests. [Doc. 154 at 9:3-7.] The government's response to Mr. Harbour's motion for a bill of particulars cites to two witness interviews – one by L.P., Mr. Harbour's bookkeeper, and other by P.B., a principal of PAIF. [Doc. 211 at 10:10-24.] L.P. stated in

BASKIN PLC
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
Telephone 602-812-7977

her interview that, in regard to the "Harbour/PAIF/Green Circle relationship," Mr. Harbour "altered the Borrowing Base spreadsheet" in order to "convince PAIF to fund the Draw Requests" submitted by Green Circle. [Doc. 211 at 10:10-15.]  L.P. further stated that Mr. Harbour "would never allow any loan to be written-off" and that "[m]any of the changes made by Harbour altered the write-off amounts, including reducing the amounts owed and the spreadsheet would ultimately reflect what the principal should have been." [*Id*.]

P.B. stated in his interview that "Harbour provided fraudulent information regarding [payday] consumers" and that Oak Tree, Mr. Harbour's entity, "either withheld information regarding the late payments or altered the payment schedule." [Doc. 211 at 10:21-24.]  P.B. gave the example that "if a borrower was going to be late for a 3rd time, Oak Tree would forgive the late payment and add the payment to the back of the loan." [*Id*.]  The documents and information the Witnesses are to produce relate directly to these false allegations. Gleaning the appropriate and relevant information from a production that has yet to start will be extremely time intensive and laborious.

For example, the documents to be produced for the period from June 2015 through July 2017 include Green Circle's accounting ledgers, QuickBooks, bank statements, signature cards, checks, wire transfers, Green Circle's financial statements, including profit loss statements, balance sheets and income statements, PAIF's financial statements, contemporaneous electronic, written, or otherwise recorded communications between Alonzo Primus, Green Circle Officers, Mr. Burgess, and Robert Farrell relating to the borrowing base calculation and the $1.1 million transfer, all agreements between LJP and Green Circle, and evidence of payment or compensation to LJP from or on behalf of Green Circle. [Doc. 198 at 4.]

The requested communications will likely include discussions of, and attachments containing, internal calculations of the borrowing base by PAIF and external calculations of the borrowing base by Green Circle, underwriting procedures for loans made to consumers, daily lending reports of PAIF's advances to Green Circle, and drafts and redlines of the

lending agreements between PAIF and Green Circle. Green Circle's accounting ledgers and QuickBooks files should include lists of payday consumers numbering in the 5,000 range in June 2015 and reaching up to 20,000 consumers, all of which would fluctuate daily, including the actual names of the consumers.

This information will require hundreds of hours to review and analyze. The loan agreement between Green Circle and PAIF will explain how a borrowing base calculation must be done for Green Circle to generate a draw of funds from PAIF. Mr. Harbour's expert(s) must calculate the monthly borrowing bases from scratch to match up what Green Circle submitted to what the loan agreement delineated. To do so, Mr. Harbour's expert(s) must analyze hundreds of daily withdrawals from PAIF by Green Circle for June 2015 through September 2016 and thousands of loans to consumers. The expert(s) will also have to consider the daily funds drawn down from PAIF against its line of credit and compare this information to the list of consumers, which was updated daily. The experts must then analyze the daily withdrawals from PAIF for October 2016 through July 2017 to determine how much PAIF loaned to consumers after they took over the portfolio in September 2016 and compare them to the financial statements provided for the same time period.

The subpoenaed information will shed light on why and/or how PAIF concluded that the borrowing base calculations submitted by Green Circle and allegedly altered by Mr. Harbour were incorrect. P.B.'s claim that Mr. Harbour would alter the calculations submitted to PAIF by forgiving late payments and adding those to the back of the loan [Doc. 211 at 10:21-24] suggests a high level of access to consumer information and sophistication by Mr. Harbour to alter inputs in the accounting/lending software. With a maximum loan amount of approximately $300 for each consumer, and several millions of dollars of loans in circulation at any given time, Mr. Harbour would have had to change information for thousands of consumers the day the borrowing base certificates were submitted to PAIF.

