PAUL ANTHONY MARTIN
Acting United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN P. SCHOCH
Georgia Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>               Plaintiff,<br>v.<br><br>David Allen Harbour,<br><br>               Defendant. | CR-19-00898-PHX-DLR (DMF)<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO CONTINUE TRIAL**<br>**(Doc. 220)** |

## SUMMARY

This case is ready to proceed to trial on May 18, 2021. Defendant Harbour's Motion to Continue the trial for the second time cites two unavailing reasons for this request: (1) pending disclosure from Green Circle; and (2) the COVID-19 health pandemic. For both reasons the motion should be denied as Harbour has sufficient discovery to address Count 3 of the Superseding Indictment (SSI), the victims strongly oppose any further continuances, and COVID-19 exposure can be mitigated by implementing certain protocols in addition to the availability of widespread vaccinations.

## GREEN CIRCLE DISCLOSURE

Harbour's argument that the trial should be continued because he has yet to receive compliance from Princeton Alternative Income Fund (PAIF) related to Green Circle should

be denied as he has already received relevant disclosure. Moreover, Harbour's 17(C) subpoena issued in May 2020 is overly broad by seeking information unrelated to the specific allegation in the superseding indictment (SSI) regarding the fraud perpetrated on PAIF. Harbour falsely argues that the documents are related to the single count charged on August 11, 2015. By way of background, Harbour fraudulently received a draw request in the amount of $1.1 million from Green Circle on August 11, 2015. (*See* SSI, Doc. 154, Count 3). The source of these funds was from investor and hedge fund PAIF. According to the written agreements between Harbour, Green Circle, and PAIF, Harbour was responsible for the preparation and production of records, to include the Borrowing Base of the lending portfolio, to PAIF for funding purposes.[1] Harbour directed his internal bookkeeper, L.P., to submit the Borrowing Base to PAIF. PAIF personnel reviewed the Borrowing Base for thoroughness and approved the amount of $1.1 million (originally, the request was over $1.9 million).[2] After the business relationship between Harbour and PAIF ended in 2016, PAIF took possession of the Green Circle entity, and after reviewing records between 2015-2016, discovered the portfolio was worth $2 million less than portrayed by Harbour.[3] As a result, Harbour was charged with Count 3 secondary to the fraud perpetrated on PAIF. (Doc. 154).

At trial, the government will demonstrate that Harbour (and others at his direction) provided false or misleading information regarding the Borrowing Base information to PAIF in order for them to continuously provide funds to Green Circle from on or about August 2015 through the fall of 2016. This resulted in a lawsuit filed in Arizona District Court.[4] Indeed, L.P. advised investigating agents that she provided Harbour via email the Borrowing Base spreadsheet, which he then manipulated, altered, and returned to her to

---

[1] (*See* Bates 038932 – 039058, 039060 – 039080, 039100 – 039124, 047530 – 047536).

[2] (*See* Bates 039766, 040344).

[3] (*See* Burgess Memorandum of Interview (MOI); Bates 040341).

[4] (*See Fund Recovery Service ("FRS") vs. Oak Tree Bates*: 039060 – 039080; Ex. A). Defense counsel in the instant case represented Harbour in this civil case, among others.

email to PAIF.[5]  L.P. told the government that it was her duty to create and enter the information into the Borrowing Base spreadsheet, and send it to Harbour for review prior to sending the financials to PAIF. (*Id.*)  L.P. told investigating agents the following details regarding Harbour misleading PAIF about the Borrowing Base:

- Harbour was observed altering/changing/manipulating the Borrowing Base spreadsheet prior to being sent to PAIF.
- Harbour would never allow any loan to be "written-off" as non-performing.
- Many of the changes made by Harbour altered the write-off amounts, including reducing the amounts owed, and the spreadsheet would ultimately reflect what the principals should have been.
- The alteration of the spreadsheet by Harbour was not because of a conflict of accounting principles or figures but was conducted as a means to convince PAIF to fund the Draw Requests. (*Id.*)

