GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN SCHOCH
Georgia State Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, <br><br> Plaintiff, <br><br> v. <br><br> David Allen Harbour, <br><br> Defendant. | No. CR-19-00898-PHX-DLR (DMF) <br><br> **UNITED STATES' *EX PARTE* PETITION TO REVOKE DEFENDANT HARBOUR'S RELEASE PENDING TRIAL AND TO ISSUE AN ARREST WARRANT** <br><br> **(Filed *Ex Parte* and Under Seal)** |

## INTRODUCTION AND SUMMARY

Pursuant to 18 U.S.C. §3148, the United States of America, by and through undersigned counsel, hereby moves the Court to revoke the current Order authorizing the release of defendant David Allen Harbour. The evidence summarized below and in the attached memoranda of investigation (MOI) establishes by clear and convincing evidence that Harbour has violated the condition of his release that orders him not have direct or indirect contact with certain victims; and there is probable cause that he violated 18 U.S.C.

§ 1512(b)(1) by attempting to tamper and tampering with potential witnesses while on pretrial release. The later violation triggers a statutory presumption that no conditions or combination of release conditions will assure the safety of the community and of others. *See* 18 U.S.C. § 3148(a)-(c). The United States therefore requests that this Court issue an arrest warrant and promptly schedule the hearing called for by the statute to determine Harbour's release status. *See id.* at § 3148(b).

## RELEVANT FACTS

### A.   Procedural Facts

On August 7, 2019, Harbour was arrested and detained on an indictment charging three counts of wire fraud and 19 counts of transactional money laundering (Doc. 3) On August 9, 2019, Harbour was released on conditions, including that he not have direct or indirect contact with persons who are considered victim(s), potential witness(es), family member(s) of victim(s)/witness(es), Phillip Burgess, Mark Burg, Richard Turasky, Joe Cathay and Rhonda Gray. (Doc. 17) After further investigation, the indictment was superseded on November 20, 2020. (Doc. 154) Additional victims added to the superseding indictment are Allison and Dan Wilson, and Carol and Pat Hill. (*Id.*)

### B.   Harbour's Contact with Victims and Witness Tampering

Harbour has had repeated indirect contact with the victims and witnesses previously identified in this case from at least approximately July 2020 up to November 10, 2021.

#### 1.   Mark Burg

In 2017, Mark Burg contacted the Internal Revenue Service, Criminal Investigation Division (IRS-CID) and provided an interview detailing Harbour's theft of $1 million from him. (*See* Ex. A.) Because Harbour resided in Phoenix, the case was forwarded to the Phoenix FBI Field Division. Burg was interviewed several times both before and after the indictment in this case. (*See* Exs. B, C.) He was also deposed by the Securities Exchange Commission (SEC) related to investment with Harbour.[1] In addition, his accountant Dean

---

[1] Bates 036873-037000

- 2 –

Avedon was also interviewed about his interaction with Harbour regarding the return of Burg's money. (*See* Ex. D.) The Superseding Indictment references seven substantive counts of money laundering involving modest payments (some were *Ponzi* payments) made to Burg. (*See* Doc. 154, Counts 2-8.) It is a condition of Harbour's release that he not have direct or indirect contact with Burg. (Doc. 17, p.1.)

Two months before the scheduled January 25, 2022 trial, Alan Baskin, Harbour's attorney, contacted Burg's attorney, Keith Davidson, repeatedly. Baskin pitched to Davidson an agreement that Harbour would pay Burg the $1 million that Harbour owed to him in exchange for Burg signing a declaration proposed by Baskin. Baskin reviewed the proposed declaration with Davidson, but refused to provide a copy to Davidson. The declaration requires, among other things, that Burg acknowledge that he is not a victim of Harbour and that Harbour had a right to do whatever he wanted with Burg's money. Davidson considers the proposed declaration to be misleading. Baskin stated that no money would be transferred until Burg agreed to sign the declaration. On behalf of Burg, Davidson insisted that the money be transferred without conditions because Burg has a perfected judgment against Harbour in Los Angeles Superior Court. (*See* Ex. E.)

As Baskin did not persuade Davidson and Burg, Kenneth Bobrow, a long-time business associate and investor with Harbour contacted Burg at Harbour's direction (Harbour provided Bobrow Burg's telephone number) to convince Burg to sign the declaration. (*See* Ex. F.)

Baskin subsequently contacted Davidson again. When no money for his client was forthcoming, Davidson advised Baskin by e-mail to cease contact with him on behalf of Burg. (Ex. G.)

