**ADAMS & ASSOCIATES, PLC**
**Ashley D. Adams, 013732**
7502 E. Monterey Way
Scottsdale AZ 85251
Phone: (480) 219-1366
Facsimile: (480) 219-1451
aadams@azwhitecollarcrime.com
*Attorney for Defendant*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

United States of America,

    Plaintiff,

v.

David Allen Harbour

    Defendant.

Case No. CR-19-00898-PHX-DLR (DMF)

**RESPONSE TO UNITED STATES' *EX PARTE* PETITION TO REVOKE DEFENDANT HARBOUR'S RELEASE PENDING TRIAL AND TO ISSUE AN ARREST WARRANT**

## I. INTRODUCTION

The government has failed to establish probable cause that Mr. Harbour tampered with any witnesses or violated his release conditions. Unlike the cases the government relies on, Mr. Harbour had no direct contact with any witness. Instead, his attorneys, who were simply doing their job, contacted the witnesses. The witness declarations at issue, which are damaging to the government's case, were negotiated at arms-length. With the exception of

one witness, the declarations were negotiated *through the witnesses' attorneys*.[1] Mr. Harbour and his counsel also intended to hand over the declarations to the government prior to trial. Settlement negotiations, coupled with the exchange of documents, testimony, and drafts, do not constitute witness tampering, as a matter of law. No evidence exists showing that defense counsel coaxed witnesses to lie.

In addition, the government failed cite a single case holding that counsel's contact with a witness equates to "indirect" contact by a defendant, and therefore a release violation. Lawyers are not prohibited by the Federal Victims' Rights Act, nor any other law, from contacting victims. Indeed, had counsel not attempted to interview these witnesses, they would have subjected themselves to an ineffective assistance of counsel claim.

At all relevant times Mr. Baskin acted in good faith on behalf of Mr. Harbour, whom he has represented in this proceeding along with several other civil matters. Counsel has the right to speak to witnesses, ascertain their story, and ensure the accuracy of their statements produced by the government. No one forced the witnesses to engage in negotiations or to sign anything. As for Mr. Bobrow, no evidence exists that he acted at Mr. Harbour's direction, or asked anyone to lie. The Petition must be denied.

## II.   RELEVANT BACKGROUND

Mr. Harbour's release conditions prohibit direct or indirect contact with certain persons, which for purposes of this motion includes alleged victims Mr. Burg, Mr. Turasky,

---

[1] As set forth below, Mr. Baskin suggested that Mr. Turasky retain an attorney, but he declined.

ADAMS & ASSOCIATES, PLC
7502 e. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366
(480) 219-1366

Carol and Pat Hill, and Dan and Allison Willson.  [Docs. 17 and 154.]  The government claims Mr. Harbour has had repeated indirect contact with these witnesses from at least approximately July 2020 up to November 10, 2021.  [Doc. 267.]  Mr. Harbour had no direct contact with any of them.

### A. <u>Mark Burg</u>

Mr. Burg's $1 million investment is the subject of Count 2 of the indictment.  [Doc. 154 at 11.]  Mr. Burg also sued Mr. Harbour in California state court and obtained a default judgment of $1,002,253.61 on August 27, 2020.  [Ex. 1.]  In an attempt to resolve the pending issues, Mr. Baskin spoke with Mr. Burg's counsel, Keith Davidson, for the first time on October 26, 2021. [Ex. 2.]  The two agreed to meet in California on November 10, 2021, along with Mr. Burg, with the lawyers negotiating a settlement agreement and declaration during the interim. [Ex. 3.]  On November 1, 2021, to educate and provide transparency for the negotiations, Mr. Baskin emailed Mr. Davidson Mr. Burg's testimony from an SEC investigation of Mr. Harbour, the memoranda of Mr. Burg's interviews, and the underlying investment documents, which were to be exhibits to the proposed declaration.  [*See* Exs. 4 and 5.]

Mr. Baskin and Mr. Davidson had a one-hour Zoom meeting on November 2, 2021, to review and discuss the declaration.  [*See* Ex. 6.]  Mr. Davidson told Mr. Baskin that he would not continue the negotiations unless Mr. Baskin had $1 million in his trust account by November 5, 2021. [Ex. 7.]  The money did not arrive.  On November 10, 2021, Mr. Davidson emailed Mr. Baskin demanding a $1 million wire to his trust account before "entertain[ing]" further negotiations." [*Id*.]  Shortly before Mr. Davidson's email, Kenny

Bobrow, a friend of Mr. Harbour's, spoke with Mr. Burg, which apparently prompted Mr. Burg to contact the government. [Doc. 267 at Ex. F.] The government has not offered any evidence showing that Mr. Harbour told Mr. Bobrow to make the call.

