1  **ASHLEY D. ADAMS, PLC**
   **Ashley D. Adams, 013732**
2  7502 E. Monterey Way
   Scottsdale AZ 85251
3  Phone:          (480) 219-1366
   Facsimile:      (480) 219-1451
4  aadams@azwhitecollarcrime.com
   *Attorney for Defendant*

5

6              IN THE UNITED STATES DISTRICT COURT

7                 FOR THE DISTRICT OF ARIZONA

8  United States of America,              Case No.  CR-19-00898-PHX-DLR (DMF)

9                          Plaintiff,
                                          **DEFENDANT'S SUPPLEMENTAL**
10 vs.                                    **MEMORANDUM FOR**
                                          **DEFENDANT'S RELEASE**
11 David Allen Harbour,                   **REVOCATION HEARING**

12                         Defendant.     **(Before the Honorable Deborah M.**
                                          **Fine on January 18, 2022, at 2:30**
13                                        **p.m.)**

14

15          Defendant, David Allen Harbour, by and through undersigned counsel, hereby files

16 his Supplemental Memorandum in Response to the Government's Petition to Revoke his

17 Release Pending Trial.  This Supplemental Response is filed in advanced of the second day

18 of hearing, before the Honorable Deborah Fine on January 18, 2022, at 2:30 p.m., and is

19 intended to address those matters raised in the Government's Supplemental Petition to

20

21

22

*Sidebar:* ADAMS & ASSOCIATES, PLC / 7502 E. Monterey Way / Scottsdale, AZ 85251 / (480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

Revoke (DKT. 290), and the Exhibits thereto.  Defendant also incorporates herein his original Response to the Government's Petition. (DKT. 273).

**I.** **The government cannot show by clear and convincing evidence that Mr. Harbour indirectly contacted Mark Burg by its reliance on conflicting hearsay statements by Kenny Bobrow.**

Attached to the government's Supplemental Petition were two conflicting summaries of Kenny Bobrow interviews.  The first, Government's Exhibit 12, was FBI Agent Troy Cofer's 302 of Bobrow's interview after agents unexpectedly appeared at Bobrow residence on December 13, 2021.  Cofer wrote the following in his report:  **"BOBROW contacted Mark Burg in the last month via telephone at the request of ALAN BASKIN, defense attorney for DAVID HARBOUR."** Government Exhibit (hereinafter "GOV EX" 12.) This was the first time the FBI ever contacted Mr. Bobrow.  He was not represented by counsel during the December 13, 2021, interview.  After Mr. Bobrow told agents that Mr. Baskin requested him to call Burg, agents handed Mr. Bobrow a "target letter" telling him he was being investigated for witness tampering. (Target Letter, GOV EX 22.)

The other summary of Mr. Bobrow's interview, dated December 20, 2021, GOV EX 14, was authored by IRS agent Brandon Lopez.  The December 20th, 2021, interview of Mr. Bobrow took place at the law firm of Ryan Rapp & Underwood.  Mr. Bobrow, by this time, had retained Andrew Pacheco as criminal counsel.  Mr. Bobrow signed a free talk letter with the government before the interview, on December 19, 2021. (Defendant's Exhibit

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

(hereinafter "DF EX" 46.) [1]  During this interview, according to the summary, Mr. Bobrow claimed that *he* (Mr. Bobrow) had asked Mr. Harbour if *he* (Mr. Bobrow) should call Mark Burg.  Mr. Bobrow claims that Mr. Harbour replied "with a yes."  (GOV EX 12, ¶18.) Mr. Bobrow also stated, however, that he had been having discussions with Mr. Baskin regarding the proposed payment to Burg and other matters. [2]  **There does not appear to be any dispute that Mr. Baskin knew that Mr. Bobrow had plans to contact Burg.**  There further does not appear to be any evidence that Mr. Baskin ever told Mr. Bobrow *not* to call Mr. Burg. [3]

The statements relied upon by the government are hearsay, conflicting, and thus unreliable.  It is noteworthy that before Bobrow retained counsel, and was provided with the limited use immunity inherent in a "free talk" letter, Mr. Bobrow was completely clear as to who instructed him to call Burg--Mr. Baskin who was also Mr. Bobrow's lawyer, both then and for many years earlier.  Bobrow provided a very simple answer to a very straightforward

---

[1] These numbered Exhibits are those that have been provided to the Court in a notebook, and to the government in an electronic format via e mail.

[2] Mr. Baskin has also been Kenny Bobrow's attorney for many years as well.

