**ASHLEY D. ADAMS, PLC**
**Ashley D. Adams, 013732**
7502 E. Monterey Way
Scottsdale AZ 85251
Phone:        (480) 219-1366
Facsimile:    (480) 219-1451
aadams@azwhitecollarcrime.com
*Attorney for Defendant*

**CHRISTIAN DICHTER & SLUGA, P.C.**
**Stephen M. Dichter, 004041**
sdichter@cdslawfirm.com
**Jill Ann Herman, 020180**
jherman@cdslawfirm.com
**Iulia Taranu, 034458**
itiranu@cdslawfirm.com
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Phone: 602-253-5808
Fax: 602-792-1710

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No.  CR-19-00898-PHX-DLR (DMF) |
|---|---|
| Plaintiff, | |
| vs. | **DEFENDANT HARBOUR'S CLOSING ARGUMENT MEMORANDUM FOLLOWING RELEASE REVOCATION HEARINGS** |
| David Allen Harbour, | |
| Defendant. | **(Oral Argument is set before the Honorable Deborah M. Fine on February 25, 2022, at 1:00 p.m.)** |

**ADAMS & ASSOCATES, PLC**
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1    Defendant files his Closing Argument Memorandum on the Petition.[1]   This

2 Memorandum is filed pursuant to DKT. 327. Defendant incorporates his Response to the

3 original Petition. (DKT. 273.)

4 **I.      There is no Probable Cause to indicate that any witness tampering occurred.**

5    The government alleged that Mr. Harbour violated 18 U.S.C. § 1512(b)(1) through "non-

6 coercive attempts to tamper with witnesses," including attempts "to persuade a witness to give

7 false testimony," Section 1512(b)(1) prohibits "knowingly…corruptly   persuad[ing]" or

8 "attempt[ing] to" corruptly persuade another person "with intent to…influence…the

9 testimony of any person in an official proceeding."   It appears that the Court has properly

10 concluded that the government has produced no evidence that Mr. Harbour corruptly tried to

11 persuade anyone to give false testimony. While the effort to settle a civil case with Mark Burg

12 through his counsel might well have been a very poor strategic choice with Burg a government

13 witness, it was entirely guided by Mr. Baskin.[2] Since all involved here have rejected *any* corrupt

14

15 [1] The government's December 21, 2021 Supplemental Petition and Harbour's Supplemental
Response were stricken. (DKTs. 306 and DKT. 306-1 through DKT. 306-16, and DKT. 307.)
16 This notwithstanding, on February 1, 2022, a Second Supplemental Petition to Revoke was filed.
(DKT. 326)  Harbour had no opportunity to respond.  This Court has made clear that no further
17 pleadings or exhibits are to be filed other than closing memoranda, lest they be stricken.
Revocation Hearing Transcript, (hereinafter "RT", p. 42, included in Exhibit 2.)  Thus, the
18 Second Supplemental Petition should have been stricken. Should the Court consider it
substantively now, doing so will constitute a manifest violation of Harbour's due process rights.

19
[2] If the Court concludes there was witness tampering, defendant respectfully demands a culprit
20 hearing be conducted. There is no reason for the government to be the third-party beneficiary of
a theoretical dispute between client and the lawyer as to whose fault it was that Mr. Burg was
21 contacted. The culprit hearing should be *ex parte* so it is sealed from government's exploitation.
This having been said, defendant has no reason to believe that Mr. Baskin would deny the

22

motivation on Mr. Baskin's part, which is, obviously, the correct conclusion, the defense will

address what concerns the court the most: That "Mr. Harbour communicated with Mr. Burg

through Mr. Bobrow." *See*, RT, 1/18/22, p. 252.[3]

### A.   David Harbour did not employ Kenny Bobrow to Indirectly Contact Mark Burg.

It is very clear that Mr. Baskin used his client, Kenny Bobrow, to reach out to Mark

Burg to explore the idea of settlement. Once that occurred, the parties conferred at arm's length,

*through counsel,* regarding both satisfaction of the judgment and a proposed Declaration.

In his December 13, 2021, FBI interview, Bobrow stated that "in the last month"

[November] he contacted Burg at the request of Baskin, whom was both Harbour's and

Bobrow's lawyer. (GOV EX 12.)  Once he said this, the agents handed Bobrow a target letter.

