GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN SCHOCH
Georgia State Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br>   v.<br><br>David Allen Harbour,<br><br>            Defendant. | No. CR-19-00898-PHX-DLR (DMF)<br><br>**UNITED STATES' MEMORANDUM IN SUPPORT OF REVOCATION** |

In the two years since his arrest and indictment, Harbour has committed five separate federal crimes in violation of his pretrial release conditions: witness tampering, bank fraud, wire fraud, false statement on a credit application, and conspiracy to commit each of those offenses. In addition, Harbour violated other pretrial release conditions by indirectly contacting victims, soliciting an investor for investments that benefitted Harbour, and engaging in financial transactions exceeding $1000 without reporting those transactions to his Pretrial Services Officer.

Because of these violations, which show Harbour's complete and ongoing lack of respect for the Court's authority, Harbour should be detained pending trial. He poses a risk of flight due to the increased penalties that he will incur because of these additional offenses, his apparently limitless access to unexplained funds, and his disregard for the

Court's orders. There is no condition or combination of conditions that could assure that Harbour would not flee. He should be held detained pending trial.

## I. Procedural Background

### A. Post-Arrest Detention Hearing, August 19, 2019

Following Harbour's original arrest two-and-a-half years ago, the Court expressed concerns about Harbour's truthfulness and Harbour's finances, unexplained sources of money, and representations in his financial affidavit. It observed, presciently: "… from the Court's point of view, I feel like there are so many unanswered questions regarding the defendant's finances, the sources of the monies that he has been living on. The financial affidavit is wholly inadequate." (Hr'g Tr. Aug. 8, 2019, p. 4). The Court also observed that Harbour "was not forthright on the financial affidavit or with pretrial services about his finances….so defendant's own signature on a signature bond means little to me after what I've read, but -- and his wife's does as well. That bond seems woefully insufficient to the defendant's finances are very complicated and confusing at this point." (Hr'g Tr. Aug. 8, 2019, p. 6). This Court further observed that, "while he has lived a lifestyle that is beyond most people's ability to support, *it's been on borrowed money*." (Hr'g Tr. Aug. 8, 2019, pp. 6–7 (emphasis added)).

The Court also expressed concerns about Harbour's work as an investor/adviser/consultant: "What does he do as a I'm not sure what's real and what's not, because he -- It says he has no money, but he incurs tax debt in tremendous sums. Consultant? I need a full description of that so I can deal with this whole -- Are there -- Is he working as an investment consultant? What does it mean? So I can find the appropriate boundaries of any appropriate employment restrictions." (Hr'g Tr. Aug. 8, 2019, p. 17).

The Court ultimately ordered Harbour to be released and imposed the following relevant conditions: (1) "not commit any federal, state or local crime"; (2) "avoid all direct or indirect contact with persons who are considered alleged victim(s), potential witness(es), family members of victim(s)/witness(es), Phillip Burgess, Mark Burg, Richard Turasky, Joe Cathey and Rhonda Gray"; (3) "defendant shall not solicit investors for any investment

while on Pretrial Release"; and (4) "The defendant shall not obtain any new financial accounts . . . . [or] make any financial transactions totaling over $1000.00 in any month to any person or entity without prior approval of Pretrial Services. Any transaction over $1000 to any person or entity in any month that benefits defendant also requires Pretrial Services approval." (Doc. 17)

### B.     First Petition for Violation of Release Conditions, February 4, 2020

PTS filed a petition submitting that Harbour had violated his release conditions when he failed to disclose a financial transaction involving $45,000 on a credit card belonging to his wife. (*See* Doc. 94) In support of this petition, the United States requested additional restrictions to Harbour's financial terms. (Doc. 82) The Court denied the petition. In doing so, the Court clarified for Harbour that the financial conditions applied to all transactions directed by Harbour or for his benefit, stating: "and so we're not going to make it that the elimination of the condition 'for your benefit' means that you can direct things out of other people's accounts. If you're directing it, and they're not directing it, then you still need to get Pretrial Services' approval." (Hr'g Tr. 5/19/20, p.19; Doc. 89) The Court also modified Harbour's relevant financial condition: "The defendant shall not make any financial transactions totaling over $1000.00 in any month to any person or entity without prior approval of Pretrial Services. Prior approval of Pretrial Services is not required for defendant's pre-established rents for residential purposes, attorneys fees, recurring payments, and his children's school tuition and activities." (Doc. 89)

