ASHLEY D. ADAMS, PLC
Ashley D. Adams, 013732
7502 E. Monterey Way
Scottsdale AZ 85251
Phone: (480) 219-1366
Facsimile: (480) 219-1451
aadams@azwhitecollarcrime.com

CHRISTIAN DICHTER & SLUGA, P.C.
Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Jill Ann Herman, 020180
jherman@cdslawfirm.com
Iulia A. Taranu, 034458
itaranu@cdslawfirm.com
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 253-5808
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of American,<br><br>                    Plaintiff,<br><br>        vs.<br><br>David Allen Harbour,<br><br>                    Defendant. | Case No. 2:19-cr-00898-DLR (DMF)<br><br>**OBJECTIONS TO RULING IN DOC. 346 (MARCH 1, 2022) AND MOTION TO REVOKE THE ORDER OF DETENTION**<br><br>(Oral Argument Requested) |

Pursuant to 18 U.S.C. §3145(b), Rule 59, F.R.Crim. P., and Local Rule 7.2, Defendant Harbour ("Harbour") respectfully objects to portions of the Ruling in Doc. 346 entered March 1, 2022, as outlined in this pleading and moves to revoke the detention

order. This pleading is supported by the following Memorandum of Points and Authorities.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

The government moved to revoke Harbour's release on December 13, 2021 and asked this Court to issue an arrest warrant. Doc. 267. The government twice amended its Petition, the last time being on the final day of the presentation of evidence and after the Court had forbidden any further filings, an order it punctuated by striking filings by both Parties filed after the cut-off date. *See* Order, Doc. 306, 1/17/2022; Doc. 307, 1/18/2022; *See,* Government Supplement Doc. 326, February 1, 2022. For reasons unknown, the Court did not strike Doc. 326.

### First Petition, Doc. 267

The government's claims were, in the order it outlined them:

1. Witness tampering: Mark Burg. The government lost.

2. Indirect contact with Mark Burg. The government won it is objected to here.

3. Witness tampering with respect to Rich Turasky. The government lost.

4. Indirect contact with Rich Turasky. The government lost.

5. Witness tampering with respect to Carol Hill. The government abandoned that claim.

6. Improper indirect contact with Carol Hill. The government abandoned that claim.

---

[1] The hearing transcripts for the Detention Hearing that occurred over 4 separate hearing dates have all been ordered and received and, therefore, as required, are available to the Court.

Therefore, the only portion of the government's original petition to survive the detention hearing was the claim of "indirect contact" with government witness Mark Burg. Query whether, had the Court known that only one of the six allegations supporting the warrant would be proven, would the Court have ordered Harbour's arrest? Similarly, as the two supplements are reviewed below, would the Court have ordered Harbour's arrest, let alone kept him in detention for, at this point, well-over three months. After all, even Bernie Madoff got bail.

**Supplemental Petition, Doc. 290**

The government filed a "Supplement" to the original Petition (Doc. 267) on December 21, 2021. It added to the original claims, which it reiterated, two new claims.

7.     Defendant shall not solicit investors for any investment while on pretrial release. The government lost.

8.     The defendant shall not make any financial transactions totaling over $1000.00 in any month to any person or entity without prior approval of Pretrial Services. Prior approval of Pretrial Services is not required for defendant's pre-established rents for residential purposes, attorney's fee, recurring payments, and his children's school tuition and activities.

The Court told the government that its reference to this condition was erroneous. [RT 12/29/21; p. 19, ll. 10-25]

**Second Supplemental Petition, Doc. 326**

As indicated, the government filed a Second Supplement to the original Petition (Doc. 267) on the last day of the evidentiary hearings.

9.  Defendant shall not commit any federal, state or local crime.

The Court found that probable cause existed to support a claim for mortgage fraud (18 U.S.C. §1014). Harbour objected to the Court's acceptance of the second supplement

because it was filed on the last day of the detention hearing. The fact that the Court considered the new claim constituted a denial of due process. The Court heard the claim over Harbour's objections and ruled in favor of the government.

Harbour objects to all the findings entered against him by the Magistrate Judge. He is entitled to *de novo* review. A new evidentiary hearing is requested.

### CONDITIONS OF RELEASE[2]

The Court set or modified conditions of release three times, *viz*.

