GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
COLEEN SCHOCH
Georgia State Bar No. 366545
Assistant United States Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Kevin.Rapp@usdoj.gov
Email: Coleen.Schoch@usdoj.gov
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

v.

David Allen Harbour,

Defendant.

No. CR-19-00898-PHX-DLR (DMF)

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER [DOC. 358] AND UNITED STATES APPEAL OF THE MAGISTRATE JUDGE'S FAILURE TO FIND A VIOLATION OF CERTAIN RELEASE CONDITIONS**

The Court should reject Defendant Harbour's arguments and deny his motion to revoke the detention order. The magistrate judge considered three days of evidence and testimony from the parties and based on all the evidence, found that Harbour committed an array of pretrial release violations and is a flight risk. The magistrate judge correctly found probable cause that Harbour committed mortgage fraud in violation of several federal statutes and that Defendant violated other pretrial release conditions by clear and convincing evidence when he indirectly contacted one of his victims and chose not to disclose multiple financial transactions over $1000. The magistrate judge incorrectly concluded that Defendant did not violate federal law by engaging in witness tampering, and the United States appeals that specific finding to this Court.

Based on Defendant's violations and all the evidence before it, the magistrate judge determined that Harbour is unlikely to abide by any conditions imposed upon him. It then found that it was unable to devise any condition or combination of that could reasonably assure Defendant's appearance at future court proceedings.

In the two years since his arrest and indictment, Harbour has committed several separate federal crimes. In addition, Harbour violated other pretrial release conditions by indirectly contacting a victim and engaging in financial transactions exceeding $1000 without reporting those transactions to his Pretrial Services Officer. These violations show Defendant's complete and ongoing lack of respect for the Court's authority, and Defendant should be detained pending trial. He poses a risk of flight due to the increased penalties that he will incur because of these additional offenses, his apparently limitless access to unexplained funds, his disregard for the Court's orders, and is a serious economic danger to the community.

The Court should deny Defendant's motion to revoke the detention order and also find that Defendant violated federal law by engaging in witness tampering. There is no condition or set of conditions that can reasonably assure Defendant's appearance at trial.

**LEGAL STANDARD**

Pursuant to 18 U.S.C. § 3145(b), and Federal Rule of Criminal Procedure 59(a), a party may appeal from an order of detention entered by a Magistrate Judge. Review of the Magistrate Judge's detention order is *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th Cir. 1990). The Court must review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference. *Id.* at 1193. If necessary or desirable, the Court may conduct additional evidentiary hearings in its discretion. *Id.*

**ARGUMENT**

**A. Harbour's Increased Prison Exposure is an Incentive to Flee.**

While the weight of the evidence is the least important factor to consider when assessing whether a defendant is a flight risk, *see, e.g.*, *United States v. Treselyan*, No. CR-20-00549-PHX-DWL, 2021WL3055040, at *4, it is relevant here because the specter of a lengthy prison sentence is an incentive for Harbour to flee. After a hasty and tortured evaluation of his Guidelines exposure, Harbour incorrectly concludes that he faces only 46–57 months' imprisonment. (Mot. to Revoke at 6) The base offense level for wire fraud is 7 (U.S.S.G. § 2B1.1). The United States calculates that 18-levels will be added due to the substantial loss to Harbour's victim-investors of between $3.5 million and $9.5 million[1] (U.S.S.G. § 2B1.1(b)(1)(J)). The superseding indictment alleges the following losses due to Harbour's fraud:

| Name | Amount |
|---|---|
| Rhonda Gray | $1,001,242.67 |
| Carol and Pat Hill | $581,621.34 |
| Alison Wilson | $100,000.00 |
| SNI Fund 1/ Richard Turasky | $500,000.00 |
| Mark Burg | $1,000,000.00 |
| Dan Wilson | $100,000.00 |
| PAIF | $1,100,000.00 |
| Joe Cathey | $1,200,000.00 |
| **Total Loss** | **$5,582, 864.01** |

The United States further calculates that an additional 2 levels will be added because Harbour's fraud involved sophisticated means (U.S.S.G. § 2B1.1(b)(9)(c)),[2] an additional 2–4 levels may be added due to Harbour's leadership role in directing others including

[1] Harbour's post-indictment payments to Turasky and the Wilsons do not affect the loss calculation. Even if they did, the same 18-level enhancement applies, as the remaining losses still exceed $3.5 million.

