Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Jill Ann Herman, 020180
jherman@cdslawfirm.com
Iulia A. Taranu, 034458
itaranu@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 253-5808
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of American,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>David Allen Harbour,<br><br>　　　　　Defendant. | Case No. 2:19-cr-00898-DLR (DMF)<br><br>**REPLY TO GOVERNMENT RESPONSE (Doc. 360) to DEFENDANTS OBJECTIONS (Doc. 358) TO RULING IN DOC. 346 (MARCH 1, 2022) AND REPLY TO OPPOSITION TO REVOKE THE ORDER OF DETENTION**<br><br>(**Oral Argument Requested**) |

## INTRODUCTION RE GOVERNMENT SEEKING REVIEW

Defendant sought a *de novo* review of Magistrate Judge Fine's Order of Detention pursuant to 18 U.S.C. §3145(b) and Rule 59, F.R.Crim. P. The Government failed to respond to any of the Defense arguments, thus conceding them. Instead, the government complained about the case having been continued in November. The government then sought its own review of the Magistrate Judge's Ruling (Doc. 346). The government has no right of review under 18 U.S.C. §3145(b), the section it cited. Only a Defendant ("the

person") may seek review of an Order of Detention. Had the Magistrate Judge declined to detain the defendant, *then* the government could have sought review under §3145(a). The Court has therefore determined that no probable cause existed to support a witness tampering charge with respect to Mark Burg. Nor does Rule 59, F.R.Crim.P. assist the government. The statute supersedes the Rule. Finally, assuming the government had a right to have the Detention Order reviewed, the government had 14-days to do so. That date was March 15; not March 29.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Defendant's Medical Condition

The government's reference to Defendant's long-term COVID argument is no more than an airing of grievances. COVID was not an issue in the Detention Hearing. However, accusations without support affects the government's credibility in general.[1] Obviously, though the government did not see the medical reports, the Court more or less told the government what they said. (Doc. 256)[2] when the Court continued the trial.

/ / /

/ / /

---

[1] We do not understand why previous counsel did not share the reports filed with the Court under seal with the government. We will supply them to the government upon counsel's assurance that they will not be made public absent a court order.

[2] Dr. L. Markham McHenry's Report of 9/20/21 was filed under seal in Doc. 249 (Motion for Reconsideration filed 9/27/21). The report of Christopher J. Nicholls, Ph.D, was filed under seal along with Defendant's Banner Physical Therapy appointment calendar – which was thwarted by his arrest and detention since December 13, 2021 – in Doc. 254 (Motion to Continue) filed 10/25/21. He still needs to finish his therapy, preferably, prior to trial.

**Santa Clarita Bankruptcy**

The second place where the government wanders off-topic concerns the what the government called the "complicated" Santa Clarita bankruptcy. The debtor owns just under 1000 acres of property in the middle of Santa Clarita, California.[3] The debtor was/is owned 50/50 by Bart Shea and by attorney, David Lunn. The first deed of trust on the property is owned by Blue Ox. So, coming out of the Chapter 11 proceeding filed by Santa Clarita, LLC means having to resolve the first party secured debt. The Blue Ox claim was resolved by settlement. *See*, 2:20-bk-12402-MCW, Doc. 545, 3/29/22.

Of course, until the deal closes, it has not closed. If it does, new equity holders and participants will be introduced into Santa Clarita. This will likely affect some interests, including the Harbour family interests (which amounts to 10% of the Shea/Lunn ownership).[4] Other interests, like Mr. Bobrow's, are fixed. *See*, 2:21-ap-00053-MCW, Doc. 263, 9/1/2021, Declaration of David Lunn, Exhibit 5. Mr. Bobrow's entity, KB-2011, will receive $5 million plus interest and an additional $3.2 million in a secured claim, thus almost $9 million. *Id.,* Exhibit 5 (Term Sheet dated 11/3/2020). The term sheet referenced explains how Mr. Bobrow's position in the bankruptcy came to exist.

Prologis (historically, Amazon's builder of choice) entered into an Agreement to buy the Santa Clarita property for $286 million. *See*, 2:20-bk-12402-MCW, Doc. 81,

---

[3] The ownership is papered through entities, as are various interests in the property. The property is located in Los Angeles County. It once had environmental issues but insurance resolved them. Properly developed, the total project may be worth a billion dollars or more.

[4] This is the basis for Harbour's description of himself as Shea's partner in the Santa Clarita property in the July 7, 2021 email.

