# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | Case No.  CR-19-00898-PHX-DLR(DMF) |
| Plaintiff, | **DECLARATION OF BART SHEA** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

I, Bart Shea, am an adult over the age of 18 years, and I am competent to provide this declaration, testify to the same, and affirm that the contents are true.  I make this Declaration based upon my own personal knowledge and do so under penalty of perjury.

1.     I am the sole owner of Shea-Connelly Development, LLC. I have been in the real estate business in Arizona for over 40 years. I develop and construct multi-family, senior housing, residential and commercial properties.

2.     I hired David Harbour on September 3, 2019 as my VP of Projects. In this role, David works directly for me on various projects I assign.

3.     David was diagnosed with COVID this past summer and missed over 8 weeks of work.   David has not been the same since his COVID diagnosis and is now dealing with Long COVID symptoms. He is not able to focus very well and has short-term memory issues.

4.     David is only working 4-5 hours a day for me, because he loses focus and gets very tired.  I believe it is just going to take time for him to get better, as he is an invaluable employee and I do not want to lose him.

5.     I asked David to find some houses to remodel in Phoenix and Paradise Valley. David found the house at 2123 E. Georgia Ave., Phoenix, AZ 85016 that I purchased through

{WB718561v1 }

a limited liability company.  My legal counsel created the LLC and came up with the structure for the purchase of the property.

6.     I gave David this project because it does not take much mental capacity to purchase a house.  I understand that the government is alleging David was doing all the negotiating and dealing on the house.  This is not correct because David always acted under my supervision and direction, which was critical because of his condition.

7.     I spoke to F.M., the loan officer who provided the loan. I only spoke to him a few times and I never met him in person. I do not believe David ever met him in person either. I told F.M. that David was my employee and to work through him to get all the documents needed for the loan.

8.     I spoke to the real estate agent regarding the purchase of the house and I told her that I had to see and sign every document and every document had to go through legal counsel.

9.     The original contract was in the name of Shea-Connelly Development, LLC, but it was changed on advice of counsel to a new LLC, 2123 Georgia LLC. The contract was never in my name or David's name and never would have been.

10.    It is common practice in the real estate industry to create an LLC to purchase property and give your attorney the ability to sign for the company.

11.    I have multiple projects going on in Arizona and California and it is not possible for me to run all of them without delegating the work. To complete the purchase, I told David to put his name or his wife's on various contracts or vendors as necessary.

12.    The loan documents were delivered via courier to my office and I signed them and sent them back. I signed them as the manager of the LLC and not as an individual. I relied on my attorney to review all the loan documents and agreements to make sure everything was done correctly. I also gave my legal counsel power of attorney to sign on behalf of the company.

13.     I have built and or remodeled over 100 houses in my career. I have never come across a more dishonest seller or seller agent. The material maintenance issues with the house they left off the contract are so egregious I am considering filing a complaint against the seller, seller's agent and broker. I already caught the seller's agent in one lie and as a result, his broker had to provide a seller's credit at closing.

14.     David asked me if he and his family could move into the house at 2123 E Georgia because it is closer to his kids' school and their church. I told him that he could move in if he did not mind the construction and understood that it could be sold in the next 12 months.  It is always better to have someone living in a house than have it sitting empty, even if you are remodeling it.

15.     The house David is living in is owned by an LLC of which I am the sole member and Manager. David does not have any ownership in the house.

DATED this __4__ day of November, 2021.


_____
BART SHEA

{WB718561v1 }3

# EXHIBIT 2

**Patrice Land**

| | |
|---|---|
| **From:** | Frank Madia |
| **Sent:** | Wednesday, August 18, 2021 1:42 PM |
| **To:** | Patrice Land |
| **Subject:** | FW: Ken Bobrow |

Frank Madia
NMLS #168250
President
Equitable Home Mortgage, Inc.
6831 E. 5th Ave.
Scottsdale, Az. 85251
480-429-2108 direct line
602-377-3250 cell phone
480-429-2150 fax
frank@frankmadia.com

**From:** Bart Shea <shea@scd-llc.com>
**Sent:** Wednesday, August 18, 2021 1:38 PM
**To:** Frank Madia <frank@frankmadia.com>
**Subject:** Ken Bobrow

Frank,

Ken Bobrow hired me in 1979 and gave me as a young kid my first project, to build an apartment complex for him and has continued to invest in me and partner with me to do this day. Ken has been in the multi-family industry in Chicago and Phoenix since the 1960's and is a dear friend and mentor.

Hopefully this explains our relationship,

Thank you,

Bart

1

Equitable 00023
HARBOUR_053685

# EXHIBIT 3

**WEISS BROWN**
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
Telephone No. 480-327-6650
Email: alan@weissbrown.com
           mladen@weissbrown.com

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | **Case No.  CR-19-00898-PHX-DLR(DMF)** |
|---|---|
| Plaintiff, | **DECLARATION OF MARK BURG** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

I, Mark Burg, am an adult over the age of 18 years, and I am competent to provide this Declaration, testify to the same, and affirm that the contents are true.  I make this Declaration based upon my own personal knowledge and do so under penalty of perjury.

1.    I have been represented by counsel in connection with the drafting of this declaration, and a Settlement and Release of Claims Agreement with David Harbour, Pujanza Management LLC ("Pujanza") and any all affiliates, entities, family members of David Harbour, effective November___, 2021 and make this declaration of my own free-will.  I have not been asked to say anything but the truth. I do not make any of the statements in this declaration so Mr. Harbour will repay me; I make this declaration to set the record straight regarding our business dealings.

