FILED ✓    ___ LODGED
___ RECEIVED    ___ COPY

JUN 1 4 2022

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1  GARY M. RESTAINO
   United States Attorney
2  District of Arizona
   KEVIN M. RAPP
3  Arizona State Bar No. 014249
   Email: Kevin.Rapp@usdoj.gov
4  COLEEN SCHOCH
   Georgia State Bar No. 366545
5  Email: Coleen.Schoch@usdoj.gov
   Assistant United States Attorneys
6  Two Renaissance Square
   40 N. Central Ave., Suite 1800
7  Phoenix, Arizona 85004
   Telephone: 602-514-7500
8  Attorneys for Plaintiff

**REDACTED FOR
PUBLIC DISCLOSURE**

9

10            IN THE UNITED STATES DISTRICT COURT

11              FOR THE DISTRICT OF ARIZONA

12  United States of America,          No. CR-19-00898-PHX –DLR

13                     Plaintiff,
                                       **SECOND SUPERSEDING
14          vs.                        INDICTMENT**

15  David Allen Harbour,               VIO:   18 U.S.C. § 1343
                                              Wire Fraud
16                     Defendant.             (Counts 1–10)

17                                            18 U.S.C. § 1341
                                              Mail Fraud
18                                            (Counts 11–12)

19                                            18 U.S.C. § 1957
                                              Transactional Money Laundering
20                                            (Counts 13-23)

21                                            26 U.S.C. § 7201
                                              Tax Evasion
22                                            (Count 24)

23                                            26 U.S.C. §7206(1)
                                              False Statement
24                                            (Count 25)

25                                            26 U.S.C. § 7212(a)
                                              Obstruction
26                                            (Count 26)

27                                            18 U.S.C. § 1349
                                              Conspiracy
28                                            (Count 27)

18 U.S.C. § 1344(2)
Bank Fraud
(Count 28)

18 U.S.C. § 1343
Wire  Fraud
(Counts 29-30)

18 U.S.C. § 1957(a)
Transactional Money Laundering
(Counts 31-32)

18 U.S.C.§ 1028A(a)(1)
Aggravated Identity Theft
(Counts 33-34)

18 U.S.C. § 981(a)(1)(C);
18 U.S.C. § 982(a)(1);
21 U.S.C. § 853;
28 U.S.C. § 2461(c)
(Forfeiture Allegations)

**THE GRAND JURY CHARGES:**

At all times material to this Second Superseding Indictment, within the District of Arizona and elsewhere:

## **INTRODUCTION**

1.      Beginning on or about January 2007 and continuing through July 2019, Defendant DAVID ALLEN HARBOUR defrauded investor-victims out of approximately $10,082,864.01 by promoting and selling fraudulent high-yield investments, in most cases involving investments in high-rate loans to consumers and general investments. Some of these loans in which Defendant HARBOUR purported to solicit investors are known as "payday loans." Defendant HARBOUR induced investors to provide funds by making materially false statements and omissions orally during in-person meetings, in written solicitations, promissory notes, self-styled contracts, engagement letters, commercial security agreements, operating agreements, text messages, emails, and other documents. Defendant HARBOUR then used the investment funds for purposes other than what was promised to investor-victims, such as for personal living expenses to support his and his family's lavish lifestyle to include, but not limited to, private golf resort membership fees, substantial personal credit card payments, extravagant parties, mortgage payments, an

1  expensive power boat, private chartered jets, luxury homes, jewelry and other business

2  ventures. In some instances, Defendant HARBOUR made *Ponzi* payments with funds

3  received from later investor-victims to make payments to earlier investor-victims in an

4  effort to continue the fraud.

5  2.  Defendant HARBOUR orchestrated the fraud scheme through numerous entities,

6  including HighPointe Capital Group, LLC(HighPointe Capital Group); Nautical Holdings,

7  LLC (Nautical Holdings); Pujanza Management, LLC (Pujanza); Milagro Consulting, LLC

8  (Milagro); Oak Tree Management, LLC (Oak Tree); 21020, LLC (21020); DNA

9  Management, LLC (DNA Management); DNA Investments, LLC (DNA Investments);

10  NorthRock, LLC (NorthRock); AJS Management, LLC (AJS Management); and Canyon

11  Road Holdings, LLC (Canyon Road).

12  **HIGH-YIELD INVESTMENT FRAUD SCHEME**

13  3.  Beginning in December 2007, Defendant HARBOUR solicited investor-victims by

14  promising significant returns in short periods of time. Defendant HARBOUR told investors

15  their funds would be invested in short-term, high interest-rate loans to consumers (also

16  known as payday loans), and general investments. Defendant HARBOUR represented he

17  made 18%-20% returns for his clients and assured investors that investing in payday

18  lending was not risky because the small loans were made to a diversity of consumers.

19  Investors were falsely told their funds would be used only as short-term loans to small

20  consumer and start-up businesses and that their funds were secured by Defendant

21  HARBOUR's personal guarantees.

22  a.  Defendant HARBOUR set up various LLCs, such as Pujanza and

23  NorthRock, with some investor-victims to facilitate investments in the payday lending

24  scheme. Defendant HARBOUR solicited numerous investors into a payday lending

25  scheme and other unspecified investments known as KSQ Management, LLC (KSQ).

