Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Jill Ann Herman, 020180
jherman@cdslawfirm.com
Iulia A. Taranu, 034458
itaranu@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710
Attorneys for Defendant David Harbour

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>　　　　　Defendant. | Case No. 2:19-cr-00898-DLR (DMF)<br><br>**DEFENDANT'S BRIEF ON THE REBUTTABLE PRESUMPTION IN DENTENTION HEARINGS** |

Defendant, David Allen Harbour ("Defendant"), submits his Opening Brief on the "Rebuttable Presumption." [1]

### BACKGROUND

At the very end of the continued detention hearing, the Government argued that, because the grand jury had indicted Defendant for "mortgage fraud," the statute raised a "rebuttable presumption" the defendant needed to overcome showing that he would not be an economic threat to the community.

### APPLICABLE LAW

---

[1] A Declaration from Harbour will be provided. It cannot accompany this filing due to the fact that absent an 88-mile round trip to CoreCivic, the only way to send or receive written papers to or from Harbour is via surface mail.

The issue is governed by the interplay between 18 U.S.C. § 3142(b) and 3148(b)(2), which provides in relevant part(s):

> If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community. If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions, the judicial officer shall treat the person in accordance with the provisions of section 3142 of this title and may amend the conditions of release accordingly.

The government circumvented the Court's *de novo* review of probable cause by having the grand jury charge Defendant with mortgage fraud. As the government will likely acknowledge almost every case involving "danger" is talking about a physical danger; not an economic danger. Economic danger only applies in "some cases." *United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992). A recent District Court case, *United States v. Shields*, 2015 WL 900694 (February 24, 2015) noted that, while *Reynolds* was short on definitions, *United States v. Provenzano*, 605 F.2d 85, 95 (3rd Cir.1975), was not nearly so limited. If anything like the *Provenzano* standard applies, Defendant should be released. Once the Defendant has rebutted the presumption, the ordinary considerations of §1342(b) come into play.

## ARGUMENT

I.  <u>Defendant poses no economic danger to the community, and the rebuttable presumption under 18 U.S.C. § 3142(b) is easily met.</u>

In *Reynolds*, the court cited to the 3rd Circuit's decision in *United States v. Provenzano* for an instance where an individual poses an economic danger to the

2

community. 605 F.2d 85, 95 (3rd Cir.1975). Provenzano was found to pose an economic danger because of three preexisting economic crime *convictions*, not simply probable cause findings. *Id*. at 96. Additionally, had he been released, Provenzano retained a position within the community (the underworld) that would allow him to exert substantial influence.

*Reynolds* saw a similar situation to Provenzano in that the defendant had already been convicted. The court stated that the danger the defendant posed could include economic harm. 956 F.2d at 192. This, simply put, is not even remotely close to the situation of Harbour. Harbour is *charged* with a mortgage fraud in which every other participant will never be charged.

However, before delving into the weakness of the "new" case, we will first discuss "economic danger" as it applies and does not apply to Harbour. Before his arrest in December 2021, Harbour was both employed at Shea-Connelly Development, LLC ("SCD") *and* was to participate with a percentage of the sales proceeds and development fees in a number of developments in the Valley orchestrated by Bart Shea along with the Santa Clarita property in California. Two things are certain: 1) Shea admits that Harbour was to participate in the development deals and 2) Shea contends that, having fired Harbour, his participation is ended and he will get nothing.[2] While it is yet to be seen whether Harbour's participation in the Arizona development deals result in gains to offset the advances provided in 2021, it is clear that those issues will not be resolved any time

---

[2] Shea contends that Harbour was never supposed to participate in Santa Clarita, but this is false. However, since the Santa Clarita deal has *apparently* cratered, it may make no difference.

soon. Therefore, it may safely be said that Shea has cut-off Harbour. The money received for his benefit from Shea through loans to SCD by Daryl Deel no longer exists. Shea's termination of his relationship has coincided with Deels' complete abandonment of Harbour. Finally, Kenny Bobrow, formerly a father figure to Harbour (according to Shea) has also abandoned him, sued him, and, along with Shea, become a government witness against him.

Harbour is, therefore, entirely bereft of funds and funding sources other than from his own family members. He is basically as much of an economic danger to the community as is the average homeless person. He has no job and no sources of income. He will live in Abby Harbour's parents' Fountain Hills home for free, if released. With the vehicle leased by SCD for the Harbour's having been surrendered, as this memorandum is written, the Harbours do not even have a car.

How then, can Harbour constitute an economic danger to the community? There is simply no way. He has no money and no property. There is no one from whom he can raise money other than from his own family.

II.  The Process Through Which the Presumption is Rebutted Militates in Favor of Setting Conditions of Release.

The rebuttable presumption allows a defendant to demonstrate that conditions of release exist that will ensure the safety of the community. We have proposed conditions, which will be supplied to the Court in a separate document, showing that this is so. *See, United States v. Dillon*, 938 F.2d 1412 (1st Circ. 1991); *Suppa*, 799 F.2d at 199; *United States v. Dominguez*, 783 F.2d 702, 706 n.7 (7th Cir. 1986); *United States v. Contreras*,

776 F.2d 51 (2d Cir. 1985); *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985); *United States v. Mosuro*, 648 F. Supp. 316, 318 (D.D.C. 1986).

