GARY M. RESTAINO
United States Attorney
District of Arizona
KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN SCHOCH
Georgia State Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-19-00898-PHX-DLR (DMF) |
| Plaintiff, | |
| v. | **JOINT PROPOSED PRETRIAL RELEASE CONDITIONS** |
| David Allen Harbour, | |
| Defendant. | **(Defendant Requests Oral Argument)** |

Pursuant to the Court's orders (Dkt. 396, 405), the parties submit this joint filing regarding proposed pretrial release conditions for Defendant Harbour. The United States maintains that no condition or combination of conditions can assure Defendant's presence at trial or protect the community from the economic danger that he poses to individuals and the community. Defendant's personal history before the Court also shows that Defendant will not comply with any conditions imposed and will attempt to avoid and subvert the authority of the Court if released.

**Joint Proposal**

The parties have agreed that the Court should impose the following non-exhaustive list of release conditions upon Defendant:

1. Not travel outside of Maricopa County for any purpose without prior express approval from the Court. There shall be no travel out of the United States.

2. Avoid all direct or indirect contact with alleged victim(s), potential witness(es), family members of victim(s)/witness(es), and co-conspirator(s): Victoria and Kenneth Bobrow, Steve Baker, Mark Burg, Phillip Burgess, Pam Case, Joe Cathey, Daryl Deel,[1] Melvin Dunsworth,[2] Steve Emmons, Rhonda Gray, Carol Hill, Pat Hill, Maya Langbein,[3] David Lunn, Bart Shea, Patrick Spaulding, Richard Turasky, Dan Willson, Allison Willson. The government may add or remove individuals on motion to the Court at any time.

3. Defendant shall not solicit money, property, or assets of any kind from any individual or entity for any purpose, including investments, loans, or gifts, whether or not that solicitation directly or indirectly benefits Defendant or his spouse. Defendant's solicitations of his spouse, children, parents, and parents-in-law are excluded from this bar.

4. Submit to active GPS monitoring.

5. Appear at all proceedings as required and to surrender for service of any sentence imposed.

6. Not commit any federal, state, or local crime.

7. Cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.

8. Advise the court, defense counsel and U.S. attorney in writing in advance of any change in address or telephone number.

9. Refrain from excessive use of alcohol and not use or possess any narcotic or other controlled substance defined by 21 U.S.C. 802 unless prescribed for defendant by a licensed medical practitioner in the course of his/her

---

[1] Defendant objects because he asserts that this witness will testify for the defense.
[2] Defendant objects because he asserts that this witness will testify for the defense.
[3] Defendant objects because Maya's husband is a ticket broker, Abby Harbour is a consultant to a merchant credit card services company, and Abby Harbour is soliciting John Lengbein to use the merchant services offered by that business.

– 2 –

legitimate medical practice. This provision does not permit the use or possession of medicinal marijuana even with a physician's written certification.

10. Surrender all travel documents to Pretrial Services and not obtain a passport or other travel document during the pendency of these proceedings.

11. Report as directed to the U.S. Pretrial Services 1-800-769-7609 or 602-322-7350.

12. Maintain weekly contact with his attorney by Friday, noon of each week.

### Additional Proposed Conditions

In addition to the agreed-to conditions above, the United States and/or Defendant ask the Court to impose the following additional release conditions. The parties disagree regarding the requirements in these conditions:

13. **Bond:** Defendant must post additional bond.

**United States**: Defendant shall execute an agreement to forfeit upon failing to appear as required, a $2 million cash bond secured by cash and assets in which Defendant Harbour has a verified personal interest. The assets shall include the ALB Harbour Spousal Lifetime Access Trust and any retirement or investment accounts held in the name of Defendant, his spouse, or his children.

An increase to $2 million is necessary because both the Grand Jury and the Magistrate Judge found probable cause to believe that Defendant committed additional felony frauds while on pretrial release, lied to his pretrial services officer, and made misrepresentations to the Court. Defendant faces substantial additional prison exposure in the SSSI: he is a greater flight risk now than in August 2019, the risk also increases as trial nears. Defendant's previous behavior on pretrial release shows that he will not comply with any conditions imposed. A bond provided by anyone else other than Defendant does not give him a financial interest in his own appearance and compliance, which is the very point of a bond. Finally, the Gottshalks are not an appropriate surety. Defendant committed new crimes despite the existing bond on their Fountain Hills home. In addition, Defendant has

had no qualms about defrauding the Gottshalks twice already—with respect to both the Martingale residence and the Georgia residence.

**Defendant**: Increase property bond on Gottschalk Fountain Hills home from $500,000 to $750,000.

The Defense has no idea what is meant by a $2 million cash bond unless the government means a personal appearance bond. Harbour does not have $2 million. As for Abby Harbour's SLAT, it has an interest in "Proze," which a CBD company. If one believe Bart Shea's version of the facts surrounding the development deals, the SLAT has no other assets. If one doesn't believe Bart Shea, the SLAT has the fees and equity that is supposed to result, if those development deals come to fruition (many millions of dollars). Obviously, getting the fees and equity from Shea is going to require a lawsuit after this case is over.

As for the Gottschalks, the $250,000 increase in the DOT securing the present $500,000 real estate bond will come from the Gottschalks. Arizona is a community property State, the Gottschalks are Abby Harbour's parents, and her daughters are their grandchildren. If they want to give their daughter and the grandchildren *anything*, it is none of the government's business.

14. **Third Party Custodian**: Defendant shall be placed in the third-party custody of a responsible adult with whom he can reside. Abby Harbour is not an appropriate custodian.

**United States**: Because Defendant repeatedly violated his release conditions and made misrepresentations to the Court and to pretrial services, he should not be released without a third party custodian who has the trust of the Court and can supervise Defendant's activities. Defendant's spouse is not an appropriate custodian because, as the magistrate court found, "Noteworthy is that Defendant Harbour does not have a reliable third-party custodian available because the people with whom he is close, including his spouse, appear to be aware of or involved in the violations of his release conditions." Detention Order 5.

**Defense:** The government's has continually attempted to create, from whole cloth, a portrait of David Harbour that is not even close to the person he is. At this point the so-

called violations of his release conditions have mostly evaporated but for the government's vague reference to their supposed violation.

Did he witness tamper? No.

Did he ask Kenny Bobrow to call Mark Burg? Some evidence he did and an equal amount of evidence he did not. Clear and convincing evidence? Hardly.

In terms of the money, for three years he received sporadic advances from only one entity: Shea-Connelly Development. These were in the form of advances on future development fees that Shea admits he had coming (though he has now repudiated his obligation to pay them). So, this will be decided in a law suit.

The last time Harbour got money from Deel was in about 2015 and from Bobrow, it was in 2008. And, of course, his family benefitted from their parents. So, the notion that Harbour is some sort of leech or vampire is farcical and exists no where in fact and only in a fictional portrait being painted of him by the government.

And in terms of money and his conditions of release, we urge the court to read them. He only had to report certain things to pretrial and they were very limited in nature. Attorney's fees paid by others? No. Payment of debts accrued prior to the 2019 Indictment? No. Income? No. Usual and customary family expenses. No.

The government complains that Baskin was clever in getting the Magistrate Judge to agree to these limitations but if he was that doesn't mean that Harbour violated them by adhering strictly to them.

Of all the money that flowed to Harbour's benefit through Deel's extensions of credit to Shea Connelly Development, LLC, all of it except $100,000 (which Abby Harbour used to repay a loan she had taken from her IRA) went for lawyers or settlement or went back to Shea. The Harbours got the $100,000.

As the days have gone by, it seems like that on each of those days, the government has proposed yet one-more additional condition. Yesterday, it was about employment. Today it is about third-party custody. If we went another day, no doubt tomorrow would bring yet another new proposed condition.

All of this is for no better purpose than to make the situation appear so fraught, so complicated, and the defendant look so evil, that the Court will be hot-boxed into throwing its judicial hands up in despair. On our part, we hope the Court has seem through it. Every day the defendant remains in custody take a day away from his preparation for his trial. Is this a coincidence? We think not.

15. **Home Detention**: Defendant shall be restricted to a single residence in Maricopa County except for religious services, medical, substance abuse, or mental health treatment, attorney visits, court appearances, and court-ordered obligations.

**United States**: Defendant cannot be trusted not to abide by release conditions. He must be confined to his home. Defendant committed additional federal crimes and solicited new investments from his place of then-employment and from the Bobrow's home. Defendant also traveled to Disneyland after falsely stating to PTS that he was traveling to California for business (business travel to California was authorized by his then-conditions *if* preapproved by PTS). Defendant will use his freedom to circulate within the community to solicit money and property from those in his orbit, just as he solicited a job, a Cadillac, two cellular phones, the Georgia residence, and employment for his spouse from Shea. Defendant also faces substantial additional prison exposure in the SSSI and is a greater flight risk now than in August 2019.

**Defendant**: Defendant should also be permitted to leave home detention for meals, movies, local entertainment, and similar events with his Family and also driving his children to school and cheer practice. In this context, Family means Harbour's wife, children, his sister and her family, his mother and his in-laws.

Harbour not only got permission to travel to Kansas City from PTS – it was to get Daryl Deel's signature on the August 2021 loan agreement – he supplied the flight information to PTS and the government knows this because they interviewed Gretchen White who confirmed it.

Harbour did not need approval to travel to California for work, He only needed to get permission to travel for *personal* reasons. His travel to California for personal reasons was authorized and while the trip was also supposed to be for business, as represented, permission for the business travel was not needed.

As it happened, Harbour and Shea were *supposed* to travel to Santa Clarita but Bart Shea changed his plans because there was a significant bankruptcy court hearing in the Santa Clarita case here on December 3r, 2021 and he needed to be here for it. Therefore, Harbour did not go to Santa Clarita. The government knew this and, notwithstanding its actual knowledge has misstated the facts. We also disagree that Harbour has increased exposure as a result of the SSSI.

    16.    **Employment**: The parties agree that Defendant shall actively seek verifiable employment and provide proof of such to pretrial services. Defendant shall not seek or obtain paid or unpaid employment, consulting, or volunteer work of any type or kind that relates in any way to real estate, investments, banking, or financial services.

**United States**: The United States additionally proposes that Defendant shall not seek or obtain paid or unpaid employment, consulting, or volunteer work with or on behalf of any entity owned, operated, or controlled by a friend or anyone with whom Defendant has had a previous financial relationship. Defendant must obtain prior approval from PTS and the government of his proposed employment.

Defendant has proposed that he obtain employment measuring homes for carpeting estimates from Cale Clayton of Clayton Floor Design Group, LLC. The United States opposes this employment because Clayton has already been involved in Defendant's failure comply with his financial condition. Abby Harbour charged approximately $120,000 to her American Express card for a SKYBOX at the Waste Management Phoenix Open. Gov't Mem. Re: Violation of Release Conditions at 2 (Doc. 82). According to Defendant, Clayton used the SKYBOX for his business/personal and reimbursed Abby Harbour for the fee. Def.'s Mem. Re: Alleged Violation of Release Conditions at 2 (Doc. 86). Only *after* his

- 7 –

pretrial officer investigated did Defendant provide information about that charge. PTS Pet. for Action on Conditions at 1 (Doc. 56). Rather than violating Defendant, the magistrate judge revised his financial condition to be both more explicit and to be easier for Defendant to comply. Minute Entry (Doc. 89).

**Defendant**: Abby Harbour is working for Clayton Floor Design Group already. So, is that a problem? What the government reports about the golf tournament, if true at all, is something Abby Harbour did. Was it illegal? If it was not illegal, why was it a problem?

What is completely clear is that the government does not want to see Harbour employed at all, at least doing anything above selling popcorn at ball games for minimum wage. What business it is of the government's for whom Harbour works as long as he is not working for the underworld or in a capacity that we have agreed to have him avoid?

17.   **Internet Restrictions**:   The United States submits that Defendant's internet access should be restricted.

**United States**: Defendant shall not possess any devices which allow access to the Internet such as satellite dishes, tablets, computers, electronic games, web-televisions, Internet appliances, and cellular telephones. Defendant shall not establish any email accounts or accounts with any internet service providers.

This provision is necessary because Defendant used telephones, the capabilities of tablets and computers, and the internet to commit new crimes and to violate his financial, investment, and travel restrictions while on pretrial release. He is an economic and criminal danger to those with whom he can come into contact. His friends, family, and business associates become his victims, his co-conspirators, or both.

**Defendant**:   This provision is rejected completely. The government's statements are all misleading and some of them are false. Harbour absolutely did not violate his travel restrictions and the only "crime" he committed post-release was the so-called mortgage fraud. The government is writing pure fiction in this pleading.

The government's reliance on claimed instances of crimes committed while on release is unproven and the fact that the government could get a grand jury indictment is absolutely meaningless in these quarters.

Without access to the internet, the case cannot be defended. We have an over 800,000-page database, the access to which is through the cloud. In addition, I will need to have unfettered access to my client via the internet (email). This is 2022; not 1972.

18. **Telephone Restrictions**: Defendant's telephone access should be restricted.

**United States**: Defendant should be prohibited from possession and use of any telephone, land line, satellite, or cellular. Defendant used cellular and land line telephones to commit new crimes and to violate his conditions while on pretrial release. Defendant used his cellular telephone to commit felony crimes dating back to 2007 as well as the crimes that he committed while on pretrial release. Defendant's proposal is insufficient because it permits Defendant to obtain additional phones, borrow phones, and use email and other methods of communication.

**Defendant**: Defendant will obtain a new cellular telephone. The number will be supplied to the government. Harbour will be permitted to use it to call: His wife, his mother, his daughters, his sister, his in-laws, his lawyers, and a list of his friends, unconnected with any of the events charged, the names of whom will be supplied to the government. If the government has a specific reason why a particular friend so identified should not be contacted, we can discuss it and, if necessary take it to the Court. Harbour will agree to the government getting a copy of the monthly phone bill and, if it wishes, Harbour will agree to a consensual trap and trace device on the telephone.

19. **Contact Limitation**: Defendant must reside at a location separate from co-conspirator Abby Harbour. Defendant must not discuss any aspect of this criminal prosecution with Abby Harbour. Their communications shall be limited to personal and family matters.

**United States**: Abby Harbour is an unindicted co-conspirator in the Second Superseding Indictment. She was aware of Defendant's frauds and directly benefitted from them by living an extravagant lifestyle (the forfeiture count of the SSSI identifies some of her jewelry and watches) financed by the life savings of Defendant's friends, employees, and business associates. This extravagant lifestyle continued during Defendant's pretrial release—she enjoyed a $4,000 weekend in Sedona, a $14,000 weekend in Disneyland, drove a new Cadillac provided by Shea, used a new cellular phone purchased by Shea, and resided at the Georgia residence purchased by Shea. Since Defendant's arrest in 2021, Abby Harbour has also participated in his fraud by scheduling and conducting a meeting with Shea in which she told him that Defendant had forged Shea's name on the promissory note to her parents. Finally, as Defendant's spouse, she is jointly liable for the $4 million tax liability in the SSSI.

**Defendant**: The government's statements, above, are mostly false. The evidence in this case will show that the entire causation for losses suffered in payday "one" is the fault of the United States, as an expert report about to be disclosed in this case makes crystal clear.

The government has this entire case backwards. Harbour had interests in DNA, Canyon Road, and NorthRock. The three entities were completely profitable until, as the government admitted in Joel Tucker's Superseding Indictment:

> On August 1, 2012, President Obama signed a law referred to as Operation Chokepoint, which resulted in banks refusing to make Automated Clearinghouse withdrawals from their customer's bank accounts associated with payday lenders, which greatly reduced the profitability of payday loans. Many payday lenders went out of business after Operation Chokepoint.

While the government's statement in Tucker's indictment was actually a bit of a fabrication - Operation Chokepoint was described in the Congressional Report as a clandestine operation commenced by the Department of Justice and about which the Department of Justice lied to Congress – the government was essentially correct.

The government killed payday lending. Every lender in this case who lost money in payday lending, which included millions lost by Harbour himself, can rightly blame the Obama Administration and its exercise of *force majeure*. While no "law" was enacted by Congress to accomplish the government's stated goal to end payday lending, it was, rather, accomplished by threats made to banks with ACH accounts. The ACH accounts were, of course, the "chokepoint" and persons interviewed by the government have told the government precisely that.

The people whose money paid for the lifestyle the government seeks to paint Harbour with were not those who loaned money *to* Harbour's businesses. Their money was loaned to KSQ and KSQ loaned their money, along with tens of millions of dollars from others, including Kenny Bobrow, to lenders downstream who, in turn, loaned money to consumers. Money was made at each level and given the very large consumer borrowing base – it should be remembered that the crash of 2008 killed banking - a lot of money was made, including by Harbour. It was from the arbitrage that the lenders to Harbour were paid; not from other money loaned to Harbour's businesses.

Shea's statements to the government in April are a complete fabrication.

Further, while there is a $4 million tax liability, it exists solely based upon a civil settlement in October, 2018, months after the last act of evasion was alleged. The settlement amount is not going to be admissible under Rule 408 F.R.Evid. and the issue of whether the $4 million liability can be erased (through a net loss carry back) is bound-up in the matter currently stayed in Tax Court. The government's suggestion that the married couple live apart is shocking, even barbaric. Even when both partners in a marriage are indicted together, the courts do not force them to live apart.

20. **Financial Conditions**: Defendant must address certain financial transactions with PTS. The parties' disagreements are underlined.

**United States**: Defendant shall <u>seek prior approval</u> for <u>any transaction</u> of <u>$500</u> or more that directly or indirectly benefits Defendant or Abby Harbour. <u>Defendant shall also seek prior approval for any series of transactions with a single person or entity that will</u>

total $1500 or more in 30 days. Defendant shall not execute any promissory note on behalf of himself, his spouse, or any other individual. This financial condition specifically includes transactions among family members, friends, and business associates, transactions to or from the ALB Harbour Spousal Access Lifetime Trust, and transactions to or from legal counsel and any other professional service providers.

Defendant has thrice avoided prior financial conditions by characterizing loans and expenses as something else. PTS should have visibility into Defendant's expenses, not just his receipt of money in order to evaluate Defendant's financial picture, better identify suspicious transactions, and protect the public. Defendant is likely to continue to seek to raise and borrow funds for his attorney fees and his family's living expenses. He and his spouse also have an extensive track record of driving around in other people's vehicles. The provision regarding multiple transactions is proposed to avoid structuring by Defendant. Defendant should be prohibited from signing promissory notes because he defrauded individuals by persuading them that he would personally insure their investment and has committed multiple frauds by forging others' signatures on promissory notes. Legal fees must be included because the payment of legal fees was used to conceal a kickback to Abby Harbour, in which $50,000 of a retainer was returned to her and replaced with $200,000 received from the $1 million draw that Defendant obtained from RTI's (the LLC of Shea and Lunn) line of credit with Deel.

**Defendant**: Defendant shall report any receipt of money from any source derived and in any manner characterized of $1000 or more that directly or indirectly benefits Defendant or Abby Harbour. This condition specifically includes transactions among family members, friends, and business associates, transactions to or from the ALB Harbour Spousal Access Lifetime Trust, but excludes transactions to or from legal counsel and any other professional service providers. The government's allegations in this case are wrong in all material respects. The presumption of innocence still exists.

The government's conclusion as to a supposed "kickback" to Abby Harbour is as flawed as is its overall understanding of this case, provides a perfect example of how the

government adds one and one to get five, and is emblematic of why the government's position on these items needs to be rejected. The government has created a person who simply does not exist.

Here, money for fees paid to Baskin came from Abby Harbour's early withdrawal from her IRA. She paid the 10% excise tax imposed for early withdrawal. When Baskin did not need the money - he was, at that point, paid-up - the Harbours asked if the money could be returned. And it was. Legal fees – especially the undersigned - are none of the government's business, as the government has repeatedly stated at every hearing in which the subject has arisen.

The government's conclusions about mischaracterization of financial transactions are also misstated. The advances from Shea *were* advances, as Shea has himself stated and only recently has he decided that they are to be recharacterized as loans. Harbour has been totally consistent throughout his release. And, notwithstanding Shea's characterization of the monies paid in 2021 as "loans" and, thus, not reportable as income until and unless it is clear that they will not be repaid, Harbour plans to declare the money to be income.

Respectfully submitted this 30th of June, 2022

GARY M. RESTAINO
United States Attorney
District of Arizona

*/s Coleen Schoch*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

*/s Stephen M. Dichter*
Stephen M. Dichter
Christian Dichter & Sluga, P.C.
Attorney for David Allen Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Stephen Dichter, *Attorney for Defendant*

*s/Daniel Parke*
U.S. Attorney's Office