Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Jill Ann Herman, 020180
jherman@cdslawfirm.com
Iulia A. Taranu, 034458
itaranu@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
| Plaintiff, | **DEFENDANT'S REPLY BRIEF ON THE REBUTTABLE PRESUMPTION IN DETENTION HEARINGS** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

Defendant, David Allen Harbour ("Defendant"), submits his Reply Brief on the "Rebuttable Presumption."

**ARGUMENT**

**1. Indirect Witness Contact with Burg:** On December 3, 2021, the government filed an inaccurate Petition to Revoke (Doc. 267). By December 13, 2021, the government knew the Petition was false but failed to correct it. Bobrow had no knowledge of a declaration or any agreement that he was supposed to get Burg to sign stating he was not a victim. He told the agents that Baskin told him to call Burg. This makes perfect sense, since Bobrow was also Baskin's client and Baskin knew that Bobrow knew Burg.[1]

---

[1] Agent Cofer testified that after the agents left on 12/13/21, Vickie Bobrow overheard Baskin ask Bobrow to twice repeat that he (Baskin) had *not* told Bobrow to call Burg). RT, 12/29/2021; p. 51, ll. 7-8. The existence of the call made it clear that that Baskin had

The government failed to prove by clear and convincing evidence that Harbour told Bobrow to call Burg. Baskin knew that, if Harbour used Bobrow to contact Burg it would violate a condition of release but if Baskin, who represented Bobrow, had Bobrow contact Burg, there would not be a problem.

**Structuring:** Judge Fine concluded that "defendant structured financial transactions." She was wrong. The standard was clear and convincing and the review here is *de novo*. Harbour was guided by counsel at every step of his release. He did *precisely* what Judge Fine permitted him to do. We analyzed each of Harbour's applicable release conditions in Doc. 358, pp. 4-5.[2] In short summary: The sources and uses for payment of 1) attorney's fees, 2) payments to settle pre-indictment debt, 3) income, and 4) family expenses did not need to be reported to PTS. Nor did Harbour need PTS authority to travel to California *for work*. It was because his prospective work trip to California was going to be combined with the family Disneyland Trip that he sought and received PTS approval. He also got permission from PTS for the trip to Kansas City. If the government is contending PTS did not approve these trips, the government is not being accurate.

**Kenny Bobrow** The government knows nothing about Kenny Bobrow. In 2007, Bobrow loaned Harbour's company $2,500,000 at a generous 25% simple rate of interest. Harbour, who guaranteed the Note, made about $2,200,000 in interest payments. Harbour's

---

*absolutely* told Bobrow to call Burg. Baskin was coaching Bobrow to say otherwise, if asked. Why would such a call have even been made had Baskin not told Bobrow to call Burg? Remember, Baskin was the architect of the entire Burg settlement effort. Harbour had been arrested before Bobrow was confronted. Baskin obviously knew it, due to his involvement, was about to withdraw from Harbour's representation, after which he has invoked his right to remain silent.

[2] On 3/1/21, in an earlier failed attempt to revoke Harbour's release, government counsel stated that, if only Harbour had consulted Baskin about these transactions, it would have been O.K. RT, March 1, 2021, p. 5, ll. 8-14; p. 33, ll. 13-19. Fair point. Every dime acquired and used by Harbour to settle preindictment debts and to pay lawyer's fees went through his lawyer's trust account. In fact, Baskin was at the heart of everything the government has relied upon to revoke Harbour except for the Georgia Avenue residence.

last loan from Bobrow was in 2008. The Turasky transaction with Bobrow, which the government also does not understand, shifted an obligation owed to Turasky to one owed to Bobrow, while Bobrow and Turasky engaged in a business venture of their own that has been successful. Bobrow did not loan Harbour money to close on the Georgia Avenue residence, he loaned it to Shea. And no one except the government says otherwise. If it was true that Bobrow loaned Harbour the money, why does Shea *still* agree that Bobrow will be repaid when the residence is sold.[3]

**The Gottschalks** Next, the government contends that the Gottschalks are also "frequent victims" of Harbour. Not meaning to be flip but has anyone asked the Gottschalks whether they are victims of Harbour? And the answer is yes, as a matter of fact, they were asked. In an interview of Tim Gottschalk, the government agents were told, basically, that the family would help their daughter, their son-in-law, and granddaughters whenever and however they felt like so doing.[4]

**Shea Georgia Avenue Purchase** With respect to the Georgia Avenue property, the idea for the house was Bart Shea's new partner, Ken Akimoto. Shea owned the house.[5]

---

[3] Agent Cofer regards Vickie Bobrow as a more reliable witness than Kenny Bobrow. RT, 6/16/2022, p. 139, ll. 14-25. But, in her 302 dated 12/28/21, she does not claim that Harbour asked for money for the house nor that he brought a loan agreement over. Rather, she said that Harbour brought over a single gift letter well after the purchase of the house and that Kenny Bobrow loaned Bart Shea $140,000 to help Shea buy the Georgia Avenue house for remodel and sale. This matches Kenny Bobrow's 12/13/21 interview.

[4] The Gottschalks just helped Abby buy a Kia.

[5] The government contends that Harbour forged Shea's signature on the Gottschalk note. No one testified to that. Our unopposed expert concluded Shea "probably" signed the Gottschalk note, Exhibit D-51; Exhibit D-84. Since precisely the same criteria provided the foundation for her concluding Shea signed the two draw requests – Shea conceded he "maybe" signed those - it may safely be concluded that Shea signed the Gottschalk promissory note. It is also to be observed that, in its argument, the government contended that Harbour forged the Bobrow note. The government seemingly cannot get its own story straight.

Shea looked forward to splitting the anticipated $3,000,000 gain after restoration with Akimoto. The gift letter or letters must have been the idea of Frank Madea. He is the sole owner of Equitable. Since Madea concocted the idea of the gift letters and with Equitable having made the loan out of its own line of credit, Madea's ownership of 100% of Equitable means that Equitable cannot be a victim and there is no mortgage fraud. If it falls, so do all the dependent counts.

**Negative Inference Requested** Concerned that this Court would not sustain probable cause regarding mortgage fraud, the government "cleverly" sought to eliminate this Court review by indicting a mortgage fraud case (the day before the hearing). The government's deliberate circumvention of this Court's review merits the adoption of a negative inference that, had the indictment not been superseded, this court would not have sustained probable cause.[6] The government's attempt to justify violating the bar date could not pass the straight-face test.

### The Government's Cases

None of the government's cases are of any precedential value. In ***United States. v. Patterson***, No. 19-CR-230, 2020 WL 6200164, at *8 (E.D. Cal. Oct. 22, 2020), Patterson admitted lying to law enforcement and had purchased two airline tickets, one to New York and the other to Mexico.

In ***United States. v. Slade***, No. 09-CR-1492-ROS(LOA), 2013 WL 2455926, at *12 (D. Ariz. June 5, 2013), Magistrate Judge Anderson made fact-specific findings of probable cause to believe that Slade committed theft in Texas while on release. *Slade* pleaded guilty the day after he was revoked so there was no review.

---

[6] Nothing, as the testimony made clear, supported Judge Fine's conclusion. Shea, in his immunized April, 2022 interview actually confessed having timely knowledge of the $100,000 gift letter, saying that Harbour brought it to him, he threw Harbour out of his office, and told him to "take care of it." What gift letter? We had understood that Shea denied any knowledge about any gift letters. Shea' April interview hurt the government's case. It did not strengthen it.

4

In *U.S. v. Soria*, No. 2:11-CR-00156-LDG, 2011 WL 3651272, at *9 (D. Nev. Aug. 17, 2011), the defendant while on release was arrested with 9 new victim's checks in a continuation of the mortgage fraud he had engaged in for some time. He had been ordered to not work in the mortgage industry and he lied about it to PTS. The court referred to multiple criminal acts while on release. In our case, there is no evidence that Harbour did anything illegal with respect to the Georgia Avenue house at all but it is the only act of *illegality* even alleged against him in about 3 years of otherwise spotless performance.

In *United States. v. Williams*, No. 12-CR-463, 2015 WL 9480013, at *3 (D. Nev. Dec. 29, 2015), the Defendant admitted committing new crimes while on release and argued, in a motion to reconsider, that she posed no danger. Key to the court's detention order was the juxtaposition of the old crimes to the new crimes temporally and in-kind. Here, the heartland of the indictment consists of two alleged payday lending schemes dating back to 2012 that are, sadly, indicative of nothing other than the government's utter lack of any understanding of either of them.

In Doc. 358, supra., we discussed how PAIF's $1.1 million claim and Burg's $1 million fall away. This left the government with next to nothing in terms of "victims" at least victims whose claims are not, pretty obviously, time barred (e.g., Rhonda Gray, Kenny Bobrow, and Carol Hill). Joe Cathey's newly added $3,000,000 "claim" is also easily defeated.

In *U.S. v. Cloudy*, No. 13-CR-28, 2013 WL 5979345, at *2 (N.D. Cal. Nov. 8, 2013) the defendant admitted to having committed crimes while on release, still resided with her victim, and failed to tell PTS she had been arrested.

In *U.S. V. Bararia*, No. 2:12-CR-236, 2012 WL 5453673, at *8 (D. Nev. Nov. 7, 2012) the physician defendant was ordered to not "order, possess, dispense, or prescribe any controlled substances," which he commenced starting again the next day. The continuous violations of the court's explicit instruction are what lead to the "callous disregard" and the revocation of detention.

5

**Miscellaneous Extraneous Government Misstatements**

In its Response, the government makes a series of new erroneous allegations. In closing argument, RT 6/23/22; p. 220, ll. 5-9, the government contended that, at Barnes & Noble, Abby Harbour talked to Shea about how Harbour had forged Shea's signature on the *Bobrow* note. But, on p. 5, fn. 3 of its Response (Doc. 411), it is now the *Gottschalk* note that Harbour supposedly forged. At p. 226, ll. 16-19, counsel argued that, according to Shea, Harbour got $2 million for the RFI loan, a company in which Harbour had no interest and by which he was not employed. Counsel must not have read the loan agreement and promissory note. Exs. D-65 and 66. The loan agreement was with SCD, which employed Harbour and a stated authority under the loan agreement was to fund advances to and for the benefit of Harbour and other employees.

Next, the government claims that Turasky got money from the Deel $8 million loan. That is flatly false. The government next argues that Defendant *engineered* the signing of two false gift letters. No evidence supports that contention. Why would Harbour engage in felonious conduct to assist Bart Shea in making about $3 million on a house flip in which he had no interest?

Before his 12/13/21 arrest, Harbour was to have received the benefit of $1.5 million from the $8 million line. Deel sent amount to Baskin's trust account. As we have previously described, Abby Harbour received $100,000 to repay a loan she drew on her IRA. This was a non-reportable family expense. $800,000 was released to Shea when the $1 million Burg settlement was abandoned. The Wilson pre-indictment debt was settled and was not reportable. Lawyers got the rest. So, fist, it was never $2 million. And last, it was $700,000 of which Abby Harbour got $100,000. These payments were not reportable, nor was any prior approval was required. These conditions were adhered to scrupulously, guided by Baskin, who, after all, knew the conditions of release and was responsible to both his client and to the Court to make sure they were being observed. Baskin received all the money in his trust account. Judge Fine could change the

6

conditions. She was not free, however, to punish Harbour for not adhering to conditions that, in retrospect, she wished she had imposed but had not imposed.

**Standard:** The Court raised the question of what is needed to rebut the rebuttable presumption. The answer is "some" evidence. What "some" evidence means is precisely the amount of evidence that this Court, in exercise of its discretion, deems enough to meet the undefined standard. Neither side found anything more than the *ad hoc* decisions of other District Judges and Magistrate Judges. No bright-line test was found.

**Summary 1) Mortgage Fraud:** Nothing required the government to supersede the indictment the day before the *de novo* review hearing. It is not as if the government was up against a deadline. The deadline had passed on November 30, 2020. The government violated the court mandated deadline only by 562 days. So what motivated it to choose the day before the hearing to supersede? The government is in sole control of the grand jury. It deliberately tried to divest the Court of its *de novo* review. Alone, the government's sole control and brazen affrontery merits the adoption of a negative inference that the government would have lost on probable cause.

Beyond that we proved that, as against Harbour, the mortgage fraud case is basically non-existent. It is even likely that no crime was committed by anyone. That is the quintessence of a very weak case.

**Prior Release Conditions** As to allegations of violations of prior release conditions, the government clearly loses. There were no violations and, certainly, least none proved to be "highly probable." The defendant should be released and the Court should not be deterred by the government's gaming the appeal by superseding the indictment when it just as easily could have abided this Court's *de novo* review.[7]

---

[7] The government complains the Defense has done anything to show that there are conditions of release that would ensure that would ensure his appearance and prevent him from constituting a danger. The government must have missed studying the jointly filed Doc. 410. It lays out in detail conditions of release that would or should satisfy any Court's concern.

RESPECTFULLY SUBMITTED this 5th day of July 2022.

CHRISTIAN DICHTER & SLUGA, P.C.


By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Jill Ann Herman
    Iulia A. Taranu
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez