GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN SCHOCH
Georgia State Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>David Allen Harbour,<br><br>Defendant. | No. CR-19-00898-PHX-DLR (DMF)<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S SUBMISSION RE PROPOSED CHANGES TO NEW CONDITIONS OF RELEASE RE "WITNESSES" [Doc. 425 ]** |

## INTRODUCTION

Defendant's motion urging the Court to allow Harbour and his wife, Abby Lynn Harbour ("Abby"), and perhaps others, to have direct and indirect contact with certain witnesses on Harbour's behalf should be denied. The court has imposed conditions that require Harbour to avoid all direct or indirect contact with certain witnesses because they are alleged victim(s), potential witness(es), co-conspirators, or family members of victims, witnesses, or co-conspirators. In light of the fact that this Court has found that Harbour has violated this condition previously, the Court should maintain the condition as it is currently written or clearly state that the only indirect contact permitted would be that which is initiated and attended in full by Defendant's counsel.

Defendant's motion fails to recognize that the three witnesses addressed in his motion are likely to be government witnesses. His motion is also riddled with misrepresentations and factual inaccuracies. Harbour makes unsupported claims without taking the time to consult transcripts, investigative reports, and exhibits that were admitted at the evidentiary hearings relating to revocation and provided in discovery that contradict his claims.

Harbour should have no contact, direct or indirect, with the three subject witnesses. Again, this court has already determined that Harbour has had indirect contact with witnesses in violation of his release conditions. The government believes that the prohibition on indirect contact should include contacts by Abby, who has acted (at a minimum) as Defendant's agent in furthering his various fraudulent schemes for a decade. Abby is not only well aware of Harbour's long history of numerous civil and criminal entanglements, she has been a willing participant in them, and is a defendant in a number of civil suits filed by aggrieved investors. In addition, Abby has benefited considerably from the unlawful diversion of investor funds to finance her lavish and unsustainable lifestyle, at the expense of victims, many of whom were inexperienced investors who put their retirement savings or life insurance proceeds in Defendant's hands.

While it appears to the government that Defendant's request only becomes ripe if and when he is released on conditions, Defendant's proposal that Abby be allowed to contact these witnesses in an unsupervised and unrestricted manner underscores how untenable it is for Harbour to be released on any conditions. Therefore, the government asks that the Court restrict indirect contact with these witnesses to communications initiated and attended in full by defense counsel.

## **ARGUMENT**

**I.   The Release Condition Should Prohibit Abby Harbour from Contacting the Three Subject Witnesses.**

Abby is an agent of her husband and possibly his co-conspirator in tax evasion , the Baskin "kickback" payment, and the Georgia residence transaction. She should be

precluded from contacting any witness related to the pending trial. The government believes that the condition prohibiting Harbour from direct or indirect contact with the named individuals includes contact between Abby and those individuals on behalf of herself or Harbour.

Abby has been married to Harbour for 12 years. She is well-aware of her husband's history of protracted and chronic financial fraud. Since 2011, Harbour has been the subject of an array of civil and criminal entanglements resulting in 22 separate actions in various jurisdictions.[1] In addition to the actions identified in Exhibit A, there are four additional lawsuits filed by victim-investors who will be witnesses at the upcoming trial. *Gray v. Harbour*, No. CV2018-054740 (Maricopa Cnty Super. Ct.); *Bobrow v. Harbour,* CV2022-001520 (Maricopa Cnty Super. Ct.), *Cathay v. Harbour*, No. CV2022-001520 (Kan. Dist. Ct); and *Burg v. Harbour*, No. BC678175 (Los Angeles Super. Ct.). Abby is named as a defendant in *six* of these lawsuits, including a tax court action. *See* Ex. A. Numerous tax liens and levies of the Harbours' personal joint bank accounts have occurred over the years. Abby was present during Harbour's arrest and the search and seizure of assets (including some belonging to her) by federal agents.

Abby has the motive to tamper with the government's witnesses in this matter on behalf of Harbour as she has benefited financially over the years from diverted investor funds and tax avoidance. As detailed in both the FTC and SEC complaints and the second superseding indictment, she has lived a life of private chartered jets, private golf club memberships, vacation homes in Mexico and Idaho, expensive jewelry (including a six-carat custom diamond ring), luxury trips, a $750,000 boat named after her, and residence in a succession of multi-million dollar homes purchased by others.[2] These expenditures,

---

[1] *See* Ex. A, a summary of civil cases including lawsuits by the Federal Trade Commission and the Securities and Exchange Commission against Harbour and Abby.

[2] *See* Ex. H; FTC complaint detailing the Harbours' expenditures of $6.6 million. Paragraph 27 details $100,000 in Abby's personal expenditures from the DNA bank account. The Harbours admit they received the funds and then spent it. *See* Ex. I

plus her own failed business venture, were financed by diverted investor funds and tax avoidance. Abby was also directly involved in fraudulent transactions on behalf of Harbour, which are detailed below. Counsel's suggestion that Abby is acting in a Kovel capacity is misplaced. Def.'s Mot. at 4. The Kovel Rule is an extension of the legal principles of lawyer-client privilege and confidentiality. In addition to lawyers, it extends to other professional experts who may be involved in a case. Such professionals can include the accountant who is consulted by the client or indirectly through the client's attorney. These experts might include financial advisors or financial planners. *See United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) (presence of accountant while client relating complicated tax story to a lawyer does not destroy attorney-client privilege). Abby is not a professional and communications between her and Harbour's defense counsel (and witnesses) are not privileged.

### A. Abby's Involvement in the Harbours' Tax Evasion

As detailed in the SSSI (Count 24) Harbour is charged with tax evasion. Indeed, two months before Harbour was arrested, he acknowledged a $5 million tax lien in an under-oath deposition. *See* Ex. B, p. 3. The Harbours filed jointly, and Abby would be aware of their failure to pay taxes. Among other things, Abby signed for certified mail from the IRS, addressed only to her, notifying her of a $173,000 tax lien.[3] Despite their failure to pay taxes on diverted investor funds, Abby benefited from a lavish lifestyle at the expense of investors and taxpayers for years. As noted above in the FTC complaint, the Harbours received $6.6 million from the failed KSQ venture, spent and did not pay taxes on it. *See* Ex. H.

### B. Baskin's "Kickback" of Legal Fees to Abby's Bank Account

On March 26, 2021, Baskin received $200,000 from Shea Connelly Development for Harbour's attorney's fees. *See* Ex. G-102, p. 2. Of this $200,000, $50,000 was kicked back to Abby Harbour's bank account. Abby then used those funds for her living expenses

---

[3] HARBOUR-041622-041631

and country club membership fees. *See* Ex. G, p. 101. This transaction occurred *after* the court revised Harbour's conditions over the government's objection. Hr'g Tr., p. 14 (Mar. 2, 2021). The receipt of $50,000 for the benefit of Harbour was not vetted by PTS, nor were any of the transactions following the receipt of these funds. Harbour misrepresented to the Court that these attorney's fees were originally paid from Abby's trust stating, "money for fees paid to Baskin came from Abby Harbour's early withdrawal from her IRA. She paid the 10% excise tax imposed for early withdrawal." Def.'s Mot., Doc. 410, p.13. As the United States pointed out at a recent court appearance, this statement as to the source $200,000 paid in March 2021, is demonstrably false. *See* Ex. C. Those funds came from SCD, *not* Abby's trust. The government encouraged defense counsel to provide any evidence to support Harbour's assertion, Hr'g Tr. July 19, 2022, p. 17, but no such evidence has been provided. In short, either Harbour or Abby (or both) misled defense counsel on the source of this money. This misrepresentation is similar to counsel's misrepresentation to the court that a $16,000, Harbour family vacation to Disneyland in December 2021, was paid by Abby's parents. It was not.[4]

### C. Abby's Involvement in the Georgia Transaction

Abby was intimately involved in the fraudulent Georgia transaction. According to the Bobrows, she approached them about lending $140,000 for earnest money and a down payment. (*See* Ex. G-18, ¶ 26) According to both Kenneth and Victoria Bobrow, Abby "did all the talking." (*Id*.; Ex. D-74, ¶ 6) Her parents (the Gottschalks) also contributed approximately $200,000 for this transaction. It is likely that Abby negotiated this payment from her parents. Similar to the payment to Baskin, Abby misrepresented to Victoria that the $200,000 had come from Abby's trust.[5] (*Id.*) Importantly, according to Victoria Bobrow, it was Abby who brought the false gift letter to Kenneth Bobrow to sign. (*Id.*) In

---

[4] *See* Doc. 360, Exs. L and M; Gottschalk interview (HARBOUR-055609-10)

[5] At trial, the United States will present numerous instances over the last ten years where Harbour misrepresented that he has unfettered access to Abby's trust and used that trust as collateral for millions of dollars in loans.

addition, two secured promissory notes were executed with both Kenneth Bobrow and the Gottschalks. Harbour forged Bart Shea's signature on these documents, which Abby was very much aware of. She was confronted by Shea regarding his purported signature on these two documents. (Ex. G-65, ¶ 24) On the same day Abby saw her husband in jail, Abby met with Shea at Barnes and Noble and relayed to Shea that Harbour had told her that he forged the signatures. Jail calls between Abby and Harbour reference her meeting at Barnes and Noble on that day. (*See* Ex. G-88)

### D. Abby Chooses to Use Borrowed Funds to Finance a Lifestyle That She Cannot Afford.

On October 14, 2021, Abby received a $500,000 wire from Deel. Abby used this money, not to pay rent on their multimillion-dollar residence, to pay the Harbour's joint tax liability, or to purchase her own vehicle, but to book a $16,000 VIP weekend tour of Disneyland and a $3700-two-night stay at a luxury resort in Sedona, Arizona.[6] If permitted unfettered contact with the government's witnesses, it seems likely that she will continue to milk victims and avoid her tax obligations to finance her unsustainable lifestyle.

## II. The Prohibition on Harbour's Indirect Contact with Dunsworth, Deel, and Maya Langbien Should Include Contact Through Abby.

With Abby's knowledge of Harbour's numerous lawsuits, a federal indictment, and her involvement in the transactions above, she should not be permitted to contact Dunsworth, Deel, and Maya Langbien on behalf of herself or Harbour.

The relationship between Deel and Dunsworth and the Harbours is strikingly similar to that of Kenneth Bobrow and the Harbours. Harbour has characterized both Dunsworth and Deel as adopted uncles and detailed the length of time they have known the Harbours (14 years), that they spent family vacations together, were present at the Harbour's 2010 wedding, etc. Def.'s Mot. at 3. Deel and Dunsworth may be the Harbours' benefactors of today, but tomorrow, like Bobrow, they may be his victims. Bobrow was similarly

---

[6] *See* Doc. 360, Exs. G, K, L.

described as an adopted grandfather to the Harbour children, a father figure to Harbour for over 12 years, and he apparently vacationed with the Harbours. Ex. G-18. Defendant's motion also details numerous business interests that Dunsworth and Deel had with Harbour but fails to mention that these two gentlemen collectively lost tens of millions of dollars as a result of their investments with and personal loans to Harbour. Similarly, the 84-year-old Bobrow lost millions to Harbour over the years in numerous failed business transactions and loans. (*Id.*)

In considering whether the Harbours should contact the government's witnesses, the Court should look no further than to how the Bobrow-Harbour relationship ended. Bobrow was involved in Harbour's efforts to indirectly contact Burg, was involved in the Georgia transaction where he signed a false gift letter at Abby's behest and lost $140,000 in the transaction. Abby specifically promised Bobrow he would be paid back in November 2021, but that has not happened. (*Id.*) Bobrow invoked the Fifth Amendment related to Harbour's detention hearing, (Hr'g Tr. p. 24 (Dec. 29, 2021), and sued Harbour in February 2022 for the Pat Spaulding fraud.[7] Both events are now included in the second superseding indictment. Doc. 387, ¶¶ 4–10.

**Melvin Dunsworth**. First, Harbour's claims about what Dunsworth told the government are false. *See* Ex. D. Dunsworth was deposed by the SEC in 2016 regarding a civil complaint filed in 2016 by the SEC. During that deposition, Dunsworth admitted that he lost nearly $7 million to Harbour and Joel Tucker's KSQ venture.[8] The group that Dunsworth represented lost nearly $60,000,000 and filed for bankruptcy. *See* Ex. E. The bankruptcy shows that Dunsworth lost approximately $27 million, and Deel lost $11 million in the Harbour/Tucker venture (aka KSQ). In addition, Dunsworth loaned Harbour nearly $1 million that has never been repaid. Dunsworth was interviewed by an investigating agent in June 2020. (Ex. D) In contrast to Harbour's claim that Dunsworth advised agents that he would get his lawyer involved to have the agents cease contacting

---

[7] *Bobrow v. Harbour,* CV2022-001520 (Maricopa Cnty Super. Ct.),
[8] Dunsworth SEC Deposition, 6/30/16, Bates No. 005195-005433.

him, Dunsworth gave a candid assessment of Harbour and frankly told the agent about his financial history with Harbour. Dunsworth stated he is in his seventies, and the whole "Harbour ordeal" has given him mental anxiety. *Id.* Dunsworth never told the agent to not call him. *Id.* Like Bobrow, the 73-year-old Dunsworth likely sees any chance of recouping the millions that he lost to Harbour to be slim if Harbour remains in jail and is convicted.

**Daryl Deel**. First, Harbour's insistence on that both he and Abby be permitted unfettered contact with Deel is surprising in light of his under-oath declaration filed in this case. Doc. 415, ¶ 18. In an effort to convince the court that he had no access to unexplained money from various benefactors that would allow him to flee, Harbour represented that Deel had cut all ties with him. *Id.* Nevertheless, Deel is in the same position as Bobrow and Dunsworth: he lost millions to Harbour's various ventures, including when Harbour used Deel's money to pay off (Turasky and the Willsons) and to attempt to pay off (Burg and Hill) victim-investors, to fund his legal defense, and to fund two luxury vacations for the Harbours in late 2021. Harbour acknowledges in an under-oath deposition in June 2019 (two months before his arrest) that he was unemployed and owed Deel $9,000,000. Ex. B.)

Second, Harbour suggests that Deel told agents to stop contacting him and that he advised agents that "he would spend his money how he saw fit." Def's Mot. at 5. None of this is true. The agents have had one meeting with Deel with *two* of Deel's attorneys present. Ex. F. Among other things, Deel advised investigating agents that he has lost $9.5 million to Harbour's various ventures. *Id.* For all these reasons, Abby should also be precluded from contacting Deel on behalf of Harbour.

**Maya Langbien.** Langbien is an important witness in the pending trial as she represented Shea in the Georgia transaction. She apparently is also a family friend of the Harbours, which is likely why Harbour selected her to represent Shea in the Georgia transaction. Ms. Langbien received a 2.3% commission on the $3.4 million purchase of the Georgia residence.[9]

---

[9] Harbour spent $300,000 of victim-investor funds at M. Langbien's husband's company, the Ticket Exchange. *See* Ex. H, FTC Compl. ¶ 28(e).

Harbour has taken the position that the Georgia residence was purchased for Shea's benefit and suggests that he was doing Shea a favor by moving into the residence to deter would-be copper thieves. However, at trial, it will be abundantly clear that Langbien dealt exclusively with Harbour. Maya Langbein and Harbour exchanged 42 text messages and numerous emails prior to closing.[10] The text and email messages show Harbour negotiating the purchase of the property for the benefit of his family not Shea (*e.g*., arranging with Maya Langbein the delivery of furniture, measuring the rooms, making sure the HVAC and fountains were repaired prior to move-in, etc.). Shea's agent tells the loan officer that Harbour is even willing to waive inspection. Moreover, Harbour expresses how excited he and his family are to be moving into a property that is a short distance from the private school attended by his children. In one text, Langbien appears to be under the mistaken impression that Harbour is lending the earnest money to Shea, when in fact Harbour is obtaining it from others. *Id*. Harbour gives the same impression to the seller's agent, M.E. *See* Ex. G. Harbour visits the Georgia residence three times with his family, contractors, and another unidentified person, all for the purpose of arranging the purchase for his own benefit. *Id.* As with Deel and Dunsworth, neither of the Harbours should be allowed to contact Maya Langbien, for any reason, without the conversation being initiated and attended in full by defense counsel.

Respectfully submitted this 10th day of August, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

---

[10] HARBOUR-056430-056437.

## CERTIFICATE OF SERVICE

I hereby certify that on August 10th, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*
Daniel Parke
U.S. Attorney's Office