Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710
Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>Defendant. | Case No. 2:19-cr-00898-DLR (DMF)<br><br>**DEFENDANT'S REPLY TO UNITED STATE'S RESPONSE TO DEFENDANT'S SUBMISSION RE PROPOSED CHANGES TO NEW CONDITIONS OF RELEASE RE "WITNESS" [Doc. 435]** |

  Defendant ("Harbour") respectfully responds to the government's Response to Defendant's Submission re Proposed Changes to New Condition of Release re "Witness" (doc 435) on or before Friday, August 19, 2021.

  There are significant misstatements in the government's submission that, in our view, need correction.[1]

---

[1] The first of which is on p. 2, ll. 8-9 of the Government's Response, *viz.*, "Again, this court has already determined that Harbour has had indirect contact with witnesses in violation of his release conditions." The Magistrate Judge found that Harbour indirectly contacted Burg through Bobrow. *This* court found that the government had failed to prove that Harbour indirectly contacted Burg through Bobrow. Doc. 427, pp. 3, ll. 2-13. Or should we expect the government to contend that this is not a misstatement because, although MJ Fine's finding has been reversed in *de novo* review, she is still "this court" and therefore the government did not mislead this court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

The government contends that our motion was "riddled with misrepresentations and factual inaccuracies." The use of the word "misrepresentation" directed at the undersigned is provocative, even incendiary, as it is affirmatively stating that the undersigned lied to the court ("the action or offense of giving a false or misleading account"). Having read the government's response, it would be easy, too easy, to return the compliment but instead, we prefer to offer the following explanation for the government's numerous misstatements and that is this: It is, by now, obvious that the government agents assisting government counsel have either little idea of what this case is about or no idea whatsoever.

### Deel, Dunsworth and Maya Langbein

The notion that Deel and Dunsworth are going to be government witnesses is absurd. Of course, the government could issue a subpoena to them. I could do the same for every government witnesses (except for agents subject to the requirement to obtain agency approvals).

**Melvin Dunsworth:** His Declaration dated September 18, 2020 is attached as Exhibit 1. Dunsworth is a key defense witness because he straddles both payday lending epochs that form the heartland of the government's case. Dunsworth was the 50% owner of NorthRock. It loaned money to KSQ that it borrowed from, for example, Joe Cathey's $3 million. Unlike the agents, whose assertion to Cathey during his interview in Dallas that NorthRock was paid fees by KSQ led to Cathey filing a lawsuit against Harbour in Kansas, Dunsworth knows (and the records of NorthRock show) that KSQ never paid a finder's fee to NorthRock or to Dunsworth or Harbour in association with NorthRock.[2]

Dunsworth also knows that NorthRock was entirely profitable and that every lender was being timely paid until Operation Chokepoint shut down payday lending in

---

[2] *See*, Exhibit 2, Harbour's *pro per* Answer to the Cathey Johnson County lawsuit.

2013. He witnessed the government's collapse of payday lending first hand and, according to Government Exhibit E, Dunsworth lost over $26 million[3] in connection with NorthRock's post-Operation Chokepoint bankruptcy.[4]

Dunsworth was also involved in the "second" iteration of payday lending that forms the other half of the government's principal theory in this case.[5] This was the Green Circle case. Dunsworth will testify that, Alonzo Primus, who all knew as Green Circle's controller and none knew, at the time, was also PAIF's chief credit officer[6] and

---

[3] Government Exhibit E reports not only the principal but also the accrued interest. Dunsworth actually lost about $7-10 million in NorthRock. Altogether, about $30 million was loaned to NorthRock and, as has and will be demonstrated, the government is causation for his and every other lender's losses in first payday.

[4] *See*, Exhibit 3, 4:18-cr-00153-RK (Doc. 17, filed 05/21/19), p. 5, ¶ 13. In Joel Tucker's Second Superseding Indictment, the government admitted – and it to be remembered that we have only one government – that "[o]n August 1, 2012, President Obama signed a law referred to as Operation Chokepoint, which resulted in banks refusing to make Automated Clearinghouse withdrawals from their customers' bank accounts associated with payday lenders, which greatly reduced the profitability of payday loans. Many payday lenders went out of business after Operation Chokepoint." As Congress found during the hearings it conducted, the Justice Department actually initiated a clandestine operation to coerce banks into closing the ACH accounts, after which, as the Congressional Report noted, the Justice Department, at first, lied to Congress about it.

[5] There are four unrelated parts of this case, as it is presently indicted. First, there is the payday lending case. Second, there is the new 2007 case involving Bobrow on which the statute of limitation expired years ago. Third, there is the 2021 mortgage fraud case. Fourth, there is the Rhonda Gray case on which the statute of limitations may well have expired years ago and which has zero to do with payday lending. Related to the First case is the tax evasion charges which has a virtual endemic number of problems of its own.

[6] Primus' dual role was something that was a closely held secret for a long time. But through the PAIF bankruptcy, and the racketeering action brought by the Trustee against Burgess, Primus, and others, the SEC Complaint against Burgess and others, along with (unsuccessful) prodding we engaged in here to try to force Phil Burgess and the others represented by Gerald Krovatin to produce PAIF documents, Primus not only admitted, but proclaimed in a Declaration filed in this Court, that he simultaneously was Green Circle's consultant and, he says, an officer of PAIF. As Green Circles' controller - he was far more than a "consultant" - he overdrew loans from PAIF and as PAIF' chief credit officer, Primus along with Burgess defaulted the loans, which collapsed Green Circle and

3

Phil Burgess and Alonzo Primus collapsed Green Circle by calling a default on its borrowings from PAIF. This, in turn, collapsed Oak Tree, whose loans to Green Circle were subordinated to PAIF's much larger loan portfolio.

What we have done here, we hope, is to introduce the Court to something that, heretofore has never really been discussed: That no crimes were committed by Harbour with respect to payday lending at all. This is what the agents have missed for all of these years. The agents have gotten the payday lending part of this case entirely backwards. The government has maintained and still maintains here that the Harbours lived an elaborate lifestyle as a result of diverting investor funds. This is a completely false statement.

There were a finite amount of investor funds that flowed into payday lending. The investor funds loaned to DNA, to Canyon Road, and North Rock in payday lending that Operation Chokepoint killed were passed on to where they should have gone. In the case of DNA and North Rock, the funds were loaned to KSQ which pooled the funds of those entities and many others like them and subsequently loaned them to others who, in turn, loaned money to consumers in States in which the usury laws permitted those loans to be made. We can find no one, even Joel Tucker, who was indicted based upon investor losses in the first payday lending. That was the government' point in making the admission it made. Tucker, whom the government trots out every time, in its ignorance, it talks about Harbour not having COVID, was not indicted for a payday lending scheme.[7]

The large amounts of money earned by Harbour and others, including Kenny Bobrow, who had his own payday lending business and who also loaned money directly

---

took Oak Tree down because its lending was subordinated to PAIF much larger extensions of credit.

[7] The court has the medical reports concerning Harbour and we offered them to the government on its representation that it would not disclose them beyond the government. The government never responded to the proposal.

4

to KSQ came from the returns on the re-lending of the money and those returns are what supported the lifestyle upon which the government thinks – as it always thinks - it is going to rely upon to try to sway the jury to hate the defendant.

The money spent by Harbour and others did not come from those who loaned to DNA, Canyon Road, NorthRock, or Oak Tree. The money flowed upstream from the ultimate borrowers who needed short term loans and who paid very high, but legal, rates of interest to gain access to funds that the then-paralyzed banking industry could no longer supply. It was those payments passed upstream that provided the returns.[8]

What is truly unfortunate about the government's erroneous representation of the underlying facts of its payday lending case is that, ever since the first attempts by the government to revoke Harbour's release, it has managed to bamboozle judges listening to its *spiel* that there is so much money involved in it that Harbour *must* be considered a flight risk. This is what has now led to bail being set at $1 million. But the reality is that none of money lost by the so-called payday loan victims in this case was lost because of a fraud perpetrated by Harbour.

Harbour knew all of the people who loaned money to DNA and Canyon Road (and, in the Green Circle case, to Oak Tree) and Melvin Dunsworth knew all the people who loaned money to NorthRock.[9] They were their friends by and large. Why would Harbour have defrauded his friends? This notion is completely ridiculous.

There is no reason for my client and his wife to be precluded from having contact with Melvin Dunsworth. He is, as we explained in our original filing, a close family

---

[8] Payday lending took off in the wake of the 2008 financial collapse when if banks were loaning money at all, they were only loaning money to those who did not need money.

[9] As Joe Cathey pleaded in his Johnson County complaint, he neither knew or met or even spoke to David Harbour before he loaned $3 million to NorthRock. So, besides the fact that his only claim is that Harbour did not tell him that he was getting a finder's fee in NorthRock on his $3 million – an allegation informed by the agents' mistakenly telling Cathey that KSQ paid fees to NorthRock – it is doubtful that Cathey will even get to testify against Harbour in this criminal case.

friend and supporter of Harbour's innocence of these charges. For example, after Harbour was imprisoned in CoreCivic, Melvin Dunsworth came into town and stayed with the Harbour family at the Georgia Avenue house.

**Daryl Deel:** Mr. Deel was also involved in both payday lending, is an important witness for the defense, and the government knows that there is no way that his proposed testimony is going to assist the government's case. If anything, he is even closer to the Harbour family than Dunsworth, though that would take a lot. Deel is a CPA and a successful businessperson was involved in both payday loan epochs with Harbour and consulted with Harbour on structuring the loans to Green Circle. Recently, Deel came into town to meet with the government's new BFF, Bart Shea, and resolve just how much Shea owes Deel ($2.5 million and how it is going to be repaid).[10]

Both Deel and Dunsworth lost far more than any purported victim in this case and they know and will testify why that happened. Because the government, in first payday and PAIF, in second payday caused the losses.

**Maya Langbein:** It is not Maya Langbein with whom Harbour wishes to be able to have contact; it is her husband, John, who is not on the list. We brought his name into this proceeding *solely* to make sure everything was done in the sunlight.

We have attached as Exhibits 4, 5, and 6, the Declarations of Daniel Wilson, Alison Wilson, and Richard Turasky's Declaration and Settlement Agreement. We do to punctuate our penultimate point which is that there are no crimes that were committed

---

[10] Obviously, without even asking, this seems to represent the total of the $1 million draw request (that Shea says he did not sign) and the second $4 million draw request (of which Deel only advanced $1 million, which Shea also said he did not sign) plus the advances that were to come to the undersigned (only half was paid by to the undersigned by Shea). Of course, our document examiner testified that Shea more likely than not signed the draw requests. Though Shea now claims the advances were "loans" and though the court characterized them as "payday" loans, they were not. The IRS will definitely call these advances income and, therefore, even though the government's characterization of them as loans would likely bind the IRS, they will be reported as income.

with respect to either payday lending and, if Harbour cannot make the new bail, to presage why a bail reduction may be sought. Harbour is not a flight risk because in Harbour's mind an Equal Access to Justice Application is what he thinks the *coda* to this case will be. These declarations represent the actual state of the government's case with respect to payday lending. And, although Hill and Burg would not sign theirs, the drafts provide a roadmap of why their "victimhood" will also not hold up. Harbour is not going to run away from this case, but towards it.

### The Baskin Kickback

There was no Baskin "kickback." We are chagrined that the government thinks there was one and unhappy that the court seemed to agree. The government's misstatements and the court's misunderstanding is simple to understand when one examines the following sentence from the government's response:

> Harbour mispresented to the Court that these attorney's fees were originally paid from Abby's ***trust*** stating, "money for fees paid to Baskin came from Abby Harbour's early withdrawal from her ***IRA***. [emphasis added]

Response, p. 5, ll. 406. So, not to appear flip, but in our left hand, we have the trust (called "Abby's SLAT") and in our right hand, we have the IRA. Hello. These are two *different* things but the government uses the terms interchangeably.

When Harbor was indicted in August, 2019, Abby withdrew $100,000 from her IRA and advanced it to Baskin's firm which was on an hourly fee arrangement. *See*, Exhibit 7. Baskin recorded it as coming from her. It was placed in Baskin's trust account. *See*, Exhibit 8. Abby paid the 10% excise tax for early withdrawal. *See*, Exhibit 9. We have attached the relevant SLAT Chase Bank records. Exhibit 10 shows the account opened in December 2018 (Daryl Deel went to the bank to open it with Abby). Exhibit 11, the September statement, covers the period of August 9 – September 10, 2019, when the payment to Baskin was made. The checking account had $11,412.67 on August 9 and

7

$3,818.40 on September 10. Obviously, the Baskin fee payment did not come from the Trust.

The government said that Deel loaned SCD $200,000 for Harbour's attorney's fees in March 2021. This is false. That $200,000 advance came directly from SCD. The Deel loan to SCD was not until August 2021.[11] In any event, by March, Baskin was flush with fee money and he remitted to Abby $50,000 of the money that Abby had advanced in 2019. In 2019, Baskin had received $100,000 from Abby's parents, $100,000 from Abby, and $75,000 from Harbour's mother, so, when he received $200,000 from SCD, he had more money than he needed. *See,* Exhibits 13 (payment made by Abby's parents, the Gottschalks) and 14, (payment made by David's mother).

So, the *best* that can be said for the government is that it negligently misled itself and the court by conflating the Trust (Abby's SLAT) with her IRA. Had Abby never advanced the $100,000 and had she gotten the $50,000, the government's version would have plausibility but, as has and as will be in this case, the actual facts are far different than the facile spin the government put on them.[12]

/ / /

/ / /

---

[11] The government also misidentified the source of the Turasky settlement funds, claiming they came from the Deel August 2021 loan agreement. Turasky settled in October 2020. So the money could not have come from the August 2021 loan.

[12] The government describes the SLAT as having existed for many years and as being a well from which funds for numerous fraudulent schemes were drawn. This is completely false. The SLAT did not even have a bank account until December 2018. The government agents did not find any money flowing to Baskin from the Trust. They looked in the wrong place. This is akin to when one of the crack private investigators helping Kenny Bobrow's lawyer sue Harbour in 2022 on a 2007 debt pleaded that a man named Patrick Spaulding never existed. This was because he looked for "Spalding" and could not find him. When we sent the lawyer the 2010 obituary from the Kansas City *Star*, which included a sentiment posted by Harbour family, we would expect the allegation to be withdrawn, but it was not.

# THE FTC

It is disappointing that the government thinks the FTC sued Harbour. It did not.[13] Or that the government thinks that anything related to the FTC action will be admissible. It will not be admissible. There was an FTC action and in it, a Receivership was created. The Receiver sought a turnover order requiring DNA and the Harbours to turnover money that had been received from Canyon Road Holding, LLC. This was government Exhibit H. The opposition was government Exhibit I.

Curiously omitted by the government was our Exhibit 12, which is a Joint Motion by the Receiver, DNA and the Harbours filed a month after Exhibit I was filed. It stayed the turnover proceeding while settlement discussions took place. *See* Rule 408, F.R.Evid. Thus, nothing was proven nor were there any admissions. What is most interesting about the FTC's Section 13(b) lawsuit is that the U.S. Supreme Court ruled in a payday loan case that the FTC had overstepped its authority in bringing it. *See*, *A.M.G. Management, LLC v. Federal Trade Commission*, 593 U.S. ___, 141 S. Ct. 1341, 209 L. Ed. 2d 361 (2021).[14] So, even if Rule 408 did not bar the government from using the eventual settlement, the government's allegations based upon the Receiver's motion is not going to be admissible.

---

[13] Harbour was deposed for about 11 hours by the FTC after it sued the named defendants. One supposes that, had the FTC thought that Harbour was an active part of some fraud, it obviously would have amended the complaint to name DNA, Harbour and even Abby Harbour. It did not.

[14] In a unanimous decision authored by Justice Stephen Breyer, the Court found that the FTC did not have the authority under Section 13(b) of the FTC Act to seek equitable monetary relief, overturned the lower court decisions, and remanded the case for review. Breyer wrote that the FTC could engage in other processes to seek monetary relief for consumers, or "it is, of course, free to ask Congress to grant it further remedial authority." The FTC case discussed herein was filed by the FTC under the provisions of Section 13(b) of the FTC Act.

## OTHER LITIGATION

The government's major reason for raising and discussing the lawsuits in which Harbour is to show that Abby Harbour was deeply involved in what the government contends were Harbour's so-called "many frauds." The Government listed the suits in Exhibit A and we will respond in our Exhibit 15.

Overarching a review of the individual lawsuits, as the court knows, Arizona is a community property state. To obtain a judgment enforceable against the assets of the marital community, the non-acting spouse must be named. There are no claims brought in any suit identified by the government, in which Abby Harbour's name appears, that accuses her of any wrongdoing. She is named solely because she is married to David Harbour and that, in the suits she is named, it is alleged that David Harbour acted on behalf of the marital community. The government's conclusion is completely uninformed.

## CONCLUSION

The heartland of this mishmash of four (or five) separate cases jammed into a single creative piece of creative writing is the charge that Harbour engaged in payday loan fraud against a very few specific people – his friends or Melvin Dunsworth's friends - and that this fraud generated the enormous sums of money that Harbour spent on a lavish lifestyle. First, as the evidence will show, most of the money generated was generated before any of these alleged victims loaned any money to DNA, Canyon Road, NorthRock or even OakTree. The kind of money the prosecution thinks it will be able to mesmerize the jury with obviously could not have come from the comparatively small amounts of money loaned by the alleged victims identified in the Second Superseding Indictment. Hopefully, the government does not think that the Rules of Evidence will permit it to introduce evidence of money spent by the Defendant that cannot be traced to an identified victim. We are out of space to actually review the claims in the Second Superseding Indictment but motions to be filed soon will do so.

For now suffice to say that, if the Court requires that Harbour not have contact with Daryl Deel, Melvin Dunsworth, or the husband of the government's witness, John Langbein, he will abide the Court's order. But denominating contact by Abby Harbour with Deel, Dunsworth, or Maya Langbein as an "indirect" contact by Harbour would be completely unfair and inappropriate.[15]

RESPECTFULLY SUBMITTED this 19th day of August 2022.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2022 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff

/s/ Yvonne Canez

---

[15] The government makes a point of noting that at one point the undersigned wrote that Deel and Dunsworth were not returning phone calls and that the undersigned has assumed from that silence that they must have decided to abandon Harbour. This turned out to be a misunderstanding.