# EXHIBIT 1

Baskin PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone No. 602-812-7977
E-mail: alan@baskinrichards.com
        mmilovic@baskinrichards.com
Name and State Bar No.:   Alan Baskin #013155
                          Mladen Z. Milovic #035560

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                              Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>                              Defendant. | Case No.  **CR-19-00898-PHX-DLR(DMF)**<br><br>**DECLARATION OF MELVIN DUNSWORTH** |

I, Melvin Dunsworth, am an adult over the age of 18 years, and I am competent to provide this declaration, testify to the same, and affirm that the contents are true. I make this Declaration based upon my own personal knowledge and do so under penalty of perjury.

1.    I understand that I may be regarded as a victim in connection with David Harbour's July 30, 2019 indictment and some of my other business dealings with Mr. Harbour. I am not a victim and do not wish to be treated by the government or the Court as a victim. I consider Mr. Harbour a friend.

2.    I do not want any indictment to include my initials or any reference to me or any transactions related to any loans I made to Mr. Harbour or any entity with which he was associated, or any other business dealings we have had.

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

3.      In or around January 2015 through July 2015, I loaned approximately $1,260,000 directly to Green Circle.

4.      Later in 2015 I agreed to substitute $1.1 million of the Green Circle loan with a loan in that amount to Oak Tree and Mr. Harbour. This was formalized by a loan and security agreement dated July 1, 2016.

5.      From around January 2015 to September 2016, I was a consultant for the Wakpamni Lake Community Corporation ("WLCC") and worked in operations. In that position, I reviewed personnel performance for Green Circle Lending ("Green Circle"), which was a sovereign entity and the economic arm of WLCC. I also reviewed the viability of potential vendors for Green Circle and was a member of the compliance committee.

6.      David Harbour, through Oak Tree and Milagro Consulting ("Milagro") and other entities, provided financial and operational support to Green Circle. For its services to Green Circle, Milagro was entitled to a consulting and success fee.

7.      Alonzo Primus, a CPA, was a consultant and the accountant for WLCC. Through his conduct and authority, I understood him to be in charge of Green Circle. He signed on Green Circle's bank accounts, had check-writing authority, and approved all payments, transfers and wires. He initiated all outgoing payments to Oak Tree, Milagro and other entities.

8.      I understand that, along with working for Green Circle and WLCC, Alonzo Primus also worked for Princeton Alternative Income Fund, LP ("PAIF"), a lender with whom Green Circle did business. I did not learn until August 2016 that PAIF or Phil Burgess, its CEO, had any connection to Green Circle. I also understand that Green Circle's attorney Jennifer Weddle was not even aware that PAIF or Phil Burgess had anything to do with Green Circle. During the summer of 2016, I also learned that: (1) Green Circle's leads for potential borrowers were sourced by MicroBilt, another one of Phil Burgess' companies; (2) Alonzo Primus controlled the ACH side of Green Circle's operations and earned money from each transaction; (3) Mr. Primus' spouse handled Human Resources operations at Green Circle;

2

and (4) Alonzo was associated with, and compensated by, the company in charge of Green Circle's compliance work.

9.      I believe that Alonzo Primus, by working for PAIF behind the scenes and taking money from Green Circle's operational costs, and Phil Burgess, by wrongfully accelerating Green Circle's debt to Princeton, caused Green Circle to fail as a viable, profitable business.

10.     David Harbour and I each owned 50% of NorthRock LLC ("NorthRock"). NorthRock borrowed money from lenders to fund KSQ for small-dollar loans.

11.     NorthRock borrowed approximately $30,000,000 from 2012 through May 2013 from various lenders. NorthRock then loaned the same approximately $30,000,000 to KSQ.

12.     KSQ defaulted on its loans to NorthRock in the summer of 2013.

13.     KSQ defaulted because of Operation Choke Point, a 2013 federal initiative which targeted payday lenders, amongst others.

DATED this 18th day of September, 2020.

MELVIN L. DUNSWORTH

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

# EXHIBIT 2

## THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
## CIVIL COURT DEPARTMENT

JOE CATHEY and DIANNE CATHEY,

           Plaintiffs,

vs.

DAVID ALLEN HARBOUR,

           Defendant.

Case No. 22CV02337

Court No. Div2
Chapter 60

**DEFENDANT'S *PRO SE* ANSWER**

Defendant David A. Harbour's ("Harbour"), answers Plaintiffs' Complaint ("Complaint"), *in propria persona*, as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Regarding the allegations in Paragraph 1 of Plaintiffs' Complaint, Defendant admits that Plaintiffs Joe Cathey and Dianne Cathey are residents of Nemo, Texas.

2.      Regarding the allegations in Paragraph 2 of Plaintiffs' Complaint, Defendant admits that he ("Harbour") is an individual residing in Florence, Arizona, admits that he is presently incarcerated at CAFCC-Florence (in Florence, Arizona), admits that he is awaiting trial in Case No. 2:19-cr-00898-DLR that is pending in the United States District Court for the District of Arizona and notes that compliance with Rule 60-211(a) is not possible because Harbour has no access to email whilst incarcerated; meaning that Plaintiff must serve him via mail only.

3.      Regarding the allegations in Paragraph 3 of Plaintiffs' Complaint, Defendant denies that jurisdiction is proper in Johnson County District Court, as this case is pleaded

**FAX FILED** 

06/27/2022  4:58PM (GMT-04:00)

solely as a fraud case; not as a contract case, and Defendant committed no acts in Kansas from which the claim arises.

4.      Regarding the allegations in Paragraph 4 of Plaintiffs' Complaint, Defendant admits that, assuming the Court has jurisdiction over the subject matter and *in personam* jurisdiction over Harbour, then venue of this action is proper in the Johnson County District Court. Harbour denies all other allegations is ¶ 4 note specifically admitted herein.

### FACTUAL ALLEGATIONS RELATING TO HARBOUR'S FRAUD - INCLUDING THROUGH SILENCE

5.      This paragraph does not contain any allegations, and therefore no response is necessary.

6.      Regarding the allegations in Paragraph 6 of Plaintiffs' Complaint, Defendant due to insufficient information, cannot admit or deny whether prior to July 2012, a friend advised Joe Cathey about an opportunity to loan money to an entity named NorthRock, LLC ("NorthRock"), admits that NorthRock was owned and operated by Melvin Dunsworth ("Dunsworth") and Harbour, and affirmatively alleges that, until through acts of *force majeure* the United States Department of Justice destroyed the payday lending business, NorthRock was engaged in a specific part of the payday lending business, namely, loaning funds at interest to participants in payday lending who loaned money to consumers.

7.      Regarding the allegations in Paragraph 7 of Plaintiffs' Complaint, Defendant due to insufficient information, cannot admit or deny whether: a. Cathey went to Lenexa, Kansas and met at the offices of the attorney for NorthRock, b. Learned that NorthRock

2

was engaged in the business of acquiring capital that it then loaned to a payday lending entity owned by Joel Tucker. C. That Cathey also learned that Tucker was also reportedly involved with a company called "eData" that reportedly managed/systemized payday lending electronically.

8.      Regarding the allegations in Paragraph 8 of Plaintiffs' Complaint, Defendant due to insufficient information, cannot admit or deny whether Cathey: a. made several trips to the Kansas City area, b. met with Dunsworth, and toured the eData facilities in Shawnee Mission, Kansas, or that, c. On one of these occasions, Dunsworth advised Cathey that NorthRock was formed for the sole purpose of acquiring large sums of cash from lenders such as Cathey to loan to Joel Tucker's entity which in turned loaned such funds to payday lenders. Harbour admits that the Tucker entity was named KSQ Management, LLC ("KSQ").

9.      Regarding the allegations in Paragraph 9 of Plaintiffs' Complaint, Defendant admits that prior to making any loans to NorthRock, Cathey insisted on personal guaranties from Dunsworth, Harbour and Tucker; denies due to insufficient information whether Cathey specifically inquired whether money from any loans he might make to NorthRock would be taken out up front by anyone, including Dunsworth, Harbour or Tucker; denies due to insufficient information whether Cathey was told that none of them would make any money until loans made by Cathey to NorthRock were paid in full.  Harbour affirmatively alleges that he had never and has never spoken to or advised Cathey about anything but affirmatively alleges that, as to Harbour and Dunsworth any representation made to Cathey that neither of them would receive money from any loans Cathey make to NorthRock as

3

and for such things as "finder's fees" (which is what Plaintiff appears to be trying to express) was a true and correct statement. Neither Harbour nor Dunsworth ever received finder's fees from any money Cathey loaned to NorthRock and any statement to the contrary, such as those apparently made to Cathey by Federal agents was and is false, libelous, and malicious.

10.     Regarding the allegations in Paragraph 10 of Plaintiffs' Complaint, Defendant admits that in July 2012, Plaintiffs made a $2,000,000 loan to NorthRock and received a promissory note from NorthRock. Harbour affirmatively alleges that the documents surrounding Cathey's loan speak for themselves as to their terms and deny any and all allegations that deviate from the terms of the papers. Harbour denies that the provisions regarding jurisdiction and venue have any application to the current suit because this is a fraud suit; not a suit on the loan agreement or guaranty. funds were to be used for the purposes authorized in the various papers that surrounded the loan, that the main purpose was to loaned to KSQ for payday lending purposes. To the extent Plaintiff contends that Harbour engaged in fraudulent conduct, that conduct occurred, if at all, in Arizona; not in Kansas. Harbour admits that a copy of the July 2012 $2,000,000 Promissory Note was attached Exhibit "A" to the Complaint and that Plaintiff refers to it as "Note No. 1".)

11.     Regarding the allegations in Paragraph 11 of Plaintiffs' Complaint, Defendant admits that Harbour executed a Guaranty of Note No. 1 and denies all other allegations in ¶ 11 as irrelevant to this lawsuit, which is based solely upon allegations of fraudulent conduct. Had the action been founded on a breach of contract against NorthRock

4

or was a suit on the guaranty, Harbour would concede to jurisdiction in Kansas but, as Plaintiff well and truly knows, the statute of limitations for suit on the note and/or guaranty has long since expired.  Harbour admits that a copy of the Guaranty of Note No. 1 is attached to the Complaint as Exhibit "B".

12.    Regarding the allegations in Paragraph 12 of Plaintiffs' Complaint, Defendant admits that at no time prior to executing and delivering the Guaranty of Note No. 1 that is Exhibit B to the Complaint did Harbour disclose to Plaintiffs that he was to or would receive up front any portion of the money they were lending to NorthRock in any manner whatsoever and affirmatively alleges that, even though Harbour never spoke to Cathey or communicated with Cathey about the Loan, it was absolutely true that neither Harbour nor Dunsworth ever received any portion of the money Cathey was lending to NorthRock.  Harbour affirmatively alleges that whoever told Cathey that Harbour and/or Dunsworth was getting fees out of Cathey's money (what are referred to as "finder's fees,") was, at best, negligently misstating the actual facts.

13.    Regarding the allegations in Paragraph 13 of Plaintiffs' Complaint, Defendant admits NorthRock made timely payments on Note No. 1 between July 2012 and December 2012.

14.    Regarding the allegations in Paragraph 14 of Plaintiffs' Complaint, Defendant admits that in December 2012, Plaintiffs loaned an additional $1,000,000 to NorthRock. Defendant incorporates by reference his answer to ¶ 10 of the Complaint as if fully set-forth herein. This is because the defenses with respect to Note No. 1 outlined in ¶ 10, *supra*., apply with equal force to Note No. 2.

5

15.     Regarding the allegations in Paragraph 15 of Plaintiffs' Complaint, Defendant admits Harbour executed a Guaranty of Note No. 2 and denies all other allegations in ¶ 15 as irrelevant to this lawsuit, which is based solely upon allegations of fraudulent conduct. Had the action been founded on a breach of contract against NorthRock or was a suit on the guaranty, Harbour would concede to jurisdiction in Kansas but, as Plaintiff well and truly knows, the statute of limitations for suit on the note and/or guaranty has long since expired.  Harbour admits that a copy of the Guaranty of Note No. 2 is attached to the Complaint as Exhibit "D".

16.     Regarding the allegations in Paragraph 16 of Plaintiffs' Complaint, Defendant admits that at no time prior to executing and delivering the Guaranty of Note No. 2 that is Exhibit D to the Complaint did Harbour disclose to Plaintiffs that he was to or would receive up front any portion of the money they were lending to NorthRock in any manner whatsoever and affirmatively alleges that, even though Harbour never spoke to Cathey or communicated with Cathey about the Loan, it was absolutely true that neither Harbour nor Dunsworth ever received any portion of the money Cathey was lending to NorthRock.  Harbour affirmatively alleges that whoever told Cathey that Harbour and/or Dunsworth was getting fees out of Cathey's money (what are referred to as "finder's fees,") was, at best, negligently misstating the actual facts.

17.     Regarding the allegations in Paragraph 17 of Plaintiffs' Complaint, Defendant admits NorthRock continued to make timely payments on Note No. 1 and 2 between December 2012 and August 2013, admits that the September 2012 payments on Notes Nos. 1 and 2 were late, that no payments were made in October 2013 on either Note

6

Nos. 1 or 2 and that, therefore, Notes 1 and 2 and Harbour's Guaranties, Exhibits B and D fell into default and further alleges that the Statute of Limitations long ago expired with respect to claims that might have been brought as against Harbour on the Notes or Guaranties.

18.     Regarding the allegations in Paragraph 18 of Plaintiffs' Complaint, Defendant due to insufficient information, cannot admit or deny whether Joe Cathey came to Kansas in or about October 2013 and met with Dunsworth, Harbour and others at eData's office in Shawnee Mission, Kansas. However, if the evidence shows that Harbour was there, he does not recall advising patience – because by then, as he, Dunsworth, and Cathey all were aware, the Department of Justice had, through what began as a clandestine operation concealed from Congress and about which Congress later found that the Department of Justice had lied, destroyed payday lending as it had existed when Cathey made his loans. Harbour admits that, if the evidence suggests he was at the meeting described, he would not have mentioned anything to Cathey about receiving any portion of any funds up front from KSQ that the Plaintiffs had loaned to NorthRock and that is because, notwithstanding the misrepresentations of those who in 2020 apparently told Cathey that Harbour was receiving finder's fees in NorthRock know shockingly, almost nothing about the criminal case they are prosecuting against Harbour.  So it be clarion clear, Harbour *never* received finders fees out of *any* money loaned to NorthRock by *anyone*.

19.     Regarding the allegations in Paragraph 19 of Plaintiffs' Complaint, Defendant due to insufficient information, cannot admit or deny whether in or about

December 2013, Note No. 1 and Note No. 2 were modified and the modification agreements were consented to and executed by, among others, Harbour.

20.    Regarding the allegations in Paragraph 20 of Plaintiffs' Complaint, Defendant due to insufficient information, cannot admit or deny whether thereafter, partial payments were made on Note No. 1 and Note No. 2, whether a partial payment was made by Harbour on or about July 2014 in the amount of $2500.

21.    Regarding the allegations in Paragraph 21 of Plaintiffs' Complaint, Defendant due to insufficient information, cannot admit or deny whether in August 2020, Joe Cathey met with and was interviewed by representatives of the United States Attorney's office out of Arizona and the FBI in Dallas, Texas in connection with criminal investigations related to Harbour.  If during this meeting, Cathey was advised by anyone that Harbour received off the top a 25% "finder's fee" from Joel Tucker and/or KSQ from the funds that the Plaintiffs had loaned to NorthRock, whoever said that was mistaken. Harbour can neither admit or deny whether Cathey would have loaned NorthRock a total of $3 million if Cathey had known that Harbour was receiving a 25% finders fee (or any other finder's fee stated at any percentage), the fact is that Harbour did not receive any finder's fees in NorthRock and statements that he did are, and will remain, maliciously wrong.

22.    Regarding the allegations in Paragraph 22 of Plaintiffs' Complaint, Defendant admits that on or about November 24, 2020, a Superseding Indictment was filed in the criminal case captioned *United States of America v. David Allen Harbour,* Case No. 2:19-cr-00898-DLR pending in the United States District Court for the District of Arizona

8

and admits that a copy of the Superseding Indictment was attached to the Complaint as Exhibit E.)

23.     Regarding the allegations in Paragraph 23 of Plaintiffs' Complaint, Defendant admits that among the charges contained in the Superseding Indictment is language to the effect that Harbour had an arrangement with Joel Tucker/KSQ to receive a 25% finder's fee based on Plaintiffs' (and others') loans to NorthRock, which funds were then loaned to KSQ. Harbour affirmatively alleges that the Superseding Indictment was incorrect, and maliciously incorrect. Harbour and Dunsworth never received finder's fees (by whatever name they are called) from anyone who loaned money to NorthRock for subsequent lending to Tucker/KSQ.

24.     Regarding the allegations in Paragraph 24 of Plaintiffs' Complaint, Defendant admits only that this fraud action was brought with two years of the meeting with representatives of the prosecution in 2020 but denies that there was any fraud by silence regarding finder's fees (by whatever name Plaintiff chooses to call them), or any fraud whatsoever and denies the balance of the allegations in ¶ 24.

25.     Regarding the allegations in Paragraph 25 of Plaintiffs' Complaint, Defendant admits there remains outstanding on both Notes the total principal sum of $1,335,518.50 and affirmatively alleges that the applicable statutes of limitation under the notes and guaranties have long since expired.

## COUNT I - FRAUD THROUGH SILENCE

26.     This paragraph does not contain any allegations, and therefore no response is necessary.

27.     Harbour denies the allegations in Paragraph 27 of Plaintiffs' Complaint. Harbour did not receive a 25% fee or any other fee in connection with Plaintiff's loans to NorthRock.

28.     Harbour denies the allegations in Paragraph 28 of Plaintiffs' Complaint.

29.     Harbour denies the allegations in Paragraph 29 of Plaintiffs' Complaint.

30.     Harbour denies the allegations in Paragraph 30 of Plaintiffs' Complaint.

31.     Harbour denies the allegations in Paragraph 31 of Plaintiffs' Complaint.

32.     Harbour denies all allegations in the Complaint not specifically admitted.

**33.   Affirmative Defenses:**

a.  Absence of personal jurisdiction, KS-ST 60-212,

b.  Failure to state a claim upon which relief may be granted,

c.  Any and all damages sustained by Plaintiff arose solely from the *force majeure* conduct engaged in - first secretly – as found by Congress during its investigation of the conduct of the United States Department of Justice during the Second Obama Administration. The Department of Justice, through threats made to the banks that provided ACH services to payday lenders, such as KSQ, successfully destroyed the legal payday loan business in the United States in 2013. This was done for partisan political reasons and the actions of the Department of Justice were unauthorized by any statute.

d. Though its actions, the United States Department of Justice succeeded in causing Plaintiff to lose the money he loaned to NorthRock, it destroyed NorthRock, and financially impaired Harbour, Dunsworth, and many others.

e. At the time the Department of Justice commenced Operation Chokepoint, whose goal was to destroy payday lending (as expressed in Obama's February 2013 State of the Union Address – NorthRock was operating precisely as it had been designed to operate, was current in all payments, and was regularly paying its lenders.

f. Kansas has adopted the Restatement (Second ) of Contracts.  Under it, performance by NorthRock was excused by the unforeseen and unforeseeable actions of the Department of Justice in destroying payday lending as it theretofore existed.

WHEREFORE, Defendant prays that Plaintiff's Complaint be dismissed with prejudice, that Plaintiff take nothing from it, and that Defendant be awarded costs, including reasonable attorney's fees, if and when Defendant is able to engage counsel.

By: _____

David Harbour
Register No. 22704508
CAFCC-Florence
PO Box 6300
Florence, AZ 85132
*In Propria Persona*

11

**ORIGINAL** of the foregoing
filed this 27ᵗʰ day of June, 2022
with:

Clerk of Court
150 W Santa Fe St.
Olathe, KS 66061

**COPY** of the foregoing mailed
this 27ᵗʰ day of June, 2022 to:

Mark S. Gunnison
mgunnison@paynejones.com
11000 King Street
P.O. Box 25625
Overland Park, KS 66225-5625
Attorneys for Plaintiffs

12

OJA 218

## Self-Represented Litigant Certification Form

By signing this form, I certify that, to the best of my knowledge, information, and belief, and based on my reasonable review of the document's contents, the attached filing complies with the certification requirements in the Temporary Rule for Filing in a District Court by a Self-Represented Litigant as follows:

(a) I have signed the attached filing and provided my name, address, email address (if available), telephone number, and fax number (if available); and

(b) The attached filing contains no personally identifiable information (PII) or meets an exception in the Temporary Rule for Filing in a District Court by a Self-Represented Litigant because the filing (check box that applies):

☒ contains no PII (if this box is checked, do not check any other boxes); or

☐ requests that this document be sealed under the Temporary Rule for Filing in a District Court by a Self-Represented Litigant for the following reason (check box that applies):

☐ a pre-existing order was entered by the court on _____ that seals this document;

☐ this document asks the court to issue an order that seals the following document: [include general description of document contents without including PII.] _____; or

☐ this document asks the court to seal the following document already filed in the case: [describe the document already on file so that the clerk can identify it without using PII] _____.

Date: _6/27/2022_

Signature: _____

Name of Party: _David Hacboue_

# EXHIBIT 3

## SALE OF FAKE DEBT SCHEME

13.     On August 1, 2012, President Obama signed a law referred to as Operation Chokepoint, which resulted in banks refusing to make Automated Clearinghouse withdrawals from their customers' bank accounts associated with payday lenders, which greatly reduced the profitability of payday loans. Many payday lenders went out of business after Operation Chokepoint.

14.     On June 20, 2012, Tucker and the other owners of eData sold the company to the Wyandotte Indian tribe. By the terms of the sale agreement, Tucker did not retain ownership or chain of title to any payday loans made by eData's clients.

15.     However, despite selling his interest in eData, Tucker maintained a file of 7.8 million leads ('7.8 file') he had acquired through eData, containing detailed customer information including names, addresses, bank accounts, social security numbers, dates of birth, etc. Tucker's company eData sold the detailed customer information from online payday loan applications or inquiries to its payday lender clients. The 7.8 file did not necessarily represent loans, as loans were made by the various payday lenders. The 7.8 file contained listed customers, some of whom withdrew their requests for loans, some of whom were denied loans, some of whom obtained loans and repaid them, and some of whom obtained loans and defaulted in the payments.

16.     Notwithstanding that the 7.8 file did not necessarily represent loans, much less defaulted loans, and notwithstanding that Tucker did not own the loans, he proceeded to package, market, and sell this information as collectible debt to multiple debt buyers through 2014 and 2015. Tucker had the 7.8 file broken into subparts to package, market, and sell.

17.     Tucker, for the purpose of executing the scheme to defraud, often used intermediaries and debt brokers to recruit debt buyers by presenting to potential buyers that he

5

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | **Case No.  CR-19-00898-PHX-DLR(DMF)** |
| Plaintiff, | **DECLARATION OF DAN WILLSON** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

I, Dan Willson, am an adult over the age of 18 years, and I am competent to provide this declaration, testify to the same, and affirm that the contents are true.  I make this Declaration based upon my own personal knowledge and do so under penalty of perjury.

1.    I have been represented by counsel in connection with the drafting of this declaration, and a Settlement and Release of Claims Agreement with David Harbour, Canyon Road Holdings LLC ("Canyon Road") and any all affiliates, entities, family members of David Harbour, effective November _8_, 2021, and make this declaration of my own free-will.  I have not been asked to say anything but the truth. I do not make any of the statements in this declaration so Mr. Harbour will repay me, which he already has; I make this declaration to set the record straight regarding our business dealings regardless.

2.    I understand that I may be regarded as a victim in connection with the above captioned matter.  I do not believe I am a victim and I do not wish to be treated by the government or the Court as a victim.

3.    I do not want any indictment to include my initials or any reference to me or any transactions related to any loans I was involved with either personally or through an entity that I controlled or am associated to have made to Mr. Harbour or any entity with which he was associated, or any business dealings we have had.

4.      I met David Harbour through Alison Willson.

5.      Following meetings between Mr. Harbour, Alison Willson, and myself, Alison Willson and I loaned $100,000 to Canyon Road on or around February 21, 2014 (the "Note") through our trust, the DAW Family Trust ("DAW"). *See* **Exhibit 1**.

6.      Alison Willson attended all of my meetings with Mr. Harbour prior to me making the loan to Canyon Road. Ms. Willson heard and participated in my discussion of the terms of the loan. Ms. Wilson and I separately and on numerous occasions discussed the details of our loans to Canyon Road as well.

7.      I was comfortable loaning money to Canyon Road because of the success Alison Willson had on her first loan to transaction with David Harbour.

8.      I did not know exactly what Canyon Road did or whether it was involved in payday lending. I understood Mr. Harbour was involved in different businesses.

9.      Mr. Harbour told me that he was an owner of Canyon Road, which was operated out of Kansas City by Ted Rowland, who I understand was also an owner. I do not recall speaking with Mr. Rowland, but I acknowledge receiving checks from him.

10.     I understood that Mr. Harbour would receive money from Canyon Road. The amount of money Mr. Harbour received, when he received the money and how he received the money, was not important to me or relevant to my decision to loan money to Canyon Road. My sole concern was having my loan repaid, regardless of the precise nature of the business Canyon Road conducted.

11.     In or about September 2014, I stopped receiving interest checks from Mr. Rowland. At some point after February 24, 2015, Mr. Harbour told me that Canyon Road was no longer operating and that he no longer owned it.

12.     Mr. Harbour stated in his deposition on April 17, 2019 during my divorce proceedings that he did not own Canyon Road. I understand that at the time of Mr. Harbour's deposition, Mr. Harbour in fact did not own Canyon Road as it had been taken over by the FTC as part of a receivership action.

2

13.     In or around October of 2015, I told Mr. Harbour I wanted my $100,000 paid back, because I was trying to make my portfolio more liquid. Mr. Harbour told me he would request a redemption of my $100,000 from Canyon Road and its administrator, Mr. Rowland. When Mr. Rowland did not redeem my loan, Mr. Harbour had his company HPCG, LLC ("HPCG") continue making loan payments., which Mr. Harbour was not required to do.

14.     HPCG began making the payments in 2015, which stopped in approximately March 2016. I do not recall Mr. Harbour informing me why the payments stopped or what was going on with my loan.

15.     Mr. Harbour told me in August 2016 on the phone that he was working on another business venture (i.e., some type of a lab) to pay me back. He met with me at his office at Tatum and Shea several times to discuss his business and my personal matters. During one of these meetings in or around Thanksgiving 2018, Mr. Harbour may have explained the allegations in a United States Securities and Exchange Commission ("SEC") matter related to him. This meeting took place after I discovered the SEC injunction in or around August 2018.

16.     I am a sophisticated investor, and I understood the risks in lending money and the possibility that I might not get it back.

17.     I understand that the parties identified in the Note were Canyon Road and DAW, and not Mr. Harbour.

18.     Mr. Harbour never told me there was no risk to making the loans, nor did he or the loan agreement guarantee that I would get my money back.

19.     My divorce decree granted me the rights to the DAW loan to Canyon Road. Through my company, Gigi Holdings, LLC, I am the rightful owner of any loan proceeds that would have been payable to DAW pursuant to its loan with Canyon Road, and later HPCG.

20.     I did not initiate contact with the government about my business relationship with Mr. Harbour and I have not filed any complaints against him. The FBI reached out to me and told me I was a victim in this case. The FBI never showed me any documents. The FBI told me that Mr. Harbour was being prosecuted for fraud against multiple individuals.

3

21.     I consider my loan with Mr. Harbour paid in full and resolved.  I do not believe Mr. Harbour misrepresented any of the terms of my loan to Canyon Road.  If Mr. Harbour did forget to disclose a term of my loan, I do not believe it was intentional.   I do not believe I was defrauded by Mr. Harbour in relation to my loan to Canyon Road.

22.     I believe Mr. Harbour always had good intentions and would pay back my loans when he had the funds to do so.

23.     I believe Mr. Harbour always acted in good faith prior to and after me loaning money and I do not believe Mr. Harbour ever planned, tried, wanted, or intended to harm me, deceive me, or cheat me out of my money.

24.     I have not sustained any out-of-pocket losses from my business dealings with Mr. Harbour.  I waive any claim I may have to restitution in *United States v. Harbour*.

25.     I do not want to participate in any fashion, whether as a witness or victim, in *United States v. Harbour*.

26.     I ask that Mr. Harbour not be subject to any release condition preventing him from having contact with me.

DATED this _8_ day of November, 2021.


_____
DAN WILLSON

4

Exhibit A

DANIEL WILLSON
ALISON WILLSON
REDACTED

82-504/1070                                    1142

DATE 2-21-14

PAY TO THE ORDER OF CANYON ROAD HOLDINGS LLC.            $ 100,000 00

one hundred thousand and 00/100                          DOLLARS

1STBANK   www.efirstbank.com
(800) 964-3444

LOAN,
MEMO

REDACTED                        1142

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | **Case No.  CR-19-00898-PHX-DLR(DMF)** |
| Plaintiff, | **DECLARATION OF ALISON WILLSON** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

I, Alison Willson, am an adult over the age of 18 years, and I am competent to provide this declaration, testify to the same, and affirm that the contents are true.  I make this Declaration based upon my own personal knowledge and do so under penalty of perjury.

1.      I have been represented by counsel in connection with the drafting of this declaration, and a Settlement and Release of Claims Agreement with David Harbour, Canyon Road Holdings LLC ("Canyon Road") and any all affiliates, entities and family members of David Harbour, effective November 16th, and make this declaration of my own free-will.  I have not been asked to state anything but the truth.  I do not make any of the statements in this declaration so Mr. Harbour will repay me, which he already has; I make this declaration to set the record straight regarding our business dealings regardless.

2.      I understand that I am regarded as a victim in connection with David Harbour's November 24, 2020 superseding indictment.    I do not believe I am a victim and I do not wish to be treated by the government or the Court as a victim.

3.      I do not want any indictment to include my initials or any reference to me or any transactions related to any loans I was involved with either personally or through an entity that I controlled or am associated to have made to Mr. Harbour or any entity with which he was

{WB721197v1 }

associated, or any business dealings we have had. I met David Harbour in approximately 2011 through a mutual friend.

4.      Following a meeting between Mr. Harbour, our mutual friend, and myself in or about August of 2011, I loaned $100,000 to Canyon Road. The $100,000 loan was comprised of $90,000 from my self-directed IRA and $10,000 from my personal funds.

5.      I had no idea what Canyon Road did or whether it was involved in payday lending, nor did the topic ever come up during my conversations with Mr. Harbour. I understood Mr. Harbour was involved in a lot of different businesses. It was not important or material to me which business Canyon Road was in as long as I received my scheduled payments.

6.      Mr. Harbour told me that he was an owner of Canyon Road, which was operated out of Kansas City by Ted Rowland, who was also an owner. I understood that Mr. Rowland was also Mr. Harbour's friend. I communicated with Mr. Rowland by email. I do not specifically recall receiving loan payments from him, but I acknowledge receiving checks with his name on them.

7.      Between 2011 and 2014, I had minimal communication with Mr. Harbour, as I received all scheduled payments. Canyon Road paid off my first loan in October 2013.

8.      On February 10, 2014, I emailed Mr. Harbour asking if I could "reinvest" and make another $100,000 loan. *See* **Exhibit 1**. On February 13, 2014, I sent a follow-up email, telling Mr. Harbour that I wanted to "move forward as soon as possible." Again, I knew Mr. Rowland or Mr. Harbour had a number of businesses, and was again not concerned about the exact details of the business.

9.      Following meetings between Mr. Harbour, Dan Willson, and myself, I loaned $100,000 to Canyon Road on or about February 18, 2014 (the "Note") through my IRA. I decided to make a second loan to Canyon Road because my first loan was paid in full. There was no conversation during the second loan about what business Canyon Road conducted or how Mr. Harbour made money from it.

10.     Dan Willson attended some of my meetings with Mr. Harbour prior to me making the second loan to Canyon Road.  Mr. Willson heard and participated in my discussions of the terms of the loan.  Mr. Willson and I separately and on numerous occasions discussed the details of our loans to Canyon Road as well.

11.     I understood that Mr. Harbour would receive money from Canyon Road. The amount of money Mr. Harbour received, when he received the money and how he received the money was not important to me or relevant to my decision to loan money to Canyon Road.  My sole concern was having my loan repaid, regardless of the precise nature of the business Canyon Road conducted.

12.     In or about September 2014, I stopped receiving interest checks from Canyon Road.  Mr. Harbour told me that Canyon Road was no longer operating and that he and Mr. Rowland no longer owned it because the Federal Trade Commission had assumed control and ownership.  Mr. Harbour told me he was going to transfer my loan to another company he owned, HPCG, which he did not have to do. Liberty Trust, the custodian of my funds, reviewed the Note, however they only advised me regarding the correct beneficiary designation to be identified in the Note.  I passed along this information to Mr. Harbour so he could finalize the loan agreement.  *See* **Exhibit 2**.

13.     I signed a second "amended" loan agreement with HPCG, LLC ("HPCG") dated November 1, 2015 acknowledging my loan was a general business loan and the use of the funds was at the sole discretion of HPCG.  *See* **Exhibit 3**.

14.     HPCG began making payments in 2015, which stopped in approximately April 2016. I do not recall Mr. Harbour informing me why the payments stopped or what was going on with my loan.  I understood that Mr. Harbour was working on some other business ventures to pay me back.

15.     I told Mrs. Purifoy to mail my interest checks for deposit to Liberty Trust in Dallas, Texas.  *See* **Exhibit 2**.

16.     Mr. Harbour never told me there was no risk to making the loans, nor did he or the loan agreement guarantee that I would get my money back.  I am a sophisticated investor and understood that lending money is risky and I might not get my money back.

17.     In addition to Canyon Road, I have made other loans and alternative investments.

18.     I did not hire Mr. Harbour as my investment or financial advisor and never relied upon him in that capacity.

19.     While I assumed Mr. Harbour invested his own money into Canyon Road, he never told me that he did and I never asked him.  I first relied on Canyon Road, and then HPCG – but not Mr. Harbour – to repay my loan.  Mr. Harbour did not personally guarantee my loan.

20.     Although I had not received any payments from Mr. Harbour since 2016, I believed he was working to repay me.  He returned my phone calls, met with me when I asked, and kept me up to date on his new businesses.  At one of my meetings with Mr. Harbour at his Tatum and Shea office, he told me about the SEC investigation and his settlement with the SEC. The SEC matter was not material to me regarding my loan with Mr. Harbour.

21.     I did not initiate contact with the government about my business relationship with Mr. Harbour and I have not filed any complaints against him. The government reached out to me first.  They never showed me any documents and did not tell me they were including my name and transaction in Mr. Harbour's indictment.

22.     I consider my loan with Mr. Harbour paid in full and resolved.  I do not believe Mr. Harbour misrepresented any of the terms of my loan to Canyon Road.  If Mr. Harbour forgot to disclose a term of my loan, I do not believe it was intentional.  I do not believe I was defrauded by Mr. Harbour in relation to my loan to Canyon Road and the subsequent transition to HPCG.

23.     I believe Mr. Harbour always had good intentions and would pay back my loans when he had the funds to do so, even though he was not required to, due to his good character.

24.     I believe Mr. Harbour always acted in good faith prior to and after me loaning money and I do not believe Mr. Harbour ever planned, tried, wanted, or intended to harm me, deceive me or cheat me out of my money.

25.     I have not sustained out-of-pocket any losses or harm, either intended or actual, from my business dealings with Mr. Harbour.  I waive any claim I may have to restitution in *United States v. Harbour*.

26.     I do not want to participate in any fashion, whether as a witness or a victim, in *United States v. Harbour*.

27.     I ask that Mr. Harbour not be subject to any release condition preventing him from having contact with me.

DATED this /6th day of November, 2021.


ALISON WILLSON

# EXHIBIT 6

**BASKIN PLC**
6263 N. Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
Telephone No. 602-812-7977
E-mail: alan@baskin.law
         mmilovic@baskin.law
Name and State Bar No.:   Alan Baskin #013155
                          Mladen Z. Milovic #035560

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | **Case No. CR-19-00898-PHX-DLR(DMF)** |
|---|---|
| Plaintiff, | **DECLARATION OF RICHARD TURASKY** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

I, Richard Turasky, am an adult over the age of 18 years, and I am competent to provide this Declaration, testify to the same, and affirm that the contents are true. I make this Declaration based upon my own personal knowledge and do so under penalty of perjury.

1.     I understand that I may be regarded as a victim in connection with David Harbour's July 30, 2019 indictment, November 24, 2020 superseding indictment, and some of my other business dealings with Mr. Harbour. No longer do I believe I am a victim and I do not wish to be treated by the government or the Court as a victim.

2.     I do not want any indictment to include my initials or any reference to me or any transactions related to any loans I was involved with, either personally or through an entity I

control or am associated to have made to Mr. Harbour or any entity with which he was associated, or any other business dealings we have had.

3. In or around July 2014, I understood Mr. Harbour was raising funds for Green Circle ("GC") through Oak Tree Management, LLC ("Oak Tree"). On or around July 30, 2014, I loaned approximately $500,000 (the "Loan") to Oak Tree through my entity, Capital Investment Fund I, LLC ("CIF"). On July 31, 2014, Oak Tree made a payment of $150,000 to CIF.

4. The Loan was formalized by a promissory note (the "Note"). The Note was secured by a commercial security agreement dated June 26, 2014 between Oak Tree and CIF (the "Security Agreement"). The Security Agreement granted CIF a security interest in, among other things, certain accounts, promissory notes, chattel paper, and instruments that may have existed between Oak Tree and GC, and all proceeds thereof. This security interest was perfected by a pledge agreement dated June 26, 2014 between CIF and Oak Tree.

5. Also on June 26, 2014, Mr. Harbour signed a resolution authorizing loans (the "Resolution") that was, along with the Note, Security Agreement, and pledge agreement, drafted by CIF's legal counsel. I understood that Mr. Harbour relied on CIF's counsel to draft these documents properly.

6. The Resolution authorized Oak Tree to enter into agreements and execute documents that Mr. Harbour deemed advisable, necessary, expedient, convenient, or proper related to the various loans, extensions of credit, and other financial accommodations by CIF with Mr. Harbour's as the Manager.

7. The Resolution also authorized Oak Tree to retain and not loan to GC such borrowed funds reasonably necessary to pay costs associated with Oak Tree's role as Managing Partner of the venture between Oak Tree and CIF, including overhead, legal, and other fees. The amount to retain and not loan to GC was at the sole discretion of Mr. Harbour.

8.     Pursuant to the Note, approximately $80,000 in interest payments was made to CIF between 2014 and 2016. The payments came from Oak Tree and or GC. The payments from Oak Tree and GC were proper and per the terms of the Note.

9.     Mr. Harbour and I have resolved our differences related to CIF, Oak Tree and Green Circle. I consider any disputes with Mr. Harbour and/or any entity related to Mr. Harbour concluded and fully resolved.

10.    I waive any claim I may have to restitution in *United States v. Harbour*.

11.    I ask that Mr. Harbour not be subject to any release condition preventing him from having direct or indirect contact with me.

DATED this 15 day of January, 2021.

RICHARD TURASKY JR

3

# EXHIBIT 7



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

**Account Number**
<span style="background:black;color:red">REDACTED</span>

**Statement Period**
**August 1-31, 2019**

**Need help reading this statement?**
Visit **www.schwab.com/StatementHelp** for more information.

## Market Monitor

| Rates | Yield |
|---|---|
| Bank Sweep: Interest Rate as of 08/30$^2$ | 0.18% |

## Your Independent Investment Manager and/or Advisor

STRATEGIC ASSET MANAGEMENT LLC
PO BOX 541
BELLEVILLE KS          66935-0541
1 (785) 527-5631

*The custodian of your brokerage account is: Charles Schwab & Co., Inc.*
This report is provided by Schwab. Except as noted in the terms and conditions, your Investment Manager and/or Advisor is independently owned and operated and not an affiliate with Schwab. For questions about this statement, or if there is a change in your financial situation, investment objectives, or risk profile, please contact your Independent Investment Manager and/or Advisor.

## Table of Contents                                                      Page

| | |
|---|---|
| Terms and Conditions | 2 |
| Change in Account Value | 4 |
| Asset Composition | 4 |
| Income Summary | 5 |
| Cash Transactions Summary | 5 |
| Investment Detail | 5 |
| Transaction Detail | 6 |
| Bank Sweep Activity | 7 |
| Contribution Summary | 8 |
| Distribution Summary | 8 |
| Endnotes For Your Account | 8 |

ABBY L HARBOUR
CHARLES SCHWAB & CO INC CUST
ROTH CONVERSION IRA
15527 E PALATIAL DR
FOUNTAIN HILLS AZ          85268-4368

08/30-67059-TTCG1302-145025 *



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

Account Number 

Statement Period
**August 1-31, 2019**

# Terms and Conditions

This Account statement is furnished solely by Charles Schwab & Co., Inc. ("Schwab") for your Account at Schwab ("Account"). Schwab Institutional is a division of Charles Schwab & Co., Inc., and provides back office brokerage and related services to investment advisors and retirement plan providers. Unless otherwise defined herein, capitalized terms have the same meanings as in your Account Agreement. Schwab is a registered broker-dealer and is not affiliated with your Investment Advisor whose name appears on this statement ("Advisors") except in the case of Charles Schwab Investment Advisory, Inc. ("CSIA"), Schwab Private Client Investment Advisory, Inc. ("SPCIA"), or an affiliated company that may act as the investment advisor on a fund. Advisors are independently owned and operated. Schwab neither endorses nor recommends any particular Advisor or its investment strategy and has no responsibility to monitor trading by any Advisor in your Account. Schwab has not verified any statement accompanying any Advisor's logo appearing on this statement. Advisors provide investment advisory services for your Account. Schwab provides brokerage and custody services for your Account. Schwab has agreements with Advisors under which Schwab provides Advisors with institutional trading, custody and related services, and products. Not all of these products and services may benefit your Account, and Schwab may provide them to Advisors at no cost. Schwab's commitment to place a certain amount of its clients' assets in brokerage accounts at Schwab within a certain period of time. This commitment could influence an Advisor's recommendation or requirement that its clients establish brokerage accounts at Schwab.

**GENERAL INFORMATION AND KEY TERMS:**
If you receive any other communication from any source other than Schwab which purports to represent your holdings at Schwab (including balances held at a Depository Institution) you should verify its content with this statement.
**AIP (Automatic Investment Plan) Customers:** Schwab receives remuneration in connection with certain transactions effected through Schwab. If you participate in a systematic investment program through Schwab, the additional information normally detailed on a trade confirmation will be provided upon request.
**Average Daily Balance:** Average daily composite of all cash balances that earn interest and all loans from Schwab that are charged interest. Interest cycles may differ from statement cycles.
**Bank Sweep Feature and Bank Sweep for Benefit Plans Features:** Schwab acts as your agent and custodian in establishing and maintaining your Bank Sweep and Bank Sweep for Benefit Plans features as a Schwab Cash feature for your brokerage account. Deposit accounts constitute direct obligations of banks affiliated with Schwab and are not obligations of Schwab. Bank deposit accounts are insured by the FDIC within applicable limits. The balance in the bank deposit accounts can be withdrawn on your order and the proceeds returned to your securities account or remitted to you as provided in your Account Agreement. For information on FDIC insurance and its limits, as well as other important disclosures about the Bank Sweep and Bank Sweep for Benefit Plans features, please refer to the Cash Features Disclosure Statement available online or from a Schwab representative.
**Cash:** Any Free Credit Balance owed by us to you payable upon demand which, although accounted for on our books of record, is not

segregated and may be used in the conduct of this firm's business.
**Current Yield:** Annual dividend paid on an equity divided by the current market price.
**Dividend Reinvestment Customers:** Dividend reinvestment transactions were effected by Schwab acting as a principal for its own account, except for the reinvestment of Schwab dividends, for which an independent broker-dealer acted as the buying agent. Further information on these transactions will be furnished upon written request.
**Interest:** For the Schwab One Interest, Bank Sweep, and Bank Sweep for Benefit Plans features, interest is paid for a period that differs from the Statement Period. Balances include interest paid as indicated on your statement by Schwab or one or more of its affiliated banks. These balances do not include interest that may have accrued during the Statement Period after interest is paid. The interest paid may include interest that accrued in the prior Statement Period. For the Schwab One Interest feature, interest accrues daily from the second-to-last business day of the prior month and is posted on the second-to-last business day of the current month. For the Bank Sweep feature, interest accrues daily from the 16th day of the prior month and is credited/posted on the first business day after the 15th of the current month.
If, on any given day, the interest that Schwab calculates for the Free Credit Balances in the Schwab One Interest feature in your brokerage account is less than $.005, you will not accrue any interest on that day. For balances held at banks affiliated with Schwab in the Bank Sweep and Bank Sweep for Benefit Plans features, interest will accrue even if the amount is less than $.005.
**Margin Account Customers:** This is a combined statement of your margin account and special memorandum account maintained for you under Section 220.5 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of the separate account as required by Regulation T is available for your inspection. Securities purchased on margin are Schwab's collateral for the loan to you. It is important that you fully understand the risks involved in trading securities on margin. These risks include:
- You can lose more funds than you deposit in the margin account.
- Schwab can force the sale of securities or other assets in any of your account(s) to maintain the required account equity without contacting you.
- You are not entitled to choose which assets are liquidated nor are you entitled to an extension of time on a margin call.
- Schwab can increase its "house" maintenance margin requirements at any time without advance written notice to you.
**Market Price:** The most recent price evaluation available to Schwab on the last business day of the report period, normally the last trade price or bid as of market close. Unpriced securities denote that no market evaluation update is currently available. Price evaluations are obtained from outside parties. Schwab shall have no responsibility for the accuracy or timeliness of any such valuations. Pricing of assets not held at Schwab is for informational purposes only. Some securities, especially thinly traded equities in the OTC market or foreign markets, may not report the most current price and are indicated as Stale Priced. For Limited Partnerships and Real Estate Investment Trust (REIT) securities, you may see that the value reflected on your monthly account statement for this security is unpriced. NASD rules require

that certain Limited Partnerships (direct participation programs) and Real Estate Investment Trust (REIT) securities, that have not been priced within 18 months, must show as unpriced on customer statements. Note that these securities are generally illiquid, the value of the securities will be different than its purchase price, and, if applicable, that accurate valuation information may not be available.
**Market Value:** The Market Value is computed by multiplying the Market Price by the Quantity of Shares. This is the dollar value of your present holdings in your specified Schwab Account or a summary of the Market Value summed over multiple accounts.
**Non-Publicly Traded Securities:** All assets shown on this statement, other than certain direct investments which may be held by a third party, are held in your Account. Values of certain Non-Publicly Traded Securities may be furnished by a third party as provided by Schwab's Account Agreement. Schwab shall have no responsibility for the accuracy or timeliness of such valuations. The Securities Investor Protection Corporation (SIPC) does not cover many limited partnership interests.
**Option Customers:** Be aware of the following: 1) Commissions and other charges related to the execution of option transactions have been included in confirmations of such transactions previously furnished to you and will be made available promptly upon request 2) You should advise us promptly of any material changes in your investment objectives or financial situation 3) Exercise assignment notices for option contracts are allocated among customer short positions pursuant to an automated procedure which randomly selects from among all customer short option positions those contracts which are subject to exercise, including positions established on the day of assignment.
**Schwab Sweep Money Funds:** Includes the primary money market funds into which Free Credit Balances may be automatically invested pursuant to your Account Agreement. Schwab or an affiliate acts and receives compensation as the Investment Advisor, Transfer Agent, Shareholder Service Agent and Distributor for the Schwab Sweep Money Funds. The amount of such compensation is disclosed in the prospectus. The yield information for Schwab Sweep Money Funds is the current 7-day yield as of the statement period. Yields vary. If on any given day, the accrued daily dividend for your selected sweep money fund as calculated for your account is less than ½ of 1 cent ($0.005), your account will not earn a dividend for that day. In addition, if you do not accrue at least 1 daily dividend of $0.01 during a pay period, you will not receive a money market dividend for that period. Schwab and the Schwab Sweep Money Funds investment advisor may be voluntarily reducing a portion of a Schwab Sweep Money Fund's expenses. Without these reductions, yields would have been lower.
**Securities Products and Services:** Securities products and services are offered by Charles Schwab & Co., Inc., Member SIPC. Securities products and services, including unswept intraday funds and net credit balances held in brokerage accounts are not deposits or other obligations of, or guaranteed by, any bank, are not FDIC insured, and are subject to investment risk and may lose value. SIPC does not cover balances held at banks affiliated with Schwab in the Bank Sweep and Bank Sweep for Benefit Plans features.

SIPC has taken the position that it will not cover the balances held in your deposit accounts maintained under programs like our Bank Sweep feature. Please see your Cash Feature Disclosure Statement for more information on insurance coverage.
© 2016 Charles Schwab & Co., Inc. ("Schwab"). All rights reserved. Member SIPC. This statement is furnished solely for your account at Schwab.
Except as noted in this statement's Terms and Conditions, Investment Advisors whose names appear in this statement are not affiliated with Schwab. Please see Terms and Conditions. (0616-1204)



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

Account Number
REDACTED

Statement Period
**August 1-31, 2019**

## Terms and Conditions (continued)

**Short Positions:** Securities sold short will be identified through an "S" in Investment Detail. The market value of these securities will be expressed as a debit and be netted against any long positions in Total Account Value.

**Accrued Income:** Accrued Income is the sum of the total accrued interest and/or accrued dividends on positions held in your Account, but the interest and/or dividends have not been received into your account. Schwab makes no representation that the amounts shown (or any other amount) will be received. Accrued amounts are not covered by SIPC account protection until actually received and held in the Account.

**IN CASE OF ERRORS OR DISCREPANCIES:  If you find an error or discrepancy relating to your brokerage activity (other than an electronic fund transfer) you must notify us promptly, but no later than 10 days after this statement is sent or made available to you.  If this statement shows that we have mailed or delivered security certificate(s) that you have not received, notify Schwab immediately. You may call us at 800-515-2157. Any oral communications should be re-confirmed in writing to further protect your rights, including rights under the Securities Investor Protection Act (SIPA).  If you do not so notify us, you agree that the statement activity and Account balance are correct for all purposes with respect to those brokerage transactions.**

**IN CASE OF COMPLAINTS:** If you have a complaint regarding your Schwab statement, products or services, please write to the Client Advocacy Team at Charles Schwab & Co., Inc., Attention: Client Advocacy Team, 211 Main St., San Francisco, CA 94105, USA, or call Schwab Signature Alliance at 800-515-2157.

**Address Changes:** If you fail to notify Schwab in writing of any change of address or phone number, you may not receive important notifications about your Account, and trading or other restrictions might be placed on your Account.

**Additional Information:**
We are required by law to report to the Internal Revenue Service certain payments to you and credits to your Account during the calendar year. Retain this statement for income tax purposes. A financial statement for your inspection is available at Schwab's offices or a copy will be mailed to you upon written request. Any third party trademarks appearing herein are the property of their respective owners. Schwab and Charles Schwab Bank are affiliates of each other and subsidiaries of the Charles Schwab Corporation.

(1017-7MAX)



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

| Account Number | Statement Period |
|---|---|
| REDACTED | **August 1-31, 2019** |

**Account Value as of 08/31/2019: $ 204,035.35**

## Change in Account Value

| | This Period | Year to Date |
|---|---|---|
| **Starting Value** | **$ 245,090.39** | **$ 512,887.98** |
| Credits | 0.02 | 0.23 |
| Debits | (100,025.00) | (100,025.00) |
| Transfer of Securities (In/Out) | 0.00 | 0.00 |
| Income Reinvested | 0.00 | 0.00 |
| Change in Value of Investments | 58,969.94 | (208,827.86) |
| **Ending Value on 08/31/2019** | **$ 204,035.35** | **$ 204,035.35** |
| **Total Change in Account Value** | **$ (41,055.04)** | **$ (308,852.63)** |

## Asset Composition

| | Market Value |
|---|---|
| Bank Sweep <sup>X,Z</sup> | $ 19,308.55 |
| Equities | 184,726.80 |
| **Total Assets Long** | **$ 204,035.35** |
| **Total Account Value** | **$ 204,035.35** |



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

**Account Number**
REDACTED

**Statement Period**
**August 1-31, 2019**

## Income Summary

| | This Period | Year To Date |
|---|---|---|
| Bank Sweep Interest | 0.02 | 0.23 |
| **Total Income** | **0.02** | **0.23** |

## Cash Transactions Summary

| | This Period | Year to Date |
|---|---|---|
| **Starting Cash** * | **$ 119.19** | **$ 118.98** |
| Deposits and other Cash Credits | 0.00 | 0.00 |
| Investments Sold | 119,214.34 | 119,214.34 |
| Dividends and Interest | 0.02 | 0.23 |
| Withdrawals and other Debits | (100,000.00) | (100,000.00) |
| Investments Purchased | 0.00 | 0.00 |
| Fees and Charges | (25.00) | (25.00) |
| **Total Cash Transaction Detail** | **19,189.36** | **19,189.57** |
| **Ending Cash** * | **$ 19,308.55** | **$ 19,308.55** |

*Cash (includes any cash debit balance) held in your account plus the value of any cash invested in a sweep money fund.

## Investment Detail - Bank Sweep

| Bank Sweep | Starting Balance | Ending Balance |
|---|---|---|
| CHARLES SCHWAB BANK | 119.19 | 19,308.55 |
| **Total Bank Sweep** X,Z | **119.19** | **19,308.55** |
| **Total Bank Sweep** | | **19,308.55** |

Please see "Endnotes for Your Account" section for an explanation of the endnote codes and symbols on this statement.

**Page 5 of 8**



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

**Account Number**
REDACTED

**Statement Period**
**August 1-31, 2019**

## Investment Detail - Equities

| Equities | Quantity | Market Price | Market Value |
|---|---|---|---|
| **DYNAVAX TECHS CO** | 44,620.0000 | 4.14000 | 184,726.80 |
| SYMBOL: DVAX | | | |
| **Total Equities** | **44,620.0000** | | **184,726.80** |

| | |
|---|---|
| **Total Investment Detail** | 204,035.35 |
| **Total Account Value** | 204,035.35 |

## Transaction Detail - Purchases & Sales

### Equities Activity

| Settle Date | Trade Date | Transaction | Description | Quantity | Unit Price | Total Amount |
|---|---|---|---|---|---|---|
| 08/22/19 | 08/20/19 | Sold | ALPHABET INC. CLASS      A: GOOGL | (100.0000) | 1,192.2176 | 119,214.34 |
| **Total Equities Activity** | | | | | | **119,214.34** |
| **Total Purchases & Sales** | | | | | | **119,214.34** |

## Transaction Detail - Deposits & Withdrawals

| Transaction Date | Process Date | Activity | Description | Location | Credit/(Debit) |
|---|---|---|---|---|---|
| 08/26/19 | 08/26/19 | Funds Paid | IRA ROTH PREM  DSTRIB 5 | | (100,000.00) |
| **Total Deposits & Withdrawals** | | | | | **(100,000.00)** |

The total deposits activity for the statement period was $0.00.  The total withdrawals activity for the statement period was $100,000.00.

Please see "Endnotes for Your Account" section for an explanation of the endnote codes and symbols on this statement.



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

**Account Number**
REDACTED

**Statement Period**
**August 1-31, 2019**

## Transaction Detail - Dividends & Interest (including Money Market Fund dividends reinvested)

| Transaction Date | Process Date | Activity | Description | Credit/(Debit) |
|---|---|---|---|---|
| 08/15/19 | 08/16/19 | Bank Interest [X,Z] | BANK INT 071619-081519: SCHWAB BANK | 0.02 |
| **Total Dividends & Interest** | | | | **0.02** |

## Transaction Detail - Fees & Charges

| Transaction Date | Process Date | Activity | Description | Credit/(Debit) |
|---|---|---|---|---|
| 08/26/19 | 08/26/19 | Service Fee | WIRED FUNDS FEE | (25.00) |
| **Total Fees & Charges** | | | | **(25.00)** |

| | |
|---|---|
| **Total Transaction Detail** | **19,189.36** |

## Bank Sweep Activity

| Transaction Date | Transaction | Description | Withdrawal | Deposit | Balance [X,Z] |
|---|---|---|---|---|---|
| **Opening Balance** [X,Z] | | | | | **119.19** |
| 08/15/19 | Interest Paid [X,Z] | BANK INTEREST - CHARLES SCHWAB BANK | | 0.02 | 119.21 |
| 08/15/19 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 0.02 | | 119.19 |
| 08/19/19 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 0.02 | 119.21 |
| 08/23/19 | Auto Transfer | BANK CREDIT FROM BROKERAGE [X] | | 119,214.34 | 119,333.55 |
| 08/27/19 | Auto Transfer | BANK TRANSFER TO BROKERAGE | 100,025.00 | | 19,308.55 |
| **Total Activity** | | | **100,025.02** | **119,214.38** | |
| **Ending Balance** [X,Z] | | | | | **19,308.55** |



**Roth Conversion IRA  of**
**ABBY L HARBOUR**
**CHARLES SCHWAB & CO INC CUST**
**ROTH CONVERSION IRA**

**Account Number**
REDACTED

**Statement Period**
**August 1-31, 2019**

## Bank Sweep Activity (continued)

*Bank Sweep: Interest Rate as of 08/30/19 was 0.18%.* ᶻ

## Contribution Summary

|  | 2018 | 2019 |
|---|---|---|
| Conversion | 11,004.74 | 0.00 |
| **Year To Date Total** | **11,004.74** | **0.00** |

## Distribution Summary

|  | Gross Amount | Federal Tax Withheld | State Tax Withheld | Earnings | Net Amount |
|---|---|---|---|---|---|
| Roth Prem | 100,000.00 | 0.00 | 0.00 AZ | 0.00 | 100,000.00 |
| **Year To Date Total** | **100,000.00** | **0.00** | **0.00** | **0.00** | **100,000.00** |

## Endnotes For Your Account

| Symbol | Endnote Legend |
|---|---|
| **X** | Bank Sweep deposits are held at FDIC-insured bank(s) ("Banks") that are affiliated with Charles Schwab & Co., Inc. |
| **Z** | For Bank Sweep and Bank Sweep for Benefit Plans features, interest is paid for a period that differs from the Statement Period. Balances include interest paid as indicated on your statement by Schwab or one or more of its affiliated banks. These balances do not include interest that may have accrued during the Statement Period after interest is paid. The interest paid may include interest that accrued in the prior Statement Period. |

# EXHIBIT 8

Page: 7

DAVID & ABBY HARBO

US V. DAVID HARBOUR

09/19/2019
Account No.     1261.06
Statement No.     19377

| 08/27/2019 | Los Angeles County Superior Court - Obtain additional documents related to Mark Burg v. David Harbour, et al. | 11.00 |
| 08/27/2019 | First Legal - Obtain certified copy of Special Warranty Deed | 31.99 |
| | Total Advances | 1,403.44 |
| | Total Current Work | 38,724.14 |

### Payments

| | Total Payments Received - Thank You Thru 09/19/2019 | -38,724.14 |
| | Balance Due | $0.00 |

### Client Trust

| 08/08/2019 | Trust Deposit | 75,000.00 |
| 08/19/2019 | Trust Deposit | 100,000.00 |
| 08/26/2019 | Trust Deposit | 100,000.00 |
| 08/29/2019 | Payment to FRS matter (1261.01) | -66,447.96 |
| 08/29/2019 | Payment to Sanford matter (1261.02) | -54,173.70 |
| 08/29/2019 | Payment to SEC matter (1261.03) | -10,776.50 |
| 08/29/2019 | Payment to Gray matter (1261.04) | -11,181.84 |
| 08/29/2019 | Payment to General matter (1261.05) | -7,420.00 |
| 09/19/2019 | Payment to Sanford matter (1261.02) | -644.70 |
| 09/19/2019 | Payment to Gray matter (1261.04) | -44.37 |
| 09/19/2019 | Client Fund Payment | -38,724.14 |
| | Ending Client Trust Balance | $85,586.79 |

DUE UPON RECEIPT
PLEASE SHOW ACCOUNT NUMBER ON REMITTANCE

# EXHIBIT 9



## Two-Year Comparison Worksheet

**2020**

| | |
|---|---|
| Name(s) as shown on return | Social security number |
| DAVID A. & ABBY L. HARBOUR | REDACTED |
| 2019 Filing Status MARRIED FILING JOINT | 2020 Filing Status MARRIED FILING JOINT |
| 2019 Tax Bracket  0.0% | 2020 Tax Bracket  0.0% |

| Description | Tax Year 2019 | Tax Year 2020 | Increase (Decrease) |
|---|---|---|---|
| WAGES, SALARIES, AND TIPS | 36000. | 53000. | 17000. |
| SCHEDULE D (CAPITAL GAIN/LOSS) | -3000. | -3000. | 0. |
| SCH. C (BUSINESS INCOME/LOSS) | -255153. | -750000. | -494847. |
| SCHEDULE E (RENTAL AND PASSTHROUGH) | 0. | -25000. | -25000. |
| OTHER INCOME | -12589384. | -12808537. | -219153. |
|   TOTAL INCOME | -12811537. | -13533537. | -722000. |
| | | | |
| ADJUSTED GROSS INCOME | -12811537. | -13533537. | -722000. |
| | | | |
| STANDARD DEDUCTION | 24400. | 24800. | 400. |
|   TOTAL DEDUCTIONS | 24400. | 24800. | 400. |
|   TAXABLE INCOME | 0. | 0. | 0. |
| | | | |
| FORM 5329 (TAX ON PENSION/IRA/MSA) | 10000. | 0. | -10000. |
| SCH. H (HOUSEHOLD EMPLOYMENT TAX) | 2689. | 0. | -2689. |
|   TOTAL TAX | 12689. | 0. | -12689. |
| | | | |
| FEDERAL INCOME TAX WITHHELD | 3535. | 2924. | -611. |
|   TOTAL PAYMENTS | 3535. | 2924. | -611. |
| | | | |
| TAX OVERPAID | 0. | 2924. | 2924. |
| AMOUNT REFUNDED | 0. | 2924. | 2924. |
| BALANCE DUE | 9154. | 0. | -9154. |
| LATE PAYMENT/LATE FILING PEN. & INT. | 206. | 0. | -206. |
| TOTAL DUE AFTER PENALTY & INTEREST | 9360. | 0. | -9360. |
| | | | |
| ARIZONA STATE RETURN | | | |
| NON-REFUNDABLE CREDITS | 160. | 160. | 0. |
| PAYMENTS | 208. | 689. | 481. |
| REFUNDABLE CREDITS | 100. | 100. | 0. |
| AMOUNT REFUNDED | 308. | 789. | 481. |
| | | | |
| KANSAS STATE RETURN | | | |
| PAYMENTS | 3835. | 0. | -3835. |
| AMOUNT REFUNDED | 3835. | 0. | -3835. |

026301 04-01-20

# EXHIBIT 10



JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218- 2051

November 23, 2018through December 10, 2018
Primary Account: REDACTED

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-935-9935** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00050009 DRE 601 211 34518 NNNNNNNNNNN  1 000000000 06 0000

ABBY L. HARBOUR SPOUSAL LIFETIME ACCESS
TRUST
DARYL DEEL TRUSTEE
8901 N MARTINGALE RD
PARADISE VALLEY AZ 85253-2052



## CONSOLIDATED BALANCE SUMMARY

### ASSETS

| Checking & Savings | ACCOUNT | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|
| Chase Premier Plus Checking | REDACTED | $0.00 | $25.00 |
| Chase Premier Savings | REDACTED | 25.00 | 25.00 |
| **Total** | | **$25.00** | **$50.00** |
| | | | |
| **TOTAL  ASSETS** | | **$25.00** | **$50.00** |

## CHASE PREMIER PLUS CHECKING

ABBY L. HARBOUR SPOUSAL LIFETIME ACCESS    Account Number: REDACTED
TRUST
DARYL DEEL TRUSTEE

## CHECKING SUMMARY

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$0.00** |
| Deposits and Additions | 25.00 |
| **Ending Balance** | **$25.00** |
| | |
| Annual Percentage Yield Earned This Period | 0.00% |

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | **Beginning Balance** | | **$0.00** |
| 11/23 | Transfer From Chk Xxxxx9018 | **25.00** | 25.00 |
| | **Ending Balance** | | **$25.00** |

 **CHASE**

November 23, 2018 through December 10, 2018
Primary Account: REDACTED

## CHASE PREMIER SAVINGS

ABBY L. HARBOUR SPOUSAL LIFETIME ACCESS                    Account Number: REDACTED
TRUST

DARYL DEEL TRUSTEE

### SAVINGS SUMMARY

| | AMOUNT |
|---|---|
| **Beginning Balance as of  12/07/18** | **$25.00** |
| **Ending Balance** | **$25.00** |
| Annual Percentage Yield Earned This Period | 0.00% |

You earned a higher interest rate on your Chase Premier Savings account during this statement period because you had a qualifying Chase Premier Plus Checking account.

---

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**  Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

# EXHIBIT 11



**CHASE**
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218- 2051

August 09, 2019 through September 10, 2019
Primary Account: <span style="background:red">REDACTED</span>

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-935-9935** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00057552 DRE 601 211 25419 NNNNNNNNNNN  1 000000000 06 0000
ABBY L. HARBOUR SPOUSAL LIFETIME ACCESS
TRUST
DARYL DEEL TRUSTEE
8901 N MARTINGALE RD
PARADISE VALLEY AZ 85253-2052



## CONSOLIDATED BALANCE SUMMARY

### ASSETS

| Checking & Savings | ACCOUNT | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|
| Chase Premier Plus Checking | REDACTED | $11,412.67 | $3,818.40 |
| Chase Premier Savings | REDACTED | 5,027.86 | 5,028.04 |
| **Total** | | **$16,440.53** | **$8,846.44** |
| **TOTAL  ASSETS** | | **$16,440.53** | **$8,846.44** |

## CHASE PREMIER PLUS CHECKING

ABBY L. HARBOUR SPOUSAL LIFETIME ACCESS          Account Number: REDACTED
TRUST
DARYL DEEL TRUSTEE

## CHECKING SUMMARY

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$11,412.67** |
| Deposits and Additions | 1,213.16 |
| Electronic Withdrawals | -8,782.43 |
| Fees | -25.00 |
| **Ending Balance** | **$3,818.40** |
| Annual Percentage Yield Earned This Period | 0.01% |
| Interest Paid This Period | $0.07 |
| Interest Paid Year-to-Date | $1.17 |

 **CHASE**

August 09, 2019 through September 10, 2019
Primary Account: **REDACTED**

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| | **Beginning Balance** | | **$11,412.67** |
| 08/19 | American Express ACH Pmt    M1992         Web ID: 2005032111 | -507.91 | 10,904.76 |
| 08/19 | Target Card Srvc Bill Pay    000000005720132 Web ID: T510215170 | -352.68 | 10,552.08 |
| 08/20 | Southwest Gas    Web      4212732752027   Web ID: 5880085720 | -24.15 | 10,527.93 |
| 08/21 | Venmo          Payment    2398496059      Web ID: 3264681992 | -25.00 | 10,502.93 |
| 08/22 | 08/22 Online Transfer To Chk ...5826 Transaction#: 8565025686 | -24.00 | 10,478.93 |
| 08/23 | 08/22 Payment To Chase Card Ending IN 9323 | -5,104.81 | 5,374.12 |
| 08/23 | 08/22 Payment To Chase Card Ending IN 1435 | -70.03 | 5,304.09 |
| 08/29 | 08/22 Online Payment 8586672664 To City of Phoenix Arizona | -953.11 | 4,350.98 |
| 09/03 | Aps Electric Pmt Payment    4205060000      Web ID: 1860011170 | -591.40 | 3,759.58 |
| 09/06 | Online Transfer From Mma ...8389 Transaction#: 8615338728 | **1,213.09** | 4,972.67 |
| 09/06 | 09/06 Online Payment 8619250923 To Town of Paradise Valley | -50.00 | 4,922.67 |
| 09/06 | 09/06 Online Payment 8619253089 To City of Phoenix Arizona | -214.80 | 4,707.87 |
| 09/09 | Avista Res Regis Bill Pay   12088452831      Web ID: 7529211611 | -824.71 | 3,883.16 |
| 09/09 | Venmo          Payment    2468383703      Web ID: 3264681992 | -25.00 | 3,858.16 |
| 09/10 | Southwest Gas    Web      4212732752027   Web ID: 5880085720 | -14.83 | 3,843.33 |
| 09/10 | Interest Payment | **0.07** | 3,843.40 |
| 09/10 | Monthly Service Fee | -25.00 | 3,818.40 |
| | **Ending Balance** | | **$3,818.40** |

**WANT TO AVOID PAYING A MONTHLY SERVICE FEE ON YOUR CHECKING ACCOUNT?**

A monthly Service Fee was charged to your  Chase Premier Plus Checking  account.  Here are the two ways you can avoid
this fee during any statement period.
- **Have an average qualifying deposit and investment balance of at least $15,000.00 during your
  statement period.**
  (Your average qualifying deposit and investment balance was $12,616.00)

  *Talk to a banker about transferring your balances to Chase today!*

- **OR,** authorize us to make automatic payments to your qualifying Chase mortgage from your Chase account.
  (You do not have a qualifying Chase mortgage)

  *Talk to a banker about a Chase mortgage!*

**Stop in today and explore all Chase has to offer.**



August 09, 2019 through September 10, 2019
Primary Account: <span style="color:red">REDACTED</span>



## CHASE PREMIER SAVINGS

ABBY L. HARBOUR SPOUSAL LIFETIME ACCESS                    Account Number: <span style="color:red">REDACTED</span>
TRUST
DARYL DEEL TRUSTEE

### SAVINGS SUMMARY

|  | AMOUNT |
|---|---|
| **Beginning Balance** | **$5,027.86** |
| Deposits and Additions | 0.18 |
| **Ending Balance** | **$5,028.04** |
| | |
| Annual Percentage Yield Earned This Period | 0.04% |
| Interest Paid This Period | $0.18 |
| Interest Paid Year-to-Date | $3.04 |

The monthly service fee for this account was waived as an added feature of Chase Premier Plus Checking account.

### TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | **Beginning Balance** | | **$5,027.86** |
| 09/10 | Interest Payment | 0.18 | 5,028.04 |
| | **Ending Balance** | | **$5,028.04** |

You earned a higher interest rate on your Chase Premier Savings account during this statement period because you had a qualifying Chase Premier Plus Checking account.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**



August 09, 2019 through September 10, 2019
Primary Account: REDACTED

This Page Intentionally Left Blank

# EXHIBIT 12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 4:14-cv-00783-DW |
| Plaintiff, | |
| v. | |
| CWB SERVICES, LLC, *et al.,* | |
| Defendants. | |

**JOINT MOTION FOR STAY OF TURNOVER PROCEEDINGS AS TO DNA
INVESTMENTS, LLC, DAVID A. HARBOUR AND ABBY HARBOUR**

Receiver, Larry E. Cook, Plaintiff, the Federal Trade Commission ("FTC"), David A. Harbour, individually and on behalf of DNA Investments LLC ("DNA"), and Abby Harbour, jointly propose a stay of all proceedings related to the Receiver's Motion for Turnover of Property (ECF # 150) (the "Turnover Motion") through and until April 30, 2016.

In support thereof, the undersigned respectfully states as follows:

1.     The Receiver filed the Turnover Motion on March 31, 2015.

2.     The FTC filed its Suggestions in Support of the Turnover Motion on May 8, 2015 (ECF # 157).

3.     DNA and the Harbours filed their Suggestions in Opposition to the Turnover Motion on May 22, 2015 (ECF # 161) which set the Receiver's Reply Suggestions deadline for June 8, 2015.

1

4.    The parties subsequently agreed to extend the Receiver's Reply Suggestions deadline to June 29, 2015 as reflected by the Court's Order Granting Joint Motion for Extension of Time (ECF # 164).

5.    The parties have reached a settlement of the Turnover Motion pursuant to which the final installment payment is not due until April 1, 2016.

6.    By April 30, 2016, the parties will know whether the terms of the settlement have been met (in which case the Turnover Motion will be withdrawn by the Receiver) or not (in which case the Receiver will notify the Court the Turnover Motion proceedings should resume).

WHEREFORE, the Receiver, the FTC, David A. Harbour, individually and on behalf of DNA, and Abby Harbour respectfully request that the Court grant this motion and stay all further proceedings on the Turnover Motion until April 30, 2016.

Dated: June 26, 2015                    Respectfully submitted,


                                        LATHROP & GAGE LLP

                                        /s/ Brian M. Holland
                                        Brian M. Holland, MO Bar #51307
                                        2345 Grand Blvd, Suite 2400 Kansas
                                        City, MO 64108 Telephone: 816-292-
                                        2000 Telecopier: 816-292-2001 Email:
                                        bholland@lathropgage.com

                                        *Attorney for Larry E. Cook, Receiver*

/s/ Charles M. Thomas
Charles M. Thomas, MO Bar #28522
Assistant United States Attorney Charles
Evans Whittaker Courthouse 400 East Ninth
Street, Room 5510 Kansas City, MO 64106
Telephone: (816) 426-3130
Facsimile: (816) 426-3165

E-mail:      charles.thomas@usdoj.gov

*Attorneys for Plaintiff Federal Trade Commission*

/s/ Matthew J. Wilshire
Matthew J. Wilshire, DC Bar #483702
Lisa A. Rothfarb, MD Bar
Federal Trade Commission
600 Pennsylvania Ave., N.W., Mail Stop CC-10232
Washington, D.C. 20580
202-326-2976 (Wilshire)
202-326-2602 (Rothfarb)
mwilshire@ftc.gov,
lrothfarb@ftc.gov

MILLER SCHIRGER, LLC

/s/ Matthew  W. Lytle
John J. Schirger, MO Bar #60583
Matthew W. Lytle, MO Bar #59145
4520 Main Street, Suite 1570
Kansas City, Missouri 64111
jschirger@millerschirger.com
mlytle@millerschirger.com
Telephone: (816) 561-6500
Facsimile: (816) 561-6501

*Attorneys for David A. Harbour, Abby Harbour, and
DNA Investments LLC*

3

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on June 26, 2015, I electronically filed the foregoing document with the Clerk of the Court for the Western District of Missouri using the CM/ECF system, which will send a notice of electronic filing to all parties participating in the Court's CM/ECF system.

      <u>/s/ Brian M. Holland</u>

4

24209707v1

# EXHIBIT 13

American State Bank & Trust Co
1321 Main St, PO Box 1346
Great Bend, KS 67530-1346
Phone: 620-793-5900

XXXXXX5729

Temp-Return Service Requested

Sep 18, 2019

Pg   1 of   1

JULIANNE GOTTSCHALK
2540 SUNSET DRIVE
BELLEVILLE KS 66935

1

You can now use your mobile device to make everyday purchases!
Add your American State Bank Debit card to your Mobile Wallet app today.
Personal Interest Checking
08/19/2019 Beginning Balance                                         173,260.92
              3 Deposits/Other Credits                    +            3,227.63
              1 Checks/Other Debits                       -          100,020.00
09/18/2019 Ending Balance        31 Days in Statement Period         76,468.55
-----------------------------------------------------------------------------
---------------------------- Deposits/Other Credits --------------------------
08/28/2019 ACH Deposit          SSA   TREAS 310 XXSOC SEC               935.10
08/30/2019 ACH Deposit                                               2,273.33
  KANSAS PUBLIC EM DIRECT PAY PLOYEES RETIREME
09/18/2019 Accr Earning Pymt     Added to Account                        19.20

----------------------------- Other Debits -----------------------------------
08/19/2019 Withdrawal      *Alan Baskins-Wire to Abby*               100,020.00
-----------------------------------------------------------------------------

| |                    | Total For    | | Total           |
| |                    | This Period  | | Year-to-Date    |
|---|------------------|--------------|---|---------------|
| Total Overdraft Fees |              | $        .00  | $        .00  |
| Total Returned Item Fees |          | $        .00  | $        .00  |

----------------------------- Daily Ending Balance ---------------------------
08/19       73,240.92     08/30       76,449.35    09/18       76,468.55
08/28       74,176.02

----------------------------- Earnings Summary -------------------------------
         ** Below is an itemization of the Earnings **
                  paid this period.              **
Interest Paid This Period        19.20 Annual Percentage Yield Earned  0.30 %
Interest Paid YTD               355.76 Days in Earnings Period            31
                                       Earnings Balance              75,371.20

Notice: See Reverse Side for Important Information

# EXHIBIT 14

| | | Account No. | Statement Period |
| --- | --- | --- | --- |
| | | REDACTED | 07/28/19 Thru 08/25/19 |

**400 Membership Checking 047980**

| rans. Date | Credit | Debit | Balance | Transaction Description |
| --- | --- | --- | --- | --- |
| 08/05/19 | | -2,034.58 | 109,529.35 | ACH Withdrawal Draft # 9857 CITICARD PAYMENT, CHECK PYMT, 4 |
| 08/06/19 | | -167.18 | 109,362.17 | ACH Withdrawal Draft # 9860 GAP VISA, CHECK PYMT, 0000004479941 |
| 08/07/19 | | -2,311.64 | 107,050.53 | Draft Withdrawal Draft # 9856 Tracer 23531640 |
| 08/07/19 | | -299.00 | 106,751.53 | Draft Withdrawal Draft # 9859 Tracer 23541727 |
| 08/07/19 | | -12.50 | 106,739.03 | POS Card purchase WALGREENS STORE 206 SCOTTSDALE, AZ, |
| 08/07/19 | | -16.46 | 106,722.57 | POS Card purchase WALGREENS STORE 206 SCOTTSDALE, AZ, |
| 08/09/19 | | -24.01 | 106,698.56 | POS Card purchase WALGREENS STORE 206 SCOTTSDALE, AZ, |
| 08/10/19 | | -11.32 | 106,687.24 | Card purchase SCOTTSDALE BURGER B SCOTTSDALE, AZ, 000 |
| 08/10/19 | | -50.56 | 106,636.68 | POS Card purchase WALGREENS STORE 206 SCOTTSDALE, AZ |
| 08/10/19 | | -167.01 | 106,469.67 | POS Card purchase FRYS-FOOD-DRG #0 20427 N. HAYDEN, SC |
| | | | | 60067307 |
| 08/12/19 | | -75,000.00 | 31,469.67 | Draft Withdrawal Draft # 9862 Tracer 23616208 |
| 08/13/19 | | -703.00 | 30,766.67 | ACH Withdrawal Draft # 9861 AAA Insurance, ARC PYMT, LRDT |
| | | | | AZSS202308785-PAS |
| 08/13/19 | | -111.07 | 30,655.60 | POS Card purchase TARGET T-1432 16825 E Shea Blvd, Foun |
| | | | | 11432073 |
| 08/14/19 | | -50.00 | 30,605.60 | POS Card purchase WALGREENS STORE 206 SCOTTSDALE |
| 08/15/19 | | -17.93 | 30,587.67 | ACH Withdrawal Draft # 9865 CARDMEMBER SERV., CR CD |
| | | | | ////////0000790408, 403766004797062e |
| 08/15/19 | | -251.54 | 30,336.13 | ACH Withdrawal Draft # 9863 American Express, ARC PYMT |
| 08/16/19 | | -43.98 | 30,292.15 | ACH Withdrawal Draft # 9864 TJ MAXX MC, CHECK PYMT, |
| 08/16/19 | | -607.08 | 29,685.07 | ACH Withdrawal WF LOAN/LINE, AUTO PAY, WELLS FARG |
| | | | | 650 |
| 08/17/19 | | -22.00 | 29,663.07 | POS Card purchase USPS PO 03766306 SCOTTSDALE, A |
| 08/17/19 | | -179.65 | 29,483.42 | POS Card purchase FRYS-FOOD-DRG #0 14845 E.SHEA |
| | | | | 60007010 |
| 08/19/19 | | -16.23 | 29,467.19 | ACH Withdrawal SOUTHWEST GAS, APP, AUTO PAYMI |
| | | | | RONALDA |
| 08/19/19 | | -171.85 | 29,295.34 | ACH Withdrawal APS electric pmt, PAYMENT, HARBOUR, |
| 08/21/19 | 2,090.60 | | 31,385.94 | ACH Deposit SSA TREAS 310, XXSOC SEC, KATHRYN J |
| 08/21/19 | | -44.61 | 31,341.33 | POS Card purchase SPROUTS FARMERS MAR SCOT |
| 08/22/19 | | -14.15 | 31,327.18 | POS Card purchase WALGREENS STORE 164 FOUN |
| 08/24/19 | | -22.67 | 31,304.51 | POS Card purchase WALGREENS STORE 206 SCOT |

nt Owner(s): David Harbour

\* Indicates draft out of sequence
e Indicates draft converted to ele

**ared Draft Recap:**

| DRAFT | DATE | AMOUNT | DRAFT | DATE | AMOUNT | DRAFT | DATE | AMOUNT | D |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 856 | 08/07 | 2,311.64 | 9859 | 08/07 | 299.00 | 9862 | 08/12 | 75,000.00 | 9 |
| 857e | 08/05 | 2,034.58 | 9860e | 08/06 | 167.18 | 9863e | 08/15 | 251.54 | |
| 858 | 07/31 | 18.00 | 9861e | 08/13 | 703.00 | | | | |

T NUMBER 8499 IS ASSIGNED TO DRAFTS WHEN THE PRE PRINTED DRAFT NUMBER CANNOT BE READ. DESERT FINA
OR PRE AUTHORIZED DEBITS.

**Money Market 639970**

| Balance | + Credits | + Dividends | - Debits | - Service Charges | Average Balance |
| --- | --- | --- | --- | --- | --- |
| 88.70 | $ 0.00 | $ 24.07 | $ 0.00 | $ 0.00 | $ 40,508.89 |

| e | Credit | Debit | Balance | Transaction Description |
| --- | --- | --- | --- | --- |

# EXHIBIT 15

**EXHIBIT 15**
**OTHER LITIGATION**

| | | |
|---|---|---|
| FRS GC LLC v Oak Tree, et al. | Dismissed | Community Allegations |
| T Denny Sanford | Harbours won | N/A |
| Netland (Johnson Cnty) | Not Served | Abby Not named |
| Trecize | Just. Ct. | Abby Not named |
| McFadden/Discovery Land | Unk | Abby Not named |
| Grissinger Holdings | Dismissed | Community Allegations |
| Grissinger Holdings | Dismissed | Community Allegations |
| Harbour v FTC | Dismissed | Abby Plaintiff |
| Netland (Johnson County) | Judgment (others) | Abby not named |
| FTC Case (in Text) | Settled | Turnover proceeding |
| Pam Bobrow | Dismissed | Abby Not named |
| Andante Law Group | Dismissed | Abby Not named |
| Harbour | Plaintiff | Abby Not named |
| Eruces | Dismissed | Abby Not named |
| Sunbank | Dismissed | Abby Not named |
| Banks Swimming Pool | Mechanics Lien | Abby Named |
| HMC CAH | Dismissed | Abby Not named |
| HMC  CAH | Dismissed | Abby Not Named |
| Tax Court | Case Stayed | Abby is Petitioner |

**Newer Cases Not in Exhibit A But in Text**

| | | |
|---|---|---|
| Bobrow v. Harbour | Case Stayed | Abby Not Named |
| NetLend v. Harbour | Active Case | Abby Not Named |
| Cathey v. Harbour | Active Case | Abby Not Named |
| Gray v. Harbour | Case Stayed | Community Property Allegations |