Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
| Plaintiff, | **MOTION #1 TO DISMISS OR ALTERNATIVELY TO STRIKE SURPLUSAGE FROM THE INDICTMENT** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

Defendant, David Harbour, by and through undersigned counsel, respectively moves this Court to strike prejudicial surplusage from the Second Superseding Indictment ("SSI") in terms of the upcoming *criminal* trial.[1] In terms of how to categorize this motion, it most likely falls under F.R.Crim.P. 12(b)93)(B) and, therefore, in some

---

[1] We are left confused by the government's representations at the August 20, 2020, hearing.

ways, though greatly expanded well beyond R.G., who was the subject of the first Motion to Dismiss, does touch some of the points raised in Doc. 98, filed July 17, 2020.[2]

The principal reason this motion is brought is that it remains unclear what the government intends to try to introduce before the *petit* jury to try to prove the *charges* in the indictment beyond a reasonable doubt versus what it intends to try to prove later in a Rule 32.2 forfeiture proceeding *if* it obtains convictions on offenses for which forfeiture has been noticed, here, the "payday" loan allegations.

Respectfully, the Court's Order, Doc. 132, left this a bit unclear as well. For example, when the Court stated, "[i]n sum, the government shall have the opportunity to prove *at trial* whether R.G.'s 2010 transaction is sufficiently related to the charged conduct to justify the forfeiture allegation," [emphasis added] what "trial" did the Court mean?

If the Court meant a supplementary proceeding *after* the trial on the charges (whether decided by the Court or the retained jury) and that, perforce, the evidence of R.G.'s 2010 loan, or K.B.'s 2007 loan (and his ex-wife's), or J.C.'s 2012 loan, or P.H.'s 2013 loan, or D.W.'s 2014 loan will not be presented to the *petit* jury during the trial of the criminal charges, then we need to go no further now. Evaluation of the expiration of the SOL can be evaluated at the same time as the connection of these potential forfeiture claims to the charged offenses. Here, we are only interested in what is going to be admitted in the *criminal* trial; not at the forfeiture proceeding.

---

[2] The Response was Doc. 108, filed 7/31/20; the Reply was Doc. 113, filed 8/7/20; the oral argument was conducted on August 20, 2020 and the Court's Ruling is Doc. 132, filed 9/11/2020.

But, if the government plays coy and does not declare, at this late date, what it intends to do and where, then the motion should be decided for purposes of the *criminal* trial.[3] The government can clear this up very quickly in its response. There are five alleged victims of the *charges* in the "payday loan" portion of the SSI and six so-called "investor-victims" whose alleged losses are associated with no charges at all.

We will call these two disparate groups, the Group of 5 and the Group of 6. They are discussed in detail in the body of this Motion. If the government does not intend to use any members of Group of 6 as witnesses in the *criminal* trial nor try to introduce any evidence concerning the alleged loans or investments and alleged losses in the *criminal* trial, then this Motion can be deferred.[4]

Therefore, with the exception of the allegations of wealth and spending, discussed at the end of the motion, the issues surrounding the Group of 6 must be considered and decided in the event that the government does not concede our points. Here, we refer to everything other than the actual conduct charged in the Counts of the SSI as "surplusage." The reason that the surplusage should be stricken, in the event that government intends to use it in the criminal trial, is that it would denote that the

---

[3] The prior motion attempted to dismiss R.G. from the forfeiture allegations and we have no quarrel with the Court having found that the Motion to Dismiss was not well taken at that time.

[4] One potential witness, K.B., who has, to date, provided a proffer under circumstances of limited use immunity after invoking the 5th Amendment was identified as a "investor-victim" in the SSI. We recognize that, under certain circumstances, K.B. might be a witness in the mortgage fraud trial – we expect it to be severed from the payday loan trial based upon a motion for relief from prejudicial joinder filed together with this Motion – and, therefore, we are only calling upon the government to make certain representations concerning K.B. in its Response to this Motion.

3

government has proceeded through this entire case under a serious misapprehension regarding the Federal criminal code.

The government's error may be summarized as follows: Federal law does not criminalize schemes and artifices to defraud *people* or entities[5]; State criminal codes do that. Under the laws of the various, the scheme to defraud is the crime. Under the Federal criminal code, the crime is the use of the mail (18 U.S.C. §1341) or interstate wire facilities (18 U.S.C. §1343) in furtherance of a scheme and artifice to defraud. The reason for this is Constitutional. It is founded in Federalism.

The mail fraud statute, which has been around since just after the Civil War, could be enacted because, Constitutionally, the mails were under the exclusive jurisdiction of the Federal government. *See*, U.S. Constitution, Article I, Section 8, Clause 7. The wire fraud statute could be enacted because under the Fifth Amendment as the Federal government has exclusive jurisdiction over interstate commerce and the interstate wire system was in "interstate commerce."

So, it should be clearly understood that there exists Constitutional and statutory reasons why what the government has done with all three Indictments in this case, culminating in the SSI, cannot stand in material part. The United States cannot exercise jurisdiction to indict schemes and artifices to defraud persons or entities unless expressly permitted by statute. Its power to indict schemes and artifices to defraud persons and

---

[5] Financial institutions are an exception and there are others but there is no general Federal "scheme and artifice" statute akin, e.g., to A.R.S. §13-2310.

4

entities is derived solely from the limited jurisdiction granted to the Federal government under the Constitution to regulate the mails and to regulate interstate commerce.

An example contrasting §§ 1341 and 1343 with a "general" scheme and artifice statute is present in this case. For example, Count 28 accuses Defendant of bank fraud.[6] If Mr. Harbour knowingly engaged in a scheme and artifice to defraud a financial institution – meaning that he acted with the willfulness required to support a scheme and artifice to defraud a bank - then whether the mails, the facilities of interstate commerce, carrier pigeons, or hand to hand deliveries were used in furtherance of the scheme is irrelevant. It is the *scheme* that is punished.[7]

By applying this non-controversial and simple principle to the SSI, we can now sweep away what is clearly surplusage. Aside from the bank fraud charge, only if a mail or wire fraud count is matched with a specific victim of a scheme and artifice to defraud

---

[6] As originally enacted in 1984, 18 U.S.C. §1344 did not criminalize frauds against "financial institutions" but only against "federally chartered or insured financial institution[s]." The rationale for the limitation was the perceived need for a nexus between the power being exerted by the Federal government and its Constitutional or other authority. In response to the S&L collapse in 1989, the FIRREA statute dropped the requirement that the bank be federally chartered or insured and simply identified "financial institutions" as the purposed victim. Over the years, as the government's representative here knows better than most anyone, the definition of "financial institution" was considerably broadened to keep up with the diverse array of financing modalities being newly created as modern times progressed. But, the specific helps isolate and distinguish the "general."

[7] Though not for today, those claims are as flawed as are the others in this case. Obviously, the demand for gift letters came from Frank Madia III, the sole owner of the mortgage lender, Equitable Home Mortgage, Inc. He knew at all material times that the closing was to be accomplished with borrowed money and he also knew that the mortgage loan was being funded by his company's own funds. So, obviously, there could be no fraud at all. Madia was no mere loan officer trying to deceive his employer. He was the boss. He *was* Equitable.

can the scheme and artifice allegation remain in the SSI and be considered by the trial jury.

Counts 1-10 are wire fraud counts. There are three victims identified in Counts 1-10. R.T. is Count 1, 9 and 10. M.B. is Counts 2, 4, 5, 6, 7, and 8. PAIF is Count 3. Counts 11 and 12 are mail fraud counts. Count 11 relates to AW. and Count 12 relates to C.H.

Counts 13-23 are transactional money laundering counts. The specified underlying "unlawful activity" charged is "wire fraud" under 18 U.S.C. §1343. Note that the specific underlying activity is not a "scheme and artifice" to defraud but the use of interstate wire facility in furtherance of the scheme and artifice to defraud. In other words, the money laundering charges have no independent existence. A conviction for money laundering can only be returned if the underlying, companion, wire fraud charges are convicted.[8] And, perforce, the money laundering must relate to the three alleged victims of wire

---

[8] Though, of course, here the sense one gets of the money laundering charges is that the government believe that they are the payment of money obtained by fraud. This is one of those places the government has woefully misunderstood the facts. We have, since our entry into the case, tried to explain the facts and supplied documents that corroborate our statements. But, even if the government is not listening or reading, it is important that the Court understand what really happened, if for no other reason than that it has set bail so high that it cannot presently be met. The money paraded by the government as spent by Harbour on lifestyle came long before the charged conduct and could not, perforce, come from any of the Group of 5 or Group of 6. But, more than that, the money did not come from *any* money lent to Harbour or any of his ventures. The money, and there was definitely a lot of it, came from the actually inexhaustible supply of commercial borrowers who needed short term loans. None of those loans were illegal as far as anyone knows. They produced a lot of income all the way up the line to the street lenders, from them to the aggregators like KSQ. Another aggregator was K.B.'s company, Net Finance. Two of Harbour's companies, DNA and NorthRock (with M.D.), were lenders to aggregators like KSQ.

fraud, R.T., M.B. and PAIF. If the wire fraud charges fail, the money laundering charges automatically fall.[9] [10]

Where this all comes to a head is in ¶25 of the SSI, the list of so-called "investor-victims." There are 11 identified "investor-victims." Three of them are the alleged victims of the wire fraud counts. They are R.T. ("SNI Fund I/ R.T."), M.B., and PAIF. Two are the alleged victims of the mail fraud counts. They are C.H. and A.W. The other six "investor-victims" are not associated with any charges. That is, they are not alleged victims of wire fraud, mail fraud, or the transactional money laundering charges associated with the wire fraud charges.

So, K.B. and his $2.5 million must be stricken as prejudicial surplusage from the indictment for purposes of the criminal trial. So must his ex-wife, P.C. for $200,000 (even though P.C.'s $200,000 is included in K.B.'s $2.5 million. R.G., for just over $1 million, must be stricken. So must J.C. for $3 million, P.H. for $500,000, and D.W. for $100,000.[11]

To punctuate the overriding principle: The government did not allege that any of these six "investor-victims" were victims of mail fraud, wire fraud, or transactional

---

[9] No money laundering charges ae associated with Counts 11 and 12, the mail fraud counts.

[10] Counts 29 and 30 are also wire fraud counts and Counts 31 and 32 are money laundering counts. They are self-contained in a completely different part of the SSI, one that we expect must be severed for trial, as explained in our separately filed Motion to Sever and For Relief from Prejudicial Joinder. While the allegations are untrue, they are not part and parcel of this motion.

[11] The issue of whether, assuming Defendant is convicted, these alleged "losses" may be considered as "relevant conduct" is a separate issue that is not ripe for decision and, in our view, will never be so.

money laundering. In other words, there are no allegations of Federal crimes committed by the Defendant against them. Understanding, with the background we supplied, that the crime is not a "scheme and artifice" to defraud but "wire fraud" and "mail fraud," makes the distinction easy to see.

To permit the government to describe the Group of 6 as "victims" of Defendant's alleged scheme and artifice when they are not victims of wire fraud and mail fraud will be incredibly prejudicial to the Defendant receiving a fair trial. And while it might be suggested that motions in limine to be filed sometime later will be sufficient to preclude the allegations surrounding their alleged losses from being presented to the jury, there is a complicating factor that calls out for a decision now.

That factor is that for *all* criminal purposes, including criminal forfeiture, offenses that are suggested, albeit not charged, are all outside the 5-year statute of limitations. The first indictment was returned on July 30, 2019. Therefore, anyone or anything not in the SSI that occurred prior to July 30, 2014, is presumptively barred by the 5-year Statute of Limitations. The first indictment named R.T., M.B., and Green Circle (the government actually meant PAIF) as the three wire fraud victims. The second superseding indictment was returned on November 24, 2020. It contains the same wire fraud counts (1-10) and the same two mail fraud counts identified in the present SSI. So, if the Group of Six are entirely "out" for purposes of the criminal trial on the charges in the SSI, we can avoid presently resolving whether the 5-year SOL would also bar the criminal forfeitures noticed by the government, but, if the Group of Six are "in" the criminal case for any

purpose associated with "payday lending," then the statute of limitations must be discussed and resolved.

We will discuss the SOLs in more detail in a separately filed motion. Here suffice to state that the SOLs related to the Group of Six have all expired and, with respect to A.W. and C.H., the only two "payday loan" mail fraud charges, the 5-year SOLs have also expired.

Specifically, the K.B. and P.C. claims expired on December 13, 2012, or, if one successfully contended that the SOL should date from a certain February 14, 2014 email, then the SOL expired on February 14, 2019. The R.G. claim expired on March 22, 2015 or, if one successfully contended that it did not commence running until 2016 when R.G. contends she heard from Defendant for the last time, it ran five years later, in 2021. Indeed, the government knew about R.G. when the case was originally indicted on July 30, 2019. Had there been a mailing or a wire transaction, the government *would have* brought a mail fraud or wire fraud charge, but it did not. Why not? Because there were no mailings or wires.[12]

The SOL related to C.H. expired on December 15, 2017. The SOL related to P.H. expired on February 8, 2018. The SOL related to A.W. expired on February 18, 2019. As to D.W., the SOL expired on January 1, 2019.[13]

---

[12] R.G. met Harbour with the life insurance company's check at a Bank where the check was handed to the banker.

[13] ¶25 of the SSI missed the D.W. date by a whole year. D.W. hand delivered the check to Harbour on February 21, 2014.

Count 11 (A.W.) relates to a $7,500 check sent by Harbour's company, HighPointe Capital, to A.W.'s account at Liberty Trust on April 28, 2016. But, if there was a mail fraud or a wire fraud with respect to A.W., it was complete, as the cases we have cited in our companion SOL motion, indicate, when the object of the alleged fraud was complete, that is when Defendant got the money. A.W.'s money was obtained by hand-delivery on February 18, 2014. As indicated above, the SOL ran on February 18, 2019. We will anticipate the government responding by explaining why Count 11 should not be dismissed on SOL grounds and reply to the Response when we see what the government contends.

C.H.'s situation is similar. The government conceded that as to the combined P.H. and C.H.'s $500,000 (received via hand delivery of a cashier's check on February 8, 2013), the SOL expired. So why is C.H. $81,621.34 allegedly received even earlier, on December 15, 2012 not also barred by the SOL? We suppose that it is because the government contends that Harbour signed and handed to C.H. a check for $255 that she, evidently, mailed to the bank where her IRA was located. We can address at another time whether a mailing sent by the alleged victim meets the "mailed or caused to be mailed" element and we will address in our SOL motion whether the check somehow re-animated a SOL that otherwise ran in 2017.

**OTHER SURPLUSAGE**

All the verbiage concerning Harbour's wealth and spending needs to be excised from the Indictment. First, on a pedestrian level, none of it could possibly relate to the

Group of 5, except for $250,000 of Burg's loan.[14] The claimed exorbitant spending long pre-dated the obtaining of the funds from the Group of 5 and even most of the Group of 6. As to K.B. and P.C., the earliest of the Group of 6 (2007), the money did not remain with Harbour; in fact, as the evidence will develop (someday but, we believe not here and now), it was not even handed to Harbour but to others in Kansas City, agents, they claimed for Patrick Spaulding, that K.B. flew in to meet. As for R.G., the $1 million plus in life insurance proceeds she was hiding from her and her husband's judgment creditors had long before been absorbed into HighPointe Capital and was not even due to be repaid until 2020.

On a more esoteric level, the government's underlying contention is that, because Harbour lived the lifestyle described by the government, the victims were not repaid. This sophomoric assumption results from turning a completely blind eye towards the only reason that the first iteration of "payday" lending failed: The Department of Justice's Operation Chokepoint killed it, as was its intent and as the government conceded, nay, proclaimed, in Joel Tucker's Superseding Indictment.[15]

---

[14] Before it was needed by Green Circle, $250,000 of Burg's funds were used, as permitted in the Operating Agreement to pay OakTree expenses and Harbour advances to OakTree. Normally, in fraud cases, we would say that the Operating Agreement is simply a vehicle designed by the defendant to provide the ability to deceive the victim, but here, as is the case with other so-called victims, it was the so-called victim's own lawyer that drafted the paperwork.

[15] *See,* e.g., U.S. Congress. (2014a). "The Department of Justice's 'Operation Choke Point': Illegally Choking Off Legitimate Businesses?," Committee on Oversight and Government Reform Staff Report 113th Congress, (May 29). *http://oversight.house.gov/wp-content/uploads/2014/05/Staff-Report-Operation-Choke-Point1.pdf.*

The government knows that every so-called victim in the first iteration of payday lending was paid timely the interest payments due until the government shut down payday lending through Operation Chokepoint just as the government knows that everyone involved in the second iteration of payday lending (Green Circle) also got their interest payments on a timely basis until PAIF foreclosed Green Circle which collapsed the subordinated OakTree loans. And, to boot, the government also knows that all of the "victim" funds (obviously not including K.B., P.C. and R.G., who had nothing to do with Harbour's involvement in payday lending whatsoever) were sent along to where they were supposed to go. What the government continually misses is that it was not the money of the so-called victims that funded the lifestyle the government parades for reasons too obvious to need discussion; it was the payments made and also taken through the ACH accounts that the government "choked-off" at the "choke-point," that funded the lifestyle. But this was hardly a Ponzi Scheme. Given the crash of 2008-09, there was, in fact, an inexhaustible supply of people who needed immediate cash and those who were able to supply the money needed by those millions of Americans on a more or less continual basis made a lot of money. Until, that is, the Obama Administration, for unabashed political reasons, decided to impoverish the lenders to the benefit of the borrowers.

**CONCLUSION**

The relief required at this juncture is basically as broad as the government's intent to use evidence outside the actual charges and the verbiage needed to support the charges. There is no broad Federal statute criminalizing schemes and artifice of anything other

than against banks. This part of the overall case is about three alleged victims of wire fraud and two alleged victims of mail fraud. The case must be limited to what is charged as opposed to the very flawed, baseless, novel written by the government. The other two parts of the case need to be severed, as outlined in Motion #3. Only then can the Defendant get the fair trial(s) to which he is entitled. No spillover effect. Each case stripped to its essence with the government to prove that case beyond a reasonable doubt. No trying to portray the Defendant as having gotten (temporarily) rich off the *victims* when the government is perfectly aware that this never happened.

RESPECTFULLY SUBMITTED this 9th day of September 2022.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

### CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff

/s/ Yvonne Canez