GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249)
Assistant U.S. Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
kevin.rapp@usdoj.gov
Telephone (602) 514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-19-00898-PHX-DLR (DMF) |
| Plaintiff, | |
| v. | **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTIONS TO DISMISS [Docs. 444 and 445] AND MOTION TO BIFURCATE TRIAL [Doc. 446]** |
| David Allen Harbour, | |
| Defendant. | |

Defendant David Allen Harbour has filed three motions that erroneously seek to dismiss certain counts, remove "surplusage" from the second superseding indictment, and sever counts into a bifurcated trial. These motions are unavailing (and utterly confusing) and should be denied. These motions are contrary to prevailing law and misstate and misunderstand the evidence and facts. Defendant engaged in a series of uninterrupted and interrelated fraudulent schemes since 2007 that culminated in his indictment and arrest in August 2019. These schemes involved Defendant's violation of a number of federal statutes including fraud by the use of wires, of mailings, and by identity theft. In 2021, Defendant, undeterred by a multi-count federal indictment and his pretrial release restrictions, again defrauded the same 2007 victim by engaging in a real estate transaction in which he made misrepresentations to the lender and engaged in identity theft (by forging secured promissory notes), among other things. Defendant's frauds spanned 14 years, and

each scheme involves similar misrepresentations and omissions of material facts. In some cases, the schemes involve the same victims and actors that unwittingly promoted his fraudulent schemes. Each scheme has begat the next, as Defendant fraudulently induced old investors to invest in the next investment and also used new investors' money to make payments to earlier investors.

Throughout this time, Defendant diverted millions of dollars of investors' funds to live a lavish and sustainable lifestyle and avoided the payment of millions in federal income taxes. During the collection period of February 6, 2016, until IRS Criminal Investigation contacted the Revenue Officer assigned to Defendant on April 10, 2019, Harbour provided multiple false statements and obstructed the IRS from collecting on tax due and owing. Harbour's balance as of March 13, 2020, was $90,148.25; $500,432.53; $55,665.72; and $165,938.82 for tax years 2005, 2006, 2011 and 2012, respectively. Harbour continued to provide false statements and filed in tax court for the 2012 tax year. Eventually, an agreement was reached between Harbour and the IRS on October 23, 2018. The parties agreed that Harbour owed $2,339,629 in tax and an additional penalty of $467,925.80 for the 2012 tax year. As of June 21, 2021, Harbour owed $3,398,440.40 in tax, $539,277.94 in interest and $581,481.99 in penalties for a total balance of $4,519,200.42 for the 2012 tax year. Harbour's false statements were made to IRS Civil during 2016 – 2018. (*See* Doc 387; Counts 24-26) These false statements were made in relation to the tax years of 2005, 2006, 2011 and 2012.

Lastly, Harbour, from the very inception of the frauds, furthered his various schemes with the use of wires (*e.g.*, emails, text messages and phone calls, etc.) and mailings. Defendant's three motions should be summarily denied.

## RELEVANT FACTS

### A.  Defendant's Misrepresentations to Investors

Harbour engaged in 14 years of overlapping fraudulent schemes:

- The Pat Spaulding Fraud (2007-2012);
- The Rhonda Gray life insurance fraud (2010-2016);

- The KSQ Fraud (2011-2013);
- The Green Circle Fraud (2014-2018);
- Tax evasion (2007-2016); and
- The Georgia Fraud (2021).

These interrelated frauds included the following similar misrepresentations:

- That the investor would receive a high rate of return ranging from 18% to 25%.
- That Harbour had been successful with previous similar investments. He wasn't.
- That he had invested his own money into the investment. He didn't.
- That many of the important documents involve forgeries by Harbour or he otherwise assumed the identity of someone else (*e.g.*, assumed the identity of the deceased Pat Spaulding, forged both contracts (the Gray Fraud) and secured promissory notes (Georgia Fraud), etc.
- That an investor would be the only one to have Harbour's personal guarantee in the event the investment was unsuccessful. Harbour acknowledges that he had $20,000,000 in personal guarantees in May 18 , 2016.[1]
- Once the investment failed, Harbour would represent to previous investors that he was starting a new scheme, in an industry (unbeknownst to the investor) that Harbour knew nothing about, and that Harbour would represent would make good on the investor's previous failed investment.
- When sued by an aggrieved investors, Harbour would settle the case with a payment schedule, make one or two payments and then default on the settlement. Or, Harbour would convince the investor to forgo filing a civil case with promises that he would return the funds.
- Harbour provided an array of excuses for not paying investors as promised, blamed other individuals for the lack of funds, or blamed the government. This

---

[1] *See* Harbour interview, FBI 302, HARBOUR 051041-051042

included blaming the deceased Pat Spaulding, Joel Tucker, Operation Chokepoint, ocean-floor cables that had been cut, etc.

- That Harbour would return the investor's money once an asset was sold. He never did.

**B.  Defendant's Omission of Material Facts from Investors**

In addition, each of Harbour's frauds included not only misrepresentations but the following omissions of material facts:

- That Harbour, by his own admission, knew nothing about the actual day-to-day operation of the business of payday lending. His role was only to find investors, receive an exorbitant commission concealed from the investor, and when the scheme failed, blame it on someone else or on the government.

- That his own financial situation was dire: Harbour had subprime credit, a primary residence in some stage of foreclosure, substantial unsecured debt, IRS tax lien notices,  was unable to qualify for a credit card (the American Express cards that he and Abby Harbour used was guaranteed by a former girlfriend) or even qualify for any financing.

- That he was diverting investor funds to pay off substantial personal credit card debt for lavish personal expenses (*e.g.*, jewelry, travel, private box seats suites at sporting events, expensive birthday parties (for him and his children), a private concert by the 1970s band the Eagles, the use of private jets, etc.).

- That he was using new investor funds to pay off earlier investors with *Ponzi* payments.

- That KSQ (a partnership between now-convicted Joel Tucker and Harbour) was under investigation by both the Securities and Exchange Commission, ("SEC") , the Federal Trade Commission ("FTC") and the Federal Bureau of Investigation ("FBI"). None of the investors in the subsequent Green Circle (payday) lending scheme were advised about these multiple civil and criminal investigations.

**C. The Pat Spaulding Fraud: Victims Kenneth Bobrow and Pam Case.**

In 2007, Harbour approached the then-69-year old Kenneth Bobrow ("Bobrow") to invest $2.5 million.[2] Harbour represented that the investment would obtain a high rate-of-return and would generally be invested in the "Dollar Stores and student housing located in Kansas." Harbour represented to Bobrow that he had loaned the money to an individual named Pat Spaulding and entered a promissory note with Spaulding on July 27, 2007.[3] Instead, Harbour forged Spaulding's name on the promissory note—Spaulding's mother and sister both confirmed that it was not his signature. (Ex. A) In addition, the signatures appears suspiciously like Harbour signed it. Harbour told both Bobrow and Bobrow's then-wife, Pam Case, that they would receive 18% return on their investment. Case invested $200,000, but never received any return at all. Harbour blamed the loss on Spaulding.

In truth, Spaulding was a Kansas high school acquaintance of Harbour who was not only not involved in the private equity investing but worked as a laborer in the moving industry. (*Id.*) During the time of the supposed investment, Spaulding resided in Washington State, not Kansas, and was convicted in Washington State for heroin possession on March 5, 2006. According to online obituary, Spaulding died on July 27, 2009. Harbour conveyed his condolences at the time.

Four years after Spaulding's death, Harbour directed Carol Hill[4] to send Spaulding an email (constituting wire fraud), threatening Spaulding with litigation if he did not honor the promissory note. (Ex. B) As noted above, Spaudling had died in 2010, and the email address to which Hill was directed to send in 2014 was established in 2014 at a location one mile from Harbour's address.[5] Harbour also sent Bobrow a memo outlining how he intended to make good on the Spaulding note, including by providing proceeds to Bobrow

---

[2] Harbour defrauded Bobrow 14 years later when he was 83, via the Georgia mortgage fraud that was the subject of Harbour's pretrial release violation.

[3] HARBOUR-042441-042444.

[4] Hill was Harbour's administrative assistant from 2009 until his arrest. She interacted with the various investors including Bobrow, Gray, Turasky, Burg, and others. Hill lost $581,000 to Harbour in the KSQ fraud. *See supra*

[5] HARBOUR-042333-042334.

once they were paid by Spaulding.[6] Harbour did so knowing that Spaulding was never involved in this investment and had died four years prior. Notably, Harbour refused to provide either Bobrow or Case any location or contact information for Spaulding.

As was typical, Bobrow and Case sued Harbour, and Harbour entered into a settlement with Case wherein he agreed to pay the funds he owed to her on a monthly basis. As for Bobrow, Harbour entered into tolling agreements to delay Bobrow from filing a lawsuit.[7] Harbour made a few payments to Case (likely sourced from subsequent investors) and then defaulted on the settlement. Like his subsequent fraud schemes, Harbour used wires to further the scheme (*e.g.*, numerous emails, text messages and phone calls). Harbour made various payments to Bobrow over the years totaling $2.2 million. These payments were less than Harbour agreed to pay, and it is unclear where these funds came from, although Harbour did obtain $1,000,000 from Gray during this time frame. *See supra*

### D. Rhonda Gray Life Insurance Fraud

As the court may recall Harbour has previously challenged the inclusion of Rhonda Gray("Gray") as a victim by moving to dismiss her from the forfeiture allegation. (Doc. 98) The court denied that motion. (Doc. 132) Importantly, the government's response details the numerous communications by wires (*e.g.*, emails, text messages and phone calls). (Doc. 108 ) From 2010 until 2016 Harbour misleads Gray about the existence and location of the $1,000,000 she unwittingly gave to Harbour believing he was a trusted investment adviser. In 2016, after Gray attempted to confront Harbour over the whereabouts of her money he ceased all contact.

Importantly, during the same time frame that Harbour defrauded Case and Bobrow (2007-2012) he defrauded Rhonda Gray out of a $1,000,000 of life insurance proceeds. As detailed in previous pleadings Gray, similar to Case (and Hill for that matter), was unsophisticated with investments and distraught by the sudden death of her husband and

---

[6] HARBOUR-042451-042452

[7] Harbour and Bobrow Workout Agreement, October 23rd, 2014 and Amended October 18th, 2016.

was referred to Harbour for investment advice. (Doc. 108) Initially, Harbour, acting in the capacity of an investment adviser, was able to convince Gray to enter into a contract where he would provide her "legal entity design, tax compliance and evaluation, liability and insurance protection, financial product assistance, decision making, income recognition, and cash flow producing investments."[8] Similar to the Pat Spaulding Fraud Harbour forges his business partner's, Robert Eckholt. signature. (*See* Doc. 108, Ex A, pp 4-5; Ex. C ; deposition of Eckholt, pp. 58-63 ) The fee for Harbour's services was listed in the contract as $10,000 a month, payable on the first day of each month. Gray paid Harbour $80,000 for a period of eight months. It is unclear what services, if any, that Harbour performed to justify his exorbitant monthly fee in light of Gray's financial situation after her husband's passing.

In any event, once Harbour gained Gray's trust, he convinced Gray to provide the $1,000,000 in life insurance proceeds. He misrepresented that he would make a 3% return for Gray and then they would split the returns over 3%. Harbour failed to provide any document that memorialized this agreement. At her children's urging Gray requested that Harbour provide her something in writing that confirmed that he was managing her $1,000,000. Similar to his other fraudulent agreements with investors Harbour provided a document that indicated that the $1,000,000 was a loan to Harbour when it wasn't. From 2010 until 2016 Harbour refused to return to Gray her money even when she demanded the return the funds for various expenses including medical bills for her dying mother. Harbour made various claims as to what he did with the money including that it was invested in a hospital, was in an off-shore account in the Cayman Islands, or even placed in his mother's name.

When Gray demanded the return of the money Harbour came up with various excuses including blaming it on a cut wire that ran under the ocean, vaguely referring to Operation Choke point, or that he did not want to return it in a lump as it would

---

[8] Ex. C, Ex. 3.

"draw the attention of the government." (Doc. 108) [9] Significantly, Harbour, at one point, represented that he had invested Gray's money in payday lending. During this same time frame Harbour stole Gray's life insurance proceeds (2010-2016) he was also operating the KSQ fraud with Joel Tucker starting in 2011 and then, after KSQ collapsed based on Tucker and Harbour's fraud, Harbour commenced the Green Circle fraud from (2014-2016).

Harbour committed the fraud on Gray in a variety of ways. First, he made romantic overtures toward Gray who was vulnerable after her husband's suicide. These overtures are detailed in a number of text messages and voicemails where Harbour proclaims his love for Gray. (See Doc. 108, pp. 5-6) [10] Eckholt observes Harbour flirting with Gray and did not view it as a normal investment adviser -client relationship. (Ex. C. pp 52-53) He also exchanges an explicit text message with Gray referencing oral sex. [11]

Whenever Gray would question Harbour about the location of her money Harbour would insist on taking her to an expensive Scottsdale restaurants in an effort to placate her concerns while portraying himself as her trusted investment advisor, confidant, and that he loved her. Unbeknownst to Gray, Harbour was married at the time and had children. From 2010, Harbour provided Gray numerous excuses as to why he was unable to return her $1,000,000. After numerous emails, phone calls, text messages (all furthering his fraudulent scheme) and in person meetings Harbour returned Gray $67,000. In sum, it is unclear what Harbour actually did with Gray's $1,000,000 but during this same time frame Harbour made the following expenditures:

- Returned to Bobrow $2.2 million.

---

[9] Harbour's attorneys have at various times referenced Operation Choke point as a reason the payday lending scheme known as KSQ was unsuccessful. There's no evidence that this Operation impacted Harbour's fraud but it doesn't explain why Harbour continued on with the payday lending scheme with the Green Circle fraud *after* Operation Chokepoint was in effect.

[10] *See* voicemail from Harbour to Gray, dated 11/1/16 (Disclosure 1).

[11] HARBOUR-047943

- $7,257,601.67 of AMEX payments from 2010 to 2016.[12]
- Expensive Jewelry (including a $60,000 watch and six carat ring) was purchased between 12/03/2003 – 12/01/2013.[13]

In sum, Harbour through text messages, emails and phone calls misrepresents to Gray that her $1,000,000 is comingled into another investment similar to KSQ and Green Circle. (Doc. 108, pp. 5-6) Harbour portrays himself as being involved in a hedge fund, a "$25 million facility", and that he is constantly traveling, and busy meeting with investors. (*Id.*) In reality, Harbour fails to disclose his true financial picture which was deteriorating as his house was foreclosing, he was facing IRS tax liens, and lawsuits from other investors are mounting. He also fails to reveal to Gray that during this time frame Harbour is being investigated by the SEC[14], the FTC[15],and the FBI contacted Harbour about Tucker's fraud,[16] and various complaints are being lodged against KSQ from a number of state Attorney Generals.[17] Again, Harbour discloses none of this to Gray or any investor for that matter.

**E. Carol and Pat Hill, Allison and Dan Wilson, Joe Cathay: KSQ Fraud**

The KSQ fraud commenced in 2012 during the same time frame that Bobrow, case and Gray were demanding return of their funds. Importantly, it is during the same time frame that Harbour continued to misrepresent to Bobrow, Case and Gray that he was unable to return their funds. Bobrow is expected to testify that Harbour approached him to invest in KSQ but due to the fact he had not returned his funds from the Pat Spaulding fraud he

---

[12] AMEX statements; HARBOUR-023841:HARBOUR-025946 (January 2009 – August 2017).

[13] HARBOUR-047041: 047059.

[14] Harbour asserts his Fifth Amendment right against self-incrimination in response to questions by the SEC. A fact that was never disclosed to any investors. It is likely that various other civil cases were stayed (including Gray's) due to the possibility that Harbour would invoke the Fifth Amendment.

[15] Harbour is questioned about KSQ in an under-oath deposition and

[16] *See* Harbour FBI 302, HARBOUR 051041-051042.

[17] *See* Harbour FTC Deposition, HARBOUR-048494- 048803

demurs.[18] Again, after years of stonewalling Gray's request to return her money, she is told that her money was invested in a payday lending scheme similar to that of the failed KSQ and later Green Circle.

Harbour, working with Joel Tucker, solicits more than 20 investors to invest with Tucker. The KSQ fraud is perpetrated between 2012 and 2014. According to the Receiver assigned to the FTC case, Harbour verifies he received the $6.6 million in his response to the FTC complaint. According to his bookkeeper Laura Purifoy ("Purifoy") Harbour fails to disclose his commissions to investors.[19] Purifoy also is expected to testify that when Harbour made interest payments to investors the monies came from other investors. (*Id.*) Carol and Pat Hill invested their life savings of $581,000 with Harbour. Pat Hill provided $500K to Harbour's DNA Investments in February 2013 and the same day, a wire in the amount of $500K was sent from DNA Investments to KSQ. On February 11, 2013, KSQ wires $125K (which happens to be 25% of $500K) to DNA Investments. Harbour details his responsibility (or lack thereof) for the investor funds in a startling admission during an under-oath deposition by the FTC where he acknowledges that despite being a two thirds owner of the company but knew nothing about the operations of the business.[20] He characterizes his role of "just finding the money." (*Id.*)

It is also significant that Harbour was involved with Joel Tucker in payday lending. Harbour is alerted to the fact that Joel's brother, Scott, who was also operating a pay day lending scheme was under investigation.[21] Harbour is questioned about the fact that there was an expose on Scott Tucker's scheme on CBS. Harbour receives numerous emails about customer complaints regarding the pay day lending scheme, but he never discloses these

---

[18] *See* Ex. 12, Bobrow MOI, dated 12/20/2021, ¶ 11.

[19] *See* Purifoy MOI, dated July 15, 2020, HARBOUR 047530- 047536

[20] Harbour FTC Deposition HARBOUR-048494- 048803.

[21] Scott Tucker (and his attorney) were prosecuted for the a payday lending scheme resulting in their convictions and lengthy prison sentences. The scheme was detailed in the Netflix documentary Dirty Money. https://www.kansascity.com/news/local/crime/article194154579.html

1   complaints to investors. [22]

2      Harbour convinced Hill to liquidate a $81,000 of her Individual Retirement Account

3   ("IRA"). He did this by convincing her to transfer her funds to a self-directed IRA company

4   known as IRA Plus Southwest, LLC. [23] In addition, Harbour learned that Hill's husband,

5   Pat, had inherited $500,000. Harbour convinced him to invest that money with Tucker. Hill

6   lost the entirety of the money. Although the money was invested with Harbour in 2012.

7   The fraud persists for several years that included Hill continuing to mail IRA fees at

8   Harbour's direction. (*See* Doc. 154, count 11.) Count 11, dated April 22, 2016, is a mailing

9   within the five years statute of limitations. 18 U.S.C. §3282.

10      Similarly, Harbour defrauded Alison and Dan Wilson out of $200,000 ($100,000

11   each). Again, Harbour convinced Alison Wilson to open an account with self-directed IRA.

12   Harbour in turn sent that money so he was able to funnel Wilson's otherwise safe IRA to

13   Liberty Trust Company based in Texas. Harbour continued to perpetuate the fraud by

14   mailing $7,500 to Liberty. (*Id*. at Count 12) [24] Harbour never discloses to the Wilsons the

15   various investigations and complaints he is receiving involving KSQ. Indeed, the Wilsons

16   don't even know where Harbour is investing their money.

17      Harbour is sued by both the FTC and SEC based on his involvement with Tucker.

18   [25]He intentionally fails to disclose this fact to subsequent investors in Green Circle, neither

19

20          [22] HARBOUR-048494- 048803

          [23] HARBOUR-039874:039883

21          [24] In November 2021, two months prior to a January 2022 trial date. Attorney Alan
22   Baskin, at Harbour's direction, approached Wilson's attorney in an effort to pay her off so
     that she would not testify against Harbour at the upcoming trial. The witness tampering
23   involving Turasky, Hill, Burg, the Wilsons will be subject of a motion in limine prior to
     trial. In sum, Allison Wilson has now repudiated the Harbour prepared statement (that she
24   refused to sign under oath) in exchange for her not testifying at trial. Allison Wilson
     considers her to be a victim, believes that Harbour defrauded her, and is expected to testify
     that Harbour deceived her about  her investment with him  at the upcoming trial.

25          [25] The SEC filed a Complaint in the District of Arizona on July 31, 2018 against
26   Harbour. (SEC complaint 040734-040747) In the Complaint, the SEC alleged that Harbour
     raised funds in connection with raising funds for the purpose of financing of payday
27   lending. However, instead of directing the money to revenue-generating businesses that
     could achieve the high returns he promised, Harbour used substantial portions of the
28   invested funds to finance his personal lifestyle and pay off his personal debts. Harbour
     ultimately used $1,535,000 of the $2,450,000 that he raised from four investors to pay his

does he disclose that he was contacted by the FBI regarding Tucker in 2016.[26]

### F.  Harbour's Tax Evasion, False Statements to the IRS and Obstruction

Relevant to Counts 24-26 , on April 14, 2016, assigned IRS Collection Revenue Officer K. Groenenboom ("Groenenboom") received Harbour's signed Form 433-A and financial documents.[27] Harbour indicated he grossed $50,000 per month in income from his consulting business, Milagro Consulting and paid $37,330 in business expenses and an additional $40,665 in personal expenses for a difference of -$27,995. According to bank records, Harbour deposited $4,972,799.76, or an average of $331,519.98 per month from January 2015 – March 2016, which is approximately $281,000 per month more than he listed on Form 433-A.

Harbour did not disclose other bank accounts to Groenenboom on the April 2016 Form 433-A. These accounts were held in his personal name, one of his businesses, and a nominee's account that he had control over. The total amount of funds deposited from January 2015 through March 2016 was $4,972,799.76; with an average monthly funds deposited into all accounts (including all disclosed accounts) of $331,519.98. Nontaxable inter-account transfers were not included in this calculation, other than $199,000 deposit from Pujanza BMO x5244. This deposit is traced from the $1 million victim investor, Mark Burg, provided Harbour.

In sum, Harbour willingly did not disclose the funds he stole from investors as income. This included the funds he stole from Burg to pay his AMEX bill as well as, $250,000 taken from investor Charlie Wear for the down payment ($150,000) for the Martingale property. [28] Neither investor authorized their investment funds to be used for

---

personal expenses and pay off his debts.. Again, Harbour invoked the Fifth Amendment when questioned in a SEC deposition.

[26] Harbour FBI 302  HARBOUR 051041-051042

[27] Form 433-A is used to obtain current financial information necessary for determining how a wage earner or self-employed individual can satisfy an outstanding tax liability.

[28] Harbour was arrested in August 2019 at the Martingale residence. He was evicted shortly thereafter. Both Harbour and his in-laws (the Gotttchalks )who guaranteed the rental agreement. Both the Harbours and the Gottchalks  were sued by the real owner based

Harbour's personal expenditures. Similar to embezzlement cases, the funds were used as income proceeds by Harbour.

On April 14, 2016, Groenenboom requested Harbour produce additional records for the accounts listed on Form 433-A. On May 16, 2016, Groenenboom received a fax from with Harbour's attorney with additional records. These records included Abby Harbour's Charles Schwab Roth IRA account #3807-3577, valued at $492,472.39 as of December 31, 2015; Abby's Chase bank account #799359018 that indicated $260,464.44 was deposited during the month of February and childcare expenses of $4,000 per month paid by AJS Management (AJS). Upon review of Abby's Chase account ending x9018, Groenenboom noticed a payment of $92,091.95 paid to American Express on February 8, 2016. Groenenboom noted in the Inventory Control System (case history file) that Harbour did not disclose an American Express account on the Form 433-A.

On June 6, 2016, Groenenboom received the statements regarding the Abby American Express card, indicating purchases for grocery, floral, athletic club, airfare, clothing (Nordstrom, Dillard's, Saks, Neiman Marcus), Amazon, dining, and gymnastics.

Harbour did not disclose his American Express card to the IRS. As stated above, initially there was no American Express account disclosed to the IRS until Groenenboom discovered the transaction on Abby's (also initially undisclosed account) Chase x9018. Upon request for documents from Groenenboom, only Abby's card information was provided. In reality, Harbour used an American Express card as well and all of the cards, including Abby's, were tied to nominee account holder and former girlfriend, WY. [29]

In an interview with Special Agents, WY stated she was a former girlfriend of Harbour and they had made an agreement regarding Harbour's use of WY's American Express account. WY would allow Harbour to use credit cards in his and Abby's names which were tied to WY's American Express account; in exchange, Harbour was responsible for all payments to the credit card account, including purchases made by WY.

on Harbour defaulting on the rent, among other things.

[29] (*See* Doc. 82, Ex. D; FBI 302, WY)

Harbour had online access to the credit card statements and had the American Express statements sent to his office in Arizona. Harbour directed his staff to hide the statements upon arrival at his office and for his employees to not disclose anything in regard to WY's involvement or ownership of the account to Abby.

Analysis of the American Express card account revealed the following: purchases for Abby's card for the period of January 2016 – May 31, 2016 totaled $84,312.41. During this same time period, Harbour would have been responsible for the total of $277,260.00 in purchases on all of the American Express cards. Harbour paid at least $679,443.50 during the 10 months (June 2015 – March 2016) prior to signing the Form 433-A and continued to pay an additional $987,496.02 to the American express from April 2016 through his final payment of $57,718.92 on June 1, 2017. \

During this same time period Bobrow, Case, Gray, the Wilsons, Burg, among other investors, were asking for a status of their investment. PAIF (who provided Harbour a credit line for Green Circle) was also inquiring of the flow of funds after receiving a subpoena from the SEC regarding Harbour. Harbour directed Purifoy to produce a spreadsheet *via* email on June 23, 2016 that detailed the return of investment payments to Capital Investment Fund I (Richard Turasky), KC Lending, and [the] Joplin Group. This was a false statement as it indicated significant payments to investors, such as $350K to Capital Investment Fund I. Turasky has sued Harbour and the court entered a default judgement in favor of Capital Investment I on February 15, 2018.

In sum, although during the April 26, 2017 meeting Harbour stated he did not have a job and only $1,900 in a bank account, an analyzation of the American Express activity for January 2017 – April 2017 revealed $277,706.49 in payments.

In the final analysis, Harbour had the ability to pay his tax liabilities (and the monies owed to investors), but he chose to use monies to fund a lavish lifestyle. Harbour (and his wife) were financially responsible for over $6 million in credit card transactions from December 2011 – June 2017 via a nominee-held American Express account that was not disclosed to the IRS.

- 14 –

As part of the FTC investigation referenced above, the Receiver assigned to the case detailed in a filing that the Harbours had received over $6 million in proceeds from various individuals that was largely spent on personal, lavish expenditures. In a response to the FTC filing, the Harbours did not dispute that they had received the funds; however, they had spent the money. The Harbours eventually settled with the FTC for a fine of $750,000. Not surprisingly, Harbour diverted money from Green Circle to satisfy the FTC penalty.

Subsequent to his arrest in August 2019, Harbour immediately contacted various golf resort communities, where he held memberships.[30] Harbour attempted to liquidate these memberships and receive the cash value. At any point in time during the IRS collection activity, Harbour could have cashed-out these memberships. The value of these assets, nor their existence was ever disclosed to the IRS.

As stated above, Harbour's agreement with WY allowed he and Abby (it's unclear if Abby knew about WY and that her credit card was guaranteed by Harbour's former girlfriend ) to use American Express credit cards that were in their name and tied to WY's account, and in return, Harbour would be responsible for the all the American Express balance (to include Yaeger's American Express purchases). From December 13, 2011 through July 17, 2917, the American Express account reflected $ 6,485,806.56 in credits and $6,597,984.81 in debits. In sum, Harbour, similar to his various fraud schemes, misrepresented to the IRS that he had no money, was sheltering his wife's trust while paying $250,000 in credit card bills with investor funds.

### G. Green Circle Fraud: Richard Turasky and Mark Burg

Around 2014, Harbour began a business investment relationship with a Native American-owned entity known as Green Circle. Harbour solicited some of his previous investors and convinced them to invest in Green Circle. Harbour told some of the investors who lost money in the KSQ scheme that he would be able to repay them with substantial returns on investments with Green Circle. In addition, during text messages with Gray he

---

[30] *See* SEC Depositions and FBI 302s of Dunsworth, Wear, Burg and Turasky.

references that her (2010) investment is now in a similar investment to Green Circle. (Doc. 108) Some of these investors, in an effort to recoup their losses from KSQ, decided to invest in Green Circle and sent their investment funds directly to Green Circle bank accounts instead of providing the funds directly to Harbour's entities similar to the KSQ venture.

In addition to the KSQ investors, Harbour raised funds from new investors (in part to make Ponzi payments to earlier KSQ investors) for the Green Circle venture. Similar to the previous investment schemes, Harbour utilized promissory notes to record the financial transactions and, in some instances, signed personal guarantees. The major difference in Harbour's actions between the KSQ scheme and the Green Circle scheme was that he kept a portion of the investor's funds that were invested and only provided a portion of the funds to Green Circle. Unlike KSQ, instead of receiving his finder's fee on the back end, he took it on the front-end. Again, investor-victims did not know that Harbour was keeping a large percentage of their investment funds for his own personal compensation, nor would he have been authorized to do so.

In some instances, Harbour continued to randomly make Ponzi payments to some of the investors with other investors' funds or from sources that were not from the investment vehicle. Victim Mark Burg, who did not invest in KSQ, was convinced to provide Harbour $1 million for investment into Green Circle. Harbour only provided $600,000 to Green Circle and used the remaining $400,000 to make payments to his American Express credit card and for lavish family vacations, among other personal expenditures. Another investor, victim Turasky, invested $500,000, and only $55,000 went to Green Circle. Similar to Burg's funds, Turasky's funds were used to pay the balance on Harbour's American Express credit card and to make *Ponzi* payments to other investors. Despite Harbour's representations regarding the return on investment, Turasky received only minimal interest payments of $64,571.27. For investor Burg's $1 million investment, he received only $65,000 in wire transfer payments from Harbour's Pujanza Management bank account from June 2015 to January 2017.

During the Green Circle fraud scheme, Harbour transitioned from raising individual investor funds to securing a Revolving Credit Promissory Note, executed June 19, 2015, for Green Circle from FinTech Financial, LLC (all of FinTech's interest was assigned to Princeton Alternative Income Fund (PAIF), an investment fund established on June 25, 2015). PAIF provided funds *via* draw requests to Green Circle for payday loans. The draw requests were submitted by Green Circle employees and were reviewed by PAIF prior to funding. Per the agreement, Harbour had to provide certain financial information to PAIF for their review that would be material to the funding decision for each draw request. Defendant Harbour misrepresented the financial condition and operations of Green Circle. PAIF began funding Green Circle in July 2015.

From the beginning of the business arrangement with PAIF, Harbour manipulated the records to his advantage in order to entice PAIF to fund the draw requests. [31]The records included a spreadsheet that gave a false impression of the lending portfolio and the status of Green Circle. (*Id.*) For example, per the guidelines of funding, customers who were in arrears with the Green Circle payday lending were barred from receiving any new loans. Instead, Harbour issued new loans to the borrowers who were about to go into default, which absorbed the old loans. Harbour misrepresented to PAIF that Green Circle was a functional and profitable portfolio and that the loans were performing and not in default. PAIF relied on this information for their lending decision and would not have provided funds if the borrowers' loan status was accurately represented. Harbour never disclosed to investors that the loans were non-performing. Harbour's business relationship ended with Green Circle upon PAIF learning of a SEC investigation into Harbour and the raising of investment funds for Green Circle.

**H. The Georgia Fraud: Kenneth and Victoria Bobrow**

Fourteen years after Harbour defrauded Kenneth Bobrow (and his second wife Pam Case) Harbour once again defrauds Bobrow and his third wife Victoria Bobrow in what is

---

[31] *See* Purifoy FBI 302, HARBOUR 47530 – 047536.

known as the Georgia transaction. In this fraud Harbour's wife, Abby, becomes a willing accomplice. Abby is the one who approaches the Bobrows to make the $140,000 investment, lies to them that she is putting in $100,000 of her own money into the investment, presents them with a false gift letter for them to sign, learns from Harbour that he had forged the secured promissory notes and conveys that fact to Bart Shea.

In any event, this Court well is well aware of the facts of this fraud has it was laid out in a multi-day evidentiary hearing before Magistrate Judge Fine who found that Harbour had violated his release conditions by, among other things, committing various frauds in the Georgia transaction. (Doc. 346)(" the Court finds that probable cause has been shown that Defendant Harbour conspired to commit wire fraud, bank fraud, and false statement on loan and credit applications in violation of 18 U.S.C. §§ 371, 1014, 1349, 1343, and 1344.") Following Magistrates Judge's finding a Grand Jury indicted Harbour with crimes related to that transaction. (*See* Doc. 387; Counts 27-34). This Court concluded that. " because a grand jury, after evaluating the evidence, found that probable cause was proven as to the alleged crimes, the Court finds that probable cause has been shown to exist as to those offenses alleged in Counts 27 through 34 of the Superseding Indictment, alleged to have occurred while Defendant was out on release." (Doc. 427)

Importantly, the Georgia Fraud contains the same hallmarks of the previous frauds dating back to 2007. *First*, it involved one of the same victims as the Pat Spaulding fraud, Bobrow. *Second*, it involved the forging of documents (identity theft) similar to the Spaulding Fraud and the Gray Fraud. *Third*, it involved a purchase of an asset (the Georgia residence) where Harbour puts none of his own money toward the acquisition but reaps all the benefits. *Fourth*, Harbour orchestrates this muti-million dollar transaction in keeping with Harbour's veneer of success when in reality he is destitute. In sum, the recent Georgia transaction is an extension of Harbour's protracted 14 history of deception that is the culmination of interrelated frauds

## LAW AND ARGUMENT

**A. Harbour's Motion to dismiss or alternatively strike surplusage from the**

**Indictment and Motion should be denied.(Doc. 444 and 445)**

Harbour seeks to dismiss claims in the second superseding indictment ("SSI") because he argues that they are barred by the five- year statute of limitations. (Doc. 444) He also moves to strike surplusage from the SSI. The Government has identified no published cases within the Ninth Circuit that have addressed a motion moving to strike surplusage under Rule 12(b)(3). This corresponds with Defendant's failure to cite even a single case or to set forth a standard by which the Court should evaluate potential surplusage in an indictment that will not be seen by the jury or used to prove the Government's case.

The balance of the motion sorely misunderstands the law. As detailed above Harbour engaged in a 14- year scheme to defraud various investors. As this was an ongoing scheme that involved wires and mailings to further the scheme it is only required that certain counts fall within the applicable statute of limitations. The money stolen from Bobrow, Case and Gray allowed Harbour to continue to defraud investors by using their money to perpetuate Harbour's veneer of success in an effort to entice other subsequent investors. He also used their money to make *Ponzi* payments to other investors. And, in turn used subsequent investors funds to make modest payments to Bobrow, Gray and Case then cease all payments entirely.

Because Harbour's conduct constitutes a continuing offense, acts perpetuated on Bobrow, Case and Gray (2007-2016) that would normally fall outside the statute of limitations can be considered as his ongoing to scheme to defraud. In all cases Harbour perpetrated his fraud by the use of wires (*e.g.*, text, emails, phone calls) and the mails.

For example, both Wilson and Hill's initial investment is outside of the statute of limitations but the mailings to keep the self-directed IRAs (Counts 11 and 12) are committed at Harbour's direction to further his scheme and to make them believe their investment was safe.

Although unpublished and cited by Defendant, *United States v. Sebero*, No. 08-CR-185-JLQ, 2009 WL 720953, at *2 (E.D. Wash. Mar. 16, 2009),, favors the Government. In

*Sebero*, the court concluded that the statute of limitations did not begin running while the defendant continued to receive benefits from his scheme to defraud. *Id.* While Sebero "did not make affirmative representations during the statutory period, . . . the benefits he received would not have been wired but for his affirmative representations to the VA." *Id.*

In addition, *Carroll v. United States*, 326 F.2d 72, 86 (9th Cir. 1963), which is distinguished by *Sebero*, was also distinguished by the Ninth Circuit itself in United States v. Brown, 578 F.2d 1280, 1285 (9th Cir. 1978). The *Brown* court held that "mailings of purported monthly payments to the purchasers of the land contracts, in our view, constitute an integral part of the transaction which the court found to be fraudulent." *Id.* Brown, similar to Willson and Hill's initial investment, concluded that even though the contracts were not signed within the limitations period, the securities fraud charges against Brown were not barred. *Id.* The Brown court specifically noted that "In analogous prosecutions under the mail fraud statute (18 U.S.C. s 1341) activities tending to lull investors, either to prevent discovery of fraud or to permit further fraudulent activities to progress unhindered, have been held to constitute a part of the execution of the fraudulent scheme and to be integral to the offense rather than incidental to it." *Id.* (citing *United States v. Sampson*, 371 U.S. 75 (1962); *United States v. Ashdown*, 509 F.2d 793 (5th Cir. 1975)). Here, Defendant has done exactly this, continually leading his investors on, either with the promise of a new, more successful investment, by making *Ponzi* payments, or by (in the case of Wilson and Hill) directing them to keep the self-directed IRA accounts viable, preventing them from discovering his fraud and recovering their "investments."

When an offense is continuing, the corresponding statute of limitations period begins once all elements of the offense are established, regardless of the continuous behavior. *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). The elements of wire fraud are (1) a scheme to defraud, (2) use of the wires in furtherance of the scheme and (3) a specific intent to deceive and defraud. *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001)(In general, to be in furtherance of a scheme to defraud, the charged mailing or wire transmission need not be an essential element of the scheme, just a step in the plot. 18

U.S.C.A. §§ 1341, 1343.) The Ninth Circuit has stated that wire fraud is a continuing offense. *United States v. Pace*, 314 F.3d 344, 350 (9th Cir. 2002).

Harbour's acts from 2007 onwards are relevant and essential to proving his fraud even outside of the statute of limitations because his conduct is charged as a continuing offense. A continuing offense involves (1) an ongoing course of conduct that causes (2) a harm that lasts if that course of conduct persists. *United States v. Morales*, 11 F.3d 915, 921 (9th Cir. 1993). Unlike most crimes, it is only after this course of conduct is complete that the crime "is complete" for statute of limitations purposes. *United States v. Holden*, 806 F.3d 1227, 1231 (9th Cir. 2015 (citing *Toussie v. United States*, 397 U.S. 112, 115 (1970)). An offense is continuing when either (1) the explicit language of the substantive criminal statute compels such a conclusion or (2) the nature of the crime involved is such that Congress must assuredly have intended that it be treated as continuing one. *Toussie*, 397 U.S. at 115. Wire fraud (and mail fraud for that matter) is a continuing offense. *Pace*, 314 F.3d at 350.

In *Pace*, the defendant was charged with wire fraud, among other crimes, such as money laundering and prosecuted in the District of Arizona which ultimately led to a conviction. *Pace* at 347. The defendant appealed based on lack of venue. *Id.* at 348. The government argued that venue was proper as wire fraud is a continuing offense and the scheme began or continued while the defendant was in Arizona. *Id.* at 348-49. Here, venue is not an issue, but *Pace* sets forth Ninth Circuit law on wire fraud being a continuing offense. *Id.* at 350.

In *Holden*, the defendant was convicted of thirty-two counts of health care fraud. *Holden*, 806 F.3d at 1229. He appealed claiming the actions were time-barred under the statute of limitations, while the district court permitted the altering of the indictment so that certain counts would be merged into a single, continuing offense. *Id.* at 1231. In holding that the district court did not err in allowing health care fraud to be charged as a continuing offense, the court identified that the "clock" for the statute of limitations for a continuing offense begins once the persisting course of conduct which makes the offense continuing

1   is completed. *Id.*

2   Here, Harbour's schemes can be appropriately charged as a continuing one. As

3   detailed above, Harbour continued to engage in a fraud- scheme –all conducted in the same

4   manner for many years. The various schemes had the same misrepresentations, omissions

5   of material facts, and, in some cases, victims. Simply put, these schemes had the same

6   common denominators, meaning they were a part of Harbour's ongoing course of conduct

7   which continued to harm the victims as the conduct continued. *Morales*, 11 F.3d at 921.

8   These factors alone push Harbour's case into the continuing offense category from *Toussie*,

9   and the Ninth Circuit's statement in *Pace* that wire fraud is a continuing offense. The court

10  in *Pace* pointed to 18 U.S.C. §3237 to determine that wire fraud is a continuing offense.

11  *Pace*, 314 F.3d at 350. The relevant statutory language is "Any offense involving the use

12  of mails…is a continuing offense." 18 U.S.C. §3237(a). Although this language does not

13  explicitly mention wire fraud, the Ninth Circuit in *United States v. Garlick* stated that the

14  statute for wire fraud was intended to replicate that for wire fraud. *Garlick*, 240 F.3d at

15  792. Thus, the two offenses can be considered similar, which can allow an analogous

16  comparison for wire fraud within the §3237 language.

17  Additionally, the Ninth Circuit in *United States v. Tanke* has given more wiggle

18  room for prosecuting wire fraud schemes:

19          Not every perpetrator deliberately plans and devises a well-integrated, long

20          range, and effective scheme from the outset. Allowances must be made for

21          the reality that embezzlements and other schemes to defraud are open-ended,

22          opportunistic enterprises. They may evolve over time, contemplate no fixed

23          end date or adapt to changed circumstances.

24

25  *United States v. Tanke*, 743 F.3d 1296, 1305 (9th Cir. 2014) (determining that the court

26  must look to the perpetrator to determine the end of a scheme to defraud) (citations,

27  alterations, and internal quotation marks omitted).

28          Harbour continued his schemes to continue to obtain money so that he could make

- 22 –

*Ponzi* payments to earlier investors, prevent the victims from suing him or otherwise alerting the authorities, and so that he could continue to live a lavish ( and ultimately unsustainable) lifestyle at the expense of the investors. Once the Pat Spaulding fraud unraveled Harbour took Gray's $1,000,000 and likely used these funds to pay off other aggrieved investors. He then moved on to the KSQ fraud. That fraud resulted in a $67,000,000 bankruptcy, a SEC, FTC and FBI investigation. Harbour not knowing anything (by his own admission during an FTC deposition ) about the operations of the payday KSQ lending scheme he convinced investors to invest in Green Circle. There he again took exorbitant commissions not disclosed to the investors and altered the borrowing base so that PAIF (who supplied him a line of credit based on false information) would continue to fund the loans.[32]

Lastly, having been evicted from a Paradise Valley home in 2019 for failing to pay the negotiated $20,000 per month rent and diverting investor funds for a "down payment", Harbour convinced Bobrow (the 2007 victim) yet again to invest $140,000 so that he could maintain the veneer of success and reside in a $3.5 million mansion in 2021. He did this by misrepresenting source of down payment to the original lender (and any successor lender) and forging names on secured promissory notes.[33] He committed the same identify theft in the Spaulding fraud (by forging the deceased Spaulding name on a promissory note) and in the Rhonda Gray fraud (by forging Robert Eckholt's name on an engagement letter).

Harbour's series of interrelated frauds is distinguishable from the Ninth Circuit's decision in *United States v. Niven*, also a wire fraud case. There, the Ninth Circuit held the instances of wire fraud at issue were not continuing offenses because of the nature of the fraud. *United States v. Niven*, 952 F.2d 289, 293 (9th Cir. 1991). The offense terminated with each transmission of fraudulent material by mail or wire, thus making the offenses not continuing. *Id.* Harbour's frauds are distinguishable from *Niven* because Harbour's

---

[32] *See* FBI 302 Laura Purifoy, HARBOUR 47530 – 047536.
[33] See Equity Home Mortgage File with false gift letter, Harbour X-X.

scheming did not end until 2021, within the statute of limitations.

Because Harbour was committing a continuous offense, the statute of limitations clock does not start until the continuing course of action is completed. *Holden*, 806 F.3d at 1231. In this case, that course of action did not stop until 2021, which is obviously within the statute of limitations. As noted above Harbour, while on pretrial release, returned to the 83-year old Bobrow (who he defrauded 14 years prior) to convince him to invest $140,000 in a multi-million dollar home for Harbour's family's benefit. Harbour orchestrated (with the help of his wife) a false gift letter scheme and forged se]cured promissory notes.

Harbour's schemes dating back to 2007 are part of an uninterrupted scheme to defraud even if his earlier actions have fallen outside the statute of limitations. Harbour's actions, despite their temporal differences, have similar hallmarks and badges, and continued unabated over a protracted period. *In re Wickard* , 455 B.R. 628, 634 (Bnkr. W.D. Mich 2011) ("Such transfers, following closely after commencement of litigation and effected without apparent documentation, bear the hallmarks or badges of fraud.") In sum, his motion to dismiss and remove surplusage from the SSI should be denied.

### B.  Harbour's Motion for severance of Payday lending scheme, tax charges and mortgage fraud (Doc. 446) should also be denied.

#### 1.  The Legal Standard for Severance

Harbour argues that there is no logical relationship between the three overarching offenses: one offense relates to a Payday lending business, the second offense relates to tax counts from 2017-18, and the third offense is a mortgage fraud. Harbour argues that these are unrelated distinct offenses that should be severed and tried separately. He is incorrect.

Federal Rule of Criminal Procedure 8 authorizes joinder of separate counts of criminal misconduct in a single indictment. The "validity of the joinder is determined solely by the allegations in the indictment." *U.S. v. Terry,* 911 F.2d 272, 276 (9th Cir.1990); *see also U.S. v. VonWillie,* 59 F.3d 922, 929 (9th Cir.1995) ("we examine only the allegations in the indictment").n Rule 8 requires something more than "thematic" commonality, as in the offenses derive from the same body of law, to justify joinder. *U.S.*

*v. Jawara,* 474 F.3d 565, 572 (9th Cir.2007) (common ground of "immigration law" between counts charging defendant with document fraud related to his asylum and conspiracy to commit marriage fraud was insufficient to justify joinder). Instead, Rule 8(a) permits joinder if the offense alleged: (1) are of the same or similar character; or (2) are based on the same act or transactions; or (3) are connected with or constitute parts of a common scheme or plan. Fed. R. Crim P. 8(a).

Joinder is proper pursuant to the "common scheme or plan" prong of Rule 8(a) when the counts "grow out of related transactions ... Stated another way, we ask whether commission of one of the offenses either depended upon or led to the commission of the other; proof of the one act either constituted or depended upon proof of the other." *Jawara,* 474 F.3d at 572. Thus when one criminal act results "directly from other criminal activity", both offenses may be alleged in the same indictment. *U.S. v. Whitworth,* 856 F.2d 1268, 1277 (9th Cir.1988).

None of the cases on which Defendant attempts to rely for severance under Rule 8(a) presented the same type of scheme in which Harbour engaged in. In *United States v. Renzi*, No. 08-cr-00212-TUC-DCB-BPV, 2009 WL 10675612, at *11 (D. Ariz. Dec. 11, 2009), the magistrate judge severed the counts against all defendants into three groups and denied the request for severance of the co-defendants. The charges against Renzi and his co-defendants are distinguishable from those against Harbour. While the court in Renzi found that the Government did not show that "substantially the same facts must be adduced to prove each of the joined offenses," *id.* at *6, here the Government would have to prove substantially the same facts: specifically Harbour's use of each new scheme to keep prior investors' money and to recruit new investors, as well as his use of new investors' money to make Ponzi payments to prior investors and support his lavish lifestyle.

The "predominant consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to ensure that a given transaction need only be proved once." *United States v. Roselli*, 432 F.2d 879, 901

(9th Cir. 1970). Separate trials would result in the necessity that the Government redundantly prove that Harbour solicited the same victims for multiple investments on multiple occasions and to re-call the same witnesses to testify about their investments and conversations with Defendant if the Court were to sever this case into different trials.

In addition, *United States v. Goldtooth* is irrelevant here because that indictment contained in it no allegations from which the court could determine the relationship among the claims. No. CR-19-08108-PCT-DGC, 2021 WL 1688237, at *1 (D. Ariz. Apr. 29, 2021) ("The indictment provides no other factual detail about the alleged offenses. Although the parties proffer additional facts in their briefs, the Ninth Circuit has instructed that " 'the validity of joinder is determined solely by the allegations in the indictment.'") (internal citations omitted). In contrast, here, the 26-page SSI provides detailed information regarding Harbour's overlapping and interrelated schemes.

Courts consider the extent to which the allegations of criminal misconduct overlap to determine whether counts are "same of similar" for joinder purposes. Relevant factors include: the temporal overlap between the offenses; the location where the offenses took place; the identity of the victims of each offense; the likelihood the evidence tending to prove each offense will overlap; and whether the elements of the offenses overlap. *See Jawara,* 474 F.3d at 578. No one factor is dispositive. To the contrary, the: weight given to a particular factor will depend on the specific context of the case and the allegations in the indictment. But the bottom line is that the similar character of the joined offenses should be ascertainable-either readily apparent or reasonable inferred-from the face of the indictment. Courts should not have to engage in inferential gymnastics or resort to implausible levels of abstraction to divine similarity. *Id.* Where on balance the two offenses are dissimilar, the Court must grant relief from misjoinder and sever the misjoined counts. *See id.* at 569 (misjoinder because the immigration offenses were "unrelated in nature and purpose, temporal scope, physical location, modes of operation, and key evidence.").

But again, each of Harbour's frauds begets another fraud of similar character and

design. The Pat Spaulding Fraud, Rhonda Gray life insurance Fraud, KSQ , Green Circle and the Georgia Fraud involve the forging of names or otherwise assuming the identity of another, the diversion of investor funds to make *Ponzi* payments to earlier investors to deter them from suing him or otherwise going to the authorities, and the diversion of investor funds for Harbour's personal expenditures, and to avoid the tax due and owing so that he could spend the money on himself. For example, owing Bobrow and Case approximately $2,500,000 requires Harbour to obtain Gray's $1,000,000. When that money runs out, he involves himself in the KSQ fraud, knowing nothing about payday lending (by his own under oath admission) he is a two-thirds owner of the entity that served as a conduit to transfer funds to Tucker. When that fraud goes belly up Harbour transitions to the Green Circle fraud. Harbour makes similar misrepresentations and omissions to the Green Circle investors so that he can divert their monies to previous investors, sustain his lifestyle, and avoid the payment of substantial taxes.

Finally, even after being arrested for fraud, Harbour is intent on living in a multimillion-dollar residence to further his veneer of success. In 2021, he has no real employment, no assets, and subprime credit (to put it mildly). Harbour convinces others to invest in the million-dollar Georgia residence by fraudulently orchestrating a false gift letter scheme and forging secured promissory notes. In the final analysis, this motion to sever counts should be likewise denied.

Respectfully submitted this 7th day of October, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

*Attorneys for defendant David Allen Harbour*

*s/ Daniel Parke*
US Attorney's Office