Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
|---|---|
| Plaintiff, | |
| vs. | **REPLY TO RESPONSE** |
| David Allen Harbour, | |
| Defendant. | **(ORAL ARGUMENT REQUESTED)** |

Defendant David Allen Harbour, by and through his attorneys, replies to the consolidated response filed by the government (Doc. 445). Mr. Harbour's three motions sought to dismiss surplusage contained in the Second Superseding Indictment (SSI) (Doc. 444), dismiss counts 11 and 12 based on the statute of limitations (Doc. 445), and to sever the counts contained in the SSI into three trials (Doc. 446).

## <u>INTRODUCTION</u>

Senior District Judge Thomas Francis Murphy, Jr., former police commissioner of New York City, prosecutor of Alger Hiss, and the brother of the famed Yankees' closer

of the 1930's Johnny Murphy, was a long-time friend of our District's Judge Walsh, and at his invitation, conducted a regular winter calendar in the 1970's and perhaps earlier.

In fashioning a ruling on a Motion to Suppress in a case I prosecuted, he wrote, "Had Wilkey Collins been alive and well and writing about the comings and goings of a small band of individuals in the dusty twin border towns of Nogales, Arizona and Nogales, Sonora, surely he would have been on his way to another best seller."

While the intervention of time, mortality, and the random draw meant that Judge Murphy never reviewed the government's Response, had those circumstances not precluded it, he may well have reached the same conclusion regarding the government's present response. It is best described as a contrivance of pure fiction borne out of misconceptions of fact, law, and the Rules (of Criminal Procedure and of Evidence) profound enough to leave one breathless.

Basically, the government has taken a 15-year period and jammed a group of completely unrelated alleged events together that occurred here and there over the time span and called them a single crime.[1] To be sure, there were no crimes at all, as will be explained, albeit briefly, so as to leave the government as dazed and confused as possible until jeopardy attaches, but, certainly there was no crime that started in 2007 and was not completed until 2021 other than in counsel's wild imagination, *viz*.:

---

[1] The government actually extends this even farther backwards in time with its innuendos about Abby Harbour's jewelry in 2003. *See*, Government Response, Doc. 445, p.9, ll. 2-3. This is an interesting statement and bespeaks a lack of attention to detail that is a signature of the Response. Of course, Harbour did not meet Abby until 2008. In 2003, she was a freshman at Kansas University, so perhaps an earlier boyfriend ought to feel at risk.

| | |
|---|---|
| 2007 December | Kenny Bobrow/Pam Case |
| 2010 March | Rhonda Gray |
| 2012 | Payday Lending 1 |
| 2014 | Payday Lending 2 |
| 2016 - 2018 | Three single-date tax evasions, etc. |
| 2021 | Bank and Mortgage Fraud |

## **RELEVANT FACTS**

### A.    **Defendant's Misrepresentations and Omissions to Investors**

Beginning in 2011, Harbour became involved in Payday lending, about which he knew little except this:  If, like others, he could raise money and get it into the hands of the actual Payday lenders either directly or through accumulators like KSQ (Joel Tucker's company), very large returns could be made for the lenders and the middlemen, like himself. These expected returns did not depend upon at all upon the existence of a continuing stream of lenders *to* Harbour or the others in the business. If he, or they, had repaid early lenders with proceeds loaned by later lenders, this would have been a Ponzi scheme. But Payday lending is the absolute opposite of a Ponzi scheme because the borrowers on Main Street were the sole source of all the very large returns paid to everyone up the chain.

They were millions of people living in States that had repealed or that never had usury laws, who needed a quick $300-$500 loan, and were willing to pay a very high but not illegal rate to get it and they were unable to borrow from banks because, after 2008 crash, banks only lent to those who did not need money. It is imperative that the Court understand this. The money that supported the lavish lifestyle with which the government wishes to impress the jury and besmirch Harbour did not come from those whom the government describes as "victims." The so-called "victims'" money went where it was

supposed to go. Even Burg's million went to Green Circle though some of it was used by Harbour to pay expenses and to re-pay himself for expenses advanced in starting up the businesses. All of that was allowed by virtue of the documents created by Burg's own lawyers.[2]

While the government has propounded a creative laundry list of supposed "omissions" of material fact, there is only one that is even facially of any interest. That is the "fees" issue. According to the government, Harbour allegedly did not disclose that he was getting fees for moving the alleged victim's money into Payday lending and, the story goes, had the victims known, some of them would not have loaned the money. So, on one level, this must mean that those people must have thought that Harbour was doing everything for free. Harbour was making money on the arbitrage, the difference between the rate Harbour was getting and the rate the lender was getting. Now, beyond that, was Harbour getting additional fees?

If Harbour was getting fees out of his lenders' money, that would mean that Harbour's lenders would not get returns calculated on their total loan amount but on their loan amount minus fees taken by Harbour. If that was going to occur, it absolutely should have been disclosed. It never happened And this lies at the root of the government's

---

[2]  Mark Burg's lawyers created the Pujanza operating agreement. In it, Burg's lawyers authorized Harbour to reimburse himself for costs he had incurred and to enter into loan agreements on behalf of Pujanza, that is, to use Mark Burg's money. Green Circle, the Payday lender, did not need all of Burg's money to deploy immediately, Harbour, as he was permitted to do used some of it and then, as cash is fungible, replaced that money with other dollars and sent those dollars on to Green Circle. Burg got interest on the money Harbour borrowed. In fact, he asked for 4th quarter interest to be combined with 3rd quarter interest as a matter of convenience to himself.

"misunderstanding." First, Harbour only got fees out of KSQ in association with DNA loans; not Canyon Road and not NorthRock. Who paid those fees? KSQ paid them to DNA.[3] Did one cent of those fees come from the money loaned by anyone to Harbour or that he passed on to KSQ and that KSQ loaned to the actual Payday lenders? Not a cent. Then where did the fees come from? From the millions of borrowers on every Main Street across the 35-or so States that permitted any interest rate set forth in writing to be charged.

While the government – which, after all – was responsible for Operation Chokepoint – should have known just how much money Payday lending was generating to anyone on the lender side all the way up to the so-called victim-investors, here the government seems entirely ignorant to where the money actually came from and how much of it there was. There was veritable river of money from which to pay Harbour fees based upon money he raised and injected into the Payday loan ocean of money. None of this was illegal. Neither Joel Tucker nor anyone else, as best we can determine was ever prosecuted *for* Payday lending. How could the DOJ do that, considering that DOJ was caught by Congress red-handed having conducted Operation Chokepoint?

A number of lenders *to* DNA, the sole operation managed by Harbour were not only aware that Harbour was getting a finder's fee from KSQ, but they demanded a piece

---

[3] The government is ostensibly relying on the 2020 FBI 302 of Laura Purifoy who, either mistakenly or mendaciously stated that Harbour got finders fees from KSQ on everything. The bank records will never bear this out. She is the same individual whose contention that Harbour created a false accounts receivable aging report to PAIF has been thoroughly debunked that the government removed her name from the "no contact" list appurtenant to the conditions.

of the fee for themselves. Two were Pat and Carol Hill. They signed a finder's fee agreement which, but for the Department of Justice killing Payday lending (as the government exclaimed in the Joel Tucker superseding indictment, would have paid the Hills the entire finder's fee for two years of their three year loan after Harbour received the finder's fee for the first year. It is attached as Exhibit 1. The government's interview of their lawyer, Philip Hantel, confirms that the finder's fee agreement was reached. It is attached as Exhibit 2.

While DNA was operated by Harbour,[4] Canyon Road, about which the government is completely confused, was not. Canyon Road was an operator, like Green Circle, lending to the street. While Canyon Road was owned by Harbour and Ted Rowland, it was operated by 100% by Rowland. Canyon Road received nothing from KSQ. It was a competitor. Meanwhile, NorthRock was just like DNA except that it was operated by Melvin Dunsworth. While NorthRock brought lenders to KSQ, it received no finders fees from KSQ.

**B.     The Pat Spaulding Fraud: Victims Kenneth Bobrow and Pam Case**

The most important point of the motions, unaddressed by the government, is that there are no counts in the indictment concerning this alleged fraud of which a jury could

---

[4] KSQ had a whole group of entities like DNA that generated lenders. One was NorthRock, which was owned 50/50 by Harbour and Melvin Dunsworth but was operated solely by Dunsworth and, as DNA attracted people Harbour had mostly known for years, so, too, did Dunsworth attract people he knew like, for example, Joe Cathy. Another feeder of KSQ was Kenny Bobrow who had his own company, NetFinance, LLC. It was just like DNA.  Bobrow got finder's fees from KSQ. Like Harbour he also wound up getting killed by Operation Chokepoint. Bobrow claimed NetFinance lost $16 million in Operation Chokepoint and that he personally lost $5-6 million. Harbour had zero to do with Net Finance.

find Harbour guilty. In other words, the government simply did not respond to our main point: Federal law contains no general scheme and artifice statute. The crimes with which Harbour is charged criminalize the use of the mails or an interstate wire communication in furtherance of a scheme to defraud a victim; not the scheme itself.

Having failed to even address this point with respect to Bobrow, Case, Gray, Pat Hill, Joe Cathy, and Dan Wilson (the Group of 6), the Court should simply rule that the government has conceded. Of course, the evidentiary gloss is really immaterial, as there are no Bobrow/Case counts at all (nor any involving the Group of 6). Nevertheless, even if there were Bobrow/Case counts, they would be misjoined and subject to being severed from Payday Lending, Tax Evasion, and Bank/Mortgage Fraud. Kenny Bobrow sued David Harbour in February 2022.[5] Bobrow loaned Harbour $2,500,000 in 2007. He assembled the money; it was not all his. The proceeds came from the sale of Bobrow's Aspen home ($1,750,000), from his first wife ($250,000), from his then-present wife, Pam Case ($200,000), and from his business partner ($300,000). The government contends that this was fraudulent transaction, in other words that, at the time he obtained

---

[5] While the government speculates that the Bobrow lawsuit was stayed because Harbour would have pleaded the 5th Amendment, this is not the case. Harbour filed a speaking, substantive answer to the Bobrow lawsuit, which waived the assertion of the 5th Amendment. The Parties mutually agreed, albeit, perhaps for difference reasons, to stay the litigation until after the conclusion of the criminal case but the potential assertion of the 5th Amendment by Harbour was not one of the reasons. Similarly, Harbour filed a substantive *pro per* answer to a 2022 civil lawsuit filed by Joe Cathy in Johnson County, Kansas. It is not stayed. The Rhonda Gray lawsuit against Harbour was also stayed but, as this occurred long before my involvement in the Harbour case, I do not know what the thinking was. I can state this, however: I have never attempted to use the civil discovery processes to advance my client's defenses in a related criminal case that is already in existence. It is inappropriately unfair to the government to do so.

the money, Harbour intended to never pay it back. This is nonsense. There is no dispute that Harbour repaid Bobrow at least $2,300,000.[6] The civil lawsuit itself concedes that by not suing for the principal *and* interest but solely for the unpaid principal. For criminal purposes, the entire $2.5 million was repaid.

Meanwhile, the government also contends that Harbour paid nothing to Pam Case. First, her $200,000 was, as stated, part of the $2.5 million. Next, she received a minimum of $175,000 in payments between 2007 and 2014. Third, when the settlement and workout agreement was entered into in 2014, Harbour paid $50,000 that went to Pam Case, plus another $28,750, detailed below, for a total of $253,750 on her $200,000 portion of the $2.5 million 2007 loan.

The Highpointe Capital Operating Account records show three checks to Pam Case, each in the amount of $9,583.33. These are checks number 3210, dated 2-16-2016, number 3225 dated 3-31-2016, and 3255, dated 6-13-2016. *See*, Harbour_034115, *et. seq.* These were repayments to Pam Case. In addition, the same group of checks produced by the government shows two $10,000 checks issued to Vicki Bobrow, who was (and is) Kenny Bobrow's third-wife under her prior name, Victoria Rautbord. *See*, check 3202, dated 2-2-2016, check 3228 dated 4-18-2016. These checks were for Kenny Bobrow,

---

[6] For criminal purposes, Bobrow was completely repaid; for civil purposes while there is no dispute that the money *was* paid, the loan agreements, guaranties, and work-out papers show that it was and remains denominated as interest. But the fact that money was repaid directly to Kenny Bobrow and to others who from whom Bobrow had raised money, and was repaid years before the investigation here commenced, is neither disputed nor can help but to completely undercut the idea that the 2007 transaction was fraudulent. What fraudster repays the "victim" the money received?

who was then in a hotly contested marital dissolution action with Pam Case. In addition to these payments, Harbour paid M.G., Bobrow's business partner $100,000 directly.

So, for *criminal* purposes, Harbour had repaid all or substantially all the money "he" had received from Bobrow in 2007.[7] Now, for reasons best known to the "crack investigator" that Bobrow's counsel (or someone) engaged, Bobrow's complaint contends that Patrick Spaulding *never existed*, that he was a fictional character ("call me Ishmael"). This was apparently, because the investigator could not find anyone, anywhere, named Patrick "Spalding." However, he could easily have found Patrick Spaulding, which is the name of the person who signed the loan agreement between Harbour and Spaulding.[8]

The civil complaint and the government go on to discuss the February 11, 2014 email "from" David Harbour to an email address for the deceased Pat Spaulding. There is

---

[7] I say "he" advisedly. This is not at all how the deal went down. Spaulding, himself, was not in the Dollar Store or campus housing business but he knew people who were and was and was helping them raise money. The money raised was supposed to flow through Spaulding for the obvious reason that it was how Spaulding was going to get his fee. Bobrow and Harbour flew to Kansas City in 2007 to meet the actual deal people. Neither Harbour nor Bobrow met with Spaudling whom Harbour thought lived in New Mexico at the time. They met in offices in Overland Park, Kansas. Harbour got the money and except for $100,000 that went into a limo business in Scottsdale and $250,000 that was loaned to Bart Shea on December 21, 2007 (the morning of the day when Harbour's father died) sent to the people who were raising the money. The bank records no longer exist. The recipients of the money made a few payments then went dark and so did Spaulding. Now, for civil purposes, Harbour, guaranteed the repayment but, for our purposes here, we have accounted for all the money.

[8] Curious that accusation of non-existence would find its way into the pleading, we sent Bobrow's counsel Spaulding's 2010 obituary as it appeared in the Kansas City *Star*, complete with the sentiment posted by Harbour's mother on behalf of the Harbour family.

nothing in the email or about the email that suggests that Harbour had anything to do with it being sent or even knew that it had been sent in 2014. The email was *sent* by Carol Hill who, interestingly, did not bother to copy Harbour with it, even though it ostensibly came from him. And, even more curious is why Harbour did not send it himself? He sent thousands of emails annually. But not this one. Harbour actually found out about this email from Bobrow years later, who explained why he sent it.

Yet, in a map-making exercise that the government evidently considered significant, it pointed out that the email was sent from a location that was only a mile from Harbour's house. The same can be said for the distance between Bobrow's house to the office. However, there is a far more significant geographic feature of which the government was apparently unaware: Kenny Bobrow's officed in Harbour's building. He was separated from Harbour's office only by Carol Hill's desk. She did secretarial work for both Harbour and Bobrow. Cross-examination of Carol Hill concerning the February 11, 2014 email (not to mention other matters) might be expected to be a particularly difficult experience for her but, in sum, what does any of this this have to do with Payday Lending, the Rhonda Gray life-insurance proceeds fraud, income tax evasion, and/or bank fraud? Nothing. Any applicable SOL for the 2007 "fraud" expired long ago (2012). Most importantly, no charges in the SSI relate to the alleged 2007 fraud. It is not part of Counts 1-10 (wire fraud), 11-12 (mail fraud), 13-24 (money laundering) or the balance of the charges.

///

///

### C.     Rhonda Gray Life Insurance Fraud

The Rhonda Gray loan has been the subject of prior litigation in this case occasioned by motion to dismiss her from the forfeiture allegations. In Doc. 98, filed 7/17/20, the defense moved to dismiss the forfeiture count with respect to Rhonda Gray. The government's response is Doc. 108, 7/31/20. The defense reply is Doc. 113, 8/7/20. Oral argument was conducted on August 20, 2020. The transcript is attached as Exhibit 3.

The government's position was that Rhonda Gray was included in the indictment (then, the original indictment) as and for an element of sentencing, assuming "Harbour's potential sentence for his scheme to defraud others." Doc. 108, p. 8, ll. 20-28. Our motion to strike and dismiss is in complete harmony with that position. We did not move to eliminate her *now* from being considered for purposes of restitution and or sentence enhancement, should a time ever come when restitution and sentencing occur, but solely to preclude the *petit* jury from considering the uncharged misconduct in determining whether Harbour is guilty beyond a reasonable doubt of Counts 1-10, 11-12, and 13-24 (involving the Group of 5).

The court denied the earlier Motion to Dismiss and this is not a motion to reconsider that decision. Whether she can be considered a victim for purposes of restitution and sentencing will be determined only *after* the *petit* jury has returned a verdict of guilty and only if the Court or a jury, at Defendant's option, finds the uncharged conduct sufficiently related to the convictions. This is what prompted the government to argue that the 2020 motion was premature (a position with which we agree). However, the motion to dismiss proceeded in a manner that, while it should have

made things completely clear did not do so and, thus was a precursor and a bellwether for decisions that actually do need to be made now.

As indicated, the August 20, 2020 oral argument was, at least, highly instructive because it further supports the points Harbour is addressing here. The government took the position that for purposes of the restitution and sentencing, the scheme was broader than the counts whereas the court understood that the loss had to be connected to the counts. RT, pp. 7-8. And, as to "where" Rhonda Gray was in the indictment, the government stated that she was in Paragraph 1 of then original Indictment, an investor-victim of Payday lending, to which the Court aptly said, "show me."  RT, p. 11, l. 1 – p. 12. The government could not meet the court's concern because Rhonda Gray is not in any charged count. Finally, after several pages of direct questioning by the Court, counsel conceded that Rhonda Gray was not connected with any wire fraud or any money laundering count. There were no mail fraud charges until the Superseding Indictment in November 2020.

The government concludes that she was a "victim-investor" in the scheme which is broader than the counts for purposes of the restitution and sentencing; not in terms of the criminal charges. RT, pp. 13-14. The government reiterated this argument with great vigor at RT, p. 17, ll. 1-8 when it said that the evidence concerning her loss and the nexus to the charges for which there might be conviction would occur *after* the *petit* jury renders its verdict and that the evidence would be considered in a subsequent proceeding that may be heard by the same jury or by the Court. The government reiterated the point again on p. 18, ll. 17-20, when it said that the purpose of her being identified in the

indictment was to put the defense on notice that she is a "victim-investor" and she was a victim of the scheme. This point is reiterated through the argument, with the court stating,

> But the actual counts of wire fraud are entirely different. They have --there is three counts and they're two in 2014 and one in 2015, and neither one of them involve her or were -- involved the type of scheme she gave up the money in.

To which the government responded:

> Very typical. We could have just one count here. If I understand, I don't think the defense is arguing that in order to be -- to receive -- or to be part of forfeiture, you have to have a substantive count that supports that. You just have to -- you just have to be -- the Court just has to make a finding that this person was a victim, they gave monies, and those monies should be part of the money judgment.

RT, pp. 20-21.

When the government tried to explain the evidence, the Court interrupted to indicate that it was interested in the "allegations" and not in the evidence. RT, p. 22, ll. 15-17. For our purposes, here, this should be sufficient to gain the Defense what it is seeking: A ruling that, for purposes of determining Harbour's guilt before the *petit* jury, the alleged Rhonda Gray life insurance fraud is not going to be presented. And though it may be difficult to discern that government counsel had conceded this point, a close reading of the government's response to the MTD (Doc. 108) and, more importantly, the court's probing questioning during the oral argument on August 20, 2020, leaves no doubt that the concession was made.

As the hearing wound up, the government made another important concession, which was that Harbour did not solicit Rhonda Gray for anything. "He [Harbour] just says, I'm going to take your money an invest it. And then when she tries to get it back

later on, he starts talking about the payday lending" RT, p. 37, ll. 8-9. We will look at this in a moment however; what counsel clearly did misstate was that Rhonda Gray was ever a high-return lender to Harbour.

> THE COURT: Well, the fraud scheme involves him soliciting victims to invest by promising excessive returns. Is she one of the people he solicited to invest by promising excessive returns in short term periods?
>
> MR. RAPP: Yes. That's absolutely true. I mean, that's –
>
> THE COURT: And she was falsely told that her funds would be used as short term loans to small start-up businesses. Is that what she was told?
>
> MR. RAPP: Well, I don't know if she was told that specific, but she was -- she was basically told that we're going to take your money and you're going to get an excessive return on it, that's why you ought to trust in me to handle the management of your money.

RT, p. 37, ll. 10-23.

This was a crucial misstatement in the context of the motion then pending because it played a large role in the court's decision to deny the motion to dismiss. Perforce, the misstatement must generate a brief, but salient, discussion concerning Rhonda Gray.

It seems curious that the only note that the government and even Rhonda Gray's lawyer in the civil litigation have discussed is a three year, 5% note dated 2013. The reason that this is curious is that Rhonda Gray loaned Highpointe Capital just over $1,000,000 in March 2010. So, there were actually two promissory notes, a 2010 Note that we do not believe Rhonda Gray ever gave to the government and a 2013 note that was operative if only because the transaction with which the 2013 note was supposed to be connected never closed. It was connected with the proposed sale of a building in San Antonio.

The 2010 loan was evidenced by a 10-year, 3% promissory note, the terms of which are confirmed in Rhonda Gray's own hand-written notes. The Note signed by Harbour is attached as Exhibit 4. Moreover, in addition, the oft-referred to series of typed notes kept by Ms. Gray in the form of a diary from 2009 – 2016 never once use the words "payday loan." *See*, Harbour_000090-000136.

Ms. Gray loaned $1,001,243.00 to Highpointe Capital for its use in its business, promising no more than a pedestrian interest rate of 3%. This, as the Court noted, was hardly an exorbitant return. Even the never-funded loan of 2013 would have paid only 5%. It was, as the government stated, only later in time that Harbour told her, among other things that she was in Payday lending. When she loaned the money in 2010, Habour was not involved in Payday lending at all. Later, assuming *arguendo*, that he had segregated her $1 million, which is, of course, preposterous, and decided to put her million into Payday lending, it was not because he had solicited her to do so nor would she have gotten the high returns associated with Payday lending. This differs from each and every Group of 5 and Group of 6 member who was in Payday lending (other than Alison Wilson, albeit for completely different reasons).

### D.    Carol and Pat Hill, Allison and Dan Wilson, Joe Cathy: KSQ Fraud

This is, at least, the heartland of the first Payday lending. While we anticipate this to be the subject of expert testimony in the trial, a *precis* of Operation Chokepoint and the havoc it wreaked (and was designed to impose) was outlined in *Community Financial Services Association of America v. Federal Deposit Insurance Corporation*, 132 F.Supp.3d 98 (D.C.D.C. 2015), attached as Exhibit 5.

In an earlier pleading we attached the Congressional proceedings conducted in 2015 related to the at-first clandestine DOJ operation. Four things can thus be stated as being completely factual and not subject to even the slightest debate about the first Payday lending: 1) It was entirely legal except in States whose usury laws outlawed it, 2) The Obama Administration sought to kill it and did kill it through Operation Chokepoint, 3) Everyone associated with Payday lending in this case got every penny they had been promised until the effects of the government's destruction of Payday lending took hold, and 4) Everyone associated with the first Payday lending, including Harbour and everyone who had lent money to Harbour for Payday lending lost their money.

The government's theory of fraud could, therefore, not be that Harbour inveigled the "victims" to loan money for use in Payday lending because the government's counsel's bosses directly and proximately caused everyone's losses. Rather, the theory is "if I had but known that . . . then I would have not . . . " Whether this is true or not true is for later motions and, eventually, for the trial. As we all are aware, fraud by material omission is far more limited than fraud by material misrepresentation. It depends upon the existence of a duty.  Everyone has a duty to not make material misrepresentations but only those in special relationships with special duties owe duties related to material omissions. Just for future reference, lenders and borrowers do not owe those duties. But that is a problem for the government for another day.[9]

---

[9] Parenthetically, the government raises the point why did Harbour go back into Payday lending after Operation Chokepoint which bespeaks the larger question, why did anyone go back into Payday lending? The answer is simple: The sovereignty of Native American Tribes. All Payday 2 lending was done by organizations owned by Native American

For now, the Group of 5 (Counts 1-24) are not in play. Their counts will be tried. Nor did we try to sever Payday 1 from Payday 2. What is in play is the Group of 6, three of whom (Bobrow, Case, and Gray) have already been discussed. That leaves Pat Hill, Dan Wilson, and Joe Cathy. Like the other three members of the Group of 6, no charged conduct exists with respect to them. Whether they can be included in the post-verdict restitution or judgment proceedings has nothing to do with anything going on pre-verdict and will become litigable if there is a finding of guilty on some or all of Counts 1-10 and or 11-12, the wire and mail fraud counts.[10] The second reason that they are not includable as witnesses for the government in the criminal trial is that the government has conceded that the SOLs expired on any actual criminal charges that might have related to them.

### E.   Harbour's Tax Evasion, False Statements to the IRS and Obstruction

There are two kinds of tax evasion. The usual type is where the taxpayer has net income for which tax is owed but willfully evades reporting that tax by falsely claiming a

---

Tribes. *See*, Exhibit 12, Greenberg Traurig Opinion letter dated January 28, 2015; Exhibit 13, Greenberg Traurig Opinion letter dated January 29, 2015.

[10] This leads us back to the biggest issue which the government did not address and that is the difference between ordinary state scheme and artifice statutes (or even the Federal bank fraud statute in which the "scheme" is the crime and the means is immaterial). The wire and mail fraud statutes are not statutes that criminalize schemes and artifices to defraud. A scheme to defraud is merely the first element. The second element is a mailing or use of a wire facility and the third element is that the use of the mails or of a wire facility must be in furtherance of the scheme. While we find implausible that the government has, over time, forgotten what the crime is, we reluctantly accede that it has done so. No matter. The primary reason that the Group of 6 are not victims of wire or mail fraud here is that it was not charged that they were, meaning that any proof that they were victims of some generalized scheme, while, arguably relevant for later proceedings if the government achieves a favorable government verdict, are not relevant here and in respect to these motions.

different total amount of taxable income and a different tax. In our case, Harbour is charged with evading his 2012 income tax but the evasion charged is not an evasion committed in 2013 when he filed the 2012 tax return. The six year statute of limitations expired long before the tax charges were added in November 2020.

So, instead, the government charged that three statements of assets provided to the IRS in 2016, 2017 and 2018 (Form 433-A) were willfully false because they omitted listing assets that, had the IRS known them to exist, could have been used to pay the tax then due and owing for 2012, which, according to the Superseding Indictment, was, $179,012.19 as of June 8, 2018.[11] Then, in the SSI, government contends that, as of November 24, 2020 the sum was over $4,000,000. In the Response, the government says that in March 2020, the amount owed for 2012 was $165,938.82. For some reason, the government also includes amounts for the uncharged years, 2005, 2006, and 2011 (all of which, included for 2012 were paid prior to indictment). Response, p. 2, ll. 11-12.

Of course, the government knows that for criminal purposes, the relevant amount is what was owed for 2012 as of the last willful act of evasion, which was June 6, 2018, and, further, that for criminal purposes interest and penalties are not counted. What the government should know but has, implausibly, ignored is Rule 408, F.R.Evid. In October, 2018, the IRS and Harbour reached a *settlement* related to the 2012 audit.  That audit was still open as of the date of the last charged willful act of evasion on June 8, 2018 and the IRS Agent knew it was being contested. So, even if Rule 408 did not preclude the use of

---

[11] Not to quibble, but, actually, the amount of tax owed for 2012 as of the final "final act" of evasion was $165,938.82, as reflected in the tax lien filed by the IRS on April 20, 2016. *See*, Exhibit 14.

the plus-$4 million number because it was the result of a negotiated settlement that ended *that* round in tax court, the number is still irrelevant in this case because, as of June 8, 2018, the amount that Harbour was supposedly evading was the number the IRS contended was then-owed in taxes for 2012, which was the $165,938.82.[12]

These alleged affirmative acts of evasion, submitting false 433-As in 2016, 2017, and 2018, have nothing to do with the 2007 alleged Bobrow/Case "Spaulding" fraud, nothing to do with the alleged two Payday loan frauds, and nothing to do with the subsequent bank fraud case.

### F.    Green Circle Fraud: Richard Turasky and Mark Burg

The analysis for the Green Circle fraud is similar to the analysis of Payday 1 except that Turasky and Burg *are* two supposed victims of the Green Circle Fraud. We did not argue that the second Payday loan case should be severed from the First Payday loan case.

### G.    The Georgia Fraud: Kenneth and Victoria Bobrow

No possible argument can be made for trying the Georgia Fraud case along with the Tax case, the 2007 Spaulding Fraud, the Rhonda Gray Life Insurance Fraud, and/or the Payday lending case sufficient to pass the straight face test. The government knows or should know that each of the *charged* cases is very weak. However, convicting Harbour would be a lot easier if a bunch of uncharged conduct is lumped together with a hodgepodge of unrelated, different cases, charged as one case. To this, the government adds some more uncharged conduct, the fact that Harbour lived in another house in 2017

---

[12] The settlement in October was for $2.5 million in taxes for 2012.

for which he did not pay rent: the Jeff Smith case. We might add that after the Jeff Smith house, he lived in his in-laws Fountain Hills house rent-free. But, there is no reason to argue about the Jeff Smith house issue here. When the Georgia Fraud is severed and motions in limine are due to be filed, we will discuss the Jeff Smith house.

## LAW AND ARGUMENT

### A.   Harbour's Motion to dismiss or alternatively strike surplusage from the Indictment and Motion should be granted. (Doc. 444 and 445).

In its response, the governement combined Doc. 444 and 445 into one response, somewhat conflating the two arguments. For the purposes of this Reply, we have attempted to separate the arguments back to their original form.

#### a.   Doc 444

Regarding Doc. 444, the governement only addresses this motion in its first paragraph of its response. Defendant has moved to strike the surplusage under Fed.R.Crim.P. 12(b)(3), and the governement has failed to reply to the motion except by stating that there are no 9th Circuit cases that have addressed a motion to strike surplusage. The government is incorrect. Finding reported cases is, of course, almost impossible, if not impossible, because the government does not get an appeal from a court's granting a motion to strike surplusage. However, cases from this Court support the striking of surplusage. Exhibits 6 and 7 did so in in *United States v. Knox*, 21-cr-02195; Exhibits 8 and 9 did so in *United States v Renzi*, 08-cr-212; and Exhibits 10 and 11 did so in *United States v. Shepard,* 10-cr-1032. In short, our courts have had no issue with striking surplusage under the Federal Rules.

### b.   Doc 445

As for Doc. 445, Defendant's motion to dismiss based on statute of limitations, the governement contends that the statute of limitations does not begin to run until all of the elements of the offense are established, regardless of the continuous behavior. *See* Doc. 455 pg. 20 ln. 22-24 (citing to a 7th Circuit case). We do not disagree with the elements of wire fraud as cited by the governement. However, Mr. Harbour's alleged actions did not 'toll' the statute of limitations as alleged by the government.

The governement concedes that Harbour's actions have temporal differences but claim that the "similar hallmarks and badges" are what toll the statute of limitations until 2021. Doc. 455 pg. 24 ln. 11-12. Specifically, the governement claims that all charges were tolled until 2021 because in 2021, Mr. Harbour allegedly committed mortgage fraud.

This goes contrary to all of the case law cited by the government. In every case cited by the governement, the defendants were committing a scheme under *one particular factual circumstance under one particular statute* for the entirety of the time periods, whether that be wire fraud, mail fraud, or healthcare fraud. Assuming Mr. Harbour committed the crimes alleged, he allegedly engaged in multiple, unrelated frauds, each one stopping at a particular point in time. In no case cited by the government is it enough to toll the statue of limitations that a defendant commits a new, unrelated crime of similar hallmarks and badges at a later point. That would be the same as saying that a bank robber who commits a bank robbery in 2000 has their statute of limitations tolled until

2022 if they committed another bank robbery in a similar manner in 2022; this is simply not the law.

First, even if we assume that the government properly pled in its SSI that the statute of limitations did not begin to run until 2021, the termination of Mr. Harbour's contacts with the alleged victims still lies outside of the 5-year statute of limitations. In a charge for wire fraud, the wire must be "incident to the execution of the scheme" and not "part of an after-the-fact transaction that, while foreseeable, was not in furtherance of the defendant's fraudulent scheme." *United States v. Lazarenko*, 564 F.3d 1026, 1036 (9th Cir. 2009) *holding that* defendant's transfer of fraudulently obtained funds three to four years after the initial wire fraud were not "in furtherance" of the underlying fraud. Any of the alleged transactions by Mr. Harbour were not conducted in furtherance of the underlying transaction. Mailings designed to avoid detection or responsibility for a fraudulent scheme fall within the mail fraud statute when they are sent prior to the scheme's completion, and it is the scope of the scheme as devised by the defendant that determines when the scheme is completed. *United States v. Tanke*, 743 F.3d 1296, 1303 (9th Cir. 2014). If the scheme as devised has not been fully executed, then the mailing, even if sent to conceal the scheme, is not within the statute. *Id.*

*Tanke*, while ultimately finding that defendants conduct fell within the scheme, is distinguishable from what has been alleged by the government. In *Tanke*, the court found that there was no gap in the mailings; there was a series of false and misleading transactions with no temporal gap that would have placed the mailing at issue outside of the mail fraud statute. *Id.* at 1305.

Second, even if the SSI was properly pled, Mr. Harbor did not engage in continuing and systematic contacts with his alleged victims that would have created a false sense of security. We recognize that the issue of when a scheme is completed is not purely one of timing, but also if the wire or mailing "is a part of the execution of the scheme as conceived by the perpetrator at the time, not if the defendant, prior to the wire or mailing had obtained all the money they expected to get." *United States v. Jinian*, 725 F.3d 954, 961 (9th Cir. 2013). The wire and mail fraud counts, Counts 1-10 and 11 and 12 are based upon a theory that the mailings allowed the "crimes" to persist. This is a position that will fail for reasons that will make themselves clear after jeopardy has attached. But we do not seek here dismissal of the claims related to the Group of 5, merely the striking of the Group of 6 for criminal trial purposes and for severance based upon mis joinder. Striking surplusage is the means to demonstrate that the Group of 6 uncharged misconduct will not pollute the trial.

### B. Harbour's Motion to sever the Payday lending charges, tax charges and mortgage fraud (Doc. 446) should be granted.

#### 1. The Legal Standard for Severance

The government argues that all of the charges alleged should not be severed because each act is somehow connected to a common scheme or plan. *See* Doc. 455 pg. 25 ln. 7-13. To do so, the governement cites the appropriate legal standards and case law, also cited in Defendant's Motion to Sever (Doc. 446). The government acknowledges that joinder is determined solely by the allegations in the indictment. *See U.S. v. Terry*, 911 F.2d 272 (9th Cir. 1990). The law permits severance of unrelated counts when there is improper joinder to avoid undue prejudice. The risk of undue prejudice is "particularly

great" whenever joinder of counts allows evidence of other crimes to be introduced would otherwise be inadmissible. *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000). Undue prejudice may also arise from the joinder of a strong evidentiary case with a weaker one. *Id*.

The government is correct when it points out that none of the cases cited by Mr. Harbour "present the same type of scheme in which Harbour engaged in." Doc. 455 pg. 25 ln. 15. We do not mean to appear to be flip, but this is likely because few if any prosecutors have ever misinterpreted joinder under Fed.R.Crim.P. 8 so brazenly as in this case. A careful reading of the extent case law lends guidance into the causal connection required for the governement to join charges.

For example, in *Jawara*, the government correctly identified that the common ground of immigration law between counts charging document fraud related to asylum and conspiracy to commit marriage fraud was insufficient to justify joinder. *See* U.S. v. Jawara, 474 F.3d 565, 572 (9th Cir. 2007). But *Jawara* is more than just noting this connection; the 9th Circuit found that document fraud *for immigration purposes* and a marriage fraud committed *for immigration purposes* were not of "same or similar character." *Id*. at. 576-579. In *Jawara*, the defendant committed two frauds for the same purpose: to immigrate to the United States. *Id*. The court held that committing document fraud and marriage fraud to avoid immigration laws were not of the "same or similar character" because they alleged different statutory violations requiring proof of different elements and acts were separated by more than three years. *Id*.

The situation in *Jawara*, while different factually, deals with the same attempt by the government to link unrelated cases into one trial. Mr. Harbour seeks to sever the payday lending counts, the tax fraud counts, and the mortgage fraud counts because they allege different statutory violations, occurred at different periods of time, and all three require different evidence to prove. "Courts should not have to engage in inferential gymnastics or resort to implausible levels of abstraction to divine similarity." Doc. 455 pg. 26 ln. 22-23. But the governement *is* resorting to implausible levels of abstraction to divine similarity. The attempt is to link charges that have no causal nor temporal connections by claiming that all those charges should be tried under one umbrella.

In *United States v. Meili Lin*, the U.S. District Court for the Northern District of California cited to an unreported decision that it found persuasive in severing counts of false tax returns and making false statements to the IRS and financial institutions charged in an indictment. *See United States v. Meili Lin*, 326 F.R.D. 214, 220 (N.D. Cal. 2018). In the decision of *United States v. Osuagwu*, the defendant had been charged with mortgage fraud and conspiracy related to mortgage fraud, tax fraud, and tax-related obstruction. 3:16-CR-343-K (01), 2018 WL 1014176 at *2 (N.D. Tex. Feb. 22, 2018). The court granted the defendants motion to sever the mortgage fraud counts from the tax fraud counts because the indictment failed to properly allege a close connection between the mortgage fraud and tax fraud counts. *Id*. The *Meili Lin* court found *Osuagwu* persuasive, holding that as written, the indictment did not sufficiently allege a connection between the tax counts and the false statements. *Meli Lin*, 326 F.R.D. 241 at 221. Specifically, the court held that "It would be an unwarranted extension of the law to accept the

Government's argument that the counts are part of a common scheme or plan simply because they all relate to the Defendants' 'financial lives during overlapping time periods.'" *Id*. The government position in this present case is identical to that of the *Meili Lin* court: they are attempting to link all of the counts simply because they relate to Mr. Harbour's financial life during overlapping time periods. But even more egregious than in *Meili Lin*, the government is also attempting to link counts from unrelated time periods by linking the payday and tax counts to the alleged mortgage fraud in 2021.

The governement also claims that *United States v. Goldtooth* is not relevant here because *Goldtooth* deals with a case where the court could not determine the relationship among the claims. No. CR-19-08108-PCT-DGC, 2021 WL 1688237, at *1 (D. Ariz. Apr. 29, 2021. This Reply ends all controversy about the connection between the Payday Loan counts, the Tax counts and the Bank/Mortgage fraud counts. There is no connection beyond the fiction spun by the government.

RESPECTFULLY SUBMITTED this 14th day of October 2022.

CHRISTIAN DICHTER & SLUGA, P.C.


By /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez