# EXHIBIT 1

February 8, 2013

David Harbour
DNA Investments, LLC
21020 N Pima Rd
Scottsdale, AZ 85255

Dear Carol & Pat:

This letter will confirm our agreement ("Agreement") in connection with Carol & Pat Hill ("Finder"), to enter into participation agreement with DNA Investments, LLC (the "Company"). The terms of our Agreement are as follows:

1.  Portfolio Participation

Finder will receive 10.00% of the interest payments on the $500,000 funded by Carol & Pat Hill on July 1, 2014 for the duration of Patrick Mason Hill & Carol Marie Hill Living Trust's loan. For avoidance of doubt, the amount is $4,166.67 per month for 36 months or 10.0% on the outstanding balance when amortization begins.

2.  Termination.

This Agreement may be terminated at any time by either party by written notice to the other party, but such termination shall not affect the obligation of the Company to pay the Portfolio Participation as provided in paragraph 1.

3.   Accurate Information.

Company hereby represents and warrants that all information provided Finder pertaining to the Company shall be true and correct; and Company shall hold Finder harmless from any and all liability, expenses or claims arising from the disclosure or use of such information.

4.  Arizona Law Applies.

This Agreement shall be governed by and construed under the laws of the State of Arizona, and any action brought by either party to enforce or interpret the terms of this Agreement shall be brought in the appropriate court in the State of Arizona.  In any such action or proceeding to

enforce or interpret the terms of this Agreement, the prevailing party shall recover all costs and expenses thereof, including reasonable attorneys' fees, from the losing party.

5.  Confidentiality

The terms of this agreement are confidential.  Neither party shall release, publish, reveal or disclose, directly or indirectly any term contained herein to any other person, entity or group, without the prior written consent of the other party.  Each party acknowledges that damages may be an inadequate remedy in the event of a breach, or an intended or threatened breach, of this provision and accordingly, either party shall be entitled to seek (without waiving any additional rights or remedies, including monetary damages, otherwise available to either party at law, in equity, or by statute) preliminary and permanent injunctive relief in the event of a breach, or an intended breach or threatened breach, by the other party.

If the foregoing correctly sets forth our Agreement, please sign and return the enclosed copy of this letter.

Very truly yours,

Carol & Pat Hill

By:

Carol & Pat Hill

ACCEPTED AND AGREED TO AS OF THE DATE OF THIS LETTER:

DNA Investments, LLC

By:

David Harbour
Member

# EXHIBIT 2



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000298749 | **Location:** | Via Phone |
| **Investigation Name:** | DAVID ALLEN HARBOUR | | 602-370-9072 |

**Date:** November 15, 2021
**Time:** ~8:32 AM - 8:59 AM
**Participant(s):** Philip Hantel, Attorney for Carol Hill
Brandon Lopez, Special Agent, IRS:CI
Troy Cofer, Special Agent, FBI

Philip Hantel (Hantel) was interviewed telephonically by Special Agents Lopez and Cofer. After being advised of the identity of the interviewing agents and the nature of the interview, Hantel provided the following information:

1. Hantel was retrained as the attorney for Carol Hill (Hill) and has been in the capacity since April 2021. Hill retained Hantel's services after she was contacted by DAVID HARBOUR's (HARBOUR) attorney Alan Baskin (Baskin). Baskin had contacted Hill about a proposed settlement payment of funds owed to her. Hill retained Hantel to consult and handle the discussions with Baskin and Hantel believes Hill was uncomfortable talking directly to Baskin.

2. Hantel felt as though Hill did not understand what was going on when Baskin called her. After Hantel was retained, Hantel spoke with Baskin who relayed that he was happy Hantel was retained to handle the negotiation. Baskin wanted to reimburse Hill $81,000 in regard to the investment she made from her IRA in exchange for Hill's signature on a Declaration.

3. Hantel went to Baskin's office and reviewed the Declaration and took notes. Baskin would not provide a copy to Hantel. Prior to transferring funds to Hill, Baskin wanted the following:
   a. Information regarding Volente, the financials of Volente and if there was any fraud present at Volente.
   b. The acknowledgement of the letter dated February 2013 stating that there was a Finder's Fee to be paid to Hill. Hantel told the Agents that this letter was provided subsequent to her funding and a conversation that took place between HARBOUR, Kenny Bobrow, and herself, in which Bobrow found out that Hill had invested and asked HARBOUR if he was going to give Hill the Finder's Fee.
   c. The acknowledgement that Hill was aware of the Finder's Fee collected

by HARBOUR from Joel Tucker for raising funds such as Hill's investment.  Hantel told the Agents he did not know why Baskin was bringing up the February 2013 Letter as a basis for a defense, as according to his understanding, HARBOUR was indicted for not disclosing the Finder's Fee he received from Joel Tucker to his investors.

d.  Hill's signature on the Declaration attesting that she is not a HARBOUR victim.

4.  The negotiations fell apart rather quickly as Hill did not want to sign anything that was not true and turned down the offer.  Communications ceased with Baskin until recently as of a couple weeks ago.  Baskin contacted Hantel to let him know that he had the money sitting in his Trust account and was ready to pay Hill.  Hantel understood that this was only the $81,000 invested from Hill's IRA.  Baskin stated that once Hill signed the Declaration, the funds would be transferred within 30 days.  Baskin did not disclose the source of the funds. Hantel does not believe HARBOUR has the other $500,000 owed to Hill.

5.  Agent Lopez asked Hantel if Baskin relayed why the payment was only for the $81,000 which correlates to Count 12 of the indictment and not the $500,000 that is also owed to the Hills as victims, but not included as a specific count. Hantel stated he did not ask, and no information was provided by Baskin.

6.  Agent Lopez asked Hantel if Baskin addressed the fact that HARBOUR had included the Hill $81,000 investment in his NORTHROCK bankruptcy filing, and that it could be a violation of the bankruptcy proceedings to pay a creditor outside of the bankruptcy.  Hantel stated he did not ask, and no information was provided by Baskin and wouldn't want Hill to sign anything for funds that could be taken by the Bankruptcy Trustee.

7.  Hill has continued to not accept the payment offer or sign the Declaration. Hantel believes it is unethical for an attorney to buy a witness.  Baskin also told Hantel that the HARBOUR family misses Hill and wishes to make amends and see her again.

The agents thanked Hantel for his time and ended the phone call.

I prepared this memorandum on November 15, 2021, after refreshing my memory from notes made during and immediately after the interview with Philip Hantel .

Brandon Lopez
Special Agent

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR 19-00898-DLR |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 20, 2020 |
| David Allen Harbour, | ) | 1:27 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**ORAL ARGUMENT ON MOTION TO DISMISS**

**APPEARANCES:**
For the Plaintiff (Appearing Telephonically):
    U.S. ATTORNEYS OFFICE
    By:  **Mr. Kevin M. Rapp**
    2 Renaissance Square
    40 N Central Ave., Suite 1800
    Phoenix, AZ 85004

For the Defendant (Appearing Telephonically):
    BASKIN RICHARDS, PLC
    By:  **Mr. Alan S. Baskin**
         **Mr. Mladen Z. Milovic**
    2901 N Central Ave., Suite 1150
    Phoenix, AZ 85012

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1            **P R O C E E D I N G S**

2            COURTROOM DEPUTY:  Criminal case number 19-898, United

3    States versus David Allen Harbour, on for oral argument.

4            Counsel, please announce for the record.

5            MR. RAPP:  Good afternoon.  Kevin Rapp on behalf of

6    the United States.

7            MR. BASKIN:  Good afternoon, Your Honor.  Alan Baskin

8    and Mladen Milovic for Mr. Harbour, who is here with me in the

9    room on the call.

10           THE COURT:  Okay.  Thank you.

11           We're here on the motion to dismiss.  I've read the

12   motion, the response, and the reply.

13           This is a motion brought pursuant to Federal Rule of

14   Criminal Procedure 12(b)(3)(B)(v) where the defendant's moved

15   to dismiss the indictment on grounds the indictment fails to

16   state an offense.

17           In considering the motion to dismiss the indictment,

18   I've got to accept the allegations in the indictment as true

19   and analyze whether a cognizable offense has been charged.

20           In ruling on a pretrial motion to dismiss for failure

21   to state an offense, I'm bound by the four corners of the

22   indictment.  The motion to dismiss the indictment can be

23   determined before trial if it involves a question of law rather

24   than fact.

25           And, for those reasons, I think I need to start with

1    Mr. Rapp and go through the indictment and discuss where it is

2    alleged the portions that are claimed to be missing.

3            So first, Mr. Rapp, considering this motion, it

4    involves the allegations in the indictment, do you agree to

5    that, do you agree that I'm only to consider the allegations in

6    the indictment and not extrinsic facts?

7            MR. RAPP:  Well, here's what I would say is I did not

8    view that as a motion to dismiss the indictment, I just -- I

9    viewed this as a motion to dismiss one of the victims -- the

10   loss attributable to one of the victims from the -- from the

11   money judgment in the forfeiture allegation.  I viewed it --

12           THE COURT:  Well, no, I'm not -- I'm not suggesting

13   this is the entire indictment.  He's asking to dismiss one

14   portion of the indictment.  And that portion involving the

15   request that you've -- that you were discussing, that portion

16   of the indictment is all we're talking about.

17           MR. RAPP:  Right.

18           THE COURT:  So --

19           MR. RAPP:  Okay.  I'm sorry.

20           THE COURT:  All I'm asking is, for purposes of this

21   motion, as I understand the law, I'm only to consider what's

22   alleged in the indictment.

23           Do you agree?

24           MR. RAPP:  Well, what I would say is that, certainly,

25   the indictment contains certain allegations, but at the time --

1    so let me just take a step back.

2             I think this motion is premature, to put it mildly.

3    The --

4             THE COURT:  Well, let me back up.  Your response does

5    not ask for a continuance or a stay.  Are you asking for that

6    now?

7             MR. RAPP:  A continuance or stay of -- of what?

8             THE COURT:  You're saying -- you're saying this is

9    premature and we should decide something later down the road, I

10   think.

11            MR. RAPP:  Well, right, yes.  That's -- that's -- the

12   Court should hold this -- a decision on the money judgment in

13   abeyance.  I mean, the way this would work, frankly, is we go

14   to trial on an indictment, and a jury -- if the jury convicts,

15   then we would proceed to a forfeiture proceeding and then

16   sentencing.

17            And -- and a money judgment and forfeiture allegation

18   take place in a bifurcated proceeding.  A jury has to convict

19   on the counts in the indictment, and then a defendant can elect

20   to have that same jury make certain findings with respect to

21   forfeiture, and of course that's by a preponderance.

22            A money judgment is -- is somewhat different.  I

23   believe the law is that the Court would make that decision.

24   The Court would, at the time of sentencing, say, look, you

25   don't have any assets that are necessarily traceable to the

1    fraudulent proceeds, in this case, the investor funds.  You

2    don't have any assets that -- that -- that are traceable to

3    that, and, frankly, that's basically the situation as we stand

4    in this case.

5           But I'm going to -- I'm going to -- I'm going to

6    impose a money judgment based on the aggregate amount of money

7    that the investors lost in this case, and that money judgment

8    can be used against, perhaps, other property that you have, and

9    the government can enforce that money judgment.  And, you know,

10   for example, in fact --

11          THE COURT:  Well, let me just --

12          MR. RAPP:  Sure.

13          THE COURT:  -- interrupt you.

14          You're not arguing anything you argued in your

15   response or you're not addressing his motion.

16          His motion simply says, you failed to state a claim

17   for the money judgment because you haven't connected the loss

18   of that money to the counts alleged in the indictment.  That's

19   what I want to talk about.

20          MR. RAPP:  Okay.  All right.  Well, what I -- okay.  I

21   was just -- I was just sort of giving what I believe the

22   posture of the money judgment is, but what I would say is --

23          THE COURT:  No.  Wait.  Wait.  Stop.

24          We are here on a motion to dismiss pursuant to the

25   Rules of Federal Procedure, Rule 12 (b)(3)(B)(v).  And there

1  has been no argument made that that's not -- that we can't

2  consider that motion for purposes of that rule.  You've

3  addressed the motion, you filed a response, and I want to talk

4  about that.

5         And the rule requires that I am to look at the

6  allegations in the indictment to see if it states a charge.

7  And they're claiming you haven't stated a charge for the money

8  judgment you're seeking because you haven't connected the

9  offense for which you're claiming that money could be recovered

10 for to any of the counts in the indictment.

11        Let's talk about that.

12        MR. RAPP:  Okay.  So what I would say is that --

13        THE COURT:  Let me back up.  Have I misstated what

14 you've understood this motion to be?

15        MR. RAPP:  Well -- well, no.  I mean, I just still

16 think it's -- it's premature.  You've got to have a trial

17 first.  I think what they're arguing --

18        THE COURT:  Wait.  Rule 12 (b)(3)(B)(v) allows him to

19 bring a motion before trial, like he's done here, and challenge

20 the legal sufficiency of the indictment as to that specific

21 allegation he's challenging.  And that's what we're here to

22 talk about.

23        I'm trying to understand your -- are you saying that

24 he can't do that?

25        MR. RAPP:  No, he -- he -- he can -- he can do that,

1    it's just that the decision cannot be -- so what -- what he's

2    saying is you actually need a substantive count, and that's not

3    correct.  You can have -- a court can make a finding --

4              THE COURT:  Well, stop.  Stop.

5              You didn't argue that in your response.  I'm not --

6    I'm hearing new things here.  What you argued was that there is

7    facts outside the indictment that support what you're asking

8    for.  So is -- I'm trying to understand what you're arguing

9    now.

10             MR. RAPP:  Well, I think I'm arguing what I argued in

11   my motion, is that at trial a victim will testify that she gave

12   Mr. Harbour approximately a million dollars.

13             THE COURT:  Well, I understand.  Let me -- I

14   understand what you've said she's going to claim.  What I'm

15   trying to understand is he's argued that, for your indictment

16   to state a claim, you have to show that the criminal activity

17   underlying her million dollar loss is one of the charges in

18   this indictment.

19             Do you understand that to be his motion?

20             MR. RAPP:  I do, yes.

21             THE COURT:  Okay.  Do you disagree with him that under

22   the law you have to -- for this claim to be -- to be litigated

23   in our suit, you have to at least allege it was connected to

24   the underlying crimes?

25             MR. RAPP:  Yes.

1          THE COURT:  Okay.  Then let's talk about what's

2     alleged in the indictment.

3          Are you -- I'm trying to get to the point.  Are we in

4     agreement that, for purposes of deciding his motion to dismiss,

5     we need to look at what's in the indictment?  Are you going to

6     say that we have to look at some outside facts?

7          MR. RAPP:  Yeah, you're going to have to -- look, an

8     indictment does not contain the entirety of the government's

9     case.  It's a very bare bones -- it's a very bare bones

10    allegation.  And it's -- and at trial is when the evidence is

11    presented where the Court can find that -- whether it's

12    relevant conduct or whether it's --

13         THE COURT:  Yeah, I understand how that works very

14    well.  I'm very familiar with it.  I'm just trying to

15    understand his motion is your indictment -- in order to state a

16    claim that you're seeking regarding these monetary damages, you

17    have to say something in the indictment that connects the money

18    she lost to the underlying charges.  That's all they're saying.

19    You don't have to prove it in the indictment, you just have to

20    allege it.

21         MR. RAPP:  Yes.

22         THE COURT:  And so I'm trying to get to the point

23    where is it alleged in the indictment that -- that the money

24    she lost -- the million dollars that RG lost was connected

25    to -- and I think you've only argued counts 1 through 3 in your

1    response -- where is it alleged that -- alleged it's connected

2    to any counts, let alone counts 1, 2, 3?

3            MR. RAPP:  Well, it doesn't have to be the counts.  He

4    has a scheme.  He's perpetrated a scheme.  There is more

5    victims than is alleged in the indictment.  And --

6            THE COURT:  No, I understand that.  And we're talking

7    -- but they're saying this -- this scheme involved a mortgage

8    situation.  Her scheme, or the scheme involving her, involved

9    her being induced to giving over the monies for him to invest

10   for her at five percent or some nature.

11           MR. RAPP:  Yes.

12           THE COURT:  And he's saying, her scheme was entirely

13   different than the schemes you're claiming here.

14           MR. RAPP:  Okay.  I'm happy to respond to that.  No,

15   it isn't.  There is -- he has certain hallmarks to his scheme.

16   His hallmarks are --

17           THE COURT:  Whoa.  I don't want to hear what the facts

18   are going to prove at trial.  I want to talk about what you've

19   alleged in the indictment.  That's what a Rule 12 (b)(3)(B)(v)

20   motion is based on, what's in the indictment.  And that's why I

21   want to -- that's what I'm trying to get to is where in the

22   indictment does it connect it?

23           MR. RAPP:  Well, all -- all the facts that are going

24   to be presented at trial are not in the indictment, so --

25           THE COURT:  Wait.  I have done this for -- for a long

1    time and I understand that.  I don't expect them to be in

2    there.  The argument that he's making is that under the law for

3    there to be a claim that you can pursue, you have to at least

4    allege in the indictment a connection.  And I'm trying to find

5    the alleged connection so I can rule on it.

6          MR. RAPP:  Well, what I would say is that it's

7    premature to make that decision without hearing what is

8    presented at trial.  So she --

9          THE COURT:  Well, let me ask you this.  Have you

10   looked at Federal Rule of Criminal Procedure Rule 12

11   (b)(3)(B)(v)?

12         MR. RAPP:  Yes.  Yes.

13         THE COURT:  And do you understand it allows him to

14   bring this motion, before you present any evidence, to

15   challenge the sufficiency of the allegations alone?

16         MR. RAPP:  Right.  I understand that.  And so --

17         THE COURT:  So you argue that you don't have to put

18   any evidence in yet, you're right, but you at least have to

19   make the allegation.  And that's all we're looking at is what's

20   alleged in the indictment.

21         MR. RAPP:  Okay.  Well, what's in the -- what's in the

22   indictment, if you just go to between January 20, 2010, and

23   October --

24         THE COURT:  I have the indictment in front of me.

25   Where are you referring to?

1          MR. RAPP:  Paragraph 1.

2          THE COURT:  Okay.

3          MR. RAPP:  He defrauded investor victims out of

4  approximately $2.9 million by promoting and selling fraudulent

5  high yield investments, primarily involving investments in high

6  rate loans to small and start-up businesses.

7          THE COURT:  That was the payday loan investments that

8  he defrauded investors from, and that's set forth in counts 1

9  through 3 and 4 through 22.

10          MR. RAPP:  Yes.  And she -- she falls into that

11  category.

12          THE COURT:  Okay.  I'm on that.  So, show me, where is

13  that alleged?

14          MR. RAPP:  Well, I don't -- I'm just -- I am just

15  telling you that that's what --

16          THE COURT:  Well, let me back up.

17          The 2.9 million doesn't include her money.

18          MR. RAPP:  No, but her money is in that, so -- so

19  here's -- here's what he -- here's what he does.  He -- he gets

20  the money from the investor, and then he diverts all or a

21  portion of that money for his own personal expenditures, or he

22  misrepresents the -- he misrepresents the nature of the

23  investment.  So when she gives her million dollars --

24          THE COURT:  Okay.  Let's focus on the indictment.

25  Keep me -- keep me -- keep taking me through this indictment

1    where I can tie her into the charges in the indictment.

2         MR. RAPP:  Right here.  Whenever I refer to a victim

3    investor, she falls into that category.

4         THE COURT:  Wait a minute.

5         Well, first of all, on paragraph 1, her money is not

6    in that 2.9.  She wasn't part of the $2.9 million that was

7    invested with him promoting and selling fraudulent high yield

8    investments.

9         MR. RAPP:  That's true, except what we fully expect

10   her to testify to is that --

11        THE COURT:  No.  No.  Whoa.  Whoa.  Whoa.  I don't

12   want to hear what she's going to testify.  I want to -- tell me

13   what's in this indictment that connects it.  That's all I'm

14   looking for.

15        MR. RAPP:  That's it.  She's a victim investor.

16   That's it.  That's what connects her to his fraudulent scheme.

17        THE COURT:  Where does it say that?

18        MR. RAPP:  She -- she's a victim investor.  She's one

19   of the victim investors.  She's identified as RG.  That's --

20   that's sufficient to place her in as a victim investor.  And I

21   can tell you -- I can tell you --

22        THE COURT:  I have the indictment in front of me.

23   Just tell me what you're referring to.

24        MR. RAPP:  Let's see here.

25        Okay.  So if you go to paragraph 5:  Beginning at a

1   time unknown to the grand jury, but at least as early as in or

2   about January 2010, and continuing to a time unknown to the

3   grand jury, but to at least in or about October 2015, using all

4   of these entities that we've referenced above, he devised a

5   scheme and artifice to defraud and obtain money and property

6   from victim investors by materially false and fraudulent

7   pretenses.

8           THE COURT:  Okay.

9           MR. RAPP:  She's a victim investor.  That's -- she

10   falls into that category.  And so, again, we -- I think the

11   Court is focusing on this payday lending scheme.  That

12   certainly was one part of his scheme.

13           THE COURT:  Let me back up.  Let me ask you a

14   question.  You've got counts 1, 2, and 3 broken down into

15   three -- into the boxes you've got there.  Count 1 is July 30,

16   2014.  Did she fit into that one?

17           MR. RAPP:  No, she's not one of those.  She is not --

18   she -- so I can just short circuit this.  She's not a

19   substantive count right now.

20           THE COURT:  Okay.  So she's not --

21           MR. RAPP:  She's still --

22           THE COURT:  Is she connected in any way to the wire

23   fraud counts 1, 2, and 3?

24           MR. RAPP:  No, she is not.

25           THE COURT:  What about the transactional money

1    laundering, counts 4 through 22?

2         MR. RAPP:  She is not part of that either.  She's

3    still a victim investor, though, and that's -- that places him

4    on notice that between those two dates, as a victim investor,

5    she invested money with Harbour.  She now is within -- she's

6    with -- she is sufficiently within the start of his scheme, and

7    what we think might have been the end of the scheme, although

8    we think it's even later.  But -- and, of course, as the Court

9    knows, those dates are -- they don't have to be exact, they

10   just have to be an approximation.  So she's a victim investor.

11        The hallmarks of his scheme are, A, give me your

12   money.  I'm going to take your money and I'm going to invest it

13   in a certain investment vehicle.  And you're going to --

14        THE COURT:  Okay.  I understand that.  I understand.

15   I'm just trying to understand how the indictment makes the

16   connection.  And I'm relying on your response.  I went through

17   that very carefully.  And you state in your response that,

18   quote, in short, in the wire fraud offenses charged in counts 1

19   through 3, the requisite nexus is established between the funds

20   that derived from uncharged conduct and the wire fraud scheme

21   if the funds are involved in the fraudulent scheme.

22        Then you listed additional circumstances of uncharged

23   conduct to the wire fraud scheme that are not even addressed in

24   the indictment anywhere that I can see.

25        MR. RAPP:  Yes.  Right.  I mean, you know, sometimes

1    our indictments are 2 pages, sometimes they're 60 pages.

2              THE COURT:  I understand that, but let me direct you.

3              This is a motion to dismiss and all we're worried

4    about is what's in the indictment.  Your response gives me lots

5    and lots of facts that may be true, I don't know, I'm not here

6    to weigh the facts or even consider the facts.  I'm here to

7    consider the allegations in the indictment.  So the fact that

8    you give me two pages of text messages, I don't know that

9    means -- I can't even use that.

10             I can't consider that for purposes of ruling on a

11   motion to dismiss, can I?

12             MR. RAPP:  Well, there is -- the mere fact that I say

13   it's from January 2010 to 2015 and it's -- there are victim

14   investors is sufficient.

15             THE COURT:  Well, you know, but the problem is your

16   counts start in July of 2014.

17             MR. RAPP:  Right.  They start within the -- I didn't

18   mean to interrupt.

19             THE COURT:  Go ahead.

20             MR. RAPP:  They trigger the statute of limitations.

21   Look, there is -- there is a lot of activity that happens in

22   white collar financial fraudulent schemes that predates

23   substantive counts that are within the statute of limitations.

24   I mean, I know the Court knows that.  I mean, the --

25             THE COURT:  I'm not arguing about that.  I'm just

1    saying what I'm looking at is what's in your indictment.  And

2    if you have a connection between her money invested and the

3    charges in the indictment, as I understand the -- I think both

4    of you agree on that, there has to be that connection -- then

5    you're fine.  That's all I'm looking for in the indictment.

6         I don't want to -- what I saw in the response was a

7    lot of facts that aren't in the indictment and that I can't

8    consider.  So I want to get to the indictment and understand

9    how in this indictment is there a nexus between counts 1

10   through 22 and her investments back in 2010 when she was

11   tricked into giving -- into turning over her life insurance

12   money.

13        MR. RAPP:  Well, if the Court is saying that there has

14   to be a correlation between a substantive count and the money

15   judgment, that's not -- that's not accurate.

16        THE COURT:  You didn't argue that.  You argued facts

17   and didn't give any law that supports your position.  If you've

18   got some law that tells me that, then I want to see it, because

19   the only thing I saw is that you're arguing that there was a

20   connection.  In fact, you state there was a connection in

21   counts 1, 2, and 3 established between the funds that were

22   derived from undercharged conduct in the wire fraud scheme,

23   then you attached a bunch of texts which were the uncharged

24   conduct, which aren't even addressed or mentioned in the

25   indictment.

1          MR. RAPP:  Right, because the -- because all I say is

2     -- is, look, you've got these two dates.  She's identified as a

3     victim investor, that's it.  That places him on notice that

4     during those dates she is a victim investor, she -- she

5     provided money at -- at -- you know, after a jury trial when we

6     get to the stage of a money judgment, just like restitution,

7     you can consider all the losses that the defendant committed in

8     the money judgment.  And she would be one of those.

9          THE COURT:  The argument that the defense is making is

10    that, yeah, you can consider that if it's connected to the

11    underlying charges.

12         MR. RAPP:  Right.

13         THE COURT:  And your response is that's true, but we

14    have a connection because of these facts I'm telling you that

15    aren't alleged in the indictment.  And I want to know -- all I

16    want to know is how does this indictment make the sufficient

17    nexus for me to allow this claim to continue to exist?

18         MR. RAPP:  Because -- because she's identified as a

19    victim investor.  And in --

20         THE COURT:  Okay.

21         MR. RAPP:  -- in the introduction on paragraph 5, when

22    we get down to the wire fraud counts, we say --

23         THE COURT:  Okay.  Tell me where you are now.

24         MR. RAPP:  I'm at paragraph 5 under wire fraud.

25         THE COURT:  We've already talked about that.

 1          MR. RAPP:  Yeah.  Look, that's it.  She's -- she's --
 2     we have identified her as a victim investor.  She is in this
 3     category of victim investors that -- that provided him money
 4     between these dates.  That, by itself, is sufficient.
 5          What I -- what I have said in my motion is, look, I'm
 6     just going to tell you, this is what she intends to testify to,
 7     but there is sufficient -- there is sufficient information in
 8     this indictment to place them on notice that she is a victim
 9     investor and she was a victim in his scheme and so --
10          THE COURT:  Go ahead.
11          MR. RAPP:  Now -- well, I would say if we go to trial
12     on it and the Court finds that, you know what, I don't -- I
13     don't find her to be a victim investor, and I don't -- I
14     don't -- by a preponderance of the evidence, by the way, I
15     don't think her losses should be included in a money -- a money
16     judgment.  And the Court would also have to make a finding that
17     I don't also -- I mean, you know, look, this is really
18     academic, because the fact of the matter is this is a
19     restitution case, you know, which is a different theory of
20     recovering money for the victims, and it's a more predominant
21     theory.
22          We would be seeking a restitution order that would
23     aggregate all the victims who lost money, and many of those
24     victims are not in this indictment.  And in other cases what
25     typically happens is you have a handful of victims detail --

1           THE COURT:  I understand.  I understand how that

2    works.  But, tell me, is she going to be a victim for

3    restitution too or --

4           MR. RAPP:  Yes.

5           THE COURT:  You have made forfeiture allegations.

6    Once you put that in the complaint, you've made an allegation

7    that they have argued, you haven't said anything differently,

8    requires you to establish a claim for forfeiture that -- and to

9    make that claim for forfeiture, you have to show the connection

10   between the forfeiture -- the money being -- you're requesting

11   be forfeited and the underlying offenses.  And your underlying

12   offenses start in 2014.  She coughed up the money to the

13   defendant back in 2010 under a different scenario than what's

14   been alleged here.  And they're saying there is just no nexus

15   for a forfeiture.

16          Now, they're not arguing you can't seek restitution.

17   And your texts show that there was an ongoing -- there appears

18   to be an ongoing effort by the defendant to have the victim

19   continue to keep the money there, but that looks like a

20   different scheme and a different time, and it looks like it's

21   not alleged in any of the counts.

22          So, for restitution, you're stating that the standard

23   is much lower than for a forfeiture.  Forfeiture is part of the

24   allegation in the indictment, then there needs to be something

25   alleged in the indictment that makes the connection for

1    forfeiture to be allowed, doesn't it?

2         MR. RAPP:  Well, yeah, but there is.  There is.  First

3    of all, the forfeiture allegation is a preponderance of

4    evidence standard.  You would just have to find by a

5    preponderance.  Okay.

6         THE COURT:  Let me interrupt you again.  I'm not here

7    to weigh the evidence.  You know, you can have the lowest

8    standard possible, it doesn't matter for purposes of the

9    indictment.  All we're looking at is what's alleged.  So, you

10   know, you may be able to prove it very easily at trial, but I'm

11   not here to make that determination.  All I'm trying to find

12   out is is the allegation for forfeiture in the indictment

13   sufficient to allege a claim for forfeiture?

14        And the law, as I understand it, and you both seem to

15   agree, that there needs to be some connection between the

16   underlying offenses and the money that's being forfeited.

17        MR. RAPP:  You're right.  And I would just say that we

18   have identified her as a victim investor.

19        THE COURT:  Okay.

20        MR. RAPP:  We have placed a starting date and an

21   ending date on the scheme and --

22        THE COURT:  Wait.  That's the allegation made in count

23   5 about but --

24        MR. RAPP:  Paragraph, paragraph 5.

25        THE COURT:  Paragraph 5, I'm sorry.  But the actual

1   counts of wire fraud are entirely different.  They have --

2   there is three counts and they're two in 2014 and one in 2015,

3   and neither one of them involve her or were -- involved the

4   type of scheme she gave up the money in.

5          MR. RAPP:  Very typical.  We could have just one count

6   here.  If I understand, I don't think the defense is arguing

7   that in order to be -- to receive -- or to be part of

8   forfeiture, you have to have a substantive count that supports

9   that.  You just have to -- you just have to be -- the Court

10  just has to make a finding that this person was a victim, they

11  gave monies, and those monies should be part of the money

12  judgment.

13         THE COURT:  Well, I think there has to be -- I agree

14  with you.  She doesn't have to be part of the substantive

15  count, but the allegations in the indictment, at least

16  according to the argument from the defense, is that there was

17  this fraudulent -- scheme to defraud involving people under a

18  different time frame and different theory than what she was

19  involved in.

20         Now, there is evidence from your texts you've

21  submitted that there has been some commingling of the funds in

22  an ongoing effort by him to keep her involved, but that's not

23  alleged in the indictment.  There is just this idea that she

24  was a victim and -- but there is nothing that I can see in the

25  indictment that talks about her other than just being a victim

1    one time.  I don't know how that connects it to the --

2         MR. RAPP:  I think what the Court is saying is that,

3    look, there is this payday fraudulent scheme.  From looking at

4    the four corners of the indictment, she doesn't really look

5    like she's in that payday scheme.  And so what I would say is

6    she's a victim investor, and so therefore her -- her lost money

7    should be part of the money judgment.  I can just -- I can just

8    tell you that she's going to testify that on -- and this goes

9    back to an interview that the defense has in her 302, where she

10   says, hey, I kept calling him asking for my money.  And he

11   says, oh, it's in this payday loan -- this payday loan

12   investment that I'm involved in.  I mean, he gives her all,

13   frankly, all sorts of explanations.  That's one of them.  She's

14   going to testify to that.

15        THE COURT:  Let me interrupt you again.  I apologize.

16   But I'm not interested in what the evidence is at this point.

17   All I'm interested in is what the allegations are.

18        Because, as I understand my role here, I'm not allowed

19   to look at the evidence for purposes of deciding whether or not

20   it states a claim, I'm only looking at what's alleged.  We'll

21   look at the evidence at trial.  But the allegation of the

22   indictment needs to be sufficient to state a claim, and that's

23   what the defense is arguing, the problem that they're raising

24   anyway.

25        So I think I understand your response.  You're saying

```
1    for the purposes of this motion to dismiss, the nexus between

2    RG and the allegations in the complaint is the allegation that

3    she's a victim investor; is that right?

4            MR. RAPP:  That's correct.

5            THE COURT:  Is there anything more than that?

6            MR. RAPP:  No.  I mean, I -- there is -- there is a

7    lot of other -- look, there is a lot of other victims that --

8            THE COURT:  Is there anything more than that that

9    you're claiming the nexus between RG and the specific counts in

10   the complaint that he's charged with, that the defendant is

11   charged with?

12           MR. RAPP:  No.  She's in the category of victim

13   investors and that -- and then she's identified as a victim by

14   the initials RG in the indictment.  And she made the

15   investments between the date that the -- the defendant is

16   noticed of in the indictment.  That's sufficient --

17           THE COURT:  Okay.

18           MR. RAPP:  -- to place him on notice not only of her

19   victim status that she's part of the scheme, and therefore is a

20   properly -- properly in the money judgment for forfeiture.

21           THE COURT:  All right.  Okay.  Thank you.

22           Let me hear from the defense now.

23           MR. BASKIN:  Your Honor, this is Alan Baskin.

24           Can I -- can I talk then?

25           THE COURT:  Yeah, Mr. Baskin, my first question for
```

1    you is --

2          MR. BASKIN:  Sure.

3          THE COURT:  -- what do you claim the indictment needed

4    to say in order for there to be a proper -- a proper claim for

5    forfeiture?

6          MR. BASKIN:  The indictment needed to link RG to the

7    underlying scheme.  And just saying, as the government

8    conceded, oh, she's a victim investor, lost money --

9          THE COURT:  Let me interrupt you.  Do you have a case

10   that says that's not enough?

11         MR. BASKIN:  Your Honor, the cases that we cited, I

12   would start with the Riley case.  Um, I would look at Lo.  I

13   would look at Tanke.  And what they all say is that the conduct

14   at issue has to be part of the scheme that's alleged.  And the

15   Tanke court warns against this type of -- it's, in essence, an

16   implied scheme to conceal.  So the courts have been very

17   consistent in saying there has to be overlap between the

18   conduct at issue and the scheme alleged.  You can't just have a

19   general scheme.  So I would look at Tanke.  I'd look at

20   Lazarenko.  I'd look at Lo.  I'd look at Riley.  And they all

21   talk about, very specific, about scheme; and in furtherance of

22   the scheme; in connection with the scheme; incident to the

23   scheme; a link in the chain.  So there has to be a connection.

24         I'll give you an example, Your Honor.  You know, you

25   have conduct that involves someone steals a bunch of money, and

1    they send an e-mail a couple weeks later explaining why they

2    stole it.  Well, okay, that's part of the same scheme.  This --

3    when you have here, as agreed, March 22, 2010, is the date of

4    her transaction.  First count of the indictment is July 30th of

5    2014.  There is no connection.  So, yes, we believe that there

6    needs to be a connection.

7              And we believe, when you look at the indictment, as

8    you're doing, it characterizes at page 4, a high yield

9    investment fraud scheme.  And it talks very specifically about

10   payday lending.  And what follows are payday lending investors'

11   investments, and then money alleged stolen from the payday

12   lender, and then the accompanying money laundering counts.  So

13   while we disagree that Mr. Harbour did anything wrong on Green

14   Circle, there is a Green Circle scheme alleged, I can't dispute

15   that, but there is not -- there is no linkage or nexus or

16   connection between RG.  She's just strapped in there.

17             And then, Your Honor --

18             THE COURT:  Let me interrupt you.

19             MR. BASKIN:  Sure.

20             THE COURT:  If there was a Green Circle scheme that

21   was taking place back in 2010 and she was an investor then, but

22   the allegations don't begin until 2014, would she in that case

23   -- would there be a proper nexus then for -- to say it was

24   properly alleged?

25             MR. BASKIN:  Um, I guess what I would say, Your Honor,

1    is if she were in a scheme that is the same scheme as alleged,

2    a payday lending, high interest rate, short term return scheme,

3    I might have a little bit more trouble with it, Your Honor.

4    But the investment or loan or transactions are diametrically

5    opposed and they're not -- they don't belong together.  So

6    that's -- that's what I would -- what I would say.

7           And this -- her -- her transaction predates the

8    existence of Green Circle by years, so they don't belong

9    together.  She does not --

10          THE COURT:  What about the funds have been

11   intermingled?

12          MR. BASKIN:  Your Honor, I believe that's mentioned in

13   the pleadings.  But, actually, your comment about -- you know,

14   the Court's inquiry, bound by the four corners of the

15   indictment, it's funny, because I'm ready to argue facts too.

16   Because you have -- there is no allegation of a penny of hers

17   being commingled.  And, as a matter of fact, you -- counsel for

18   the government conceded that all of the charged counts involved

19   someone else's money.

20          And -- and, you know, I don't think we're having this

21   conversation if there is actual evidence, you know, or -- or

22   that type of allegation instead of a throwaway line in a

23   response by the government.  So I -- I -- I --

24          THE COURT:  Let me ask you this.  Let me ask you.

25   Both of you argue facts that aren't in the indictment.  Am I

1    mistaken in my understanding of the law on this, that we're

2    only looking at the allegations in the indictment?

3            MR. BASKIN:  Actually, Your Honor, it's funny that you

4    ask that.  I'm guilty as charged of arguing facts, and I would

5    argue them all day.

6            To your point, though, I've got the, you know, the

7    Buckley case and the Jenkins case from the Ninth Circuit, that

8    say that you're bound by the four corners of the indictment and

9    you accept those facts as true as alleged in the indictment.

10   And I -- I have no business trying to -- trying to dance around

11   that.  That's what the law says.

12           In this particular proceeding, it's at a summary

13   trial.  We have introduced other evidence, as did the

14   government, to -- to provide some context.  But, at the end of

15   the day, you have a payday lending scheme that's alleged, you

16   have a bunch of people associated with that scheme that we

17   agree are part of that scheme -- if it is a scheme, which I

18   don't agree with -- and then you have RG just dropped in there.

19   And she shouldn't be there, period.

20           And, Your Honor --

21           THE COURT:  Let me ask you this.  As a practical

22   matter, if she's a victim of this defendant in his fraudulent

23   schemes, isn't RG entitled to restitution?

24           MR. BASKIN:  Well, actually, Your Honor, I would come

25   at it this way.  The reason that RG isn't tethered to a

1    substantive count is because it would be time barred because

2    her investment is from 2010.  So I would argue that that's

3    really the --

4         THE COURT:  All I want to know is yes or no.  Do you

5    think that -- there is two ways she can recover on this, one is

6    the forfeiture claim, the other is restitution.  Is she not

7    entitled to restitution?  Is there a statute on that?

8         MR. BASKIN:  Your Honor, I would send you to the Lo

9    case, because the forfeiture cases and the restitution cases

10   overlap.  And the Lo case is an example of someone who -- it's

11   an employer fraud case.  You probably know it better than I do.

12   It's an employer fraud case.  The guy steals a couple million

13   dollars.  And he says, wait a minute, I only admitted to

14   certain counts.  I only admitted to a floor of 1.7.  And the

15   government says, no, no, no, no, no.  And the Court says,

16   actually, your conduct is 2.3 and you're responsible for it.

17   Why?  Because it was part of the scheme that was alleged, even

18   though he wasn't convicted or didn't plead to all of those

19   counts.

20        Same thing here.  The payday lending scheme, if we go

21   to trial and the government wins on payday lending, RG should

22   not be entitled to a penny.  Setting aside motions in limine to

23   preclude her from testifying, but it all comes back to her

24   being part of the payday lending scheme.  And what the

25   government's asking you to say is, hey, I call her an investor,

1    game on.  And that's not good enough.  And that's not

2    consistent with the case law in this circuit.  So that's --

3    that's my answer.

4              THE COURT:  Okay.  Anything else you want to add?

5              MR. BASKIN:  I better stop while I am behind, Your

6    Honor.  So, no, I don't have anything else.  Thank you.

7              THE COURT:  I have a few notes.  Let me see if I

8    missed anything.

9              MR. BASKIN:  Okay.

10             THE COURT:  So why isn't the allegation in paragraph 5

11   of the indictment, why isn't that enough?

12             MR. BASKIN:  Okay.  Your Honor, I guess --

13             THE COURT:  Because it's clearly pointing to her,

14   because that's the date of her investment with your client.  It

15   says, beginning at the time unknown to the grand jury, but at

16   least as early as in or about January 2010, that that's

17   obviously referring to RG.

18             Do you agree with that?

19             MR. BASKIN:  Your Honor, I don't dispute that at all,

20   because 2010 has to refer to her.  No disagreement there.

21             To answer your question -- I'm sorry.  Were you -- are

22   you -- were you still going?  I didn't mean to cut you off.

23             THE COURT:  No.  Go ahead.

24             MR. BASKIN:  To answer your question, the more

25   important line, which is at page 4, in paragraph 3, and

1    paragraph 3 A, when it talks very specifically about a high

2    yield scheme.  And it says, Harbour represented funds from

3    investors would go to Green Circle, and so on and so forth.

4    The government has admitted that that isn't the case here.

5           So I think if you were to say, hey, Baskin, because of

6    that line in paragraph 5, then you think giving into that

7    argument that you can just dangle an investor in there

8    randomly, not tether them to a count, not tether them to a

9    scheme, and that's good enough?  It isn't good enough, Your

10   Honor.  It isn't.  If RG was tied into this scheme, we're not

11   having this conversation.

12          RG is four-and-a-half years, at beast, before, five

13   years over before the majority of the counts.  So it is a

14   stretch of stretches to say that she -- just because she's an

15   investor, and that's alleged, it's good enough.

16          And I would then say, if you're going to say that,

17   that makes it a substantive count, and then it's time barred

18   because it's from 2010.  So that would be my follow on to that.

19   And I've tried to behave and not get into that argument, so

20   that would be -- so you've got a two-part answer.

21          THE COURT:  What about the texts, assuming that --

22   that -- I'm just curious -- there are texts showing that your

23   client was inducing her to leave her money with him, and

24   talking about how her money was commingled with other

25   investors, which are obviously the investors in this case,

1    wouldn't that be enough to keep her in?

2             MR. BASKIN:  No, it wouldn't, Your Honor.

3             THE COURT:  Even if it was alleged in the indictment?

4             MR. BASKIN:  Even -- I'm -- I'm all in on this, yes.

5    Even if it were alleged in the indictment, Your Honor, because

6    it has to be a link in the chain.  It has to be part of

7    Harbour's scheme starting in 2010 that he was going to get this

8    money, he was going to put it into payday lending, and then he

9    was going to lie to her about it.  It's not a standalone.

10            There is a great discussion in the Tanke case about

11   how far and how broadly the money laundering -- excuse me, the

12   wire fraud and mail fraud statute should be read, and there is

13   a point where it has to stop.  And when you look at all the

14   cases that have allowed, you know, time to pass beyond the five

15   years, there is proximity, there is money being stolen,

16   explanations shortly after that.

17            Here you have years that pass, and you would have to

18   find that it was pursuant to the scheme hatched in 2010.  And

19   so I would -- that's why I said I came ready to argue facts

20   too.  So my point is, hypothetically, if this case were to get

21   recharged, we'd be back with a motion on time.  And I'm not

22   afraid of those lulling allegations, because the lulling has to

23   be tied in, has to be incident to the scheme, and it's just

24   not.  It's just not.  It might not be conduct we like to see.

25   It might be distasteful.  But there is no implied -- there is

1    no implied scheme to conceal.  That's what Tanke says.  And

2    that's from our circuit just a few years ago.

3            Sorry if that was more answer than you wanted, but,

4    obviously, I feel pretty strongly about that issue.

5            THE COURT:  Okay.  All right.  Mr. Rapp, anything else

6    you want to add?

7            MR. RAPP:  I would just say that's nonsense.  I mean,

8    Harbour is the one who devised the scheme.  We didn't devise

9    the scheme.  He takes the money from RG in 2010.  She, as you

10   can imagine, wants to get the money back, and he is giving her

11   all sorts of excuses.  And one of those excuses, and I would --

12   and, you know, look, this motion is -- this motion is more for

13   the edification of the defense than it is for the Court.

14           Go back and look at her interview that was taken in

15   2018.  She's one of the first victims that is -- that is

16   interviewed, and she tells the investigating FBI agent:  He

17   told me my money was in payday lending.  All right.  I don't

18   care if it was or wasn't.  My guess is it isn't, just like a

19   lot of these victims.  The point is is he's engaging in a

20   scheme to separate these investors from their money and

21   diverting that money for his own personal expenditures.

22           During this time frame, as I say in my motion, he made

23   $7 million in payments to his AMEX card, all during the time

24   that she can't get the million dollars of her -- the death

25   benefit from her husband back from him.  And he's saying all of

1  this in which are wire fraud, when you say -- when you are

2  using -- the wire itself doesn't even have to be fraudulent, it

3  just has to further the scheme.  And so when he is --

4       THE COURT:  Let me ask you this.  Are you saying she

5  was a victim of the high yield investment fraud scheme that

6  you've set out in paragraphs 3 and 4?

7       MR. RAPP:  He made her that.  He made her that,

8  because what I am proffering to the Court, and what is -- this

9  isn't out of whole cloth, it's in her -- it's in her 302 that I

10  would refer to --

11       THE COURT:  Let me ask you.  Let's stick with the

12  indictment and the allegations.  Is there something in the

13  indictment -- is there something in the indictment that says --

14       MR. RAPP:  The indictment --

15       THE COURT:  Let me finish.  Let me finish my question.

16  Is there something in the indictment that connects her to the

17  high yield investment fraud scheme that you've set out in

18  paragraphs 3 and 4?

19       MR. RAPP:  We'll do it at trial.  She's a victim

20  investor.  She's going to testify that when he --

21       THE COURT:  It's a yes or no question.  Is there

22  something in the indictment?  Yes or no?

23       MR. RAPP:  No, but there doesn't need to be.  There is

24  sufficient -- there is sufficient allegations in the indictment

25  that categorizes her as a victim investor.  End of story.

```
 1     That's enough for her to be considered a victim investor such
 2     that her money should be included in a money judgment in the
 3     forfeiture allegation.  It just doesn't --
 4           THE COURT:  There doesn't need to be a nexus between
 5     her investment and the scheme which is charged in the
 6     indictment?
 7           MR. RAPP:  I don't even know if there is sufficient on
 8     these other people by the bare bones allegations in an
 9     indictment.  I mean, an indictment is -- is -- is, at a bare
10     minimum, just a notice --
11           THE COURT:  I'll repeat my question.  Are you saying
12     that she doesn't need to be a victim of a high yield investment
13     fraud scheme?
14           MR. RAPP:  She -- she was.
15           THE COURT:  She does not have to be identified in the
16     indictment as a victim of the high yield investment fraud
17     scheme as you've spelled out in the indictment?
18           MR. RAPP:  She is.  When I say she's a victim investor
19     and I characterize --
20           THE COURT:  No, no, no.  I'm talking about the scheme
21     you've identified in your indictment as the high yield
22     investment fraud scheme.
23           MR. RAPP:  Yes, she's a victim.
24           THE COURT:  Are you claiming she's -- and where does
25     it say that?
```

1          MR. RAPP:  It doesn't have to.  She's a victim

2    investor and it says that these victim investors were the

3    victims of a high yield investment fraud scheme.  She is.  When

4    we get to trial, she's going to say, he had me in some kind of

5    payday lending deal when I was asking him for the money back.

6    That's -- that's -- I may not have said RG will testify that

7    she, when asked --

8          THE COURT:  No, we're not -- we don't care what she's

9    going to testify to.  We want to know what you've alleged are

10   the facts.  The allegations in the indictment.

11         MR. RAPP:  In paragraph 3, Harbour solicited investor

12   victims to invest by promising excessive returns in short

13   periods of time.  That's what she -- that's what he did.  He

14   got her to eventually sign a promissory note.

15         Harbour told investors their funds would be invested

16   in short term, high interest rate loans to small and start-up

17   businesses, also known as payday loans.  She is squarely in

18   that.  And the defense will say, oh, no.  She gave her money

19   back in 2010 before the inception of this Green Circle.  And

20   what I would say is --

21         THE COURT:  So she is one of the --

22         MR. RAPP:  She's one of the --

23         THE COURT:  She's one of the people that were

24   solicited as investor victims to invest in promising excessive

25   returns in short term periods of time, that's her --

1          MR. RAPP:  She is because -- well, from the -- from

2    the inception, she -- he didn't go to her and say, I am putting

3    your money in payday loans.  It's only later when he

4    establishes this Green Circle, and she says, hey, where's my

5    money?  He says, you're in this payday lending.

6          So, you know, I don't know if I have to get into that

7    much detail.  What I'm -- it's not -- it's not our words, it's

8    his words to her.  Your money --

9          THE COURT:  It doesn't take a lot of detail, it just

10   takes enough to tell me that she's -- the allegations show

11   there is a nexus between the charges and her investment.

12   That's all I'm looking for.

13         MR. RAPP:  Well, we view her as a victim -- an

14   investor victim.  She's in that same category.  She's no

15   different than anybody else.

16         Now, they may -- there may be different permutations

17   to the representations he's making, there may be different

18   documents that some investors are signing and some aren't, it

19   doesn't matter.  They're investor victims.  And it -- he's

20   representing a whole -- a whole bunch of -- of different

21   reasons why -- reasons where their money is going and reasons

22   why they're not getting it back, but that's sufficient for --

23   for purposes of an indictment, which is just a bare bones

24   notice document.

25         THE COURT:  I'm familiar with what an indictment is.

1    So in paragraph 3, Harbour solicited -- it says, Harbour

2    solicited investor victims, you can put RG's name right in

3    there for every one of those that said investor victims?

4         MR. RAPP:  Yes.  I mean, the only thing I would say

5    there is -- is his -- with her, I mean, this really goes

6    outside the four corners, but he doesn't solicit her for

7    anything.  He just says, I'm going to take your money and

8    invest it.  And then when she tries to get it back later on, he

9    starts talking about the payday lending.

10        THE COURT:  Well, the fraud scheme involves him

11   soliciting victims to invest by promising excessive returns.

12   Is she one of the people he solicited to invest by promising

13   excessive returns in short term periods?

14        MR. RAPP:  Yes.  That's absolutely true.  I mean,

15   that's --

16        THE COURT:  And she was falsely told that her funds

17   would be used as short term loans to small start-up businesses.

18   Is that what she was told?

19        MR. RAPP:  Well, I don't know if she was told that

20   specific, but she was -- she was basically told that we're

21   going to take your money and you're going to get an excessive

22   return on it, that's why you ought to trust in me to handle the

23   management of your money.

24        THE COURT:  Okay.  All right.  Well, I'll take it

25   under advisement.

1              COURTROOM DEPUTY:  Judge, before you --

2              MR. BASKIN:  Your Honor.

3              THE COURT:  Who is speaking, please?

4              MR. BASKIN:  Your Honor, this is Alan Baskin.

5              I understand you're taking it under advisement.  I

6    just had a quick question, not having been before you recently.

7    There is a trial date actually set on November 4th.  I'm trying

8    to get some guidance about that -- about that date, what that

9    means in this particular pandemic.  If the Court could -- could

10   give me some instruction on that.

11             THE COURT:  Well, if it's November 4th, that far out,

12   I would plan on it.

13             MR. BASKIN:  Okay.

14             THE COURT:  While we're on the phone.  There is a

15   motion regarding sealed documents that came in recently.  Have

16   you seen that?

17             MR. BASKIN:  This is Alan, Your Honor.  There is a

18   motion that came in last night that followed some conversations

19   I had with Mr. Rapp.  We'll respond to that in due course.

20   Yes.

21             THE COURT:  Okay.

22             MR. BASKIN:  I've seen it.

23             THE COURT:  I'm going to just tell you, I want you not

24   to disclose anything until I rule on this motion, no public

25   disclosure to anybody until after we get this resolved.

1          MR. BASKIN:  Your Honor, that won't be an issue at
2    all.  No problem.
3          THE COURT:  Okay.  And then, Mr. Rapp, the party
4    seeking to have documents sealed have the burden of
5    establishing a reason for the sealing.  I haven't looked at the
6    reasons, but if there is no reason, I'm not going to seal it.
7    All right.  Okay.
8          I mean, if it's -- if this is -- this is -- this is
9    confidential, that's not enough.  You've got to show me why
10   it's confidential and give me some basis for sealing it.
11         MR. RAPP:  Are you talking about -- are you talking
12   about a recent filing we made or -- or --
13         THE COURT:  There was a motion, I thought, I looked at
14   it briefly this morning, where there were some concerns by --
15   by, I think, by you, Mr. Rapp, that the defense is going to
16   disclose documents that you had turned over to them, and you
17   felt that should be left under seal, if I understood the motion
18   right.
19         Did I misunderstand that?
20         MR. RAPP:  Well, maybe.  All I'm seeking is a
21   protective order.  These documents -- we are -- we are
22   preparing documents and providing documents in this federal
23   criminal prosecution.  They're not to be used in other forums.
24   For example, if I give you an exhibit list and a witness list,
25   that's for -- that's for this case.  That's not to be used in

1   other -- in state cases or to given -- given to a third party,

2   because we can't --

3           THE COURT:  Okay.  Well, let me make it clear.  I

4   don't issue protective orders without a reason.  So if you've

5   got a good reason for a protective order, I'll grant it.  I'm

6   just telling you, the government -- whoever is requesting a

7   protective order needs to give me some reasons that establish

8   good cause for that.  Okay.  That's all I'm saying.

9           All right.  Okay.  So when can the defense get their

10  response in on this?

11          MR. BASKIN:  Your Honor, we will try to get it in by

12  the end of next -- end of next week.

13          And, again, I avow there won't be any disclosure of

14  any -- any documents.  And parenthetically, the filings were

15  made under seal, so -- but I -- I -- I understand the

16  government's concerns, although I don't agree, and we'll

17  address it.  We'll try to get it to you ahead of the date.

18          THE COURT:  Your response will be due on August 28th.

19          MR. BASKIN:  Okay.  We'll make that.  Yes, Your Honor.

20  We'll get it to you.

21          THE COURT:  Okay.  All right.

22          MR. RAPP:  Can I have a reply on that?

23          THE COURT:  Yes.  How much time do you need?

24          MR. RAPP:  I don't need -- maybe four or five days,

25  not the full seven.

1           THE COURT:  A week from August 28th, whatever date

2     that lands on.

3           MR. RAPP:  All right.

4           THE COURT:  That's a Friday.  I think that's -- that

5     would be September 4th.

6           MR. RAPP:  Okay.

7           COURTROOM DEPUTY:  Yes, Judge, September 4th.

8           THE COURT:  All right.  Okay.  I'll take this under

9     advisement.

10          Anything else to take up while we're all together?

11          Are you guys going to be ready to try this case in

12    November?  Anybody?

13          MR. RAPP:  I usually leave it up to the defense to

14    answer that question.  We're presumed to always be ready.

15          I will tell the Court, as I told the Court last time,

16    is that we have received approval for tax charges against the

17    defendant.  We have provided the defense the documents related

18    to -- that support those tax charges.  In other words, there is

19    a special agent report with -- with exhibits that support those

20    tax charges.  So, obviously, we have not indicted him on those

21    tax charges because we haven't had a -- we haven't had a grand

22    jury in this district since February, and so it leaves me very

23    little choice with -- with how to proceed.

24          I mean, we -- we -- we are looking at some options,

25    but we fully expect that those charges would be part of a trial

1    of this defendant.

2            MR. BASKIN:  Your Honor, this is Alan Baskin.

3            Mr. Rapp did provide the special agent report.  We've

4    sent multiple e-mails asking for the exhibits.  Number one, we

5    don't have them.  Number two, there are no new charges,

6    although discovery closed from the government months and months

7    and months ago.  There has been discussion of other charges

8    also.  And so this comes back to my concern about November.

9            If we're -- if you're being told there is going to be

10   new charges and we're ten weeks from the trial, then there is

11   no business having the trial in November.  So -- and I am

12   putting on the record my request for the -- sorry, I am putting

13   on the record my request for those exhibits.

14           I'm sorry, Your Honor.

15           THE COURT:  There is not -- there is nothing in front

16   of me asking for a continuance or anything else, so I'm not

17   moving this trial date.

18           Now, I agree with you, it's probably in your client's

19   best interest to go get this thing resolved globally, that's

20   typically how it works.  I don't know, maybe this case may be

21   different.  But if there is a motion, I'll consider it, but

22   there is nothing in front of me.

23           So as things stand right now, I am going to be

24   prepared to try this case in November, unless something else

25   comes up regarding the virus and the pandemic.  But absent a

1   motion to continue with good cause, we should be ready to try

2   this case.

3           MR. BASKIN:  And -- and, Your Honor, this is Alan

4   Baskin again.

5           I wasn't trying to be argumentative.  I did not

6   introduce the topic of new charges.  To the extent that becomes

7   an issue, or other considerations come into play, we'll

8   definitely bring it to your attention.  I was just inquiring in

9   general as to the trial date.  That's all.

10          THE COURT:  Okay.  Well, I would appreciate if -- if

11  there are new charges and you want a continuance, that you get

12  that in soon so I can -- if we do continue this trial, I can do

13  something with that November date.

14          MR. BASKIN:  Okay.  Your Honor.

15          THE COURT:  All right.  Okay.  Anything else to take

16  up before we close out?

17          MR. RAPP:  Not from the government.  No.  Thank you.

18          MR. BASKIN:  Nothing, Your Honor.  Thank you for all

19  the time today.

20          THE COURT:  All right.  We'll stand in recess bye-bye.

21          MR. BASKIN:  Bye.

22          (Proceedings concluded at 2:32 p.m.)

23                  *          *          *

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 24th day of August,

13  2020.

14

15

16              /s/ Christine M. Coaly
17              Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25

# EXHIBIT 4

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Initials |
|-----------|-----------|----------|----------|
| $1,001,243.00 | 03-22-2010 | 03-22-2020 | RH |

| References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. |
|---|

Borrower:    HPCG, LLC                              Lender: Rhonda Gray
             21020 N. Pima Road                             P.O. Box 5033
             Scottsdale, AZ 85255                           Scottsdale, AZ 85261

---

Principal Amount: $1,001,243.00                    Rate: 3.0% annually                    Date of Note: March 22, 2010

**PROMISE TO PAY.** HighPointe Capital Group ("HPCG, LLC"), an Arizona limited liability company ("Borrower") promises to pay to Rhonda Gray ("Lender") One Million One Thousand Two Hundred Forty Three Dollars and 00/100 ($1,001,243.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance.

**PAYMENT.** Lender will accrue interest on a simple, non-compounded monthly basis of Two Thousand Five Hundred Three Dollars and 11/100 ($2,503.11) per month for one hundred and twenty months (120), see attached Schedule A. Borrower will make a lump sum payment to Lender of One Million Three Hundred One Thousand Six Hundred Fifteen Dollars and 90/100 ($1,301,615.90) on March 22, 2020, see attached Schedule A. If Borrower makes early payments to Lender, the payments will be applied first to any accrued unpaid interest and then to principal outstanding. The interest rate for this Note is computed by applying the ratio of the annual interest rate divided over a twelve month year (.0025%), multiplied by the outstanding principal balance, multiplied by the actual months the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**USE OF FUNDS.** The funds advanced under this Note to Borrower and repaid to Lender is a general business loan and not an investment. The funds advanced under this Note shall be used at the sole discretion of the Borrower and the Manger of the Borrower which shall include expenses related directly to the Manager.

**SOURCE OF FUNDS.** The Lenders funds advanced to Borrower are the Lenders and not that of a third party. Lender acknowledges the funds advanced are not subject to any encumbrances or judgments and the Lender has the right to loan the funds to Borrower.

**FIXED INTEREST RATE.** The interest rate on this Note is fixed at a rate of 3.00% per annum. **NOTICE:** Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.00% of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 10.00% ("Default Interest Rate"). However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower may pay, without a penalty, all or a portion of the amount owed earlier than it is due. Any Prepayment will be first applied to accrued unpaid interest and then to principal outstanding.

**DEFAULT.** The following shall constitute an event of default ("Event of Default") under this Note:

   **Payment Default.** Borrower fails to make any payment when due under this Note.

   **Cure Provisions.** A default in payment is curable. Borrower must not have been given a notice of a breach of Payment Default within the preceding ninety (90) days. The Payment Default may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within ninety (90) days; or (2) if the cure requires more than ninety (90) days, immediately initiates steps and Lender agrees to an extension of more than ninety (90) days to cure such default.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else who is not Lender's salaried employee to help collect this Note if Borrower does not pay. Borrower will be liable for all reasonable costs incurred in the collection of this Note, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

**GOVERNING LAW.** This note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Arizona without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Arizona.

**CHOICE OF VENUE.** Lender agrees to the jurisdiction of the courts of Maricopa County District Court, State of Arizona.

LENDER WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY CLAIM, COUNTERCLAIM, ACTION OR PROCEEDING BASED ON OR PRETAINING TO THIS AGREEMENT.

**DISPUTE RESOLUTION.** ANY DISPUTE SHALL BE FINALLY SETTLED BY AN ARBITRATOR UNDER THE RULES OF ARBITRATION OF THE AMERICAN ARBITRATION ASSOCIATION AS SUCH RULES ARE THEN IN EFFECT. ANY ARIBRATION SHALL BE HELD IN MARICOPA COUNTY, ARIZONA. The arbitrator shall be an individual skilled in the legal and business aspects of the subject matter of the dispute(s) or claim(s) at issue. If after due notice in accordance with such rules any party fails to be present at or fails to obtain an adjournment of the arbitration, the arbitration may proceed in the absence of such party. The arbitrator may grant any remedy or relief within the scope of this Note and the applicable provisions hereof which they deem just and equitable, including without limitation specific performance of the terms of such provisions. Judgment upon the decision of the arbitrator may be entered in any court of competent jurisdiction. Costs of arbitration shall be shared equally by the Borrower and Lender.

**NO PERSONAL LIABILITY OF MANAGER, MEMBER OF BORROWER, DIRECTORS, OFFICERS, HEIRS OF BORROWER:** The terms of this Note, including any rights of Lender enumerated herein, are applicable to Borrower and not the Manager or Member of Borrower. Nothing in this Note should be construed to be binding on the Manager or Member of Borrower individually or personally or to the heirs of the Borrower or Manager of the Borrower.

**COLLATERAL.** Lender acknowledges the funds advanced to Borrower are un-secured.

**GENERAL PROVISIONS.** This Promissory Note sets forth the entire understanding of the parties with respect to the matters described herein, it supersedes all prior agreements or notes between the parties regarding the matters reference herein including both written and oral, and cannot be cancelled, amended or modified except by a written agreement signed by each of the parties clearly stating the new agreement or note is a modification and or amendment of this Promissory Note. This will be a business loan to HPCG, LLC, the Borrower, and the funds will be used at the sole discretion of Borrower. Borrower is not required to get any pre-approvals from Lender on how Borrower or the Manager of the Borrower uses the funds. Lender acknowledges the Manager of Borrower is David Harbour. Lender is relying solely on HPCG and no other entity or individual, including the Manager, to repay Lender. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan. Lender is a sophisticated and accredited investor and represents that by reason of either (a) its business or financial experience or (b) the business or financial experience of its professional advisors who are unaffiliated with and who are not compensated by the Borrower or any Affiliate or selling agent of the Borrower, directly or indirectly, that Lender could reasonably be assumed to have the capacity (i) to evaluate the merits and risks of the loan to Borrower and (ii) to protect its own interests in connection with the loan to Borrower. Additionally, Lender has a preexisting personal or business relationship with Borrower or one or more of its agents, officers or directors and is aware of his, her, its, or their character, business acumen, and general business and financial circumstances. In reaching the decision to extend a loan to Borrower, Lender has carefully evaluated its financial resources and position and the risk associated with this loan, and Lender acknowledges that is able to bear the economics risks of this loan including a loss of principal, and that the Borrower makes no guarantees, express or implied, regarding the repayment of this loan.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

CEO / Manager

## Schedule A

| | | | |
|---|---|---|---|
| Loan Amount | $ | 1,001,243.00 | |
| Date | | 3/22/2010 | |
| Term (months) | | 120 | |
| Annual interest rate | | 3.00% | |

| Date | Month | Beginning Principal Balance | | Accrued Interest | | Ending Principal Balance | |
|---|---|---|---|---|---|---|---|
| 3/22/10 | | $ | 1,001,243.00 | | | $ | 1,001,243.00 |
| 4/22/10 | 1 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/10 | 2 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/10 | 3 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/10 | 4 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/10 | 5 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/10 | 6 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/10 | 7 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/10 | 8 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/10 | 9 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/11 | 10 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/11 | 11 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/11 | 12 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/11 | 13 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/11 | 14 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/11 | 15 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/11 | 16 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/11 | 17 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/11 | 18 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/11 | 19 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/11 | 20 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/11 | 21 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/12 | 22 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/12 | 23 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/12 | 24 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/12 | 25 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/12 | 26 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/12 | 27 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/12 | 28 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/12 | 29 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/12 | 30 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/12 | 31 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/12 | 32 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/12 | 33 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/13 | 34 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/13 | 35 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/13 | 36 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/13 | 37 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/13 | 38 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/13 | 39 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/13 | 40 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/13 | 41 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/13 | 42 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/13 | 43 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/13 | 44 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/13 | 45 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |

## Schedule A

| Date | Month | | Beginning Principal Balance | | Accrued Interest | | Ending Principal Balance |
|---|---|---|---|---|---|---|---|
| 1/22/14 | 46 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/14 | 47 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/14 | 48 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/14 | 49 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/14 | 50 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/14 | 51 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/14 | 52 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/14 | 53 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/14 | 54 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/14 | 55 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/14 | 56 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/14 | 57 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/15 | 58 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/15 | 59 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/15 | 60 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/15 | 61 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/15 | 62 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/15 | 63 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/15 | 64 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/15 | 65 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/15 | 66 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/15 | 67 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/15 | 68 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/15 | 69 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/16 | 70 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/16 | 71 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/16 | 72 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/16 | 73 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/16 | 74 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/16 | 75 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/16 | 76 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/16 | 77 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/16 | 78 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/16 | 79 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/16 | 80 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/16 | 81 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/17 | 82 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/17 | 83 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/17 | 84 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/17 | 85 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/17 | 86 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/17 | 87 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/17 | 88 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/17 | 89 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/17 | 90 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/17 | 91 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/17 | 92 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/17 | 93 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |

## Schedule A

| Date | Month | | Beginning Principal Balance | | Accrued Interest | | Ending Principal Balance |
|---|---|---|---|---|---|---|---|
| 1/22/18 | 94 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/18 | 95 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/18 | 96 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/18 | 97 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/18 | 98 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/18 | 99 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/18 | 100 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/18 | 101 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/18 | 102 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/18 | 103 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/18 | 104 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/18 | 105 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/19 | 106 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/19 | 107 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/19 | 108 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 4/22/19 | 109 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 5/22/19 | 110 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 6/22/19 | 111 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 7/22/19 | 112 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 8/22/19 | 113 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 9/22/19 | 114 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 10/22/19 | 115 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 11/22/19 | 116 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 12/22/19 | 117 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 1/22/20 | 118 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 2/22/20 | 119 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| 3/22/20 | 120 | $ | 1,001,243.00 | $ | 2,503.11 | $ | 1,001,243.00 |
| Total | | $ | 1,001,243.00 | $ | 300,372.90 | $ | 1,301,615.90 |

| | | | |
|---|---|---|---|
| Principal Outstanding | $ | 1,001,243.00 | |
| Accrued Interest Owed | $ | 300,372.90 | |
| **Total amount due at maturity 3/22/20** | $ | **1,301,615.90** | |

# EXHIBIT 5

132 F.Supp.3d 98
United States District Court, District of Columbia.

COMMUNITY FINANCIAL SERVICES
ASSOCIATION OF AMERICA, LTD., et al., Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
et al., Defendants.

Case No. 14–CV–953 (GK)
|
Signed September 25, 2015

**Synopsis**
**Background:** National trade association representing payday lenders, together with payday lender, brought action against Federal Deposit Insurance Corporation (FDIC), Board of Governors of Federal Reserve System, and Office of Comptroller of Currency (OCC), seeking declaratory and injunctive relief to set aside certain informal guidance documents and other actions by defendants as part of their alleged participation in United States Department of Justice (DOJ)-initiated campaign to force banks to terminate their business relationships with payday lenders. Defendants filed motions to dismiss. Plaintiffs filed motion for leave to file second amended complaint.

**Holdings:** The District Court, Gladys Kessler, J., held that:

[1] plaintiffs had standing to bring this action;

[2] plaintiffs' claims were not moot, notwithstanding FDIC's issuance of two new guidance documents;

[3] the agency actions in question were neither final agency actions nor binding norms and, thus, were not subject to judicial review under the Administrative Procedure Act (APA);

[4] plaintiffs sufficiently stated a claim for which due process protections applied; and

[5] plaintiffs sufficiently alleged that their liberty interests were implicated by defendants' alleged actions and that alleged stigma deprived them of their rights to bank accounts and their chosen line of business, so as to state a claim for violation of procedural due process.

Motions to dismiss granted in part and denied in part, and motion to amend granted.

**Procedural Posture(s):** Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (53)

[1]     **Finance, Banking, and Credit**◆─Jurisdiction and authority

Consumer Financial Protection Bureau (CFPB) has authority to supervise payday lenders and promulgate regulations pertaining to payday lending. 🚩 12 U.S.C.A. § 5491(a).

[2]     **Finance, Banking, and Credit**◆─In general; nature and status
**Finance, Banking, and Credit**◆─Powers, functions, and dealings in general

Federal Deposit Insurance Corporation (FDIC) is an independent agency that acts as the primary federal regulator for certain state-chartered banks, in which capacity it prescribes standards to promote banks' safety and soundness, either by regulation or guideline; the agency also examines banks, prepares examination reports, and brings enforcement actions.

[3]     **Finance, Banking, and Credit**◆─Administrative Agencies and Proceedings
**Finance, Banking, and Credit**◆─Jurisdiction and authority

Office of the Comptroller of the Currency (OCC) is an independent bureau within the United States Department of the Treasury that functions as the primary supervisor of federally chartered "national" banks and savings and loan associations; the OCC administers statutory

provisions governing most aspects of the federal banking system and has broad authority to examine the safety and soundness of the banks it supervises.

[4]  **Finance, Banking, and Credit**⚷Federal Reserve Board

Board of Governors of the Federal Reserve System is a federal agency authorized to regulate and examine bank holding companies and state-chartered banks that are members of the Federal Reserve System.

[5]  **Federal Courts**⚷Limited jurisdiction; jurisdiction as dependent on constitution or statutes

As courts of limited jurisdiction, federal courts possess only those powers specifically granted to them by Congress or directly by the United States Constitution.

[6]  **Federal Courts**⚷Weight and sufficiency

Plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction to hear the case. Fed. R. Civ. P. 12(b)(1).

[7]  **Federal Courts**⚷Presumptions and burden of proof

In deciding whether to grant a motion to dismiss for lack of jurisdiction, the court must accept all of the factual allegations in the complaint as true. Fed. R. Civ. P. 12(b)(1).

[8]  **Federal Courts**⚷Evidence; Affidavits

In deciding whether to grant a motion to dismiss for lack of jurisdiction, the court may consider matters outside the pleadings, and may rest its decision on its own resolution of disputed facts. Fed. R. Civ. P. 12(b)(1).

[9]  **Federal Courts**⚷Case or Controversy Requirement

No principle is more fundamental to the judiciary's proper role in this nation's system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. U.S. Const. art. 3, § 2, cl. 1.

[10]  **Federal Civil Procedure**⚷In general; injury or interest
**Federal Courts**⚷Injury, harm, causation, and redress

One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue. U.S. Const. art. 3, § 2, cl. 1.

[11]  **Federal Civil Procedure**⚷In general; injury or interest
**Federal Civil Procedure**⚷Causation; redressability

Irreducible constitutional minimum of standing contains three elements: (1) plaintiff must have suffered an injury in fact which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, (2) there must be a causal connection between the injury and the conduct complained of, and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

[12]  **Federal Civil Procedure**⚷In general; injury or interest
**Federal Civil Procedure**⚷Pleading

Plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation; at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss courts presume that the general allegations embrace those specific facts which are necessary to support the claim.

[13]  **Federal Civil Procedure**⚷Matters deemed admitted; acceptance as true of allegations in complaint

Courts must accept as true all material allegations of the complaint at the pleadings stage.

[14]  **Federal Civil Procedure**⚷In general; injury or interest

**Federal Civil Procedure** Causation; redressability

When plaintiff's asserted injury arises from the government's regulation of a third party that is not before the court, it becomes "substantially more difficult" to establish standing; where standing has been found on the basis of third-party conduct, the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress.

[15] **Federal Civil Procedure** In general; injury or interest

While the court accepts as true all material allegations made by plaintiffs, plaintiffs bear a greater burden of what they must allege in order to show standing on the basis of third-party conduct.

[16] **Declaratory Judgment** Subjects of relief in general

Plaintiffs, a payday lender and a national trade association representing such lenders, had standing to bring action for declaratory and injunctive relief against Federal Deposit Insurance Corporation (FDIC) and other government entities to set aside informal guidance documents and other actions as part of defendants' alleged participation in Department of Justice (DOJ)-initiated campaign to force banks to terminate their business relationships with payday lenders; at pleading stage it was undisputed that plaintiffs suffered injury in fact, as association's members had lost beneficial banking relationships, plaintiffs alleged sufficient facts that, if proven true, could have shown that defendants' conduct was substantial factor motivating decisions of third parties, namely, banks, that were direct source of plaintiffs' injuries, and injunctive relief and/or invalidation of agency documents providing guidance on risk management would result in substantial likelihood of redressability.

1 Cases that cite this headnote

[17] **Federal Civil Procedure** Causation; redressability

In order to establish standing on the basis of third-party conduct, to show causation, plaintiffs must show that defendants' actions were a substantial factor motivating the decisions of the third parties that were the direct source of plaintiffs' injuries.

[18] **Federal Civil Procedure** Causation; redressability

Redressability component of standing requires that plaintiffs demonstrate a substantial likelihood that the requested relief will remedy the alleged injury in fact.

[19] **Federal Civil Procedure** Causation; redressability

"Substantial likelihood" that requested relief will remedy the alleged injury in fact, as required to establish standing, requires more than a remote possibility that plaintiffs' situation might improve were the court to afford relief, but is not so demanding as to require plaintiffs to show to a certainty that a favorable decision will redress their injury.

[20] **Federal Civil Procedure** Causation; redressability

Plaintiffs cannot establish standing by requesting relief that the court lacks the authority to grant.

[21] **Federal Civil Procedure** Causation; redressability

To establish the redressability component of standing, plaintiffs are not required to show to a certainty that a favorable decision will redress their injury.

[22] **Finance, Banking, and Credit** Judicial review or intervention; actions
**Injunction** Financial institutions, transactions, and services

While the section of the Federal Deposit Insurance Act divesting federal courts of jurisdiction to "affect by injunction or otherwise" or "modify" cease-and-desist orders issued by certain federal

banking agencies precludes the court's jurisdiction to issue an injunction that interferes with an enforcement action or other specified orders, that does not preclude the court's ability to grant any injunctive relief whatsoever. 📁 12 U.S.C.A. § 1818(i)(1).

[23]   **Constitutional Law** 🔑 Advisory Opinions
**Federal Courts** 🔑 Rights and interests at stake

Doctrine of mootness is premised upon the notion that a federal court is constitutionally forbidden to render advisory opinions or to decide questions that cannot affect the rights of litigants in the case before them.

[24]   **Federal Courts** 🔑 Weight and sufficiency

Burden to establish that a case is moot is a heavy one.

[25]   **Federal Courts** 🔑 Trade, Business, and Finance

Claims of payday lender and national trade association representing such lenders, in their action against the Federal Deposit Insurance Corporation (FDIC) and other government entities to set aside informal guidance documents and other actions claimed to be part of defendants' alleged participation in Department of Justice (DOJ)-initiated campaign to force banks to terminate their business relationships with payday lenders, were not moot, notwithstanding FDIC's issuance of two new guidance documents clarifying that banks' termination of relationships with payday lenders was not required; while the subject documents may have addressed a portion of plaintiffs' allegations, they did not resolve the entirety of plaintiffs' claims, as invalidation of agency documents was only one facet of the relief sought.

1 Cases that cite this headnote

[26]   **Action** 🔑 Persons entitled to sue
**Federal Civil Procedure** 🔑 In general;  injury or interest

Principle of "prudential standing" denies a right of review if the plaintiff's interests are so marginally

related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

[27]   **Action** 🔑 Persons entitled to sue
**Federal Civil Procedure** 🔑 In general;  injury or interest

Zone of interests test no longer falls under the prudential standing umbrella, nor is the zone of interests test a jurisdictional requirement; instead, the zone of interests test is now considered a merits issue, in which the court asks whether the plaintiff has a cause of action under the statute in question.

[28]   **Federal Civil Procedure** 🔑 Insufficiency in general

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, plaintiff need only plead enough facts to state a claim to relief that is plausible on its face and to nudge his or her claims across the line from conceivable to plausible. Fed. R. Civ. P. 12(b)(6).

[29]   **Federal Civil Procedure** 🔑 Claim for relief in general

Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. Fed. R. Civ. P. 12(b)(6).

[30]   **Federal Civil Procedure** 🔑 Pleading, Defects In, in General
**Federal Civil Procedure** 🔑 Determination

Court deciding a motion to dismiss must not make any judgment about the probability of the plaintiffs' success, must assume all the allegations in the complaint are true, even if doubtful in fact, and must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged. Fed. R. Civ. P. 12(b)(6).

[31]   **Federal Civil Procedure** 🔑 Matters deemed admitted;  acceptance as true of allegations in complaint

Court deciding a motion to dismiss does not accept as true legal conclusions or inferences that are unsupported by the facts alleged. Fed. R. Civ. P. 12(b)(6).

[32] **Federal Civil Procedure**⚿Claim for relief in general

Complaint which tenders naked assertions devoid of further factual enhancement will not suffice. Fed. R. Civ. P. 12(b)(6).

[33] **Administrative Law and Procedure**⚿What constitutes finality in general

In context of the final agency action requirement for judicial review under the Administrative Procedure Act (APA), one way of viewing the final agency action question is whether the action constitutes a de facto rule or binding norm that could not properly be promulgated absent the requirements of the APA; by demonstrating the latter, a party implicitly proves the former, because the agency's adoption of a binding norm obviously would reflect final agency action. 5 U.S.C.A. § 704.

[34] **Administrative Law and Procedure**⚿What constitutes finality in general

Supreme Court's two-part *Bennett* test is used to determine when agency action is reviewable as "final" under the Administrative Procedure Act (APA): (1) the action under review must mark the consummation of the agency's decisionmaking process, that is, it must not be of a merely tentative or interlocutory nature, and (2) the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. 5 U.S.C.A. § 704.

[35] **Administrative Law and Procedure**⚿Finality in General

Final agency action under the Administrative Procedure Act (APA) may be comprised of a series of agency pronouncements rather than a single edict. 5 U.S.C.A. § 704.

[36] **Administrative Law and Procedure**⚿What constitutes finality in general

In evaluating whether legal consequences flow from agency action, such that it is reviewable as "final" under the Administrative Procedure Act (APA), courts may consider the effects of the agency's action, inquiring whether the agency has: (1) imposed any rights and obligations, or (2) genuinely left the agency and its decisionmakers free to exercise discretion. 5 U.S.C.A. § 704.

[37] **Administrative Law and Procedure**⚿Finality in General

Language used by an agency is an important consideration in determining whether legal consequences flow from agency action, such that it is reviewable as "final" under the Administrative Procedure Act (APA). 5 U.S.C.A. § 704.

[38] **Administrative Law and Procedure**⚿What constitutes finality in general

Agency's expressed intentions may be evaluated in determining whether legal consequences flow from agency action, such that it is reviewable as "final" under the Administrative Procedure Act (APA); this entails a consideration of three factors: (1) the agency's own characterization of the action, (2) whether the action was published in the Federal Register or the Code of Federal Regulations, and (3) whether the action has binding effects on private parties or on the agency. 5 U.S.C.A. § 704.

[39] **Finance, Banking, and Credit**⚿Judicial review and enforcement
**Finance, Banking, and Credit**⚿Federal Reserve Board
**Finance, Banking, and Credit**⚿Judicial review or intervention; actions

Alleged actions of Federal Deposit Insurance Corporation (FDIC), Board of Governors of Federal Reserve System, and Office of Comptroller of Currency (OCC) in promulgating certain informal guidance documents for banks, engaging in coercive back-room communications,

and creating de facto rule against providing financial services to payday lenders were neither final agency actions nor binding norms and, thus, were not subject to judicial review under the Administrative Procedure Act (APA); although, given their publication and wide distribution, it was reasonable to view documents as consummation of agencies' decision-making processes rather than as tentative or interlocutory steps, the same could not be said for the amorphous de facto rule, documents did not create legal obligations, but were advisory, providing guidance on agencies' views regarding risk management, and documents did not commit agencies to particular course of action. 5 U.S.C.A. § 704.

[40]   **Administrative Law and Procedure**⬦Agency Action

Guidance that does not tell regulated parties what they must do or may not do in order to avoid liability is merely a general statement of policy, not a final agency action subject to judicial review under the Administrative Procedure Act (APA). 5 U.S.C.A. § 704.

[41]   **Administrative Law and Procedure**⬦Finality in General

Guidance documents must establish a new substantive rule before they can be characterized as "final" action under the Administrative Procedure Act (APA) subject to judicial review. 5 U.S.C.A. § 704.

[42]   **Administrative Law and Procedure**⬦ Requirements for Reviewability in General

In determining whether agency documents reflected "final" agency action, and so were subject to judicial review under the Administrative Procedure Act (APA), the court need not limit its analysis to the four corners of the documents; rather, it may look to post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties. 5 U.S.C.A. § 704.

[43]   **Administrative Law and Procedure**⬦Finality in General

While an enforcement action may be sufficient to show legal consequences, it is not per se indicative of final agency action, for purposes of determining availability of judicial review under the Administrative Procedure Act (APA); the enforcement action must still be evaluated within the *Bennett* rubric of "rights or obligations" or "legal consequences." 5 U.S.C.A. § 704.

[44]   **Constitutional Law**⬦Arbitrariness

Fifth Amendment's due process clause protects the individual citizen from the arbitrary exercise of power by the government. U.S. Const. Amend. 5.

[45]   **Constitutional Law**⬦Procedural due process in general

For a plaintiff to establish a procedural due process claim, it must show that: (1) it has a protected interest, (2) the government deprived it of this interest, and (3) the deprivation occurred without proper procedural protections. U.S. Const. Amend. 5.

[46]   **Administrative Law and Procedure**⬦ Adjudication

Supreme Court has recognized a distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other; adjudicative proceedings require more individualized process than rule-making decisions. U.S. Const. Amend. 5.

[47]   **Constitutional Law**⬦Financial institutions, transactions, and services
       **Finance, Banking, and Credit**⬦Administrative Agencies and Proceedings
       **Finance, Banking, and Credit**⬦Powers, functions, and dealings in general

Allegations of payday lender and national trade association representing payday lenders, that Federal Deposit Insurance Corporation (FDIC)

and other government entities promulgated risk-management guidelines for banks, that they engaged in coercive back-room communications aimed at payday lenders and targeting specific payday lenders, and that they took these actions for the direct purpose of putting payday lenders out of business, stated a claim for which due process protections applied; defendants' alleged actions were not legislative in nature, but were more analogous to an adjudication of payday lenders' right to do business, and the effects of defendants' actions were neither indirect nor incidental. U.S. Const. Amend. 5.

[48]   **Constitutional Law**⟜Rights, Interests, Benefits, or Privileges Involved in General

First inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in "property" or "liberty." U.S. Const. Amend. 5.

[49]   **Constitutional Law**⟜Rights, Interests, Benefits, or Privileges Involved in General

In order to have a life, liberty, or property interest protected by due process, a party must have more than an abstract need or desire; the party must have a legitimate claim of entitlement to it. U.S. Const. Amend. 5.

[50]   **Constitutional Law**⟜Rights, Interests, Benefits, or Privileges Involved in General

Interests afforded due process protection are not created by the Constitution, but are defined by existing rules or understandings that secure certain benefits and that support claims of entitlement to these benefits. U.S. Const. Amend. 5.

[51]   **Constitutional Law**⟜Reputation; defamation

While a company may have a liberty interest in avoiding the damage to its reputation and business caused by stigma, stigma alone is insufficient to implicate due process interests. U.S. Const. Amend. 5.

[52]   **Constitutional Law**⟜Reputation; defamation

**Constitutional Law**⟜Public contracts

In addition to stigma or reputational harm, plaintiff asserting a due process claim must be able to show that: (1) the government has deprived plaintiff of some benefit to which it had a legal right, for example, the right to be considered for government contracts in common with all others, or (2) the government-imposed stigma is so severe that it broadly precludes plaintiff from pursuing a chosen trade or business. U.S. Const. Amend. 5.

1 Cases that cite this headnote

[53]   **Constitutional Law**⟜Financial institutions, transactions, and services
**Finance, Banking, and Credit**⟜Administrative Agencies and Proceedings
**Finance, Banking, and Credit**⟜Powers, functions, and dealings in general

Payday lender and national trade association representing payday lenders stated a claim for violation of their right to procedural due process by alleging that Federal Deposit Insurance Corporation (FDIC) and other government entities promulgated certain informal guidance documents for banks, engaged in coercive back-room communications, and created de facto rule against providing financial services to payday lenders, that stigma resulted from defendant agencies' actions, that the stigma deprived plaintiffs of two interests, namely, their interest in having bank accounts and their interest in their ability to engage in their chosen line of business, and that defendants' actions thus implicated a protected liberty interest. U.S. Const. Amend. 5.

**Attorneys and Law Firms**

**\*105** David Henry Thompson, Harold Smith Reeves, Howard C. Nielson, Jr., Charles John Cooper, Cooper & Kirk, PLLC, Washington, DC, for Plaintiffs.

Duncan Norman Stevens, Erik Bond, Federal Deposit Insurance Corporation, Arlington, VA, Yvonne F. Mizusawa, Federal Reserve Board, Peter Chadwell Koch, Office of the

Comptroller of the Currency, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

Gladys Kessler, United States District Judge

In June 2014, Plaintiffs' Community Financial Services Association of America, Ltd. ("CFSA") and Advance America, Cash Advance Centers, Inc. ("Advance America") filed a Complaint against Defendants the Federal Deposit Insurance Corporation ("the FDIC"), the Board of Governors of the Federal Reserve System ("the Board"), and the Office of the Comptroller of the Currency and Thomas J. Curry, in his official capacity as the Comptroller of the Currency ("the OCC"). Plaintiffs seek declaratory and injunctive relief to set aside certain informal guidance documents and other actions by the FDIC, the Board, and the OCC on the grounds that they exceed the agencies' statutory authority, are arbitrary and capricious, were promulgated without following the procedures required by law, and deprive Plaintiffs of liberty interests without due process of law.

This matter is before the Court on Defendants' Motions to Dismiss for Lack of Jurisdiction and for Failure to State a Claim (collectively, "Motions to Dismiss") [Dkt. Nos. 16, 17, 18], Plaintiffs' Motion for Jurisdictional Discovery ("Motion for Discovery") [Dkt. No. 25], and Plaintiffs' Motion for Leave to File a Second Amended Complaint [Dkt. No. 56]. Upon consideration of the motions,[1] oppositions, replies, surreplies, notices of support, response, the entire record herein, and for the reasons stated below, the Motions to Dismiss are **granted in part and denied in part,** the Motion for Discovery is **denied,** and the Motion for Leave to File a Second Amended Complaint is **granted.**

## I. Background

### A. Factual Overview[2]

[1] Plaintiff CFSA is a national trade organization that represents payday lenders and Plaintiff Advance America is a payday lender and member of CFSA. SAC ¶¶ 14–16. Payday lenders are by and large licensed and regulated by the states, as well as some federal consumer protection laws. Board Mot. at 3. The Dodd–Frank Act gave the Consumer Financial Protection Bureau ("CFPB") authority to supervise payday lenders and promulgate **\*106** regulations pertaining to payday lending. *See* SAC ¶¶ 39–41; Dodd–Frank Act Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5491(a). CFPB is not a party in this case.

[2] Defendant FDIC is an independent agency and acts as the primary federal regulator for certain state-chartered banks. In that capacity, the FDIC prescribes standards to promote banks' safety and soundness, and may do so by regulation or guideline. The FDIC also examines banks, prepares examination reports, and brings enforcement actions. *See* FDIC Mot. at 2; FDIC, *Who is the FDIC?,* available at www.fdic.gov/about/learn/symbol.

[3] Defendant OCC is an independent bureau within the U.S. Department of the Treasury that functions as the primary supervisor of federally chartered (national) banks and savings and loan associations. The OCC administers statutory provisions governing most aspects of the federal banking system and has broad authority to examine the safety and soundness of the banks it supervises. *See* OCC Mot. at 5; OCC, *About the OCC,* available at http://www.occ.gov/about.

[4] Defendant Board of Governors of the Federal Reserve System is a federal agency authorized to regulate and examine bank holding companies and state-chartered banks that are members of the Federal Reserve System. State member banks that are regulated by the Board are also regulated by state banking agencies. *See* Board Mot. at 2–3.

Payday lenders utilize the services of banks as part of their business. For example, "[w]hen a prospective borrower applies for the loan ... he or she typically provides a post-dated check or an electronic debit authorization for the value of the loan, plus a fee. The lender immediately advances the customer funds, then after a specified period of time, usually determined by the customer's next payday, the borrower returns to repay the loan and fee. But if the customer does not return, the terms of the transaction permit the lender to deposit the post-dated check or to execute the debit authorization. In order to have that security, the lender must have a deposit account with a bank and/or access to the Automated Clearing

House (ACH) network." SAC ¶ 28; *see also* OCC Motion to Dismiss ("OCC Mot.") [Dkt. No. 18–1] at 1 ("a payday lender typically must submit checks provided by its borrowers through the payment system by causing the checks to be deposited at a bank.")

Plaintiffs allege that Defendants participated and continue to participate in a campaign initiated by the United States Department of Justice ("DOJ"), known as "Operation Choke Point," to force banks to terminate their business relationships with payday lenders. Operation Choke Point has recently been the subject of a House Committee Investigation and reports. *See* SAC ¶¶ 56–58; STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON THE DEP'T OF JUSTICE'S "OPERATION CHOKE POINT": ILLEGALLY CHOKING OFF LEGITIMATE BUSINESSES? (Comm. Print 2014) ("Comm.Report"); STAFF OF H. COMM. ON OVERSIGHT AND GOV'T REFORM, 113TH CONG., FEDERAL DEPOSIT INSURANCE CORPORATION'S INVOLVEMENT IN "OPERATION CHOKE POINT" (Comm. Print 2014) ("Comm. FDIC Report").

Defendants allegedly forced banks to terminate relationships with Plaintiffs and Plaintiffs' members by first promulgating regulatory guidance regarding "reputation risk," and by later relying on the reputation risk guidance "as the fulcrum for a **\*107** campaign of backroom regulatory pressure seeking to coerce banks to terminate longstanding, mutually beneficial relationships with all payday lenders." Pls.' Opp'n at 9.

### B. Procedural Background

On June 5, 2014, Plaintiffs filed their original Complaint against Defendants asserting violations of the APA and due process [Dkt. No. 1]. The First Amended Complaint was filed on July 30, 2014 ("FAC") [Dkt. No. 12]. On August 18, 2014, the Board filed its Motion to Dismiss for Lack of Jurisdiction, or Alternatively for Failure to State a Claim [Dkt. No. 16] ("Board Mot."). The FDIC filed a similar Motion [Dkt. No. 17] ("FDIC Mot."), as did the OCC [Dkt. No. 18] ("OCC Mot."). On October 2, 2014, Plaintiffs filed their Opposition to Motions to Dismiss [Dkt. No. 23] ("Pls.' Opp'n").

The following day, Plaintiffs filed a Motion for Discovery [Dkt. No. 25] ("Discovery Mot."). On October 31, 2014, the

Board filed its Reply in support of its Motion to Dismiss [Dkt. No. 41] ("Board Reply") and its Opposition to Plaintiffs' Motion for Discovery [Dkt. No. 42] ("Board Discovery Opp'n"); the FDIC filed its Reply [Dkt. No. 46] ("FDIC Reply") and Opposition [Dkt. No. 45] ("FDIC Discovery Opp'n"); and the OCC filed its Reply [Dkt. No. 44] ("OCC Reply") and Opposition [Dkt. No. 43] ("OCC Discovery Opp'n"). Plaintiffs filed their Reply in support of their Motion for Discovery [Dkt. No. 49] ("Pls.' Discovery Reply") on November 10, 2014. Plaintiffs also filed a Surreply to Defendants' Replies in Support of the Motions to Dismiss [Dkt. No. 50] ("Pls.' Surreply") the same day. In response, the FDIC filed a Surreply [Dkt. No. 51] ("FDIC Surreply") on November 14, 2014.

On October 23, 2014, prior to the filing of Defendants' Replies and Discovery Oppositions, Plaintiffs filed a Notice of Supplemental Support [Dkt. No. 35] ("Pls.' First Supp.") notifying the Court of a letter from an FDIC official to a depository institution. On December 12, 2014, after briefing was complete on the Motions to Dismiss and the Motion for Discovery, Plaintiffs filed a Second Notice of Supplemental Support [Dkt. No. 52] ("Pls.' Second Supp.") to notify the Court of a U.S. House of Representatives Committee Report on the FDIC's involvement in Operation Choke Point. On December 23, 2014, the FDIC filed a Response to Plaintiffs' Second Supplemental Notice [Dkt. No. 53] ("FDIC Supp. Resp.").

### II. Second Amended Complaint

After briefing was complete on the Motions to Dismiss and the Motion for Jurisdictional Discovery, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint on April 10, 2015 [Dkt. No. 56]. Defendants' only opposition to the Motion to Amend is that the proposed Second Amended Complaint is futile because it does not overcome the alleged deficiencies in the First Amended Complaint with regard to standing and/or failure to state a claim. Consequently, Defendants argue that the Motion to Amend should be denied as futile. *See* Opp'ns to Motion to Amend. Because this Court finds, *infra*, that Plaintiffs have standing and some claims survive the Motions to Dismiss, and are therefore not futile, Plaintiffs' Motion to Amend will be **granted.** For purposes of deciding the Motions to Dismiss, the Court will rely on the

Second Amended Complaint [Dkt. No. 56–1] ("SAC") in this Memorandum Opinion.

## III. Jurisdiction

### A. Standard of Review Under Fed. R. Civ. P. 12(b)(1)

[5][6][7][8] As courts of limited jurisdiction, federal courts possess only those powers **\*108** specifically granted to them by Congress or directly by the United States Constitution. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The plaintiff bears the burden of establishing by a preponderance of the evidence that the Court has subject matter jurisdiction to hear the case. *See Shuler v. United States,* 531 F.3d 930, 932 (D.C.Cir.2008). In deciding whether to grant a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the court must "accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.,* 402 F.3d 1249, 1253–54 (D.C.Cir.2005) (quoting *United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). The Court may also consider matters outside the pleadings, and may rest its decision on its own resolution of disputed facts. *See Herbert v. Nat'l Acad. of Sci.,* 974 F.2d 192, 197 (D.C.Cir.1992).

### B. Standing

[9][10] As a threshold matter, Defendants argue that Plaintiffs do not have standing. Article III of the Constitution limits the jurisdiction of federal courts to certain "Cases" and "Controversies." *See* U.S. Const. art. 3, § 2. "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA,* ––– U.S. ––––, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013) (quoting *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589, (2006)). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Id.* (internal quotation marks and citation omitted).

[11] "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact ... which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of ... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks, citations, and footnote omitted).

[12] "A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." *Osborn v. Visa Inc.,* No. 14–7004, 797 F.3d 1057, 1063, 2015 WL 4619874, at \*4 (D.C.Cir. Aug. 4, 2015) (citing *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that the general allegations embrace those specific facts which are necessary to support the claim.' " *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

[13] Our Court of Appeals recently reiterated and emphasized the requirement that courts must "accept as true all material allegations of the complaint" at the pleadings stage. *Osborn,* 797 F.3d at 1064, 2015 WL 4619874, at \*5 (internal citation omitted). In *Osborn,* the Court of Appeals found that the plaintiffs' alleged facts were "specific, plausible, and susceptible to proof at trial," and therefore they "pass[ed] muster for standing purposes at the pleadings stage." *Id.* at 1066, 2015 WL 4619874, at \*6.

**\*109** [14][15] "When a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes 'substantially more difficult' to establish standing." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,* 366 F.3d 930, 938 (D.C.Cir.2004) (quoting *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130). Where standing has been found on the basis of third-party conduct, "the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Id.* at 941. Therefore, while the Court accepts as true all material

allegations made by Plaintiffs, Plaintiffs bear a greater burden of what they must allege in order to show standing on the basis of third-party conduct.

[16] In this case, the elements of causation and redressability "hinge on the independent choices of the regulated third party," namely the banks. *Id.* at 938. While it is Plaintiffs' burden to "*adduce* facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury," *Id.* (quoting *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130) (emphasis added), at the motion to dismiss stage, Plaintiffs need only allege facts that are "specific, plausible, and susceptible to proof at trial." *Osborn,* 797 F.3d at 1066, 2015 WL 4619874 at *6.

#### 1. Injury in Fact

Defendants do not dispute that Plaintiffs have suffered an injury in fact. CFSA's members, including Plaintiff Advance America, have lost beneficial banking relationships, causing them on short notice to lose business and expend resources to locate new banking partners. Pls.' Opp'n at 11. Many payday lenders have not been able to replace the terminated bank relationships. *Id.* Plaintiffs have also alleged that Defendants' actions have deprived them of their ability to compete for banks' resources and have stigmatized them. *Id.* at 12–13.

In sum, it is clear that Plaintiffs have alleged facts sufficient to show an injury in fact at the pleadings stage.

#### 2. Causation

Defendants argue that Plaintiffs do not meet the causation prong of standing because their injuries are not "fairly traceable" to any acts by the Defendants, and that it was the independent decisions of the respective banks to terminate their relationships with Plaintiffs' members. *See* Board Mot. at 10–11; FDIC Mot. at 12, 15.

[17] To show causation, Plaintiffs must show that the Defendants' actions were a "substantial factor motivating the decisions of the third parties that were the direct source of the [P]laintiff[s'] injuries." *National Wrestling Coaches,* 366 F.3d at 940–41. Thus the key issue is the degree of

Defendants' alleged involvement or influence on the banks' decisions to terminate relationships with payday lenders.

Plaintiffs allege that the Defendants undertook a "two-stage regulatory campaign designed to cripple and ultimately eliminate the payday lending industry." Pls.' Opp'n at 9. The first stage involved Defendants issuing informal regulatory guidance regarding "reputation risk." Plaintiffs allege that the Defendant agencies expanded the definition of "reputation risk" beyond its traditional understanding to include bad publicity due to the actions of third parties, even when the actions were unrelated to work done on behalf of the bank. SAC ¶¶ 5, 47–51.

Plaintiffs cite to several documents issued by the FDIC, as well as one by the **110** OCC, as examples of the expansion of "reputation risk." *See e.g.,* OCC, Third–Party Relationships: Risk Management Guidance, OCC Bulletin 2013–29 (Oct. 30, 2013); FDIC, Financial Institution Letter: Guidance for Managing Third–Party Risk, FIL44–2008 (June 6, 2008); FDIC, Financial Institution Letter: Guidance on Payment Processor Relationships, FIL–127–2008 (Nov. 7, 2008); FDIC, Financial Institution Letter: Payment Processor Relationships, FIL–3–2012 (Jan. 31, 2012); FDIC, Managing Risks in Third–Party Payment Processor Relationships, 8 SUPERVISORY INSIGHTS (Summer 2011). The Supervisory Insights article included a list of merchant categories—including payday loans—"that have been associated with high-risk activity." Managing Risks in Third–Party Payment Processor Relationships, 8 SUPERVISORY INSIGHTS at 7; Pls. Second Supp., Ex. B at 157 (collectively, "Agency Documents").

The second stage, according to Plaintiffs' theory, is that Defendants relied on the expanded definition of "reputation risk," as outlined in the regulatory guidance, "as the fulcrum for a campaign of backroom regulatory pressure" to coerce banks into terminating relationships with payday lenders. Pls.' Opp'n 9. Defendants allegedly acted in concert with DOJ in Operation Choke Point and "used their prudential 'safety and soundness' regulatory authority" to pressure banks. SAC ¶ 5; *see also* SAC ¶¶ 56–60.

Plaintiffs further allege that, as part of Operation Choke Point, Defendants privately threatened banks with adverse regulatory action if they continued doing business with

payday lenders. *See id.* In support of their theory, Plaintiffs cite to an internal DOJ memo titled "Operation Choke Point: Eight–Week Status Report," in which meetings with the FDIC and the possibility of the FDIC assigning agents to work on DOJ cases were discussed. Pls.' Opp'n at 25 (citing Memorandum from Michael S. Blume, Dir., DOJ Consumer Prot. Branch, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., DOJ Civil Div. at 6 (Apr. 17, 2013), in Comm. Report app. at HOGR–3PPP000048.

Plaintiffs also refer to a February 15, 2013 letter from FDIC Regional Director M. Anthony Lowe to an unidentified bank regarding that bank's involvement in payday lending. *See* Pls.' Supp. Support, Ex. A [Dkt. No. 35–1]. In the letter, Lowe states, "we have generally found that activities related to payday lending are unacceptable for an insured depository institution." *Id.* at 2. Lowe also states that members of the Region's Senior Management will be contacting the bank in the near future "to further discuss [its] concerns relative to the aforementioned [payday lender] relationship." *Id.* Similarly, Plaintiffs cite to an internal email from Marguerite Sagatelian, Senior Counsel with the FDIC Consumer Enforcement Unit, stating that FDIC Legal was "looking into avenues by which the FDIC can potentially prevent [its] banks from facilitating payday lending." Pls. Second Supp., Ex. B at 118 [Dkt. No. 52–2].

Plaintiffs bolster their allegations by noting that the Federal Reserve Board of Governors is the prudential regulator for three banks that have already terminated relationships with Plaintiffs and their members, the OCC is the prudential regulator for seven banks that terminated relationships with Plaintiffs and their members, and that the FDIC is the prudential regulator for four banks that terminated relationships with Plaintiffs and their members. SAC ¶ 84.

Plaintiffs also point to a DOJ memo indicating that it had been in contact with "several state attorneys general, FTC, FDIC, the Federal Reserve Bank of Atlanta, **\*111** and [they] hope to begin working with the OCC soon," in "an attempt to increase their knowledge and attention to the roles banks and payment processors play in facilitating fraud." Memorandum from Michael S. Blume, Dir., DOJ Consumer Prot. Branch, to Stuart F. Delery, Ass't Att'y Gen., DOJ Civil Division at 14 (Sept. 9, 2013), in Comm. Report app. at HOGR–3PPP000339. Finally, Plaintiffs claim that Defendants

undertook the actions they did with the express purpose of pressuring banks to terminate relationships with payday lenders.

In sum, Plaintiffs have alleged sufficient facts, that, if proven true, could show that the Defendants' conduct was a "substantial factor motivating the decisions of third parties that were the direct source of [P]laintiff[s'] injuries." *National Wrestling Coaches,* 366 F.3d at 940–41. Because the "facts alleged by the Plaintiffs are specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage." *Osborn,* 797 F.3d at 1066, 2015 WL 4619874 at *6.

### 3. Redressability

[18][19] Next, Defendants argue that Plaintiffs lack standing because their injuries are not redressable by the Court. Redressability requires that Plaintiffs demonstrate "a substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Teton Historic Aviation Found. v. U.S. Dep't of Def.,* 785 F.3d 719, 724 (D.C.Cir.2015) (quoting *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)). A "substantial likelihood" requires "more than a remote possibility ... that [Plaintiffs'] situation might ... improve were the court to afford relief," *Warth v. Seldin,* 422 U.S. 490, 491, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), but is not so demanding as to require Plaintiffs to "show to a certainty that a favorable decision will redress [their] injury." *Teton,* 785 F.3d at 726 (quoting *Nat'l Wildlife Fed'n v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988)).

Plaintiffs' prayer for relief includes: (1) declaring various Agency Documents to be unlawful, (2) declaring that Defendants significantly changed the definition of reputation risk without notice and comment rulemaking; (3) declaring that Defendants deprived Plaintiffs of liberty without due process of law; (4) enjoining Defendants, "as well as those acting in concert with them," from implementing the aforementioned Agency Documents, from relying on the revised definition of "reputation risk," and from applying informal pressure to banks to encourage them to terminate relationships with payday lenders; (5) enjoining Defendants, "as well as those acting in concert with them," from harming

the reputations of Plaintiffs and from seeking to deprive them of access to financial services; and (6) other such relief as the Court deems just and proper. SAC ¶ 205.

[20] Defendants focus their redressability arguments primarily on the invalidation of the Agency Documents, offering little discussion about Plaintiffs' other requested *112 relief. They also argue that 🚩 12 U.S.C. § 1818(i)(1) prevents this Court from providing any injunctive relief that interferes with "the issuance or enforcement of any notice or order." Board Mot. at 15–16; FDIC Mot. at 43–44; OCC Mot. at 18–19. The nature of any injunctive relief the Court is able to provide is extremely relevant to standing, as "Plaintiffs cannot establish standing by requesting relief that the Court lacks the authority to grant." *Long Term Care Pharmacy All. v. Leavitt,* 530 F.Supp.2d 173, 185 (D.D.C.2008).

Therefore, the Court will address the parties' redressability arguments regarding the invalidation of the Agency Documents and injunctive relief separately, and will then assess the "substantial likelihood" of redressability. 🚩*Teton Historic Aviation Found.,* 785 F.3d at 724.

### i. Invalidation of Agency Documents

Defendants argue that, even if the Court were to invalidate the Agency Documents that allegedly redefine reputation risk and enjoin Defendants' actions, it does not necessarily follow that the banks will re-establish relationships with the Plaintiffs. *See* FDIC Mot. at 16–20; OCC Mot. at 13–14; Board Mot. at 14.

Defendants explain that the Agency Documents do not require banks to sever relationships with any third parties, but only provide guidance on risk management. For that reason, Defendants argue that the documents could not have been the impetus for the termination of the bank relationships, and invalidation of them will not necessarily be the catalyst for reinstatement of the bank relationships. *See* FDIC Mot. at 17; OCC Mot. at 14–15. The Board argues that this is particularly true for it, because Plaintiffs are not even seeking to invalidate any Board documents. *See* Board Mot. at 14.

Defendants argue further that invalidation of the Agency Documents would not provide prospective relief to Plaintiffs.

Banks would still be required to abide by safety and soundness standards, and independently determine whether they can adequately manage risks. *See* OCC Mot. at 14–15; Board Mot. at 14.

Defendants also point out that the Agency Documents do permit banks to have relationships with payday lenders. Moreover, the FDIC notes that it recently promulgated two Financial Institution Letters ("FILs") explicitly stating that banks "that properly manage" relationships with customers engaged in higher-risk activities, and the associated risks, "are neither prohibited nor discouraged from providing" services to those customers. FDIC Mot. at 18–19 (quoting FIL–43–2013). Thus, the FDIC argues that invalidating the Agency Documents is unlikely to provide prospective relief, as there would be no change in the FDIC's official position, which already permits relationships with payday lenders. *Id.* at 19.

[21] Although invalidation of the Agency Documents would not necessarily lead to restoration of banking relationships, it may certainly affect Defendants' ability to pressure banks in the future. Plaintiffs have argued that Defendants relied on the definition of "reputation risk" contained in the Agency Documents as the "fulcrum" of their campaign pressuring banks to terminate relationships with payday lenders. Pls.' Opp'n at 9. Under Plaintiffs' theory, it is likely that the invalidation of the Agency Documents could deprive Defendants of this "fulcrum." Plaintiffs are not required to "show to a certainty that a favorable decision will redress [their] injury." 🚩*Teton Historic Aviation Found.,* 785 F.3d at 726 (internal citation omitted).

### *113ii. 🚩 Section 1818(1) and Injunctive Relief

Defendants argue that Section 1818 of the Federal Deposit Insurance Act ("FDI Act") divests the Court of jurisdiction to grant Plaintiffs most of the injunctive relief they seek. *See* Board Mot. at 15; OCC Mot. at 18–20; FDIC Mot. at 44–45; 🚩 12 U.S.C. § 1818(i)(1). 🚩 Section 1818(i)(1) states that "no court shall have jurisdiction to affect by injunction or otherwise" any ongoing or future enforcement action by Defendants, or to "review, modify, suspend, terminate, or set aside" such actions. 🚩 12 U.S.C. § 1818(i)(1).

As an initial matter, Plaintiffs correctly point out that there is no enforcement action at issue here, nor are they asking the Court to enjoin future enforcement actions. *See* Pls.' Opp'n at 25.

Defendants argue that any injunction the Court might enter is likely to interfere with or effectively enjoin future enforcement actions, and is therefore precluded by 🚩Section 1818(i)(1). *See* Board Mot. at 15–17; OCC Mot. at 20; FDIC Reply at 22–23. The FDIC further argues that the limitation imposed by 🚩 Section 1818(i)(1) extends to supervisory actions as well, such as examination findings and notices of undercapitalized status. *See* FDIC Mot. at 44–45; FDIC Reply at 22–23.

[22] While it is true that 🚩Section 1818(i)(1) precludes this Court's jurisdiction to issue an injunction that interferes with an enforcement action or an order under 🚩 Sections 1818, 1831*o*, or 1831p-l, that does not preclude the Court's ability to grant *any* injunctive relief against Defendants. The exact contours of any injunctive relief this Court might grant would depend on the specific facts that are proven. Mere speculation that an injunction "might" interfere with "any notice or order" does not necessarily mean that the Court has no authority to grant Plaintiffs' claims for injunctive relief that do not cover 🚩 Sections 1818, 1813*o*, or 1831p–1.

Moreover, all the cases cited by Defendants involve challenges to specific enforcement actions or orders. *See, e.g.,* 🚩*Board of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,* 502 U.S. 32, 39, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (court lacked jurisdiction to enforce automatic stay in bankruptcy against agency enforcement proceeding); 🚩*Ridder v. Office of Thrift Supervision,* 146 F.3d 1035, 1039 (D.C.Cir.1998) (no jurisdiction under 1818(i)(1) to enjoin provision in consent order); 🚩 *Groos Nat'l Bank v. Comptroller of the Currency,* 573 F.2d 889, 895 (5th Cir.1978) (court cannot issue declaratory judgment that would prevent agency from pursuing enforcement).

That is simply not the case here. 🚩Section 1818(i) does not necessarily prevent the Court from granting Plaintiffs' requests for injunctive relief.[4]

### iii. Likelihood of Redressability

Even if some injunctive relief might be available to Plaintiffs, the Court must also determine if injunctive relief and/or the invalidation of the Agency Documents will result in a "substantial likelihood" that Plaintiffs' injuries will be redressed.

Defendants point out that other reasons unrelated to the challenged Agency Documents and actions by Defendants may affect banks' individual decisions on whether to reinstate relationships with payday lenders. *See* Board Mot. at 15 (citing 🚩*National Wrestling Coaches,* 366 F.3d at 939); FDIC Mot. at 14. Such factors include **\*114** safety and soundness standards, bank capacity and systems to effectively manage risk, DOJ's continued activities under Operation Choke Point, etc.*See* OCC Mot. at 14; Board Mot. at 14. Due to these factors, Defendants contend, it is not clear that a decision by this Court would change the outcome of banks' decisions.

Plaintiffs believe that, because some banks regretted terminating payday lenders, "they presumably would reverse those decisions if the coercive regulatory influence was removed." Pls.' Opp'n at 20. Plaintiffs support this assumption with letters from banks indicating that the banks were "very sorry" to terminate the relationship, were "frustrated and disappointed" with the situation, and, in the case of one bank, expressing the "hope [that they could] find a way to work together again soon." *Id.* (citations omitted). These letters do suggest that some banks would likely consider re-establishing relationships.

Although they believe banks would resume relationships with them should the Court order relief, Plaintiffs argue that it is not necessary to show that even a single bank would restore service to payday lenders in order to establish redressability. Pls.' Opp'n at 19. Instead, Plaintiffs argue that, to the extent Defendants deprived them of "the ability to compete for banks' limited compliance and risk management resources on an equal footing," and therefore Plaintiffs need only demonstrate that they are "able and ready" to compete for banking services should the Court provide relief. Pls.' Opp'n at 19 (citing 🚩*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

*City of Jacksonville,* and the redressability standard Plaintiffs cite it for, do not support Plaintiffs' argument. *City of Jacksonville* involved a challenge to a minority business program that required 10% of the amount spent on city contracts be set aside for "Minority Business Enterprises." *Id.* at 659, 113 S.Ct. 2297. The Supreme Court found that, in order to establish standing, the plaintiff did not need to show that it would have won the contracts, but rather only needed to demonstrate that the policy prevented it from competing for the contracts on an equal basis. *Id.* at 666, 113 S.Ct. 2297. Unlike *City of Jacksonville,* this case does not involve any sort of set-aside or quota program. Nor was *City of Jacksonville* a third-party standing case, which is "substantially more difficult." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Moreover, Plaintiffs do not even allege that bank relationships were terminated because Plaintiffs were at a competitive disadvantage due to Defendants' actions.

Plaintiffs argue that the injunctive relief they request would "restrain Defendants from inflicting additional injury by continuing to pressure banks to terminate [Plaintiffs'] accounts," thereby providing meaningful prospective relief and redressability. Pls.' Opp'n at 19 (emphasis omitted).

However, Defendants provide little in the way of counterargument as to why injunctive relief would not redress Plaintiffs' injuries. The FDIC and OCC do not address the issue at all, and instead rely wholly on their belief that injunctive relief is not available because of Section 1818(i)(1). *See* FDIC Reply at 3–4; OCC Reply at 9–13. The Board responds that, even if the Court enjoined Defendants from exerting regulatory pressure, it does not necessarily follow that banks would restore any relationships and "banks *still* could terminate these relationships" with payday lenders for a multitude of lawful **115** business reasons. *See* Board Reply at 10–11 (emphasis in original).

While the Board is correct that banks could still terminate payday lenders even if Plaintiffs received injunctive relief, Plaintiffs are not required to show that banks could not, under any circumstances, terminate relationships in order to show redressability. If Plaintiffs are able to prove that injunctive relief would result in a substantial likelihood that banks will restore relationships or not terminate relationships in the future, they have sufficiently established.

Assuming for now the truth of Plaintiffs' allegations that Defendants expanded the definition of reputation risk and relied on that expanded definition to pressure banks into terminating relationships with payday lenders, it is reasonable to conclude that a Court order invalidating the guidance documents and enjoining Defendants would redress Plaintiffs' injuries. In the absence of such pressure, some banks may well choose to reestablish relationships with Plaintiffs. Finally, the absence of such pressure is also likely to prevent additional banks from terminating relationships with Plaintiffs in the future.

In sum, Plaintiffs have alleged facts sufficient to show that there is a "substantial likelihood" that a favorable ruling by this Court would redress their injuries.

### C. Mootness

The FDIC argues that the two guidance documents it has issued render Plaintiffs' case moot, FDIC Mot. at 22, because, to the extent the FDIC Agency Documents may have previously led banks to terminate relationships with payday lenders, the two more recent FILs they have issued expressly clarified that termination of relationships is not required.

The two new guidance documents, as noted previously, are FILs issued in September 2013 and July 2014. The FILs state that banks, with appropriate controls in place, may continue to do business with "merchant customers engaged in higher risk activities," and those who properly manage such relationships "are neither prohibited nor discouraged" from doing business with payday lenders (among others). FIL–43–2013 at 2; FIL–41–2014 at 2. The July 2014 FIL also removed the list of high-risk merchant categories, due to "the misperception that the listed examples of merchant categories were prohibited or discouraged." FIL–41–2014 at 2. Therefore, the FDIC concludes, even if the FDIC Agency Documents did force banks to terminate their relationships with payday lenders, the two FILS negate any such action now.

[23][24] The doctrine of mootness is premised upon the notion that "[a] federal court is constitutionally forbidden to render advisory opinions or 'to decide questions that cannot affect

the rights of litigants in the case before them.' " *Better Gov't Assoc. v. Dep't of State,* 780 F.2d 86, 90–91 (D.C.Cir.1986) (quoting *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)). Plaintiffs state that under the two-pronged test established by the Supreme Court, Defendants bear the burden of showing that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Pls.' Opp'n. at 22 (quoting *Reeve Aleutian Airways, Inc. v. United States,* 889 F.2d 1139, 1142–43 (D.C.Cir.1989)); *see also County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). This burden "is a heavy one." *Reeve Aleutian Airways,* 889 F.2d at 1143).

**\*116** **[25]** The FDIC has not met this heavy burden. The invalidation of the Agency Documents is only one facet of the relief Plaintiffs' seek—Plaintiffs' other alleged harms and requested relief are not mooted by the FDIC's clarification of the Agency Documents. Furthermore, in addition to the allegation that the Agency Documents forced banks to terminate relationships with them, Plaintiffs also allege that the Agency Documents improperly redefine "reputation risk" and violate the APA. SAC ¶¶ 137, 169, 195. The September 2013 and July 2014 FILs do not change the definition of or even mention "reputation risk." *See* FIL–43–2013; FIL–41–2014; *see also* Pls.' Opp'n at 23. Nor do the FILs remedy the alleged APA violations of the previous FILs.

Therefore, while the September 2013 and July 2014 FILs may have addressed a portion of Plaintiffs' allegations, they have not resolved the entirety of Plaintiffs' claims. Therefore Plaintiffs' claims are not moot.

### D. Plaintiffs' Motion for Jurisdictional Discovery
In response to Defendants' contention that the Court has no jurisdiction, Plaintiffs have filed a Motion for Jurisdictional Discovery in order to further support their Complaint. Because the Court has found that it has jurisdiction, Plaintiffs' Motion for Jurisdictional discovery is moot and is therefore **denied.**

### E. Prudential Standing

**[26]** Defendant FDIC argues that, even if Plaintiffs have Article III standing, Plaintiffs fail to meet prudential standing requirements because they are not within the zone of interests protected by the relevant statutes. FDIC Mot. at 20. The principle of prudential standing "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

The FDIC states that the statutes giving it the authority to promulgate guidelines, as well as the FDIC Agency Documents, are focused on promoting the safety and soundness of banks, and that those interests are not implicated by Plaintiffs' claims. FDIC Mot. at 21.

Plaintiffs failed to respond to this argument in their Opposition, and the FDIC argues that Plaintiffs have therefore conceded this point. *See* Pls.' Opp'n; FDIC Reply at 5; *see also Clifton Power Corp. v. Fed. Energy Reg. Comm'n,* 88 F.3d 1258, 1267 (D.C.Cir.1996) (taking as conceded a seemingly sound argument that was not opposed); *Rosenblatt v. Fenty,* 734 F.Supp.2d 21, 22 (D.D.C.2010) ("an argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded").

It was only after the FDIC stated that Plaintiffs had conceded this argument that Plaintiffs filed a Surreply addressing prudential standing. Plaintiffs counter that "inherent in *all* of Plaintiffs' arguments that are based upon the [FDI] Act ... is the proposition that Plaintiffs' injuries fall within the zone of interest protected by the [FDI] Act." Pls.' Surreply at 2–3.

**[27]** However, the Supreme Court's recent decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014), "makes plain the zone of interests test no longer falls under the prudential standing umbrella." *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n,* 788 F.3d 312, 319 (D.C.Cir.2015) (citing *Lexmark,* 134 S.Ct. at 1387 n. 4). **\*117** Nor is the zone of interests test a jurisdictional requirement." *Id.* Instead, the Supreme Court ruled that the zone of interests test is now considered a merits issue, in which the "court asks whether the plaintiff 'has a cause of

action under the statute.' " *Id.* (quoting *Lexmark,* 134 S.Ct. at 1387).

Given the clear holdings from the Supreme Court and our Court of Appeals' clear rulings that the zone of interests test is not related to jurisdiction or standing, the FDIC's argument that Plaintiffs lack prudential standing necessarily must be **denied.**

## IV. Failure to State a Claim

### A. Standard of Review Under Fed. R. Civ. P. 12(b)(6)

[28][29] To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge [ ] [his or her] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563, 127 S.Ct. 1955.

[30][31][32] Under the *Twombly* standard, a "court deciding a motion to dismiss must not make any judgment about the probability of the plaintiffs' success ... [,] must assume all the allegations in the complaint are true (even if doubtful in fact) ... [, and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 17 (D.C.Cir.2008) (internal quotation marks and citations omitted). The court does not, however, accept as true "legal conclusions or inferences that are unsupported by the facts alleged." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.,* 758 F.3d 296, 315 (D.C.Cir.2014) (citation omitted). Furthermore, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " will not suffice. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955) (alteration in *Iqbal* ).

### B. APA Claims

Plaintiffs allege that Defendants violated the APA in a number of ways. The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are, *inter alia*: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations"; or "without observance of procedure required by law." 5 U.S.C. § 706(2).

Plaintiffs allege that Defendants: (1) promulgated binding rules without providing notice and comment, as required by law, *see* SAC, Counts 1, 5, and 9; (2) exceeded their authority conferred by 12 U.S.C. § 1831p–1 to set standards for safety and soundness, *see* SAC, Counts 2, 6, and 10; (3) acted arbitrarily and capriciously, *see* SAC, Counts 3, 7, and 11; and (4) deprived them of protected liberty interests without due process of law, *see* SAC, Counts 4, 8, and 12.

### 1. Final Agency Action Requirement

[33] Before the Court can evaluate the merits of Plaintiffs' APA claims, it must first determine whether Defendants' actions are considered final agency actions. The APA authorizes judicial review only of "[a]gency action made reviewable by statute and final agency action for which there **\*118** is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiffs have cited no provision of the FDI Act authorizing judicial review beyond that which is provided for in the APA. Therefore, the alleged agency actions by Defendants must be final agency actions in order to be judicially reviewable. *Nat'l Ass'n of Home Builders v. Norton,* 415 F.3d 8, 13 (D.C.Cir.2005); *see also Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("When ... review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.' ") (citing 5 U.S.C. § 704).

[34][35] "The Supreme Court has established a two-part test to determine when an agency action is reviewable as final." *Nat'l Ass'n of Home Builders,* 415 F.3d at 13. First, the action under review "must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (quoting *Bennett v. Spear,*

520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' " *Id.* (quoting *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154). Final agency action may be comprised of "a series of agency pronouncements rather than a single edict." *Ciba–Geigy Corp. v. Envtl. Prot. Agency,* 801 F.2d 430, 435 n. 7 (D.C.Cir.1986).

[36][37][38] Our Court of Appeals has also given guidance for evaluating whether legal consequences flow from an action. One line of analysis "considers the effects of an agency's action, inquiring whether the agency has '(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion.' " *Id.* (quoting *CropLife Am. v. Envtl. Prot. Agency,* 329 F.3d 876, 883 (D.C.Cir.2003)). "The language used by an agency is an important consideration in such determinations." *Id.* "The second line of analysis looks to the agency's expressed intentions. This entails a consideration of three factors: (1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Id.* at 806–07 (internal quotation marks and citation omitted).

### 2. Defendants' Actions Constitute Neither Final Agency Actions Nor Binding Norms

[39] Plaintiffs point to two actions by each of the Defendants that they consider final agency actions: 1) the promulgation of the Agency Documents; and 2) coercive back-room communications and the creation of a *de facto* rule against providing financial services to all payday lenders. *See* SAC ¶¶ 116–22, 127, 148–54, 159, 180–184, 189. The FDIC and OCC argue that the Agency Documents do not constitute final agency action, *see* FDIC Mot. at 23–24; OCC Mot. at 21–29, while the Board notes that Plaintiffs do not even allege that any guidance documents issued by the Board violate the APA, *see* Board Mot. at 18. In addition, Defendants argue that **\*119** the communications Plaintiffs cite in support of their argument of a *de facto* rule do not constitute final agency action. Board Mot. at 19; FDIC Mot. at 36–37.

As noted above, under *Bennett,* Defendants' actions cannot be viewed as "final agency action" under § 704 of the APA unless they "mark the consummation of the agency's decisionmaking process" and either determine "rights or obligations" or result in "legal consequences." *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154 (citations and internal quotation marks omitted).

After setting forth the two-step *Bennett* analysis, Plaintiffs inexplicably fail to discuss the first *Bennett* step and make no argument as to how the Agency Documents or the alleged *de facto* rules "mark the consummation of [Defendants'] decisionmaking processes." *See* Pls.' Opp'n at 27–28. The closest Plaintiffs come to addressing the first *Bennett* step is a passing reference stating, without further explanation, that the Agency Documents "purport to reflect the agencies' expertise, experience, and reasoned reflection." Pls.' Opp'n at 29. Plaintiffs continue that "[n]othing in the guidelines suggests that they are 'tentative, open to further consideration, or conditional on future agency action.' " *Id.* (quoting *City of Dania Beach, Fla. v. F.A.A.,* 485 F.3d 1181, 1188 (D.C.Cir.2007)).

Plaintiffs' statement sufficiently alleges that the Agency Documents reflect the consummation of the agencies decision-making process, rather than a tentative or interlocutory step in that process. Given that the documents were published and widely distributed by the FDIC and OCC, it is reasonable to view them as the consummation of the agencies' decision-making processes. Therefore, the Court finds that the first *Bennett* prong has been met with regard to the Agency Documents.

Plaintiffs have alleged that Defendants created a *de facto* rule—in other words, Defendants' alleged "coercive communications with banks," taken together, have effectively created a rule against providing financial services to payday lenders.

It is not readily apparent how the amorphous *de facto* rule against payday lenders alleged by Plaintiffs is the consummation of the Defendants' decision-making processes.[6] In the absence of any explanation by Plaintiffs, the Court concludes that the alleged *de facto* rule fails to meet the first step of the *Bennett* test. Having failed the first prong of the *Bennett* test, any alleged *de facto* rule created by

Defendants is not a final agency action and therefore not subject to review under the APA.[7]

Turning to the second prong of the 🚩 *Bennett* test, Plaintiffs make several arguments regarding the legal consequences of the Agency Documents. Plaintiffs characterize them as "filled with obligatory language and threats of enforcement actions." Pls.' Opp'n at 31. Such characterizations are clearly unsupported by the facts on which Plaintiffs rely. Plaintiffs excerpt phrases from the Agency Documents such as "it is essential that," "it is imperative that," and "the FDIC expects," as examples **120 of obligatory language. *Id.* Read in context, it is clear that the language does not create new legal obligations. Instead, the language is used with regard to banks' overall responsibility to manage risks and third-party risks[8]— obligations that existed prior to the Agency Documents. In addition, the documents consistently use non-mandatory language such as "should," rather than "shall" or "must." *See e.g.,* FIL–127–2008; OCC Bulletin 2013–29; *see also* 🚩 *Holistic Candlers & Consumers Ass'n v. F.D.A.,* 664 F.3d 940, 944 (D.C.Cir.2012) (use of "should" and "may" make plain that "there has been no order compelling the appellants to do anything") (internal citation omitted).

[40] Indeed, Plaintiffs actually acknowledge the advisory nature of the Agency Documents, stating that "[a]lthough the banks' failure to follow the agencies' informal guidance may not directly trigger civil liability, these guidance documents set a standard for risk management that may also be used indirectly in other civil enforcement actions," Pls.' Opp'n at 33, and alleging that some "letters *encourage* banks to cut off relations ... if the risks are too great." *Id.* at 32 (emphasis added). Although the Agency Documents provide guidance on the FDIC and OCC's views regarding risk management, they do not impose any obligations or prohibitions on banks. Guidance that "does not tell regulated parties what they must do or may not do in order to avoid liability" is merely a general statement of policy. 🚩 *National Mining Ass'n.,* 758 F.3d 243, 252 (2014).

[41] Furthermore, the Agency Documents expressly state that they are not obligatory and are meant only to serve as guidance. *See e. g.,* FIL–44–2008 at 2 ("[t]he guidelines should not be considered a set of mandatory procedures"); OCC Bulletin 2013–29 at 1 ("[t]his bulletin provides guidance to national banks and federal savings associations"). While

this alone does not totally insulate the documents from having legal consequences, the agency's characterization of the documents is one of the relevant factors for consideration. 🚩 *Ctr. for Auto Safety,* 452 F.3d at 806–07. Guidance documents must establish a "new substantive rule" before they can be characterized as final action under the APA. *Broadgate, Inc. v. USCIS,* 730 F.Supp.2d 240, 245 (D.D.C.2010).

[42] The Court need not limit its analysis to the four corners of the Agency Documents. Our Circuit has "looked to post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties." 🚩 *Nat'l Min. Ass'n v.McCarthy,* 758 F.3d 243, 253 (D.C.Cir.2014).

Plaintiffs allege that Defendants engaged in a campaign of backroom pressure against banks and payday lenders, relying on the definition of "reputation risk" outlined in the Agency Documents. *See* Pls.' Opp'n at 29. Specifically, Plaintiffs argue that the use of "reputation risk" in many termination letters from banks indicates that the redefinition of "reputation risk" has been actively enforced. *Id.* However, these letters are from banks, not Defendants, **121 and do not indicate any legal consequences or enforcement stemming from the Agency Documents or Defendants.

In a similar vein, Plaintiffs argue that DOJ's attachment of an FDIC guidance document to subpoenas is indicative of the legal effect of the guidance document. Pls.' Opp'n at 33. Plaintiffs cite to 🚩 *Barrick Goldstrike Mines Inc.* for the proposition that an informal action stating an agency's position, along with the threat of enforcement action, may constitute final agency action. *See* Pls.' Opp'n at 29–30 (citing 🚩 *Barrick Goldstrike Mines Inc. v. Browner,* 215 F.3d 45, 48 (D.C.Cir.2000).

[43] While an enforcement action may be sufficient to show legal consequences, it is not *per se* indicative of final agency action. The enforcement action must still be evaluated within the 🚩 *Bennett* rubric of "rights or obligations" or "legal consequences."

In 🚩 *Barrick,* an enforcement letter from the guidance-issuing agency, relying on the guidance document as the basis for enforcement, caused the guidance document to have legal consequences. In this case however, none of the Defendants

have issued any enforcement letters and *Barrick* is not relevant.

DOJ's use of an FDIC guidance document does not necessarily reflect the FDIC's views, nor do any legal consequences flow from the document itself; any legal consequences flow from the actions of DOJ. Plaintiffs point to no case law to support the contention that DOJ's use of the FDIC's document constitutes enforcement action—and therefore final agency action—by the FDIC.

Plaintiffs also allege that the guidelines provide the Defendant agencies with a justification for requiring a bank to submit a safety and soundness plan, which is "an initial step toward exercising their enforcement powers." Pls.' Opp'n at 32. Obviously, there is an important distinction between an initial step toward an enforcement action, and an actual enforcement action. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 731–32 (D.C.Cir.2003) (no final agency action where agency issued preliminary determination of violation of law, but was required by statute to bring a formal action before it could make a legally binding determination). Plaintiffs are not alleging that the Agency Documents commit the FDIC or OCC to a particular course of action. It remains within the FDIC and OCC's discretion to determine whether an enforcement action is warranted.

For all the foregoing reasons, the Court concludes that the Agency Documents are not final agency actions for purposes of § 704 review because they do not determine any rights or obligations. Consequently, they are not subject to judicial review under the APA and all of Plaintiffs claims under the APA fail to state a claim. Therefore, Defendants' Motions to Dismiss shall be **granted** with regard to Counts 1, 2, 3, 5, 6, 7, 9, 10, and 11, as well as the portions of Counts 4, 8, and 12 that plead violations of the APA.

### C. Violation of Fifth Amendment Due Process

In Counts 4, 8, and 12 of the Second Amended Complaint, Plaintiffs allege that Defendants stigmatized them, deprived them of their bank accounts, and threatened their ability to engage in their chosen line of business, all without notice and opportunity to be heard, in violation of their procedural due process rights under the Fifth Amendment to the United States Constitution. *See* SAC ¶¶ 141–47, 173–79, 198–204; U.S. Const. amend. V.

**\*122** [44][45] The Fifth Amendment's due process clause protects the individual citizen from the arbitrary exercise of power by the government. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). For a plaintiff to establish a procedural due process claim, it must show that (1) it has a protected interest, (2) the government deprived it of this interest, and (3) the deprivation occurred without proper procedural protections. *See Indus. Safety Equip. Ass'n, Inc. v. Envtl. Prot. Agency,* 837 F.2d 1115, 1122 (D.C.Cir.1988).

### 1. Applicability of Due Process Protections

Defendants argue that the Supreme Court has held that due process protections are not applicable to legislative activities of an administrative agency that are generalized in nature and affect a large number of parties. *See* Board Mot. at 28–29 (*citing Natural Res. Def. Council, Inc. v.Envtl. Prot. Agency,* 859 F.2d 156, 194 (D.C.Cir.1988); *Bi–Metallic Inv. Co. v. State Bd. of Equalization Colorado,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)); OCC Mt. at 37–38. In *Bi–Metallic,* the Supreme Court held that no hearing was constitutionally required prior to a decision by Colorado to increase the valuation of taxable property. *Bi–Metallic Inv. Co.,* 239 U.S. at 445–46, 36 S.Ct. 141.

[46] However, the Supreme Court has recognized a distinction in administrative law "between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Florida E. Coast Ry. Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). Adjudicative proceedings require more individualized process than rule-making decisions. *See id.* at 244–45, 93 S.Ct. 810.

[47] Plaintiffs' allegations fall somewhere in between the Court's two opposing poles. Plaintiffs first allege that Defendants' promulgated guidelines, which are akin to "policy-type rules or standards." Plaintiffs also allege that Defendants engaged in coercive backroom communications

aimed at payday lenders and targeted specific payday lenders. *See* Pls.' Opp'n at 43 n. 17. Plaintiffs allege that Defendants took these actions for the direct purpose of putting them out of business, which is more akin to an informal adjudication.

The FDIC also argues that the Due Process Clause does not apply to the indirect adverse effects of government action. *See* FDIC Mot. at 43 (citing *O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 789, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980)). While the *O'Bannon* court distinguished "between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally," this case fits into neither category. *O'Bannon,* 447 U.S. at 788, 100 S.Ct. 2467. Though Defendants' alleged actions were directed at the banks, Plaintiffs argue that they were the intended targets—that Defendants undertook the actions with the express purpose of affecting Plaintiffs. Taking Plaintiffs' allegations as true, the impact was neither "indirect" nor "incidental," and therefore *O'Bannon* is inapplicable.

Defendants' actions, as alleged by Plaintiffs, are not legislative in nature and are more analogous to an adjudication of payday lenders right to do business. Nor are the effects of Defendants' alleged actions indirect or incidental. Therefore, the Court concludes that Plaintiffs have sufficiently **\*123** stated a claim for which due process protections apply.

### 2. Interests Protected by Due Process

[48][49][50] Turning to the merits of Plaintiffs' alleged due process claim, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' " *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 59, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (U.S. Const.amend.14). In order to have a life, liberty, or property interest, a party must have more than an abstract need or desire—the party must have "a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Interests afforded due process protection are not created by the Constitution, but are defined by existing

"rules or understandings that secure certain benefits and that support claims of entitlement to these benefits." *Id.*

Plaintiffs allege that the stigma resulting from Defendants' actions have affected two of their protected interests: 1) an interest in their bank accounts; and 2) an interest in their ability to engage in their chosen line of business. Pls.' Opp'n at 42–43.

[51][52] While a company may have a "liberty interest in avoiding the damage to its reputation and business" caused by stigma, *Reeve Aleutian Airways, Inc. v. United States,* 982 F.2d 594, 598 (D.C.Cir.1993), the Supreme Court has held that stigma alone is insufficient to implicate due process interests, *see Gen. Elec. Co. v. Jackson,* 610 F.3d 110, 121 (D.C.Cir.2010) (citing *Paul v. Davis,* 424 U.S. 693, 708, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In addition to stigma or reputational harm, the plaintiff must be able to show "that (1) the government has deprived them of some benefit to which they have a legal right, e.g., the right to be considered for government contracts in common with all other persons; or (2) the government-imposed stigma is so severe that it broadly precludes plaintiffs from pursuing a chosen trade or business." *Id.* at 121 (internal quotation marks and citations omitted).

[53] Plaintiffs have alleged that the stigma promulgated by Defendants has resulted in lost banking relationships, and that the continued loss of banking relationships may preclude them from pursuing their chosen line of business. Pls.' Opp'n at 42–43. This is sufficient to constitute a "tangible change in status" and implicate a protected liberty interest. *O'Donnell v. Barry,* 148 F.3d 1126, 1141 (D.C.Cir.1998).

Plaintiffs also argue that the stigma deprived them of their right to a bank account. Plaintiffs cite to *National Council of Resistance of Iran v. Department of State* ("*NCRI* ") for the proposition that our Court of Appeals has previously held that a colorable allegation of a property interest in a bank account is sufficient to support a due process claim. *See* Pls.' Opp'n at 42–43 (citing *NCRI,* 251 F.3d 192, 204 (D.C.Cir.2001)).

It is important to distinguish between the right to have a bank account, and the right to the contents of one's bank account. In *NCRI,* it was not only the bank account alone, but also the

funds that it contained. *NCRI, 251 F.3d at 204.* The issue here is not that Plaintiffs have been denied access to their funds, but that they have been denied an account at all.

In *Wisconsin v. Constantineau,* the Supreme Court held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *See* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). The Supreme Court elaborated its **\*124** *Constantineau* holding in *Paul v. Davis,* stating that when an individual is "deprived ... of a right previously held under state law" as a result of stigmatization, due process is required. *Paul v. Davis,* 424 U.S. 693, 708, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The deprivation at issue in *Constantineau* was "the right to purchase or obtain liquor in common with the rest of the citizenry." *Id.*

Plaintiffs have alleged a similar deprivation here—"the previously held right to ... hold bank accounts." *NCRI, 251 F.3d at 204.* "Many people ... would consider [this] right[ ] more important than the right to purchase liquor." *Id.* The loss of a bank account as a result of stigma is sufficient to implicate a right to due process.

In sum, Plaintiffs have sufficiently alleged that their liberty interests are implicated by Defendants' alleged actions and that the alleged stigma has deprived them of their rights to bank accounts and their chosen line of business, so as to state a claim for violation of constitutional due process.

## V. Conclusion

For all of the foregoing reasons, Defendants' Motions for Lack of Jurisdiction, or Alternatively for Failure to State a Claim are **granted in part and denied in part.** Plaintiffs' Motion for Jurisdictional Discovery is **denied,** and Plaintiffs' Motion for Leave to File a Second Amended Complaint is **granted.** An Order shall accompany this Memorandum Opinion.

## All Citations

132 F.Supp.3d 98

## Footnotes

1   *See* Section I. B, Procedural Background, *infra*, for a detailed history of the relevant briefs and their shorthand citations.

2   For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. *Aktieselskabet AF 21.November 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 15 (D.C.Cir.2008); *Shear v. Nat'l Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979). Therefore, the facts set forth herein are taken from the First Amended Complaint. The Court is not required though, to accept "a legal conclusion couched as a factual allegation" or inferences unsupported by the facts set forth in the complaint. *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 193 (D.C.Cir.2006).

3   Plaintiffs argue that they need only allege that the relief requested would result in a "significant increase in the likelihood" that their banking relationships will be reinstated." Pls.' Opp'n at 19–20 (citing *Utah v. Evans,* 536 U.S. 452, 464, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002)). Both phrasings are used in our Circuit and are essentially the same in practice. *See, e.g., Town of Barnstable, Mass. v. Fed. Aviation. Admin.,* 659 F.3d 28, 31 (D.C.Cir.2011) (stating "significant increase in the likelihood" and "substantial probability" are synonymous); *Spectrum Five LLC v. Fed. Commc'ns Comm'n,* 758 F.3d 254, 261 (D.C.Cir.2014) (utilizing "significant increase in the likelihood" standard).

4   The FDIC also argues that Plaintiffs' requested injunctions are overbroad and improper. FDIC Mot. at 45. While the FDIC may turn out to be correct, that alone does not, at this time, defeat jurisdiction to provide injunctive relief.

5   An alternate way of viewing the final agency action question is whether the action constitutes "a *de facto* rule or binding norm that could not properly be promulgated absent" the requirements of the APA. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,* 452 F.3d 798, 806 (D.C.Cir.2006). By demonstrating the latter, a party implicitly proves the former, "because the agency's adoption of a binding norm obviously would reflect final agency action." *Id.*

6   Plaintiffs' allegation of a *de facto* rule is not to be confused with a legal conclusion that Defendants created a *de facto* rule sufficient for purposes of § 704.

7   In the SAC, Plaintiffs also allege that Defendants coerced Early Warning Services ("EWS"), a credit reporting company, "directly and indirectly through its five parent banks" to set an effective Annual Percentage Rate cap of 36% and cease providing its services to payday lenders. SAC ¶ 112. EWS is not regulated by Defendants. Plaintiffs fail to allege in the SAC any facts that could support an argument that Defendants' alleged coercion was the consummation of the Defendants' decision-making processes.

8   For example: "*The FDIC expects* a financial institution to adequately oversee all transactions and activities that it processes and to appropriately manage and mitigate operational risks, Bank Secrecy Act (BSA) compliance, fraud risks, and consumer protection risks, among others." FIL–3–2012 at 2 (emphasis added); "Financial institutions that do not adequately manage these relationships may be viewed as facilitating fraudulent or unlawful activity by a payment processor or merchant client. Therefore, *it is imperative* that financial institutions recognize and understand the businesses with which they are involved." FIL–127–2008 at 1 (emphasis added).

---

**End of Document**                                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   23

# EXHIBIT 6

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-21-02195-001-TUC-CKJ (DTF) |
|---|---|
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Shaun Knox, | |
| Defendant. | |

Pending before the Court is Defendant Shaun Knox's ("Knox" or "Defendant") a Motion to Strike Indictment Surplusage that was filed on October 20, 2021. (Doc. 17.) The Government filed a timely response (Doc. 19) and Defendant filed a timely reply (Doc. 21).

Pursuant to LRCrim. 5.1, this matter came before the undersigned Magistrate Judge for an evidentiary hearing and a report and recommendation. Oral argument on the motion was held on November 19, 2021. The Court, having considered the briefing, arguments, and evidence presented, recommends that the motion to strike surplusage should be granted for the reasons discussed below.

**FACTUAL BACKGROUND**

On September 1, 2021, the Defendant was indicted on four counts of indecent exposure while incarcerated in violation of Arizona Revised Statutes §§ 13-1402(A) and (C), and 18 U.S.C. §§ 7(3) and 13. (Doc. 1.) The alleged conduct took place at the Tucson Federal Correctional Complex ("FCC Tucson") in Tucson, Arizona, in which Defendant is

accused of exposing his genitals to female correctional employees on February 2, 2021; May 21, 2021; June 16, 2021; and June 25, 2021. (*Id.*; Doc. 19 at 2–3.) Under each of the four counts, the Government included the following language "and after having been convicted of Sexual Abuse, a felony, in violation of 18 U.S.C. §§ 1153, 2242, and 2246(2)(A), on March 8, 2010 in the United States District Court, District of South Dakota." (Doc. 1 at 1–3.) On October 20, 2021, Defendant filed the instant Motion to Strike Indictment Surplusage (Doc. 17) to challenge the inclusion of this language under each count.

## DISCUSSION

The indictment in this case states that on February 2, 2021; May 21, 2021; June 16, 2021; and June 25, 2021; "on land acquired for the use of the United States;" Defendant exposed his genitals in the presence of various correctional employees; was reckless about whether the correctional employees, as reasonable people, would be offended or alarmed by the act "and after having been convicted of Sexual Abuse, a felony, in violation of 18 U.S.C. §§ 1153, 2242, and 2246(2)(A), on March 8, 2010 in the United States District Court, District of South Dakota." (Doc. 1 at 1–3.)

Defendant moves pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure to strike language related to the past conviction for sexual abuse contained within each count in the indictment. (Doc. 17 at 1.) Defendant's motion to strike relies on the assertion that the inclusion of language regarding his past conviction of sexual abuse is irrelevant and prejudicial surplusage. (*Id.* at 3.) Specifically, Defendant asserts that prior convictions under Ariz. Rev. Stat. § 13-1402(C) "are relevant only to determine how the offense should be classified, and if convicted, whether the defendant's sentence will be enhanced," and that his prior conviction for sexual abuse is not an element of his indecent exposure charges. (*Id.* at 4.) Defendant further contends that Ariz. Rev. Stat. § 13-1402(C) "specifies that the prior convictions must be for violations of Ariz. Rev. Stat. §§ 13-1402 and 13-1406," and since his prior conviction does not fall under either statute, it cannot be used for the purposes of sentencing enhancement. Finally, Defendant avers that the surplus language

is also prejudicial on its face and would only serve to taint a jury with improper considerations. (*Id.* at 4–6.)

In its Response, the Government argues that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." (Doc. 19 at 3) (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). The Government further asserts since the elements of the prior foreign federal conviction are the same or more restrictive that then charged offenses under the state statute, it can be used "to narrow the statutory basis of the foreign conviction, not to establish the conduct underlying it." (Doc. 19 at 4) (citing *State v. Dunbar*, 465 P.3d 527, 540 (Ariz. Ct. App. 2020), *review denied* (Dec. 15, 2020)). Finally, the Government assets that the elements of 18 U.S.C.A. § 2242, as defined in 18 U.S.C.A. § 2246(2), mirrors those of Ariz. Rev. Stat. § 13-1406, and thus, "can be used to increase the defendant's charges to felony offenses." (Doc. 19 at 3–4.)

Defendant filed his Reply brief and noted that *Apprendi* explicitly excludes prior convictions from the category of facts that must be submitted to a jury. (Doc. 21 at 2.) Defendant further notes that the Government did not attempt to rebut his assertion that the language is prejudicial. (Doc. 21 at 2.) Finally, Defendant argues that his prior conviction would not meet the test for establishing a prior historical conviction as set forth in *State v. Crawford*, 214 Ariz. 129 (2007), because the prior federal conviction does not contain the *mens rea* element that must be met under the equivalent state statute. (Doc. 21 at 5.)

At oral argument Defendant reasserted the arguments contained within his briefing and emphasized that the plain language of the statute does not make a prior conviction an element of the crime of indecent exposure. Additionally, Defendant conceded that a change in the language to simply indicate that an act occurred that was a felony offense might sufficiently resolve the prejudicial effect of the language. The Government stated that the prior conviction classifies the charges as a misdemeanor or a felony, as a result they had to raise it before the grand jury because they are seeking felony charges. Similarly, the Government stated that they had to include the language because they are

seeking felony charges and they had to put Defendant and the Court on notice. As such, the Government concedes that the language can be stricken, so long as there is a procedure in place to allow them to seek elevation to a class 6 felony pursuant to Ariz. Rev. Stat. § 13-1402(C) and a determination that Defendant and the Court have sufficient notice that it is their intent to seek felony charges on all four counts. The Government also admitted the potential prejudicial effect but noted that there are procedural mechanisms that could protect Defendant from any unfair prejudice.

The Court notes that the Parties did not cite to any case law directly on point, nor did the Court find any that specifically addresses Ariz. Rev. Stat. § 13-1402(C) and its application. However, the Court agrees with Defendant that the plain language of Ariz. Rev. Stat. § 13-1402 did not make a prior conviction an element of the crime of indecent exposure under subsection (A).[1] Rather, subsection (C) provides that prior convictions under §§ 13-1402 and 13-1406 can elevate the defendant's indecent exposure charge from a class 1 misdemeanor to a class 6 felony. Ariz. Rev. Stat. § 13-1402(C). Where a prior conviction is not explicitly set forth as an element in the statute, *Apprendi* held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Accordingly, since Defendant's prior conviction is not an element necessary to prove that Defendant committed indecent exposure in violation of Ariz. Rev. Stat. § 13-1402, the Court finds that the determination of whether Defendant's prior conviction meets the criteria to elevate his indecent exposure charge from a misdemeanor to a felony is a legal question for the Court, not a question of fact that is reserved for the jury. The adequacy of the charge as a felony is one that can be determined during the sentencing phase if Defendant is convicted.

Additionally, at oral argument, the Government stated that they were compelled to include the language at issue to place the Defendant and the Court on notice that it is their

---

[1] Indeed, the 2021 revisions to the Revised Arizona Jury Instructions issued by the State Bar of Arizona do not include a prior conviction as an element to the crime of indecent exposure. *See* RAJI (Criminal) 5th, at § 14.02 (2021).

intention to seek class 6 felony charges for each of the four counts in the indictment, and conceded that otherwise they do not oppose striking the language at issue in the instant motion. The Government also agreed that the language at issue could be considered prejudicial but asserted that any potential for unfair prejudice could be avoided by ensuring that there are procedural protections in place.

Consequently, the Court finds that Defendant's motion to strike is due to be granted and the language related to his past conviction should be stricken from the indictment. The Court finds that Defendant and the Court have been placed on notice that the Government is seeking to charge Defendant with class 6 felonies for each of the four counts included in the indictment.

## CONCLUSION

Accordingly, IT IS RECOMMENDED that Defendant Knox's Motion to Strike Indictment Surplusage (Doc. 17) be GRANTED.

IT IS THEREFORE RECOMMENDED, that the following be struck from each count in the Indictment: "and after having been convicted of Sexual Abuse, a felony, in violation of 18 U.S.C. §§ 1153, 2242, and 2246(2)(A), on March 8, 2010 in the United States District Court, District of South Dakota." (Doc. 1 at 1–3.)

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the district court. The parties shall have fourteen days within which to file responses to any objections. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2). Failure to file timely objections to this recommendation may result in the acceptance of the recommendation by the district court without de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 23rd day of November, 2021.

Honorable D. Thomas Ferraro
United States Magistrate Judge

# EXHIBIT 7

1    **WO**

2

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

9    United States of America,                No. CR-21-02195-001-TUC-CKJ (DTF)

10              Plaintiff,                     **ORDER**

11   v.

12   Shaun Knox,

13              Defendant.

14

15

16       On November 23, 2021, Magistrate Judge D. Thomas Ferraro issued a Report and

17   Recommendation ("R&R") in which he recommended that certain language be struck from

18   the indictment in this case. (Doc. 23)  The Government has failed to file an objection to

19   the R&R, and the deadline by which to do so, December 7, 2021,  has passed.

20       The standard of review applied to a Magistrate Judge's R&R is dependent upon

21   whether a party files objections – the Court need not review portions of the R&R to which

22   a party fails to object. *Thomas v. Arn*, 474 U.S. 140, 149 (1985).  "[W]hile the statute does

23   not require the [court] to review an issue de novo if no objections are filed, it does not

24   preclude further review by the [court], sua sponte or at the request of a party, under a de

25   novo or any other standard." *Id*. at 154.  The Court reviews for clear error portions of the

26   R&R to which there is no objection.  *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739

27   (7th Cir. 1999); *see also Campbell v. United States Dist. Ct.*, 501 F.2d 196, 206 (9th Cir.

28   1974).

The Court has reviewed and considered the Magistrate Judge's R&R and related documents and finds no error.

**IT IS ORDERED:**

1.  The Report and Recommendation (Doc. 23) is ADOPTED.

2.  The following language shall be struck from each count of the Indictment:

"and after having been convicted of Sexual Abuse, a felony, in violation of 18 U.S.C. §§ 1153, 2242, and 2246(2)(A), on March 8, 2010 in the United States District Court, District of South Dakota." (Doc. 1 at 1-3)

3.  This matter remains set for jury trial on January 11, 2022, at 9:30 A.M.

Dated this 13th day of December, 2021.

Honorable Cindy K. Jorgenson
United States District Judge

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,    )
                             )    NO.    CR 08-00212-TUC-DCB (BPV)
                Plaintiff,   )
                             )
        vs.                  )    **ORDER**
                             )
RICHARD RENZI, JAMES SANDLIN,)
ANDREW BEARDALL, and DWAYNE)
LEQUIRE,                     )
                             )
                Defendants.  )
_____)

On October 15, 2008, Defendant Renzi filed a motion to strike surplusage in the indictment. (Doc. No. 102.) The Government filed a timely response (Doc. No. 145) and a reply memorandum was filed (Doc. No. 167).

The matter came on for Oral Argument before the Court on December 5, 2008.

The Court, having considered the briefing, arguments, and evidence presented, orders that the motion to strike surplusage should be GRANTED IN PART and DENIED IN PART for the reasons discussed below.

**I.    DISCUSSION**

Renzi moves pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure to strike allegations contained in ¶¶ 1, 11, 14, 15 and 26(k), that Renzi served on the Natural Resources Committee of the House of Representatives and describe the Committee's responsibilities, as impermissible under the Speech or Debate Clause of the U.S. Constitution.

Renzi also moves to strike ¶¶ 6-9 of the indictment, that cite a series of civil laws and internal rules relating to the conduct of Members of the House of Representatives, as they could confuse the jury by creating the misleading impression that a violation of these internal rules or civil laws also constitutes a criminal offense.

The Government objects, submitting that Renzi's motion, at bottom, is a substantive attack on the evidence against him, rather than a legitimate motion to strike "irrelevant or immaterial" allegations in the Indictment.

A.    The Allegations

There are two groups of allegations that Renzi has moved to strike. The first group involves allegations regarding legislative status. Renzi contends that the following allegations relating to Renzi's service on the Natural Resources Committee violate the Speech or Debate Clause of the United States Constitution, and must be stricken from the indictment:[1]

> 1.    RICHARD G. RENZI ("RENZI") was a Member of the United States House of Representatives as Representative for Arizona's First Congressional District. He was first elected in November 2002, and was reelected in 2004 and 2006. RENZI maintained congressional offices in both Washington, D.C., and in the District of Arizona. At all times relevant to this Indictment, RENZI was a member of the House of Representatives Natural Resources Committee.
>
> . . .
>
> 11.    The Secretary of the Interior has authority to approve certain land

---

[1]    On November 13, 2008, after the Motion to Strike Surplusage was filed, the Government filed a Superseding Indictment (Doc. No. 178), resulting in the renumbering of all but the first paragraph at issue in this case. Thus, paragraphs 1, 11, 14, 15 and 26(k) in the original indictment are paragraphs 1, 13, 16, 17 and 27(k) in the superseding indictment.

The Court, for continuity purposes, will refer to the paragraphs in the original indictment, as that is how they were presented to the Court and referred to by all parties in their memorandum. The Court's order, however, will reflect the number of the paragraphs as set out in the Superseding Indictment.

exchanges. Some land exchanges, such as those involving land in different states or land managed by different federal agencies, require legislative approval. In the United States House of Representatives, land exchanges fall under the jurisdiction of the Natural Resources Committee, of which RENZI was a member.

14. .... The land exchange [proposed by Company A] would need legislative approval by Congress. The Natural Resources Committee would need to approve the proposed legislation prior to a floor vote in the House of Representatives.

15. ....As with Company A's proposal, Investment Group B's proposal would require legislative approval and undergo scrutiny by the Natural Resources Committee.

. . .

26(k). During the April 16, 2005, meeting between RENZI and Investment Group B, RENZI insisted that Investment Group B purchase the Sandlin Property as part of its land exchange proposal and told Investment Group B that it would receive a "free pass" through the House of Representatives Natural Resources Committee.

(Indictment ("Ind."), ¶¶ 1, 11, 14, 15, 26(k))

The second group of allegations relates to the civil laws and internal rules of the House of Representatives that set out prophylactic ethical rules for Members of Congress. Renzi submits that the Court should strike the following allegations because they are non-justiciable and because they could confuse the jury by creating the misleading impression that a violation of an internal rule also constitutes a criminal offense:

6. RENZI and other Members of the House of Representatives were required to take the following oath of office at the beginning of each new Congress:

I, [Member's Name], do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will

well and faithfully discharge the duties of the office on which I am about to enter: So help me God.

7. In addition to the above oath, the Rules of the United States House of Representatives provided that:

> a. a Member of the House of Representatives was prohibited from receiving outside compensation as a result of the improper exercise of influence from the Member's position in Congress; and

> b. a Member was required to file truthful annual Financial Disclosure Statements with the Clerk of the House;

8. RENZI also had a specific statutory duty each year, under Title I of the Ethics in Government Act of 1978, as amended (5 U.S.C. app. 4, § 101 et seq.) to file annual Financial Disclosure Statements.

9. Consistent with his oath of office and the duties of the office he held, Defendant RENZI owed the citizens of the United States and the United States House of Representatives a duty to perform the responsibilities of his office free from deceit, self-dealing, bias, and concealment.

(Ind.,¶¶ 6, 7, 8, 9.)

B.   Analysis

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). Rule 7(d) further provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment ...." Insofar as the language of an indictment goes beyond alleging elements of the crime, it is mere surplusage that need not be proved, and must not be allowed to prejudice a defendant in the context of his case. *United States v. Jenkins*, 785 F.2d 1387, 1392 (9ᵗʰ Cir. 1986) (citations omitted). "The purpose of Rule 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *United States v. Ramirez*, 710 F.2d 535, 545 (9ᵗʰ Cir. 1983) (citation omitted).

> 1.   *Allegations regarding legislative status: Paragraphs 1, 11, 14, 15 and 26(k)*

Renzi's motion to strike portions of these paragraphs rely on the assertions contained

1    in Renzi's motion to dismiss based on violations of the Speech or Debate Clause.  Renzi

2    argues that, should the Court decided not to dismiss the counts, the Court should, at

3    minimum, strike the portions of the indictment that relate to Renzi's service on the Natural

4    Resources Committee ("NRC").  Renzi raises no independent argument, under Rule 7(d), for

5    striking these portions of the indictment as surplusage.  Renzi relies for support primarily on

6    the Eleventh Circuit case *U.S. v. Swindall*, 971 F.2d 1531 (11th Cir. 1991).  In *Swindall*, the

7    Eleventh Circuit held that Speech or Debate Clause of the U.S. Constitution prohibited

8    inquiry into the subject of committee membership.  *Id.*, at 1546.

9         Renzi's reliance on the Eleventh Circuit's decision in *United States v. Swindall* is

10   misplaced. *See* 971 F.2d 1531 (11th Cir. 1992).  As the Government contends, this case is

11   distinguished from *Swindall*, because in *Swindall* it was the use the government made of

12   Swindall's legislative status that concerned the court of appeals - the government argued that

13   the trier of fact could draw inferences from his legislative status as a member of the banking

14   and judiciary committee.  The court of appeals concluded that if the inference were drawn

15   that Swindall acquired such knowledge through his committee membership, that the

16   conclusion would have to be made that he acquired such knowledge by performing a

17   legislative act such as reading a committee report or talking to a member of his staff.  *Id.* at

18   1543.  Unlike *Swindall*, which required that the Government prove Swindall had knowledge

19   of particular bills because of his committee membership, Renzi's membership on the NRC

20   is relevant only to show why his alleged extortion victims approached him in the first place,

21   and to demonstrate the power he had over them.  No inference into legislative acts like that

22   in *Swindall* need be drawn, what is relevant in this case is the simple fact of Renzi's

23   membership in the NRC.

24        This distinction was convincingly made by the Third Circuit in *United States v.

25   McDade*, 28 F.3d 283 (3rd Cir. 1994).  In *McDade*, the Third Circuit held that the Speech or

26   Debate Clause does not require dismissal of any count of an indictment simply because it

27   refers to the defendant's status as a member of a congressional committee.  *Id.*, at 291.  The

28   Third Circuit distinguished *Swindall*, stating that "[w]hile the *Swindall* opinion contains

- 5 -

language that may be read out of context to mean that the Speech or Debate Clause flatly prohibits proof of legislative status, we believe that a close examination of the *Swindall* opinion and its reasoning suggests that the court did not intent to adopt such a broad holding." *Id.*, at 292. Likewise, this Court declines to find the allegations contained in Paragraphs 1, 11, 14, 15 and 26(k) violate the Speech or Debate Clause.

The Court does find that the allegations contained in Paragraphs 14, 15, and 26(k), more specifically, the italicized excerpts specified in Renzi's motion, are excess allegations that do not change the basic nature of the offense charged, are not necessary to prove the existence of any of the charged counts, are potentially prejudicial, and should be stricken from the indictment as surplusage.

>    2.    *Allegations regarding civil laws and House rules:  Paragraphs 6-9*

The Government argues that the reference to House Rules will be used to establish Renzi's duty to file the Financial Disclosure Statement and the materiality of his falsehoods and omissions. The Government further argues that the House Rules implementing the Ethics in Government Act are relevant evidence in reviewing Renzi's state of mind in making false statements in connection with the conspiracy charged in Count One, and the indictment's reference to them is proper.

Though the Government may prove that Renzi took the oath of office as a Member of the House of Representative, that he was subject to the internal Rules of the United States House of Representatives, and that he had a statutory duty to file Financial Disclosure statement under the Ethics in Government Act, establishing these facts are not necessary to prove the existence of a scheme to defraud and deprive the United States of its intangible right to the honest services of Renz.

In *United States v. Mandel*, the District Court of Maryland struck as surplusage a reference to the Maryland Code of Ethics where the indictment incorrectly implied that violation of the Code by the governor establishes fraud on citizens and could confuse jurors on the issue. 415 F.Supp. 997 (D. Md. 1976), rev'd on other grounds, 591 F.2d 1347 (4th Cir. 1979), rev'd en banc, 602 F.2d 653 (4th Cir. 1979).

- 6 -

The concerns cited in *Mandel* apply here. Although the Government cites to several cases which suggest that the Government *may* prove these allegations at trial, the Government has not cited to any cases which demonstrate that these allegations are *essential* to prove the crime for which Defendant is charged. "[T]he function of a federal indictment is to state concisely the essential facts constituting the offense, not how the government plans to go about proving them." *United States v. Edmond*, 924 F.2d 261, 269 (D.C. Cir.,1991) (citing Fed.R.Crim.P. 7(c)(1)). The language of paragraphs 6-8 is therefore mere surplusage.

The allegations in paragraphs 6-8 could also potentially blur the elements necessary for conviction and risk prejudicing defendant, and thus should be struck from the indictment. As in *Mandel*, *supra*, references to the Oath of Office, the House rules, and the Ethics in Government Act risk prejudice in this case, in that a jury might erroneously conclude that a violation of those allegations amounts to a criminal honest services fraud. Conversely, there is a potential risk of confusion to a jury that proof of a violation of these allegations is necessary to prove honest services fraud.

Defendant asserts that Paragraph Nine is improperly cited as a legal conclusion which "reinforces the impression that violating the oath, the rules or the Act is enough to find the defendant guilty of deceit and fraud." (Motion to Strike, at 11.) The allegation that Renzi owed a duty to perform the responsibilities of his office free from deceit, self-dealing, bias, and concealment is relevant to, and essentially the essence of, the Government's honest services charge. "Words that are employed in an indictment that are descriptive of that which is legally essential to the charge in the indictment cannot be stricken as surplusage." *United States v. Root*, 366 F.2d 377, 381 (9th Cir. 1966)(citing *Butler v. United States*, 20 F.2d 570 (8th Cir. 1927). The honest services charge derives from 18 U.S.C. § 1346, which reads in its entirety: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest service. 18 U.S.C. § 1346. The Ninth Circuit has concluded that § 1346 reaches schemes to defraud individuals of the intangible right to honest services of government officials. See *United States v. Williams*, 441 F.3d 716, 722 (9th Cir. 2006). Before there can be deprivation of a

right to the honest services of a government official, however, that official must owe a duty to provide honest services. The allegations in paragraph nine are descriptive of that element of the offense. Thus, the use of these words is relevant to the Government's case.

Accordingly,

IT IS ORDERED Defendant Renzi's Motion to Strike Surplusage is GRANTED IN PART and DENIED IN PART.

IT IS THEREFORE ORDERED, that the following be struck from the Superseding Indictment:

(1)     The third sentence of ¶ 16: "The land exchange would need legislative approval by Congress."

(2)     The second sentence of ¶ 17: "As with Company A's proposal, Investment Group B's proposal would require legislative approval and undergo scrutiny by the Natural Resources Committee."

(3)     The portion of ¶ 28(k) indicated as follows: "and told Investment Group B that it would receive a "free pass" through the House of Representatives Natural Resources Committee."

(4)     Paragraphs Eight through Ten, in their entirety.

DATED this 13th day of January, 2009.

_____
Bernardo P. Velasco
United States Magistrate Judge

# EXHIBIT 9

WO

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

United States of America, )
)
        Plaintiff, )
)     CR 08-212 TUC DCB (BPV)
v. )
)     **O R D E R**
Richard Renzi, James Sandlin, Andrew Beardall,)
and Dwayne Lequire, )
)
        Defendant, )
_____ )

      This matter having been referred to Magistrate Judge Bernardo P. Velasco, he issued an

Order on January 14, 2009, pursuant to 28 U.S.C. § 636(b)(1)(A). (Order: document 258.)

Magistrate Judge Velasco denied in part and granted in part the Motion to Strike Surplusage in

the Indictment[1] filed by Defendant Renzi. The Magistrate Judge struck some of the allegations

regarding legislative status as surplusage because he found the allegations do not change the

basic nature of the offense charged, are not necessary to prove the existence of any of the

charged counts, and are potentially prejudicial. He struck all of the allegations related to civil

laws and internal rules of Congress, except one paragraph that summarizes the elements of the

"honest services" offense.

      Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59, the parties had ten days from

the filing date of the Magistrate Judge's Order to file written objections with this Court. Failure

_____

[1]Subsequent to the filing of the Motion to Strike Surplusage, the Government filed a Superceding Indictment. The Court refers to the paragraphs that are the subject of the motion to strike as they are numbered in the Superceding Indictment. The corresponding numbers are as follows: (Indictment ¶ 1, Superceding Indictment ¶ 1); (Indictment ¶ 6, Superceding Indictment ¶8); (Indictment ¶ 7, Superceding Indictment ¶8);( Indictment ¶8, Superceding Indictment ¶10);( Indictment ¶11, Superceding Indictment ¶13); (Indictment ¶14, Superceding Indictment ¶16); (Indictment ¶15, Superceding Indictment ¶ 17); (Indictment ¶ 26(k), Superceding Indictment ¶ 28(k)).

to object waives a party's right to review. Fed. R. Crim. P. 59(a). The Court reviews *de novo* all questions presented by the parties in their objections. The Court may reconsider such matters where it is shown that the Magistrate Judge's Order is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A).

Both Defendant Renzi and the Government filed Objections.

Defendant Renzi argues that Magistrate Judge Velasco committed error when he failed to strike the references to Congressman Renzi's legislative status in paragraphs 1 and 13. Defendant argues these references violate the Speech or Debate Clause and/or are irrelevant and prejudicial in the same way as the language struck by Magistrate Judge Velasco in paragraphs 17, 17 and 28(k). Defendant Renzi argues Magistrate Judge Velasco erred by failing to strike Paragraph 11 because it contains the Government's unsupported legal conclusions regarding the scope of duties allegedly owed under the honest services doctrine.

The Government argues that Magistrate Judge Velasco committed error by striking allegations in the Indictment that "are part of the government's proof at trial." (Government's Objection at 1.)

<u>Surplusage Strikes</u>

Paragraphs of the Indictment and Superceding Indictment at issue in Defendant Renzi's Motion to Strike and Magistrate Judge Velasco's strikes are as follows:

¶ **1**. RICHARD G. RENZI ("RENZI") was a Member of the United States House of Representatives as Representative for Arizona's First Congressional District. He was first elected in November 2002, and was reelected in 2004 and 2006. RENZI maintained congressional offices in both Washington, D.C., and in the District of Arizona. At all times relevant to this Indictment, RENZI was a member of the House of Representatives Natural Resources Committee. . . .

¶ **8**. ~~RENZI and other Members of the House of Representatives were required to take the following oath of office at the beginning of each new Congress: I, [Member's Name], do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.~~

¶ **9**. ~~In addition to the above oath, the Rules of the United States House of Representatives provided that:~~

a. a Member of the House of Representatives was prohibited from receiving outside compensation as a result of the improper exercise of influence from the Member's position in Congress; and

b. a Member was required to file truthful annual Financial Disclosure Statements with the Clerk of the House;

¶ **10**. RENZI also had a specific statutory duty each year, under Title I of the Ethics in Government Act of 1978, as amended (5 U.S.C. app. 4, § 101 et seq.) to file annual Financial Disclosure Statements.

¶ **11**. Consistent with his oath of office and the duties of the office he held, Defendant RENZI owed the citizens of the United States and the United States House of Representatives a duty to perform the responsibilities of his office free from deceit, self-dealing, bias, and concealment.

¶ **13**. The Secretary of the Interior has authority to approve certain land exchanges. Some land exchanges, such as those involving land in different states or land managed by different federal agencies, require legislative approval. In the United States House of Representatives, land exchanges fall under the jurisdiction of the Natural Resources Committee, of which RENZI was a member.

¶ **16**. .... The land exchange [proposed by Company A] would need legislative approval by Congress. The Natural Resources Committee would need to approve the proposed legislation prior to a floor vote in the House of Representatives.

¶ **17**. ....As with Company A's proposal, Investment Group B's proposal would require legislative approval and undergo scrutiny by the Natural Resources Committee.
. . .

¶ **28(k)**. During the April 16, 2005, meeting between RENZI and Investment Group B, RENZI insisted that Investment Group B purchase the Sandlin Property as part of its land exchange proposal and told Investment Group B that it would receive a "free pass" through the House of Representatives Natural Resources Committee.

(Superceding Indictment).

Magistrate Judge Velasco correctly noted that an Indictment "must be a plain, concise, and definite written statement of the essential acts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Insofar as the language of an indictment goes beyond alleging elements of the crime that need not be proved, surplusage must not be allowed to prejudice a defendant. *United States v. Jenkins*, 785 F.2d 1387, 1392 (9th Cir. 1986). The purpose of Rule 7(d) is to protect a defendant against prejudicial or inflammatory allegations

1  that are neither relevant nor material to the charges.  *United States v. Ramirez*, 710 F.2d 535,

2  545 (9th Cir. 1983).

3       The Magistrate Judge found that the Speech or Debate Clause does not require

4  striking allegations regarding Defendant Renzi's legislative status (*see* Superceding

5  Indictment at ¶¶ 1, 13, 16, 17, 28(k)), but strikes were warranted in respect paragraphs 16,

6  17 and 28(k) to the limited extent necessary to prevent unnecessary prejudice to the

7  Defendant.  The allegations related to the civil laws and internal rules of the House of

8  Representative that set out prophylactic ethical rules for Members of Congress, (*see*

9  Superceding Indictment at ¶¶ 8-10), were stricken to prevent unfair prejudice and confusion.

10      The Court finds that Magistrate Judge Velasco's strikes in paragraphs 16 and 17 were

11  required to prevent prejudice and because the sticken allegations are not essential acts

12  necessary to prove the charges against Defendant Renzi.

13      The Government charged Defendant Renzi with violating 18 U.S.C. § 1346, which

14  reaches schemes to defraud individuals of the intangible right to honest services of

15  government officials.  For this reason alone it is necessary for the Government to allege

16  Defendant Renzi's legislative status.  "It is well established that the Speech or Debate

17  Clause does not prohibit proof of a defendant's status as a member of the United States

18  Senate or House of Representatives."  *United States v. McDade*, 28 F.3d 283, 289 (3rd Cir.

19  1994).  Introducing legislative status does not violate the Speech or Debate Clause if it goes

20  to the purpose or motivation for soliciting or making the bribe as compared to challenging

21  the legislative act or the Congressman's motivation for the legislative act.  *Id.* at 289-90

22  (citing *United States v. Brewster*, 408 U.S. 501, 504-527 (1972); *United States v. Helstoski*,

23  576 F.2d 511 (3rd Cir. 1978), *aff'd*, 442 U.S. 477 (1979)).  The Magistrate Judge correctly

24  held the allegations relating to legislative status do not violate the Speech or Debate Clause.

25      The Court affirms the Magistrate Judge's strikes in paragraphs 16 and 17.  The

26  language he struck is surplusage.  The language not struck by Magistrate Judge Velasco is a

27  sufficient statement of the essential acts constituting this aspect of the case.

- 4 -

As to paragraph 28(k), the Magistrate Judge erred in striking the allegation of the specific promise made by Defendant Renzi, which was that Investment Group B would receive a "free pass" through the House of Representatives Natural Resource Committee. This allegation goes directly to the proof of official action being promised and is neither irrelevant nor immaterial. It also is an overt act alleged as one of the elements of the conspiracy count under 18 U.S.C. § 371.

The Court affirms the Magistrate Judge's decision to strike paragraphs eight through 10. As the Magistrate Judge noted: "Though the Government may prove that Renzi took the oath of office as a Member of the House of Representatives, and that he had a statutory duty to file a Financial Disclosure statement under the Ethics in Government Act, establishing these facts are not necessary to prove the existence of a scheme to defraud and deprive the United States of its intangible right to honest services from Defendant Renzi." (Order at 6.) This Court agrees that these allegations could easily confuse jurors and unnecessarily prejudice Defendant.

The Court affirms the Magistrate Judge's decision to not strike paragraph 11 in the Superceding Indictment, except that this Court strikes the word "bias." With this one exception, paragraph 11 tracks the two "core categories" of official misconduct for honest services mail and wire fraud under 18 U.S.C § 1346: 1) taking a bribe or otherwise being paid for a decision while purporting to be exercising independent discretion and 2) nondisclosure of material information. *United States v. Weyrauch*, 548 F.3d 1237, 1247 (9th Cir. 2008).

**Accordingly,**

**IT IS ORDERED** that after a full and independent review of the record in respect to the parties' objections, the Magistrate Judge's Order (document 258) is accepted and adopted as the findings of fact and conclusions of law of this Court, with the exceptions noted below.

**IT IS FURTHER ORDERED** that the following be struck from the Superseding Indictment:

1.  The third sentence of ¶ 16: "The land exchange would need legislative approval by Congress."

2.  The second sentence of ¶ 17: "As with Company A's proposal, Investment Group B's proposal would require legislative approval and undergo scrutiny by the Natural Resources Committee."

3.  Paragraphs Eight through Ten, in their entirety.

4.  Paragraph 28(k): the word "bias."

**IT IS FURTHER ORDERED** that this matter remains referred to Magistrate Judge Bernardo P. Velasco for all pretrial proceedings and Report and Recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) and LR Civ. 72.1(a), Rules of Practice for the United States District Court, District of Arizona (Local Rules).

DATED this 9th day of April, 2009.

David C. Bury
United States District Judge

# EXHIBIT 10

1
2
3
4
5
6        **IN THE UNITED STATES DISTRICT COURT**

7        **FOR THE DISTRICT OF ARIZONA**

8
9    **UNITED STATES OF AMERICA,**            )        **CR 10-1032-TUC-CKJ [CRP]**
                                             )
10                        **Plaintiff,**       )
                                             )        **REPORT & RECOMMENDATION**
11   **vs.**                                  )
                                             )
12                                           )
     **MOSES ANTONIO SHEPARD,**               )
13                                           )
                          **Defendant.**      )
14   _____ )

15
16          In two separate motions filed on April 22, 2011, Defendant challenges the sufficiency

17   of the Indictment.  (Docs. 282, 283).  Defendant's advisory counsel also filed two motions

18   challenging the Indictment: a Motion for Bill of Particulars (Doc. 284) and a Motion to Strike

19   Surplusage from the Indictment (Doc. 285).  Defendant joined advisory counsel's motions.

20   (Doc. 305).  The Government responded to Defendant's *pro se* motions and later to advisory

21   counsel's motions.   (Docs. 286, 311, 312).   Recently, Defendant filed a Motion for

22   Indictment Debate Hearing and Reply Supporting Striking Surplusage.  (Doc. 325).

23          Defendant contends, in essence, that the Indictment does not sufficiently allege he has

24   violated the cited statutes.  Advisory counsel asserts statutory interpretation arguments in the

25   Motion to Strike Surplusage and contends, in the Motion for Bill of Particulars, that more

26   detailed facts on the two charged counts should be made available to Defendant.  The Court

27   will first address Defendant's motions to dismiss along with advisory counsel's Motion to

28   Strike Surplusage.  The Court will then address the Motion for Bill of Particulars.

1    In considering a pre-trial motion to dismiss an indictment for failure to state an

2    offense, the Court must accept the truth of the allegations in the indictment. *See United*

3    *States v. Jensen*, 93 F.3d 667, 669 (9th Cir.1996). In analyzing whether an offense has been

4    properly charged, the Court is bound by the four corners of the indictment. *United States v.*

5    *Boren*, 278 F.3d 911, 914 (9th Cir.2002). "The indictment either states an offense or it

6    doesn't. There is no reason to conduct an evidentiary hearing." *Boren*, 278 F.3d at 914. An

7    indictment is generally sufficient "if it sets forth the elements of the charged offense so as to

8    ensure the right of the defendant not to be placed in double jeopardy and to be informed of

9    the offense charged." *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir.2004) (internal

10   quotation marks and citation omitted).

11   Defendant is charged with two counts. Count One alleges:

12       From on or about August 6, 2009, through April 13, 2010, at or near Tucson,
         in the District of Arizona, MOSES ANTONIO SHEPARD, with the intent to
13       harass, intimidate, and cause substantial emotion distress to Linda Mari
         Arnaud, a person in another State, did use the mail, any interactive computer
14       service, and any facility of interstate or foreign commerce to engage in a
         course of conduct that caused substantial emotional distress to Linda Mari
15       Arnaud; to wit, MOSES ANTONIO SHEPARD repeatedly contacted Linda
         Mari Arnaud by means of electronic mail; in violation of Title 18, United
16       States Code, Sections 2261A(2)(A) and 2261(b)(5) and (b)(6).

17   (Doc. 22).

18   Count One adequately alleges cyber-stalking. The statute states, in relevant part,

19       Whoever –
         (2) with the intent --
20       (A) to kill, injure, harass, or place under surveillance with the intent to kill,
         injure, harass, or cause substantial emotional distress to a person
21       in another State or tribal jurisdiction or within the special maritime and
         territorial jurisdiction of the United States . . . uses the mail, any interactive
22       computer service, or any facility of interstate or foreign commerce to engage
         in a course of conduct that causes substantial emotional distress to that person
23       or places that person in reasonable fear of death of, or serious bodily injury to,
         any of the persons described in clauses (i) through (iii) of subparagraph (B);
24       shall be punished as provided in section 2261(b) of this title.

25   18 U.S.C. § 2261A(2). Count One tracks the language of the statute and provides dates and

26   locations of communications comprising violations. The statute specifies six types of intent

27   that can result in a violation of the statute. Using interstate commerce, including email,

28   constitutes interstate stalking if a person engages in that activity across state lines with the

intent: to (1) kill, (2) injure, (3) harass, (4) place under surveillance with intent to kill, injure, harass, (5) intimidate, or (5) cause substantial emotional distress. 18 U.S.C. § 2261(A)(2).

The Court notes the Government cites a district case from West Virginia in which the court in that case identified, in *dicta*, five intentions under the statute. *See United States v. Shrader*, 2010 WL 2179572 at 4, footnote 3 (S.D.W.Va.2010). In *Shrader*, the district court included "intimidate" in the intentions that required a person to place a victim under surveillance. The Court disagrees with this interpretation. Intimidate is separated from the surveillance intentions by the conjunction "or". Intimidate stands alone as a separate intention someone can have to violate the statute.

Count One alleges that Defendant cyber-stalked the victim from August 6, 2009 through April 13, 2010 from Tucson through electronic mail with the intent to harass, intimidate and cause substantial emotional distress and that Defendant's conduct did cause the victim substantial emotional distress. The Count is sufficient and there is no surplusage.

Count Two alleges:

> On or about February 2007, MOSES ANTONIO SHEPARD traveled from Tucson, in the District of Arizona, in interstate or foreign commerce, with the intent to harass and intimidate Linda Mari Arnaud; to wit, MOSES ANTONIO SHEPARD traveled to West Hartford, Connecticut, in attempt to have contact with Linda Mari Arnaud, and did attempt to contact Linda Mari Arnaud while in West Hartford, Connecticut, and in the course of and as a result of such travel MOSES ANTONIO SHEPARD caused substantial emotional distress to Linda Mari Arnaud, in violation of Title 18, United States Code, Sections 2261A(1) and 2261(b)(5).

(Doc. 22). Count Two adequately alleges interstate stalking. The statute states, in relevant part,

> Whoever--
> (1) travels in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, or place under surveillance with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, or causes substantial emotional distress to that person, a member of the immediate family (as defined in section 115) of that person, or the spouse or intimate partner of that person . . . shall be punished as provided in section 2261(b) of this title.

18 U.S.C. § 2261A(1). Count Two alleges that in February 2007, Defendant traveled from Tucson, Arizona to West Hartford, Connecticut in an attempt to contact the victim, that

1    Defendant did attempt to contact the victim and that Defendant's actions caused the victim

2    substantial emotional distress. Count Two tracks the language of the statute and provides a

3    date and location of the travel that comprised the violations.

4        In his Motion, Defendant contends not only that the Indictment is insufficient but also

5    that the statutes cited in the Indictment do not apply to him as he was not a romantic partner

6    of the victim. Defendant misinterprets the statutes. No personal relationship is required

7    between the perpetrator and victim in 18 U.S.C. § 2261A. It is sufficient that the perpetrator

8    committed one of the enumerated acts with one of the identified intents and caused the victim

9    one of the listed injuries. Defendant confuses the requirements of § 2261A with the

10    requirements of subsection § 2261(a). The offenses listed in 18 U.S.C. § 2261(a) are not

11    applicable to Defendant's case. Defendant is not charged with violating § 2261(a) and the

12    prosecution is not required to allege any elements from that subsection including the element

13    that the perpetrator have a personal relationship with the victim.

14        Defendant may have been confused because the Indictment cites § 2261, but only

15    subsection (b). The penalties listed in 18 U.S.C. § 2261(b) apply for the crimes outlined in

16    § 2261 *and*, as is the case for Defendant, for crimes listed in 18 U.S.C. §§ 2261A(1) and (2).

17        Similarly, Defendant also argues that he has not committed any violence against the

18    victim and that a crime of violence is required by the statutes. Defendant is incorrect. No

19    crime of violence is required to violate §§ 2261(A)(1) or (2). The prosecution does not have

20    to prove any of the elements of 18 U.S.C. § 2261(a) as Defendant is not charged with

21    violating that subsection of §2261. Rather, Defendant is charged with violating 18 U.S.C.

22    §§ 2261A(2) and (1). The prosecution has properly charged Defendant with the offenses and

23    informed Defendant of the charges against him. It is not required to do anything further in

24    the Indictment.

25        Defendant also makes a statutory interpretation argument, alleging the terms

26    "intimidate" and "harass" should be stricken from the Indictment as the statute, § 2261A,

27    requires first that a perpetrator place a victim under surveillance with the intent to intimidate

28    the victim. Thus, to simply intimidate a person is not a crime under the statute. Likewise,

1    Defendant argues "harass" cannot stand alone, rather the perpetrator must also intend to kill

2    and injure the victim. Advisory counsel makes a similar statutory interpretation argument

3    in the Motion to Strike Surplusage from the Indictment; specifically advisory counsel argues

4    "intimidate" and "cause substantial emotional distress" are specific intent terms that first

5    require the Government to allege the perpetrator "placed [the victim] under surveillance."

6    (Doc. 285). The Court disagrees with the arguments of both Defendant and advisory counsel.

7        First, "intimidate" does stand alone. The statute, § 2261A, provides cyber-stalking

8    can occur when someone uses email with the intent "to kill, injure, harass, or place under

9    surveillance with the intent to kill, injure, harass, or intimidate, or cause substantial emotional

10   distress..." 18 U.S.C. § 2261A(2). Defendant and advisory counsel argue intimidate is

11   connected to first placing a victim under surveillance and cannot be a stand-alone allegation.

12   They argue the perpetrator must first place a victim under surveillance with the intent to

13   intimidate. This is not a correct reading of the statute.

14       The commas and conjunctions must have meaning. The commas separate the

15   individual intents. A perpetrator can intend to kill a person, injure a person or harass that

16   person and specific intent would be satisfied if one of those three intentions occurred. A

17   perpetrator could also intend to place a person under surveillance with the intent to do either

18   of the three above actions (kill, injure or harass). Next, the statute has a comma and the

19   conjunction "or". These separate the next acts that satisfy the specific intent requirement.

20   A person can send an email intending to intimidate or intending to cause substantial

21   emotional distress. Neither of these types of intent require that the perpetrator place the

22   victim under surveillance. They are separate intents.

23       This reasoning also applies to the statutory language for Count Two. Defendant is

24   charged with traveling from Arizona to Connecticut to intimidate and cause the victim

25   substantial emotional distress in violation of 18 U.S.C. 2261A(1). The language of this

26   subsection parallels the language from subsection (2). It states, in relevant part, any person

27   who travels in interstate commerce "with intent to kill, injure, harass, or place under

28   surveillance with intent to kill, injure, harass, or intimidate another person, and in the course

1  of, or as a result of, such travel places that person in reasonable fear of the death of, or

2  serious bodily injury to, or causes substantial emotional distress to that person..." 18 U.S.C.

3  § 2261A(1). The act of intimidating is a separate form of intent. Defendant has been

4  properly charged under the statute.

5  Defendant's argument that "harass" cannot stand alone as a form of specific intent is

6  also incorrect. Harass is separated by a comma from other forms of specific intent and when

7  read in the context of the statute, is an independent form of intent.

8  The Court notes Defendant's "Counter Indictment" is essentially a rehashing of his

9  Motion to Challenge Indictment. (Doc. 283). There are some differences which the Court

10  will not specifically address as the differences are Defendant's musings on which other

11  subsections the prosecution should have or meant to charge him and alleged mistakes

12  deriving from Defendant's complete misreading of the statutes under which he is charged.

13  The Court notes one misreading of the statute; Defendant alleges in Count Two that

14  his intent actions must have caused the victim to fear death or serious bodily injury. This is

15  not a correct reading of the statute. The statute states that a perpetrator's specifically intended

16  action must put the victim "in reasonable fear of the death of, or serious bodily injury to, or

17  causes substantial emotional distress to that person, a member of the immediate family (as

18  defined in section 115) of that person, or the spouse or intimate partner of that person". 18

19  U.S.C. § 2261A. There are three results of a perpetrator's intended acts that result in

20  violations of the statute. The perpetrator can put the victim in reasonable fear of death or

21  serious bodily injury or cause substantial emotional distress. These are three independent,

22  separate results. The prosecution has alleged Defendant caused the victim substantial

23  emotional distress. That allegation is sufficient under the statute.

24  The final motion this order will address is advisory counsel's Motion for a Bill of

25  Particulars. (Doc. 284). For Count One, advisory counsel requests Defendant receive all the

26  dates, times, and locations of the alleged offenses including identifying all the emails that

27  Defendant allegedly "repeatedly" sent to the victim. As to Count Two, Defendant requests

28

1   specifics on the time, date, and key circumstances surrounding his purported trip to West
2   Hartford, Connecticut.

3       As discussed above, the Government provided sufficient allegations in Count One.
4   Defendant now requests information about the emails he is accused of sending the victim.
5   The Government states it has provided Defendant with copies of all the emails and has
6   provided the defense with a copy of the electronic evidence in this case. The Indictment
7   alleges that the emails at issue in Count One occurred between August 6, 2009 through April
8   13, 2010. This is sufficient information for Defendant. He has a copy of all the emails and
9   he has the applicable dates. Defendant does not need a bill of particulars on this Count.

10      Count Two is also specific in its charges. It alleges that Defendant traveled in
11  February 2007 from Tucson, Arizona to West Hartford, Connecticut in violation of the inter-
12  state stalking statute. Defendant has the date of the allegation and he knows the specific
13  incident at issue. Like Count One, Defendant knows the date of the allege offense, location
14  of the offense, his conduct and intent that is at issue, the identity of the victim and the effect
15  of his actions on the victim. A bill of particulars is not needed on this Count.

16  **RECOMMENDATION**

17      For the reasons outlined above, the Magistrate Judge recommends that the District
18  Judge after her independent review and analysis:

19      **DENY** Defendant's Motion to Challenge Indictment. (Doc. 282).

20      **DENY** Defendant's Motion to Counter Indictment. (Doc. 283).

21      **DENY** Defendant's to Strike Surplusage from the Indictment. (Doc. 285).

22      **DENY** Defendant's Motion for Bill of Particulars. (Doc. 284).

23      **DENY** Defendant's Motion for Joinder to Motion to Strike Indictment Surplusage and
24  For Bill of Particulars. This motion should have been filed as a notice, stating Defendant's
25  intent to join advisory counsel's two motions. The Court accepted Defendant's joinder.
26  (Doc. 305).

27      **DENY** Defendant's Motion for Indictment Debate Hearing and Reply Supporting
28  Striking Surplusage. (Doc. 325).

1    Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file

2    written objections within fourteen days of being served with a copy of the Report and

3    Recommendation.  If objections are not timely filed, they may be deemed waived.  The

4    parties are advised that any objections filed are to be identified with the following case

5    number: **cr-10-1032-CKJ**.

6    DATED this 9th day of June, 2011.

7

8

9    **CHARLES R. PYLE**
     **UNITED STATES MAGISTRATE JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 11

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )          No.  CR 10-1032-TUC-CKJ
        vs.                        )
                                   )
MOSES ANTONIO SHEPARD,             )              **ORDER**
                                   )
                Defendant.         )
_____)

On June 9, 2011, Magistrate Judge Charles R. Pyle issued a Report and Recommendation ("R and R") (Doc. 331) in which he recommended that the Motion to Challenge Indictment (Doc. 282) be denied, the Motion to Counter Indictment (Doc. 283) be denied, the Motion to Strike Surplusage From the Indictment (Doc. 285) be denied, the Motion for Bill of Particulars (Doc. 284) be denied, and the Motion for Indictment Debate Hearing and Reply Supporting Striking Surplusage (Doc. 325) be denied.  The magistrate judge also recommended the Motion for Joinder to Motion to Strike Indictment Surplusage and for Bill of Particulars (Doc. 305) be denied.[1]  The R and R notified the parties that they had fourteen days from the date of being served with the copy of the Report and Recommendation to serve and file any objections.

---

[1]The Magistrate Judge stated that this motion, indicating Defendant's intent to join advisory counsel's two motions, should have been filed as a notice of joinder.  The magistrate judge accepted Defendant's joinder.

Advisory counsel filed objections to the R and R. *See* Docs. 350 and 351. Defendant filed a Motion to Reconsider and Objections to R and R, in which he incorporates the objections made by advisory counsel. *See* Doc. 359. The government has responded to the objections. *See* Docs. 383 and 384.

*Dismissal/Surplusage*

As stated by the magistrate judge, "Defendant contends, in essence, that the Indictment does not sufficiently allege he has violated the cited statutes." R and R, p. 1. Similarly, advisory counsel asserts surplusage must be stricken based on statutory interpretation arguments. The magistrate judge determined that "[u]sing interstate commerce, including email, constitutes interstate stalking if a person engages in that activity across state lines with the intent: to (1) kill, (2) injure, (3) harass, (4) place under surveillance with intent to kill, injure, harass, (5) intimidate, or (6) cause substantial emotional distress." R and R, pp. 2-3, violates 18 U.S.C. § 2261A(2). However, to give this interpretation to the statute, Congress would have included additional language:

Whoever –

(2) with the intent –

(A) to kill**[ or]** injure**[ or]** harass, or place under surveillance with the intent to kill, injure, harass, or intimidate, or cause substantial emotional distress to a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States . . . uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii) of subparagraph (B); shall be punished as provided in section 2261(b) of this title.

18 U.S.C. § 2261A(2), *with modifications in bold*.

However, the interpretation argued by the defense similarly does not withstand scrutiny. To accept Defendant's interpretation of the statute, Congress would have had to remove language:

Whoever –

(2) with the intent –

- 2 -

(A) to kill, injure, harass, or place under surveillance with the intent to kill, injure, harass, [ ] intimidate, or cause substantial emotional distress to a person in another State or tribal jurisdiction or within the special maritime and teR and Ritorial jurisdiction of the United States . . . uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii) of subparagraph (B); shall be punished as provided in section 2261(b) of this title.

18 U.S.C. § 2261A(2), *with modification in bold*.

In affording meaning to each conjunction included within the statute, the Court must recognize the conjunction "or" in the phrase "place under surveillance with the intent to kill, injure, harass, or intimidate[.]" Because that conjunction is included, the subsequent "or" between "intimidate" or "cause substantial emotional distress to a person" necessarily means that phrase is separated from "place under surveillance." The statute, therefore, is appropriately read as follows:

Whoever, with the intent to

1. kill,

2. injure,

3. harass,

4. place under surveillance with the intent to kill, injure, harass, or intimidate, or

5. cause substantial emotional distress to a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States . . .

uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii) of subparagraph (B); shall be punished as provided in section 2261(b) of this title.

*See e.g. United States v. Shrader*, 2010 WL 2179572, *4, n. 3 (S.D.W.Va. 2010). Although the Court rejects the magistrate judge's conclusion regarding the intimidation allegations, the Court adopts the remainder of the R and R dealing with the dismissal/surplusage issues.

However, the indictment does not allege that Defendant, with the intent to place under surveillance with the intent to kill, injure, harass, or intimidate, used the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of

conduct . . . " In other words, although the government originally argued that Defendant's conduct could constitute surveillance, that was not alleged in the indictment. Although "[a]n indictment is not required to set out all those elements of the offense which must be found by the jury before they may find the accused guilty[, it] is sufficient 'that the necessary facts appear in any form, or by fair construction can be found within the terms of the indictment.'" *Stapleton v. United States*, 260 F.2d 415, 418 (9th Cir. 1958), *quoting Hagner v. United States*, 285 U.S. 417, 433, 52 S.Ct. 417, 420, 76 L.Ed. 861 (1956). The allegations in the indictment referring to using the mail, any interactive computer service, or any facility of interstate or foreign commerce and referring to traveling in interstate commerce cannot be said to have alleged necessary facts to allege intent to place under surveillance with the intent to intimidate. The reference in the indictment, therefore, to intimidation is not related to an alleged crime; the language is surplusage. The Court will grant, in part, the Motions to Counter Indictment and to Strike Surplusage and order reference to intimidation in Counts One and Two be stricken.

*Bill of Particulars*

A bill of particulars is "designed to apprise the defendant of the specific charges being presented to minimize danger of surprise at trial, to aid in preparation and to protect against double jeopardy." *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983). "In determining whether a bill of particulars should be ordered, a court should consider whether the defendant has been advised adequately of the charges through the indictment and all other disclosures made by the government." *Id*., *citation omitted*. The purposes of a bill of particulars is served if the indictment "provides sufficient details of the charges" and full discovery is made pursuant to Fed.R.Crim.P. 16. *United States v. Mitchell*, 744 F.2d 701 (9th Cir. 1984).

As summarized by the magistrate judge:

As discussed above, the Government provided sufficient allegations in Count One. Defendant now requests information about the emails he is accused of sending the victim. The Government states it has provided Defendant with copies of all the

- 4 -

emails and has provided the defense with a copy of the electronic evidence in this case. The Indictment alleges that the emails at issue in Count One occurred between August 6, 2009 through April 13, 2010. This is sufficient information for Defendant. He has a copy of all the emails and he has the applicable dates. Defendant does not need a bill of particulars on this Count.

Count Two is also specific in its charges. It alleges that Defendant traveled in February 2007 from Tucson, Arizona to West Hartford, Connecticut in violation of the interstate stalking statute. Defendant has the date of the allegation and he knows the specific incident at issue. Like Count One, Defendant knows the date of the allege offense, location of the offense, his conduct and intent that is at issue, the identity of the victim and the effect of his actions on the victim. A bill of particulars is not needed on this Count.

R and R, p. 7.

The language of the indictment, along with the disclosures made by the government, adequately advises Defendant of the charges against him. Moreover, the defense argument that "the simple fact of traveling interstate is not per se a crime[,] Advisory Counsel Objections, Doc. 350, p. 4, fails to acknowledge that the statute requires additional conduct to make the interstate travel unlawful – such additional conduct has been alleged.

Further, the Court disagrees with the apparent defense assertion that a medical diagnosis is needed to prove substantial emotional distress. As stated by the *Shrader* court:

. . . First, as a preliminary matter, the argument that substantial emotional distress must be proven by medical records necessarily presumes that victims of stalking under Section 2261A(2) seek counseling. Otherwise, if these victims did not seek counseling, convictions under Section 2261A(2) would be impossible and this provision would, therefore, be without effect. However, the unfortunate truth is that the vast majority of stalking victims do not seek any psychological counseling at all. See Patricia Tjaden and Nancy Thoennes, *Stalking in America: Findings From the National Violence Against Women Survey,* (United States Department of Justice, Washington, D.C.), April 1998, at 11 (finding that, in a survey of stalking victims, "[a]bout a third of the women (30 percent) and a fifth of the men (20 percent) said they sought psychological counseling as a result of their stalking victimization."). The argument that substantial emotional distress can only be proven at trial through medical records is at odds with the reality of what happens with the majority of stalking victims, and therefore leads to an untenable interpretation of Section 2261A(2).

Substantial emotional distress need not be proven through medical records for other reasons as well. While it is the fear of death or serious bodily injury prong of Section 2261A(2) that contains the modifier "reasonable," the fact that the "substantial emotional distress" prong omits this modifier does not mean that medical records are required for proof of the latter. First, nothing in the plain text of Section 2261A(2) requires medical records to prove substantial emotional distress. Moreover, interpreting Section 2261A(2) to require medical records for proof of emotional distress would make the language of the provision redundant. The requirement that the fear of death or serious bodily injury be reasonable insures that such a fear in a

victim is not without merit, and the statute's requirement that the emotional distress of a victim be substantial similarly ensures that the emotional distress of a victim meets a minimum quantum. Therefore, requiring medical records for proof of substantial emotional distress is an unnecessary requirement given that the text of the statute already sets a standard – "substantial" – for the emotional distress of a victim.

Finally, Defendant's argument that substantial emotional distress must be proven by medical records is at odds with decisions from other courts. *United States v. Clement*, crim. no. 09-0337-01, 2010 U.S. Dist. Lexis 73985, *5, 2010 Westlaw 1812395, *2 (May 3, 2010 W.D.La.) (testimony of victim and law enforcement officer sufficient to prove emotional distress in a Section 2261A(2) case); *State v. Askham*, 120 Wash.App. 872, 883, 86 P.3d 1224 (2004) (expert testimony not required to establish the reasonable person standard for emotional distress); *Snowden v. State*, 677 A.2d 33, 38 (Del.1996) (same); *State v. McCarthy*, 294 Mont. 270, 276, 980 P.2d 629 (1999) (applying reasonable person test for determination of emotional distress or reasonably apprehended bodily injury); *State v. Martin*, 940 S.W.2d 6, 9 (Mo.App. W.D.1997) (Medical evidence to prove that victim suffered substantial emotional distress unnecessary "when there is substantial credible evidence from other sources to support such a finding."). *See also United States v. Bodkins*, crim. no. 4:04-CR-70083, 2005 U.S. Dist. Lexis 32420, *5, 2005 Westlaw 2179987, *2 (September 9, 2005 W.D.Va.) (regarding the reasonable fear of death or serious bodily injury in a Section 2261A(1) stalking case). . . .

*Shrader*, 716 F.Supp.2d 464, 474-75 (S.D.W.Va. 2010). Further, just as the *Shrader* court did not find the defense comparison to civil litigation to be well-taken, *id*., at 475, the Court does not agree with the defense's comparison to *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 737 (9th Cir. 1986). Not only does *Miller* deal with a civil claim seeking damages, but the *Miller* court was discussing "severe" distress. Moreover, the court ultimately determined that plaintiffs' statements that they experienced physical and emotional symptoms should be presented to a trier of fact to determine if they were causally related to the unlawful conduct. The *Miller* court did not require empirical proof or a medical diagnosis.

The Court finds that Defendant has been advised adequately of the charges through the indictment and all other disclosures made by the government. A bill of particulars is not warranted.

Accordingly, IT IS ORDERED:

1.    The Report and Recommendation (Doc. 331) is ADOPTED IN PART AND REJECTED IN PART.

2.    The Motion to Challenge Indictment (Doc. 282) is DENIED.

3.    The Motion to Counter Indictment (Doc. 283) is GRANTED IN PART.

4.      The Motion to Strike Surplusage From the Indictment (Doc. 285) is GRANTED IN PART.

5.      The Motion for Bill of Particulars (Doc. 284) is DENIED.

6.      To the extent Defendant seeks to join in the arguments presented in the Motions to Strike Indictment Surplusage and for Bill of Particulars, the Motion for Joinder (Doc. 305) is GRANTED.

7.      The Motion for Indictment Debate Hearing and Reply Supporting Striking Surplusage (Doc. 325) is DENIED.

8.      Reference to intimidation in Counts One and Two of the Indictment are STRICKEN.

DATED this 27th day of July, 2011.


_____
Cindy K. Jorgenson
United States District Judge

# EXHIBIT 12



Jennifer H. Weddle
Tel 303.572.6565
Fax 303.572.6540
weddlej@gtlaw.com

January 28, 2015

**VIA EMAIL:** dharbour@hpcg.com

Oak Tree Management LLC
21020 N. Pima Road
Scottsdale, AZ  85255

       Re:    Legality of Wakpamni Lake Community Corporation's Green Circle Consumer
               Lending Business

Dear Oak Tree Management:

       This firm represents Green Circle, an online lending enterprise, Green Circle is a duly-organized subsidiary of the Wakpamni Lake Community Corporation ("WLCC"), and an economic arm and instrumentality of the Wakpamni Lake Community (the "Community"), a subordinate tribal governmental unit of the Oglala Sioux Tribe of the Pine Ridge Indian Reservation.  The Oglala Sioux Tribe is organized in accordance with Section 16 of the Indian Reorganization Act of 1934 and pursuant to the Tribe's federally-approved Constitution and Bylaws.  WLCC and Green Circle are each validly existing and in good standing under applicable Tribal law, including Article VI of the Oglala Sioux Tribe Constitution and Bylaws; Resolution 78-101 passed by the Oglala Sioux Tribal Council on January 23, 1978; and Resolutions passed by WLCC on March 5, 2014 and by the Wakpamni Lake Community on March 4, 2012 and April 1, 2012.

       Green Circle is a wholly-owned subsidiary of the Community government.  As requested, this letter summarizes the basis for our position that Green Circle is legal and properly authorized under applicable Tribal and federal law.  Further, authorizations to pay on any Green Circle loans to consumers constitute valid authorizations under the NACHA Operating Rules.  This firm is of the opinion that each ACH debit Green Circle originates in the network will have been properly authorized as required by NACHA Rules 2.4.1.1 and 2.3.2.3, and that Green Circle has been duly established as an economic arm of a sovereign tribal government.

**Executive Summary**

       Green Circle is a Tribal business entity, established by the Community, for the Community, and under Tribal law.  It is wholly owned and controlled by the Community.  As you know, Green Circle's status as an arm of the Community, as discussed briefly below, means that the tribe has jurisdiction and states lack any legal ability to regulate these activities by Green Circle absent the enactment of federal laws by the Congress.  That has not happened.  State usury

Oak Tree Management LLC
January 28, 2015
Page 2

_____

laws and licensing procedures simply do not apply to Green Circle.  Any ACH debit to a
consumer account originated for Green Circle is legal under applicable Tribal and federal law.

The Community is cautious and conservative with respect to its business approach and
thus closely manages Green Circle to ensure its compliance with all applicable laws, regulations
and policies.  In fact, pursuant to an Intergovernmental Memorandum of Understanding dated
September 5, 2014, with an instrumentality of the Rosebud Sioux Tribe ("Rosebud"), the
Community has secured additional outside tribal governmental compliance services that also
review Green Circle's practices.

## Background On Green Circle

Green Circle was established by the Community under the Tribe's business enterprise
laws and is wholly owned and controlled by the Community for the benefit of the Community.
Green Circle is subject to robust Tribal regulation and management, including the additional
Rosebud compliance reviews.

Traditional methods of governmental revenue-raising are generally unavailable to the
Community.  The Community lacks a property tax base because significant Reservation lands are
held in trust by the United States.  The Tribe also lacks any practical sales tax or income tax base
because typical unemployment on the Reservation has historically exceeded fifty percent.  The
Community also has little, if any, natural resources to develop such as oil and gas or timber.  The
Pine Ridge Indian Reservation is very remote and economic development is difficult.  The Tribe
is not near a major population center that would support a significant gaming enterprise.  The
Community does support some small business enterprises, but its geographic isolation and
distance from any significant shipping opportunity (such as air or rail) make any production
activities more than challenging.  E-commerce, such as the online lending businesses, represents
a new ray of economic hope for the Community and its members.

Because of how important the online lending businesses are to the Community, the
Community government has been very cautious in establishing the businesses, requiring their
close management and auditing, and mandating robust consumer-protective practices as overseen
by the Rosebud governmental compliance team.

Green Circle was formed in compliance with Tribal law, by action of the WLCC Board
and by the Community government, by officials duly authorized and empowered to take those
actions.  We are empowered to speak for Green Circle in this instance and provide you with the
legal analysis you have requested.

## Tribal Sovereignty

Tribal sovereignty is a well-established legal principle and the cornerstone of the legal
and political existence of American Indian tribes.  From the earliest years of the republic, courts
have recognized the political independence and self-governing status of Indian tribes.  *See*

Oak Tree Management LLC
January 28, 2015
Page 3
_____

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831) (classifying tribes as "domestic dependent nations"); *Worcester v. Georgia*, 31 U.S. 515, 559 (1832) (explaining that the tribes are "distinct independent political communities, retaining their original natural rights" and not dependent on federal law for their powers of self-government). An Indian nation's sovereignty is not the result of reparations or a specific grant of authority by Congress, but rather the "inherent powers of a limited sovereignty which has never been extinguished." *United States v. Wheeler*, 435 U.S. 313, 322-323 (1978); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 60 (1978) ("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority..."); Powers of Indian Tribes, 55 Interior Dec. 14 (D.O.I.) (1934), 1934 WL 2186.

Because a tribe (and by extension its subsidiary governmental units) retains all inherent attributes of sovereignty that have not been divested by Congress, the proper inquiry with respect to a tribe's exercise of its sovereignty is whether Congress—which exercises plenary power over Indian affairs—has limited that sovereignty in any way. *See Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 852-53 (1985); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130,148-149 n.11 (1982); Felix Cohen's Handbook of Federal Indian Law, § 6.02[1] (2005). Further, "[I]n the absence of federal authorization .... *tribal sovereignty*, is privileged from diminution by the States." *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Eng'g*, 476 U.S. 877 (1986) (emphasis supplied).

In the consumer lending context, Congress has not acted to constrain tribal authority in any way. In fact, in the Consumer Financial Protection Act of 2010, Congress defined "state" to include "any federally recognized Indian tribe," 12 U.S.C. § 5481(27), and in so stating included Indian tribes among the governmental units working with the Consumer Financial Protection Bureau for consumer protection purposes. Additionally, in recent sessions of Congress, both the House and the Senate have proposed bills to amend the Truth in Lending Act to include state and tribal entities, but those bills have enjoyed virtually no traction. *See* H.R. 6483, 112th Cong. (2012); S. 3426, 112th Cong. (2012). Instead, in this space, tribal sovereigns are acting as parallel actors to states, but they are not under the same sovereign umbrella.

Instead, Indian tribes are governments whose status as distinct, self-governing political entities predates the United States Constitution. Indian tribes do not derive their existence, and in most respects their authority to govern or do business, from the United States. Of course, commerce among Indian tribes predated European contact. After European contact, commerce by and with Indian tribes expanded in many different modes according to needs and opportunities of the time. On behalf of the Union, Article I, Section 8 of the United States Constitution delegates to Congress exclusive authority to regulate commerce with Indian tribes. Laws enacted by Congress in the 1790s regulating sales, leases and other conveyances of tribal land and trade with Indian tribes remain substantially in effect. *See* 25 U.S.C. §§ 177 and 261-264. Many treaties between the United States and Indian tribes, which like laws enacted by Congress, are the law of the land under the Supremacy Clause of the Constitution both secure and regulate trade by and with Indian tribes. Federal laws, regulations, executive orders, and

Oak Tree Management LLC
January 28, 2015
Page 4

_____

policies too numerous to list promote and regulate commerce by and with Indian tribes. This remains true in the modern context as well.

    For example, in 2000, Congress also presented definite and unambiguous support for the unencumbered development of tribal economies.  In the Native American Business Development Act, Congress made specific findings regarding tribal economic development and the role of the federal government and federal agencies in that nation-building pursuit. Specifically, the Act found that:

    (1)  clause 3 of section 8 of article I of the United States Constitution recognizes the special relationship between the United States and Indian tribes;

    (2)  beginning in 1970, with the inauguration by the Nixon Administration of the Indian self-determination era, each President has reaffirmed the special government-to-government relationship between Indian tribes and the United States;

    (3)  in 1994, President Clinton issued an Executive memorandum to the heads of departments and agencies that obligated all Federal departments and agencies, particularly those that have an impact on economic development*, to evaluate the potential impacts of their actions on Indian tribes*;

    (4)  consistent with the principles of inherent tribal sovereignty and the special relationship between Indian tribes and the United States, *Indian tribes retain the right to enter into contracts and agreements to trade freely, and seek enforcement of treaty and trade rights*;

    (5)  Congress has carried out the responsibility of the United States for the protection and preservation of Indian tribes and the resources of Indian tribes through the endorsement of treaties, and the enactment of other laws, including laws that provide for the exercise of administrative authorities;

    (6)  the United States has an obligation to guard and preserve the sovereignty of Indian tribes in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes;

    (7)  the capacity of Indian tribes to build strong tribal governments and vigorous economies is hindered by the inability of Indian tribes to engage communities that surround Indian lands and outside investors in economic activities on Indian lands;

    (8)  despite the availability of abundant natural resources on Indian lands and a rich cultural legacy that accords great value to self-determination, self-reliance, and independence, Native Americans suffer higher rates of

Oak Tree Management LLC
January 28, 2015
Page 5
_____

unemployment, poverty, poor health, substandard housing, and associated
social ills than those of any other group in the United States;

(9)  the United States has an obligation to assist Indian tribes with the
creation of appropriate economic and political conditions with respect to
Indian lands to—

>     (A)  encourage investment from outside sources that do not
>          originate with the tribes; and
>
>     (B)  *facilitate economic ventures with outside entities that are not
>          tribal entities*;

(10)  the economic success and material well-being of Native American
communities depends on the combined efforts of the Federal Government,
tribal governments, the private sector, and individuals;

(11)  the lack of employment and entrepreneurial opportunities in the
communities referred to in paragraph (7) has resulted in a
multigenerational dependence on Federal assistance that is—

>     (A)  insufficient to address the magnitude of needs; and
>
>     (B)  unreliable in availability; and

(12)  the twin goals of economic self-sufficiency and political self-
determination for Native Americans can best be served by making
available to address the challenges faced by those groups—

>     (A)  the resources of the private market;
>
>     (B)  adequate capital; and
>
>     (C)  technical expertise.

25 U.S.C. § 4301(a) (emphasis supplied).  With a clear Congressional intent to encourage
and foster tribal development vis-à-vis external sources of capital and expertise, you
should feel confident that the Green Circle enterprise to which you provide contractual
services is entirely legal.

The broad-ranging potential implications of tribal sovereignty have been routinely
addressed by the United States Supreme Court, which has consistently left imposition of any
restraints on sovereignty solely before Congress.  *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*,
523 U.S. 751 (1998) (holding "The petitioner there asked us to abandon or at least narrow [a
tribal sovereignty] doctrine because tribal businesses had become far removed from tribal self-
governance and internal affairs.  We retained the doctrine, however, on the theory that Congress
had failed to abrogate it in order to promote economic development and tribal self-sufficiency.  .
. .  The rationale, it must be said, can be challenged as inapposite to modern, wide-ranging tribal

Oak Tree Management LLC
January 28, 2015
Page 6
_____

enterprises extending well beyond traditional tribal customs and activities. . . .  In our interdependent and mobile society, however, tribal [sovereignty] … extends beyond what is needed to safeguard tribal self-governance" and the Court declined to place limitations on tribal sovereignty so as to "defer to the role Congress may wish to exercise in this important judgment").

Confirmed with this strong legal backdrop on tribal sovereignty, there is nothing unusual about the Tribe's sovereign determination to make its territory a favorable forum for credit practices that might be disfavored by other sovereigns.  This sort of economic engineering is commonplace for corporate-friendly forums like Delaware and South Dakota, which routinely 'export' their corporate-favorable state laws upon out-of-state customers who live in states or territories with more restrictive state laws (e.g., South Dakota exports its liberal usury laws to agreements with customers in states that, under their state law, cap interest rates).  This practice is common and does not subject Delaware or South Dakota to collateral attacks by sister sovereigns.  *See Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S.* 299 (1978) (concluding that that national banks can charge the highest interest rate allowed in the bank's home state, regardless of where the borrower lives).  The varying credit practices and policies between sovereigns may not always seem equitable, but they are not illegal and they do not give rise to a right of one sovereign to invade the sovereign domain of another.  The Community is very much the regulator of its lending enterprises, and also assisted by Rosebud as well for an additional layer of consensual governmental oversight.

### Application Of Rule 2.4.1.1 To Green Circle

There is no applicable state law here.  Green Circle's consumer documents provide for the application of Community law, including the Community's Tribal Credit Code.  Community law requires Green Circle's compliance with the principles of the exact same consumer protection provisions required by federal law.  *See* Tribal Credit Code, § 5.1.  Therefore, Green Circle's compliance with applicable Community law makes originating depository financial institutions' honoring of Green Circle ACH debits to consumer accounts entirely consistent with NACHA Bulletin #2-2013 and all NACHA Rules.  This also means that there is no "void" to fill by analyzing the place of contract.  The consumer contracts utilized by Green Circle state clearly that Community law governs.

We are aware of no legal support for the intimation by some state actors that the location of a consumer's bank account activity is dispositive such that it can displace an arms-length contractual relationship between a sovereign American Indian tribal government and a consumer.  To the contrary, the electronic transfer system is an integral part of the federal banking and payment system and commerce.  There is nothing in federal or state law that would purport to allow a public official unilaterally to countermand a debit authorization without a valid court order.  Federal law permits national banks, FDIC-insured state-chartered banks and certain other classes of lenders (e.g., preferred ship-mortgage lenders), to make loans to residents of states without being subject to state usury and licensing laws.  Loans by tribal sovereigns are no different.

Oak Tree Management LLC
January 28, 2015
Page 7

_____

As you know, the ACH payment-processing system is an integrated part of the nation's banking and financial system, which even more broadly includes traditional check writing, wire transfers, remotely created checks, electronically created payment orders, ACH transactions, Check 21, and other varieties of payment.  The ACH system is based upon the banking powers of the participating depository institutions, is highly regulated by the federal regulators, and is governed by numerous federal statutes and regulations, as well as the NACHA Operating Rules.  The Community, Green Circle and Green Circle's third-party contract service-providers, each materially comply with the principles of each of these laws, regulations, Rules and policies.

**Green Circle's Consumer Documents in Compliance with All Applicable Law**

Green Circle offers fully-amortizing, small denomination, unsecured installment loans to consumers via the internet.  Green Circle's consumer contract was authored by Greenberg Traurig to be materially compliant with all Community laws and the principles of federal consumer lending laws.  We have additionally reviewed and tested the Green Circle consumer contract as programmed and determined that the technology utilized by Green Circle is accurately conveying the contract information and the contract in material compliance with Community laws and the principles of federal laws.

**Conclusion**

Tribal sovereignty and the right of a tribe to govern its own activities is a long-standing and well-settled principle of federal law.  Accordingly, Green Circle's activities are legal under all applicable laws, and in particular the proper basis for origination of ACH debits from state-based consumer accounts.

We render this opinion to the parties named above and it may not be relied upon in any manner by any other person or entity without our prior written consent.  This opinion is limited to the matters stated herein and no opinion may be implied or inferred beyond the matters expressly stated.  This opinion is an expression of our professional judgment and is not a guarantee of any result.  This opinion is given as of its date and we assume no obligation to advise of changes that may later be brought to our attention.

Sincerely,

GREENBERG TRAURIG, LLP

Jennifer H. Weddle

# EXHIBIT 13



Jennifer H. Weddle
Tel 303.572.6565
Fax 303.572.6540
weddlej@gtlaw.com

January 29, 2015

**VIA EMAIL:** dharbour@hpcg.com

Milagro Consulting, LLC
21020 N. Pima Road
Scottsdale, AZ 85255

Re:   Enforceability of Green Circle Exclusive Strategic Financial Consulting Services
      Agreement

Dear Milagro Consulting:

Wakpamni Lake Community Corporation (the "WLCC") has authorized, and its duly-organized subsidiary, Green Circle, has executed that certain Exclusive Strategic Financial Consulting Services Agreement effective January 8, 2015.

As counsel to the Green Circle, we have examined and are familiar with the books, records and files of Green Circle and the executed Exclusive Strategic Financial Consulting Services Agreement and information as we have considered pertinent, and based upon our review of the aforementioned, we are of the opinion as follows:

1.      Green Circle is a duly-organized subsidiary of the Wakpamni Lake Community Corporation, and an economic arm and instrumentality of the Wakpamni Lake Community, a subordinate governmental unit of the Oglala Sioux Tribe. The Oglala Sioux Tribe is organized in accordance with Section 16 of the Indian Reorganization Act of 1934 and pursuant to the Tribe's federally-approved Constitution and Bylaws. WLCC and Green Circle is each validly existing and in good standing under applicable Tribal law, including Article VI of the Oglala Sioux Tribe Constitution and Bylaws; Resolution 78-101 passed by the Oglala Sioux Tribal Council on January 23, 1978; and Resolutions passed by WLCC on March 5, 2014 and by the Wakpamni Lake Community on March 4, 2012 and April 1, 2012.

2.      WLCC and Green Circle each had and has the authority pursuant to the Tribal laws referenced in Paragraph 1 above, and pursuant to their Articles of Incorporation and pursuant to specific Resolutions of their governing bodies and the Wakpamni Lake Community to: take all actions to authorize and execute the Exclusive Strategic Financial Consulting Services Agreement with Milagro Consulting, as specifically authorized by WLCC Resolution No. 1-8-15.

3.      The Exclusive Strategic Financial Consulting Services Agreement has been duly authorized, executed and delivered and constitutes a legal, valid and binding limited obligation

Milagro Consulting, LLC
January 29, 2015
Page 2

of Green Circle, enforceable against Green Circle in accordance with it terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganizations, readjustment of debt, moratorium or other laws, judicial decisions, or principles of equity relating to or affecting the enforcement of creditor's rights or contractual obligations, generally.

4.    WLCC and Green Circle have each taken all of the actions necessary to duly authorize the Exclusive Strategic Financial Consulting Services Agreement. No other approval, consent or order of any governmental authority is required to be obtained before the execution and delivery of the foregoing instruments or before the foregoing instruments shall be in full force and effect.

5.    To our knowledge, based solely on a certificate of authorized officers of WLCC and Green Circle, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, pending or threatened against either WLCC or Green Circle in any court, entity, agency, tribunal, or board, affecting the corporate existence of WLCC or Green Circle, the titles of its officers or their respective offices which otherwise seeks to prohibit, restrain or enjoin the Exclusive Strategic Financial Consulting Services Agreement, or questioning or affecting the validity or enforceability of the Exclusive Strategic Financial Consulting Services Agreement, or the transactions contemplated thereby, or the powers or authority of WLCC or Green Circle to perform any obligations under the Exclusive Strategic Financial Consulting Services Agreement.

6.    The actions taken by Green Circle are within its powers, and will not conflict with or constitute, on behalf of Green Circle, a breach of, any law, court decree or order, administrative regulation, ordinance, resolution, agreement, indenture or any other instrument to which Green Circle or its property is bound.

7.    Each of the Resolutions is in full force and effect according to the terms thereof and has not been amended, modified or supplemented, and was duly adopted, approved and authorized in strict compliance with all of the provisions of applicable Tribal law.

8.    The foregoing opinions are further subject to the following qualifications:

(i)    We are licensed to practice law in the State of South Dakota and in the jurisdiction of the Oglala Sioux Tribe, and we express no opinion concerning any law other than the law of the State of South Dakota, the law of the Oglala Sioux Tribe and applicable federal laws.

(ii)    The opinions expressed herein are based upon an interpretation of, and are limited to, existing laws, ordinances and regulations, which laws are subject to change at any time by legislation, administrative action or judicial decision.

We render this opinion to the parties named above and it may not be relied upon in any manner by any other person or entity without our prior written consent. This opinion is limited to the matters stated herein and no opinion may be implied or inferred beyond the matters expressly stated. This opinion is an expression of our professional judgment and is not a

Milagro Consulting, LLC
January 29, 2015
Page 3

guarantee of any result.  This opinion is given as of its dates and we assume no obligation to advise of changes that may later be brought to our attention.

Sincerely,

*Jennifer H. Weddle*

Jennifer H. Weddle
Denver Shareholder

# EXHIBIT 14

| Form 668 (Y)(c)<br>(Rev. February 2004) | 1872 | Department of the Treasury - Internal Revenue Service<br>**Notice of Federal Tax Lien** |
|---|---|---|

| Area:<br>SMALL BUSINESS/SELF EMPLOYED AREA #6<br>(800) 913-6050 | Serial Number<br><br>209566216 | For Optional Use by Recording Office |
|---|---|---|

**As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.**

● This Notice of Federal Tax Lien has been filed as a matter of public record.

● IRS will continue to charge penalty and interest until you satisfy the amount you owe.

● Contact the Area Office Collection Function for information on the amount you must pay before we can release this lien.

● See the back of this page for an explanation of your Administrative Appeal rights.

000863

Name of Taxpayer   DAVID A HARBOUR & ABBY L HARBOUR

Residence        11546 E RANCH GATE RD
                 SCOTTSDALE, AZ 85255-8238

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax<br>(a) | Tax Period<br>Ending<br>(b) | Identifying Number<br>(c) | Date of<br>Assessment<br>(d) | Last Day for<br>Refiling<br>(e) | Unpaid Balance<br>of Assessment<br>(f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2012 | XXX-XX-6379 | 11/11/2013 | 12/11/2023 | 165938.82 |

| Place of Filing<br><br>COUNTY RECORDER<br>KOOTENAI<br>Coeur d'Alene, ID 83814 | Total | 165938.82 |
|---|---|---|

This notice was prepared and signed at _____ SEATTLE, WA _____ , on this,

the **20th** day of ___April___ , ___2016___ .

| Signature<br><br>*Cheryl Corder*<br>for KARLA J GROENENBOOM | Title<br>REVENUE OFFICER<br>(480) 503-7282 | 26-01-1241 |
|---|---|---|

**(NOTE:** Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax Lien Rev. Rul. 71-466, 1971 - 2 C.B. 409)

**Part 3 - Taxpayer's Copy**

CAT. NO 60025X
Form **668 (Y)(c)** (Rev. 02-04