1   GARY M. RESTAINO
    United States Attorney
2   District of Arizona
    KEVIN M. RAPP
3   Arizona State Bar No. 014249
    Email: kevin.rapp@usdoj.gov
4   COLEEN SCHOCH
    Georgia State Bar No. 366545
5   Email: Coleen.Schoch@usdoj.gov
    Assistant U.S. Attorneys
6   Two Renaissance Square
    40 N. Central Ave., Suite 1800
7   Phoenix, Arizona 85004
    Telephone: 602-514-7500
8   *Attorneys for Plaintiff*

9

10              IN THE UNITED STATES DISTRICT COURT

11              FOR THE DISTRICT OF ARIZONA

12   United States of America,              CR-19-00898-PHX-DLR (DMF)

13              Plaintiffs,
                                            **UNITED STATES'**
14       vs.                                **MOTION *IN LIMINE* TO DETERMINE**
                                            **ADMISSIBILITY OF EVIDENCE**
15
     David Allen Harbour,
16
                Defendant.
17

18          The United States files this Motion *in Limine* to provide the Court with notice of

19   evidence that the government will seek to introduce in its case-in-chief and to respectfully

20   request that the Court make a pretrial ruling that each category of evidence is admissible

21   or will be admissible when the United States lays the anticipated foundation discussed

22   below. A pretrial ruling on the admissibility of the eight categories of evidence discussed

23   below is in the interests of judicial economy because it will allow trial to proceed more

24   smoothly and result in a more efficient and effective use of the jury's time.

25          The United States has divided the evidence into ten categories: (1) Harbour's under

26   oath examinations by the FTC, SEC, and depositions in two civil cases, (2) obituaries and

27   related news articles of Pat Spaulding and Ted Rowland, (3) summary exhibits, (4) emails

28   and text messages sent or received by Harbour, (5) other documents including

correspondence, signed personal guarantees, promissory notes, produced in discovery that were obtained and provided by Harbour to victim investors, (6) certified domestic business records pursuant to Fed. R. Evid. 803(6) and 902(11), (7) a notarized affidavit signed by Harbour, (8) evidence of exorbitant spending on luxury items, and (9) evidence of witness tampering.

Pretrial consideration of evidentiary matters is permissible under the rules and will greatly streamline the presentation of the evidence at trial.[1] *Palmerin v. City of Riverside*, 794 F.2d 1409, 1403 (9th Cir. 1986) ("Pretrial motions are useful tools to resolve issues which would otherwise 'clutter up' the trial. Such motions reduce the need for sidebar conferences and argument outside the hearing of the jury, thereby saving jurors' time and eliminating distractions."); *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) (granting government's motion in limine to make pre-trial ruling "regarding admissibility of approximately 260 emails that the government seeks to admit in its case against the defendant"); *id*. at 43 ("At the Court's request, the government helpfully provided a chart listing each email by exhibit number and indicating which theory or theories the government offers for admission of each exhibit"); *United States v. Davis*, 826 F. Supp. 617, 620 (D.R.I. 1993) ("Defendants suggest that a motion *in limine* may not be used to admit evidence prior to trial, rather, it may only be used to exclude evidence. This argument cannot be sustained. . . . Ruling on these issues now will avoid a needless, time-consuming dispute in the middle of what is expected to be a very long trial. Therefore, this Court will exercise its discretion to rule on the motion now.").

## I.    Defendant's Prior Testimony

Harbour was the subject of two regulatory inquiries. One investigation was conducted by the Federal Trade Commission ("FTC") in 2015. As part of its investigation,

---

[1] *Donnelly Corp. v. Gentex Corp.*, 918 F. Supp. 1126, 1130 (W.D. Mich. 1996) ("[T]he Court . . . has authority under Federal Rules of Evidence 103, 104, 402 and 403 (as well as the Court's inherent authority to manage trials) to make rulings concerning preliminary questions as to the admissibility of evidence.").

the FTC examined Harbour, on April 7, 2015, for twelve-hours in an under-oath deposition (totaling 310 pages). Harbour gave a variety statements and admissions concerning his involvement with KSQ, Ted Rowland, Joel Tucker, among others. In addition, Harbour was questioned about an array of email exchanges between Rowland and Tucker. [2] The emails demonstrate Harbour's knowledge of cease-and-desist orders from various states, complaints from borrowers, the investigation of Joel Tucker's brother Scott who was also in the payday lending industry (and was convicted and sentenced to 16 years in prison), among other topics. Harbour disclosed none of these concerns to investors. Importantly, Harbour settled with the FTC with a penalty of $750,000. His settlement admitting wrongdoing is independently admissible because he failed to alert investors of the investigation, disclose his statements made during the deposition that were at odds with what he was telling the investors about the nature of the investment, and omitted other important and material information.

Harbour was also investigated by the Securities Exchange Commission ("SEC") for his involvement in the Green Circle payday lending Ponzi scheme. He was examined under oath on October 25, 2016. Several Green Circle investors were deposed including Mark Burg and Rich Turasky, Charles Wear, among others. [3] Harbour invoked his Fifth Amendment right against self-incrimination at the beginning of his examination and declined to answer most questions. Typically, a criminal defendant's invocation of his Fifth Amendment against self-incrimination is inadmissible. *United States v. Baker,* 999 F.2d

---

[2] Rowland committed suicide on October 24, 2016. The United States is also seeking to admit Rowland's obituary and at least related news article. As noted in previous pleadings, Joel Tucker was convicted of 12 counts of interstate transportation of stolen money, two counts of bankruptcy fraud, and one count of falsification of a record in bankruptcy, an additional count of interstate transportation of stolen money, an additional count of bankruptcy fraud, and one count of tax evasion. and sentenced to twelve years in prison related to the payday lending scheme involving Harbour.

[3] Turasky actually was not the source of money provided to Harbour. This issue will be addressed more fully in the section regarding witness tampering.

412, 415 (9th Cir.1993) (quoting *United States v. Negrete–Gonzales,* 966 F.2d 1277, 1280–81 (9th Cir.1992)( "Due process requires that defendants be able to exercise their constitutional right to remain silent and not be penalized at trial for doing so." ) However, during this same time frame when Harbour was invoking his Fifth Amendment rights (October 2016), he was telling investors that the SEC investigation was a "misunderstanding", that his assistant Carol Hill (also a victim-investor) "accidentally transferred money from the wrong account", that they would get their money returned despite the investigation or he just failed to disclose the SEC investigation at all to investors. Accordingly, his invocation his relevant and admissible as it is material to whether the victims, had they known, would have reported Harbour to the authorities, filed a civil lawsuit seeking damages, or sought other available remedies against Harbour.

Harbour was also deposed in two civil cases. In April 2019, Harbour was deposed in in the divorce proceeding involving Allison and Dan Wilson. The Wilsons had invested $200,000 with Harbour. Like various other investors Harbour diverted their funds for his own use, failed to make required payments, provided them scant and confusing information about where their money was actually invested, etc. In addition, he was also spending investor money on numerous lavish expenditures. During that deposition Harbour makes numerous admissions that are relevant to the case.

Next, Harbour was sued by Denny Sandford. Similar to other lawsuits Sandford provided money to Harbour and failed to return to Sandford interest payments. Harbour was deposed on July 23, 2019—one month before he was indicted and arrested on the instant case. Again, Harbour made a number of admissions, inconsistent statements, claimed to not recall basic details of his investments. All admissions are relevant and admissible.

Prior to trial the United States will provide defense counsel excerpts from the four depositions and identify the witness the United States intends to admit the deposition excerpts through. In the event there are questions about the authenticity of the depositions the United States intends to call the court reporters for each deposition at trial.

## II.     Spaulding and Rowland Obituaries

The United States requests that the Court take judicial notice of obituaries for Patrick Scott Spaulding, which was published in the Kansas City Star.[4] In addition the United States is seeking the admission of obituary and news articles announcing the death of Frampton Ted Rowland .[5]

Federal Rule of Evidence 201(b) provides that judicial notice must be "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The Ninth Circuit has confirmed that a court may take judicial notice of the contents of a newspaper article. *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458 (9th Cir.1995) (quoting Fed. R. Evid. 201(b)). Other district courts have taken judicial notice that a person is deceased based on an obituary published in a newspaper. *See Beeman v. TDI Managed Care Servs., Inc.*, No. 02-cv-1327, 2016 WL 11637594, at *12 (C.D. Cal. Nov. 10, 2016) ("Hence, the Court takes judicial notice of [the] obituary."); *Wilson v. Gordon & Wong Law Grp., P.C.*, No. 2:13-cv-00609, 2013 WL 6858975, at *4 (E.D. Cal. Dec. 24, 2013) ("Accordingly, the Court takes judicial notice of [the] obituary."); *United States v. Beeman*, 1:10-cv-237, 2011 WL 3021789 (W.D. Pa. July 22, 2011) ("Based upon the aforementioned April 7, 1997 obituary, this Court will take judicial notice of the fact that Defendant Howard Beeman is, in fact, deceased.")

Accordingly, the Court should take judicial notice of Patrick Scott Spaulding's obituary. His 2009 death is relevant because Harbour misrepresented to both Kenneth Bobrow and Pam Case that Spaulding had signed promissory note for $7,000,000 where

---

[4]    *Available    at*    https://www.legacy.com/us/obituaries/kansascity/name/patrick-spaulding- obituary?id=4502023 (last visited Nov. 23, 2022)

[5]    *Available    at*    https://www.thepitchkc.com/frampton-ted-rowland-iii-payday-lending-figure-dies-at-52/ (last visited Dec. 20, 2022).

he would invest the money in Dollar Stores and Texas student housing. Spaulding died in Albuquerque, NM in 2009. Carol Hill at Harbour's direction sent an email to Spaulding in 2014 threatening legal action. This is an obvious fabrication devised by Harbour. More importantly, Harbour never disclosed Spaulding's death to Case or Bobrow.

Next, Ted Rowland was Harbour's business partner from 2011 until 2014. Rowland committed suicide in 2016. Articles announcing his death in Kansas describes that he was involved in a payday lending fraud. During this time period Harbour is representing to investors in his own pay day lending scheme (Green Circle) that was successful and was profitable. It wasn't. He also entices investors with the false claim that his previous pay lending scheme was successful. Rowland's obituary and news articles are replete with references to his fraudulent pay day ending scheme. This is clearly relevant because it demonstrates Harbour's knowledge that KSQ and the Rowland related scheme was fraudulent. In addition, his other partner Joel Tucker, is under numerous civil and criminal investigations and eventually pleads guilty and is sentenced to prison.

### III.   Summary Exhibits

The United States intends to present records of summary exhibits at trial. Many of these summary exhibits were provided to Defendant in discovery and as attachments to pleadings. (*See* e.g., Doc. 228) The government will produce any remaining summary exhibits to Harbour within a reasonable time prior to trial.

The United States respectfully requests the Court find that these exhibits are admissible under Rule 1006, which provides that evidence may be admitted "in the form of a chart, summary, or calculation" where "[t]he contents of voluminous writings, recordings, or photographs . . . cannot conveniently be examined in court." For a summary chart to be admissible under Rule 1006, "[a] proponent … must establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection. These materials must be admissible, but need not themselves be admitted into evidence." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011). Here, both of these requirements are satisfied.

First, the documents on which the exhibits are based—Harbour's personal and business bank records, credit card records —are themselves admissible. In fact, the United States intends to offer those documents into evidence at trial in addition to offering the summary exhibits. *United States v. Milkiewicz*, 470 F.3d 390, 397 (1st Cir. 2006) ("the summary may be admitted in addition to the underlying documents to provide the jury with easier access to the relevant information"). Second, the underlying documents have been produced in discovery.

For these reasons, the Court should issue a ruling that the government's summary exhibits are admissible under Rule 1006. The documents they summarize are voluminous and encompass thousands and thousands of pages. Courts have recognized that summary exhibits are particularly appropriate under these circumstances. *United States v. Kelley*, 105 F.2d 912, 918 (2d Cir. 1939) ("The prosecution's accountants were allowed to present their calculations from the books and returns in evidence. This kind of evidence when based upon documents themselves competent and accessible, is always admissible, a jury without such guidance would be totally unable to cope with complicated accounts.").

## IV.    Emails and Text Messages Sent or Received By Harbour[6]

The discovery in this case contain numerous emails sent and received by Harbour or Harbour's agents The United States intends to introduce such emails into evidence at trial. In some cases, this evidence will be introduced through a trial witness who personally sent or received the email in question. No foundational questions should arise in those circumstances. *See* Fed. R. Evid. 901(b)(1) (one acceptable method of authentication is

---

[6] When this motion refers to "email," it is referring to an email and any attachments associated with the email. A "message unit" is "[a]n email and any attachments that are associated with the email." Sedona Conference Glossary: Commonly Used Terms for E-Discovery and Digital Information Management (2d ed. Dec. 2007). The Ninth Circuit has relied upon the Sedona Glossary to assist in the understanding of electronic discovery. *See Resnick v. Netflix, Inc.* (*In re Online DVD-Rental Antitrust Litig.*), 779 F.3d 914, 929 n.8 (9th Cir. 2015); *see also Morgan Hill Concerned Parents Association v. California Department of Education*, 2017 WL 445722 n.3 (E.D.CA February 2, 2017).

testimony by a "witness with knowledge" that "an item is what it is claimed to be").

In other cases, however, the United States does not anticipate calling the sender (or any recipients) of the email as a trial witness. For the reasons set forth below, the United States respectfully requests this Court make a pre-trial finding that all emails sent or received by Harbour (or between the Defendant and his employees (*e.g.,* Carol Hill, Laura Purifoy, etc.) are admissible.

### A. Authenticity

As a threshold matter, the Court should find that these emails satisfy the authentication requirements of Rule 901. Rule 901(a) simply requires that a proponent of evidence makes a prima facie showing of authenticity so that a reasonable juror could find "that the item is what the proponent claims it is." This requirement "does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what is purports to be." *United States v. Dhinsa*, 243 F.3d 635, 658-59 (2nd Cir. 2001) (citations omitted). Once this threshold showing has been made, any questions concerning the genuineness of the item normally go to the weight of the evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 n.6 (9th Cir. 2002) ("Once the trial judge determines that there is prima facie evidence of genuineness, the evidence is admitted, and the trier of fact makes its own determination of the evidence's authenticity and weight."). Here, there are two independent reasons why the Court should find that Rule 901's low threshold for admission has been satisfied.

### B. Distinctive Characteristics

First, the emails can be authenticated under Rule 901(b)(4) because their "appearance, contents, substance, internal patterns, [and] other distinctive characteristics" show that they are what they purport to be—emails sent to and from defendant. Specifically, the "to" and "from" lines located in the header at the top of each email identify—by name—the sender and recipients (*e.g.*, "FROM: David Harbour"). In addition, many of the emails include a signature and/or signature block at the end that

repeats the name of the sender. Finally, the contents of the emails clearly concern the Harbour's business operations and related entities. (*e.g.*, KSQ, DNA investments, Highpoint Capitol Group, Pujanza, Oak Tree Management, Green Circle, etc.).

In *United States v. Safavian*, 435 F. Supp. 2d 36 (D.D.C. 2006), the court authorized the admission of a cache of emails based on the presence of similar "distinctive" identifiers. *Safavian* involved a prosecution arising from the Jack Abrahamoff lobbying scandal. Before the trial, the government announced that it intended to admit approximately 260 emails that had been extracted from the server of Abrahamoff's law firm, under the theory that the emails constituted "e-mail exchanges between Mr. Safavian, Mr. Abrahamoff, and other individuals." 435 F. Supp. 2d at 38-39. The government filed a lengthy motion in limine seeking a determination that the emails would be authentic and admissible despite the absence of a witness with personal knowledge of the emails. The court granted the motion in relevant part, holding that the government could introduce the majority of the emails through its case agent or another summary witness. *Id*.

As relevant here, the *Safavian* court concluded the government had made a sufficient showing as to authenticity because "these e-mails contain the name of the sender or recipient in the bodies of the email, in the signature blocks at the end of the e-mail, in the 'To:' and 'From:' headings, and by signature of the sender. The contents of the emails also authenticate them as being from the purported sender and to the purported recipient, containing as they do discussions of various identifiable matters." *Id*. at 40.

Likewise, in *United States v. Siddiqui*, 235 F.3d 1318 (11th Cir. 2000), the Eleventh Circuit rejected an authenticity challenge to an email that had been admitted as proof of communications made and received by the defendant. *Id*. at 1322-23. Relying on Rule 901(b)(4), the court found that the government had properly authenticated the email showed familiarity with the underlying scheme, and because the email contained references to the defendant's nickname. *Id*.

### C.  Emails Are Admissible Because Exceptions to Hearsay Apply

Any objection from the defense to the admission of Harbour authored emails on hearsay grounds should be rejected. As discussed below, each email falls outside the definition of hearsay for one or more reasons. Additionally, some of the emails are being offered for non-hearsay purposes.

#### i.      Party-Opponent Admission

First, any email sent by one of the Defendants falls outside the definition of hearsay because it qualifies as a party-opponent admission under Rule (801)(d)(2)(A). *In re Homestore.com Inc. Securities Litigation*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) ("Emails written by a party are admissions of a party opponent and admissible as non-hearsay under Fed. R. Evid. 801(d)(2)(A)."); *Safavian*, 435 F. Supp. 2d at 43 ("The statements attributed directly to Mr. Safavian come in as admissions by a party opponent under Rule 801(d)(2)(A)…."); *Siddiqui*, 235 F.3d at 1323 ("Those [emails] sent by Mr. Siddiqui constitute admissions of a party….").

#### ii.      Statement of Party's Agent

Second, all of the emails sent by Harbour's employee (such as Carol Hill, Laura Purifoy, etc.) are statements of a party's agent under Rule 801(d)(2)(D) and are therefore admissible against each Harbour as if it were his own statement. *See* Fed. R. Evid. 801(d)(2)(D) (excluding from the definition of hearsay any "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship").

To invoke Rule 801(d)(2)(D), the proffering party bears the burden of establishing that (1) the statement was made by an "agent" of the opposing party and (2) the statement concerned a matter within the agent's scope of employment. *Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002). Both elements are clearly satisfied here. First, all Harbour's employees qualify as an "agent" because they were employed by Harbour at the time of the communications.

### iii.     Adoptive Admission

The three preceding subsections demonstrate why the Harbour's emails are admissible based on the identity and role of the sender. In addition, the circumstances under which these emails were received provides an independent basis for their admission.

Specifically, many of the emails are admissible against the recipients as adoptive admissions under Rule 801(d)(2)(B). Under that rule, a statement is not hearsay if it is offered against a party and is "a statement of which the party has manifested an adoption or belief in its truth." Notably, such an "adoption" can be manifested by silence: "The general rule concerning admissions by silence or acquiescence is well established. When an accusatory statement is made in the defendant's presence and hearing, and he understands and has an opportunity to deny it, the statement and his failure to deny are admissible against him." *United States v. Moore*, 522 F.2d 1068, 1075 (9th Cir. 1975); *see also United States v. Gil*, 58 F.2d 1414, 1420 (9th Cir.1995), ("[I]t's not a question of the court weighing the evidence at this time and deciding whether the showing [that a statement is adopted by silence] is strong or weak. The court merely needs to decide that there is a substantial enough showing to present the issue to the jury for them to perform that weighing function.").

### iv.     Not Offered for Truth

Finally, many of the Harbour emails also are admissible to show Harbour's' notice, knowledge, state of mind, intent, and pattern of communication. For example, some of the emails discuss complaints from investors and payday loan borrowers. Courts have repeatedly recognized that email evidence may be admitted for these legitimate non-hearsay purposes. *Safavian*, 435 F. Supp. 2d at 44-45 ("[A] number of the e-mails are admissible under Rule 803(3) to show Mr. Safavian's state of mind at the time he received them. . . . Other e-mails provide context for the defendant's statements. . . . Still others are non-hearsay because the truth of the emails' contents. . .are unimportant. It is the fact of these discussions rather than their contents . . .that is being offered by the government."); *United States v. Tamura*, 694 F.2d 591, 598 (9th Cir. 1982) (holding that telexes received

by defendant were admissible "for the non-hearsay purpose of showing [Tamura's] knowledge of the scheme").

### D.  The Text Messages are Admissible

Similar to emails bearing Harbour's email address he also exchanged numerous text messages to victim investors. There is clearly sufficient evidence to connect Harbour to text messages. *See United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985) (requiring the government to "make a prima facie showing of authenticity"); *United States v. Morel-Pineda*, 829 Fed. Appx. 187 (9th Cir. 2020) ("Text messages between defendant and third parties obtained from phone found at defendant's apartment were sufficiently authenticated, in prosecution for distribution of methamphetamine; agent testified that number in messages was one witness used to communicate with defendant, and phone with that number was found upon searching defendant's apartment.").

In each case the recipient of Harbour's text messages are well known to him (i.e., Rhonda Gray, Allison Wilson, Carol Hill, Mark Burg, Kenneth Bobrow, etc.) Indeed, Harbour provided his phone number to the recipient. The content and context of the messages is relevant to investments they made with Harbour at his urging. This evidence establishes a prima facie case that Harbour was the user of the subject cell phone number. Last, like the emails, the text messages also qualify as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A), 801(d)(2)(E).

### V.  Letter Correspondence Sent to Harbour

A number of letters sent to Harbour from investors, attorneys representing investors, regulatory agencies, personal guarantees, promissory notes, are admissible under 803(3) to show Harbour's notice, knowledge, state of mind, intent, and pattern of communication. For example, these letters discuss his failure to return funds or provide updates regarding the status of funds. Or, they are from State and federal regulatory agencies notifying him that he needs to cease and desist pay lending in their state.

The United States intends to introduce many of these documents into evidence at trial. In some cases, this evidence will be introduced through a trial witness who personally

sent or received the document in question. As in the case of emails, no foundational questions should arise in those circumstances. *See* Fed. R. Evid. 901(b)(1).

In other cases, however, the United States does not anticipate calling the sender or recipients of these documents as a trial witness and respectfully requests the Court make a pretrial ruling that all documents falling into this category are admissible. To start, these documents satisfy the authentication requirements of Rule 901(a) because they were produced to the government by Harbour or they contain other distinctive characteristics that show that they are what they purport to be. (*See* Part IV, *supra*.) Further, each document falls outside the definition of hearsay for one or more reasons. Additionally, some of these documents are being offered for non-hearsay purposes. It is also requested that the Court further clarify that these documents may be introduced at trial through a government agent or other summary witness. *Safavian*, 435 F. Supp.2d at 42 ("The jury may draw whatever reasonable conclusions and inferences it chooses to from these e-mails and how to consider them, but the Court will not permit any testimony beyond the bare fact of what words appear on a particular e-mail by a case agent or summary witness who neither composed nor received these emails.").

## VI.    Business Records Pursuant to Fed. R. Evid. 902(11) Certification

The United States intends to introduce several categories of bank records at trial including (a) records from Harbour business entity bank accounts bank accounts; (b) records from David and Abby Harbour' personal bank accounts; and (c) credit card statements for credit cards in the name of both David and Abby Harbour.

The Court should hold that these exhibits are business records admissible under Fed. R. Evid. 803(6). Fed. R. Evid. 902(11) provides that certified domestic records of regularly conducted activities can be self-authenticating and therefore admissible under Rule 803(6) if accompanied by written declaration from a records custodian or other qualified person certifying that the records: (a) were made at or near the time of the occurrence of the matters set forth by, or from, information transmitted by a person with knowledge of those matters; (b) were kept in the course of the regularly conducted activity; and (c) were made in the

course of the regularly conducted activity as a regular business practice. With respect to these records, the United States has obtained certificates of authenticity from the respective issuing banks and provided these certifications to defense.

### VII. Harbour's Signed and Notarized Affidavit

The United States intends to admit a signed notarized affidavit that contains Harbour's 2012 financial statement and a notarized agreement of what he executed with victim investor C.J.'s $15 million. Victim Rhonda Gray is expected to testify that Harbour represented to her that her $1 million was invested with C.J.'s money. The affidavit is both relevant and admissible.

### VIII. Evidence of Harbour's Exorbitant Spending on Luxury Items

The United States also moves this Court for the admission of evidence at trial of Harbour's (and his wife's) lifestyle, spending, and the financial benefits that he obtained by his frauds. This evidence is related to motive, knowledge, and intent, and because it demonstrates that Harbour made money in his many schemes, and also that he did not use that money to repay investors who asked for their money back or to even pay his taxes. As noted in the second superseding indictment (SSI) Harbour purchased a certain lifestyle for himself and his family in order to appear successful and, importantly, to obtain access to potential victims with access to funds and to perpetuate his frauds.

This evidence is also relevant to show Harbour's ongoing motive to defraud his victims was to obtain the financial benefits, have access to luxury goods that he could otherwise not afford, recognition among legitimate high net worth individuals, maintain a glittering façade of legitimacy and admiration in the community, and, most important, association with unsuspecting wealthy individuals that he could coax into investing into his fraudulent schemes. The relevance of this evidence is not substantially outweighed by the danger of unfair prejudice to Harbour. The United States seeks to introduce evidence of these tangible and non-tangible benefits to show Harbour's motive and opportunity.

As set forth in detail in the SSI, Harbour engaged in a widespread fraudulent scheme to defraud investors and obtain money and property under false pretenses. In addition to

diverting millions of dollars for himself, Harbour obtained significant personal benefits arising from the money he obtained from victims. He lived a luxurious lifestyle replete with multiple expensive homes, a luxury SUV and Mercedes, hundreds of thousands of dollars in jewelry for himself and his wife (including a six-carat ring purchased for over $100,000), as well as memberships at multiple golf courses and resorts with substantial initiation fees and monthly dues, a high-end boat, luxury travel and accommodations, expensive restaurants, and extravagant parties, and assorted high-end merchandise. Harbour also obtained non-tangible experiences that enhanced his status in society. The relationships Harbour developed by use of his spending allowed him to associate with celebrities and other wealthy and powerful individuals in wealthy enclaves of Scottsdale, Paradise Valley and even Beverly Hills.

Harbour solicited his victims in Arizona and other states. As noted in the indictment and in discovery, Harbour was a member of several private, luxury golf resorts located in Scottsdale, Arizona, Cabo San Lucas, Mexico, Palm Springs, California, and Harrison, Idaho where he solicited potential investors. Defendant also invited several victim investors to his $3 million vacation condominium at Gozzer Ranch Golf and Lake Club in Harrison, Idaho or his condominium in Cabo San Lucas. Defendant took potential investors on luxury boats, to fine dining, to his Skybox during Arizona State University football games, and to his 16th hole Skybox at the Phoenix Waste Management Open. Instead of investing his victims' money as represented to them, in some instances Defendant took 25% of the investment off the top as his payment; he also used victims' money to pay off his American Express bill, to pay auto loans, and to make *Ponzi* payments to other victims.

Evidence of Harbour's veneer of wealth and spending is highly probative of his motive and intent to defraud investors. In *United States v. Unruh*, the court held that evidence of the defendant's creation of a façade of wealth through loaning a potential investor's wife a fur coat and carrying a large "wad of bills" consisting of hundred-dollar bills was relevant to the defendant's scienter. *United States v. Unruh*, 855 F.2d 1363, 1377 (9th Cir. 1987). Similar to the defendant in *Unruh*, Harbour used investment funds to create

the image of a successful investor. He hosted parties, including an expensive wedding and birthday party in Cabo San Lucas. He used investor funds to finance these extravagant parties. He was a member at numerous private golf resorts and had numerous vacation homes. By using investor funds to fund his lavish lifestyle, he was able to create the image of a successful investor, instilling confidence in prospective investors, and inducing further investment. Simply put, Harbour used this false image in order to induce investment. Evidence is not brought merely to show that the Harbour was wealthy, but to show that Harbour was able to use his image of and veneer of wealth to defraud investors. Harbour's wealth was both motivated by, and obtained through, creating a false perception of successful investment. The Government does not seek to admit this evidence merely to show that Harbour lived the high life. It will establish a nexus between both Harbour's spending and his ability to attract victims.

### A.      Defendant's Luxury Lifestyle and Spending are Probative of His Motive to Defraud

Evidence of Harbour's lifestyle and spending habits are highly probative of his motive and intent to defraud investors. The Government is not presenting evidence to show that Harbour was wealthy to appeal to class prejudice. In fact, Harbour was not wealthy— far from it. Indeed, Harbour could not qualify for a credit card but insisted on having an American Express Black Card that only high net worth individuals are eligible to receive. A number of the investors will testify to Harbour's use of the card and how they were impressed that he was able to qualify for the card. [7] Unbeknownst to the investors, Harbour relied on an ex-girlfriend, Wendy Yeager, to qualify for the card. He consistently failed to pay bills, his home was in some stage of foreclosure for most of his fraudulent schemes, and he had subprime credit. By 2014, Harbour was unable to qualify for a mortgage and

---

[7]      *See*      https://www.investopedia.com/articles/personal-finance/062415/black-centurion-vs-platinum-american-express.asp#toc-american-express-black-card      (last visited Dec. 20, 2022).

had to rely upon his in-laws to guarantee his rent of a multimillion-dollar house. He defaulted on the rent and other agreements, was evicted, and his in-laws were sued. In addition, he owed millions in back taxes. Despite his bleak financial picture Harbour maintained a façade of success.

Evidence of Harbour's prolific spending on luxuries is also inextricably tied to the government's proof that Harbour benefited from his fraud and how that he did not use the money in the way he represented to his victims. This evidence is relevant because it represents the fruit of Harbour's various fraudulent schemes.

In *United States v. Feldman*, 788 F.2d 544 (9th Cir.1986), the Court found no abuse of discretion in a bank robbery trial, where the court had admitted evidence that the defendant's joint account with his father was overdrawn by more than $8,000, and the father had told the bank that his signature was forged on the checks creating the overdraft. The Court found that the evidence that Feldman owed "substantial sums" was relevant to show motive, quoting another case that said "[e]vidence that tends to show that a defendant is living beyond his means is of probative value in a case involving a crime resulting in financial gain." *Id.* at 557 (quoting *United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.1979)).

Ina addition, Harbour's ostentatious displays of wealth leads victims to believe that profits are coming from legitimate business activity (*e.g.*, a successful return on investments), and they remain unaware that other investors are the source of funds. A Ponzi scheme can maintain the illusion of a sustainable business as long as new investors contribute new funds, and as long as most of the investors do not demand full repayment and still believe in the non-existent assets they are purported to own. Here, Harbour began diverting new investors' money to make payments to earlier investors, pay his credit card, pay his membership fees at numerous private golf clubs, buy jewelry, pay the $750,000 penalty with the FTC, and numerous other personal expenditures.

In a Ponzi scheme, a con artist like Harbour offers investments that promise very high returns with little or no risk to their victims. "A 'Ponzi scheme' typically describes a

pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Eberhard v. Marcu,* 530 F.3d 122, 132 n. 7 (2d Cir. 2008); *accord In re BLMIS*, 654 F.3d 229, 232 (2d Cir. 2011) ("Net Equity Decision "), cert. denied, — U.S. —, 133 S. Ct. 25 (2012); *see United States v. Moloney*, 287 F.3d 236, 242 (2d Cir.) ("A Ponzi scheme by definition uses the purportedly legitimate but actually fraudulently obtained money to perpetuate the scheme, thus attracting both further investments and, in many cases, new investors to defraud."). Some courts have applied a four factor test to determine if a Ponzi scheme existed: "1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors." *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP )*, Adv. P. No. 10–03493, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014) (citation omitted).

The returns are said to originate from a business or a secret idea run by the con artist. In reality, the business does not exist, or the idea does not work. The con artist pays the high returns promised to earlier investors using the money obtained from later investors. Instead of engaging in a legitimate business activity, the con artist attempts to attract new investors to make the payments that were promised to earlier investors. The operator of the scheme also diverts his client's funds for his personal use. *Secs. Investor Protection Corp. v. Bernard L. Madoff Invest. Secs., LLC*, 531 B.R. 439, 449 (Bankr. S.D.N.Y. 2015).

With little or no legitimate earnings, Ponzi schemes require a constant flow of new money to survive. When it becomes hard to recruit new investors, or when large numbers of existing investors cash out, these schemes collapse. As a result, most investors end up losing all or much of the money they invested. In some cases, the operator of the scheme may simply disappear with the money. Here, Harbour simply devised another attractive scheme in a desperate effort to keep earlier investors satisfied that he would make them whole, prevent them contacting authorities, or filing lawsuits.

Evidence of wealth and spending are admissible where "related to motive, knowledge, and intent." *United States v. Reyes*, 660 F.3d 454, 463 (9th Cir. 2011). In *Reyes*, the Ninth Circuit held that, while "the Government was not permitted to introduce evidence simply to show that Reyes was wealthy," evidence of wealth and spending was admissible to show "Reyes's motivation for his involvement in the [fraudulent] scheme." *Id.* It further held that evidence of wealth and spending were admissible "even if such evidence is generally not sufficient, standing alone, to prove intent and fraud." *Id.* at 464. Furthermore, as in *Reyes*, each time Harbour made an extravagant purchase or payment, it is reasonable to infer that he knew his fraudulent activity allowed him to pay for those items. *Id*.

Harbour was clearly living well beyond his means. Evidence that tends to show that a defendant is living beyond his means is of probative value in a case involving a crime resulting in financial gain. *United States v. Tierney*, 424 F.2d 643, 647 (9th Cir.) *United States v. Falley*, 489 F.2d 33, 39 (2d Cir. 1973). A trial court is within its wide discretion to admit this evidence. *See United States v. Fernandez*, 497 F.2d 730, 735 (9th Cir. 1974), *United States v. Saniti*, 604 F.2d 603, 604 (9th Cir. 1979). As noted above, Harbour's true financial picture was disintegrating at the same time he was spending on luxuries.

Notably, in contrast to *United States v. Mitchell*, 172 F.3d 1104, 1106 (9th Cir. 1999), Defendant's wealth and lifestyle are relevant more than to simply show he was wealthy. Evidence of Defendant's wealth and lifestyle are brought to show his motive and intent to defraud investors, as well as to show how he was able to do so. *Id.*

The Northern District of California recently granted in part a motion in limine to exclude evidence of specific purchases and details of branding of clothing, hotels, or personal items that the defendant purchased on the grounds that the prejudicial effect of producing such evidence would outweigh any probative value. *United States v. Holmes*, No. 5:18-cr-00258-EJD, Doc. 798. That case concerned the defendant's fraudulent representations of her company's (Theranos) blood-test technology as functional, thus inducing investment. *Id*. In contrast to *Holmes*, Harbour used the façade of success in order to induce investment and feed his desire for luxuries that he could not afford.

- 19 -

Similar to the defendant in *Unruh*, Harbour used investment funds to create the image of a successful investor. He hosted lavish multimillion dollar parties, was a member at numerous private expensive golf resorts, and had numerous vacation homes in Coeur de Laine, Idaho and Cabo San Lucas, Mexico. By using investor funds to fund his lavish lifestyle, he was able to create the image of a successful investor, instilling confidence in prospective investors, and inducing further investment. In sum, evidence of lavish spending at the expense of investors is not sought to be admitted merely to show that the Harbour was wealthy (he was not), but to show that the Harbour was able to use his façade of wealth to induce and defraud investors.

### B.     Defendant's Lavish Spending is Not Substantially Outweighed by Unfair Prejudice.

Even so, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Here, the Government is not appealing to any improper class prejudice or intent to inflame the jury, but that Harbour's desire to maintain his lifestyle and the accompanying connections and benefits were motivating factors for him to continue to engage in the fraudulent conduct alleged in the second superseding indictment.

Harbour's desire for wealth is a piece in a complex puzzle comprising his intent to perpetuate a number of frauds, including persuading victims to "re-invest" their "funds" into his next "investment" to avoid the preset obligation (memorialized in one of numerous personal guarantees) to pay them back. The government will present evidence of specific purchases made with funds provided by certain victims on certain dates. "[W]ealth evidence, unlike poverty evidence, does not entail the same risk of unfair prejudice." *United States v. Flores*, 510 F. App'x 594, 595 (9th Cir. 2013). In sum, evidence of Harbour's lavish spending at the expense of numerous investors is relevant and admissible.

### IX.    Harbour's Home Purchases and Intent to Purchase Other Homes

Evidence at trial will demonstrate that Harbour committed fraud with respect to the Georgia residence by coordinating the submission of a false gift letter and presenting both Bobrow and Tim Gottschalk forged secured promissory notes. (*See* SSI, Doc. 387) As detailed in the SSI, Harbour was intent on living in homes that far exceeded his means and to give unsuspecting investors the impression that he was a successful investment manager. Also referenced in the SSI is Harbour residing, from October 2016 until August 2019, at the $2.7 million (Paradise Valley) Martingale residence, where he was arrested, and numerous items of jewelry were seized.

In 2014, Harbour had defaulted on the mortgage of his primary residence located on Ranchgate Road, Scottsdale. Harbour agreed with J.S. that he would pay $20,000 per month in rent for Martingale, remodel the home, and provide a $150,000 toward the purchase. Harbour, of course, defaulted on the rent, failed to remodel the home, left it in disrepair, and the $150,000 toward the purchase was actually a diversion of investor funds. The Gottschalks (Harbour's in-laws) guaranteed Harbour's rent of Martingale and were sued and had to settle with J.S for an undisclosed amount of money.

At trial, the United States intend to admit evidence of other luxury home purchases in close proximity to Harbour receiving investor funds. For example, in June 2010 Harbour purchased a house in the private golf club known as Silverleaf for $2.2 million. Harbour put $720,000 in cash as a down payment. This purchased occurred three months after he stole victim Rhonda Gray's $1 million dollars.

From December 2013 to October 2016, Harbour spent nearly $275,000 in rent for a multimillion-dollar home located on E. Santa Catalina Drive, Scottsdale. Also, in July 2013 Harbour purchased for $3 million a condo in Gozzer Ranch, Idaho. This was five months after he received $581,000 from his executive assistant Carol Hill. This was also during the same time that KSQ was collapsing, and Harbour and his partners were facing an array of complaints from various states, individual borrowers, an FTC complaint and IRS collection activity. Harbour was also facing demands from investors for return of funds.

The United States also intends to admit three other instances where Harbour, despite being destitute, was attempting to purchase multi-million-dollar homes. First, Robert Eckholt will testify that Harbour attempted to purchase a $3 million home in DC Ranch Scottsdale. Harbour had mispresented to the loan officer that he was from a wealthy family having inherited Lear jet stock. Right before closing of this home Harbour was unable to come through with financing and the sale never went through. Eckholt will also testify to Harbour's claims of inherited wealth and being a Certified Public Accountant.

Second, Mark Burg will testify that in 2016 (before Burg received his subpoena to testify before the SEC) that Harbour was interested in investing in the film industry and considered a move to Beverly Hills, California. He asked Burg if there were any homes in his neighborhood available. Burg, believing that Harbour was legitimately wealthy, arranged for Harbour and his wife to view a $7.5 million home that belonged to the ex-wife of a famous actor. Harbour never purchased the house.

Third, Victoria Bobrow is expected to testify that Harbour had contacted Victoria's real estate agent, L.T., in December 2019, because he was looking to purchase a 25-acre parcel in the private golf club of Forest Highlands in Flagstaff, AZ. Victoria was upset with Harbour because he was not in apposition to make such a purchase and therefore wasted the agent's time. In addition, Harbour was using the Bobrow's membership number, without their permission, to purchase expensive meals at the club.

 In sum, these multimillion-dollar home purchases rentals, And attempts to purchase expensive homes are relevant for the reasons detailed above to give the impression that he was a successful money manager and to feed his desire to live a life of unsustainable luxury.

### X.   Witness Tampering

This Court is well aware of Harbour's efforts to tamper with witnesses based on the pleadings and evidentiary hearings conducted before the magistrate judge and the subsequent appeal (*See* generally Docs. 267, 290, 339, 375, and 411 ) The government intends to admit evidence of Harbour's efforts to indirectly tamper with witnesses, including all exhibits related to these efforts (*e.g.*, text messages, recorded phone calls,

declarations, settlement agreements, etc.). Harbour tampered or attempted to tamper with Allison and Dan Wilson, Carol Hill and Mark Burg. Each intends to testify to his efforts.

Since the series of hearings before the Magistrate Judge and the appeal of the order to this Court, the United States has learned that Harbour's efforts at tampering with witness Richard Turasky were misguided. Turasky, in order to satisfy a claim dating to 2014, accepted $500,000 from Harbour, in 2020, involving a convoluted investment. In all cases the monies promised to provide to the victims (Turasky, the Wilsons, Hill, and Burg) in exchange of for them signing a declaration avowing they were no longer a victim never really belonged to Harbour. But, in the case of Turasky, his investment with Harbour wasn't really *his* money. The actual source of that money belonged to as Scott Prater. Prater is expected to testify that he was defrauded by both Harbour and Turasky.

## XI.    Conclusion

Based on the foregoing, the United States respectfully requests the Court make a pretrial determination that the evidence contained within the ten aforementioned categories are admissible at trial.

Respectfully submitted this 20th day of December, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Kevin M. Rapp*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

  I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrant:

  Stephen M Dichter, *Attorney for Defendant*

 *s/Daniel Parke*
U.S. Attorney's Office