Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United States of America, | Case No. CR-19-00898-PHX-DLR(DMF) |
|---|---|
| Plaintiff, | |
| vs. | **DEFENDANT'S THIRD MOTION IN LIMINE: TO EXCLUDE EVIDENCE CONCERNING WEALTH, SPENDING, AND LIFESTYLE** |
| David Allen Harbour, | |
| Defendant. | |

Pursuant to Federal Rules of Evidence 401, 402, and 403, Defendant David Allen Harbour moves *in limine* to preclude the government from introducing evidence of his purported wealth, spending, and lifestyle.

**I.      INTRODUCTION**

The government alleges Mr. Harbour engaged in a high-yield investment fraud scheme in which he induced investors to provide funds by making materially false statements and omissions. [Doc. 154 at 2:9-10.] The government further alleges Mr. Harbour used the investment funds for purposes other than what was promised to investor-victims, such as

supporting his family's "lavish lifestyle." [*Id.* at 2:12-14.] According to the government, this "lavish lifestyle" included expenditures on "golf resort membership fees," "extravagant parties," "private-chartered jets," "mortgage payments," and "an expensive power boat." [*Id.* at 2:15-17.] The government claims Mr. Harbour invited investors to his "vacation condominium at Gozzer Ranch Golf and Lake Club," "his condominium in Cabo San Lucas," his "Skybox during Arizona State University football games," his "16th hole Skybox at the Phoenix Waste Management Open," and on his "luxury boats and out to fine dining and entertainment." [*Id.* at 4:2-11.] The government states "Harbour portrayed a veneer of success by telling investors about luxury expenditures that intended to give the illusion that he was a successful investor." [Doc. 3 at 5:12-13.] For example, Mr. Harbour allegedly described to an investor that for his fortieth birthday he "flew all of his friends to the party location on a private chartered airplane and hired the 1970s band, The Eagles, to play at his party." [*Id.* at 5:15-16.]

What this summary proves, first, is that, as we have stated before, the government does not understand the case. It understands what it has convinced itself is true and correct about the case but that understanding is unsupported by the facts. We do not mean to seem flip here but permitting the government to introduce the evidence it wants to introduce will almost surely lead to a mistrial once the Court appreciates how off-based the government is, if the Court does not correctly keep that evidence out now.

Here is the literal truth and it is not subject to debate. In payday lending, the lenders – they were not "investors[1]" – loaned money to Harbour (through DNA) or to Canyon Road,

---

[1] Sadly, this a significant legal distinction that the government has never appreciated. Lenders are different than investors. Of the Group of Five (named victims) and the Group of Six (so-

which was operated by Ted Rowlands and which *was* a Payday lending company, or to North Rock, which was like DNA and was operated by Melvin Dunsworth.

Money is fungible. All the money that the "payday" lenders – the Group of 5 and three of the Group of 6, plus Burg – the sole "investor" handed to Harbour was sent on to the lenders downstream. DNA and NorthRock were lenders to KSQ which was an aggregator. KSQ took the loans to DNA and to NorthRock, as well as Kenny Bobrow's own company, Net Finance, plus many others and re-loaned the funds to the payday lenders who loaned to the borrowers on "Main Street." Canyon Road was, itself, a direct payday lender one-step closer to the street than was KSQ.

The bottom-line, and the government either knows this or should know this, is that none of the money used by Harbour to support his lifestyle came from the any so-called victim. All that money flowed upstream from the ultimate borrowers to the payday lenders, to the aggregators, to DNA and NorthRock and, in part, thereafter to the Defendant. And, since cash is fungible, there was never any requirement that dollars bills be transferred by serial number.

Until Operation Chokepoint shut down payday lending in mid-2013, every single person

---

called "investor-victims," a term with no actual meaning in the law), ten of the eleven were lenders with Burg as the sole "investor" to whom duties to refrain material omissions were owed. And one of the lenders was not a lender from whom Harbour borrowed. PAIF, like Oak Tree, was a lender to Green Circle, the Native American tribal organization whose sovereignty permitted it to continue to make Payday loans after Operation Chokepoint first killed the business. PAIF's loans to Green Circle were senior to Oak Tree's loans under a June 2015 subordination agreement. PAIF allowed Green Circle to repay $1.1 million to Oak Tree that Oak Tree had loaned to Green Circle before PAIF ever appeared on the scene. PAIF's complaint is that Harbour misrepresented material facts to PAIF in order to convince PAIF to authorize Green Circle to remit the $1.1 million back to Harbour (OakTree). So, with respect to PAIF there are, and could not be any material omissions. Only actual misrepresentations which the evidence will show were not misrepresentations, at least not by Harbour.

who had loaned money to Harbour to be re-loaned in payday lending had gotten every single penny to which they were entitled. These were regular interest payments. There was utterly no causation between anything done or not done by Harbour that caused any loss to the lenders. That was all on the Obama Administration whose Attorney-General, Eric Holder, threatened banks allowing the use of automated clearing house accounts through which payday borrowers had agreed to repay their small-dollar loans.

There is no doubt that Harbour received a lot of money in return for being involved in the first iteration of payday lending – the one killed by Operation Chokepoint - but it was not the money of any alleged victim identified in the SSI.

Therefore, lurid lifestyle evidence is prejudicial, irrelevant, and lacks any legitimate purpose for introduction at trial. It has no bearing on whether Mr. Harbour engaged in the alleged schemes to defraud with which he is charged. Other than the generalized statements about Mr. Harbour's wealth and lifestyle, there is no evidence that anyone invested funds based on Mr. Harbour somehow flaunting his wealth. The Court should exclude the evidence under Rules 401, 402, and 403.

**II.     ARGUMENT**

    **A.     Evidence of Mr. Harbour's Wealth, Lifestyle, and Spending Touted to Investors is Irrelevant.**

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). "Relevancy simply requires that the evidence logically advance a material aspect of the party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188

4

(9th Cir. 2019) (internal quotations omitted). Irrelevant evidence is not admissible. Fed. R. Civ. 402.

Evidence regarding Mr. Harbour's purported "lavish lifestyle" has no bearing on whether he devised "a scheme and artifice to defraud" investors "by means of materially false and fraudulent pretenses and representations, and by the concealment and omission of material facts" through the use "of wire and radio communications." [Doc. 154 at 10:20-28.] Specifically, how Mr. Harbour lived his life does not logically advance whether he "defrauded investor-victims out of approximately $4,382,864.01 by promoting and selling fraudulent high-yield investments . . . known as 'payday loans.'" [*Id*. at 2:6-9.][2]

The government merely alleges Mr. Harbour "induced investors" with "materially false statements and omissions" and showed off his wealth to investors. However, the government's references to Mr. Harbour entertaining investors at his vacation condominiums, on luxury boats, and at sporting events do not make any more or less probable that he committed wire fraud, mail fraud, or money laundering. The government fails to connect Mr. Harbour's wealth and lifestyle to a motive or specific acts of inducement as to any named investor or purported victim. Instead, it offers generalized statements unattributable to any charged count, which are meant to impermissibly inflame the jury. Without a particularized connection between Mr. Harbour's "lavish lifestyle" and the alleged criminal conduct, evidence of his lifestyle is irrelevant.

///

///

---

[2] In the latest fictional rendition presented by the government, the number has now jumped to over $10 million.

5

### B.     Evidence of Mr. Harbour's Wealth, Spending, and Lifestyle Touted to Investors Is Unfairly Prejudicial.

Even if evidence of Mr. Harbour's wealth, lifestyle, and spending has some minimal probative value, it still must be excluded because the danger of unfair prejudice substantially outweighs any such minimal probative value. Fed. R. Evid. 403. Unfair prejudice is the "capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Prejudicial evidence invites the jury to decide the case on an "emotional" basis. Fed. R. Evid. 403 advisory committee's note. "Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992).

Evidence of Mr. Harbor's "lavish lifestyle" is highly prejudicial. Offering evidence of Mr. Harbour's purported wealth, lifestyle, and spending habits at trial would be a blatant appeal to "class prejudice," which is highly improper as it "may so poison the minds of jurors even in a strong case that an accused may be deprived of a fair trial." *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 239-40 (1940). Appeals to class prejudice that are "obvious" and "persistent" are unfairly prejudicial. *United States* v. *Stahl*, 616 F.2d 30 32-33 (2d Cir. 1980) (discussing a prosecutor's trial strategy centered on inflaming prejudice against the defendant's wealth). The Ninth Circuit has expressly recognized the "great deal of unfair prejudice" that flows from wealth-based evidence. *United States v. Mitchell*, 172 F.3d 1104, 1108-09 (9th Cir. 1999) *holding that* trial court erred in admitting poverty evidence in a robbery. Touting Mr.

Harbour as a wealthy individual who took "private-chartered jets" and invited investors to, and showed off, "vacation condominium[s]" and "Skybox[es]" is exactly the appeal to class prejudice against which the Supreme Court cautioned. *See Socon*, 310 U.S. 150 at 239-40. Such an appeal serves only to lure the jury into convicting Mr. Harbour based on an "emotional" or otherwise "improper basis," which Rule 403 bars. *See* Fed. R. Evid. R. 403 advisory committee's note.

Courts have routinely found in similar cases that evidence of wealth or lifestyle is irrelevant or that its probative value is low and dwarfed by the severe risk of unfair prejudice to the defendant. *See, e.g.*, *Unruh*, 855 F.2d at 1377 (holding evidence of the defendant's wealth "needlessly risks leading the court into an abuse of discretion when it offers evidence with minimal probative value that could cause jurors to decide the case on legally irrelevant grounds"); *U.S.* v. *Brown*, 720 F.2d 1059, 1069 (9th Cir. 1983) (holding evidence of lifestyle and wealth presented a serious potential for prejudice and is precisely the sort of information Rule 403 seeks to exclude); *Stahl*, 616 F.2d at 32 (reversing conviction where government repeatedly referred to defendant's wealth and characterized the defendant as a "multi-millionaire businessman in real estate," purportedly to show that the defendant had motive to pay a bribe in order to avoid taxes).

Evidence must also be excluded if its "probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, [or] wasting time . . .." Fed. R. Evid. 403.  Introduction of the government's evidence regarding Mr. Harbour's "lavish lifestyle" at trial would require countless mini-trials scrutinizing the reasonableness and propriety of each of Mr. Harbour's expenditures, such as "personal credit card payments,"

"mortgages," or "fine dining and entertainment." [Doc. 154 at 2:15-16; 4:8-9.] The government has no legitimate reason to introduce evidence of Mr. Harbour's purported wealth, lifestyle, or spending that would justify injecting unfair class-based prejudice into the case and compromising Mr. Harbour's right to a fair trial.

Evidence of Mr. Harbour's wealth and spending habits will inflame the emotions of the jury and risk a conviction on improper grounds. Combining a morally questionable payday lending business with arguments concerning an individual's wealth and greed can easily lead jurors to judge the merits of this case based on emotions rather than fact.

### C. Specific References to Mr. Harbour's Use of Funds Allegedly Obtained Through Wire Fraud Are Irrelevant and Inadmissible.

The Court should preclude the government from introducing any evidence of specific uses of the funds Mr. Harbour allegedly obtained through wire fraud. The amount of money Mr. Harbour earned and how he spent it is irrelevant to his guilt or innocence. Use of funds obtained through wire fraud is not necessary to prove the actual crime. The elements of transactional money laundering, 18 U.S.C. § 1957, also do not include proving the destination of the monetary transactions in criminally derived property.[3] Evidence of how Mr. Harbour

---

[3] There are five elements to this offense that the government must prove:

FIRST, the defendant must knowingly engage or attempt to engage in a monetary transaction;

SECOND, the defendant must know that the transaction involved criminally derived property;

THIRD, the criminally derived property must be of a value greater than $10,000;

FOURTH, the criminally derived property must also, in fact, have been derived from a specified unlawful activity; and

spent the money he allegedly obtained through the purported scheme is irrelevant to whether he committed wire fraud and money laundering and is thus inadmissible. *See United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) ("[I]t is irrelevant if Mr. Brooks spent his fortune on lavish parties, instead of donating it to starving Malawian orphans."); *U.S. v. Unruh*, 855 F.2d 1363, 1377 (9th Cir. 1987) (holding that lifestyle evidence of a fur coat and a wad of cash should not be entered unless clearly connected to a specific criminal act); *United States v. Mitchell*, 172 F.3d 1104, 1109 (9th Cir. 1999) (finding that evidence of wealth or poverty without more to connect an individual to a crime is irrelevant and that the evidence must show "more than the mere fact that the defendant is poor").

      Here, the fact that Mr. Harbour acquired funds and the mechanism through which he did so are not in dispute – and, in reality, neither is the legality of the mechanism. Payday lending was not illegal in States that permitted high-interest loans. The government fails to connect Mr. Harbour's specific expenditures to participation in criminal activity. It is thus irrelevant whether Mr. Harbour spent his money on "golf resort membership fees," "extravagant parties," "private-chartered jets," "mortgage payments," and "an expensive power boat" or donated the money to starving Malawian orphans.

      The government has not offered in any pleading or motion a legitimate reason, such as motive, for introducing evidence of Mr. Harbour's purportedly "lavish lifestyle." Nor can it, as any such argument would rest on the assumption that Mr. Harbour must have been motivated

---

FIFTH, the monetary transaction must have taken place during the period of the indictment. https://www.justice.gov/archives/jm/criminal-resource-manual-2171-jury-instruction-elements-18-usc-1957

to commit fraud to acquire or maintain his "lavish lifestyle." This argument would not carry the day for the government, as "almost everyone" – whether rich or poor – "has a motive to get more money," and "most people, rich or poor, do not steal to get it." *Mitchell*, 172 F.3d at 1109; *see also United States v. Ewings*, 936 F.2d 903, 906 (7th Cir. 1993) ("The government maintains that the evidence established the defendant's motive because it showed that Ewings had an 'appetite' for money. But who doesn't?") That the government could make the same wealth-based motive argument in any wire-fraud case involving a wealthy person with expensive possessions shows just how little probative value such evidence has.

This situation has arisen recently in the District of California in *United States v. Holmes*. In *Holmes*, the Court excluded evidence of the defendant's lifestyle and wealth under Fed. R. Evid. 403 because evidence of wealth can be construed as an appeal to class prejudice which is considered "highly improper" because it would be so poisonous to the minds of jurors that even in a strong case, the defendant may be deprived of a fair trial. *United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2021 WL 2044470, at *5 (N.D. Cal. May 22, 2021). The Holmes court dealt with similar alleged scheme to defraud investors charging the defendant with wire fraud and conspiracy to commit wire fraud.

The government argued that they were entitled to submit the evidence to demonstrate motivating factors for her continued use in the fraud and the conduct alleged in the indictment. *Id*. In our present case, the government appears, through multiple filings and the Second Superseding Indictment, to be attempting to use Mr. Harbour's lifestyle for the same purposes. This is impermissible, as appeals to class prejudice that are obvious and persistent are unfairly

10

prejudicial. *Id. citing to United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980). A desire for wealth or fame is not probative of an intent to defraud. *Id.*

### D. Specific References to Mr. Harbour's Use of Funds Allegedly Obtained Through Wire Fraud Are Highly Prejudicial and Must be Excluded.

Specific references to how Mr. Harbour spent the funds allegedly obtained through wire fraud are prejudicial in the same way as evidence of wealth and lifestyle. *See supra* Section II.B. For example, Counts 18, 20, and 23 reference allegedly illegal transfers of hundreds of thousands of dollars to Mr. Harbour's American Express credit card account and to a Federal Trade Commission ("FTC") Receiver. If the jury in this case hears evidence of what Mr. Harbour used the allegedly illicit funds for – paying credit card bills greater than most jurors' yearly salaries – it may well lead to the same type of wealth-based class prejudice contemplated in *Stahl* and *Mitchell*. Any other specific references to how Mr. Harbour spent the money he allegedly obtained through wire fraud – whether it was on jewelry, travel, dining, vacations, vehicles, or anything else – would also lead to the insurmountable prejudice warned of in *Stahl*. This prejudice would substantially outweigh the minimal probative value of evidence that is not material or necessary to prove any element of the charged offense. Accordingly, the Court should preclude the government from introducing specific instances of how Mr. Harbour spent the money he allegedly obtained illegally.

Finally, a "conviction for wire fraud requires the Government to prove the defendant had 'a specific intent to defraud,' *not* an intent to personally gain from the fraud." *United States v. Dowie*, 411 F. App'x 21, 25 (9th Cir. 2010) (emphasis added); *see also United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) ("[We] hold that wire fraud requires the intent to deceive

11

*and* cheat — in other words, to deprive the victim of money or property by means of deception."); *United States v. Welch*, 327 F.3d 1081, 1106 (10th Cir. 2003) ("No appellate court to our knowledge has ever held an intent to achieve personal gain is an element of a traditional mail or wire fraud charge involving the deprivation of property."). Thus, *what* Mr. Harbour gained from the alleged scheme to defraud and how he used any purported proceeds is not an element of the charged scheme. It is instead improper prejudicial surplusage.

## III.   CONCLUSION

Mr. Harbour respectfully requests an order precluding the government from introducing evidence of his purported wealth, lifestyle, or spending habits, and evidence of specific instances of how he spent the money he allegedly obtained through wire fraud.

RESPECTFULLY SUBMITTED this 20th day of December 2022.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2022 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office

1  40 N. Central Avenue, Suite 1800
2  Phoenix, AZ 85004
   Attorney for Plaintiff
3
4  /s/ Yvonne Canez

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28