Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
|---|---|
| Plaintiff, | |
| vs. | **DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITAL; OR, ALTERNATIVELY, FOR A DETERMINATION OF FATAL VARIANCES BETWEEN THE CHARGES AND THE PROOF ADDUCED** |
| David Allen Harbour, | |
| Defendant. | |
| | (Oral Argument Requested) |

The government has rested. Defendant David Allen Harbour (Defendant) moves under Rule 29, F.R.Crim.P. for a Judgment of Acquittal. References to the charges are to the Second Superseding Indictment ("SSI").

The standard in a Rule 29 motion is whether, viewing all the evidence in the light most favorable to the government, no rational juror could find the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Although *Jackson* requires the reviewing court initially to construe all evidence in favor of the government, the evidence so construed may still be so supportive of innocence that no

rational juror could conclude that the government proved its case beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc). "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." *Id.*

Viewing the evidence in the light most favorable to the government, the jury could not reasonably find the defendant guilty beyond a reasonable doubt. In other words, the evidence the government has presented fails not only to prove guilt beyond a reasonable doubt, but also to meet the much lower threshold of sufficient evidence to send the case to the jury. Therefore, a judgment of acquittal is warranted.

In addition, and alternatively, there are fatal variances between precisely what was charged in the SSI and what was shown by the government's evidence to the extent that the same amounts to an attempt to amend the SSI. The result is the same. Many, if not all counts of the SSI must be dismissed.

"An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984) *citing to United States v. Cusmano*, 659 F.2d 714, 718 (6th Cir.1981). Constructive amendments normally involve a complex of facts while a variance occurs where the indictment and the proof involve only a single, though materially different sets of facts. *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002), *holding modified*

*by United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007). However, even some variances may be fatal when it affects the substantial rights of a defendant. *Id*. at 615-616, *citing to United States v. Tsinhnahijinnie,* 112 F.3d 988, 990–92 (9th Cir.1997) (finding fatal variance where indictment charged defendant with sexual abuse of child occurring on Indian reservation during summer of 1992, but proof fluctuated between placing the abuse at place and time in indictment and placing it off reservation in 1994); *Jeffers v. United States,* 392 F.2d 749, 752–53 (9th Cir.1968) (finding fatal variance where indictment alleged that money solicited by religious group was used for non-religious purposes, but evidence failed to prove that use was non-religious, instead showing that use was merely contrary to representations made when money was collected).

As for constructive amendments: "There are two types of constructive amendments: first, where "there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument, and second, where the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017).

Each Count and each element of each count will be discussed with specific focus on exactly what the government charged because the charged conduct govern what the government must prove beyond a reasonable doubt. While the government can prove more, e.g., allegations drawn from the Bill of Particulars, they must be *in addition* to what the grand jury charged and a replacement for that which the grand jury charged.

**Count 1, 9, and 10:  Wire Fraud, Richard Turasky:** The allegation in Count 1 is that Harbour used some of Turasky's money to pay business expenses instead of Harbour deploying all of the money immediately to Green Circle to fund payday lending. "Similar to M.B.'s funds, R.T.'s funds were used to pay the balance on HARBOUR's American Express credit card and to make Ponzi payments to other investors."

Exhibits 674 and 1505, belie the government's contention as does Turasky's testimony. Turasky has, finally, admitted that the documents drafted by his own lawyers permitted Harbour to use the money for expenses. The Loan and Assignment Agreement, Exhibit 1505, as well as his Declaration, Exhibit 674, say the same thing. It is undisputed that, under the loan documents at the time payments were to be received, payments commenced that were precisely the amounts that were supposed to be repaid began to be repaid. Turasky agreed from the stand.

Additionally, the amount to be repaid was based upon the $350,000 amount: not the $500,000 amount. This is because the $150,000 returned via wire the next day was not considered to have been invested by both Harbour and his agent, Joel Vetrano. Laura Purifoy corroborated that $350,000 was considered as loaned because the $150,000 was paid back the next day. This was agreed to by Turasky in his Declaration that he agreed he read before signing under penalty of perjury. Interest payments were made under the amortization table that pertained to the $350,000; not the $500,000.

While Turasky testified that it was "customary" for the borrower to pay the lender's fees, which, according to Turasky were, or would be, $150,000, nothing in the loan agreement drafted by Turasky's lawyer's required Harbour to pay those claimed

fees. Cash is fungible[1] and the entirety of Turasky's $350,000 eventually was sent to Green Circle without any effect on the interest payments to Turasky. Laura Purifoy's testimony supported this as well. *See* Trial Transcript Day 8 PM Session pg. 159 ln. 1-11. Nothing in the Loan Agreement mandated that *all* of the $350,000 arrive at Green Circle on the same day. Turasky loaned the $350,000 to OakTree; not to Green Circle.

Counts 9 and 10 are also wire fraud counts. These counts do not relate to money taken from Turasky but to payments made to Turasky. Wire fraud is the willful theft of money or property received *from* a victim pursuant to a scheme and artifice to defraud in which the use of interstate wire communications are used in furtherance of the scheme and artifice to defraud. Wire fraud does not include the use of the facilities of interstate communications to pay money to a victim except in circumstances neither alleged nor even the subject of proof here. The forensic accountant has not proven that any funds paid to Turasky's entity were from specific underlying criminal activity.

**Count 2, 4-8: Wire Fraud, Mark Burg:** The principal allegation, contained in Count 2, is the same as with respect to Turasky in Count 1. That contention is that $400,000 of Burg's $1 million investment did not go to Green Circle, whereas $600,000 did. Cash is fungible. While all of Burg's $1 million investment did not go to Green Circle the day it was received, eventually dollars representing the full $1 million did and the delay was not shown to have had any effect on the payments of $8,125.00 received quarterly by Burg.

---

[1] *United States v. Sperry Corp.*, 493 U.S. 52 (1989).

Again, it is crucial to remember that all the papers were drafted by Burg's lawyer, Robin Gilden. Whereas, Turasky made a loan, Burg *invested* $1 million in Pujanza, an entity of which he held a 1% ownership interest. According to the First Amended and Restated Pujanza Operating Agreement, Exhibit 819, Harbour, as the manager of Pujanza, was entitled to use the $1 million as he saw fit, including for expenses, without any oversight by Burg. These were not powers that Harbour created for himself. Had there been, an argument could be made that the arrogation of such powers by Harbour in documents created by Harbour would have been a "badge" of fraud. Here, however, it is unquestioned that these powers were granted to Harbour by Burg's own lawyers.

More importantly, Burg agreed on the stand that Harbour did have the right to use his money to defray business expenses. Shown Section 5.8 of the Operating Agreement re-drafted by his lawyer, Robin Gilden, he was forced to agree that Harbour had the right to use the money to reimburse business expenses.

The government's only other fact witness with respect to these counts, Dean Avedon, testified that there was an oral agreement between Burg and Harbour (as to how often and in what amount payments would be made). Burg never testified to that and, once again, the Operating Agreement drafted by Burg's lawyers did not support Avedon's position. There was, in fact, no mandatory schedule governing when the invested funds would be returned, as Avedon agreed on the stand. Regardless, the agreement Burg's lawyers drafted contained the usual contractual provision that invalidated any and all prior written or oral agreements.

Counts 4-8 are all related to payments of $8,125.00 which, had there been any requirement for distributions in the documents drafted by Burg's lawyers, would have been those distributions. As in the case of the interest payments charged in Counts 9 and 10 (with respect to Turasky), the five payments *to* Burg are not properly the subject of wire fraud claims. Wire fraud is the willful obtaining of money or property from a victim through the use of an interstate wire facility in furtherance of a scheme or artifice to defraud. In other words, but for the fact that Harbour was permitted, under documents prepared by Burg's lawyers, to use some or all of the $1 million investment for expenses, Count 2 might constitute a valid wire fraud charge. But not the five $8,125 payments to Burg.

The FTC investigation had nothing to do with Green Circle, Pujanza, Milagro, or OakTree. According to Larry Cook, the FTC action (never proven to any legal conclusion), so far as the evidence in this case is concerned, was not brought based upon the activities of the Canyon Road portfolios, Harbour or Canyon Road but was based upon Coppinger's call center, CWB. Cook agreed that no one said that Harbour did anything wrong with respect to Canyon Road. The conversations between Harbour and Burg that led to the $1 million investment had nothing to do with the FTC investigation into CWB owned and operated by Coppinger, and the entities exclusively managed by Ted Rowland. The (ultimately) illegal turnover motion was not brought until March 31, 2015, long after Burg had made his investment. The Receiver acknowledged that no claims of wrongdoing needed to exist in order to seek turnovers from Harbour and none were ever proven.

Why, when Harbour's activities were all directed at recovering from the destruction of his business that he associated with Operation Chokepoint, would have devised a plan to steal Burg's $1 million or Turasky's $350,000? Recovering from effects of Operation Choke Point which, in Harbour's belief, had caused the demise of DNA Investments would take years and a lot more than these sums.

**Count 3: Wire Fraud, PAIF:** This claim is different from all the others. The government charged that,

> . . . HARBOUR had to provide certain financial information to PAIF for their review that would be material to the funding decision for each draw request. Defendant HARBOUR misrepresented the financial condition and operations of Green Circle. PAIF, began funding Green Circle in July 2015.

The government proved only the following: At the direction of Bob Ferrell, PAIF's CEO, Purifoy sent a $1.1 million funding request from PAIF on August 10, 2015. The draw request was funded on August 11, 2015.

PAIF did not ask that Harbour supply anything to support the funding request before it was received, nor did Harbour submit anything in support of the request. This single event forms the entirety of Count 3. What the government showed during their case-in-chief is that the very first borrowing base report (Exhibit 2294) was finalized by about September 10, 2015, fully a month *after* the $1.1 million was funded (August 11, 2015). That was the borrowing base for August 31, 2015. There had been at least four draft versions of the August 31, 2015, borrowing base. The August 31, 2015, borrowing base was the first and only borrowing base introduced by the government.

According to Ms. Purifoy, who was the government's sole fact witness with respect to Count 3, some (unknown number of) months after August 2015, Harbour proposed pen and ink changes on three later borrowing base printouts.

Purifoy typed the proposed changes and sent them to Stefan Andreev, who worked for Green Circle. She pointed out the changes that Harbour had proposed. Andreev, who, according to Purifoy was fully informed by her of the changes she claimed that Harbour directed, disagreed with the changes. Whether the changes proposed by Harbour ever went past the stage of Andreev having seen and rejected them, was not the subject of any evidence introduced by the government. Meanwhile, the $1.1 million had been received may months earlier. Thus, whatever Harbour did or tried to do did not and could not have played any role at all in the obtaining of the $1.1 million. Of course, the $1.1 million was no more than a return of proceeds loaned by OakTree to Green Circle.

Count 3 must be dismissed. There is no evidence of any illegal conduct at all. The government's allegation that Harbour supplied false and fraudulent information to PAIF to induce PAIF to fulfill the OakTree $1.1 million draw request was not supported by a single bit of evidence. Purifoy stated that she had zero involvement in the $1.1 million except to request the funding and that she knew nothing about how or why the $1.1 million was allowed to be drawn.

**Count 11. Mail Fraud, Alison Willson:** There are no speaking allegations concerning Alison Willson in the SSI. In other words, the government did not say anything about the supposed fraud perpetrated on Alison Willson. The only mention of Alison Willson ("A.W.") is in the list of Investor-Victims on p. 11, line 22 of the SSI.

As an investor-victim, Alison Wilson was not a charged victim at all.

| A.W. | Canyon Road | $100,000.00 | 02/18/2014 |

Further, Count 11 says only the following,

| Count | Payor Account | Check Date | Posted Date | Description of Item Mailed | Amount (Approximate) |
|---|---|---|---|---|---|
| 11 | HighPointe Capital Group, LLC BMO x7406 | 4/22/2016 | 4/28/2016 | Check # 3231 to Liberty Trust Co. FBO: A.W. in the amount of $7,500 | $7,500.00 |

Had the government charged Harbour with defrauding Alison Willson as a named "victim" as opposed to the non-charged "investor-victim," there might be something to send to the jury (absent the existence of the host of other problems with Count 11 identified below). We assume that Alison Willson loaned $100,000 to Canyon Road on February 18, 2014. However, the government has not *charged* that the $100,000 was willfully and fraudulently obtained by Harbour by means of false and fraudulent pretenses, misrepresentations, or affirmative material omissions and that Harbour used the mails in furtherance of a scheme.

Setting aside the charging issues, here is what has been shown, taking the evidence in the light most favorable to the government: Alison Willson had made an earlier loan to Canyon Road. There was no evidence that her first loan ever went into payday lending. As the FTC Receiver, Larry Cook, stated, payday lending had been the "primary" business of the Canyon Road funds but it was never its only business. Lionel Green concurred. Willson's first loan had either been paid-off completely or, Willson thought it

had been completely paid-off. Pleased with the success of the earlier loan, Willson approached Harbour about loaning more money but not into payday lending. There is no evidence that her first loan went into payday lending. She was interested in another business line in which Canyon Road was involved. *See,* Exhibit 369.

In any event, Count 11 does not specify anything about the nature of Harbour's allegedly fraudulent conduct. This is sufficient to require the dismissal of Count 11 on its own. Despite all of this, what is eminently clear is that, unless the government has proven something sufficient to have caused the 5-year SOL to have *not* expired, the SOL on Count 11 expired on February 18, 2019, and Count 11 was charged on November 24, 2020, some 21 months after the expiration of the SOL.

There is another grave problem with the Alison Willson charges and that is embodied in the testimony of the government's forensic expert, Jeanette Paige and Exhibit 682. Alison Willson is Count 11. Her then-husband, Dan Willson, is not a charged count. Closely examined, Exhibit 682, advanced by the government to trace Alison Willson's funds, actually, either traced Dan Willson's funds or leaves it undetermined and undeterminable whose funds were deployed. This is because Dan Willson's funds were received a week before Alison Willson's funds and the dates of distribution make it clear that it was more likely than not that Dan Willson's money (or Canyon Road's own money) was actually being traced.

As will be amplified in connection with Count 12 (the Carol Hill mail fraud count), the contention is that the "mailing" of the $7,500 check on April 22, 2016, was, somehow, in furtherance of the fraud that, in the usual course, was otherwise completed

when the Willson funds were received by Canyon Road on February 28, 2014. *See* Exhibit 682.

What else did the government prove with respect to Willson? It proved nothing. The government did not even prove that the check was mailed or caused to be mailed by Harbour. Rather, Willson admitted, and Purifoy confirmed, that the $7,500 check was picked-up by Willson at the HPCG office and that, if the check was mailed to Texas, it was Willson who mailed it. More importantly, for purposes of this Rule 29(a) Motion is how the mailing of the check can be seen as "in furtherance" of the fraud that was otherwise completed on February 18, 2014. The specific "mailing" that is the foundational underpinning for Count 11 is a $7,500 interest payment made by HPCG on April 22, 2016. In her Declaration, sworn under penalty of perjury, and admitted as Ex. 676, Willson explained the transaction.

Willson swore that, even though Harbour was not required to do so, after the FTC shut-down Canyon Road, Harbour agreed that HPCG would assume the responsibility for the February 2014 note to Canyon Road. To accomplish that, Harbour rewrote the $100,000 note in November 2015 with HPCG as the obligor, even though there was no legal consideration for it having done so.

The $7,500 interest payment that was made in April 2016 was made not on the February 2014 Canyon Road note but on the November 11, 2015, HPCG note (that is, the note described in the Willson Declaration, Ex. 676).

Thus, to the extent that the SSI charged (or meant to charge) Harbour with any crime in which Willson was the victim, if the April 22, 2016, $7,500 payment was the

crime (use of the mails in furtherance of the scheme and artifice to defraud), that payment was not associated with, nor could not have been associated with, the February 2014 Canyon Road note. To complete the circle, no fraud has ever been alleged with respect to the November 11, 2015, HPCG note which replaced the February 18, 2014, Canyon Road note. Since no crime was alleged in the SSI with respect to the HPCG note that replaced the Canyon Road note and since the $7,500 payment was an interest payment on the HPCG note; not the Canyon Road note, the government's first problem is that the $7,500 payment that forms the basis of Count 11 is not connected with any crime outlined (pleaded) in the SSI.

Taking the facts the other way and ignoring the existence of the November 11, 2015 HPCG Note, in order for Count 11 to survive this Rule 29(a) motion, the government would have offered evidence from which, first, the Court and, if there was a factual dispute to be resolved, the jury, could find that the running of the SOL was interrupted.

What did the government show about the issue of whether the 5-year SOL should be considered tolled or interrupted? The government brought forward no evidence on the issue from which the Court or a properly instructed jury could find that the 5-year SOL on Count 11 had not expired on February 18, 2019. Nor, had the government decided to proceed on the basis of the November 11, 2015, HPCG note, would the government have been saved, since the SOL on the November 11, 2015, note expired on November 11, 2020. The first superseding indictment was November 24, 2020, and it was there that Counts 11 and 12 first appeared.

Because the SOL analysis for Count 11 and the SOL analysis for Count 12 are the same, we will next discuss Count 12, the Carol Hill mail fraud and adopt the "lulling" discussion in it to both Counts 11 and 12.

**Count 12.  Mail Fraud, Carol Hill:**  Paragraph 15 of the SSI states that,

> C.H. was Defendant HARBOUR's employee who invested $81,621.34 with HARBOUR through his entity NorthRock, on or about December 15, 2012. C.H. had the funds in her IRA, and HARBOUR directed her to transfer the IRA to Liberty Trust Company located in Texas, and the loan to NorthRock would be serviced through Liberty Trust.

The only other mention of Carol Hill in the SSI is in Count 12, itself, which charges that on or about May 3, 2016, Harbour mailed or caused to be mailed a $255.00 check to her IRA company. Factually, it is undisputed that it was Hill's idea to use HPCG's money to pay her $255.00 IRA account maintenance fee notwithstanding that she was making $50,000 a year in her job.

It was she who wrote the check. It was she who signed David Harbour's name to the check. And, finally, it was she; not Harbour, who decided to mail the check and who mailed the check. The only thing that Harbour did was to be charged with mail fraud.

While all of these factors could be the subject of an interesting trial practice seminar, we do not need to get there in order to dispose of Count 12. The 5-year statute of limitations on Count 12 expired on December 15, 2017. Count 12 was not charged until November 24, 2020.

The general rule is that the SOL runs from the completion of fraud which means from when the defendant willfully obtained money or property from the victim through false or fraudulent pretenses. Here, the government contended that $81,621.34 went to

NorthRock on December 15, 2012 but as is now known, the December 2012 NorthRock bank statement did not show the receipt of the $81,621.34. Hill testified that she mailed the money to Melanie at NorthRock. R.T. February 3, 2023, p. 82. This is the sole evidence of the use of the mail in furtherance of the scheme. This loan was, as stated, made in December 2012.[2] The sole basis that could extend the SOL for Count 12 beyond December 15, 2017 would be if the $255.00 payment that Hill made for herself from HPCG funds after having signed Harbour's name to the check and mailing it herself to her own Texas-based IRA company somehow prevented the SOL from expiring on December 15, 2017.

What would arguably prevent the SOL from expiring? According to the case-law, if the May 3, 2016, mailing was "in furtherance" of the fraud, that is, if the mailing could be considered a "lulling" letter, the SOL would not have expired.

While the government falsely contended that she repeatedly asked and demanded her money from Harbour, the evidence introduced by the government through Carol Hill was that, once the loan went into default – no interest payments were ever made on the $81,621.34 and the principal was never repaid – she never had a single conversation about the event with Harbour. There was not and could not have been any lulling. Worse for the government, it now appears that the bank statement on which her deposit should

---

[2] The $500,000 Pat Hill loan was made in February 2013. The $500,000 loan to DNA (which went to KSQ and was the subject of a Finder's Fee Agreement between Harbour and the Hills) is not the subject of any charge of the SSI because the government conceded, in pleadings filed pre-trial, that the 5-year SOL had expired.

have appeared is void of any reference to the money having been received and Paige testified that she could not trace it.

More importantly, the $255.00 check that Hill elected to have HPCG fund and that she wrote, signed, and mailed in order to pay an administrative fee to her own IRA account manager, did not constitute and could not constitute an act in furtherance of the alleged fraud to the extent that it would extend the SOL.

The government elected to not introduce any evidence as to how the payment of the $255.00 administrative fee was "in furtherance" of the fraud that, under ordinary rules, was complete when, allegedly acting with the intent to steal her $81,621.34, Harbour induced her to loan her IRA money to NorthRock. The government having introduced no facts from which a properly instructed jury could conclude that the $255.00 check constituted "lulling" activity, the Court is required to apply the 5-year SOL and therefore must dismiss Count 12.

Lulling activities in wire fraud must be "incident to the execution of the scheme" and not "part of an after the fact transaction that, while foreseeable, was not in furtherance of the defendant's fraudulent scheme." *United States v. Lazarenko*, 564 F. 3d 1026, 1036 (9th Circ. 2009). In mail fraud, mailings designed to avoid detection or responsibility for a fraudulent scheme fall within the mail fraud statute when they are sent prior to the scheme's completion, and it is the scope of the scheme as devised by the defendant that determines when the scheme is completed. *United States v. Tanke*, 743 F.3d 1296, 1303 (9th Circ. 2014). The issue of when a scheme is completed is not purely one of timing, but also if the wire or mailing "is a part of the execution of the scheme as

conceived by the perpetrator at the time, not if the defendant, prior to the wire or mailing had obtained all the money they expected to get." *United States v. Jinian*, 725 F. 3d 954, 961 (9th Circ. 2013).

In a prosecution for mail fraud, the government must establish that a defendant used the mails for the purpose of executing the fraudulent scheme or artifice. *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000), *holding modified by United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007). It is sufficient for the government to show that either the mailing was an essential element or that it was incident to an essential part of the scheme. *Id*. The question in determining if a mailing is attributable to the scheme to defraud is if the mailing is part of the execution of the scheme as conceived by the perpetrator at the time. *Id*. citing to *Schmuck v. United States*, 489 U.S. 705, 711, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Put another way, the requirement is satisfied if the completion of the scheme or prevention of its detection is in some way dependent upon the mailings. *United States v. Mitchell*, 744 F.2d 701, 703 (9th Cir. 1984).

The mailing of a $255.00 check for Carol Hill's benefit was in no way in furtherance of the scheme alleged by the government, nor has the government shown any evidence of it going towards the alleged scheme. Additionally, there was no testimony by Carol Hill that the $255.00 caused her to not detect the alleged theft of her money; the government could have decided to elicit that testimony but did not.

**Counts 13-23 Transactional Money Laundering**

The government charged that:

On or about the dates listed below . . Defendant HARBOUR, individually and doing business under the entities described above, along with other individuals and entities . . . knowingly engaged and attempted to engage in the following monetary transactions in the United States in criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely wire fraud in violation of 18 U.S.C. § 1343, with each instance being a separate count under this indictment:

| Count | Date (On or about) | Amount (Approximate) | Financial Institution | Description of Transaction |
|---|---|---|---|---|
| 13 | 08/05/2014 | $34,665.33 | Northern Trust | Check #1238 from DNA Investments Northern Trust x9412 to D.S. |
| 14 | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from Oak Tree Northern Trust x1790 to DNA Management Northern Trust x3388 |
| 15 | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from DNA Management NT3388 to HighPointe Capital Group BOA x3354 |
| 16 | 08/08/2014 | $37,500.00 | Bank of America | Transfer from HighPointe Capital Group BOA x3354 to Herrington Park 1, LLC |
| 17 | 08/21/2014 | $12,083.90 | Northern Trust | Check #1542 from 21020 Northern Trust x5180 to J.R.G. |
| 18 | 08/27/2014 | $142,785.88 | Northern Trust | ACH Debit Payment from DNA Investments Northern Trust x9412 to Defendant HARBOUR American Express |
| 19 | 08/28/2014 | $13,682.69 | Bank of America | Transfer from HighPointe Capital Group BOA x3354 to Employment Edge |
| 20 | 12/04/2014 | $223,121.88 | Northern Trust | ACH Debit Payment from DNA Management Northern Trust x3388 to Defendant HARBOUR American Express |
| 21 | 8/12/2015 | $915,000.00 | BMO Harris | Oak Tree BMO 1964 to Milagro BMO 5236 |

| 22 | 08/13/2015 | $750,000.00 | Bank of America | Milagro BMO 5236 to Defendant HARBOUR BOA x8017 |
| 23 | 09/02/2015 | $500,000.00 | Bank of America | Defendant HARBOUR BOA x8017 to FTC Receiver LEC |

Since the transactional money laundering charges are linked to the wire fraud charges, they are and can only be associated with the wire fraud victims in the SSI. Counts 13-19 are associated with the alleged Turasky wire fraud counts (Counts 1, 9 and 10). Count 20 is associated with the alleged Burg wire fraud counts (Counts 2, 4-8). Counts 21, 22, and 23 are associated with the alleged PAIF wire fraud count (Count 3).

**PAIF.** We have already shown that government has not introduced sufficient evidence to survive the Rule 29(a) Motion with respect to PAIF. If Count 3 falls away, as it must, then Counts 21, 22, and 23 fall away with Count 3.

**Turasky.** Counts 13-19 are all payments that were made using the $350,000 that Turasky admitted on the stand could be used for business expenses and that the Loan and Assignment Agreement and Turasky's Declaration also agreed could be used for business expenses. The Judgment Loan Documents included Exhibit A, the Resolution Authorizing Loans. The Loan and Assignment Agreement and the Declaration both spell out the contents of the Resolution. Therefore, the fact that Turasky denied having seen Exhibit A, the Resolution Authorizing Loans, was immaterial to the admissions he made in the Loan and Assignment Agreement and the Declaration. He knew when he signed both documents that Harbour had the right to borrow the funds, and he agreed to the same

on the stand. He agreed that he signed both documents and, while he said he did not focus on them particularly, he also did not try to repudiate them.

In short, in it beyond peradventure that Harbour was permitted to use Turasky's money for expenses.[3] If Turasky's money could be used for expenses, then Harbour's use of Turasky's money to pay expenses is not money laundering. This is because the funds were not obtained fraudulently. They were obtained under the terms of documents that were prepared by Turasky's own lawyers that permitted the money to be used for expenses. Therefore, the government has failed to prove that the Turasky money was obtained by fraud and, consequently, that its use for the purposes stated in Counts 13-19 constituted money laundering. There was neither an underlying fraud nor, as a result, the use of proceeds derived from fraud.

**Burg.** There is no essential difference between the seven Turasky money laundering counts and the single Burg money laundering count. Burg's lawyers drafted the documents that permitted Harbour to direct OakTree Management to borrow the money from Pujanza, where the Burg money had been received. Burg and Avedon both admitted that, under the documents prepared by Robin Gilden, Harbour had the power to borrow the funds to pay expenses.

And, as with Turasky, the issue really comes down to whether in building OakTree Management, Harbour had amassed business expenses ultimately reimbursable

---

[3] There is no evidence that the $350,000 received from Turasky – cash is fungible – was not eventually all received by and within Green Circle or that Turasky was not paid the full interest rate on the full $350,000. Turasky's contention that $500,000 was loaned that the $150,000 which all agree was sent back the next day was for payment of his loan expenses remains just that, Turasky's contention.

to Harbour or to other of his entities that exceeded the amount of money he borrowed from Burg ($223,121.88). He had the same power with respect to funds loaned by Turasky.

In the case of Turasky, the government did not show that within a reasonable period of time (meaning that it caused no loss of interest payments to Turasky), "his" money went to Green Circle to be used for consumer loans. In the case of Burg, according to the deal papers created by his own lawyers, no interim payments were required to be made to Burg at all. Any payments made or not made to Burg were at Harbour's sole discretion as Manager of Pujanza.

With respect to finders fees, the government has alleged that Harbour received finders fees from KSQ, and that those finders fees were never disclosed to lenders, the failure allegedly constituting a material omission.

However, the government only produced one witness that discussed Harbour receiving finder's fees: Joe Cathy. The issue is that Mr. Cathy only knew about the finder's fees after the government told him. On January 27, 2023, the Court reiterated that it had been assured by the government that they had evidence based on the accounts and the experts that the money received by Harbour could be tied back to the schemes. RT January 27, 2023, p. 14-15, ll. 24-25; 1-2. But that evidence was never admitted; when asked on cross examination, Ms. Paige could not link the funds received to finder's fees. The funds could have come from numerous sources such as principal payments, interest, or even finder's fees, but the burden of proof remains with the government and

21

they failed to have their experts link any funds to finder's fees. Ms. Paige could not link the funds received to finder's fees.

She admitted that she took payments that appeared to match percentages that might have existed, if there was finder's fees, but could not actually trace them across the KSQ synapse because the government never obtained the KSQ bank records. The funds could have come from numerous sources such as principal payments, interest, or even finder's fess, but the burden of proof remains with the government, and they failed to have their experts link any funds to finder's fees.

The bottom line is that the government never proved why Harbour got $27 million from KSQ or how KSQ received that money. The government never even tried to do so. What is obvious is that Harbour got $13 million more back from KSQ than was ever contributed to KSQ. Was this $13 million fees? Was it arbitrage? Participation agreements? Were payments for consulting? Showing the payments were based upon fraudulent conduct was the requirement imposed by the Court on the government, which failed to meet the test. The government has ignored Canyon's $6.2 million completely. And the government never proved anything concerning NorthRock.

The government's failure to prove what it charged and to link the character assassination that was at the heartland of the government's case must have consequences.

RESPECTFULLY SUBMITTED this 24th day of February 2023.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860

Phoenix, Arizona 85004
Attorneys for Defendant David A. Harbour

### CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez