GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN SCHOCH
Georgia State Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00898-PHX-DLR (DMF) |
| Plaintiff, | |
| v. | **UNITED STATES' OPPOSITION TO DEFENDANT'S SECOND MOTION FOR MISTRIAL (Doc. 648)** |
| David Allen Harbour, | |
| Defendant. | |

The Court should deny Defendant's second motion for mistrial. The United States presented evidence at trial that satisfies both prongs of the Court's conditions for its presentation of certain wealth evidence. First, each of the individual investors associated with counts charged in the Second Superseding Indictment (Carol Hill, Alison Willson, Richard Turasky, and Mark Burg) testified that Defendant's apparent wealth was material to their decision to invest with him. Second, the United States established that Defendant obtained that money by means of fraud, specifically the Pat Spaulding Fraud of Ken Bobrow and Pam Case, the Craig Jackson Fraud, the Rhonda Gray Fraud, and the Carol Hill/Pat Hill Fraud. The United States' presentation of evidence satisfied the Court's conditions, and the motion for mistrial should be denied.

# THE COURT'S PRETRIAL RULING

At the final pretrial hearing, the Court held that the United States could present evidence of Defendant's appearance of wealth if it laid a two-part foundation. Hr'g Tr. 160-61 (Jan 17, 2023) ("I'm going to rule that the evidence of his lifestyle and exorbitant spending is admissible if the government lays the foundation."). The Court defined those two parts as: (1) "One is that the investors in the indictment were aware of his financial life -- his lifestyle and exorbitant spending and his apparent financial success, and that was something that they considered as important in their decision to invest"; and (2) "Secondly, he has to prove that that money came through some fraud. . . . Against anybody. That he's operating with money that came to him by some illegal means and using that money to entice others to invest with him based on his appearance of success." *Id.* at 163.

The Court engaged in a specific and lengthy discussion with the parties in which it explained that the first part of the foundation was confined to the five investors associated with Counts in the Second Superseding Indictment, and second part of the foundation could relate to money that Defendant obtained from *anyone*.

> THE COURT: Let me just clarify. We're talking about, when we talk -- there's two parts to my foundation. One is that the investors who invested knew that he was -- appeared to be wealthy.
>
> MR. RAPP: Yes.
>
> THE COURT: That applies to those five.
>
> MR. RAPP: Yes.
>
> THE COURT: But the money can have come from any investor.
>
> MR. RAPP: Yes, yes.
>
> THE COURT: That's what I'm saying. So I don't want to limit-
>
> MR. RAPP: Look it, it comes from this Craig Jackson. He gave him $15 million --
>
> THE COURT: No, no. I'm not limiting who the money came from when you prove that this money he was flashing around came from fraudulent means.

        MR. RAPP: Yes.

        THE COURT: It can come -- if you prove that it was a fraud that came from somebody else, then you're able to show that he was -- you may be able to show that his lifestyle was based on that.

Hr'g Tr. 162 (Jan 17, 2023). The discussion continued with the Court providing specific examples:

        THE COURT: Mr. Rapp, who's one of the five investors?

        MR. RAPP: Let's just take Carol Hill for example.

        THE COURT: Carol Hill.

        MR. RAPP: Just take Carol Hill for example.

        THE COURT: Carol Hill.

        MR. DICHTER: Carol Hill, she's charged -- he's charged with -

        THE COURT: Let me finish. Carol Hill, if she comes on the stand and says, I learned about Mr. Harbour and his investments. He was such a fine dresser. He had a place up in Aspen or whatever else or whatever he had, and because he was so successful, I considered investing with him. That was one of the factors that led me to invest with him.

        MR. DICHTER: Okay.

        THE COURT: Then he brings in evidence to show that that wealth that he appeared to have wasn't based on legitimate business investments. It was based on defrauding other people.

        MR. DICHTER: Uh-huh.

        THE COURT: That's what he's going to be able to do if he can lay the foundation first that there were investors who relied on that in making their decision.

….

        THE COURT: I just wanted to explain to Mr. Dichter how people who aren't one of the five, their evidence of their fraud could be used to --

        MR. DICHTER: I hear what you're saying.

        THE COURT: -- to establish that Mr. Harbour was not a successful businessman as he portrayed himself and led others to believe.

Hr'g Tr. 163 (Jan 17, 2023).

Defendant objected, arguing: "Well, I hear you, but the bottom line is that when you get to the end of it, it can't go anywhere because you can't convict him of being wealthy." Hr'g Tr. 163 (Jan 17, 2023). The Court's response was clear: "I know. We're not doing that." Hr'g Tr. 163 (Jan 17, 2023).

# ARGUMENT

The United States has satisfied both prongs of the Court's requirements for presenting wealth evidence at trial. First, each of the individual investors associated with counts charged in the Second Superseding Indictment (Carol Hill, Alison Willson, Richard Turasky, and Mark Burg)[1] testified that Defendant's apparent wealth was material to their decision to invest with him. Second, the United States established that Defendant obtained his money through some fraud, specifically the Pat Spaulding Fraud of Ken Bobrow and Pam Case, the Craig Jackson Fraud, the Rhonda Gray Fraud, and the Carol Hill/Pat Hill Fraud.

**A. Count-Associated Investors Testified that Defendant's Apparent Wealth was Material to their Decision to Invest with Defendant.**

Each of the investors associated with counts charged in the Second Superseding Indictment testified that Defendant's apparent wealth was material to their decision to invest:

**1. Carol Hill**

Ms. Hill testified regarding the wealth that she observed Defendant to have and how it led to her decision to invest her money with him:

> Q. Okay. And was there a conversation that you had with Mr. Harbour in December of 2012 about the possibility of investing with him?
>
> A. It was like clockwork, is how I can explain it. I was paying IRA investors their interest payments, and it was an exorbitant amount of money. And it just so happened David walked

---

[1] The fifth victim is Princeton Alternative Income Fund.

> behind me and I said, why can't I do this? He said, do you have an IRA? And I said, yes. And I told him how much it was, and he said okay.
>
> And then he said -- he told me about the different companies to put it in, and I said -- he said that's where I have mine. I said, then that's where I want to put mine.
>
> Q. Okay. Was it important to you that he had invested his own IRA into one of these companies?
>
> A. Yes.

C. Hill Trial Tr. pp. 80-81 (Feb. 3, 2023).

### 2. Alison Willson

Ms. Willson also testified regarding the wealth that she observed Defendant to have and how it led to her decision to invest her money with him:

> Q. And what did you observe about Mr. Harbour at this meeting?
>
> A. Well, he seemed to be -- looked like he was succeeding or successful in -- because he had a posh office, you know, displaying his kids and his wife and talking about trips and -- I mean, he seemed to be successful, and I just trusted.

Trial Tr. pp. 143 (Feb. 8, 2023).

> Q. Did it matter to you what you were investing in?
>
> A. Um, I just thought he was -- it was going to be successful. It -- I don't know.
>
> Q. I'm sorry. Why did you think it was going to be successful?
>
> A. Well -- Well, because Suzie Alofs was investing, and she has a lot more money than I do. And then her boyfriend [Craig Jackson] invested, and he has a lot more money than she has. So I assumed that, you know, they knew what they were doing, so I just -- following them.

Trial Tr. pp. 144 (Feb. 8, 2023); see e.g., 144:13-25

### 3. Richard Turasky

Mr. Turasky testified regarding the wealth that he observed Defendant to have. Trial Tr. pp. 191-206 (Feb. 9, 2023); *see e.g.*, 201:9-10 ("Usually people using an American

Express Black Card have a lot of money."). Mr. Turasky also testified about the significance of that wealth to his response when Defendant asked him to invest:

> Q. So up to this point in – when you made this investment, did you think that – that the –based on your – your – the time period that you had spent with Mr. Harbour that – that he was doing pretty well?
>
> A. Yes, I did.
>
> …
>
> A. I got the impression from David at all times that he was a successful guy.

Trial Tr. p. 234 (Feb. 9, 2023).

> Q. Well, if – if you did know that he had millions of dollars in personal guarantees, would that have made a difference in you going forward with this investment?
>
> A. It's not unusual for people that are in the investment space to have a lot of personal guarantees. Banks typically require personal guarantees as a course of doing business. And if you finance investments, I would expect that he would have bank loans that had guarantees. So that would not be unusual.
>
> Q. But – comparing that to the lifestyle that you had observed with Mr. Harbour, would that cause you any concern, that he would have all these guarantees out?
>
> A. No, because he seemed to be living a lifestyle that he could afford his lifestyle and afford the guarantees.

Trial Tr. p. 236 (Feb. 9, 2023).

### 4. Mark Burg

Mr. Burg testified extensively regarding the wealth that he observed Defendant to have. Trial Tr. Pp. 20-47 (Feb. 16, 2023); *see e.g.*, 24:16-18 ("I was like, I don't know who this guy is, but he has a ton of money. I mean, who spends, you know, a million dollars on a birthday party."). Mr. Burg also testified about the significance of that wealth to his response when Defendant asked him to invest:

> Q. And when you were presented with this investment by Mr. Harbour, did you run it by -- what's the name of your business manager?
>
> A. Dean Avedon.
>
> Q. Did you run it by Mr. Avedon?
>
> A. Yes.
>
> Q. And did you explain in any detail what you knew about this investment?
>
> A. I said to him, he's a friend. He's super smart. He has a ton of money.
>
> Q. Let me just stop you here. We're talking about Mr. Harbour, not Mr. Avedon?
>
> A. Yes.
>
> Q. All right.
>
> A. I said to Dean, David Harbour has a ton of money. He knows everybody. He's had the same investors for years. Dean said, don't do it. I don't understand what it is. And I said, I'm investing in David, all righty? And I trust him.
>
> Q. And has that -- is that sort of your -- was your instinct --
>
> A. Yeah. I kind of go with my gut, and my gut said he's a good guy. He's a friend. Give him the million dollars.

Trial Tr. Pp. 47-48 (Feb. 16, 2023). The United States has satisfied the first prong of the Court's analysis.

### B. Defendant Obtained His Apparent Wealth Through Fraud.

The United States demonstrated at trial that Defendant obtained the money with which he impressed these investors by means of fraud, specifically the Pat Spaulding Fraud of Ken Bobrow and Pam Case, the Craig Jackson Fraud, the Rhonda Gray Fraud, and the Carol Hill/Pat Hill Fraud.

#### 1. Pat Spaulding Fraud

In December 2007, Defendant obtained $2.5 million from Ken Bobrow and other investors that Bobrow had located for a completely fictitious investment. Defendant persuaded Ken Bobrow to invest $2,500,000 pursuant to a Loan Agreement and a (later

twice revised) Multiple Advance Note. Exs. 138, 149. Defendant personally guaranteed this investment. *Id.* Defendant represented to Bobrow that his money would be used to fund Family Dollar franchises, apartment complexes, and student housing. Ex. 897; Lisa Berges, Trial Tr. pp. 135-37 (Feb. 9, 2023); Ken Bobrow, Trial Tr. 133:10-13 (Feb. 15, 2023).

After Defendant stopped making payments, Defendant for the first time represented to Bobrow that Defendant had loaned Bobrow's investment to "Pat Spaulding." Ex. 142; K. Bobrow, Trial Tr. pp. 76-78 (Feb. 15, 2023). An investigator hired by Bobrow found that Spaulding had died in 2009. K. Bobrow, Trial Tr. p. 78 (Feb. 15, 2023). In addition, the purported address of "Pat Spaulding" on the purported promissory note does not exist, and the purported signature of "Pat Spaulding" much more closely resembles that of Defendant than of Patrick Spaulding on his Washington State driver's licenses. *Compare* Ex. 142 *with* Ex. 667; J. Paige, Trial Tr. (Feb. 23, 2023). Finally, in 2014, Defendant had Hill send "Pat Spaulding" an email threatening legal action to a Gmail address that was created in Phoenix the same day the email was sent and was accessed most recently in August 2021, both years after Spaulding died. Exs. 140 (Email); 136 (Google Data); J. Paige, Trial Tr. (Feb. 23, 2023).

**2.  Craig Jackson Fraud**

In 2009, Defendant represented to Craig Jackson that he was "an experienced and competent investment advisor" and that he would "manage and invest funds in accordance with instructions from" Jackson. Ex. 397 (Harbour Affidavit). Jackson retained Defendant as his "personal CFO," and Defendant withdrew $6 million from Jackson's trust in 2009. *Id.* Defendant also withdrew an additional $1.9 million and $9 million from Jackson's trust in 2010. *Id.* Jackson instructed Defendant to place all of this the money "only in conservative investments" and to make the funds available "no later than September 10, 2012." *Id.*

Defendant did neither. By mid-August 2012, Defendant had returned only approximately $2.9 million of the $16.9 million taken. *Id.* Jackson's representatives met with Defendant to "try[] to recover the money and find out what happened to it." J. Braun,

Trial Tr. p. 164 (Feb. 15, 2023). At that meeting, Defendant "really couldn't explain what happened to the money, exactly where it was invested in. We kept trying drill down and get information about what happened to it, when it was going to be repaid, where it was, and the answers that we kept getting were just talking in circles. It didn't make any sense, certainly not for somebody who had been entrusted with that many -- that much money." J. Braun, Trial Tr. p. 165 (Feb. 15, 2023). At the meeting, Defendant never stated that Jackson's money was involved in payday lending or with KSQ. J. Braun, Trial Tr. pp. 166-67 (Feb. 15, 2023). Nevertheless, repayments to Jackson was sourced from KSQ, even though Jackson was not an investor in KSQ. Exs. 686-87 J. Paige, Trial Tr. (Feb. 23, 2023).

### 3. Rhonda Gray Fraud

In 2010, Defendant obtained $1,001,242.67 from Rhonda Gray by means of material misrepresentations and omissions. Ex. 216, 219, Defendant told Gray that "he [wa]s an investment advisor and he helps his clients with investment protection, and he helps with strategizing and negotiating, so he was going to advise [Gray] on an investment. R. Gray, Trial Tr. pp. 36-37 (Feb. 2, 2023). Gray signed over the $1 million check to Defendant through his company HighPoint Capital Group, LLC. Ex. 216. Gray requested a safe investment with at least a 3% return, and Defendant agreed. R. Gray, Trial Tr. pp. 46-47, 159 (Feb. 2, 2023). Defendant told Gray that he invested her money in a hospital. *Id.* at 46-57. He did not explain to her the risks of her investment. *Id.* at 85-86.

When Gray wanted to access her money to provide for her parents and to save her home, Defendant made myriad excuses for why he could not access her money. For example, he told her that it was "offshore" with his mother's money, that he could not transfer it because there was a wire cut in the middle of the ocean, that he was too busy working in New York, that it would not be safe to give it to her. Exs. 787-94 (text messages). Defendant also engaged Gray romantically, leading her to believe that there was a relationship between them. R. Gray, Trial Tr. p. 50 (Feb. 2, 2023). R. Eckholt, Trial Tr. p. 212 (Feb. 2, 2023).

### 4. Carol Hill/Pat Hill Fraud

In February 2013, Defendant obtained $500,000 from Carol and Pat Hill by means of material omissions. Defendant, through his entity DNA Investments, sent their money to KSQ but did not disclose the 25% finder's fee he received for doing so. Exs. 251 ($500,000 Promissory Note); 188 (Finder's Fee Agm't); C. Hill, Trial Tr. 128-30 (Feb. 3, 2023). In addition, Ms. Hill was an unsophisticated investor, and Defendant never explained to her the risks of her investment. C. Hill, Trial Tr. 83-84 (Feb. 3, 2023). When Hill confronted Defendant about losing her money, he

For all these reasons, the United States has satisfied the second prong of the Court's analysis.

### DEFENDANT'S MOTION

Defendant's motion for mistrial does not quote the actual language of the Court's decision and ignores its specific finding that the wealth Defendant obtained through fraud need not be a fraud charged in a specific count. Therefore, Defendant's arguments are erroneously confined to the United States' alleged failure to prove that KSQ—an independent entity in which Defendant had no ownership interest—and Canyon Road—an entity in which Defendant had a 2/3 interest but about which he testified in depositions that he had 0% control—were convicted of fraud. Defendant's arguments are completely untethered from the Court's ruling. The United States briefly addresses Defendant's four misdirected arguments for completeness. They are irrelevant to the Court's resolution of Defendant's motion.

1. "The government did not prove that KSQ was a fraudulent entity."

Lisa Berges testified that she personally reviewed the financial records of KSQ and found that the money contributed by Ken Bobrow's company NetFinance had not been "put on the street" for payday loans but had been spent by Joel Tucker on exorbitant personal expenses and excessive kickbacks to Defendant. Ex. 897; Lisa Berges, Trial Tr. pp. 135-37 (Feb. 9, 2023).

2. "The government offered no evidence that KSQ had even been charged with fraud by any governmental entity, let alone that KSQ (or Joel Tucker) had been convicted of fraud in connection with payday lending or any other business venture in which Defendant gave or received money to or from KSQ."

The United States has shown that Defendant obtained millions by means of frauds that long preceded KSQ. KSQ was also not owned or managed by Defendant, who testified in depositions that he had no knowledge of KSQs operations or the payday lending industry. Finally, establishing that any person or entity was actually and finally "convicted of fraud" is not required by the two-pronged standard set forth by the Court. Nor was such a standard ever requested by Defendant.

3. "With respect to Canyon Road, the government also failed to offer any proof that Canyon Road was adjudicated a fraudulent entity."

The United States has already shown that Defendant obtained millions of dollars by means of frauds that preceded Canyon Road. Establishing that any of Defendant's companies was "adjudicated a fraudulent entity" is not required by the two-pronged standard set forth by the Court. Nor was such a standard ever requested by Defendant.

4. "The government told the Court that KSQ and Canyon Road had a direct relationship with each other. No government witness supported that contention."

Laura Purifoy, Defendant's bookkeeper, testified that NetFinance, Canyon Road, and NorthRock were all on the spreadsheet submitted to KSQ by DNA Investments for payment:

> Q. What companies of Mr. Harbour's were involved in KSQ?
> 
> A. DNA Investments was the only Harbour company. We had NetFinance that was an investor. We had NorthRock that was an Investor. We had individuals. Charlie Wear was an investor. And Kathy Harbour was an investor.
> 
> Q. Were you aware of Canyon Road being an investor?
> 
> A. Yes, I'm sorry.

L. Purifoy Trial Tr. 92 (Feb. 14, 2023).

**CONCLUSION**

The Court should deny Defendant's second motion for mistrial. The United States presented evidence at trial that satisfied both prongs of the analysis required by the Court to present certain wealth evidence at trial. Each of the individual investors associated with counts charged in the Second Superseding Indictment (Carol Hill, Alison Willson, Richard Turasky, and Mark Burg) testified that Defendant's apparent wealth was material to their decision to invest. The United States also showed that Defendant had obtained that money through some fraud, specifically the Pat Spaulding Fraud of Ken Bobrow and Pam Case, the Craig Jackson Fraud, the Rhonda Gray Fraud, and the Carol Hill/Pat Hill Fraud. The motion should be denied.

Respectfully submitted this 27th day of February, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*
KEVIN M. RAPP
COLEEN SCHOCH
Assistant U.S. Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*
Daniel Parke
U.S. Attorney's Office