GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
COLEEN SCHOCH
Georgia State Bar No. 366545
Email: Coleen.Schoch@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>David Allen Harbour,<br><br>　　　　　Defendant. | No. CR-19-00898-PHX-DLR (DMF)<br><br>**UNITED STATES' RESPONSE TO RULE 29 MOTION [Doc. 649]** |

## LEGAL STANDARD

In considering a Rule 29 motion, the Court "must determine whether, viewing the evidence in the light most favorable to the government, the jury could reasonably find the defendant guilty beyond a reasonable doubt." *United States v. Merriweather*, 777 F.2d 503, 507 (9th Cir. 1985). The motion must be denied if the reviewing court concludes, ". . . after viewing the evidence in the light most favorable to the prosecution," that "*any* rational trier of fact could have foun." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## LAW AND ARGUMENT

The United States was required to prove that Harbour had a specific intent to defraud, by means of false or fraudulent pretenses, representations, or promises, and obtained money or property as a result. 18 U.S.C. §§1341 and 1343. The Ninth Circuit has

explained that "to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions." *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1085 (2021). In other words, intent to both "deceive and cheat" must be shown. *Id*.

The United States' case rests on the premise that Richard Turasky, Mark Burg, Carol Hill, Allison Wilson and Princeton Alternative Investment Fund ("PAIF") were the victims of Defendant's scheme to defraud. The false or fraudulent pretenses, representations, or promises are that their investments would be invested in some type of investment venture when in fact they were diverted for personal expenses, payments to other investors, a payment to the FTC to resolve a settlement, etc.

In addition, Harbour omitted an array of other material information that would have been important to the investors' decision to invest. Omissions of material fact and half-truths may be used to establish a scheme to defraud. *United States v. Woods*, 335 F.3d 993, 997–98, 1000 (9th Cir.2003); *see also United States v. Montgomery*, 384 F.3d 1050, 1063–64 (9th Cir.2004) (holding that a statement is false if it is half true or conceals facts or information necessary to make the statement as a whole not misleading). "Moreover, deceitful statements of half-truths or the concealment of material facts is actual fraud violative of the mail fraud statute.... [T]he deception need not be premised upon verbalized words alone. The arrangement of the words, or the *circumstances* in which they are used may convey the false and deceptive appearance." *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir.1967) (citations omitted)(emphasis added).

In addition to wire and mail fraud, the United States has established the essential elements of transactional money laundering (counts 13-23. To prove a conviction for money laundering under 18 U.S.C. § 1957, the government must establish that the accused: (1) knowingly engaged in a financial transaction; (2) knew that the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was in fact derived from a specified unlawful activity. *United States v. Messer*, 197 F.3d 330, 341

(9th Cir. 1999). "[A] a money laundering conviction does not require proof of a specific predicate offense; it merely requires proof that the laundered funds constituted the proceeds of a predicate offense." *United States v. Mankarious*, 151 F.3d 694, 703 (7th Cir. 1998); *United States v. Tencer*, 107 F.3d 1120, 1130-31 (5th Cir. 1997). But here, there is sufficient evidence that Defendant committed wire fraud, therefore, the essential elements of transactional money laundering have also been committed.

The United States intends to supplement this response during oral argument with a power point deck that demonstrates the exhibits and testimony that supports the charged counts.

**A. Richard Turasky: Count 1, 9, and 10:**

**1. Misrepresentations**

In Turasky's case, on July 30, 2014, he wired $500,000 to Harbour's account from Illinois to Arizona. It was agreed that part of the investment Harbour would wire back $150,000 to cover expenses associated with a larger investment. Instead of investing the $350,000 into an investment Harbour diverted the money for personal expenses unrelated to the investment. Ex. 690. Only $55,000 went to the actual Green Circle investment. *Id*. As a result, Harbour made only several interest payments before defaulting on the investment. *Id*. Turasky sued Harbour and received a judgment in the amount of $841,479.56 . Ex. 895.

**2. Omissions**

Harbour engaged in several material omissions regarding the Turasky investment. First, he failed to inform Turasky that he his current payday lending operation had received numerous complaints for consumer fraud (from 2012-2014) from various states *prior* to Turasky's investment. Exs. 718,719,724,726,727,729,730,733,735. Second, two months after Turasky's investment Harbour failed to inform Turasky that his pay day lending operation was seized and shuttered by the Federal Trade Commission. Trial Tr. pp. 87-88, 208, (2/10/23).

### 3. Circumstances Surrounding Investment

Turasky also testified that he believed Harbour to be a successful investor based on Harbour's conspicuous displays of wealth. Turasky cited to Harbour's membership in several expensive private golf clubs where initiation fees exceeded $100,000 in addition to monthly or annual dues. Trial Tr. pp. 187-188, 192 (2/9/23). Harbour represented that he had an interest in a private jet with Denny Sandford. *Id*. at pp. 196-97. He also observed Harbour to have two expensive vehicles that included a Range Rover and S Class Mercedes estimating that each of their values exceeded $100,000. *Id.* pp. 205-206. Harbour also conspicuously displayed his AMEX Black card that was actually guaranteed by his ex-girlfriend Wendy Yaeger. *Id*. at 199-201; Ex. 517. In Turasky's opinion, the card was difficult to obtain and, to qualify for the card, you had to have a significant net worth. *Id*.

Harbour cultivated Turasky as an investor by inviting him to yet another of Harbour's private golf courses (Gozzer Ranch) where not only was he a member but owned a multimillion-dollar condominium. In addition, Turasky observed that Harbour had a luxury boat that Harbour informed Turasky cost $800,000. Trial Tr. pp.203-204, (2/9/23).

In reality, at the time of Turasky's investment, Harbour was imploding financially facing crushing debt. By 2014, Harbour owed millions in personal guarantees to a number of other investors including Joe Cathey ($3 million), Craig Jackson ($15 million), Kenneth Bobrow ($2.5 million) and John Grissenger. Turasky was never informed that Harbour had these liabilities. Also, unknown to Turasky and, by Harbour's own admission, he had "very little" income the year *prior* to Turasky's investment and the paltry income in 2014. By 2015 he had no income. During 2013-2015 he was living off of loans by three investors Deel. Dunsworth and Bobrow. Ex 744, p. 71, lns. 5-21. Bobrow was unaware he was supporting Harbour during this time period. Trial Tr. p.p. 82-84, (2/15/23) By 2015, Harbour was being questioned by the FTC (twice) and exposed to a significant monetary settlement.

In sum, Harbour misrepresented and omitted material information to Turasky in advance of his investment. The circumstances surrounding his investment gave Harbour

the allusion that he was a successful and wealthy investor when in reality he wasn't. There is sufficient evidence, under the Rule 29 standard. for the Turasky related counts to be considered by the jury.

### B. Mark Burg, Counts 2, 4-8: Wire Fraud:

#### 1. Misrepresentations

Similar to Turasky, Burg wired $1,000,000 from California to Arizona on December 2, 2014. It was unclear to Burg what Harbour actually did for a living. Harbour never really explained the nature of the investment to Burg. He understood Harbour to be in some type of business loans. Harbour misrepresented that he had the same group of investors, everybody was "doing great", and that they made a minimum of 20% sometimes more. Trial Tr. p. 32, (2/16/23) Harbour never disclosed to Burg that he was going to divert 40% of his investment for personal expenses, a Ponzi payment to another investor. etc. Ex. 688.

Harbour mispresented that his previous investors had been successful. Trial Tr. p. 41 (2/16/23) This is an obvious misrepresentation because not only had they not been successful he was in reality defaulting on loan payments. He also suggested that he had numerous investors when he did not. At this point he had only a few investors.

Burg understood from Harbour that that he was going to get paid back in three years with a minimum of 20% return resulting in $1.6 million. *Id*. at 49. Burg also believed that there were other investors with him and only found out later that it was just him in the investment. *Id*. at 54. In 2015 Harbour misrepresented that the investment was doing really well when in reality it was not. *Id*. at 51. By the summer of 2016 Burg was questioning Harbour about the status of his money and Harbour was misrepresenting he couldn't give him back his money because his lawyers were saying he had to give back all the money when in fact the money had already been dissipated to Harbour's personal expenses. *Id*.at 62. Harbour even misrepresented that he could return Burg investment in the form of watches that were worth a million dollars. *Id.at* 63. Harbour did have some expensive watches but they were not worth a million dollars each. Exs. 799,800 and 891.

In August 2016, Burg received a subpoena to be deposed by the SEC related to his investment with Harbour. Trial Tr. at 71, (2/16/23). Burg contacted Harbour and he misrepresented that the SEC investigation was a "giant mistake" , a "clerical error" and "they [SEC] are looking at us because of our success", stating that "our success was so big it triggers flags". *Id*. at 72-73. Following the SEC investigation Harbour promised to make payments but it wouldn't go through blaming it on the bank. *Id*. at 74. During this same time frame Harbour left an email with Burg saying that he will return Burg's money. Ex. 630.

### 2. Omissions

Similar to Turasky, Harbour failed to inform Burg of the numerous regulatory complaints for consumer fraud. Trial. Tr. p. 45. (2/16/23) Importantly, the FTC had seized Harbour's previous pay day lending operation four months *prior* to Burg's investment. Trial Tr. pp. 13-126, (2/7/23)  Harbour never informed Burg of the numerous liabilities in the form of personal guarantees that predated his investment. Trial Tr. p.45, (2/16/23). He also did not inform Burg that a year after he met Harbour, he had very little income in 2013 and 2014, and none in 2015. (*Id*.) Indeed, he failed to inform Burg that he was living off of loans from three investors (Deel, Dunsworth and Bobrow) Although Deel and Dunsworth did not testify at trial,  Bobrow did and knew nothing about subsidizing Harbour. Trial Tr. p.p. 82-84, (2/15/23) Just the opposite Bobrow had a judgment against Harbour for $2.5 million. To the extent that Burg understood some of his money was in payday lending he didn't inform Burg that Harbour knew nothing about that industry.

In addition, Harbour never told Burg that he intended to use his money to pay his personal credit card, fund trips and vacations,  pay other investors money he owed. Trial Tr. pp. 48-49, (2/16/23). He believed as detailed below that Harbour was a "really, really rich guy that was super successful." *Id*. at 49.

After his investment he fails to inform Burg that he was deposed by the FTC and interviewed by the FBI about his previous pay day lending operations. *Id*. at  58.

### 3. Circumstances of the Investment

1       Also similar to Turasky, Burg met Harbour at the El Dorado Club in Cabo San Lucas. The club had a $125,000 initiation fee and cost $30, annually and Defendant owned a home there. Trial Tr. p. 21-22, (2/16/23)  Harbour boasted about among other things, a 40th Birthday party that included a chartered jet and a private concert by the 1970s band the Eagles  for his guests. *Id*. at p. 24.  In addition to the El Dorado Club, Burg learned that Harbour also had a property at a similar high end private club called Gozzer ranch. *Id*. at 25. It also had an initiation fee of $125,000 and annual fee of $18,000. *Id*.at 29. Harbour invited Burg to use his  estimated $4 million place after Burg sold his vacation home in El Dorado. *Id*. at 26-28, 34. While at Gozzer Harbour took Burg out on his two boats that Burg estimated was valued at $300,000 to $400,000 each. He also had an expensive Cadillac Escalade  with a satellite dish. *Id*. at  34. Harbour even suggested that they buy a large parcel of property at Gozzer. *Id*. The current house that was not particularly nice was estimated at $5 million. *Id*. at 35.  Harbour even misrepresented that he was considering the purchase of  a house in Maui. *Id*.

      Burg also related that Harbour would come to the Los Angeles for some type of business meetings and stay at the expensive Peninsula Hotel in Beverly Hills. Trial Tr. p. 31, (2/16/23) Harbour related other expensive trips to the London Olympics and  Augusta National for the Masters,  even representing  he could get Burg  on this exclusive course. *Id*. at  32. Burg did not know people within his circle of contacts that could get him on this course. *Id*.

      In 2014, Harbour also set up golf outings at two of the private clubs (Whisper Rock and Silverleaf) he had a membership in Scottsdale for Burg's college friends. *Id*. at pp. 37-38; Exs. 567, 568.  Burg also related that Harbour had a suite at the Phoenix Waste Management open and was able to get tickets. *Id*. at 39. Harbour also misrepresented that he had a partial interest in a private plane. *Id*.

      In sum, Burg believed that Harbour had the same level of success and the trappings of wealth that Burg observed with members of  the entertainment industry. Trial Tr. at pp, 40-41, (2/16/23). Later, in 2015, Harbour let Burg use his condominium in Gozzer Ranch

for a family vacation. *Id.* at 55.  Only a few months prior to this trip Harbour sat for a deposition and provided a recorded statement to the FTC. The FTC investigation was not disclosed to Burg. *Id.*

Two years into Burg's relationship with Harbour and observing conspicuous displays of wealth Harbour solicits Burg to invest. *Id.* at pp 42-42. Harbour convinces Burg to invest by identifying other investors Kenny Bobrow and Daryl [ Deel] claiming that, "Kenny is retired doesn't have to work because of the returns he has been receiving investing with Harbour." *Id.*  Burg stated that, " and my attitude was, well, if Kenny keeps going back to him, he must be doing well, or why would he keep investing with him time and time again." (*Id.*) Harbour represented that the returns were always 20%. (*Id.*) Unbeknownst to Burg, Harbour was in arrears on the Pat Spaulding note.

Again, Harbour never gave Burg specifics of what the money was invested in saying 'there were all kinds of deals",  "there was a health care company."   When pressed Burg admitted that he really didn't know what Harbour did for income. Trial Tr.  p. 45. (2/16/23). Based on these misrepresentations and the circumstances surrounding the investment Burg invested in David Harbour despite warnings from his business manager. *Id.*  at p. 48.

By 2016, Harbour's money was gone he was under investigation by the SEC. Nevertheless, Harbour was still promoting a façade that he was legitimate and successful investor looking to enter the film production business. *Id.*  Despite relying on others to support his lifestyle, he  travelled to Beverly Hills to look at a $7.5 million home owned by a famous actor. Harbour never revealed that he was renting a house and his primary residence had been foreclosed upon. *Id.*at pp. 65-66. In sum, there is more than sufficient evidence of wire fraud, involving Burg's $1,000,000 investment, for the jury to consider.

**C. Statute of Limitations for Mail Fraud, Counts 11 and 12.**

Defendant devised a fraudulent investment scheme that started with the 2007 Family Dollar Store/Pat Spaulding scheme and ended on December 13, 2021 when he was arrested following the tampering of witnesses (Burg, Willson, Turasky and Hill). Counts 11 and 12

that involve a mailing to the Liberty Trust Company that in April-May, 2016 were in furtherance of that scheme. In other words, the scheme was not complete when Harbour received the funds from both Wilson and Hill, included the mailings in 2016 and the tampering in 2021.

In *United States v. Brown*, 578 F.2d 1280, 1285 (9th Cir. 1978) the court held that "mailings of purported monthly payments to the purchasers of the land contracts, in our view, constitute an integral part of the transaction which the court found to be fraudulent." *Id.* Brown, similar to the payments that Harbour directed to both Willson and Hill to make by mailing funds to the Liberty Trust Company, concluded that even though the contracts were not signed within the limitations period, the securities fraud charges against Brown were not barred. *Id.* The Brown court specifically noted that "in analogous prosecutions under the mail fraud statute (18 U.S.C. s 1341) activities tending to lull investors, either to prevent discovery of fraud or to permit further fraudulent activities to progress unhindered, have been held to constitute a part of the execution of the fraudulent scheme and to be integral to the offense rather than incidental to it." *Id.* (citing *United States v. Sampson*, 371 U.S. 75 (1962); *United States v. Ashdown*, 509 F.2d 793 (5th Cir. 1975)).

In *United States v. Tanke*, 743 F.3d 1296 (9th Cir. 2014), the Ninth Circuit found that in deciding when mailings designed to avoid detection or responsibility for a fraudulent scheme fall within the mail fraud statute, we begin with the general principle that the mailing must be sent "*prior* to the scheme's completion." *United States v. Lane,* 474 U.S. 438, 453,  (1986) (emphasis in original). But when is a scheme complete? As is the case here,  the *Tanke* court provided  a partial answer is that it plainly does not end before the perpetrator has obtained money or property from the victims. *Tanke* * 1301. Thus, before proceeds of the fraud have been obtained, a mailing need only in some way further the scheme, as mailings designed to avoid detection or responsibility clearly do. *Id.*; *see also United States v. Bach*, 172 F.3d 520 (7th Cir. 1999), which held that mailings designed to lull victims of a Ponzi scheme  into believing that their investments were safe, were sufficient to bring the scheme within the five year statute of limitations for mail fraud.

Once proceeds of the fraud have been obtained, it is harder to say when a scheme ends. The only easy case is that of an ongoing scheme, in which the perpetrator has received some of the proceeds of the fraud but expects to receive additional proceeds of the fraud in the future. *Tanke* at 1302. It is well settled that mailings sent in the midst of such a scheme, including those designed to avoid detection or responsibility, fall within the statute. *See Schmuck v. United States,* 489 U.S. 705, 711–12, 714 (1989); *United States v. Jinian,* 725 F.3d 954, 962–63 (9th Cir.2013); *Sun Sav. & Loan Ass'n v. Dierdorff,* 825 F.2d 187, 196 (9th Cir.1987); *United States v. Price,* 623 F.2d 587, 590 & n. 2, 593 (9th Cir.1980), *overruled on other grounds by United States v. De Bright,* 730 F.2d 1255 (9th Cir.1984).

In *United States v. Sampson,* 371 U.S. 75, (1962), for example, the defendants were charged with mail fraud based on letters they sent to their victims *after* they obtained the victims' money. (emphasis added) *See id.* at 78–79. The letters were designed to lull the victims into a false sense of security in order to postpone their ultimate complaint to authorities. *See id.* at 78. The district court said there could be no liability because the letters were sent after the money was received, but the Supreme Court disagreed. *See id.* at 79. The Court explained that the question was not whether the money had been obtained but whether the defendants' plan had been fully executed. *See id.* at 80. The Court held that the defendants' scheme had not been fully executed at the time the letters were sent because the scheme had contemplated lulling activities from the start:

> [T]he indictment in this case alleged that the defendants' scheme *contemplated from the start* the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims. The indictment specifically alleged that the signed copies of the accepted applications and the covering letters were mailed by the defendants to the victims for the purpose of lulling them by assurances that the promised services would be performed. We cannot hold that such a *deliberate and planned* use of the United States mails by defendants engaged in a nationwide, fraudulent scheme *in pursuance of a previously formulated plan* could not, if established by evidence, be found by a jury under proper instructions to be "for the purpose of executing" a

scheme within the meaning of the mail fraud statute.
*Id.* at 80–81. (emphasis added).

Here, by the time both Willson and Hill mailed their checks to Liberty Trust in 2016 their funds had been dissipated in the KSQ fraud. Harbour had already had his pay day lending operation shut down by the FTC two years earlier in September 2014. He was interviewed by the FTC twice in April of 2015. These facts were never shared with either Willson or Hill. He was living on borrowed funds, had no real income and millions of dollars in personal guarantees. By 2016, his house was in foreclosure and he was renting a home but failing to pay rent. By May of 2016, the same month that Hill sent her check to Liberty the SEC had sent subpoenas to Turasky investigating Harbour. In August of 2016 Burg contacted Harbour about his own SEC subpoena and Harbour misled him about the profitability of Green Circle.

In addition, Harbour clearly became aware that both Willson and Hill were to be witnesses against him at trial. He then attempted to discourage them from testifying in exchange for the payment of principle. In sum, Harbour devised a scheme that extended into 2021 and the mailings in 2016 were just act in furtherance of that scheme.

**D. Allison Wilson, Count 11, Mail fraud**

Similar to other victims, Wilson, an unsophisticated investor, testified that she mailed the check to Liberty Trust Company, stating "I mailed them to Liberty Trust…using certified mail. Trial Tr. pp. 217 (Feb. 8, 2023); see e.g., 217:3-8

**1. Misrepresentations**

Harbour misrepresented that he could obtain 15% returns on Willison's money and never explained that there were any risks associated with the investments. Trial Tr. pp. 145 (Feb. 8, 2023); see e.g., 145:1-8. In his FTC deposition Harbour took positions that Willson disagreed with based on her conversations with Harbour:

Q. Mr. Harbour testified that he never invested any funds for

- 11 -

you, your former husband, or your friends. Was that -- is that what you believed?
A. No.
Q. He testified that he had nothing to do with Canyon Road Holdings. What did he tell you about his involvement with Canyon Road Holdings?
A. Nothing. That he was -- it was part of his business. The name of his business, I should say.
Trial Tr. pp. 175 (Feb. 8, 2023); see e.g., 175:2-10

### 2. Omissions

Similar to the other victims, Willson was never informed of Harbour's previous consumer fraud complaints from state regulatory authorities, nor was she informed of the FTC injunction, seizure of assets, etc. *see arg. supra.* She also was not informed that her funds were invested in payday lending. Trial Tr. pp. 218 (Feb. 8, 2023); see e.g., 218:23-25.

### 3. Circumstances surrounding the investment

Willson testified that Harbour "looked like he was succeeding or successful in -- because he had a posh office…. talking about trips and….I mean, he seemed to be successful, and I just trusted. " Trial Tr. pp. 143 (Feb. 8, 2023); see e.g., 143:1-17. Willson also relied on the fact that both Susie Alofs and Craig Jackson invested with Harbour. *Id.* Unbeknownst to Willson, Harbour had defaulted on payments to both Alofs and Jackson and was scrambling to make payments by diverting money from other sources. Alofs was continually asking Carol Hill about payment by text message   or stopped by the office seeking payment.  Trial Tr. pp-27-28, (2/3/23). Hill passed on Alofs complaints to Harbour. *Id.* Two years prior to Willson's (2014) $100,000 investment, Jackson had retained attorneys to seek payment in 2012. Trial Tr. pp 165. (2/15/23) When pressed Harbour could not explain with any specificity what happened to Jackson's money. *Id.* None of this was disclosed to Willson. In sum, Willison's mailing of the check to Liberty Trust Company in Dallas, Texas was a mailing in furtherance of Harbour's fraud scheme and should be considered by the jury.

- 12 -

### E. Carol Hill, Mail Fraud, Count 12:

Carol Hill made two investments with Harbour. The first was in November 2012 for $81,000 to Northrock. At Harbour's direction she liquidated her Vanguard IRA and transferred the funds to the Liberty Trust Company in Dallas. Texas. The second was for $500,000 in February 2013 that was provided to Harbour's DNA account and then sent to Joel Tucker. Hill also testified that she frequently would sign checks on Harbour's behalf at his direction. Trial Tr. at p. 48 (2/3/23) Similar to Turasky and Burg, Hill, as Harbour's assistant, was well aware of Harbour's lifestyle that included private jet travel, extravagant parties in Cabo, purchases of jewelry, private golf club memberships, expensive suites/boxes at ASU and the Waste Management open and vacation homes.

#### 1. Misrepresentations

When she was deciding to invest money with Harbor it was important to her that Harbour also had his IRA in the same investment. Trial Tr. at pp. 81, 84, 155, (2/3/23). This was untrue as Harbour only had a $3,000 investment in the name of his daughter. Ex. 255. Harbour also convinced Hill to invest by telling her that Melvin Dunsworth "liked her" and he would "give her a high interest rate." Trial Tr. p. 83, (2/3/23).

#### 2. Omissions

Hill worked for Harbour from 2010 until his arrest in August 2019. Despite her significant investments of $581,000, Harbour never explained to Hill exactly what he did for investments. *Id.* at p. 44. In addition, he never explained the risks associated with an investment that had such a promised high rate of return. *Id*. at pp. 83-84. Harbour not once provided any material regarding the investment, the track record, and whether the investment was successful or any other relevant information, for that matter. *Id*. at pp. 85 102.

Harbour never referred Hill, an unsophisticated investor, to another advisor to provide an independent opinion regarding the investment. *Id*. at 104. Regarding Hill's second investment of $500,000, Harbour never provided her any information about the

risks associated with the investment. *Id*. at 89.

Eventually the interest payments stopped (on the $500,000 invested with DNA) and Harbour never provided Hill an explanation as to why the payments ceased. *Id*. at 126. Harbour also never explained his compensation for Hill's investment. *Id.* at 129. This included information regarding a 25% finder's fee that Harbour received for providing the $500,000 to Tucker. Ex. 188. Indeed, he never even told her prior to the investment that her money was with Joel Tucker. Although Harbour offered Hill a finder's fee for the $500,000 as a lulling payment that never happened either.   Harbour never explained how her money ended up with Joel Tucker and what he had to do with her investment. *Id.* at 135.  As for the $81,000 investment with Northrock Harbour omitted to tell Hill that her investments was in Bankruptcy only mentioning to her in passing that she would receive "something" from Melvin Dunsworth. *Id* at 151-152. Following the bankruptcy Harbour never explained the implications of Hill being a creditor in the Northrock bankruptcy. Trial Tr. at pp. 153-154, (2/3/23). In sum, Harbour both misrepresented and omitted material facts to Hill regarding her investments and Defendant's Rule 29 motion regarding Count 11 should be denied.

### F.  PAIF, Count 3, Wire Fraud

Count 3 involved a wiring of funds from New Jersey to Illinois and was coordinated by Harbour in Arizona.   Similar to the previous victims, there is no evidence that PAIF was aware that Harbour's previous pay day lending operation suffered from state regulatory complaints, an FTC shutdown, and an FTC monetary settlement (that was funded by PAIF funds), etc. *See arg. supra.*

Importantly, Laura Purifoy testified that Harbour made "changes to the Borrowing Base two or three times"  before it was sent to PAIF misrepresenting the status of the consumer loan borrowers. Trial Tr. pp. 103-105,112,118-122, 126 (2/14/23). Purifoy testified that on the borrowing base spreadsheet it had a running balance of monies owed to PAIF that were based on emailed borrowing base and aging reports. *Id.* pp. 112-115.

PAIF relied on accurate financials. *Id.* In the final analysis, Purifoy testified that the borrowing base had to be accurate and she knew that it was not because Harbour changed it misrepresenting the status of the consumer borrowers. *Id.* As this wire fraud count furthered Harbour's scheme it likewise should be considered by the jury.

G. **Transactional Money Laundering**

The funds involved in the counts 13-23 that are the subject of the transactional money laundering counts were sourced from the monies received from wire fraud. Once the Court finds that there is sufficient evidence for the jury to consider the wire fraud counts they must also find that the United States has proven the essential elements of transactional money laundering.

Respectfully submitted this 27th day of February, 2023.

> GARY M. RESTAINO
> United States Attorney
> District of Arizona
>
> *s/ Kevin M. Rapp*
> KEVIN M. RAPP
> COLEEN SCHOCH
> Assistant U.S. Attorneys

# CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*
Daniel Parke
U.S. Attorney's Office