Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
|---|---|
| Plaintiff, | **DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR MISTRIAL** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

Defendant David A. Harbour ("Harbour"), by and through undersigned counsel, respectfully replies to the government's Response to the Motion for Mistrial.

The government's response argues why they believe they have met the two-part test as articulated by the Court. We do not disagree that the first prong of the test was met; indeed, it is the lifestyle evidence that gives rise to the mistrial. It is only section B of the government's argument (beginning on page 7) that merits a reply.

The fatal flaw with the governments argument is that while they have shown money existed and was given to Harbour through lenders/investors, they have failed to

put forth a mere scintilla of evidence that money came from a fraud or was used in an illegal manner.

With respect to the so-called Pat Spaulding fraud, the government contends $2.5 million was obtained from Ken Bobrow for a fictitious Family Dollar investment, Apartment Complexes and Student Housing. However, the government has not shown that the money went anywhere but to these investments. Nor has the government shown that the money went or did not go anywhere, except that it was not in Mr. Harbour's bank account as of November 2010. This is the difference between allegation and proof. Harbour got $2.5 million over a span of months from the Bobrow lending group.

First, if the government called this a fraud, it was up to the government to show that the $2.5 million was procured by fraud. The government introduced no evidence to suggest that it was. The government contended that Mr. Harbour never mentioned Spaulding until 2014 after the payments stopped. Mr. Bobrow on cross-examination agreed in his lawsuit against Mr. Harbour that Spaulding was around since the beginning, that is 2007. On cross examination Mr. Bobrow is asked Q: Was it your testimony this morning that it wasn't until years and years and after the 2007 loan that you ever heard of Pat Spaulding? A: If I testified on timing, I'm not terribly sure that I was correct. Page 126 lines 18-22. Then on pages 130 lines 24-25 and page 131 lines 1-14 in the lawsuit filed by Mr. Bobrow, Bobrow attorney states, The loan agreement and multiple advance note were entered into pursuant to an investment loan program established by Harbour and HighPointe……part of a larger $7 million loan that was to be made by HighPointe to Pat Spaulding.

The government telling the court that Defendant for the first time represented to Bobrow that Defendant had loaned Bobrow's investment to Pat Spaulding is false.

Mr. Bobrow agreed that he went to Kanas City with Mr. Harbour in association with the Family Dollar Store investment to look at Family Dollar Stores. Mr. Bobrow states "I cannot remember if those were the stores that were under the collateral or not. I never got a list of the collateral that I recall."

Thus, Mr. Bobrow admitted there were Family Dollar stores that were tied to his investment as collaeral. Page 134 lines 9-17. Nobody has testified that Mr. Harbour said he and Mr. Bobrow met with Spaulding in Kansas City.

We agree with the government, that Lisa Berges testified she received payments on the Family Dollar store investment starting in January 2008 and was paid until 2014, See Exhibit 900. This is 20 months prior to Mr. Jackson's investment with Mr. Harbour in August 2009.

The government persists in misrepresentations with respect to the so-called Spaulding Fraud. The government then says on page 8 lines 12 and 13, Defendant had Hill send "Pat Spaulding" an email.

That is false because it is contrary to Ms. Hill's testimony. On cross-examination Ms. Hill is asked, "Do you even recall actually – in other words, close your eyes, go back in time. Can you actually even remember doing this or not?" A: I can't recall.

Next, if the government contended, as it did, that the $2.5 million loan was repaid with money procured later by fraud which was used to repay the $2.5 million, it was for the government to prove that with evidence.

3

The government did not introduce any evidence to show that either the $2.5 million or the funds used to repay it were the product of fraud. The government could never have proved any of this because the government did not procure any bank records before November 2010 and the so-called Spaulding transaction occurred in 2007-2008.

For Craig Jackson, the government failed to show that any of the $6 million[1] handed to Harbour in a loan that was not documented at all could be traced either to repaying Bobrow or to the purchase of any luxury items. The government's evidence concerning so-called luxury items was concentrated, as one would expect, on 2011-2013, when the payments from Canyon Road and KSQ were at their zenith. Other than a single men's watch in 2008 (the government did not produce any evidence on how it was purchased), the government showed no evidence of wealth that occurred before the advent of activities associated with payday lending.

With respect to Rhonda Gray, the government failed to show that the $1 million was used for anything that was not in the conservative return zone. But the *rasion d'etre* for the Rhonda Gray transaction was completely different. It was an asset protection

---

[1] The government, in its response, claims Harbour took $16.9 million from Jackson. Doc. 654 p. 8, l. 27. However, this calculation is completely inaccurate. The government relies on Ex. 397 as the basis for their calculation. In Ex. 397, a Anthony Stacy is claimed to have withdrawn $1.9 million from the Jackson Trust. Second, Jason Braun, CJ attorney, testified the $9 million was *not* sent to Harbour's account page 182 15-17, the $9 million withdrawal was given to the Palo Verde Fund for a partnership interest. These were not entities affiliated with Harbour, and as the exhibit clearly indicates, Jackson's contention was that, but for Harbour's involvement, *Stacy*; not Harbour would never gotten the funds. No one claimed that Harbour got any more than $6 million, which was entirely repaid in 2012. In short, the government knows that the additional $10.6 million was never received by Harbour.

4

endeavor engaged in knowingly and willfully by Ms. Gray. There was no evidence that could trace any Harbour luxury purchase to her $1 million.

To emphasize the government's error, the only evidence of luxury items does not begin until after Canyon Road and KSQ are operational; meaning the Bobrow funds from 2007, Jackson funds from 2009, and Gray funds from 2010 could never be linked under any standard of law to Harbour making purchases to entice other investors. The only alleged fraudulent conduct within the time frame occurred in December 2012 with Ms. Hill's alleged loan to NorthRock of $81,000 which the governments forensic accountant could not find and the February 8, 2013, $500,000 loan which went to KSQ and which will be addressed later in this response.

The government contended before trial that the evidence they were going to show would prove that the Bobrow, Jackson, and Gray money was used for the purpose of showing Harbour to be finically successful; that has not happened. *See* Doc. 593 p. 11, ll. 12-23. As the Court understood it, the government claimed it had evidence of Harbour's bank statement and the timing of the investments or fraudulent schemes that could link the money. *Id*. at p. 13, ll. 17-23. The government talked about houses, cars, private jets, weddings, birthdays, but they never tied any of Bobrow, Jackson, or Gray back to any of those items.

The government knew the purchases happened from 2011 – 2013 and that would not match the make believe time-line. The wedding was in May 2011, the birthday was June 2013, the Idaho House was July 2013, the Cabo house was October 2012.

This is all reflected in the bank statements the governments forensic accountant has examined, we know she examined them because she agreed with the $14.7 million out of DNA Investments to KSQ, the $27 million from KSQ and the $6.1 million from Canyon Road. The first deposit from Canyon Road was in April 2011, the first deposit from KSQ was in October 2011. The last deposit from Canyon Road was in July 2014 and the last deposit from KSQ was May 2014. See Exhibit 29. Note the money stopped prior to the FTC's investigation in September 2014.

The government could have proven the second prong of the Court's test a variety of ways but without at least having bank statements for the period 2007-2010, which the government knew it did not possess and could not get. Instead, the government insists that the Court take their word that there was fraud used to purchase luxury items, but there is simply no evidence.

As the Court itself, noted, these proffers may have been acceptable during pretrial phase. The government has now rested and has not put forth sufficient evidence of where the money received by Harbour went.

The government knowing it would fail without having the bank statements for the relevant time period of Bobrow, Jackson and Gray and having the bank statements for the relevant time period when all the large dollar items were purchased needed to go in a different direction and try to tie the Finder's Fee Agreement, Exhibit 188, to the $27 million received from KSQ and the $6.1 or $6.6 million from Canyon Road. It took the jury and the court through some metal gymnastics to try and come up with $950,000 of Finder's Fees. Ms. Paige testified to the following: Mr. Harbour would receive a 25%

origination on loans to DNA Investments within five business days. The deposit on February 11, 2013 was for $150,000, which is 30% not 25%.

The government said in document 654 that Harbour did not disclose his 25% Finder's Fee that he received for the Hill's $500,000. Are we now playing horseshoes and hand grenades? Is 30% close enough to 25% even though the agreement the government is referencing says 25%?

Carol and Pat Hill signed a Finder's Fee Agreement with Mr. Harbour. More relevant, the government did not produce a deposit into any of Mr. Harbours accounts for 25%. Joe Cathey has nothing to do with DNA Investments and Mr. Cathey testified that he never met or spoke to Mr. Harbour until after September 2013, that is when his payments stopped. (Ms. Paige used some magician type wording when she said that Mr. Harbour only paid Mr. Cathey $2,500 on his $3 million loan. NorthRock was responsible for paying Mr. Cathey not Mr. Harbour or DNA. Mr. Cathey said he was getting around $70k an month until September 2014. But Ms. Paige and the government inferred that Mr. Cathey only received $2,500.) With respect to Mr. Cathey his loan has nothing to do with the Finder's Fee Agreement. Why would it?

In the month of December 2012 when Mr. Cathey sent $1,000,000 to NorthRock on December 11, 2012 and NorthRock sent the $1,000,000 to KSQ on December 11, 2012. Ms. Paige had to really move some pieces around and leave some pieces out in order to match Mr Harbour's DNA Investments bank statement deposits from KSQ. Ms. Paige needed to come up with $300,000 in Finder's Fees from Mr. Cathey in order to match the deposit from KSQ of $300,00 within five business days of December 11, 2012.

This was not easy, NorthRock sent $1,000,000 on December 11, $1,225,000 on December 12 and $600,000 on December 14. Which was a total of $2,825,000. 25% of that amount would be $706,250, not $300,000. So she took $1,200,000 of that amount and poof, we have $300,000. In the NorthRock December 2012 bank statement Exhibit 906, NorthRock sent KSQ the following wires.

There are a myriad of other government failures of proof. One relates to finder's fees. Has did a single lender/investor from the DNA/KSQ relationship testify that she or he did not know that Harbour was getting fees from KSQ? In this entire case, the sole DNA/KSQ "investor-victim" was and is Pat Hill, whose $500,000 loan to DNA is not a charged count. Pat Hill, who is not one of the "Five," obviously knew there was a finder's fee. The basis of his knowledge is that he was, along with Carol Hill, to get the 10% finder's fee from KSQ after the first year.

Two very recent events punctuate the need for the Court to order a mistrial; both reasons are the government's conduct. First, the government sent an e-mail that outlined the subject matters that the government intended to cover on cross-examination. *See* Exhibit 1. This email was directly connected with the Court permitting the introduction of the evidence that is the subject of the Motion for Mistrial. (Doc. 648).

The second event was the quite remarkable sidebar concerning whether the Defense could question Cathie Cameron about Ponzi schemes. This was permitted and a supplemental Ponzi scheme jury instruction is being submitted on this date.

During the sidebar, government counsel told the court that it had no intention of introducing evidence that Defendant's activities were part of a Ponzi scheme. TT, 2/24/23, p. 135-136, ll. 23-25; 1-17.

This startling announcement drew a sharp response from the Court. The Court stated that the sole reason all of the other evidence had been admitted (e.g., Spaulding, Jackson, Gray, the credit cards, and wealth), was based upon the government's Ponzi scheme assertions.

The government's Ponzi scheme assertions had reached their zenith in Doc. 485, the government's December 20, 2022, Motion in Limine to Determine Admissibility of Evidence. Under the section entitled "Defendant's Luxury Lifestyle and Spending are Probative of His Motive to Defraud," the government made the following statements:

- "Harbour was also investigated by the Securities Exchange Commission ("SEC") for his involvement in the Green Circle payday lending Ponzi scheme." Doc. 485 p. 3, ll. 4-5.
- "Harbour solicited his victims in Arizona and other states. As noted in the indictment and in discovery, Harbour was a member of several private, luxury golf resorts located in Scottsdale, Arizona, Cabo San Lucas, Mexico, Palm Springs, California, and Harrison, Idaho where he solicited potential investors. Defendant also invited several victim investors to his $3 million vacation condominium at Gozzer Ranch Golf and Lake Club in Harrison, Idaho or his condominium in Cabo San Lucas. Defendant took potential investors on luxury boats, to fine dining, to his Skybox during Arizona State University football games, and to his 16th hole Skybox at the Phoenix Waste Management Open. Instead of investing his victims' money as represented to them, in some instances Defendant took 25% of the investment off the top as his payment; he also used victims' money to pay off his American Express bill, to pay auto loans, and to make *Ponzi* payments to other victims." Doc. 485 p. 15; ll. 12-22.
- "In [sic] addition, Harbour's ostentatious displays of wealth leads victims to believe that profits are coming from legitimate business activity (*e.g.*, a successful return on investments), and they remain unaware that other investors are the source of funds. A Ponzi scheme can maintain the illusion of a sustainable business as long as new investors contribute new funds, and as long as most of the investors do not demand full repayment and still believe in the non-existent assets

they are purported to own. Here, Harbour began diverting new investors' money to make payments to earlier investors, pay his credit card, pay his membership fees at numerous private golf clubs, buy jewelry, pay the $750,000 penalty with the FTC, and numerous other personal expenditures. In a Ponzi scheme, a con artist like Harbour offers investments that promise very high returns with little or no risk to their victims." Doc. 485 p. 17; ll. 18-28.

But for the government's assertions, most of them entirely false that all of the otherwise extraneous and highly prejudicial evidence was part of a 15-year long Ponzi scheme, none of the proffered evidence would have been permitted. In addition to the above statements, the government also cited numerous cases on Ponzi schemes to bolster its argument to admit Harbour's lifestyle.

None of it has anything to do with the core of the government's case, the one involving payday lending. This Court asked the government directly during the Final Pretrial Conference if the evidence would show that there is no other source of money going into Harbour's account and if the money was going to pay back other people as part of a Ponzi scheme, to which the government replied "yes." Doc. 593 p. 7; ll. 4-17.

To make matters worse, as argued in the Motion for Mistrial, the government has failed to show that any of the money received by Harbour either from KSQ ($27 million) or Canyon Road ($6.2 or $6.6 million) was fraudulent, either to Harbour's knowledge or altogether.

Thus, it was the combination of the alleged Ponzi scheme and the allegation that Harbour's wealth or his appearance of wealth was based upon funds received pursuant to fraud that made all the otherwise extraneous and highly prejudicial evidence admissible.

The government's explicit threats in Exhibit 1 make it impossible for the Defendant to testify. Whatever he might offer in terms of responding to the evidence

concerning the charges in the Second Superseding Indictment would be completely overshadowed by the extraneous issues on which examination would have to be permitted as a direct result of the Court's rulings.

It is now clear that these rulings were procured by the government through misrepresentations as to what the government would be able to prove. The government promised the Court that experts would trace payments to Kenny Bobrow and to Craig Jackson from the funds provided by other investors or lenders. However, as the government knew, there are no Harbour bank records prior to November 1, 2010. Therefore, the government could not and did not trace payments to Bobrow/Case or Jackson to the funds provided by any subsequent lender or investor.

Payday lending commenced in 2011 and about it plenty is known. Harbour sent all the funds received by Harbour and his entities to KSQ ($14.7 million) and he received back $27 million. He also received $6.2 million (per Ms. Paige) or $6.6 million (per Larry Cook) from Canyon Road. The government did not prove that any of these funds were fraudulently obtained, let alone that Harbour knew they were. Additionally, the government, while they produced finders fees agreements, did not link the agreements to a company from which the funds would have been received.

Within the funds in excess of the money sent to KSQ or the miniscule amount sent to Canyon Road were the millions of dollars used to pay the $2.5 million to Bobrow and the $6 million to Jackson and to pay for all the wealth-related items catalogued in Exhibit 618, Ms. Paige's chart.

We are filing a single-point brief today on why Dr. Manning's testimony should not be stricken even though Mr. Harbour cannot testify. If the Court strikes Dr. Manning's testimony because Harbour cannot possibly testify, given the government's threats in Exhibit 1, striking Dr. Manning's testimony could only be seen as another direct result of the Court's mistaken rulings concerning the extraneous evidence fomented by the government's pretrial contentions.

Only if the case is mistried does Harbour stand a chance of receiving a fair trial on the charges against him.

RESPECTFULLY SUBMITTED this 27th day of February 2023.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
Stephen M. Dichter
Justin R. Vanderveer
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Attorneys for Defendant David A. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2023 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004

1 | Attorney for Plaintiff
2 |
3 |
4 | /s/ Yvonne Canez