Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>                Defendant. | Case No. 2:19-cr-00898-DLR (DMF)<br><br>**DEFEDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S RULE 29 MOTION (Doc. 649)** |

Defendant David A. Harbour ("Harbour"), by and through undersigned counsel, submits this Reply to the Government's Response to Defendant's Rule 29 Motion.

**A.   Richard Turasky: Count 1, 9, and 10:**

    **1.   Misrepresentations**

The government cannot amend the indictment. The fraud charge outlined in the Second Superseding Indictment ("SSI") stated solely the following concerning Turasky. Harbour defrauded Turasky by using his loan proceeds as follows:

> Another investor, victim R.T., invested $500,000, and only $55,000 went to Green Circle. Similar to M.B.'s funds, R.T.'s funds were used to pay the balance on HARBOUR's American Express credit card and to make Ponzi payments to other

investors. Despite HARBOUR's representations regarding the return on investment, investor R.T. received only minimal interest payments of $64,571.27. Doc. 387, SSI, ¶ 22.

Here, the government at least does not abandon its assertions. However, now is not the time for government assertions as to what the evidence might show. The evidence is all in. Turasky stated from the stand that Harbour was entitled to use his money for business expenses and the Loan and Assignment Agreement, and his Declaration, leave no room for any doubt that Harbour was entitled to use Burg's funds for expenses.

However, the government did not introduce any evidence that Turasky's money was used for Harbour's personal expenses.

The entirety of the evidence introduced was completely to the contrary. According to Laura Purifoy, the American Express card was used for all expenses; TT, 2-14-23, P. 55, ll. 18-22. It was up to her to sort out which were business expenses, and which were personal expenses. She made the determination as between business and personal expenses, and Harbour was not resistant to her assignments. TT, 2-14 23, p. 46, ll. 3-5; p. 47, ll. 10-19. Ms. Purifoy also stated that Harbour did not use investor funds to pay personal expenses. TT, 2-14-23, P. 169, ll. 21-23. Also, the American Express records, Exhibit 27 for identification, were not introduced.

So, what the evidence showed, through the government's own witnesses, Turasky and Purifoy, was that the evidence in support of the charges in the SSI with respect to Turasky are not strong enough to survive a Rule 29(a) motion. Harbour was entitled to use Turasky's money as he did; for business expenses.

### 2.  Omissions

Two omissions not charged in the SSI are put forward. The defense's position is that these omissions, having not been charged, cannot sustain a conviction. These cannot substitute for the charged conduct. These claims are that Harbour did not inform Turasky of nine consumer *complaints* associated with Canyon Road in 2012-early 2014. These were *complaints,* they were not proven violations and they were certainly not material when reflected against the 1.4 million consumer loan files that Larry Cook testified constituted the Canyon Road loan portfolios. Omissions must be *material*. It cannot be asserted that 9 unproven complaints over a 3+ year period out of 1.4 million consumer loan files in a business in which Harbour had no operational control was a *material* omission. The second alleged omission is that Harbour never told Turasky about the FTC investigation even after the September 2014 shutdown. This was several months after the loan had been made. So, what this means is that when the alleged fraud was perpetrated, there was no FTC action and would not be one for several more months. This alleged omission is not relevant to the investment.

### 3.  Circumstances Surrounding Investment

Turasky was aware of what Operation Chokepoint had done to payday lending and he knew that both Harbour and Bobrow were in payday lending. He knew that Harbour was trying to engage in payday lending through Native American organizations and he was placed in contact with the Tribe's lawyer, which gave him comfort concerning the potential loan.

Turasky had known Harbour for several years. However, there was absolutely no evidence that what attracted Turasky to the prospective loan was anything other than the possibilities of a very expansive involvement in payday lending through Native American organizations, up to $10 million was the charter that Turasky gave to Zacks (which failed to produce any money at all). Thus, the government did not even introduce any evidence to support that the impression of wealth was what induced Turasky to move forward. Rather, Turasky testified as to the due diligence that he engaged in.

**B.** Mark Burg, Counts 2, 4-8: Wire Fraud:

1. Misrepresentations.

The government cannot amend the indictment as to Burg any more than it can as to Turasky. The fraud charge outlined in the Second Superseding Indictment ("SSI") stated solely the following Burg:

> Victim M.B., who did not invest in KSQ, was convinced to provide HARBOUR $1 million for investment into Green Circle. HARBOUR only provided $600,000 to Green Circle and used the remaining $400,000 to make payments to his American Express credit card and for lavish family vacations, among other personal expenditures. Another investor, victim R.T., invested $500,000, and only $55,000 went to Green Circle. Similar to M.B.'s funds, R.T.'s funds were used to pay the balance on HARBOUR's American Express credit card and to make *Ponzi* payments to other investors.

Doc. 387, SSI, ¶ 22.

The government persists in the nature of the misrepresentations charged, which is salutary since, as in the case of Turasky, they were shattered by the evidence, which is, not surprisingly, a lot different than the government's accusations. It is beyond controversy that, even to a greater extent than with Turasky, the evidence has shown

that Burg's lawyers and financial advisers were intimately involved in the negotiation and documentation of Burg's involvement in Green Circle. The First Amended and Restated Pujanza Operating Agreement gave Harbour the absolute right to use some or all of Burg's $1 million for expenses.  It also did not provide for any specific interim payments to Burg and, as in the case of Turasky, Burg and Avedon admitted, albeit grudgingly, that Harbour was entitled to use the money for business expenses.

While the government *contended* that Harbour used the money for personal expenses, it never *proved* that he did nor, given its witness lineup, could it ever have done so.  For example, the court itself commented that all of the American Express Card charges could have been business expenses.

> THE COURT: I guess the problem with the question is
> he wouldn't know what's on that Amex card. It's possible the
> business expenses could be on there as well.

TT 2-16-23 Pg 131, Lns 23 –25

Ms. Paige never looked at the business as a whole and never analyzed any of the expenses charged.  She simply traced funds for specific transactions in an imperfect and incomplete fashion.

While, if the government's case proceeds beyond the close of its case-in-chief, the Burg and Turasky situations are resolved with complete finality based upon Cathie Cameron's testimony, here, we must stop at the government's proof.  It is insufficient to survive the Motion because the fraud allegation is, solely, that Harbour used Burg's money to pay personal expenses. He was, without question, permitted to do so.

2. Omissions. These are the same as the allegations concerning Turasky, in part, and, given the date of the investment in December 2014, did come after the FTC's shutdown of CWB and Canyon Road. Canyon Road was shut down for reasons that were never presented in Court by the government. When Canyon Road was shut down, no action was taken as against Harbour. As it turned out, whatever the reason for the shutdown, the government's evidence showed that it was because of the actions of the call center, CWB, an entity with which Harbour had no involvement, just as he had no involvement with the operations of Canyon Road. He owned a piece of Canyon Road. He was, in short, like a shareholder.

The Green Circle business model was entirely unconnected with Canyon Road. On March 31, 2015, the FTC Receiver moved with respect to Harbour for the first and only time, in a turnover action that was later withdrawn.

Meanwhile, a review of the government's allegations concerning omissions compared to the actual testimony reveals that little, if anything, of what the government is contending was actually proved. Since there was no personal guaranty to Burg, whether Harbour had personal guaranties to others was and remains irrelevant. Most of what the government is contending occurred long after Burg put in his $1 million. For example, the Drawbridge SEC investigation all occurred in 2016. Fraud focuses on what the defendant intended when he obtained the funds; not events long-afterwards.

3. Circumstances of the Investment. What Harbour "boasted" about was, in fact, true. Was Harbour required to show Burg the ownership status of the of the things he had? If I invite you to my home, do I need to show you my mortgage? Are you

entitled to know that my house has very little equity? Harbour had these things and had acquired them with 100% legal funds, as we have seen.

**C.     Statute of Limitations for Mail Fraud, Counts 11 and 12.**

"In the case of mail fraud, the crime is not complete until the defendant uses the mail or causes the mail to be used in execution of the scheme to defraud." *United States v. Hymes*, 113 F. App'x 755, 756 (9th Cir. 2004). "In both the mail fraud and wire fraud contexts, courts have consistently recognized Congress' intent, repeatedly holding each use of the mails to be a discrete offense. Further, one who 'causes' another to use the mail or wires, if such use can be reasonably foreseen, fulfills the 'use' element." *United States v. Sebero*, No. 08-CR-185-JLQ, 2009 WL 720953, at *5 (E.D. Wash. Mar. 16, 2009) *citing to United States v. Garlick*, 240 F.3d 789, 793 (9th Cir. 2001). "Moreover, each mailing in a furtherance of a prohibited scheme to defraud constitutes a separate mail-fraud violation." *United States v. Beardslee*, 197 F.3d 378, 385 (9th Cir. 1999), opinion amended on denial of reh'g, 204 F.3d 983 (9th Cir. 2000). We have held that where " 'the execution of the scheme as conceived by' [the defendant] depended" on a mailing, that mailing constitutes "an 'essential step' " of the scheme and offers sufficient basis for a mail fraud conviction." *United States v. Eglash*, 813 F.3d 882, 885 (9th Cir. 2016). "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95, 65 S. Ct. 148, 151, 89 L. Ed. 88 (1944).

The government relies heavily on *Tanke* to allege that Harbour lulled investors, keeping the statute of limitations running for mail fraud all the way until his arrest in 2021. Doc. 659 p. 11 ll. 15-16. The Defense would like to point out its initial difficulty in understanding the government's analysis of *Tanke* from pages 9-11 in context of the issues at hand. After analysis, the government simply copied and pasted entire sections of *Tanke* without identifying it was copying the verbiage of *Tanke*.

While the government is obviously correct in reciting the holdings of *Tanke*, they are distinguishable without the full context of the case. In cases where the defendant obtains all the intended proceeds of the alleged scheme and later uses the wires to avoid detection of the scheme, the courts must look at the scope of the scheme as devised by the defendant to ascertain whether the wires occurred before or after the scheme's completion. *United States v. Tanke*, 743 F.3d 1296, 1303 (9th Cir. 2014). To that end, there must be an actual and specific plan to conceal a scheme to defraud – not a generalized one that can be inferred from the mere existence of a fraudulent scheme. *Tanke*, 743 F.3d at 1303; see also *United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009); *United States v. Sampson*, 371 U.S. 75 (1962). The government must have shown a specific pan to conceal; it cannot be enough that the scheme included a general desire not to get caught. The government was required to prove, at a minimum, that the already conceived scheme included a specific plan for evading detection. *Tanke*, 743 F.3d at 1303. The mailing must be incident to the execution of the scheme and not part of an after-the-fact transaction that, although foreseeable, was not in furtherance of the defendant's fraudulent scheme. *Lazarenko*, 564 F.3d at 1037. This statue is inherently

broad, and the governments interpretation of what constitutes lulling would take it too far. *Id*. at 1037; *Tanke*, 743 F.3d at 1304.

Two mailings exist in this case, one pertaining to Ms. Willson and one for Ms. Hill. In the case of Ms. Hill, she drafted a check, signed Harbour's name to it, and sent it to keep her IRA account open. The government has not put forth evidence where a reasonable juror, viewing the evidence in favor of the government, could find that the check related to Ms. Hill had anything to do with a lulling activity. As for Ms. Willson, her check was a scheduled interest payment that was never mailed by Harbour; it was picked up from the office by Ms. Willson then mailed by her to a trust company. The government failed to provide any evidence on the effect the check had on Ms. Willson, or Ms. Hill, sufficient to prove lulling.

**D.     Allision Wilson, Count 11, Mail Fraud**

**1.     Misrepresentations**

The government cites a 'misrepresentation' that "Harbour took positions that Willson disagreed with based on her conversations with Harbour." This is not a misrepresentation: it is a disagreement in classification between Willson and Harbour.

**2.     Omissions**

Here, the government argues that, as with all other investors, Willson was not informed about the fraud complaints, FTC injunction, seizure of assets, etc. As with the other instances of this argument, it is not relevant. Willson invested *before* the seizure of assets, FTC injunction, etc. Harbour could not have possibly omitted something that did not exist at the time. As for the fraud complaints, again, the number of complaints did not

give rise to a duty to disclose them to investors. The government failed to produce any evidence that the investors should have known that information; they failed to establish a duty for Harbour to revel that information nor prove that the complaints were even valid to the point where an investor would be influenced by them.

### 3. Circumstances Surrounding the Investment

Harbour appeared successful because he was successful. The evidence shows that the investors he claimed to have really had invested with him. Any conduct pertaining to Susie Alofs discussed by the government in the section is completely unrelated to Willson; the government does not allege Alofs complaints were passed to Willson. Willson mailing her check to Liberty Trust cannot be construed to be in furtherance of the fraud scheme. Willson received a scheduled payment that was picked up in person. Even assuming the government met their burden regarding proving a scheme, it is not enough that the check was eventually mailed. The government was required to show that Harbour caused the check to be mailed and failed to do so. *See Pereira v. United States*, 347 U.S. 1, 9, 74 S. Ct. 358, 363, 98 L. Ed. 435 (1954).

### E. Carol Hill, Mail Fraud, Count 12:

#### 1. Misrepresentations

The only misrepresentation alleged in the SSI is that Harbour failed to inform Hill of the finder's fee agreement with DNA. That is charged as applying to the $500,000 but the $500,000 is not part of the charges; only the $81,000 is part of the charges (Count 12). As for the $500,000, the Hills, themselves, signed a finder's fee agreement with Harbour so the government's allegation with respect to the $500,000 is false, even though

10

it is also irrelevant.  two allegations contained here are that it was important to Ms. Hill that Harbour was in the same investment and that Harbour told her Mr. Dunsworth would give her a high interest rate. First, the government has not even proven that Ms. Hill's money was received by NorthRock.  It did not see the funds recorded on the NorthRock bank statements.

To the extent that Hill was attracted to loan based upon Harbour's wealth, in November 2012 that wealth was 100% real and, as the evidence showed, was derived from 100% legal sources.

**2.     Omissions**

Ms. Hill worked for Harbour for 9 years and was exposed to his businesses for years prior to that since they worked in the same building. The government now expects this Court to believe the argument that she had no idea what Harbour did.  Moreover, when Hill made her loan to NorthRock (again, the government could not apparently find a record that she had done so), there was no risk associated with payday lending.  As the government's evidence showed, every lender was being paid, like clockwork, as they were supposed to be paid.  Government witnesses have supplied the answer for what broke it all down:  Operation Chokepoint. A force that was as unanticipated as it was illegal. Hill could see the track record for herself and, in fact, that is why she was moved to ask about becoming involved.  Payday lending was a could not miss business until it was not. The risks about which the government thinks she should have been informed had nothing to do with why her $81,000 was lost.

11

**F.     PAIF, Count 3, Wire Fraud**. The government's argument is unavailing. The most the government has proved, all through Laura Purifoy, is that many months after Harbour received the $1.1 million, in which her total involvement was to send an August 10, 2015 email to PAIF's CEO Bob Ferrell, Harbour suggested pen and ink changes to borrowing base spreadsheets that were reviewed and rejected by Stefan Andreev, at Green Circle. That is all there is. Count 3 must be dismissed.

**G.     Transactional Money Laundering**

Only if the underlying wire fraud counts survive the Rule 29(a) motion can the transactional money laundering charges associated with the wire fraud counts that survive go forward. For example, the PAIF wire fraud charge, Count 3, must fail. Therefore, the three money laundering charges for which Count 3 provides the underlying specific unlawful conduct, Counts 21, 22, and 23 must also be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 28th day of February 2023.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2023 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| 1 | Kevin M. Rapp |
| 2 | Kevin.rapp@usdoj.gov |
|   | Coleen Schoch |
| 3 | Coleen.schoch@usdoj.gov |
|   | U.S. Attorney's Office |
| 4 | 40 N. Central Avenue, Suite 1800 |
| 5 | Phoenix, AZ 85004 |
|   | Attorney for Plaintiff |
| 6 | |
| 7 | /s/ Yvonne Canez |
| 8 | |