Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
|---|---|
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION TO CONTINUE RELEASE ON BAIL UNTIL SENTENCING** |
| David Allen Harbour, | |
| Defendant. | |

Defendant David A. Harbour ("Harbour"), by and through undersigned counsel, submits this Motion to Continue Release on Bail until Sentencing.

### BACKGROUND

In January of 2023, this Court permitted the Defendant to be released from custody until the completion of his first trial. Following the conclusion of that trial, the government moved to remand the Defendant to custody; this was denied by the Court, as Mr. Harbour still had two remaining trials. However, the Defendant has recently signed a plea deal on the remaining two trials, resolving all charges brought by the government against Mr. Harbour. It is expected that the plea will be formally entered on Tuesday,

March 7, 2023. Sentencing for the first trial is currently scheduled in June of 2023. It is fully expected that the government will seek to remand Mr. Harbour into custody following the plea deal being entered and accepted by this Court. Respectfully, Mr. Harbour seeks to remain outside of custody under his already incredibly strict bail arrangements.

## **ARGUMENT**

The decision to permit release pending sentencing is wholly fact dependent and is committed to the sound exercise of discretion by the Court.  No statutory impediment to the Court's decision to release Harbour pending sentencing exists here.

18 U.S.C. § 3143 permits the release of a defendant pending sentencing:

"(a)Release or Detention Pending Sentence.

(1)Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence…be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142[1] and is awaiting imposition or execution of sentence be detained unless—

    (A)

        (i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

---

[1] 18 U.S.C. 3142(f)(1)(A), (B), and (C) pertain to: crimes of violence (A), offenses where the sentence is life imprisonment or death (B), and sentences under the Controlled Substances Act carrying a term of imprisonment of 10 years or more (C).  None of these issues are present in this case.

(ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

(B)the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community."

Under the above statute, this Court is permitted to release or keep Mr. Harbour released if it finds by clear and convincing evidence that he is not likely to flee or pose a danger to the community. The Court stated on March 3, 2023, that there was clear and convincing evidence that Mr. Harbour was not a flight risk.

For starters, Mr. Harbour is already free on highly restrictive release conditions to prevent Mr. Harbour from being a flight risk or from posing any danger to the community and, according to the Court's pre-trial services officer, Harbour has met the conditions of his release to the letter and, if anything, has been overcommunicating with the pre-trial services officer.

Courts have released defendants awaiting sentencing. *See United States v. Hinton*, No. 1:20-CR-171, 2021 WL 1345517, at *2 (W.D. Mich. Apr. 12, 2021); *United States v. Lee*, No. 3:19-CR-12-S (5), 2019 WL 4854109, at *5 (N.D. Tex. Oct. 1, 2019); *United States v. Perez*, No. 3:18-CR-128-N (2), 2018 WL 6436439, at *5 (N.D. Tex. Dec. 7, 2018); *United States v. Wilson*, No. 3:15-CR-02838-GPC, 2018 WL 295970, at *2 (S.D. Cal. Jan. 4, 2018)[2].  Notably a case in the Ninth Circuit, Elizabeth Holmes is still free on $500,000 bail long after her lengthy sentence was imposed, and allowed to self-report

---

[2] Defendant does observe that some of these cases also deal with "exceptional circumstances." However, this Court need not analyze exceptional circumstances, as it is not applicable here.

with the Court still having under advisement her motion to remain free while she appeals her conviction and sentence. *See*, *United States v. Holmes*, 5:18-cr-00258, Doc. 1712, 1-10-2023.

The government has previously relied on *United States v. Gerrans* to argue for Mr. Harbour's detainment. Doc. 674 at p. 2. However, *Gerrans* is distinguishable from the matter at hand. First, the defendant in Gerrans relied upon 'exceptional circumstances' of the COVID-19 pandemic to file his motion; that is not applicable here. *United States v. Gerrans*, No. 18-CR-00310-EMC-1, 2020 WL 1865420, at *2 (N.D. Cal. Apr. 14, 2020). Second, the court found that the defendant was a danger to the community because he had threatened the prosecutor's life and had access to firearms. *Id*. No such threats have been made by Mr. Harbour, and the government has never contended that he poses a threat of violence to the community.

The government also contends that other circuits have held there is no constitutional right to bail pending sentencing and that the law disfavors release pending sentencing. Doc. 674 at pp. 2-3. While Defendant acknowledges the law places a high burden to show that he is not a flight risk nor a danger to the community, 18 U.S.C. § 3143 clearly contemplates a courts authority to determine if a defendant can be released pre-sentencing, and while other jurisdictions may not permit it, the 9th Circuit does.

### Operation Chokepoint Makes this Case Entirely Unique

This case did not begin with any illegality by the Defendant but by what Congress called an unprecedented abuse of power by the Department of Justice. The government did not try to rebut; nor could it have rebutted Dr. Manning's Report or the three

transcripts of Congressional Hearings which provided much of the background for Dr. Manning's findings. Nor did the government try to rebut its own witness's testimony concerning Operation Chokepoint. Lionel Green, Larry Cook, Rich Turasky, and Lisa Burgess all agreed with Dr. Manning and he agreed with the government in Tucker's Superseding Indictment: Operation Chokepoint killed payday lending.

The Department of Justice then prosecuted the Defendant. In so doing, the Department of Justice not only blithely ignored its own prior illegal conduct but went so far as to mock and deride Operation Chokepoint as some sort of fantastical creation. The government did this in, among other places, the Second Superseding Indictment.

In truth and in fact, as a wise voice remarked, but for Operation Chokepoint, this case would not even exist. In June, 2013, Defendant was thriving. He was, legitimately, a very successful participant in the payday loan business that, unbeknownst to him and everyone else in it, the Obama Administration had secretly decided to kill in August 2012.

That such a plan existed was noted, though in a misleading manner, in ¶13 of the Superseding Indictment in Joel Tucker's case. *See*, 4:18-CR-00153-RK, Doc. 17, 5-21-2019.

> 13. On August 1, 2012, President Obama signed a law referred to as Operation Chokepoint, which resulted in banks refusing to make Automated Clearinghouse withdrawals from their customers' bank accounts associated with payday lenders, which greatly reduced the profitability of payday loans. Many payday lenders went out of business after Operation Chokepoint.

In our history, there have certainly been businesses that were outlawed by virtue of Federal law, most prominently the entire liquor industry effective in 1920 under the 18th

Amendment to the Constitutional Amendment, or by Statute, or by Executive Order. We are aware of no other *secret* government plot to destroy a lawful industry in the entire history of the United States.

We are firmly of the opinion that this Defendant was a victim of illegal government conduct and we believe that, under the advisory Guidelines, the illegal nature of the government's conduct can certainly find expression in the sentence to be imposed in this case. How could it be otherwise, if our justice system is, indeed, a system of justice?  Equity is part of justice, as is mercy.

Operation Chokepoint is part of the background of the offense which is required to be considered after the Guidelines calculation ("nature and circumstances of the offense"). How else could a Court to reflect the outrage expressed by Congress in evaluating the political decision to kill a lawful industry? We submit that it would be completely unjust for the Court to fail to consider the nature of the government's conduct and its impact on this Defendant.

But for the government's illegal conduct, there is no reason to believe that Defendant's participation in the benefits of payday lending would have ever ended. There was, after all, no evidence that KSQ received a dime of its revenue from illegal activity. There was no evidence of even a hint of regulatory action.

Meanwhile, with respect to Canyon Road, the government's dragnet of subpoenas produced nine complaints over three-plus years totaling around $1000.

As a result of Operation Chokepoint, not only was Defendant financially ruined but so too were many others severely affected, including Ken Bobrow, whose investors lost about $11.5 million and who lost $4-$5 million personally.

It is significant that the jury rejected bit of the government's case that was prior to the FTC action launched in September 2014. By its acquittals in Counts 11 (Willson) and 12 (Hill), the jury spoke its collective mind, in so far as it could, in rejecting the government's creation of Operation Chokepoint. If the jury had had the ability to speak even more clearly concerning anything and everything pre-Green Circle, the verdicts on Counts 11 and 12 would have simply presaged the jury's condemnation of the government's conduct with respect to Operation Chokepoint.

As of June 2013, Defendant was legitimately receiving about $1 million a month from KSQ (Joel Tucker) and about $200,000 a month from Canyon Road.[3] As of June 2013, every single lender/investor in DNA and NorthRock was receiving payments according to their promissory notes. As of June 2013, every penny received by DNA for lending to KSQ had gone, 100%, to KSQ. The same can be said for the far lesser amounts received by Defendant based upon distributions caused by Harbour's ownership of 67% of the distributable profits of Canyon Road. The government could not and did not prove that any of the money received by the Defendant was tainted in the slightest.

---

[3] Operation Chokepoint had a human cost as well. At least three suicides are directly related to it. Ted Rowland killed himself. So did Blaine Tucker (Joel and Scott's brother) and so did Sam Forseth, who was Del Kimball's partner. Together, Kimball and Forseth owned the payday lending call center used by KSQ.

The failure of the government to prove that any revenues received by Defendant in 2011-2013 were based upon fraud was and remains significant for several reasons all of them pertinent to both the Guidelines calculation and to the post-Guidelines sentencing factors under §3553(a) (discussed below).

This included the (uncharged) Pat and Carol Hill $500,000 loan to DNA in February 2013.  We do not mean to appear flip in the slightest but it is absolutely true that, although Ms. Hill did not know it whilst seated in the gallery on the government's side of the courtroom, it was the government's action in destroying payday lending, and not anything done by Defendant that cost the Hills their $500,000. Had the government not destroyed payday lending, there is absolutely no reason to believe that the Hills would not have been fully repaid. But for Operation Chokepoint, payday lending would have continued.

### Role of the Sentencing Guidelines

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Staten*, 466 F.3d. 708 (9th Cir. 2006). Although Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. Booker, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007).

### Section 3553(a) Considerations

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, see id. § 3553(a)(2); "the kinds of sentences available," id. § 3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, see id. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," id. § 3553(a)(6); and "the need to provide restitution to any victims," id. § 3553(a)(7). See Gall, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

This brings us to the governments' argument of why Mr. Harbour is allegedly a flight risk: his sentencing. The government argues in Doc. 674 that similar fraud cases have received lengthy prison sentences following trial.

- *United States v. Mario Bernadel*, CR-08-00256-PHX-SMM: Here, the defendant engaged in a mortgage fraud involving 32 residences, $10,000,000 in losses, led 7 other co-conspirators in the scheme, had a category II criminal history, and received the conviction in 2009 following the financial collapse caused by similar mortgage fraud issues that decimated the United States financial system. The 17-year sentence imposed is not even remotely similar to the situation of Mr. Harbour. Mr. Harbour's conduct was not part of a nation-wide issue that led to a recession, he did not lead any co-conspirators, does not have a category II criminal history, and the total monetary amount in this case is far below $10 million.

- *United States v. Eitan Maximov*, CR-10-00822-PHX-DGC: The sentencing imposed in this case stemmed from the court's finding that Maximov was clearly an organizer, which triggered the aggravating role sentence enhancement. *Maximov v. USA*, No. CV-14-00636-PHX-DGC, 2015 WL 4745118, at *1 (D. Ariz. Aug. 10, 2015). That enhancer is not applicable to Mr. Harbour and the 8-year sentence imposed in *Maximov* is not an appropriate measure of possible time.

- *U.S. v. Liddle*, CR-10-01725-PHX-SRB: Defendant was convicted on 68 counts in *Liddle* and ordered to pay restation of $25,389,425.00. *See* Case No. 2:10-CR-01725-PHX-SRB Doc. 378. Again, the governments reliance on this as an example for sentencing is not well taken. Mr. Harbour only had 18 counts returned as guilty and a monetary value of the case far below that of *Liddle*.

- *U.S. v. Slade*, CR-09-1492-PHX-ROS: Slade's conviction for a Ponzi scheme with two co-defendants and between $20-$50 million is distinguishable. There are no-

codefendants, thus no possible enhancements for leading a scheme, and the monetary value in *Slade* far exceeds that of Mr. Harbour.

- *U.S. v. Woodard*, CR-10-1721-02-PHX-DLR: Here, the defendant was convicted of 19 counts in total, 18 of which were wire fraud. Mr. Harbour's convictions for wire fraud are fewer in number, which inherently results in less points in the sentencing guidelines.

- *U.S. v. Anderson/Plany*, CR-12-1606-PHX-SRB: This case involved a conviction for mortgage fraud; Mr. Harbour's conviction was not for mortgage fraud. The reason for an extended sentence, argued by Mr. Rapp in front of this very Court, was pursuant to Section 3553(a), which increased their sentence due to the defendant's role in the housing market collapse. The government continuously relies on mortgage fraud sentences stemming from one of the worst financial disasters in American history, which were inherently punished stricter than what is applicable here.

- *U.S. v. Audette*, CR-14-00858-PHX-SPL: Defendant's 20-year conviction was based on ninety (90) counts of wire fraud in a scheme that lasted between the early 1990's and 2003. Mr. Harbour only has 18 counts. Additionally, the 9th Circuit Court of Appeals upheld 80 of those counts and ordered 10 counts to be resentenced. *United States v. Audette*, 923 F.3d 1227, 1230 (9th Cir. 2019).

**Forthcoming Rule 29(a) and Rule 33 Motions – Pre-Green Circle**

Defendant was convicted of wire fraud and transactional money laundering. Turasky was Count 1 and other related counts. Burg was Count 2 and other related

counts.  PAIF was Count 3 and other related Counts. The total "losses" in these Counts is: Turasky - $350,000 (or, alternatively, $500,000).  Burg - $1 million. PAIF - $1.1 million. However, Turasky parlayed his potential loss into a gain based upon the deal he struck with Bobrow. As for PAIF, the evidence is unrebutted that PAIF converted $1.9 million of OakTree's money in the Green Circle bank account as of September 2016 by foreclosing the Green Circle loan portfolio. On a dollar-to-dollar basis, PAIF is $800,000 to the better as a result of its relationship with OakTree.[4]

We anticipate re-urging the Rule 29(a) Motion filed at the end of the government's case and also filing a Rule 33 motion for a new trial.

These will be the salient points with respect to everything pre-Green Circle (2014):

- The Court established two-part tests for the admission of two classes of evidence provided that the government met two stringent tests for their admissibility.

- With respect to evidence of "wealth," the government needed to prove, first, that the 5 "victims" (as opposed to anyone else) were impressed by the Defendant's exhibition of wealth and, second, that the wealth was purchased with funds obtained by fraud.

- Two of these five resulted in verdicts of acquittal. These were the unsophisticated lenders/investors, Willson and Hill.

---

[4]  PAIF went into bankruptcy in the District of New Jersey but did not include the Green Circle portfolio in the filing. Why? Likely because it was profitable. During the bankruptcy, Philip Burgess and Alonzo Primus were sued for racketeering by the U.S. Trustee. *See*, Exhibit 1. Later, Burgess was sued by the SEC. *See*, Exhibit 2. The SEC lawsuit is still ongoing.

- PAIF was the senior lender and there was no evidence at all from PAIF or any member, officer or employee of PAIF.  Harbour never met Burgess nor Primus or anyone else related to PAIF, so "wealth" could not have been a factor with PAIF.

- There was no evidence that Turasky relied upon viewing Harbour's wealth as a precondition for his loan. There was evidence that he was aware that Green Circle was a venture reliant upon Harbour using the sovereignty of Native American organizations to work around State usury laws and Federal Regulation.  Turasky was intimately familiar with Operation Chokepoint and had owned part of a call center business.

- Burg was impressed with Harbour's apparent wealth.

- Only with Burg, did the government meet the first part of the two-part test.

- However, the government failed the second part of the test. That part of the test required the government to prove that the money used by Harbour to "appear" to have wealth had to be the result of money he received fraudulently. There was zero evidence, either directly or circumstantial, that the over $30 million obtained by Mr. Harbour from KSQ and Canyon Road was fraudulently obtained by anyone.

- With the exception of one watch the government showed Harbour bought after June 2013, every other purchase for which the government produced proof, was bought during the height of Harbour's receipt of large amounts of money from completely legitimate sources. Even the jewelry purchased after June 2013 was not tied to any lender/investor funds.

- First, large amounts of money, about $200,000/month, started to be received from Canyon Road in April 2011.

- Then, even larger payments to DNA from KSQ began in October 2011.

- The only evidence received in the case on the subject – from Laura Purifoy and FBI forensic accountant Jeanette Paige – was that all the money received by Harbour through every entity that was supposed to be sent-on to KSQ and Canyon Road was timely sent-on to KSQ and Canyon Road as per the loan agreements.

- Similarly, every lender/investor was being repaid from legitimate businesses on a timely basis according to the provisions of the promissory notes the full amount of the amortized payments called for under the notes.

- Therefore, the inescapable conclusion is that the money that was coming to DNA Investments and the related Harbour entities was not the lender's own money. It was KSQ's money or Canyon Road's money.

- In fact, Ms. Paige, the government's forensic accountant, testified that she did not have access to KSQ's bank accounts and did not know the source of the money that was sent to Mr. Harbour except that she knew KSQ was in the payday lending business.

- The material wealth, houses, cars, jewelry, and golf memberships – except Whisper Rock Golf Club purchased in 2004 - that the Court ruled was relevant evidence was, irrefutably, all purchased while the funds from KSQ and Canyon Road were flowing to DNA and the related Harbour entities.

- The government did not prove that any of those funds were the product of fraud. Ms. Paige stated unequivocally that there was no evidence that any of these payments were fraudulent.

- Consequently, the government failed the two-part test established by the Court for admissibility of evidence of wealth.

- The Court overruled the Defense's mistrial motion without any explanation as to how the government met the test the Court had established.

- The government was also permitted to introduce evidence of "other acts" based upon another two-part test. Here, the government promised the Court that, through experts and <u>bank records</u>, it would establish:

  o That the $2.5 million Bobrow group loan of 2007 was a fraud.  It failed to do so.

  o That the $2.5 million Bobrow group loan was paid-off with proceeds of the Jackson $6 million loan of 2009 and/or the Gray $1 million loan of 2010. It failed to do so.

  o That the Bobrow loan and Jackson loans were paid off with funds obtained by fraud in payday lending, that is, with fraudulent payments from KSQ, Canyon Road or both. Remember, the government told the Court it would provide evidence that the money Mr. Harbour used to pay lenders and acquire the trappings of wealth was from the KSQ-Canyon Road consumer fraud. The government told the Court that KSQ and Canyon Road were one in the same. All wrong. It failed to do any of that.

- The government failed in each element of the proof it asserted it would produce.

- No bank records exist from prior to November 2010,

    o The only November 2010 bank records in existence show a balance of $64,000 as of the beginning of November 2010.

    o What was the wealth that Craig Jackson and Rhonda Gray saw in August 2009 and March 2010?

    o What did Kenny Bobrow see in 2007? Nothing.

    o Carol Hill describing Mr. Harbour skipping down the hall because he had just received Mr. Jackson's money. He got the money in August 2009.

    o Carol Hill started working for Mr. Harbour in November 2010 when the balance in the bank account was $64,000.

- The government failed to show that any proceeds received by Harbour from KSQ or Canyon Road were fraudulent. Joel Tucker's indictment had nothing to do with payday lending and that was the point of ¶13 of the Superseding Indictment. Tucker was indicted for acts unrelated to payday lending.  Among other things, he was indicted for stealing the debt portfolios and selling them.

- The failure of the government to meet the second element of the test established by the Court meant that evidence highly prejudicial to the Defendant under Rule 403 was admitted.

The government's failure of proof should result in both the renewed Rule 29(a) motion and the new trial motions being granted.

**Forthcoming Rule 29(a) and Rule 33 Motions – Green Circle Timeframe**

As we have noted, the jury rejected anything and everything it could reject pre-Green Circle by acquitting the Defendant of Counts 11 and 12. These were the case's only connection with pre-Green Circle activities.

There were three alleged victims with respect to Green Circle.

**PAIF - $1.1 Million**

The easiest to dispatch is PAIF but only if the Court, as it should have done so and as it still should do, mandates that the government adhere to what it claimed the fraud was. With respect to PAIF, the SSI stated:

> 24.    From the beginning of the business arrangement with PAIF, HARBOUR manipulated the records to his advantage in order to entice PAIF to fund the draw requests. The records included a spreadsheet that gave a false impression of the lending portfolio and the status of Green Circle. For example, per the guidelines of funding, customers who were in arrears with the Green Circle payday lending were barred from receiving any new loans. Instead, HARBOUR issued new loans to the borrowers who were about to go into default, which absorbed the old loans. HARBOUR misrepresented to PAIF that Green Circle was a functional and profitable portfolio and that the loans were performing and not in default. PAIF relied on this information for their lending decision and would not have provided funds if the borrowers' loan status was accurately represented. HARBOUR never disclosed to investors that the loans were non-performing.

The only evidence in the case presented by the government was through Laura Purifoy. She testified that, some unknown number of months after OakTree's receipt of $1.1 million, Harbour made pen and ink changes to the borrowing base spreadsheet, that she alerted Stefan Andreev, at Green Circle and that Stefan Andreev agreed that the changes proposed by Harbour should be rejected.

The government never even introduced any evidence that met the allegations of ¶ 24. The only documents introduced with respect to PAIF were drafts of the first borrowing base (for the month after) the month in which the payment was made and which showed that the parties (Green Circle, PAIF, and OakTree) were trying to determine how to best portray the borrowing base. There were four competing versions of how to represent it, with PAIF CEO Bob Ferrell making the final decision in mid-September 2015.

There was a complete failure on the part of the government to prove what it alleged in ¶ 24. No witnesses from PAIF ever testified that PAIF received a fraudulent borrowing base after years from hearing from the government that either Mr. Burgess or Mr. Primus would be the key witness in providing the false borrowing base calculations. The government never provided any actual borrowing base calculations that were supposedly relied upon by PAIF to advance any monies to Green Circle, let alone the $1.1 million. More importantly, Ms. Purifoy admitted not knowing which borrowing bases were marked up and not knowing what happened to them after she sent them to Mr. Andreev except that she stated he also rejected Mr. Harbour's changes. Therefore, how could any rational person surmise that the changed borrowing base calculations ever made it to PAIF without someone from PAIF saying they did? What we do know from Ms. Purifoy, is that Mr. Harbour and Ms. Purifoy did not have the ability to alter the actual customers of Green Circle because they did not have access to the loan management software, which is in direct contradiction to paragraph 24. Finally, Ms.

Purifoy stated she had nothing, zero to do with any documents financial or otherwise with the approval of the $1.1 million from PAIF to Green Circle.

Last, with respect to PAIF, its seizure of $1.9 million of OakTree money in Green Circle's account in September 2016, offset any loss is might be said to have suffered when it fulfilled the $1.1 million draw request on August 11, 2015.

**Turasky - $350,000 or $500,000**

This is what the evidence showed:

- Turasky sent $500,000 to OakTree and received $150,000 back from OakTree the next day.

- Turasky's lawyers drafted the documents.

- The documents gave Harbour authority to use the funds precisely as he used the funds.

- OakTree regarded Turasky as having put in $350,000.

- Turasky testified that Harbour was permitted to use the $350,000 to cover business expenses, provided that, at some point, the entire $350,000 would be used to generate the returns to Turasky that he expected to receive.

- The unrebutted evidence is that Turasky's $350,000 was used, in part, to pay OakTree expenses.

- Ms. Paige's and Ms. Cameron's assessments may be viewed harmoniously and doing so reaches the same result.

- Eventually, Turasky's $350,000 all reached Green Circle. It formed part of the $1.9 million that PAIF foreclosed.

- Therefore, the jury could not have found that Harbour kept all Turasky's money.

- From the evidence admitted without any objection or any objection being sustained, the jury could only have found that Turasky agreed that Harbour was entitled to use the $350,000 for expenses provided that it eventually reached Green Circle and that is exactly what happened.

- What were the misrepresentations?

- What was the fraud?

- The SSI plead solely that the fraud was Harbour's failure to tell Turasky that he would and could use Turasksy's $350,000 for expenses.

- If the government is relying on material omissions to support the alleged fraud, they are not pleaded anywhere in the SSI.

- The SSI did not plead any omissions of material facts which, had they been known to Turasky, would have led him to reject the infusion of the $350,000.

### Burg - $1 Million

- Like Turasky, Burg's lawyers drafted the operative documents.

- Like Turasky, Burg and Avedon also testified that Harbour could use the $1 million to pay expenses provided that eventually the $1 million would be put into Green Circle to generate returns.

- This is precisely what occurred.

- Burg's $1 million was in Green Circle's account when PAIF seized the account in September 2016.

- From the evidence admitted without any objection or any objection being sustained, the jury could only have found that Burg agreed that Harbour was entitled to use the $1 million for expenses provided that it eventually reached Green Circle and that is exactly what happened.

- What were the misrepresentations?

- What was the fraud?

- The SSI plead solely that the fraud was Harbour's failure to tell Burg that he would and could use Burg's $1 million for expenses.

- If the government is relying on material omissions to support the alleged fraud, they are not pleaded anywhere in the SSI.

- The SSI did not plead any omissions of material facts which, had they been known to Burg would have led him to reject the infusion of the $1 million.

**AMG Capital Management v. FTC**

Since it was unrebutted that with respect to both Turasky and Burg, the oral testimony of both coupled with the documents their lawyers drafted gave Defendant the right to use their money for business expenses and since the evidence was also unrebutted that he did use the money, in part, for business expenses, the existing basis upon which the jury might have found Harbour guilty of defrauding Turasky and Burg was the failure to disclose the nine consumer complaints out of 1.4 million consumer loan files and/or FTC investigation.

*AMG Capital Management, LLC v. Federal Trade Commission*, 141 S.Ct. 1341 (2021), outlawed the FTC's use of Section 13(b) of the Act. Therefore, a second example

of governmental overreach against Harbour was the FTC action which, one may speculate, must have been the *raison d'etre* for the convictions in Counts 1 and 2 and the other wire fraud and transactional money laundering charges associated with them if only because there was no doubt that Harbour used the funds precisely as the documents drafted by Turasky's and Burg's lawyers drafted them.

We think is ironic that what Harbour, arguably, should have disclosed was what ultimately determined by the United States Supreme Court to have been an illegal use of government power. We also think that this irony may play a role in the sentence that will be imposed. As with Operation Chokepoint, the drafters of the Guidelines clearly did not take into consideration in drafting the Guidelines, illegal governmental conduct.

### Effect of Cumulative Errors and Government Failure of Proof

Respectfully, there are serious errors in this case. These included the entire gamut of evidence permitted by the Court to be introduced over continuing defense objections. The so-called Spaulding Fraud, the Craig Jackson loans, the Rhonda Gray loan, the Bob Eckholt forgery allegations (recall that Rhonda Gary claimed she saw Eckholt sign the engagement), the Wendi Yaeger American Express Card allegations,[5] and 100% of the evidence of wealth were completely extraneous to the charges in the SSI.

---

[5] According to Ms. Paige, Wendi Yaeger spent an average of $1500/month for over 10 years on the American Express card, which comes out to $180,000 tax free dollars. In addition, she got the benefit of the points which, given the level of spending on the card, were enormous. She took full, complete, and, as she stated, grateful advantage of the payments and of the points. Had OakTree not failed due to PAIF's foreclosure, there is no reason to believe that this second iteration of payday lending (through a Native American Tribal Organization) would have failed. Had the illegal Operation Chokepoint not been sprung upon the lawful payday loan industry, there is not reason to believe that

All of these tremendously prejudicial and extraneous allegations occurred long before the 2014 advent of Green Circle. In between this highly prejudicial evidence was the phenomenal legal success of the first iteration of payday lending. That success drew a solid and bright line between everything that had come before. Payday lending was legal and the government was unable to show that any of the $30 million in receipts by DNA and the other Harbour entities over the period between April 2011 and when Operation Chokepoint became effective in about June 2013 was fraudulently received.

The government's invitation to the Court to allow all this extraneous evidence was, unfortunately, successful and a direct result of it was that Harbour, who planned to testify, could no longer think of doing so. This had an enormous effect on his ability to talk about Green Circle.

And, as it turned out, the only thing of importance in the SSI, that is the only thing that needed more defense than Harbour was able to provide was Green Circle. It was not Green Circle that, standing alone, prevented Harbour from testifying. What kept him off the stand was the government's threat of the areas of cross-examination. Verily, there was nothing about Green Circle that, standing alone, would have precluded him from testifying.[6]

The cumulative effect of the government having provoked the Court into committing reversable error, should the Court not address and correct the errors, is that

_this case would have existed or that Ms. Yaeger, Ms. Willson, or Ms. Hill would have lost anything. Neither would Pat Hill or Dan Willson lost anything._

[6] The jury knew that the FTC action against Harbour had been determined to be illegal because of the FTC's use of Section 13(b) of the Act.

Harbour's rights to a fair trial were severely impacted. This will lead him, of course, to seek his freedom on bail to pursue an appeal in the event that the post-trial motions are denied.  We sincerely believe that the slightly higher burden required to be eligible for bail on an appeal exist in the same facts that support release pending sentencing.

Finally, with respect to this section of the Motion, we return to what makes this motion so different than every other such motion ever filed and that is the conduct of the Department of Justice and its minions to destroy our client's business and the FTC's illegal use of Section 13(b) to try to secure disgorgement from Mr. Harbour (an effort it abandoned). Had the Congress enacted legislation signed by the President that outlawed payday lending (and, these days, had a suit to block the statute's enforcement failed), Defendant would be out-of-luck. But, there was no statute; there was only an abuse of law by the Department of Justice. That was later compounded by the FTC's reliance on Section 13(b).

Not only are these factors that may be considered after the Guideline calculations are arrived at but we think it could be rightfully be contended that these unique circumstance overarch the Guidelines altogether. We do not believe that the government's own illegal conduct was taken into account by the drafters of the Guidelines. The Government's illegal conduct ruined David Harbour's life.

If we incarcerate people in order that those convicted pay a price to the people, represented in the form of our government, what does the government rightfully deserve here? The government cannot be incarcerated in order to vindicate the rights of the people upon whose rights it tramples, upon whose fortunes its illegalities are visited.

Respectfully, we believe that, if the Court does not reverse its own government-induced errors, a reviewing court will do so and that, eventually, release on appeal bail may well be granted.

Defense counsel needs Mr. Harbour's involvement in moving forward with the Rule 29(a), Forfeiture and Rule 33 motions and, if they are unsuccessful, with sentencing. This will be Mr. Harbour's only chance to tell the Court his story without the threat of cross-examination on extraneous subjects, that is he will describe his mental state and intent following Operation Chokepoint and what led to Green Circle. He will enlighten the Court to his interactions with Mr. Turasky, Mr. Burg and PAIF. All the things he intended to do at trial. I believe the Court realized the trepidation Mr. Harbour showed when the Court asked Mr. Harbour if he intended to testify and could gleam that he did in fact want to tell the Court and the jury all about Green Circle. Mr. Harbour cannot prepare or assist defense counsel if he is in confinement, and we ask the Court to consider these reasons in addition to the report of pre-trial services in allowing his release pending sentencing.

RESPECTFULLY SUBMITTED this 6th day of March 2023.

CHRISTIAN DICHTER & SLUGA, P.C.


By: /s/ Stephen M. Dichter
     Stephen M. Dichter
     Justin R. Vanderveer
     2800 North Central Avenue, Suite 860
     Phoenix, Arizona 85004
     Attorneys for Defendant David A. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2023 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez