# EXHIBIT 1

WOLLMUTH MAHER & DEUTSCH LLP
51 JFK Parkway
First Floor West
Short Hills, New Jersey 07078
 - and -
500 Fifth Avenue
New York, New York 10110
Tel: (212) 382-3300
Fax: (212) 382-0050

*Counsel for Matthew Cantor, Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Case No: 18-14603 (MBK) |
| | : | |
| PRINCETON ALTERNATIVE INCOME FUND, | : | Chapter 11 |
| LP, *et al.*, | : | |
| | : | |
| Debtors.[1] | : | |

------------------------------------------------------------x

| | | |
|---|---|---|
| MATTHEW CANTOR, solely in his capacity | : | |
| as Chapter 11 Trustee for Debtors Princeton | : | **ADVERSARY COMPLAINT** |
| Alternative Income Fund, LP, and Princeton | : | |
| Alternative Funding, LLC f/k/a MicroBilt | : | Adv. Proc. No. |
| Capital Funding, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PHILIP N. BURGESS, JR., MICROBILT | : | |
| CORPORATION, MICROBILT FINANCIAL | : | |
| SERVICES CORPORATION, ROSEBUD | : | |
| MANAGEMENT LLC, ALONZO J. PRIMUS, | : | |
| LJP CONSULTING LLC, WALTER | : | |
| WOJCIECHOWSKI, JOHN "JACK" COOK, | : | |
| and PRINCETON ALTERNATIVE FUNDING | : | |
| MANAGEMENT LLC, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------x

---

[1] The Debtors are Princeton Alternative Income Fund, LP ("PAIF") and Princeton Alternative Funding, LLC ("PAF").

Plaintiff, Matthew Cantor, solely in his capacity as Chapter 11 Trustee (the "Trustee") for

the Debtors, by and through his counsel, Wollmuth Maher & Deutsch LLP, as and for his

complaint (the "Complaint") in this Adversary Proceeding alleges as follows:

<u>Nature of the Action</u>

1.      This is an action for civil violations of New Jersey's Racketeer Influenced and

Corrupt Organization Act, N.J. Stat. Ann. § 2C:41-1 *et seq.* ("NJ RICO"), fraudulent

conveyances, common law breach of fiduciary duty, aiding and abetting breaches of fiduciary

duty, causing the Debtors to breach their fiduciary duties to investors, as well as for breaches of

contract and declaratory judgments that certain contractual and indemnification provisions

purporting to bind the Debtors are unenforceable and void.  Defendants owed fiduciary duties to

the Debtors, by virtue of their status as officers, partners, managers or agents of the Debtors.

Defendants misappropriated Debtors' funds, caused Debtors to incur liabilities, and caused

Debtors to lend money to third-parties, with whom Defendants had conflicting, self-interested

economic relationships on unreasonable terms and with the intent and effect of profiting at the

Debtors' expense.  In so doing, they caused the Debtors to breach their fiduciary and contractual

duties to direct and indirect investors in PAIF.  Defendants' fiduciary breaches and aiding and

abetting in such breaches were made in bad faith and/or through fraud, willful misconduct and

gross negligence.  Defendant MicroBilt Corporation ("MicroBilt") also directly contracted with

Debtors to provide them with data studies, analyses and monitoring services for loans to and

collateral of Debtors' third-party borrowers, but MicroBilt immediately and continually breached

the contract.  Defendants caused the Debtors to incur obligations to MicroBilt, and to pay monies

to MicroBilt and the incurrence of such obligations, and their payment, were intentionally and

constructively fraudulent.  Certain of the Defendants are liable as immediate or mediate

transferees of the avoidable transfers made to Defendant MicroBilt. Plaintiff seeks treble

damages, restitution and disgorgement on behalf of the Debtors, avoidance of fraudulent billings

and transfers and declarations that Defendants are not entitled to any indemnification from either

Debtor under any applicable law, operating agreements or contract under which Defendants have

claimed.

<u>Jurisdiction and Venue</u>

2.      This is a core proceeding by the Debtors against a group of insiders of the

Debtors, and their co-conspirators, under 28 U.S.C. § 157(b)(2)(b) and (c). It arises in the

Debtors' above-captioned jointly-administered Chapter 11 case. This Complaint is filed in the

nature of a counterclaim to proofs of claim filed by each of the Defendants in the Debtors'

Chapter 11 cases, and is brought in conjunction with objections the Trustee has also filed to such

proofs of claim. This Court also has jurisdiction pursuant to 28 U.S.C. § 1334(b) and venue is

proper in this Court pursuant to 28 U.S.C. § 1409(a). This Court has personal jurisdiction over

each of the Defendants because they all reside or do business in the United States.

<u>Parties and Significant Non-Parties</u>

3.      The Trustee was appointed Chapter 11 Trustee of the Debtors pursuant to orders

of this Court entered on November 7, 2018 and November 15, 2018, and is duly qualified and

acting.

4.      Debtor PAIF is a limited partnership formed under the laws of the State of

Delaware. Defendants Walter Wojciechowski ("Wojciechowski"), Philip N. Burgess, Jr.

("Burgess"), MicroBilt, Alonzo J. Primus ("Primus") and others organized PAIF and sold its

limited partnership interests directly or indirectly to investors pursuant to a private placement

memorandum (the "PPM"). The stated objective of PAIF was profitably to lend the money

2

raised through the sale of its limited partnership interests (including sales to the Feeder Fund, as defined herein) to third-party lenders that, in turn, made risky, short-term, high-interest loans to consumers unable to access credit from traditional lending sources. Defendants caused PAIF to acquire credit facilities originated by others, including by certain of the Defendants, and to extend credit to the third-party consumer lenders. PAIF obtained security interests in the loans that the consumer lenders made to end user borrowers and in substantially all the other assets of the consumer lenders. Defendants identified in the PPM, including Primus, MicroBilt and Wojciechowski, held themselves out to potential Limited Partners[2] in PAIF and to investors in the Feeder Fund as knowledgeable about which consumer lenders would make the most appropriate borrowers from PAIF, and as having proprietary software and data that would allow PAIF to monitor its loans to the consumer lenders on a real-time basis as those consumer lenders, in turn, made the funds available and serviced the loans to consumers and/or the consumers defaulted on their loans.

5.      Princeton Alternative Funding, LLC was a limited liability company formed in 2014 ("Old PAF") under the laws of the State of Delaware and was the General Partner[3] of PAIF, as defined in the PAIF Agreement, defined below, from the latter's formation until February 26, 2016. Effective February 26, 2016, certain Defendants caused Old PAF to be merged into another, then newly-formed Delaware limited liability company completely under their control named MicroBilt Capital Funding, LLC, which was the "Surviving Entity" in the merger. MicroBilt Capital Funding LLC simultaneously amended its name to Princeton

---

[2] As defined in the PAIF Agreement.

[3] As defined in the PPM.

3

Alternative Funding, LLC ("New PAF" or "Debtor").[4]  New PAF was the General Partner of

PAIF from February 26, 2016 until being improperly and temporarily removed in favor of

Defendant Princeton Alternative Funding Management LLC ("PAFM") shortly after the petition

date of March 9, 2018 (the "Petition Date").  By this Court's February 23, 2019 order, New PAF

has been reappointed as General Partner of PAIF *nunc pro tunc* to the Petition Date.

6.      Defendant Burgess is an individual who resides and maintains a place of business

in the United States.  On information and belief, affiliates of Burgess own a controlling equity

interest in MicroBilt, and Burgess is deeply and intimately involved in MicroBilt's operations.

On information and belief, Burgess does not serve as an officer of MicroBilt.  However, he was

designated by a company with which he is affiliated, known as AFAB International Ltd., as a

"consultant" to MicroBilt, and was, in turn, assigned by MicroBilt as a consultant to Debtors

under the "MicroBilt Services Agreement" (the "Services Agreement").  At all relevant times

prior to the appointment of the Trustee, Burgess acted as an agent of both Debtors and owed

them fiduciary duties.  On information and belief, Burgess is an insider of the Debtors.  Burgess

also owns or controls entities that originated loans that were sold and assigned to PAIF, and

which, in self-interested breaches of Burgess' fiduciary duties to Debtors, obtained "origination,"

"referral" or other fees in connection with such loans.  These Burgess-controlled entities include

Westminster National Capital Co., Inc. ("Westminster"), AFAB International Ltd. and Bristol

Investments Ltd. (collectively, the "Burgess Entities").

7.      Defendant MicroBilt is a Delaware corporation with its principal place of

business in the United States.  According to its website, MicroBilt is a "pioneer in the now

exploding alternative credit data space" and offers short-term lenders data, software and

---

[4] New PAF and Old PAF are sometimes jointly referred to herein as "PAF."

analytics to assist in lending decisions, loan monitoring and servicing and default recovery with

respect to consumer borrowers with sub-prime credit.  On or about December 23, 2014,

MicroBilt contracted with Old PAF to provide services to the latter in its capacity as General

Partner of PAIF, through a "Services Agreement" which described MicroBilt as at least a 40%

"shareholder" in Old PAF.  On information and belief, MicroBilt exercised control over the

Debtors by virtue of its control over PAF.  MicroBilt was therefore an insider of both Old (and

New) PAF, and also acted as an agent of PAF and PAIF.  MicroBilt owed the Debtors fiduciary

duties.  As detailed herein, Defendant MicroBilt not only breached its fiduciary duties to

Debtors, but it also immediately and continually breached the Services Agreement and is liable

to the Debtors for, among other things, restitution of monies that MicroBilt improperly caused

Old PAF, New PAF and PAIF to pay to it under the contract, as well as damages to those entities

proximately caused by MicroBilt's breaches of the contract.  MicroBilt also participated in an

"enterprise" under NJ RICO with Defendants Wojciechowski, Burgess and others, as described

below, and is liable for the damages resulting therefrom.  MicroBilt received transfers from the

Debtors avoidable under sections 544 and 548 of title 11 of the United States Code, 11 U.S.C.

§§101-1532, as amended from time to time (the "Bankruptcy Code") and the New Jersey

Uniform Fraudulent Transfer Act.  MicroBilt should also be ordered to disgorge funds that it

received from or through PAIF's borrowers, and vendors to those borrowers, as fruits of its

wrongful acts.  The Services Agreement also contains several unconscionable terms which,

whether MicroBilt breached the Services Agreement or not, should be declared to be

unenforceable and void as a matter of public policy.  Those provisions include an

unconscionably broad indemnification provision, and another provision that purports to make the

Services Agreement non-terminable by Old PAF or New PAF.

5

8.      Defendant MicroBilt Financial Services Corporation ("MicroBilt Financial") is a
Delaware corporation with a principal place of business in the United States.  MicroBilt
Financial is a direct or indirect subsidiary of MicroBilt.  MicroBilt Financial is an insider of the
Debtors as a managing member of Old PAF and New PAF holding more than 20% of the
outstanding voting securities of each.  MicroBilt Financial owed both Debtors fiduciary duties.

9.      Defendant Rosebud Management LLC ("Rosebud Management") is a Delaware
limited liability company with its principal place of business in the United States.  On
information and belief, Rosebud Management is controlled by Defendant MicroBilt Financial
and is thus indirectly controlled by Defendant MicroBilt.  Rosebud Management operated
several credit lines nominally affiliated with the Rosebud Sioux Tribe of Native Americans.

10.      Defendant LJP Consulting LLC ("LJP") is a limited liability company that on
information and belief is owned or controlled by Defendant Alonzo J. Primus.  Both LJP and
Primus are residents of and do business in the United States.  LJP was a Member of New PAF
and is an insider of the Debtors to whom it owes fiduciary duties.

11.      Defendant Primus is an individual who resides in the United States.  Primus was
PAIF's Chief Credit Officer from its formation.  Primus was a Member of Old PAF, PAIF's first
General Partner, in his individual capacity, and he controls Defendant LJP, which became one of
the two managing members of New PAF.  Primus is an insider of the Debtors, to whom he owed
fiduciary duties.

12.      Primus directly or indirectly owns at least 50% of several other companies,
including HP Funding LLC, HP Funding II LLC, RAP Funding LLC, Learn2Comply LLC
("LTC") and VP Compliance Services LLC ("VPCS") (collectively with LJP, the "Primus
Entities"), that billed, and were paid, hundreds of thousands of dollars by consumer lenders

6

nominally affiliated with a Native American tribe, including, but not limited to, those Rosebud

Management-operated tribal credit lines to which Defendants caused PAIF to lend.

13.     Defendant Wojciechowski is an individual who, upon information and belief,

resides in New Jersey.  Wojciechowski is the President and Chief Executive Officer and, upon

information and belief, is a director of Defendant MicroBilt.  Wojciechowski was Chief

Financial Officer of PAIF from its inception until the present and acted as PAIF's Chief

Executive Officer from January to March 2016, and is an insider of the Debtors to whom he

owed fiduciary duties.

14.     Defendant John "Jack" Cook ("Cook") is a resident of the United States and at all

times relevant hereto served as an officer and insider of the Debtor PAIF to whom he owed

fiduciary duties.  Cook is also the Chief Executive Officer of Defendant PAFM.

15.     Defendant PAFM is a limited liability company formed under the laws of the

State of Delaware.  Defendant MicroBilt Financial is a Managing Member of PAFM with an

86% membership interest.  On or about the Petition Date, Defendants improperly substituted

PAFM for Debtor New PAF so that PAFM and its members could control the Debtors during

this bankruptcy, and reap the benefits that accrued to the General Partner of PAIF.  By this

Court's February 13, 2019 order, PAFM was removed as PAIF's General Partner *nunc pro tunc*

to the Petition Date.  Plaintiff seeks to recover from PAFM the amounts it was wrongfully paid

by PAIF in General Partner compensation, plus interest, and to disallow and/or subordinate all

amounts which PAFM has purported to charge PAIF in PAFM's capacity as General Partner

which remain unpaid.

16.     Non-party Robert Farrell ("Farrell") was a Managing Member and President of

Old PAF.  Upon information and belief, Farrell had no business relationships with any of the

7

credit lines to which PAIF prospectively or actually lent money outside of his role at Old PAF and Farrell was not suffering from a disabling conflict of interest in the discharge of his fiduciary duties, compared to Defendants, in making business decisions on behalf of PAIF concerning prospective or actual loans to such credit lines. In furtherance of Defendants' breaches of fiduciary duties and contract, Defendants, in late 2015 and early 2016, stripped Farrell of any operational role at Old PAF, and thus at PAIF, and merged Old PAF into New PAF in which Farrell was not a Managing Member, and thereby forced Farrell out of his positions with the Debtors.

17.    Non-party Ranger Alternative Management L.P. ("Ranger Management") is a registered investment advisor and manager within the Ranger Capital Group, a multi-faceted investment company. Most relevant to this matter, Ranger Management managed the investments of a domestic affiliate, Ranger Specialty Income Fund, L.P., ("Ranger Domestic") and an offshore affiliate, Ranger Direct Lending Fund Trust ("Ranger Offshore") in PAIF.[5] Between March 2015 and February 2016 Ranger Domestic invested $5.75 million directly in PAIF as a Limited Partner. Between May 2015 and January 2016, Ranger Offshore invested $55.1 million in Princeton Alternative Income Offshore Fund, Ltd. ("PAIOF" or the "Feeder Fund"), a British Virgin Islands company created by certain of Defendants to facilitate offshore investments in PAIF (*i.e.*, a "feeder fund" to PAIF). All Ranger Offshore capital contributed to PAIOF, net of expenses, was invested in PAIF and used as a part of the capital that PAIF used to make loans to the consumer lenders.

18.    Defendants' NJ RICO violations, breaches of fiduciary duty, their aiding and abetting in such breaches, the fraudulent transfers to Defendants, and MicroBilt's breaches of its

---

[5] Unless specificity is needed or desirable, Plaintiff will hereafter refer to Ranger Management, Ranger Domestic and Ranger Offshore individually and collectively simply as "Ranger."

contract obligations owed to and improper and fraudulent billing of Debtors, caused the Debtors

to be unable to fulfill a redemption demand by Ranger of its investments in PAIF and PAIOF, as

well as similar demands of other Limited Partners of PAIF and investors in PAIOF, thereby

exposing Debtors to liability to Ranger and those other Limited Partners/investors.  During

arbitration in July 2018, Ranger obtained a "Partial Final Award" (the "Award") against New

PAF and PAIF for $30.7 million plus 99 percent of the distributions attributable to the Argon

Side Pocket (defined below) plus pre-judgment interest thereon.  The Award also determined that

the Debtors breached their fiduciary duty to Ranger.

19.    With the possible exception of Defendant Rosebud Management, each and all of

the Defendants were officers, partners, managers and/or agents of the Debtors (collectively, the

"Insider Defendants"), and owed the Debtors fiduciary duties of care, loyalty, good faith and

honesty, including the obligation to act for the Debtors' benefit and in Debtors' best interests.

The Insider Defendants breached their fiduciary duties and Defendant Rosebud Management

aided and abetted therein by, among other things:  (1) causing the Debtors to breach their

contractual and fiduciary obligations, (2) causing the Debtors to incur and pay obligations to

MicroBilt instead of winding down the fund and paying the Ranger redemption demand, (3)

causing the Debtors to incur and pay obligations to the Burgess Entities, the Primus Entities and

others that were not in the best interests of the Debtors, (4) causing the Debtor PAF to enter into

and continue the Services Agreement, and overcharging the Debtors for services thereunder, (5)

causing the Debtor PAIF to acquire unsound and risky investments, including the Bristlecone

Loans, the Argon Loans and the Tribal Loans (as defined below) that were inadequately and

grossly negligently or recklessly structured, in order to benefit Defendants personally from the

payment of fees and the opportunity to obtain additional revenue from the consumer lenders, (6)

9

committing waste with respect to the assets of PAIF, including by making payments and

investments that were excessively risky, unauthorized or inappropriate, and (7) before and after

the Chapter 11 case by preferring the interests of MicroBilt, and the other Insider Defendants

over the interests of the Debtors.

20.    During the Chapter 11 case Defendants MicroBilt and Wojciechowski caused the

filing of Proof of Claim Number 8-1 by MicroBilt against PAIF for an amount in excess of $4

million.  Despite numerous requests by the Trustee that the claimant provide the invoices to

PAIF to support such claim, Defendants failed and refused to provide such documentation.  By

email dated May 31, 2019, the Trustee demanded that MicroBilt withdraw the unsupported proof

of claim, as violative of Bankruptcy Rule 9011, and warned that, if it did not, the Trustee would

seek sanctions against the persons responsible for its filing.  To date MicroBilt has not

withdrawn the undocumented claim.

Factual Background

21.    PAIF's first General Partner, Old PAF, was formed on or about August 29, 2014.

PAIF itself was formed on or about November 3, 2014.  In a PPM, Old PAF solicited

investments in limited partnership interests in PAIF.  The PPM identified PAIF as the "Fund"

and described its investment objective and strategy as linked to a contract with MicroBilt.  The

PPM states as follows:

> The Fund intends to invest substantially all of its assets into organizations which
> will originate loans in the alternative marketspace.  The Fund's investment
> objective is to provide investors consistent, risk-adjusted returns through direct
> loans to non-bank lenders operating in the alternative marketspace. The Fund will
> retain MicroBilt Corporation ("Microbilt") and employ its proprietary evaluation
> models to identify, analyze and monitor those lenders in real time.

PPM at 1.  An investor presentation slide deck created at the same time as the PPM similarly

described "The Process" for PAIF's investments as involving:  (i) screening "4000 Microbilt

10

customers" for "best in class" credit line operators as potential borrowers, (ii) analyzing the

operators' "historical lending performance for predictive returns," (iii) using "extensive

background data" supplied by MicroBilt to make lending decisions, and (iv) after extending

funds to approved operators, using "MicroBilt live data feeds [to] bring real time monitoring

capabilities to our portfolio."

22.     According to the PPM, PAIF would hold revolving notes made by the consumer

lenders upon which the latter could repeatedly draw and pay down as they made consumer loans

and the consumers paid the lines back.  The consumer lenders would be contractually required to

build reserves against defaults on their loans by the consumer borrowers and would be limited in

their ability to continue to draw down on the revolver if, as and when consumer borrowers

became delinquent on their loans.  The PPM contemplated that the PAIF revolvers would charge

the credit lines interest of approximately 20% per annum and that, after expenses, including

management fees paid to PAIF's General Partner and administrative costs, PAIF would generate

substantial returns for its Limited Partners.  The intent of all transactions in which PAIF became

a lender was that the credit facility would be structured so that PAIF held a first priority secured

claim against the assets of its borrower.

23.     The PPM further explained that Old PAF, as General Partner of PAIF, would be

"responsible for the affairs of the Fund and the management of the Fund's portfolio."  PPM at 2.

It identified non-party Farrell as "President and Co-founder" of Old PAF, another non-party,

Bert Szostak ("Szostak"), as Old PAF's "Managing Partner and Co-founder" and Defendant

Primus as a third "Managing Partner" of Old PAF.  *Id.*

24.     Defendants did not allow the disinterested members of Old PAF any meaningful

say in the management of PAIF in the areas where the Defendants were suffering from conflicts

11

of interest.  Defendants MicroBilt, Burgess and Wojciechowski together with Defendant Primus,
operated PAF and PAIF in their own self-interest (and that of the other Defendant entities in
which they were financially interested) and adversely to the interests of PAF and PAIF.

25.    On or about December 23, 2014, Defendants caused Old PAF to execute the
Services Agreement with MicroBilt, retroactively effective as of October 1, 2014.  In addition to
providing Old PAF with office space, computers and internet and telephone access at $8,000-
$10,000 per month, MicroBilt was to provide Old PAF with "Data Studies, Analysis and
Monitoring" (billed at hourly rates) of the type represented in the PPM:  that is, "proprietary
evaluation models to identify, analyze and monitor [the third-party] lenders in real time" who
were obligated to PAIF under the revolving notes and who, in turn, would make the consumer
loans that would generate returns on PAIF's investment.  In addition to causing the Debtor to
enter into the Services Agreement, the individual Defendants caused PAF and PAIF to be
entirely dependent on MicroBilt for all essential services, including maintenance of their books
and records.  In doing so, the Defendants breached their fiduciary duties to the Debtors by
entrenchment of MicroBilt in a position that was adverse to the Debtors' best interests, and
which was designed to allow MicroBilt and the Defendants to profit personally from the
perpetuation of such position.

26.    MicroBilt soon after breached the Services Agreement with Old PAF.  It
overbilled Old PAF for the office space, equipment and utilities.  As far as "analytics" are
concerned, MicroBilt's main service during the 2015 period was to provide credit checks on
proposed individual consumer borrowers when the PAIF-funded lenders asked for access to their
respective revolvers.  MicroBilt provided virtually no meaningful or valuable proprietary data
studies or analyses to Old PAF's President, Farrell, to identify and rank in terms of past

experience the credit lines themselves with whom PAIF might enter into revolving credit
arrangements.  Rather, Defendants caused PAIF to lend to entities that they themselves managed
and/or that generated side-payments and kickbacks to Defendants' business interests outside of
PAIF and its General Partner, Old PAF.  MicroBilt further breached in 2015 by failing to provide
PAIF or Old PAF with proprietary studies or analyses to monitor in real-time the performance
(or delinquencies and defaults) in the portfolios of loans made by the third-parties to consumers
that were PAIF's collateral once the third-party credit lines had drawn down on their PAIF-
funded revolvers.  Instead of live reporting, the Debtors received only once-a-month snapshots of
the loan portfolios from their borrowers.  In 2016, when PAIF's borrowers had fully drawn down
on their revolvers from PAIF (and there were, therefore, decreasing numbers of new consumer
borrower applicants on whom MicroBilt needed to run credit checks), MicroBilt's invoices for
analytics falsely showed increased hours compared to the 2015 period.  In short, MicroBilt billed
PAIF, Old PAF (and, later, New PAF) and caused them to pay MicroBilt for fictitious,
overpriced, non-conforming and/or unnecessary services.

27.     After the appointment of the Trustee, (a) MicroBilt further breached the Services
Agreement by failing to accurately and timely respond to the Trustee's request for information,
including by refusing to timely deliver information readily available in the ordinary course, and
(b) the Defendants continued to breach their fiduciary duties to the Debtors (and/or aided in the
breaches) by continually preferring the interests of adverse claimants against the Debtors over
the interests of the Debtors, including by taking positions adverse to the positions advanced by
the Trustee before the Court.

28.     In breaching the Services Agreement, MicroBilt and the other Insider Defendants
also caused Old PAF, New PAF and PAIF itself to breach the above representations in the PPM

13

and investor presentation to Ranger and others about how they would invest Limited Partners'

funds with the third-party lenders—thereby exposing Old PAF, New PAF and PAIF to investor

claims and lawsuits. The Insider Defendants also caused Old PAF, New PAF and PAIF to

breach side letters that they executed, in their capacities as agents of those entities, with Ranger

and to breach Ranger's redemption rights in the PAIF Limited Partnership Agreement, defined

below.

29.     Under the PAIF Limited Partnership Agreement dated as of January 14, 2015 (the

"PAIF Agreement"), all Limited Partners were granted the right to make withdrawals from their

capital accounts upon 180 days prior notice. *See* PAIF Agreement, § 8.02. To induce Ranger to

become the first Limited Partner, Old PAF executed a "side letter" dated March 3, 2015 in which

it agreed (among other things) to "transparency" provisions under which PAF and PAIF would

provide Ranger with advance notice of, and the right to opt-out of, prospective loans to credit

lines (at least with respect to money invested directly in PAIF as opposed to through PAIOF).

As discussed below, PAIF and PAF did not honor the transparency provisions of the side letter

with Ranger and, in 2016, the Insider Defendants (other than PAFM, which was not then yet

formed) caused PAIF to breach Ranger's redemption rights.

30.     Almost immediately after Ranger began investing in PAIF in March 2015,

Defendants began committing PAIF to revolving loans to consumer lenders aimed at offering

short-term, high-risk loans to consumers with deep subprime credit. Old PAF did not give

Ranger advance notice of or the opportunity to opt out of the commitments with the credit lines,

the second of which was with an entity later designated as "Rosebud ZTC" and managed by

Defendant Rosebud Management, a MicroBilt subsidiary. No disinterested fiduciary of PAF or

of PAIF had the benefit of any proprietary MicroBilt data or analyses before the entities made

14

the commitments to the credit lines, nor did either receive any "real-time" monitoring

capabilities through MicroBilt once the consumer lenders began to draw on their revolvers in

2015 and 2016.

31.    MicroBilt, through Rosebud Management, and Primus, through the Primus

Entities, had financial ties to Rosebud ZTC and other "tribal lending entities" affiliated with the

Rosebud Sioux Tribe of Native Americans which conflicted with their duty to make disinterested

lending decisions on behalf of PAIF.  Defendants dealt with the economic development arm of

the Tribe, called the Rosebud Economic Development Corporation or "REDCO" and two of its

subsidiaries, Rosebud Lending and Fintech Financial LLC ("Fintech").[6]

32.    Rosebud Lending was the nominal sponsor not only of Rosebud ZTC, but also of

several of the other consumer lenders to which Defendants ultimately caused PAIF to lend.

However, Rosebud Lending contracted with Rosebud Management, Primus and the Primus

Entities to perform all the operating and back-office functions for the Rosebud Lending-

sponsored credit lines in return for fees and profit splits.  Thus, Defendants were incentivized to

cause PAIF to lend to newly-created Rosebud Lending affiliates to increase their compensation

regardless of whether the lending relationship would be favorable for PAIF.  Rosebud

Management collected over $4 million from REDCO and its subsidiaries over the period 2014-

2017.  One Primus Entity, HP Funding II, invoiced Rosebud Lending over $450,000 in the

period of 2015 through 2018.  Another Primus Entity, Defendant LJP, billed and collected

---

[6] Because short-term, high interest consumer loans have the potential to violate state usury statutes, having a Native American tribe—a sovereign nation—issue and service the loan may provide legal protection under the doctrine of sovereign immunity.  However, when the tribe cedes control over the loans to non-tribal management, such as the Defendants herein, the case for sovereign immunity is weakened and adds additional material legal risk to what is already a very risky consumer lending operation from a legal and business point-of-view.  By causing PAIF to lend to Rosebud Lending affiliates that contracted with Rosebud Management and the Primus Entities, Defendants not only enriched themselves at PAIF's expense, but they also exposed PAIF to undue risks for the return on PAIF's investment in the tribal credit lines.

approximately $175,000 from MicroBilt for assistance in maintaining the latter's relationship

with Rosebud Lending between 2013 to mid-2017.

33.     Fintech, another arm of REDCO, originated loans to non-tribal lenders and then

shifted the risk to PAIF.  In one of the most fateful examples, on or about May 6, 2015,

Defendants caused PAIF to purchase from Fintech all right, title and interest in a $20 million

Loan and Security Agreement that Fintech had made to a newly-formed consumer lender called

Argon X LLC ("Argon X").  Just days earlier, on May 1, 2015, Primus Entity VPCS entered into

a consulting agreement with Argon X for a purported review of the latter's compliance and risk

management activities and procedures.  Argon X thus became PAIF's third borrower, and soon

thereafter, the first to go bankrupt at a time when it owed PAIF over $35 million.  Defendant

MicroBilt again provided no proprietary information to allow a disinterested Managing Member

of Old PAF to vet Argon X as an investment.

34.     Fintech's original Loan and Security Agreement required Argon X to use

MicroBilt for credit scoring and underwriting of Argon X's consumer loans.  Despite this,

however, MicroBilt did not provide PAF or PAIF with any tools with which to monitor Argon

X's consumer loans in real-time as contemplated in the MicroBilt Services Agreement.  And

despite MicroBilt's breach of its contract obligations to Old PAF and PAIF, Defendants caused

PAIF (through further assignments from Fintech) blindly to extend even more credit to Argon X

than the original $20 million—up to $35 million by September 2015 and $37.5 million by

February 2016.  Before increasing the line to Argon X, Burgess, Wojciechowski and certain of

the other Defendants were aware that the persons in control of Argon X had violated the credit

agreements, converted collateral and committed other fraudulent transactions.  Nevertheless,

putting their self-interest ahead of the interests of PAIF, Defendants caused the Argon X line to

16

be increased, ultimately causing PAIF to lose many millions of dollars from its Argon X investment.

35.     In another conflicted transaction that began in the summer of 2015, Defendants Burgess and Primus used their control of Old PAF and PAIF to cause them to acquire a fourth credit line, an entity known as "Green Circle," from a tribal lender called the Wakpamni Lake Community Corporation ("WLCC"). Primus, through Defendant LJP, provided back-office services to Green Circle, such as accounting and financial reporting. Primus Entities, HP Funding II, LLC, LTC and VPCS also received consulting fees from WLCC and Green Circle. Primus and the Primus Entities also received "referral fees" in connection with ACH processing services used in WLCC-affiliated and Rosebud Lending-affiliated credit lines' operations.

36.     By the fall of 2015, Farrell, on behalf of Old PAF and PAIF, complained to MicroBilt employees that MicroBilt was still not performing under the Services Agreement and that MicroBilt's non-performance was damaging PAF's and PAIF's ability to make lending decisions and to monitor its borrowers' portfolios. Defendant Burgess learned of Farrell's complaints and, assisted by Defendant Wojciechowski, began efforts to freeze Farrell and the other unconflicted Managing Member of Old PAF (Szostak), out of PAIF's General Partner. In October of 2015, Defendants temporarily locked Farrell and Szostak out of PAF's offices and blocked their access to network data about PAIF. They directed MicroBilt employees managing the payroll for PAF not to pay Farrell and Szostak their salary for November and December 2015. By letter dated January 4, 2016, Wojciechowski formally terminated their employment. Finally, in February 2016, Defendants merged Old PAF into New PAF in a transaction that left

MicroBilt Financial and Primus Entity, Defendant LJP, as the only Managing Members of

PAIF's new General Partner, New PAF.[7]

37.    By letter dated March 28, 2016, Ranger notified New PAF, PAIF and PAIOF that

it was redeeming all of its interests in the latter two funds effective 180 days hence, as provided

in the PAIF Agreement.

38.    Shortly thereafter, Ranger instructed New PAF "to cease investing Ranger's

assets" and that "PAIF should not renew the credit lines that were initially funded using

investments from either [Ranger Domestic] or [Ranger Offshore]."  As of April 1, 2016, PAIF

had seven credit lines that had drawn down on their revolvers with a combined principal balance

of approximately $62,628,000.

39.    Instead of preparing to honor Ranger's redemption demand, or bringing in

disinterested fiduciaries for New PAF, PAIF and PAIOF to make business decisions on their

behalf regarding the demand, Defendants ignored the demand and exposed New PAF, PAIF and

PAIOF to even more liabilities by opening five additional credit lines:  Credit Line 5 (Credda);

Credit Line 8 (TKC Worldwide); Credit Line 10 (Rosebud DRT); Credit Line 11 (Rosebud

RQC); and Credit Line 12 (Big Valley).  The total commitment on the five new lines was

$41,500,000, although PAIF had nowhere near that much additional capital to lend.[8]

---

[7] In 2016, Farrell and Szostak, individually and derivatively on behalf of Old PAF sued, among others, Burgess, Wojciechowski, MicroBilt, MicroBilt Financial and New PAF for the above conduct.  They have voluntarily dismissed the derivative claims without prejudice at the request of the Trustee.  The remaining claims in that litigation against the non-debtors (the "Farrell/Szostak Litigation") is proceeding in New Jersey State Court.  Upon information and belief, Defendants herein have used their control of PAIF and New PAF to cause them to advance or reimburse such Defendants for their legal fees and expenses in connection with the Farrell/Szostak Litigation. This action seeks a declaration that Defendants were not entitled to such advances or reimbursements, a declaration that they are not entitled to any further advances or reimbursements or indemnity in connection with the Farrell/Szostak Litigation, or with any other litigation, and restitution of all indemnification amounts previously paid by PAIF or New PAF.

[8] As of the date of Ranger's redemption demand in March 2016, Ranger was the only Limited Partner in PAIF and investor in PAIOF, with a total contribution amount of $61,900,000.  From April 2016 to March 2017, Defendants

40.     Defendants' acts in the face of Ranger's redemption demand can be explained
only in terms of their conflicts of interest in obtaining fees from the consumer lenders in
Defendants' personal and corporate capacities; that is, other than through their capital
investments and economic interests in PAF.  PAIF had the ability as a matter of contract in its
revolving credit arrangements with the consumer lenders existing as of the date of Ranger's
redemption demand to cease funding in its discretion, and also to demand payment on the lines at
any time and have the consumer lenders repay PAIF without penalty.  Thus, PAIF had little or no
legal exposure to the consumer lenders in honoring Ranger's redemption demand.  Moreover,
Defendants knew or should have known from monthly reports that they were receiving from the
consumer lenders that several consumer lenders were experiencing high levels of defaults on
their consumer loans that had left PAIF severely under-collateralized and that materially negated
the consumer lenders' ability to pay PAIF back the principal they had borrowed.  Yet,
Defendants continued to allow these same lines to draw down on their revolvers in breach of the
contractual requirements for such draw downs and, in some cases, even increased the amounts of
PAIF's commitments to such lines.

41.     After the Insider Defendants caused the debtor PAIF to establish the Argon Side
Pocket (as defined below) purportedly for the exclusive benefit of Ranger, they nevertheless
diverted funds from the Argon Side Pocket rather than paying those funds to Ranger, thereby
reducing Ranger's claims against the Debtors.  In so doing, the Insider Defendants intentionally
increased the liabilities of the Debtors to Ranger in violation of their fiduciary duties to the
Debtors.

---

attracted a handful of other Limited Partners and other investors, who contributed a total of $8,575,000 in limited
partnership interests and $2,743,000 to PAIOF.

42.    Defendants Wojciechowski and Cook (with the intentional assistance of Burgess) also recklessly or willfully failed to mark down PAIF's collateral and inaccurately calculated the net asset values of PAIF, and the Statements of its and the Feeder Fund's Limited Partners' Capital Accounts ("NAVs") as the defaults by the fund's borrowers increased.  The falsification of PAIF's NAVs not only exposed PAF and PAIF to investor lawsuits, but also directly harmed PAIF by artificially increasing the management fee it was to pay to its General Partner.  Limited Partners in turn were harmed because PAF purportedly took some portion of its management fees as Limited Partner equity interests in PAIF, diluting the other Limited Partners.

43.    MicroBilt billed and collected approximately $2 million for services that it supposedly provided to PAIF's consumer lender borrowers from the credit lines' inception to June 30, 2018.  Westminster, a Burgess-owned company, collected at least $66,000 in fees and expenses from New PAF for "loan origination" services in connection with two credit lines that were funded by PAIF after the Ranger redemption demand.  Yet another Burgess wholly-owned company, AFAB International Ltd., collected tens of thousands of dollars from PAIF credit lines and their vendors for various consulting services and referrals.  Defendants Rosebud Management, Primus, LJP and the other Primus Entities similarly billed and collected hundreds of thousands of dollars from credit lines issued to Rosebud Lending affiliates that were funded by PAIF both before and after Ranger's redemption demand.

44.    The following charges/obligations incurred by Debtors and payment/transfers to MicroBilt (such obligations and payments, collectively, "Transfers") were made either (a) with actual intent to hinder, delay or defraud entities to which New PAF and PAIF were already or soon to be indebted, and are avoidable under sections 544 and 548(a)(1)(A) of the Bankruptcy Code and N.J. Stat. Ann. § 25:2-25 or (b) if occurring after November 2016 (i) constituted

20

payments of antecedent debts to an insider while the Debtor was insolvent and MicroBilt had

reasonable cause to believe the Debtor was insolvent, and are avoidable by the Trustee under

section 544 of the Bankruptcy Code and N.J. Stat. Ann. § 25:2-27(b), (ii) if occurring within one

year of March 9, 2018 constituted transfers voidable under section 547 of the Bankruptcy Code,

as they were made while the transferor was insolvent, to a creditor, on account of an antecedent

debt, which enabled the transferee to receive more than it would in a chapter 7 case if such

Transfers had not been made, and (iii) were made for less than reasonably equivalent value when

one or more of the conditions set forth in section 548(a)(1)(B)(ii) prevailed with respect to the

financial condition of the Debtor transferor, and are therefore avoidable under that section.

| | PAF | | PAIF | |
|---|---|---|---|---|
| | Shared Services | | Analytics | |
| Quarter | Charges | Payments | Charges | Payments |
| Q1'16 | 28,385 | - | 117,141 | - |
| Q2'16 | 94,941 | - | 175,925 | - |
| Q3'16 | 743,095 | - | 130,100 | - |
| Q4'16 | 273,583 | - | 130,875 | (462,391) |
| Q1'17 | 499,566 | - | 155,505 | - |
| Q2'17 | 310,882 | - | 161,933 | - |
| Q3'17 | 203,423 | (110,000) | 211,615 | (137,100) |
| Q4'17 | 502,912 | (363,084) | 210,050 | (271,988) |
| Q1'18 | 145,295 | - | 134,425 | (211,615) |

45.    In early September 2016, Defendants caused New PAF, PAIF and PAIOF to

request an extension of the 180-day period for the effectiveness of Ranger's March 28, 2016

redemption demand from September 30 to October 31, 2016.  Ranger agreed.  On October 28,

2016, three-days before the new deadline, Defendants caused counsel for New PAF to attempt to

preempt Ranger's redemption demand through what they called a "mandatory redemption" of Ranger's interests under the PAIF Agreement that would further delay Ranger's repayment into 2017. According to the arbitration panel that later decided Ranger's claims against New PAF and PAIF for breach of the PAIF Agreement, the mandatory redemption notice was ineffective and could not be justified in the name of protecting other investors in PAIF and/or PAIOF. The panel ordered New PAF and PAIF liable for damages and pre-judgment interest for failure to honor Ranger's redemption demand beginning November 30, 2016. PAIF and PAF were insolvent no later than November 1, 2016 for purposes of the constructive fraudulent Transfers set forth above.

46. The Insider Defendants controlled the disposition of the Debtors' assets, and the Insider Defendants' purposes and objectives as evidenced by their conduct after the receipt of Ranger's redemption demand was to hinder, delay or defraud Ranger in the ability to recover the capital it had invested in the Debtors. Thus, the Insider Defendants' intent should be imputed to the Debtors.

47. Moreover, each of the Transfers was to an insider, was not disclosed, the Debtors had been threatened with suit by Ranger before the Transfers were made, the Debtors received less than reasonably equivalent consideration in exchange for the Transfers, the Debtors were or became insolvent at the time of the Transfers or shortly thereafter, and the Transfers were made at or around the time when the Debtors became liable for a substantial debt.

48. On or about December 7, 2016, representatives of Argon Credit, LLC, the parent company of PAIF's largest credit line (Argon X), informed New PAF that Argon X's prior reporting concerning the performance of its loan portfolio—*viz.* PAIF's collateral—had been misrepresented and that Argon X had many millions in non-performing loans. Upon information

and belief, Defendants MicroBilt, Burgess and Wojciechowski had notice of "red flags"

concerning Argon X's performance months earlier but turned a blind eye and allowed Argon X

unfettered access to its PAIF revolver until December 7, 2016. Argon Credit, LLC and Argon X

filed for bankruptcy later that month. Another of PAIF's credit lines (Line 9, Bristlecone) filed

for bankruptcy in April 2017.

49.    Defendants created a wholly-owned subsidiary of PAIF called Fund Recovery

Services, LLC ("FRS") to prosecute claims on behalf of PAIF against Argon X in the latter's

bankruptcy proceedings. At the same time, Defendants invoked the "side pocket" provisions of

PAIF Agreement to segregate the liabilities (and few remaining assets) associated with the

bankrupt Argon X credit line from the accounting for the other credit lines to which PAIF had

lent and to allocate the ensuing losses and any gains directly to individual Limited Partners (the

"Argon Side Pocket"). Those same "side pocket" provisions required Defendants to maximize

the return to those Limited Partners bearing the losses in the Argon X credit line (chiefly,

Ranger) by, among other things, taking over the servicing of the few consumer loans made by

that line which were still performing and minimizing the expenses incurred in connection with

the servicing and defaults. Defendants, however, used their control of PAIF and FRS to bilk the

Argon Side Pocket of $2.5 million dollars in unrelated or exorbitant expenses (such as their own

attorneys' fees in legal disputes with Ranger discussed immediately below) and to direct $2

million in Argon Side Pocket recoveries into PAIF to be used to pay PAIF expenses instead of to

Ranger, thereby exposing PAIF to liability to Ranger for not honoring the Argon Side Pocket

provisions.

50.    In 2017, Ranger commenced arbitration against New PAF, PAIF, PAIOF and

several of the Defendants herein. During the pendency of those proceedings, including several

days of testimony before the panel, on March 9, 2018, New PAF and PAIF filed the instant

bankruptcy proceedings.  Ranger applied for and obtained relief from the automatic stay

provisions from this Court to proceed with the arbitration against New PAF and PAIF only, and

only on certain claims including breach of contract, breach of fiduciary duty, fraud and violations

of the securities law.  On July 20, 2018, the panel issued a short-form "Partial Final Award"

(defined above as the "Award") on the claims as to which the stay was lifted, which included

findings of breach of contract and fiduciary duty by the Debtors and damages in favor of Ranger

for $30.7 million dollars plus 99 percent of the distributions for the Argon Side Pocket plus

prejudgment interest thereon calculated under Delaware law from November 30, 2016.  The

Delaware Court of Chancery confirmed the Award on or about June 25, 2019.

51.    After the filing of the Debtors' Petition and the improper substitution of PAFM

for New PAF as General Partner for PAIF, PAFM claimed a substantial amount in General

Partner fees.  Upon information and belief, any amounts collected by PAFM while it was

General Partner have been distributed to other Defendants, including MicroBilt.  During the

period that PAFM was improperly substituted as General Partner for PAIF, Defendant Cook

refused to appropriately instruct MicroBilt under the Services Agreement and otherwise

facilitated MicroBilt's breach of that Services Agreement to the detriment of PAIF.

52.    As of the date of this Complaint, only four of the twelve credit lines to which

PAIF lent money were not in default, although the TKC line matured on June 30, 2019 and has

not been repaid in full.  The Bankruptcy Court entered an Order on July 12, 2019 approving a

settlement with TKC whereby the Trustee expects to realize 72.5% of the principal balance

outstanding as of closing of that settlement on July 29, 2019.

53.     Of the twelve credit facilities operated by PAIF, five were to so-called Tribal
Lenders, *i.e.*, consumer lenders who claim the purported sovereign immunity of Native American
tribes allows them to charge interest rates vastly exceeding the amounts chargeable under the
usury laws of every state in the United States.[9]  Making loans to Tribal Lenders carries
substantially greater risk than lending to other deep subprime consumer lenders because of the
enhanced difficulty in collecting on the collateral for such loans.  PAIF was not adequately
compensated for the risks it incurred in loans it made to Tribal Lenders, as the interest rates PAIF
was able to charge to such Tribal Lenders were not materially higher than the rates it charged to
other consumer lenders.  All or substantially all of the loans to Tribal Lenders defaulted and
PAIF incurred millions of dollars in losses on the loans it made to Tribal Lenders.

54.     Each of the loans to Tribal Lenders was originated by a company known as
Fintech.  On information and belief, one or more of the Defendants obtained material personal
benefits, directly or indirectly, by causing PAIF to acquire loans from Fintech and to commit to
make advances to the various Tribal Lenders identified above.

55.     In causing PAIF to acquire loans to the Tribal Lenders, the Insider Defendants
breached their fiduciary duties to PAIF, and committed waste of PAIF's assets.  Defendant
Rosebud Management aided and abetted in the Insider Defendants' fiduciary breaches.

56.     The Insider Defendants also caused PAIF to acquire from Burgess Entity
Westminster two loans to borrowers known as Bristlecone SPV ("Bristlecone") and Credda.  In
structuring and originating the Bristlecone and Credda loans, Westminster failed to adequately
investigate and understand the borrowers, the collateral and competing creditors for the same
collateral.  Rather than structure the Bristlecone and Credda loans in a manner that would be

---

[9] The five Tribal Lenders to which PAIF extended credit were known as Green Circle, TKC, Rosebud DRC,
Rosebud RQC, and Big Valley.

25

protective of the interests of PAIF, the Insider Defendants, motivated by the prospect of personal

gain, caused PAIF to acquire those loans nonetheless. In so doing, the Insider Defendants

breached their fiduciary duties to PAIF and committed waste of PAIF's assets.

57.     The Insider Defendants also caused the Debtors to become the subject of an

investigation by the Securities and Exchange Commission ("SEC"), which has caused the

Debtors to incur substantial expenses for counsel fees and other costs, and potential liability to

the SEC based on proofs of claim filed by the SEC in the Debtors' Chapter 11 cases.

58.     Plaintiff seeks recovery from all Defendants of the above amounts, with interest,

plus disgorgement, with interest, of all fees, profits and other funds Defendants received in self-

interested transactions with Debtors, their credit line borrowers and with affiliates of, vendors to

or consumer borrowers from the credit lines. Plaintiff also seeks to avoid the Debtors' fraudulent

and preferential Transfers and incurrence of obligations to or for the benefit of MicroBilt, treble

damages under NJ RICO and recovery of his attorneys' fees in this matter. Plaintiff also seeks

damages from all Defendants for breach of contract, breach of fiduciary duty, aiding and abetting

breaches of fiduciary duty, and violations of NJ RICO.

59.     Finally, several Defendants have filed proofs of claims seeking indemnification

and/or contribution from Debtors. Although Defendants have not identified the source of

indemnification, Plaintiff seeks a declaratory judgment that no indemnification or contribution

was or is owed by either Debtor in favor of such claimant Defendants, together with restitution

or disgorgement of any and all amounts previously paid pursuant to their indemnification claims

while Defendants were in control of the Debtors' purse strings. The Trustee also seeks common

law contribution from Defendants that caused (or that aided and abetted in causing) PAIF, Old

PAF or New PAF to be liable to third-parties, such as PAIF's Limited Partners and from those

26

Defendants that through their conduct caused (or that aided and abetted in causing) PAIF, Old

PAF or New PAF to incur attorneys' fees and expenses defending or otherwise, in connection

with lawsuits and investigations arising out of Defendants' conduct.

AS AND FOR A FIRST CAUSE ACTION
(Breach of Contract – Defendant MicroBilt Corporation)

60.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs

as if fully set forth herein.

61.    The Services Agreement provides, among other things, for MicroBilt to supply

PAF with daily access to offices and conference rooms, wireless laptops, VOIP telephones and

unlimited internet access.  Contemporaneous documents reveal that the agreed monthly charge

was to be $8,000 to $10,000.  MicroBilt overbilled PAF (and, after the Petition Date, PAFM) for

these services.

62.    The Services Agreement also required MicroBilt to provide Old PAF (and later

New PAF and, after the Petition Date, PAFM) on behalf of PAIF "Data Studies, Analysis and

Monitoring" as more fully described in the PPM and other materials that Old PAF and MicroBilt

contemporaneously circulated to potential investors in PAIF.  More specifically, MicroBilt

contracted to provide Old PAF on behalf of PAIF data studies and analyses that were proprietary

to MicroBilt (*i.e.*, not based on publicly available data) that would allow for:  (i) screening "4000

Microbilt customers" for "best in class" credit line operators as potential borrowers, (ii)

analyzing the operators' "historical lending performance for predictive returns," (iii) using

"extensive background data" supplied by MicroBilt to make lending decisions, and (iv) after

extending funds to approved operators using "MicroBilt live data feeds [to] bring real time

monitoring capabilities to our portfolio," as was described in the PPM, and an investor

presentation slide deck.

27

63.    MicroBilt breached the Services Agreement by failing to provide the contracted-for studies and analyses before Old PAF and PAIF extended credit to "credit line operators" and, thereafter, supplied Old PAF, New PAF and PAIF materials on a monthly (not real-time) basis that were non-proprietary and available from other credit services and/or that were materially duplicative of materials that it prepared under separate contracts for third-parties for which MicroBilt was paid by those third-parties.  MicroBilt also breached the Services Agreement by failing to render invoices monthly as required by its terms.

64.    PAF had fully performed the Services Agreement prior to MicroBilt's breach.

65.    The Trustee seeks and is entitled to restitution of money Old PAF, New PAF, PAFM and/or PAIF paid MicroBilt under the Services Agreement for non-conforming performance and/or paid pursuant to indemnification claims made by MicroBilt or its consultants (including, but not limited to Defendant Burgess) under the Services Agreement.

66.    The Trustee seeks and is also entitled to damages from MicroBilt for loans made by or on behalf of Old PAF, New PAF, PAFM and/or PAIF without the benefit of the contractual bargain of proprietary studies and analyses (a) identifying "best in class" borrowers, and (b) providing them with real-time "monitoring of borrowers" to whom PAIF lent money.

67.    The Trustee seeks and is entitled to a declaration that, as a result of MicroBilt's breaches of the Services Agreement, neither MicroBilt nor any affiliate of or consultant to it is entitled to claim any future indemnification under the Services Agreement from Old PAF, New PAF, PAFM or PAIF, and all proofs of claim filed by MicroBilt for unpaid invoices rendered to either Debtor should be expunged.

68.    Under Paragraph N of the Services Agreement, should the Trustee prevail, he is entitled to his attorneys' fees and other expenses in connection with enforcing the Services

Agreement against MicroBilt in this action and any subsequent judgment enforcement
proceedings.

AS AND FOR A SECOND CAUSE ACTION
(Primary Violation of NJ RICO – All Insider Defendants)

69. Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs
as if fully set forth herein.

70. Each of the Insider Defendants owed fiduciary duties to one or both of the
Debtors.

71. Each of PAIF, PAF and PAFM while under the control of the Defendants was an
"enterprise" within the meaning of the NJ RICO statute, N.J. Stat. Ann. § 2C:41-1(c), the
business of each of which was to act as either the General Partner of PAIF, or as an investment
vehicle under the control of its General Partner.

72. Each and all of the Insider Defendants conducted or participated in the affairs of
PAIF, PAF and PAFM through a pattern of racketeering activity, including misappropriation by
a fiduciary within the meaning of N.J. Stat. Ann. § 2C:21-15 and N.J. Stat. Ann. § 2C:20-4.

73. The Insider Defendants did so by failing to disclose their adverse self-interests in
conducting the affairs of PAIF, PAF and PAFM, causing PAF or PAIF to pay them or their
affiliates directly or indirectly for services that promoted their adverse self-interest at PAIF's
expense, and causing PAIF to make excessively risky loans, including Tribal Loans, and other
loans whereby the Insider Defendants or their affiliates profited at PAIF's expense. Specifically,
these Defendants caused PAIF to lend money to third-party consumer lenders, or to acquire loans
from third party originators like Fintech, that had contracted with Defendants or their affiliates,
including but not limited to Rosebud Management, the Primus Entities and the Burgess Entities.

74.     The Insider Defendants failed to recuse themselves from PAF's and PAFM's decision-making on behalf of PAIF as to credit lines with which Defendants' affiliates had financial relationships and deliberately froze-out unconflicted Managing Members of Old PAF from that decision-making.  Defendants also caused Old PAF and PAIF to enter into (and New PAF and PAFM to maintain) oppressive, one sided agreements with Defendants or their affiliates designed to protect Defendants at the expense of the Debtors, which agreements contained provisions that were void and unenforceable as contrary to public policy.

75.     The Insider Defendants caused PAIF to lend to and to expand or renew lending relationships to consumer lenders for the unlawful purposes of prioritizing their gains from operation of the credit lines and without regard to their fiduciary duties (a) to maximize and achieve returns from the credit lines for PAIF or its subsidiaries or General Partner, and (b) to protect PAIF from liability to Ranger and from insolvency arising out of Ranger's redemption demand and Ranger's interest as the Limited Partner with the greatest interest in the Argon Side Pocket.

76.     The Insider Defendants misappropriated PAIF's and its subsidiaries' money in the conduct of the affairs of PAIF, PAF and PAFM through numerous breaches of their fiduciary duty.  All such acts and omissions were committed by the Insider Defendants willfully and in bad faith and are outside the exculpatory provisions of relevant agreements as a matter of fact and law.

77.     PAIF is a person that was injured in its business and property by reason of Defendants' conduct of the affairs of Old PAF, New PAF and PAFM, its General Partners, and its subsidiaries, through a pattern of racketing activity and PAIF is entitled to recover from said Defendants, jointly and severally, treble the amount of damages determined at trial.

30

## AS AND FOR A THIRD CAUSE ACTION
### (Conspiracy to Violate NJ RICO – All Defendants)

78.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

79.     If and to the extent that any Defendant herein, including but not limited to Defendant Rosebud Management, was not itself a fiduciary to or of PAIF, PAF or PAFM, such Defendant (each a "Conspiring Defendant") agreed with those remaining Defendants that were the fiduciaries (each a "Primary Violator Defendant") to enable and profit from the latter's breach of duty to PAF and PAFM, and thus to PAIF, by contracting directly with the credit lines to which PAF and PAFM caused PAIF to lend.

80.     The contracts and relationships between each Conspiring Defendant and the credit lines constituted overt acts in furtherance of the agreement between all Conspiring Defendants and all Primary Violator Defendants to operate or participate in the operation of PAF and PAFM as General Partner of PAIF through a pattern of racketeering acts including misappropriation by a fiduciary.

81.     PAIF is a person that was injured in its business and property by the agreement and overt acts of the combined Conspiring Defendants and Primary Violator Defendants in furtherance of a conspiracy to operate PAIF's General Partners, PAF and PAFM, through a pattern of racketeering activity and, accordingly, PAIF is entitled to recover from said Defendants, jointly and severally, treble the amount of damages determined at trial.

31

## AS AND FOR A FOURTH CAUSE ACTION
(Common Law Breach of Fiduciary Duty – All Insider Defendants)

82.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

83.     Each of the Insider Defendants owed fiduciary duties to the Debtors.

84.     Each of the Insider Defendants breached his or its fiduciary duties in the manner set forth above, including by failing to fully and accurately disclose his or its adverse self-interests in conducting the affairs of Old PAF, New PAF and PAFM as General Partner to PAIF and in causing PAIF and/or its subsidiaries, or other persons described above, to pay him or it directly or indirectly for services that promoted his or its adverse self-interest at PAIF's and its subsidiaries' expense.  The Insider Defendants also caused the Debtors to breach their contractual and fiduciary duties to Ranger, as determined by the Award.  In addition, the Insider Defendants caused PAIF to lend money to third-party credit lines that had contracted with Defendants' affiliates, including but not limited to Rosebud Management, the Primus Entities and the Burgess Entities.  The Insider Defendants also improperly charged FRS for expenses unrelated to the Argon Side Pocket, overcharged for services that did relate to the Argon Side Pocket and/or exposed PAIF to liability to Ranger by allocating Argon X recoveries to PAIF's general accounts rather than to the Argon Side Pocket they had created.  The Insider Defendants also caused the Debtors to commit waste as aforesaid, by making loans to Tribal Lenders, by negligently originating loans that they then foisted on PAIF as buyer, and by increasing or continuing advances to PAIF's borrowers when they should have honored Ranger's redemption demand and wound down and liquidated the fund.

85.     Each of the Insider Defendants failed to recuse himself or itself from PAF's and PAFM's decision-making on behalf of PAIF as to credit lines with which the Insider Defendants'

32

side-businesses had financial relationships and deliberately froze-out unconflicted Managing

Members of Old PAF from that decision-making.

86.     The Insider Defendants caused PAIF to lend to and to expand or renew lending

relationships to credit lines for the unlawful purposes of prioritizing their gains from their side-

businesses connected to the credit lines and without regard to their fiduciary duties to (a)

maximize and achieve returns from the credit lines for PAIF and PAF and (b) protect PAIF from

liability to Ranger and from insolvency arising out of Ranger's redemption demand.

87.     All such acts and omissions were committed by the Insider Defendants willfully

and in bad faith and are outside the exculpatory provisions of relevant agreements as a matter of

fact and law.

88.     The Insider Defendants are liable to the Debtors for all losses suffered by the

Debtors arising from their breaches of duty, for disgorgement of amounts paid to them directly or

to their affiliates proximately related to their self-interested breaches of fiduciary duty and for

damages in an amount to be determined at trial proximately resulting from their wrongful acts or

omissions.

## AS AND FOR A FIFTH CAUSE ACTION
### (Aiding and Abetting Common Law Breach of Fiduciary Duty – All Defendants)

89.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs

as if fully set forth herein.

90.     If and to the extent that any Defendant herein, including but not limited to

Defendant Rosebud Management, was not itself a fiduciary to or of PAF or PAIF, such

Defendant (each an "Aiding and Abetting Defendant") had actual knowledge that the remaining

Defendants (each a "Primary Violator Defendant") were fiduciaries to those entities.

91.     Each Aiding and Abetting Defendant was an affiliate of one or more Primary Violator Defendant(s).

92.     The contracts and relationships between each Aiding and Abetting Defendant and the credit lines to which the Primary Violator Defendants caused PAIF to lend constituted substantial assistance in further of the Primary Violator Defendants' breaches of their fiduciary duties to PAF and/or PAIF.

93.     The Aiding and Abetting Defendants are liable to PAF and PAIF for disgorgement of amounts paid to them in assisting the Primary Violator Defendants' breaches of fiduciary duties and for damages in an amount to be determined at trial proximately resulting from the conflicted decision-making of the Primary Violator Defendants in PAIF's loans to the credit lines with whom the Aiding and Abetting Defendants had financial relationships.

AS AND FOR A SIXTH CAUSE ACTION
(Declaratory Judgment – All Defendants)

94.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

95.     The Services Agreement, PAIF Limited Partnership Agreement and the PAF and PAFM operating agreements provide for limited indemnification of claims made by third-parties against certain of their officers, partners and members and others (the "Indemnification Provisions").  Certain Defendant herein have claimed that the Indemnification Provisions purport to cause PAF, and indirectly PAIF, to indemnify some or all of said Defendants against negligent or intentional acts, as well as from causing damages alleged to result from violations of applicable law, theft, embezzlement, or any other crime, extortion, or any other tort or any unlawful act.

34

96.     To the extent that the Indemnification Provisions theoretically apply to any Defendant herein, the enforcement of those provisions would violate public policy and are legally unenforceable in light of said Defendants' intentional or grossly negligent wrongful acts and omissions alleged herein.

97.     Plaintiff is entitled to a declaration that, as a result of their breaches of fiduciary duty, other wrongful acts and acts and omissions under conflicts of interests, none of the Defendants are entitled to contractual or common law indemnification from any of Old PAF, New PAF or PAIF.

AS AND FOR A SEVENTH CAUSE ACTION<br>
(Declaratory Judgment – Defendants MicroBilt, Wojciechowski, MicroBilt Financial & Primus)

98.     Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

99.     The Services Agreement between MicroBilt and PAF contains an indemnification clause at Paragraph 10(O).

100.     Defendants Wojciechowski, MicroBilt, MicroBilt Financial and Primus have claimed a right to contractual indemnification from the Debtors.  To the extent any of those claims are based on the indemnification provision of the Services Agreement, or other contracts to which either of the Debtors are parties, the Trustee seeks a declaratory judgment that any claim by any of the Defendants named in this paragraph against any of the Debtors for contractual indemnity is unenforceable.  PAIF is not a party to the Services Agreement and is not liable to indemnify anyone under it.

101.     The indemnification clause in the Services Agreement, by its terms, purports to bind each party to indemnify the other against claims of third-parties for acts or omissions of the indemnitee "whether negligent or intentional" that "directly or indirectly caused or [are] alleged

35

to have caused" damages or injury, including but not limited to "violation of applicable law,
theft, embezzlement or any other crime . . . tort or violation of any civil or personal right or any
unlawful act" (the "Willful Acts Indemnity").

102.    The Trustee, on behalf of PAF and PAIF, is entitled to declarations (a) that the
Willful Acts Indemnity is contrary to public policy, is void and is unenforceable and either
should be severed from the Services Agreement, or renders the Services Agreement null and
void, and (b) that MicroBilt is not entitled to any indemnification from any of the Debtors or
their predecessors-in-interest.

103.    The Trustee, on behalf of Old PAF, New PAF and PAIF, is also entitled to a
declaration that none of the Defendants are entitled to any indemnification from either of the
Debtors.

104.    The Services Agreement further provides at Paragraph 5 that it is not terminable
by Old PAF and shall continue in perpetuity, if not terminated for breach that remains uncured
for greater than 30 days, "so long as MicroBilt maintains greater than forty percent (40%)
ownership of [PAF]. . . ."

105.    The Trustee is entitled to a declaration that the Services Agreement has been
terminated because of MicroBilt's prior, uncured breach or, in the alternative, that the perpetuity
provisions of Services Agreement are void and unenforceable as a product of overreaching by a
fiduciary, unconscionability and as against public policy.

## AS AND FOR AN EIGHT CAUSE ACTION
### (Intentional Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(A) – MicroBilt)

106.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

107.    MicroBilt billed Debtors for and, against those bills, Debtors transferred their cash and other property and/or incurred obligations to or for the benefit of MicroBilt within two years before the date of the Debtors' filing of the petition for relief in the above-captioned bankruptcy case.

108.    Those transfers made or obligations incurred after the March 28, 2016 date of Ranger's redemption demand were made or incurred against false, fictitious or overstated MicroBilt invoices for goods or services (*i.e.*, for inadequate consideration to an insider) at a time when the Debtors faced extreme financial difficulties or actual insolvency and were made or incurred with actual intent to hinder, delay or defraud Ranger and other present or future creditors of Debtors.

109.    The Plaintiff is entitled to avoid all such intentionally fraudulent transfers made or obligations incurred voluntarily or involuntarily by the Debtors to or for benefit of the MicroBilt on or after March 28, 2016.

110.    Plaintiff seeks recovery of all transfers under section 550 of the Bankruptcy Code from either MicroBilt as initial transferee, or any mediate or immediate transferee of such initial transferee.

## AS AND FOR A NINTH CAUSE ACTION
### (Constructive Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(B) – MicroBilt)

111.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

112.    As of November 30, 2016, Debtors were liable to redeem Ranger's interests in PAIF and PAIOF.

113.    As of November 1, 2016, Debtors were insolvent, were engaged in business or transactions or were about to engage in business or transactions for which any property remaining with either or both of them was an unreasonably small capital and/or Debtors intended to incur, or believed that they would incur, debts beyond either or both of their ability to pay as such debts matured.

114.    On and after November 1, 2016, MicroBilt rendered false, fictitious or overstated invoices for goods or services to Debtors and Debtors transferred their cash and other property and/or incurred obligations to or for the benefit of MicroBilt in exchange for less than reasonably equivalent value.

115.    The Plaintiff is entitled to avoid all such constructively fraudulent transfers made or obligations incurred voluntarily or involuntarily by the Debtors to or for the benefit of MicroBilt on or after November 1, 2016.

116.    Plaintiff seeks recovery of all transfers under section 550 of the Bankruptcy Code from either MicroBilt as initial transferee, or any mediate or immediate transferee of such initial transferee.

AS AND FOR A TENTH CAUSE ACTION
(Intentional Fraudulent Transfer – N.J. Stat. Ann. § 25:2-25(a) – MicroBilt)

117.   Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

118.   Debtors made transfers of their cash and other property and/or incurred obligations to or for the benefit of MicroBilt at and after the time of Ranger's redemption demand on March 28, 2016 with actual intent to hinder, delay or defraud Ranger and other present or future creditors of PAIF and New PAF.

119.   The Plaintiff is entitled to avoid the transactions, and to recover under section 550 of the Bankruptcy Code against MicroBilt or any mediate or immediate transferee.

AS AND FOR AN ELEVENTH CAUSE ACTION
(Constructive Fraudulent Transfer – N.J. Stat. Ann. §§ 25:2-25(b), 25:2-27 – MicroBilt)

120.   Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

121.   As of November 30, 2016, Debtors were in default for failure to redeem Ranger's interests in PAIF and PAIOF.

122.   As of November 1, 2016, Debtors were insolvent, were engaged in business or transactions or were about to engage in business or transactions for which any assets remaining with either or both of them were unreasonably small in relation to the business or transaction and/or intended to incur, or believed that they would incur, debts beyond either or both of their ability to pay as such debts matured.

123.   On and after November 1, 2016, Defendants caused Debtors to transfer the Debtors' cash and other property and/or incurred obligations to or for the benefit of MicroBilt in exchange for less than reasonably equivalent value.

124.    The Plaintiff is entitled to avoid the transactions, other equitable relief or damages for all such constructively fraudulent transfers made or obligations incurred by the Debtors to or for MicroBilt on or after November 1, 2016.

### AS AND FOR A TWELFTH CAUSE OF ACTION
#### (Insider Preferences – N.J. Stat. Ann. § 25:2-27(b) – MicroBilt)

125.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

126.    Defendant MicroBilt, an insider, received payments of antecedent debts while the Debtor was insolvent and MicroBilt had reasonable cause to believe the Debtor was insolvent, which transfers are avoidable by the Trustee under section 544 of the Bankruptcy Code and N.J. Stat. Ann. § 25:2-27(b).

127.    Plaintiff is entitled to avoid the transactions, and to recover under section 550 of the Bankruptcy Code against MicroBilt

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
#### (Voidable Preferences – 11 U.S.C. § 547 – MicroBilt)

128.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

129.    All payments to MicroBilt by the Debtors set forth above occurring within one year of March 9, 2018 constituted transfers voidable under section 547 of the Bankruptcy Code, as they were made while the transferor was insolvent, to a creditor, on account of an antecedent debt, which enabled the transferee to receive more than it would in a chapter 7 case if such Transfers had not been made.

130.    The Plaintiff is entitled to avoid the transactions, and to recover under section 550 of the Bankruptcy Code against MicroBilt

## AS AND FOR A FOURTEENTH CAUSE ACTION
<u>(Contribution – All Tortfeasor Defendants)</u>

131.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

132.    On or about July 20, 2018, a JAMS arbitration panel in the matter captioned *Ranger Specialty Income Fund, L.P. et al. v. Princeton Alternative Funding, LLC, et al.*, JAMS Arbitration Ref. #1450004894 (the "JAMS Arbitration"), issued the Award in favor of Ranger against New PAF and PAIF in the amount of $30.7 million plus 99 percent of the distributions for the Argon Side Pocket plus pre-judgment interest from November 30, 2016 for, among other acts, breach of fiduciary duty to Ranger in denying Ranger's redemption request.

133.    The Insider Defendants who directed Old PAF, New PAF and PAIF, and each Aiding and Abetting Defendant who substantially assisted the Insider Defendants (collectively, the Insider Defendants and Aiding and Abetting Defendants are referred to hereafter as the "Tortfeasor Defendants"), are jointly liable with New PAF and PAIF for the above Award and are thus liable to New PAF and PAIF for contribution.

134.    In addition to incurring liability and attorneys' fees and expenses in the defense of the JAMS Arbitration, New PAF and PAIF have incurred attorneys' fees and expenses in connection with a SEC investigation (the "SEC Investigation") into each and both of them and into Old PAF for acts and omissions caused by and/or substantially assisted in by the Tortfeasor Defendants.

135.    New PAF and PAIF are entitled to contribution from the Tortfeasor Defendants for all attorneys' fees and expenses incurred by them in connection with the SEC Investigation and any private lawsuit, government investigation or regulatory action against either or both of them arising out of the Tortfeasor Defendants' acts or omissions alleged herein.

41

## AS AND FOR A FIFTEENTH CAUSE ACTION
(Equitable Subordination – All Claimant Defendants)

136.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

137.    As of the date of this Complaint, certain Defendants herein—namely, MicroBilt, MicroBilt Financial, Burgess, Wojciechowski, Rosebud Management, Primus and LJP (collectively, the "Claimant Defendants") have filed proofs of claim in the Debtors' bankruptcy case under the Services Agreement, the PAIF Agreement, the New PAF Limited Liability Agreement, other agreements and documents and common law for fees, indemnity, contribution or other moneys allegedly due to each them.

138.    Each and all of the Claimant Defendants have engaged in inequitable conduct which conduct resulted in injury to creditors and Limited Partners of the Debtors or conferred an unfair advantage on said Claimant Defendant(s).

139.    Equitable subordination of the full amount of each and every one of each Claimant Defendant's claims against the Debtors to a position junior to the interests of the Limited Partners in the Debtor PAIF, and junior to the equity interests in the Debtor PAF, is necessary to offset the harm that the Debtors and their respective creditors have suffered as a result of the Claimant Defendant's inequitable conduct and such subordination would be consistent with the provisions and purposes of the Bankruptcy Code.

WHEREFORE, Plaintiff Matthew Cantor, in his capacity as Chapter 11 Trustee for Debtor New PAF, successor-in-interest to Old PAF, and of Debtor PAIF respectfully requests the following relief:

1.    Disgorgement of all monies received by any Insider Defendant or an affiliate of an Insider Defendant (including but not limited to Rosebud Management, the

Primus Entities and the Burgess Entities) from a breach of the Insider Defendant's duties to PAIF, Old PAF, New PAF or FRS;

2.  Restitution from Defendant MicroBilt of monies paid to it by PAIF or by Old PAF, New PAF or PAFM on behalf of PAIF, under the Services Agreement;

3.  A declaratory judgment that the Services Agreement is terminated because of MicroBilt's breaches and damages in an amount to be determined at trial from MicroBilt for breaches of the Services Agreement;

4.  Damages in an amount to be determined at trial from each Insider Defendant proximately caused by its or his breach of duty and damages from each and every Defendant that aided and abetted the breach by an Insider Defendant and proximately caused or contributed to said damages;

5.  Treble damages as allowed under NJ RICO for the injury to PAIF's business and property by reason of Defendants' conduct of the affairs of Old PAF, New PAF and PAFM, its General Partners, and FRS, PAIF's subsidiary, through a pattern of racketing activity and/or Defendants' conspiracy to do so;

6.  A declaratory judgment that none of the Defendants are entitled to indemnification from any of Old PAF, New PAF or PAIF;

7.  A declaratory judgment that the Willful Acts Indemnity in the Services Agreement is void and unenforceable and severed from the Services Agreement (if said Services Agreement is not terminated in its entirety);

8.  A declaratory judgment that the perpetuity provisions of Services Agreement are void and unenforceable and severed from the Services Agreement (if said Services Agreement is not terminated in its entirety);

9.  Avoidance, other equitable relief or damages under the above federal and state statutes, including 11 USC § 550, in connection with each fraudulent transfer to or obligation incurred by either PAIF or New PAF or both to or for the benefit of MicroBilt and each insider or voidable preference made by either Debtor or both to or for the benefit of MicroBilt;

10.  Contribution from each Tortfeasor Defendant for damages to third-parties and/or attorneys' fees and expenses incurred by Old PAF, New PAF and/or PAIF as a result of the Tortfeasor Defendants' conduct;

11.  Equitable subordination of the full amount of any and all claims filed against either Debtor in the above-captioned Chapter 11 proceedings by or on behalf of any Claimant Defendant to claims of all other creditors;

43

12. The Trustee's attorneys' fees and litigation expenses in this Adversary Proceeding and in connection with any subsequent enforcement proceedings related thereto;

13. Pre-judgment and post-judgment interest;

14. Costs; and

15. Such other and further equitable or legal relief as the Court may deem just and appropriate.

Respectfully submitted,

WOLLMUTH MAHER & DEUTSCH LLP
*Counsel for Matthew Cantor, Chapter 11 Trustee*

By:＿＿＿＿＿＿ */s/* Paul R. DeFilippo＿＿＿＿＿
Paul R. DeFilippo
James N. Lawlor

*Counsel for Matthew Cantor, Chapter 11 Trustee*

Dated:  July 29, 2019

44

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE
COMMISSION,

                        **Plaintiff,**

     **v.**

PRINCETON ALTERNATIVE
FUNDING LLC, MICROBILT
CORPORATION, PHILIP N.
BURGESS, Jr., WALTER
WOJCIECHOWSKI, and JOHN
COOK, Jr.,

                        **Defendants.**

No.

JURY DEMAND

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") files this

Complaint against Defendants Princeton Alternative Funding LLC ("PAF"), Microbilt

Corporation ("Microbilt"), Philip N. Burgess, Jr. ("Burgess"), Walter Wojciechowski

("Wojciechowski"), and John "Jack" Cook, Jr. ("Cook") (collectively "Defendants"), and alleges

as follows:

## INTRODUCTION

1.    From March 2015 through February 2017 (the "Relevant Period") Defendants

solicited investors to buy limited partnership interests in the Princeton Alternative Income Fund,

LP ("PAIF") and its offshore feeder fund, Princeton Alternative Income Offshore Fund, Ltd.

("PAIOF") (together with PAIF, the "Fund") through materially false and misleading statements

regarding: (1) the management team of PAF; (2) PAF's and Microbilt's ability to monitor the

Fund's investments in real time; (3) the method by which PAF and Microbilt selected investments for the Fund; and (4) the satisfaction and continued investment of the Fund's largest investor. Defendants, by making, authorizing, disseminating, and otherwise substantially assisting others in making these false and misleading statements, raised more than $73 million for the now-bankrupt Fund.

2.     Defendants' materially false statements and omissions violated the anti-fraud provisions of the federal securities laws, including Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Alternatively, Burgess, Wojciechowski, and Microbilt knowingly or recklessly aided and abetted PAF's and Cook's false statements and omissions, as well as the false statements and omissions of PAF's chief executive officer.

3.     The Commission respectfully requests, among other things, that the Court permanently enjoin Defendants from committing further violations of the federal securities laws as alleged in this Complaint, order Defendants Burgess, Cook, Wojciechowski, and Microbilt to pay civil penalties, permanently enjoin Burgess, Cook, and Wojciechowski from soliciting any person or entity to purchase or sell any security, and order any other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)-(e) & 78aa(a), and Sections 20(b)-(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b)-(d) & 77v(a).

5.      Venue is proper in the District of New Jersey pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Among other things, many of the Defendants reside and conduct business in this District and they conducted much of the activity alleged in this Complaint in this District, including soliciting and communicating with investors and operating the Fund.

6.      Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails, including the use of email, telephone, and the internet in connection with certain of the illegal acts alleged in this Complaint, a number of which occurred within this District.  In addition, Defendants have solicited investors to purchase limited partner interests in the Fund in several states and other countries, including Texas, Illinois, California, the United Kingdom, and Russia.

## DEFENDANTS

7.      **PAF** is a Delaware limited liability company with its principal place of business in Princeton, New Jersey.  PAF was the general partner of PAIF and the investment manager of PAIOF, and was not registered with the Commission as an investment adviser.  On March 9, 2018, PAF filed a voluntary petition for Chapter 11 bankruptcy protection, and the Bankruptcy Court appointed a trustee in November 2018.  The Court confirmed a Chapter 11 Plan on March 31, 2020, pursuant to which Microbilt, together with an advisory committee composed of investors, assisted in the liquidation of PAIF's assets.  The Bankruptcy Court closed the case on May 11, 2021.

8.      **Microbilt** is a Delaware corporation with its principal place of business in Princeton, New Jersey.  Microbilt owned a majority of PAF through a wholly owned subsidiary, Microbilt Financial Services Corporation.  During the Relevant Period, Microbilt's largest

shareholders were Burgess and his immediate family, who owned (under Burgess's control) approximately 48% of its shares through Bristol Investments, LLC ("Bristol") and other entities.

9.      **Burgess**, 58 years old, resides in Princeton, New Jersey.  Burgess owns numerous companies, including Bristol.  Burgess previously served as Microbilt's CEO from April 2000 until he stepped down in January 2007 when he was the target of a criminal investigation.  In October 2008, Burgess pleaded guilty to charges of income tax evasion and failure to pay payroll taxes to the IRS, and was sentenced to eight months in prison.  During the Relevant Period, Burgess served both as a paid "consultant" to Microbilt and in a management role at PAF, which he and other defendants actively sought to conceal from prospective and existing investors.

10.     **Wojciechowski**, 63 years old, resides in Bensalem, Pennsylvania.  He has served as the CEO of Microbilt since January 2007, and later served as Microbilt's chief financial officer ("CFO").  While still serving as CEO and CFO of Microbilt, Wojciechowski served as CFO of PAF beginning in March 2016, an advisor to PAF throughout the Relevant Period, and interim CEO to PAF from January to March 2016.

11.     **Cook**, 54 years old, resides in Princeton, New Jersey.  Starting in March 2016, Cook served as PAF's chief operating officer ("COO") and chief compliance officer ("CCO").  Cook became PAF's CEO in January 2018.  Cook previously held series 3, 7, 24, and 63 licenses.

## OTHER RELEVANT ENTITIES

12.     **PAIF** is a Delaware limited partnership with its principal place of business in Princeton, New Jersey.  PAF was the general partner of PAIF.  PAIF had 10 limited partners, including PAIOF.  PAIF filed a voluntary petition for Chapter 11 bankruptcy protection on

March 9, 2018.  The Bankruptcy Court appointed a trustee in November 2018, confirmed the

Chapter 11 plan on March 31, 2020, and closed the case on August 24, 2020.

13.     **PAIOF** is a British Virgin Islands business company, and is a PAIF feeder fund.

PAF served as the investment manager to PAIOF, which had five shareholders.

14.     **Investor R** is a Delaware limited partnership with its principal place of business

in Dallas, Texas.  Investor R has been registered with the Commission as an investment adviser

since 2013.  During the Relevant Period, Investor R served as the adviser and manager to two

pooled investment vehicles, which collectively invested $6.8 million in PAIF and $55.1 million

in PAIOF, respectively, between March 2015 and February 2016.  Investor R was the largest

investor in the Fund.

15.     **CEO A,** 51 years old, resides in West Orange, New Jersey.  CEO A served as

PAF's CEO from March 2016 to January 2018.

**FACTUAL ALLEGATIONS**

**I.     Creation of PAF and the Fund**

16.     Microbilt is a consumer credit reporting company that specializes in subprime

consumer data.  It sells a variety of products and services that it claims help reduce the risk to

companies in the alternative lending industry.  Alternative lenders are companies outside of

traditional banks that provide, among other things, high-risk loans or leases to subprime

consumers (consumers who pose a high risk of defaulting based on their credit history and other

factors).

17.     In 2013, many of Microbilt's customers were alternative lenders that provided

high-risk loans in the "subprime" (high-risk) consumer space.  These loans are often available

online, through non-bank lenders, and come with very high interest rates and frequently have

5

other onerous terms.  In 2013, many alternative consumer lenders were facing financial challenges—partly because of government investigations into predatory practices in the alternative lending marketplace that focused in part on the relationships between banks and alternative lenders.  Without access to adequate financing, these alternative consumer lenders were issuing fewer loans to consumers.

18.     As a result, leading up to the Relevant Period, Microbilt's revenue also suffered, as alternative lenders and other Microbilt customers bought fewer of Microbilt's products to evaluate the creditworthiness of subprime consumer borrowers.

19.     In order to provide alternative consumer lenders with capital and, in turn, increase Microbilt's revenue, Burgess—after serving his criminal sentence for felony tax fraud and while working as a "consultant" for Microbilt—proposed that Microbilt create a private fund that would invest in the subprime lending market by providing lines of credit to alternative lending consumer finance companies at annual interest rates of approximately 20-24%.  The consumer finance companies, in turn, intended to earn a profit by drawing down money from the lines of credit and lending those funds to subprime (high-risk) borrowers at rates of interest that ranged from 69% to over 700%.

20.     Wojciechowski, Microbilt's CEO, agreed with Burgess's proposal that Microbilt create and operate the private fund.  Burgess's concept for Microbilt's fund required that the consumer finance companies would both: (i) pay to use Microbilt's data products in underwriting the loans they made to subprime borrowers; and (ii) allow Microbilt and its private fund manager to monitor the underlying loans the consumer finance companies made to subprime customers, and thereby monitor the Fund's investments (*i.e.*, the lines of credit it extended to consumer finance companies at high interest rates).

21.     To implement their plan, in August 2014, Microbilt—through the actions of Burgess and Wojciechowski and others—formed PAF to serve as the general partner and manager of the Fund.  On September 30, 2014, Microbilt deposited $10,000 in a PAF bank account, and another investor deposited $5,000 on September 26, 2014.  These deposits constituted PAF's initial funding.

22.     In November 2014, PAF formed PAIF, and it began offering and selling limited partnership interests in PAIF, including shares in its related offshore fund, to individual investors from March 1, 2015, through March 1, 2017.  Most of the investors in the Fund were institutional investors, one of which held about 85% or more of the outstanding equity interests during the Relevant Period.

23.     As manager of the Fund, PAF received a management fee of 1-2% of the Fund's assets under management ("AUM") annually, depending on the investor.  PAF received these fees on a monthly basis in advance based on the value of each limited partner's capital account, as of the first day of the month.  PAF also received an incentive allocation equal to 10-20% of the net income allocated for the year to each limited partner, depending on the investor.

24.     In February 2016, Burgess and Wojciechowski hired Cook, who had no experience in the alternative lending space, to serve as the COO and CCO of PAF.  Burgess and Wojciechowski also hired CEO A to serve as PAF's CEO.  Like Cook, CEO A had no experience in the alternative lending marketplace.

**A.     The Fund's Offering Documents**

25.     The Fund's private placement memorandum ("PPM") stated that the Fund "intends to invest substantially all its assets into organizations which will originate loans in the alternative marketspace."  The PPM stated further that the investment objective of the Fund was

"to provide investors consistent, risk-adjusted returns through direct loans to non-bank lenders . . . ."

26.     From the start, Burgess and Wojciechowski, who worked on behalf of and under the control of Microbilt and PAF, arranged for PAF (through Microbilt) to provide two key services to mitigate the risk of financial loss to the investors (limited partners) in the Fund.  First, Microbilt and PAF were supposed to engage in a due diligence process to rank alternative lending consumer finance companies based on their historical performance and thereby enable the Fund to invest in (by lending money to) the best alternative lending consumer finance companies.  Second, to minimize the risk to the Fund's capital, Microbilt and PAF were supposed to provide live monitoring of the loans the consumer finance companies made to the subprime borrowers.

27.     As an example, Burgess highlighted these very points in a September 20, 2016 email that he wrote to Cook, CEO A, and other PAF employees who solicited investors to "spread the knowledge" and "build an FAQ book" about Microbilt, PAF, and the Fund.  In the email, which the recipients later used as talking points with investors (as Burgess intended when he wrote it), Burgess asserted, "Microbilt provides [the Fund] with a steady client base of competent operators.  Historically, they have been best operators based on actual performance. We like to think they are 'good loans' and that these clients originate 'good loans', but Microbilt provides *us* with the below [the live monitoring] to ensure that our capital is not at risk." (emphasis added).

28.     Relatedly, the PPM provided that the Fund would enter into contractual agreements with "Microbilt Corporation . . . and employ **its proprietary evaluation models to identify, analyze, and monitor those lenders in real time**. . . ." (emphasis added).

29.     As designed, Microbilt and its key personnel were integral to the operation of PAF and the Fund.  First, Microbilt was supposed to recommend consumer finance companies to PAF as potential recipients of lines of credit (revolving loans) for the Fund.  Microbilt purportedly would recommend consumer finance companies from its existing client base of consumer finance companies that used its data services.  These preexisting relationships should have allowed Microbilt to: (1) evaluate and rank their previous actual performance in the alternative lending industry; and (2) only recommend the best performing (and thus lowest risk) borrowers to PAF.  As described below, although defendants and their agents repeatedly touted these putative advantages, Microbilt did not employ them in practice during the Relevant Period.

30.     Second, Microbilt's products purportedly allowed PAF to screen the consumers and provide valuable information—"live" and in "real time"—about the underlying consumer loans.  This information included: the financial health of the (subprime or high-risk) borrower; the borrower's ability to repay the loan; whether the repayment of a loan to a consumer borrower had come from the consumer's bank account; and whether the borrower was current on its payments, was near default, or had defaulted, so that Microbilt and PAF could ensure that the consumer loan was replaced with better collateral to secure the credit line.  As described below, while Defendants made contemporaneous representations otherwise, Microbilt did not, in fact, provide live or real time analysis of the high-risk loans that secured the credit lines for much of the Relevant Period.

31.     In addition to stating the Fund's investment strategy and its relationship with Microbilt, investor presentations, the PPM, and other marketing materials also listed the members of PAF's management team.  Initially, these documents represented that management included Original President A as President of PAF and Managing Partner B as Managing

Partner. Burgess was an acquaintance of both Original President A and Managing Partner B, and he hired them. Although they both had previous private fund experience, neither of them had experience with alternative lending investments, which formed the basis of the proposed investments of the Fund.

32. Because they lacked experience in the alternative lending field, Original President A, Managing Partner B, and the rest of the original PAF management team, relied heavily on the deep experience that Burgess, Wojciechowski, and others at Microbilt had in evaluating and selecting credit lines (investments) for the Fund, and creating marketing materials that described Microbilt's alleged "real-time monitoring" capabilities and the diligence and processes that were being performed to select the best consumer finance companies for investment by the Fund.

33. Burgess had a substantial role in the decision-making and management of PAF but Defendants concealed this information from investors. By touting PAF's management team in investor presentations, marketing materials, and the PPM, Defendants had an obligation to ensure those statements did not mislead investors. However, by omitting Burgess's crucial role in PAF's management from these materials, Defendants rendered the statements of who participated in PAF's management team false and misleading. These omissions further acted to conceal Burgess's criminal conviction. Defendants knew that fraud is a primary risk throughout the alternative consumer lending industry and, therefore, Defendants knew, were reckless in not knowing, or should have known that misrepresenting the management team of PAF and omitting Burgess would have been material to investors' decisions about whether to commit capital to the Fund.

34. In January 2016, at Burgess's direction, Wojciechowski fired Original President A and Managing Partner B. From January 4, 2016, until March 2016, Burgess and

Wojciechowski managed the Fund. During this time, Burgess and Wojciechowski took no steps to update the PPM and marketing materials to reflect this change in management.

35. The investor presentations, marketing materials, and the PPM were updated in March 2016 by Cook, shortly after he was hired, to include the names and management positions for Cook, CEO A, and Wojciechowski. Defendants Burgess and Wojciechowski each reviewed and approved these materials for dissemination to investors, and Cook took a primary role in drafting updates to the investor presentation. The updates to these marketing materials, however, still misrepresented the members of the PAF management team by failing to disclose Burgess's substantial role in the management of PAF and the Fund.

36. The omission of Burgess from these materials was particularly important because neither Cook nor CEO A had any previous experience in the alternative consumer lending markets and both relied upon Burgess's expertise in operating PAF and the Fund.

## II. Defendants materially misrepresented the members of the management team and risk reduction features of the Fund to existing and prospective investors.

### A. Defendants materially misrepresented and concealed Burgess's significant role in managing PAF and the Fund.

37. During the Relevant Period, Defendants Burgess and Wojciechowski, working on behalf of and under the direction of Microbilt and PAF, and Cook, working on behalf of and under the direction of PAF, knowingly, recklessly, or negligently made and/or disseminated materially false statements to investors and potential investors that misrepresented the management of the Fund and concealed the significant role that Burgess, who had recently been convicted of tax fraud, played in managing both PAF and the Fund. Investor presentations, the PPM, and other marketing materials and public statements never included Burgess in the management team or advisory board for PAF. The same materials disclosed lesser employees,

11

including one employee as an advisory board member whose role was limited to formatting PowerPoint presentations and making trade show banners, and another who did not know that he was even on the advisory board.

38.     Burgess and Wojciechowski sought to conceal Burgess's role from the outset. Burgess, in a series of emails on January 2-4, 2015, instructed Wojciechowski how to respond to a reporter who had been inquiring about whether Burgess was involved in the Fund.  On January 4, 2015, Wojciechowski sent an email to the reporter falsely claiming that Burgess was only a "consultant."  Specifically, Wojciechowski deceptively asserted, "Phil is not involved in the operations and he is a [sic] purely a consultant to the company that primarily works on product development.  His LinkedIn profile is out of date and *he really is not involved in PAF*." (emphasis added).  Significantly, Wojciechowski's false description of Burgess's role was word-for-word what Burgess had instructed him to say.

39.     Similarly, on January 6, 2016, while he was actively managing PAF, Burgess emailed a presentation about PAF and the Fund to a potential investor that failed to disclose Burgess's involvement with the Fund, let alone that he was as a member of the management team.

40.     Cook drafted investor presentations and tear sheets (single-paged documents that are used to summarize key information about individual companies or funds), and both Wojciechowski and Burgess reviewed and approved them for dissemination knowing that PAF employees would (and did) routinely email them to numerous potential and existing investors throughout 2016 and 2017.  All of the investor presentations and tear sheets misrepresented the composition of the PAF management team by omitting Burgess's name—and thereby any indication of his criminal history—from any description of the management team.

12

41.     For example, on June 21 and October 12, 2016, and February 1, 2017, Cook
emailed an investor presentation about PAF and the Fund to different potential investors that
failed to mention Burgess in any manner, including in the description of PAF's management
team and advisory board.

42.     These representations and omissions about the composition of PAF's and the
Fund's management team were false and misleading because Burgess:

     a.  controlled all management decisions at the Fund;

     b.  created management and operations policies for the Fund;

     c.  reviewed potential consumer credit companies and reviewed their loan portfolios;

     d.  sat on the credit committee and exercised substantial influence over decisions
about which consumer credit companies the Fund would extend credit, *i.e.* invest;

     e.  had the authority to hire and fire members of PAF's management—an
authority he exercised on more than one occasion; and

     f.  negotiated and set pay and benefits for members of the PAF management team
and its employees.

43.     Despite describing himself only as a "consultant" for Microbilt, and not having
any *formal* role in Fund management, there is no question Burgess was intimately involved in
managing the Fund, including how to conceal his role in the Fund, identifying and selecting the
Fund's investments, and identifying the Fund's risk mitigation tools.

44.     For instance, in an email conversation between Burgess, Wojciechowski, Cook,
and others on January 29, 2017, Burgess instructed Cook, CEO A, and Wojciechowski how and
when to disclose the nature of PAF's access to financial data and loan information.  In the email
conversation, Burgess instructed Cook, Wojciechowski, and another PAF employee, to be less

transparent with investors about the Fund's (lack of) access to the type of data the Fund claimed that it used to mitigate risk. To that end, Burgess instructed them to "[b]e careful with too much transparency as it will bite you in the ass." He later added, "I am also NOT suggesting you lie, but don't volunteer unless you are ask[ed] the direct question." He then noted his apparent belief that "[y]ou cannot trust anyone, period, and good deeds do not go unpunished. He [the investor] will jerk you around on future investments, just to continue to get info out of you." To underscore his concern, Burgess added, "I will bet you my left nut (and I like my nuts) that this [investor] comes after us and uses your words to get us. Don't let that happen." Less than a minute after sending this email, Burgess replied to all with a single sentence stating, "Also, delete these emails please."

45.     Burgess also conducted himself as if he controlled and owned PAF (albeit not publicly, or to investors or prospective investors) and he made clear to Cook, Wojciechowski, CEO A, and others at PAF that: (1) he controlled the Fund; (2) it was being run using "his money," and (3) that they could not make decisions about "his money" without his approval. In the same January 29, 2017 email conversation, Burgess told Cook, Wojciechowski, and others:

> Right now I am putting 100% of the money up for this venture. When you offer to waive fees or cut fees, that is my money. I would be 100% supportive if you gave up the money you are getting, as part of those type offerings, but if you are not offering the money you are getting as part of the deal, I do not support them at all. It is unfair you [sic], to me, to offer up my continued financial support without discussing it with me. That is not making business decisions about the fund on your own, it is spending my money, without my approval.

46.     Additionally, on February 16, 2016, during a discussion with an industry representative about PAF's position with Consumer Finance Company A, Burgess even told the industry representative that he "owned" PAF.

14

47.     Cook, Wojciechowski, and others knew of Burgess's significant role.  For example, Cook admitted under oath that PAF "really relied on [Burgess's] expertise" and opinions, and Burgess had influence over the Fund, as Burgess was "the guy" who knew the consumer lending market and Microbilt.  Similarly, Wojciechowski admitted that Burgess was "involved" with PAF and that Burgess participated in PAF management meetings and decisions regarding certain credit lines.

48.     Despite his expertise in the industry, PAF's reliance on that expertise, and his ability to influence and control the decisions of PAF and the Fund, Burgess's name never appeared in the Fund's marketing materials such as investor presentations, the PPMs, and tear sheets (which Cook drafted and reviewed and Burgess and Wojciechowski approved).  Defendants knew these marketing materials would be and were routinely emailed or otherwise disseminated by PAF employees, including Cook, to numerous potential and existing investors throughout 2016 and 2017.

49.     At all relevant times, Burgess, Cook, and Wojciechowski knew of Burgess's prior criminal conviction and incarceration for tax fraud.  At all relevant times, Burgess, Cook, and Wojciechowski knew, were reckless in not knowing, or should have known that representations concerning PAF's management were false and misleading because Burgess's name and the nature of his involvement were not disclosed in the Fund's investor presentations, the PPM (both of which Cook and PAF employees routinely disseminated and presented to existing and potential investors), and the above referenced statements to investors and potential investors.

50.     Information about the management of a fund is material information to investors who are making investment decisions.  Such information was particularly important in this case as failing to identify Burgess also concealed that a member of the management team was a felon,

who had been convicted of fraud charges and spent time in prison; this was critical information that any reasonable investor would have wanted to know before investing in the Fund. Burgess, Cook, and Wojciechowski knew, were reckless in not knowing, or should have known that Burgess's participation in the management of PAF and the Fund's investments and his criminal conviction and incarceration for tax fraud were material to investors' decisions whether to invest in the Fund.

51.     Despite this, Microbilt, PAF, and Cook, acting on behalf of and under the control of PAF, and Burgess and Wojciechowski, acting on behalf of and under the control of Microbilt and PAF, repeatedly and continually misrepresented the identity of who was managing PAF by omitting the key information regarding Burgess's active participation in the management of PAF and the Fund's investments when making statements, to or otherwise communicating with, investors and potential investors.

52.     Burgess, Wojciechowski, and Microbilt, with knowledge or in reckless disregard of the fraudulent activity described above, provided substantial assistance to Cook's and PAF's failure to inform investors of Burgess's participation in the Fund by reviewing and approving material misstatements (as described in detail above) that Burgess, Wojciechowski, and Microbilt knew, or were reckless and not knowing, would be sent to investors.

**B.     Defendants materially misrepresented to investors that the Fund had the ability to reduce investment risk by tracking investments in "real time."**

53.     During the Relevant Period, Burgess and Wojciechowski, working on behalf of and under the direction of Microbilt and PAF, and Cook, working on behalf of and under the direction of PAF, knowingly, recklessly, or negligently made and/or disseminated materially false statements to investors and potential investors that the Fund had consistent "real-time"

access to monitoring systems that would evaluate the consumer finance company lenders and the subprime borrowers to reduce the risk of loss to the Fund.

54.     One of those systems was the Loan Management System ("LMS"), a computer database system that the consumer finance companies use to maintain each borrower's key information, such as the terms of each loan, opening balances, and payments (or delinquencies), among other information.  Another system was transaction logs, or "T-Logs" that comprised data that Microbilt received from third-party payment processors.  Further, Defendants represented that they had the ability to pull bank account transaction details and data on the subprime borrowers that allowed Defendants to see the payments and sources of payments to the consumer finance companies, and thereby mitigate the risk of fraud and nonpayment.

55.     The putative ability of Microbilt and PAF to analyze bank account transaction details and data about the consumer finance companies' loans to subprime borrowers "live" or in "real-time," rather than on a monthly or other lengthier periodic or episodic basis, if at all, was a key selling feature that Defendants used to solicit investors in the Fund.  Defendants touted the partnership between Microbilt (which was supposed to provide the live monitoring systems) and PAF as a "model that allows micro [sic] tracking of the individual loans."  These representations were materially false and misleading.  Had the technology existed as Defendants advertised, the arrangement could have given PAF a competitive advantage because it would have, for instance, provided constant insight into how the individual subprime borrowers were performing on their loans and, thus, reduced the risk to investors in the Fund.

56.     For example, on June 21, 2016, Cook emailed a PAF investor presentation to Investor X that falsely stated that, "[u]tilizing historical and real-time data analytics, Princeton

Alternative Funding seeks to fill that void by providing and managing credit facilities while targeting the highest quality finance companies that face U.S. consumers."

57.    In a September 2016 telephone call with Investor Y, Cook and CEO A represented that PAF had access to the consumer finance companies' loan management systems and could look at the underlying portfolios on a daily basis, despite the fact that they knew such access did not exist for the majority of the Fund's invested capital.  Burgess and Wojciechowski provided the false information to Cook and CEO A, and controlled its dissemination during the pitch to Investor Y.

58.    On October 11, 2016, Cook, Wojciechowski, and CEO A met with Investor Y and described to Investor Y some of the real-time monitoring systems that Defendants used to monitor investments, including products used to monitor bank accounts and transactions.

59.    On October 12, 2016, and February 1, 2017, Cook emailed Investor Y and another investor a similar investor presentation.  This investor presentation asserted that regulatory changes had made it harder for consumer finance companies to borrow money from traditional banks, and that this, in turn, made it "harder for millions of U.S. consumers to get access to loans."  The presentation also stated that, "[u]tilizing historical and real-time data analytics, Princeton Alternative Funding seeks to fill that void by providing and managing credit facilities while targeting the highest quality finance companies that face U.S. consumers" and, "Princeton Alternative Funding's strategic partnership with Microbilt provides . . . World-class analytics" and "[b]est in class monitoring capabilities with real-time feeds."  Investor Y invested in the Fund on December 1, 2016.

60.    The statements Cook, Wojciechowski, and CEO A made and disseminated to investors were false because they claimed that PAF was monitoring the Fund's investments on a

18

real-time basis to reduce the risk of the subprime lending market to the Fund. On the dates that Cook, Wojciechowski, and CEO A made statements, and when Cook disseminated these statements, PAF did not have access to "real-time" data analytics for a majority of the Fund's invested capital. The Fund did not have the consistent capability to monitor the loans on a daily basis or in "real time," and had not done so since the inception of the Fund.

61. Cook, Wojciechowski, and CEO A knew, were reckless in not knowing, or should have known that these statements were false at the time they made them and Cook disseminated them. Cook was responsible for credit monitoring starting in 2016-2017. Cook, Wojciechowski, and CEO A knew that from at least August 2016 through at least December 2016, PAF and the Fund could not monitor, either completely or in part, the financial performance of Consumer Finance Companies A, B, and C. When Cook emailed investor presentations, and when Cook, Wojciechowski, and CEO A spoke with potential investors in September or October 2016, falsely stating that PAF and the Fund had real-time monitoring, they knew, were reckless in not knowing, or should have known that Microbilt and PAF could not monitor, in real time, the performance of the Fund's credit lines.

62. During this same period, Burgess, as an agent of Microbilt and PAF, was also providing PAF employees with false information about the "real-time" capabilities and monitoring of the consumer finance companies. On September 20, 2016, Burgess wrote an email to PAF employees that he authorized them to use to answer inquiries from potential investors. In that email Burgess wrote, "Microbilt also provides live monitoring as the lenders are required to report to Microbilt . . . . Further, Microbilt provides us with tools that allow [the Fund] to pull transaction detail for all bank accounts, general ledger, payroll & the Loan Management System, daily. . . . We have access to the raw data & backup data 24 x 7." A PAF

employee used Burgess's statement word-for-word when communicating with potential investors
on September 21 and 22, 2016.

63.      Burgess's statements were false.  PAF, the Fund, and Microbilt did not have
consistent real-time access to the consumer finance companies' systems and data.  Burgess knew
that as of at least May 4, 2015—when the Fund already had issued three lines of credit (*i.e.*, three
investments with consumer finance companies)—when he informed the Fund and PAF
management that the Fund, PAF, and Microbilt, did not have real-time monitoring and that it
would take Microbilt, PAF, and the Fund "*another few months to finish that*."  (emphasis added).
Thus, as of May 2015, although the Fund was already extending lines of credit to consumer
finance companies and actively soliciting investors for the Fund, PAF and Microbilt did not have
"live" or "real-time" monitoring, and did not even suggest that they expected to for at least
"another few months."

64.      Microbilt's and PAF's ability to monitor data in "real time" did not significantly
improve over time.  For example:

    a.    PAIF extended a line of credit to Consumer Finance Company B on November
          19, 2015.  By October 2016, PAF still lacked access to Consumer Finance
          Company B's LMS system, when Cook, on October 10, 2016, contacted
          Consumer Finance Company B to request access to it.

    b.    PAIF extended a line of credit to Consumer Finance Company C on August 28,
          2015.  On October 10, 2016, Cook informed Consumer Finance Company C that
          PAF and the Fund still lacked access to Consumer Finance Company C's LMS
          system.

     c.   PAIF extended a line of credit to Consumer Finance Company A on May 1, 2015. Consumer Finance Company A was the Fund's largest consumer finance company (meaning that Consumer Finance Company A borrowed and owed the most money to the Fund compared to all of the Fund's other credit line investments). From at least September 2016—when Cook sent an email requesting access to Consumer Finance Company A's LMS—through at least December 2016, PAF lost access to Consumer Finance Company A's financial reporting, and it was unaware of Consumer Finance Company A's financial condition during at least a four-month period.

65.    In September 2016, when Burgess wrote emails that he authorized and knew PAF employees would send to potential investors, Burgess knew, was reckless in not knowing, or should have known that PAF could not monitor, in real time, the performance of the Fund's credit lines. He had attended weekly team meetings during this period, when Microbilt's inability to access the LMS and T-Logs were discussed. Burgess also received and sent emails relating to requests to restore access to the consumer financial companies' loan management systems.

66.    PAF's as well as Cook's, CEO A's, Wojciechowski's, and Burgess's statements regarding the ability of PAF, Microbilt, and the Fund to monitor lenders' financial data in "real time" were material to investors' decision about whether to invest in the Fund because any reasonable investor would have wanted to know that the Fund's investments were *not* being carefully monitored "in real time" to reduce the inherent risk in the alternative (higher-risk) lending space. During the Relevant Period, Cook, CEO A, Wojciechowski, and Burgess's were acting on behalf of and under the control of PAF.

67.     Burgess and Wojciechowski, acting on behalf of and under the control of Microbilt, with knowledge or in reckless disregard of the fraudulent activity described in the preceding paragraphs, provided substantial assistance to Cook's, CEO A's, and PAF's material misstatements that PAF could monitor lenders' financial performance in real time by reviewing and approving material misstatements (which Burgess knew, or was reckless in not knowing, would be sent to investors).

68.     Microbilt, with knowledge, or in reckless disregard of Burgess's and Wojciechowski's misconduct, provided substantial assistance to Cook's, CEO A's, Burgess's, and PAF's material misstatements that PAF could monitor lenders' financial performance in real time.

**C.      Defendants materially misrepresented the process they employed to select "the best operators in the alternative lending sector" to reduce risk in the Fund's investments.**

69.     During the Relevant Period, Burgess and Wojciechowski, working on behalf of and under the direction of Microbilt and PAF, and Cook, working on behalf of and under the direction of PAF, knowingly, recklessly, or negligently made and/or disseminated materially false statements to investors and potential investors that PAF management used Microbilt's "historical rankings" to select only the best consumer finance companies in which to invest or extend credit lines.

70.     In investor presentations used in 2015, 2016, and 2017, PAF falsely claimed to investors that it would review its ranking of subprime consumer finance company lenders generated from Microbilt's extensive database on the actual historical performance of these operators and provide credit lines to those lenders that were the best operators based on actual

22

performance in the alternative lending space.  PAF further represented that this review and ranking would lower the risk to investors in the Fund.  For example:

    a.    Cook drafted, reviewed. and approved for distribution an investor presentation that falsely stated, "Princeton Alternative Funding's strategic partnership with Microbilt provides . . . World-class analytics and unmatched lender [consumer finance company] due-diligence" as well as "Historical rankings of best operators in the alternative lending sector." On June 21, 2016, Cook emailed PAF's investor presentation that contained this language to Investor X.

    b.    On September 13, 2016, Cook and CEO A told Investor Y that Microbilt had 10,000 customers, of which 4,000 were lenders.  Of these 4,000 lenders, Microbilt picked about 450 to be the top operators in the space. Microbilt referred these lenders to PAF.

    c.    During an October 11, 2016 in-person meeting with Investor Y, Cook, Wojciechowski, and CEO A falsely told Investor Y that PAF's biggest consumer finance company was one of Microbilt's "best operators" and that Microbilt had had a relationship with the company for many years.

    d.    On February 1, 2017, Cook emailed the investor presentation quoted above in Paragraph 70.a to another potential investor.

71.    Burgess also wrote emails that he authorized and directed PAF employees to send to potential investors that falsely represented that PAF used "historical rankings" in the consumer finance company selection process.  According to September 20 and 22, 2016 emails that Burgess wrote to a PAF employee, who sent them by email to a prospective investor: "Microbilt provides

PAIF with a steady client base of competent operators. Historically, they have been best operators based on actual performance" and "[y]ou will not find another investment manage[r] that has a stronger competitive advantage. No one comes close to having the pool of lenders and the tools necessary to protect our investors' capital."

72.     Contrary to these statements and representations that Cook, Burgess, CEO A, and Wojciechowski drafted, authorized for distribution, made, and disseminated on behalf of and under the control of Microbilt and PAF, to investors and potential investors, Microbilt did not employ "historical rankings" based on actual performance to determine the "best operators in the alternative lending sector" in its selection and screening process for the Fund's credit lines to consumer finance companies. In reality, PAF's selection of consumer finance lenders was haphazard at best, and some of the lenders that PAF selected were neither "historically ranked" (or ranked at all for that matter), nor were some even existing clients of Microbilt.

73.     Only once, in 2014, did Microbilt rank its clients at all. Using November 2014 data, a Microbilt employee examined 418 Microbilt accounts that used short-term lending products (out of 4,374 total clients, the remainder of which did not use short-term lending products) and ranked them on a variety of factors. Only 57 of 418 clients had data for reported loans and a recorded bad credit rating (the percentage of accounts that perform in an unacceptable manner). Of those 57, only two became lenders of the Fund's eventual 12 credit lines. Moreover, contrary to CEO A's, Burgess's, Cook's, and Wojciechowski's assertions, many of the consumer finance company lenders in which the Fund invested either were poorly rated by this 2014 internal ranking or were not even long-term clients of Microbilt.

74.     During the Relevant Period, Wojciechowski, the CEO of Microbilt and CFO of PAF, did not know whether Microbilt had ever performed *any* analysis that could conceivably have generated "historical rankings" of the "best operators in the alternative lending sector."

75.     Cook, as PAF's COO, CCO, and CEO A at PAF, as members of the credit committee that selected the credit lines, knew, were reckless in not knowing, or should have known that—because they did not exist— PAF could not have relied on historical rankings of the best operators in the alternative lending sector in deciding in which alternative consumer lenders to invest the Fund's capital.  Given both Cook's and CEO A's inexperience with both the alternative consumer lending industry and the services Microbilt could provide, Burgess and Wojciechowski, as agents of Microbilt, were the source of the false information that Cook prepared and provided to investors.  Burgess and Wojciechowski knew, were reckless in not knowing, or should have known that the information that they provided to Cook and CEO A was false and that they would in turn provide the false information to potential investors or investors in the Fund.

76.     Cook and CEO A, acting on behalf of and under the control of PAF, and Wojciechowski, acting on behalf of and under the control of PAF and Microbilt, knew, were reckless in not knowing, or should have known that PAF did *not* have current consumer finance company rankings provided by Microbilt (that would have supported that PAF and the Fund invested in only those lenders that were best in class) when: (i) Cook emailed investor presentations to existing and prospective investors; and (ii) Cook and Wojciechowski spoke with potential investors in September and October 2016, stating that PAF and the Fund only invested in "historically ranked" lenders.

77.     In September 2016, when he drafted emails that he knew PAF employees would send to potential investors, Burgess, acting on behalf of and under the control of PAF and Microbilt—based on his years of experience in the industry and his roles with Microbilt and PAF—knew, was reckless in not knowing, or should have known that PAF did not have current consumer finance company rankings from Microbilt that showed that PAF and the Fund invested in only those lenders that were "best operators based on actual performance" in the alternative lending sector.

78.     Defendants' statements regarding the historical rankings and quality of the lenders that the Fund invested in were material to investors' decisions about whether to invest in the Fund.  The alternative lending marketplace is very risky, both in terms of fraud and credit risk. PAF's and Microbilt's ability to review the actual historical performance of several thousand consumer lenders and rank them based on such performance would have mitigated the risk to Fund investors.

79.     Burgess, Cook, CEO A, and Wojciechowski, acting on behalf of and under the control of PAF and Microbilt, knowingly, recklessly, or negligently, materially misrepresented that PAF's investments consisted of lenders that were "historically rank[ed as] best operators in the alternative lending sector."

80.     Burgess and Wojciechowski, acting on behalf of and under the control of PAF and Microbilt, with knowledge or in reckless disregard of the false statements, provided substantial assistance to Cook's, CEO A's, and PAF's material misstatements that the Fund's investments consisted of lenders that were "historically rank[ed as] best operators in the alternative lending sector" by reviewing and approving those material misstatements that Burgess and Wojciechowski knew, or were reckless in not knowing, would be sent to investors.

81.     Microbilt, through Burgess's and Wojciechowski's fraudulent practices, with knowledge or reckless or negligent disregard of Burgess's misconduct, provided substantial assistance to Cook's, CEO A's, and PAF's material misstatements regarding the due diligence PAF used to select lenders and the manner in which PAF described those lenders to investors.

**D.      Defendant Cook made material misstatements and omissions to investors regarding the Fund's largest investor.**

82.     From the Fund's inception until March 2016, Investor R was the Fund's first, and only, investor.  Throughout the lifetime of the Fund, Investor R's contributions always constituted the largest investment in the Fund, amounting to no less than 85% of the Fund's AUM.

83.     Because of Investor R's outsized investment, a decision to redeem its investment would have had a significant, negative impact on the financial viability of Fund.  Thus, in deciding whether to invest, some prospective investors inquired about the status of both Investor R's investment and its overall relationship with PAF's management.  Cook, acting for and under the control of PAF, provided materially false responses to those investors.  For example:

a.      In a July 18, 2016 email discussion Investor X asked Cook about Investor R's redemption terms, noting their "concern of [the Fund's] business viability if one day they decide to redeem."  Rather than disclose the truth, that Investor R had *already* submitted a redemption request, Cook instead responded deceptively that the Fund had "been in discussions with [Investor R] for an additional investment."

b.      In a January 19, 2017 email responding to a potential investor's question regarding redemptions, Cook disclosed the redemption of a small investor

(approximately $1.5 million) but failed to mention any redemption

requests submitted by Investor R.

84.     Defendant Cook's statements and omissions were false and misleading.  On

March 28, 2016, four months before the first investor inquiry, Investor R submitted a redemption

request after discovering tax and accounting issues created by the structure of the Fund.  Under

the terms of the limited partnership agreement, as amended by a side letter agreement, Investor

R's redemption would have been effective no later than September 30, 2016, with Investor R

receiving 100% of its funds by October 31, 2016.  At no point did Investor R rescind its

redemption request.

85.     At least by May 2, 2016, if not earlier, Cook was aware that Investor R sought to

redeem its investment.  Cook attended weekly PAF management team meetings that included

discussions of Investor R's redemption no later than May 2, 2016.

86.     Cook and PAF knowingly, recklessly, or negligently made material

misrepresentations and omissions regarding Investor R's efforts to seek redemption from the

Fund.

87.     In total, from March 2015 through February 2017, Cook, Burgess,

Wojciechowski, PAF, and Microbilt used the false and misleading statements to raise $73

million from fourteen investors.

## FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
(Against Cook, Burgess, Wojciechowski, PAF, and Microbilt)

88.     Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

89.     Since at least March 2015, specifically by failing to inform investors and potential

investors of Burgess's involvement in the Fund and reviewing, authorizing, making, and

disseminating material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund to investors and the status of the Fund's largest investor, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

90.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Violations of Securities Act Sections 17(a)(1) & (3)
(Against Cook, Burgess, Wojciechowski, and Microbilt)

91.     Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

92.     Since at least March 2015, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and reviewing, authorizing, making, and disseminating material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund to investors and the status of the Fund's largest investor, Cook, Burgess, Wojciechowski, and Microbilt, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more

devices, schemes or artifices to defraud, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

93.　　By reason of the foregoing, Cook, Burgess, Wojciechowski, and Microbilt violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) & (3) of the Securities Act, 15 U.S.C. §§ 77q(a).

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(a)
(Against PAF)

94.　　Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

95.　　Since at least March 2015, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and reviewing, authorizing, making, and disseminating material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund to investors and the status of the Fund's largest investor, PAF, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently, to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

96. By reason of the foregoing, PAF violated and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange Act
### Section 10(b) and Rule 10b-5 Thereunder
(Against Burgess, Wojciechowski, and Microbilt)

97. Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

98. By engaging in the conduct alleged in this Complaint, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and making material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund to investors and the status of the Fund's largest investor, Cook, CEO A, and PAF directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

99. Burgess, Wojciechowski, and Microbilt knew, or were reckless in not knowing, that Cook, CEO A, and PAF were engaged in the unlawful conduct alleged in this Complaint, and Burgess, Wojciechowski, and Microbilt knowingly or recklessly substantially assisted and participated in the wrongdoing. Burgess, Wojciechowski, and Microbilt provided substantial assistance to Cook, CEO A, and PAF and substantially participated in the fraud by effecting some of the material misstatements and omissions alleged in this Complaint and reviewing and

approving material misstatements and omissions that Burgess, Wojciechowski, and Microbilt knew would be sent to investors.

100.    By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Burgess, Wojciechowski, and Microbilt aided and abetted Cook's, CEO A's, and PAF's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Securities Act Section 17(a)
(Against Burgess, Wojciechowski, and Microbilt)

101.    Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

102.    By engaging in the conduct alleged in this Complaint, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and making material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund and the status of the Fund's largest investor Cook and CEO A, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

103.    By engaging in the conduct alleged in this Complaint, specifically by failing to inform investors and potential investors of Burgess's involvement in the Fund and making material misrepresentations and omissions concerning important risk reduction strategies in place at the Fund and the status of the Fund's largest investor, PAF directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of

transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently, to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

104.    Burgess, Wojciechowski, and Microbilt knew, were reckless in not knowing, or should have known, that Cook, CEO A, and PAF were engaged in the unlawful conduct alleged in this Complaint.  Burgess, Wojciechowski, and Microbilt provided substantial assistance to Cook, CEO A, and PAF and substantially participated in the fraud by effecting some of the material misstatements and omissions alleged in this Complaint and reviewing and approving material misstatements and omissions that Burgess, Wojciechowski, and Microbilt knew would be sent to investors.

105.    By reason of the foregoing, pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), Burgess, Wojciechowski, and Microbilt aided and abetted Cook's, CEO A's, and PAF's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

### **I.**

Issue a Final Judgment permanently restraining and enjoining: (1) all Defendants, their agents, servants, employees and attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from (i)

violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and (ii) violating Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Issue a Final Judgment directing Burgess, Wojciechowski, Cook, and Microbilt to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## III.

Issue a Final Judgment permanently restraining and enjoining Burgess, Wojciechowski, and Cook from, directly or indirectly, including, but not limited to, through any entity owned or controlled by them, soliciting any person or entity to purchase or sell any security, provided, however, that such injunction shall not prevent Burgess, Wojciechowski, and Cook from purchasing or selling securities for their own personal accounts.

## IV.

Grant such further relief as the Court may deem just and appropriate for the benefit of investors.

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.

Dated: June 24, 2021               Respectfully submitted,


                /s/ James E. Smith
                James Smith
                Joshua Braunstein
                Attorneys for Plaintiff
                SECURITIES AND EXCHANGE
                COMMISSION
                100 F Street, NE
                Washington, DC  20549
                Tel: (202) 551-5881 (Smith)
                Tel:  (202) 551-8470 (Braunstein)
                smithja@sec.gov
                braunsteinj@sec.gov

                **Lead Attorneys**
                **Attorneys to be Noticed**

**LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceedings.

Dated:  June 24, 2021

/s James E. Smith
James Smith
Joshua Braunstein
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC  20549
Tel: (202) 551-5881 (Smith)
Tel:  (202) 551-8470 (Braunstein)

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission ("SEC") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as an eligible alternative to the SEC to received service of all notices or papers in the action at the following address:

> David Dauenheimer
> Deputy Chief, Government Fraud Unit
> Assistant U.S. Attorney
> 970 Broad Street
> Newark, NJ, 07102
> Email: david.dauenheimer@usdoj.gov
> (973) 645-2700

Dated: June 24, 2021

> /s James E. Smith
> James Smith
> Joshua Braunstein
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE
> COMMISSION
> 100 F Street, NE
> Washington, DC  20549
> Tel: (202) 551-5881 (Smith)
> Tel:  (202) 551-8470 (Braunstein)