Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
| Plaintiff, | **DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL** |
| vs. | |
| David Allen Harbour, | (Oral Argument Requested) |
| Defendant. | |

Defendant David Allen Harbour, by and through his attorneys, respectfully moves this Court to vacate the judgments against him and grant a new trial pursuant to Federal Rule of Criminal Procedure 33.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Pro. 33(a). Other than motions brought on the grounds of newly discovered evidence, a motion for a new trial must be filed within 14 days of the verdict being returned. *Id*. at (b). A district court has the power to grant a motion for a new trial. *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000), *disapproved of by Washington v. Poole*, 507 F. Supp. 2d 342

(S.D.N.Y. 2007); *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980). In a motion for a new trial, the court does not view the evidence in the light most favorable to the verdict and may weigh evidence and evaluate the credibility of witnesses. *Id. see also United States v. Williams*, No. CR 2:08-376 WBS, 2014 WL 4417406, at *1 (E.D. Cal. Sept. 8, 2014), *aff'd,* 673 F. App'x 620 (9th Cir. 2016). A verdict may be set aside and a new trial ordered if the court concludes that, while in theory evidence may be sufficient to sustain a convection, the evidence weighs against the verdict returned by the jury. *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992); *United States v. Ionutescu*, 752 F. Supp. 2d 1091, 1095 (D. Ariz. 2009).

## **ARGUMENT**

1.      The evidence presented at trial was not sufficient to sustain a guilty conviction.

"If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Lincoln*, 630 F.2d at 1319.

This case is a poster-child for the granting of a new trial as is shown in the renewal of the Rule 29 Motion which is also being filed as of this date. To save space, the substance of the renewed Rule 29 Motion is incorporated by reference as if fully set-forth herein.

Here, we analyze the evidence with respect to each of the three alleged remaining victims, PAIF, Turasky, and Burg.

2

1

**PAIF - $1.1 Million**

2

The easiest to dispatch is PAIF but only if the Court, as it should have done so and

3

4

as it still should do, mandates that the government adhere to what it claimed the fraud

5

was. With respect to PAIF, the SSI stated:

6

7

8

9

10

11

12

13

14

> 24.    From the beginning of the business arrangement with PAIF,
> HARBOUR manipulated the records to his advantage in order to entice
> PAIF to fund the draw requests. The records included a spreadsheet that
> gave a false impression of the lending portfolio and the status of Green
> Circle. For example, per the guidelines of funding, customers who were in
> arrears with the Green Circle payday lending were barred from receiving
> any new loans. Instead, HARBOUR issued new loans to the borrowers who
> were about to go into default, which absorbed the old loans. HARBOUR
> misrepresented to PAIF that Green Circle was a functional and profitable
> portfolio and that the loans were performing and not in default. PAIF relied
> on this information for their lending decision and would not have provided
> funds if the borrowers' loan status was accurately represented. HARBOUR
> never disclosed to investors that the loans were non-performing.

15

The only evidence in the case presented by the government was through Laura

16

Purifoy. She testified that, some unknown number of months after OakTree's receipt of

17

$1.1 million, Harbour made pen and ink changes to the borrowing base spreadsheet, that

18

19

she alerted Stefan Andreev, at Green Circle and that Stefan Andreev agreed that the

20

changes proposed by Harbour should be rejected.

21

The government never even introduced any evidence that met the allegations of ¶

22

24. The only documents introduced with respect to PAIF were drafts of the first

23

24

borrowing base (for the month after) the month in which the payment was made and

25

which showed that the parties (Green Circle, PAIF, and OakTree) were trying to

26

determine how to best portray the borrowing base. There were four competing versions of

27

28

3

how to represent it, with PAIF CEO Bob Ferrell making the final decision in mid-September 2015.

There was a complete failure on the part of the government to prove what it alleged in ¶ 24. No witnesses from PAIF ever testified that PAIF received a fraudulent borrowing base after years from hearing from the government that either Mr. Burgess or Mr. Primus would be the key witness in providing the false borrowing base calculations. The government never provided any actual borrowing base calculations that were supposedly relied upon by PAIF to advance any monies to Green Circle, let alone the $1.1 million. More importantly, Ms. Purifoy admitted not knowing which borrowing bases were marked up and not knowing what happened to them after she sent them to Mr. Andreev except that she stated he also rejected Mr. Harbour's changes. Therefore, how could any rational person surmise that the changed borrowing base calculations ever made it to PAIF without someone from PAIF saying they did? What we do know from Ms. Purifoy, is that Mr. Harbour and Ms. Purifoy did not have the ability to alter the actual customers of Green Circle because they did not have access to the loan management software, which is in direct contradiction to paragraph 24. Finally, Ms. Purifoy stated she had nothing, zero to do with any documents financial or otherwise with the approval of the $1.1 million from PAIF to Green Circle.

Exhibit 516, analyzed in depth in connection with the renewed Rule 29 Motion makes the government's problem worse with respect to PAIF and, for different reasons, also worse with respect to Turasky and Burg. With respect to PAIF, the June 23, 2016 email enclosing the Green Circle bank records and a spreadsheet prepared by Laura

Purifoy, came almost a year after PAIF's repayment of $1.1 million advanced to Green Circle by OakTree. So, although the government relied on it to show that PAIF relied upon it in making the payment 10-months earlier, that attempt was both absurd and false. The June 23, 2016, email and schedules could not have influenced a payment made 10-months earlier.

Last, with respect to PAIF, its seizure of $1.9 million of OakTree money in Green Circle's account in September 2016, offset any loss that may have been have suffered when it fulfilled the $1.1 million draw request on August 11, 2015.

**Turasky - $350,000 or $500,000**

This is what the evidence showed:

- Turasky sent $500,000 to OakTree and received $150,000 back from OakTree the next day.

- Turasky's lawyers drafted the documents.

- The documents gave Harbour authority to use the funds precisely as he used the funds.

- OakTree regarded Turasky as having put in $350,000.

- Turasky testified that Harbour was permitted to use the $350,000 to cover business expenses, provided that, at some point, the entire $350,000 would be used to generate the returns to Turasky that he expected to receive.

- The unrebutted evidence is that Turasky's $350,000 was used, in part, to pay OakTree expenses.

- Exhibit 516 showed, unequivocally, that all of Turasky's $350,000 reached Green Circle's bank account by December 14, 2014.

- Purifoy's schedule

- Ms. Paige's and Ms. Cameron's assessments may be viewed harmoniously and doing so reaches the same result.

- Eventually, Turasky's $350,000 all reached Green Circle. It formed part of the $1.8+ million that PAIF foreclosed. Exhibit 516 shows the $1.8 million in the Green Circle account in 2016.

- Therefore, the jury could not have found that Harbour kept all Turasky's money.

- From the evidence admitted without any objection or any objection being sustained, the jury could only have found that Turasky agreed that Harbour was entitled to use the $350,000 for expenses provided that it eventually reached Green Circle and that is exactly what happened.

- What were the misrepresentations?

- What was the fraud?

- The SSI plead solely that the fraud was Harbour's failure to tell Turasky that he would and could use Turasksy's $350,000 for expenses.

- If the government is relying on material omissions to support the alleged fraud, they are not pleaded anywhere in the SSI.

- The SSI did not plead any omissions of material facts which, had they been known to Turasky, would have led him to reject the infusion of the $350,000.

**Burg - $1 Million**

- Like Turasky, Burg's lawyers drafted the operative documents.

- Like Turasky, Burg and Avedon also testified that Harbour could use the $1 million to pay expenses provided that eventually the $1 million would be put into Green Circle to generate returns.

- This is precisely what occurred.

- Exhibit 516 shows Burg's money (OakTree) and the Joplin Group money that replaced the Burg money ($400,000) used for expenses.

- Burg's $1 million was part of the $1.8 million in the Green Circle account when PAIF seized the account in September 2016.

- From the evidence admitted without any objection or any objection being sustained, the jury could only have found that Burg agreed that Harbour was entitled to use the $1 million for expenses provided that it eventually reached Green Circle and that is exactly what happened.

- What were the misrepresentations?

- What was the fraud?

- The SSI plead solely that the fraud was Harbour's failure to tell Burg that he would and could use Burg's $1 million for expenses.

- If the government is relying on material omissions to support the alleged fraud, they are not pleaded anywhere in the SSI.

- The SSI did not plead any omissions of material facts which, had they been known to Burg would have led him to reject the infusion of the $1 million.

2.     The introduction of other 'victims' not charged in the indictment was unfairly prejudicial.

Since the outset of this case, the Defense has strenuously objected to the government being permitted to introduce evidence of individuals who were not named as victims in the Counts of the indictment but whom, nonetheless, were portrayed as victims by the government. Rejecting the sound defense argument that Federal law does not criminalize general schemes and artifices to defraud that would be chargeable under Federal law but only use of the facilities of interstate wire communications in furtherance of a scheme and artifice to defraud the victim associated with the count or counts of the indictment, the Court decided to permit the government to offer this evidence only if the government could meet the two-prong test it set-forth: that one or more of the Group of Five listed in the indictment (Burg, Turasky, PAIF, Willson, and/or Hill) both were attracted to making the Investment because of Harbour's wealth or its appearance *__and__* that the wealth came from a funds obtained via fraud. *See*, RT, January 17, 2023, p. 160-161 and p. 163, ll. 9-16; p. 165, l. 16 -p. 166, l. 1; p. 167, ll. 21-25.

First, the jury rejected the unsophisticated alleged victims, Willson and Hill altogether. Second, there was no evidence that Turasky met the first part of the test (knowledge of wealth). However, assuming arguendo that he did, and that Burg was impressed with Harbour's supposed wealth, no link was never established between the wealth or its appearance and funds obtained by fraud to pay for the wealth.

The governments entire case was based around the theory that Mr. Harbour defrauded numerous people for tens of millions of dollars. Even now, post-conviction, the government is parading this case as a fraud in excess of $20 million dollars and that

extended from 2007 to 2021[1]. This is completely inaccurate; the charges of which Mr. Harbour was convicted have a putative loss of $2.45 million.[2] No conduct engaged in prior to July 2014 was the subject of any conviction. It is obvious the government intended to prejudice the jury against Mr. Harbour by introducing evidence that should have been excluded under Fed. R. Evid. 403 and 404. In short, what the evidence showed was that all the luxury items were purchased between 2011 and 2013 and that the source of the purchases was money received from Canyon Road and KSQ. The failure of the government to prove that fraudulently obtained money paid for the wealth Harbour acquired meant that the evidence of the wealth should have been excluded. Having created a test, the Court then failed to impose the test on the government.

The second test the government also failed was the requirement that, in order to admit the Bobrow, Jackson, and Gray alleged frauds, it needed to tie the payment of Bobrow to Jackson and/or Gray money and the payment of Jackson to Gray money or otherwise fraudulently obtained money. This the government could not do.

One of the first and largest examples of evidence that should have been excluded was the Craig Jackson $6 million. The proof in trial was only that Mr. Harbour received $6 million from Craig Jackson in 2009. The government could not prove what happened

---

[1] https://www.justice.gov/usao-az/pr/scottsdale-man-convicted-investment-fraud.

[2] The defense position for sentencing will be that the loss is actually zero and that is because the defendant is only responsible for losses that are causally related to the illegal conduct. The Green Circle losses are not causally related to Harbour's conduct. Burg and Turasky lost money when PAIF foreclosed the Green Circle loan portfolio. PAIF lost nothing. When it foreclosed, it made up its $1.1 million with $1.8+ million of money to which PAIF had no entitlement at all. The government's "but for" causation theory is not the type of causation recognized in this Circuit for determining offense severity.

to the $6 million, other than that Harbour repaid the $6 million in 2012. The government made the claim that Jackson's $6 million was part of a Ponzi scheme and that Jackson's $6 million was used to pay Bobrow and Case. This was never proven.

There are no bank statements from prior to November 2010. The earliest extent bank statement showed a balance of $64,000 on October 31, 2010. The government could offer no proof of where the money to repay Bobrow's and Case's 2007 loan in the amount of $2.5 million came from. Specifically, the government did not show and could not show that Jackson money (2009) was used to pay Bobrow. Nor could the government show that payments to Bobrow and Jackson came from sources other than KSQ and/or Canyon Road, entities that the government failed to prove were frauds. The government was required to show that payment of the $6 million loan came from fraudulently obtained property.

The government also contended that Mr. Harbour took an additional $9 million from Jackson, but this evidence was refuted by Jason Braun, Jackson's lawyer. Mr. Braun testified that the $9 million never went to Mr. Harbour, it went to Tony Stacy at the Palo Verde Fund. The governments continued assertions that Mr. Harbour was responsible for the $6 million plus the $9 million as part of a 'fraud' was factually incorrect and should never have been allowed to be argued to the jury.

This issue continues with the remaining individuals who were named in the indictment but not identified in any particular counts.

Joe Cathey never met Mr. Harbour until after the payments stopped in September of 2013. Prior to that, all of Mr. Cathey's dealings were solely with Mr. Dunsworth. No

1   representations were made nor could have been made to Cathey by Harbour and there is

2   no conspiracy charge in the SSI.

3
    There is also no proof that Dunsworth or Harbour received finder's fees based
4
5   upon Cathey's loans to NorthRock. The exhibit relied upon by the government witnesses,

6   the so-called 25%/30% Agreement is between DNA and KSQ, not between NorthRock

7   and KSQ.

8
    The wealth evidence the government introduced should also never have been
9
10  admitted and tainted the jury. The government showed no more than that the "wealth"

11  was purchased during 2011-2013 when Harbour was making an enormous amount of

12  money from KSQ and Canyon Road. The government did not establish any links between

13
    allegedly fraudulent money and items Mr. Harbour purchased.
14
15  The failure of the government to meet the tests established by the Court led both

16  the admission of evidence concerning wealth and evidence concerning prior acts that

17  should have not been admitted. Its admission severely prejudiced the Defendant. The

18
19  prejudice was severalfold. We have already shown that the evidence of wealth and of

20  "other acts" was designed to make the Defendant appear "bad" to the jury.[3] The

21  admission of this evidence also set-up the government's threatening email, which is what

22  kept Harbour from testifying.

23

24

    _____

25  [3] The other acts were the 2007 Spaulding Loan, the 2009 Jackson $6 million loan, the
26  2010 Gray $1 million loan and the 2021 Georgia Avenue property transaction permitted
    as Rule 404(b) evidence.
27

28

## CONCLUSION

Mr. Harbour was denied a fair trial due to the governments misleading to the Court regarding the source of wealth-based evidence and the admission of evidence on individuals not connected with any counts in the indictment. As such, if this Court denies the Rule 29 motion, the only appropriate remedy is to grant a new trial pursuant to Rule 33.

RESPECTFULLY SUBMITTED this 16th day of March 2023.

CHRISTIAN DICHTER & SLUGA, P.C.


By: /s/ Stephen M. Dichter
Stephen M. Dichter
Justin R. Vanderveer
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Attorneys for Defendant David A. Harbour

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez