Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>Defendant. | Case No. 2:19-cr-00898-DLR (DMF)<br><br>**DEFENDANT'S RENEWED RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**<br><br>(Oral Argument Requested) |

Defendant David Allen Harbour (Defendant) renews his prior motion under Rule 29, F.R.Crim.P. for a Judgment of Acquittal. References to the charges are to the Second Superseding Indictment ("SSI"). Rule 29 permits the renewal of a Rule 29(a) motion made at the end of the government's case if filed within 14 days of a guilty verdict being returned. F.R.Crim.P. 29(c)(1). Federal district courts have the power to grant a verdict of acquittal before or after the submission to the jury. *State of Ariz. v. Manypenny*, 672 F.2d 761, 765 (9th Cir. 1982).

The standard in a Rule 29 motion is whether, viewing all the evidence in the light most favorable to the government, no rational juror could find the defendant guilty

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Although *Jackson* requires the reviewing court initially to construe all evidence in favor of the government, the evidence so construed may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc). "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." *Id*. The case further supports granting the motion where there is a total failure of proof of a requisite element. *See also*, *Briceno v. Scribner*, 555 F.3d 1069 (9ᵗʰ Cir. 2009).

A defendant may request acquittal post-trial for any offenses for which the evidence is insufficient to sustain a conviction. *United States v. Garcia*, No. R2000248003TUCJCHDTF, 2022 WL 3286591, at *2 (D. Ariz. Aug. 11, 2022). Viewing the evidence in the light most favorable to the government after the Defense presented its case, the jury could not have reasonably found the defendant guilty beyond a reasonable doubt. *United States v. Magallon-Jimenez*, 219 F.3d 1109, 1112 (9th Cir. 2000). Here, the evidence the government presented failed to prove guilt beyond a reasonable doubt. Therefore, a judgment of acquittal is warranted.

In addition, and alternatively, there are fatal variances between precisely what was charged in the SSI and what was shown by the government's evidence to the extent that the same amounts to an attempt to amend the SSI. The result is the same. Many, if not all counts of the SSI that the jury returned for a conviction must be dismissed.

"An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984) *citing to United States v. Cusmano*, 659 F.2d 714, 718 (6th Cir.1981). Constructive amendments normally involve a complex of facts while a variance occurs where the indictment and the proof involve only a single, though materially different sets of facts. *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002), *holding modified by United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007). However, even some variances may be fatal when it affects the substantial rights of a defendant. *Id*. at 615-616, *citing to United States v. Tsinhnahijinnie,* 112 F.3d 988, 990–92 (9th Cir.1997) (finding fatal variance where indictment charged defendant with sexual abuse of child occurring on Indian reservation during summer of 1992, but proof fluctuated between placing the abuse at place and time in indictment and placing it off reservation in 1994); *Jeffers v. United States,* 392 F.2d 749, 752–53 (9th Cir.1968) (finding fatal variance where indictment alleged that money solicited by religious group was used for non-religious purposes, but evidence failed to prove that use was non-religious, instead showing that use was merely contrary to representations made when money was collected). *See generally*, *Stirone v. United States*, 361 U.S. 212, 215-216 (1960).

As for constructive amendments: "There are two types of constructive amendments: first, where "there is a complex of facts [presented at trial] distinctly

different from those set forth in the charging instrument, and second, where the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017).

Here, what is singular about the case is that with respect to the three remaining "victims" – the jury acquitted the Carol Hill and Alison Willson charges – there was no evidence to support the PAIF counts of conviction and, for Turasky and Burg, no evidence to support convictions for what the government charged in the SSI. The only basis upon which the jury could have convicted these counts would have been on a theory that was not charged in the SSI. The SSI charged exclusively a misrepresentation theory whereas the government offered proof of a material omissions theory, which was not charged in the SSI with respect to Turasky and Burg.

**Count 1:  Wire Fraud, Richard Turasky:** The allegation in Count 1 is that Harbour used some of Turasky's money to pay expenses instead of Harbour deploying all of the money immediately to Green Circle to fund payday lending.

> Similar to M.B.'s funds, R.T.'s funds were used to pay the balance on HARBOUR's American Express credit card and to make Ponzi payments to other investors.

SSI, Doc. 387, ¶ 22.

Counts 9 and 10, which were also associated with Turasky, were returned as not guilty by the jury. These acquittals are key because it means that the jury found that payments to Turasky were not fraudulent and this means that the entire $350,000 had

4

been used as allowed.  If it had not been, the payments would not have been based, as they were, on the $350,000 but on some lesser amount.

Exhibits 674 and 1505, belied the government's contention, as did Turasky's testimony. Additionally, Exhibit 516, which, ironically, the government used to supposedly bolster its case, can actually be seen to have done precisely the opposite.

Turasky admitted that the documents drafted by his own lawyers permitted Harbour to use the money for expenses. The Loan and Assignment Agreement, Exhibit 1505, as well as his Declaration, Exhibit 674, say the same thing. It is undisputed that, under the loan documents at the time payments were to be received, payments commenced that were precisely the amounts that were supposed to be repaid began to be repaid. Turasky agreed from the stand.

Additionally, the amount to be repaid was based upon the $350,000 amount: not the $500,000 amount. This is because the $150,000 returned via wire the next day was not considered to have been invested by both Harbour and his agent, Joel Vetrano. Laura Purifoy corroborated that $350,000 was considered as loaned because the $150,000 was paid back the next day. This was agreed to by Turasky in his Declaration that he agreed he read before signing under penalty of perjury. Interest payments were made under the amortization table that pertained to the $350,000; not the $500,000.

While Turasky testified that it was "customary" for the borrower to pay the lender's fees, which, according to Turasky were, or would be, $150,000, nothing in the loan agreement drafted by Turasky's lawyer's required Harbour to pay those claimed

fees. Cash is fungible[1] and the entirety of Turasky's $350,000 eventually was sent to Green Circle without any effect on the interest payments to Turasky. Laura Purifoy's testimony supported this as well. *See* Trial Transcript Day 8 PM Session pg. 159 ln. 1-11. Nothing in the Loan Agreement mandated that *all* of the $350,000 arrive at Green Circle on the same day. Turasky loaned the $350,000 to OakTree; not to Green Circle. All of his money was in the Green Circle bank account by December 2014.[2]

We mentioned Exhibit 516. As will be discussed in more detail, below, Exhibit 516 is a remarkable document. Among the many things it establishes, conclusively, one is that, beyond any peradventure all of Turasky's $350,000 reached Green Circle's bank account by December 15, 2014. This is precisely what Cathie Cameron testified to.

**Count 2, 3, 6, 7, 8: Wire Fraud, Mark Burg:** The principal allegation, contained in Count 2, was the same as with respect to Turasky in Count 1. That contention was that $400,000 of Burg's $1 million investment did not go to Green Circle, whereas $600,000 did. Cash is fungible. While all of Burg's $1 million investment did not go to Green Circle the day it was received, eventually dollars representing the full $1 million did and the delay was not shown to have had any effect on the payments of $8,125.00 received quarterly by Burg. Just as Exhibit 516 established that Turasky's $350,000 reached the Green Circle account, the same exhibit also proves that all of Burg's money also reached the Green Circle account. That money, according to Ms. Cameron, consisted of $600,000

---

[1] *United States v. Sperry Corp*., 493 U.S. 52 (1989).

[2] It is to be remembered that the government's last question to Purifoy on direct was whether she had any concern that Harbour was using investor money to pay personal expenses, to which her answer was "no." TT, Day 8, 2-14-2023, p. 169, ll. 21-23.

of Burg's money and $300,000 of the Joplin Loan money and $100,000 of OakTree money. Exhibit 516 shows all $1 million in Green Circle's account.

Again, it is crucial to remember that all the papers were drafted by Burg's lawyer, Robin Gilden. Whereas Turasky made a loan, Burg *invested* $1 million in Pujanza, an entity of which he held a 1% ownership interest. According to the First Amended and Restated Pujanza Operating Agreement, Exhibit 819, Harbour, as the manager of Pujanza, was entitled to use the $1 million as he saw fit, including for expenses, without any oversight by Burg. These were not powers that Harbour created for himself. Had there been, an argument could be made that the arrogation of such powers by Harbour in documents created by Harbour would have been a "badge" of fraud. Here, however, it is unquestioned that these powers were granted to Harbour by Burg's own lawyers.

More importantly, Burg agreed on the stand that Harbour did have the right to use his money to defray business expenses. Shown Section 5.8 of the Operating Agreement re-drafted by his lawyer, Robin Gilden, he was forced to agree that Harbour had the right to use the money to reimburse business expenses.

The government's only other fact witness with respect to these counts, Dean Avedon, testified that there was an oral agreement between Burg and Harbour (as to how often and in what amount payments would be made). Burg never testified to that and, once again, the Operating Agreement drafted by Burg's lawyers did not support Avedon's position. There was, in fact, no mandatory schedule governing when the invested funds would be returned, as Avedon agreed on the stand. Regardless, the

agreement Burg's lawyers drafted contained the usual contractual provision that invalidated any and all prior written or oral agreements.

Counts 4-8 were all related to payments of $8,125.00 which, had there been any requirement for distributions in the documents drafted by Burg's lawyers, would have been those distributions. The jury returned not guilty verdicts on Counts 4 and 5. As in the case of the interest payments charged in Counts 9 and 10 (of which Defendant was also acquitted), the payments *to* Burg are not properly the subject of wire fraud claims. Wire fraud is the willful obtaining of money or property from a victim through the use of an interstate wire facility in furtherance of a scheme or artifice to defraud. In other words, but for the fact that Harbour was permitted, under documents prepared by Burg's lawyers, to use some or all of the $1 million investment for expenses, Count 2 might constitute a valid wire fraud charge. But not the five $8,125 payments to Burg. The wire fraud statute prohibits only deceptive schemes to deprive someone of money or property. *Kelly v. United States*, 206 L. Ed. 2d 882, 140 S. Ct. 1565, 1571 (2020). Wire fraud is completed when the alleged scheme to defraud causes a benefit to be wired. *United States v. Sebero*, No. 08-CR-185-JLQ, 2009 WL 720953, at *3 (E.D. Wash. Mar. 16, 2009). Thus, wiring funds back to a 'victim' cannot be construed as wire fraud.

The FTC investigation had nothing to do with Green Circle, Pujanza, Milagro, or OakTree. According to Larry Cook, the FTC action (never proven to any legal conclusion), so far as the evidence in this case is concerned, was not brought based upon the activities of the Canyon Road portfolios, Harbour or Canyon Road but was based upon Coppinger's call center, CWB. Cook agreed that no one said that Harbour did

anything wrong with respect to Canyon Road. The conversations between Harbour and Burg that led to the $1 million investment had nothing to do with the FTC investigation into CWB owned and operated by Coppinger, and the entities exclusively managed by Ted Rowland. The (ultimately) illegal turnover motion was not brought until March 31, 2015, long after Burg had made his investment. The Receiver acknowledged that no claims of wrongdoing needed to exist in order to seek turnovers from Harbour and none were ever proven.

Why, when Harbour's activities were all directed at recovering from the destruction of his business that he associated with Operation Chokepoint, would he have devised a plan to steal Burg's $1 million or Turasky's $350,000? Recovering from effects of Operation Choke Point which, in Harbour's belief, had caused the demise of DNA Investments would take years and a lot more than these sums.

**Count 3, 21, 22, and 23: Wire Fraud and Transaction Money Laundering, PAIF:** This claim is different from all the others. The government charged that,

> . . . HARBOUR had to provide certain financial information to PAIF for their review that would be material to the funding decision for each draw request. Defendant HARBOUR misrepresented the financial condition and operations of Green Circle. PAIF, began funding Green Circle in July 2015.

The government proved only the following: At the direction of Bob Ferrell, PAIF's CEO, Purifoy sent a $1.1 million funding request from PAIF on August 10, 2015. The draw request was funded on August 11, 2015. *See*, Exhibit 1518.

The government did not introduce *any* evidence that PAIF asked Harbour to supply anything to support the $1.1 million funding request, including any financial information whatsoever in July and August 2015. In fact, the government did not

introduce any evidence that Harbour or anyone else at his direction supplied PAIF with anything before the $1.1 million was received. There was no evidence that, in 2015 Harbour represented anything to PAIF, let alone that he misrepresented anything to PAIF.

What the government showed during their case-in-chief is that the very first borrowing base report (Exhibits 2293 and 2294) was finalized by September 11, 2015, fully a month *after* the $1.1 million was funded (August 11, 2015). That was the borrowing base for August 31, 2015. There had been at least four draft versions of the August 31, 2015, borrowing base. The August 31, 2015, borrowing base was the first and only borrowing base introduced by the government. The government introduced no evidence that the August borrowing base was false and, indeed, there were, as stated, four versions of it being passed around. *See*, Exhibit 1354.

According to Ms. Purifoy, who was the government's sole fact witness with respect to Count 3 and the related money laundering charges, some (unknown number of) months after August 2015, Harbour proposed pen and ink changes on three later borrowing base printouts. Purifoy typed the proposed changes and sent them to Stefan Andreev, who worked for Green Circle. She pointed out the changes that Harbour had proposed. Andreev, who, according to Purifoy was fully informed by her of the changes she claimed that Harbour directed, disagreed with the changes. Whether the changes proposed by Harbour ever went past the stage of Andreev having seen and rejected them, was not the subject of any evidence introduced by the government. Meanwhile, the $1.1 million had been received may months earlier. Thus, whatever Harbour did or tried to do did not and could not have played any role at all in the obtaining of the $1.1 million. Of

course, the $1.1 million was no more than a return of proceeds loaned by OakTree to Green Circle.

During final argument, the government displayed Exhibit 516 to the jury in support of its argument regarding the PAIF counts. *See*, TT, 2-28-23, p. 129. Exhibit 516 had been introduced during the testimony of Laura Purifoy. *See*, TT, 2-14-23, p. 131-135.[3]

Purifoy testified that Exhibit 516 was sent by her to Alonzo Primus (the Green Circle Treasurer) on June 23, 2016. This was 10 months after the draw of $1.1 million on August 11, 2015. She sent Primus a spreadsheet showing money coming through OakTree Management to Green Circle's BMO Harris Bank's account. OakTree had read-only access to the Green Circle account and could not move money in or out of the Green Circle account. Please let this sink in very clearly:   The Green Circle bank records

---

[3] Curiously, in Doc. 225, the government's response to a motion to continue filed on 3-15-2021, the government contended that Count 3 was based solely on the August 11, 2015 $1.1 million wire because "it was based on false information (altered Borrowing Base information) provided at the direction of Harbour to PAIF." P. 3, ll. 19-21. The government added that the wire fraud charged in Count 3 related to a "discrete point in time." Therefore, "[i]n sum, the documents sought by Harbour *after* August 11, 2015 are irrelevant to this charge." *See*, p. 3, l. 19-p. 4, .7. Of course, Exhibit 516 is dated June 23, 2016, but this is not the only falsehood the government conveyed to the Court. The misstatement was repeated and amplified in Doc. 378 filed 5-5-2022. Here, the government asserted that Harbour personally sent PAIF a falsified accounts receivable aging report. P. 2, ll. 5-17. This government statement was false. The government never even tried to introduce an accounts receivable aging report from a time prior to the $1.1 million disbursement.

actually showed what money flowed through Oak Tree to Green Circle and also directly to Green Circle.[4]

She was asked about the spreadsheet she created within Exhibit 516. It showed Turasky's investment ($350,000) on certain specific dates, as shown in Green Circle's bank statements. The spreadsheet showed money moving from OakTree to Green Circle.

Though completely contrary to the government's theory, what Exhibit 516 showed was that, consistent with Cathie Cameron's testimony, Turasky's entire $350,000 was deposited in Green Circle. Specifically, according to Green Circle's bank statements (over which OakTree management had no authority) on August 6, 2014, $50,000 of Turasky's money was deposited in Green Circle's account. Another $15,000 was deposited on October 3, 2014. Then, another $100,000 was deposited on October 23, 2014. Next, another $50,000 was deposited on November 27, 2014. Then another $100,000 was deposited on December 3, 2014 and, finally, $35,000 was deposited on December 15, 2014.

From the government's own evidence, three conclusions are inescapable: 1) Exhibit 516 does not support and cannot support the government's case with respect to PAIF in the slightest; 2) Exhibit 516 corroborates Cathie Cameron's testimony which was that *all* of Turasky's $350,000 was sent to Green Circle, which supports the Rule 29

_____

[4] Thus, when counsel argued that the Turasky $350,000 never reached Green Circle and pointed to Exhibit 516 on the screen, he was either negligently or deliberately dissembling. Given that Exhibit 516 was actually a devastatingly bad exhibit for the government, as is being shown here, negligence on the part of government counsel is far more likely here. Yes, Green Circle's bank records over which Harbour exercised no control, showed Turasky's entire $350,000 received by December 2014. Purifoy created the spreadsheet using the attached bank records; Green Circle's bank records.

Motion with respect to the Turasky counts; 3) Jeanette Paige's analysis about what happened to Turasky's $350,000 is completely wrong, just as Cathie Cameron testified. *See*, Exhibit 516, pages -051 and -052.

Count 3, 21, 22, and 23 must be dismissed. There was no evidence of any illegal conduct at all. The government's allegation that Harbour supplied false and fraudulent information to PAIF to induce PAIF to fulfill the OakTree $1.1 million draw request was not supported by any evidence.

### Counts 13-23 Transactional Money Laundering

The government charged that:

> On or about the dates listed below . . . Defendant HARBOUR, individually and doing business under the entities described above, along with other individuals and entities . . . knowingly engaged and attempted to engage in the following monetary transactions in the United States in criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely wire fraud in violation of 18 U.S.C. § 1343, with each instance being a separate count under this indictment:

| Count | Date (On or about) | Amount (Approximate) | Financial Institution | Description of Transaction |
|-------|--------------------|----------------------|-----------------------|----------------------------|
| 13 | 08/05/2014 | $34,665.33 | Northern Trust | Check #1238 from DNA Investments Northern Trust x9412 to D.S. |
| 14 | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from Oak Tree Northern Trust x1790 to DNA Management Northern Trust x3388 |
| 15 | 08/08/2014 | $37,500.00 | Northern Trust | Transfer from DNA Management NT3388 to HighPointe Capital Group BOA x3354 |
| 16 | 08/08/2014 | $37,500.00 | Bank of America | Transfer from HighPointe Capital Group BOA x3354 to Herrington Park 1, LLC |

| 17 | 08/21/2014 | $12,083.90 | Northern Trust | Check #1542 from 21020 Northern Trust x5180 to J.R.G. |
|----|-----------|------------|----------------|----------------|
| 18 | 08/27/2014 | $142,785.88 | Northern Trust | ACH Debit Payment from DNA Investments Northern Trust x9412 to Defendant HARBOUR American Express |
| 19 | 08/28/2014 | $13,682.69 | Bank of America | Transfer from HighPointe Capital Group BOA x3354 to Employment Edge |
| 20 | 12/04/2014 | $223,121.88 | Northern Trust | ACH Debit Payment from DNA Management Northern Trust x3388 to Defendant HARBOUR American Express |
| 21 | 8/12/2015 | $915,000.00 | BMO Harris | Oak Tree BMO 1964 to Milagro BMO 5236 |
| 22 | 08/13/2015 | $750,000.00 | Bank of America | Milagro BMO 5236 to Defendant HARBOUR BOA x8017 |
| 23 | 09/02/2015 | $500,000.00 | Bank of America | Defendant HARBOUR BOA x8017 to FTC Receiver LEC |

Since the transactional money laundering charges are linked to the wire fraud charges, they are and can only be associated with the wire fraud victims in the SSI. Counts 13-19 are associated with the alleged Turasky wire fraud counts. Now, one count (Count 1), since Harbour was acquitted of Counts 9 and 10. Count 20 is associated with the alleged Burg wire fraud counts (Counts 2, 4-8). Counts 21, 22, and 23 are associated with the alleged PAIF wire fraud count (Count 3).

Money laundering, by definition, involves the proceeds of unlawful activity and it is well settled law that the transaction charged as money laundering cannot be the same transaction through which the funds became tainted by crime. *United States v. Shellef*,

732 F. Supp. 2d 42, 72 (E.D.N.Y. 2010). In *Shellef*, the court dismissed money laundering counts under Fed. R. Crim. P. 29 since the money laundering counts were the same transactions from which the wire fraud counts came from. *Id*. at 47. Similarly, the money laundering counts in Mr. Harbour's case are tied directly to the underlying wire fraud. The government effectively tries to 'double-dip' and charge Mr. Harbour with the same conduct multiple times. As held in *Shellef*, a conviction for the same conduct twice cannot be allowed to stand and must be dismissed pursuant to Rule 29.

**PAIF.** With the emergence of Exhibit 516 and an evaluation of what it actually shows, we have gone even farther in undercutting the viability of the PAIF counts than we did in the first Rule 29 motion. We had already shown that government had not introduced sufficient evidence to survive the Rule 29(a) Motion with respect to PAIF. We have now shown even more. If Count 3 falls away, as it must, then Counts 21, 22, and 23 fall away with Count 3.

**Turasky**. Counts 13-19 are all payments that were made using the $350,000 that Turasky admitted on the stand could be used for business expenses and that the Loan and Assignment Agreement and Turasky's Declaration also agreed could be used for business expenses. The Judgment Loan Documents included Exhibit A, the Resolution Authorizing Loans. The Loan and Assignment Agreement and the Declaration both spell out the contents of the Resolution. Therefore, the fact that Turasky denied having seen Exhibit A, the Resolution Authorizing Loans, was immaterial to the admissions he made in the Loan and Assignment Agreement and the Declaration. He knew when he signed both documents that Harbour had the right to borrow the funds, and he agreed to the same

on the stand. He agreed that he signed both documents and, while he said he did not focus on them particularly, he also did not try to repudiate them.

In short, in it beyond peradventure that Harbour was permitted to use Turasky's money for expenses.[5] If Turasky's money could be used for expenses, then Harbour's use of Turasky's money to pay expenses is not money laundering. This is because the funds were not obtained fraudulently. They were obtained under the terms of documents that were prepared by Turasky's own lawyers that permitted the money to be used for expenses. Therefore, the government has failed to prove that the Turasky money was obtained by fraud and, consequently, that its use for the purposes stated in Counts 13-19 constituted money laundering. There was neither an underlying fraud nor, as a result, the use of proceeds derived from fraud.

**Burg.** There is no essential difference between the seven Turasky money laundering counts and the single Burg money laundering count. Burg's lawyers drafted the documents that permitted Harbour to direct OakTree Management to borrow the money from Pujanza, where the Burg money had been received. Burg and Avedon both admitted that, under the documents prepared by Robin Gilden, Harbour had the power to borrow the funds to pay expenses.

---

[5] There is no evidence that the $350,000 received from Turasky – cash is fungible – was not eventually all received by and within Green Circle or that Turasky was not paid the full interest rate on the full $350,000. Turasky's contention that $500,000 was loaned that the $150,000 which all agree was sent back the next day was for payment of his loan expenses remains just that, Turasky's contention. In fact, Exhibit 516 is authoritative that all of Turasky's $350,000 received by Green Circle be December 2014.

And, as with Turasky, the issue really comes down to whether in building OakTree Management, Harbour had amassed business expenses ultimately reimbursable to Harbour or to other of his entities that exceeded the amount of money he borrowed from Burg ($223,121.88). He had the same power with respect to funds loaned by Turasky.

In the case of Turasky, the government did not show that within a reasonable period of time (meaning that it caused no loss of interest payments to Turasky), "his" money went to Green Circle to be used for consumer loans. In the case of Burg, according to the deal papers created by his own lawyers, no interim payments were required to be made to Burg at all. Any payments made or not made to Burg were at Harbour's sole discretion as Manager of Pujanza.

## CONCLUSION

The defense respectfully asserts that there was insufficient evidence introduced to sustain the convictions and the verdicts must be overturned.  This is especially true with respect to the PAIF counts. With respect to Turasky and Burg, in addition and, alternatively, there was a fatal variance between the charge. In each case, the government charged Harbour with misrepresenting that every penny of the loan/investment would be deployed to payday lending and would not be used for expenses. Here, the government clearly failed, as, atop everything else, Exhibit 516 completely corroborated Ms. Cameron's testimony that all of Burg's and Turasky's funds reached Green Circle. The same exhibit, standing alone, showed Ms. Paige's testimony to have been incorrect.

This left the government with only the uncharged material omission of failing to disclose the FTC investigation. However, Turasky's money was received months prior to the September FTC takeover of Canyon Road. Turasky stated that, by October, he had found out about the FTC action. Did he testify that he asked for his money back then? He did not. So, if the FTC investigation falls out as a material omission, that leaves only the nine old consumer complaints for which the government showed no more than there were nine complaints out of 1.4 million consumer files. This puissant omission could not be material under the law.

For Burg, the evidence was that he invested in December 2014, about 4 months before the FTC directed any attention towards Harbour (which was on March 31, 2015). Again, the SSI did not charge this as a material omission. Burg's charges also were solely about the alleged misspending of Burg's money, something that the government failed to prove in each and every respect.

RESPECTFULLY SUBMITTED this 16th day of March 2023.

CHRISTIAN DICHTER & SLUGA, P.C.


By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

1

**CERTIFICATE OF SERVICE**

2

3

        I hereby certify that on March 16, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

4

5

Kevin M. Rapp
Kevin.rapp@usdoj.gov

6

Coleen Schoch
Coleen.schoch@usdoj.gov

7

U.S. Attorney's Office

8

40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004

9

Attorney for Plaintiff

10

11

/s/ Yvonne Canez

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28