Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>Defendant. | Case No. 2:19-cr-00898-DLR (DMF)<br><br>**DEFENDANT'S REPLY TO THE GOVERNMENT'S RULE 29 RESPONSE**<br><br>(Oral Argument Requested) |
|---|---|

Defendant David Allen Harbour, by and through his attorneys, reply to the government's response to Defendant's renewed Rule 29 motion.[1]

## **INTRODUCTION**

Pursuant to Fed.R.Crim.P. 29, Defendant renewed his prior Rule 29 motion for judgment of acquittal. *See* Doc. 649; 699. The government presented evidence at trial that was insufficient to prove a guilty verdict on the 17 counts and the evidence that was

---

[1] Defendant has prepared a series of Power Point slides that further detail many of the points made here and in the Reply to the Response to the New Trial motion. These are anticipated to be used in the event the Court grants oral argument. However, we cannot be certain that the Court will grant oral argument and, therefore, we plan to file the Power Point slides next week as a hedge against the Court not allowing oral argument.

presented was unrelated to what was alleged in the indictment. Defendant's Rule 29 motion should be granted.

## APPLICABLE LAW

1. Rule 29

The Parties agree that *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) governs the Motion; *see also, United States v. Merriweather*, 777 F.2d 503, 507 (9th Circ. 1985). A court must reverse a verdict if the evidence of innocence or lack of guilt is such that all rational triers of fact must conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt. *United States v. Nevils*, 598 F.3d 1158, 1165 (9th Cir. 2010).

2. Wire Fraud

As conceded by the government, "The Ninth Circuit has explained that to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions." Doc. 710 pg. 3 ll. 24-28 *quoting United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020). The key here is that it is the intent to deprive a victim that makes wire fraud a crime. *Miller* holds that, like the mail fraud statute from which it is derived, wire fraud criminalizes the use of wires to further not just a mere deception, but a scheme or artifice to defraud or obtain money or property. *Miller*, 953 F.3d at 1101. In its holding, *Miller* interpreted wire fraud to be an intent to deceive *and* cheat based on the Supreme Court's ruling in *Shaw v. United States*, U.S. S. Ct. 462, 196 L.Ed. 2d 373 (2016). *Id*. at 1102. Mere deception is insufficient to convict a defendant of wire fraud. Mere

deception is, at most, what the government proved (related to non-disclosure of the FTC and State regulatory investigations. *Miller*, *Id.* (9th Circuit). [2]

Other Circuits have gone on to elaborate on the requisite elements of wire fraud and the definitions used in a wire fraud charge. The Eastern District of Tennessee granted a defendants Rule 29 motion and acquitted him of wire fraud, finding that the defendant could not have been found guilty since federal wire fraud "forbids only schemes to *defraud*, not schemes to do other wicked things, e.g., schemes to lie, trick or otherwise deceive." *United States v. Hu*, No. 3:20-CR-21-TAV-DCP-1, 2021 WL 4130515, at *14 (E.D. Tenn. Sept. 9, 2021). The court in *Hu* also acknowledged the Eleventh Circuit's reasoning in a separate case that concluded "to defraud, one must intend to use deception to cause some injury; but one cannot deceive without intending to harm at all" and thus "deceiving is a necessary condition of defrauding but not a sufficient one" or "put another way, one who defrauds always deceives, but one can deceive without defrauding. *Id. citing to United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). Courts have also held that misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). This matches the 9th Circuit quote that deception is insufficient to convict to wire fraud. So, since the 9th Circuit decision in *Miller,* the Circuit is now in harmony with the 11th and 2nd Circuits. This distinction is absolutely crucial with respect to Turasky and Burg and, in fact, is outcome determinative.

---

[2] The government's theory is, or had to be, that the fraud was Green Circle but it never introduced any evidence that Green Circle was a fraud. To the contrary, Green Circle was a pay day lender that made loans and collected them until PAIF foreclosed Green Circle and seized the bank account into which Oak Tree's money, including Burg's $1 million, Turasky's $350,000 and about $650,000 in other money had been deposited. Ex 516.

**ARGUMENT**

1. <u>Count 1: Wire Fraud, Richard Turasky:</u>

Under *Miller* (9th Circuit) the government was required to prove every single element of wire fraud and it failed to do so. Count 1 of the Second Superseding Indictment (Doc. 387) charged the Defendant with wire fraud involving $500,000 affiliated with Richard Turasky. The amount was actually $350,000 as $150,000 was immediately wired back to Mr. Turasky the next day. RT, 2/14/23, p. 199.

As in the case of Mr. Burg and as in the case of PAIF, the government shifted its theory of the case during the trial. The Second Superseding Indictment charged Mr. Harbour with affirmatively misrepresenting that all of Mr. Turasky's loan would be used to make payday loans when, on fact, not all of his money was used to make payday loans. The problem with that theory is that, first, Mr. Turasky repudiated it from the witness stand and, second, that the Agreements created by Mr. Turasky's lawyers as well as the Loan and Assignment Agreement and Declaration corroborated his on-stand testimony. Mr. Harbour was entitled to use some or all of Mr. Turasky's money to pay expenses. RT, 2/10/23 p. 204, and Exhibits 1505 and 674.

The government proved that, at the moment(s) Mr. Turasky's money was received, the monies were not immediately sent to Green Circle to be extended to payday lenders. Ms. Paige testified as to how the money was used. But her testimony was accurate only to the extent of her examination, which examined the disposition of $500,000 over a period of

days and which did not involve seeing where the entire $350,000 eventually wound-up.[3] Cash is, indeed, fungible. Taking Mr. Turasky at his word, which is to be presumed at this point, provided he was paid interest as and when promised on his full loan and provided that his full loan (which was $350,000 and not $500,000) eventually went into payday lending, he had achieved the benefit of his bargain.

And, *voila*, Exhibit 516, introduced by the government, proved not only that Mr. Turasky's $350,000 wound up at Green Circle, but that Mr. Harbour sent a total of $2.9 million to Green Circle of which $1.9 million still remained in September 2016, when PAID foreclosed. Ms. Cameron's testimony corroborated not only that Mr. Turasky's $350,000 reached Green Circle but that it was still there in September 2016, when PAIF exercised its power as the senior lender to foreclose Green Circle and preclude Oak Tree's ability to request disbursements of funds in the Green Circle account.[4]

Realizing that affirmative conduct for which Mr. Harbour had been indicted could not be proved and that Green Circle was a real company doing actual business,[5] counsel opted instead for the customary last refuge of any and all woe-begotten prosecutions: "if he

---

[3] There is no disharmony between the testimony of Ms. Paige and Ms. Cameron. Like a clock that is not working, Ms. Paige's testimony was accurate only as of a particular moment in time but only as of that precise moment in time. Ms. Cameron's testimony was based upon the entire history of Oak Tree's involvement with Green Circle.

[4] There was never any proof that Mr. Harbour or anyone at Oak Tree had signature authority over the Green Circle bank account. RT, 2/24/23 p. 37. Oak Tree could request funds but could not unilaterally cause funds to be withdrawn. It had to make a draw request and send it to Green Circle. RT, 2/23/23 p. 206.

[5] RT, 2/14/23, p. 204.

had only told me about [fill in the blank of your choice], I would have ***never*** [invested] [loaned] him the money."[6]

The government's strong emphasis on the omissions as a basis for the convictions cannot be ignored. Since, with respect to Mr. Turasky, the totality of the evidence proved beyond any shadow of a doubt that Mr. Harbour was permitted to use the money precisely as he did, as seen in Exhibits 1505 and 674, the only basis for the conviction on Count One, the Turasky wire fraud count must have been the "omissions." It could have been nothing else.

However, this is where the critical impact of the 9th Circuit's recognition, in *Miller, supra,* of the recognition that an intent to cheat is an absolute requirement under the wire fraud statute. An intent to deceive, standing alone, is insufficient to constitute a crime. *Miller*, 953 F.3d at 1101; *see also United States v. Canada*, No. 20-50188, 2021 WL 3630230, at *2 (9th Cir. Aug. 17, 2021); *United States v. Sharma*, 851 F. App'x 708, 710 (9th Cir. 2021); *United States v. VanDyck*, No. CR 15-742-TUC-CKJ, 2020 WL 3078386, at *1 (D. Ariz. June 10, 2020); *United States v. Kramer*, No. 16-CR-00322-EJD-1, 2020 WL 5408165, at *4 (N.D. Cal. Sept. 9, 2020); *United States v. Holmes*, No. 18-CR-00258-EJD, 2020 WL 6047232, at *13 (N.D. Cal. Oct. 13, 2020); *United States v. Gerrans*, 477 F. Supp. 3d 1035, 1045 (N.D. Cal. 2020), *aff'd,* No. 20-10378, 2022 WL 73051 (9th Cir. Jan. 7, 2022); *United States v. Williams*, No. CR 17-00101 LEK, 2020 WL 4883937, at *6 (D.

---

[6] Besides the 9th Circuit having finally joined the other Circuits in recognizing that deception or deceit, standing alone, is insufficient to complete the crime of wire fraud, the requirement for both recognizes reality. Can one imagine anyone who has ever lost money *ever* disagreeing with the prosecutor asking, "had he told you about [fill in the blank] would you have [invested] [loaned] the defendant the money?

Haw. Aug. 19, 2020); *United States v. Avery*, No. 3:07-CR-00028-RRB, 2021 WL 149676, at *2 (D. Alaska Jan. 13, 2021); *United States v. Hansen*, No. CR18-092RAJ, 2022 WL 1186456, at *2 (W.D. Wash. Apr. 21, 2022); *United States v. Abouammo*, No. 19-CR-00621-EMC-1, 2022 WL 17584238, at *11 (N.D. Cal. Dec. 12, 2022); *United States v. Thompson*, No. CR19-159-RSL, 2022 WL 834023, at *3 (W.D. Wash. Mar. 21, 2022); *Luna v. Girgis*, No. 221CV09765FWSAFM, 2022 WL 17078104, at *6 (C.D. Cal. Oct. 4, 2022); *RJ v. Cigna Health & Life Ins. Co.*, No. 5:20-CV-02255-EJD, 2022 WL 4021890, at *5 (N.D. Cal. Sept. 2, 2022);

In *United States v. Szilagyi*, No. CR13-116-01-PHX-DGC, 2018 WL 6620506, at *1 (D. Ariz. Dec. 18, 2018), Judge Campbell conducted a bench trial on wire fraud counts. The government alleged three misrepresentations made to victims, and after assessing each, found the defendant not guilty. *Id.* at 3. Specifically, the government alleged that the defendant made a misrepresentation, then attempted to prove that the defendant never used the money for the intended purpose. *Id.* at 2-3. The court concluded that the government failed in its burden of proof in all three areas.

Of note here is the third alleged misrepresentation, that the defendant did not use the money given for the purposes she had claimed it would be used for to the victims. *Id.* at 3. An FBI forensic accountant provided testimony of her tracing of the defendant's bank account. However, the accountant did not look at all bank accounts, nor did she know the ultimate destination of the funds. *Id.* The court determined that it cannot be proof beyond a reasonable doubt when the government failed to prove what actually happened to the money. *Id.*

The same is true here: The government's forensic accountant, Jeanette Paige, started her examinations after funds were deposited and stopped at the low balance thereafter. RT, 2/23/23 p. 90, 91, and 195. She never evaluated what the money could or could not be used for and her trace of funds completely ignored admitted Exhibit 516. Such an incomplete investigation is analogous to the *Szilagyi* verdict; if this case was preponderance of the evidence, then Ms. Paige's investigation may have been sufficient, but the applicable standard is beyond a reasonable doubt. No rational jury could have returned a guilty verdict based on an incomplete investigation. Judge Campbell remarked, concerning the FBI forensic accountant in his case that "the agents had other accounts and provided no information about them. Here, Ms. Paige was told which accounts to trace and, as if Judge Campbell's case, provided information concerning no other accounts even though the Green Circle account into which all the funds eventually were deposited was sitting in front of her face. Had she but looked, she would have seen the same summary as her trial directors had before them in Exhibit 516.

Sitting alone, Judge Campbell was the personification of a "rational juror" but also had the benefit of simultaneously being a Judge, as is this Court. Just as Judge Campbell stated that the government had the entire burden of proving each element of wire fraud and that the defendant had no burden of disproving it, the same is true here and, with respect to PAIF, as will be seen shortly, never was Judge Campbell's enunciation of this crucial distinction more apt. These cases are in many ways almost identical and should have had the same outcome.

Thus, it is clear that no rational jury could have concluded beyond a reasonable doubt that Mr. Harbour's intent was to cheat Mr. Turasky. This is the crucial element of wire fraud. Therefore, all that is left are the material omissions alleged by the government. Were you told about prior State investigations? Were you told about the FTC investigation? Were you told that his prior payday loan venture had failed.[7] Each of these questions was answered "no" and each was followed up with the "had you known" question, drawing the inevitable "no, I would not have [invested][loaned] the money." If mere deception was the *sine qua non* of wire fraud, the government could never lose a wire fraud case.

2.  <u>Count 2, 6, 7, 8: Wire Fraud, Mark Burg:</u>

Mr. Burg's case is practically identical to Mr. Turasky's case. Initially, not all of Mr. Burg's $1 million (received in several tranches over several months) went directly to Green Circle ($600,000 did and $400,000 did not). Count 2 is the money Mr. Burg sent to Mr. Harbour and Counts 6, 7, and 8 are money that was sent to Mr. Burg, not money that Mr. Burg sent to the Defendant. In all the f Count 2 falls, Counts 6, 7, and 8 cannot stand because they are dependent upon and not independent from Count 2.

The Defendant did not seek additional money from Burg; he received $1,000,000, and that was it. *If* there was any actual wire fraud, it would end with the wiring of the $1 million. Counts 6, 7, and 8 were payments back to Burg, but they could not have possibly

---

[7] It is undisputed that Harbour's prior business failed only because the prosecutor's then-boss, Attorney General Eric Holder, illegally organized a secret campaign to destroy payday lending. The government offered no evidence to the contrary and every witness, as the Court aptly observed, who testified about payday lending stated that Operation Choke Point destroyed it. With respect to Canyon Road, Larry Cook (the receiver) testified that Harbour was not accused of any wrongdoing whatsoever and that any misconduct was associated with Tim Coppinger. RT, 2/08/23, pp. 29-33.

furthered the fraud since the money had already been obtained. At least under these particular circumstances, it cannot be said that sending someone payments constitute wire fraud. *See*, *Kelly v. United States*, 206 L. Ed. 2d 882, 140 S. Ct. 1565, 1571 (2020) *holding that* the wire fraud statute prohibits only deceptive schemes to <u>deprive</u> someone of money or property. As a matter of law, no rational juror could have returned a guilty verdict on these counts.

Beyond this issue, Count 2 for Mr. Burg is really the same as Count 1 for Mr. Turasky except that in the case of Count 2; not only Mr. Burg but also his financial advisor, Mr. Avedon conceded every single point that, had the facts been different, might otherwise have pointed to the existence of the crucial element of an intent to cheat that was missing here. Mr. Burg and Mr. Avedon conceded that Mr. Harbour was entitled to use the $1 million for expenses provided that the $1 million was eventually invested in payday lending and that Mr. Burg not miss out on any return to which he was entitled.[8] RT, 2/16/23 p. 128, 112-114, 209.

As in the case of Mr. Turasky, the government certainly proved that on the day or days the Burg $1 million was received, not all of it was directed to Green Circle to be deployed in payday lending. However, and we do not mean to be flip, "so what?" According to Mr. Burg, this was not required, his money could be used for other purposes and so long as he got his interest payments, it was "fine." RT, 2/16/23, pp. 112-114. And, as

---

[8] It being recalled that the operative agreement, Ex 2217 and 2218, actually did not provide for any mandatory interim payments because, at the insistence of Mr. Burg's lawyers, the original loan agreement was recast as an investment that was to eventually return "up to" 20%. RT, 2/16/23, p. 209-210, 214-215.

in the case of Mr. Turasky, the unrebutted testimony of Cathy Cameron as fortified by Exhibit 918 [the Ms. Paige summary of the $35 million] and Exhibit 516, the Laura Purifoy summary of all monies to and from Green Circle through Oak Tree or otherwise, Mr. Burg's $1 million was still sitting in the Green Circle bank account along with Mr. Turasky's $350,000 and about $650,000 of Oak Tree's own money when, in September 2016, PAIF seized the funds deposited by Oak Tree into the Green Circle account.

With the same fatal flaws in both cases, just as it did in Mr. Turasky's case, the government resorted to the contention that material omissions with respect to Mr. Burg actually constituted the fraud. However, the same cases that require the Court to acquit Mr. Harbour of Count 1 also require an acquittal of Counts 2, 6, 7, and 8.

3.  Count 3, 21, 22, and 23: Wire Fraud and Transactional Money Laundering, PAIF:

An examination of the PAIF charges needs to start with Doc. 378 because before the trial commenced, this was the case the government averred to the Court that it was going to present. In Doc. 378, p. 4 ll. 16 – 20, the government stated,

> He [Alonzo Primus] attached as an exhibit to his declaration an email dated August 6, 2015, to him from the Defendant himself attaching a July 31, 2015, accounts receivable aging report. It was that email from the Defendant and that false report on which PAIF relied in transferring $1.1 million to the Defendants company on August 15, 2011 [*sic*].

In Doc. 378, p. 4 l. 28 and p. 5, ll. 1 -3, the government also stated,

> As mentioned, the government previously advised the Court that L.P., a cooperating government witness, who was Harbour's internal bookkeeper, has told the government that Harbour personally falsified the July 31, 2015, aging report before he sent it to PAIF" (Doc. 225, pp. 2-3).

These statements proved to be completely false. None of what the government asserted would be proved in trial was even introduced in trial. Before the trial, the

11

government's theory was that a July 2015 A/R Report was the fraudulent document that induced PAIF to send $1.1 million to Green Circle which Green Circle used to repay to Oak Tree $1.1 million of the $2.9 million that Oak Tree had loaned to Green Circle.[9]

Instead, on the fly, the government changed its theory completely. Now, using two defense exhibits, Exhibits 2293 and 2294, that the government had objected to because their disclosure was contended to be untimely, it completely reconstructed its theory of the case. Now, instead of using an allegedly fraudulent A/R Report to induce PAIF to send the $1.1 million to Green Circle, the fraud was supposedly sending at some far distant, undefined time, altered borrowing base documents to PAIF to prevent PAIF from finding out that Harbour had obtained the $1.1 million based on false pretenses.

Except there was no proof that any of this had ever occurred. Exhibit 2294 was an email sent by Ms. Purifoy to Stefan Andreev on September 8, 2015. Andreev worked for Green Circle. He reported to Alonzo Primus, the Green Circle Treasurer and COO. Exhibit 2293 was the August 31, 2015 borrowing base. It was the very first borrowing base, and done in collaboration with Mr. Primus and not Mr. Harbour. It was not altered in any way. *See*, L. Purifoy, RT 2/14/23, p. 277-278.

---

[9] In Doc. 378 the government referenced a document in which Gerald Krovatin, PAIF's lawyer, told the government (and everyone else) that the July 31, 2015 account receivable report was the document upon which PAIF relied in making the funds available. Yet the government did not use this documents because it knew that the accounts receivable report was not false. This was, of course, the document that the government also contended was the trigger for the disbursement of the $1 million on August 11, 2015. The defense was prepared to show that the accounts receivable report was created by Primus direct report, Stefan Andreev, a Green Circle employee, but, when the government abandoned this theory of proof, the documents did not need to be used by the defense.

Months later, according to Ms. Purifoy – she did not know when - Mr. Harbour made proposed pen and ink changes to borrowing bases that were submitted not, as the government contends, to PAIF, but to Green Circle.[10] RT, 2/14/23 p. 177-179. She entered the changes and sent them to Andreev telling him that these were changes she had been asked to make and that she disagreed with them. She testified that Andreev also disagreed with them. She said that she had no idea what, if anything, Andreev did with them beyond that he disagreed with them. RT, 2/14/23, p. 182-183.

That was the totality of the government's evidence as to the so-called fraud against PAIF. Again, as in Judge Campbell's case, it was the government's task to prove beyond a reasonable doubt that a false bowing base had been submitted to PAIF that caused PAIF to disburse the funds to Green Circle to disburse to Oak Tree. To summarize: No PAIF witness was called. No Green Circle witness was called.  The government proved that on August 10, 2015, Harbour (through an entity) requested that Green Circle return $1.1 million of the approximately $2.9 million Oak Tree had loaned to Green Circle for Green Circle to use to make payday loans. The next day, Green Circle wired the money to the Harbour entity. Next, in September, 2015 the very first borrowing base was prepared by several collaborators, of which Oak Tree was one, PAIF was another, and Green Circle was the third. From the collaboration, a borrowing base emerged. Finally, months later, Mr. Harbour sought changes in two borrowing bases on grounds with which Green Circle (acting through Mr. Andreev) disagreed. The government offered no evidence that Mr. Harbour's proposed

---

[10] PAIF was the senior lender to Green Circle and Oak Tree was subordinated to Green Circle. The borrowing base was submitted to Green Circle; not to PAIF.

changes were accepted. And, if any inference can be drawn at all, it can only be that, since Green Circle was clearly informed of, and opposed, the proposed changes and, since it was Green Circle's borrowing base, and Mr. Andreev was in charge of it, the changes were rejected. In short, there was not one scintilla of evidence that there were *any* false statements or pretenses or anything else along those lines that Mr. Harbour employed to get the $1.1 million of Oak Tree's own money *back* from Green Circle.

The government's original theory, as we pointed out, was that Mr. Harbour had forwarded a false Accounts Receivable report before the $1.1 million was sent by Green Circle to Oak Tree but the government abandoned that theory for the trial. Instead, at trial, without having offered any proof that the junior lender to a common borrower committed any act of fraud against the senior lender to the same common borrower, the government argues to the Court, here, that months after the fact, Mr. Harbour attempted, without any proof of success, to lull PAIF into discovering what, exactly? Presumably, to keep PAIF from discovering that he had altered a borrowing base or an accounts receivable report in order to obtain the $1.1 million. But, what the government did not prove and did not even attempt to prove was that prior to obtaining the $1.1 million any borrowing base or any accounts receivable report of *any* kind had been supplied to PAIF at all, let alone one of either variety that was fraudulent. In short, the jury was never shown a false borrowing base that was sent to PAIF and there was no testimony that a false borrowing base was every sent to PAIF. If an altered borrowing base was ever sent to Andreev at Green Circle, it was certainly not one prepared before the August 2015 payment but more importantly, there was no evidence that PAIF *ever* received a false borrowing base at all.

The government argued that by merely sending a draft borrowing base to PAIF that was in draft form, it must be fraud. The government bears the burden of showing that some actual harm or injury was contemplated by the schemer in a wire fraud charge. *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970). Even though the government is not required to prove actual injury, it must, at a minimum, prove that the defendant[s] contemplated some actual harm or injury to their victims. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). This theory is not unique to the Second Circuit, there is judicial consensus that a scheme to defraud must threaten some cognizable harm to its target and meet all the requisite elements. *United States v. Lemire*, 720 F.2d 1327, 1335 (D.C. Cir. 1983). If PAIF never received any fraudulent document, there was no harm and could be no harm to PAIF and PAIF was the supposed victim.

**CONCLUSION**

This Court recognized that Harbour's intent with respect to Green Circle, also never proved to be a fraudulent enterprise in the slightest,[11] was to rebuild the business. RT 2/16/23, pp. 228-234. The Obama Administration unlawfully destroyed the pay day business. lending business was neither fraudulent nor was it a failure. It was enormously successful. But for the government's unlawful action, we would not be here at all.

/ / /

/ / /

---

[11] If Green Circle was a Ponzi Scheme, then how does the government explain why PAIF was a "victim" and not a co-conspirator? PAIF was the senior lender, by far, to Green Circle.

RESPECTFULLY SUBMITTED this 5th day of May, 2023.

          CHRISTIAN DICHTER & SLUGA, P.C.


          By: /s/ Stephen M. Dichter
             Stephen M. Dichter
             Justin R. Vanderveer
             2800 North Central Avenue, Suite 860
             Phoenix, Arizona 85004
             Attorneys for Defendant David A. Harbour

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez