Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Allen Harbour

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
| Plaintiff, | **DEFENDANT'S OBJECTIONS TO DRAFT PRESENTENCE REPORT** |
| vs. | |
| David Allen Harbour, | Hon Douglas L. Rayes |
| Defendant. | |

Defendant, Mr. David Allen Harbour ("Harbour") respectfully objects to the Draft Presentencing Report ("PSR") as set forth herein.

**Summary of Defense Position:** In ¶14, Ms. Briggs ("the author") affirms that all of the offense conduct information derived from the government's reports and the case agent's comments. Therefore, it is no fault of its author that the Draft PSR is an almost complete work of fiction.

From its agents to its lawyers, the government has never understood much of anything about its case, either in terms of the law or the facts. The reason is an evident and disturbing obsession with putting Mr. Harbour away. Unfortunately, in adopting the

"government's version," its author then has been led astray in terms of adjustments to the appropriate offense level, arriving at the, frankly, absurd conclusion that the case is a Level 41 and that the 20 year and 10 year statutory maximums provide Harbour with a "break."

**Standard of Proof:** "As a general rule, factual findings underlying a sentencing enhancement need only be found by a preponderance of the evidence," especially when the enhancement is based on the underlying conviction. *United States v. Lonich*, 23 F.4th 881, 910 (9th Circ. 2022); *United States v. Hymas*, 780 F.3d. 1285, 1289-90 (9th Circ. 2015). However, when an enhancement will have an extremely disproportionate impact on the sentence, the Ninth Circuit holds that due process may require the government to demonstrate facts underlying a disputed enhancement by clear and convincing evidence. *Lonich*, 23 F.4th at 910. In determining whether a disproportionate effect on sentencing may require a heightened standard of proof, the court is to evaluate the totality of the circumstances. *Hymas*, 780 F.3d at 1289.

Three factors are assessed in determining the disproportionality: 1) whether the increase in sentence is based on the extent of a conspiracy; 2) whether the increase in the number of offense levels is less than or equal to four; 3) whether the length of the enhanced sentence more than doubles the length of sentence authorized by the guideline range. *See Lonich*, 23 F.4th at 910-16. Two of these factors are obviously present in the proposed enhancements. Two are sufficient.

**Offense Level Computation:** For the fraud and money laundering counts, the author used §2S1.1 which cites back to 2B1.1, Level 7. That is the correct level and the

defense, for reasons amply stated in the succeeding pages, objects to any and all adjustments above that Level, *viz.*

1.      **Loss**:  In order for any loss to be assigned to the Defendant there must be a direct causal connection between the conduct and the loss. Here, the loss of which the government *accused* Harbour was embodied in Counts 1, 2, and 3. Those numbers are well known: Turasky $350,000 (*or* $500,000, the difference being of no consequence to the Guidelines), PAIF $1.1 million, and Burg $1 million. The total putative loss is, therefore, $2,450,000. Assuming a direct causal connection between the "loss" and Mr. Harbour's conduct, under 2B1.1(I), 16 levels would be added, resulting in an Offense Level of 23 before adjustments, if any. As will be seen, there are no upward adjustments. Therefore, at worst, the range for the offenses of conviction is Level 23, Criminal History Category 1, which suggests a range of from 46 to 57 months. Seventeen months have already been served and will be credited.

However, if Harbour's fraudulent conduct was *not* the actual cause of the loss, the additional levels are not to be added and the Total Offense Level would remain Level 7. For reasons that will explained below, in an abbreviated fashion, but that will be expanded on in the Defense Sentencing Memorandum, the fraud is Level 7, Criminal History Category 1.[1] Meanwhile, the Tax Case is Level 16 from the Tax Table, minus a 2 (or 3) level adjustment for acceptance of responsibility.

---

[1] So, 0-6 months as opposed to the 17 months Defendant has already served. With respect to Count 24, to which Harbour pleaded guilty, the stipulated loss was no more than $170,000. Therefore, as we will discuss in the text, later, 2T1.1(a)(1) directs us to the Tax Table (2T4.1(F)) and the $170,000 tax loss coincides with Level 16 (21 – 27 months) before a 2 or 3 level reduction. The proposed adjustment for evasion of more than

In short summary, regarding the crucial element of loss causation, it is incontrovertible that Burg's and Turasky's total loans/investments wound-up precisely where they were supposed to wind-up: in Green Circle's bank account. *See*, e.g., Exhibit 516 (which is a government exhibit that the government did not quite understand and, therefore, promoted, and that the defense did understand).

The proximate cause for the loss of the Turasky and Burg funds was, solely, the superseding intervening action of the senior lender, PAIF. In other words, Green Circle was not a fraud.[2] Whereas, Oak Tree had loans outstanding to Green Circle of $2.9 million in September 2016, PAIF had more money in outstanding loans in place to Green Circle and priority, so when PAIF foreclosed the loans, PAIF swept up the junior lender's (Oak Tree) funds to satisfy or partly satisfy PAIF's claims.

With respect PAIF's charged loss of $1.1 million, when PAIF foreclosed the Green Circle loan portfolio, there was $2.9 million in the Green Circle account that had been deposited by Oak Tree. As has already been stated, of that total $350,000

$10,000 in undeclared income is inapplicable because, first, the evasion charged was of payment; not a filing evasion and, second, because the controversy that was civilly settled in February 2019 was based upon the disallowance of expenses; not the willful failure to report income.

[2] Indeed, in November, 2015, the significant District Court opinion in *Everette v. Mitchem*, 146 F.Supp.3d 720 (D. Md. 2015) was decided. This case upheld the claims of sovereign immunity of Native American payday loan companies like Green Circle. The District Court decision validated the earlier opinions of the highly respected Greenberg Traurig law firm which had underlain and supported the entire program through which Harbour endeavored to recoup the losses he and lenders to his company that were caused by the United States' illegal conduct in eradicating Harbour's (and everyone else's) earlier payday lending businesses. This was accomplished through Operation Choke Point. This will be discussed further in connection with the author's apparent, though not explained, position on relevant conduct.

represented Turasky's funds and $1 million represented Burg's funds. The difference between what PAIF seized ($2.9 million) and the combined totals of Turasky's and Burg's funds ($1,350,000) was $1,550,000. So, even if PAIF lost $1.1 million based upon the position that it should not have transferred $1.1 million to Green Circle to hand back to Oak Tree (from whence the money had gone to Green Circle to begin with), when PAIF foreclosed Green Circle, it got back "its" $1.1 million and another $450,000 of Oak Tree's money to which it had no direct claim against Oak Tree or Harbour. The subordination agreement that was in place permitted that outcome. PAIF suffered no loss as a result of its relationship with Harbour. To the contrary, PAIF made $450,000.[3] Consequently, Harbour objects to any increase in offense levels from Level 7.

### A $41,541,703.58 Loss?  Not Even Close.

**MARK BURG**: We have already discussed his $1 million.

- Mr. Burg's business manager for 30 years, Dean Avedon, advised Mr. Burg's lawyer on what the financial returns should be and how to structure them. (Harbour 49959 and 49960) (Trial Tr. 2/16/23, pp.183-184)

- Mr. Avedon testified that Mr. Burg could make up to 20%, not a guaranteed 20%. (Trial Tr. 2/16/23, pp.184)

- Mr. Burg's lawyer authored the Operating Agreement that dictated the terms and

---

[3] As of the moment PAIF foreclosed and shut down Oak Tree's access (by approved request) to funds in the Green Circle account, Green Circle was doing fine in the payday loan business and Oak Tree and Milagro were owed hundred of thousands of dollars. So, Oak Tree and Milagro were both also doing very well as were Turasky and Burg who had received all the payments to which they were then entitled. As perhaps will be better seen when we discuss the alleged "relevant conduct," what is missing in the sentencing portion of the case is loss causation attributable to Harbour's conduct. Both his earlier and his later payday loan related businesses (DNA and Oak Tree) were doing splendidly when, first, the illegal conduct of the United States government and, second, PAIF's foreclosure of the Green Circle loan portfolio, caused great losses to everyone involved, of which Harbour was also a victim.

conditions of Mr. Burg's money. (Harbour 049394) (Trial Tr. 2/16/23, pp.93)

- Dean Avedon, advised Mr. Burg that he spoke to Mr. Harbour and the deal sounded good, he could make up to 20%, the tax rate would be 57%. (Harbour 049936)

- Mr. Avedon advised Mr. Burg to hire a lawyer to create the agreement for him to invest his money. (Harbour 049935)

- Mr. Burg's lawyer spoke to Mr. Harbour and she said Mr. Harbour explained to her the deal and she gets it. She will revise the Operating Agreement. (Harbour 49951)

**Ms. Briggs told the Court the following:**

- The Defendant was to be compensated for advising Mr. Burg.

**The Truth from the Evidence**

- The Operating Agreement defined the terms between Mr. Burg and Mr. Harbour

- The Operating Agreement allowed for Mr. Harbour and Mr. Burg to compete with the company. Mr. Burg's lawyer told Mr. Avedon and Mr. Burg in an email that Mr. Harbour would be competing and she changed the Operating Agreement to allow Mr. Harbour to be paid from Green Circle. (Exhibit 2217 and 2218)

- Section 5.6 Competing Activities – allowed the Manager and his affilaites to directly compete with the company. The other Members are not entitled to any profits. (Exhibit 2217 and 2218)

**Ms. Briggs told the Court the following:**

- Mr. Harbour only sent $600,000 to Green Circle and used the remaining $400,000 to make payments to his American Express card and for his lavish lifestyle.

**The Truth from the evidence**

- Mr. Burg testified that Mr. Harbour could use his money for expenses (Trial Tr. 2/16/23, pp.128)

- Mr. Avedon testified that Mr. Harbour could use Mr. Burg's money for expenes. (Trial Tr. 2/16/23, pp.209)

- Mr. Burg testified his money did not have to go to the investment all at once, as long as it got there it was okay. (Trial Tr. 2/16/23, pp.112-113)

- Exhibit 516 shows Green Circle receiving $2,957,204 from Mr. Harbour. The government did not put on any evidence whose money made up all the $2, 957,204. No evidence that Mr. Burg's money was not in the $2,957,204.

- Ms. Purifoy testified that Mr. Harbour did not use investor money for personal expenses. (Trial 2/14/23, pp.169)

- Ms. Cameron testified that Mr. Harbour did not use any investor money in Oak Tree for personal expenses. (Trial Tr. 2/24/23, pp.18,96-97)

- Ms. Cameron testified it was an appropriate transfer of funds to reimburse DNA Management for business expenses incurred. (Trial Tr. 2/24/23, pp.96)

- Ms. Cameron testified it is common to have transfers between companies that are owned by the same person. (Trial Tr. 2/24/23, pp.97)

- IRS Agent Lionel Green testified that it is not commingling funds, he calls them inter-company transfers. (Trial Tr. 2/9/23, pp.121-122)

- IRS Agent Lionel Green testified that Mr. Harbour used his American Express card for business expenses. (Trial Tr. 2/9/23, pp.122)

- Ms. Purifoy testified that "due to due from" accounts are money borrowed from one entity and placed in another and there is nothing illegal about it. (Trial Tr. 2/14/23, pp.186)

**Conclusion re Mark Burg.** Thus, while the jury might have found Harbour guilty of Count 2 (Burg's $1 million) based upon "deception," even if the court errs in not reversing the conviction (because deception is insufficient) it did not and could not have found Harbour guilty based upon the deal being fraudulent because it was not fraudulent. But, even if it did that, there is no loss causation. The superseding, supervening act of PAIF to foreclose Green Circle's loan portfolio which had the effect – right or wrong - of allowing PAIF to sweep the Oak Tree funds in the Green Circle account is the sole reason that Burg lost his $1 million.

### **Why did Mr. Burg lose $1 million**?

- Princeton Alternative Income Fund "PAIF" foreclosed on Green Circle and took the money Oak Tree had loaned Green Circle, which included Mr. Burg's $1 million.

- Mathew Cantor the Bankruptcy Trustee filed a RICO complaint against PAIF. He accused PAIF of self-dealing with Green Circle and PAIF had a redemption from their senior lender Ranger.

- Phil Burgess has been sued by the SEC for a $73 million fraud for material omissions and misrepresentations. He did not disclose his prior felony conviction

- Without the intervention of PAIF into Green Circle, Green Circle would have continued to be a profitable and successful business.

- Mr. Harbour could never have foreseen in December 2014 when Mr. Burg invested that Green Circle would sign a loan agreement with PAIF, nor that PAIF would receive a 6 month redemption demand Ranger, its largest lender that would lead PAIF to foreclose on Green Circle.

- Mr. Harbour could never have foreseen in July 2014 that PAIF would be charged by the SEC for a $73 million fraud.

**RICHARD TURASKY**: We have already discussed his $350,000. However, while he delivered $500,000 altogether, he received $150,000 back the next day after his first fund's delivery.

## Ms. Briggs told the Court the following:

- Rich Turasky invested $500,000.

## The Truth from the Evidence

- The government in Doc. 710 admitted Mr. Turasky only invested $350,000. They did not say $500,000.

- Ms. Purifoy testified the loan agreement was $350,000. (Trial Tr. 2/14/23, pp.199)

- Joel Vetrano, Mr. Turasky's financial advisor, emailed Ms. Purifoy and Mr. Harbour that the loan amount was $350,000. He included an amortization table with payments based on $350,000. (Trial Tr. 2/15/23, pp.18-20, Exhibit 2013 and 2014)

- Ms. Purifoy testified she paid Mr. Turasky based on the loan amortization schedule of $350,000. (Trial tr. 2/15/23, pp.20-21, Exhibit 2014)

- Mr. Turasky testified he signed the Declaration, Exhibit 674. (Trial Tr. 2/10/23, pp.199)

- Mr. Turasky stated in the Declaration that his payments were per the note and proper. This confirms the amount was $350,000.

**Ms. Briggs told the Court the following**:

- Mr. Turasky only received minimal interest payments of $9,333.33.

**The Truth from the Evidence**

- Mr. Turasky's declaration stated he was paid approximately $80,000.

- Mr. Turasky's declaration stated he was paid per the terms of his note.

**Ms. Briggs told the Court the following**:

- Mr. Harbour only sent $55,000 to Green Circle.

- Mr. Harbour used Turasky's funds to pay the balance of his credit card and make Ponzi payments.

**The Truth from the evidence**

- Mr. Turasky testified that Mr. Harbour could retain his money and not lend it all to Green Circle. (Trial Tr. 2/10/23, pp.204)

- The Loan and Assignment Agreement and the Declaration state the money could be used for expenses at Mr. Harbours sole discretion. No mention of it all having to eventually go to Green Circle. (Exhibit 1505 and 674)

- The Loan and Assignment Agreement and Declaration show that Mr. Harbour did nothing illegal with Mr. Turasky's money.

- Mr. Turasky testified that Mr. Harbour could use his money for expenses (Trial Tr. 2/16/23, pp.128)

- Exhibit 516 shows Green Circle receiving $2,957,204 from Mr. Harbour and Mr. Turasky's $350,000 is included.

- Ms. Purifoy testified that Mr. Harbour did not use investor money for personal expenses. (Trial 2/14/23, pp.169)

- Ms. Cameron testified that Mr. Harbour did not use any investor money in Oak Tree for personal expenses. (Trial Tr. 2/24/23, pp.18,96-97)

- Ms. Cameron testified it was an appropriate transfer of funds to reimburse DNA Management for business expenses incurred. (Trial Tr. 2/24/23, pp.96)

- Ms. Cameron testified it is common to have transfers between companies that are owned by the same person. (Trial Tr. 2/24/23, pp.97)

1
2
- IRS Agent Lionel Green testified that it is not commingling funds, he calls them inter-company transfers. (Trial Tr. 2/9/23, pp.121-122)

3
- IRS Agent Lionel Green testified that Mr. Harbour used his American Express card for business expenses. (Trial Tr. 2/9/23, pp.122)

4
5
6
- Ms. Purifoy testified that "due to due from" accounts are money borrowed from one entity and placed in another and there is nothing illegal about it. (Trial Tr. 2/14/23, pp.186)

7
**Ms. Briggs told the Court the following**:

8
9
- The numerous complaints KSQ received from borrowers, cease and desist order issued by several states, and investigations by the FTC and SEC.

10
**The Truth from the evidence**

11
12
- Mr. Turasky testified that Mr. Harbour told his financial advisor, Joel Vetrano at lunch with Mr. Bobrow, about the FTC investigation. (Trial Tr. 2/10/23, pp.167)

13
- Mr. Turasky testified that Mr. Harbour disclosed the FTC in an email on October 29, 2014. (Trial Tr. 2/10/23, pp.165,166)

14
15
16
- Mr. Turasky testified that he went with Mr. Harbour on November 8, 2014 to the ASU v Notre Dame football game. This was after he knew about the FTC and was still socializing with Mr. Harbour. (Trial Tr. 2/10/23, pp.142)

17
- Mr. Turasky testified that Joel Vetrano was working with Mr. Harbour on a daily basis. (Trial Tr. 2/10/23, pp.161)

18
19
- KSQ was not, itself, a payday lender, no evidence that KSQ had any consumer complaints, cease and desist orders, investigations by the FTC and SEC.

20
21
- Mr. Harbour was not investigated by the FTC. Mr. Harbour had nothing to do with the FTC, *viz.*

22
- Mr. Cook the FTC Receiver testified to the following:

23
- Mr. Harbour was never named as a defendant by the FTC (Trial Tr. 2/8/23, pp.14)

24
25
- Mr. Harbour was never sued by the FTC or the receiver for anything including monetary relief, punitive damages or injunctive relief. (Trial Tr. 2/8/23, pp. 26)

26
27
- He was looking for a return of $6.6 million that was paid to DNA and they never won a turnover motion of the $6.6 million (Trial Tr. 2/8/23, pp. 27 -28)

28
- No Court determined that Mr. Harbour was liable for any fraudulent conduct

whatsoever with respect to Canyon Road. (Trial Tr. 2/8/23, pp. 29 – 30)

• Tim Coppinger's operation was doing things that complaints had been made on and various states had acted upon. And that is what ultimately got the FTC involved. It was Coppinger's end of things. (Trial Tr. 2/8/23, pp. 32-33)

• There was no connection between KSQ and Canyon Road (Trial Tr. 2/8/23, pp. 37)

• Mr. Harbour was not investigated by the SEC. Mr. Harbour settled with the SEC in August 2018, almost two years after Mr. Burg invested.

### **Why did Mr. Turasky lose $350,000**?

• Princeton Alternative Income Fund "PAIF" foreclosed on Green Circle and took the money Oak Tree had loaned Green Circle, which included Mr. Turasky's $1,000,000.

• Mathew Cantor the Bankruptcy Trustee filed a RICO complaint against PAIF. He accused PAIF of self-dealing with Green Circle and PAIF had a redemption from their senior lender Ranger.

• Phil Burgess has been sued by the SEC for a $73 million fraud for material omissions and misrepresentations. He did not disclose his prior felony conviction, a 2008 District of New Jersey felony tax evasion conviction.

• Melvin Dunsworth declaration

• Without the intervention of PAIF into Green Circle, Green Circle would have continued to be a profitable and successful business.

• Mr. Harbour could never have foreseen in July 2014 when Mr. Turasky made the loan, that Green Circle would sign a loan agreement with PAIF, nor that PAIF would receive a 6 month redemption demand Ranger, its largest lender that would lead PAIF to foreclose on Green Circle.

• Mr. Harbour could never have foreseen in July 2014 that PAIF would be charged by the SEC for a $73 million fraud.

### **PAIF**

   **The only charge against Harbour arising from PAIF was for $1.1 million. PAIF has no other claims for purposes of sentencing.**

### **Ms. Briggs told the Court the following**:

• The defendant transitioned to securing a Revolving Credit Promissory Note for Green Circle. It was assigned to PAIF which was established June 19, 2015.

1

### The Truth from the Evidence

2

3
•    Alonzo Primus the accountant for Green Circle and, secretly, also the Chief Lending Officer for PAIF brought PAIF to Green Circle.

4
•    Alonzo redlined the Term Sheet between FinTech and Green Circle, on behalf of Green Circle even though he was an Officer of PAIF.

5

6
•    Alonzo told Green Circle it was approved as a borrower to PAIF.

7
•    Alonzo asked Blake and Mr. Harbour when Green Circle was going to start borrowing from PAIF.

8

9
•    PAIF was created on November 3, 2014 not June 19, 2015.

10

### Ms. Briggs told the Court the following:

11

12
•    The Defendant misrepresented the financial condition and operations of Green Circle and PAIF began funding Green Circle in July 2015.

13

### The Truth from the Evidence

14
•    No evidence that Mr. Habour misrepresented any information to PAIF.

15
•    No evidence of any draw request in July 2015.

16

17
•    Email from Mr. Primus asking when Green Circle is going to start borrowing from PAIF

18

19
•    Emails between Mr. Harbour and Mr. Andrev and Mr. Primus and Steve Smith about Green Circle.

20

### Ms. Briggs told the Court the following:

21

22
•    Mr. Harbour issued new loans to borrowers who were about to go into default which absorbed the previous loans.

23

### The Truth from the evidence

24

25
•    Ms. Purifoy testified that Mr. Harbour did not have access to the loan management system to alter the borrowers. (Trial Tr. 2/14/23, pp174).

26
•    The government never brought this up during the trial.

27

### Ms. Briggs told the Court the following:

28
•    Fraudulent emails were sent to PAIF through 2016 and some were sent from the

bookkeeper Laura Purifoy.

## **The Truth from the evidence**

- Ms. Purifoy testified she did not send any emails to PAIF with altered borrowing bases.

- No evidence of any false borrowing bases sent to PAIF.

- Ms. Purifoy only did the borrowing bases through January 2016.

- Mr. Andreev took over the borrowing bases in February 2016.

## **Ms. Briggs told the Court the following:**

- The business relationship ended when the SEC investigated Mr. Harbour.

## **The Truth from the evidence**

- No employees or officers of PAIF were deposed by the SEC regarding Green Circle.

- The SEC investigation was into Drawbridge, not Mr. Harbour.

- The SEC investigation involving Mr. Harbour did not happen until 2018, almost two years after PAIF foreclosed on Green Circle.

- PAIF had a received a 6-mont redemption demand from Ranger, PAIF's largest investor and PAIF foreclosed on multiple portfolios; not just Green Circle's.

## **The $1.1 million withdrawal**

- There is no mention of the $1.1 million withdrawal in the PSR. The $1.1 million was approved by Geneva Lone Hill of Green Circle as a reduction of the Oak Tree debt.

- The government in Document 710 admitted the $1.1 million was a repayment of KC Lending's money (loaned to Oak Tree) and that it was not PAIF's money.

- No evidence at trial that Mr. Harbour submitted any false documents to PAIF for the $1.1 million withdrawal.

## **Ms. Briggs told the Court the following:**

- The defendant failed to disclose he diverted $500,000 in PAIF funds towards his $750,000 FTC settlement.

**The Truth from the evidence**

- The government in Document 710 said Mr. Harbour diverted KC Lending's money, not PAIF's money to pay the FTC.

- PAIF loaned the money to Green Circle and Green Circle sent the money to Oak Tree, it was not PAIF's money. It was Green Circle's money.

- Mr. Harbour and Mr. Dunsworth executed a loan agreement that allowed Mr. Harbour to use KC Lending funds for personal expenses.

- Mr. Dunsworth signed a declaration with his attorney avowing that he loaned the $1.1 million to Mr. Harbour as a personal loan.

**How did PAIF lose $3.4 million?**

- PAIF got a senior position in the loan portfolio, which included $1.9 million of Oak Tree's money.

- The August 31, 2015 borrowing base shows that PAIF was in a secured position and the numbers were approved by Alonzo Primus. (See emails between Alonzo and Laura)

- PAIF continued to loan operate Green Circle through 2018, they did not include Green Circle in the bankruptcy.

- No financial documents to support how PAIF lost any money.

- PAIF never turned over the financial information to the Defense that Judge Raye's required them to turn over.

- The $1.1 million was not withdrawn fraudulently and they received a portfolio that was worth more than the $1.1 million.

- The is no support for the contention that PAIF lost $3.4 million when the claim is that PAIF was defrauded out of $1.1 million.

- $3,420,060.58 has not been produced from the government since the indictment in 2019.

- When PAIF sued Mr. Harbour, this amount was never disclosed.

- PAIF controlled the portfolio and created false billings per the RICO lawsuit.

- There is no connection to the $1.1 million withdrawal in August 2015 and the $3,420,060.58.

- Ms. Purifoy provided Phil Burgess and his team the accounts receivable and borrowing base in November 2015 with all the back up. No accusation of manipulating

the borrowering base, the consumers or the accounts receivable.

- Mr. Burgess created a new company to bill the portfolio's he took over.

- No evidence of any consumers being moved to current from past due to manipulate the collateral.

## ¶ 19 The KSQ Alleged Fraud

## Paragraph 19, the KSQ/Joel Tucker Fraud Scheme

- Ms. Briggs told the Court multiple false statements in Paragraph 19. We will go through each false statement to the Court, then provide the Court with the Truth from the evidence.

- In 2011, Mr. Harbour began an investment with KSQ and the investments were recorded via one of the defendants companies, Canyon Road.

## The Truth from the Evidence

- Canyon Road and KSQ had zero connection. They were two separate companies.

- We will take a second and explain to the Court what Agent Green and FTC Receiver Larry Cook explained.

  ○ KSQ was a lender to payday lending companies. Mr. Rapp told the Court over and over and Mr. Cathey that KSQ had FTC and State agency complaints. Impossible. KSQ was not a payday lender.

  ○ Joel Tucker owned a lead aggregator for payday lenders. Edata was like Experian, it created credit profiles of subprime consumers for payday lending companies. Payday lending companies would pay Edata for these leads, or consumers. Edata knew the success rate on the consumers that got loans and Edata would know the default rate. Edata knew this data, because it charges a monthly fee, which was a percentage of the active portfolio of the payday lender.

  ○ Since Joel Tucker knew the success of the payday lender who was using Edata, he also loaned them money. He could "cherry pick" the best operators.

  ○ KSQ would borrow the money then loan it to select payday lending operators.

  ○ Canyon Road was a payday lender who that also made short-term business loans and that had nothing to do with KSQ.

○ KSQ did not loan money to Canyon Road.

○ Canyon utilized a call center in Kansas City owned by Tim Coppinger., CWB Services.

○ Larry Cook testified that Tim Coppinger and CWB is what created all the consumer complaints and State Agencies. Not David Harbour, nor Joel Tucker, nor KSQ.

○ Larry Cook testified that David Harbour did nothing wrong and was never accused of fraud.

○ David Harbour had no control of CWB and was not the cause of the FTC or the State Agencies shutting down Canyon Road.

- When Operation Choke Point shut down the payday lender's ability to ACH the consumer accounts the money could not flow upstream to KSQ. Therefore, KSQ could not pay NorthRock, NetFinance (Mr. Bobrow's company), DNA Investments nor any other lender.

**Ms. Briggs told the Court the following:**

- The business arrangement was not successful.

- Defendant received a 25% Finder's Fee from KSQ on the investors' money.

**The Truth from the evidence**

- Joe Cathey testified he was paid per the terms of his Promissory Note until September 2013 (Trial Tr. 2/8/23, pp.103)

- Pat Hill was paid per the terms of his Promissory Note until Operation Choke Point. (Exhibit 29)

- Ms. Purifoy testified that Mr. Harbour did not slice off 20% of the lenders money. (Trial Tr. 2/14/23, pp.219-220)

- Ms. Purifoy testified that DNA paid its lenders per the terms of the Notes until KSQ quit paying DNA (Trial Tr. 2/14/23, pp.216-217)

- Ms. Purifoy testified that Mr. Harbour sent all of the lenders money to KSQ and KSQ paid DNA per the money it received. (Trial Tr. 2/14/23, pp.221)

- Ms. Purifoy testified that KSQ paid DNA for the amount on the lenders Notes and the extra money would go to David. (Trial Tr. 2/14/23, pp.222) This proves they were not paid on a net amount (investment minus finders fee time interest rate) but on the gross amount with the finder's fee coming from KSQ's own profits, which were obviously enormous.

- The evidence shows that DNA Investments and KSQ were very successful businesses prior to Operation Choke Point.

- The goal of Operation Choke Point was to terminate payday lending.

- According to the expert testimony of Professor Robert Manning, Operation Choke Point succeeded in transferring about $506 billion of wealth from the lenders (including the alleged pre-Operation Chokepoint lenders such as Messrs. Dyer and Cathey) to the far poorer consumer borrowers on "Main Street."

## **Ms. Briggs told the Court the following:**

- KSQ was a fraud scheme.

## **The Truth from the evidence**

- Agent Green testified KSQ was a real company in the payday lending business.

- KSQ was not indicted or charged with any fraud by the DOJ.

- Joel Tucker was not indicted for payday lending.

- KSQ had been in business since 2006, five years before Mr. Harbour started lending money to it.

- KSQ paid NorthRock, DNA Investments and NetFinance per the terms of their agreements until Operation Choke Point.

- Ms. Paige testified she did not have the bank statements of KSQ.

- No evidence of KSQ being investigated by any federal agency.

- The last payment Mr. Harbour received from KSQ was in June 2014 and the last substantial payment was received a year earlier, in June 2013.

- In Mr. Tucker's own District of Kansas indictment, the government contended that Mr. Tucker started his debt scheme in July 2014.

17

- Mr. Tucker received his first monies from the fake debt scheme in July 2014. Mr. Harbour did not receive any money from KSQ or Mr. Tucker after June 2014.

- No evidence KSQ was a scheme or a fraud.

- No evidence Mr. Harbour received any money from the Lender's to DNA Investments and NorthRock.

- No evidence Mr. Harbour received any money from the Finder's Fee agreement they presented at the trial, Exhibit 384A and Exhibit 188.

- No that evidence the money Mr. Harbour received from KSQ was fraudulent.

**Ms. Briggs told the Court the following:**

- The Defendant diverted a substantial amount of the investor's money for his own personal expenditures.

**The Truth from the evidence**

- Ms. Purifoy testified that all of the lender's money on the contract went from DNA to KSQ, Mr. Harbour did not take a slice. (Trial Tr. 2/14/23, pp.219-220)

- Ms. Purifoy testified that Mr. Harbour did not use investor funds for personal expenditures. (Trial Tr. 2/14/23, pp.169)

- Ms. Purifoy testified that money would come in from KSQ, she would pay the investors the amount they were owed then David would be paid at the end. (Trial Tr.2/14/23, pp.54)

- FBI Agent Paige testified the investor money she traced all went to KSQ, not to Mr. Harbour. (Trial Tr. 2/23/23, pp.38)

- No evidence of any investor funds being diverted to Mr. Harbour.

**Ms. Briggs told the Court the following:**

- The defendant misrepresented his liabilities and net worth to entice investors to invest with personal financial statements.

## **The Truth from the evidence**

- The only evidence at the trial of any lender receiving a personal financial statement and personal guarantee was Joe Cathey.

- Mr. Cathey did not receive the personal financial statement from Mr. Harbour and no evidence was provided that Mr. Harbour even knew that Mr. Cathey had the personal financial statement introduced.

- There was no evidence that Mr. Harbour created the personal financial statement or knew what was on it. He certainly did not give it to him in July 2012.

- Ken Bobrow got a personal guarantee in 2007, but no personal financial statement.

- Craig Jackson got a personal financial statement in August 2012.  This was 3 years after he had loaned Mr. Harbour $6 million.

- Obviously, the August 2012 statement was not used to entice Mr. Jackson to loan Mr. Habour the money in 2009.

- Mr. Jackson did not receive a personal guarantee.

- No evidence of Mr. Harbour provided anyone a personal financial statement to entice them to invest with him.

## **Operation Choke Point Effect on Payday Lending**

- Lisa Berges testified that Operation Choke Point crushed NetFinance, Mr. Bobrow's payday lending company. (Trial Tr. 2/9/23, pp.152)

- IRS Agent Lionel Green testified that Operation Choke destroyed payday lenders.

- Rich Turasky testified that he knew of Operation Choke Point and it shut down ACH accounts which were the lifeblood of the practice, hence the nickname for the government operation.

- Dr. Robert Manning testified Operation Choke Point destroyed payday lending.

- The District of Kansas indictment of Joel Tucker said Operation Choke Point hurt payday lenders.

- Joe Cathey said he was told that Operation Choke Point is why KSQ could not pay the interest.

- At trial, he was not permitted to say who told him that but, here, we can state that it was Joel Tucker of KSQ who explained what had occurred in June 2013.

**Kenneth Bobrow:  $2,300,000. No fraud proven.  Civil lawsuit is underway. More than that was paid-back.**

**Ms. Briggs told the Court the following:**

**Defendant represented in 2007 the funds would only be used for family dollar stores and student housing**.

**The Truth from the Evidence**

- Exhibit 898 is the loan agreement between Mr. Bobrow and Mr. Harbour. The loan agreement states that Mr. Bobrow will be advised of the terms of any investment. It does not say the money is exclusively for Family Dollar Stores and Student Housing.

- Exhibit 783 is the workout agreement between Mr. Harbour and Mr. Bobrow. Section C says that to best of Harbour knowledge and belief the money was used for Family Dollar and Student Housing.

- The Workout agreement was done in October 2014. The email to Spaulding was in February 2014. Mr. Bobrow's Private Investigator determined that Pat Spaulding was a fictious person. This was, of course, utterly incompetent.  Messrs. Spaulding and Harbour were junior and senior high school teammates.

- After Mr. Spaulding died, his obituary was in the Kansas City Star and a sentiment was posted by the Harbour family.

- Mr. Bobrow, after being told by his P.I. that Pat Spaulding was supposedly a fictious creation did not sue Mr. Harbour or accuse Mr. Harbour of any fraud.

- As of October 2014, Mr. Harbour's bank statements from 2007 were available to review and would have shown whether Mr. Bobrow gave Mr. Harbour the money.

- The absence of any record of bank records showing that Mr. Harbour received the funds directly in 2007 – records that would have been immediately available to Mr. Bobrow's counsel in 2014, supports only one conclusion: That Mr. Bobrow sent the money directly to the investment and did not give it to Mr. Harbour.

- Exhibit 785 is an Affidavit that Mr. Harbour signed regarding the amount of money that went to Pat Spaulding for Family Dollar Stores.

- The current balance is blank
- Funds received per the Halstead (Bobrow) note and funded is blank
- The amount of the last payment is blank

- The amounts are all blank because Mr. Bobrow and Mr. Harbour did not have any records if anything was ever funded to that loan or if it was funded directly to the Family Dollar Store group and had nothing to do with the Pat Spaulding.

- The $7,000,000 loan is only for Family Dollar Stores, there is no evidence of the Student Housing.

- No evidence that Mr. Harbour misrepresented who Mr. Spaulding introduced Mr. Harbour too.

### Ms. Briggs told the Court the following:

- The Defendant misrepresented to Ms. Case she would receive an 18% return.

### The Truth from the evidence

- Ms. Case and Mr. Harbour did not have any written or other agreements with Ms. Case. Her agreement was solely with Mr. Bobrow and not Mr. Harbour. Ms. Case was a participant with Mr. Bobrow in his loan. (Trial Tr. 2/1/23, pp.38)

- Ms. Berges testified that she paid Ms. Case 18% on her $200,000 loan. (Trial Tr. 2/9/23, pp.177,178)

- Ms. Case testified she did receive 18%, $3,000 a month, or $36,000 a month and the payments started relatively soon. (Trial Tr. 2/1/23, pp.41,42)

- Ms. Case testified she received the payments form 2008 – 2012 (Trial Tr. 2/1/23, pp.42)

- Five years of $36,000 a year and three payments for a total of $9,000 in 2013 totals $207,000 and that is what Ms. Case testified she received.

### Ms. Briggs told the Court the following:

- The Defendant misrepresented that Spaulding was the reason the loan failed.

### The Truth from the evidence

- No evidence Mr. Harbour told anyone that Mr. Spaulding was the reason the

21

transaction failed.

- No evidence Mr. Harbour wrote the email to Mr. Spaulding.

- Ms. Hill does not know who wrote the email to Mr. Spaulding.

- No evidence Mr. Harbour created the Spaulding email.

In short, the allegation that Mr. Harbour faked the February, 2014 Spaulding Email is supported by zero evidence.

### Ms. Briggs told the Court the following:

- Mr. Harbour used investor funds for his personal life style on lavish items and made Ponzi payments from investor-victims money and concealed this to continue his fraud.

### The Truth from the evidence

- We have proven this multiple times that Mr. Harbour did not use any investor money for his personal life style.

- All of the wealth about which Ms. Paige testified that she tracked was purchased after funds began to flow from Canyon Road in April 2011.

### Ms. Briggs told the Court the following:

- Mr. Harbour signed a personal guaranty promising to return his $2.5 million.

### The Truth from the evidence

- This is true. Mr. Harbour did pay Mr. Bobrow back his $2.5 million.

- Lisa Berges testified that Mr. Harbour made all his payments from 2008 – 2013.

- We have included the analysis using Ms. Berge's testimony along with bank statements and 1099's that were sent to Mr. Bobrow.

**Mr. Bobrow:  Georgia Avenue Loan:  $241,000.  Charges dismissed.  House has been sold and, presumably, Bart Shea, who owned the home and was the beneficiary of the loan has repaid it.**

1 The charges brought from this supposed event were dismissed. These charges
2 were never supported by anything and, even if they were, like the 2007 Spaulding
3
4 "Fraud," the 2009 Jackson "Fraud," and the 2010 Gray "Fraud," they had nothing to do
5 with the Fraud that was convicted, the 2014-2016 Green Circle Fraud.

6 **Paragraph 26,31,32 the Georgia property**

7 • **Ms. Briggs repeated numerous false statements either copied from the
8 government's reports or as a result of the agent interview in ¶¶ 26,31,32. We
9 will go through each false statement to the Court, then provide the Court with
the truth from the evidence.**

10 **Ms. Briggs told the Court**
11
12 • **Mr. Harbour approached Mr. Bobrow $241,000 toward the down payment on
the Georgia house.**
13

14 The Truth from the Evidence
15
16 • Mr. Bobrow wired $141,000, not $241,000.

17 • Bart Shea signed a declaration that he asked Mr. Bobrow for the money for the
house.
18
19 • Mr. Bobrow met with Mr. Shea at his office and they discussed the house and Mr.
20 Bobrow after this meeting hand delivered a check to the Title Company for
$100,000.

21 • Mr. Bobrow told Agent Lopez and Cofer on December 13, 2021 that he gave
22 money to Bart Shea for a house he was remodeling.

23 • Mr. Bobrow told the Agents the house was Mr. Shea's house, not Mr. Harbour's.

24 • Mrs. Bobrow told the Agents the house was a remodel for Mr. Shea, not Mr.
25 Harbour.

26 • Mr. Bobrow told the Agents he knew Mr. Harbour would move into the house, but
27 he would move out during construction.

28

- Mr. Bobrow told the agents Mr. Shea would remodel the house then sell it for $4-5 million.

- No evidence the House was for Mr. Harbour or his family.

- The owner of Equitable Home Mortgage told the Agents that Mr. Harbour always told him the house was not his nor for him.

- Mr. Shea told Ashley Adams that he asked Mr. Bobrow for the loan for the house.

- The recorded jail calls between Mr. Shea and Mr. Harbour proved that Mr. Shea wanted the Harbour family to move into the Georgia Avenue residence after Mr. Shea bought it to guard against thieves stealing all the copper pipes from house, a very notable issue for those remodeling houses.

## **Ms. Briggs told the Court the following:**

- On August 12, 2021 the defendant provided a false gift letter to equitable home mortgage.

The Truth from the evidence

- No evidence Mr. Harbour provided any gift letter to Equitable Mortgage.

- The owner of Equitable Home Mortgage did not say that Mr. Harbour sent him a gift letter.

- The one and only email that involves a gift letter with Mr. Harbour does not have an attachment. Even Magistrate Judge Fine said there was not an attachement to the email, so we do not know what the Gift letter was.

- Ms. Bobrow testified that Mr. Harbour brought a gift letter to their house for Mr. Bobrow to sign in September 2021 a month after the house had already closed. That is the only gift letter Ms. Bobrow testified that Mr. Harbour brought to the house, not in August 2021.

- Mr. Shea in his Declaration stated that Mr. Harbour was not in the office in the month of August 2021, he was home sick with COVID.

- Zero evidence of the August 12, 2021 Gift Letter is connected to Mr. Harbour.

- Mr. Shea told Ashley Adams he told Mr. Harbour to get the gift letter signed.

**Ms. Briggs told the Court the following**:

- the defendant forged Mr. Shea's name on two loan agreements.

- The gift letter misrepresented that Shea and Bobrow were cousins.

- Harbour moved into the house in November 2021.

**The Truth from the evidence**

- The handwriting expert stated it was more likely than not Mr. Shea signed the Gottschalk loan agreement.

- Bart Shea told Ashley Adams, Mr. Harbour's former counsel, that he signed the loan agreements with Bobrow and Gottschalk.

- Mr. Bobrow testified he wrote in the name cousin on the Gift letter, not Mr. Harbour. (Trial Tr. 2/15/23, pp.104)

- If it was Mr. Harbour's house why did he move into the house in November 2021 when the house closed in August 2021.

**Ms. Brigg told the Court the following:**

- The defendant devised a scheme that he would obtain a home loan.

- Mr. Harbour lived in the house rent free.

**The Truth from the evidence**

- Mr. Shea told the Agents his investor partner asked him to buy a house to remodel and sell for around $7 million.

- No evidence Mr. Harbour was the one who wanted the house.

- Mr. Shea in his Declaration stated the house was for him to buy, remodel and sell. The house was not for Mr. Harbour.

- Mr. Shea told the Agents and Ashley Adams it would be cheaper to have the Harbour family live in the house then to pay a security company to monitor the house.

- Mr. Harbour did not sign any documents for the house.

- Mr. Harbour did not intiate any wires for the house to be sent to Wells Fargo.

- No evidence the house was ever for Mr. Harbour.

- Mr. Harbour had nothing to do with paying the real estate commissions. Mr. Shea signed the contract with the real estate agents, not Mr. Harbour.

- Mr. Shea signed all documents pertaining to the funding on the house, which included paying the real estate agent commissions.

**Summary of the $242,000 and the Georgia property and sentencing enhancements**

The house was valued at more than the loan and it recently sold for $3.5 million; more than was paid for it. The loan was for $2.3 million. Bart Shea signed all the loan applications. Bart Shea signed the closing documents and bought the house. Shea signed a Declaration under penalty of perjury and submitted it to Judge Rayes in November 2021 stating that he solicited Mr. Bobrow for the loan; not Mr. Harbour.

Bart Shea told Ashley Adams he solicited Mr. Bobrow for the money for the house, not Mr. Harbour. Bart Shea said that Mr. Harbour was acting under his direction on the house. Bart Shea told Ashley Adams that he signed the loan agreements with Bobrow and Gottschalk. A forensic document examiner confirmed that is was highly likely that Shea signed some the documents associated with the transaction and that as to others, she could reach no conclusion. No witness ever claimed, let alone proved, that Mr. Harbour signed any of the allegedly forged documents. Finally, in several recorded jail calls between Mr. Shea and Mr. Harbour, Mr. Shea stated exactly why the house was purchased, why he had asked the Harbour family to live in it while it was being remodeled, and called Mr. Rapp a number of foul names for thinking otherwise.

**<u>Rhonda Gray: $1 million.  No fraud proven. Civil suit is underway.</u>**

**<u>Paragraph 18, the Rhonda Gray Fraud Scheme</u>**

- Ms. Briggs told the Court multiple false statements in Paragraph 18. We will go through each false statement to the Court, then provide the Court with the Truth from the evidence.

## **<u>Ms. Briggs told the Court</u>**

- Defendant used Ms. Gray's money for personal expenses and Ponzi payments.

## **<u>The Truth from the Evidence</u>**

- Ms. Paige testified she only had bank accounts starting in November 2010. (Trial Tr. 2/23/23, pp.206-207)

- Exhibit 54 is the HPCG Bank of America account starting in November 2010. The beginning balance is $63,981.

- No bank records to show how Ms. Gray money was used.

- No evidence of Ms. Gray's money being used for personal expenses or Ponzi payments.

- Mr. Rapp told the Court: "So circumstantially, where's the million dollars for Rhonda Gray? Circumstantially, some of that could have been used to pay back Mr. Bobrow or Pam Case or one of the other many investor." (Hr. 1/27/23, pp.9, lines 5-8)

- Lisa Berges, testified that she inputted all the payments from Mr. Harbour into Quick Books and provided the printout to the Court in Exhibit 900 (Trial Tr. 2/9/23, pp.141).

- The payments in Exhibit 900 to Mr. Bobrow stop in February 2010 and do not start again until April 2011. Ms. Gray's loan to Mr. Harbour was on March 22, 2010. So her money was not used to pay Mr. Bobrow.

- Exhibit 55 shows as of 11/3/2010, Mr. Harbour's account balance was $33,739.59, so no payments to Mr. Bobrow from Ms. Gray in April 2011 when the payments started again.

- No evidence of any "other many investor" during 2010 that was paid by Mr. Harbour using Ms. Gray's money.

- No evidence supports what the government rep[resented to Ms. Briggs nor, therefore, what she told the Court.

**<u>Ms. Briggs told the Court the following</u>**:

- Ms. Gray wanted her money between 2010 and 2016.

**<u>The Truth from the evidence</u>**

- Ms. Gray testified she had a judgment creditor and it would be risky to get her money back until after July 2016. (2/2/23, pp.176)

- Ms. Gray in her typed notes wrote in January 2016, that she cannot be mad at Mr. Harbour because he is just doing what's best for me. Exhibit 213.

- The *raison d'etre* for Ms. Gray to move the life insurance proceeds to Mr. Harbour's control was to be able to demonstrate to the judgment creditors that the funds were not under her control.

- The bank judgment creditor knew about the life insurance proceeds but was unable to reach them because she could honestly state that they were not in her control. They were under Mr. Harbour's control.

- Unless renewed within 5 years, the Judgment would expire in July 2016. The judgment was not renewed.

- Ms. Gray then asked for her $1 million

**<u>Ms. Briggs report supports Mr. Harbour</u>**

- Tms. Briggs reported that Mr. Harbour borrowed $1,002,242.67 and the loan was for 3%.

- Mr. Harbour agrees with this and the loan agreement between Ms. Gray and Mr. Harbour matches the report.

- This supports, as Ms. Gray testified and AUSA Schoch said in opening arguments, the loan was for 3% not 5%. The amount was for $1,002,242.67 not $1,000,000.

We now have multiple supports for the loan agreement that Mr. Harbour has is solely a 2010 loan agreement between HPCG and Ms. Gray. It was a 10-year loan at 3% and is now in suit in Superior Court. It does even come close to constituting relevant conduct within the Sentencing Guidelines. It was not a high-yield, short-term, payday

lending loan. If viewed as an investment, its purpose was not capital enhancement but capital preservation.

**Joe Cathey: $3 million.  No fraud proven and no causation. Cathey's loss was proximately caused by the illegal conduct of the Obama Administration.**

**In Paragraph 19, Ms. Briggs reported to the Court false statements found in the government reports and/or told to her by agents.  The Draft PSR does not match the actual testimony and evidence from the trial regarding Joe Cathey.**

**We will go through each point she told the Court and then provide the truth from the testimony and the evidence.**

<u>**Ms. Briggs told the Court the following:**</u>

- **The defendant misrepresented to Mr. Cathey he was the only one with a personal guarantee**

<u>**The Truth from the Evidence**</u>

- Mr. Cathey testified that he never met or spoke to Mr. Harbour before he loaned money to NorthRock. So Mr. Harbour did not tell Mr. Cathey before he loaned money that Mr. Harbour had only signed two personal guarantees. (Trial Tr. 2/8/23, pp.62-63, 103)

- Mr. Harbour would not have told Mr. Cathey at the meeting in Kansas City that he only signed one personal guarantee, because Dave Dyer and Daryl Deel were at the meeting. Mr. Cathey has confused Mr. Harbour with Mr. Dunsworth. Mr. Harbour never told Mr. Cathey he only signed two personal guarantee's.

- No evidence Mr. Harbour knew that Mr. Cathey was given a financial statement of Mr. Harbour's in July 2012 and that Mr. Harbour knew Mr. Cathey relied on it to loan money to NorthRock.

- Mr. Cathey testified that Harbour never told him that he didn't get a fee. Cathy didn't talk to Harbour until after the payments stopped. (Trial Tr. 2/8/23, pp.102)

- Mr. Cathey received the personal financial statement from Mr. Dunsworth, not Mr. Harbour.

- No evidence the personal financial statement was wrong or not accurate in July 2012.

- Personal financial statement for Mr. Harbour is community property, therefore it would not have included any personal guarantees that Abby Harbour had not signed. Example is Mr. Bobrow. Mrs. Harbour did not sign his, only Mr. Harbour.

29

- Mr. Cathey had an attorney, his attorney should have known that in order for a personal guarantee to be enforced it needs both signatures in Arizona.

### Ms. Briggs told the Court the following:

- Mr. Cathey was not aware of Mr. Harbour's 25% Finder's Fee.

### The Truth from the Evidence

- No evidence that NorthRock or Mr. Dunsworth (the other 50% owner), or Mr. Harbour received a Finder's Fee from KSQ for loans made by North Rock.

- Mr. Cathey was paid on 100% of his loan from NorthRock not a net amount. See Exhibit 906 and 421.

- NorthRock was paid on 100% of its loans to KSQ, not a net amount. See Ms. Purifoy testimony.

### Ms. Briggs told the Court the following:

- **The numerous complaints KSQ received from borrowers, cease and desist order issued by several states, and investigations by the FTC and SEC.**

### The Truth from the evidence

- KSQ was not, itself, a payday lender, no evidence that KSQ had any consumer complaints, cease and desist orders, investigations by the FTC and SEC.

- Mr. Harbour was not investigated by the FTC until 2018. Mr. Harbour had nothing to do with the FTC.

- Mr. Cook the FTC receiver testified to the following:

  - Mr. Harbour was never named as a defendant by the FTC (Trial Tr. 2/8/23, pp.14)

- Mr. Harbour was never sued by the FTC or the receiver for anything including monetary relief, punitive damages or injunctive relief. (Trial Tr. 2/8/23, pp. 26)

- The Receiver brought a Motion seeking a return of $6.6 million that was paid to DNA but the Receiver abandoned the turnover motion without it having been decided. (Trial Tr. 2/8/23, pp. 27 -28)

- No Court determined that Mr. Harbour was liable for any fraudulent conduct whatsoever with respect to Canyon Road. (Trial Tr. 2/8/23, pp. 29 – 30)

- Tim Coppinger's operation was the basis for the complaints made by State licensing authorities. And that is what ultimately got the FTC involved. It was Coppinger's end of

things. (Trial Tr. 2/8/23, pp. 32-33)

•      There was no connection between KSQ and Canyon Road (Trial Tr. 2/8/23, pp. 37)

•      Mr. Harbour was not investigated by the SEC. Mr. Harbour settled with the SEC in August 2018, almost two years after Mr. Burg invested.

### **Why did Mr. Cathey lose $3,000,000?**

•      Operation Choke Point.

•      Dr. Robert Manning testified that Operation Choke Point destroyed the payday lending business in 2013. (Trial Tr. 2/17/23, pp.33)

•      The government did not, and could not, refute this contention because Congress had made contrary findings, the Executive Branch had overreached, which was a charitable way of saying that the Obama Administration had set-out to destroy payday lending and without the benefit of a statute or an Executive Order, had succeeded in so doing.

•      Agent Green testified that he audited around 20 payday lenders and Operation Choke Point stopped the ability to ACH which absolutely harmed the payday lending business. I'm not sure if that were, but it was absolutely – my understanding is that the ACH was absolutely essential to the payday lending operation. Yes." (Trial Tr. 2/9/23, pp.67,71)

•  Mr. Dichter: "Well it choked off – Operation Choke Point was designed to, and did, choke off the use of ACH accounts by payday lenders. Agent Green: "Agreed. Yes." (Trial Tr. 2/9/23, pp.67)

•  Mr. Dichter: "There was a huge impact that resulted from the inability to utilize ACH accounts that affected the payday loan industry. You agree with that?" Agent Green: "I would agree with that." (Trial Tr. 2/9/23, pp.70)

•  Agent Green testified that KSQ was in the payday lending business (Trial Tr. 2/9/23, pp.64)

•  Joe Cathey testified: "What they basically said is it shut down the electronic transfers so all the money that was loaned out just disappeared. You couldn't send any more out, get any more back." (Trial Tr. 2/8/23, pp.110)

•  Melvin Dunsworth declaration in 2020. Operation Choke Point is the reason KSQ quit paying NorthRock.

### **Pat/Carol Hill**

**No fraud proven. Jury acquitted on anything and everything associated, in any way with DNA, KSQ, and Canyon Road.  The Hills' losses were proximately**

**caused by the uncontested and uncontroverted illegal conduct of the Obama Administration.**

The Jury acquitted Mr. Harbour on anything and everything associated, in any way with DNA, KSQ, and Canyon Road.  The Hills' losses were proximately caused by the uncontested and uncontroverted illegal conduct of the Obama Administration.

#### Ms. Briggs told the Court the following:

• Ms. Hill started working for Mr. Harbour in November 2009.

#### The Truth from the Evidence

• Ms. Hill testified she started working for Mr. Harbour in November 2010.

#### Ms. Briggs told the Court the following:

• Ms. Hill on December 15, 2012 invested $81,621.34 with Mr. Harbour's entity NorthRock.

#### The Truth from the Evidence

• Jeanette Paige, the Forensic Accountant for the FBI testified that she reviewed the December 2012 NorthRock bank statement and was not able to locate the $81,621.34 investment. (Trial Tr. 2/23/23, pp.96)

• The 1/1/2013 NorthRock bank statement does not have a deposit for $81,621,34 or any deposit from Ms. Hill.

• The December 15, 2012 Promissory Note between Ms. Hill IRA and NorthRock was signed by Melvin Dunsworth not Mr. Harbour. (Exhibit 566)

• Ms. Paige testified that Mr. Harbour was not a signer on the NorthRock checking account. (Trial Tr. 2/23/23, pp.206)

• Ms. Paige testified she did not see any money being distributed to Mr. Harbour from NorthRock's bank account. (Trial Tr. 2/23/23, pp.98)

• Contrary to what Ms. Briggs told the Court, there is no evidence Ms. Hill loaned $81,621.34 to NorthRock in December 2012. Even if Ms. Hill had loaned money to NorthRock, Mr. Harbour did not control the bank account as he was not a signer.

• The charges against Mr. Harbour were in Count 11 of the Second Superseding Indictment and the jury acquitted.

**<u>Ms. Briggs told the Court the following:</u>**

- Mr. Harbour would increase her interest rate on her IRA loan if she invested $500,000 with Mr. Harbour.[4]

**<u>The Truth from the evidence</u>**

- Exhibit 566 is Ms. Hill's IRA Promissory Note and the rate is 30%. It was signed on December 15, 2012 by her and Mr. Dunsworth.

- Ms. Hill Promissory note with Mr. Harbour for her $500,000 loan was signed on February 6, 2013, almost two months later. (Exhibit 251)

- Ms. Hill Promissory Note was not amended to increase the interest rate after she invested the $500,000.

- Ms. Hill testified that Mr. Harbour told her that her interest rate could be 20 – 30% because Melvin really liked her. (Trial Tr. 2/3/23, pp.83) Nothing to do with investing $500,000 with Mr. Harbour.

- No evidence at the trial from Ms. Hill that she was going to get a higher interest rate, if she also invested $500,000 with her.

- Harbour was paid or was to be paid a finder's fee by KSQ based upon the $500,000 loan, namely, 10%.

- The Hills obviously knew this because, had Operation Choke Point not killed payday lending, the Hills were going to get the finder's fee themselves in years 2 and 3 of their loan.

**<u>Ms. Briggs told the Court the following</u>**:

- Mr. Harbour had Ms. Hill sign his name on fictious documents

**<u>The Truth from the evidence</u>**

- Ms. Hill testified that she signed Mr. Harbour's name on checks and documents, but she never said anything was fictious. (Trial Tr. 2/3/23, pp.63)

- No evidence of Mr. Harbour having Ms. Hill sign his name on fictious documents.

- The government never showed any documents at the trial that were fictious that Ms. Hill signed Mr. Harbour's name.

---

[4] The $500,000 loaned by Pat and Carol Hill to DNA was not charged.

**<u>Ms. Briggs told the Court the following:</u>**

- Mr. Harbour did not disclose the 25% finder's fee he received for providing the $81,621.94 money to KSQ.

**<u>The Truth from the evidence</u>**

- The $81,621.94 was loaned to NorthRock; not to DNA.  There was no evidence that NorthRock ever received any finder's fees.

- The 25% agreement, to the extent it was relevant to anything, was between DNA and KSQ.  Mr. Harbour was to receive a finder's fee from KSQ on the $500,000 loan to KSQ but it was 10%.

- He would receive it for the first year of the three year Note and the Hills would receive it for the second and third years.

- Ms. Paige and Agent Green testified they could not trace the Finder's Fee Agreement in Exhibit 188 and Exhibit 384 to Mr. Harbour's bank accounts.

- Ms. Paige testimony: Ms. Paige: "No particular rhyme or reason. I wasn't able to differentiate like a salary or <u>percentage payments from the finder's fees</u>. Everything was just mixed together in those accounts." Ms. Schoch: "What about the transfers to different accounts that you mentioned? Did you -- were you able to discern anything from those?" Ms. Paige: "<u>No</u>". (Tr. 2/23/23, pp.40-41)

- Agent Lionel Green of the IRS who audited Mr. Harbour from 2011 – 2014 testified on Mr. Harbour being paid a Finder's Fee from KSQ.

- Mr. Rapp introduce Exhibit 384, the Finder's Fee Agreement between Mr. Harbour and Mr. Tucker. DNA Investments and KSQ Management.

- Mr. Rapp: "and did he explain that if the money came directly to Mr. Harbour that he would then take his finder's fee and then pass it on to, to Mr. Tucker, or, or did he give you details about that?

- Agent Green: "I do not recall any details about that. And looking at the books, again, I tried to reconcile this, to the books and records, so I looked for, you know, to take, this is the, as I, my understanding is that this is kind of the roadmap of the compensation. And so then I wanted to tie the books and records and reconcile the books and records to this road map and I was not able to do that. (Trial Tr. 2/9/23, pp 57)

- The 32 year veteran IRS auditor could not reconcile the Finder's Fee agreement to any income for Mr. Harbour, which supports it was not applied to each lender to DNA Investments.

▪   Exhibit 29 shows an increase in the interest payments from KSQ to DNA Investments by $8,333.33 from March to April 2013. Mr. Harbour was paid 20% from Mr. Tucker and he gave all the interest to Mr. and Mrs. Hill. This shows KSQ was paying interest on 100% of the loan amount, not a net amount.

### **Ms. Briggs told the Court the following:**

▪   Which included $6.6 million in payments to the defendant as a finder's fee

▪   KSQ was investigated by the Federal Trade Commission (FTC)

### **The Truth from the evidence**

• Mr. Harbour did <u>not</u> get $6.6 million in finders fees from KSQ.

• The FTC Receiver, Mr. Cook testified that Mr. Harbour was paid $6.6 million from Canyon Road. (Trial Tr. 2/7/23, pp.199); not from KSQ.

• These payments were distributions based upon Mr. Harbour's partial ownership of Canyon Road.

• No Court determined that Mr. Harbour was liable for any fraudulent conduct whatsoever with respect to Canyon Road. (Trial Tr. 2/8/23, pp. 29 - 30)

• Agent Lionel Green of the IRS audited both KSQ and Canyon Road and testified they were separate businesses and found no material interaction between the entities. (Trial Tr. 2/9/23, pp. 73,74)

• Mr. Cook testified there was no connection between KSQ and Canyon Road (Trial Tr. 2/8/23, pp. 37)

• No evidence that KSQ was ever investigated by the FTC.

• No evidence of what Ms. Briggs told the Court about the $6.6 million and KSQ being investigated by the FTC.

### **Why did Mr. and Ms. Hill lose $500,000?**

•   Operation Choke Point was the cause for their loss not Mr. Harbour

•   Dr. Robert Manning testified that Operation Choke Point destroyed the payday lending business in 2013. (Trial Tr. 2/17/23, pp.33)

•   Agent Green testified that he audited around 20 payday lenders and Operation Choke Point stopped the ability to ACH which absolutely harmed the payday lending business. I'm not sure if that were, but it was absolutely – my understanding is that the

ACH was absolutely essential to the payday lending operation. Yes." (Trial Tr. 2/9/23, pp.67,71)

• Mr. Dichter: "Well it choked off – Operation Choke Point was designed to, and did, choke off the use of ACH accounts by payday lenders. Agent Green: "Agreed. Yes." (Trial Tr. 2/9/23, pp.67)

• Mr. Dichter: "There was a huge impact that resulted from the inability to utilize ACH accounts that affected the payday loan industry. You agree with that?" Agent Green: "I would agree with that." (Trial Tr. 2/9/23, pp.70)

• Agent Green testified that KSQ was in the payday lending business (Trial Tr. 2/9/23, pp.64)

• Joe Cathey testified: "What they basically said is it shut down the electronic transfers so all the money that was loaned out just disappeared. You couldn't send any more out, get any more back." (Trial Tr. 2/8/23, pp.110)

• Melvin Dunsworth declaration 2020. Operation Choke Point is the reason KSQ quit paying NorthRock, no fault of Mr. Harbour.

**Alison Willson**

No fraud proven. Jury acquitted on anything and everything associated, in any way with DNA, KSQ, and Canyon Road.  Willson's losses were proximately caused by the uncontested and uncontroverted illegal conduct of the Obama Administration.

**<u>Ms. Briggs told the Court</u>**

• Ms. Briggs did not have any substance in her report on Ms. Wilson and why Mr. Harbour owes her $100,000.

**<u>The Truth from the Evidence</u>**

• The governments theory was a false misrepresentation that Mr. Harbour made a Finder's Fee from KSQ for Ms. Wilson money to Canyon Road, because really her money went to KSQ. All made up.

• Ms. Schoch told the Court that Ms. Wilson was recruited for Canyon Road and her money was funneled to KSQ without her knowledge. (Trial Tr. 2/23/23, pp.61-62)

• FBI forensic accountant Ms. Paige testified that Ms. Wilson money went to Canyon Road not KSQ. (Trial Tr. 2/23/23, pp.120, 162)

- Ms. Wilson signed a Declaration under oath that she was not defrauded by Mr. Harbour.

- Ms. Paige testified that Mr. Harbour was not a signer on the Canyon Road checking account.

- Mr. Cook testified that Mr. Harbour was not the cause of the FTC shutting down Canyon Road.
- No evidence Mr. Harbour made any false misrepresentations to Ms. Wilson

**Why Did Ms. Wilson Lose $100,000**

- Mr. Cook the FTC receiver testified to the following:

- Mr. Harbour was never named as a defendant by the FTC (Trial Tr. 2/8/23, pp.14)

- Mr. Harbour was never sued by the FTC or the receiver for anything including monetary relief, punitive damages or injunctive relief. (Trial Tr. 2/8/23, pp.26)

- He was looking for a return of $6.6 million that was paid to DNA and they never won a turnover motion of the $6.6 million (Trial Tr. 2/8/23, pp 27 -28)

- No Court determined that Mr. Harbour was liable for any fraudulent conduct whatsoever with respect to Canyon Road. (Trial Tr. 2/8/23, pp.29 – 30)

- Tim Coppinger's operation was doing things that complaints had been made on and various states had acted upon. And that is what ultimately got the FTC involved. It was Coppinger's end of things. (Trial Tr. 2/8/23, pp. 32-33)

- There was no connection between KSQ and Canyon Road (Trial Tr. 2/8/23, pp.

- Ms. Willson's $100,000 was Count 10 of the Second Superseding Indictment.

**Craig Jackson**

The number is not $15 million; it is actually $6 million. However, no fraud was charged and no fraud was proven and the $6 million that was borrowed was all repaid by 2012, as required.

The $9 million was invested by Jackson into the Palo Verde Fund operated by Tony Stacy. The government know full well that Mr. Harbour never received the $9

million from Mr. Jackson and so do Mr. Jackson's own lawyers. Because Mr. Harbour introduced Mr. Jackson to Tony Stacy, Mr. Jackson has contended that Mr. Harbour ought to be civilly liable to Mr. Jackson for negligent misrepresentation and breach of fiduciary duty and the parties on presently on their 10th Tolling Agreement putting off any civil litigation concerning the allegations.

### **Ms. Briggs told the Court**

- Mr. Harbour lost $15,000,000 of Mr. Jackson's money.

- The PSR did not provide any written explanation of why the money was included or how Mr. Harbour lost Mr. Jackson's money.

### **The Truth from the Evidence**

- Mr. Harbour signed an Affidavit that he knew in 2009 when he borrowed the money from Mr. Jackson that he had to pay him back in 2012. This was the agreement but it was an oral agreement.
  - Jason Braun testified there may have been a written agreement between Mr. Harbour and Craig, he could not remember. (Trial Tr. 2/15/23, pp.175)
  - Jason Braun testified the Affidavit has interest being paid to Craig, so there must have been a Promissory Note between Mr. Jackson and Mr. Harbour with interest payments. (Trial Tr. 2/15/23, pp.181)
  - The Affidavit did not attach the Promissory Note between Mr. Jackson and David.
  - No evidence of the written agreement provided by the government outlining the terms and conditions of how Mr. Harbour could use the money.
  - Therefore, no restrictions were proved.
  - Mr. Jackson did not refuse to sign the Agreement that included the lines that Mr. Harbour crossed out.
  - Mr. Harbour did pay Mr. Jackson back in 2012.
  - Mr. Harbour agreed to invest Mr. Jackson money into conservative investments.
  - Nothing defined what Mr. Jackson or Mr. Harbour believed conservative investments were
  - No evidence of any communications or discussions between Mr. Jackson and Mr. Harbour on what the criteria was for conservative investments.

- The affidavit did not say the funds had to be invested in liquid investments, because that is not what Mr. Harbour did, and Mr. Jackson knew that.
- No evidence Mr. Jackson or his lawyers ever accused Mr. Harbour of fraud or using Craig's money in a nefarious way.
- Nothing in the Affidavit accused Mr. Harbour of any misrepresentations to Craig.
- In August 2012, David's bank statements were available for Mr. Jackson and his lawyers to review if they believed Mr. Harbour used the money fraudulently. They did not request to review the bank statements.
- Nothing said that Mr. Harbour had to pay Mr. Jackson back from the investments his money went into, he just had to be paid back.
- No evidence what investments Craig's money did or did not go to.
- No evidence Mr. Harbour ever intended to not pay Mr. Jackson back.
- No evidence Mr. Jackson was entitled to keep ownership of the investments his money was in and get to have his money paid back to him. He did not get to have his money liquidated from various investments and get to keep the upside of the investment.
- No evidence of the investments that Mr. Harbour was doing in 2009 and 2010 where Craig's money could have gone.
- It is the governments burden to prove where Craigs money went with evidence, not David's burden to prove it did not go there.
- Mr. Jackson never sued Mr. Harbour for any wrong doing on how he used Craig's money.
- Personal expenses
  - No evidence Craig's money was used for personal expenses of David's
  - No evidence Craig's money was used to make Ponzi payments
  - No evidence Craig's money was used to buy wealth.
  - The houses, jewelry, golf clubs, private planes, etc. the government showed in Exhibit 918 started in 2011. The same time payday lending started. Not in 2009 or 2010.
- Mr. Rapp told the Court Mr. Harbour had a cash infusion of $15 million into his account.
- Jason Braun, Craig's lawyer, testified that Mr. Harbour did not get the $9 million it went to Tony Stacy.
- Jason Braun testified that Mr. Jackson signed a subscription agreement with Tony Stacy for the $9 million and the money went to Tony Stacy not David. (Trial Tr. 2/15/23, pp.182)
- The Affidavit stated that Mr. Jackson signed a subscription agreement for the $9 million.
- Agent Lionel Green testified he did not see a deposit into David's account for $9

million.

- Jason Braun testified that after they met with Mr. Harbour to review Craig's $6 million, he created the Affidavit to memorialize the agreement that Mr. Jackson and Mr. Harbour had in 2009 when Mr. Harbour borrowed the money. (Trial Tr. 2/15/23, pp.166)
  - ○ What promises had been made
  - ○ What he was supposed to do with the money
  - ○ When the money was supposed to be paid back
  - ○ Detailed facts of the intentions in August 2009
  - ○ After the meeting with Mr. Harbour they did not accuse Mr. Harbour of any wrong doing, so if they believed that Mr. Harbour did not use the money per the instructions of Craig, they did not say that in the Affidavit.
  - ○ If Jason thought Mr. Harbour told them things in there meeting that were not true or fraudulent, they did not put it in the Affidavit.

Mr. Jackson filed a claim in the Palo Verde Receivership, CV2013-012420, which was in Maricopa County Superior Court.  The investment with Stacy was into one of the Palo Verde entities.  His proof of claim, which was approved, was for $6,761,062 and this was because, during the life of that investment, he had been repaid $2,238,938.

Because the Receiver had not contested the claim, Mr. Jackson was not required to submit the subscription and other disclosure agreements he had signed. However, there has been other litigation surrounding Palo Verde, including litigation in the Northern District of Oklahoma that is illuminating.  In *Michael A. Farley v. Anthony R. Stacy and Paul A. Ross*, No. 14-cv-008-JHP-PJC, the Plaintiff, Mr. Farley, invested a large sum of money – albeit not nearly as much as Mr. Jackson - in the same investment as had Craig Jackson and at about the same time. Mr. Jackson invested in late-2009 and Mr. Farley invested in early 2010. The subscription agreements were Exhibits to the Motion and Cross-Motion for summary judgment and, as a consequence, were readily available.

It seems clear that the of agreements and disclosures signed by Mr. Farley and

those signed by Mr. Jackson must have been either *exactly* the same or almost the same. In Doc. 127 filed on 6/23/2015, the District Judge granted summary judgment in favor of Mr. Stacy and Mr. Ross (Mr. Stacy was proceeding *pro per* and mostly relied upon Mr. Ross' pleadings. The Court found that there had been complete disclosure of all material risks and that there was no actionable fraud. The 10th Circuit affirmed.  No. 15-5056, April 14, 2016.

In short, there can be no doubt that Mr. Jackson, whose testifying counsel admitted had signed the subscription agreement and disclosures, would suffer the same fate as did Mr. Farley had he sued Mr. Stacy for fraud and, consistent with this, we see no evidence of a suit by Mr. Jackson against Mr. Stacy. There was no fraud and, even if there was, as against Mr. Stacy, there was certainly none as against Mr. Harbour. Rather, the contention, if suit is ever filed, is based upon allegations of negligence.

**Dave Dyer**

Dyer loaned the money to NorthRock; not to DNA and KSQ was neither a fraud nor owned by Harbour. While the author, parroting the government, contends the number was $10,447.779, it was far less: $6,145,000. Meanwhile, no fraud was charged and none was proven. The Jury acquitted on anything and everything associated, in any way with DNA, KSQ, and Canyon Road.

Dyer's losses were proximately caused by the illegal conduct of the Obama Administration expressed through Operation Choke Point. Meanwhile, although Dyer has sued Harbour, through his entity, Netlend, the suit is based solely upon allegedly enforceable commercial guaranties of the loans. There are no fraud allegations in the law

suit. Netlend's motion for summary judgment based upon the guaranties was denied without prejudice. Meanwhile, the defense is twofold.  One is a technical defense based upon the fact that Netlend sued Mr. Harbour twice before and dismissed each prior action voluntarily, thus raising a *res judicata* defense under Rule 41 of the Civil Rules. The second defense is a *force majeure* type claim, based upon the Restatement and Operation Choke Point, which was something unknown and, at the time, unknowable to the parties.

### Ms. Briggs told the Court the following:

- Ms. Briggs did not provide any substance in the report on Dave Dyer and why his loss was included and how he is a victim of Mr. Harbour's.

- Mr. Harbour never had any control over Mr. Dyer's money.

### The Truth from the Evidence

- No evidence Mr. Harbour solicited Mr. Dyer and he has known Mr. Dunsworth for over 25 years. Mr. Dyer and Mr. Dunsworth were friends for over 10 years and Mr. Dunsworth introduced Mr. Dyer to Mr. Harbour.

- Dave Dyer raised money for NorthRock per a registered offering.

- Dave Dyer had a side agreement with Joel Tucker to receive a fee for different levels of money that he raised, this was not disclosed to his investors.

- Dave Dyer has sued Mr. Harbour two different times and never accused Mr. Harbour of fraud.

- Dave Dyer did extensive due diligence on KSQ and Joel Tucker

- 100% of Dave Dyer's group's money in NetLend went to KSQ.

- Mr. Harbour was not paid any Finder's Fee's on Mr. Dyer's loans to NorthRock then to KSQ.

- Mr. Dyer's group was paid on 100% of the money they loaned to NorthRock, not a net amount.

- Mr. Harbour was not a signer on the NorthRock checking account.

- Mr. Dyer and Mr. Dunsworth, the manager and operator have known each other for

over 20 years. Mr. Dunsworth has invested millions of dollars with Mr. Dyer and lost it all.

• Mr. Dyer loaned $6,145,000 to NorthRock, not $10,447,779.

### Why did Mr. Dyer lose $6,145,000?

• Melvin Dunsworth declaration.

• Operation Choke Point.

• Dr. Robert Manning testified that Operation Choke Point destroyed the payday lending business in 2013. (Trial Tr. 2/17/23, pp.33)

• Agent Green testified that he audited around 20 payday lenders and Operation Choke Point stopped the ability to ACH which absolutely harmed the payday lending business. I'm not sure if that were, but it was absolutely – my understanding is that the ACH was absolutely essential to the payday lending operation. Yes." (Trial Tr. 2/9/23, pp.67,71)

• Mr. Dichter: "Well it choked off – Operation Choke Point was designed to, and did, choke off the use of ACH accounts by payday lenders. Agent Green: "Agreed. Yes." (Trial Tr. 2/9/23, pp.67)

• Mr. Dichter: "There was a huge impact that resulted from the inability to utilize ACH accounts that affected the payday loan industry. You agree with that?" Agent Green: "I would agree with that." (Trial Tr. 2/9/23, pp.70)

• Agent Green testified that KSQ was in the payday lending business (Trial Tr. 2/9/23, pp.64)

• Joe Cathey testified: "What they basically said is it shut down the electronic transfers so all the money that was loaned out just disappeared. You couldn't send any more out, get any more back." (Trial Tr. 2/8/23, pp.110)

• Melvin Dunsworth declaration in 2020. Operation Choke Point is the reason KSQ quit paying NorthRock.

### Tim Donmoyer:  $3 million.

No fraud proven. Jury acquitted on anything and everything associated, in any way with DNA, KSQ, and Canyon Road. Donmoyer's  losses were proximately caused by the uncontested and uncontroverted illegal conduct of the Obama Administration.

**Ms. Briggs told the Court the following:**

- Nothing in the PSR about Mr. Donmoyer and how he is a victim of Mr. Harbour's.

**The Truth from the Evidence**

- All of Mr. Donmoyer's money was sent to KSQ.

- Mr. Donmoyer was paid on 100% of his loan, not a net amount.

- None of Mr. Donmoyer's money was diverted to Mr. Harbour

- Mr. Harbour was not paid a Finder's Fee from Mr. Donmoyer's loan.

- Mr. Harbour did not solicit Mr. Donmoyer.

- Mr. Donmoyer was solicited by a friend of Mr. Harbour's.

- Mr. Donmoyer said he wanted to loan the same amount as his friend, which he did.

**Why did Mr. Donmoyer lose $3,000,000?**

- Operation Choke Point.

- Dr. Robert Manning testified that Operation Choke Point destroyed the payday lending business in 2013. (Trial Tr. 2/17/23, pp.33)

- Agent Green testified that he audited around 20 payday lenders and Operation Choke Point stopped the ability to ACH which absolutely harmed the payday lending business. I'm not sure if that were, but it was absolutely – my understanding is that the ACH was absolutely essential to the payday lending operation. Yes." (Trial Tr. 2/9/23, pp.67,71)

  - Mr. Dichter: "Well it choked off – Operation Choke Point was designed to, and did, choke off the use of ACH accounts by payday lenders. Agent Green: "Agreed. Yes." (Trial Tr. 2/9/23, pp.67)

  - Mr. Dichter: "There was a huge impact that resulted from the inability to utilize ACH accounts that affected the payday loan industry. You agree with that?" Agent Green: "I would agree with that." (Trial Tr. 2/9/23, pp.70)

  - Agent Green testified that KSQ was in the payday lending business (Trial Tr. 2/9/23, pp.64)

  - Joe Cathey testified: "What they basically said is it shut down the electronic transfers so all the money that was loaned out just disappeared. You couldn't send any more out, get any more back." (Trial Tr. 2/8/23, pp.110)

- Melvin Dunsworth declaration in 2020. Operation Choke Point is the reason KSQ quit paying NorthRock.

**Geoff White, $400,000, Susie Alofs: $250,000, Mary Reace: $100,000.**

No one has ever alleged that there was anything fraudulent about the Critical Access Hospital Project ("HHI"), which is the source of these three amounts.

### HHI:

- Mr. Harbour raised $15 million for HMC/CAH, a company based in Kansas City, MO who was buying, building and remodeling Critical Access Hospitals.

- Mr. Harbour hired Squire Sanders and Dempsey ("SSD") in Phoenix, Arizona to create a Subscription Agreement and Operating Agreement for the raise.

- SSD created HighPointe Hospital Investment LLC ("HHI").

- Mr. White was not an investor. He represented a group, all of whose members signed Subscription Agreements

- Ms. Reace signed the subscription agreement.

- Ms. Alofs signed a Promissory Note with HighPointe Capital Group as a general business loan.

- The Subscription Agreement outlined the risk of investing and they could lose all their money.

- The Subscription Agreement states the investor has read the Operating Agreement and agrees to the terms and conditions.

- The Affordable Care Act "Obama Care" severely impacted the Hospital investment.

- This occurred when Obamacare shifted Medicare reimbursement away from CAH's (in rural areas) and moved it to urban hospitals.  Like Operation Choke Point, shifting reimbursement under the Affordable Care Act ("Obamacare") away from red-State rural hospital to blue State/blue City urban hospitals, was a purely political choice.

- Mr. Harbour was owed a management fee per the Operating Agreement of 2.5% of the money raised on an annual basis. This is $300,000 per year. Mr. Harbour did not take a fee in 2011 – 2017. He was owed as of December 2017 $2,100,000 per the Operating Agreement.

- As of 2022, Mr. Harbour is owed approximately $3,500,000 per the Operating Agreement.

- Per the Operating Agreement Mr. Harbour is to be paid his management fee prior to any distributions to the Members.

- Per the Operating Agreement Mr. Harbour is to be reimbursed his expenses before any distributions to the Members.

- Mr. Harbour incurred over $900,000 of expenses for HHI.

- The expenses were all traced through bank statements by Carol Hill.

- HMC/CAH and the Bankruptcy Trustee agreed with the amount of money Mr. Harbour sent to HMC/CAH which was approximately $15 million. This is the amount Mr. Harbour raised from the investors to HHI. 100% of the money was sent to HHI.

- Mr. Harbour hired Bryan Cave out of Kansas City, Lewis and Rice out of Kansas City and Carmondy McDonald to represent HHI in the Bankruptcy and related litigation.

- Mr. Harbour did not ask for any capital calls from the Members to cover the expenses of the Bankruptcy and litigation.

- Per the Operating Agreement Mr. Harbour could have had a capital call and required the Members to pay for the expenses.

In addition to the alleged victim-related causation and relevant conduct objections, the following objections relate to specifically numbered paragraphs.

### Paragraph 15:  The Overall Fraud

- Ms. Briggs told the Court multiple false statements in Paragraph 15. We will go through each false statement to the Court, then provide the Court with the Truth from the evidence.

### <u>Ms. Briggs told the Court</u>

- Defendant misrepresented the backgrounds and experience of the principals, the amount of funds actually going to the investment, the investor would be paid back before the defendant was compensated, and the defendant had invested his own personal funds to give the impression his own funds were at risk.

## The Truth from the Evidence

- No evidence from the trial that Mr. Harbour told anyone he would not be compensated before the investor was paid back.

  ○ The government put on one witness who testified to this, Joe Cathey. Mr. Cathey testified he never spoke to Mr. Harbour before he loaned money to NorthRock. Mr. Cathey never heard Mr. Harbour say he would not be paid from KSQ.

- All of the Lender's money went to KSQ from NorthRock and DNA Investments.

  ○ FBI Agent Paige testified the investor money she traced all went to KSQ, not to Mr. Harbour. (Trial Tr. 2/23/23, pp.38)

  ○ Ms. Purifoy testified that all of the lender's money on the contract went from DNA to KSQ, Mr. Harbour did not take a slice. (Trial Tr. 2/14/23, pp.219-220)

  ○ NorthRock received a no-change audit letter for 2012 from Agent Lionel Green

- Mr. Harbour personally loaned $680,000 to KSQ per Exhibit 29.

- The Principal's had experience in the payday lending business:

  ○ The principal of KSQ was Joel Tucker and he had been in the business since at least 2006.

  ○ The principal of Canyon Road was Ted Rowland and he had been in the business since 2007.

## Ms. Briggs told the Court the following:

- Mr. Harbour used investor funds for his personal life style on lavish items and made Ponzi payments from investor-victims money and concealed this to continue his fraud.

## The Truth from the evidence

- We have proven that Mr. Harbour did not use any investor money for his personal life style.

- Every witness who testified on the subject agreed that every penny of the lender/investor funds went precisely where it was supposed to go.

- In Payday One (which comprises all the money represented by the government and author as fraudulent except Bobrow, Gray, and Jackson before 2011), the payments received by DNA from KSQ were arbitrage (the difference between the interest charged by DNA to KSQ and the interest DNA paid to its lenders) and finder's fees paid by KSQ from its own money. This delta was sufficient for a gross differential of about $10 million on the $17 million sent by DNA to KSQ.

- In addition, DNA received $6.6 million from Canyon Road. These were distributions based upon Harbour's passive partial ownership of Canyon Road.

- The very large differential was more than sufficient to support the lifestyle used by the government to bias the court and jury.

- If all of the investor money in DNA and NorthRock went to KSQ and/or to Canyon Road, then it is axiomatic that no ***investor*** money was used to support personal life style.

- Rather, Harbour's profits were used. All the lifestyle was shown (by the government) to have been acquired between April 2011 and June 2013, except for the 2004 Whisper Rock Golf Club membership and a ring bought in November 2013. This was after Canyon Road started monthly payments in April 2011 and until Joel Tucker told Mr. Harbour and others on the flight to Los Angeles in June 2013 that his ACH accounts had been shut down (this was the method used by the Obama Administration to kill payday lending. Operation Choke Point was the name the clandestine Obama Administration officials involved gave their own illegal operation (illegal in the sense that no statute or Executive Order permitted what the governmental co-conspirators were doing).

- With respect to the post-Operation Choke Point time frame, that begins in July 2014 when Mr. Turasky's $500,000 was received and, the next day, $350,000 was wired right back.

- The government was correct that, initially, a good deal of the $350,000 was used to pay expenses.

- This was explicitly allowed.

- Mr. Turasky's $350,000 reached Green Circle according to Laura Purifoy and (Government) Exhibit 516 and was still in that account when PAIF's September 2016 foreclosure of the Green Circle loan portfolio resulted in Oak Tree not

48

having any further access to the $1.9 million still in the Green Circle account. Before then, Oak Tree could request disbursements but it never had any signature authority to withdraw funds.

- The same is true concerning Mr. Burg's $1 million. It could be used to pay expenses and 40% of it was so used before it also wound up with the other 60% in the Green Circle bank account.

- This was explicitly allowed.

- When PAIF seized the Green Circle bank account, $2.9 million of it consisted of funds deposited by Oak Tree.

- Therefore, in addition to the $1,350,000 in the Green Circle bank account that represented Turasky and Burg funds, there was an additional $1,550,000.

- PAIF sent $1.1 million to Green Circle to pay to Pak Tree to retire $1.1 million in loans made by Oak Tree to Green Circle.

- When PAIF seized the Green Circle account, PAIF nabbed not only the Burg and Turasky funds but also recouped the $1.1 million it had forwarded to Green Circle to repay Oak Tree.

- PAIF also received and retained an additional approximate $450,000 when it seized the account.

- Therefore, PAIF suffered no loss anyway one looks at it.  It made a $450,000 "profit" off of Oak Tree.

### **Ms. Briggs told the Court the following**:

- Mr. Harbour defrauded investors out of $41,541,703.92

### **The Truth from the evidence**

- We have provided evidence on each person listed in the loss amount detailing how they were not defrauded at all.

- If we ignore the requirement of a causal link between the loss and the fraud, the best that can be said for the loss in the *convicted* counts is that the loss is $2,450,000 which, added to the Base Offense Level 7, results in a Level 23.

- But we cannot ignore the requirement of a causal connection. There is none as we

have demonstrated.

## Paragraph 33: Assets in Other's Names

- Ms. Briggs reported several false statements in Paragraph 33. We will go through each false statement to the Court, then provide the Court with the Truth from the evidence.

## Ms. Briggs told the Court

- Mr. Harbour primary residence was in the name of Jeff Smith.

- Wendy Yaeger only received the benefit of $127,190.18 on American Express.

- Nautical Holding's in wife's name.

The Truth from the Evidence

- Ms. Purifoy testified that Mr. Harbour was renting the house on Martingale Rd and Jeff Smith was the owner. This was true and, of course, does not denote hiding assets in someone else's name.

- Wendy Yaeger testified she got to use all the points for the American Express card, which included going on cruises, Amazon purchases and airplane flights.

- This was in addition to the money she charged on a monthly basis which averaged about $2,500/month and was increasing steadily over the 10-year time period.

- She testified that having the card in her name gave her access to a lifestyle that she could never otherwise have had.

- She testified that, as time went on, she began using the card more and more liberally.

- The money and the enormous quantity of points that were earned and used by her exclusively was untaxed.

- The arrangement worked to her complete satisfaction until PAIF foreclosed on Green Circle and, even worse, since Mr. Harbour was well on his way to recouping with a newer venture into which he was involved, the government indicted him in July 2019.

- Nautical Holding's was set up by the attorney's and it had a lien on it from day one

by Deel Investments. Exhibit 495

### ¶¶ 34-36, 38 Witness Tampering

### <u>Ms. Briggs told the Court</u>

- Bobrow contacted Burg at Mr. Harbour's direction.

- Bobrow contacted Burg to get Burg to sign a declaration.

- On December 20, 2021 Agents conducted an interview with Bobrow.

- Bobrow said the Defendant and his wife came to the house and asked for $141,591.67.

### <u>The Truth from the Evidence</u>

- Mr. Bobrow told Agent Lopez and Cofer when he was interviewed on 12/13/21, that Alan Baskin asked him to call Mark Burg, not Mr. Harbour. (Bobrow 12/13/21, FBI 302)

- Mr. Bobrow told the Agents he did not know anything about a declaration or settlement (Bobrow 12/13/21, FBI 302)

- Mark Burg never told the agents that Bobrow wanted him to sign a declaration on November 10, 2021. (Burg 11/10/21, FBI 302)

- Agent Cofer testified with Magistrate Judge Fine that Mr. Bobrow called Mr. Burg to get him to sign a declaration, then Agent Cofer told Judge Rayes that Mr. Bobrow called Mr. Burg about a financial transaction, not a declaration.

- Both Magistrate Judge Fine and Judge Rayes found that there was no probable cause to support that Mr. Harbour had engaged in witness tampering or obstruction of justice with respect to Mr. Burg.

- This had been the principal basis for the government's successful attempt to revoke Mr. Harbour's release and to subject him to 17 months of pretrial confinement.

- The government withdrew the allegation that there had been any attempt to tamper with Mr. Turasky.

- Mr. Turasky's settlement of his claim through a Loan and Assignment Agreement

in October 2020 and his declaration 4 months later were not a quid pro quo arrangement.

- Mr. Turasky received no benefit for the Declaration; he merely provided assistance in the form of his Declaration.

- With respect to Alison Willson, she was represented by counsel and she swore to the truthfulness of her representations in the Declaration she signed.  She did not repudiate any specific averments in her Declaration. Her Declaration revealed, paragraph by paragraph, with references to specific exhibits attached why she had not been defrauded.

- The Jury agreed with Ms. Willson that she had not been defrauded and acquitted Mr. Harbour of Count 10, a mail fraud charge.

- With respect to the Georgia Avenue loan, how could Mr. and Mrs. Harbour come to the Bobrow house to ask for $141,597.67 when the amount needed for closing was not known or knowable until August 24, 2021, the day of closing. Exhibit 180.

- Ms. Bobrow told the Agents Ms. Harbour came over with a gift letter after the house had already closed, not before.  This was on or about September 24, 2021.

- Therefore, the gift letter was not and could not be material to the loan on the Georgia Avenue house.

### ¶ 50 Obstruction and Forgery

### Ms. Briggs told the Court the following:

- Ms. Bobrow (the third one, Vicki) said the Mr. Harbour badgered Mr. Bobrow about defendants criminal trial.

- Ms. Bobrow said that Mr. Harbour provided Mr. Bobrow, Mr. Burg's cell phone number in December 2021.

- Mr. Harbour used Ms. Bobrow cell phone to send text messages to Rich Turasky when they were on vacation together.

- Mr. Harbour used the iPad that was given to them to send emails on behalf of Mr. Bobrow to Mr. Turasky.

- Ms. Bobrow testified that Mr. Harbour sent the text messages from her phone on

October 2, 2021. (Trial Tr. 2/15/23, pp.153 and Exhibit 110)

- Ms. Bobrow testified that Mr. Harbour was in flagstaff Labor Day weekend 2021 (Trial Tr. 2/15/23, pp.159-160)

- Mr. Bobrow testified that Mr. Harbour sent the emails to Rich Turasky when they were together in Flagstaff. (Trial Tr. 2/15/23, pp.88-89)

### The Truth from the evidence

- The Defense subpoenaed Forest Highlands requesting the visitor log for the Bobrows for August through October 2021.

- The visitor log shows that Mr. Harbour was not at Forest Highlands on October 2, 2021 nor on Labor Day weekend in 2021 nor any and all of the dates that Vicki and Mr. Bobrow said Mr. Harbour was there.

- The log shows that, on October 2, 2021, when Vicki Bobrow testified that Mr. Harbour was at their Forest Highland's home and hijacked the cell phone to send a

- The iPad Mr. Bobrow gave to the Harbour's had a password and Mr. Bobrow did not know the password. (Trail Tr. 2/15/23, pp. 123)

- Ms. Bobrow committed perjury two different times.

- She testified that she saw Mr. Harbour use her cell phone on the following dates.
  - 9/5/21 – Harbour not in Flagstaff, the Bobrows were there per the billing statement
  - 10/2/21 – Harbour not in Flagstaff

- Mr. Bobrow testified the communications with Mr. Harbour about Rich Turasky and his deal were at the Bobrow house in Flagstaff. (Trial Tr. 2/15/23, pp.88)

- Mr. Bobrow has been caught lying under oath. He testified that he saw Mr. Harbour take his phone and use it to send emails. (Trial Tr. 2/15/23, pp.92) Exhibit 109

- We know Mr. Bobrow was in Flagstaff on these dates. (Trial Tr. 2/15/23, pp.94)

- The dates of the emails are as follows:
  - 9/5/21 – the first email between Ken Bobrow and Rich Turasky about the deal. Harbour is not in Flagstaff.

- ○ 9/11/21 – Second email from Ken Bobrow to Rich Turasky - Harbour not in Flagstaff – Bobrow was there per the Club bill
- ○ 9/23/21 – Harbour not in Flagstaff –

- These are not coming from the iPad, because Ken and Vicki Bobrow said they saw David take the phone and send the emails.

- Ken Bobrow testified that he did not know anything about the investment with Rich. (Trial Tr. 2/15/23, pp.94)

- Mr. Turasky testified that he negotiated the October 2021 investment with Mr. Bobrow.

- Mr. Bobrow in his FBI 302 12/22/21 told the Agents he was investing his $250,000 because it was a good deal and it had nothing to do with Mr. Harbour.

### Ms. Briggs told the Court the following:

- In 2021, K. Bobrow contacted Turasky on behalf of the defendant.

### The Truth from the evidence

- Mr. Turasky told the Agents he did not know if Mr. Bobrow called him at the request of Mr. Harbour or on his own volition. (Turasky 11/11/21 FBI 302)

- Mr. Turasky told the agents that he signed a Declaration and Loan and Assignment Agreement with Mr. Harbour (Turasky 11/11/21 FBI 302)

- The Loan and Assignment Agreement explains why Mr. Bobrow called Mr. Turasky. He called him at the direction of Bob Corson, not Mr. Harbour. Exhibit 1505.

### ¶¶ 59-61 The Georgia Avenue Property

### Paragraph 59

- K. Bobrow was a vulnerable victim. Ken was involved with Bart Shea and the company on a daily basis in 2020 and 2021.

- K. Bobrow loaned Bart Shea over $2 million between 2019 and 2021.

- Bart Shea swore in a Declaration that he was the one who asked Ken for the money for the house.

- Ken Bobrow took the check to the title company after meeting with Bart Shea, not David.

- Ken Bobrow told the agents that Alan Baskin asked him to call Burg, not Harbour.

- There are numerous telephone tolls that show a running contact between Mr. Bobrow and Alan Baskin.

- Re Rhonda Gray: She was introduced to Mr. Harbour by a third party.

- She was running a management company with over 30 rental houses and commercial business.

- She was a widow, for sure, and was saddled with debt but she was a veteran in commercial and residential property.

- As explained earlier, she needed to protect the properties against a major bank judgment creditor.

- Rhonda Gray agreed that Mr. Harbour did a good job for her, well worth the money she paid him.
- Rhonda agreed that she would risk losing her money if she got it back while the Bank's judgment was still active.

### **Paragraph 60 - Bobrows**

- The Bobrows cannot get their stories straight as to when the Harbour's came over.

  ○ V. Bobrow said the Harbours came over a month after the house closed with a gift letter.

  ○ K. Bobrow said they came over and asked for $141,591.67, but that was not possible unless they were there on the day of the closing and had a crystal ball to know how much was needed to close on the house.

  ○ K. Bobrow told the Agents on 12/13/21 he loaned money to Bart Shea for a house, not Mr. Harbour.

  ○ No evidence of Mr. Harbour asking Carol Hill to sign any fraudulent documents.

  ○ The government did not provide any false documents Mr. Harbour asked Ms.

Hill to sign.

- ○ It has been established that Baskin asked Mr. Bobrow to call Burg.

- ○ No evidence that Ms. Purifoy sent any fraudulent emails or fraudulent financial information.

### **Paragraph 61**

- This has already been addressed. No evidence of any of this.

- We have proven that both K. Bobrow and V. Bobrow lied about Mr. Harbour being in Flagstaff on 9/5/21, 9/23/21, 9/29/21, 10/2/21. They cannot say the iPad was used because they said they saw Mr. Harbour use it.

- Vicki Bobrow testified when David Harbour took Kenny's phone and sent the text it was getting cold out so it was late September, October so they were in Flagstaff.

- Vicki Bobrow testified that she saw David texting Rich from Ken's phone on 10/2/21. (Trial Tr. 2/15/23, pp. 153, 157, Exhibit 110).

- The visitor's log show that Mr. Harbour was not at Forest Highlands to see the Bobrows that day but, rather, that her daughters were there on October 2, 2021.

- Vicki Bobrow testified that her memory is not very good. (Trial Tr. 2/15/23, pp.158)

- Vicki Bobrow testified that Ken's memory is faulty. (Trial tr. 2/15/23, pp.159)

- Mr. Bobrow did not know why he was testifying, that is, he did not know that this was Mr. Harbour's criminal trial.

### **PROPOSED ADJUSTMENTS**

The author proposed several upward adjustments, all of which are objected to by the Defense and none of which are supported.

**More than 10 Victims - ¶57**

In ¶ 57, the author proposes a 2 Level upward adjustment because the "offense" involved more than 10-victims. The "offense" involved 3 victims, Burg, Turasky, and PAIF.  The other "victims" do not meet the definition because the conduct engaged in was not "relevant conduct" under the Guidelines. Indeed, the conduct was not even criminal in nature.  No charges have ever been brought nor could be brought as a result of any conduct prior to July 1, 2014 (the Turasky charges).

**Sophisticated Means - ¶57**

The author proposed a 2 Level upward adjustment for "sophisticated means." We have discussed each of the alleged "victims" of the case both within and without the charges of conviction. Again, none of them fit the definition of relevant conduct. Every supposed indicia of "sophisticated means" involves someone or something that was not charged and that was never proven by either a preponderance of the evidence. The alleged indicia grouped in ¶57 are mostly even misstated, most badly misstated. For example, the allegation that Mr. Harbour concealed his finder's fees from "investors" has two-major flaws: First, the "finder's fees" were never received from investors' funds. The fundamental lack of understanding of this point may stand as the most disappointing amongst many disappointments.

A lender or an investor loans $1 million to DNA at 20% interest for 3 years, meaning an entitlement to $200,000 a year for the length of the loan/investment. If Mr. Harbour were to have received a 10% or a 25% "finder's fee" from the lender's/investor's funds, then either 10% or 25% *less* would have flowed to KSQ and the

interest paid by KSQ would have been paid on the net amount sent to KSQ. However, this never occurred. What did occur was that Mr. Harbour re-loaned the hypothetical lender's/investor's funds ($1 million) to KSQ at a rate of interest higher than the rate of interest DNA was paying to the lenders/investors. Secondarily, KSQ paid Mr. Harbour a finder's fee of 10% (the 25% applied solely to 3 lenders) from its own funds.

KSQ re-loaned the money DNA had loaned to KSQ to a final intermediary at an even higher rate of interest and the final intermediary re-loaned the money to actual internet "payday lenders," meaning they made the small-dollar, high-interest, and even higher compounding interest loans to consumers.

Dr. Manning's Expert Report, forwarded directly to the author to keep the docket as uncluttered as possible (and never contradicted by government) shows how the loans operated and how much was collected from consumers, especially those who did not pay the loans off as provided in the loan agreements. The money flowing upstream was enormous but the business was entirely legal.[5]

---

[5] As Dr. Manning explained, when the "Tea Party" Republicans took control of the House in 2010, the Obama's Administration's attempt to place limits on Payday Lending failed (except with respect to loans to Service personnel). By far, the most prolific users of payday loans were persons regarded by the Obama Administration as its supporters. In complete frustration, the Administration, led by the prosecution team's boss, Eric Holder, secretly launched Operation Chokepoint, whose stated goal was to end payday lending by "choking" off the payday loan process at its "point" of highest importance which was the use by payday lenders of their automated clearing house accounts ("ACH") maintained by commercial banks. Hence, the task force named what it was doing "Operation Choke Point." It illegally transferred $5-6 billion from the lenders – which included the so-called victims including Dyer, Cathey, Hill, and Willson - to the ultimate recipients of the payday loans. The mechanism of ACH accounts allowed small-dollar loans to be effectively collected in situations wherein the use of lawyers to file lawsuits would have been cost prohibitive.

**Investment Advisor/Securities Law**

The author invokes §2S1.1(a)(1) and §2B1.1(a)(1) to propose a 4 Level upward adjustment because the offense involved securities or because the defendant was an investment advisor. No one has ever charged or even suggested that the charged and convicted conduct involved securities, nor that the uncharged conduct contended by government and, apparently, the author, to be "relevant conduct" involved securities, nor that Mr. Harbour was an investment advisor. In the Guidelines, an "investment adviser" means a person so-defined under the Investment Adviser's Act of 1940, which requires the registration of investment advisers. Harbour owned a company, DNA, to which loans were made. There was no use of any advertisement to attract potential lenders. All were friends or based upon the referral of friends. Therefore, the loans could not even be classified as securities and, again, except in this draft presentencing report, no one has suggested that they were.

**Money Laundering ¶58**

§2S1.1(b)(2)(A) is invoked by the author to propose a 1-Level upward adjustment. Mr. Harbour was convicted of wire fraud and the monetary transactions of which he was convicted all were traced to the "underlying offense," namely wire fraud, for which the base Offense Level is 7. In short, (b)(2)(A) does not apply because (b)(1)(A) governs.

**Victim Related Adjustments ¶59**

The author proposed a 2 Level upward victim related adjustment because Mr. Bobrow was a vulnerable adult. Assuming *arguendo* that Mr. Bobrow was badgered to call Mr. Burg, there is no evidence that Mr. Harbour did the badgering, nor does the

telephone conversation recorded by Mr. Burg on December 3, 2021 with the assistance of the FBI, reveal any actual vulnerability of Mr. Bobrow at all.

Second, badgering, if any, was done by the FBI of Mr. Bobrow to change his initial statement to the FBI agents (on December 13, 2021) that lawyer Alan Baskin (who had also been Mr. Bobrow's lawyer) was the person who asked him to call Mr. Burg (on November 10, 2021).

Third, even if Mr. Harbour had implored Mr. Bobrow to call Mr. Burg – they knew each other and Mr. Bobrow had introduced Mr. Harbour to Mr. Burg on a golf course years earlier, this did not involve Mr. Bobrow in any criminal conduct of his own as a "victim." In other words, Mr. Bobrow was not a "victim" at all with respect to anything to do with Mr. Burg and, if he was not a "victim," he was not a "vulnerable" victim.

As to Rhonda Gray, the other so-called "vulnerable" victim, the author calls her vulnerable because her husband had recently suddenly died. The author knows nothing about the Rhonda Gray transaction and it can be certain that the government never told the author that Rhonda Gray, the owner of at least 32-residential and commercial properties was in rising dire financial circumstances when she was referred to Mr. Harbour to help her protect the proceeds of her husband's life insurance policy (just over $1 million) from the family creditors, including two banks.

According to her trial testimony, Mr. Harbour did an admirable job of protecting the money from her creditors during the 5-year existence of the substantial judgment

obtained by one of the banks and by getting the other bank creditor handled.  He also settled several other matters.  The creditors were successfully fended off.

It is true that the money could not be paid back and that there is a civil suit against Mr. Harbour and HPCG as a result.  But, to call Ms. Gray a vulnerable victim because her husband had recently died not only hardly describes her is also bit sexist. She made a series of very plausible decisions to use Mr. Harbour – she was placed in contract with him; he did not reach out to her – to protect her funds.  Nor can a 10-year (covering the period of the original judgment and one renewal at the end of 5-years) loan at 3% made in April 2010 be considered "relevant conduct" to a up-to-20% return on a short-term loan made to be deployed, ultimately, in payday lending, where the ultimate interest rates paid by consumers, especially those who did not timely pay-off their loans, provided interest rates that high (in a milieu of 3% commercial interest, at most, in the market place).  No victim-related upward adjustments are appropriate.

### Role in the Offense ¶ 60

The author proposes an upward adjustment of 2 Levels because the Defendant was allegedly an organizer, leader, manager or supervisor in criminal activity other than as described in §3B1.1(a) or (b), involving subsection (c).  This was a one-defendant case in which none of the people identified in ¶60 were either named as defendants or even implicated as criminally involved. To be eligible for an adjustment under 3B1.1, the persons directed by the defendant must have been "participants." The word, "participant" means "a person who is criminally responsible."  Most of the paragraph is, frankly, mere agent babble.  The recorded jail calls as well as Bart Shea's Declaration and statements to

Ashley Adams, as well as every single piece of paper signed in connection with the formerly alleged Georgia Avenue transaction prove beyond all peradventure that the house purchase for remodel was to benefit Bart Shea and his partner when it was sold for around three times its purchase price.

The benefit to the Harbour family was supposedly to live in the house expense free while it was being remodeled and this was at Bart Shea's request because he feared that the house would be robbed of all its valuable copper piping were it to remain empty.[6]

There are, consequently, no appropriate role adjustments in this case.

### Obstruction ¶ 61

The author proposes a 2 Level upward adjustment for obstruction, throwing in a potpourri of indicia supposedly supporting the position taken. All are meritless.  Two courts have found that there was no probable cause to believe that Mr. Harbour had engaged in witness tampering with respect to Mr. Burg.  It was, Mr. Bobrow told the agents, Bob Corson who had him reach out to Mr. Turasky which led to the October 2021 agreement by which Mr. Bobrow acquired Mr. Turasky's judgment against Mr. Harbour. Mr. Turasky's Declaration was prepared and signed 3+ months later and repeated assertions made by Mr. Turasky in the earlier papers. Carol Hill was asked to sign a Declaration, through counsel-to-counsel contacts, which she declined to do.  The Declaration frankly resembled her ultimate testimony, from which the jury found that she

[6] The Harbour family spent over $30,000 of its own money on upkeep in the seven-months Abby Harbour and the couple's daughters lived there and, in one of the jail calls, Mr. Shea criticized Mr. Harbour for laying out the expenses.  This is because, to reduce the eventual tax on the gain that the sale of the house would have produced, the expenses could have been used but not if the tenant paid them.

was not a victim, acquitting Mr. Harbour in Count 11.  The balance of the paragraph is sheer nonsense. The cell phone hi-jacking is disproved by the Forest Highland's gate records for August-October 2021 which show that Mr. Harbour was not present at Forest Highland when he was supposedly present to hi-jack the cell phone. Vicki Bobrow simply was mistaken or deliberately lied.  According to Carol Hill, she never signed Mr. Harbour's name to anything for which she had not been given specific permission, meaning there was no forgery.

The proposed increase for obstruction is unwarranted and unsupported.

## Relevant Conduct

Relevant conduct, here, must mean, if anything, one of two things: 1) Either a common scheme or plan or 2) the same course of conduct.

**(i) Common scheme or plan.** For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme).

**(ii) Same course of conduct.** Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or

regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

The basic problem was hard-wired into the SSI. As has been pointed out innumerable times by the defense and, if not corrected here, surely to be corrected elsewhere, there is simply no such thing in Federal criminal law as a 15-year scheme and artifice to defraud as could exist under, for example, Arizona's A.R.S. §13-2310 or the general fraud statutes of any other state.

The case law cited in our Rule 29 and Rule 33 motions amply demonstrate that wire fraud – which is the only type of fraud charged – is a specific type of crime that does not punish nor seek to punish the scheme or artifice to defraud but the use of interstate wire facilities *in furtherance* of the scheme. That case law is invoked and is incorporated by reference.

**Common Scheme or Plan:**

Courts cannot formulate a precise formula for when relevant conduct is applicable; however, when one component is absent, courts must look for a stronger presence of at least one other component. *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir. 1992). When conduct alleged to be relevant is temporally remote from the conduct resulting in a conviction, the relevance of the extraneous conduct depends on its similarity to the conviction, it is not enough that the extraneous conduct merely amounts to the same offense. *Id*. Offenses are part of the same course of conduct if sufficiently connected or related to each other so that they are part of a single episode, spree, or ongoing series of

offenses. *United States v. Parlor*, 2 F.4th 807, 812 (9th Cir.), *cert. denied,* 211 L. Ed. 2d 385, 142 S. Ct. 623 (2021)

A common scheme or plan asks whether commission of one of the offenses either depended upon or necessarily led to the commission of the other. *United States v. Jawara*, 474 F.3d 565, 574 (9th Cir. 2007). Similarity, regularity, and temporal proximity are significant elements in determining whether offenses involve the same course of conduct or a common scheme or plan. *Hahn*, 960 F.2d at 910; *United States v. Roederer*, 11 F.3d 973, 979 (10th Cir. 1993); *United States v. Mullins*, 971 F.2d 1138, 1143 (4th Cir. 1992). However, a common modus operandi alone is not enough to demonstrate a common scheme or plan. *United States v. Haworth,* 44 F. App'x 254, 255 (9th Cir. 2002). When a factor, similarity for example, is missing or relatively weak, a stronger showing of other factors such as regularity and temporal proximity between the uncharged acts and the offense convicted is required. *United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996).

The mere fact that two schemes share the same ultimate purpose is insufficient to demonstrate a common scheme or plan. *See United States v. Jutla*, No. CR19-141-RSM, 2021 WL 2530847, at *3 (W.D. Wash. June 21, 2021). A common scheme or plan requires that crimes were jointly planned, or, at a minimum, that the commission of one would entail the commission of the other as well. *United States v. Lopez*, 78 F.3d 595 (9th Cir. 1996).

Other Circuits have considered same or similar conduct and common schemes or plans for criminal sentencing purposes. In *Stuck*, a defendant's prior fraud for $8.7

million dollars and a $50,000 fraud did not meet the common scheme or plan as required for prior fraud to be relevant conduct under sentencing guidelines. *United States v. Stuck*, 419 F. Supp. 3d 373, 378 (D. Conn. 2019).  More is required than a showing of common pecuniary motive to establish a common scheme or plan; there was no suggestion of common victims and a four and a half year time gap. *Id*. In *Gomez*, defendants uncharged cocaine sales to a specified individual were unrelated to the drug conspiracy that the defendant was involved in and were therefore not included in calculating defendants base level offense. *United States v. Gomez*, 164 F.3d 1354, 1356 (11th Cir. 1999). The Course of conduct on which the trial focused was focused to drug sales out of a car wash operation, and since the uncharged cocaine sale was to an individual, not through the car wash, it was not includable as part of the same course of conduct or a common scheme or plan. *Id.*

### Tax Offense

Defendant pled guilty to Count 24, a tax evasion count.  It was not a tax evasion count based upon filing of a tax return – here the 2012 tax return – but based upon a willful failure to pay no more than $170,000 in taxes, when he could have done so accomplished by not revealing *all* of the sources from which the tax could have been paid.  For criminal sentencing purposes, the amount was $170,000.  For restitution purposes, the parties agreed that the tax, penalties, and interest embodied in a civil agreement would stand as the restitution amount. The plea agreement states that the number might change.  And, so it might.  It might go up, as a result of the interest continuing to accrue but there are also circumstances under which the number might go

down.  With the taxes equaling the restitution, should something occur to reduce the taxes owed and the interest and penalties, then, perforce, the restitution number will be reduced.

However, for criminal purposes, $170,000 equals Level 16.   The proposed enhancement, an upward adjustment of 2 Levels is not appropriate because Count 24 does not charge a failure to report or correctly identify income derived from criminal activity. The charge is simply the willful evasion of no more than $170,000 in taxes.

We are directed to the Tax Table (2T4.1(F)) and the $170,000 tax loss coincides with Level 16 (21 – 27 months) before a 2 or 3 level reduction. A 2 Level reduction leaves us at Level 14 and a 3 Level reduction at Level 13. Under §3E1.1, Mr. Harbour is a Level 13, Criminal History Category 0-1 (12-18 months).  Defendant has already been in custody for 17 months.

### Conclusion

Defendant is a Level 7 for sentencing on the fraud and money laundering counts and a Level 13 for the tax evasion charge.  Anything and everything that attempts to contradict that conclusion has been the subject of these objections.

RESPECTFULLY SUBMITTED this 16th day of May 2023.

CHRISTIAN DICHTER & SLUGA, P.C.


By: /s/ Stephen M. Dichter
      Stephen M. Dichter
      Justin R. Vanderveer
      2800 North Central Avenue, Suite 860
      Phoenix, Arizona 85004
      Attorneys for Defendant Mr. Harbour

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2023 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Coleen Schoch
Coleen.schoch@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez