**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00898-001-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| David Allen Harbour, | |
| Defendant. | |

Before the Court is Defendant David Allen Harbour's motion for acquittal and motion for new trial, which are fully briefed. (Docs. 698-99, 709-10, 714, 723.) For the following reasons, the Court grants the motion for acquittal in part and denies the motion for new trial.

**I. Background**

On June 14, 2022, a grand jury returned a second, superseding indictment ("SSI"), charging Harbour with twelve counts of wire fraud, two counts of mail fraud, thirteen counts of money laundering, one count of tax evasion, one count of making a false statement, one count of obstruction, one count of conspiracy, one count of bank fraud, and two counts of aggravated identity theft. (Doc. 388.) Trial on Counts I-XXIII began on February 1, 2023.[1] (Doc. 538.) At the end of the thirteen-day trial, the jury returned a verdict of guilty on seventeen counts and a verdict of not guilty on six counts. Harbour

---
[1] The Court trifurcated trial, scheduling trial for the remaining counts on dates after completing the trial on Counts I-XXIII.

contests the seventeen counts in both his motion for acquittal and motion for new trial, filed pursuant to Federal Rules of Criminal Procedure 29 and 33 respectively.

**II. Motion for Acquittal**

Under Rule 29, the Court "must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The evidence is sufficient to support a conviction if 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Milwitt*, 475 F.3d 1150, 1154 (9th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Harbour challenges his wire-fraud convictions and the related counts of money laundering. Wire fraud

> criminalizes the use of interstate wires to further, not mere deception, but a scheme or artifice to defraud or obtain money or property, i.e., in every day parlance, to cheat someone out of something valuable. It follows that to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive and cheat.

*United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020).

**A. PAIF**

Count III charges Harbour with wire fraud for transmitting $1.1 million from Green Circle to Oak Tree. The reason the wire transaction furthers a fraudulent scheme, the SSI alleges, is because Harbour "manipulated [Green Circle's] records to his advantage," specifically spreadsheets relating to Green Circle's lending portfolio and status, "in order to entice PAIF to fund the draw requests," of which the $1.1 million was one. Counts XXI, XXII, and XXXIII are money laundering charges predicated on Count III.

Harbour argues that evidence at trial showed that he manipulated spreadsheets after receiving the $1.1 million—not before, as alleged in the SSI—and that no evidence showed that PAIF received those spreadsheets before (or after) it made the lending decision. (Doc. 633 at 103-05, 112, 118-22, 126.) The evidence is insufficient to support a conviction based

on the allegations made in the SSI.

Nevertheless, the Government offers two other theories, that (1) Harbour sent—and PAIF received—manipulated spreadsheets after the lending decision was rendered that were calculated to lull PAIF into maintaining its lending decision and (2) Harbour omitted material facts in his presentation to PAIF before the lending decision. These fail for lack of evidentiary support at trial and because convicting on any such evidence would amount to a conviction based on evidence that fatally varies from the allegations in the SSI.

Regarding the lulling theory, there's no evidence that PAIF received manipulated spreadsheets from Harbour or Green Circle at any time. The Government suggests that the testimony of Laura Purifoy, the bookkeeper at Green Circle tasked with liaising with PAIF, provides sufficient circumstantial evidence that she passed it on to PAIF.[2] She testified that she had misgivings about the accuracy of the spreadsheet Harbour sent to her to pass on to PAIF, but she never testified that she sent the spreadsheets to PAIF or that it was her habit to do so or that she had successfully completed a similar task in the past. Purifoy was on the witness stand during two days of trial. The Government did not elicit testimony from her or present evidence, direct or circumstantial, that she passed the spreadsheets on to PAIF. If Purifoy had passed the spreadsheets on to PAIF, she could have so testified at trial. For the jury to find that PAIF received these post-decision spreadsheets, would require it to speculate.

At oral argument, the Government argued that Harbour's omissions of material fact to PAIF formed a basis for the underlying fraud. There is no factual basis for the jury to have determined that Harbour omitted material facts in his dealings with PAIF. There was no evidence presented about what Harbour did or did not tell PAIF and, if there were omissions, whether the omissions were material.

The Government's argument that circumstantial evidence establishes Harbour omitted material facts to PAIF before PAIF made its lending decision requires speculation. The Government first argues that the testimony of other victims about the information

---

[2] The Court notes that no representative from PAIF testified.

withheld by Harbour in his dealings with them is evidence that he withheld the same information from PAIF. PAIF is unlike the other victims, who were individual investors. What Harbour did or did not tell other investors is not evidence of what he did or did not tell PAIF.

Second, the Government's argument that the alleged omissions were material to PAIF also rests on speculation. No expert testified that the Government's asserted omissions to PAIF would have been material to an entity like PAIF in making the lending decision. What other individual investors considered material in their investment decisions is not evidence that it would have been material to PAIF. There is no evidence that the alleged omissions were material to PAIF.

The Government also argues that Harbour must have withheld material information because he received the $1.1 million. The logic is circular, assuming that because PAIF agreed to lend, Harbour had to have made omissions, and the omissions had to be material. No reasonable jury could convict on this evidence without engaging in speculation.

What's more, the Government's two theories would be fatal variances from the allegations contained in the SSI, even if supported by evidence sufficient to survive a Rule 29 motion. A variance "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)). A variance is fatal when it results in "1) inadequate opportunity to prepare a defense and exposure to unanticipated evidence at trial; 2) deprivation of the right to be tried only on charges presented in an indictment returned by a grand jury; and 3) exposure to prejudicial evidentiary spillover." *United States v. Morse*, 785 F.2d 771, 775 (9th Cir 1986) (citations omitted). In wire fraud cases specifically, a variance is fatal if the proof at trial goes to "a scheme to defraud that differed from the allegations presented to the grand jury in the original indictment." *United States v. Agadaga*, 19 F.3d 29, *2 (9th Cir. 1994) (summarizing *Jeffers v. United States*, 392 F.2d 749, 752-53 (9th Cir. 1968)).

First, the omissions theory. Paragraph 24 of the SSI, which outlines the fraudulent scheme with respect to the $1.1 million from PAIF, makes specific allegations and concerns only affirmative misrepresentations. The SSI included general allegations of omissions made to investors, who the Government interprets to mean individual investors Burg and Turasky (Doc. 710 at 5-6), but, as the Government conceded in oral argument, PAIF, was a lender, not an investor (Doc. 749 at 38). Consequently, a fair reading of the SSI, considering PAIF's status as a lender and the specificity of the allegations in Paragraph 24, reveals no allegations that Harbour omitted material facts to PAIF. Had Harbour been notified of an omission theory with respect to PAIF, he might have conducted discovery into whether witnesses from PAIF claimed he made omissions, what omissions PAIF would have considered material for that transaction or presented expert testimony to contest materiality. The omission theory differs from the fraudulent scheme alleged in the SSI and is thus a fatal variance from the misrepresentation theory in the SSI.

Next, the lulling theory. In the context of wire fraud, lulling is a use of the wires designed to keep a fraudulent scheme from discovery by the victim, usually by wiring something to the victim. *See, e.g.*, *United States v. Lane*, 474 U.S. 438, 451 (1986).[3] As noted above, the SSI alleged that Harbour concocted a fraudulent scheme as to PAIF, used misrepresentations to coax PAIF into lending to Green Circle, and then wired those funds to Oak Tree, another of Harbour's entities, as part of the scheme. At no point does the SSI mention any spreadsheets allegedly sent to PAIF after PAIF rendered its lending decision. Indeed, the Government's own filings back this up:

> *The wire fraud count charged by the government* [*in Count III*] *is in relation to a discrete point in time and is relevant to a wire initiated on August 11, 2015, and before.* In addition, the material records pertinent to the funding decision of PAIF was the Borrowing Base provided by Harbour's employee, [Purifoy] As noted above, [Purifoy] has stated that Harbour deliberately manipulated the Borrowing Base records consistently, including the activity surrounding the $1.1 million transfer. Harbour's records for his own entities are

---

[3] Although *Lane* concerns mail fraud, the Court applies it and other mail-fraud caselaw because "the mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

> separate from those of Green Circle. [Purifoy] knew that Harbour was misrepresenting the Borrowing Base and will testify to the actions at trial. *In sum, the documents sought by Harbour after August 11, 2015, are irrelevant to this charge*.

(Doc. 225 at 4 (emphasis and alterations added).) The lulling theory is an altogether different scheme from the one presented in the SSI and is thus a fatal variance.

For lack of evidence or for fatal variance, Harbour must be acquitted on Count III. Because Counts XXI, XXII, and XXIII are money laundering charges that depend on the Count III wire fraud, Harbour must be acquitted of these as well.

**B. Turasky and Burg**

Counts I and II charge Harbour with obtaining investments from Burg and Turasky and using those investments for personal expenses rather than approved uses under the investment agreements. (Doc. 388 ¶ 22.) The Government presented evidence that Harbour made representations to Burg and Turasky, leading them to invest with him. However, the Government presented evidence that, contrary to his representations, he used the investment money for personal expenses, such as payments to his American Express credit card. (Doc. 647 at 162-165, 184.) Burg and Turasky testified that although they understood that they agreed that Harbour could use their investment money for legitimate business expenses, they did not agree that their investment agreements permitted Harbour to use their funds for personal expenses. (Docs. 613 at 205-06 (Turasky); 644 at 48 (Burg).)

Harbour offered evidence through Dr. Cameron that the payments to his American Express cards were reimbursement for his investments in the businesses and therefore legitimate businesses expenses. But this merely created a factual dispute for the jury to resolve, and it did, rejecting Harbour's theory. The jury had sufficient evidence to find that Harbour used Burg's and Turasky's funds in a manner contrary to the relevant agreements. The jury, therefore, had sufficient evidence to convict Harbour of wire fraud with respect to Burg and Turasky.

For this reason, Harbour's argument that all of Burg's and Turasky's funds eventually ended up in Green Circle does not compel acquittal. "Intent to repay . . . is not

a defense to wire fraud." *Miller*, 953 F.3d at 1103. Even if Turasky's and Burg's funds ended up in Green Circle as promised, the jury still had sufficient evidence to conclude that those funds took impermissible detours on the way there and thus advanced the fraudulent scheme.

Harbour also argues that a defendant cannot commit wire fraud by wiring funds back to the victim. Not so. As explained above, lulling is a use of the mail or wires designed to keep a fraudulent scheme from discovery, including by mailing or wiring something to the victim. *Lane*, 474 U.S. at 451. Because there was evidence of a fraudulent scheme directed to Burg and Turasky and subsequent, wired payments that were tendered to Burg and Turasky, the jury had sufficient evidence to reasonably conclude that the payments were part of the fraudulent scheme as lulling payments and were thus wire fraud.

**III. Motion for New Trial**

Defendant's motion for new trial was brought pursuant to Fed. R. Crim P. 33(a), which states: "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A court should grant a motion for new trial "only in exceptional cases in which the evidence preponderates highly against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (quoting 2 *Wright Federal Practice and Procedure, Criminal* § 553 at 487 (1969)). A court may evaluate witness credibility where the witness's testimony is patently incredible or flouts physical realities. *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

Harbour presses the same sufficiency of the evidence argument to the same counts contested in the motion for new trial.[4] As noted above, the jury had sufficient evidence to conclude that Harbour used Turasky's and Burg's funds in a manner not permitted by the investment agreements, and part of that evidence came from witness testimony that was neither wholly incredible nor presenting a physical impossibility. Because of this, the Court cannot conclude that the evidence preponderates highly against the verdict.

Harbour also argues that he's entitled to a new trial because evidence of "'victims'

---

[4] The Court does not address the counts related to the PAIF funding as the motion for acquittal will be granted as to counts III, XXI, XXII, XXIII.

- 7 -

not charged in the indictment" and Harbour's exhibitions of wealth unfairly prejudiced the jury. (Doc. 698 at 8.) The Court disagrees. The Government sought to introduce evidence of Harbour's exhibition of wealth as part of his aura of success. The Government sought to show that the wealth came on the backs of other investors whose money was used to support his lifestyle instead of being properly invested. A fraudulent scheme began long before it reached the named victims in the SSI. To guard against prejudice, the Court created a two-pronged test to establish the foundation for such evidence. (Doc. 647 at 160-61.) The Government had to show that (1) at least one of the five victims listed in the indictment—Turasky, Burg, PAIF, Willson, Hill—considered Harbour's wealth or its appearance when deciding to invest and (2) such wealth was obtained through fraud. (*Id.* at 163.)

Harbour first attacks the test for

> rejecting the sound defense argument that Federal law does not criminalize general schemes and artifices to defraud that would be chargeable under Federal law but only use of the facilities of interstate wire communications in furtherance of a scheme and artifice to defraud the victim associated with the count or counts of the indictment.

(Doc. 699 at 8.) This misses the point. The test does not criminalize a general scheme and artifice to defraud. It merely clarifies how the Government must establish evidentiary foundation for Harbour's wealth, that is, that his wealth was a façade, obtained through illegal means and used to convey a sense of success that would cause potential investors to trust his investment advice.

Harbour also argues that the Government did not meet this test. The Government met its burden on the first prong, showing that several victims in the indictment considered Harbour's wealth when deciding to invest with him. (Docs. 601 at 80-81; 610 at 143-44; 611 at 234, 236; 644 at 24, 47-48.) The Government also met its burden on the second prong with circumstantial evidence, introducing evidence of several past frauds and traced the money such that a jury could infer that he derived his wealth from those fraudulent actions. (Docs. 600 at 36-37, 46-57, 82, 84-86, 90; 611 at 135-37; 643 at 76-78, 164-67; 103-04, 115, 126.) Evidence of non-indictment victims and Harbour's wealth did not

impermissibly prejudice the jury and thus do not compel a new trial.

The fraudulent acts alleged to have occurred before the charged offenses that are tied to the gravamen of wire fraud—the fraudulent scheme—are also admissible on that basis. *See* 18 U.S.C. § 1343; *Lane*, 474 U.S. at 451 ("To find a violation of the mail fraud statute, 18 U.S.C. § 1341, the charged 'mailings' must be 'for the purpose of executing the scheme.'" (quoting *Kann v. United States*, 323 U.S. 88, 94 (1944)). The Government is entitled to present the scheme in its fullness, regardless of whether it began before the charged wires. *See Lane*, 474 U.S. at 451-53 (sustaining convictions of mail fraud for lulling payments to a victim even when the government did not charge the act of fraudulently obtaining the victims' money because the defendant's fraudulent scheme had not ended, and the payments were a part of that fraudulent scheme).

Harbour argues further that "the jury rejected the unsophisticated alleged victims, Willson and Hill" but does not explain its import. Yes, it's true that the jury acquitted Harbour of the counts associated with Willson and Hill. The jury was entitled to conclude that the fraudulent scheme did not extend to Willson and Hill. It doesn't follow from these acquittals that the fraudulent scheme did not extend to the counts associated with Turasky and Burg.

**IT IS ORDERED** that Harbour's motion for acquittal (Doc. 699) is **GRANTED IN PART**. Harbour is acquitted of counts III, XXI, XXII, and XXIII. Harbour's convictions otherwise remain undisturbed.

**IT IS FURTHER ORDERED** that Harbour's motion for new trial (Doc. 698) is **DENIED**.

Dated this 28th day of June, 2023.

Douglas L. Rayes
United States District Judge