Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
|---|---|
| Plaintiff, | **DEFENDANT'S MOTION FOR RECONSIDERATION OF RENEWED RULE 29 MOTION** |
| vs. | |
| David Allen Harbour, | (Oral Argument Requested) |
| Defendant. | |

Defendant David Allen Harbour moves for partial reconsideration of the Order on the Renewed Rule 29 Motion (Doc. 757) pursuant to LR Civ. 7.2(g). This motion focuses solely on the Turasky and Burg issues. As a matter of law, the Counts associated with Turasky and Burg must also be dismissed despite the jury returning a verdict of guilty. Doc. 757 also denied Defendant's motion for a new trial pursuant to Fed.R.Crim.P. 33 and reconsideration of that portion of Doc. 757 is not sought. Finally, if Counts 1 and 2 are dismissed, as was case with PAIF, the associated transactional money laundering counts will fall away as well.

Motions to reconsider are limited to two grounds: 1) manifest error or 2) new facts or new legal authority. To meet the "manifest error" requirement, the movant is required to point out with specificity the matters that were "overlooked" or "misapprehended" by the Court. "Manifest error" as used in Rule 7(g) appears to be the same as in F.R.Civ.P., Rule 59(e).

> A manifest error of law under Rule 59(e) is the "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir.2000) (quoting *Sedrak v. Callahan*, 987 F.Supp. 1063, 1069 (N.D.Ill.1997)). This is a high standard that is "not demonstrated by the disappointment of the losing party." Id.

*Susinka v. U.S.*, 19 F.Supp.3d 829, 834 (N.D. Ill. 2014)

This Motion meets that high standard. Doc. 757 is the first time the Court explained Defendant's convictions. In doing so, the Court itself, albeit unintentionally, showed precisely why its ruling upholding the verdicts on Counts 1 and 2 and the related money laundering charges must be reversed. In this Motion, we point out with specificity that the Court misapprehended the nature and quality of the evidence supposedly presented in support of the new case theory that, with the government's urging, the Court adopted after the 6/6/23 arguments to support the convictions. There was no evidence presented supporting the new theory. Further, the court overlooked that the new theory was at complete variance with the Second Superseding Indictment (SSI) and overlooked the case law necessary to support the new theory did not support it at all but, rather, supported the opposite conclusion.

///

///

**ARGUMENT**

The well-known, plain language of the wire fraud statute does not stop with the plain language. Federal case law, both in the Ninth Circuit and other jurisdictions, has fleshed out the essential elements of wire fraud. Wire fraud requires three essential elements: 1) a scheme to defraud; 2) the use of a wire, radio, or television to further the scheme; and 3) a specific intent to defraud. *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017).

More recent case law has held that, while a defendant may have the intent to deceive, without an intent to cheat a victim out of money or property, there can be no conviction. *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020); *see also*, *United States v. Waters*, 937 F.3d 1344 (11th Cir. 2019) (to be convicted under §1343 a scheme must be to defraud as opposed to a scheme to do something other than to defraud).

*Miller* overturned the Ninth Circuit's former approach (intent to deceive *or* cheat) based on *Shaw v. United States*[1], and in doing so, relied heavily on holdings from other circuits. In addition to showing an intent to deceive, wire fraud requires showing that the defendant contemplated and intended actual harm or injury to the victim. *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (only a showing of intended harm will satisfy the element of fraudulent intent); *see also*, *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987) (the misrepresentation must have been to the object of the contract).

---

[1] *Shaw v. United States*, 580 U.S. 63, 67, 137 S. Ct. 462, 467, 196 L. Ed. 2d 373 (2016).

The cases make clear that there is a difference between schemes that do nothing more than cause victims to enter transactions they may have otherwise avoided versus schemes that are dependent on an essential element of the bargain to be misrepresented. *United States v. Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *21 (N.D. Cal. Feb. 11, 2020) citing to *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016), *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). In *United States v. Starr*, the Second Circuit held that misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud conviction. 816 F.2d at 98-99. Wire fraud charges cannot be sustained in those situations because the alleged victims received exactly what they paid for, and there was no discrepancy between the benefits anticipated and the benefits received. *Id.*, *see also Regent Office Supply Co.,* 421 F.2d at 1174 (*holding that* no conviction could be sustained under the mail fraud statute where misrepresentation was not directed to the nature of the bargain).

In *Takhalov*, the Eleventh Circuit held that a "scheme to defraud" refers only to schemes in which a defendant lies about the nature of the bargain itself. 827 F.3d at 1313.

In *Holmes*, the well-known Theranos fraud, the Court provided a very apt hypothetical that pointed out the difference. *See,* 2020 WL 666563 at 22.

> "Imagine you go to the doctor's office for a blood test. The nurse tells you that before test, he will bring you apple juice. Instead, because he dislikes you, he brings you cranberry juice. He takes your blood and you get your (accurate) results. Did you get what you bargained for? Yes. You still got your blood test and received the correct results. The fact that you got cranberry juice is irrelevant; you did not ask for juice; it was secondary to the core transaction. Next imagine, you go to the doctor's office for the same blood test. The nurse comes to your patient-room and tells you about a new type of blood test. He says this new test only requires a couple drops of blood but remains just as accurate and reliable as a classic blood test. You agree to use the new test, only to discover later that the test

was neither accurate nor reliable. Have, you been defrauded? Yes. Why? Because the misrepresentation went to the value of the bargain. You paid for something that you did not receive. You paid for an accurate and reliable test and, because you did not receive that, you have been deceived about the characteristics of the good.".

The same logic applies here: in the case of Turasky and Burg, it is not relevant where the money went as long as it eventually arrived at its promised destination. Whether the Defendant misrepresented the path of the money is totally irrelevant since it ended up in the place for which the parties bargained. Indeed, both Turasky and Burg reaped the benefits of their bargained exchange: That is until circumstances out of Harbour's control shut down the flow of money. *See Kelly v. United States*, 206 L. Ed. 2d 882, 140 S. Ct. 1565, 1573 (2020) (*holding that* a property fraud conviction under federal wire fraud cannot stand when the loss to the victim is an incidental byproduct of the scheme); *United States v. Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993) (*holding that* losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement of mail fraud).

Applying the forgoing to this Motion, in Doc. 757, the Court found, consistent with the evidence, that Mr. Harbour could use Burg's and Turasky's money for business expenses, provided it eventually reached Green Circle. Exhibit 516, which stands unrefuted, are Green Circle's bank statements and a summary prepared by Laura Purifoy. It is undisputed that, by October 2015, all of Burg's and all of Turasky's funds had reached Green Circle.[2] The "bargain" between the parties was fulfilled. In *U.S v Guertin*,

---

[2] Where the funds were used as Green Circle chose to use them until PAIF took over Green Circle. Whether, in September 2016, when PAIF took over the funds were in an

67 F.4th 445 (D.C Cir. 2023), the Court cited *U.S. v Shellef* and *U.S. v Takhalov* in ruling that the wire fraud statute applies "only to those schemes in which a defendant lies about the nature of the bargain itself."

But, the Court, for the first time and on its own motion, although pushed to the conclusion by the government's false or erroneous answers to the Court's questions,[3] focused solely on the "detour" the money took before it reached Green Circle and not upon whether Mr. Harbour was entitled to use the money for expenses – he was – but whether he could use the money for "personal expenses." In so doing, the Court for-ordained what the outcome here must be. The Court determined that Mr. Harbour committed wire fraud because he used money for personal expenses and omitted to tell Turasky and Burg that he might do so. The fact that, for a time, Mr. Harbour may have derived a personal benefit from the temporary use of the funds is insufficient to prove wire fraud in the absence of a willful intent to harm the "victim" in the *bargain*. That simply did not occur here. *See*, *Regent, supra.; Starr, supra.*

This raises two questions that, only now, can be addressed because, only now, has the basis for the convictions been explained by the Court. The omission by Mr. Harbour to seek and receive specific approval amongst categories of expenses that was, in the

---

account or were on the street in the form of payday loans is irrelevant to this case. Mr. Harbour was only responsible for ensuring that the funds reached Green Circle.

[3] As stated, the case law distinguishes between misrepresentations to acquire money and misrepresentations about the bargain between the parties. The Court must evaluate and determine the bargain between the parties to satisfy the mandatory element of wire fraud, namely, the specific intent, i.e., willful intent to harm. If the bargain, the object of the contract, was not misrepresented but something else was, there cannot be wire fraud, only deceit.

Court's view, sufficient to convict. The ultimate bargain – to send the funds to an investment – was realized. In short, the government needed to prove that the Defendant intended to cause harm to the victim regarding the benefit of the bargain. *U.S. v. Frost*, 125 F.3d 346 (6th Cir. 1997). No such evidence was presented by the government.

In *U.S. v Starr*, *supra*., the Defendant was found guilty of 15 counts of mail and wire fraud. The trial court, under Rule 29, acquitted the defendant of all the charges because deception was insufficient. The government appealed and the 2nd Circuit affirmed the trial court's decision. This was even though the Appellate court found that the Starrs deceived their customers. They represented that funds deposited with them would be used only to pay for their customers' postage. In fact, the Starrs used only a portion of those funds to pay postage; the remainder was misappropriated to their own use. Moreover, the Starrs caused fraudulent postal receipt forms to be sent to their customers in order to avoid detection of their scheme.

Clearly the Starrs' customers were deceived. The record, however, showed little else. Specifically, the evidence did not identify what harm, if any, the Starrs intended to inflict on their customers. In fact, the proof offered on that element was quite to the contrary. The government did not explain how the Starrs intended the misrepresentation to cause direct pecuniary harm to their alleged victims.

> As previously noted, an inference of such intentions is unreasonable in light of the purpose of the scheme. Therefore, any "harm" intended by the Starrs is, at most, metaphysical and certainly not of the character identified in *Regent* as being sufficient to infer fraudulent intent.

> *Id. at p. 100*

Respectfully, the Court's conclusion that the "detour" the money took to pay "personal" expenses was the fraud is an *ipse dixit* conclusion and manifestly erroneous. It directly conflicts with what the government told the Court and the jury. According to the government, the case was not about personal versus business expenses. *See,* RT 2/24/2023 and p 187.[4]

Thus, looking at the first prong of what the Court needed to find to support the Court's own self-definition of the alleged "fraud," it was the "bargain" that needed to be fraudulent, meaning that Defendant needed to willfully intend to cheat Burg and Turasky out of their money by misrepresentations of the bargain itself. As in *Starr*, no such evidence was ever even proffered, let alone sufficient evidence introduced to sustain a conviction. The Court's determination that Mr. Harbour's omitting to tell Burg and Turasky that he was planning to use the money for personal expenses was not a lie about the bargain.[5]

---

[4] To convict Mr. Harbour on the new theory, the Court had to have found that the bargain was Harbour getting money from Turasky and Burg to pay his personal expenses. But, this is counter to what the Court itself said at the 6/6/23 hearing. The Court stated, "he wasn't just giving it to Harbour to use to pay business expenses. He wanted some return, right?" (6/6/23, pg. 80-81) There, the Court agreed that the bargain was for Turasky and Burg to get a return on their money. Their money went to Green Circle and that was the bargain. Harbour never lied about nor made misrepresentations about the bargain.

[5] "Thus, the Eleventh Circuit concluded that a "scheme to defraud" within the meaning of the federal wire fraud statute, "refers only to those schemes in which a defendant lies about the nature of the bargain itself." Id. Such can take two primary forms: the defendant might lie about the price or he might lie about the characteristics of the good. Id. at 1313– 14. "But if a defendant lies about something else—e.g., if he says that he is the long-lost cousin of a prospective buyer—then he has not lied about the nature of the bargain and has not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie alone." Id. at 1314." *Hu, supra.*

"Business" versus "personal" expenses coupled with the "detour" are now the sole bases for the convictions of Counts 1 and 2.[6] Having become newly injected into the case, it was appropriate to examine, *ab initio*, that which the government assured the Court and the jury was *not* the issue, namely that the case was *not* about the distinction between personal and business expenses.

However, having found a new basis for sustaining the convictions, aside from whether the omission to subcategorize which expenses could and could not be paid with the funds provided, it is mandatory that the Court examine the evidence that supports or does not support the allegation that the money *was* used to pay personal expenses. At every phase and, at every moment, the Court must remember, as Judge Campbell pointed out in *U.S. v. Szilagyi*, *supra*, the burden of proof never shifts to the defense.

The entirety of the government's evidence as to the use of Burg's and Turasky's money is captured in four exhibits. Exhibit 908 (Paige's Burg summary), Exhibit 909 (Burg back-up), Exhibit 912 (Paige's Turasky summary), and Exhibit 913 (Turasky back-up). What is crucial is that the American Express account records (Exhibit 27 for

---

[6] $400,000 of Burg's money and $295,000 of Turasky's money took the "detour." During her cross examination of Ms. Cameron, Ms. Schoch, confronted her: "Do you understand that this case is not about personal versus business expenses?" (Trial Tr. 2/24/23, pg.187). That sort of a question is a statement by the government as to its position and, here, the government and the defense agreed. Neither the indictment nor the Bill of Particulars made such a distinction. Only the Court, urged to do so by the government in the 6/6/23 hearing raised this "new" issue. The earlier theory – that the money could not be used for expenses at all – was rendered asunder by the evidence and especially the testimony of Turasky (Count 1) and Burg and Avedon (Count 2). The government has also now incurred another fatal variance from the SSI.

identification), and bank records for DNA Management, LLC ("DNA") (Exhibit 32 for identification) were never introduced into evidence.

Ms. Paige, whom the government did not designate as an expert, never opined whether the usages of the funds she traced from Burg and Turasky to the Harbour accounts and then out of the accounts were for business or personal expenses. No trial witness testified that Mr. Harbour ever used investor money to pay personal expenses. Finally, the government's sole fact witness on Harbour's expenses, Purifoy, testified that Mr. Harbour did not use investor money to pay personal expenses. RT, 2/14/23, pp. 45-48, p. 169. [7]

Exhibit 908 purports to show the disposition of Burg's $1 million. All of it went into Oak Tree. $600,000 went directly to Green Circle. Of the remaining $400,000, $370,000 went to DNA and from there, $223,121.38 was used to pay an American Express bill with the American Express records (Exhibit 27) also never having been introduced.

No one ever testified at all about DNA or about American Express in terms of what was paid, to whom, or for what purpose. Thus no one ever testified that money transferred to DNA or paid to American Express was for "personal" expenses nor that personal expenses were paid with lender/investor funds.

---

[7] This fact means that Ms. Paige was mistaken when she said that the DNA and AMEX statements were in evidence and makes even more mistaken Mr. Rapp's argument to the jury that Ms. Paige summaries were based upon other evidence in the case. RT, 2/28/23, p. 130. Without these two crucial exhibits (marked for identification but never introduced), this statement was improper and prejudicial. *See, e.g., generally, U.S. v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995).

No witness ever testified that a single dollar of the $223,121.88 was actually used to pay Mr. Harbour's personal expenses and no document received into evidence proves a single dollar was so-used. Of the remaining entries in Exhibit 908, 21020 LLC was the building in which Harbour operated Oak Tree and other business ventures ($15,000), $9,333.33 was a payment to Turasky (obviously, a legitimate Oak Tree expenses), and $6,000 went to HighPointe Capital Group (about which there was no evidence at all).

So, was the $400,000 that took a detour on its way from Oak Tree to Green Circle, but that eventually got there *actually* used to pay Mr. Harbour's personal expenses? If the answer is, "who knows," the government loses.

This is as far as the government advanced the evidence:

Mr. Rapp: "Based on your review of the books and records, did you have any idea how and in what manner he was paying for business expenses?"

[IRS] Agent Green: "There was an American Express credit card." (RT, 2/9/23, pp. 122)

During the Burg examination, the Court stated: "I guess the problem with the question is he wouldn't know what's on that Amex card. It's possible the business expenses could be on there as well." (RT, 2/16/23, pg.131).

In a case virtually on all-fours with this case at the trial court level, *U.S. v. Szilagyi*, 2:13-cr-00116-DGC, Doc. 234, 12/18/18, Judge Campbell aptly noted

"Defendant is not required to prove that her statements were true in order to defeat an allegation that they were false."[8]

The DNA statements and the American Express card statements were crucial to any determination by the jury, beyond a reasonable doubt, that of the $400,000 in Burg's money that took a detour to Green Circle *any* was used for personal expenses.[9] *See, U.S. v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994) (mere suspicion or speculation does not rise to the level of sufficient evidence).

With respect to Burg and Turasky, the government loses on both grounds. First, the omission, as in the example from *Holmes*, was not involved in the bargain but was secondary to the bargain and cannot support a fraud conviction. Just as important, however, is the complete failure of the government to prove that the money was used for "personal" expenses.

In Turasky, the government's position only appears slightly better but appearances are deceiving. Exhibits 912 and 913 are the sole support for the Turasky expense contentions. Of the $500,000 total, Exhibit 912 shows $150,000 going back directly to Turasky, $190,500 going to DNA Investments, LLC, of which $142,785.88 went to make an American Express credit card payment. In addition, $34,665.33 was shown as a

---

[8] During the 6/6/23 hearing, the government told the Court that the fraud was proven because they lost their money. The Court correctly corrected the government: The fact they didn't get paid does not prove it was a fraud. People lose money in investments all the time. (RT, 6/6/23, pg.107).

[9] As in *Szilagyi*, the problem was the government's failure to completely trace Burg's and Turasky's money into the Green Circle bank accounts. However, although the government did not completely understand Exhibit 516 and misrepresented to the jury, Exhibit 516 traced their money exactly.

payment to "D.S."  But "D.S." was never identified. Exhibit 913 (the "back-up") shows no more than that there was a check. The check was never introduced into evidence; it was never even marked for identification. How could the government prove that this payment was for a "personal" expense as opposed to a "business" expense without proving to whom the check was written, the reason it was written and that it was for a "personal" expense and not a business expense.

The government never offered any evidence that any of the payments made with respect to the "money laundering" counts enumerated in Exhibit 912 (13-19) were *not* business expenses. Throughout the trial, the government evidently proceeded as if simply showing that the money was used for expenses of any kind was sufficient.

What sums up the government's problem is, facially, the most obvious example of the failure of proof: Although there are no bank records to support it, Exhibit 912 declares that an $11,518.75 payment was made to Rancho Solano Preparatory School. Was that payment for the Harbour childrens' tuition? Was there even any evidence introduced that the Harbours had children in preparatory school? The only thing ever said about the Harbour children was that they were "toddlers." Do toddlers go to "preparatory schools?" Were invoices for tuition for that school introduced? No. For all anyone knows, the payment just as easily could have been in the nature of paying the school because a Harbour business vehicle crashed through a school fence.

The other payments have the same problems: The American Express payment made from Turasky money is like the American Express payment made with Burg

money. There was utterly no proof that the American Express payments were not for business expenses.

Getting back to Exhibit 912, the money laundering counts other than the American Express charge (Count 18) are Counts 13-17, and 19.[10] Paige's testimony could not shed light on these expenses at all. (RT, 2/23/23, p. 196). Nor does the Exhibit beyond showing that money was paid to payees. Counts 14-16 relate to the same $37,500 that ended up at something called Harrington Park I, LLC. That LLC is not in Exhibit 700, the list of 50 bank accounts allegedly controlled by Mr. Harbour. What was it for? Who knows? Who testified that the payment was for a personal expense of Mr. Harbour and not a business expense? No one. The government had and has the sole burden of proof.

Count 19 was a payment to Employment Edge. Can it really be argued that the payment was for personal expenses? Not rationally.

In short, the case has moved away from what was charged to an alternative theory for which no evidence had been introduced.[11] Once the main theory with respect to Burg and Turasky collapsed, which was that Mr. Harbour simply stole a significant part of

---

[10] Of course, to the extent that any of the money laundering claims involve payments to Burg or Turasky, even if they were transactional money laundering claims (dependent upon the underlying fraud to be criminal), that does not exclude them as "business expenses." Was there a business purpose to make payments to Turasky and Burg? Of course, there was. It was part of the deal. Thus, *those* payments could never constitute "personal" expenses.

[11] The SSI charged, in ¶¶ 21 and 22, that Mr. Harbour raised money from Burg and Turasky and never remitted a large portion of their funds to Green Circle. Instead, according to the government, Mr. Harbour kept a large portion of their funds as and "for his own personal compensation" and used this illegally obtained "compensation" to "make payments to his American Express credit card and for lavish family vacations." Doc. 387, pp. 9-10.

their money, put it in his pocket, and never even sent it to Green Circle, and once the second theory collapsed, that he improperly used the money temporarily for expenses, the tertiary position, that he used the money for personal expenses rather than business expenses needed to be proved beyond a reasonable doubt and there was no evidence introduced from which that could be found. It is difficult to conceive of error that is more manifest.

## **CONCLUSION**

A jury cannot convict a defendant of wire fraud based on "misrepresentations amounting only to deceit." *See U.S. v Takhalov*, 827 F.3d 1307 (11 Cir. 2016) and *Shellef, supra.*, *Regents, supra.* and *Starr; accord U.S. v Miller*, 953 F.3d 1095 (9th Cir. 2020) (deception is not enough for a wire fraud conviction).[12] Even if we accept the Court's conclusion that the jury rejected Ms. Cameron's testimony, it merely punctuates the government's failure to prove that the expenses that were paid from Burg's and Turasky's funds were for personal expenses.

---

[12] The Court erroneously invoked *Miller, supra.* to support its comparison of the embezzler's conduct in *Miller* (he stated he intended to pay back the money he stole) with Mr. Harbour's conduct. There is no valid comparison. *Miller* is not a misrepresentation case and there was no bargain between the parties. Mr. Harbour was permitted to use the money for expenses and the documents actually provided that he never had to move the funds to Green Circle, though the witnesses (Burg, Avendon, and Turasky) said that he did. The evidence is unrebutted that Mr. Harbour did precisely that. Had he not done so, all the Burg and Turasky money would not have been where Exhibit 516 shows it wound up; namely in the Green Circle bank account, the precise bargain that Burg's and Turasky's lawyers negotiated with Mr. Harbour. Oak Tree had no ability to claw back the money at any time and when PAIF took over Green Circle's operations, wherever the money wound up is a question for someone else to answer.

Though the Court could reject the approach taken by Judge Campbell in *U.S. v. Szilagyi, supra.*, the failure of the government to trace the funds into Green Circle's account dooms the government's case. But, now, in addition to that failure, the new theory of the case punctuates the government's failure to prove that the funds on the "detour" were used for personal expenses, rather than business expenses. This ends any possibility of upholding the current convictions.

The government argued to the Court that it should focus on the case law. The government was correct. The case law mandates that the Court acquit the Defendant of the Burg and Turasky counts.

With respect to PAIF, the Court stated that, even if a theory of fraud could be seen as having been established, it was at fatal variance with what had been charged in the SSI. The same can be seen here. Even if the new theory of the case is sufficient to make out a fraud, it is at fatal variance with the SSI. There, the government's theory was that Green Circle was a Ponzi Scheme and Mr. Harbour was accused of stealing large portions of Burg's and Turasky's investment/loans, putting the money in his pocket, and never sending it on to Green Circle. Neither theory was proven. Now, the case is wholly different, as has been amply demonstrated. The new theory is not supported by the case law pertaining to fraud. The new theory was not supported by the introduction of any evidence.

Before getting to the fatal variance, the new fraud cannot survive the case law that distinguishes deceit from fraud in the bargain. Here the actual bargain was fulfilled once funds sufficient to represent and or cover the entirety of Burg's and Turasky's

loans/investments was forwarded by Oak Tree to Green Circle, that is, by October 2015. And, even worse, if the theory could be supported by the cases, the government never introduced any evidence to support the new theory, let alone sufficient evidence to sustain convictions beyond a reasonable doubt.

It is hard to imagine error that is, or could be, more manifest than the error made by the Court when it adopted a completely new and different theory of the alleged crimes. Defendant respectfully suggests that the Court must reconsider its refusal to dismiss of the Counts associated with Turasky and Burg, that it order the government to respond to the motion, permit the Defendant to reply, conduct an oral argument, if it deems it necessary, and throw out the Counts involving Burg and Turasky.

RESPECTFULLY SUBMITTED this 11th day of July 2023.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004Attorney for Plaintiff

/s/ Yvonne Canez