1    Stephen M. Dichter, 004043
     sdichter@cdslawfirm.com
2    Justin R. Vanderveer, 037657
     jvanderveer@cdslawfirm.com
3    CHRISTIAN DICHTER & SLUGA, P.C.
4    2800 North Central Avenue, Suite 860
     Phoenix, Arizona 85004
5    Telephone: (602) 792-1700
     Facsimile: (602) 792-1710
6

7    Attorneys for Defendant David Harbour

8           **IN THE UNITED STATES DISTRICT COURT**

9

10            **FOR THE DISTRICT OF ARIZONA**

11    United States of America,       Case No. 2:19-cr-00898-DLR (DMF)

12           Plaintiff,      **DEFENDANT'S MOTION FOR**
                          **CLARIFICATION OF THE**
13         vs.             **COURT'S DENIAL OF**
                          **DEFENDANT'S MOTION FOR**
14    David Allen Harbour,       **RECONSIDERATION (DOC. 769)**
15           Defendant.      (Oral Argument Requested)
16

17

18        Defendant David Allen Harbour, by and through his attorneys, respectfully
19 requests that the Court clarify its recent ruling denying the Defendant's Motion to
20 Reconsider its Denial of Defendant's Rule 29 Motion with respect to Turasky and Burg.
21 The Request is made so that the Parties might better understand the reasons the Motion
22 was denied, as the Court's views will be material to the upcoming sentencing and to
23 better clarify the record for the appeal to the 9th Circuit as well as the eventual §2255 IAC
24
25 proceeding that can be anticipated based on the Court's position that the Defense failed to
26 discuss "circumstantial" evidence.
27

28

**Clarification Needed from the Court**

1.   **Constructive Amendment of the Indictment/Fatal Variance:** In its ruling, the Court did not address the argument raised by the Defendant that the theory of the case was changed from: 1) the defendant stole money from Turasky and Burg that never made it to Green Circle to, 2) that their money could not be used for expenses, to 3) that their money could not be temporarily detoured to be used for personal expenses amounted to an amendment of the indictment, requiring a judgment of acquittal.

*U.S. v Adamson*, 291 F.3d 606 (9th Cir. 2002), holds that a constructive amendment occurs when the defendant is charged with one crime but, in effect, is tried for another crime. *See also*, *Jeffers v U.S*, 392 F.2d 749 (9th Cir. 1968). The SSI does not charge that Harbour used Turasky money for personal expenses. Government Exhibit 516 is the Green Circle bank statements showing $2.9 million went to Green Circle. The SSI said only $655,000 went to Green Circle.  The SSI stated that Turasky's money was used to make Ponzi payments. No evidence (direct or circumstantial) of that was introduced at trial.[1] The SSI stated that Burg's money was used to pay for lavish family vacations and other personal expenses. No evidence of that was introduced in trial. Here, there existed a clear divergence between the misrepresentations specified in the SSI and the misrepresentations shown at trial. Because the SSI specified a different particular

---

[1] The reader should understand that, as previously, when we used the word "evidence" as in there was no "evidence," we meant there was no direct evidence or circumstantial evidence for, in respect to the issues raised in the Rule 29 and Motion to Reconsider, there never was any question that no direct evidence existed at all. Here, instead of wasting words discriminating as between direct and circumstantial evidence, the use of the word "evidence" means both direct and circumstantial evidence.

misrepresentation, the SSI failed to inform the defendant of the actual misrepresentation that would be shown at trial. This was a constructive amendment and, if a variance, a fatal variance.

The Court: "I'm focused on what's in the SSI and what the evidence is, and I don't want to know about the history, I don't want to know about things not in the record. All I want to know is – focus on is what's in the SSI and what is it that you're claiming is wrong or what is the basis for your arguments." (Hr. 6/6/23, pp.56-57).

Mr. Rapp told the Court: "And she's [Laura Purifoy] our best witness on that count. She's going to say Green Circle was a Ponzi scheme." (Hr. 1/17/23, pp.199, lines 14-15). However, Ms. Purifoy testified that Green Circle was a real company. (Trial Tr. 2/14/23, pp.204).

Later, the Court: "You're not arguing that Green Circle was not a legitimate business, are you?"

Mr. Rapp: "No, I am not arguing that. Green Circle was a payday lending operation based upon an Indian Tribe." (Hr. 6/6/23, pp.23).

Ms. Schoch told the Court they never alleged a Ponzi Scheme with Mr. Harbour. (Trial Tr. 2/24/23, pp.136).

The Court:

> I understand a Ponzi scheme, there's connections because one's funding the other. And you made arguments, and I relied on those arguments in making some of my earlier rulings, that this was – there's a Ponzi scheme here. But later, during the course of the case, you guys backed off that argument and said there was no Ponzi scheme.

(Hr. 6/6/23, pp.22).

The Court:

Paragraph 22 of the SSI contains allegations with respect to Turasky. It alleges that RT invested $500,000 but only $55,000 made it to Green Circle, secondly, that RT's funds were used pay the balance of the American Express credit card and to make Ponzi payment to other investors; and third, that Harbour represented a rate of return that was not met.

(RT 6/6/23, pp.70).

The Court agreed the SSI never mentioned Harbour was charged with using Turasky money to pay for personal expenses, but, curiously, that is what the Court stated the jury had convicted Harbour of doing.

How could the defense know the government was going to argue that Harbour used Turasky money for *personal* expenses? This position only arose in the June 6, 2023, hearing. Before, once the government abandoned the position that the money never reached Green Circle, the government's new position was that the money could not be used for any expenses. However, the evidence and testimony, with which the Court agreed, was that Harbour was allowed to use Turasky's money to pay for business expenses which is the Amex card per Agent Green, Purifoy and Cameron.

In Exhibit 912 Ms. Paige showed an "inter-company" transfer to DNA Management from Oak Tree. These were the only alleged personal expenses in the entire trial and the DNA Management bank statements were not entered into evidence to support Ms. Paige's exhibits. Ms. Paige did not testify as to which expenses were personal in Exhibit 912, nor did anyone else. It was left to the jury to speculate, provided, however, that the distinction between business and personal expenses was *never* actually tried because, as Ms. Schoch told the Court and the jury, the case was not about personal

4

versus business expenses. (RT, 2/24/23, p. 187). This issue arose only in the June 6, 2023 post-trial hearin2023,

Ms. Purifoy testified that "due to and due from" accounts are money borrowed from one entity and placed in another and there is nothing illegal about it. (Trial Tr. 2/14/23, pp. 186).

Agent Green, when asked by Mr. Rapp if Mr. Harbour commingled funds, he responded. "I don't think I drew that conclusion. He viewed them as 'inter-company transfers.'" (Trial Tr. 2/9/23, pp. 121 -122).

Cathie Cameron testified that it is common to have transfers between companies that are owned by the same person and Ms. Cameron testified that it was an appropriate transfer of funds to reimburse DNA Management for business expenses incurred (Trial Tr. 2/24/23, pp. 96-97).

Further, it is noteworthy that the jury acquitted Harbour on Counts 4, 5, 9, and 10. These were the payments from the Green Circle account to Burg and Turasky. They had to have been based on Green Circle having received their entire $1,000,000 and $350,000 because, otherwise, the payments would not have been in amounts that comported with the return on the full amounts loaned or invested. And recall that Harbour had no control over the Green Circle account. Since, Purifoy's testimony and Exhibit 516 proved without any contradiction that Harbour sent all their money to Green Circle and the jury acquitted, as indicated above, perforce the jury had to have believed that all of the money went to Green Circle and not merely $655,000. In addition, the acquittals of Counts 9 and 10 meant that Turasky did get the represented rate of return on the entire $350,000.

Given that the Court did not require the government to respond to the Motion to Reconsider, we respectfully call upon the Court to clarify its ruling and state the basis for concluding why this did not amount to a constructive amendment of the SSI.

### 2.   **Misrepresentations by Omission Versus Fraud Concerning the Deal:**

The Court did not address the case law that was cited to support the irrefutable law that an omission or misrepresentation about something other than the actual deal is sufficient to support a conviction for wire fraud.  We respectfully request the Court to clarify why it did not acquit on wire fraud in the face of extensive authority that shows that, once the Court had found and the government conceded that there was no fraud with respect to the "deal," meaning Green Circle was a real payday lending operation and the money, per the jury's acquittals and the evidence, all went to Green Circle.

The Court did not identify what circumstantial evidence proved Harbour lied or misrepresented the bargain between him and Burg and him and Turasky. The SSI said the bargain between Harbour and Burg and Turasky was Green Circle and it was a fraudulent scheme. The government told the Court over 60 times in previous papers and hearings that Green Circle was a Ponzi scheme. The government's final "nail in the coffin" to prove Harbour misrepresented the bargain was that government cooperating witness, Ms. Purifoy, Harbour's own bookkeeper, who, the government said, was going to testify that Green Circle was a Ponzi scheme, that did not occur. This caused the government's original theory (of Harbour lying or misrepresenting the bargain) to fall apart and that was the reason that the "expense" fraud emerged during the trial and that, once it was

shown that expenses could be paid with their money, the "personal" expenses theory to emerge *after* the trial.

In *U.S. v. Binday*, 804 F.3d 558 (2nd Cir. 2015), the Court stated that "where proof of a misrepresentation affecting an essential element of the bargain is lacking, the government cannot, without more, bootstrap such proof by showing that an alleged deceit was a 'but for' cause of a transaction." The "bootstrap," was the misrepresentation by omission about the money being temporarily "detoured" for expenses. Because there was no misrepresentation about Green Circle, the cases preclude finding wire fraud.

In the absence of the Court requiring the government to support its contentions, which newly emerged only in the Court's ruling on the Rule 29 motion with respect to Turasky and Burg, we respectfully request the Court to clarify its ruling.

3.      **Direct Versus Circumstantial Evidence:** The Court's ruling seemingly conceded the Defense had shown that there was no direct evidence that the Defendant had used Turasky and Burg's money for personal expenses. However, the Court indicated, the Defense had not even contested that there was circumstantial evidence from which the jury could have so found.

Respectfully, a simple example shows that the court conflated and confused the direct and circumstantial evidence. We will, once again, refer to the payment to Rancho Solano as the example in Exhibit 912. FBI Forensic Accountant Jeanette Paige showed that there was a $11,518.75 payment made from Turasky's money to Oak Tree to DNA Management to Rancho Solano.

*Direct* evidence that this was a personal expense would have been the testimony of someone with knowledge that the payment was made for the tuition expenses of the Harbour children. There was no such evidence. However, there was also no circumstantial evidence and it was the absence of circumstantial evidence that we criticized in the Motion for Reconsideration (as we had in the Rule 29 motion).

In this case, any circumstantial evidence that the payment to the school was for a personal expense would have required a showing that the Harbour's had a child old enough to have attended that school in 2014.  There was no evidence. In fact, the sole evidence about a Harbour offspring was Carol Hill's testimony that she babysat the Harbour's "newborn baby" on a trip to Mexico in 2011. Without the circumstances from which the jury could draw the inference, all that remains is mere speculation and that is insufficient to support an inference. Perhaps the business made a donation to the school. Perhaps, as we suggested earlier, the payment was for damage done by a business vehicle to school property. So, we argued that what was missing was *circumstantial* evidence; not direct evidence, of which no one, including the Court, contended any existed.

Three witnesses testified how Harbour paid for expenses. Agent Green, Ms. Purifoy and Ms. Cameron. None of them testified Harbour used investor money to pay for personal expenses. To the contrary, there was direct and circumstantial evidence that Harbour did not use Burg's and Turasky's money to pay for personal expenses.

Ms. Purifoy testified in specific detail how she reconciled Harbour's bank accounts and his American Express card. She classified the expenses as personal or business and Harbour did not give her any pushback on how she classified the expenses. (Trial Tr.

2/14/23, pp.45-48). Purifoy, who had first-hand knowledge of Harbour's finances, testified that he did not use investor funds to pay for personal expenses. (Trial Tr. 2/14/23, pp. 169). Cameron's testimony, which was based upon her forensic examination of the same business records that Purifoy described was virtually identical. (Mr. Harbour did not take any of the Oak Tree's lenders funds for himself personally). (Trial Tr. 2/24/23, pp. 18, 96-97).

IRS Agent Lionel Green testified that he audited Harbour for the relevant years and Harbour used the Amex for business expenses. (Trial Tr. 2/9/23, p. 33). Mr. Rapp asked Agent Green "Based on your review of the books and records, did you have any idea how and in what manner he was paying for business expenses?" Agent Green responded, there was an American Express credit card. (Trial Tr. 2/9/23, pp. 122).

Ms. Paige, who was not an expert witness, did not opine as to whether the payments were for personal expenses or that she even knew what the charges were. (Trial Tr. 2/23/23, pp.6). She did nothing more than trace funds over a limited period of days. An example is the payment to Santa Catalina LLC (Exhibit 912), where she was asked, "[d]o you know what that is?" Ms. Paige: "I don't know the entity." (Trial Tr. 2/23/23, pp.204). She offered no testimony other than as to how she saw the flow of funds. (Trial Tr. 2/23/23, pp.211).[2]

---

[2] The Court made it clear: "[d]on't argue anything to me unless it's in evidence. I don't want to hear anything that's outside the four corners of what was presented at trial." (Hr. 6/6/23, pp.44-45) There was no evidence concerning the American Express statements or the DNA Management account statements and there could not be because neither was in evidence and no government expert testimony concerning them existed; only Cameron expressed opinions.

In short, there were only two Exhibits (908 and 912) that could constitute the starting point from which circumstantial evidence could have been developed to support a jury inference that Harbour used Turasky and Burg's money to pay for personal expenses, but these exhibits were both the starting and ending points. Exhibit 908 (Burg) had nothing in it that even suggested any personal expenses for lavish vacations or anything else.

Importantly, the Court appropriately made the following comment: "I don't know that a jury would have the expertise or the ability to recognize or understand business expenses, would they?" (Hr. 6/6/23, pp.98,99). This statement is of profound significance. This was followed by another important Court comment: The Court: "I'm asking you, is there any evidence in the record other than Ms. Cameron as to what was money spent by the defendant on Oak Tree?" Mr. Rapp: "No." (Hr. 6/6/23, pp.104). And, further, Mr. Rapp: "Did you view reasonable expenses to be, you know, approximately $240,000 to his black Amex card?" The Court (sustaining a defense objection): "I guess the problem with the question is he wouldn't know what's on that Amex card. It's possible the business expenses could be on there as well." (Trial Tr. 2/16/23, pp.131)[3]

And, moreover,

Mr. Rapp: "Mr. Burg, what did you think "reasonable expenses" would be?"

Mr., Burg: "Rent, phone, fax costs, messengers, an assistant." (Trial Tr. 2/16/23, pp.132).

---

[3] Paige agreed that her review was a snapshot of the records and that she had never searched to determine how much money Harbour had put into the establishment of Oak Tree. (Trial Tr. 2/23/23, pp. 204-205).

* * *

Mr. Burg: "Limited business expenses, yes." Mr. Dichter: "What -- limited to what?" Mr. Burg: "Rent." Mr. Dichter: "Okay." Mr. Burg: "Assistants. Whatever a normal course of business would be." Mr. Dichter: "Perfect." (Trial Tr. 2/16/23, pp.112).

The government has never proved with circumstantial or direct evidence the expenses Harbour paid were personal and not business. The jury could only speculate.

Mr. Dichter: "Having read this, does it refresh your present recollection that you didn't care if he took part of the money you provided as part of your investment to pay your legal fees?" Burg: "Yes." (Trial Tr. 2/16/23, pp.107).

Burg testified that §5.8 of the Operating Agreement allowed Harbour to be reimbursed for his business expenses. Dean Avedon testified David talked to Burg's lawyer and explained the deal, and she said that she got it. (Trial Tr. 2/16/23, pp. 195 – 196) Circumstantially, Harbour explained to her that he had expenses and would use Burg money to pay for them and she agreed. Had she not agreed that it was okay to do that, §5.8 would not be in the Agreement. Cathie Cameron testified that Harbour's business expenses were the building, salaries, telephone, stationery, the usual stuff and marketing to get new investors (Trial Tr. 2/24/23, pp.43) which matched the testimony of Burg and Turasky concerning "reasonable" business expenses.

Turasky testified "The Resolution also authorized Oak Tree to retain and not loan to GC such borrowed funds reasonably necessary to pay costs associated with Oak Tree's role as Managing Partner of the venture between Oak Tree and CIF, including overhead, legal, and other fees. The amount to retain and not loan to GC was at the sole discretion of Mr. Harbour."

There was plenty of evidence as to what some of the business expenses were: Purifoy testified she made $65,000 a year in salary. Hill testified she made $50,0000 a year in salary ($165,000 in total). Purifoy testified that Harbour would have meals with investors on his Amex statements. Hill and Purifoy both testified that Harbour used the ASU and Waste Management suites to entertain clients and new investors. Burg and Turasky testified that Harbour used his Amex when they were together. Turasky testified that he and Vetrano went to Harbour's building to work on Green Circle numerous times. Turasky testified the address of the building was on his promissory note, which was 21020 N. Pima Rd Scottsdale, AZ 85255 (Trial Tr. 2/9/23, pp.212-213). Purifoy and Hill testified they worked in the building. Agent Green testified he met them there in 2016. Exhibit 912 has an expense of $12,083.90 for a company 21020 LLC. Cathie Cameron testified 21020 LLC was the entity that owned the building and $12,083.90 was the monthly payment ($144,000 annually). (Trial Tr. 2/24/23, pp.101). So, the chances that this was a "personal expense" are zero and the Court's suggestion that a jury could have found that this was a personal expense is not supportable.

The actual direct and circumstantial evidence is all in harmony: Harbour had incurred legitimate business expenses and he used his bank account and Amex card to pay for them. The testimony of Burg, Turasky, Green, Purifoy, Hill, and Cameron all match.

The jury could not have inferred that Harbour spent Burg and Turasky money on personal expenses that were not a reimbursement at the same time Harbour was incurring hundreds of thousands of dollars in business expenses for things such as salaries, legal,

rent and overhead for which he was allowed to use Burg and Turasky money. The Court should clarify its denial of the motion without even ordering a government response.

Moreover, with respect to Burg:

Mr. Dichter: "So if you look at 5.8, does that say -- section 5.8, "Expense Reimbursement to Manager. The manager shall be entitled to reimbursement of any reasonable expenses actually incurred by the manager in connection with the company and its business and operations"; did I read that correctly?"
Mr. Burg: "Yes, good job."
Mr. Dichter: "Thank you. Now, what does this section mean to you?"
Mr. Burg: "I was instructed to give you yes-or-no questions."
Mr. Dichter: "Only to questions that call for yes-or-no answers. So --okay, we'll do it your way. This section means that the manager shall be entitled to reimbursement of any reasonable expenses actually incurred by the manager in connection with the company and its business and operations, correct?"
Mr. Burg: "Yes."
Mr. Dichter: "Thank you. Who was the Manager?"
Mr. Burg: "David Harbour."

In other words, even the premise that Harbour was not permitted to reimburse himself for expenses he had advanced on behalf of the business was belied by the Agreement signed by Burg.  So too was the Court's finding that the potential use of funds for this purpose was not disclosed. Thus, the Court's ruling that when Harbour did not send all the money to Green Circle at once but retained a portion of it while sending the rest over time was akin to "paying the investor back" and not a defense, was demonstrably wrong and, therefore, respectfully, ought to be clarified. The evidence from the trial does not support that Harbour could not retain portions of the money from Turasky and Burg and send it to the investment over time, in fact, it was the opposite. The evidence supports that Harbour could retain the money and send it to the investment over time. This undercuts the entire basis for the justification of the convictions.

Burg testified that his money did not have to go to the investment all at once and could be used for expenses as long as it got there. (Trial Tr. 2/16/23, pp. 112 – 113). Burg further testified that Harbour could use his money for some other purpose as long as he got his interest payment it was fine and Burg admitted he did get his interest payment. (Trial Tr. 2/16/23, pp. 114).

The only evidence at trial that traced money into the Green Circle bank account was Exhibit 516. All the money went to Green Circle.  The government admitted they did not trace the money in and out of Green Circle or even look at the Green Circle bank account. The case law in this District supports that limited tracing is not enough to sustain the government's burden of proof. *United States v. Szilagyi*, No. CR13-116-01-PHX-DGC, 2018 WL 6620506, at *3 (D. Ariz. Dec. 18, 2018).

The Court: "This is a yes or no question: Did anyone trace the source of all of the money that went into Green Circle during the relevant time period?"
Mr. Rapp: "No." (Hr. 6/6/23, pp.46)
The Court specifically asked Mr. Rapp during the trial if his witness would track the money from Green Circle and he told the Court Ms. Paige did track them.
The Court: "So, Mr. Rapp, this witness [Agent Paige] will track the money?"
Mr. Rapp: "Yes."
The Court: "that goes into Green Circle and where it came from and where it went to?"
Mr. Rapp: "Yes." (Trial Tr. 2/15/23, pp.170).

The evidence in the record was that Ms. Paige testified she did not look at the Green Circle bank records.

Mr. Dichter: "What bank records did you look at besides those that are listed in the chart at the bottom here?"
Ms. Paige: "The records that are in Exhibit 700." (Trial Tr. 2/23/23, pp.206).
Mr. Dichter: "And Green Circle? Ms. Paige: "Green Circle, the defendant is not a signer on the account." (Trial Tr. 2/23/23, pp.206).

Contrast that with Ms. Purifoy's testimony about tracing the Green Circle bank statements. The jury heard from Ms. Purifoy that she actually traced all the money from Oak Tree to Green Circle. Ms. Purifoy's testimony about Exhibit 516.

> Ms. Schoch: "What's the date on this email?"
> Ms. Purifoy: "June 23, 2016."
> Ms. Schoch: "And what are you emailing him about?"
> Ms. Purifoy: "It indicates that I'm sending the spreadsheets that show that the money's coming through Oak Tree Management and bank statements as back up."
> Ms. Schoch: "And what entity are the bank statements for?"
> Ms. Purifoy: "Green Circle." (Trial Tr. 2/14/23, pp.131-132).
> Ms. Schoch: "And what does it show?"
> Ms. Purifoy: "the topline shows Capital Investment Fund, which is Rich Turasky, investments on specific days."
> Ms. Schoch: "And where did you get this information from?"
> Ms. Purifoy: "The bank statements."
> Ms. Schoch: "The bank statements of what?"
> Ms. Purifoy: "Green Circle." (Trial Tr. 2/14/23, pp.133).

So, what evidence would the jury have relied upon to reasonably infer that all the money from Turasky and Burg did not go to Green Circle?  The only evidence was that the money all went, eventually, and "eventually" precisely met Turasky's and Burg's stated expectations. And, since the money was permitted to take this path, sending it on to Green Circle was not, as the Court stated, a "repayment" and, "therefore not a defense." The jury's acquittal proved all the money went.

### Conclusion

Defendant anticipated that the Court would order government to respond to the Motion for Reconsideration, especially because the Court's explanation for why it sustained the jury verdicts related to the wire fraud on Turasky (Count 1) and Burg (Count 2) - which are also the only thing supporting the money laundering convictions – did not relate to what was charged in the SSI, or even presented during trial, let alone

proved during trial. The entire "personal expenses" as a basis for the convictions arose during the June 6, 2023, hearing. But we cannot move to reconsider the motion to reconsider. As it stands, the Court has suggested that trial defense counsel – whom the prosecutor refers to as doing a "disservice to the defense bar" – was deficient in failing to point out the circumstantial evidence that did not support the jury's verdict. There was none and, in fact, we did point that out.

In reality, what the Court has done, inadvertently, was to shift the burden of proof from the government to the defense to prove that Harbour did *not* use Turasky's and Burg's money for personal expenses whereas the Court should have required the government to prove he did use their funds for personal expenses beyond a reasonable doubt, precisely what Judge Campbell found that had occurred in *Szilagyi*. For example, the Range Rover. It could have been a business expense and it could have been a personal expense. It was for the government to prove it was a personal expense beyond a reasonable doubt. So too, the Oak Tree to DNA Management to Harbour's personal account might have been a business expense (salary or reimbursement) or a personal expense. It was for the government to prove these were not business expenses.

Now, the irony is that, whereas the SSI stated that Harbour used Burg's money for "personal" expenses, it did not state that he used Turasky's money for personal expenses. Exhibit 908, the tracing of Burg's money by Jeanette Paige, doesn't show a thing that could be remotely considered a personal expense (given that Exhibit 27, the Amex statements, were never introduced). However, Exhibit 912 (Turasky), had expenses listed

that the government could have tried to prove beyond a reasonable doubt were personal expenses but Harbour was never charged with that in the SSI.

By not requiring the government to respond to the Motion for Reconsideration, the Court excused the government entirely from ever having to sustain that burden of proof. Someone – and since the Court did not require the government to do it – respectfully, the Court is the only "someone" that can – must explain what circumstantial evidence was introduced. Merely concluding that circumstantial evidence existed is completely insufficient. Recall that there was not even any testimony about what Exhibits 908 and 912 showed, let alone that the expenses on them were "personal" in nature.

In actuality, all the circumstantial evidence points to the undeniable fact that OakTree, like Green Circle, was a real business. It had a location for which it paid rent. It had employees who earned salaries and it had business relationships that extended to Illinois (Turasky), California (Burg), and South Dakota (Green Circle), meaning there would be travel and entertainment expenses. It used electricity. And water. And supplies. In short, OakTree had the usual myriad of business expenses. In contrast, there was no circumstantial evidence that shows that any of the expenses were actually personal in nature.

In light of the forgoing, we respectfully and humbly ask the Court to clarify its ruling that denied the motion to reconsider without requiring a government response.

RESPECTFULLY SUBMITTED this 16<u>th</u> day of August, 2023.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter

Justin R. Vanderveer
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Attorneys for Defendant David A. Harbour

### **CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2023 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez