GARY M. RESTAINO
United States Attorney
District of Arizona
KEVIN M. RAPP
Arizona State Bar No. 14249
Email: kevin.rapp@usdoj.gov
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-19-00898-PHX-DLR (DMF) |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION OF RENEWED RULE 29 MOTION[Doc. 764]** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

## INTRODUCTION

The jury found that Defendant David Allen Harbour (Harbour) committed wire fraud by misrepresentations and omissions to victims Turasky and Burg (and PAIF for that matter). In so doing they further found that Ex. 516 was among a number of forged and false documents that Harbour used to perpetuate his fraud and rejected Harbour's claim that it was authentic. In addition, the government presented substantial evidence that Harbour used Burg and Turasky's funds for personal expenses, and Harbour presented no evidence to contradict that evidence.

In considering now a third renewed motion for judgment of acquittal the court should find that all inferences, credibility determinations, weight of the evidence, and draw justifiable inferences of fact in favor of the government and reject Harbour's motion.

## COURT'S QUESTIONS

**1. The Government has argued that the exhibit Defendant relies on in his post-trial motions—Exhibit 516, dated June 23, 2016, prepared by Purifoy and sent to Alonzo Primus, the Green Circle Treasurer—is part of the fraud, and not an accurate document.**

**a. Assuming, for purposes of this question that Exhibit 516 is accurate, does the Government agree with Defendant's contention that Exhibit 516 shows that the Turasky and Burg money was deposited into the Green Circle account? If not, explain with citations to the record.**

**i. The jury rejected Harbour's claim that Ex. 516 was accurate and accepted the Government's argument that it was a false document.**

In short, as detailed in the testimony of FBI Forensic Accountant Jeanette Paige ("Paige") and supplemented with trial exhibits 908, 909, 912, and 913 it shows that the total amount of funds that Turasky and Burg provided to Harbour were *never* deposited in Green Circle as represented by Harbour's fraudulent Ex. 516.

As argued to the jury, Paige's testimony and the summary charts (Exs. 908, 909, 912, and 913) demonstrate that Exhibit 516 is not accurate. Indeed, the Government argued in closing argument that it was a fraudulent document and cited the relevant testimony from Paige. ((Paige)Trial Tr. 2/17/23 (pm) p. 129). The jury obviously agreed with the government's evidence and arguments, rejected Harbour's claim, and found him guilty. *Jackson v. Virginia,* 443 U.S. 307, 319, (1979) ("In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government". All permissible inferences must be drawn in the government's favor. *Id.* In addition, the court must be careful to avoid usurping the role of the jury. In *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984), upon a motion for judgment of acquittal, "the Court 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'

1    " *Id.* (quoting *Curley v. United States,* 160 F.2d 229, 232 (D.C.Cir.1947)).

2    Here, the court must accept the jury's conclusion that Ex. 516 was, like many of

3    Harbour's documents that were admitted during trial (or in some cases Harbour attempted

4    to admit certain documents that were rejected) false. Rule 29(c) does not provide the trial

5    court with an opportunity to "substitute its own determination of ... the weight of the

6    evidence and the reasonable inferences to be drawn for that of the jury." *Id.* In fact, if the

7    court "concludes that either of the two results, a reasonable doubt or no reasonable doubt,

8    is fairly possible, [the court] must let the jury decide the matter." *Curley,* 160 F.2d at 233.

9    Based on the totality of evidence presented at trial, the jury rejected Harbour's argument

10   that Ex. 516 was accurate and accepted the government's evidence that 516 was just

11   another document that Harbour manufactured.

12   **ii. The tracing of Oak Tree Management.**

13   *First,* Ex. 516 represents that there was a total of $2,990,203.81 sent to Green Circle

14   from 5 funding sources, related to Harbour's entity, Oak Tree Management ("OTM"),

15   between August 6, 2014, and October 16, 2015. (Ex. 516, p. 51) Although Ex. 516 was

16   purportedly created and sent by Harbour (or Harbour's employee Purifoy at his direction)

17   indicating the source and application of funds related to OTM, including those from CIF I

18   (Turasky), that, by itself, does not make the document an accurate accounting of OTM.

19   (Trial Tr., 2/14/23 am, p. 131).

20   *Second,* according to Exhibit 516, CIF I contributed $350,000 to Green Circle, OTM

21   provided $412,203.81, KC Lending (Dunsworth) provided $1,160,000, the Joplin Group

22   (led by Deel) provided $1,035,000 and there is an additional line item of Joplin Accrued

23   Interest that lists $33,000. FTC Receiver Larry Cook identified some of the individuals as

24   the Joplin investors, namely Deel and Simpson. ((Cook) Trial Tr, 2/8/23, pp. 43, 52) The

25   Joplin investors were further identified in an email and attachments sent from Purifoy to

26   Wear. *(See* Ex. 516*; Id.*; ((Purifoy) Trial Tr., 2/14/23-am, p.127; Trial Ex. 669). Those

27   investors included Deel, Ronnie Simpson, Donnie Simpson, Trey Butler, Frank Winkler,

28   and Wear. (*Id.*)

Importantly, absent from the Exhibit 516 is a line item for Burg and Wear (Wear sent funds intended for Green Circle directly to Harbour). ((Paige) Trial Tr, 2/23/23, p. 21; Trial Ex. 694; Trial Ex. 916) Less than half of Wear's funds were sent to Green Circle. (*Id.* at 22; Trial Exs. 694, 916). Harbour used Wear's funds for the downpayment of the Harbour's Martingale residence (Trial Exs. 669, 916)).

Ex. 516 demonstrates that outside of KC Lending, the Joplin Group, and the Joplin Accrued Interest, the two remaining line items of sources of funds are CIF I and OTM. Collectively, the falsified accounting indicates that the combined amount provided to Green Circle from CIF I and OTM is $762,203.81 ($350,000 + $412,203.81), (Ex. 516, p. 57). This amount is approximately half of the $1.5 million that was provided by Turasky and Burg. However, as detailed below, these line items contained in Ex. 516 are misrepresentations. According to Ex. 516, Deel's Joplin Group provided $1,035,000 and possibly an additional $33,000 related to the Joplin Accrued Interest line item. Not only is this a false statement due to the fact that Burg's funds have wrongfully been included in this calculus (see below), but the total amount of funds are still below the $1.1 million provided by the Joplin Group. (Trial Ex. 669).

Harbour's argument that [he] was only responsible for ensuring that the funds reached Green Circle (Doc764, pgs. 5-7) fails. Because Harbour never testified his responsibility for these funds was never presented to the jury. In sum, there is no countervailing credible evidence that rebuts Paige's forensic analysis. Last, by their verdict, the jury rejected Cameron's testimony and the Court should accept the jury's determination.

**iii. Paige's Testimony**

Paige testified that out of the $1,000,000 in funds provided by Burg, only $600,000 was actually provided to Green Circle between the dates of December 3, 2014, and January 9, 2015. ((Paige) Trial Tr., 2/17/23 pm, pp. 182-189). This information is detailed in Ex. 908. According to Ex. 516 , the following funds (and the only funds) that were provided to Green Circle during the same time frame are listed below:

| Source | Date | Amount |
|---|---|---|
| CIF I (Turasky) | 12/03/2014 | $100,000 |
| CIF I (Turasky) | 12/15/2014 | $35,000 |
| OTM | 12/15/2014 | $90,000 |
| Joplin Group | 12/23/2014 | $150,000 |
| Joplin Group | 01/05/2015 | $125,000 |
| Joplin Group | 01/09/2015 | $100,000 |
| Total: | | $600,000 |

(Trial Ex. 516)

Again, Paige testified to the tracing analysis and the use of Burg's remaining funds, to include $223,121.88 for an American Express payment (Money Laundering Count #20) and a *Ponzi*-payment in the amount of $9,333.33 on December 16, 2014, to CIF I, (Turasky). ((Paige Trial Tr, 2/17/23 pm, pp. 184-186). The Los Angeles based Burg was an investor in the Wyoming LLC Pujanza and, therefore, not a member of the Joplin (Missouri) Group and his funds have been fraudulently identified as being sourced from that group according to Ex. 516. (*See* Ex. 669).

**iv. Turasky (CIF I) Funds**

The application of CIF I (Turasky) funds; according to Ex. 516, the remaining funds sourced from CIF I that total $215,000 are listed as follows:

| Source | Date | Amount |
|---|---|---|
| Capital Investment Fund I (Turasky) | 08/06/2014 | $50,000 |
| Capital Investment Fund I (Turasky) | 10/03/2014 | $15,000 |
| Capital Investment Fund I (Turasky) | 10/23/2014 | $100,000 |

| Capital Investment Fund I (Turasky) | 11/27/2014 | $50,000 |
|---|---|---|
| Total | | $215,000 |

(Trial Ex. 516)

Paige testified to the source and application of the funds provided by CIF I (Turasky) and the information was presented to the jury in Ex. 912. ((Paige) Trial Tr., 2/17/23 pm, pp. 162-176) Paige identified CIF I's $50,000 funding to Green Circle on August 6, 2014, that matched Ex. 516, as well as an additional $5,000 sent on August 28, 2014, which was not captured in Ex. 516. (*Id.* at 168, Ex. 912, Ex. 913). These were the only CIF I monies that were provided to Green Circle (*Id.*). It should be noted that Paige's tracing analysis detailed in Ex. 912, details the uses of CIF I's monies to include the following non-business expenses:

- $12,083.90 a *Ponzi* payment to previous investor Grissinger Holdings (Money Laundering Count #17)[1];
- $142,785.88 American Express payment (Money Laundering Count #18);
- $11,518.75 payment to Rancho Solano Preparatory School;
- $7,500 a rental payment for Harbour's residence;
- $2,514.77 payment to the Land Rover Financial Group for Harbour's vehicle.

(Trial Ex. 912)

The applications of funds received from CIF I, $150,000 was sent to Capital Investment Advisor (Turasky) on July 31, 2014, after the $500,000 funding to OTM on July 30, 2014. ((Paige) Trial Tr., 2/17/23 pm, pp. 162-166; Exs. 912, 913). The purpose of this transfer was not a return of investment funds, but as a repayment of expenses incurred

---

[1] Cathey and Gunnison both testified that Grissinger was yet another investor defrauded by Harbour. ((Cathey and Gunnison) Trial Tr. 2/8/23, pp. 58-12 )

by Turasky. ((Turasky) Trial Tr., 2/10/23 am, pp. 89, 190). Paige testified that she identified $150,000 paid to Harbour's Blue Pine Management US Bank x0819 in April of 2014 from The Capital Companies, an entity managed by Turasky. ((Paige) Trial Tr, 2/23/23, p. 79). Turasky testified regarding his payment of expenses in the amount of $150,000 in legal expenses that were to be reimbursed by Harbour. Importantly, this Court may recall that Harbour misled the FTC about his knowledge of Blue Pine Management. ((Turasky) Trial Tr, 2/10/23 – am, pp. 97-99, Ex. 211, pp. 243. lines 13 -17, 19-25). He claimed he wasn't involved in Blue Pine management despite being a signatory on the account. ( FTC deposition, Ex. 211 p. 260; Ex. 66, p. 78 )

In addition, Turasky testified that he sought and won a judgment against Harbour and OTM in the amount of $500,000 plus the $150,000; clearly two separate transactions. ((Turasky) Trial Tr, 2/10/23, p. 227; Exs. 261, pp. 72-97, 349, 384, pp. 25-27, 397, and 895).

In sum, the testimony of both Turasky and Paige, in addition to trial exhibits were considered by the jury. Whether this Court agrees that the amount of CIF I's total funds for Green Circle were either $350,000 or $500,000 does not matter. Neither amount of CIF I funds were transferred to Green Circle. The funds sent to Green Circle on October 3 and 23, 2014; and November 27, 2014, were misrepresented in Ex. 516 as being sourced from CIF I. The source of these funds was a modest deposit as indicated in Ex. 507. Harbour received $100,000 on October 22, 2014, and $100,000 on November 24, 2014, in funds from Deel as part of Harbour's 2nd mortgage on his Silverleaf property. ((Purifoy) Trial Tr., 2/14/23 am, pp. 88-91; Ex. 507)

### v. Harbour's Omissions regarding his finances

The Second Superseding Indictment ("SSI") (and the two previous indictments for that matter) placed Harbour on notice that the government's case involved not only misrepresentations but references omissions five separate times throughout the SSI. (*See* Doc. 387, ¶s 1,36,55, 56) The specific omissions were supplemented when this Court

ordered the government to provide a bill of particulars (BOP). (*See* Order at Doc. 222, Doc. 228 – BOP filed 03/22/2021, BOP filed 01/11/2022, BOP filed 12/08/2022).

Accordingly, Harbour was clearly on notice of the United States' theory from three separate indictments, a BOP, discovery (including Jenks Act statements disclosed well before the government's obligations), and numerous pretrial pleadings. 18 U.S.C. 3500; *United States v. Long,* 706 F.2d 1044, 1054 (9th Cir.1984) ("Rule 7(f) of the Federal Rules of Criminal Procedure provide that the Court may in its discretion require a bill of particulars where necessary to inform the defendant of the charges against him, to minimize the danger of surprise at trial, to prepare for the defense, and to protect against double jeopardy. In deciding whether to order a bill of particulars, a court "should consider whether the defendant has been advised adequately of the charges through the indictment and *all other disclosures made by the government*."(emphasis added) A defendant, however, is "not entitled to all of the *evidence* the government intends to produce, but only the *theory* of the government's case." *United States v. Sanchez,* 2020 WL 7248104 (citing *United States v. Dunn*, 841 F.2d 1026,1029 (10th Cir 1988) ("finding that an indictment gave the defendant adequate notice of the allegations against which defense was required where the indictment quoted the relevant statutory language, and included the date, place, and subject matter of the alleged offense. ***An indictment need not go further and allege in detail the factual proof that will be relied upon to support the charges***." (emphasis added) In sum, Harbour was repeatedly fully informed of the government's theory regarding omissions.

**vi. Harbour did not have business expenses to be reimbursed.**

Importantly, as detailed at trial, Harbour's claim that he was reimbursed for business expenses is based on a false predicate: Harbour did not have independent wealth or funds available to invest in the start-up of a new company (Green Circle) and as such, there would not have been any reimbursed business expenses due to Harbour. Again, at the time Harbour started Green Circle he was relying on investor funds for subsistence. ((Bobrow), Trial Tr, 2/15/23, p. 62 ; Ex. 744)

As this Court knows, Harbour's payday lending scheme involving Joel Tucker had been seized in September 2014 after numerous consumer complaints. ((Cook) Trial Tr., 2/28/23, p. 122; Ex. 3). His is previous KSQ/DNA/ Northrock disaster was never disclosed to either Turasky or Burg. ((Burg) Trial Tr, 2/16/23 am, p. 45; (Turasky) Trial Tr., 2/10/23, p. 207) As the Court may recall Harbour's statements to Cook, demonstrated that Harbour was living off of funds from Dunsworth, Deel, (and unbeknownst to him) Bobrow. (( Bobrow) Trial Tr, 2/15/23 p. 62). In addition, Cook testified that Harbour told him that he was $20 million in debt during this time. ((Cook) Trial Tr., 2/8/2023, p. 54.) Again, his dire financial picture was not disclosed to Turasky or Burg. In sum, his financial picture was material to both Turasky and Burg's decision to invest. Last, Cook attempted to claw back the $6.6 million Harbour received related to Canyon Road. (*Id.*).

In addition, in 2013 Cathey testified that Harbour told him that, "[he] had no money, that he was living with his in-laws, and that he was broke." ((Cathey)Trial Tr., 2/8/23, p. 83). Harbour told Cook that he was living off of funds from Deel, Dunsworth and Bobrow for living expenses to the tune of $200,000 per month. ((Cook) Trial Tr., p. 122; Ex. 3). In sum, the jury clearly rejected Harbour's manufactured claim that the diversion of Turasky and Burg's funds were for reimbursed business expenses. This Court should as well.

**b. List the evidence the Government relied on when it informed the Court during oral argument that Exhibit 516 was part of Defendant's fraud and not accurate.**

The government relied on trial Exs. 908, 909, 912, and 913 that demonstrated that both Turasky and Burg's funds were diverted for Harbour's personal expenses. In addition, Paige's testimony explained the tracing of the money to Harbour's personal expenses. ((Paige) Trial Tr, 2/17/2023-pm, pp. 182-189).

Importantly, trial testimony and exhibits demonstrated that Harbour was a serial forger of documents and would manufacture a false document to give an investor an impression the investor's money was actually going to the represented destination or that the investment even existed. As this Court knows from trial testimony and exhibits Harbour frequently manufactured numerous false documents and email addresses, or used other's

email addresses to further his fraudulent scheme. Below are just a few examples:

- The Pat Spaulding fraudulent promissory note and email. (Trial Exs. 140, 781, 782).
- The use of Purifoy's email address *after* she left Harbour's employment ((Purifoy) Trial Tr, 02/14/2023, pg. 40; Ex. 640, 642, 644).
- The creation of the Pat Spaulding email address in 2014 (five years after Spaulding's death) in Scottsdale. (*See* Trial Exs. 136, 167)
- The use of Bobrow's cellphone and iPad to convince Turasky to provide $500,000. ((Bobrow) Trial Testimony, 02/15/2023, p. 94).
- Introduction of two false gift letter as 404(b) evidence. ((Bobrow) Trial Tr., 2/15/23, p. 11; Exs. 113, 114).
- Engagement letter with Robert Eckholt's forged signature. ((Eckholt)Trial Tr. 2/2/23, pp. 217-220; Ex. 217)

Last, Harbour unsuccessfully attempted to introduce false documents that had "recently" been located to support his false narrative. During the cross examination of Turasky defense counsel attempted to introduce a Harbour created document that Turasky had never seen ((Turasky) 2/10/23(am), pp. 175- 204) Harbour also manufactured a back dated promissory note dated in 2010 but never signed by Gray. ((Gray) Trial Tr. 2/2/23, p. 170)

**c. Did the Government present any evidence or argument to the jury, that the accuracy or reliability of the information contained in Exhibit 516 was in dispute or that its accuracy was a question of fact?**

Again, exhibits 908, 909, 912, and 913 demonstrates that Burg and Turasky's money was diverted for personal expenses. Importantly, Harbour never disclosed to either Burg or Turasky that he intended to use the funds for his children's tuition, his car payment, payments to other investors, etc. Therefore, because the money was not put in for its intended purposes it could not have generated the returns represented by Harbour because it was never loaned out to consumer borrowers.

- 10 -

1    The United States argued that the email sent by Purifoy to Primus (Ex. 516) was
2  inaccurate during closing argument. (Trial Tr. 2/28/23, p. 129; *See* Ex. A Government
3  Power Point used to supplement closing argument) Therefore, the jury by their verdict
4  accepted this argument and rejected Harbour's claim that Ex. 516 was accurate. *United*
5  *States v. Sierra*, 2013 WL 458276 (S.D. N.Y. 2013)("A motion for a judgment of acquittal
6  on the ground that the evidence underlying the conviction was insufficient to sustain a
7  guilty verdict does not provide the trial court with an opportunity to substitute its own
8  determination of the weight of the evidence and the reasonable inferences to be drawn for
9  that of the jury; if a court concludes that either of the two results, a reasonable doubt or no
10 reasonable doubt, is fairly possible, the court must let the jury decide the matter."); *United*
11 *States v. Dimora*, 879 F. Supp. 2d 718 (N.D. Ohio 2012)("Under the *Jackson v. Virginia*
12 standard, a court considering a motion for judgment of acquittal does not reweigh the
13 evidence, re-evaluate the credibility of witnesses, or substitute its judgment for that of the
14 jury.")

15    **d. Was there any tracing of the money into Green Circle that contradicts**
16       **Defendant's contention?**
17    Again, exhibits 908, 909, 912, and 913 show the money was diverted to Harbour's
18 personal expenses. *See* arg, *infra.*

20 **2. What is the evidence that $350,000, representing some or all of Turasky's**
21 **investment, did not reach Green Circle?**
22    The account tracing by Paige and exhibits 912 and 913. ((Paige) 2/17/2023-pm,
23 pp. 182-189)

25 3. **What is the evidence that the $1 million Burg investment did not all reach Green**
26 **Circle?**
27    Paige's testimony in combination with Exs. 908 and 909 demonstrate that all of
28 Burg's money did not reach the Green Circle account.

- 11 -

1

2      **4. For purposes of this question, assume the Court will follow the reasoning employed**

3      **in** *United States v. Szilagvi*, **No. CR13-116-01-PHX-DGC, 2018 WL 6620506, at \*3 (D.**

4      **Ariz. Dec. 18, 2018).**

5          **a. To prove that the funds did not end up at Green Circle, would Green Circle's**

6          **accounts need to be traced up to the time of the indictment?**

7          First, PAIF took over the Green Circle portfolio in September 2016 after learning that

8      Harbour had defrauded them regarding the massive default of the consumer borrowers.

9      (*See* Doc. 779; Ex. A ) PAIF seized only $46,000 of funds remaining. Not $1.1 million as

10     falsely claimed by Harbour at trial. Following this seizure the SEC filed a complaint against

11     Harbour and sought the depositions of Burg, Turasky, Wear, Dunsworth and Harbour. In

12     sum, the Green Circle accounts did not need to be traced as Paige's analysis demonstrated

13     that Burg and Turasky's funds had already been diverted for personal expenses.

14         Paige's testimony regarding the tracing of funds for the Green Circle account, exhibits

15     908, 909, 912, and 913 show Burg's funds were diverted for personal expenses. ((Paige)

16     Trial Tr., 2/17/2023 (pm), pp. 181-189) Harbour relies upon Exhibit 516 and that includes

17     a fraudulent accounting that allocates the source of funds provided to Green Circle. As

18     pointed out above (and at trial), this is a false document. The government traced the funds

19     provided by victims Burg, Turasky and Wear. In addition, the government identified funds

20     provided by Deel and members of the Joplin Group. (Ex. 669) Lastly, the remaining

21     funding source line item listed on Exhibit 516 is *KC Lending*, Dunsworth's entity.

22         *United States v. Szilagvi,* 2018 WL 6620506, is distinguishable from the instant case

23     for an array of reasons that are important to consider before addressing the tracing that was

24     done in that case. The most important difference is that the judge was the fact finder in

25     *Szilagvi*, but a jury was the fact finder in the instant case.

26         *First*, the *Court* in *Szilagvi* found that the government presented no evidence regarding

27     Defendant's education or past business experience. *Id.* at 2. Here, the United States

28     presented substantial evidence that Harbour misled both Burg and Turasky about his

- 12 -

experience. For example, he failed to disclose that his previous pay day venture (KSQ/DNA/Northrock) was an utter failure resulting in numerous consumer complaints and an FTC seizure. ((Cook) Trial Tr., 2/28/23, p. 122; Ex. 3). He also failed to disclose millions in personal guarantees and that he was subsisting off of other investors money. ((Turasky) Trial Tr, 2/10/23 - am, pp. 126-128; (Cathey) Trial Tr, 2/08/23 - am, pp. 69 - 70; (Gunnison) Trial Tr, 2/08/23 - am, pp. 121 - 122; (Denhoff) Trial Tr, 2/08/23 - pm, pp. 94 – 95; (Bobrow) Trial Tr, 2/15/23 - pm, pp. 73 – 79; (Burg) Trial Tr, 2/16/23 - am, p. 45) And, his apparent outward success was a veneer as he had no real money of his own. Indeed, there was evidence that he even lied about his educational background claiming that he was a CPA and that he attended the Wharton School at University of Pennsylvania. (Gunnison) Trial Tr., 2/8/23, p. 115 ; (Eckholt) 2/2/23, p.201)

Also, In *Szilagvi* the investors were referred to Szilagvi because she apparently had experience in international finance. *Id* at 2. Both victims testified that they inquired of various sources regarding international financing and ultimately were referred to Defendant. *Id.* The government presented no evidence to explain why persons referred the victims to Defendant unless she had some involvement in international finance. *Id.*

Here, in contrast, neither Burg nor Turasky were referred to Harbour because he was recognized as a savvy investor rather, they were cultivated by Harbour over time. Upon an initial introduction (Turasky) at Whisper Rock and (Burg) at El Dorado neither immediately invested with Harbour. ((Turasky) Trial Tr, 2/09/23, pp. 190; (Burg) Trial Tr, 2/16/23, pp. 20-41) Instead, Harbour groomed them over time by rubbing shoulders with them at private golf clubs. In Turasky's case, Harbour lavished him with access to sideline football games at ASU. ((Turasky) Trial Tr , 2/9/23,(am) p. 197). Unbeknownst to Turasky, Harbour was ultimately unable to pay for the expensive 50 -yard line suite he had acquired there.

Similarly, with Burg, Harbour gave him (and Burg's friends) access to golf rounds at exclusive golf clubs in the Phoenix area. ((Burg) Trial Tr., 2/16/23 (am), p. 37 ; Ex. 567) Harbour generally bragged about his 40th birthday party that included a private concert with

the 1970s rock band the Eagles, drove an expensive vehicle at Gozzer, had dinners with Turasky at the expensive Steak 44 where Harbour flaunted the AMEX black card (that Harbour never qualified for), and Burg observed Abby's enormous wedding ring, and Harbour even expressed interest in a $7.5 million Beverly Hill's mansion. ((Turasky) *Id.* 02/09/2023 at p. 197-199; (Burg) *Id.* at 02/16/2023, p. 24, 63-66). All of these lavish gestures and flaunted material wealth gave Turasky and Burg the false impression that Harbour was successful. ((Turasky) *Id.* 02/09/2023 at p. 200-201; (Burg) *Id.* at 02/16/2023, p. 24). In reality he wasn't. As noted above he was living off investor money in 2014 and was losing his home and having his car repossessed. ((Cook) Trial Tr. 02/07/2023, pp. 191-199; Ex. 744; (Cathey) Trial Tr, 2/08/23 p. 83; (Bobrow) Trial Tr, 2/15/23 pp. 62, 82).

Another important difference between Szilagvi and Harbour is Szilagvi actually undertook efforts to obtain financing. She arranged for the victims to meet twice with a vice president of a Swiss bank – an individual researched by both victims and found to be legitimate and credible. *Szilagvi* at 2. Defendant held more than six meetings with the victims, had them complete substantial paperwork, traveled back and forth to Europe, traveled to China, and appeared to work on obtaining the financing over the course of several years. *Id*. at 3.

Again, in contrast, Harbour never introduces Burg to anyone involved in the investment or even explained what the investment concerned. He provided vague explanations and just took Turasky's and Burg's money and immediately diverted to pay his personal expenses.

Moreover, in Szilagvi the court found that the defendant made wild claims about how she could " quintuple Matt Logan's $100 million on a "trading platform" in three months, her assertion that she could obtain gold bullion in Asia as collateral for the loans and fly it back to Zurich on the plane with her, her recorded telephone rants when talking with Frank D'Aries, and her "Year of the Truth" questionnaire in which she posited a series of odd questions, including questions about the borrower's religion and "Political Persuasion." *Szilagvi* at 3. The Court concluded that considered as a whole, the evidence suggests that [Szilagvi]is eccentric, even if she is competent to stand trial. *See* Doc. 141

Again, Harbour is distinguishable as he just claimed he had made 20-30% returns for previous investors. ((Burg) Trial Tr, 02/16/2023 - am, pp. 42) This of course was untrue, and Harbour knew it was false as the previous payday lending scheme had collapsed with him owing $20 million in personal guarantees to certain investors and in debt to many others, including Rhonda Gray. ((Cook) Trial Tr. 02/07/2023 - pm, pp. 194-199; Ex. 744; (Turasky) Trial Tr, 2/10/23 - am, pp. 126-128; (Cathey) Trial Tr, 2/08/23 - am, pp. 69 -70; (Gunnison) Trial Tr, 2/08/23 - am, pp. 121 - 122; (Denhoff) Trial Tr, 2/08/23 - pm, pp. 94 – 95; (Bobrow) Trial Tr, 2/15/23 - pm, pp. 73 – 79; (Burg) Trial Tr, 2/16/23 - am, p. 45). In *Szilagvi* , the defendant represented that the loans would close on a certain date. *Id.* at 3. The Court found that it was wildly suspicious but did not demonstrate that she had the requite intent to defraud. *Id.* Here, Harbour never disclosed that the other investors had been net losers in previous schemes and that Green Circle was a desperate attempt to recoup losses and stave off lawsuits, and even a criminal investigation. He never disclosed to the investors that the consumer borrowers involved in Green Circle were in default. Importantly, he never disclosed that he was going to use a substantial portion of Burg and Turasky's money for personal expenses.

Again, it is unclear what business-related expenses Harbour had incurred as they were never identified by Harbour's "expert" during trial. Last, Harbour tried to explain away the SEC complaint and Burgs requirement of a SEC deposition as Harbour having such success with the investment. ((Burg) Trial Tr. 02/16/2023 - am, p. 72). In sum, *Szilagvi*, is inapposite and distinguishable.

Finally, it is only after you consider all the factual differences between the schemes employed by *Szilagvi,* and Harbour do you compare what they did with the funds. With *Szilagvi*, the court placed emphasis on the fact that not all of Szilagvi's accounts were traced. Here, the entirety of Burg and Turasky's funds never reached Green Circle. Period. That material fact was never disclosed to either Turasky and Burg and would have impacted their decision to provide Harbour funds in the first instance. Importantly, the fact that the entirety of those funds never reached Green Circle made it all the more unlikely

that Harbour could generate the promised returns of 20-30%. The other line items in Ex. 516 have been accounted for to demonstrate that the accounting in Ex. 516 was a misrepresentation.

In the financial analysis, Paige traced Burg and Turasky's funds and determined that those funds were diverted for Harbour's personal expenses. There was no credible identifiable evidence of legitimate business expenses. It was important for the jury to focus on Harbour's actions *before* he received money which included numerous misrepresentations and omissions to further his fraudulent scheme. His misrepresentations were noticed in a series of superseding indictments, a Bill of Particulars, discovery and various pretrial pleadings, etc.

**b. How could tracing that ended before the indictment be relevant to show that the money invested by Turasky and Burg was never placed into Green Circle?**

Paige's testimony, exhibits 908, 909, 912, and 913 show that Burg and Turasky's funds were dissipated ((Paige) Trial Tr, 2/17/23 -pm, pp. 181 – 189 and 2/23/2023, pp. 12 – 75; Exs. 908, 909, 912, 913). There was sufficient tracing analysis and the source of funds identified and entered into evidence for jury to find that not all of Burg and Turasky's funds were provided to Green Circle as represented by Harbour. ((Paige) Trial Tr., 2/17/23 - pm, pp. 162 – 189; 2/23/2023, pp. 12 – 75; Exs. 908, 909, 912, 913) In addition, any remaining investor funds identified in Exhibit 516, notably from the Joplin Group or KC Lending, have been identified in additional discovery to include wire transfer details and additional bank statements. Once PAIF confronted Harbour regarding the financials of Green Circle, he abandoned his position and the tribe surrendered what was left of the portfolio to PAIF in 2016, years before the indictment was filed.

**5. The SSI stated that Turasky's money was used to make Ponzi payments. Was any evidence (direct or circumstantial) of that introduced at trial?**

Paige's testimony supplemented by exhibit 912 shows that a payment was made to another investor John Grissinger with Turasky's payment. Again, Harbour never

represented that he was going to use Turasky's money to pay other investors. Both Burg and Turasky testified that had they known their funds were to be used to pay other investors they would not have invested as it would have been material to Turasky's decision to invest funds. ((Turasky) Trial Tr, 2/9/23, pp. 237-238; 2/10/2023, pp. 210-212)

**6. The SSI does not charge that Defendant used Turasky's or Burg's money for personal expenses. Why isn't the theory employed by the Government and accepted by the Court (the diversion of the funds to private expenses as a theory of fraud) either a constructive amendment of the SSI or fatal variance?**

Evidence that Harbour used both Turasky and Burg's investments for personal expenses neither constituted a constructive amendment nor was a prejudicial variance of the allegations in the Second Superseding Indictment for wire fraud, where the government provided ample evidence to establish Harbour's numerous misrepresentations and omissions in the charged scheme to defraud investors.

 Evidence at trial that Harbour used investor funds, diverted for personal expenses, was admitted to demonstrate Harbour's knowledge and furtherance of the scheme, and provided the jury a circumstantial explanation of why Harbour was only able to make a few quarterly payments before his scheme collapsed. In sum, the evidence was not materially different from what was alleged in the SSI. There was no constructive amendment or prejudicial variance of the SSI.

> *First*, the SSI provides notice to Harbour when it states:
> *HARBOUR then used the investment funds for purposes other than what was promised to investor-victims, such as for personal living expenses to support his family's lavish lifestyle to include, but not limited to, private golf resort membership fees, substantial personal credit card payments, extravagant parties, mortgage payments, an expensive power boat, private chartered jets, and other business ventures.*

(Doc. 387)
Furthermore, Harbour only provided $600,000 to Green Circle and used the remaining funds ($400,000) at his disposal to make payments to his American Express credit card and for lavish family vacations, among other personal

expenditures. Turasky, Victim R.T., invested $500,000, and only $55,000 went to Green Circle. Similar to Burg's funds, Turasky's funds were used to pay the balance on Harbour's American Express credit card and make Ponzi payments to other investors. (Doc. 154)

Second, where an objection to the sufficiency of an indictment is untimely, as in this case here, the Ninth Circuit will construe the indictment liberally in favor of validity *United States v. Ross,* 206 F.3d 896, 899 (9th Cir.2000); *see also United States v. Coleman,* 656 F.2d 509, 511 (9th Cir.1981)(" '[W]hen an indictment is not challenged before the verdict, it is to be upheld on appeal if the necessary facts appear in any form or by fair construction can be found within the terms of the indictment.")(internal quotations and citations omitted)(*quoting United States v. Pheaster,* 544 F.2d 353, 361 (9th Cir.1976). Under this more liberal standard of review, the combination of the statutory citation, *see Coleman,* 656 F.2d at 512 ("The citation of the applicable statute provided a means by which the defendant could inform himself of [the missing] element of the offense if there were any doubt on that score." (quoting *United States v. Roberts,* 296 F.2d 198, 200 (4th Cir.1961), and the facts as set forth in the indictment provided a sufficient basis for Greene to appraise himself of the charged offense, *see Ross,* 206 F.3d at 899. Therefore, Harbour has failed to show that his constitutional rights were compromised by the SSI. *United States v. Miller,* 471 U.S. 130, 144 (1985).(" [T]he variance complained of added nothing new to the grand jury's indictment and constituted no broadening," )

*Third*, there was no constructive variance of the indictment implicated here. [A] constructive amendment occurs when 'the crime charged [is] substantially changed at trial, so that it [is] impossible to know whether the grand jury would have indicted for the crime actually proved." ' *Id.* at 765 (quoting *United States v. Von Stoll,* 726 F.2d 584, 586 (9th Cir.1984)). "An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally, or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *Von Stoll,* 726 F.2d at 586. "The line essentially is between the situation in which different evidence supports the charged crime and that in which the evidence supports a crime other than that charged." *Pisello,* 877 F.2d at 765.as

no variance in the evidence. *United States v. Pisello,* 877 F.2d 762, 764 (9th Cir.1989).

Again, here the evidence demonstrated that Harbour engaged in a scheme to obtain money or property by making misrepresentations that had natural tendency to influence a person to provide money or property. 18 U.S.C §1343. As argued *ad nauseum* Harbour engaged in a scheme where he portrayed a veneer of success when in fact, he was nearly destitute without the assistance of witting and unwitting (Bobrow) investors to provide him money. He mispresented the success of a previous payday lending operation and importantly mispresented the returns to both Turasky and Burg that were never achieved in the current payday lending operation or the previous one.

Lastly, Harbour was never prejudiced in a defense. Indeed, this Court granted Harbour wide latitude to disclose reports of two experts untimely (the notice of Dr. Manning and his report were both untimely) over the government's objection. Dr. Manning was strategically noticed just two months prior to trial where the defense misrepresented to this court that the report was completed in November 2022 when in reality it was completed on June 12, 2022. Defense counsel misrepresented to the court the following:

> THE COURT: Now, in reviewing your response, and
> correct me if I'm wrong, it looked like you were -- this was a
> trial strategy to wait till the last minute to disclose that.
> Am I reading that wrong?
> MR. DICHTER: No. Absolutely wrong.
> THE COURT: Okay.
> MR. DICHTER: All right. So I got on this case in
> February, March of 2022.
> THE COURT: I just wanted to -- because I was reading
> into it what you were saying, and it sounded like you had said
> you waited.
> MR. DICHTER: No. No. The government was the one
> that engaged in a little bit of -- and I'm not faulting for
> them, but before I got into the case, every scheduling order
> had included a last day for expert reports and addendums to
> expert reports. And once I got into the case, nothing was ever
> said about experts at all. But here's what happened.
> I got into the case --
> THE COURT: No, I don't need to hear that. All I

1
2
3
4
5
6
7
8
9

> wanted to know is were you -- was this a tactic as opposed to
> just -- how come -- how did this report come up on
> November 19th, 2022?
> MR. DICHTER: So first I inquired of a company that goes and finds
> experts, like we're all familiar with in the civil world.
> Found one. Began working with that person. But because of
> other circumstances, I didn't have enough money to pay him all
> the way through, and I couldn't use his report professionally
> without paying him.
> So when I got the money finally to pay his bill, which
> was not insubstantial, I got the report on November 16th and
> disclosed the fact that I was going to call him on
> November 16th and disclosed the report on November 23rd.

10

(Hr'g. Tr, 1/17/23, pp,. 180-182)

11

12

13

However, an email between defense counsel and Dr. Manning clearly demonstrated the report was completed nearly five months before it was disclosed, (See Ex. B; email between defense counsel and expert; Hr'g. Tr. 07/06/2022, p. 1).

14

15

16

17

18

There's more. Harbour's forensic accountant (Cameron) was noticed several years ago on 06/15/2020 (Doc. 95), but the report was not disclosed until two weeks before trial. (Doc. 575) Despite these strategically delayed disclosures the Court allowed both experts to testify and their testimony was rejected by the jury. Finally, Harbour disclosed nearly 3000 documents for use at trial there days before trial commenced. (*Id.* p. 11)

19

20

21

22

23

24

25

26

27

Here, Harbour cannot demonstrate any prejudice in mounting a defense despite defense counsel's gamesmanship regarding delayed disclosure. In addition, Harbour received Jenks Act material well in advance of the government's obligations allowing him notice of the testimony of *all* witnesses including Burg and Turasky. *See* 18 U.S.C. §3500; *Berger v. United States*, 295 U.S. 78, 82 (1935); *United States v. Hughes*, 505 F.3d 578, 587 (6th Cir. 2007) ("To demonstrate substantial prejudice, the appellant must show that the variance prejudiced his ability to defend himself or prejudiced the overall fairness of the trial") Here, there was neither no fatal variance nor constructive amendment. Harbour was not prejudiced in his defense.

28

**7. Was evidence presented at trial that Defendant did not pay any legitimate business expenses from his bank account?**

The account tracing, during Paige's testimony (Exs. 908, 909, 912, and 913) demonstrates that Harbour used Burg and Turasky funds for his personal expenses, including:

- American Express payments (Exs. 908 & 912)
- Payment to Land Rover (Ex. 912)
- Transfer to David and Abby Harbour personal accounts (Ex. 912)
- Payment to the Harbour's children school (Ex. 912)
- In addition to the AMEX analysis stated above., *arg. Infra.*

Again, Harbour had *de minimis* business expenses related to the Green Circle venture that were only the modest salaries paid to Hill and briefly to Purifoy before she departed Harbour's employment. In sum, Harbour engaged in a 12-year scheme to defraud. It is unclear what legitimate business expenses he really had.


8. **Was evidence presented at trial that Defendant did not pay any legitimate business expenses through his Amex card?**

Here, Harbour had no legitimate business expenses and none were presented at trial. Indeed, at trial, Harbour admitted no records that detail an accounting of legitimate business expenses. Purifoy was Harbour's bookkeeper but provided no evidence of business expenses and surprisingly, defense counsel never asked her about Harbour's expenses.

Both Hill and Purifoy were paid modest salaries until Purifoy terminated her employment in July 2016 when she received a subpoena from the SEC. (Trial Tr. 2/14/23, (am and pm) p. 119,165) As the Court may recall Harbour did not even have an office. First working out of Purifoy's living room and then later the garage at Ranch Gate and then Martingale. ((Purifoy) Trial Tr. 2/14/23, p. 144; (Hill) Trial Tr. 2/3/23(pm), p. 66) Martingale was obtained by fraud and wound up in a lawsuit between the real owner and

Harbour's hapless in-laws.

To the extent Harbour is claiming that the lavish travel, expensive restaurants, luxury hotels (the Beverly Hills Peninsula) were somehow legitimate business expenses defies credibility. *SEC v. Fisher*, 2022 WL 13650848, at *4 (S.D. Fla. Oct. 21, 2022) (travel and dinner-seminar expenses were "spent in furtherance of drawing in more victims [and] are not, by any stretch of the imagination, legitimate business expenses"); *SEC v. Voight*, 2021 WL 5181062, at *8 (S.D. Tex. June 28, 2021) (no deduction where defendants' own records did not address any business expenses and review of records revealed only a Ponzi Scheme, not a legitimate business.")

The SSI charged money laundering transactions associated with the Harbour's payments to the American Express card (counts 18 and 20). As detailed below, the American Express card was held in the name of Harbour's ex-girlfriend and was used to pay for her personal expenditures, as well as Harbour's and his wife, Abby Harbour's personal expenses. (Yaeger), Trial Tr., 02/07/2023, pp. 24-95; Ex. 517 and sub-exhibits of 517 thereof). The jury heard testimony of American Express nominee-account holder, Yaeger and accompanying text message exchanges between Yaeger and Harbour. Harbour directly texted Wendi and conveyed to her to allow charges to be processed that were made by Abby Harbour. For example, on January 27, 2014 ((Yaeger) Trial Tr., 2/7/23 p. 36, Ex. 517 and sub-exhibits of 517)), verification was required for Abby's charges related to pro flowers, Dick's sporting, discount dance, charges at Peoria Nissan and Hestan Vineyards. (*Id.*)

On April 13, 2014, when Harbour was relying on investor funds for subsistence, he verified he was at the U. S. Master's (Augusta, Georgia) when Yaeger contacted him and advised that AMEX needed verification of charges. ((Yaeger) Trial Tr., 02/07/2023, p. 36, Ex. 517-008). On May 6, 2014, Harbour texted that, "Abby had put 70K on the card for a new Escalade." ((Yaeger) Trial Tr. 2/7/23 (am), pp. 30-100)

Yaeger testified, on cross examination, that she was aware of Abby's usage of the American Express card increase (*Id.* 100). In addition, Yaeger also testified that per the

agreement she had with Harbour, all of her personal expenses were paid by Harbour and included that Harbour told her that she wasn't was spending enough on the card (*Id.* 102). The fact that Harbour used an AMEX card that he did qualify for and was guaranteed by a former girlfriend was never disclosed to either Burg or Turasky (or any investor for that matter). Turasky even commented on Harbour's use of the black AMEX. (Turasky Trial Tr., 02/09/2023 - am, pp. 199-201).

Paige testified to the tracing analysis and payment form used to purchase multiple items of expensive jewelry by Harbour ((Paige) Trial Tr., 2/15/23, p. 197; 2/23/23, p. 47, Exs. 867, 887-894). Harbour's former employee, Carol Hill also testified that she viewed jewelry purchases on the American Express account ((Hill) Trial Tr, 2/3/2023, p. 76).

Purifoy testified that Harbour used the American Express card for "everything". ((Purifoy) Trial Tr., 2/14/23 am, p. 55) These expenses included charges related to Harbour's boats located at his vacation home in Idaho and anything that came across from American Express. (*Id.* at 81). Purifoy reviewed expenses from American Express and booked them as either as business or personal. (*Id.* at 45-50). Furthermore, Purifoy testified that Abby's use of the American Express card was 99% personal and was usually $100,000 or more every month, in addition to Yaeger's use of the card was $3,000 to $5,000 per month. (*Id.* p. 55-56). Purifoy testified that she paid the American Express card bill from Harbour's DNA Investments bank account. *(Id.* p. 56).

Lastly as evidence that Harbour was using the AMEX for personal expenses is Yeager's testimony during the following exchange:

Q. So let's talk about this agreement where he would continue.
to make -- **pay for your charges on the card?**
A. **Correct.** He -- he always paid that card, you know, from
day one. That was the agreement.

Q. And you could see Abby's usage of the card increasing,
right?
A. Yes.
Q. And you could see that **Abby had a card**?
A. Yes.
Q. But you agreed that it was okay for her to have a card,

right?

A. He asked, yes.

Q. And you agreed?

Q. The trip to New Zealand, that was points deal, too, wasn't it?

A. No, I don't believe that was.

Q. How was that -- how did that happen, then, if it wasn't points? Was the Amex card just used?

A. Yes, I think it was used over there.

((Yaeger) Trial Tr., 2/7/23 am, pp. 30-100) )

**9. Is part of the Government's theory that Defendant was required to seek and receive specific approval from Turasky and Burg amongst categories of expenses? If so, what in the SSI provided Defendant notice of this theory?**

The SSI is clear that Harbour's scheme involved omissions that are clearly noticed in the SSI (and previous indictments), the BOP, discovery, pleadings, etc. (See Doc. 387)

Burg and Turasky testified that they understood their money would be used to invest, not to fund Harbour's lifestyle. (See Turasky Trial Tr., 02/10/2023, pp. 205-212; Burg Trial Tr., 02/16/2023, pp.73). Again, Harbour used Burg and Turasky's funds for American Express payments, a Payment to Land Rover Financial, Transfer to David and Abby Harbour personal accounts, and payments to the Harbour's children's school. ( Ex. 912) The intended purpose of the investment funds was stated to the victims. Harbour did not operate as promised and used their funds at his own discretion. As noted above, all of their funds were not sent to the intended purpose (Green Circle). (Exs. 908, 912)

**10. What evidence was presented that the payments made with respect to the "money laundering" counts enumerated in Exhibit 912 (13-19) were not business expenses?**

Again, the account tracing during Paige's testimony that demonstrated payments to American Express payments, a payment to Land Rover, transfers to David and Abby Harbour's personal accounts, and a tuition payment. ((Paige) Trial Tr, 2/17/23 - pm, pp.

164-175, Ex. 912) The money laundering counts associated with Exhibit 912 are counts 13-19 and related to the investment by CIF I (Turasky). These transactional money laundering counts are in excess of $10,000 and derived from specified unlawful activity proceeds, to wit, count 1 of the indictment ($500,000 wire fraud on or about July 30, 2014, from sender SNI Fund 1 (Turasky).

Turasky testified that had he been aware of the material omissions and knew the truth behind Harbour's false statements, and veneer of success, he would not have provided funds in the first place. ((Turasky)Trial Tr. 2/9/23(am), p. 236-238; 2/10/23(am), pp. 207-212) Harbour used the funds to make payments to previous investors (who were not part of the Green Circle investment) to include D.S. (count 13) and J.R.G. (count 17). ((Paige) Trial Testimony, 02/17/2023 - PM, pp. 164-168; Ex. 912; Doc. 687, p. 26)

The laws enacted to combat money laundering are enacted to battle the placement, layering and integration of wire fraud proceeds and the use of ill-gotten gains. The use of any funds over $10,000 that have been acquired through fraud are charged as individual counts of money laundering as transactions occur, such as the transfer of funds between Harbour's bank accounts (counts 14 & 15). (Doc. 687) Harbour's use of wire fraud proceeds is a perfect example of the spending statute in violation of 18 USC 1957 in the payment of the American Express card. The jury was provided testimony from multiple witnesses to include Harbour's former employees, the nominee-credit card account holder (Yaeger) and Paige on the charges associated with the American Express account.

**11. In the Government's view, what specifically was the lie about the bargain that Defendant employed to cheat Burg and Turasky out of their money?**

The lie (or misrepresentations and omissions) includes Harbour's failure to adequately disclose his financial picture. Also, he misrepresented his success with previous investments such as KSQ/DNA/Canyon Road.   In addition, Burg and Turasky were never informed that their funds would not be used to invest, but instead to fund Harbour's lifestyle that included:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- American Express payments
- Payment to Land Rover
- Transfer to David and Abby Harbour personal accounts
- Tuition payments
- Payments to other defrauded investors

Again, both Turasky and Burg relied upon Harbour's veneer of success of expensive cars, lavish vacation homes, costly jewelry, etc. None of this was real as Harbour had no legitimate employment and was subsisting off of investor funds.

Respectfully submitted this 25th day of September, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Kevin M. Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants who have entered their appearance as counsel of record.

 *s/Daniel Parke*
U.S. Attorney's Office