**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00898-001-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| David Allen Harbour, | |
| Defendant. | |

Before the Court is Defendant's Motion for Reconsideration of Renewed Rule 29 Motion. (Doc. 764.) The motion is fully briefed (Docs. 796-799) and for the reasons set forth herein is denied.

## I.     Background

On June 14, 2022, a grand jury returned a second superseding indictment ("SSI") charging Defendant with twelve counts of wire fraud, two counts of mail fraud, thirteen counts of transactional money laundering, one count of tax evasion, one count of making a false statement, one count of obstruction, one count of conspiracy, one count of bank fraud, and two counts of aggravated identity theft. (Doc. 387.) The SSI alleges that Defendant was involved in a scheme, dating back to January 2007 and continuing through July 2019, to defraud investors by "promoting and selling fraudulent high-yield investments, in most cases involving investments in high-rate loans to consumers and general investments." (*Id.* at 2.) Much of the alleged fraudulent activity occurred beyond

the applicable statute of limitations and was not charged in the SSI, but the Government asserted that the non-charged activity nonetheless was part of Defendant's fraudulent scheme.

On January 6, 2023, the Court entered an order (Doc. 529) granting Defendant's motion for reconsideration (Doc. 480) of his motion to sever (Doc. 446), resulting in the severance of the charges into three groups to be tried in three separate trials. The first set of charges tried were the first ten wire fraud counts, the two mail fraud counts, and the first eleven transactional money laundering counts. These charges named five victims: Princeton Alternative Income Fund ("PAIF"), Richard Turasky, Mark Burg, Allison Wilson, and Carol Hill. The SSI set forth allegations of fraud involving six other alleged victims who were not directly connected to the charges, but whom the Government contended were victims of Defendant's years-long scheme.

The jury trial on this first set of charges lasted 16 days. At the conclusion of the Government's case, Defendant filed a Rule 29 Motion for Judgment of Acquittal; or, Alternatively, for a Determination of Fatal Variances Between the Charges and the Proof Adduced, asking the Court to enter a judgment of acquittal on all counts.  (Doc. 649.) On February 28, 2023, in open court and after oral argument, the Court denied Defendant's motion. (Doc. 671.) On March 2, 2023, the jury returned its verdicts. As to the wire fraud charges, the jury found Defendant guilty of counts 1-3 and 6-8, and not guilty of counts 4-5 and 9-10. As to the transactional money laundering charges, the jury found Defendant guilty of all eleven counts (counts 13-23).  As to the mail fraud charges, the jury found Defendant not guilty on both counts (counts 11 and 12). The victims of the counts for which Defendant was found guilty were Turasky, Burg, and PAIF. Defendant was found not guilty of the counts involving Wilson and Carol Hill.

On March 7, 2023, pursuant to a plea agreement, Defendant entered a plea of guilty to count 24 (tax evasion) and counts 25-34 were dismissed.

On March 16, 2023, Defendant filed a post-verdict Renewed Motion for Judgment of Acquittal, seeking acquittal on all counts. (Doc. 699.) After a June 11, 2023, oral

1  argument, the Court issued an order granting the motion in part, acquitting Defendant of

2  the counts involving PAIF (counts 3 and 21-23), but denying relief on the remainder. (Doc.

3  757.)

4        On July 11, 2023, Defendant filed a Motion for Reconsideration of Renewed Rule

5  29 Motion. (Doc. 764.) On July 28, 2023, the Court, without ordering a response from the

6  Government, entered an order denying the motion for reconsideration. (Doc. 769.)

7        On August 16, 2023, Defendant filed a Motion for Clarification of the Court's

8  Denial of Defendant's Motion for Reconsideration. (Doc. 774.) In many respects,

9  Defendant's motion for clarification reads like a motion seeking reconsideration of an order

10 denying a motion for reconsideration. Nevertheless, given the complexity of the case, the

11 Court decided to take a second look and, on September 7, 2023, entered an order requiring

12 the Government to respond to Defendant's Motion for Reconsideration of Renewed Rule

13 29 Motion. (Doc. 780.) The Court's order also directed the parties to respond to a number

14 of specific questions and to support their answers with citations to evidence in the trial

15 record.

16 **II.     Legal Standards**

17        Motions for reconsideration should be granted only in rare circumstances.

18 *Defenders of Wildlife v. Browner,* 909 F. Supp. 1342, 1351 (D. Ariz. 1995). Mere

19 disagreement with a previous order is an insufficient basis for reconsideration. *See Leong*

20 *v. Hilton Hotels Corp.,* 689 F. Supp. 1572, 1573 (D. Haw. 1988). A motion for

21 reconsideration ordinarily will be denied "absent a showing of manifest error or a showing

22 of new facts or legal authority that could not have been brought to its attention earlier with

23 reasonable diligence."  LRCiv 7.2(g).

24        Under Federal Rule of Criminal Procedure 29(a), the Court "must enter a judgment

25 of acquittal on any offense for which the evidence is insufficient to sustain a conviction."

26 "The evidence is sufficient to support a conviction if 'viewing the evidence in the light

27 most favorable to the prosecution, any rational trier of fact could have found the essential

28 elements of the crime beyond a reasonable doubt.'" *United States v. Milwitt*, 475 F.3d 1150,

1154 (9th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Defendant challenges his wire fraud convictions and the related counts of money laundering.

> [T]he wire fraud statute, in plain and simple language, criminalizes the use of interstate wires to further, not mere deception, but a scheme or artifice to defraud or obtain money or property, i.e., in every day parlance, to cheat someone out of something valuable. It follows that to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions. In other words, a defendant must intend to deceive *and* cheat.

*United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020)

### III.   Discussion

#### A. Exhibit 516

Defendant's guilty verdicts concern loans made by Turasky and Burg. Defendant obtained money from Turasky and Burg to invest into a pay-day lending operation that Defendant promoted, called Green Circle. The primary basis of Defendant's motion is one trial exhibit, Exhibit 516, which was not mentioned in Defendant's first Rule 29 motion (Doc. 649) nor his reply to the Government's response to that motion (Doc. 665). It was first identified by Defendant as "a remarkable document" and the basis for an acquittal in his post-verdict Rule 29 motion (Doc. 699).

Defendant contends that Exhibit 516 amounts to a tracing by Laura Purifoy, Defendant's bookkeeper, of deposits made by Defendant on behalf of his investors, including Turasky and Burg, into Green Circle's bank account. Exhibit 516 consists of (1) Green Circle's BMO banking statements for the months of October 2014 through October 2015 and (2) an attachment prepared by Purifoy ("the Purifoy Attachment") accompanied by a transmittal email to Alonzo Primus dated June 23, 2016.

The premise of Defendant's motion is that Exhibit 516 is irrefutable proof that Defendant made the agreed-upon deposits on behalf of Turasky and Burg into Green Circle, through his company Oak Tree. Alternatively, Defendant contends that Exhibit 516,

at a minimum, proves that there were deposits in amounts that could have been on behalf of Turasky and Burg, and that under either scenario, because the Government did not track the source of monies into the Green Circle account, no reasonable jury could have found that he did not make the promised deposits. Consequently, Defendant contends that no factual basis exists for the jury to find that he had the necessary intent to deceive or cheat.

The BMO bank statements in Exhibit 516 do not identify any person or entity making a deposit. The Purifoy Attachment attempts to remedy that deficiency by purportedly identifying the "Oak Tree funding to Green Circle." The BMO statements start in October 2014. The Purifoy Attachment begins two months earlier in August 2014. The accuracy of the BMO bank statements is not in question. The interpretation and accuracy of the Purifoy Attachment are in question.

Defendant makes the following arguments regarding Exhibit 516:

> The Green Circle bank statements do not delineate the specific contributor of funds, the funds came to Green Circle from Oak Tree.
>
> . . .
>
> [A]n Excel spread sheet within Exhibit 516, prepared by Purifoy, showed, in part, specific individual lenders. "The top line shows Capital Investment Fund, which is Rich Turasky, investments on specific days."
>
> . . .
>
> So, where is Burg's $1 million? The uncontroverted evidence is that all of Burg's and Turasky's went to Oak Tree.
>
> . . .
>
> Purifoy testified that a net of $1.829 million went to Green Circle. . . . It was all there by October 2015[.]

(Doc. 797 at 2-3.)

> By not examining the Green Circle bank statements nor all of [Defendant's] entities bank statements, which included Oak Tree, Ms. Paige failed to account for the money that went form Oak tree to Green Circle . . . . Thus Ms. Paige "missed" $2,060,000. If we take the amount that Paige missed by not tracing the Green Circle and all of [Defendant's] entities bank statements, including Oak Tree, with the amount Ms. Paige's limited tracing showed went to Green Circle, the gross amount

1    is $3,147,103 that Oak Tree sent to Green Circle.

2    (*Id.* at 4-6.)

3    No other witness claimed that part of the net $1.829 million
     sent to Green Circle was theirs. Nothing but speculation and
4    shifting the burden of proof could allow the jury to conclude
     that Turasky and Burg were *not* part of the $1.829. Cameron's
5    testimony concerning Appendix A and her slide #3 showed the
     jury that Oak Tree sent Green Circle $1.89 million by
6    December 31, 2015[.]

7    (*Id.* at 7.)

8    [T]he contents of Exhibit 516 were received by the jury as the
     indubitable equivalent of a stipulation but only as far as the
9    arithmetic goes. . . . [A]n Excel spreadsheet prepared by
     government witness Purifoy . . . assigns to specific sources the
10   entries in the bank statements. . . . The numbers [fit] precisely.

11   (*Id.* at 9.)

12        In his motion for reconsideration and his motion for clarification, Defendant

13   questions the theory upon which the Court denied his renewed Rule 29 motion. The motion

14   also further elaborates on the meaning of Exhibit 516 and again argues, among other things,

15   that Exhibit 516 is undisputed evidence that the questioned money ended up in Green

16   Circle.

17   **B.  Turasky and Burg Investments**

18        On July 30, 2014, Turasky, acting in the name of Capital Investment Fund I, LLC

19   ("CIF"), provided $500,000 to Oak Tree pursuant to a promissory note executed on July

20   30, 2014, to be loaned to Green Circle. The next day, on July 31, 2014, $150,000 was

21   returned to Turasky and, as part of the transaction, CIF's attorneys prepared a resolution

22   authorizing Oak Tree to retain and not loan to Green Circle such borrowed funds

23   reasonably necessary to pay costs associated with Oak Tree's role as Managing Partner of

24   the venture between Oak Tree and CIF.

25        On November 14, 2014, Burg entered into an Operating Agreement with Defendant,

26   wherein Burg invested $1 million in an entity named Pujanza that, under Defendant's

27   direction, was to in turn loan the money to Green Circle. The First Amended and Restated

28   Pujanza Operating Agreement, prepared by Burg's attorneys, provided that Defendant, as

manager of Pujanza, could use the $1 million as he saw fit. Burg agreed at trial that he understood that to mean it could be used to pay operating expenses. He testified that the $1 million did not have to go to the investment all at once and could be used for expenses, if it ultimately got to Green Circle.

As part of its evidence, the Government traced the money invested by Turasky and Burg to a variety of locations, including payments of an American Express credit card, Defendant's mortgage payment, and his car rental payment. A total of $55,000 of Turasky's $350,000 investment was traced to the Green Circle account and a total of $600,000 of Burg's $1 million was traced to the Green Circle account. (Exhs. 908, 909, 912, and 913.) The Government did not trace the source of the money that came into Green Circle. That gives rise to Defendant's argument that the only evidence at trial that traced money into Green Circle was Exhibit 516.

Defendant contends Exhibit 516 shows that the Turasky $350,000 investment reached Green Circle's account through six deposits made from August 6, 2014, through December 15, 2014. Defendant further contends that the Government cannot prove that Burg's $1 million investment did not reach the account through eleven deposits from December 13, 2014, through October 16, 2015. Defendant argues that the Turasky and Burg money was part of the $1.829 that the Purifoy Attachment indicates Oak Tree sent to Green Circle.

The Court agrees with Defendant that, pursuant to the relevant agreements, Defendant was authorized to employ the investment money for legitimate business expenses and that money is fungible. However, despite Defendant's best efforts, Exhibit 516 does not show that the Government failed to prove Defendant did not invest the money as agreed. A reasonable jury could find Exhibit 516 unreliable, and in some respects, contrary to Defendant's positions. Exhibit 516 does not preclude a rational jury from finding that only some, but not the entirety, of the Turasky and Burg investment moneys reached Green Circle.

First, Defendant argues that the money the Purifoy Attachment shows as "Oak Tree

funding to Green Circle," includes all the Turasky and Burg investments. However, the Purifoy Attachment identifies investor deposits into Green Circle by investor. Defendant argues that the deposits that are identified as deposits of CIF should be recognized as the CIF (Turasky) investment. But Defendant argues the opposite when it comes to the Burg money. Defendant argues that, despite there being no mention of Burg or Pujanza in the exhibit, a reasonable jury could only find that money identified under the names of other investors was $1 million Burg invested.

Facts support a finding that the entirety of the Turasky and Burg money was not contained in the $1.89 million identified in the Purifoy Attachment. The jury was not required to, and apparently did not, accept Defendant's argument that any money identified in the Purifoy Attachment as deposited into Green Circle through Oak Tree was or could have been Turasky's and Burg's money. The money was identified as being connected to certain investors. The only money identified as Oak Tree money was $412,203.81, far less than the $1 million Burg invested.

Second, although the Purifoy Attachment identifies deposits connected to CIF, it contains inconsistencies with known deposits that are not identified or that are incorrectly identified.  Despite the undisputed fact that $600,000 of the Burg investment was deposited into Green Circle, it was not mentioned in the Purifoy Attachment. When asked, Purifoy had no explanation for its absence. (Doc. 633 at 140.)

Another investor whose name should have appeared on the Purifoy attachment is Wear, who provided $500,000 to Defendant to be invested in Green Circle. Although some of his funds were used by Defendant for the downpayment on Defendant's home, some of the funds were traced to Green Circle. Neither Wear nor an accounting of his Green Circle funds appear on Exhibit 516.

At page 51 of Exhibit 516, the Purifoy Attachment credits the "Joplin Group" with funding $1,006,958.83 to Green Circle "per BMO Bank statement." The accompanying spread sheet, pages 52-57 of that exhibit, purports to identify the dates and amounts of deposits by each of the funding sources identified on the exhibit. The spread sheet indicates

that the Joplin Group (led by Deel) was credited for funds deposited into Green Circle's BMO account as early as December 23, 2014, and reflects multiple significant deposits before October 2015. However, the Joplin Group did not execute the $1.1 million Loan and Forbearance Agreement (Doc. 669), the agreement to provide those funds, until October 12, 2015. The jury could have found that the Purifoy Attachment was wrong again about the $1,006,958.83 credited to the Joplin Group.

Defendant's argument that Burg's money was somehow included in the Joplin Group money is further contradicted by the fact that Burg was an investor in Pujanza. Burg was not a member of the Joplin Group. The argument made by Defendant that Burg's money was sourced by the Joplin Group is inconsistent with the facts. The inconsistencies in the Purifoy Attachment with known deposits traced to Green Circle could have led the jury to find that the Purifoy Attachment was unreliable.

Finally, although Exhibit 516 purportedly accounts for the $350,000 Turasky investment, the jury could have found the exhibit was not credible. Paige traced $50,000 to Green Circle on August 6, 2014, and another $5,000 on August 28, 2014. Exhibit 516 reflected the $50,000 but not the $5,000. Paige traced the money Turasky invested with Defendant to a payment on the American Express card bill in Defendant's former girlfriend's name, payment to a preparatory school, a rent payment on Defendant's home, and a lease payment on his vehicle. The jury could have found that the funds Exhibit 516 credited to CIF as being deposited in Green Circle on October 3, October 23, and November 27, 2014, were funds invested by Deel, who invested the exact amount the Purifoy Attachment claims was deposited on behalf of Turasky that day. (Exh. 507.)

Defendant's argument that Exhibit 516 irrefutably establishes that all of the Burg and Turasky money eventually made it Green Circle and therefore Defendant could not have had the requisite state of mind fails. There was evidence from which the jury could find that not all the investment money from either investor reached Green Circle. The evidence was sufficient to sustain a conviction on all remaining counts on which the jury found Defendant guilty.

### C. Detour of the Turasky and Burg Investment Money

Both Turasky and Burg agreed that, pursuant to their agreements, Defendant he could use their investment money for legitimate business expenses. Burg and Turasky testified that they did not agree their investment agreements permitted Defendant to use their funds for personal expenses. (Docs. 613 at 205-06 (Turasky); 644 at 48 (Burg).) Dr. Cameron testified that Defendant's use of Turasky's and Burg's investment money was reimbursement for his investments in the businesses and therefore legitimate businesses expenses.

There was no evidence at trial that Defendant incurred legitimate business expenses for which he now claims he was reimbursed from the Turasky and Burg investments. There was evidence that Defendant, during the relevant time, did not have the funds to front business expenses. There was evidence that his businesses were failing, that he was living off funds lent/given by friends, Dunsworth, Deel and Bobrow. There was evidence that Defendant stated in 2013 that he had no money, was living with his in-laws, and was broke.

The Government presented evidence that Defendant used the investment money for such things as a payment to a previous investor, an American Express card payment, a payment to preparatory school, a house rental payment, and a payment on Defendant's personal vehicle. Defendant's American Express credit card was in the name of a former girlfriend, Yeager. Although there was evidence that the credit card was used to pay business expenses, the evidence at trial was that Defendant, his wife, and Yeager also used the card for personal expenses. A reasonable jury considering the factual question of whether the payments made on the credit card bill were business related could have rejected Defendant's arguments. There was evidence that Defendant used Burg's and Turasky's funds in a manner contrary to the relevant agreements.

The jury, therefore, had sufficient evidence to convict Defendant of wire fraud with respect to Burg and Turasky. Because there was evidence of a fraudulent scheme directed to Burg and Turasky and subsequent wired payments that were tendered to Burg and Turasky, the jury had sufficient evidence to reasonably conclude that the payments were

part of the fraudulent scheme as lulling payments and were thus wire fraud.

### D. Constructive Amendment of the Indictment/Fatal Variance

Defendant argues:

> [T]he SSI never mentioned [Defendant] was charged with using Turasky money to pay for personal expenses[.]
>
> . . .
>
> How could the defense know the government was going to argue that [Defendant] used the Turasky money for *personal* expenses? This position only arose in the June 6, 2023, hearing.

(Doc. 774 at 4.)

However, in his renewed Rule 29 motion (Doc. 699), Defendant spells out what he understood count 1 of the SSI to have alleged:

> The allegation in Count 1 is that [Defendant] used some of Turasky's money to pay expenses instead of [Defendant] deploying all of the money immediately to Green Circle to fund payday lending.
>
> "Similar to M.B.'s funds, R.T.'s funds were used to pay the balance on [Defendant's] American Express credit card and to make Ponzi payments to other investors."

(Doc. 699 at 4.) Defendant's summary, filed on March 16, 2023, indicates that he understood the SSI included allegations that Defendant's use of the investment money to pay expenses was part of the alleged fraudulent activity. Defendant was adequately apprised by the SSI of the nature of the accusations he was defending. There was no constructive amendment of or fatal variance from the indictment.

**IT IS ORDERED** that Defendant's Motion for Reconsideration of Renewed Rule 29 Motion (Doc. 764) remains **DENIED**.

//

//

//

//

//

- 11 -

**IT IS FURTHER ORDERED** that Defendant's Motion for Clarification of the Court's Denial of Defendant's Motion for Reconsideration (Doc. 774) is **DENIED** as moot.

Dated this 1st day of November, 2023.

Douglas L. Rayes
United States District Judge