Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710
Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. 2:19-cr-00898-DLR |
|---|---|
| Plaintiff, | |
| vs. | **DEFENDANT'S REPLY TO UNITED STATE'S SUBSTANTIVE RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION OF FORFEITURE (Docs. 808, 838) DOC 843** |
| David Allen Harbour, | |
| Defendant. | |

The Court ordered the government to respond to the Defense motion for reconsideration Doc. 804, specifically as regarded manifest error and community property. The Order notwithstanding, the government still did not respond to the law supporting the Defense position that, in the absence of "ill-gotten gains," there can be no forfeiture ordered in favor of Cathey, Bobrow, Case, Hill's, Turasky or Burg.

The manifest error was failing to applying the law (requiring ill-gotten gains) to each person listed in Doc. 801 and to continue to sustain the wire fraud and money laundering convictions in light of the new evidence (in the form of the Stipulation and 2014 Schedules C and E). Without an underlying crime *and* ill-gotten gain as a proximate result of the individual crime against the individual for whom forfeiture is sought, there can be no forfeiture in favor of that individual. The government disregarded that, in order for the District Court to order forfeiture, the government must prove Harbour committed

wire fraud by a preponderance of the evidence against the people listed in Doc. 801. The case law, coupled with the evidence, neither of which have been refuted by the government, proves Harbour did not commit wire fraud against the people listed in Doc. 801. The government stated the Party seeking reconsideration "must identify each error and explain how it is 'plain and indisputable', amounting to a complete disregard of the controlling law or credible evidence on the record." (Doc.843, pg.3, ll.20-22). However, the government also agrees that new facts are also a reason for reconsideration. (Doc.843,pg.3, ll.12,13). The government also agrees there must be a nexus to the crimes of conviction, but leaves out that a crime (the crime of conviction) must have occurred with respect to the "victim" for whom forfeiture is sought. Doc. 804 cited extensive authority and emphasized the new facts, both of which support Harbour did not commit the remaining crimes of conviction.[1]

**Ken Bobrow and Pam Case**. The government states the Defendants calculations are not based on any actual evidence but rather unrelated witness testimony. (Doc.843, pg.6, ll.9,10). This is false. Defense cited bank statements and canceled checks proving Case was paid an additional $117,083 from Harbour. (Doc. 804 Exhibit 3). The government did not refute the fact of these nor the testimony. With respect to Bobrow, the government states the Defense makes its own assumption that every payment was made timely and in the same amount and some payments were due and not made. (Doc. 843, pg.5, ll.23-26). This is also false. Lisa Berges testified that all the payments were timely from 2008 until 2014, except the last 6 months, but, even, if not timely, were still made. (Tr. 2/9/23, pg.144). The government states that Berges did not testify to the

---

1 The new facts are the Stipulation and Declaration of Senior Counsel Wong Doc. 844-1that the Stipulation is final along with the Declaration of Jason Silver and Petitioners' Second Amended Petition ("SAP") filed in Tax Court on 8/18/2020 and IRS letter to Harbour. The 2014 Schedules C and E showing expenses and the stipulated gross receipts are now final and can be relied upon by the Court in so far as they support or do not support forfeiture.

specific date in 2008 when the payments began (Doc. 843, pg.6, ll.2-3). False again. Berges testified that Exhibit 900 was her QuickBooks print out of payments received and they started in 2008. Exhibit 900 shows the first payment received was on 1/11/2008. (Tr. 2/9/23, pg.142-144). The government did not refute the testimony of Bobrow and Berges that Bobrow received payments from 2008 – 2014.   In fact, both testified all the payments were made. The government does not refute that Bobrow received a 1099-Int from Harbour in 2012 to the same entity, KB-2011 LLLP for $198,650 nor does the government refute it should be added to the amount Berges has listed in Exhibit 900 (Doc. 804, Exhibit 3). The government conceded that the only evidence they used was Exhibit 900 which showed Bobrow was paid $2,122,973.33. (Doc. 843, pg.6, ll.3,4). The government did not add the 1099-Int Bobrow received of $198,650 or the $117,083 that Case received in its calculations of how much Bobrow and Case *actually* received.

The case law is clear, and the government did not refute it, that a reasonable estimate of *all* the evidence must be considered and the Court can consider evidence outside of the trial record. Instead it states the Defense did not submit any actual evidence, which was patently false. These two amounts alone, which is not all the available evidence in Doc. 804 Exhibit 3, reduces the amount Bobrow was not paid to $21,625. [Amount Bobrow loaned $2,300,000 less Paige amount of $2,122,973.33 + $198,650 = $21,625 as opposed to $177,025] and with Case it proves she was paid more than her loan amount. Paige reported $88,333 + $117,083 = $205,416 which is $5,416 more than she gave Harbour. The government simply argues it is a disagreement as to the weight and interpretation of the evidence.

The only evidence the government is using to calculate the amount of forfeiture for Bobrow is Exhibit 900, which is conflicted by the testimony of all three witnesses.[2] The actual testimony of the witnesses and evidence in the form of bank statements,

---

2 The government has never provided any supporting documentation on how they came up with $83,333 in payments to Case listed in Doc. 801.

canceled checks and 1099's along with Exhibit 900, support that Bobrow and Case received all their money back which is in alignment with the Prosecutor telling the Court that Bobrow received all his principal back. (Hr. 7/26/23, pg.78). There is no evidence that Harbour actually received the $2.3 million from Bobrow in order for Harbour to have any ill-gotten gains. Importantly, the government did not refute that Harbour did not receive those funds personally. Beyond the fact that the evidence proves they were paid back all their money, the government must prove that Harbour committed wire fraud against Bobrow and Case and that they are tied to the offense of conviction in order to be eligible for forfeiture. The government did not refute there is no evidence that Harbour committed wire fraud against Bobrow and Case.

The government alleges that Family Dollar Store was made up, it never existed. This was contradicted by testimony and evidence. Case testified that Bobrow took her to see a Family Dollar store on the West side of Phoenix, which matched the schedule of investments that Bobrow's handwriting was on and there is no evidence it came from Harbour (Exhibit 897). The schedule of investments showed that he loaned money to a Family Dollar store in Phoenix. The government did not refute that Bobrow received payments from someone other than Harbour on the 2007 Family Dollar Store loan. The government has never explained why someone other than Harbour would pay Bobrow on the loan if they did not receive any money. The evidence shows Bobrow took Case to see a Family Dollar Store in Phoenix and Bobrow was paid on the Family Dollar loan from someone other than Harbour, therefore the preponderance of the evidence supports Bobrow funded a Family Dollar Store directly. In addition, there can be no cheat without evidence that Harbour actually received the $2.3 million from Bobrow, let alone any ill-gotten gains. Finally, the government never refuted the case law that Bobrow and Case are not tied to the offense of conviction through similarity and temporal proximity. There was a 7 year time gap between the 2007 loan – all of which was repaid – and the earlier

moments in the offenses of conviction. Moreover, they have nothing in common with the Burg and Turasky offenses, which hang by a thread themselves, about to be severed.

**Joe Cathey and Pat and Carol Hill** – The government argues that Defense mistakenly applied "intent to deceive or cheat" with Cathey and the Hills, because that only goes to conviction.[3] Then it contradicts itself by saying the money Harbour obtained from his fraudulent scheme must be forfeited, because Harbour deceived them. In order for Cathey and the Hills to be eligible for forfeiture, first they must show evidence of the elements of wire fraud, then be tied to the offense of conviction through similarity and temporal proximity. The case law does not support that Harbour committed wire fraud against Cathey and the Hills. The government states that Harbour obtained proceeds from Cathey and the Hills through his fraudulent scheme and that is why they are entitled to forfeiture. (Doc. 843. pg.5, ll.2-4).

*First*, for Harbour to commit wire fraud and therefore be a part of the alleged scheme, he had to of intentionally deceived and cheated Cathey and the Hill's and the evidence and corresponding case law overwhelmingly proves Harbour did neither. With respect to Cathey, the government finally admits that Harbour never dealt directly with Cathey, but in the same breath says he acquired money from Cathey by deception. (Doc. 843, pg.5, ll.12).[4] How could *Harbour* have deceived Cathey, if he never even spoke to him or corresponded with him, meaning he never solicited him, before Cathey loaned money to NorthRock. Cathey testified he had lunch with Joel Tucker and he knew his money was going to Joel to send to payday lenders across the country. (Tr.2/8/23, pg.91).

---

3 The government did not refute that the NorthRock bank statements do not show a deposit of Carol Hill's $81,621.34. The government does not refute that Paige testified she did not trace the $81,621.34 to any bank statement. There is no evidence that Hill ever actually loaned the $81,621.34 supporting the acquittal. Harbour cannot have an ill-gotten gain of money he never got.

4 Compare this to the government telling the jury that Harbour created a relationship of trust with Cathey before he loaned the money and that is why he loaned the money.

Paige testified 100% of Cathey's money went to KSQ, which is Tucker. The evidence proves Harbour neither deceived or cheated Cathey. The evidence proves under the case law no wire fraud. (Doc.804, pg.7). In addition, as the Court knows and has even commented that, but for Operation Choke Point – an illegal and once-secret Executive Department plot to destroy pay day lending when a Congress divided in the 2010 elections refused to outlaw it - no one who lost money in pay day lending has any reason to be able to blame Tucker, let alone Harbour, any more that such a "victim" could blame Bobrow who "lost" $5 million of his own money and about $11 million of "other people's money" in pay day lending also due to no one other than President Obama and his Attorney General.

*Second*, the government did not refute the case law that coincidence, suspicion and speculation are not evidence. Paige agreed that a coincidence of dates was her only basis for saying that Harbour's gross income was a 25% Finder's Fee from KSQ tied to Cathey's loan to NorthRock (Doc.804, pg.8). Harbour's gross income of a 25% Finder's Fee is the "deception" the government is alleging against Harbour. Since coincidence is not evidence, there cannot be deception and no wire fraud.[5]

*Third*, the government did not refute the case law that *if* Paige did trace a 25% Finder's Fee from KSQ to Harbour tied to Cathey or the Hill's loans it had to have come from the *victims'* money to be eligible for wire fraud. Both Paige and Agent Green testified that their investigations had found no proof that this happened, nor did the government deny that they so testified. The government did not refute or provide any countervailing evidence or case law on the accounting by the Defense on Cathey and Hills money, proving Harbour did not receive a "kick-back" or Finder's Fee tied to it or that it came from their money, Doc. 804, pg.8,9 and Doc. 804 Exhibits 1 and 2. In fact,

---

5 This theory has been abandoned by the government. In Doc. 844, pg.4, ll.24-25, the Prosecutor states that Harbour's "gross income is not probative of *any* material fact in the case." If Harbour received finder's fees from KSQ they *were* gross income. How can both theories exist in the same time and space continuum?

Paige testified there wasn't even a deposit from KSQ to Harbour that equaled 25% of the Hills money as can be seen in Doc. 804 Exhibit 2. Without evidence proving Harbour received a Finder's Fee directly from their money, there cannot be wire fraud. Regardless, the gross receipts Harbour received from KSQ are not material to the case and therefore would not be material to proving Harbour received a 25% Finder's Fee.

*Fourth*, the government did not refute any of the case law the Defense cited about the falsely presented alleged 15 year scheme involving uncharged conduct. The Defense listed multiple cases from different Circuits proving the governments version of the scheme is not supported by any case law. Nor could it, because the extensive legal authority is all spot-on stating what the government is alleging the scheme was, namely, Harbour using lender money to support his lifestyle, is insufficient to constitute a scheme at all. Even if the government could find cases that say getting money to pay for personal lifestyle was a scheme, with respect to Cathey, Hill's, Bobrow and Case the government has provided zero evidence that Harbour used their money for personal expenses to even comport with the alleged scheme. Since the government did not even address the overwhelming case law in favor of the Defense, it must be considered as an admission that the case law does not exist to support the governments theory of a scheme.

Not only did the government not even discuss, let alone refute, *U.S. v Stuck*, 419 F. Supp 3d 373 (D. Conn. 2019), the government did not counter the absence of factual similarity and temporal proximity to the offenses of conviction. *US v Hahn*, 960 F.2d 903, 910-911 (9th Cir. 1992); *U.S. v Mullins*, 971 F.2d 1138, 1144 (4th Cir. 1992).

**Burg and Turasky**. The government's Doc. 844-1 supports Harbour's contention that he did not commit wire fraud against Burg and Turasky. Attachment A in the Response to the Government's Answers to the Court's question, is a Declaration from Harbour's Tax lawyer, Jason Silver, and the SAP to the Tax Court regarding the adjustments made by IRS Agent Green in his final Audit Report for tax years 2013 and 2014  Agent Green testified that when he completed his part of the audit, he sent his final

adjustments in an Audit Report. The government misrepresents that Wong in his Declaration stated Harbour's 2013 and 2014 business expenses are unresolved (Doc. 844) and then compounds it with a blatantly false statement. "the returns filed by Harbour for 2013 and 2014 are unresolved and will not be addressed until 2015 and 2016 are outstanding are temporarily paused pending the resolution of petitioner's criminal case." (Doc. 844, pg.2). This particular misrepresentation may be the most outrageous because the government is now well beyond the point of complete desperation. Jason Silver's Declaration and the reading of the Stipulation in an intellectually honest fashion shows that, with respect to 2014, what remains at issue is contained in paragraphs #11 and #12 of the Stipulation. The Stipulation, with respect to gross receipts and expenses, makes the audit final for 2014 and, thus admissible if for no other reasons that the Stipulation constitutes administrative *res judicata* and is a party admission under Rule of Evidence 802(d)(2).

The government stated the Court has rejected the Defense arguments of the transfer of Burg and Turasky investment funds in Doc. 800. (Doc.843, pg.6, ll.18-20). The Stipulation was filed on 11/13/23, which was after the Courts rulings in Docs 800 and 801. The Stipulation and 2014 Schedules C and E now final are "new facts." LRCiv 7.2(g)(1) (Doc.843, pg.3, ll.11-14). The government told the Defense to produce its 2014 Schedules C and E to prove its gross receipts and business expenses (Hr. 7/26/23, pg.64, 65) not realizing that the stay had been lifted in Tax Court. This is the definition of "hoist by one's own petard."  Or, as has been stated, "for they sow the wind and they shall reap the whirlwind." (Hosea 8:7).

The law of this case is the following Court's ruling and solely this ruling: A rational jury could find that Harbour defrauded Turasky and Burg because, in the absence of Harbour having gross income in 2014 that exceeded the $695,000 of Burg and Turasky money he claimed he used for business expense *reimbursement*, he could not reimburse himself and, perforce, the money must have been used for *personal* expenses. Therefore,

Burg and Turasky were defrauded. (Doc.800). Paige's tracing in Exhibits 908 and 912 along with the Schedules C and E, and the gross receipts freshly agreed to by the United States in the Stipulation, plus the agreements with Turasky and Burg prove that Harbour did not commit wire fraud against Burg and Turasky.

Another important admission by the government is the case law allows Harbour to deduct direct cost from the $695,000 of Turasky and Burg, but, the government claims, Harbour did not provide any evidence of direct cost. (Doc. 843, pg.7, ll.8-13). This is another false statement. At the 7/26/23 hearing Defense Counsel provided the Court with Cameron's expert report and a schedule of direct costs totaling $832,687, which are more than $695,000. Harbour's 2014 Schedules C and E support Cameron's amount of direct cost. A direct cost is any cost which can be identified specifically with a particular cost objective. "The sacrifice incurred in economic activities that which is given up or forgone to consume, to save, to exchange, to produce." (FASB Concept statements No.6 n.9) Agent Green testimony supports Cameron's report and the direct cost that were provided to the Court are allowed under the case law.

<u>Community Property</u>

In discussing *U.S. v Wolf* 375 F. Supp. 3d. 428 (SDNY 2019) the government left out, or better said, did not refute that the District Judge ruled criminal forfeiture cannot take a spouse's interest in community property. There, the Court overruled the government's attempt to forfeit substitute assets because the wife's interest in the substitute assets was vested prior to the offense of conviction under Arizona community property law. Agent Paige traced when the jewelry was purchased and it was all prior to July 2014, the first offense of conviction which is in alignment with *Wolfe*.

Nor did the government address, let alone refute, that in *U.S. v Lester* 85 F.3d 1409, 1413 (9th Cir. 1996) and *U.S. v Chavez* 323 F.3d 1216 (9th Cir. 2003) the 9th Circuit ruled that criminal forfeiture does not contemplate seizure of an innocent spouse property to satisfy the offending spouse obligation. With the claim filed by Abby Harbour along

with the governments admission through the tracing done by FBI FA Paige that all the jewelry was purchased prior to the offense of conviction, under the case law, the Court must disallow the government's attempt to substitute the jewelry and Whisper Rock golf membership, which, under the laws of Arizona, is community property. With the government's admission that gross receipts are not material to the case and Paige traced in Exhibit 918 Harbour using his gross receipts to purchase the jewelry, the use of substitute assets must be denied.

Conclusion

The government, failing to actually address the issues, pawns off the tired saw that the Defense arguments are merely a disagreement with the Court and an attempt to re-litigate the case. To the contrary, the Defense provided specific case law for each person listed and the corresponding evidence which the government again chose not to refute. The government also chose to not provide any rebuttal evidence to the additionally proffered evidence. Frankly, it is astounding that the government is still trying to argue that Harbour received a 25% Finder's Fee from KSQ tied to the loans from lenders to DNA and NorthRock. There was and is absolutely no evidence that such was the case. Despite the absence if any proof, the government continues to rely upon the finder's fees allegation to support that Harbour deceived Cathey and the Hills for forfeiture, restitution and sentencing.[6] At the same time, the government forgets that deception without fraud in the bargain is insufficient to support fraud, ignoring that the 9th Circuit recognized that

---

6 This also goes to Donmoyer, Dyer and every other lender to DNA Investments and NorthRock. Harbour received payments from KSQ above the amount of interest and principal for the lenders. The government did not prove what those payments were for, except the government's witnesses testimony proved they were not from the 25% Finder's Fee as the Prosecutor has alleged. Donmoyer told the agents in his 302 that he would expect Harbour to be paid from the profits of the portfolio. Paige testified that Harbour, indeed, could have been paid from the profits of KSQ. Since the profits have nothing to do with the lenders money, it cannot be wire fraud *US v Lew* 875 F.2d 219 (9th Cir. 1989). This is now all moot, because the Prosecutor told the Court that Harbour's gross income is not material to the case.

both deception coupled *with* fraud in the bargain were *both* required. Once Dunsworth sent Cathey's money to KSQ and Carol sent hers and Pat Hill's $500,000 to KSQ, the bargain was fulfilled. Cathey admitted he met with Tucker, his money was supposed to go to Tucker for payday lending, his money did go to Tucker and he was paid per the terms of his agreement until Operation Choke Point. Hypothetically, even if the evidence showed that Harbour got a Finder's Fee from *his* money and even if Harbour had met with Cathey before Cathey loaned the money and deceived him by telling him he would not get a Finder's Fee from *his* money, the deception, standing alone, would not be a fraud about the bargain. In this hypothetical, Harbour might have deceived Cathey, but he did not cheat and without fraud in the bargain there can be no wire fraud conviction.

The Court cannot forget the representation the Prosecutor already made to the Court about having the evidence, "all assets purchased came from the victims funds and should be forfeited" (Doc. 746 page 5). The government has now admitted that is not true. (7/26/23, pg.77). Once again the Prosecutor has walked away from a statement to the Court about the evidence it had to prove its allegations. This has been a continued theme throughout the entire case against Harbour. Continually, the government has told the Court one thing on one day and then a different thing the next time.

The government was given a second chance and failed to take advantage of the opportunity. Not responding to the case law and the arguments do not make them go away. Harbour did not commit wire fraud against Turasky and/or Burg and, therefore, all claims of forfeiture are and ought to be moot.

RESPECTFULLY SUBMITTED this 22nd day of January 2024.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
      Stephen M. Dichter
      Justin R. Vanderveer
      2800 North Central Avenue, Suite 860
      Phoenix, Arizona 85004

1                                           Attorneys for Defendant David A. Harbour

2

3

4                          **CERTIFICATE OF SERVICE**

5           I hereby certify that on January 22, 2024 I electronically transmitted the attached
document to the Clerk's Office using the CM/ECF system for filing and for transmittal
6    of Notice of Electronic Filing to the following CM/ECF registrants:

7    Kevin M. Rapp
8    Kevin.rapp@usdoj.gov
     Assistant United States Attorney
9    Joseph F. Bozdech
10   Joseph.bozdech@usdoj.gov
     Assistant United States Attorney
11   U.S. Attorney's Office
     40 N. Central Avenue, Suite 1800
12   Phoenix, AZ 85004
13   Attorney for Plaintiff

14

15   /s/ Yvonne Canez

16

17

18

19

20

21

22

23

24

25

26

27

28