Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. 2:19-cr-00898-DLR |
|---|---|
| Plaintiff, | **DEFENDANT'S RESPONSE TO UNITED STATE'S SUPPLEMENTAL MOTION RE: RESTITUTION AND LOSS** |
| vs. | |
| David Allen Harbour, | |
| Defendant. | |

Unlike the government, which filed Doc. 848 without asking the Court for leave to do so, before Harbour filed a supplemental sentencing memorandum (based upon Burgess' testimony and the documents he supplied on 12-2-23), we asked and received the Court's permission to file papers responding to the new material.

Given the predilection of the government to move to strike whatever it can, whenever it can, we should think that the Court ought to strike this unauthorized pleading.[1] However, as Doc. 848 is nothing more than another compilation of false

---

[1] The next day, the government filed another document with leave, this one responding to the Supplemental Filing the Court allowed the Defense to file. However, because *that* document actually responded – as best the government could respond – to the Defense filing pertaining to Burgess' testimony and documents, we do not complain about it. Although the government never sought leave to respond to our filing re Burgess, the defense would not have thought to oppose the response. Instead, we will reply to it. For,

representation, we will regard this unauthorized supplemental sentencing memorandum as just another opportunity, in the hope that, as the government piles misrepresentation upon misrepresentation, *ad infinitum*, the Court will finally come to understand that the government is far from a "minister of justice" in this case and unworthy of belief.

The government wants to allocate Burg's restitution to Pat and Carol Hill, disregarding that the case law requires loss causation with respect Burg being entitled to any Restitution. Burg is not entitled to restitution because there is no loss causation with respect to him. Where is Burg's money? Burgess used it, in part, to help pay off Ranger.

The government begins its misrepresentations by stating that Harbour dropped Jackson's name to solicit Gray, Alofs and Wilson. This is, frankly, unhinged. Alofs and Jackson were in an intimate relationship. Harbour met Alofs through Jackson in 2009. Meanwhile, Alofs was friends with Alison Willson and after she told Willson that she, Alofs, had loaned money to Harbour in 2010, a year after Jackson's loan, Willson then reached out to Harbour.

Harbour met Jackson through the same person through whom Rhonda Gray met Jackson. This was Grays insurance agent. Gray was a plus-one of the insurance agent at the Child Help Gala in 2010 and introduced Gray to Jackson and to Harbour the same evening. Gray testified she met with her lawyer, CPA and insurance agent to figure out how to protect her life insurance money. It was they who recommended that Harbour assist Gray. Harbor and Gray agreed that her money should be put into the hospital bridge loan.

The government then states that Harbour used Jackson's money to either pay other investors or pay for his own personal expenses. This contradicts the Prosecutors proffers to the Court to get the Jackson evidence into the trial. Recall that the Prosecutor told the

---

if the right to respond can be assumed, based upon the permission given to the defense to file, the right to reply can also be assumed.

Court he had traced $15 million into Harbour's bank account and traced the money out. This was flatly false.

Although the Court asked the Prosecutor at two different hearings if he had Harbour's bank statements that traced the money and the Prosecutor told the Court he did, in fact, he never had the bank statements. While earlier pleadings filed by the defense had demonstrated the government's lack of knowledge with respect to Tax Court, here we can see that the government is equally bereft of knowledge concerning State Receiverships.

Jackson signed a subscription agreement with Palo Verde Capital and wired $9 million to Palo Verde. Meanwhile, Jackson wired Harbour $6 million and was paid back all $6 million. Harbour never got the $9 million and, if he had, then the Receiver would not have *approved* Jackson's personal claim for the $6.8 million of the $9 million Jackson had received back from Palo Verde. We know the Court understands that, if Jackson had not filed a proof of claim under penalty of perjury that he had invested the $9 million in Palo Verde, the Receiver would not have approved the claim. If Harbour got the money and Harbour put it into Palo Verde, then it would have been Harbour's claim. We have previously supplied the Receivership documents establishing this beyond peradventure.

With respect to Alofs, not only does the government completely ignore the-intimate relationship the government knew existed between her and Jackson, the government also knows nothing about Alofs' loans. She actually had two different loans with Harbour, one in July 2010 and one in May 2011. The first loan was to the Hospital company that filed bankruptcy and, actually, Alofs met directly with multiple executives who comprised the Hospital management team. This is also where Rhonda Gray's money went, as her notes indicate. Alofs second loan was to Canyon Road Holdings which paid Alofs back 100% of her money with interest.[2] Everyone in the Hospital investment was

---

2 The lenders to payday one in the spring of 2011 were all paid back, because they had two year loan agreements and their loans matured prior to Operation Choke Point.

tied to the Bankruptcy and the Affordable Care Act. Harbour was not the cause of Alof's loan being defaulted. Alof's never sued Harbour for any fraud or misrepresentations. It was a simple breach of contract against HPCG, not Harbour.

The government then states that Reace, White and Donmoyer all lost money due to Harbour's fraud. We will unpack this false statement by the Prosecutor. *First*, the government has never turned over any documents between Harbour and White. Nor will they, White never loaned money to Harbour nor invested money with Harbour. *Second*, Reace signed a subscription agreement that she understood the risk of investing. The bankruptcy court approved HPCG Hospital Investment proof of claim that Harbour sent all the investors' money to the Hospital Investment. This included Reace, Alofs and Gray.

There has never been any allegations of fraud with respect to the Hospital investment. *Third*, the government alleges that Donmoyer was not made aware of Harbour receiving a 25% Finder's Fee with respect to his $3 million loan. What Donmoyer actually stated was that, if Harbour did receive a 25% Finder's Fee, Harbour would have a deposit of $750,000 (25% of $3 million). Of course, Harbour's bank statements show no deposit of $750,000 and this corroborates the testimony of Agent Green and Paige that Harbour did not receive any gross income from KSQ connected to the 25% Finder's Fee. Of course, per the government, the 25% Finder's Fee issue is now moot, because, according to the government, in its desperation to avoid the new trial the Court truly must grant, the government contends that Harbour's gross income is "not probative of any material fact in the case." (Doc.844, pg.4, ll.23-24)

Next, the government has provided a restitution table that is *not* supported by the Court's ruling in Doc. 801. There, the Court ruled Rhonda Gray and Victoria and Ken Bobrow could not meet even the preponderance of the evidence test for purposes of forfeiture and therefore, they could hardly meet the test for Restitution which also requires loss causation analysis.

4

The government included Carol Hill's IRA of $81,621.34, even though Paige testified there is no evidence Carol Hill actually sent her IRA proceeds to NorthRock. The evidence at the trial of Carol Hill IRA paper work was for $79,351.02, not $81,621.34 (Exhibit 252). Pat and Carol Hill $500,000 requires loss causation to be eligible for Restitution and the evidence proved Operation Choke Point is why they lost their money, not Harbour. The same goes for Joe Cathey (who dismissed his civil lawsuit against Harbour for fraud). Harbour is not the reason anyone connected with pay day lending before June 2013 lost money. What Professor Manning (whose opinions have never been questioned by the government, let alone rebutted) termed a $4-6 billion wealth transfer, took that money away from people like Cathey, the Hills, Bobrow, Donmoyer, Dyer, Bobrow's investors and everyone else, was Operation Choke Point.

Meanwhile, in Doc. 804, the Defense proved there was no fraud against Ken Bobrow and Pam Case and they were paid back 100% of their money. Therefore they are not eligible for restitution. The case law requires for Restitution, they must fall under the requirements of the Mandatory Victims Restitution Act ("MVRA") an individual will be "proximately harmed as a result of" the defendants crime if either there is no intervening causes, or if there are any such causes, if those causes are directly related to the defendants offense. *U.S. v Gossi* 608 F.3d 574 (9th Cir. 2010 ). A victim for restitution purposes is a person who has suffered a "loss caused by specific conduct that is the basis of the offense of conviction." For that reason, a restitution order must be based on losses directly resulting from the defendants criminal conduct. *See U.S. v Sablan* 92 F.3d 865 870 (9th Cir. 1996).

The Prosecutor told the Court there is clear and convincing evidence Harbour defrauded Jackson out of $15 million. But, now, the government has changed its position on Jackson once again. The government now agrees that Jackson's $9 million went to Palo Verde, adds a new false wrinkle: it was Harbour who sent the money. We have already addressed how, if this was the case, the Receiver would not have accepted

5

*Jacksons* receivership claim. The government next falsely states the entirety of the $15 million of Jackson is a two page agreement, which are the services Harbour would provide for Jackson, claiming there are no agreements for the $15 million (Doc.848, pg.5, ll.6-8).

Does the government not recall that Exhibit 397, drafted by Jackson's lawyers stated, at #24:

> On or about August 20, 2009, the Trust (by Craig. H. Jackson) signed a subscription Agreement whereby it purchased $9 million of Partnership Interest in the Palo Verde Fund, LP. On or about August 31, 2009, the Trust funded the purchase of the Partnership interests via a $9 million wire transfer."

Craig Jackson on behalf of his trust, signed a subscription agreement for $9 million and wired the $9 million directly to Palo Verde. This is in alignment with the Receivership of Palo Verde Fund agreeing to Jackson's claim. Nothing states that "Harbour had access" to the $9 million or controlled the $9 million. The Receivership never mentions Harbour or that Harbour had any control of Palo Verde Fund or managed the funds for Palo Verde.

The Prosecutor next shows that he did not even try to corroborate his witness' testimony when he notes that Carol Hill testified Harbour was "skipping down the hall" when he had achieved access to Jackson's money (Doc.848, pg.5, ll.10-11). However, Hill testified that she started working for Harbour in 2010 (Tr.2/3/23, pg.19). Jackson loaned Harbour the $6 million in August 2009. Exhibit 397 ##8 and 9. As a result, after reviewing those parts of Exhibit 397, Ms. Hill could not have seen Harbour "skipping down the hall" with respect to Jackson's money unless she was possessed of clairvoyance.

These statements contradict the Prosecutors proffers to the Court. The Prosecutor told the Court there are two Promissory Notes between Harbour and Jackson for the $6 million and the $9 million. The reference to a $9 million note was complete fiction.

      THE COURT: Let me back up. My recollection was like Mr. Dichter's is that there was 6 million, and 9 million wasn't given to Mr. Harbour.
      MR. RAPP: No, that's not true. It's -- there --Could we go to the HDMI to the podium, Mr. Vasquez, and to the Court's screen. These are the two promissory notes. (Hr. 6/6/23, pg.148)

The Defense has asked the Prosecutor for these two notes, but has never turned them over. The Defense is perplexed by the Prosecutors now saying it was only a two page document after telling the Court it had the actual promissory notes. Meanwhile, Jason Braun, Jackson's lawyer testified that Harbour owed Jackson interest, which means there was a Promissory Note (Tr. 2/15/23, pg.181). Braun testified that he along with Jackson's other lawyers authored Exhibit 397 (Tr.2/15/23, pg.175). Exhibit 397 #19 states, "The monthly payments will continue until all of the accrued and accruing interest and/or earnings are fully paid to the Trust, no later than December 31, 2012." The use of the words "earnings," signifies that the Jackson side knew that Jackson's $6 million had been invested. Regardless, Exhibit 397 – drafted by Jackson's lawyers – did not claim the $6 million was *not* invested.

This supports there was a Promissory Note between Harbour and Jackson, although Jackson's attorneys chose not to attach it to the Affidavit between Jackson and Harbour. Since they created the Affidavit, it means they either forgot to attach it or they believed it was in best interest of their client to not attach it. Rapp points out that Braun stated that Harbour told him the $6 million was "gift," but, if Harbour did say that, it is certainly neither mentioned, nor, more importantly declaimed in Exhibit 397 which was drafted by Braun.

The Prosecutor then tries to say that the only reason Harbour was paying Jackson back was based upon a meeting Harbour had with Jackson attorney's in June 2012 (Doc.848, pg.6). The government references pg. 167 of Braun testimony for the date June 2012, nothing on page 167 mentions June 2012. Regardless, the Affidavit speaks for itself. It states that Harbour and Jackson agreed in 2009, that he would be paid back in

2012 (Exhibit 397, #11-13). He was paid back in 2012, meaning there was no intent to defraud.

The Prosecutor then makes the statement that HighPointe Capital Group, DNA Investments and DNA Management were not investment vehicles. This contradicts the testimony of Purifoy and Eckholt. Eckholt testified that Harbour raised $1 million each for two different clients and they paid him back (Tr.2/2/23, pg.227). This proves that Harbour had other business deals than payday lending and they were successful. This is also the same time frame that Harbour received the $6 million from Jackson, proving Harbour was investing money. Purifoy testified she created the financial statements for HPCG (Tr. 2/14/23, pg.45). There would only be financial statements if there were investments and Agent Green testified that Harbour's business was fund-raising. In addition, Green audited Harbour for 2011-2014 and never even hinted that Harbour was running a Ponzi scheme.

The government states it is unclear what Harbour used Jackson's funds for but they were not invested (Doc.848, pg.7). Again, this is contrary to what the Prosecutor told the Court prior to the trial. He said he had traced the Jackson money out of Harbour's account. This was false. The government has not tied any of Jackson's money to any Ponzi payments or personal expenses of Harbour. The government keeps forgetting it has the burden to prove how the $6 million was used by clear and convincing evidence. The Prosecutors own words admits it is not "clear" therefore it cannot be clear and convincing that it was used for Ponzi payments and pay personal expenses in its own admission.

The government next states that Harbour diverted the KSQ "returns" to pay Jackson (Doc.848, pg.7). This unsupported allegation has a multiple of issues. *First*, the Prosecutor stated that Harbour's "Gross Income is not probative of any material fact in the case"[3] *Id.* Therefore, Harbour using his gross income from one of his entities to pay

---

3 26 USCS Section 61(a) of the Internal Revenue Code provides a brood definition of gross income. Except as otherwise provided in this subtitle, gross income means all

8

Jackson back, DNA or otherwise, does not prove or support any material fact in the case, including Jackson. *Second*, this Court ruled money is fungible, which follows the Supreme Court's ruling that money is fungible. "The property returned need not be the very same bills or checks" See *Robers v US* 572 US 639 (Supreme Court 5-5-2014). What gross income was used is irrelevant. *Third*, the government's argument means if Harbour loaned Jackson's money to Company A and B, then only Company A and B gross income can be used to pay Jackson back. This is nonsensical and not how business works nor is it in alignment with the case law or was a requirement imposed by Jackson.

The government never met the burden to prove that Harbour did not invest Jackson's money and of course, no charges in the SSI related to Jackson. *Fourth*, the Prosecutor has once again changed his story. Now, the government claims Harbour diverted the "return" owed to the lenders in order to pay Jackson. However, previously the accusation was that Harbour never even sent the lenders' fund *to* KSQ. The evidence in the trial was that Harbour did not divert any "returns" of DNA. The bank statements and the testimony of Purifoy and Hill prove that Harbour paid the lenders when the money came in from KSQ. Those payments are the "returns." The government admitted they were all promissory notes, not Subscription agreements. Therefore the "returns" were defined in the Promissory Note and once Harbour made the debt payment or the "return" to the lenders the remaining money was Harbour's to spend as he choose.

*Fifth*, per Paige's tracing, Jackson was last paid by Harbour in June 2013 (accrued interest) after repaying the entire $6 million by the end of 2012. In June 2013 Harbour made all the debt payments to the lenders whose money was sent to KSQ. Therefore Harbour did not divert any "returns" that were supposed to go to lenders to Jackson. Once again, the Prosecutor made statements without actually looking at the evidence. If he had looked at the bank statements and reviewed the testimony of Purifoy, Hill and Paige, he

---

income from whatever source derived. *Comm'r v Schleier* 515 U.S. 323 (Supreme Court 1995). This includes gross receipts for a business.

would have known that Jackson was not paid after June 2013, so no "diversion" of "returns" could have happened.

The Prosecutor states that "Harbour's" Affidavit attempts to detail the path of the $15 million. No, Jason Braun testified that he and other attorneys representing Jackson authored the Affidavit, not Harbour. They detailed the path of the $15 million. The Prosecutor is still trying to show that Exhibit 886, a tax strategy by Harbour's then Tax Lawyer, Jack Beaver, was fraudulent. Jack Beaver is a certified tax law specialist. Beaver made an argument and the Tax Court rejected it, deeming the $4.1 million to be gross income to Harbour on the 2012 HighPointe Capital Group Schedule C. This brings us full circle to the Prosecutors statement that Harbour's gross income cannot be used to prove any material fact in the case. This concession by the government along with the admission that it was unclear how Harbour used Jackson's money eradicates its (uncharged) "case" with respect Jackson in its entirety.

The Prosecutor then decides that Harbour used the $15 million for purposes that were not intended by the agreement, with zero proof. Nowhere in the Affidavit, authored by Jackson's lawyers, does it say that Harbour used the money *not* per the instructions of Jackson. No where in the Affidavit does it accuse Harbour of making misrepresentations or material omissions to Jackson. Nowhere in the Affidavit does it say Harbour stole $6 million from Jackson. Nowhere in the Affidavit does it say Harbour had any control of the other $9 million. The government has no evidence, let alone clear and convincing evidence that Harbour committed any fraud whatsoever with respect to Jackson. This is all contrived nonsense.

The Prosecutor then tries to say that Harbour intended to lose Jackson's money and therefore, the Court should use intended loss with Jackson because it was part of a Ponzi scheme. *First*, the evidence proved the $9 million was sent directly to Palo Verde, not Harbour, therefore it cannot be considered for the alleged Ponzi scheme. *Second*, there is no proof of any Ponzi scheme. In fact, AUSA Schoch told the Court the government was

not even alleging a Ponzi scheme in this case. The Prosecutor has not traced one dollar of Jackson or any lender's money to Ponzi payments. *Third*, the Prosecutor is completely ignoring that Harbour had revenue from multiple sources during the time frame of Jackson's money including the Hospital Investment and the companies that Eckholt testified to, meaning Harbour had a legitimate business. The Prosecutor cites to *U.S. v Bowman* 81 Fed. Appx. 104 (9th Cir. 2003). This case makes it clear that the government must prove similarity and temporal proximity and cites *U.S. v Hahn* 960 F.2d 903, (9th Cir. 1992) on the requirements needed. In *Bowman* the scheme was telling the lenders their money was backed by Lloyds of London. It was 38 investors over two years and the two Ponzi schemes overlapped and the government traced the money coming in from one lender and then being used immediately to make interest payments to an old lender.

In the instant case, it is 5 years from the offense of conviction, it has no similarity to Burg and Turasky and the government did not trace one dollar from Jackson being used to pay other lenders even though it told the Court it did. Finally, the money that was used to pay Jackson back were Harbour's gross income from a legitimate business, not lenders, and not material to any fact in the case.

*Hahn* also applies to Reace, Alofs, Gray, and White. They have no connection to Burg and Turasky. Reace was in 2008, Gray and Alofs in 2010 and they were all a part of the Hospital investment. In approving Harbour's $15 million claim and confirming the Plan of Reorganization, the Federal Bankruptcy Judge confirmed that the investment was a not a fraud. Also, there is no temporal proximity and no similarities.

The Prosecutor next says that Harbour told lenders he attended an Ivy League school.[4] The only testimony at the trial about Harbour being a CPA and expecting a Lear

---

4 Harbour did attend an Executive Management program at the Wharton Business School while at Arthur Andersen. Due to the Department of Justice putting AA out of business, Harbour was not able to finish. Harbour never stated he went to Harvard.

Jet inheritance came from Eckholt.[5] None of this was supported by the testimony of any witness who loaned money to Harbour. Not one lender testified that Harbour told them and they relied upon him going to a certain college, nor that he was a CPA, nor that he was expecting to inherit Lear Jet stock as something they relied upon to loan him money.[6]

The Prosecutor is trying to now pivot and go all in on Jackson. The Prosecutor did not name Jackson for Forfeiture or Restitution or in the SSI, but believes Jackson should be used for sentencing enhancements. The Prosecutor habitually ignores the case law with respect to intent to defraud, deceive and cheat, relevant conduct and loss causation.

*Intent to defraud*, Harbour and Jackson agreed in the joint Affidavit, Exhibit 397, that Jackson signed a subscription agreement with Palo Verde and sent the $9 million to Palo Verde. Harbour borrowed $6 million in 2009 and would pay it back in 2012. This is exactly what Harbour did, no intent to defraud.

*Deception and Cheat,* Harbour got $6 million, used it per Jackson's instructions, as stated in Exhibit 397, and paid back $6 million, so no deception and no cheat. He never got or controlled $9 million so no deceive or cheat there either.

*Temporal Proximity,* Jackson has zero connection to Burg and Turasky. He loaned money 5 years prior and was paid back two years before Harbour borrowed money from Turasky and received Burg's investment. There is no evidence of Jackson money being used to pay Burg and Turasky or Burg and Turasky money being used to pay Jackson for the Ponzi. No temporal proximity.

---

5 Larry Cook asked Harbour if he was a CPA and Harbour said no Doc. 844-2. Eckholt testified Harbour told him he worked for a CPA firm, which the testimony proved was true and the government admitted, Arthur Andersen. Since Eckholt is the only one who testified to this, it is more probable than not that Eckholt just assumed Harbour was also a CPA.

6 Eckholt testified that Harbour had a picture of his Grandfather in his office with Bill Lear at a Lear Jet stock holders meeting. This is true and Harbour's Grandfather was one of the original people with Lear Jet and he owned its stock.

12

*Similarity*, there is no connection or similar use of the money. The Prosecutor admitted Green Circle was not a Ponzi scheme. The Prosecutor did not trace Jackson's money and the evidence shows Harbour did invest it per his instructions. The Prosecutors theory is Harbour did not invest any of Jackson's money, but did invest Burg and Turasky money. No mention of misrepresentation or material omissions in Exhibit 397. There are no similarities.

*Loss causation,* none on the $6 million, it was not lost. Harbour had no control of the $9 million and the Receivership did not accuse Harbour of having any involvement in the operations of Palo Verde or in the investment decisions. Therefore no loss causation.

The Prosecutor told the Court that Harbour's scheme was to get lenders money and use it for personal expenses (Hr.6/6/23, pg.22). Now the Prosecutor is saying that Harbour had a Ponzi scheme with Jackson's money. The "scheme" for relevant conduct changes from one hearing and motion to the next.

The Palo Verde Receiver, in his final report stated; "In October 2017, the Receiver issued his report which, among other things, described the Receiver's findings regarding the fraud committed by the General Partner of the Fund and recommended that the Court not give priority to investors that remained in PVF over investors that the General Partner transferred to PVPEF." No criminal charges were ever brought against Palo Verde or Tony Stacy, just like no criminal charges were ever brought against anyone in payday lending. This Prosecutor is the only one alleging that Harbour should be responsible for Palo Verde losing $6.7 million of Jackson's $9 million and all the lenders who lost their money because of Operation Choke Point. As we have pointed out previously, Palo Verde was sued by an investor in the District of Oklahoma and the District Judge dismissed it because the investor signed a subscription agreement acknowledging it knew the risk of investing, same thing Jackson did as admitted to in Exhibit 397 #24.

/ / /

/ / /

## Conclusion

The Prosecutor has changed his theory of Harbour's scheme from getting money to pay for personal expenses to a Ponzi scheme. There is no evidence of Harbour using money from Jackson, Donmoyer, Bobrow, Reace, Alofs, the Willsons, or Gray to make Ponzi payments.[7] Under *Hahn*, the government cannot meet the clear and convincing standard of relevant conduct. This is just the latest example of the government playing fast and loose with the truth in the hope that it can convince the Court that what is false is true. We hope the Court is not taken in by this gambit.

Trying to bring Jackson and the supposed existence of a "Ponzi Scheme" back into this case after many months of trying to distract the Court's attention through the display of a series of other "shiny objects," is an obvious and desultory "Hail Mary." The government is not supposed to try the kitchen-sink approach *in seriatum* fashion. The government knows that Harbour is innocent of what he was charged with. Under *Berger* someone in that Office needs to absorb the meaning of what has been shown The offenses of conviction have nothing to do with a Ponzi scheme. Period.

RESPECTFULLY SUBMITTED this 25th day of January 2024.

CHRISTIAN DICHTER & SLUGA, P.C.

By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

---

[7] Exhibit 900 shows that someone other than Harbour was making the 2007 loan payments to Bobrow, as recorded by Lisa Berges for the Family Dollar store investment that the government called a fiction, except the money he received was obviously real money.

# **CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2024 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Assistant United States Attorney
Joseph F. Bozdech
Joseph.bozdech@usdoj.gov
Assistant United States Attorney
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez