GARY M. RESTAINO
United States Attorney
District of Arizona
KEVIN M. RAPP
Arizona State Bar No. 014249
Email: kevin.rapp@usdoj.gov
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-19-00898-PHX-DLR (DMF) |
| Plaintiffs, | |
| vs. | **UNITED STATES' MEMORANDUM RE: RESTITUTION** |
| David Allen Harbour, | |
| Defendant. | |

## SUMMARY

In advance of the restitution hearing the United States is providing this Court its position with respect to restitution. First, this Court has already found by clear and convincing evidence that the victims Mark Burg ("Burg"), Carol and Pat Hill ("the Hills) Joe Cathey ("Cathey") and PAIF sustained losses due to Harbour's fraud. Accordingly, by a preponderance of evidence, they are entitled to restitution. Again, Burg is designating his restitution payments to the Hills. (*See* Doc. 848, p. 3)

Second, Rhonda Gray ("Gary"), (like Burg, PAIF, Cathey and the Hills), sustained a loss due to Harbour's scheme to defraud as set forth in the SSI. This Court need only find that it has been proven by a preponderance of the evidence standard rather than by clear and convincing standard (used to determine loss for guideline purposes) that Gray is entitled to restitution. Importantly, the scheme to defraud is as an element of the charged counts of wire fraud that encompasses uncharged conduct.

It is unclear what happened to Gray's funds and Harbour has never provided any supporting documents demonstrating where the funds were placed. Nevertheless, Harbour told Gray her money was in "payday lending", when he was unable to return the funds, he made a veiled reference to "Operation Chokepoint", and later told her that the funds were in a hedge fund similar to PAIF. Moreover, defense counsel repeatedly told the jury that Gray's funds were in Green Circle. Lastly, her testimony was allowed to be presented at trial, she addressed this Court as a victim, and provided a victim impact statement. In short, she is entitled to restitution.

Next, although this Court found that the losses sustained by Kenneth Bobrow and Pam Case related to the Pat Spaulding fraud should not count toward losses for Guideline purposes, this Court never ruled on the losses ($140,000) sustained by Kenneth and Victoria Bobrow related to the Georgia fraud. As detailed in the SSI, the Georgia fraud was important to Harbour's scheme to defraud by attracting investors because residing in a multimillion-dollar home gave him the veneer of success. (Doc. 387, ¶s 24-32)

The Georgia fraud was in furtherance of his scheme to defraud because it involved the forgery of false "gift" letters to the lender, among other forgeries. The false gift letter scheme was admitted into evidence as subsequent bad act evidence pursuant Fed.R.Evid. 404(b). Georgia has sold but the seller had no obligation to pay the Bobrows as they were defrauded by Harbour. They are entitled to $140,000 in restitution.

Lastly, Harbour specifically agreed as a term of his plea agreement to pay the IRS $4,680,354.24 in restitution for calendar year 2012.

The United States is requesting that the Court impose restitution in a total amount of **$11,808,706.78** based on the economic loss to each of the victims detailed below:

| Victim | Restitution Amount |
|---|---|
| Victoria and Kenneth Bobrow | $140,591.67 |
| Rhonda Gray | $864,242.67 |

| | |
|---|---|
| Carol and Pat Hill | $432,939.70 |
| Joe Cathey | $1,335,518.50 |
| Mark Burg | $935,000.00 |
| PAIF | $3,420,060.00 |
| Internal Revenue Service | $4,680,354.24 |
| **Total** | **$11,808,706.78** |

Last, the United States request that in amending the J & C to include restitution, this Court include the following language:

> The defendant shall pay a total of $5,263,375.58 in criminal monetary penalties, due immediately. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows: Balance is due in equal monthly installments of $5,000 over a period of 34 months to commence 60 days after release from imprisonment. Any payment schedule represents a minimum payment obligation and does not prohibit the United States from pursuing collection through all available means.

(PSR, p. 37)

## **LAW AND ARGUMENT**

**A. Harbour is liable for restitution for conduct in furtherance of his scheme to defraud uncharged victims Gray, the Hills and Cathey.**

The loss to uncharged victims Gray, the Hills, and Cathey was perpetrated in furtherance of Harbour's scheme to defraud which is an element of wire fraud. The MVRA provides for mandatory restitution and covers "any offense committed by fraud or deceit ... in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). Restitution to persons "directly and proximately harmed" by fraud and money laundering is ordinarily mandatory. *See* 18 U.S.C. §§ 3663A(a)(1),

(c)(1)(A)(ii). In such a case, the Court is authorized to determine a restitution amount and a schedule of victims and payments.

In addition, under the MVRA, the Court is required to order full restitution to victims of a convicted offense when the offense is committed by fraud or deceit, without consideration of the defendant's economic circumstances or ability to pay. 18 U.S.C. §§ 3663A(c)(1), 3664(f)(1)(A). It is the government's burden to prove the amount of loss for restitution purposes by a *preponderance of the evidence*. 18 U.S.C. § 3664(e)(emphasis added). The government must also show by a preponderance of the evidence that an individual is a victim of the crime (including a scheme to defraud) on which the defendant was convicted, and that the victim's losses were caused by the defendant's offense conduct. *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010).

It was once the case that a defendant could be required to pay restitution *only* to the victims of the offenses of which he was convicted. *See Hughey v. United States*, 495 U.S. 411, (1990) ("Petitioner pleaded guilty only to the charge that he fraudulently used the credit card of Hershey Godfrey. Because the restitution order encompassed losses stemming from alleged fraudulent uses of cards issued to persons other than Godfrey, such portions of the order are invalid."). Subsequently, however, he portion of *Hughey* that limited restitution to those losses caused by the actual offense of conviction was abrogated by the 1990 amendments to section 3663. Section 3663 now provides that if the offense of conviction involves a scheme, conspiracy, or pattern of conduct, as is the case here, restitution may include all losses caused during the course of that scheme, conspiracy or pattern. *See* 18 U.S.C. § 3663(a)(2) (Supp. V 1999).

The *Hughey* rule still applies, however, unlike here, where the defendant has not been convicted of an offense having a conspiracy, scheme or pattern of conduct as an element. *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir.1999). In addition, even under section 3663(a)(2)'s current expanded definition, a victim must be "directly harmed by the defendant's criminal conduct." 18 U.S.C. § 3663(a)(2) (Supp. V 1999). *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 927 n. 10 (9th Cir. 2001); *accord United*

*States v. Brock–Davis*, 504 F.3d 991, 998–99 (9th Cir.2007) (also recognizing the amendments abrogating *Hughey* also abrogated circuit case law that restitution must be limited to the loss attributable to the specific conduct underlying the conviction).

More specifically, in the case of a conviction for a crime or crimes that require proof of a "scheme, conspiracy, or pattern of criminal activity," such as wire fraud, restitution may be ordered for all persons directly harmed by the entire scheme. Such restitution is not limited to harm caused by the particular counts of conviction (as it would be absent the scheme element). *See United States v. Booth*, 309 F.3d 566, 575–76 (9th Cir.2002). In this context, a restitution order may be based on related but uncharged conduct that is part of a fraud scheme. *See United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir.2003) (affirming restitution of loss from uncharged conduct beginning prior to the effective date of the MVRA). The harm to the victim must, however, be closely related to the scheme, rather than tangentially linked. *United States v. Riley*, 143 F.3d 1289, 1292 (9th Cir.1998) (quoting *United States v. Kones*, 77 F.3d 66, 70 (3rd Cir.1996)); *see also United States v. Gamma Tech Indus.*, 265 F.3d [917,] 928 [ (9th Cir. 2001) ] ("the loss cannot be too far removed from" the "conduct underlying the offense of conviction"). *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015) (emphasis added). "In other words, 'when the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, ... the restitution order [may] include acts of related conduct for which the defendant was not convicted.'" *Brock–Davis*, 504 F.3d at 999 (quoting *United States v. Lawrence*, 189 F.3d 838, 846–47 (9th Cir.1997), with emphasis added); *accord Grice*, 319 F.3d at 1178 ("[P]ermitting restitution under the MVRA for related, but uncharged mail fraud conduct occurring prior to and continuing past the MVRA's enactment is consistent with the text of the statute and related authority." (Emphasis added).

Here, an element of the charged counts of wire fraud includes a scheme to defraud:

Defendant HARBOUR, individually and doing business under the entities

- 5 -

described above, along with other individuals and entities known and unknown to the Grand Jury, knowingly and **willfully devised and intended to devise a scheme and artifice to defraud** and to obtain money and property from investor-victims by means of materially false and fraudulent pretenses and representations, and by the concealment and omission of material facts.

(*See* SSI, Doc. 387, ¶ 37) (emphasis added)

Because Harbour's counts of conviction are part of a fraud scheme (wire fraud) the uncharged victims (Gray, the Hills and Cathey) have shown a direct and proximate causation between their claimed harm and Harbour's charged offense under § 1343.

This precise issue was addressed in *United States v. Maasen*, WL 6198478 (D.AZ 2018) In *Maasen* the victim (the Defendant's ex-wife) argued that she was entitled to restitution for uncharged conduct based on a fraud scheme by Defendant. The District Court (Senior District Court Judge David C. Campbell), however, found that the victim was not entitled to restitution for Defendant's uncharged conduct because his crime of conviction (Bankruptcy Fraud) did not include, unlike wire fraud, an element of "a scheme, conspiracy, or pattern of criminal activity." *Id.* The Court noted that none of the four elements the government would have had to prove at Defendant's trial include a scheme, conspiracy, or pattern of criminal activity. *See* Doc. 126 at 8-9; *see also United States v. Lawrence*, 189 F.3d 838, 847 (9th Cir. 1999) (noting that counts for bankruptcy fraud under § 152 "contain no elements relating to scheme, conspiracy or pattern").

In the final, analysis, Harbour's counts of conviction included a scheme to defraud that was perpetrated against the Hills and Cathey but also Gray.

**B. The Court can Order a different amount of restitution than the amount found for loss.**

It is of no consequence that restitution ($11,808,706.78) exceeds the loss amount ($8,351,345). (Hr'g. Tr. 1/30/24, pp. 9-10) Different standards and different considerations govern the determination of intended loss for calculating a Sentencing Guidelines range as opposed to computing actual loss for purposes

of restitution. Those differences are critical here, because a restitution award below the $8,351,285 Guidelines loss figure determined by this Court would be, in the United States' view, at odds with the facts. (*Id.*)² *Compare* U.S. Sentencing Guidelines Manual§ 2Bl.l cmt. n. 3(A) (2002), *with* 18 U.S.C.A. § 3663A(b)(1) (West 2000 & Supp.2007). A district court's restitution order does not have to be the same as its Guidelines loss calculation. *See, e.g., United States v. Souffrant,* 517 F. App'x 803, 827 (11th Cir. 2013) ("The amount of loss arrived at for sentencing purposes 'does not necessarily equal the amount of restitution to be paid because a defendant's culpability will not always equal the victim's injury.'") (citing *United States v. Huff,* 609 F.3d 1240, 1247 (11th Cir. 2010)); *United States v. Patterson,* 595 F.3d 1324, 1327 (11th Cir. 2010) ("While the Mandatory Victims Restitution Act requires a judge to order restitution to compensate the full amount of each victim's losses, it does not require restitution to match the loss figure used for sentencing."); *United States v. Barnette,* 10 F.3d 1553, 1556 (11th Cir. 1994) ("Damages measure the amount of compensable loss a victim has suffered. Restitution, purposes, but as the case law makes clear, that is not always the situation, and there is no prohibition on a court using a higher number for restitution. *See United States v. Keller,* 236 F. App'x 274, 276 (9th Cir. 2007) (the defendant "fails to identify any authority that makes it improper for a district court to show leniency with respect to determining a defendant's prison sentence but not with respect to awarding restitution").

In sum, this Court has the authority to find that the actual loss to the victims from Harbour's scheme to defraud, for purposes of restitution, by a preponderance of the evidence, is a higher figure than the number it used for calculating the Guideline range by clear and convincing evidence.

**C. Mark Burg has designated the restitution owed to him to be paid to the Hills.**

As this Court knows, Mr. Burg sustained a loss of $1,000,000 and is owed $935,000 (the initial investment minus the Ponzi payments he received) in restitution. (PSR ¶ 24) The jury convicted Harbour of Burg related counts. (Counts 2, 6-8) In addition to a jury verdict, this Court determined by clear and convincing evidence that Harbour was responsible for a loss of $1 million to Burg. (Hr'g Tr. 1/30/24, p. 9) As noted in a previous pleading, Mr. Burg advised that he wishes that his restitution payments be directed to the Hills. The Mandatory Victims' Restitution Act ("MVRA") allows crime victims to *designate their restitution to another person or organization.* 18 U.S.C. §3663(b)(5) (emphasis added). (Doc.848, p. 3 )

**D. This Court has found by clear and convincing evidence that the Hills, Cathey and PAIF sustained losses that were proximately caused by Harbour.**

It is already the law of the case, after the Court considered testimony at trial and a sentencing hearing, that the Hills, Cathey and PAIF are entitled to restitution. Although this Court directed a verdict on the counts related PAIF it reversed its decision for loss after Philip Burgess credibly testified to the losses caused by Harbour. (H'rg Tr. 11/29/23, pp. 13-112 )

**E. Gray's loss is tied to the scheme set forth in the SSI.**

This Court found that the fraud perpetrated on Gray was part of Harbour's scheme to defraud and it was allowed to be presented to the Jury. (*See* Doc 590) In addition, Gray addressed this Court as a victim, and she also provided a victim impact statement (VIS) that was considered by this Court prior to sentencing. (*See* Gray VIS; Hr'g Tr. at 62-64). Tellingly, Harbour never objected to Gray addressing this Court as a victim but did object to others providing statement to the court challenging their victim status. (Doc. 809)

Despite her trial testimony this Court found that the victims listed in paragraph 25

of the PSR was not proven for loss purposes that it was part of the same course of conduct.[1] (Hr'g Tr. 1/30/24, p. 9) It is unclear why this Court omitted Gray for loss or perhaps it was an oversight. In any event, Gray's nearly $1 million loss was certainly related to the counts of conviction. Harbour will erroneously argue that Gray's loss had nothing to do with the "payday lending scheme" and, therefore, it is not tied to a count of conviction. This argument should be rejected for a couple of reasons.

First and importantly, during the protracted sentencing hearings Harbour has never produced a single document or any other countervailing evidence that demonstrates where Gray's funds actually went. Second, Gray provided the funds in 2010 and Harbour's excuses as to why he was unable to return the funds continued into 2016 overlapping with both the KSQ and Green Circle fraud, until he went silent in August 2016 in the wake of the SEC investigation. At various points, Harbour shifted his explanation as to where Gray's money went including advising her that it was in payday lending.

Third, Harbour provided Gray the same promissory note that he used for KSQ and Green Circle investors. (*See* Trial Exs. 219 (Gray), 252(Hill), 251(Hill), 566(Hill), 469(Wilson), 421 (Cathey)). This Court may recall that Gray insisted that she have something in writing and Harbour produced the exact same promssiory note that he had with the Hills, Cathey and Turasky sign for their "investment" with Harbour. (Trial Tr. 2/2/24, pp. 82-85)

Fourth, Defense counsel acknowledges Gray's connection to the Green Circle fraud in his opening statement claiming that her money was tied up in Green Circle:

> "But what had happened then? He says to her, in July of '16, okay. We'll arrange now to get you the money back. But then in September of '16 is when Green Circle is collapsed by PAIF, and there is no more money. Just isn't. You know? There just isn't."

---

[1] The court likely meant paragraph 24 of the PSR which detailed the losses to numerous aggrieved investors.

(Trial Tr., 2/1/23, p. 24)

Defense counsel returns to the theme of Gray's money being tied up in Green Circle in his closing argument:

> "What happened -- and so this is these timeline events that you say, oh, I now understand it. Because when you look at the interchange between them, it's that she wants the money. Harbour wants to get her the money and says, I'm going to get you the money. So that's in July. Well, what happens in August and September? PAIF shuts down the money source. It shuts down Green Circle."

(Trial Tr. 2/28/23, p 176)

Fifth, Harbour initially told Gray that her money went to some type of unspecified Hospital investment. (Trial Tr. 2/2/23 pp. 39-41). Importantly, later Harbour tells her he placed it in "payday lending." (*Id.* at p. 60) Also, consistent with the returns he had represented to other payday lenders (the Hills, Cathey, Turasky, the Wilsons, etc.) Harbour claimed it was doing better than the original 3% return and was now making a return of 12%. (*Id.*) He later mentioned that he was in a hedge fund (similar to PAIF) and implied that Gray's investment had something to do with it. (*See* Trial Tr. 2/2/23. pp. 94, 99; Ex. 787)

Sixth, similar to Burg, the Hills and Cathey, Harbour did not provide Gray any written information regarding the details of the investment. Harbour further misleads Gray about where her money was placed by claiming that, it was important to keep her in the dark so that she would have plausible deniability stating, "its best that [Gray] didn't know where they're at" (*Id.* at 60) Importantly, in 2013 Harbour, at Gray's urging provided his standard promissory notes that represented that the money was loaned to Harbour. (*Id.* at 84) Gray was confused by this as she had never intended to loan Harbour money but believed it to be in some type of investment vehicle. (*Id.*)

Seventh, Harbour used the same strategy with Gray that he did with other investors by providing her concert tickets, inviting her to his suite at the Waste management Phoenix Open, etc. (*Id.* at 77-78) In addition, similar to the Hills, Gray was unsophisticated when

it came to investments and Harbour did nothing to explain the risks or even had her seek another opinion or independent advice before providing him a check for $1 million. (*Id* at 85-86)

Eight, Harbour makes a veiled reference to payday lending when he texts Gray and says, "things have to be more detailed with our president." (*Id.* at 95; Trial Ex. 787, p.4) This is clearly a reference to Operation Chokepoint that according to Harbour's defense was implemented by the President Obama in 2012 to thwart pay day lending. In sum, Gary's losses were based on the same fraud scheme that he employed with other investor's that his court has already found as losses for guideline purposes.

### F. Kenneth and Victoria Bobrow sustained a loss as a result of the Georgia Fraud scheme and are entitled to restitution.

In 2021 Harbour devised a scheme to defraud related to the purchase of Georgia. He engaged in a wire fraud conspiracy and a bank fraud scheme. (*See* SSI, Doc. 387, ¶s 47-52) He did so by convincing the Bobrows to provide him $140,000 so that he could purchase the multimillion-dollar Georgia property without putting any of his own money at risk. He did so by forging false gift letters and secured promissory notes. (*Id.*) Both counts have as an element a scheme to defraud.

The wire and bank fraud schemes are similar to the counts of conviction as it involved the forging of documents, misrepresented the nature of the investment, and allowed Harbour to perpetuate a veneer of a successful businessman by residing in a multimillion-dollar house. Although the series of counts related to this scheme were severed, the forging of the gift letters was allowed pursuant to Fed.R. Evid 404(b) as a subsequent bad act.

In sum, the Bobrows are victims of an offense that involves as an element "a scheme, a conspiracy, or a pattern of criminal activity" and were directly harmed by Harbour's criminal conduct in the course of the scheme, conspiracy, or pattern. Georgia

has sold and the Bobrows have never been compensated for the funds that were obtained by fraud. They, therefore, are entitled to $140,000 in restitution.

**G. Harbour specifically agreed to pay restitution to the IRS in the amount of $4,680,354.24.**

On March 3, 2023, Harbour agreed to pay restitution to the IRS as a term of his plea agreement:

> **The defendant specifically agrees to pay restitution to the Internal Revenue Service in the amount of at least $4,680,354.24 for the 2012 tax year.** The defendant understands there may be additional civil adjustments to the tax due for that year after he is sentenced. The defendant further agrees to cooperate with the Internal Revenue Service regarding tax years 2013-2021, including by filing or amending his previously filed tax returns, provided, however, that "cooperation" shall include making use of any and all administrative and civil remedies available to taxpayers under the Internal Revenue Code through his advisors and attorneys. Restitution to the Internal Revenue Service will be collected and distributed after the restitution allocated to the victims in paragraph 3(e) has been fully paid.

(Doc. 695, ¶ 3(c))

## CONCLUSION

Based on the forgoing the court should impose $11,808,706.78 in restitution to the victims detailed above.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Kevin M. Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrant:

Stephen M Dichter, *Attorney for Defendant*

*s/Daniel Parke*
U.S. Attorney's Office