Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Defendant David Harbour

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:19-cr-00898-DLR (DMF) |
| Plaintiff, | |
| vs. | **MEMORANDUM ON THE SUBJECT OF RESTITUTION** |
| David Allen Harbour, | |
| Defendant. | (Hearing April 9, 2024) |

The Mandatory Victims Restitution Act 18 U.S.C.S. §3663A ("MVRA"), provides redress to the victims of fraud, but it does not supply a windfall for those who independently enter into risky financial enterprises through no fault of the fraudsters. If a person gives the Defendant his money to bet, knowing that the bet might lose, his later loss, for purposes of restitution, is, in this fundamental sense, caused not by the defendant accepting his money, but by the outcome of the bet. *U.S. v Calderon*, 944 F.3d 72 (2nd Cir. 2019).

The "bet" here was the "bargain" which was defined by the Court in Doc 800, that is, how Harbour would use the Burg, Turasky, Hill's and Cathey money. The evidence

proves beyond any doubt that Harbour used the money or placed the "bet" per the representations that were made.

Harbour never had a bargain or "bet" with PAIF. PAIF's bet was with Green Circle, as was Oak Tree's. Burgess's company, Microbilt, he claimed, could underwrite the consumer loans to a probability of a 20% (or less) rate of default. Harbour had nothing to do with PAIF, its business plan, or its bargain with Green Circle. However, Microbilt scored all the Green Circle consumer loans; those made with PAIF money and those made with Oak Tree money.

Per the testimony of Burgess, PAIF made a good bet, because if Microbilt approved the loans, they would pay. In addition, Burgess told the Court that Green Circle *always* paid and the PAIF Weekly Settlement Reports we provided the Court proved that Green Circle generated over $11 million in Gross Income and paid PAIF over $5 million. The Court ignored all of this once. We hope it will not do so again. None of which was considered by the Court. Harbour did not make the consumer loans, Green Circle did. Harbour did not underwrite the consumer loans, Burgess did, through Microbilt.

PAIF claims that it lost $3.2 million on the loans Green Circle made using Harbour supplied money. Assuming the Court buys this absurd and unsupported contention, how does that possibly become Harbour's fault?  We know all the money Oak Tree, including substituted dollars for the $695,000 of Burg and Turasky money initially deployed to repay advances Harbour had made to and for the benefit of Oak Tree, reached Green Circle. We know that Alonzo Primus, PAIF's CEO and Chief Credit Officer was Green Circle's Treasurer and Controller. And, yet, for sentencing purposes,

this Court erroneously attributed the unsubstantiated loss claims to Harbour and, we imagine, may well do the same for restitution.

The reason that PAIF "succeeded" to the interests Oak Tree had in the consumer loans made by Green Circle to consumers was because PAIF was the senior lender to PAIF. When Green Circle allegedly breached the loan covenants, PAIF's senior position allowed PAIF to gain whatever *benefit* there might have been to the Green Circle portfolio. Harbour had no guarantees out to PAIF. Harbour did not owe PAIF anything. Harbour lent to Green Circle; PAIF lent to Green Circle. PAIF only "lost" money on the Oak Tree funded loans because it failed to gain the benefit of the Oak Tree funded loans. Even if one buys the farcical and perjurious Burgess premise, since Harbour and Oak Tree had not guaranteed anything to PAIF, the fact that PAIF did not benefit did not mean that PAIF *lost* any of the money *PAIF* had loaned to Green Circle.

On his part, Cathey testified he met directly with Joel Tucker and decided to loan the money for payday lending after meeting with Joel. Carol Hill testified she was writing all these checks to lenders, and she wanted to make the high interest rate. She said her and her husband Pat decided to loan the money. Hill deposited her money into DNA and Hill wired her money out of DNA to KSQ. There was no confusion that Hill understood the "bet" or the "bargain."

Meanwhile, Burg and Turasky lawyers set the parameters of the "bet" and Harbour used their money per the parameters set by the lawyers. The documents written by Burg and Turasky lawyers did not guarantee the bet and explained they could lose the "bet." The only way this could be fault of Harbour, is if the money was not used per the terms

of the agreements. Turasky agreed in his declaration Harbour used the money per the terms. Burg and Dean Avedon testimony and relevant agreements made it clear Harbour could use Burg's money for an investment (Green Circle) and to reimburse expenses that had been incurred (2014 Schedules C and E). Burg entered into the agreements independently on the advice of his lawyers and financial advisor.

We have already noted, at length, the mistakes made by the Court in failing to proceed under Rule 32 and failing to address loss causation for sentencing. It is important to note that, as badly as we believe the Court erred in sentencing, loss causation for restitution is not permitted for loss caused by "relevant conduct even though such conduct may be properly included in offense level calculation" under the sentencing guidelines. Restitution is only for those who have been "direct harmed by the defendants criminal conduct" *U.S. v Vilar*, 729 F.3d 62 (2nd Cir. 2013) citing *U.S. v Lussier,* 104 F.3d 32, 33 (2nd Cir. 1997).

The amount of restitution that may be ordered is limited "by the victim's actual loss." *U.S. v Bussell*, 504 F.3d 956, 964 (9th Cir. 2007) This is not the gross amount, which the Court mistakenly used for sentencing. In *Lonich*, the 9th Cir. vacated the sentence and therefore the restitution, because the government did not prove that Lonich caused the losses. *U.S. v Lonich,* 23 4th 881 (9th Cir. 2021)

The 9th Cir. ruled; "An unrelated, intervening cause of a loss defeats a claim for restitution." *U.S. v Meksian*, 170 F.3d 1260 1263 (9th Cir. 1999) This applies to Cathey, Hill's, Burg, Turasky and PAIF. While the government mocked and derided Operation Choke Point, the most charitable thing that can be said is that the government did so out

of ignorance. Cathy and the Hills lost their money solely because of the illegality of Operation Choke Point.

To qualify as a victim under the MVRA, the government must show an actual and proximate cause between the harm suffered and a defendant's conduct underlying the offense conviction. "But for" causation is insufficient and although multiple links in the causal chain may exist, the chain may not extend so far as to become unreasonable. The government bears the burden of proving by a preponderance of the evidence both the amount of the victim's loss and that a "non-attenuated" causal connection exists between that loss and the defendant's conduct. *U.S. v Swor*, 728 F.3d 971, 974 (9th Cir. 2013); *see also*, *U.S. v Peterson*, 538 F.3d 1064 (9th Cir. 2008)

The 9th Cir. has found that specific findings of fact are necessary at times and the district court must set forth an explanation of its reasoning, supported by the record, when a dispute arises as to the proper amount of restitution. *U.S. v Hai Waknine*, 543, F.3d 546 (9th Cir. 2008)  Just as he vociferously disputed loss causation and related conduct for sentencing, so too does Harbour dispute *any* restitution, therefore the Court is required to explain its reasoning if it grants *any* restitution (except for Count 24, which, as the Court has already ruled, will be whatever the Tax Court determines is the tax for 2012, once it is finally decided).

The Supreme Court has explained that proximate cause is often explained as foreseeability, that is, whether the former event caused the latter and Restitution orders should represent an application of the law, not a decision makers caprice. *Paroline v U.S.*, 572 U.S. 434, 444 (2014). In summary, Restitution and Sentencing both require loss

causation, except the rules for loss causation are even more stringent for restitution than for sentencing. The government did not provide any evidence of loss causation for sentencing, and they have not provided it for Restitution.

Harbour's conviction, per Doc 800, is the law of the case. He was convicted because he only sent a portion of Turasky and Burg's money to Green Circle while using a portion of it to reimburse expenses that, the Court found -erroneously - that Harbour had not incurred.

Although the IRS refuted this ruling by allowing more than $695,000 of expenses on his 2014 Schedules C and E and that Harbour had Gross Income more than $695,000 in 2014, none of this is material or connected to the Hill's, Cathey or PAIF.

The evidence from the trial record and posttrial record proved that Harbour sent 100% of Cathey and Hill's money to the investment, KSQ. None of it was diverted to reimburse expenses that Harbour had incurred or to pay for personal expenses. Why the Court found that their losses should count as relevant conduct is a complete mystery, given that it is incontrovertible that Operation Choke Point caused their losses. That Cathey's losses were counted for sentencing, and might be counted again here, is inexplicable. No one else was charged or even described as a co-conspirator for whose conduct Harbour was responsible and Cathey never met or even spoke to Harbour until after Operation Choke Point had ruined his investment.

Meanwhile, to reach the sentence it meted out, the Court already reversed its denial of victim status to PAIF without any attempt to comply with Rule 32, F.R.Crim.P.

The bald assertion that PAIF lost $3.2 million that should be attributed to Harbour was a fraud perpetrated on this Court that it swallowed whole.

The $1.1 million PAIF advanced to Green Circle was at the request of Green Circle, not Harbour, to pay back the money Green Circle had borrowed from Harbour / Oak Tree. The trial record proved the $1.1 million was used to pay a lender of Oak Tree, which is exactly what Burgess testified was his belief the money was being advanced for. The posttrial record supported the testimony of Cameron that the $1.1 million paid back KC Lending who in fact loaned Green Circle through Harbour / Oak Tree $1.1 million. The posttrial record provided the Court with a signed Declaration from Dunsworth that supported the testimony of Cameron that she reviewed a declaration from Dunsworth.

This Declaration supported the testimony of Burgess that Green Circle used the $1.1 million to pay back a lender, which was Dunsworth, and the Green Circle bank statements proved he did loan $1.1 million. The Declaration also supported that Dunsworth then loaned the $1.1 million to Harbour as a personal loan, which again supported the testimony of Cameron.

To this day, the Court has not explained how Harbour defrauded PAIF or how Harbour caused PAIF to lose any money. The Court has chosen to dismiss the testimony of Cameron and Purifoy and the declaration of Dunsworth. The Court has also decided to dismiss the testimony of Burgess that his company Microbilt approved the consumer loans for Green Circle and that Burgess told the Court if Microbilt approved the loans, they were good loans.

The Court also decided without any explanation to dismiss the testimony of Burgess that he did not know if Harbour changed the consumer loans in the LMS and he did not know who put the July 2015 aging report together that Harbour sent to Primus. Burgess's testimony was in alignment with the testimony Purifoy, that Harbour could not change any consumers in the LMS. Again, the Court has not provided any support either factually from the trial record or case law how it determined to include PAIF in sentencing and how Harbour could of caused their losses, if in fact, they actually had any losses. The same can be said for Cathey and the Hill's.

The Court refused to provide any critical fact finding or legal conclusions on how Harbour caused their loss. To this point, the Court has never stated what the fraud is that Harbour committed against Cathey, Hills and PAIF. This is in complete disregard of the requirements set by the Supreme Court and the 9th Circuit. Both require the Court to explain its reasoning supported by the trial record.[1] Respectfully, we strongly believe that the unforced errors made in the sentencing procedure by this Court when it failed and refused to follow the mandate of the 9th Circuit, will result in, at least, a remand for re-sentencing. The Court will, unless it reverses course, face the same likelihood of reversal based on restitution.

---

[1] "To facilitate meaningful appellate review, the court must also provide a reasoned explanation for its sentencing decision." U.S. v Ameline 409 F.3d 1073 1986 (9th Cir. 2005) Under Ameline the 9th Cir. vacated the sentence "because the district court unfairly shifted the burden of proof to the defendant forcing the defendant to prove a negative and to bear the risk of his failure of proof." The 9th Cir. ordered the court to have a new sentencing hearing in accordance with F.R.C.P. 32(i).

With respect to the restitution for Harbour's 2012 tax amount, it is in tax court and waiting for a ruling on Harbour carrying back his 2014 losses to 2012, which will eliminate the tax owed for 2012. Since the tax restitution is secondary to the victim restitution, it is not relevant to these proceedings. Once Harbour and IRS come to a decision or the tax court rules, the amount will be the restitution per the plea agreement.

There are 3 steps the Government and the Court were required to go through in order to enhance the sentence and of course satisfy the requirements of Restitution.

First Step; the Court must determine what misrepresentation was fraudulent for the offense of conviction, because everything flows from this misrepresentation. What evidence and case law did the court rely on that supports the misrepresentation was fraudulent, that Harbour schemed to defraud, contemplated harm or injury and lied about the bargain.

Second Step; the Court must determine how that fraudulent misrepresentation to Burg, Turasky, Cathey, Hill's and PAIF caused their loss. The only ruling by the court with respect to the offense of conviction was Harbour misrepresenting how he would use Burg and Turasky money.

Third Step; If the trial and posttrial records show any intervening causes that may have caused the loss, the causal chain is broken. Here, there were intervening causes, and internal and external factors as well as economic forces all of which were unforeseeable and out of Harbour's control. The Court was required to consider them for sentencing. The Court is also required to consider them for restitution.

If the requirement is that the fraud be the proximate cause of the loss for the loss to be the subject of mandatory restitution under the MVRA, then the amount of mandatory restitution in this case is zero. Turasky is not seeking restitution. Burg is, though not for himself, but for the Hills. He invested $1 million. Of that, Harbour used $400,000 for reimbursement of expenses he had advanced to Oak Tree and then replaced, so that Green Circle got Burg's $1 million. Where did the $1 million wind up? Ask Burgess. PAIF got it or it was lost because Green Circle made bad loans; neither of which had anything to do with Harbour.

PAIF itself neither borrowed money from Harbour nor invested any money with Harbour. Harbour borrowed no money from PAIF nor invested any money in PAIF. The sole relationship between Harbour and PAIF was that PAIF was a senior lender to Green Circle and, if PAIF lost any money at all based upon the loans Green Circle made, there can be no reason to look to Harbour for Green Circle having done so.

Cathey never met Harbour nor spoke to him until after the collapse of Pay Day lending proximately related to Operation Choke Point. The Hills $581,000 went down alongside Cathey's money, and it is nothing short of outrageous that the same government that caused a shift of from $4 - $6 billion in wealth from the pay day lenders to the pay day borrowers by threatening the banks decided, here, to pin the losses caused by Operation Choke Point onto Harbour.

There are no losses for purposes of restitution attributable to Harbour. The restitution analysis is of particular importance because, whereas forfeiture cannot extend

1    to Abby Harbour's own jewelry that was seized for forfeiture, restitution does extend to

2    community property.

3            RESPECTFULLY SUBMITTED this 4th day of April 2024.

4
                                 CHRISTIAN DICHTER & SLUGA, P.C.
5

6
                          By: /s/ Stephen M. Dichter
7                             Stephen M. Dichter
                              Justin R. Vanderveer
8                             2800 North Central Avenue, Suite 860
                              Phoenix, Arizona 85004
9                             Attorneys for Defendant David A. Harbour
10

11                     **CERTIFICATE OF SERVICE**

12           I hereby certify that on April 4, 2024, I electronically transmitted the attached
     document to the Clerk's Office using the CM/ECF system for filing and for transmittal
13   of Notice of Electronic Filing to the following CM/ECF registrants:

14
     Kevin M. Rapp
15   Kevin.rapp@usdoj.gov
     Joseph F. Bozdech
16   Joseph.bozdech@usdoj.gov
     U.S. Attorney's Office
17   40 N. Central Avenue, Suite 1800
     Phoenix, AZ 85004
18   Attorney for Plaintiff

19

20

21   /s/ Yvonne Canez

22

23

24

25

26

27

28