# EXHIBIT A

## DECLARATION OF PHILIP N. BURGESS, JR.
## (28 U.S.C. § 1746)

PHILIP N. BURGESS, JR., of full age, declares:

1. I am a citizen and resident of the State of New Jersey. I am a consultant to Princeton Alternate Fund, LLC, which is the general partner of Princeton Alternative Income Fund, L.P. ("PAIF"). I make this Declaration in the matter of *United States v. David Allen Harbour* in order to set forth the losses to PAIF that were caused by the fraudulent misrepresentations and conduct of David Harbour. I have personal knowledge of the facts set forth in this Declaration and I am prepared to testify about them.

2. PAIF was introduced to Green Circle in early 2015 and understood that it was being managed and operated by David Harbour for the WLCC Tribe. PAIF was led to believe that, with the assistance of a handful of employees, Harbour managed all aspects of Green Circle's business. He directed funding, raised money and prepared all of the key financial documents for Green Circle, including its financial statements, borrowing base certificates and accounts receivable aging reports. Those financial documents, particularly the accounts receivable aging report, which revealed whether the underlying consumer loans were being repaid on a timely and regular basis, or whether they were in arrears or even in default, were critical to PAIF's decision to do business with Harbour and to lend money to Green Circle.

3. PAIF began reviewing these documents in May 2015 in order to decide whether to enter into a revolving loan agreement with Green Circle. Most of the documentation was provided to PAIF by Harbour's employee, Laura Purifoy, but PAIF managers had direct conversations and email exchanges with Harbour and PAIF always understood and relied on the fact that the essential financial information about Green Circle was coming from Harbour.

4. Based on the representations made to PAIF by and at the direction of Harbour, particularly the June 2015 accounts receivable aging report, in July 2015, PAIF advanced $1.1 million to Green Circle secured by the receivables due to Green Circle from consumers to whom Green Circle had made short term consumer loans.

5. In September 2016, PAIF received a subpoena from the U.S. Securities and Exchange Commission (SEC) for information about Green Circle. PAIF immediately terminated its loan agreement with Green Circle, seized the collateral that had been pledged to secure PAIF's loans to Green Circle, namely the accounts receivable from the consumer loans that Green Circle had made, and began to do a deep dive into Green Circle's financial condition. Harbour was nowhere to be found and Mr. Racine from the Tribe immediately tendered the assets to PAIF.

6. What PAIF found at that time was shocking. Unbeknownst to PAIF until then, 467 of the loans totaling $212,320 that Harbour caused Green Circle to pledge to secure the $1.1 million advance, or 20% of the entire consumer loan portfolio, was already in default at the time that Harbour and Green Circle pledged them because the borrowers had not made a single payment. Ultimately, 1,895 loans totaling $890,850 of the $1.1 million advance could not be collected and were written off.

7. PAIF had relied on financial information and material representations from Harbour, which gave us no reason to doubt that the financial condition of Green Circle met all of PAIF's lending criteria. In fact, PAIF believed, based on the information that Harbour provided, that Green Circle was doing very well.

8. For example, after PAIF took over the consumer loan portfolio, PAIF learned that, even when some of the borrowers missed three (3) payments, which is a point of no return in the consumer loan business, Harbour would cause Green Circle to write new loans, without the knowledge of those consumers, to cover the missed payments and to add additional amounts to those loans, in order to make it appear that the loans were current and to make the total Green Circle loan base appear to be larger than it actually was.

9. PAIF learned much later that Harbour caused Green Circle to regularly submit false borrowing base reports on a monthly basis in order to lull PAIF into believing that it was safe to continue to advance money to Green Circle.

10. Rather than Green Circle being in a strong financial condition, PAIF later learned that almost all of the Green Circle consumer loans did not meet PAIF's lending criteria and that PAIF had been duped.

11. Over a period of approximately 16 months, PAIF advanced Green Circle a total of $10,360,685.60 in principal on the revolving line of credit, and that represents PAIF's total potential exposure to the fraud. The greatest amount that Green Circle owed PAIF at its peak on the line was $5,423,053.27.

12. Contrary to statements made by Harbour and his counsel, when PAIF took over the Green Circle loan portfolio in September 2016, PAIF did not get $1.9 million from Green Circle's bank accounts. In fact, there was only $5,441.35 in one of the Green Circle bank accounts, and $40,855.59 in another one of the Green Circle bank accounts at that point in time.

13. Also, contrary to statements made by Harbour and his counsel, PAIF did not collect $1.9 million on the loans that Harbour and Green Circle had pledged to get the original $1.1 million advance. In fact, PAIF collected only $818,475 of that original advance.

14. Even after PAIF seized the Green Circle collateral and took over the loan portfolio, Harbour continued to steal from PAIF. PAIF learned that in November 2016, Harbour had his employees, Blake Collins, Ashley Collins and Taylor Johnson, set up an account in the name of Green Circle at San Juan Credit Union in Blanding, Utah. Harbour diverted payments from Green Circle consumers that were supposed to go to PAIF to that San Juan account. We determined that Harbour stole $105,146.39 through use of that diversionary scheme during the period from November 2016 to July 2020.

15. As set forth above, PAIF advanced a total of $10,360,685.60 in draws to Green Circle based on the misrepresentations made by Harbour and that represents the amount of PAIF's greatest

exposure. When all of PAIF's losses are taken into account, PAIF incurred a total loss of $3,420,060.58 caused by Harbour's fraud.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this

1st day of September 2023

PHILIP N. BURGESS, JR.