The only way to refute the government's allegations regarding the borrowing base, which is the basis for Count 3, the single largest wire fraud count in the SSI [Doc. 154 at 11],

is to obtain this source information from the Witnesses and reconstruct the borrowing bases submitted to PAIF from scratch and then tie the borrowing bases back to the financial statements, specifically the balance sheet of Green Circle. Taken together, this information will also support that Green Circle was, and still is, a going concern. This will contradict the government's theory that Mr. Harbour defrauded PAIF by misrepresenting "that Green Circle was a functional and profitable portfolio and that the loans were performing and not in a state of defaults" and that PAIF "would not have provided funds if the borrowers' loan status was accurately represented." [Doc. 154 at 9:13-16.]

The subpoenaed documents are also necessary to determine when the government, L.P., and P.B. allege the borrowing base was altered, the actual dollar amount by which they were altered, along with identifying the consumers whose loans were altered. Green Circle's bank statements will be used to rebuild its financial statements during Mr. Harbour's involvement, and after PAIF took over the Green Circle portfolio. This analysis would show how material, if at all, the alleged borrowing base alterations would have been to Green Circle's and PAIF's revenues.

Review of the subpoenaed information may necessitate further motion practice and/or the issuance of additional subpoenas if certain other entities and individuals were involved in PAIF's evaluation of the borrowing base calculations and funding of the charged $1.1 million transfer to Green Circle. The reviews, analyses, and reconstructions above are critical and will take several months to complete, rendering a trial within the coming months impossible. The government – not Mr. Harbour – put the borrowing base allegations at issue. Mr. Harbour must have a chance to defend these allegations appropriately and effectively.

The Witnesses, however, will not begin their production of documents until April 1. The production will likely be rolling and at present has no cut-off date. Motions in limine and the parties' expert witness reports and final summary charts are due on April 5, 2021. [Doc. 149.] The parties' disclosures of final witness and exhibit lists is due on April 12, 2021. [*Id*.] The joint voir dire, joint statement of the case, joint proposed jury instructions, and joint

proposed verdict forms are due on April 26, 2021. [*Id.*] Mr. Harbour cannot review and make use of the tens of thousands of expected documents and communications before these deadlines run, particularly where the Witnesses' production may not even be complete by the current trial date.

### ii. Mr. Harbour and his counsel are still reviewing ongoing discovery from the government.

In addition to the documents expected to be produced on or after April 1, the government continues to produce documents and summaries of witness interviews. In the response to Mr. Harbour's motion for a bill of particulars, the government claims Mr. Harbour has enjoyed full discovery from the government. [Doc. 211 at 6:19.] The government, however, cited to L.P.'s interview in the response, but did not disclose it to Mr. Harbour until after the government filed the response and only then after Mr. Harbour requested a copy of the interview summary. Mr. Harbour does not know how much more discovery the government will provide. If it continues, Mr. Harbour and his counsel may not have sufficient time to review it in light of the expected production by the Witnesses.

### B. A Continuance is Warranted to Allow Mr. Harbour to Seek Additional Third-Party Subpoenas That Will Be Dispositive of Certain Charges in the SSI.

The SSI alleges that investor-victims A.W. and D.W. collectively invested $200,000 in Canyon Road Holdings, LLC ("Canyon"). [Doc. 154 at 10:3-8.] The government, and L.P. in her recently disclosed interview, allege Mr. Harbour provided these funds to KSQ through Canyon and received a finder's fee in exchange. [Doc. 154 at 6:22-26.] The government also alleges that Mr. Harbour committed mail fraud regarding A.W.'s investment. [Doc. 154 at 13:1-5.] There were, however, no agreements between Canyon and KSQ, and Mr. Harbour did not receive a finder's fee from KSQ for funds provided to Canyon. Documentary evidence of this would be dispositive of the mail fraud count related to A.W. and any characterization of A.W. and D.W. as victims of the KSQ and Green Circle schemes alleged in the SSI.

7

Mr. Harbour is preparing a request for the issuance of third-party subpoenas to the banks where Canyon had its business account and to the FTC for all records related to Canyon. Mr. Harbour's ongoing efforts to obtain responsive documents from the Witnesses have lasted six months and counting. He will not be able to apply for third-party subpoenas related to Canyon, serve them if granted, and expect to receive responsive documents to review and analyze by May 18, much less by any of the exhibit and witness deadlines in April. The government – not Mr. Harbour – added new allegations and recently presented new evidence regarding these claims. The Court must continue the trial date.

### C. A Continuance is Warranted to Prevent the Continued Spread of COVID-19.

The grant of a continuance where the risk of spreading infectious disease can be avoided by delaying a trial is not at all uncommon and constitutes good cause for doing so. *See, e.g., United States v. Allen*, 2012 U.S. Dist. LEXIS 123487, at *15-16 (D.V.I. August 30, 2012) (continuing trial during chickenpox outbreak where travel could cause infectious public spread); *People v. Tucker*, 196 Cal. App. 4th 1313 (2011) (continuing trial where defendant was at risk of contracting "infectious disease" and a trial could expose "trial court personnel, jurors, and witnesses" to H1N1, a "debilitating and perhaps life-threatening illness"); *State v. Drewry*, 942 A.2d 981, 987 (Me. 2008) (continuing case where defendant under infectious disease quarantine).

In a response supporting the defendants' motion to continue the *Lacey* trial, the AUSA assigned to this case cited to the dangers of the COVID-19 pandemic as making it prudent to continue the trial, stating that "a continuance is warranted based on the increased severity of the pandemic and the uncertainty it brings to whether the trial may be conducted this April in a manner that ensures the health and safety of all trial participants." *See United States v. Michael Lacey, et al.*, CR-18000422-001-PHX-SMB (Doc. 1119). The government stated that a continuance was warranted to "allow the Court to assess the impact that vaccinations have had on the number of COVID-19 cases in Arizona and the safety of proceeding to trial in

8

August 2021." *Id*. The government concluded that, based on the number of COVID-19 cases in Arizona, it was highly improbable the parties could go to trial in April. *Id*.

The government's argument holds equal water as to a May trial date, particularly here, where many of the trial witnesses do not live in Arizona and some are at higher risk of COVID-19 due to their age. Several witnesses are over 65. Also, alleged victim-investor R.T. lives in Illinois and M.B. lives in California. P.B lives in New Jersey and has already experienced personal and family issues with COVID-19. [Doc. 217 at 2.] Requiring any of these witnesses to travel to Arizona and potentially expose themselves in the process is not prudent. Many of them may be reluctant, or even refuse, to travel to Arizona. Mediating and accommodating any such refusals may not only cause practical issues such as delays during the trial, but could create constitutional issues if Mr. Harbour cannot confront the witnesses testifying against him.

Also, a trial in a setting that threatens an attorney's own physical well-being amounts to the constructive denial of counsel. *See Powell v. Alabama*, 287 U.S. 45, 53 (1932). Conducting a jury trial, particularly in a complex case like this one that will last multiple weeks, requires sustained focus. Added to the normal trial stress, a May trial would require counsel to balance concern about exposure to a deadly virus from everyday tasks such as passing an exhibit to a trial participant, questioning a witness, consulting with co-counsel, and conferring with a client. Without the effective assistance of his counsel, Mr. Harbour cannot put on his constitutionally protected defense.

Recently, the Chief Judge for the District of Arizona – acknowledging that Arizona then had the highest per capita infection rate in the world – issued a general order suspending until further notice all criminal and civil jury trials not presently begun but scheduled for the month of January and February 2021. *See* General Order 21-02 at 1. Depending upon the public health situation, such trials may be further postponed. *Id* at 2. As the government acknowledged in *Lacey*, based on the number of COVID-19 cases in Arizona, it is also highly improbable that the parties in this case will be able to proceed to trial safely this May. There

is no reason for the government to believe the *Lacey* trial cannot proceed safely in April, but this case can just a month later.

## IV.　CONCLUSION.

Mr. Harbour respectfully requests the Court to continue the trial date currently set for May 18, 2021 until no earlier than January 19, 2022. He has submitted a proposed Order that would set a new trial date and direct the parties to agree to submit a scheduling order addressing the remaining pre-trial deadlines.

RESPECTFULLY SUBMITTED this 1st day of March, 2021.

BASKIN PLC

/s/ Alan Baskin
Alan Baskin
Mladen Milovic
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing to:

Kevin M. Rapp
Coleen Schoch
U.S. Attorney's Office
40 N. Central Ave., Suite 1800
Phoenix, AZ 85004
*Attorneys for Plaintiff*


 /s/ Cristina McDonald