In sum, L.P. was not comfortable with the spreadsheets that were provided to PAIF and knew the false information provided by Harbour was material to their lending decision. (*Id.*)

As noted above, Harbour is charged with wire fraud (Count 3) based on the transfer of $1.1 million on August 11, 2015, because it was based on false information (altered Borrowing Base information) provided at the direction of Harbour to PAIF.  The defense believes they require voluminous records from PAIF from June 2015 until July 2017 to "recreate the operation and financial records of Green Circle" yet do not explain how this would contradict L.P.'s testimony. (Mot. at 4)  The wire fraud count charged by the government is in relation to a discrete point in time and is relevant to a wire initiated on August 11, 2015, and before.  In addition, the material records pertinent to the funding

---

[5] (*See* Bates 040332 – 040338).

decision of PAIF was the Borrowing Base provided by Harbour's employee, L.P. As noted above, L.P. has stated that Harbour deliberately manipulated the Borrowing Base records consistently, including the activity surrounding the $1.1 million transfer. Harbour's records for his own entities are separate from those of Green Circle. L.P. knew that Harbour was misrepresenting the Borrowing Base and will testify to the actions at trial. In sum, the documents sought by Harbour *after* August 11, 2015, are irrelevant to this charge. Last and importantly, Harbour already received considerable disclosure of Green Circle documents, and the documents he is awaiting from the 17(C) subpoena are of marginal relevance. For example, Harbour received approximately 1,228 PAIF related docs.[6] These documents cover the relevant time period of the August 11, 2015 transfer. Accordingly, a motion to continue the trial based on the need to obtain additional documents from PAIF should be denied.

## **VICTIMS' RIGHTS**

Harbour's second request for a continuance should also be denied because the victims and the public have a right to proceedings free from unreasonable delay. 18 U.S.C. § 3771(a)(7) (the "Crime Victims' Rights Act" or "CVRA"); *see also* 18 U.S.C. § 3161(h)(7)(A). The victims' statutory rights—and their need for an expeditious resolution of this prosecution—strongly militates against further delay.

In sum, these victims are seeking to put this case behind them and focus on their future and deserve a trial without further delay. *See Barker v. Wingo*, 407 U.S. 514, 519 (1972) ("It is axiomatic that the Sixth Amendment right to a speedy trial belongs both to a criminal defendant and to the public. The societal interest in providing a speedy trial . . . exists separate from, and at times in opposition to, the interests of the accused.")

The Court has previously acknowledged that victims have certain rights in a federal criminal prosecution. (Doc. 147) As such, it is not surprising that the victims' desire for certainty and closure is increasing with the passage of time. While the COVID-19 health

---

[6] *See* Bates 001787 – 002003, 004569 – 004660, 004732 – 004789, 006175 – 006398, 036925 – 037163, 038932 – 039058, 039060 - -039080, 039652 – 039823, 040332 – 040345, 040379-040381, 040389-040391, 041646 – 041715.

pandemic has created its own challenges regarding moving this case forward to trial, the victims seek closure and would like to proceed to trial as soon as possible as they are looking forward to moving on with their lives.

**COVID**

Last, Harbour's argument that the May trial should be continued because of the COVID-19 pandemic should be rejected. This Court is aware of the challenges facing courts across the country when scheduling jury trials in the middle of a protracted pandemic. Harbour, however, falsely compares the trial here to that in *United States v. Lacey*, et. al. CR-18-0422-001-PHX-SMB (the Backpage Prosecution). (Mot. at 2). That case was previously scheduled (a month before the instant case) for trial on April 18, 2021. The government did not oppose a continuance, in part, for COVID considerations and suggested a mid-August trial rather than late September as urged by the defense. The Court agreed with the government and set the case for August.

In any event, the Backpage prosecution is vastly different from the case here. First, it involves a 70-page SSI charging 100 counts and an alleged criminal enterprise spanning 14 years. Second, there are 100 noticed government witness compared to 32 in the Harbour prosecution. There are approximately 1,200 exhibits compared to 81 in Harbour. More importantly, there are six defendants with each defendant averaging two attorneys. Four of the defendants have advised the court of underlying health conditions making them susceptible to COVID complications.[7] And, that case is expected to last 12 weeks as opposed to only a couple of weeks in this case. Harbour cites no health concerns for either himself or any of his proposed witnesses that would prevent a May 18, 2021 trial. In short, the COVID considerations are more compelling in the Backpage prosecution because of the complexity of that case, and Harbour posits a false equivalency.

**A. Conducting Jury Trials During COVID-19**

Despite the concerns about COVID-19 exposure, the trial here can be conducted safely in late May 2021. Last year, the United States Courts issued a comprehensive report

---

[7] *See United States v. Lacey*, CR-18-0422-001-PHX-SMB, Doc. 990.

that contains preliminary suggestions and ideas for courts to consider when restarting jury trials. (*See* Ex. B)  This fifteen-page report provides an exhaustive study of protocols the Court may implement to mitigate the risk of COVID-19 exposure among trial participants. In addition, the District of Arizona has established its own protocols for conducting jury trials during the pandemic. (*See* Ex. C)  The development of these and other protocols and practices have shown that the courts can adapt to our current challenging circumstances.

In addition, numerous preventative measures can be imposed within the courthouse. For example, reliance on trial presentation software to limit the circulation of exhibits, mandatory face masks inside the courtroom, segregating jurors from the public and other trial participants, plexiglass within the courtrooms, live streaming of courtroom proceedings in a separate courtroom for the press and public, temperature checks upon entry, a court imposed limit of the number of persons at counsel table, among other things, will ensure a safe environment for trial participants. (*See also* Exs. B-C.)

**B. The Vaccine**

In addition, circumstances in the United States have changed since the previous trial continuance was granted based on the COVID-19 pandemic.  Three vaccines (Moderna, Pfizer, and Johnson & Johnson) are currently being distributed in the United States.[8] Individuals 55 years and older, those with preexisting health issues, and other groups have received priority for vaccination.[9]  Here, the prosecution team has endeavored to become vaccinated and is also working with victims and other lay witnesses to ensure that they have received vaccinations as soon as possible.  Harbour argues that several victims (M.B., R.T., and P.B.) are in a vulnerable class and maybe reluctant to travel to testify at trial. (Mot. at 9).  On the contrary, each of those witness have been contacted and are ready and willing to testify at a May trial and oppose any further continuances.

---

[8] https://www.cdc.gov/; *see also* https://www.wsj.com/articles/how-to-get-a-covid-19-vaccine-a-state-by-state-guide-11611703769 (last visited February 2, 2021); https://www.cnn.com/2021/01/29/health/johnson-covid-19-vaccine-how-it-works/index.html (last visited February 1, 2021).

[9] https://www.wsj.com/articles/how-to-get-a-covid-19-vaccine-a-state-by-state-guide-11611703769 (last visited February 2, 2021).

## CONCLUSION

This case is ready to proceed to trial on May 18, 2021. The compliance with the 17(C) subpoena is overly broad, redundant of discovery already in Harbour's possession for nearly 18 months, and exceeds the relevancy of a single count that implicates PAIF. Second, the victims have a statutory right that requires the case to proceed to trial timely. Lastly, protocols can be implemented to mitigate COVID exposure. Defendant's motion should be denied.

Respectfully submitted this 15th day of March, 2021.

PAUL ANTHONY MARTIN
Acting United States Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alan Baskin
Mladen Milovic
Baskin PLC
6263 N. Scottsdale Rd., Suite 340
Scottsdale, AZ 85250
Email: alan@baskin.law
*Attorneys for defendant David Allen Harbour*

*s/ Joy Faraj*
US Attorney's Office