Burg himself then contacted IRS-CID Agent Brandon Lopez to complain of being harassed by Bobrow. (*See* Ex. F)

**2. Richard Turasky**

Richard Tursasky was interviewed by IRS-CID agents in June 2019 (three months before Harbour was indicted and arrested). Tursasky advised investigating agents that he

had met Harbour through Bobrow. Turasky had similar interactions with Harbour as Burg and other investors, namely Harbour bragged to Turasky about his membership in private golf clubs, that he was connected to wealthy individuals, had luxury domestic and international condominiums, and box seats at various athletic venues (ASU football, Waste Management Open, etc.), and owned both a boat and a plane. As a result of his apparent success, Turasky stated that he had invested approximately $500,000 with Harbour. Turasky did some due diligence after his investment and found that Harbour was under investigation by the Federal Trade Commission (FTC). Turasky advised agents that it would have been important for him to know if this investigation before investing with Harbour. Turasky was also contacted by the SEC in 2016 regarding his investment. To both IRS-CID and the SEC, Turasky stated that he was a victim of Harbour, who had taken his money under false pretenses and not returned it when asked. (*See* Ex. H.) The indictment alleges that Turasky's funds were used to pay Harbour's AMEX card and was used for *Ponzi* payments to other investors. (Doc. 154, ¶ 14; Counts 9-10.)

In 2020, Bobrow contacted Turasky on behalf of Harbour. Bobrow proposed that "to make Turasky whole," Bobrow would make an investment into an entity, which investment Turasky was already considering making himself. Baskin then contacted Turasky directly regarding the payment. Baskin negotiated the amount of the payment and negotiated a declaration to be signed by Turasky. Turasky stated that signed this declaration and in it avowed he was no longer a victim of Harbour. (*See* Ex. I)

###     3.     Carol Hill

Carol Hill was interviewed on September 19, 2019, approximately one month *after* Harbour was indicted and arrested. Hill advised agents that she had worked for Harbour as a personal secretary for several years. During her employment, Hill invested approximately $581,000 of her and her husband's money with Harbour's promise of returns of 20-30%. Hill later learned that Harbour sent her money to Joel Tucker[2] and that Harbour took a 25%

---

[2] Scott and Joel Tucker ran a payday lending fraud involving a Native American

finder's fee off the top of her investment. Despite many requests, Hill never received her investment back. Harbour insisted that her money went to Tucker, and Tucker would have to return it to her . (*See* Ex. J.) Although Hill's $500,000 investment is outside of the statute of limitations, it is part of Harbour's scheme. (Doc. 154, KSQ Fraud, ¶¶ 6-9, 17.) Hill's $81,000 investment forms the basis of Count 12. (Doc. 154, Count 12.)

In 2021, Baskin contacted an attorney for Hill, Phillip Hantel to negotiate Harbour's repayment to Hill of $81,000. Baskin made no mention of the $500,000 also invested by Hill. Baskin told Hantel that Hill would have to sign a declaration avowing that she was not a victim in order to receive the money. Despite needing the money, Hill was not comfortable signing the misleading declaration and negotiations failed. (*See* Ex. K.)

## **APPLICABLE LAW**

The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, instructs the Court to revoke release and the order detention of a person "who has been released under 18 U.S.C. § 3142 and has violated a condition of that release." *United States v. Addison*, 984 F. Supp. 1, 2 (D.D.C. 1997). As relevant here, an "attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court." 18 U.S.C. § 3148(b).

The court "shall enter an order of revocation and detention" if, after a hearing, it finds: "(A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; **or** (B) clear and convincing evidence that the person has violated any other condition of release;" **and** based on the factors set forth in 18 U.S.C. § 3142(g), "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the

---

tribe. Harbour funneled money to Tucker's investment, known as KSQ. (Doc. 154, ¶ 6-11) The Tuckers also led a high-flying lifestyle similar to Harbour. Scott Tucker was indicted, convicted, and sentenced to nearly 17 years' imprisonment. Joel Tucker was indicted, convicted, and sentenced to nearly 13 years' imprisonment. *See Joel Tucker shows up for sentencing this time, ordered to spend 12.5 years behind bars*, available at https://www.msn.com/en-us/news/crime/joel-tucker-shows-up-for-sentencing-this-time-ordered-to-spend-125-years-behind-bars/ar-AAM7jrG (last visited Nov. 16, 2021).

community, **or** the person is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3142(b)(1)-(2) (emphasis added).

Once a court finds probable cause to believe that the defendant committed a crime while on release, "a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3148(b). A court does not weight the factors set forth in § 3142 "unless and until" it finds "that the defendant has overcome the statutory rebuttable presumption." *United States v. McKethan*, 602 F. Supp. 719, 722 (D.D.C. 1985). And even then, the statutory "presumption does not disappear once the defendant has produced some rebuttal evidence but continues to be weighed along with other factors." *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000) (quotation marks omitted).

## ARGUMENT

Harbour has *both* committed a new federal crime and violated a different condition of release *via* the same conduct. The Court should revoke his pretrial release, and it may do so under § 3148(b)(1)(A) or (B). The facts set forth above and in the attached MOIs establish probable cause to believe that Harbour violated 18 U.S.C. § 1512(b)(1) by attempting to tamper (Burg) and tampering (Turasky) with witnesses. They also establish by clear and convincing evidence that Harbour violated his conditions of release by *indirectly* contacting his victims.

### A. Harbour Committed the Crime of Witness Tampering

Section 1512(b)(1) proscribes "knowingly . . . or corruptly persuad[ing]" or "attempt[ing] to" corruptly persuade another person "with intent to . . . influence . . . the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1). As relevant here, the statute's plain language reaches "non-coercive attempts to tamper with witnesses," *United States v. Khatami*, 280 F.3d 907, 912 (9th Cir. 2002), including attempts "to persuade a witness to give false testimony," *United States v. Cruzado-Laureaho*, 404 F.3d 470, 487 (1st Cir. 2005). *See also United States v. Baldridge*, 559 F.3d 1126, 1142 (10th Cir.) ("All circuits that have considered the issue have" held "that a non-coercive

attempt to persuade a witness to lie to investigators constitutes a violation of § 1512(b)."), cert. denied, 556 US. 1226 (2009).

That straightforward construction of the statute—that Section 1512(b)(1) reaches non-coercive witness tampering—is borne out by the D.C. Circuit's decisions applying the statute. In *United States v. Morrison*, for example, the court affirmed the conviction of a defendant who had tried to corrupt a witness "by exhorting her to violate her legal duty to testify truthfully in court," an effort that the witness understood as a request that she "'perjure' herself." 98 F.3d 619, 630 (D.C. Cir. 1996). More recently, the defendant in *United States v. Gurr*, 471 F.3d 144 (DC. Cir. 2006), was charged with conspiracy and other offenses arising from his role in financial malfeasance at a credit union. After his arrest, similar to the instant case, the defendant and another credit-union employee attempted to persuade a witness to sign an affidavit falsely stating that the witness had authorized money to be transferred from her account. *Id*. at 154. The D.C. Circuit upheld Gurr's conviction under Section 1512(b)(1), rejecting his argument that the evidence was insufficient "because there was no evidence of cooperation between Gurr and the other credit union employee and no evidence that the witness was intimidated or threatened." *Id*. The court explained that Gur "was not charged with intimidating or threatening [the witness], and the jury could reasonably find that Gurr, with the assistance of [the other employee], attempted to 'corruptly persuade the witness in order to influence her. In support of its conclusion, the court in Gurr cited with approval several out-of-circuit decisions involving non-coercive efforts to influence witness testimony that are similar to Harbour's conduct here.

For example, *United States v. LaShay*, 417 F.3d 715 (7th Cir. 2005), involved a gas station employee's efforts to convince a co-worker to lie for him about a $2,000 check that the defendant had received from the gas station's owner. The court in LaShay *followed* decisions of the Second Circuit holding that "corrupt" persuasion occurs (1) "where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it," and (2) where a "defendant tries to persuade a

witness to give a false account that tracked the defendant's position." *Id.* at 718 (quoting, respectively, *United States v. Gabriel*, 125 F.3d 89, 102 (2d Cir. 1997), and *LaFontaine*, 210 F.3d at 132). Applying those principles to the facts before it, the Seventh Circuit affirmed the employee's Section 1512 conviction, concluding that "[a] jury could properly view LaShay's remarks [to his co-worker] as an unstated invitation to lie." *Id.* at 719.

In *LaFontaine*, one of the Second Circuit decisions discussed in *LaShay*, the district court revoked the bail of a defendant who had tampered with a witness after her indictment. 210 F.3d at 128-33. LaFontaine participated in a fraudulent-billing scheme in which her health clinic performed cosmetic surgeries for patients but billed them out as necessary procedures to obtain insurance payments. After her arrest in the scheme, LaFontaine was recorded on a jail call "reminding" a relative and former employee (Reyes) that Reyes' mother had undergone the procedures listed on the clinic's false bills. When she was released from custody, LaFontaine met with Reyes several times, including one occasion on which the defendant played for Reyes a recording of the jail call "reminder" about her mother's surgeries. The Second Circuit upheld the decision revoking LaFontaine's bail, concluding that her "attempt to review the 'facts' that would likely become part of Reyes['s] trial testimony . . . satisfies the requirements of the witness tampering statute and, consequently, of the bail revocation statute." *Id.* at 133. In so concluding, the court rejected the argument that the jail call did "not show any threats or intimidation of Reyes," explaining that Section 1512(b)(1) "plainly does not require "physical force' or 'threats' to support a tampering charge, corrupt influence is sufficient." *Id.*

Finally, the First Circuit's decision in *Cruzado-Laureaho*, 404 F.3d at 487, involved a corrupt mayor who extorted money and kickbacks from local businesses and, after learning of the investigation, pressured various individuals to conform their stories to his. The First Circuit characterized Cruzado's challenge to the sufficiency of the evidence as "simple: all he did was urge witnesses to tell the truth, which is not a crime." *Id.* But the court rejected that challenge. While "Cruzado did ask that [witnesses] tell the truth," the court explained, "his version of 'the truth' that he urged upon them was anything but the

truth." *Id.* The jury could therefore find that Cruzado was trying to persuade witnesses to testify to something other than their true beliefs, which was sufficient to support his Section 1512(b)(1) convictions. *Id.*

Under these decisions, the evidence recited above and in the attached MOIs establishes probable cause to believe that Harbour indirectly, through Bobrow, contacted Burg and Turasky violating his release conditions and, importantly, committed a federal offense by violating Section 1512(b)(1) by attempting to persuade Burg and persuading Turasky — through an intermediary—to support a materially false narrative in connection with the charges in the Superseding Indictment.

The string of communications with Burg and Turasky establishes both a violation of the condition of not having contact with the victims by clear and convincing evidence and of section 1512(b)(1) under the probable-cause standard. At the very least, Burg and Turasky's description of the entreaties by Bobrow on Harbour's behalf establish "a practical probability that the evidence supports a finding that the defendant has committed a crime while on bail." *LaFontaine*, 210 F.3d at 133.

It is no defense that Harbour conveyed messages to Burg and Turasky through his intermediary. Section 1512(b)(1)'s language is sufficiently expansive to reach acts designed "to influence testimony at a proceeding by corruptly persuading [one] person through another." *United States v. Norris*, 753 F. Supp. 2d 492, 505 (ED. Pa. 2010) (emphasis added); *see also United States v. Amato*, 86 F. App'x 447, 450 (2d Cir. 2004) (unpublished) (upholding § 1512 conviction where the defendant believed a third party was cooperating against him, the defendant was concerned the third party would testify against him at trial, and the "defendant directed intermediaries" to reach out to the third party and deliver a message). Even if § 1512 alone did not reach corrupt persuasion accomplished through intermediaries, 18 U.S.C. § 2, makes it a crime both to cause an unwitting third party to corruptly persuade a potential witness and to aid and abet a complicit party in committing corrupt persuasion. In short, it is obviously no defense if Bobrow was not aware that Harbour was prohibited from indirectly contacting the victims specifically

identified in his release conditions. The burden is on Harbour, not a third-party, to comply with his release conditions .[3]

In the final analysis, the United States' evidence establishes probable cause that Harbour violated the witness-tampering statute through his intermediary's outreaches to Burg and Turasky. The probable-cause standard is not an onerous one. As the Second Circuit explained, "probable cause under § 3148(b)(1)(A) requires only a practical probability that the evidence supports a finding that the defendant has committed a crime while on bail." *United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000) (internal quotation marks, citation, and ellipses omitted); *accord e.g.*, *United States v. Aron*, 904 F.2d 221, 224 (5th Cir. 1990) ("[T]o satisfy the probable cause requirement of § 3148(b)(1)(A), the facts available to the judicial officer must warrant a man of reasonable caution in the belief that the defendant has committed a crime while on bail") (internal quotation marks omitted). The United States believes that the evidence provided establishes Harbour's violations by clear and convincing evidence as well.

A finding of probable cause to believe that Harbour violated his conditions of release by initiating contact with victims through an intermediary and committing the federal crime of witness tampering triggers the statutory presumption that no condition or combination of conditions can assure that Harbour "will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3148(b), *see United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989) (explaining that "[o]nce the presumption arises, the ball is in the defendant's court, and it is incumbent on the defendant to come forward with some evidence to rebut the presumption") (internal citation omitted). And with respect to "danger to . . . the community," courts have recognized that a defendant's "attempts to influence the testimony of" potential witnesses "constitute the type of danger to the community that [can] support detention." *LaFontaine*, 210 F.3d at 135; *see, e.g.*, *United States v. Gilley*,

---

[3] The United States has no evidence that Harbour's counsel was aware that Bobrow was contacting the victims named in Harbour's release conditions.

771 F. Supp. 2d 1301, 1308 (MD. Ala. 2011) (explaining that a probable-cause finding that a defendant engaged in witness tampering goes to "the very integrity of [the court's] own processes and the fair administration of justice," and implicates "not only the singular concern of keeping a defendant from engaging in illegal conduct, but also the public concern of encouraging all witnesses and all potential witnesses to come forward and provide information helpful to the implementation of justice") (internal brackets and quotation marks omitted).

In *Gilley*, the fraud defendant argued that she posed no danger to the community because, unlike in other witness-tampering cases, she was "a white-collar criminal with no connection to the mob . . . or to narcotics," and the evidence showed at most that she "persistently 'fed' [a witness] false testimony with the expectation that [the witness] would adopt it." 210 F.3d at 134. The Second Circuit rejected that argument. It explained that "obstruction of justice ha[d] been a traditional ground for pretrial detention by the courts, even" before the Bail Reform Act of 1984 made "dangerousness" a basis for detention. *Id.* (stating that "pretrial trial detention [i]s even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness"). And although the court acknowledged that "witness tampering that is accomplished by means of violence may seem more egregious," it concluded that "the harm to the integrity of the trial is the same no matter which form the tampering takes." *Id.* at 135. The court therefore affirmed the district court's conclusion that the defendant "posed a danger to the community," *id.* at 134, and that revocation was warranted under Section 3148(b), *id.* at 135.

### B. Harbour Violated His Release Conditions

Harbour also violated by clear and convincing evidence the condition of release prohibiting any direct or indirect contact with named victims. *See* Section 3148(b)(1)(B). Both Turasky and Burg, independent of each other, informed investigating agents that Bobrow contacted them for the sole purpose of promising a return of funds in exchange for avowal that they are no longer a victim in advance of the upcoming trial. This is

corroborated by Davidson, who informed Baskin that Burg was unwilling to sign a false declaration. Bobrow then contact's Burg. Likewise, Turasky negotiated with Baskin about the details of the declaration only after he is contacted by Bobrow.

### C. The Court Should Issue an Arrest Warrant and Hold a Hearing to Revoke Harbour's Pretrial Release

Revoking Harbour's release is appropriate for many of the same reasons. Harbour's efforts to influence the testimony of potential witnesses threaten "the integrity of the trial," even though those efforts have not been violent in nature and the underlying prosecution involves "white-collar" offenses rather than "narcotics" or violent crimes. *See LaFontaine*, 210 F.3d at 134. Harbour's conduct is also strong evidence that Harbour is conscious of his guilt of the fraud allegations in the Superseding Indictment, which gives him a greater incentive to flee this Court and to pose a danger to the community, especially to the potential witnesses in the upcoming trial.

The existing order directing Harbour not to have direct or indirect contact with specific witnesses and victims is unambiguous. Harbour's obstructive conduct demonstrates that no restrictions short of detention will assure Harbour's compliance with the Court's orders or prevent him from committing further crimes. Harbour should not be released as he cannot be trusted to follow the Court's directives or monitored sufficiently to prevent him from contacting witnesses and victims or urging an intermediary to do so on his behalf. *United States v. Manafort*, 897 F.3d 340, 345 (D.C. Cir. 2018). In *Manafort*, the court found that defendant had attempted to tamper with witnesses "after a stay away order had been put in place." *Id*. It therefore found "the defendant could not be trusted to comply with the court's directives with respect to any conditions of release due to the difficulty of monitoring compliance" and ordered the defendant detained. *Id*. The circumstances are similar here, and the Court should detain Harbour for the same reasons.

### CONCLUSION

For the foregoing reasons, the United States moves the Court to issue an arrest warrant and conduct a hearing pursuant to 18 U.S.C. § 3148(b), and to revoke its current Order authorizing Harbour's release.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

*s/ Marjorie Dieckman*
U.S. Attorney's Office

- 13 –