The government's narrative stops with the Bobrow-Burg November 10, 2021, call, but settlement negotiations continued thereafter. On November 22, Mr. Baskin texted Mr. Davidson that $1 million had arrived in trust. [*See* Ex. 8.] On November 24, 2021, Mr. Davidson texted Mr. Baskin that he was travelling for the Thanksgiving holiday [*see id*.], and on December 7, 2021, Mr. Davidson and Mr. Baskin had another lengthy Zoom call. [*See* Ex. 9.] Mr. Davidson increased the settlement demand. Later that day Mr. Baskin texted Mr. Davidson that Mr. Harbour would pay $1.1 million, but that Mr. Baskin could not commit to a firm timeline for the arrival of the extra $100,000. [Ex. 8.] That same day, Mladen Milovic, an associate with Mr. Baskin's firm, sent a draft settlement agreement to Mr. Davidson, specifying $1.1 million as the settlement amount. [Ex. 10.] The draft also contemplated either party producing the agreement to the government. *Id.*

The next day, December 8, 2021, Mr. Davidson and Mr. Baskin exchanged texts confirming that Mr. Burg would accept $1 million. Mr. Baskin advised Mr. Davidson, "I have had nothing to do with this, but I have heard from someone [2] (not my client) that MB will take 1M…." [Ex. 8.] Mr. Davidson responded, "I too understand that the settlement amount is 1mm and not 1.1." [*Id.*] Mr. Davidson made no protest or suggestion that anything was improper about the parties conversations or negotiations. Instead, Mr. Davidson

---

[2] Mr. Harbour does not dispute that this reference is to Mr. Bobrow.

inquired, "when is the soonest we can close?," which would necessitate Mr. Baskin flying to California. [*Id*.]

Mr. Baskin requested that the parties meet the following Monday (December 13), explaining that Thursday the 9th was likely too soon, and that a family member was having surgery on Friday, December 10. [*Id*.] Mr. Davidson insisted on closing on the 9th, and gave Mr. Baskin wiring instructions. [Ex. 11.] Mr. Baskin went to the bank and post-dated wiring instructions for December 9, 2021, so he could send the wire at closing, which was to occur at Mr. Burg's accountant's office. [*See* Exs. 8, 12.] Although Mr. Baskin and Mr. Davidson had further communications on December 8, 2021 [*see* Exs. 8-9.], the closing never occurred, as Mr. Burg withdrew. By this time, Judge Rayes had already signed Mr. Harbour's arrest warrant, on December 3, 2021. Mr. Harbour was not arrested until December 13, 2021. It is unknown what involvement the government had in the Davidson/Baskin negotiations.

**B.  Richard Turasky**

Richard Turasky's $500,000 investment in an entity related to Mr. Harbour is the subject of Count 1 in the superseding indictment. [Doc. 154 at 11.] On March 7, 2016, Mr. Turasky initiated proceedings against Harbour and his entity, Oak Tree Management ("Oak Tree") in the United States District Court for the Northern District of Illinois, and obtained a judgment against Mr. Harbour on March 29, 2018, in the amount of $752,251.64 in principal and unpaid interest and $89,227.92 in attorneys' fees. [Ex. 13.] On June 18, 2018, Mr. Turasky registered the Judgment in the United States District Court for the District of Arizona. [*Id*.]

Sometime prior to September 2020, Mr. Turasky contacted several individuals to share his interest regarding investing in HHL Holdings, Inc. ("HHL"), a company which offered wellness and beverage products. [Ex. 14.] Mr. Turasky's settlement agreement establishes that Mr. Harbour had nothing to do with Mr. Bobrow contacting him:

> Bobrow … and Turasky have known each other for several years. Turasky contacted individuals to share his interest regarding investing in HHL and mentioned that HHL was open to other investors. One of the individuals Turasky contacted was Bob Courson . . . who is also a friend of Bobrow. Courson told Bobrow to contact Turasky about the opportunity to invest. Bobrow then contacted Turasky….

[*Id.*]

On September 5, 2020, Mr. Turasky emailed Mr. Bobrow with attachments regarding the HHL investment, which Mr. Bobrow then forwarded to Mr. Baskin. [Ex. 15.] The parties negotiated what ultimately became an agreement where Mr. Bobrow bought and satisfied Mr. Turasky's judgment against Mr. Harbour by investing $750,000 in HHL. [*See* Ex. 14.]

On October 19, 2020, Mr. Turasky called Mr. Baskin to set up a time to discuss the settlement agreement, and emailed Mr. Baskin a redlined version of the agreement after the call. [*See* Exs. 16-18.] Mr. Baskin recommended that Mr. Turasky have counsel participate in the negotiations. Mr. Turasky declined, advising that he wanted to keep things simple and not get his lawyers involved. [Ex. 19.] The next day, Mr. Turasky, Mr. Baskin and Mr. Milovic had a call to discuss revisions to the agreement. [*See* Ex. 17.] On October 22, 2020, Mr. Turasky emailed Mr. Baskin inquiring as to the turnaround on the revisions to the agreement because he did not know how much time he had left to fund the investment in

HHL. [Ex. 20.] Over the next few days Mr. Turasky, Mr. Milovic and Mr. Baskin exchanged further drafts. [Exs. 20-21.]

On October 27, 2020, Mr. Turasky emailed Mr. Baskin and Mr. Milovic that he would sign, execute, and return a clean copy of the agreement, as well as send wire instructions for Mr. Bobrow to send the funds for the HHL investment. [*Id.*] On October 27, 2020, Mr. Milovic sent an email to Turasky with the attached agreement signed by Mr. Bobrow and Mr. Harbour. [*Id.*] Later that day, Mr. Turasky countersigned the agreement and emailed it to Mr. Baskin, Mr. Milovic, and Mr. Bobrow. [*Id.*] Over the next couple of weeks, Mr. Turasky intermittently emailed Mr. Baskin and Mr. Milovic requesting an update on the timing of Mr. Bobrow's funding for the HHL investment. Sometime in mid- to late-November, Mr. Bobrow sent the funds to Mr. Turasky. [Ex. 22.]

Only in January 2021, did the parties begin negotiating a declaration. On January 5, 2021, Mr. Milovic sent a draft declaration to Mr. Turasky, and the parties exchanged multiple redlines over the next week. [Exs. 23-25.] On January 12, 2021, Mr. Turasky emailed an attached declaration that he stated would be the final version. [Exs. 26-27.] On January 13, 2021, Mr. Milovic emailed Mr. Turasky informing him that his final version was acceptable. [Ex. 28.] On January 15, 2021, Mr. Turasky emailed a copy of the executed declaration. [Ex. 29.]

Mr. Turasky's declaration specifies that he is not a victim, which Turasky confirmed to the government on November 11, 2021. [*See* Ex. 30; Doc. 267 at Ex. I.] Mr. Turasky should have told the government this several months prior, as to ensure transparency the settlement agreement contained a provision obligating him to tell the government within sixty

7

days of execution that he had resolved his dispute with Mr. Harbour and did not wish to be treated as a victim. [*See* Ex 14.]

### C. <u>Carol Hill</u>

In addition to being an investor, Carol Hill was a longtime assistant to Harbour. She invested $81,621.34 in NorthRock, and her spouse, Pat Hill, invested $500,000 in DNA Investments. [Doc. 154 at 10.] On March 29, 2021, Mr. Baskin texted Ms. Hill asking if she would talk to him, and the parties exchanged texts over the next week. [Ex. 31.] On April 5, Ms. Baskin texted:

> Ms. Hill, a quick follow-up.  I would still like to visit with you about resolution and recommend that you retain counsel and have them contact me.  You should have someone dedicated to protecting your interests advising you.  I hope we can find a way to sort this out.

[*Id.*]

Ms. Hill hired attorney Philip Hantel, and after some discussions and emails from April – June 2021, the communications stopped until October 2021. On October 19, 2021, Mr. Baskin told Mr. Hantel that he had funds in trust to repay Carol Hill's $83,000 investment and would have another $500,000 to settle Pat Hill's claims within 30 days of execution of a full release and settlement for Carol. [Exs. 32-33.] Mr. Baskin confirmed the following regarding Carol Hill's declaration:

> As I mentioned on the phone I will come see you to review the declaration and all supporting documents in-person and will also be happy to review it with you and Ms. Hill as we need to ensure that it is 100% accurate.

[Ex. 33.]

ADAMS & ASSOCIATES, PLC
7502 e. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366
(480) 219-1366

8

On October 25, after Mr. Hantel emailed that Ms. Hill was not willing to sign a document changing or adding to what she reported to law enforcement, Ms. Baskin responded in part:

> To be clear, we only want Ms. Hill to tell the truth in connection with a resolution of her claims against Mr. Harbour. Any declaration would be supported by objective, documentary evidence. Her conversations with the government did not cover the scope of her dealings with Mr. Harbour, which is why we need to broaden any declaration to cover some additional matters.

[Ex. 34.]

On November 1, 2021, Mr. Milovic and Mr. Hantel reviewed the draft declaration at Mr. Baskin's office. [Ex. 35.] On November 10, 2021, Mr. Hantel emailed Mr. Baskin that he had spoken with Ms. Hill and, amongst other things, was "largely unable to move the needle." [*See* Ex. 36.] In response, Mr. Baskin asked if he could meet with Ms. Hill and Mr. Hantel. [*Id.*] Mr. Hantel responded that he would inquire, and the discussions did not progress any further. *Id.* [3]

## III.   ARGUMENT

Mr. Harbour did nothing to warrant detention.  He neither committed a crime nor violated his release conditions.  His counsel, not Mr. Harbour, negotiated with Mr. Burg's and Ms. Hill's counsel and with Mr. Turasky, whose declaration came long after his

---

[3] Mr. Harbour negotiated settlement agreements and accompanying declarations with Alison Willson and Dan Willson [s*ee* Exhibits 37 - 40.], which are not addressed in this response because they are not at issue. Mr. Harbour will provide briefing and additional supporting documents upon request.

9

settlement agreement. The Burg and Hill settlements were to include contemporaneous truthful declarations, supported by documentary evidence. Mr. Bobrow's involvement does not implicate Mr. Harbour in any crime or violation of his release conditions, especially where no evidence exists that Mr. Bobrow attempted to coax anyone to lie, or had nefarious dealings with any witnesses.

### A. Mr. Harbour's civil settlements and his counsel's communications with witnesses and their attorneys do not constitute witness tampering.

The gravamen of the government's Petition is the allegation that Mr. Harbour violated 18 U.S.C. § 1512(b)(1) by attempting to tamper with Mr. Burg and tampering with Mr. Turasky.  Section 1512(b)(1) prohibits "knowingly . . . or corruptly persuad[ing]" or "attempt[ing] to" corruptly persuade another person "with intent to . . . influence . . . the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1). The government claims that Mr. Harbour violated the statute using "non-coercive attempts to tamper with witnesses," including attempts "to persuade a witness to give false testimony." [Doc. 267 at 6.] To revoke his release conditions, the government must show probable cause that Mr. Harbour committed witness tampering. *See* 18 U.S.C. § 3148(b)(1)(A).

Here, there is no cause, let alone, probable cause, that Mr. Harbour committed a crime. The government devotes five full pages of the Petition to a recitation of largely inapplicable case law, all of which involve a defendant's **direct** attempt to corruptly coax witnesses to lie. *See, e.g. United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996) (upheld conviction of defendant who told witness that if anyone were to ask, she should say that defendant had been living with her for a year and that she babysat his kids, both of which the witness

ADAMS & ASSOCIATES, PLC
7502 e. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366
(480) 219-1366

acknowledged were lies); *United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006) (upheld conviction of defendant charged with crimes related to financial malfeasance at a credit union where defendant attempted to persuade a witness to sign a false affidavit stating the witness had authorized money to be transferred from her account); *United States v. LaShay*, 417 F.3d 715 (7th Cir. 2005) (affirming conviction of employee who received a $2,000 check from his employer and attempted to convince co-worker to lie about his memory of what the check was for, if asked); *United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000) (upholding district court decision to revoke bail of defendant in a fraudulent health clinic billing case who, in jailhouse calls, "reminded" a relative and former employee that the employee's mother had undergone procedures listed on the clinic's false bills and reminded the employee several times thereafter, constituting intimidating and threatening behavior). Importantly, none of the cases involve defense attorneys contacting witnesses and their counsel, as is the case here.

Mr. Baskin – not Mr. Harbour – initiated contact with witnesses and their counsel to negotiate settlements. The Federal Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, does not prevent defense counsel from directly contacting victims. In fact, Congress enacted the CVRA's enumerated rights without any reference to preventing victims from speaking with the parties. Mr. Baskin's conversations with witnesses and their counsel were entirely appropriate and even expected.[4] If Mr. Baskin had not contacted the witnesses and/or their

---

[4] Victim Rights, The United States Attorney's Office, Eastern District of California, https://www.justice.gov/usao-edca/victim-witness-assistance/rights#faq (stating that it is not

attorneys, he may have subjected himself to an ineffective assistance of counsel claim and possible malpractice. *See Halton v. Hesson*, 803 F.Supp. 1272, 1276 (1992) (granting petitioner's ineffective assistance of counsel claim where counsel failed to interview or even attempt to interview any of the victims before trial).

While the CVRA does not preclude the defense team from directly contacting any alleged victim, it does require victims to be treated "with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(8). In the same manner, defense counsel are bound by standards of professional conduct, which include respecting the rights of others and eschewing "means that have no substantial purpose other than to embarrass, delay, or burden a third person." Ann. Model Rules of Prof'l Conduct § 4.4 (2015); *see also* Ariz. Sup. Ct. R. 42, E.R. 4.4 (tracking the language of the ABA's Model Rules of Professional Conduct § 4.4); LRCiv 83.2(e) (applying the Arizona Supreme Court Rules of Professional Conduct to attorneys authorized to practice in the District of Arizona).

Mr. Baskin encouraged the witnesses to retain counsel to protect their interests in the settlement negotiations. [*See* Ex. 31.] He requested, and each witness agreed, to provide a truthful declaration describing their relationship with Mr. Harbour. Mr. Baskin also provided contemporaneous documentary support to ensure the declarations' accuracy. [*See, e.g.,* Exs. 4-5.] Mr. Baskin did not ask the witnesses to lie; he wanted them to review documents and provide declarations that were truthful *and* supported by corresponding documents. [*See,*

---

unusual or inappropriate for the defense lawyer or an investigator for the defense to contact a victim for an interview).

12

*e.g.,* Ex. 34.] Last, Mr. Baskin drafted the settlement agreements to anticipate or require production to the government [*See* Exs. 10 and 14.]

Just because the declarations damage the government's case does not transform their negotiations or end-product into witness tampering. *See United States v. Howard*, 793 F.3d 1113, 1114 (9th Cir. 2015) (Kozinski, J., concurring) (internal citation omitted) ("Defendant, no less than the government, has a legitimate interest in discussing the case with the witnesses. . . . When the government does this, we call it witness prep; there is no justification for calling it witness tampering when the defendant does precisely the same. . . . Both the defendant and the government can be guilty of [witness tampering or intimidation]. But I see no justification for precluding only one side from talking to the witnesses. Defendants should not be presumed to engage in witness tampering or intimidation . . . .").

### i. Mark Burg

The government claims Mr. Harbour attempted to tamper with Mr. Burg's testimony by entreating Mr. Bobrow to contact Mr. Burg and by attempting to persuade Mr. Burg to support a materially false narrative in connection with the charges in the SSI. [Doc. 267 at 9.] The government's evidence fails to support its contention that Harbour attempted to tamper with Mr. Burg's testimony. First, the government has not provided any evidence that Mr. Harbour expressly instructed Mr. Bobrow to contact Mr. Burg. Mr. Bobrow's communication with Mr. Burg focused on the availability of the $1 million earmarked for settlement. [Doc. 267 at Ex. F.] Mr. Burg's MOI contains no mention of Mr. Bobrow suggesting to Mr. Burg what to testify to or anything else regarding the facts of the government's case against Mr. Harbour. [*Id.*] The government's "corroboration" by Mr.

Davidson that he informed Mr. Baskin that Mr. Burg was unwilling to sign a false declaration [Doc. 267 at 12] does not mean that anyone asked him to, and all of the objective evidence is to the contrary. Defendant has produced numerous exhibits which show exactly what transpired. The government also offers no explanation of why if Mr. Harbour sought a false declaration, the parties continued negotiations well into December, and after Judge Reyes signed the arrest warrant.

The government mischaracterizes its evidence, stating that "[w]hen no money for his client was forthcoming, Davidson advised Baskin by e-mail to cease contact with him on behalf of Burg." [Doc. 267 at Ex. G.] What the government did not tell the Court is that Mr. Davidson demanded, in the same email, that Mr. Baskin wire $1 million before continuing settlement negotiations. [*Id.*] When Mr. Baskin texted Mr. Davidson that the $1 million was in trust, Mr. Davidson re-engaged almost immediately. [Ex. 8.] Mr. Burg's statements that "in reality he did not want any of HARBOUR's friends or associates to contact him and that he was willing to entertain the phone calls to obtain as much information as possible to provide to the government" and that he "wants all contact to stop" are at odds with his willingness to resume settlement discussions when the $1 million became available. [Doc. 267 at Ex. F; Ex. 8.]

Last, Mr. Burg's November 10, 2021, interview contains no mention of Mr. Bobrow discussing the contents of the declaration or Mr. Burg's planned testimony. Instead, Mr. Bobrow told Mr. Burg the $1 million would be forthcoming, which is exactly what happened. [Doc. 267 at Ex. F.] The government does not – and cannot – explain how this conversation

14

constitutes tampering. No one was, corruptly, or otherwise, asking anyone to lie. Mr. Harbour did not attempt to tamper with Mr. Burg's testimony.

### ii.  Richard Turasky

Mr. Turasky's settlement agreement contradicts the government's theory that Mr. Harbour directed Mr. Bobrow to contact him. Instead, Mr. Bobrow contacted his long-time friend Mr. Turasky at the behest of a third party. [Ex. 14.] Mr. Bobrow likely viewed this as an opportunity to help Mr. Harbour by purchasing the Judgment Mr. Turasky had against Mr. Harbour. [*Id*.] The government fails to mention these very important facts. Mr. Turasky's civil settlement agreement and his declaration, negotiated at arms-length, do not, in any manner, amount to a "materially false narrative."

The government claims in its Petition that Mr. Turasky informed investigating agents that Mr. Bobrow contacted him for the sole purpose of promising a return of funds in exchange for an avowal that he was no longer a victim in advance of Mr. Harbour's upcoming trial. [Doc. 267 at 11.] Mr. Turasky's MOI does not support this statement, as he received the investment funds from Mr. Bobrow almost two months prior to the execution of his declaration. [*See* Exs. 14, 30.] Mr. Turasky does not know whether Mr. Bobrow contacted him at Mr. Harbour's request or if Mr. Bobrow did so voluntarily. [Doc. 267 at Ex. I.] This can hardly be considered probable cause. Regardless, Mr. Bobrow was not trying to coax anyone to lie or to do anything improper.

### iii.  Carol Hill

Last, the government offers no evidence as to how Mr. Harbour improperly communicated with Ms. Hill or that he attempted to tamper with her testimony through Mr.

15

Bobrow or anyone else. Ms. Hill's inclusion in the Petition is superfluous. Mr. Harbour's counsel properly communicated with Ms. Hill and her counsel regarding a settlement and declaration. Such communications and negotiations are allowed, expected, and far from tampering. *See supra* Section II.A.

### B. **Mr. Harbour did not violate his release conditions.**

The government argues that Mr. Harbour violated his conditions of release by committing a new federal crime – witness tampering under 18 U.S.C. § 1512(b)(1) – and by indirectly contacting his alleged victims. [Doc. 267 at 6.] As discussed at length above, no probable cause exists that Mr. Harbour tampered or attempted to tamper with any witnesses. *See supra* Section II.A.

The government must prove by *clear and convincing evidence* that Mr. Harbour violated his conditions of release by indirectly contacting his alleged victims. See 18 U.S.C. § 3148(b)(1)(B). The evidence as alleged by the government and debunked here is circumstantial at best and does not come close to satisfying 18 U.S.C. § 3148(b)(1)(B)'s clear and convincing standard.

### C. **At worst, Harbour's release conditions are ambiguous as to his restriction on indirect contact with alleged victims.**

The Court has not issued a no-contact order barring Mr. Harbour's counsel from contacting the alleged victims in this matter. If the government believes that "indirect contact" in Mr. Harbour's release conditions includes contact by his counsel – which they do not – and the Court agrees, Mr. Harbour asks the Court to clarify the release conditions.

16

## IV.  CONCLUSION

Mr. Harbour and his counsel did no wrong.  They sought settlements and truthful declarations.  This is not tampering.  The government has not met its burden of proving by clear and convincing evidence that Mr. Harbour indirectly, through Mr. Bobrow, communicated with alleged victims.  The Court should deny the Petition and release Mr. Harbour.  Should the Court deem it necessary Mr. Harbour asks that it clarify the meaning of "indirect" in his release conditions.

RESPECTFULLY SUBMITTED this 20th day of December, 2021.

ADAMS & ASSOCIATES, PLC


By: */s/ Ashley Adams*
    *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20th, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing.

Kevin M. Rapp
Coleen Schoch
U.S. Attorney's Office
40 N. Central Ave., Suite 1800
Phoenix, AZ  85004
*Attorneys for Plaintiff*


 /s/ Kathy Taylor