[3]  Mr. Bobrow  told Mark Burg during their taped phone conversation that he was directly communicating with Mr. Baskin about the funds that were being held in Mr. Baskin's trust account:

[KB] I think he's gonna try and pay her back. I- I- I'm not one hundred percent sure on all that. Uhm- I'm only telling you what I know that uhm his lawyer told me that uhm, he has the funds. And it's in his accoun- in his [OV]
[MB] Alright [OV]
[KB] It's in his- Trust, like a trust account. And it's earmarked for you. So I can't see his lawyer [OV]
(Transcript of Bobrow/Burg call, GOV EX 9, p. 5.)

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

question which did not comport with the government's preferred version of the events. Mr. Bobrow was then handed a target letter.

The fact that, according to Vicki Bobrow, Bobrow's wife, Mr. Baskin twice went through the mantra of "repeat after me, I did not tell you to call Mr. Burg," can be understood two ways. Either it was true that Mr. Baskin did not tell Mr. Bobrow to call Mr. Burg or, Mr. Baskin was attempting to distance himself from the government's accusations of witness tampering.

Within days after obtaining counsel, **Mr. Bobrow changed his story.** Mr. Bobrow's wife was interviewed as well and her interview summary was only recently provided to the defense. It is noteworthy in several respects. First, there could be no better witness as to the infirmity of her husband's 83-year-old memory than his wife. She confirmed that he "is elderly and sometimes gets nervous and confused." Second, as will be discussed below in more detail, Ms. Bobrow was absolutely certain that on "either December 2, 2021, or December 7, 2021, "Harbour came to the Bobrow residence." She was not in least bit uncertain as to whether it might have been some other day in December. Therefore, the indisputable fact that it could not have been December 2nd or 7th means nothing less than that Ms. Bobrow simply invented the events she reported.

Given the extreme number of important discrepancies, relying upon Mr. Bobrow's FBI interviews to sustain even a pedestrian burden of "preponderance of evidence" should not be sustained. Here, where the government's burden is "clear and convincing evidence," it would be, respectfully, a miscarriage of justice to imprison anyone based upon his statements. The government essentially concedes that, beyond Mr. Bobrow, it has nothing

upon which to base the accusation that Mr. Harbour and not Mr. Baskin instructed or asked Mr. Bobrow to contact Mr. Burg.

 While one reasonable conclusion is that Mr. Bobrow does not remember whether Mr. Harbour or Mr. Baskin told him to call Mr. Burg, a third possibility is that Mr. Bobrow made the decision to call Mr. Burg on his own.[4]  It is perfectly obvious from the numerous texts and e-mails between Mr. Baskin and Mr. Burg's lawyer that the effort to settle with Mr. Burg and obtain from him the *actual* facts was completely controlled by Mr. Baskin.[5]

---

[4] Mr. Bobrow and Mr. Harbour met Mark Burg together in Idaho in the summer of 2013. He admitted during his phone call with Mr. Burg that he **already had** Mr. Burg's phone number in his phone.  (See Transcript of Bobrow/Burg call, Government's Exhibit 9, p. 11.) They also recounted in the same telephone call them having met each other.

[5] Mr. Baskin has been a child of this Court since his first appearance in 2000, according to PACER.  Does anyone seriously believe that he would have knowingly engaged in witness tampering or obstruction of justice?  Whatever was happening here was done with a purity of underlying motivation *because* it was being directed by Mr. Baskin. And, along those lines, let us postulate that Mr. Harbour suggested to Mr. Baskin that his other client, Mr. Bobrow, could reach out to Mark Burg who knew Mr. Bobrow at least as well as did Mr. Harbour.  Surely, Mr. Baskin did not need Mr. Harbour to introduce him to Mr. Bobrow; he was Mr. Baskin's client.  So as between Mr. Harbour reaching out to Mr. Bobrow to ask Mr. Bobrow to call Mr. Burg – which would violate the conditions of release – and Mr. Baskin asking his other client, Mr. Bobrow to reach out to Mr. Burg - conduct completely legitimate under Federal procedure, as the United States does not have a Victims Bill of Rights akin to Arizona's – in any sane universe, which is the more likely occurrence?  Mr. Baskin knew, better than did Mr. Harbour that Mr. Harbour could not use his other client, Mr. Bobrow, to contact Mr. Burg.  But, since the government does not control the victim witnesses, as does the State of Arizona, Mr. Baskin absolutely could do so.

This is not to say that Mr. Baskin exercised good judgment in directing this effort. The problem inherent in any defense contact with a government witness, especially a witness the government has claimed to be a victim, is that all it takes for the lawyer to be in serious trouble is for the witness to say, "he tried to convince me to lie."

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

Mr. Bobrow also told agents that Harbour was present for his calls with Burg.  Yet, Mr. Bobrow never provided dates, times, or places to the agents.  Agents failed to question him about that Santa Clarita Chapter 11 proceeding which, in contrast to this issue, was a subject that Messrs. Bobrow and Harbour discussed daily.  Mr. Harbour denies these allegations, and claims that he in fact, told Mr. Bobrow *to not call*  Mr. Burg.  Mr. Bobrow elected to call Mr. Burg on his own, and certainly with the blessing and/or knowledge of Mr. Baskin.

### A.    <u>Bart Shea also confirmed that  Mr. Bobrow's memory is poor.</u>

Bart Shea reported to undersigned that he has known Kenny Bobrow for 40 years, and that Mr. Bobrow commonly forgets things.  (*See* Declaration of Ashley D. Adams, summarizing interviews with Bart Shea, attached as Exhibit 1, ¶ 30.) [6]  Mr. Shea noted that while Mr. Bobrow still has very sage advice and extensive experience when it comes to real estate, his memory is not what it used to be. *Id.*  Sometimes, Mr. Shea has to spend substantial time going over details with Mr. Bobrow to make sure that he understands what is going on. *Id.*  Mr. Shea said that he always tells Mr. Bobrow to write things down because if he does

---

[6] Defendant subpoenaed Bart Shea to appear for the revocation hearing on December 29, 2021.  At that time, Judge Fine advised Mr. Shea that he should retain counsel, and that she believes that he has exposure to be charged with mortgage fraud.  Mr. Shea has since retained counsel, Pat Gitre, Esq., who advised Mr. Shea to exercise his Fifth Amendment Rights.  As such, Defendant has filed a Notice of Release of Subpoena for Mr. Shea. Undersigned counsel has submitted, instead, a declaration, summarizing her three interviews with him, since the Court has elected to consider hearsay statements in this revocation hearing.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

not, he will forget, or mix things up. *Id.* at ¶ 31.  Ms. Bobrows corroborates Ms. Adams Declaration as set forth above.

Mr. Harbour reported to undersigned that Mr. Bobrow also had back surgery in late November, 2021.  He was taking medication for his pain, including medical marijuana, which caused him to be "out of it."

### B.   Mr. Bobrow has made numerous conflicting statements to agents.

The number of other misstatements made by Mr. Bobrow that are contradicted by documents, demonstrating further his serious memory issues:

- Mr. Bobrow told agents that he was approached by Mr. Harbour to invest in Next Frontier ("HHL"), one of Rich Turasky's companies.  (GOV EX 18, ¶ 3.)  However, more than a year before the latest government attempt to revoke Mr. Harbour's release,  Mr. Bobrow signed a Loan and Assignment agreement which recited  something completely different than his present version of how he was introduced to the investment:

> Bobrow … and Turasky have known each other for several years. Turasky  contacted individuals to share his interest regarding investing in HHL and mentioned that HHL was open to other investors. One of the individuals Turasky contacted was Bob Courson . . . who is also a friend of Bobrow. Courson told Bobrow to contact Turasky about the opportunity to invest. Bobrow then contacted Turasky….

(Loan Assignment and Agreement dated 10-26-20, DF EX 14, p. 2, ¶ I.)

Mr. Bobrow's initials appear throughout this document, as does his signature at the end of the Agreement.  *Id.*

- Mr. Bobrow told agents that he invested $1 million dollars into the Santa Clarita project.  (December 20, 2021, Summary of Bobrow interview, GOV EX 18, ¶ 23.)

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

However, Mr. Bobrow filed a Notice of Claim in the Santa Clarita Bankruptcy matter claiming he was owed a debt in the amount of $3,063,763.71.  Attached to the Claim are two promissory notes, indicating that Mr. Bobrow invested approximately $2 million, not $1 million into this project.  The remaining portion of the claim appears to be interest owed on two separate notes.   (*See* Notice of Claim filed in Case 2:20-bk-12402-MCW dated 02 09 21 attached as EX 2 hereto.) Regardless, Mr. Bobrow's statements do not match publicly filed documents **which he signed.** [7]

- Mr. Bobrow told agents on December 20, 2021, that he could not recall if he already had Mark Burg's phone number. (GOV EX 18, ¶ 18.)  However, during Bobrow's call with Mark Burg on December 3, 2021, less than two weeks prior, Bobrow told Burg that he already had Burg's number in his phone. (*See* Transcript of Burg and Bobrow call, GOV EX 9, p. 11.)  Ms. Bobrow agreed.  Ms. Bobrow also noted that when she supposedly witnessed Mr. Bobrow calling Mr. Burg, Mr. Harbour had already left their residence, contradicting what her husband told agents.

- Mr. Bobrow told agents that he asked Mr. Harbour to hire a forensic accountant to review Joel Tucker's /KSQ Management's operations. (GOV EX 18, ¶ 7.) Mr. Bobrow is confused.  Incorrect and importantly so.  Pratt Kieffer & Company, out of Overland Park, Kansas, was hired to conduct an audit of companies to which *Mr. Bobrow*

---

[7] As Senator Roman Hruska of Nebraska once famously said, "a billion here, a billon there, and pretty soon you're talking about real money."  The same can be said about lesser but still enormous sums at the individual level.  Anyone ought to remember the difference between investing one million versus investing two million dollars.

had extended loans, including Cerrillos Holding Group, LLC, and Canyon Road Holdings, LLC.  (*See* Letter from Pratt Kieffer & Company dated March 6, 2012 re: Net Finance, LLC, attached hereto as Exhibit 3.)  This forensic audit had nothing to do with Joel Tucker, or any of his entities.

- Mr. Bobrow told agents that with respect to Mr. Harbour's dealings with Joel Tucker/KSQ, Mr. Bobrow was not aware of *any* Finders' Fees being paid.  (GOV EX 18, ¶ 9.)    However, Defendant is in possession of 10 separate agreements related to Finders' Fees *signed by Mr. Bobrow,* and David Harbour on behalf of DNA Investments. DNA Investments raised money for KSQ.  If Mr. Bobrow raised money for KSQ, Mr. Bobrow would receive a percentage, per the agreements he signed.  (*See* various Finders' Fees Agreements included in Exhibit 4 hereto.)

- Mr. Bobrow told agents that Mr. Harbour was present during at least one of his calls with Mr. Burg.  Mr. Bobrow does not identify, however, the date or times of any of these calls, as set forth above. Mr. Harbour asserts that he was not with Mr. Bobrow at any time while he was talking to Burg.  This takes us to ¶13 of Vicki Bobrow's interview summary.  In it she says that on either December 2, 2021 *or* December 7, 2021, Mr. Harbour came to the Bobrow residence and badgered Mr. Bobrow to call Mark Burg. Aside from the inherent preposterousness of that claim in view of the fact that Mr. Baskin had been in contact with Mr. Burg's lawyer frequently about the issue,  Mr. Harbour is completely alibied for the two dates provided by Ms. Bobrow.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

- Mr. Harbour was out of town December 2-5, 2021, on business to California, followed by a weekend in Disneyland with this family. (*See* Disneyland itinerary attached hereto as EX 6.)

- Mr. Harbour was with Mr. Shea, and Melvin Dunsworth all day on December 7, 2021, and Mr. Dunsworth stayed at the Harbour's house that evening. (*See* Declaration of Melvin Dunsworth attached as EX 7 hereto.)  Mr. Dunsworth had come into town to provide consulting services to Shea Connelly regarding an elderly living project Shea Connelly was developing.  *Id.* The only time Mr. Harbour was at Mr. Bobrow's house for phone calls during this period is when Mr. Bobrow was talking to Tamalyn Lewis of Engelman Berger, Mr. Bobrow's bankruptcy attorney in the Santa Clarita Chapter 11.

- Mr. Bobrow testified that he never was solicited to invest, nor did he invest in Volente Healthcare.  (GOV EX 18, ¶ 12.)    However, a promissory note in the amount of $145,000.00 was drafted on or about October 6, 2017, by and between Mr. Bobrow as the lender, and Volente Healthcare as the borrower.  (*See* Promissory note attached as EX 8.)  While Mr. Harbour does not have a signed copy of the note, he has *a* copy [8]

- Five different times Bobrow told agents that Mr. Harbour "borrowed" the money that was going to be used for the settlement with Mr. Burg, and was used to settle

---

[8] Since the note has been paid, the explanation for why a signed version in not available is that, traditionally, when a note is paid the original is returned to the borrower.

with others.  These statements, however, are contradicted by the "80-page loan document" that Mr. Bobrow showed agents during his interview, and discussions he has had many times with Bart Shea, David Harbour, and others.  (*See* GOV EX 18, ¶ 12.)  Mr. Harbour did not borrow funds from anyone.

- Instead, EX 9-12 attached hereto show precisely what happened.  On August 13, 2021, Deel Investments, LP, a Missouri limited partnership extended an $8 Million Line of credit ("LOC") to three of Bart Shea's companies, including Shea Connelly Development, LLC, of which Mr. Harbour is a W-2 employee (Vice President of Development). *See* EX 9 attached hereto.

- According to ¶1.3 of the Loan Agreement, the purpose of the LOC was for working capital and "to make advances and loans to employees." *Id.*

- The $8 Million promissory note ("Note") has the identical provision regarding use of funds.  *See* EX 10, ¶5 attached hereto.

- Pursuant to the Loan Agreement, on October 5, 2021, a $1 Million Draw request was signed by Mr. Shea.  The use of funds were $500,000 as an "advance" to Mr. Harbour and $500,000 for working capital. *See* EX 11 attached hereto.

- There was another draw request for $4 Million dated October 20, 2021 which was approved by Deel Investments, LP for $1 Million.  Its purpose was to provide proceeds

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

to Mr. Harbour and for working capital. This $1 Million was the proceeds earmarked, first, for the stillborn Burg Settlement.[9]  *See* EX 12 attached hereto.

- Proof of that is circumstantial but, as will be seen, it is irrefutable. A series of emails between Stephen Dichter[10] and others dated January 12, 2022, lays this out with precision. The $1 Million was advanced by Deel to Shea Connelly. Shea Connelly, in turn, deposited the $1 Million into Mr. Baskin's Trust Account as an advance on salary to Mr. Harbour.  In seeking to trace the remaining funds which would be needed in part to pay Ms. Adams' fees and those of Mr. Dichter who is presently assisting Ms. Adams in preparing for this hearing but not as counsel of record, Mr. Dichter sought to have the remaining funds still in Mr. Baskins' trust account transferred to the Christian Dichter & Sluga, P.C. trust account and the question was whose assent was needed. (*See* series of e mails by and between Mr. Dichter, Mr. Baskin, and Mr. Deel, included in EX 13 attached hereto.)

---

[9] One of the government's main points is "where did the $1 Million come from," the government speculates that its existence as a source of funds for the Burg settlement *must* mean that a loan was made to Mr. Harbour, which ostensibly would constitute a violation of release conditions unless approved by PTS. The government's speculation is easily resolved.  This is an example of how the government has conducted "half" of the investigation in this case, and stops its inquiry when it hears the answer it wants to hear.

[10] Mr. Dichter has been engaged to assist the undersigned in preparing for the hearing but, of course, with a close trial date set, cannot appear of record unless and until the case is continued and fee arrangements for first-chairing a *continued* trial were to be completed.

- Mr. Baskin first thought that Mr. Deel needed to assent.[11]  So, Mr. Deel was contacted. Mr. Deel said that he loaned the money to "Shea-Connelly Development, LLC. Bart directed the funds to be placed in Alan Baskin's trust account.  Assuming that Bart is OK with it, I am okay with the funds from Alan's trust account to be transferred to you." *See* EX 13.

- Next, Mr. Baskin wanted Mr. Shea to assent and, although counsel believed that Mr. Harbour had authority to authorize the transfer, counsel waited for his approval. In an email to Alan Baskin, Bart Shea authorized release of the remaining $75,000 in his trust account to Mr. Dichter's trust account.  *See* EX 13.

- For his own part, Ms. Baskin indicated that, as a physical matter, he had received the funds directly from Mr. Deel but that, when the Burg settlement did not take place, he sent $800,000 back to Shea-Connelly Development.  Since Bart Shea had agreed to advance the funds to Mr. Harbour for the specific purpose of funding the prospective settlement, and were not needed for that purpose, the borrower, Shea-Connelly was refunded the money and thus $800,000 less was advanced to Mr. Harbour. Earlier, Mr. Baskin indicated that Mr. Shea had directed that $100,000 be paid to Mr. Baskin, $25,000 be paid to Ms. Adams, and that the remaining $75,000 remain in Mr. Baskin's trust account. *See* EX 13.

---

[11] Since the funds were an advance to Mr. Harbour by Shea-Connelly Development, that is, were titled to Mr. Harbour, we did not agree; Mr. Harbour had directed that the funds be transferred but there was little point in arguing.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

- Mr. Harbour will receive development fees when some of the major projects close, including the Santa Clarita project valued at over $325 million dollars.  Standing alone, this justifies the advances, though nothing need do so.

- Mr. Bobrow told agents that he was to get paid back for his loan on the Georgia Property when the Georgia Property closes.  (*See* GOV EX 18, ¶ 29.) Bobrow's promissory note itself provided that it is secured by Santa Clarita, California and the KOBA I and KOBA II project in Fountain Hills, not the Georgia Property. (Bobrow promissory note, DF EX 51.)  (*See* discussion of Georgia property below.)

- Mr. Bobrow is even confused about when he met Mr. Harbour. Bobrow told agents that he met Mr. Harbour approximately 12 years ago, or in 2010.    Agents interviewed Pam Case, Mr. Bobrow's ex-wife.    (*See* summary of Case interview, GOV EX 5.)  She talked about a meeting between Mr. Harbour and Mr. Bobrow that took place in their dining room in 2007.  The parties had known each other long before this investment meeting, obviously.

- At ¶22 of the 12/20/21 Lopez Report, Bobrow claimed that the funds for the Burg settlement came from Melvin Dunsworth but, as can be seen from the tracing done above, that was a mistake.

- There are a host of other discrepancies of significance.  They are summarized and included in Exhibit 15.

- Ms. Vickie Barbrow was interviewed on December 28, 2021.  A summary of the major discrepancies is attached as Exhibit 16.  The date she says that Mr. Harbour *must*

have sent a text to Mr. Turasky by hacking her iPhone, October 2, 2020, the Harbours were in Phoenix where their girls took a piano lesson midday. *See* dated piano photo, DF EX 5 attached hereto.

In sum, the government's entire Petition to Revoke rests on unreliable hearsay, and a witness who is forgetful, gets confused, and made numerous inconsistent statements refuted by documentary evidence. The government has not interviewed Alan Baskin, Bart Shea, Bob Courson, and many others. Instead, the government has relied on one person's statements, Mr. Bobrow, whose testimony and statements are all over the place. Agents have conducted only "half" of the investigation, instead of closing the loop on these very important issues. Regardless, the evidence presented does not meet the clear and convincing standard required for revocation.

## II.   Mr. Harbour did not solicit any investors for the Georgia Property.

Albeit not completely clear, the government appears to be alleging in its Supplemental Petition that Mr. Harbour solicited investors for the Georgia Property, or that somehow the purchase thereof was for his benefit. Neither allegation is not supported by the evidence, including some of the government's own exhibits, as set forth below.

### A.   Mr. Shea and Shea Connelly's Background.

Mr. Shea is the sole member of Shea Connelly Development, LLC (hereinafter "Shea Connelly.") Mr. Shea also is the sole member of dozens of LLCs which act as holding companies for Shea Connelly's real estate projects. The LLCs are typically set up after the properties have been purchased. Shea Connelly is a real estate development firm that develops various real estate projects around the Southwest, including assisted living and

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

multi-family projects.  Shea Connelly also builds custom homes, and remodels existing homes.  Shea Connelly has been in business for approximately 40 years.  (*Adams Declaration*, ¶¶ 1-7.)

**B.  <u>Shea Connelly is David Harbour's Current Employer.</u>**

Shea Connelly is also currently Mr. Harbour's employer, although Mr. Harbour is now in custody. Mr. Harbour was hired on September 3, 2019, as Shea Connelly's VP of Projects, and works directly for Mr. Shea. Mr. Harbour is a W-2 employee and receives a salary.  His salary is approximately $90,000.  (*Adams Declaration*, ¶¶ 8-10.)

Mr. Shea has known David Harbour for approximately 18 years, or since 2005 or 2006.  Mr. Harbour arranged financing for one of Mr. Shea's projects during this time. Mr. Shea asked Mr. Harbour to find some upscale houses to remodel in the Phoenix and Paradise Valley areas.  One of Mr. Shea's investors, Ken Okamoto, was particularly interested in remodeling houses in the Biltmore area.  (*Adams Declaration*, ¶¶ 11-12.)

**C.  <u>Location of the  2121 Georgia Ave. Property.</u>**

Mr. Harbour was assigned to locate this particular asset.  He showed Mr. Shea various homes, including a property located at 2123 E. Georgia Ave. in Phoenix. Mr. Shea thinks that he looked at 4-5 homes, but it might have been more.  The Georgia property needed substantial work.  It was originally designed as a "Bachelor Pad," with a number of suite-type bedrooms circled around a courtyard.  The entire house needs to be remodeled.  Mr. Shea noted that he is very good at these types of remodels, because he can keep the "bones" of the house in place.  He remarked that the Georgia Property has "good bones," but needed to be completely updated. Mr. Shea believes that the Georgia house will be profitable project,

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

although it will take some time to get everything in place before construction will begin. Plans need to be drawn, and permits need to be obtained.  (*Adams Declaration*, ¶¶ 13-15.)

In or around July of 2021, Shea Connelly signed a purchase contract for the Georgia Property. There is currently a mortgage on the property, as well as a seller carryback note. Mr. Harbour has not made any of the mortgage payments for the Georgia Property, nor is his name on the loan. Mr. Shea's company is responsible for the loan.  (*Adams Declaration*, ¶¶ 16-18.) [12]

As indicated in Mr. Shea's Declaration dated November 4, 2021, the original contract was in the name of Shea-Connelly, but it was changed on the advice of counsel to a new LLC that Mr. Shea formed, 2123 Georgia LLC, just prior to closing.  (*See Shea Declaration*, DF EX 53.) It is common in the real estate industry to create LLC's to purchase property for liability and tax purposes. (*Adams Declaration*, ¶¶ 19-20.)

**D.    The Georgia property was not for the benefit of Mr. Harbour as Mr. Bobrow suggested during his interview.**

The Georgia Property was not bought for the benefit of Mr. Harbour, or his family. Mr. Harbour simply located the asset. Mr. Harbour asked if he could live in to house prior to, and possibly during construction, since the house was close to his children's school.  Mr. Shea agreed to allow him to do so, rent free.  Mr. Shea advised that a number of vacant properties have been burglarized and stripped recently in the Phoenix area.  Burglars are

---

[12] The government subpoenaed the title company's file related to this purchase, so it is well aware who owns the property, whose name is on the loan, and the financing structure.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

interested in stealing copper wire, appliances, and other materials that they can sell for money.  It was cheaper for Mr. Shea to have Mr. Harbour and his family stay in the house, rather than to hire a security guard.  The Harbour family paid the utility bills while they were residing there.  (*Adams Declaration*, ¶¶ 21-24.)

Construction on the Georgia Property has been delayed because Mr. Shea's prime architectural firm lost a draftsman. There have been some general sketches, but the plans have not been finalized.   Regardless, the Harbour family will be required to move out once the house was sold.  It is possible that they will be able to live there for part of the construction, but it is unclear whether conditions would have permitted it (dust, materials, danger on the site, etc.)  Importantly, Mr. Harbour is not going to receive any profits related to the sale. (*Adams Declaration*, ¶¶ 25-27.)

**E.    Mr. Shea and Kenny Bobrow's longstanding relationship.**

Mr. Shea has known Kenny Bobrow for over 40 years.  Mr. Bobrow is approximately 83-years old.Mr. Shea met Mr. Bobrow back in the 70's when Mr. Bobrow hired Mr. Shea to install cabinets on one of his projects.  Mr. Shea has borrowed money from Mr. Bobrow many times related to various projects.  Mr. Bobrow has also invested in some of Mr. Shea's companies' projects.  (*Adams Declaration*, ¶¶ 28-29.) [13]

---

[13] Mr. Shea told undersigned that Mr. Bobrow is hard of hearing and often times does not wear his hearing aids.  Mr. Shea said that he would be surprised if Mr. Bobrow had recently conducted a conversation on a speaker phone.  Mr. Shea knows Mr. Bobrow and Mr. Harbour to be very close.  He noted that Mr. Bobrow is like a father figure to Mr. Harbour. Undersigned told Mr. Shea that Mr. Bobrow had called Mr. Harbour a "sociopath" during his recorded interview with Mr. Burg.  Mr. Shea told undersigned that "Kenny" says things sometimes when he is angry that he does not mean, and later apologizes.  Mr. Shea also said

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

**F.** **Mr. Bobrow's involvement with the Georgia Property**.

Mr. Shea recalls that he asked Mr. Bobrow if he would be willing to pay the down payment for the Georgia Property, which was going to be $100,000. It is not uncommon for Mr. Shea to go to Mr. Bobrow and ask him to loan or invest money in his projects. Mr. Shea has a few "go to" people that he deals with when starting on a project, and Mr. Bobrow is one of them. Mr. Shea recalls that Mr. Bobrow came to his office to discuss the Georgia Property. He believes that they met for approximately two hours. Mr. Shea explained that when the California property closed known as the "Porta Bella" in Santa Clarita, California, Mr. Shea would be able to pay back Mr. Bobrow for the down payment for the Georgia property. (*Adams Declaration*, ¶¶ 35-36.)

Mr. Shea stated that he signed a promissory note to Mr. Bobrow for $100,000. Mr. Bobrow brought the check with him to Mr. Shea's office that day for the $100,000. The check from Mr. Bobrow is dated July 29, 2021, and was produced by the government in discovery. *(See* Bobrow check to WFG National Title dated July 29, 2021 attached as Exhibit 14.) Mr. Shea believes that Mr. Bobrow himself took the down payment to the title company's office. Mr. Shea had two other major projects closing or around the same time as the Georgia Property. As such, cash flow was an issue. Mr. Shea then asked Mr. Bobrow if he was willing to loan additional funds to Shea Connelly to get the Georgia Property closed. (*Adams Declaration*, ¶¶ 37-38.)

---

that Mr. Bobrow had called Mr. Shea a sociopath once, and later apologized. Mr. Shea said that Mr. Bobrow cares about Mr. Harbour and his family. (*Adams Declaration*, ¶¶ 32-34.)

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

Mr. Shea cannot remember if he contacted Timothy Gottschalk directly, or if was Mr. Harbour's idea to contact him.  Even though the Gottschalk's are Abby's parents, Mr. Gottschalk has also done accounting for Mr. Shea in the past. Mr. Gottschalk wired money to Mr. Bobrow, on two occasions, in approximate amount of $200,000.  Mr. Bobrow contributed the additional funds required to close, in the approximate amount of $40,000.00.

Mr. Shea entered into an amended promissory note with Mr. Bobrow on or about August 24, 2021, for the amount of $141,591.67, which represented the $100,000 deposit, and the additional costs for closing.  (DF EX 51.)   The note was secured by Mr. Shea's project in Santa Clarita, California, and the KOBA I and KOBA II project in Fountain Hills. (*Adams Declaration*, ¶ 40.)  Mr. Shea also entered into a promissory note with Tim and Julie Gottschalk on or about August 12, 2021, for the amount of $202,000.  (DF EX 54.) The note was also secured by Mr. Shea's project in Santa Clarita, California and the KOBA I and KOBA II project in Fountain Hills. [14]  (*Adams Declaration*, ¶¶ 40-41.)

Both of the above references notes were secured by the California and Fountain Hill projects because they were going to be completed prior to the remodel of the Georgia Property.   These loans were only meant to be short term, in order to get the Georgia project closed.  Importantly, Mr. Harbour will not benefit in any way from the sale of the home. (*Adams Declaration*, ¶¶ 42-44.)   Mr. Harbour further did not "solicit" any investors, as the

---

[14] Mr. Shea did not provide undersigned with a copy of this note.  It was obtained from Abby Harbour.  However, undersigned showed it to Mr. Shea, and he said that it was consistent with his recollection.

government alleges.   The promissory notes are proof that Mr. Bobrow, and the Gottschalk's *loaned* Mr. Shea money in order to get the Georgia property closed.

### F.   Kenny Bobrow's Gift Letter.

As for Kenny Bobrow's Gift Letter, Mr. Shea reported that the mortgage company contacted  either Mr. Harbour, or Mr. Shea,  and advised that Mr. Bobrow needed to sign a gift letter prior to close.  Undersigned limited review of the events leading up to closing seems to indicate that that mortgage company sent a draft gift letter to Shea Connelly for Mr. Bobrow to sign.  (*See* E-mail from Patrice Land to Frank Madia and D. Harbour, DF EX 57.) Mr. Shea believes that gift letter was sent to him by the mortgage company, but was not completely sure.  Mr. Shea told Mr. Harbour to go to Mr. Bobrow's house and have Mr. Bobrow sign the gift letter.  Mr. Shea stated that he was not going to sign the gift letter.  Mr. Shea did not remember who may have sent, or if the gift letter was sent to the mortgage company.  *(Adams Declaration*, ¶¶ 45-47.)   It is not contained in the title file produced by the government. Whether it ever made it into the Loan file is unknown at this moment.

In sum, the Georgia property was not purchased for the benefit of Mr. Harbour.  He has no interest in it whatsoever but for the fact that Mr. Shea has allowed he and his family to reside there during construction.  The family will be required to vacate the property upon its sale.   There are no "investors" per se in the property.   Instead, Mr. Bobrow and the Gottschalk *loaned* money to Mr. Shea and his company to get the property closed.  Mr. Shea is indebted to both, per the terms of the executed promissory notes.  Mr. Harbour did not solicit any investors.

**ADAMS & ASSOCIATES, PLC**
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

### III.    <u>David Harbour did not occur additional debt, but instead received an advance on his salary.</u>

As set forth above, Mr. Harbour did not borrow the money that was going to be used for the settlement with Mr. Burg, or that was used to settle with others.  Mr. Harbour will receive development fees when some of the major projects close, including the Santa Clarita project valued at over $325 million dollars. He received an advance from Shea Connelly as set forth in detail above.

The government's Petition should be denied.

RESPECTFULLY SUBMITTED this 17th day of January, 2022.

**ADAMS & ASSOCIATES, PLC**

By: */s/ Ashley Adams*
        Ashley D. Adams
        *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing.

Kevin M. Rapp
Coleen Schoch
U.S. Attorney's Office
40 N. Central Ave., Suite 1800
Phoenix, AZ  85004
Kevin.rapp@usdoj.gov
Coleen.schoch@usdoj.gov
*Attorneys for Plaintiff*

/s/*Kathy Taylor*
Paralegal to Ashley D. Adams

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366