Bobrow engaged counsel and five days later, cloaked with DOJ informal use immunity (GOV

EX 23), Bobrow changed his position.  Bobrow now said that he had discussions with both

Harbour and Baskin about Harbour settling with Burg.  The key feature of the immunized

statement was:

---

primacy of his role in this endeavor. He even billed for it. We think it rare for lawyers to bill for being a co-conspirator.

[3] The Federal Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771 does not forbid defense counsel from contacting a "victim." Actual negotiations between Mr. Baskin (for Harbour) and Mr. Davidson (for Burg) began in October 2021 and continued until Burg and, perhaps, his lawyer became government informants on December 3rd. Negotiations continued, honestly, on the Baskin/Harbour side, and as a government undercover operation on the Davidson/Burg side, ending with Harbour's arrest on December 13th and the Petition to Revoke. *See,* GOV EX 29 DF EX 1, 2-12.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1

2

> Bobrow made multiple calls to Burg. On at least one occasion and possibly as many as three instances, Harbour was present in the room when Bobrow made calls to Burg."  (GOV EX 18.)

3   A close analysis of the Bobrow phone tolls easily disproves the allegation. There were

4 three days on which Bobrow and Burg spoke. *See* Exhibit 1 attached hereto. On November 10,

5 at 10:42 AM, Bobrow started a 9 minute call. If one is relying on the Verizon contentions as to

6 the length of calls, that call ended at 10:51 a.m.  At 10:48 AM, while Bobrow was on the phone,

7 Harbour tried to reach him. Obviously, the Harbour call to Bobrow was not completed.  More

8 obviously, however, is the conclusion that, unless Harbour was standing next to Bobrow in

9 Bobrow's house calling Bobrow, he was not "in the same room" as Bobrow when Bobrow

10 called Burg 10:52 AM.

11   This eradicates Bobrow's first possible "recollection."  More importantly, it establishes

12 conclusively that Harbour did not even speak to Bobrow before Bobrow called Burg.  Bobrow

13 spoke to Burg for 12 minutes. The next day, November 11, 2021, Bobrow spoke to Baskin for

14 about 30 minutes. On November 15, 2021, Bobrow and Baskin spoke for about 14 minutes. Of

15 course, this is corroborated by Bobrow's original December 13, 2021, statement to SA Cofer

16 that it was Baskin who had directed him to call Burg. (GOV EX 12.)

17   By the time of the next Bobrow – Burg communication, on December 3, 2021 (GOV

18 EX 9), Burg and his counsel were working with the government and Harbour was with his

19 family in Disneyland. There were no Harbour calls with Bobrow at all that day. This would

20 have been the second of the "up to" three possible occasions that, according to Bobrow,

21 Harbour and Bobrow were "in the same room" when Bobrow called Burg.  Obviously, Bobrow

22 was mistaken. It is noteworthy, however, that in the transcript of the consensual call, when

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

Burg prods Bobrow to inculpate Harbour,[4] it is to Baskin that Bobrow refers; not to Harbour. He mentions "his attorney," as in "he wants you to sign something that you won't put David in jail." (GOV EX 9, p. 2.)  Later, Bobrow says "his lawyer did tell me though that the funds are there."  *Id*., p. 5.  Again, Bobrow is referring to Baskin.  Later, *Burg* suggests that *he* might want to meet with Harbour ("David tell you what, why don't you just send me a hundred grand . . . And guess what once I get that money, then I'll meet with your lawyer").  *Id.*, p. 8.

Finally, Burg tells Bobrow that he should pass along to both Harbour and "his lawyer" [Baskin] that Burg is willing to take the meeting. When poked by the agents to get Bobrow to say that Bobrow got Burg's number from Harbour, Bobrow tells Burg  "[n]o actually I had your number in my phone." *Id.*, p. 11.  Attempt to inculpate foiled.  Obviously, Harbour was not "in the room" for this call.  More importantly, nothing suggests that this call was prompted by Harbour. Finally, Bobrow did not even call Burg.  Burg made this call to Bobrow.

The last day was December 7, 2021.  However, that date also fails.  Exhibit 1 shows there was never a time when Bobrow and Harbour were in the same room to call Burg. So, the entire premise of Bobrow's firm recollection of him and Harbour being together at least once, and as many as three times while on the phone with Burg, is unsupported. More importantly, the analysis of the phone calls shows, beyond peradventure, that Harbour *never* directed Bobrow to call Burg.  If anyone did, it was Baskin. The December 7 voice mail makes this crystal clear.  (GOV EX 8.)

---

[4] Any of us who have ever directed an undercover phone call knows that the agents were directing Burg to get Bobrow to inculpate Harbour.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

Bobrow's voice mail recorded by Burg was at 1:53 PM. *Id.* It followed immediately Bobrow's 17-minute telephone conversation with Baskin. That call started at 1:37. The fact that Bobrow is discussing his just concluded telephone call with Baskin in the voice mail to Burg is as stark as Mt. Everest on the Kansas prairie. There is nothing in this voice mail that suggests for a second that it was being left on Harbour's instructions. *Id.* If anyone instructed Bobrow to call, it was Baskin.

Burg responded to the voicemail Bobrow left at 1:53 PM at 5:19 PM, speaking to Bobrow for 7 minutes, after which Bobrow immediately called Baskin at 5:25 PM for 3 minutes. At 5:30 PM, Bobrow and Harbour spoke for 7 minutes and at 5:37 PM, Bobrow and Baskin spoke for 7 minutes.[5]

Contrasted with government's burden of proving it was "highly probable" that Harbour indirectly contacted Burg through Bobrow, the proof fails. While he Court noted on January 18, 2021, that it believed the evidence of the indirect contact "seems clear and convincing so far" (RT. 252), the same conclusion cannot be reasonably reached now. Similarly, the government's assertion that, "every time there is a rejection of the offer which is contingent on

---

[5] GOV EX 7 shows Burg calling Bobrow at "00:19:27" and immediately thereafter Bobrow calling Baskin at "00:25:44." Pen registers record in Zulu Time (formerly Greenwich Mean Time or "GMT." 00:19:27 Zulu on December 8th is 5:19 PM, MST on December 7th. Similarly, :00:25:44 Zulu on December 8th is 5:27 PM MST on December 7th. This is why the recording of the voice mail was labeled December 8th.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

the declaration, there is a call by Mr. Bobrow to try to cajole Mr. Burg into signing the Declaration" (RT, p. 140), is also wrong.[6]

Was there indirect contact between Harbour and Burg through Baskin? Absolutely. Mr. Baskin's client, Mr. Harbour, is locked-up today and may remain locked up until August solely because of a strategy designed and executed by his own lawyer and that is why the defense requests a culprit hearing outside the government's purview. .

Given the extreme number of important discrepancies, relying upon Mr. Bobrow's FBI interviews could not sustain even a "preponderance of evidence" burden of proof.  Here, the burden is "clear and convincing evidence."   It would, respectfully, be a miscarriage of justice to imprison anyone based upon Mr. Bobrow's inconsistent and disproved statements.

**B.**      **Mr.  Bobrow's unreliable hearsay is not clear and convincing evidence.**

Mr. Bobrow completely changed the essential feature of his story in a matter of five days. Vicki Bobrow, confirmed that her 83-year-old husband "is elderly and sometimes gets nervous and confused."  RT, p. 164.   During the revocation hearing, the defense spent a

---

[6] There were three completed phone calls and two voice mails.  Mr. Bobrow only completed a phone call Mr. Burg once, on November 10. Bobrow left two voice messages, both on December 7.  One was recorded (though mistakenly dated the 8th by the government) and the other was not recorded.  The other two completed calls were made *to* Bobrow *by* Burg: one on December 3 (recorded) and the other on December 7 (not recorded). In the December 3 recorded call Bobrow states that the only document he thinks Burg can sign is something saying he has been paid, if he was paid.  Bobrow says that Burg cannot sign something saying Burg was not a witness and never says that Harbour wanted him to sign something saying he was not a victim, Baskin did that.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1  considerable amount of time attempting to show all of the statements Mr. Bobrow made that

2  are contradicted by documents, demonstrating further his serious memory issues. [7]

3  **C    Negotiations with Rich Turasky which resulted in the Loan Assignment Agreement, and Mr. Turasky signing a Declaration through Mr. Harbour's attorney, does not constitute witness tampering.**

4

5  Rich Turasky also had obtained a judgment against Mr. Harbour and one of his

6  companies, Oak Tree Management, LLC (hereinafter "Oak Tree") in June of 2018.  (DF EX

7  13.)  This judgment was incurred pre-indictment. In DKT. 221, March 2, 2021, the Court stated,

8  in material part:

> Defendant shall notify PTS of all financial transactions totaling over $1,000 that he makes or directs to be made in any month to any person or entity, **except for transactions that are for** attorney's fees, professional fees, expenses or **debts existing prior to the indictment**, reoccurring payments, children's expenses, family expenses, and regular housing payments. Defendant does not, however, need to obtain PTS' approval for any expenses or income.

13  Based on the forgoing, one wonders why the Turasky Agreement dated October 27,

14  2020, DF EX 14, is even part of this proceeding.

15  Very briefly, Bobrow invested in Turasky's company, Hempyre/HHL Holdings, Inc.

16  (hereinafter "HHL.") (DF EX 15.)  Bobrow contacted Turasky, who he has known for many

17  years, to discuss the HHL opportunity, and to discuss him buying Turasky's judgment as part

18

19  [7] See, e.g., GOV EX 18, ¶3; DF EX 14, p. 2, ¶(I), GOV EX 18, ¶23, *Id*. ¶ 18, GOV EX 9, p. 11. There are many other examples of Bobrow exhibiting precisely this sort of memory fail, however, the Court precluded a very large list of other examples. Respectfully, there was no basis for the Court to preclude such evidence unless the Court was satisfied that the point had been adequately made and that Bobrow's varying recollections could not possibly meet a clear and convincing evidentiary standard of proof.

20

21

22

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1  of the transaction. (DF EX 14 ¶ 1(I).)  An agreement was entered into under which Bobrow

2  bought Turasky's judgment against Harbour by investing $750,000.00 in Turasky's company,

3  HHL, (hereinafter the "Agreement"), DF EX 14. [8]  Mr. Baskin, who had represented both

4  Harbour and Bobrow, drafted the Agreement.[9] (RT, p. 165, included in Exhibit 1 hereto.)[10]

5      Two months after being paid, Baskin sent a draft declaration to Mr. Turasky. (DF EX

6  23.) Several drafts were exchanged over a span of two weeks affirming that the negotiations

7  were at arms-length.  (DF EX 23-29.)  Mr. Harbour had no direct contact with Mr. Turasky

8  and the government admitted the same.   Nothing in the Agreement eliminated (or even

9  reduced) the judgment against Harbour.   Before the Agreement, Harbour was indebted to

10 Turasky.  After the Agreement, Harbour was indebted to Bobrow. For reasons that are not

11 clear, the Court indicated that it was not admitting DF EX 14 for "the truth of the matters

12 asserted." RT, p. 203-213.

13

14

---

15 [8] The Agreement provides that Mr. Turasky was to notify the government about the settlement
within 60 days of its execution, and voluntarily provide a copy of the Agreement if asked.  The
16 Agreement also provides that Mr. Turasky is to testify truthfully if Mr. Harbour's criminal case
was to go to trial.  DF EX 14, ¶ 2(C). When the government interviewed Mr. Turasky, in
17 November of 2021, he told the investigators about the Agreement. (GOV EX 21, Turasky 302,
¶ 4.)  However, government agents never asked him for a copy, nor did Mr. Turasky provide
18 one.  RT, p. 170.)

19 [9] It is unclear who has was representing at the time.

20 [10] Mr. Turasky advised via text that he did not wish to get his attorney involved.  (DF EX 19.)
However, DF EX 15-20, a series of e mails between Mr. Bobrow, Mr. Turasky, and Mr. Baskin,
21 show that the Agreement was negotiated at arms-length, and that a number of changes to the
Agreement were made at the suggestion of Mr. Turasky. Bobrow contributed $250,000 and
22 Bart Shea contributed the remaining $500,000 into HHL, for a total of $750,000. (DF EX 22.)

**II.     The Court inconsistently applied the Rules of Evidence during these proceedings.**

The Court stated that the Rules of Evidence did not apply to this proceeding (RT, p. 236) and that hearsay was admissible (*Id.*, p. 158), adding, "if there's indicia of reliability." With respect to the Agreement, the Court questioned whether the Agreement exhibited the "indicia of reliability." In his second interview, Bobrow confirmed its existence and discussed it. (GOV EX 18.)  Was there a benefit to Harbour in 2020?  Pretty clearly there was. It was better to have Bobrow, his friend, own Turasky's $750,000 judgment than to have Turasky own it.

The Court admitted Cofer's testimony about his and Lopez's interviews of Mr. Bobrow. However, the Court rejected outright the reliability of the Dunsworth Declaration, a sworn statement signed by Dunsworth's own hand.   The Court noted that agent Cofer could be cross examined, where Dunsworth could not.  But about what could Cofer be crossed examined? Nothing beyond, "did Bobrow tell you 'x'?"  How can "x" be cross-examined? Bobrow said, first, that Baskin told him to call Burg and later that Harbour did.  "Really, agent?"  "Yes, Mr. Dichter, really."  This is hardly cross-examination. No one would suggest that the *agents* are mistaken about what Bobrow *said* but, rather that *Bobrow* was confused or mistaken.[11]  Lest one not forget, in his testimony concerning the interview of Vickie Bobrow, the agent reported

---

[11] Objectively, defendant has now proven beyond any scintilla of a doubt that Bobrow was entirely mistaken in his second interview about the Harbour's involvement in the Burg calls.

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

that she said her husband, 83 years of age, sometimes gets nervous and misstates things. RT, p. 164. [12]

The Court refused to admit the Dunsworth Declaration (DF EX 63) because the government demanded to cross-examine him as to the crucial point of December 7 events. So, what happened to the defense's right to cross-examine Bobrow?  If the government was correct that it ought to be able to hear from the witness directly, why did the defense not have an equal right?   Respectfully, the defense submits that there is no way to harmonize the Court's comparison of Bobrow's wildly varying hearsay with its rejection of Dunsworth's hearsay. [13]

## III     There is no probable cause that Mr. Harbour conspired with others to commit mortgage fraud.

### A.     Bart Shea, Shea Connelly, and Mr. Harbour's employment therewith.

The Court expressed similar concerns with respect to Harbour's relationship with Bart Shea and even as to Shea's own *bona fides*.[14]   Shea's own Declaration is DEF EX 53 and Ms.

---

[12] Vickie Bobrow told the agent that after the first interview, her husband called Baskin who had him recite twice, "I did not tell you to call Burg." Of course Baskin did this and the government's having obtained Bobrow's phone tolls, which conclusively define the entire universe of Bobrow-Burg communications, affirm clarion clear that Baskin was using his client, Bobrow, to assist his client, Harbour.

[13] We ask the Court to review the government's statements at RT 195-196, 1/18/21 and to substitute "Bobrow" for "Dunsworth" and assist the defense in understanding how it could be that, first, the government with its vast network of agents could not subpoena Dunsworth itself but also how it thought it appropriate to not bring its own immunized witness, Bobrow, to Court for him to be cross-examined about statements not even made under oath.

[14] The Court has made a number of previous comments concerning its lack of interest in Harbour's income. *See,* DKT 221, March 2, 2021, *supra* at p 8 of this Memorandum.  Hence, again, we are constrained to not understand why the Court now has such an interest in his income

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1   Adams' is DEF EX 58. While the Court has expressed doubt as to the veracity of both, a better

2   way to describe the two Exhibits is that they are "unopposed by a single scrap of evidence to the

3   contrary."   Shea has a 40-year history in real estate development with projects all over Arizona

4   and California.  (DF EX 58, *Adams Declaration*, ¶¶ 1-7.) Bart Shea, Shea Connelly's owner,

5   has known David Harbour for approximately 18 years and Shea Connelly is Mr. Harbour's

6   employer. Mr. Harbour was hired on September 3, 2019, as Shea Connelly's VP of Projects, and

7   works directly for Mr. Shea. (*Adams Declaration*, DF EX 58, ¶¶ 8-10.)  One of Mr. Shea's

8   investors, "KO", was particularly interested in remodeling houses in the Biltmore area, and Mr.

9   Harbour was assigned to locate this asset.    (DF EX 58, ¶¶ 11-12.) Mr. Harbour showed Mr.

10  Shea various homes, including a property located at 2123 E. Georgia Ave. in Phoenix. In or

11  around July of 2021, 2123 Georgia, LLC bought the Georgia Property.

12            **B.       The Georgia property was not for the benefit of Mr. Harbour.**

13          There is no evidence that the Georgia Property was bought for the benefit of Mr. Harbour,

14  or his family.  The Harbour family does live there temporarily. Mr. Harbour has not made any

15  of the mortgage payments for the Georgia Property, nor is his name on the loan. Mr. Shea's

16  company, 2123 Georgia, LLC, is the borrower.    (DF EX 58, ¶¶ 16-18.) Importantly, Mr.

17  Harbour is not going to receive **any** profits related to the sale of the Georgia property, and there

18  _____

19  including especially his potential future income.  The Court stated that it wanted Mr. Harbour
    to be successful.

20

21

22

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1  is no evidence whatsoever to support the government's assertions about this transaction.  (EX

2  58 ¶¶ 25-27.) [15]

3        **C.    Mr. Shea and Kenny Bobrow's longstanding relationship.**

4        Mr. Shea has known Mr. Bobrow since the 70's when Mr. Bobrow hired Mr. Shea to

5  install cabinets on one of his projects.  Mr. Shea has borrowed money from Mr. Bobrow many

6  times related to various projects.  Mr. Bobrow has also invested in some of Mr. Shea's

7  companies' projects.  (EX 58 ¶¶ 28-29.)

8        **D.    There is no evidence that Mr. Harbour knew the gift letter he had Mr.
            Bobrow sign was false.**

9

10       The government has produced only portions of the mortgage file. This consists of two

   gift letters. There is nothing about them that inculpates Harbour and, as indicated, the agent

11 testified that the government had no evidence indicating that Harbour they were allegedly false.

12 RT, pp. 304-305. There is also no (present) evidence that the gift letters were provided to

13 Equitable Home Mortgage, Inc., ("Equitable") the lender, before the closing. It appears that they

14 were provided a month after the closing. (GOV EX 24 and GOV EX 43.)

15 **VI.   Mr.  Harbour is not soliciting investors, nor has he violated any other conditions
           of his release.**

16

17       Mr. Harbour has gone to great efforts to follow this Court's orders.   This Court ordered

18 that Mr. Harbour did not have to disclose his income.  (DKT. 221.)  With the exception of his

19

20 [15] As first, the government baldly asserted, with no evidentiary support, that the transaction was
   a disguise, and that the property was really being purchased for Mr. Harbour. Now, the
21 government claims, Mr. Harbour conspired to commit mortgage fraud. Its agent admitted that
   there is no proof as to that theory either.  RT, pp. 304-305.

22

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1  extended COVID-19 bout, Mr. Harbour has tried to work very hard while on release.  Mr.

2  Harbour obtained a position with Shea Connelly, which owns and is developing a number of

3  major projects around Arizona and in California (Glendale, Maricopa, and Fountain Hills).[16]

4       Mr. Harbour stands to make significant development fees when projects owned and

5  controlled by Shea Connelly are developed and/or sold. Shea Connelly agreed to advance

6  income to Mr. Harbour to help him *settle his past debts*, a category which this Court said was

7  **not** something which has to be approved by pretrial. *Id.*

8       On August 13, 2021, Deel Investments, LP, a Missouri limited partnership extended an

9  $8 Million Line of credit ("LOC") to Bart Shea and several entities including Shea Connelly

10  Development, LLC, of which Mr. Harbour is an (Vice President of Development). (DF EX 55.)

11  According to ¶1.3 of the Loan Agreement, the purpose of the LOC was for working capital and

12  "to make advances and loans to employees." *Id.*  Pursuant to the Loan Agreement, on October

13  5, 2021, a $1 Million Draw request was signed by Mr. Shea.  (DF EX 67.)  Of these funds,

14  $500,000 was to be used as an "advance" to Mr. Harbour and $500,000 for working capital for

15  Shea Connelly.  *Id*.

16       There was another draw request for $4 Million dated October 20, 2021, which was

17  approved by Deel Investments, LP in the amount of $1,000,000.  Its purpose was to provide the

18  money for the stillborn Burg Settlement. [17]   DF EX 68. When that failed, the money was

19

20  [16] Mr. Harbour was, in fact, working on the Santa Clarita project before he was ever indicted.

21  [17]The government asked where did the $1 Million come from, having speculated that it must
have been a loan to Mr. Harbour, which ostensibly would constitute a violation of release

22  conditions unless approved by PTS. But the proof is 100% that the money was loaned by Deel

14

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

1  disbursed as evidenced in the Baskin-Deel-Shea-Dichter emails. Mr. Deel had the right to loan

2  Shea Connelly money (which was indeed over-secured), and Bart Shea had and has the right to

3  provide advances to Mr. Harbour.  It would have been much more beneficial for Mr. Harbour to

4  have borrowed the money to pay off the debt, but Mr. Harbour was prohibited by this Court to

5  incur any further debt.

6  **VII.    There are reasonable conditions which can assure that Mr. Harbour will not violate his conditions.**

7  

8  This Court has expressed concern as to whether there are release conditions which can

9  assure that Mr. Harbour will not violate his release conditions in the future. While the Court has

10  recently wondered whether he is a flight risk, there is no evidence that he is. The Court itself

11  listed numerous reasons supporting the view that he is not a flight risk in its March 2, 2021,

12  Order and nothing about that has changed. Both Ms. Adams and Mr. Dichter, who has now

13  appeared, are former AUSA's.[18] Counsel can and will make sure that Mr. Harbour will be under

14  a very tight leash overall.  In addition to counsel's representations, the defense suggests that the

15  following conditions should satisfy the Court's concerns:

16  

17  to SCD under its $8 Million line of credit and that SCD advanced it to Harbour. When the Burg settlement cratered, $800,000 went back to SCD and $200,000 went to Harbour's lawyers.

18  [18] Mr. Baskin is represented by Lee Stein, Kenny Bobrow is represented by Andrew Pacheco.

19  Bart Shea is co-represented by Ivan Mathew. Former AUSA's are now firmly in control of the defense of the present charges and potential charges. Without casting aspersions in other

20  directions, the children of the Federal system, meaning former AUSAs and AFPDs only do this work one way – honestly. Our reputations – in this group – speak for themselves and have so

21  spoken in an unbroken line since the Ford Administration. Theirs are not less than the reputations of the prosecutors.

22

ADAMS & ASSOCIATES, PLC
7502 E. Monterey Way
Scottsdale, AZ 85251
(480) 219-1366

- The Court can be kept apprised of Mr. Harbour's various dealings with Shea Connelly, and counsel can provide the Court with periodic updates regarding Santa Clarita's bankruptcy, and the status of Shea Connelly's projects;
- Pretrial can inspect any of Mr. Harbour's electronic devices at any time, unannounced, with exception of attorney-client exchanges;
- Location services on Mr. Harbour's electronic devices must be enabled at all times, such that his whereabouts will be recorded on his phone;
- Mr. Harbour could wear an ankle bracelet if needed, and a curfew imposed;
- Mr. Harbour can be required, on a going forward basis, to disclose any and all of his income and bills;

Preparing for the trial will be extra-challenging if Mr. Harbour remains in custody. He is obviously not a flight risk, which is the Court's and the Bail Reform Act's main area of inquiry. Mr. Harbour is not an actual threat nor is even an "economic" threat to anyone, to the extent "economic threat" even a consideration. He has been in custody for about 60 days.

RESPECTFULLY SUBMITTED this 15th day of February, 2022.

**ADAMS & ASSOCIATES, PLC**

By: */s/ Ashley Adams*
    Ashley D. Adams
    *Attorneys for Defendant*

**CHRISTIAN DICHTER & SLUGA, P.C.**

By: /s/ *Stephen M. Dichter*
    *Attorney for Defendant*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing.

Kevin M. Rapp
Coleen Schoch
U.S. Attorney's Office
40 N. Central Ave., Suite 1800
Phoenix, AZ  85004
Kevin.rapp@usdoj.gov
Coleen.schoch@usdoj.gov
*Attorneys for Plaintiff*


/s/*Kathy Taylor*
Paralegal to Ashley D. Adams