### C.     Second Petition for Action, December 12, 2020

PTS filed a second petition for action regarding a deposit into Harbour's accounts totaling approximately $216,000 of unknown origin. (Doc. 169) The United States filed a separate petition alleging that in October 2020, Harbour directed that nearly $1 million be used to pay tax liens on a property that was subject to forfeiture. (Doc. 183, Ex . A) Similar to the circumstances underlying the instant Petition, Harbour made this payment with funds loaned to him by Daryl Deel and secured by a trust in the name of Abby Harbour. (Doc.

183, Ex . A) Harbour did not notify PTS of any of these transactions, even though he directed them, and they were for his benefit.

The Court held argument on the Petitions by PTS and the Government. Unbeknownst the government, PTS, or the Court, at the time of this hearing, Harbour had already obtained $500,000 from Deel to pay back Turasky for Turasky's failed 2014 investment of $500,000 with Harbour. (Exs. G9 pp. 77–86; D18–D30,). Also unbeknownst the government, PTS, or the Court, Harbour had already successfully solicited Bobrow to invest $250,000 into an investment with Turasky for Harbour's benefit, and Harbour was already directing Bobrow to contact Turasky to sign the false declaration. (*See*, *e.g.*, Exs. G18 ¶¶ 13–16; D19).

At the hearing, Harbour requested that the financial condition be further modified. (Hr'g Tr. 3, 2021, 2021, pp. 6-10). PTS opposed the removal of the condition requiring approval for transactions over $1000 and asked at least for notification of transactions over $1000: "I can understand that Pretrial doesn't need to give approval, but I would like to know if there are transactions totaling over a thousand just based on the nature of the offense. I just want to make sure he's not posing any kind of financial danger to anybody." (Hr'g Tr. Mar. 2, 2021, p.14; *see also* pp. 15, 18–23)). The Court revised the financial condition to require Harbour to:

> [N]otify PTS of all financial transactions totaling over $1,000 that he makes or directs to be made in any month to any person or entity, except for transactions that are for attorney's fees, professional fees, expenses or debts existing prior to the indictment, reoccurring payments, children's expenses, family expenses, and regular housing payments. **Defendant does not, however, need to obtain PTS' approval for any expenses or income**.

(Doc. 221 at ¶ 3 (emphasis added))

It is now clear that Harbour pressed the Court for a financial condition that he believed would allow him to continue to obtain large loans from Deel and freely make payments to influence the testimony of victims Turasky, Burg, the Wilsons, and Hill. Under this financial condition, Harbour has directed and benefited from multi-million-dollar

transactions without notifying PTS. Furthermore, because the financial condition specifically does not apply to "income," Harbour conspired with Deel and Shea to obtain millions of dollars in loans from Deel, to route those loan funds through Shea's entities, and to have Shea pay them out to Harbour under the guise of "advances" on his "income." The Court has seen through Harbour's subterfuge: these millions of dollars are not payments for Harbour's work, but loans that Harbour is expected to repay to Deel.

### D. Petition to Revoke Release (Docs. 267, 290 and 364)

In November 2021, investigating agents were alerted that Burg was contacted by Bobrow urging him to sign a false declaration in exchange for $1 million. Agents were also notified by Hill's attorney that Harbor's representatives were making similar overtures to Hill. Agents then confirmed that Turasky and the Wilsons had in fact accepted money in exchange for signing a declaration that conflicted with their previous statements to investigating agents. The United States filed a petition to revoke (Doc. 267) and supplemented the petition on February 1, 2022 (Doc. 326). The Court held an evidentiary hearing between December 23, 2021, and February 1, 2021. During that hearing, the government established that Harbour violated four of his pretrial release conditions. (Docs. 267, 290 and 326).

*First*, Harbour violated federal law by engaging in witness tampering in violation of 18 U.S.C. § 1512(b)(1), when he directed Bobrow to contact Burg and Turasky. Harbour directed Bobrow to encourage Burg and Turasky to sign declarations avowing they were not victims in the pending prosecution in exchange for money. As the evidence developed, the government also alleged that Harbour also violated federal law by committing: (1) bank fraud in violation of 18 U.S.C. § 1344; (2) wire fraud in violation of 18 U.S.C. § 1344; (4) making a false statement in loan and credit applications in violation of 18 U.S.C. § 1014; and (4) conspiring to commit these three crimes in violation of 18 U.S.C. § 1349 (Doc. 326)[1] All of these crimes are based on the two false gift letters that Harbour emailed to Equitable Home Mortgage, Inc. (EHM).

---

[1] The Petition was supplemented on January 31, 2022, based on the receipt of the

*Second*, Harbour violated the release condition that required him to avoid all direct or indirect contact with his alleged victims and the potential witnesses in this matter. (Doc. 17) Harbour violated this condition when he directed Bobrow to contact his victims, Burg and Turasky. (Docs. 267 and 290)

*Third*, Harbour violated the release condition that prohibited him from soliciting investors for any investment. (Doc. 17) Harbour successfully solicited the 83-year-old Bobrow to invest in two separate investments. First, Harbour asked Bobrow to invest $142,000 for the purchase of the residence at East Georgia Avenue, valued at $3.7 million, for Harbour's benefit. (Doc 269, Exs. G4, G14, G16–17, G30, G32–33, G41, G43) Harbour also solicited Bobrow to invest with Turasky in HHL. (*See* Ex. 18 at ¶ 13) As detailed below, the HHL investment was designed to retire a failed investment of $500,000 from Turasky to Harbour, which Harbour still owed to Turasky.[2] Bobrow's investment in HHL led Turasky to sign of a declaration that he was no longer a victim in the pending prosecution. (*See*, *e.g.*, Exs. G18 ¶¶ 13–16; D19).

*Fourth*, Harbour violated the release condition that required him to notify PTS of certain transactions exceeding $1,000. (Doc. 221) While the current condition does not require Harbour to "obtain PTS's approval for any . . . income," Harbour obtained loans far exceeding $1000 and failed to notify PTS, because Harbour conspired with Deel and Shea to disguise those loans as "advances" on Harbour's purported "income." (Doc. 221)

## II. Argument

From the inception of this case, the Court has expressed concerns about Harbour's finances, employment, and questionable income. Two years after his arrest and indictment, Harbour has committed five separate federal crimes using other people's money: witness tampering, bank fraud, wire fraud, false statement on a loan or credit application, and conspiracy to commit these offenses. Harbour also violated other pretrial release conditions

---

false gift letters from EHM. (Doc. 326)

[2] Turasky advised investigating agents in this case and SEC investigators that Harbour had defrauded him of $500,000. (Doc. 290, Ex. G4 at ¶¶ 22–26, G9, G25).

by indirectly contacting victims, soliciting investors for investments that benefitted Harbour, and engaging in financial transactions exceeding $1000 without reporting to PTS. Harbour's actions show complete and ongoing lack of respect for federal law and for the Court's orders. He should be detained pending trial.

### A. Defendant Shall Not Commit Any Federal, State or Local Crime.

The government has established by probable cause that Defendant has committed multiple federal crimes while on pretrial release.

#### 1. The Government Has Established Probable Cause to Believe that Harbour Committed the Crime of Witness Tampering in Violation 18 U.S.C. § 1512(b)(1).

There is probable cause that Harbour violated this term by engaging in witness tampering in violation of 18 U.S.C. § 1512(b)(1). (Doc. 267 and 290) A violation of this statute requires the government show there is probable cause that Harbour knowingly, corruptly persuades another person, or attempts to do so, with intent to influence the testimony of any person in an official proceeding. *Id.* The statute's plain language reaches "non-coercive attempts to tamper with witnesses," *United States v. Khatami*, 280 F.3d 907, 912 (9th Cir. 2002), including attempts "to persuade a witness to give false testimony. (*See* Doc. 267). Here, the official proceeding was the jury trial scheduled for March 28, 2022, where Burg was expected to testify against Harbour.

On March 19, 2021, Harbour had rejected a plea offer and was scheduled to proceed to trial on January 25, 2022. (Doc. 242) The trial was continued until March 28, 2022, over the United States' objection. (Doc. 265) There are several witnesses that are expected to testify against him, and their statements have been provided to the defense and they were noticed on a preliminary witness list. Harbour, through Bobrow and his attorney, contacted five witnesses in effort to influence their testimony at the pending trial. In the case of Hill and the Wilsons they were contacted directly by attorney Baskin and then at his suggestion the three witnesses retained an attorney for negotiations. Turasky represented himself. It is noteworthy that Harbour made no efforts to contact or compensate any of the other numerous investors that have lost money to him over the years except victims identified in

the superseding indictment that were expected to testify against him.[3] In sum, Harbour directed Bobrow to contact victims (Burg and Turasky) in an effort to alter their testimony in exchange for payment of funds from a third party.

Significant evidence supports the Government's allegation that Harbour attempted to tamper with witness Mark Burg, including Phone calls between Harbour and Bobrow and interviews of both Mr. Bobrow and Mrs. Bobrow.

### *a)* *Phone calls between Harbour and Bobrow.*

Starting in early November 2021 Harbour directed Bobrow to intervene on his behalf with victim Burg in an effort get him to sign a false declaration avowing he was not a victim in the pending trial in exchange for $1 million in borrowed funds. From November 10, 2021, up to the date of Harbour's arrest, on December 13, 2021, Harbour and Bobrow exchanged thirty-nine phone calls. (Ex. G27)

On November 10, 2021, Burg alerted special agent Brandon Lopez. (Hr'g Tr. Dec. 29, 2021; Ex. G19) that Bobrow was contacting him on behalf of Harbour. Burg advised agent Lopez that "he did not want any of Harbour's friends or associates to contact him and that he was willing to entertain the phone calls to obtain as much information as possible to provide to the government. Burg informed agent Lopez that he wanted all contact to stop and for Harbour to go to jail." (*Id.*)

Contact between Harbour and Bobrow, however, preceded the November 10th call to Burg. (Ex. 27) Indeed, on that date that Bobrow called Burg (and then Burg called agent Lopez), Harbour and Bobrow had no less than five phone calls totaling thirty- minutes in

---

[3] The United States previously avowed that here was no evidence that Harbour's counsel ( Baskin) knew that Harbour was encouraging Bobrow to contact Burg. (*See* Doc. 267, fn. 3) In light of the phone logs and statements by both Bobrow and his wife, Victoria Bobrow, the United States can no longer make that claim. Indeed, if the United States had confidence that Harbour acted alone and was not enabled in his actions to obstruct justice the United States would so state. Importantly, Harbour has not asserted an advice of counsel defense regarding this violation. Indeed, Harbour withdrew defense exhibits 41-44 that included presumptively privileged communications between Harbour and Baskin, therefore, abandoning any notion that they were asserting such a defense.

length. (*Id.*) The following day (November 11th) they spoke twice. (*Id.*) By the middle of November 2021, Burg was unwilling to sign the declaration avowing he was not a victim in exchange for $1 million. Unbeknownst to Bobrow and Harbour, Burg and his attorney, Keith Davidson, were cooperating with investigating agents by agreeing to record phone calls with Bobrow and string along Harbour's attorney by giving them the impression that Burg was susceptible to changing his testimony in exchange for money. He wasn't.

Bobrow made another call when it was clear that Burg was unwilling to sign the declaration on December 3, 2021. (Ex. G3 and G9) Significantly, in the lead up to this call Bobrow and Harbour spoke on twelve separate occasions (between November 15 and December 2) totaling ninety minutes. On the day before the call initiated by Bobrow, while Harbour was apparently on vacation in California, Bobrow and Harbour spoke for 37 minutes. (*Id.*)

On December 3, 2021, Burg returned a phone call from Bobrow. (Doc. 27) The recorded call speaks for itself. (Exs. G3, G4 and G9) The call, however, must be considered within the context of the investment Shea, Bobrow (and apparently Harbour) had in the Santa Clarita bankruptcy. (Ex. G18, ¶¶ 22-25). Both Bobrow and Shea were financially invested in the outcome of this Bankruptcy. (*Id.*) And, surprisingly according to Harbour's counsel, he was supposed to make $20 million from the speculative transaction. (Hr'g Tr. Jan. 18, 2022, pp. 212-13 ) It is unclear what if anything Harbour did to put himself in a position to earn such an extraordinary commission. But what is abundantly clear he never disclosed his work to pretrial services, his amount of compensation, nor the details of this transaction. In sum, it was important to both Bobrow and Shea that Harbour, who was scheduled to proceed to trial on March 28, 2022, not be sent to jail. This is evidenced by Bobrow telling Burg. " I will tell you what it really is to me. If he goes to jail, I will lose all that money." (Exs. G3, G4, and G9 at 4:10)

Following Bobrow and Burg's call on December 3, Bobrow immediately calls Harbour. (Ex. 27). Within the two days (December 6–7), following the call with Burg, Bobrow and Harbour have seven phone calls totaling 76 minutes. (*Id.*) Another call is

placed with Burg on December 7, but only a minute in duration. (*Id.*) Harbour calls Bobrow immediately thereafter. (*Id.*) Burg then calls Bobrow back and has a 10-minute phone call. (*Id.*) Again, immediately after this call Bobrow calls Harbour to apparently report on his efforts. (*Id.*) On December 7 Bobrow leaves a two-minute voicemail on Burg's phone that was provided to agents. (Ex. G8)

During this call Bobrow references "a disconnect" between Harbour's attorney (Baskin) and Burg's attorney. (*Id.*) On this same date there are five calls between Bobrow and Harbour that totaled 30 minutes in duration. (Ex. G27)

Burg and Davidson continued to interact with Bobrow and Baskin. Despite representations that the money was available in Baskin's IOLTA, and Baskin could make the transfer, Burg never intended to sign the false declaration. Instead, Harbour presumably continued to cajole Bobrow to put pressure on Burg. On December 8th and 9th Harbour and Bobrow have six calls that total 59 minutes in duration. On December 10th, three days before Harbour's arrest, Bobrow and Harbour exchanged nine phone calls.

### b)   Interviews of Kenneth Bobrow

The government interviewed Mr. Bobrow twice regarding his contacts with Mr. Burg.

**December 13, 2021.**   During this interview, Bobrow confirmed that Harbour encouraged him to contact Burg. Bobrow told investigating agent the following: Bobrow made several telephone calls to Burg to convey to him that Harbour wanted to repay him the approximately $1 million dollars. Bobrow knows Harbour is borrowing money from "someone" in order to pay back Burg. (Hr'g Tr. Dec. 29, 2021, p. 35 ; Ex. G12).

**December 20, 2021.**   During this interview Bobrow was represented by an attorney and offered information that the government agreed could not be used against him:

Bobrow first related his failed multi-million-dollar investment history with Harbour. (Ex. G18) Importantly, despite knowing Harbour for a decade. he observed Harbour living a lavish lifestyle but had no idea where his money came from. (*Id.*)

Regarding Bobrow's efforts on behalf of Harbour with Burg, Harbour told Bobrow that he wanted to pay Burg the $1 million in exchange for Burg's signature on a document.(*Id.*) Harbour lied to Bobrow and told him that Melvin Dunsworth had provided the money. (*Id.*) Bobrow spoke with Dunsworth who advised that he was broke and did not *loan* the money. (*Id.*) Bobrow correctly speculated that Deel *loaned* the money and based on Harbour' s own evidence it was, indeed, a *loan* from Deel to Shea.(*Id.*) Shea in turn loaned the money to Harbour in anticipation that the Santa Clarita bankruptcy would pay out. Harbour requested Bobrow to call Burg to convince him to take the money.(*Id.*) Bobrow admitted to the witness tampering relating that that he made multiple calls to Burg with at least one of those calls Harbour was in the room with Bobrow during the call. (*Id.*)

          c)    *Interview of Victoria Bobrow, December 20, 2021*

Harbour was over at the Bobrow residence quite regularly. (Hr'g Tr. Dec. 29, 2021, p. 54)[4] She was not able to quantify how many times but several times, more than once, Mr. Harbour became "I think emotional about what is going on" and "what is going on" being the criminal proceedings and what is going to happen to his family. (*Id.*) On one particular occasion that Ms. Bobrow recalled Mr. Harbour saying, "Do you have his number?" And Mr. Bobrow responding with, "Yes, I got it." At that point in time, Mr. Harbour left the Bobrow residence. On another occasion, Mr. Bobrow was sitting at a table and Harbour was standing over him. (*Id.*) This is how Ms. Bobrow characterized Harbour encouraging Bobrow to contact Burg on his behalf. Both Bobrow and Vicky Bobrow confirm that Harbour was with Bobrow when he was making calls to Burg at Harbour's direction. (Hr'g Tr. Jan. 18, 2022, pp 185-86.) Lastly, Harbour was at their house quite often. (*Id*. at 188) In sum, the evidence of witness tampering of victim Burg is

---

[4] The report of the agent's interview of Victoria Bobrow was not available during the hearing on Dec. 29, 2021. It was disclosed to the defense prior to the January 18, 2022, hearing, and Harbour marked it as one of his exhibits. (Ex. D74) In an apparent oversight, his exhibit was not moved into evidence, but both parties relied on its contents during the hearings, and Special Agent Cofer testified to its substance.

- 11 -

overwhelming. Burg was unwilling to sign the declaration despite Harbour's relentless prodding of Bobrow to intercede on his behalf.

### 2. The Government Has Established Probable Cause to Believe that Harbour Committed the Crimes of Wire Fraud, Bank Fraud, False Credit Application and Conspiracy.

As the court may recall, Harbour was arrested at a Paradise Valley residence known Martingale. (*See* Doc. 10; PTSR dated 8/5/19) Following his arrest he was essentially evicted from this home. Without any significant source of income Harbour resided at a residence that belonged to his in-laws (The Gottschalks) from September 2019 until approximately November 2021.

#### a) Bank Fraud in Violation of 18 U.S.C. § 1344(2)

Harbour moved to $3.7 million residence East Georgia Avenue in November 2021. (*See* Doc. D53, ¶5) Similar to other recent residences Harbour wanted to live at this multimillionaire dollar residence without having to put any of his own money into it. He encouraged Shea to purchase the residence, remodel it and eventually sale it for a profit. (*Id.*) In the meantime, Harbour could reside at the property rent free.(*Id.*) Shea apparently was unwilling to put any of his own money into the purchase of home due to "cash flow issues". (Ex. D58) Harbour convinced his in-laws (the Gottschalks) and Bobrow to provide the 10 percent down payment. They would have to avow to the lender that this was gift (using a false gift letter), and that Shea would not have to pay the money back.

Harbour's scheme involved a common fraud in the mortgage context. False gift letters are well-known for the role they play in bank fraud in analogous situations. *See e.g.*, *In re Felsner,* 359 B.R. 842 (E.D. Mich. 2007); *United States v. Morrow,* 177 F.3d 272, 289 (5th Cir. 1999) (affirming sales representatives' convictions for conspiring and aiding and abetting bank fraud in a scheme that used, among other false documents, fraudulent gift letters to obtain financing for the purchase of mobile homes; defendant sales representative's "direct[ion] to [purchaser] to submit a falsified gift letter to secure the financing" found sufficient to prove conspiracy to defraud).

Section 1344(2) requires that that Shea, Bobrow and Harbour (1) knowingly executed a scheme or artifice to defraud obtain the money, funds or other property owned by or under the control of EHM by means of materially false or fraudulent pretenses, representations or promises; (2) that they did so with the intent to deceive EHM and obtain funds for financing; (3) that EHM was a financial institution as defined by 18 U.S.C. § 20.[5]

Here, the gift letter is false for several reasons. *First*, it misrepresented that Bobrow was providing a gift of $342,000 to Shea. Bobrow never provided $342,000 to Shea. He only provided $142,000. Harbour apparently wanted the Gottshalks' contribution of $172,000 to be included in the Bobrow/Shea gift letter. This explains why the Gottshalks wired their contribution to East Georgia Avenue to Bobrow's account. (Hr'g Tr. Dec. 29, 2021, at 94-95; Ex. G3). *Second*, Bobrow and Shea are not cousins. They misrepresented their relationship because a relative would be more likely to make such a large gift. *Third and importantly*, there was no gift. Bobrow never intended the $142,000 that he provided to be a gift. Bobrow received a secured promissory note for $142,000 that was concealed from the lender. (Exs. G17 and D51).

### b)  Wire Fraud in Violation of 18 U.S.C. § 1343

Harbour also committed wire fraud by emailing the false gift letter to the mortgage company. (Ex. G43) The wire fraud statute, section 1343, requires that Harbour devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature), and that Harbour acted with the intent to defraud. Lastly, in advancing, furthering, or carrying out the scheme, Harbour transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce. *Id.*

---

[5] Section 1344 is titled "Bank fraud" but its text uses the term "financial institution," which is broader than merely "banks" and includes all the entities listed in 18 U.S.C. § 20. In 2009, the Fraud Enforcement and Recovery Act (FERA) amended § 20 to include mortgage lending companies such as EHM.

Harbour's activities in sending a false gift letter by email is similar to the Defendants in *United States v. Dobson*, 2013 WL 4049595 at *6 (E.D. Tenn. Aug. 8, 2013). There the court found that wire fraud was committed by defendants Dobson and Gott using emails to orchestrate a broad scheme to obtain money from financial institutions by convincing these financial institutions potential borrowers had sufficient funds to obtain mortgages when in fact, they had no such funds. *Id*. There is probable cause that Harbour committed wire fraud. *Id.*

### c) False Statement on Loan and Credit Applications in Violation of 18 U.S.C. § 1014

Harbour's false gift letter scheme also violates the prohibition on false statements in loan and credit applications. 18 U.S.C. § 1014. Similar to bank fraud Shea and Bobrow (aided and abetted by Harbour) made a false statement to a financial institution knowing it was false. *Id.* They did so for the purpose of influencing in any way the action of the financial institution. *See United States v. Taylor*, 808 F.3d 1202 (9th Cir. 2015) (collecting cases). Like bank fraud, Harbour violated this statute by executing and submitting the false gift letters in an effort to obtain financing for the palatial residence at East Georgia Avenue.

### d) Conspiracy

Harbour was a member of a conspiracy to commit witness tampering, bank fraud, wire fraud, and false credit applications. *See* Title 18 USC §§371, 1349. A conspiracy requires that two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit a crime. Harbour knew the unlawful purpose of the plan and willfully joined in it. Here, Harbour clearly was the leader of the conspiracy to commit the crimes detailed above.

## B. Defendant Violated At Least Three Additional Pretrial Release Conditions.

The government established by clear and convincing evidence that Defendant has violated multiple additional release conditions while on pretrial release.

> **1. Avoid all direct or indirect contact with persons who are considered alleged victim(s), potential witness(es). (Doc. 17)**

Harbour directed Bobrow to contact both Burg and Turasky between June 2020 and December 13, 2021. The evidence set forth above details that Bobrow, at Harbour's urging, contacted both Burg and Turasky to encourage them to accept payment in exchange for signing a false declaration. Indeed, Harbour's own evidence established this contact with Turasky in violation of his conditions. (*See, e.g.*, G18 at ¶ 13 , D18). There is clear and convincing evidence that Harbour repeatedly pursued indirect contact the alleged victims and potential witnesses in this matter.

> **2. Defendant shall not solicit investors for any investment while on pretrial release. (Doc. 17)**

Harbour solicited Bobrow to invest money in two investments that would benefit Harbour. First, Bobrow told agents that Harbour asked him to invest in something called Next Frontier or HHL. Bobrow stated that Harbour had told Bobrow that this was one of Turasky's investments. (Hr'g Tr. Jan. 18, 2021, p.168. Ex. G18 at ¶ 13) Second, Harbour solicited Bobrow to invest $142,000 into the purchase of the palatial residence at East Georgia Avenue, for the benefit of Harbour. (*See* Doc. 269, Exs. G4, G14, G16–17, G30, G32–33, G41, G43, D51) This is clear and convincing evidence that Harbour solicited investors for investments while on pretrial release.

> **3. Defendant shall notify PTS of all financial transactions totaling over $1,000 that he makes or directs to be made in any month to any person or entity . . . (Doc. 221)**

Harbour violated this condition by borrowing approximately $1.9 million from Deel to pay the victims in this case: Turasky, Burg, the Wilsons, and Hill. Harbour did not notify PTS of this loan. Instead, Harbour has admitted that he, Deel, and Shea conspired together to route this money to Harbour through Shea's company, which employs Harbour, in order to disguise the loan as an "advance" on his "income," of which he was not required to notify PTS.

Despite representing that Harbour would be paid no more than $90,000 per year, Harbour made a $500,000 investment into HHL for Turasky's benefit and also paid approximately $100,000 to the Wilsons.[6] Harbour obtained the money for these payments from loans from Deel. (*See* Exs. D65-D68). Harbour was required to pay back these loans to Shea and Shea in turn to Deel after the Santa Clarita bankruptcy proceeding was resolved. (*See* Exs. D65-D68).

The loans (debts) from Deel were advanced to Harbour's current employer, Shea, by Deel for Harbour's benefit. (Hr'g Tr. Dec. 29, 2021, p. 19) Shea then passed on the loaned funds to Harbour. (Hr'g Tr. Dec. 29, 2021, p. 19) Harbour disingenuously characterized this loan of nearly $2 million as an "advance" on his "income" in order to circumvent the pretrial condition that requires him to disclose transactions in excess of $1000 that he makes or directs to be made in any month to any person or entity for his benefit to PTS.[7] (Doc. 221)

According to the Court, the financial condition was intended to restrict Harbour from "obtain[ing] new financial accounts without prior notification to and approval of Pretrial Services. *Debt to me seems like a new financial account*." (Hr'g Tr. Dec. 29, 2021, p. 19 (emphasis added)). Despite Harbour's attempts to camouflage these loans as something else, the Court has correctly identified them as loans from Deel to Harbour:

> It's not complicated. It's actually very simple and straightforward that there's a lot of paperwork here that's moving money into Mr. Harbour's hands, and now you are calling it income, but there's nothing -- from what I am perusing these documents -- that would indicate this is income. This does look like loan.

(Hr'g Tr. Jan. 18, 2022, pp. 203-213.) Harbour violated the very generous pretrial release condition requested by his counsel and imposed by the Court by clear and convincing evidence when he obtained and did not disclose this enormous loan from Deel.

---

[6] The Arizona Department of Economic Security reports that Shea paid Harbour $53,000 per year.

[7] "[T]his is a $4 million draw request to Mr. Shea's entities. The purpose was to provide proceeds to Mr. Harbour for the Burg settlement and also for working capital." (Hr'g Tr. Jan. 18, 2022, p. 210)

### III. Conclusion

Based on the forgoing, the United States moves the Court to revoke its current Order authorizing Harbour's release and detain him pending trial.

Dated this 15th day of February, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Coleen Schoch*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and provided a courtesy electronic copy to all registered CM/ECF participants.

*s/ Coleen Schoch*
U.S. Attorney's Office