**1.     Doc. 17, August 8, 2019**

a.     avoid all direct or indirect contact with persons who are considered alleged victim(s), potential witness(es), family members of victim(s)/witness(es), Phillip Burgess, Mark Burg, Richard Turasky, Joe Cathey and Rhonda Gray.

b.     The defendant shall not obtain any new financial accounts without prior notification and approval of Pretrial Services. The defendant shall not make any financial transactions totaling over $1000.00 in any month to any person or entity without prior approval of Pretrial Services. Any transaction over $1000 to any person or entity in any month that benefits defendant also requires Pretrial Services approval.

**2.     Doc. 89, May 19, 2020** (added)

a.     Prior approval of Pretrial Services is not required for defendant's pre-established rents for residential purposes, attorneys fees, recurring payments, and his children's school tuition and activities.

Hence any financial transaction involving attorney's fees were not financial accounts for which pretrial services approval was required.

---

[2]  We have listed only those conditions that were of concern to the government and the Court

**3.    Doc. 221, March 2, 2021** (added)

a.    Defendant shall not obtain new financial accounts without prior notification to and approval from PTS.

b.    Defendant shall notify PTS of all financial transactions totaling over $1,000 that he makes or directs to be made in any month to any person or entity, *except* for transactions that are for attorney's fees, professional fees, expenses or *debts existing prior to the indictment,* reoccurring payments, children's expenses, family expenses, and regular housing payments. Defendant does not, however, need to obtain PTS' approval for any expenses or income. (Emphasis added).[3]

### HARBOUR AS A FLIGHT RISK

With respect to the claims of violations of the conditions of release, the government's burden of proof was "clear and convincing evidence." With respect to the mortgage fraud claim and being a flight risk, the burden was probable cause. Since flight risk overarches everything else, we will address that first, *viz.*

In Doc. 221, its Order dated March 2, 2021 (rejecting the second attempt to revoke Harbour's release), the Court stated:

> In amending the release conditions again, the Court notes that there is a substantial secured bond of $500,000; the bond is secured by property owned by family of Defendant's wife. Also noteworthy are Defendant's strong ties to this district and that Defendant is vigorously defending these proceedings. Defendant has strong incentives to appear for Court and to follow his other release conditions, including to be law abiding.

In the detention Order, Doc. 346, the Court stated, in stark contrast,

> Further, Defendant Harbour is a serious flight risk. While Defendant Harbour has appeared for Court and reported to Pretrial Services as directed thus far, Defendant's incentive to flee is great considering the potential sentence should he be convicted. This incentive increases as trial

---

[3] Magistrate Judge Fine stated that "income" is not a financial transaction. RT, 3/2/21, p. 17, ll.22-23.

approaches, and there is the looming possibility of additional charges relating to conduct at issue in the pretrial violations.

In the year between these rulings, the government's underlying case has gotten weaker; not stronger. The strengths and weaknesses of the case were never raised in the detention hearing, let alone litigated. Without that, the Magistrate Judge's conclusion as to "incentive" of the defendant to show-up for trial is simply soothsaying. Speculation is not probable cause. Thus, if the strengths and weaknesses of the government's case need to be considered, additional evidentiary hearings would seem in order.

The government itself contended that the case was a simple one involving no more than five "charged" victims. Only three (Turasky, Burg, and Burgess, who is claimed to have succeeded to Dunsworth's position) even loaned money to Oak Tree. They loaned $2.6 million to Oak Tree of which most, the government conceded, was actually advanced to Green Circle.[4] Even assuming that all the money was the result of fraud, the offense severity level is no more than 23 before adjustments.[5] Therefore, while not insignificant, since Harbour has no prior convictions, the resulting 46 to 57 months is hardly within the Merle Haggard, "*Momma Tried*" zone. Of the five charged "victims," Burgess/Green Circle should fall-out pretrial or, if those Counts go to trial, the

---

[4] The Hills and Willsons loaned money to other payday entities earlier in time and Gray loaned money entirely previous to any payday loan activity.

[5] Some of "usual suspects," including sophisticated means and the number of victims, has already been obviated by the government's assertions. Nor do we think that a 4-level "role" adjustment would lie here as the government has basically taken the position that everyone associated with Harbour in the Oak Tree venture was some sort of victim. The point is that, with respect to the Guidelines and adjustments, the government always proposes, the Defense opposes, and the Court imposes, rarely buying into the government's entire suite of suggested enhancements.

government has far a stronger chance of losing than winning.[6] There, a government loss wipes out $1.1 million of the total.

Mark Burg accounts for $1 million of the balance of the under $3 million. In the undercover phone call that the government recorded with Kenny Bobrow (GOV Ex 9), Burg evaluated his character for truthfulness when he said: "You know what they say about agents in Hollywood? If their lips are moving, they are lying." Burg is a Hollywood talent agent. His lips were moving.[7] (I think this is risky-I would stick with the facts and take this out, but up to you.)

More importantly than his self-characterization is the following: The operating agreement through which Burg made his loan or investment gave Harbour the authority he needed to use Burg's money to defray expenses. As we are all aware, in the ordinary

---

[6] And to this end we incorporate by reference the Motion for Sanctions (Doc.340) the Reply (Doc.354) and the Court's Order (Doc. 343). It is now clear that the sole document in support of Counts 3, 21, 22, and 23 was created by Cash Source or its employer, Green Circle. Green Circle's Controller was the same Alonzo Primus who, secretly, was also the Chief Credit Officer of PAIF, which, in turn, was secretly owned by Phillip Burgess, whom, the court and the government have just learned are defendants in a $73 million SEC fraud lawsuit in New Jersey. We think it doubtful that, with this new revelation, Burgess will be a witness in the August trial and, in support, we note that it was Primus who gave the most recent declaration. Primus' non-disclosure of his dual roles – Green Circle and PAIF – helped him get sued for racketeering by the PAIF Trustee. Obviously, either would have to concede that, in July/August 2015, Harbour and Oak Tree had no access to LMS and therefore no ability to manipulate the data in LMS. Even when access to LMS was received in early October 2015, it was "read-only" access. If one or both of them appear to testify, perhaps AUSA's from New Jersey would like to come out and watch the cross.

[7] My extended family's 110 years in the motion picture and television industry (producers, directors, and pre-eminently sound mixers since the invention of talkies) clearly supports Mr. Burg's evaluation of his own character for truthfulness and, thus, he has kindly saved us the bother of calling former business associates of Burg's who would likely happily and fervently agree with his own self-assessment.

fraud case, it is common for the accused to have had documents prepared that are contrary to the "deal" as understood by the alleged victim and to later use those documents to try to defend his conduct. Indeed, the government often asserts that documents like those are "badges of fraud." The problem for the government is that Burg's *own* lawyers drafted all of the operative documents. These documents included permission for Harbour to use Burg's funds precisely in manner about which the government complains.

Burg testified before the SEC that he did not read any of the documents before signing them. Again, had Harbour's lawyers prepared the documents, the government might successfully argue that the documents were a badge of fraud but, where Burg's own lawyers prepared the documents, that argument is worthless. In fact, if a deliberate ignorance instruction is given this case, it will be the defense that gets it. Such an instruction would convert Burg's deliberate ignorance of the contractual provisions drafted by his own lawyers into constructive knowledge of their contents, and the intention to be bound by the terms of the agreements he signed but did not read.

Removing Burgess' $1.1 million and Burg's $1 million, drops Mr. Harbour to an Offense Level 19 case before adjustments (30-37 months).[8] While it is understood that the government may well try to bring in a lot of what it would call "relevant conduct" to

---

[8]   The government also contends that Harbour owes $4 million in taxes. Actually, whether the defendant owes taxes in that amount is being contested in a civil action in Tax Court and has nothing to do with this case at all. It was stayed pending a resolution of this case. In this case, the evasion charge concerns $179,000 in taxes that were paid before the indictment. The offense severity level for $179,000 before adjustments is either Level 6 (0-6 months), if there was no tax loss, and a Level 16 (21-27 months), if there was a tax loss.

pump-up the offense severity level, that is no more than an argument and, in our view, in this particular case a peculiarly bad argument.[9]

In short summary, the contention that Mr. Harbour is a flight risk at all, let alone a "serious" flight risk is unsupportable. Magistrate Judge Fine's first finding, the one in March 2021, was correct. Harbour is defending vigorously and, if anything, even more vigorously, and the substantial real estate appearance bond ($500,000) secured by their Fountain Hills winter home is still in place.[10]

The other dollar amounts in the case as it exists are very small in comparison. Turasky ($500,000) and the Willsons ($200,000) have averred to a set of facts, supported

---

[9]  In ¶13 of Joel Tucker's Superseding Indictment, the United States said: "On August 1, 2012, President Obama signed a law referred to as Operation Chokepoint, which resulted in banks refusing to make Automated Clearinghouse withdrawals from their customers' bank accounts associated with payday lenders, which greatly reduced the profitability of payday loans. Many payday lenders went out of business after Operation Chokepoint." Here, in a bit of a flight of fancy, the government contended that it was Harbour's learning of Tucker's sentence that caused Harbour to "panic" and to engage in the witness tampering scheme for which Magistrate Judge Fine found no probable cause. First, neither Tucker, nor his entity – KSQ - nor anyone associated with it, was ever convicted of payday loan violations. Tucker was convicted of interstate transportation of stolen money, bankruptcy fraud, and tax evasion. *See*, *United States v. Joel J. Tucker*, 19-00153-01-CR-W-RK, Western District of Missouri. Second, the government's reference to a "law" is completely false. President Obama signed an Executive Order that the Trump Administration repudiated by defunding its enforcement. However, what the United States said, in general, was true. President Obama destroyed the prior version of payday lending. Harbour's prior payday loan business was profitable and the lenders to were all getting their payments when the Executive Branch collapsed the businesses.

[10]  Should the Court want to increase the bond, we are advised that friends and family are prepared to post appearance bonds in reasonable amounts.

by the documents, that prove they were not defrauded at all. Carol Hill's $80,000 claim is likely barred by the statute of limitations.[11] The Rhonda Gray charges are as well.[12]

Only a particularly strong government case, coupled with a very lengthy potential sentence can fuel the determination that someone is a "serious flight risk." Here, it is easily seen that nothing in the underlying case makes it a particularly strong case for the government. To the contrary, the case is highly defensible.[13]

## POTENTIAL NEW CHARGES

The Magistrate Judge pointed to the probability of new charges as heightening her conclusion that Harbour presents a serious flight risk.

1.    **Witness Tampering:** The Court found no probable cause. There was no evidence that *anyone* endeavored to have Burg testify falsely. Were I a ham sandwich, I

---

[11]  The government has asserted creative arguments for why the claims are not barred but, given the date of the investment, the stronger argument is that the SOLs expired. There is also a question regarding whether Ms. Hill actually invested any money at all. Her deposit has not been found in North Rock bank statements.

[12]  Rhonda Gray contentions are intriguing to say the least. In 2010, she had received $1,000,000, in benefits of a life insurance policy on her husband, William V. Gray. In 2010, as a result of CV2010-001530, FirstBank of Arizona obtained a judgment against the Estate and Ms. Gray that amounted to well of $500,000. Though Mr. Gray deceased, we see no evidence of a probate, likely because he and Ms. Gray had their assets in trusts. Ms. Gray directed this money to Defendant to protect it – secret it - from the creditors.

[13]  The sole reason that Oak Tree lenders were not repaid was the foreclosure of Oak Tree's position in Green Circle by PAIF. This was a clever bit of business. When PAIF became a lender to Green Circle, Oak Tree subordinated its first position. Green Circle was limited to a $5 million credit line. Eventually, because PAIF, whose Chief Credit Officer was Alonzo Primus, forced to Green Circle, whose Controller was Alonzo Primus, to take down more than $5 million, PAIF defaulted Green Circle. Doing so wiped out the remaining under $2 million Oak Tree still had with Green Circle. Burgess did this to five other lending organizations. He did so in order to save his position with Ranger, the hedge fund that had advanced the largest portion of the $73 million for which the SEC is presently suing Burgess and others.

might be concerned about the grand jury. However, it is hard to imagine how the government could try to indict a witness tampering case here. If it did so, given the court's ruling, we predict that the rarest of rarities might ensue: A successful Rule 6(e) motion.

**2.     Mortgage Fraud:** The Magistrate Judge found probable cause to believe that Harbour engaged in a conspiracy to commit mortgage fraud. This was alleged in a supplement filed on the last day of the detention hearing.[14] The government used a grand jury subpoena to obtain Equitable Home Mortgage, Inc.'s ("EHM") file and produced from that file two "gift letters" signed by Kenny Bobrow. [15] The fact that it produced nothing else leaves the defense to conclude that nothing else in the file supported the government's theory.

A promissory note and First DOT on a residence deeded to a new Ohio LLC, 2123 Georgia, LLC, were signed on August 24, 2021, by a lawyer for the LLC acting under a power of attorney. A month later, a "gift letter" was received by EHM asserting that Kenny Bobrow had gifted $342,000+ to Bart Shea. According to Bobrow's second interview with Agents on December 20, 2021, Harbour had brought the gift letter to his

---

[14]   This detention hearing was one in which absolutely no one with first-hand knowledge testified. Kenny Bobrow had limited use-immunity but the government did not call him. Instead, FBI and IRS agents hearsay'ed in his two directly conflicting statements plus some of his wife's single statement. She stated that Kenny Bobrow was elderly – he is 83 – and that he gets nervous and misstates things. RT 1/18/22, p. 164, ll. 10-12. Bart Shea, the supposed beneficiary of the "gift letter" was ready to testify when the Magistrate Judge suggested he obtain counsel. RT 12/29/21 p. 86-87. He lawyered-up and did not testify. Alan Baskin did the same.

[15]   Conveniently, the government never produced the entire file to the defense.

house and Bobrow signed it. FBI SA Cofer testified that the government had no proof that Harbour *knew* the gift letter was false. RT 2/1/22, p. 305, ln. 1-6. Thus, at the end of the detention hearing, there was no evidence that Harbour had acted in any manner that was more culpable than an ordinary messenger service. Shea's declaration provides ample evidence that Harbour acted at all times as his employee.[16] Regardless, no evidence was presented to show that Harbour benefitted financially from the Georgia, LLC transaction.

At the inception of the house purchase, it was envisioned that SCD would purchase the house with an investor at the ready to fund a construction loan for the renovation of a very old house. DF EX 58, ¶ 12. The house was isolated on two acres and was loaded with copper. *Id.,* ¶ 123. Shea and Harbour agreed that the Harbour family could live there (rent-free but paying utilities).[17] *Id.* This advantaged SCD because an occupied house is far less subject to being ransacked and stripped than a vacant house. *Id.*

Next, was the gift letter even false? Defendants assert that it was not. The transaction that sought to raise the down-payment *absolutely* started out as a loan to SCD by Bobrow. But, between that (July-August 2021) and a month after the closing (September 24, 2021) there were, obviously, changes. First, SCD neither bought the house, made the down payment, took-on the financing, nor supplied the down payment.

---

[16] *See,* Declaration of Bart Shea, November 4, 2021 (DEF EX 54); *see also*, Declaration of Ashley Adams, (DEF EX 58).

[17] The Harbour family had been living *completely* expense-free in Abby Harbour's parents' Fountain Hills winter home since the time of the indictment. So, providing the service to Shea to save Shea the expense of a guard service cost the Harbour's money.

Closing Statement, DF EX 49. The new LLC did all that. Hence, since Bart Shea received the funds, he either "gifted" those funds to 2123 Georgia, LLC or he loaned those funds to 2123 Georgia. And, since both entities were owned by Bart Shea, the actual transaction was or could have been either a gift or a loan, at his pleasure.

We are hopeful that Kenny Bobrow will recall what he said to David Harbour when Bobrow signed the September 24, 2021 "gift letter" on the front left fender of Harbour's truck. Harbour certainly does. The support and corroboration underlying the accuracy of Bobrow's statement may be better understood from studying Exhibit 5 to David Lunn's Declaration, Doc. 263, 2:20-bk-12402-MCW, dated September 1, 2021. In any event, since the government having conceded that it has no evidence that Harbour knew the gift letter was false, there ought to not be an indictment against Harbour under 18 U.S.C. §1014. In conclusion, the potential "new" charges should not impact Harbour being considered a "serious" flight risk or even a flight risk at all.

### INDIRECT CONTACT WITH MARK BURG

Magistrate Judge Fine stated,

> While Bobrow is not a perfect witness, the phone records and other evidence corroborate Bobrow's statement to investigators that Defendant Harbour told Bobrow that Defendant Harbour wanted Bobrow to convince Burg to take the money (Government Exhibit 18 at ¶18). The Court finds that the United States has met its burden of clear and convincing evidence as to Burg but not as to Turasky.

Doc. 346, p. 3, ll. 11-15.

The evidence does not come close to supporting this conclusion *unless* the Magistrate Judge meant that if *Burg* reached out (indirectly) through Bobrow to Harbour, that violated the condition of release that forbade *Harbour* from having indirect contact

with Burg. If this was the Court's interpretation of its own conditions, that understanding was not in the conditions of release.

The defense proved that there were a total of five probable contacts between Bobrow and Burg between November 10 and December 7, 2021. With the exception of the November 10, 2021, call from Bobrow to Burg and a voice mail left by Bobrow for Burg on December 7th, every other time it could be concluded that anything other than a voice mail was left, it was Burg who initiated the call.[18] This included the consensually recorded call of December 3, 2021. The defense also disproved Bobrow's contention that Harbour hovered over him up to three times whilst Bobrow actually spoke to Burg. Unless Bobrow and Harbour were standing next to each other talking to each other on their respective cell phones, this contention was physically impossible.

The defense is entitled, of course, to *de novo* review and if the Court thinks the indirect contact to be a significant issue, we respectfully request a new evidentiary hearing on this point because the Magistrate Judge could not have possibly reached the conclusions she reached based upon the evidence that was presented. However, the main point is that all the significant contact with Burg was between Baskin, who represented Harbour (and Bobrow) and Burg's lawyer. If there was a contact, it was appurtenant to reems of contacts between counsel.

### THE MONEY

---

[18] On December 13, 2021, Bobrow categorically told the agents that he contacted Burg at the behest of Alan Baskin who was Bobrow's lawyer and also Harbour's lawyer. This was at the start of the negotiations that the Court stated did not amount to witness tampering.

Boiling down the money issues, the Court was concerned that Harbour had vast sums of money available to him without restraint and he was, therefore, a flight risk. The Court was concerned that whatever restrictions she placed on access to funds, Harbour and "his cronies," as she put it, could evade them. But the Magistrate Judge ignored that she and she alone had decided what Harbour could and could not do. First neither the Court nor the government, she said, could have any interest in income, family expenses, attorney's fees, or the payment of pre-indictment debts. All the monies claimed by Harbour's "victims" were pre-indictment debts. As to lawyer's fees, she stated this as recently as during the final oral arguments on February 25, 2022.

Of the $700,000 received by the Harbour family in 2021 in advances by SCD using funds borrowed from Deel Investments, $200,000 went to the Harbour family and the balance went for attorney's fees and settlement of pre-indictment debts and claims. The government argued that the advances were really "disguised" loans but there was utterly no evidence to support that conclusion. *See,* DEF EXs 65, 66, 67 and 69.

There was an $8 million August 2021, revolving loan agreement between Deel Investments and SCD. SCD was entitled to use loan proceeds to, among other things, make advances to SCD employees, Harbour was an SCD employee. He received advances. DEF EX 58, ¶ 48. He has back-end development fee participations in a series of SCD real estate construction projects in the Valley. If they are successful, he stands to earn millions and the advances are easily deducted from the advances. This does not make them loans. The Court found that funds were not being gathered and secreted for purposes of flight. RT, 3/19/2020, p., ll. 4-6.

**CONCLUSION**

Harbour is entitled to a *de novo* review. One issue that should be the subject of a renewed evidentiary hearing, if only because the Magistrate Judge got it so wrong is the money issue. The Magistrate Judge essentially, if figuratively, threw-up her judicial hands and said it could write no conditions that could not be evaded. This is completely untrue. If the Court tells the undersigned what it wants, suitable conditions can be drafted beyond that, a new hearing could be ordered on the indirect contact with Mark Burg, as the Magistrate Judge's ruling really strains the laws of the physical universe. However, release always looks "forward," not backwards and, there can certainly be no thought that any future direct or indirect contacts might re-occur. Third, if the Court desires to contemplate the flight risk issue, the Court could hold a hearing on the strengths and weaknesses of the government's case. Frankly, the defense does not see that as necessary. The Court can perceive that the government's case is not especially compelling. Mr. Harbour has been in jail since December 13 – over 90 days. The father-daughter dance he has attended with his girls for several years is April 1st. This motion will likely not be decided by then. We ask, therefore, that Harbour be released to house arrest forthwith pending resolution of the *de novo* review of the Order with the exception that with an ankle-monitor, he be permitted to take his daughters to the dance.

RESPECTFULLY SUBMITTED this 15th day of March 2022.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter

16

Stephen M. Dichter
Jill Ann Herman
Iulia A. Taranu
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004


ADAMS & ASSOCIATES, PLC


By: /s/ Ashley D. Adams
    Ashley D. Adams
    7502 E. Monterey Way
    Scottsdale, Arizona 85251

    Attorneys for Defendant David A. Harbour


**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2022 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004
Attorney for Plaintiff


/s/ Yvonne Canez