[2] *See United States v. Tanke,* 743 F.3d 1296, 1307 (9th Cir. 2014) (noting that while the defendant did not use corporate shells or offshore financial accounts as mentioned in Application Note 9(B), the "sophisticated means" enhancement under § 2B1.1(b)(10)(C) was justified because he engaged in "dozens of various acts" including falsifying invoices and checks, to conceal payments)

Laura Purifoy (his bookkeeper), Carol Hill (his administrative assistant), and Abby Harbour (his wife), etc. (U.S.S.G. § 3B1.1), and an additional 2 levels will be added because Harbour's offense involved an abuse of trust/use of specialized skill as a financial planner (U.S.S.G. § 3B1.3).[3] Accordingly, the United States estimates that Harbour's total offense level will be 31, in a criminal history I, with a guideline range of 108–135 months' (9–11.25 years').

Harbour is also charged with tax evasion in violation of 26 U.S.C. § 7206(1). (*See* Doc. 154, Counts 24–26) The base offense level for an evasion of $3.3 million of taxes (for tax year 2012 as of March 2022) (U.S.S.G. § 2T4.1(J)).[4] The United States further calculates that an additional 2 levels will be added because Harbour's fraud involved sophisticated means (U.S.S.G. §2T1.1(b)(1)). Accordingly, the United States estimates that Harbour's total offense level will be 26, in a criminal history I, with a guideline range of 63–78 months'. Although tax evasion has a natural statutory maximum of 60 months, the substantial amount of tax evaded would support a consecutive sentence to any sentence imposed for the other counts of conviction.

And Harbour faces even more potential prison time. The crimes underlying the petition to revoke—witness tampering, bank fraud, wire fraud, money laundering, and conspiracy—will increase Harbour's prison exposure as relevant conduct under the Guidelines[5] or consecutive prison sentences if additional charges are brought.

---

[3] Harbour previously held FINRA Series 7 and 63 qualifications and acted in the capacity as an investment advisor for at least two unaccredited investors, Rhonda Gray (recently widowed) and Carol Hill (his own administrative assistant).

[4] Harbour erroneously argues that the $3.3 million that the government is holding him accountable for evasion is being contested in tax court. (See Mot at 8 fn 8). This isn't true as Harbour is referring to tax years 2013 and 2014 not the subject years charged in the superseding indictment. Regarding 2012, the Tax Court has accepted the party's agreement that Harbour is liable for $2,339,629 for tax year 2012. (*See* Ex. A) Of course, Harbour never paid the tax due and owing with penalties and interests the loss is approximately $4 million resulting in a level 34. (U.S.S.G. §2T4.1(O)).

[5] Section 1B1.3 of the Sentencing Guidelines allows judges to consider all relevant conduct when determining the offense level. Relevant conduct is defined as "part of the same course

Harbour's steep prison exposure undoubtedly led to his desperate "hail mary" of witness tampering. As that failed, it now creates a powerful incentive to flee. *See, e.g.*, *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005) (ordering pretrial detention in white collar case in part because "[t]he combined statutory maximum penalties for the federal crimes with which Mr. Anderson is charged is 23 years. . . . At 51 years old, Mr. Anderson potentially could spend most of the remainder of his life in prison if convicted."). Harbour is facing a lengthy period of imprisonment that provides him a strong incentive to flee, one which gets strong as he commits additional crimes and as his trial nears.

**B. The Magistrate Court Correctly Found Probable Cause to Conclude that Harbour Committed Bank Fraud and Related Crimes.**

The magistrate judge correctly found probable cause to conclude that Harbour committed bank fraud and related crimes. Harbour raises a variety of spurious procedural arguments, none of which challenge the evidentiary basis of the magistrate court's finding.

1. **Probable Cause Supports the Magistrate Court's Findings**

The magistrate judge correctly found probable cause to conclude that Harbour committed bank fraud and related crimes. Harbour wanted to live at a multimillionaire dollar residence. He therefore convinced Shea to purchase the Georgia Property and his in-laws (the Gottschalks) and Bobrow to provide the  earnest deposit and closing costs. Harbour then engaged in a common form of mortgage fraud by hiding from the lender the fact that Bobrow's "gift" was in fact a loan secured by a promissory note that was required to be paid back by using a false "gift letter." This false gift letter, which Harbour emailed to the lender, misrepresented (1) that Bobrow was providing a gift of $342,000 to Shea

---

of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). A common scheme requires only that the offenses be "substantially connected to each other by at least one common factor." U.S.S.G. § 1B1.3 cmt. n. 9(A).

(Bobrow only provided $142,000); (2) that Bobrow and Shea are cousins (they are not related); and (3) that the funds were a gift (Bobrow received a secured promissory note from Shea for $142,000 that was concealed from the lender).

The evidence available to the magistrate judge established by probable cause that Harbour intended to mislead the mortgage lender that money provided by Bobrow for the Georgia Property was a "gift" to Shea when it was actually a loan secured by a promissory note and required to be repaid. The two gift letters signed by both Bobrow and Shea (*See* Exs. G-32, G-33), in combination with Shea's letter to the lender falsely asserting that he and Bobrow are "cousins" (presumably to make more plausible Bobrow's "gift"), and the secured promissory note from Shea to Bobrow (*See* Exs. G-17 and D-54), show that Harbour intended to mislead the mortgage lender when he obtained the gift letters. They also show that Shea and Bobrow intended to so mislead the lender and conspired with Harbour to do so. Their falsity is imputed to Harbour because he was the intermediary between Shea and Equitable Home Mortgage Inc. (*See* Ex. D-53, ¶ 9 ("David acted under my supervision and direction." ¶ 8 "I spoke to the real estate agent regarding the purchase of the house and told her that *I had to see and sign every document and every document had to go through legal counsel*.") According to the declaration of Attorney Adams, Shea also admitted to the existence of the false gift letter:

> As for Kenny Bobrow's Gift Letter, Mr. Shea reported that the mortgage company, Equitable Mortgage Inc., contacted either Mr. Harbour, or Mr. Shea, and advised that Mr. Bobrow needed to sign a gift letter prior to close. Mr. Shea told Mr. Harbour to go to Mr. Bobrow's house and have Mr. Bobrow sign the gift letter.

(*See* Ex. D-58; ¶ 47) The magistrate judge correctly found probable cause to conclude that Harbour committed bank fraud and related crimes in violation of 18 U.S.C. § 1344(2), when he submitted the false gift letter.

**2. Harbour's Arguments Against Probable Cause are Baseless**

Harbour's procedural arguments are baseless and none cast doubt on the magistrate court's probable cause finding. First, Harbour repeatedly complains about the use of

hearsay in the hearing and that Bobrow did not testify. (Mot. at 11 n. 14; Hr'g Tr. 2/25/22, p. 426) The Federal Rules of Evidence do not apply in detention hearings. *See* 18 U.S.C. 3142(f)(2)(B) ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."); *United States v. Abuhamra,* 389 F.3d 309, 320 n. 7 (2d Cir. 2004) ("We note, however, that even in the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers."). Judicial officers frequently and appropriately make bail determinations based on hearsay. Second, the magistrate court gave Harbour every opportunity to call percipient witnesses. He chose not to. For example, the magistrate court specifically authorized Harbour to call Melvin Dunsworth via telephone:

> THE COURT: We had a long discussion about whether you could call him as a witness, and you were very concerned about having him come here in person; and I said, "Well, let's have him here by telephone," is my memory, and I said we could do it around 3:30 or 4:00 o'clock, if my memory serves me, but you all -- I'm sure you ordered and read the transcript; and so if any of that's wrong, please tell me. Ms. Adams, do you have that witness that you'd like to call?
>
> THE COURT: Ms. Adams, I ask you again -- you have the subpoena power of this Court. I have the power, which we do, to place people under oath and there are laws against trying to unduly influence or threaten any potential witness.
>
> MS. ADAMS: Agreed.
>
> THE COURT: So I ask you again whether you have -- you can still subpoena a person whose lawyer calls and tells you that. So I've given you every opportunity to present this witness today. You may not like that conversation. I don't know what's true or not true from that conversation. I have no idea, but I know that we're here and I'm wanting to know if you're going to call that witness? You have the subpoena power of the Court available, and I gave you permission in advance to have the subpoena to be telephonic. So do you plan to call this witness telephonically?
>
> MS. ADAMS: No, your Honor.

The Magistrate Judge reiterated this position at the February 25, 2022, when Harbour's new defense counsel (Mr. Dichter) raised the same issue regarding Mr. Shea:

> THE COURT: And the defense let them all leave. I asked if there was objection. There could have been objection to their release --
>
> MR. DICHTER: I understand.
>
> THE COURT: -- and under the law, Ms. Adams could have questioned these witnesses. For example, Mr. Shea had – did not have to exercise his Fifth Amendment rights regarding what Mr. Harbour -- what he was paying Mr. Harbour. Yet the defense did not object to Mr. Shea being released.

(Hr'g Tr, 2/25/22, p. 426) In light of Harbour's argument that no crimes were committed, it is unclear what Fifth Amendment protections Harbour's friends, family, or attorney could assert. Harbour made a presumably strategic decision not to call witnesses and provides no basis on which the Court should reject his choice.

Second, Harbour incorrectly argues that the magistrate judge should not have considered the United States' untimely supplemental petition to revoke, which alleged that Harbour committed the additional crimes of bank fraud and other related offenses. (Mot. at 3–4) Harbour misunderstands the magistrate court's order. Nothing, of course, precludes the United States from filing a supplemental petition providing additional bases to revoke pretrial release as they come to light. The magistrate court merely barred the parties from filing exhibits in support of or opposition to revocation: "I struck everything that you filed on the docket because we have to admit evidence in the courtroom." (Hr'g Tr. 1/18/22, p. 57)

Finally, Harbour complains that he did not receive the entire mortgage loan file, arguing that "the fact that it produced nothing else leaves the defense to conclude that nothing else in the file supported the government's theory." (Mot. at 11 n. 15) First, the evidence available at the time already established that Harbour intended to mislead the lender by misrepresenting that monies from Bobrow and the Gottschalks were "gifts" when they were actually loans secured by a promissory note and required to be repaid. Second, the United States issued a grand jury subpoena for the entire loan file shortly before the February 1, 2022 hearing, after it learned from Bobrow that a false gift letter was used to support the purchase of the Georgia Property. The United States has since received and

produced that file,[6] and the documents, letters, and emails contained therein further establish that Harbour engaged in fraud to obtain the mortgage loan from Equitable Home Mortgage Inc. For example, Harbour exchanged emails with a loan officer misrepresenting Shea's financial picture and the status of the Santa Clarita Bankruptcy (*See* Ex. A, Emails from D. Harbour) This email was demonstrably false. The Bankruptcy Trustee, Michael Carmel, has no knowledge that the Toll Brothers were ever involved. (*See* Ex. B, IRS MOI of Michael Carmel) In addition, Harbour was not a "partner" of Shea, but rather an employee making $61,000 per year. (*See* Ex. C, DES reports of Harbour's income). Contrary to Harbour's argument, obtaining the loan file has only made the United States' allegations that Harbour committed mortgage fraud stronger.[7]

**C. The Magistrate Court Correctly Found by Clear and Convincing Evidence that Harbour Failed to Report Financial Transactions Exceeding $1000.**

After three days of evidence, the magistrate judge found by clear and convincing evidence that Harbour received nearly $2 million in loans and failed to report them to his pretrial services officer. The magistrate court rejected Harbour's attempt to recharacterize these loans an "advance" on his future "income" that he was not required to report. The magistrate judge rejected Harbour's spurious attempts to evade the conditions of his release. Harbour was required to disclose these loans to pretrial services.

Harbour received loans of nearly $2 million by Shea using funds provided to Shea by Deel. In contrast, Harbour's income from Shea was $53,000 (in 2020) and $61,000 (in 2021). (*See* Ex. C) Harbour was also required to pay back these loans after he receives his

---

[6] Bates No. 053663-054331.

[7] Harbour has repeatedly claimed the Madoff case as being analogous to his. (Mot. at 3; Hr'g Tr. 2/25/22, p. 407) While Madoff was released on conditions, Unlike Harbour, Madoff confessed to his children (who immediately turned him into the FBI), confessed to the FBI, readily pleaded guilty to running a protracted *Ponzi* scheme. Notably, Madoff did not commit new offenses while on pretrial release. In the pantheon of high-profile defendants, Harbour is more similar to Paul Manafort, whose pretrial release was revoked because he tampered with two witnesses. Manafort proceeded to trial while in custody.

portion of the Santa Clarita property. Based on the information that the United States has obtained about the Santa Clarita property and the relevant bankruptcy proceeding, Harbour's representation that he would receive $20 million and therefore be able to repay Deel for these loans is fantastical.

Harbour's apparent ability to obtain personal loans of over a million dollars from individuals also makes him a flight risk. As the magistrate court observed: "This goes to the problem of the Court trying to set any release conditions that could possibly mitigate Mr. Harbour's flight risk given the amount of money that he can have access to with these complex transactions." (Hr'g Tr. 2/1/22, p. 294). The magistrate court also correctly noted that Harbour's access to funds and apparent unconcern for lying to or manipulating the court contributed to the inability of any condition or combination of conditions to assure his presence at trial:

> That is a central problem for . . . the ability for [the court] to set reasonable conditions to mitigate flight risk, because I don't know what's true and what's not true about Mr. Harbour's finances from looking at things he's signed or other documents and the like because there's been really a lot of falsity, particularly given the Georgia transaction . . . .

(Hr'g Tr. 2/1/22, p. 295)

> [N]o matter how these conditions get written, and I have attempted to do it three times with the government and defense counsel, three times, initially and twice on revocations. No matter what I write, I wind up with a defense attorney in front of me telling me that that transaction's okay because the language didn't cover it. Mr. Harbour's free to do whatever he wants financially based on characterizations by him and his cronies about what the money is. So people are reading the release conditions and they're quelling through the cracks between them so that Mr. Harbour is completely unsupervised financially.

(Hr'g Tr. 2/25/22, p. 428) The Court should affirm the Magistrate Court's finding that Harbour violated his pretrial release conditions by clear and convincing evidence when he failed to report the nearly $2 million in loans that he received from Deel through Shea, which were covered financial transactions exceeding $1000.

**D. This Court Should Find Probable Cause that Harbour Tampered with Victim-Witness Burg.**

The magistrate court incorrectly found that the United States failed to prove by probable cause that Harbour violated the federal law of witness tampering and conspiracy to witness tampering. *United States v. Gotti,* 794 F.2d 773, 777 (2d Cir. 1986) ("This scheme indicates that where there is probable cause to believe the released defendant has committed a crime, he may thereafter be detained upon a finding, by only a preponderance of the evidence, that no conditions of release will guard against flight or dangerousness or that the person is unlikely to abide by any release condition.")

[redacted]



[Page content redacted]

- 13 -

[redacted]

**2. Harbour Engaged in Witness Tampering During this Time**

With Harbour's false claim of suffering debilitating effects of long haul COVID above as background, the court should reconsider the Magistrate's ruling regarding witness tampering. In short, the Magistrate Judge was incorrect about what constitutes witness tampering believing that Harbour had to encourage false testimony as evidenced by the following statement:

> THE COURT: And as I -- my concern about the witness tampering itself, even though there's a very low standard, here I'm not sure that the false testimony part, that there's even been probable cause regarding the *false testimony* part.

(H'rg Tr. 2/25/22, p. 366) Simply put, witness tampering in violation of § 1512(b) does not require persuading the witness to give false testimony. Instead, it entails the use of intimidation, threatens, or *corruptly* persuades *another person, or attempts to do so*, or engages in misleading conduct toward another person, with intent to— *influence*, delay, or *prevent the testimony* of any person in an official proceeding. 18 U.S.C. § 1512(b) (emphasis added)

The principal debate is over the meaning of the term "corruptly persuades." *United States v. Doss,* 630 F.3d 1181 (9th Cir.2011) Although the language of § 1512 is ambiguous, the Ninth Circuit has found the Third Circuit's reasoning the more persuasive

---

[11] Despite owing nearly $4 million in taxes and stiffing numerous investors Harbour spent nearly $16,000 on this three- day trip and did not disclose the expenditure to PTS. (*See* Exs. L and M)

and the most consistent with the Supreme Court's later analysis of §1512 in *Arthur Andersen. v. United States*, 544 U.S. 696 (2005). *Id.*

As the Third Circuit points out, the examples of non-coercive "corrupt" persuasion cited by the House Report were *bribery* and attempting to persuade a witness to lie, both actions easy to characterize as inherently wrong or immoral, and not actions which could be considered otherwise innocent persuasion. *United States v. Farrell,* 126 F.3d 484, 488 (3d Cir.1997) (noting that "attempting to persuade someone to provide false information to federal investigators" would constitute "corrupt persuasion") The Supreme Court similarly noted that the term "corrupt" and "corruptly" are normally associated with "wrongful, immoral, depraved, or evil," and, when coupled with "knowingly" in § 1512, the government must show the defendant acted with "consciousness of wrongdoing." *Arthur Andersen, 544 U.S. at 697* .

Here, it was already established that Bobrow contacted Burg at the direction of Harbour. (*See* Doc. 346 ) The question for this court to determine is whether Bobrow's contact with Burg was nothing more than innocent persuasion or he was attempting to corruptly persuade in an effort to influence his testimony prior to the March 2022 trial. The objective facts are clear that Bobrow was attempting to corruptly persuade Burg to assert in advance of the trial that he was no longer a victim, among other false statements, related to his investment with Harbour. In making this determination the court needs to consider the statements that Bobrow makes to Burg.[12] First, the return of the $1 million was conditioned on the signing of a declaration. The declarations were inexplicably never provided to Burg's attorney and Burg never saw the declaration, but he only knew that he

---

[12] Harbour repeatedly cites to Burg's statement that, "you know what they say about agents in Hollywood? If their lips are moving, they're lying as a reflection of Burg's veracity. (Mot at 7) (*Id*) Harbour's counsel is incorrect about Burg's meaning. The expected testimony at trial is that Burg was drawing parallels between the lack of veracity of Hollywood agents and Harbour. Importantly, defense counsel mistakenly believes that Burg is an agent. He isn't. He produces films and manages actors but is not their agent. These are different than an agent.(*See, e.g.*, https://en.wikipedia.org/wiki/Mark_Burg)

had to sign the declaration to receive the money. (*See* Ex. G and J; interviews of Keith Davidson)[13]

In determining whether Bobrow was attempting to corruptly persuade Burg to influence his testimony the court needs look no further than the series of phone calls with Bobrow has with Burg including a recorded voicemail. First, Burg immediately alerts agents to the calls by Bobrow on November 10, 2021 asking that they cease. (Ex. G-19) The important points that Burg relates to agents were the following:

- Bobrow told Burg that Harbour's friend, Daryl Deel (Deel) was going to provide the $1 million owed to Burg by Harbour.
- Bobrow said that Harbour wants to "make everything right."

Following the November 10, 2021 call between Burg and investigating agents Burg agrees to record phone calls with Bobrow. In a recorded call Bobrow makes the following statements to Burg in an effort to persuade Burg to sign that declaration avowing that he was no longer a victim, " And he wants you to sign something that you won't put David in jail. I think that's what's going on." (See Ex. G 9) The implication of this statement is deafening, by signing this declaration it would negatively impact the government's case such that Harbour would be found not guilty and not be sentenced to prison.

The 83-year-old Bobrow (who acknowledges that he has lost $2.5 million to Harbour over the years and was currently involved with him in the Santa Clarita bankruptcy dispute) has his own motivations to convince Burg to sign a declaration in exchange for the money stating, " I'm going to tell you what it really is with me. He owes me money and if he goes to jail, I think that I'll lose all that money." ( Ex. G 9) Again, the subtext of this is that Bobrow can't afford to have Harbour found guilty and sentenced to prison. Bobrow attempts to persuade Burg to take the money by stating, " I'm thinking that uhm. If I were in your place though I would probably take the money." (*Id.*) He reminds Burg

---

[13] The undersigned attorney requested that defense voluntarily provide the declarations that were rejected by the court as work-product but it has not been forthcoming. (Ex. I)

that Harbour and Burg were good friends: "Well ah ah ah- you guys were friends weren't you?" g(*Id.*)

Burg and his attorney (Keith Davidson) continued to string Harbour along that he would sign a false declaration in exchange for $1 million. After Burg instructs his attorney to avoid meeting with Harbour's attorney Bobrow  reaches out again to Burg. This time Bobrow leaves a voice message. (*See* Ex. G 8) During the message he makes a number of statements where he tries to convince Burg that Harbour's attorney is trustworthy but concludes the voicemail by again referencing the declaration stating, " And that um, you sign the paperwork that gives him umm… That gives him piece of mind and assurance." The piece of mind is clear: the signed declaration will detrimentally impact the government's case.  Burg had no intention of ever signing a false declaration even for $1 million. (Ex. J)

In sum, Bobrow while doing the bidding of Harbour attempts to corruptly persuade Burg to sign a false declaration that would negatively impact his testimony at the upcoming trial such that Harbour would be found not guilty and would not be sentenced to prison. In sum, Harbour and Bobrow conspired to commit witness tampering and is a considerable economic danger to the community. "Courts have long recognized that 'danger' in the context of § 3148 refers to unlawful conduct, with little distinction between whether the nature of the conduct is economic or physical." *United States v. Wong,* 2012 WL 5464178, at *4 (D. Haw. Nov. 8, 2012) (citing *United States v. Reynolds,* 956 F.2d 192, 192–93 (9th Cir.1992)) ("We further hold that danger may, at least in some cases, encompass pecuniary or economic harm.") (citation omitted).

**CONCLUSION**

The court correctly found Harbour in violation of his release conditions and that he both posed a flight risk and was incapable of abiding by release conditions. The court, however, was incorrect about not finding by probable cause for witness tampering by Harbour. Without more, Harbour's motion to revoke detention should be denied.

Respectfully submitted this 29th day of March, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 29th day of March, 2022, I electronically transmitted the attached document to the Clerk's Office and provided a courtesy electronic copy to all registered CM/ECF participants.

*s/Daniel Parke*
U.S. Attorney's Office