2/10/2021, Plan of Reorganization, p. 27. In November 2021, Prologis terminated the agreement. *See*, 2:20-bk-12402-MCW, Doc. 342, 11/10/2021. We will discuss Santa Clarita further as we examine the government's contention that it is "fantastical" to discuss the Harbour family interests in Santa Clarita.[5] In short, while no one knows whether the Santa Clarita deal will close – until it does or does not – the government's allegation that the statements were false *when made* is untrue.

**Telephone Calls:** The government notes that Harbour and Bobrow spent a lot of time on the phone. Harbour worked for Shea. Shea owned 50% of Santa Clarita. Bobrow had about 9 million reasons to talk to Harbour. The government must know that about 99.9% of the business related calls between them had nothing to do Mark Burg. Rather, the calls concerned the Santa Clarita bankruptcy.[6]

Aside from its misstatements concerning Harbour's long-term COVID and the Santa Clarita bankruptcy, there are numerous other government misstatements.

---

[5] Defendant has no role in the upcoming closing and, if it does close, the Harbour family interests will not be paid until well after the trial, perhaps years after the trial, and so the Magistrate Judge properly found that the money that the Harbour family interests stand to gain down the road do not make Defendant a flight risk. But whether Santa Clarita closes or does not, the seven other developments in Arizona in which the Harbour family has interests are going to be more than sufficient to allow for the deduction of the advances. It was on the basis of these developments; not Santa Clarita, that the advances were made, as Santa Clarita was in bankruptcy when Deel extended the $8 million line to SCD.

[6] Filed on November 20, 2020, the Administrative case has generated over 550 separate filings. There have also been 8 associated Adversary Proceedings. The best and brightest of this City's unexcelled bankruptcy bar is up to its neck in this case. Their clients' interests are very dependent upon the outcome of the case. Whether those interests will pan-out is unknowable as of this moment and certainly they are unknown to Defendant, who has no present involvement in the matter. As of July 2021, the interests involved, including the Harbour family interests, were anything but "fantastical."

1. **The "Fantastical" Santa Clarita Interests and the Georgia Residence:** Harbour contacted Frank Madia of Equitable Home Mortgage on July 7, 2021. This was part of his job for Shea-Connelly Development, LLC ("SCD"). *See*, Exhibit E to Government Response, HARBOUR_053668. *See also*, Exhibit 1, Shea's November 4, 2021 Declaration. The closing described in the email *is* the Prologis closing that was supposed to occur in January 2022 prior to Prologis cancelling the Agreement in November. Prologis was going to sell off part of the property to Toll Brothers and others.[7] Thus, Harbour's statements to Madia on behalf of Shea on July 7, 2021 were absolutely true as of that date.

2. **$100,000 gift letter:** There is no evidence that Harbour had anything to do with *this* "gift letter," not even any evidence that he saw it. On August 18, 2021, 5-days before this letter is dated, Bart Shea emailed Frank Madia and described the nature of his relationship with Bobrow. It was not familial. It was described as a long-term mentor/mentee relationship. *See*, Exhibit 2 (Equitable 00023, Harbour_053685).[8] The word "cousin" was, obviously, hand-written *later* onto the "gift" letter that Harbour took to Bobrow to sign and that he emailed to Frank Madia. Harbour did not write the word in

---

[7] *See,* Toll Brothers Master Plan for Santa Clarita, Exhibit 7.

[8] This author's guess is that someone at Equitable either had not seen the August 18th email of was concerned that *its* note buyer, 5th Street Capital, wanted a gift to reflect a familial relationship. We conclude that the so-called "need" for a "gift" letter was an outgrowth of Equitable's relationship with 5th Street Capital and not something Equitable needed from Bart Shea. Neither Shea nor Bobrow would ever have called each other cousins. But someone at Equitable might have done so.

5

and, when Harbour emailed it, it did not say "cousin" on it. *See* Government Ex 16 (Ex 12) (filed under seal) in the Detention Hearing.

3. **Trips to Kenny Bobrow's Flagstaff house:** The government suggests that Harbours visited the Bobrow's Flagstaff residence when he was ill with COVID and that this buttresses its argument that Harbour "really" was not sick. The Bobrow's sold their Flagstaff house on February 23, 2021. *See*, Exhibit 6. Harbour contracted COVID the next summer.

4. **Reason for the Purchase of the Georgia House:** 1) On December 28, 2021 Vickie Bobrow told the government that Shea told her he bought the house to remodel it and sell it and she said the *only* gift letter Harbour brought was the one after the closing. 2) In his November 4, 2021 Declaration, Shea said the same thing, *See*, Exhibit 1. 3) In his interview with the government on October 1, 2021 Frank Madia told the government that Harbour told him that he was not the buyer. 4) The government's description of this transaction if fraught with misstatements. 5) There is absolutely no evidence that Harbour convinced Shea to buy the property or that he convinced Bobrow to loan the down payment. 6) Harbour was already living totally free at another multi-million dollar residence (his in-laws) but at the Georgia residence had to pay utilities. 7) The first gift letter cannot be tied to Harbour at all. 8) The only "gift-letter" tied to Harbour is tied to him *solely* because he drove it over to Bobrow to be signed. 9) The sole government witness admitted that there was no evidence that Harbour knew the gift letter he took to Bobrow was false. How probable cause could have been found here with respect to Harbour is baffling.

5. **Disclosure to PTS of his long-term COVID:** When Harbour contracted COVID, his Pretrial Supervisor was Tammy Mayhan. She knew Harbour was ill. She was succeeded by Gretchen White. Ms. White lived in Flagstaff. She never saw Harbour. When he asked for permission to go to Disneyland, she asked about his health.

6. **Phone calls with his lawyer, Alan Baskin:** On page 13, the government states, breathlessly, that Harbour "continued to have substantial amounts of telephone contact with Baskin; they spent nine hours on the telephone together from June to December 2021." This comment is made in utter seriousness. I likely spent nine hours on the phone with Harbour last week. What is noteworthy about fn. 10, is its observation that Harbour and Baskin spent no time on the phone in July, August, and September 2021. Defense lawyers spend hundreds of hours with their clients preparing for trial and in the summer of 2021, the trial was still set for January.

7. **Harbour's Income:** This section of the government's opposition, on pp. 9-10, contains a potpourri of government misstatements. First, however, the government (finally) admits that Deel Investments loaned money to Shea Connelly Development, LLC. ("SCD"). *See,* p. 9, l. 19. SCD borrowed $2 million from Deel Investments in two tranches of $1 million each. Harbour owes Deel nothing; Shea owes Deel Investments. Harbour is only liable to have his future development shares reduced by the advances he received and may receive. The loans to SCD are heavily secured. SCD advanced $500,000 to Harbour from the first million dollars. Of this sum, $200,000 was used for Harbour family expenses. The $300,000 balance was to pay settlements of claims that preexisted the indictment and for his criminal defense attorney's fees. The second million

was advanced by SCD to Harbour and was earmarked for the Burg settlement. This turned out to be a government undercover operation. When the money was not for that purposes, $800,000 of the advance was returned to SCD. The remaining $200,000 was used to pay his criminal defense lawyers.[9] These advances will be deducted by SCD from whichever projects in which Harbour has a percentile back-end interest pay him first. There are currently seven Arizona projects underway in which Harbour has a back-end percentile interest along with Santa Clarita.

8. **Disneyland Trip:** The trip was disclosed to and was approved by PTS. More fundamentally, the $16,000 expense was (mostly) borne by Abby Harbour's parents who paid $12,000 for two days of guided VIP Tours, so their daughter and her family could avoid the long lines.[10]

///

///

///

///

---

[9] Harbour's conditions of release did not require him to report to PTS, let alone to get PTS' approval, for *any* financial transactions that involved attorney's fees whether they were loans or advances. Nor did he have to report any family expenses or adjustment or resolution of preindictment debts. He also did not have to report any income whatsoever. Thus, we expect that Harbor's Schedule C will properly report the income, the Section 162 expenses deductible from income, and that with the appropriate use of NOL carry forwards, the appropriate taxes will be reported when the 2021 returns are filed.

[10] If there is a law that limits parents' indulging their children, I wish the Court would let mine know. The government and, perhaps the court know why Abby Harbour's parents would like their daughter to avoid waiting on long lines and why they would appreciate her spending as much quality time with her family as is possible. Tomorrow, after all, is promised to no one.

**HARBOUR AS A FLIGHT RISK**

I am not a soothsayer but the government's chart of the amounts involved in this case look like hopes and dreams. PAIF is not a victim.[11]

Burg is not a victim because the documents his own lawyers prepared permitted OakTree to borrow from Pujanza. The integration clause written into the documents by *Burg's lawyers* abrogated any prior discussion points and representations. Within a few months, the borrowed monies were moved over to Green Circle.[12]

Rhonda Gray made a 2010 loan to Highpointe and like other similar loans, including one by Russ Skelton (of Jones Skelton & Hochuli) she was not repaid. It has zero to do with "payday" lending except that Operation Chokepoint wiped Harbour out completely.[13]

Carol and Pat Hill's charges are based on the contention that "had they known" Harbour was getting "finder's fees," they would never have invested. Nonsense.

---

[11] The PAIF people are in utter violation of the Court's orders with respect to document production and we doubt that the Court is going to allow them to testify, even assuming they decided to waive their 5th Amendment privileges. If the government studies the State racketeering and SEC lawsuits we handed the government, they will quickly understand who the bad guys were in Green Circle.

[12] We note, parenthetically, that Exhibit I, the email from the government to the undersigned concerning the draft proposed Burg and Hill declarations prepared by Mr. Baskin and also note fn 13 on page 16 of the Government's response. The declarations were supplied on March 28, 2022. They are attached here as Exhibits 3 and 4. They were shown to Keith Davidson during Zoom calls on November 3 and December 7, 2021. While they were never sent to Davidson, they were displayed. (That is why we produced them). Also attached as Exhibit 5 is the draft proposed Burg settlement agreement. This evidence shows the opposite of witnesses tampering. Witness tampering requires a corrupt purpose. The truth is never corrupt.

[13] And, the government's arguments notwithstanding, the 5-year statute of limitations really has expired.

9

NorthRock never got finder's fees at all and DNA Investment's finder's fee was signed over to the Hill's after the first year. The Hills signed the February 8, 2013 finder's fee agreement but, apparently, did not provide it to the government. Meanwhile, the SOL on the Hill counts, like the Rhonda Gray counts have likely expired. Finally, Joe Cathey is not part of this case at all, as counsel admitted in open Court in response to the Court's inquiries.[14]

Next, Harbour last held Series 7 and 63 licenses in 2008.[15] All of the activity in the Indictments occurred well after that.

Finally, the tax evasion charged here is based upon the last act of evasion which, the government alleges, was in June 2018. At that time, the tax due and owning for 2012 was $179,000. The fact that months later (in October, 2018), the IRS and the Harbours reached a *civil* settlement, does not alter the fact that the evasion, if proven at all, is of a far lesser amount based upon the "last act of evasion."

**Conclusion**

The government elected to not respond to the Defendant's points. Instead, it improvidently sought review of an issue it lost without any statutory support. Then, it reargued a motion to continue it lost months ago. The rest of its response consists of a

---

[14] His name does not appear in the second superseding indictment. The government is going to have reach a decision as to whether it wants to insert "first payday" into this case or not. If it does it can expect to see expert testimony on how the Obama Administration destroyed payday lending: For political reasons. Not by statute but by threats and an Executive Order, all abandoned in the succeeding Administration. David Harbour was a victim of Operation Chokepoint. So was Joe Cathey.

[15] *See*, *SEC v. David Harbour*, 2:18-cv-02401-DGC, Doc. 2, Complaint, ¶6.

series of points that were easily disproved. What remains is this: Defendant is not a flight risk and he is anxious to go to trial. The government's case is not strong. It's witness tampering case has to run through a lawyer - Alan Baskin - to even be charged and the Magistrate Judge found no probable cause for it. The facts cannot improve for the government.

The Equitable Home Mortgage file has now been produced. Nothing tied Defendant to a §1014 case any deeper than the July 7, 2021 email, already discussed, which presented a set of facts that were completely true at the time and the fact that Harbour emailed the September 24, 2021 "gift" letter signed by Bobrow to Equitable, which was, fully, a month after the loan closed. This is not evidence of guilty involvement. Meanwhile, the government's agent testified that the government had no evidence that Harbour knew the gift letter was false. The government's position on this point is also likely to not improve.

Mr. Harbour has been in custody for 113 days. This is a complicated case to defend and it would be very helpful to the defense for Defendant to be released back on the $500,000 bond that is already in place, understanding that, if the Court required additional appearance bonds, they could likely be procured. Paul Manafort had deep relationships in Russia and overseas bank accounts. Harbour's relationships are in Kansas. A Judicial official has already found, here, that there is no probable cause to believe that Harbour (or Baskin) witness tampered. One cannot read the proposed Burg Declarations (Exs. 3 and 4) and proposed Settlement Agreement (Ex. 5) and see anything resembling witness tampering.

The government's contentions about "vast sums" of money being available to Harbour are meritless. All advances are subject to being offset against monies that will eventually inure to the Harbour family as a result of development deals presently underway in Arizona plus the potential Santa Clarita development in California.

There is no reason to detain this Defendant any longer. The Defendant is presumed to be innocent and the government could not prove probable cause for the witness tampering claim that formed the main basis for the warrant.

RESPECTFULLY SUBMITTED this 5th day of April 2022.

CHRISTIAN DICHTER & SLUGA, P.C.


By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Jill Ann Herman
    Iulia A. Taranu
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2022 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004
Attorney for Plaintiff


/s/ Yvonne Canez