{WB717873v2 }

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

2.      I understand that I may be regarded as a victim in connection with David Harbour's July 30, 2019 indictment and, November 24, 2020 superseding indictment.  I am not a victim and do not wish to be treated by the government or the Court as one.

3.      I do not want any indictment to include my initials or any reference to me or any transactions related to any loans or investments I, either personally or through an entity or trust I control or am associated made to Mr. Harbour or any entity with which he was associated, or any other business dealings we have had.

4.      On or around December 1, 2014, I invested $1,000,000 into Pujanza.

5.      My legal counsel drafted Pujanza's Operating Agreement, ("Operating Agreement"), and I relied on counsel to draft it properly. [*See* Exhibit _____ at Section 13.18.] The Operating Agreement defined the purpose of Pujanza as "making investments in the form of equity investments or debt investments in various industries."

6.      The Operating Agreement gave Mr. Harbour 99% ownership in Pujanza and me 1%.  It also named Mr. Harbour Manager and Tax Partner. As Manager Mr. Harbour had full power and discretion to manage and direct Pujanza's business, property and affairs, and execute documents on behalf of the Company, including but not limited to all contracts or agreements with any third parties.  [*See* Exhibit _____ at Sections 5.1 and 5.3.1.]  He did not need approval from me or any of my advisors to engage in any of these activities.

7.      On or around December 2, 2014, Pujanza loaned approximately $1,000,000 (the "Loan") to Oak Tree Management, LLC ("Oak Tree") under the terms of the Operating Agreement. [*See* Exhibit _____.]

8.      The Loan was formalized by a promissory note (the "Note").  [*See* Exhibit _____.] The Note was secured by a commercial security agreement dated December 2, 2014 between Oak Tree and Pujanza (the "Security Agreement").  [*See* Exhibit _____.]  The Security Agreement granted Pujanza a security interest in, among other things, certain accounts, promissory notes, chattel paper, and instruments that may have existed between Oak Tree and Green Circle a wholly owned subsidiary and sovereign economic arm of, and created under the

DAH_0000013

laws of the Wakpamni Lake Community Corporation, a wholly-owned economic instrumentality of the Oglala Sioux Tribe, a federally-recognized sovereign American Indian Tribe ("GC"), and all proceeds thereof.

9.      It is my understanding and belief that on January 8, 2015, Mr. Harbour executed a consulting agreement between his company Milagro Consulting, LLC ("Milagro") and GC. This agreement gave Milagro a success fee of 80% of the profits of GC.  [*See* Exhibit _____ at p. 16.]

10.      It is my understanding and belief that on January 8, 2015, Mr. Harbour, as the Manager of Milagro, entered into a participation agreement between Milagro and Pujanza, which allowed Pujanza to participate in the profits Milagro received from GC. [*See* Exhibit _____.]

11.      The Loan authorized Mr. Harbour, as the Manager of Oak Tree, to use the funds from Pujanza to pay expenses for Oak Tree and for the benefit of Mr. Harbour at his sole discretion.  The Loan did not require Oak Tree to obtain any preapprovals from Pujanza and did not establish a limit on the amount that Oak Tree could spend on expenses for the benefit of the Manager or Oak Tree. [*See* Exhibit _____ at p. 1.]

12.      My sole concern was having my investment repaid, regardless of the precise use of the Loan proceeds.  I relied on my attorneys and advisors' representations, not Mr. Harbour's. [*See* Exhibit _____ at pp. 34, 46, and 55.]

13.      Upon information and belief $999,000 of my investment in Pujanza was loaned to GC to support its tribal lending operation.  I now understand that in some instances Mr. Harbour may have first used some of my money for business or personal expenses not related to my loan. It is my understanding and belief that Mr. Harbour had a line of credit ("LOC") with an associate that he could draw on, amongst other things, to offset any expenses he had paid with the Pujanza loan, and that he drew on the LOC and loaned to GC all amounts from Pujanza that he may have previously used for other expenses. Although I may have wanted to know if Mr. Harbour was using a portion of my investment to pay personal expenses, the

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

DAH_0000014

Operating Agreement my counsel drafted gave him the right to use the money as he did without my approval.

14.    The government never asked me about the Operating Agreement, who drafted it and what rights I gave Mr. Harbour. The government never told me my money ended up where it was supposed to go. It only asked me about one transaction and never provided any more detail.

15.    Pursuant to the Note, Pujanza received approximately $78,750 in interest between 2015 and 2017. The payments came from GC to Oak Tree, and then Pujanza. The payments from GC and Oak Tree were proper and per the terms of the Note. In turn, Pujzana made approximately $78,750 of distributions to the Mark Burg Living Trust. The distributions from Pujanza to the Mark Burg Living Trust were consistent with the terms of the Operating Agreement.

16.    I do not believe Mr. Harbour misrepresented any of the terms of my investment. I do not believe I was defrauded by Mr. Harbour in relation to my investment in Pujanza.

17.    I believe Mr. Harbour did not intend to lose my money and acted in good faith when he told me he thought it was a good investment and he would not have ever intentionally put my money at risk.

18.    I believe Mr. Harbour always had good intentions and would pay back my investment when he had the funds to do so.

19.    I do not believe Mr. Harbour ever planned, tried, wanted, or intended to harm, deceive, or cheat me out of my money.

20.    Mr. Harbour and I have resolved our differences related to my investment into Pujanza. I consider any disputes with Mr. Harbour and/or any entity related to Mr. Harbour concluded and fully resolved.

21.    I have not sustained any losses or harm from my business dealings with Mr. Harbour and waive any claim I may have to restitution in *United States v. Harbour*.

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

DAH_0000015

22.     I do not want to participate in any trial or action against Mr. Harbour in *United States v. Harbour*, but will honor any lawfully issued subpoena.

23.     I may wish to socialize with Mr. Harbour and his family, or do business with Mr. Harbour and I ask that he not be subject to any release condition preventing him from having direct or indirect contact with me, my family and my business advisors.


DATED this _____ day of November 2021.


_____
MARK BURG

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

DAH_0000016

# EXHIBIT 4

1  **WEISS BROWN**
2  6263 N. Scottsdale Road, Suite 340
   Scottsdale, Arizona 85250
3  Telephone No. 480-327-6650
   Email: alan@weissbrown.com
4         mladen@weissbrown.com

5  *Attorneys for Defendant*
6
            **IN THE UNITED STATES DISTRICT COURT**
7
              **FOR THE DISTRICT OF ARIZONA**
8

9   United States of America,              **Case No.  CR-19-00898-PHX-DLR(DMF)**

10                          Plaintiff,     **DECLARATION OF MARK BURG**

11  vs.

12
    David Allen Harbour,
13

14                          Defendant.
    _____

15      I, Mark Burg, am an adult over the age of 18 years, and I am competent to provide this

16  Declaration, testify to the same, and affirm that the contents are true.  I make this Declaration

17  based upon my own personal knowledge and do so under penalty of perjury.

18      1.    I have been represented by counsel in connection with the drafting of this

19  declaration, and a Settlement and Release of Claims Agreement with David Harbour, Pujanza

20  Management LLC ("Pujanza") and any all affiliates, entities, family members of David

21  Harbour, effective December~~November~~___, 2021 and make this declaration of my own free-

22  will.  I have not been asked to say anything but the truth. I do not make any of the statements

23  in this declaration so Mr. Harbour will repay me; I make this declaration to set the record

24  straight regarding our business dealings.

25

26

27

28
    {WB725093v1 }

DAH_0000007

2.      I understand that I may be regarded as a victim in connection with David Harbour's July 30, 2019 indictment and, November 24, 2020 superseding indictment.  I am not a victim and do not wish to be treated by the government or the Court as one.

3.      I do not want any indictment to include my initials or any reference to me or any transactions related to any loans or investments I, either personally or through an entity or trust I control or am associated made to Mr. Harbour or any entity with which he was associated, or any other business dealings we have had.

4.      I met Mr. Harbour and his family in late August 2013 at Gozzer Ranch. I was at Gozzer Ranch with my family and not Mr. Harbour. Any social events or businesses Mr. Harbour was associated with prior to August 2013 I did not attend and was not a part of.

5.      In and around March of 2014, Mr. Harbour and I met at the Peninsula hotel in Beverly Hills, CA to discuss doing business together.

6.      In and around August of 2014, Mr. Harbour sent me an agreement to loan $1,000,000.00 to Mr. Harbour. My attorneys advised Mr. Harbour that the transaction needed to take the form of an investment instead of a loan, and they drafted the agreements for my investment.

3.7.    In and around November 2014, I met Mr. Harbour at the Peninsula Hotel in Beverly Hills, CA. Around that time, I told Mr. Harbour that my advisors were still working on the operating agreement for my investment.

4.8.    On or around December 1, 2014, I invested $1,000,000 into Pujanza.

5.9.    My legal counsel drafted Pujanza's Operating Agreement, ("Operating Agreement"), and I relied on counsel to draft it properly. [*See* Exhibit _____ at Section 13.18.] The Operating Agreement defined the purpose of Pujanza as "making investments in the form of equity investments or debt investments in various industries."

10.     The Operating Agreement gave Mr. Harbour 99% ownership in Pujanza and me 1%.  It also named Mr. Harbour Manager and Tax Partner. As Manager Mr. Harbour had full power and discretion to manage and direct Pujanza's business, property and affairs, and execute

{WB725093v1 }2

documents on behalf of the Company, including but not limited to all contracts or agreements with any third parties.  [*See* Exhibit _____ at Sections 5.1 and 5.3.1.]  He did not need approval from me or any of my advisors to engage in any of these activities.

6.11.   My legal counsel did not have any conversations with Mr. Harbour about Pujanza or the nature of its business.

7.12.   On or around December 2, 2014, Pujanza loaned approximately $1,000,000 (the "Loan") to Oak Tree Management, LLC ("Oak Tree") under the terms of Pujanza's Operating Agreement. [*See* Exhibit _____.]

8.13.   The Loan was formalized by a promissory note (the "Note")  [*See* Exhibit _____.] My understanding and belief is that the Note was secured by a commercial security agreement dated December 2, 2014 between Oak Tree and Pujanza (the "Security Agreement").  [*See* Exhibit _____.] I further understand and believe that the Security Agreement granted Pujanza a security interest in, among other things, certain accounts, promissory notes, chattel paper, and instruments that may have existed between Oak Tree and Green Circle, a wholly owned subsidiary and sovereign economic arm of, and created under the laws of the Wakpamni Lake Community Corporation, a wholly-owned economic instrumentality of the Oglala Sioux Tribe, a federally-recognized sovereign American Indian Tribe ("GC"), and all proceeds thereof. I further understand and agree that Mr. Harbour had the right as the Manager of Oak Tree to subordinate the Pujanza Loan.

9.14.   It is my understanding and belief that on January 8, 2015, Mr. Harbour executed a consulting agreement between his company Milagro Consulting, LLC ("Milagro") and GC. This agreement gave Milagro a success fee of 80% of the profits of GC.  [*See* Exhibit _____ at p. 16.]

10.15.  It is my understanding and belief that on January 8, 2015, Mr. Harbour, as the Manager of Milagro, entered into a participation agreement between Milagro and Pujanza, which allowed Pujanza to participate in the profits Milagro received from GC. [*See* Exhibit _____.]

DAH_0000009

~~11.~~16. The Loan authorized Mr. Harbour, as the Manager of Oak Tree, to use the funds from Pujanza to pay expenses for Oak Tree and for the benefit of Mr. Harbour at his sole discretion. The Loan did not require Oak Tree to obtain any preapprovals from Pujanza and did not establish a limit on the amount that Oak Tree could spend on expenses for the benefit of the Manager or Oak Tree. [*See* Exhibit _____ at p. 1.]

~~12.~~17. I understood, based on advice of legal and accounting professionals, that I had made a legal and proper **investment** and my primary concern was having my investment repaid. [*See* Exhibit _____ at pp. 34, 46, and 55.]

> **Commented [AB1]:** Was not a loan.

~~13.~~18. Upon information and belief $999,000 of investment in Pujanza was loaned to GC to support its tribal lending operation. I now understand that in some instances Mr. Harbour may have first used some of my money for business or personal expenses not related to my loan. Although I may have wanted to know if Mr. Harbour was using a portion of my investment to pay personal expenses, the Operating Agreement my counsel drafted gave him the right to use the money as he did without my approval. I understand and have seen documents leaving me with the understanding and belief that all the $999,000 investment in Pujanza that was loaned to Oak Tree was subsequently loaned to GC. My primary concern was receiving my distributions and having my investment repaid.

~~14.~~19. The government never told me my money ultimately ended up in Green Circle, which is my understanding and belief based on documents that I have reviewed.

~~15.~~20. Pujanza made approximately $78,750 of distributions to the Mark Burg Living Trust. The distributions from Pujanza to the Mark Burg Living Trust were consistent with the terms of the Operating Agreement.

~~16.~~21. I do not believe Mr. Harbour misrepresented any of the terms of my investment. If Mr. Harbour did fail or forget to disclose any of the terms or representations of my investment in Pujanza, or his past business deals, I do not believe it was intentional or being deceitful. I do not believe I was defrauded by Mr. Harbour in relation to my investment in Pujanza.

> **Commented [AB2]:** We have not agreed to any of this language. The redline is in addition to the language we discussed last time. This is critical language that ties into specific language in the government's bill of particulars. This language should also be acceptable because Burg's lawyers drafted the documents specifying what David could or could not do.

~~17.~~22. I believe Mr. Harbour did not intend to lose my money.

DAH_0000010

18.23. After reviewing certain documents, I do not believe Mr. Harbour ever planned, tried, wanted, or intended to harm, deceive, or cheat me out of my money.

19.24. Mr. Harbour and I have resolved our differences related to my investment into Pujanza.  I consider any disputes with Mr. Harbour and/or any entity related to Mr. Harbour concluded and fully resolved.

20.25. I have not sustained any actual or intended losses or harm from my business dealings with Mr. Harbour and waive any claim I may have to restitution in *United States v. Harbour.*

21.26. I do not want to participate in any trial or action against Mr. Harbour in *United States v. Harbour*, but will honor any lawfully issued subpoena.

22.27. I do not want to participate in any fashion, whether as a witness or victim, in *United States v. Harbour.*

23.

24.28. I ask that Mr. Harbour not be subject to any release condition preventing him from having direct or indirect contact with me, my family and my business advisors.

DATED this ____ day of December~~November~~ 2021.

_____

MARK BURG

{WB725093v1 }5

**Commented [ 3]:** Will be in SRA.

**Formatted:** Font: Not Italic

DAH_0000011

# EXHIBIT 5

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("SRA") is entered into by and between David Allen Harbour ("Harbour") and Mark Burg ("Burg").  Harbour and Burg are collectively referred to herein as the "Parties."

## I.  RECITALS

A.      On July 1, 2014, Articles of Organization for Pujanza Management, LLC ("Pujanza"), a Wyoming limited liability company, were filed with the Wyoming Secretary of State on behalf of Harbour.  The original operating agreement became effective as of the same date.  On or around December 1, 2014, Burg and Harbour executed an amended and restated operating agreement under which Burg was admitted to Pujanza as a new member.  Pujanza issued to Burg a 1% membership interest for a purchase price of One Million Dollars ($1,000,000.00).

B.      On or around December 2, 2014, Pujanza loaned most of the $1,000,000.00 Burg invested in Pujanza to Oak Tree Management, LLC ("Oak Tree"), an entity Harbour owned.  The loan was memorialized in a promissory note dated December 2, 2014 (the "Note").  The loan was to be used to fund a payday lending entity called Green Circle, and to pay Oak Tree's and Harbour's expenses.  Payment of the expenses was at Harbour's sole discretion and he was not required and did not need to obtain any pre-approval from Pujanza or Burg regarding the expenses.  Oak Tree's payments to Pujanza under the Note were to be comprised of quarterly interest-only payments and then a lump sum payment of $1,000,000.00 in December 2019.  Pujanza was obligated to make certain quarterly distributions to Burg until Burg's investment was repaid.  Burg received around $78,750 in distributions from Pujanza.  The principal balance of the Note, which corresponds to Burg's capital contribution to Pujanza, is still outstanding.

C.      On or around November 4, 2017, Burg filed a lawsuit against Harbour and entities related to Harbour in *Mark Burg v. David A. Harbour, et al.*, BC678175 (the "Lawsuit").  The Lawsuit arose out of facts and circumstances related to Burg's investment in Pujanza, and Pujanza's subsequent loan to Oak Tree.

D.      The Parties now wish to compromise and settle all claims, including but not limited to the Lawsuit, that are related to the Note and otherwise, upon the terms and conditions set forth in Section II below.  Burg represents that he has the authority to settle all matters against Harbour on behalf of all applicable entities he may control, be a beneficiary of, or have a majority interest in.  For the remainder of this agreement, Burg and all entities he may control, be a beneficiary of, or have a majority interest in that may have claims against Harbour and/or any of Harbour's related entities will be referred to as "Burg."  Harbour, his community property, and/or any of his related entities that may be liable to Burg under any claim will be referred to collectively as "Harbour."

## II.  TERMS OF AGREEMENT

In consideration of the promises and covenants contained in this SRA, the validity and sufficiency of which are hereby acknowledged, the Parties agree as follows:

A.     **General Release and Discharge.**

For good and valuable consideration, Burg, for himself and his spouse, beneficiaries, children, heirs, trusts, trustees, executors, representatives, servants, agents, administrators, predecessors, successors, assigns, affiliates, and all other persons or entities claiming by, through or under him, hereby fully releases and forever discharges and acquits Harbour and his spouse, beneficiaries, children, heirs, trusts, trustees, executors, representatives, servants, agents, administrators, predecessors, successors, assigns, affiliates, and all other persons or entities with whom any of the foregoing have been, are now, or may hereafter be affiliated, from any and all claims, liabilities, rights, obligations, charges, promises, agreements, injuries, expenses, compensations, losses, debts, monies, damages, demands, lawsuits, appeals, complaints, grievances, causes, actions, causes of action, costs, and fees, of any nature whatsoever, whether in law, in equity, known, unknown, liquidated, unliquidated, absolute, contingent, anticipated, or unanticipated.

Burg acknowledges and agrees that the release and discharge set forth above is a general release.  Burg further agrees that he has accepted the consideration specified herein as a complete compromise of any debt Harbour may have under the Note, which debt may involve a matter of disputed issues of law and fact.  Burg assumes the risk that the facts or law may be other than he believes.  Burg expressly waives and assumes the risk of any claims for damages which exist as of this date, including those of which he does not know or suspect to exist, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would affect his decision to enter into this SRA.  Burg understands and agrees that this SRA is a compromise of disputed claims, and the consideration is not to be construed as an admission of liability on the part of Harbour, who expressly denies liability.  This release does not release any of the Parties from any of the obligations set forth in this SRA.

B.     **Settlement Payment Terms.**

Within three (3) calendar days of the Parties fully executing this SRA, Harbour will pay to Burg One Million One Hundred Thousand Dollars and Zero Cents ($1,100,000.00) ("Payment"). The Payment is given in exchange for the release in Section II.A above and in full settlement and satisfaction of any debt Harbour may have that is related to Burg, including but not limited to debts or obligations arising under the Lawsuit. The Parties agree to execute all documents necessary to effectuate this SRA.  The Parties agree to each bear their own costs, attorneys' fees, and all other expenses incurred in connection with the execution of this SRA.

C.     *United States v. David Allen Harbour*.

Burg understands that the government regards him as a victim in connection with Harbour's July 30, 2019 and November 24, 2020 indictments in *United States v. David Allen Harbour*, Case No. CR-19-00898-PHX ("*U.S. v. Harbour*").  Burg may advise the government that he does not wish to be treated by the government as a victim, waives any claim to restitution and considers his dispute with Harbour and any Harbour-related entity concluded.

Subject to the terms of Section II.D below, nothing in this SRA obligates any Party to provide this SRA to any individual or entity.  Notwithstanding the foregoing, the Parties, upon request by the government, may provide a copy of this SRA to the government in *U.S. v. Harbour*. Burg shall comply with any lawfully issued subpoena issued by either party in *U.S. v. Harbour,* and testify truthfully should *U.S. v. Harbour* proceed to trial.

D.    **Confidentiality.**    The Parties agree to keep this SRA and its terms strictly confidential and shall not disclose or divulge this SRA or its terms to any person or entity not a party to this SRA, except as otherwise provided herein, may be required by law, upon order of a court of competent jurisdiction, to implement or enforce this SRA, to the Internal Revenue Service, or any federal, state, local or other taxing authority, to any governmental or regulatory agency with authority to compel production, or to their accountants or attorneys for tax, financial, or estate planning purposes (but in the event of disclosure to such accountants or attorneys, the disclosing party shall instruct and secure such advisor's agreement to maintain the confidentiality of this SRA and its terms).  This confidentiality provision does not prohibit or restrict the Parties or their attorneys from initiating communications directly with, or responding to any inquiry from, or providing testimony before any state or federal regulatory or enforcement authority, regarding this agreement or its underlying facts or circumstances.  In the event a party receives a subpoena or other request for production or disclosure, to which the SRA and/or its terms are responsive, the subpoenaed party shall provide the other Parties with notice and a reasonable opportunity to object or move to quash.  After providing such opportunity, the party served a subpoena, request for production or other discovery request may comply with it, unless otherwise ordered to the contrary. The Parties acknowledge that remedies at law would be inadequate to fully protect against a breach of the foregoing covenant of confidentiality and, therefore, the Parties may enforce the terms of this paragraph through equitable remedies including injunctive relief.

E.    **Integration and Understanding.**    This SRA is complete and integrated, and constitutes the entire understanding between the Parties with respect to the subject matter contained herein and supersedes all previous agreements, understandings, promises, warranties, representations, inducements or conditions, oral or written, except as contained herein.  The express terms hereof control and supersede any course of performance inconsistent with any terms hereof.  Any revisions, amendments or modifications to this SRA must be in writing and signed by all Parties.  Any implied and/or oral revisions, amendments or modifications will not be binding on any of the Parties.  In entering into this SRA, the Parties represent that they have had the opportunity to seek the advice of their attorneys concerning the legal consequences of this SRA, and that the terms of this SRA are fully understood and voluntarily accepted by the Parties.

F.    **Warranty of Capacity.**    In entering into this SRA, the Parties represent that:  (1) they are legally competent and have the sole right and exclusive authority to settle the claims referred to in the recitals of this SRA and execute and provide the consideration specified in this SRA; (2) the individuals executing this SRA on behalf of the Parties have the lawful authority and good right to execute the same; (3) they have not sold assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in the recitals of this SRA; and (4) they understand and agree that this SRA is made and entered into as their free and voluntary act.

G.     **Execution of Multiple Counterparts.**  This SRA may be executed in any number of counterparts and by electronic transmission (including PDF or similar scanned format) or facsimile, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This SRA shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signature of all of the Parties reflected hereon as the signatories, and shall constitute the effective date of this SRA.  Any electronic or facsimile signature shall be given full force and effect for all purposes under this SRA.

H.     **Choice of Law, Jurisdiction and Venue.**  This SRA and all questions relating to its validity, interpretation, performance and enforcement shall be governed by, and construed and interpreted in accordance with, the laws of the State of Arizona.  If any action is brought to construe, interpret, or enforce any provision of this SRA, the Parties irrevocably consent to exclusive jurisdiction and venue in Maricopa County, Arizona.  In the event any party finds it necessary to bring an action to enforce any of the terms of this SRA or for breach of this SRA, the prevailing party in any such action or other proceeding shall be awarded its reasonable attorneys' fees and taxable costs incurred.  The Parties expressly agree and acknowledge that this paragraph shall maintain its full force and effect even if a party claims that the SRA is unenforceable, void, voidable, or otherwise invalid for any reason or grounds whatsoever.

I.     **Taxes.**  The Parties agree and acknowledge that none of the Parties, nor anyone acting or purporting to act on their behalf, has made any representation or provided any advice regarding taxes or tax liability, if any, resulting from payment of the Settlement Sum.  The Parties agree and acknowledge that they are solely responsible and liable for any federal, state, and/or local taxes that may be due on the payment of the Settlement Sum, including interest and penalties, if any.  The Parties will issue tax reporting, if any, consistent with their normal business practices.

J.     **Construction.**  The Parties agree that they have negotiated the terms of this SRA and that no term shall be construed in favor of or against one or more Parties based on the fact that one or more Parties drafted the term in dispute.  The titles, headings, and paragraph captions set forth in this SRA are for the convenience of the Parties and do not modify, limit or otherwise affect the express provisions of this SRA.

K.     **Additional Documents and Actions.**  The Parties agree to cooperate fully and execute any supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the terms and intent of this SRA.

[SIGNATURES ON THE FOLLOWING PAGE]

AS INDIVIDUALS AND ON BEHALF OF ANY RELATED ENTITY THAT MAY HAVE
CLAIMS OR OBLIGATIONS CONTEMPLATED BY THIS SRA:


_____          _____

David Allen Harbour                                      Date



_____          _____

Mark Burg                                                        Date

# EXHIBIT 6

Official Records of Coconino County   3906389
Patty Hansen - Recorder   02/26/2021 11:29:18 AM   Pgs: 4
SIMPLIFILE LC E-RECORDING   $30.00

Recorded at the request of *Clear Title Agency of Flagstaff*
When recorded mail to:

H. Wilson Elliott, III and Theresa M. Mulready, Trustees
32531 N Scottsdale Road #105-191
Scottsdale, AZ 85266

Escrow No.: 95201271

# WARRANTY DEED

For the consideration of Ten Dollars, and other valuable considerations, I or we, **Kenneth S Bobrow and Victoria Bobrow, husband and wife, who aquired title as Victoria Rautbord, an unmarried woman and Kenneth S Barbrow, an unmarried man,** the GRANTOR does hereby convey to **H. Wilson Elliott, III and Theresa M. Mulready, Trustees of the Elliott Family Trust dated June 2, 1993, amended and restated June 30, 2004, and last amended and restated September 3, 2015,** the GRANTEE, the following real property situated in **COCONINO** County, Arizona:

See Exhibit A attached hereto and made a part hereof.

*Pursuant to ARS 33-404, Beneficiaries names and addresses under said trust(s) are disclosed in Beneficiary Disclosure attached hereto.*

SUBJECT TO: Current taxes and other assessments, reservations in patents and all easements, rights of way, encumbrances, liens, covenants, conditions, restrictions, obligations, and liabilities as may appear of record.

And the GRANTOR does warrant the title against all persons whomsoever, subject to the matters set forth above.

Dated: February 23, 2021

**See Signatures and Notary Acknowledgment Page Attached**

Unofficial.gov

3906389 - Pages: 2 of 4 - 02/26/2021 11:29:18 AM

Warranty Deed - continued

Escrow No.: 95201271

## Signatures and Notary Acknowledgment Page

See acceptance attached hereto and by this reference made a part hereof

**Kenneth S Bobrow**

**Victoria Bobrow**

STATE OF ARIZONA          }
                          }SS
County of Maricopa        }

Subscribed and sworn to before me this 23rd day of February 20 21, by Kenneth S Bobrow and Victoria Bobrow

In witness whereof I hereunto set my hand and official seal.

Notary Public

My Commission Expires: 10.16.2021

JODIE J SIMER
Notary Public – Arizona
Maricopa County
My Comm. Expires Oct 16, 2021

Unofficial Copy

# BENEFICIARY DISCLOSURE

Clear Title Agency of Flagstaff
513 N Beaver St.
Flagstaff, AZ 86001

RE: Escrow No.: 95201271

The undersigned, H Wilson Elliott, III and Theresa M Mulready, being the Trustee(s) of the Elliott Family Trust dated June 2, 1993, amended and restated June 30, 2004, and last amended and restated September 3, 2015, do(es) hereby certify that as of this date said Trust Agreement is in full force and effect and has not been amended, modified or revoked.

The names and addresses of the beneficiaries of the trust, which must be disclosed on the deed, are as follows:

NAME:       H Wilson Elliott III

ADDRESS:    32531 N Scottsdale Rd. #105-191 Scottsdale AZ 85266

NAME:       Theresa M Mulready

ADDRESS:    32531 N Scottsdale Rd #105-191 Scottsdale AZ 85266

NAME:       H Wilson Elliott III

ADDRESS:    32531 N Scottsdale Rd #105-191 Scottsdale AZ

Date: _____ 2/25/2021 | 2:57 PM MST


Elliott Family Trust dated June 2, 1993, amended and restated June 30, 2004, and last amended and restated September 3, 2015

BY: _H. Wilson Elliott, III_____
H Wilson Elliott, III
Trustee

BY: _Theresa M. Mulready_____
Theresa M Mulready
Trustee

Unofficial Copy

Warranty Deed - continued

Escrow No.:  95201271

## EXHIBIT A

LOT 147 OF FOREST HIGHLANDS UNIT TWO, ACCORDING TO THE PLAT OF RECORD IN THE
OFFICE OF THE COUNTY RECORDER OF COCONINO COUNTY, ARIZONA, RECORDED IN CASE 4,
MAPS 101 TO 101D AND CERTIFICATES OF PLAT CORRECTION RECORDED IN DOCKET 1150,
PAGE 458; AND IN DOCKET 1137, PAGE 415 AND RECORDED IN DOCKET 1332, PAGE 664,
RECORDS OF COCONINO COUNTY, ARIZONA.
.


Unofficial Copy

# EXHIBIT 7

Regarding:
Porta Bella Master Planned Community
Santa Clarita, CA

**REMEDIATION FINANCIAL, INC**

Dated:
January 19, 2022

## LOI Summary

| Buyer | Amount | Land |
|---|---|---|
| KB Home | $85,738,000 | 326 - SF 6000 Lots |
| KB Homes | $66,420,000 | 328 - SF Paired Lots |
| KB Homes | $19,344,000 | 62 – SF 10000 Lots |
| JPI | $31,000,000 | 16 Acres MF |
| Wolf | $8,250,000 | 5 Acres for Senior Housing |
| Blackhall Studio | $175,200,000 | 117 Acres Commercial |
| Spirit | $60,000,000 | 50 Acres Commercial |
| DMB | $250,000,000 | 324 Acres Residential |
| Clarion | $350,000,000 | 350 Acres Commercial |
| Prologis | $286,000,000 | 286 Acres Commercial |
| Waymark | $400,000,000 | 324 Acres Residential |
| Seefried | $190,000,000 | 70 Acres |
| Amazon | $300,000,000 | 300 Acres Commercial |
| Toll Brothers | $420,000,000 | 324 Acres Residential |

Remediation Financial, Inc.
8777 E Via De Ventura
Suite 250
Scottsdale, AZ 85258

## Hidden Vista Ranch - Whittaker-Bermite Property
## Land Use Breakdown

| LAND USE | ACRES | DUs | DENSITY (DUs/ACRE) |
|---|---|---|---|
| Apartments | 36.2 | 796 | 22.0 |
| 3-Story Townhomes | 14.3 | 268 | 18.7 |
| 2-Story Townhomes | 14.69 | 219 | 14.9 |
| 2-Story Backyard Townhomes | 6.41 | 60 | 9.4 |
| 120'x120' 4-Pack Cluster | 42.5 | 352 | 8.3 |
| 45x75 Lots | 56.9 | 297 | 5.2 |
| 50x80 Lots | 65.8 | 341 | 5.2 |
| 60x100 Lots | 64.9 | 263 | 4.1 |
| 70x110 Lots | 82.6 | 229 | 2.8 |
| Town Center - Live/Work, Townhomes | 5 | 91 | 18.2 |
| Town Center - Commercial | 10.1 | | |
| Business Park | 97.2 | | |
| School Site | 10.5 | | |
| Open Space & Park | 375.6 | | |
| Metro Station | 9.3 | | |
| Totals | 892 | 2,916 | |
| Average Density (DUs / Residential Acres) | | | 7.5 |

### RESIDENTIAL SUMMARY

| | |
|---|---|
| For Sale Units | 2,120 |
| For Rental Units | 796 |
| Total Residential Units | 2,916 |
| Total Residential Acreage | 389.3 |
| Average Density (DUs / Residential/Acre | 7.5 |

## Hidden Vista Ranch - Whittaker-Bermite Property
### Detailed Land Use Breakdown

**Apartments (22 DU/AC)** — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| AP-8 | | 12.6 ACRES | 277 UNITS | 22.0 DU/ACRE |
| AP-9 | | 23.6 ACRES | 519 UNITS | 22.0 DU/ACRE |
| | TOTAL | 36.2 ACRES | 796 UNITS | |

**3-Story Townhomes**
*1500-1800 (THREE STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| MF3-24 | | 5.7 ACRES | 112 UNITS | 19.6 DU/ACRE |
| MF3-25 | | 4.1 ACRES | 57 UNITS | 13.9 DU/ACRE |
| MF3-26 | | 4.5 ACRES | 99 UNITS | 22.0 DU/ACRE |
| | TOTAL | 14.3 ACRES | 268 UNITS | |

**2-Story Townhomes**
*1600-1900 (TWO STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| MF2-27 | | 3.4 ACRES | 60 UNITS | 17.6 DU/ACRE |
| MF2-23 | | 11.3 ACRES | 159 UNITS | 14.1 DU/ACRE |
| | TOTAL | 14.69 ACRES | 219 UNITS | |

**2-Story Backyard Townhomes**
*1600-1900 (TWO STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| MF2-23 | | 6.4 ACRES | 60 UNITS | 9.4 DU/ACRE |
| | TOTAL | 6.41 ACRES | 60 UNITS | |

**120'x120' 4-Pack Cluster**
*2400-2700 (TWO STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| 9DU-5 | phase 1 | 15.4 ACRES | 126 UNITS | 8.2 DU/ACRE |
| 9DU-15,31,32,33 | phase 2 | 15 ACRES | 128 UNITS | 8.5 DU/ACRE |
| 9DU-17,37,38,39 | phase 3 | 12.1 ACRES | 98 UNITS | 8.1 DU/ACRE |
| | TOTAL | 42.5 ACRES | 352 UNITS | |

**45x75 Lots**
*2800-3100 (TWO STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| 7DU-4 | phase 1 | 23.9 ACRES | 113 UNITS | 4.7 DU/ACRE |
| 7DU-11 | phase 2 | 14.2 ACRES | 78 UNITS | 5.5 DU/ACRE |
| 7DU-18 | phase 3 | 18.8 ACRES | 106 UNITS | 5.6 DU/ACRE |
| | TOTAL | 56.9 ACRES | 297 UNITS | |

**50x80 Lots**
*3100-3400 (TWO STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| 5.5DU-3 | phase 1 | 25 ACRES | 133 UNITS | 5.3 DU/ACRE |
| 5.5DU-51 | phase 2 | 14.2 ACRES | 61 UNITS | 4.3 DU/ACRE |
| 5.5DU-21 | phase 3 | 26.6 ACRES | 147 UNITS | 5.5 DU/ACRE |
| | TOTAL | 65.8 ACRES | 341 UNITS | |

**60x100 Lots**
*3100-3400 (TWO STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| 4DU-20 | phase 1 | 29.6 ACRES | 117 UNITS | 4.0 DU/ACRE |
| 4DU-13 | phase 2 | 13 ACRES | 55 UNITS | 4.2 DU/ACRE |
| 4DU-22 | phase 3 | 22.3 ACRES | 91 UNITS | 4.1 DU/ACRE |
| | TOTAL | 64.9 ACRES | 263 UNITS | |

**70x110 Lots**
*3500-4000 (TWO STORY)* — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| LUX-1 | phase 1 | 28.1 ACRES | 77 UNITS | 2.7 DU/ACRE |
| LUX-12 | phase 2 | 22.9 ACRES | 60 UNITS | 2.6 DU/ACRE |
| LUX-19 | phase 3 | 31.6 ACRES | 92 UNITS | 2.9 DU/ACRE |
| | TOTAL | 82.6 ACRES | 229 UNITS | |

**Town Center - Live/Work, Townhomes** — NET DENSITY

| | | Acres | Units | Net Density |
|---|---|---|---|---|
| TC-34 | live/work | 2.2 ACRES | 49 UNITS | 22.3 DU/ACRE |
| TC-16 | rowtown | 2.8 ACRES | 42 UNITS | 15.0 DU/ACRE |
| | TOTAL | 5 ACRES | 91 UNITS | |

**Town Center - Commercial**

| | Acres |
|---|---|
| TC-36 | 2.9 ACRES |
| TC-35 | 3.8 ACRES |
| TC-29 | 3.4 ACRES |
| TOTAL | 10.1 ACRES |

**Business Park**

| | Acres |
|---|---|
| I-6 | 47.1 ACRES |
| I-7 | 50.1 ACRES |
| TOTAL | 97.2 ACRES |

**Open Space / Park**

| | Acres |
|---|---|
| OP-10 | 34.4 ACRES |
| OP-40 | 107.5 ACRES |
| OP-41 | 47.5 ACRES |
| OP-42 | 27.2 ACRES |
| OP-43 | 119.6 ACRES |
| OP-44 | 2.8 ACRES |
| OP-45 | 6.6 ACRES |
| OP-46 | 8.6 ACRES |
| OP-47 | 18.9 ACRES |
| OP-48 | 2.5 ACRES |
| TOTAL | 375.6 ACRES |

**School Site**

| | Acres |
|---|---|
| ES-49 | 10.5 ACRES |
| TOTAL | 10.5 ACRES |

**Metro Station**

| | Acres |
|---|---|
| MET-28 | 9.3 ACRES |
| TOTAL | 9.3 ACRES |





















Comparison of Proposed Site Plan
to TTM dated 8/11/2000

HIDDEN VISTA RANCH
SANTA CLARITA, CALIFORNIA

Proposed Site Plan is Color Coded Land Uses & Red Roadways
TTM dated 8/11/20 is Bolder Black Lines