26  Defendant HARBOUR concealed from investors that he was paid a 25% origination fee

27  for their investment. After the collapse of KSQ, Defendant HARBOUR blamed the

28  principal of KSQ, J.T., for the loss of investment funds and solicited some of the same

KSQ investors and others into a fund known as Green Circle, a Native American lending entity that he stated would finance consumer loans and generate profits. Defendant HARBOUR was the consultant and main fund-raiser of Green Circle, and his fees were dependent on the incoming cash flows he raised. Defendant HARBOUR misrepresented to investors that their principal would be paid back before he took a percentage of profits generated through the payday loans. Most investors were never told they were not in first position to receive returns. In some cases, Defendant HARBOUR convinced investors to lend him money with high rates of return. Defendant HARBOUR never paid the money back and, in some cases, made interest payments with other investors' money (i.e., *Ponzi* payments) and concealed this from investors.

b.      As a result of the fraudulent investment offerings, between January 2007 through October 2016, victim-investors provided to Defendant HARBOUR at least $6,900,000 in investment funds.

c.      Defendant HARBOUR personally solicited investors in Arizona and other states. Defendant HARBOUR was a member of several private, luxury golf resorts located in Paradise Valley and Scottsdale, Arizona, Cabo San Lucas, Mexico, Palm Springs, California, and Harrison, Idaho. Defendant HARBOUR solicited potential investors from these golf resorts. For several victim investors, Defendant HARBOUR invited them to his vacation condominium at Gozzer Ranch Golf and Lake Club in Harrison, Idaho or his condominium in Cabo San Lucas, Mexico. Defendant HARBOUR took potential investors out on a luxury boat and out to fine dining and entertainment. Defendant HARBOUR invited investors to his Skybox during Arizona State University football games. He also invited potential investors to his 16th hole Skybox at the Phoenix Waste Management Open.

d.      Defendant HARBOUR portrayed a veneer of success by telling investors about luxury expenditures that he intended to give the illusion that he was a successful investor. For example, he described his 40th birthday party to one investor, where he explained how he flew all of his friends to the party location on a private chartered airplane and attended a private concert of the 1970s band, The Eagles, in Los Angeles.

e.      Through operating agreements, contracts, promissory notes, emails, text messages and oral statements, Defendant HARBOUR misrepresented virtually every material aspect of the purported investment opportunities, including but not limited to: the backgrounds and experience of the principals, the amount of funds actually going to the represented investment, that the investor is principal would be paid back to the investor *before* Defendant HARBOUR was compensated, and that Defendant HARBOUR had invested his own personal funds into the investment, giving investors the impression that Defendant HARBOUR's own money was at risk. Defendant HARBOUR further misrepresented the source of interest payments: interest payments were coming from other investors' money in the form of *Ponzi* payments rather than proceeds from an investment.

f.      In addition to defrauding investors and lenders, Defendant HARBOUR evaded the payment of substantial federal income taxes and instead used the money to live an extravagant lifestyle that he could not otherwise afford. During IRS efforts to collect on unpaid tax liabilities, Defendant HARBOUR made multiple false statements to IRS personnel.

## PAT SPALUDING GENERAL INVESTMENT FRAUD SCHEME

4.      In December 2007, Defendant HARBOUR, through HighPointe Capital Group, solicited K.B. to invest $2,500,000 pursuant to a Loan Agreement dated December 13, 2007 and pursuante to Multiple Advance Notes.

5.      Defendant Harbour provided personal guarantees to K.B., promising to return his $2.5 million.

6.      HARBOUR represented to K.B. that the proceeds under the Loan Agreement and Multiple Advance Notes were only to be used "to fund loans made or to be made (a) to Family Dollar franchises and (b) to construct or acquire college-level student housing located in Texas" as part of a larger $7,000,000 loan that was allegedlyto be made by HighPointe Capital Group to Pat Spaulding ("Spaulding") an alleged business acquaintance of Defendant HARBOUR who Defendant HARBOUR represented had ties to both the Family Dollar Store and student housing markets.

7.      HARBOUR also solicited P.C. for the same investment. Defendant HARBOUR explained that the Family Dollar Stores were a franchise-owned product and that the real investment would be in the ownership of the Family Dollar Store building. Defendant HARBOUR did not provide P.C. details in regard to the student housing part of the investment. Defendant HARBOUR misrepresented to P.C. that she would receive a 18% rate of return.

8.      Spaulding was a high school classmate of HARBOUR, passed away in 2009, and never was involved in investments involving the Family Dollar Store or student housing as represented by HARBOUR.

9.      HARBOUR misrepresented to K.B. and P.C. that "Pat Spaulding" was the reason the why the investment did not succeed.

10.     Defendant HARBOUR continued to represent that "Spaulding" was involved in this investment by sending "Spaulding" an email threatening legal action in 2014, five years after Spaulding had died.

**R.G. FRAUD SCHEME**

11.     Defendant HARBOUR began his fraudulent activity with victim R.G. as early as 2010. R.G.'s husband passed away suddenly in 2009, and R.G. was subsequently provided with a life insurance check. She signed over the insurance check in the amount of $1,001,242.67 to Defendant HARBOUR, and he told her that he was going to invest the money and guaranteed a minimum 3% return.

12.      At various points from 2010 to 2016, R.G. wanted access to her funds that were in Defendant HARBOUR's possession. For example, R.G.'s mother was ill, and she needed the funds for medical and housing expenses. Defendant HARBOUR did not provide the funds to her but instead offered numerous excuses. Defendant HARBOUR also made excuses during in-person meetings, phone conversations, and text messages. Defendant HARBOUR maintained R.G.'s trust by texting her on numerous occasions assuring her that she should not worry and would receive a return on her investment. From 2010 to 2019, the only return of funds R.G. received was $60,000 on August 2, 2011.

**KSQ / J.T. FRAUD SCHEME**

13.     Sometime in or around 2011, Defendant HARBOUR began an investment partnership with J.T., who was based in Kansas City, MO. J.T.'s payday lending entity was known as KSQ Management, LLC (KSQ). Defendant HARBOUR solicited victims to invest by promising significant returns in short periods of time. Defendant HARBOUR told investors their funds would be invested by KSQ in short-term, high-interest rate loans known as payday loans. The investments were recorded via promissory notes with attached amortization schedules between one of Defendant HARBOUR's companies and the investor. In turn, the funds provided to KSQ were recorded as a promissory note between one of HARBOUR's entities and KSQ. In many instances, HARBOUR signed the promissory notes with personal guarantees made by him. HARBOUR misrepresented to investors such as J.C. that they were the only ones that received personal guarantees. Although this business arrangement, which he began around 2011, was not successful, HARBOUR would continue for years to entice investors with personal guarantees, knowing that he did not have the ability to pay on those guarantees.

14.     The investors were also not told that HARBOUR had an arrangement with J.T. to receive upwards of a 25% finder's fee based upon the amount of investors' funds he raised and provided to KSQ. When HARBOUR was unable to provide interest payments to investors, he told the investors that J.T was to blame. When investors lost their money, HARBOUR claimed (similar to what he misrepresented to R.G.) that "the change in laws by the President and Operation Chokepoint changed the Automated Clearing House (ACH) laws regarding payday lending." At this point, Defendant HARBOUR had continued to receive his 25% finder's fee from KSQ while blaming KSQ and J.T. for the lack of investment payments. Most, if not all, of the promissory notes signed by the victim-investors and Defendant HARBOUR were made between the investor and one of HARBOUR's entities, such as NorthRock or Canyon Road.

15.     C.H. was Defendant HARBOUR's employee who invested $81,621.34 with HARBOUR through his entity NorthRock, on or about December 15, 2012. C.H. had the

1  funds in her IRA, and HARBOUR directed her to transfer the IRA to Liberty Trust
2  Company located in Texas, and the loan to NorthRock would be serviced through Liberty
3  Trust.

4  16.   HARBOUR was also aware that C.H.'s husband P.H. had received an inheritance
5  of $500,000. HARBOUR told C.H. that he would increase the interest rate on her IRA loan
6  if she and P.H. invested the $500,000. On February 8, 2013, C.H. and P.H. provided
7  HARBOUR the $500,000 to invest. HARBOUR invested the money in KSQ but did not
8  disclose the finder's fee he received for providing the money to KSQ. C.H. repeatedly
9  asked HARBOUR when she would be paid back, to which HARBOUR responded that
10  C.H. should "go ask J.T. where her money is." HARBOUR only made minimal payments
11  to P.H. and blamed J.T. even though HARBOUR was listed on the promissory note with
12  P.H. and was ultimately responsible for paying the funds back.

13  17.   HARBOUR provided funds to KSQ through his entities: DNA Investments,
14  NorthRock, and Canyon Road. DNA Investments was personally owned by HARBOUR.
15  NorthRock was jointly owned with M.D. HARBOUR received a finder's fee from KSQ no
16  matter which company provided the funds. Due to the losses sustained by KSQ, NorthRock
17  filed bankruptcy on June 13, 2018, listing 25 investor claims totaling $35,830,253.62.

18  18.   Many of the KSQ investors wanted their money back and threatened to sue
19  Defendant HARBOUR or go to the authorities. In response, HARBOUR assured many of
20  the KSQ investor-victims they would receive a return on their investment by promising to
21  pay the investors back through a new business investment he was working on known as
22  Green Circle. He emailed some of the KSQ investors and provided excuses or told them
23  funds were coming. HARBOUR made modest interest payments to some investors. These
24  interest payments were not regularly scheduled payments as dictated in the amortization
25  schedule of the investor's promissory note but were made based on which investor
26  complained the most.

27  19.   HARBOUR continued his fraud scheme knowing that he did not disclose his
28  finder's fee arrangement with KSQ. HARBOUR did have the ability to make some

payments to the victims but instead, made substantial payments to his American Express credit card while blaming KSQ and J.T. for the failure to provide investors with returns. From 2011 through 2014, at least $14,700,000 was sent to KSQ from HARBOUR-controlled bank accounts, and $27,335,141.92 was sent to HARBOUR's bank accounts from J.T. controlled bank accounts; that amount included $6.6 million in payments to HARBOUR as a finder's fee. There were additional funds sent to KSQ either directly from investor-victims or from other HARBOUR accounts.

**GREEN CIRCLE FRAUD SCHEME**

20.     Following the collapse of KSQ in approximately 2014, HARBOUR began a business investment relationship with a Native American-owned entity known as Green Circle. HARBOUR solicited some of the previous KSQ investors and convinced them to invest in Green Circle. HARBOUR told some of the investors who lost money in the KSQ scheme that he would be able to repay them with substantial returns on investments with Green Circle. Some of these investors, in an effort to recoup their losses from KSQ, decided to invest in Green Circle and sent their investment funds directly to Green Circle bank accounts instead of providing the funds directly to HARBOUR's entities similar to the KSQ venture.

21.     In addition to the KSQ investors, HARBOUR raised funds from new investors for the Green Circle venture. Similar to the previous investment schemes, HARBOUR utilized promissory notes to record the financial transactions and, in some instances, signed personal guarantees. The major difference in HARBOUR's actions between the KSQ scheme and the Green Circle scheme was that he kept a portion of the investor's funds that were invested and only provided a portion of the funds to Green Circle. Unlike KSQ, instead of receiving his finder's fee on the back end, he took it on the front-end. Again, investor-victims did not know that HARBOUR was keeping a large percentage of their investment funds for his own personal compensation, nor would he have been authorized to do so.

22.     In some instances, HARBOUR continued to randomly make *Ponzi* payments to

some of the investors with other investors' funds or from sources that were not from the investment vehicle. Victim M.B., who did not invest in KSQ, was convinced to provide HARBOUR $1 million for investment into Green Circle. HARBOUR only provided $600,000 to Green Circle and used the remaining $400,000 to make payments to his American Express credit card and for lavish family vacations, among other personal expenditures. Another investor, victim R.T., invested $500,000, and only $55,000 went to Green Circle. Similar to M.B.'s funds, R.T.'s funds were used to pay the balance on HARBOUR's American Express credit card and to make *Ponzi* payments to other investors. Despite HARBOUR's representations regarding the return on investment, investor R.T. received only minimal interest payments of $64,571.27. For investor M.B.'s $1 million investment, he received only $65,000 in wire transfer payments from HARBOUR's Pujanza Management bank account from June 2015 to January 2017.

23.     During the Green Circle fraud scheme, HARBOUR transitioned from raising individual investor funds to securing a Revolving Credit Promissory Note, executed June 19, 2015, for Green Circle from FinTech Financial, LLC (all of FinTech's interest was assigned to Princeton Alternative Income Fund (PAIF), an investment fund established on June 25, 2015). PAIF provided funds *via* draw requests to Green Circle for payday loans. The draw requests were submitted by Green Circle employees and were reviewed by PAIF prior to funding. Per the agreement, HARBOUR had to provide certain financial information to PAIF for their review that would be material to the funding decision for each draw request. Defendant HARBOUR misrepresented the financial condition and operations of Green Circle. PAIF began funding Green Circle in July 2015.

24.     From the beginning of the business arrangement with PAIF, HARBOUR manipulated the records to his advantage in order to entice PAIF to fund the draw requests. The records included a spreadsheet that gave a false impression of the lending portfolio and the status of Green Circle. For example, per the guidelines of funding, customers who were in arrears with the Green Circle payday lending were barred from receiving any new loans. Instead, HARBOUR issued new loans to the borrowers who were about to go into

default, which absorbed the old loans. HARBOUR misrepresented to PAIF that Green Circle was a functional and profitable portfolio and that the loans were performing and not in default. PAIF relied on this information for their lending decision and would not have provided funds if the borrowers' loan status was accurately represented. HARBOUR never disclosed to investors that the loans were non-performing. HARBOUR's business relationship ended with Green Circle upon PAIF learning of a Securities and Exchange Commission (SEC) investigation into HARBOUR and the raising of investment funds for Green Circle.

**INVESTOR-VICTIMS PAYMENTS TO DEFENDANT HARBOUR**

25.     Between December 2007 and July 2019 the investor-victims made investments of approximately $10,082,864.01 primarily related to loans to small businesses, start-up businesses, and for short-term payday-style lending. The following chart represents the victims' funds that were provided based upon HARBOUR's false statements and material omissions:

| Name | Account | Amount (Approximate) | Deposit Date (On or about) |
|---|---|---|---|
| K.B. | HighPointe Capital Group | $2,500,000 | 12/13/2007 |
| P.C. | HighPointe Capital Group | $200,000 | 12/2007 |
| R.G. | HighPointe Capital Group | $1,001,242.67 | 03/22/2010 |
| C.H. | NorthRock | $81,621.34 | 12/15/2012 |
| J.C. | NorthRock | $3,000,000 | 07/2012 |
| P.H. | DNA Investments | $500,000.00 | 02/8/2013 |
| A.W. | Canyon Road | $100,000.00 | 02/18/2014 |
| SNI Fund 1/ R. T. | Oak Tree | $500,000.00 | 07/30/2014 |
| M.B. | Pujanza | $1,000,000.00 | 12/02/2014 |
| D.W. | Canyon Road | $100,000.00 | 01/01/2015 |
| PAIF | Oak Tree | $1,100,000.00 | 08/11/2015 |
| **Total** | | **$10,082,864.01** | |

**WIRE AND BANK FRAUD**

26.     In 2014, Defendant HARBOUR went into default on his mortgage loan for his residence located at XXXXX East Ranch Gate Road, Scottsdale, Arizona and the bank foreclosed on the property in 2017.

27.     In October 2015, Defendant HARBOUR, in a continued effort to demonstrate a veneer of success, arranged to purchase a multi-million-dollar residence located at XXXX Martingale, Paradise Valley, ("Martingale"). At the time, the house was valued at $2.7 million. Defendant HARBOUR had poor credit, unstable income, tax liens, owed millions of dollars to numerous investors, among other liabilities. He could not have qualified for a conventional loan to purchase the residence.

28.     Defendant HARBOUR approached J.S. to purchase Martingale. It was agreed that Defendant HARBOUR would move in, pay rent of $20,000 per month, make substantial improvements to the home, and eventually purchase the home from J.S. Due to Defendant HARBOUR's dire financial situation the agreement required personal guarantees by Defendant HARBOUR and his in-laws, T.J.G.

29.     Defendant HARBOUR moved into Martingale in October 2015. Defendant HARBOUR made only two rent payments, did not complete any remodeling as agreed, and left the home in a state of disrepair. Defendant HARBOUR was evicted from Martingale in September 2019.

30.     In 2021, Defendant HARBOUR found another luxury property for purchase located at XXXX E. Georgia Ave., Phoenix, Arizona ("Georgia Residence"). The home was valued in July 2021 at approximately $3.7 million. Again, Defendant HARBOUR was unable to qualify to purchase the property. Associate (1) was willing to purchase the property if he did not have to provide funds necessary for the purchase. Defendant HARBOUR solicited investors to provide the down payment and other related closing costs.

31.     Similar to the Pat Spaulding fraud, Defendant HARBOUR approached K.B. for the purpose of requesting that he lend approximately $141,000 toward the down payment for the Georgia Residence. Similar to Martingale, Defendant HARBOUR sought the financial

assistance of his in-laws, T.J.G, who agreed to lend approximately $202,000 for costs related to the purchase of the Georgia Residence. Defendant HARBOUR provided both K.B. and T.J.G a secured promissory note as collateral for their investment in the Georgia Residence, and an agreement for them to be paid back by Associate (1). The note purported to be signed by Associate (1). T.J.G's funds were wire transferred to K.B.'s bank account to be combined with his funds to be provided to the lender.

32.    The lender, Equitable Home Mortgage, Inc., required that a gift letter be executed avowing the funds provided by K.B. were not a loan but rather a gift. In other words, there was no expectation that Associate (1) had to re-pay the funds.

33.    HARBOUR provided two false gift letters to Equitable Home Mortgage, Inc., that misrepresented that the down payment was a gift and not a loan. This statement was false, as both K.B. and T.J.G executed separate secured promissory notes that expressly agreed that Associate (1) would return their funds. In addition, one of the gift letters provided to Equitable Home Mortgage, Inc., mispresented that Associate (1) and K.B. were cousins as an explanation as to why K.B. would gift Associate (1) approximately $340,000. Again, this was untrue. The gift letters contain a warning that the signatories fully understand that it is a federal crime to knowingly make false statements.

34.    Equitable Home Mortgage, Inc. funded the loan. HARBOUR and his family moved into the Georgia Residence in November 2021.

## COUNTS 1–10

### WIRE FRAUD

### (18 U.S.C. § 1343)

35.    The factual allegations in paragraphs 1 through 34 are incorporated by reference and re-alleged as though fully set forth herein.

36.    Beginning at a time unknown to the Grand Jury, but at least as early as in or about January of 2010, and continuing to a time unknown to the Grand Jury, but to at least in or about July of 2019, in the District of Arizona and elsewhere, HARBOUR, individually and doing business under the entities described above, along with other individuals and entities

- 13 -

known and unknown to the Grand Jury, knowingly and willfully devised and intended to devise a scheme and artifice to defraud and to obtain money and property from investor-victims by means of materially false and fraudulent pretenses and representations, and by the concealment and omission of material facts.

37.     On or about the dates listed below, for the purpose of executing and attempting to execute the scheme or artifice to defraud and to obtain money and property, HARBOUR, individually and doing business under the entities described above, knowingly transmitted and caused to be transmitted, by means of wire and radio communications in interstate commerce, certain writings, pictures, signals, and sounds, to and from the District of Arizona and elsewhere, as set forth below, with each instance being a separate count of this indictment:

| Count | Wire Date (On or About) | Sender | Recipient or Receiving Bank | Item Sent (Approximate) |
|-------|-------------------------|--------|-----------------------------|-------------------------|
| 1 | 07/30/2014 | SNI Fund 1/R.T. | Oak Tree Management NT 1790 | $500,000.00 |
| 2 | 12/02/2014 | M.B. | Pujanza Management, LLC BMO 5244 | $1,000,000.00 |
| 3 | 08/11/2015 | Green Circle | Oak Tree Management BMO 1964 | $1,100,000.00 |
| 4 | 12/31/2015 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 5 | 04/04/2016 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 6 | 07/19/2016 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 7 | 10/17/2016 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |

| 8 | 01/20/2017 | Harbour Family Pujanza Management BMO x5244 | M.B. | $8,125.00 |
| 9 | 03/15/2016 | GC BMO x9606 | R.T./C.I.F. | $10,942.24 |
| 10 | 06/15/2016 | GC BMO x9606 | R.T./C.I.F. | $11,062.49 |

In violation of Title 18, United States Code, Section 1343.

## COUNTS 11–12

### Mail Fraud

### (18 U.S.C. § 1341)

38.    The factual allegations in paragraphs 1 through 37 are incorporated by reference and re-alleged as though fully set forth herein.

39.    Beginning at a time unknown to the Grand Jury, but at least as early as in or about January of 2010, and continuing to a time unknown to the Grand Jury, but to at least in or about July of 2019, in the District of Arizona and elsewhere, Defendant HARBOUR, individually and doing business under the entities described above, along with others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme or artifice to defraud and to obtain money and property by means of materially false and fraudulent promises, pretenses, and representations, and the concealment of material facts.

40.    On or about the dates listed below, in the District of Arizona and elsewhere, for the purpose of executing and attempting to execute the aforesaid scheme or artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, Defendant HARBOUR, along with others known and unknown to the Grand Jury, placed and caused to be placed in a post office and authorized depository for mail matter, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited for delivery by a private and commercial interstate carrier, for delivery by commercial interstate carriers, as shown below for each

count, from the District of Arizona, to Texas, each such instance being a separate count of this Indictment:

| Count | Payor Account | Check Date | Posted Date | Description of Item Mailed | Amount (Approximate) |
|---|---|---|---|---|---|
| 11 | HighPointe Capital Group, LLC BMO x7406 | 4/22/2016 | 4/28/2016 | Check # 3231 to Liberty Trust Co. FBO: A.W. in the amount of $7,500 | $7,500.00 |
| 12 | HighPointe Capital Group, LLC BMO x7406 | 5/3/2016 | 5/9/2016 | Check # 3242 IRA Fee TC003721 C.H. in the amount of $255.00 | $255.00 |

In violation of Title 18, United States Code, Section 1341.

## COUNTS 13–23

## TRANSACTIONAL MONEY LAUNDERING

## (18 U.S.C. § 1957)

41.     The factual allegations in paragraphs 1 through 40 are incorporated by reference and re-alleged as though fully set forth herein.

42.     On or about the dates listed below, in the District of Arizona and elsewhere, Defendant HARBOUR, individually and doing business under the entities described above, along with other individuals and entities known and unknown to the Grand Jury, knowingly engaged and attempted to engage in the following monetary transactions in the United States in criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely wire fraud in violation of 18 U.S.C. § 1343, with each instance being a separate count under this indictment:

| Count | Date (On or about) | Amount (Approximate) | Financial Institution | Description of Transaction |
|---|---|---|---|---|
| 13 | 08/05/2014 | $34,665.33 | Northern Trust | Check #1238 from DNA Investments Northern Trust x9412 to D.S. |
| 14 | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from Oak Tree Northern Trust x1790 to |

| | | | | DNA Management Northern Trust x3388 |
|---|---|---|---|---|
| **15** | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from DNA Management NT3388 to HighPointe Capital Group BOA x3354 |
| **16** | 08/08/2014 | $37,500.00 | Bank of America | Transfer from HighPointe Capital Group BOA x3354 to Herrington Park 1, LLC |
| **17** | 08/21/2014 | $12,083.90 | Northern Trust | Check #1542 from 21020 Northern Trust x5180 to J.R.G. |
| **18** | 08/27/2014 | $142,785.88 | Northern Trust | ACH Debit Payment from DNA Investments Northern Trust x9412 to Defendant HARBOUR American Express |
| **19** | 08/28/2014 | $13,682.69 | Bank of America | Transfer from HighPointe Capital Group BOA x3354 to Employment Edge |
| **20** | 12/04/2014 | $223,121.88 | Northern Trust | ACH Debit Payment from DNA Management Northern Trust x3388 to Defendant HARBOUR American Express |
| **21** | 8/12/2015 | $915,000.00 | BMO Harris | Oak Tree BMO 1964 to Milagro BMO 5236 |
| **22** | 08/13/2015 | $750,000.00 | Bank of America | Milagro BMO 5236 to Defendant HARBOUR BOA x8017 |
| **23** | 09/02/2015 | $500,000.00 | Bank of America | Defendant HARBOUR BOA x8017 to FTC Receiver LEC |

In violation of Title 18, United States Code, Section 1957.

**COUNT 24**

**TAX EVASION**

**(26 U.S.C. § 7201)**

- 17 -

43.     The factual allegations in paragraphs 1 through 42 are incorporated by reference and re-alleged as though fully set forth herein.

44.     From in or around February 2016, through in or around June 2018, in the District of Arizona and elsewhere, Defendant HARBOUR, a resident of Maricopa County, AZ, willfully attempted to evade and defeat the payment of income taxes due and owing by him to the United States of America, for the calendar year 2012 by committing the following affirmative acts, among others:

     a.     On April 14, 2016, Defendant HARBOUR provided IRS a signed Form 433-A and financial documents that intentionally omitted bank records held under his control.

     b.     On April 26, 2017, Defendant HARBOUR provided IRS a second signed Form 433-A that contained materially false statements including regarding stated employment, financial information, and assets and liabilities. For example, Defendant HARBOUR failed to disclose bank accounts held under his control, ownership positions of his entities and entities held under the name of his wife and/or entities owned by her. Furthermore, Defendant HARBOUR did not disclose the ownership arrangement of his personal residence, and he did not disclose the possession and use of an American Express credit card held under the name of a nominee. An analysis of Defendant HARBOUR's American Express credit card activity for the period of January 1, 2017, to April 30, 2017, indicated $277,706.49 in payments were made. In addition, during the following two months (May and June 2017), Defendant HARBOUR paid American Express a total of $209,131.36. None of this information was properly disclosed on the Form 433-A

     c.     Defendant HARBOUR also falsely listed his position with a company known as Volente on the Form 433-A. Defendant HARBOUR misrepresented to the IRS that he and his wife did not have any bank accounts, and thus, he was paid by Volente via company credit card. From January 2018 through June 2018, Defendant HARBOUR had control over at least three accounts with deposits to these accounts totaling over $350,000.

     d.     In or around October 2020, Defendant HARBOUR recently received a loan from D.D. to pay a portion of his outstanding tax due and owing. The loan was taken against

- 18 -

the collateral of ALB Harbour Spousal Lifetime Access Trust, dated March 13, 2017, the same trust that was not disclosed to the IRS Revenue Officer. As of June 8, 2018, Defendant HARBOUR's tax due and owing, to include penalties and interest, totals $4,232,294.03 for 2012.

In violation of Title 26, United States Code, Section § 7201.

## COUNT 25

### FALSE STATEMENT

### (26 U.S.C. § 7206(1))

45.     The factual allegations in paragraphs 1 through 44 are incorporated by reference and re-alleged as though fully set forth herein.

46.     On or about April 26, 2017, in the District of Arizona, Defendant HARBOUR did willfully make and subscribe an Internal Revenue Service Form 433-A, which was verified by a written declaration that it was made under the penalties of perjury, which was filed with the Internal Revenue Service, and which Defendant HARBOUR did not believe to be true and correct as to every material matter therein in that Defendant HARBOUR on the Form 433-A:

    a.  did not disclose bank accounts held by Defendant HARBOUR at JP Morgan Chase Bank, N.A.;

    b.  did not disclose the existence of the ALB Harbour Spousal Lifetime Access Trust, dated March 13, 2017;

    c.  did not disclose that the ALB Harbour Spousal Lifetime Access Trust held ownership of entities in which Defendant HARBOUR had a financial interest;

    d.  did not disclose the ownership agreement regarding his personal residence;

    e.  misrepresented that Defendant HARBOUR was unemployed when in truth and fact, Defendant HARBOUR was 50% owner of Volente.

47.     Defendant HARBOUR updated and re-filed the Form 433-A with the IRS Revenue Officer on or about June 6, 2018. Defendant HARBOUR resubmitted the same false statements identified above as a–e, and also did not disclose:

    a.   bank accounts held by Defendant HARBOUR and his wife at BMO Harris Bank, JP Morgan Chase Bank, N.A., and Desert Financial Credit Union; and

    b.   Defendant HARBOUR's ownership of various items of jewelry.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT 26

## OBSTRUCTION

## (26 U.S.C. § 7212(a))

48.     The factual allegations in paragraphs 1 through 47 are incorporated by reference and re-alleged as though fully set forth herein.

49.     From in or around March 2017, through in or around June 2018, in the District of Arizona, Defendant HARBOUR did corruptly endeavor or attempt to endeavor to obstruct and impede the due administration of the Internal Revenue laws by providing the following false or misleading information to a representative of the Internal Revenue Service:

    a.      Defendant HARBOUR provided two Internal Revenue Service Form 433-As that contained false information;

    b.      Defendant HARBOUR misrepresented his wife's employment;

    c.      Defendant HARBOUR misrepresented his own employment;

    d.      Defendant HARBOUR misrepresented his ownership of his residence;

    e.      Defendant HARBOUR failed to disclose the existence of an American Express credit card that incurred charges of over $263,000 from January to May 2017.

    f.      HARBOUR failed to disclose the existence of the ALB Harbour Spousal Lifetime Access Trust that held ownership of two companies in which Defendant HARBOUR had a financial interest. HARBOUR also intentionally failed to disclose the existence of the following bank accounts: (a) HPCG Hospital Investment, BMO Harris Bank, Account No. x9225; (b) HighPointe Capital Group, BMO Harris Bank, Account No.

x9284; (c) Abby L Harbour, JP Morgan Chase Bank, Account No. x8389; Abby L Harbour, JP Morgan Chase Bank, Account No. x9018; and Kathryn J Harbour, Desert Financial Credit Union, Account No. x7980

In violation of Title 26, United States Code, Section 7212(a).

## COUNT 27

### CONSPIRACY

### (18 U.S.C. § 1349))

50.     The factual allegations in paragraphs 1 through 49 are incorporated by reference and re-alleged as though fully set forth herein.

51.     Between July 2021 and September 2021, both dates being approximate and inclusive, within the District of Arizona and elsewhere, the Defendant HARBOUR, Associate (1) and others known and unknown to the Grand Jury did conspire, confederate and agree with each other to commit the following offenses:

a.     They knowingly and willfully executed and attempted to execute a scheme and artifice to defraud a financial institution, namely Equitable Home Mortgage, Inc., and to obtain and attempt to obtain monies, funds and credits of Equitable Home Mortgage, Inc., and under the custody and control of Equitable Home Mortgage, Inc., by means of materially false and fraudulent pretenses, representations and promises, in violation of 18 U.S.C. § 1344.

b.     They devised and intended to devise a scheme and artifice to defraud another by means of false and fraudulent pretenses and for obtaining money by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice and attempting to do so caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1343.

In violation of Title 18, United States Code, Section 1349.

## COUNT 28

### BANK FRAUD

### (18 U.S.C. § 1344(2))

- 21 -

52.     The factual allegations in paragraphs 1 through 51 are incorporated by reference and re-alleged as though fully set forth herein.

53.     Between July 2021 and September 2021, both dates being approximate and inclusive, within the District of Arizona and elsewhere, Defendant HARBOUR knowingly executed, and attempted to execute, a scheme and artifice to defraud Equitable Home Mortgage, Inc., and to obtain any of the moneys, funds, credits, assets, and other property owned by and under the custody and control of Equitable Home Mortgage, Inc., by means of materially false and fraudulent pretenses, to wit: Defendant HARBOUR provided Equitable Home Mortgage, Inc., with two false gift letters that misrepresented that K.B. had gifted approximately $340,000 to Associate (1) for the purpose of obtaining a loan in the amount of $2,363,094.91 with which to finance the purchase of the Georgia Residence.

In violation of Title 18, United States Code, Section 1344.

**COUNTS 29–30**

**WIRE FRAUD**

**(18 U.S.C. § 1343)**

54.     The factual allegations in paragraphs 1 through 53 are incorporated by reference and re-alleged as though fully set forth herein.

55.     Between July 2021 and September 2021, both dates being approximate and inclusive, within the District of Arizona and elsewhere, Defendant HARBOUR devised and intended to devise a scheme and artifice to defraud, and to obtain money and property belonging to Equitable Home Mortgage, Inc., by means of materially false and fraudulent pretenses, representations, promises, and material omissions, knowing that the pretenses, representations, promises and material omissions were false and fraudulent when made.

**Purpose of the Scheme and Artifice**

56.     It was the purpose of the scheme and artifice that Defendant HARBOUR would obtain a home loan on behalf of Associate (1) through false pretenses, representations,

- 22 -

promises, and material omissions, all in order to obtain economic benefits for himself and his family members by residing rent free in the subject home for an unspecified time period.

**Use of Wires**

57.     On or about the dates specified below, in the District of Arizona and elsewhere, Defendant HARBOUR, for the purpose of executing the aforesaid scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as more particularly described below:

| Count | Date (On or about) | Transaction | Sender | Receiver | Amount (Approximate) |
|---|---|---|---|---|---|
| 29 | 08/24/2021 | Wire transfer from Equitable Home Mortgage, Inc., to WFG National Title Insurance Company | Horizon Bank (Michigan City, Indiana) | Wells Fargo Bank, N.A. (San Francisco, CA) | $2,363,094.91 |
| 30 | 08/24/2021 | Wire transfer from L.B on behalf of K.B. to WFG National Title Insurance Company | Wells Fargo Bank, N.A. x8939 (Scottsdale, AZ | Wells Fargo Bank, N.A. (San Francisco, CA) | $242,591.67 |

In violation of Title 18, United States Code, Section 1343.

## COUNTS 31–32

### TRANSACTIONAL MONEY LAUNDERING

### (18 U.S.C. § 1957)

58.     The factual allegations in paragraphs 1 through 57 are incorporated by reference and re-alleged as though fully set forth herein.

59.     On or about the dates specified below, in the District of Arizona and elsewhere, Defendant HARBOUR knowingly engaged in monetary transactions occurring within the United States by, through, or to a financial institution, affecting interstate commerce, in

criminally derived property that was of a value greater than $10,000, such property having been derived from wire fraud:

| Count | Date (On or about) | Monetary Transaction | Amount (Approximate) |
|-------|--------------------|-----------------------|----------------------|
| 31 | 08/24/2021 | Real estate commissions paid from WFG National Title Insurance Company to M. L. PLLC (Launch Real Estate). Realtor located in Arizona. | $77,940.00 |
| 32 | 08/24/2021 | Real estate commissions paid from WFG National Title Insurance Company to C.K. PLC (Launch Real Estate). Realtor located in Arizona. | $14,597.50 |

In violation of Title 18, United States Code, Section 1957(a).

## COUNTS 33–34

## AGGRAVATED IDENTITY THEFT

## (18 U.S.C. § 1028A(a)(1))

60.     The factual allegations in paragraphs 1 through 59 are incorporated by reference and re-alleged as though fully set forth herein.

61.     On or about the dates listed below, in the District of Arizona, Defendant HARBOUR, did knowingly use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(C), to wit: Wire Fraud in violation of 18 U.S.C. § 1343 and Bank Fraud in violation of 18 U.S.C. §1344, knowing that the means of identification belonged to another actual person, namely B.S:

| Count | Date (On or about) | Document | False Identification |
|-------|--------------------|-----------|-----------------------|
| 33 | August 12, 2021 | Secured Promissory Note between T.J.G. and B.S. | Defendant HARBOUR forged the name of B.S. |
| 34 | August 24, 2021 | Secured Promissory Note between K.B. and B.S. | Defendant HARBOUR forged the name of B.S. |

In violation of Title 18, United States Code, Section 1028A(a)(1).

## FORFEITURE ALLEGATIONS

The Grand Jury realleges and incorporates the allegations of Counts 1 through 23 of this

Second Superseding Indictment, which are incorporated by reference as though fully set forth herein. Pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853 and Title 28, United States Code, Section 2461(c) and upon conviction of one or more of the offenses alleged in Counts 1 through 23 of this Superseding Indictment, the defendant(s) shall forfeit to the United States of America all right, title, and interest in any and all property, real or personal, involved in such offense(s), or any property traceable to such property involved in the offense(s), or conspiracy to commit such offense(s), including the following: (a) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of a statute listed in Title 18, United States Code, Section 982; (b) all other property constituting proceeds obtained as a result of those violations; and (c) all property used in any manner or part to commit or to facilitate the commission of those violations including, but not limited to the sum of money representing the amount of money involved in the offense(s) and the property named below.

a.   A sum of money equal to at least $4,382.864.01 in United States currency, representing the amount of money involved in the offenses.

b.   All right, title, and interest in any and all personal property, involved in or traceable to any transaction set forth in Counts 1 through 23 of this Superseding Indictment. Such property includes, but is not limited to, the following personal property:

   1.   18 Karat White Gold Diamond Cuff Bracelet;

   2.   18 Karat Yellow and White Gold Custom Kansas University Jayhawk Pendant and Cable Chain;

   3.   Scott Kay Engraved Platinum Classic Band Stamped PT950;

   4.   Hamra Jewelers Engraved Custom Platinum Diamond Ring;

   5.   Patek Philippe Stainless Steel Nautilus Watch and Steel Bracelet with Serial Number A384EAP;

   6.   Engraved Custom Platinum Eternity Band;

7.   Rolex Day-Date Pearlmaster Watch with Serial Number G527156 and Masterpiece Bracelet;

8.   Stainless Navitimer Gents Breitling Watch with Serial Number 422425 and Polished Navitimer Heritage Bracelet; and

9.   Cartier Pasha Seatimer Chronograph Watch with Serial Number 604011MX and Black Rubber Bracelet,

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence,

(2) has been transferred or sold to, or deposited with, a third party,

(3) has been placed beyond the jurisdiction of the court,

(4) has been substantially diminished in value, or

(5) has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States to seek forfeiture of any other property of said defendant up to the value of the above-described forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

All in accordance with Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, Title 28, United States Code, Section 2461(c), and Rule 32.2, Federal Rules of Criminal Procedure.

A TRUE BILL

_s/_
FOREPERSON OF THE GRAND JURY
Date: June 14, 2022

GARY M. RESTAINO
United States Attorney
District of Arizona

_s/_
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

- 26 -