A defendant must only produce *some* evidence to overcome the rebuttable presumption. *Dillon*, 938 F.2d 1412, 1416. When a defendant produces such evidence, the burden of persuasion remains with the government and the rebutted presumption merely retains evidentiary weight. *Id*.; *See also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) *holding that* "Although the presumption shifts a burden of production to the defendant, the burden of persuasion remains with the government. A finding that a defendant is a danger to any other person or the community must be supported by "clear and convincing evidence."

### III. Section 3142(b) Suggests Release is Appropriate.

Once *some* evidence has been provided to rebut the presumption, the new mortgage fraud offenses are bailable as a matter of right. The strength of the government's case is against Harbour is pitiably weak. 1) What was the fraud, if there was one? It was the use of the $100,000 gift letter at the closing; not anything else.[3] In this regard, we cannot assume that there was a mortgage fraud at all. The evidence – e.g., Government Exhibit 70 – shows that Frank Madea, Equitable's 100% owner, was, obviously, the source of the demand for a gift letter. No one else would have demanded

---

[3] The $242,000+ gift letter cannot not be shown to have been received by Equitable nor can it be shown that Harbour sent it but, assuming it was received, it was received a full month after the loan closed and sold to 5th Street Capital. Therefore, the $242,000+ gift letter was not material to the transaction. By way of contrast, the $100,000 gift letter was definitely received but who sent it cannot be known since Equitable does not retain emails.

5

it. Why did he need the gift letter? Because he had already pre-sold the Shea loan to 5th Street Capital. Obviously, he did not do that for free. As the District's premier mortgage fraud prosecutor, this prosecutor knows that beyond peradventure.

There is nothing *per se* illegal about closing a loan with borrowed funds. Even Fannie Mae permits it.[4]

The crime is mispresenting that the borrowed funds were a gift. But Equitable could not have been a victim because it knew that the funds to close were not coming from the buyer. We can see in Exbibit 70, the genesis of the idea for the gift letter. Where did the idea *and* the gift letter template come from? From Frank Madea. So, Equitable is not a fraud victim. Is 5th Street Capital? If so, it is Madea's and Equitable's victim. Was Madea indicted? Kenny Bobrow signed the $100,000 gift letter. Bobrow knew he had not made a gift of $100,000 to Shea. He loaned $100,000 to Shea and another $40,000 to boot and Shea has acknowledged he will pay Bobrow back when the house sells. Was Bobrow indicted?

Bart Shea admitted he had timely knowledge about the $100,000 gift letter. He said that Harbour brought it into his office, he threw him out, and told Harbour to "take care of it." Take care of what and why? And what did Shea mean by "take care of it?" Is Shea indicted? Where did he think the other $200,000 came from? Our document examiner said he "probably" signed the Gottschalk loan and he told Ashley Adams he signed it. After all, where did Shea think the funds for closing came from? The tooth

---

[4] "Borrowed funds secured by an asset are an acceptable source of funds for the down payment, closing costs, and reserves, since borrowed funds secured by an asset represent a return of equity.") (Fannie Mae Selling Guide, B3-4.3-15: 10/30/2009).

6

fairy? Shea stood to clear $3 million from the purchase, renovation, and sale that he would share 50/50 with Ken Akimoto. Madea was going to make money on the sale of the note to 5th Street Capital. The real estate agents would make their money. Every single participant in the 2123 Georgia Property except Harbour was going to get money from the transactions but only Harbour is indicted. The government's mortgage fraud case, though creatively and excessively pleaded, is very, very weak and it can never improve. It is noteworthy that the only interview of Madea produced was the October 1st interview. We assume that his counsel has told him to stop talking. He is, after all, the most likely suspect in a mortgage fraud.

Harbour came here with his parents. His father passed but his mother remained. His sister and family live here. His wife, whose medical issues are known, and the Harbour's two daughters, 11 and 8, live here. He is a member of the Phoenix Thunderbirds was formerly on the Fiesta Bowl Committee, attends St. Thomas the Apostle and has a long association with its school. He engaged in philanthropy when he was able. As Bobrow told the agents, he and Abby are fabulous parents. His sole ties are to this community. He is, obviously, not a flight risk and his loss of sources of money, already explained, must reverse any notion that he is a flight risk or a danger. Go where? Using what?

Harbour has every reason to fight this case and, while anything can happen, my 51+ years in criminal law and 40+ in white collar work strongly suggests the government has completely misunderstood this case. It is time to release Harbour. He is no danger to anyone or anything.

RESPECTFULLY SUBMITTED this 27th day of June 2022.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
   Stephen M. Dichter
   Jill Ann Herman
   Iulia A. Taranu
   2800 North Central Avenue, Suite 860
   Phoenix, Arizona 85004
   Attorneys for Defendant David A. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez