Stephen M. Dichter, 004043
sdichter@cdslawfirm.com
Justin R. Vanderveer, 037657
jvanderveer@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2800 North Central Avenue, Suite 860
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710
Attorneys for Defendant David Harbour

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>  Plaintiff,<br><br>vs.<br><br>David Allen Harbour,<br><br>  Defendant. | Case No. 2:19-cr-00898-DLR<br><br>**REPLY TO GOVERNMENT RESPONSE TO SECOND AMENDED MOTION FOR RELEASE PENDING APPEAL** |

  Harbour filed both a Second Amended Motion for Release Pending Appeal (Doc. 913) and, the next day, we lodged an Extension of that Motion, which we asked to be filed under seal due to its subject matters. We believe that the documents lodged will appear as (Doc. 914 and 915) if the Court's allows them to be filed under seal.

  The government did not oppose the motion to seal it and the Court has not yet ruled on it. So, instead of filing its response to those areas under seal itself, the government simply ignored the existence of the motion and shared the forecasted job prospect as well as Harbour's family situation with the entire United States. *See,* Doc. 920). We are, obviously, left with no other option but to respond openly, as appropriate.

  The Court has already ruled that Harbour is not an economic danger and that Harbour has raised substantial questions for appeal. The government, characteristically, has ignored those rulings and argues to the Court, as if the rulings simply did not exist.

**Harbour's Release:** The government's position on release is simply wrong. Let us review the sentencing again: Harbour got eight years (96 months). Under the First Step Act, which the government ignored, Harbour gets 54 days per year good time measured from the entire sentence imposed. This deducts 432 days (14.4 months). So, the original 96 months becomes 81.6 months with good time.

Harbour has now served 31 months (which includes the 747 days of prior custody noted by the government and the time since his sentencing on January 30, 2024). Deducted from the 96 months sentence, this leaves 50 months to serve, assuming no Court of Appeal changes at all. Harbour started earning FSA Act credit (15 days of every 30) on January 30, 2024 by our calculations and on March 1, 2024 by the government calculations.[1] If we use the government starting date and deduct 15 days of FSA credits for every 30 days against the 50.6 months to serve, 50.6 months into the future becomes 25.3 months. What the government completely ignores and Exhibit 3 does not address is halfway house/ home confinement. At the moment, halfway house/home confinement between month 17-19 before the end of actual confinement, taking into account the FSA time credits. It works backwards. Harbour will serve a maximum of approximately 5 more months before halfway-house/home confinement can kick in.

All of this goes to the question of release under §3143(b)(2)(B)(iv) which juxtaposes the time for appeal versus the sentence remaining to be served. But the prosecutor is confused because the issue under (B)(iv) is this: If Harbour has raised a substantial question and is likely to win on appeal and the time already served (31 months) plus the time of the appeal (24 months) is less than the time he would be exposed to after having won, then he is eligible for release. If we use the 55 months, Harbour, upon a resentencing would have to reach Level 23 (46-57 months) to be

---

[1] The government's predictions are wrong. In six months (the September review), Harbour's 10-days per 30 will go to 15 per 30 and will be retroactive.

ineligible under (B)(iv), standing alone. Harbour contends that he has raised solid arguments to defeat every element of the Guidelines, as discussed below and in Doc. 913.

This is a certainty because the issues on appeal for liability are outcome dispositive. If he wins, he is acquitted of all remaining conduct charged in the indictment. If he only wins on sentencing, he would obviously, be exposed to less than the 55 months discussed immediately above as we have attacked every possible enhancement of the sentence above Level 7 (plus one level for money laundering, so Level 8).[2] Even if one entertains the fantasy that half-way house/home confinement is the same thing as actual prison, the government's conclusions still do not prevail because the government does not understand §3143(b)(2)(B)(iv). What that subsection tests is what happens if the defendant succeeds on appeal. Half-way house and home confinement allow the inmate, who remains under the *aegis* of the BOP and not serving the conditions of supervised release to work, pray, and see his children.

**Substantial Issues on Appeal:** We need not belabor this point because the Court has already stated that Harbour has met this burden. In 1985, the 9th Circuit, in *Handy* joined its sister circuits that Congress did not intend to limit bail pending appeal to cases in which the Defendant can demonstrate at the outset the appeal will probably result in a reversal or a new trial. The defendant is simply required to raise a substantial question that is not frivolous and not for the purpose of delay to be released on bail. This court determined that under 18 U.S.C. 3143 (b)(i)(ii) and (iv) Harbour raised substantial questions, and it is not for purpose of delay, meeting the requirements.

Although the government preens that the 9th Circuit will make short-work of Harbour's many-faceted brief on appeal, this *bravado* is supported by nothing but hope and thin air. A brief and truthful summary of the substantial questions of law and fact under 18 U.S.C. (b)(i)(ii) for each person the court used to enhance Harbour's sentence

---

[2] The plus 3 levels for multiple counts are negated by the minus 3 levels for early or "super" acceptance.

and award restitution and forfeiture (Hill's, Cathey, Burg and Turasky) are outlined below.

As the court can see, Harbour raised multiple questions with respect to Cathey, Hills, PAIF, Burg and Turasky. Harbour has the legal authority and the facts from the evidence from both the trial and posttrial record to support each and every substantial question, none of which was ever refuted by the government.

What is most important about this case is the blinding number of deliberate misrepresentations made by the prosecutor about the evidence to the court which hamstrung the court under Rule 32, in addition to the court's ruling on restitution and forfeiture. These misrepresentations left the court unable to explain its legal conclusions based on case law and evidence from the trial record to support the enhancements to Harbour's sentence, and award restitution and forfeiture.

At the 11/29/23 hearing, the court specifically asked the prosecutor what the fraud was on Cathey and Hill's. The prosecutor was clear, he told the court that Harbour's fraud on the Hill's and Cathey was not disclosing that he received a Finder's Fee from their loan to KSQ. IRS Agent Green and FBI FA Paige both testified this was not true, they could not connect Harbour receiving a Finder's Fee from any lender to KSQ, let alone Cathey and Hill's.

Harbour did not lie about the nature of the bargain, nor wrongfully transfer their money, or divert their money for personal expenses, nor get a Finder's Fee, nor a kick-back. He did not contemplate harm or injury to them.

In regard to PAIF, which was also used to enhance the sentence, Harbour could not wrongfully transfer the $1.1 million as he was not a signer on the Green Circle "GC" bank account. The evidence proved that the President of GC, Geneva Lone Hill, sent a letter to PAIF requesting the $1.1 million to pay back the money they had borrowed from Oak Tree. This was confirmed by Burgess when he testified the $1.1 million was not for consumer loans, it was for GC to payback Oak Tree.

4

The government consistently made misrepresentations to the Court and the jury. "A prosecuting attorney may not misstate or manipulate the evidence at trial." *United States v. Preston*, 873 F.3d 829 (9th Cir. 2017), citing *United States v. Kojayan,* 8 F.3d 1315 (9th Cir. 1993). Although PAIF will, as of November 1, 2024, no longer be subject to consideration for sentencing or restitution, this intentional misrepresentation will likely contribute to a reversal or a new trial, because it prejudiced Harbour to the jury.

With respect to Burg and Turasky, the Court already found, in Doc. 800, that there was no lie about the nature of the bargain, no wrongful transfer of the money, and no contemplation of harm or injury. The IRS Stipulation, which the Court found was not new evidence, was a Party Admission that Harbour did not make any misrepresentations about the bargain, and he did not wrongfully transfer their money. The court never explained why it dismissed the evidence from the IRS and did not use it as mitigating evidence for sentencing, restitution and forfeiture per the extensive legal authority of the 9th Circuit. *See, e.g.,* the cases cited in our Motion, *Milheiser, Monterey Plaza, and Miller* (9th Cir. 2020).

**Flight Risk:** The government contends that Harbour's mother's home in North Scottsdale is an unsuitable place for Harbour to reside and that his mother is an unsuitable candidate for him to live with. This is an absurd position. What apparently irks the government is that Harbour's mother is unwilling to use her home to secure anything beyond Harbour's appearance to serve his sentence.

This is no more than a sensible reflection on the government's years-long vendetta against Harbour. The prosecutor tried to revoke Harbour's release three different times and the sole basis upon which he sought it the third time initiated by an allegation of witness tampering that neither this Court nor Magistrate Judge Fine could sustain even under the puissant probable cause standard. It later fortified by a nonsensical claim with respect to Bart Shea's Georgia Avenue property, dismissed on government motion with prejudice.

When faced with the prospect that this Court might, in fact, release Harbour on an appeal bond, the government counsel stated his utter disbelief that this could possibly ever occur. Surely, were this author a betting person, he would take whatever the "under" is on how quickly the first attempt at revocation might occur and how quickly the government would seek to throw an 81 year-old widow out of her home.

The DOJ and its agency, the BOP, have provided the court with clear and convincing evidence that Harbour is not a flight risk. The BOP classified Harbour as "Out Custody" (The court can see in Doc. 913 Exhibit 2, Harbour's classification as Out Custody) at a "Non-Secure" facility under USSG Section 2P1.1(b)(3). Harbour is at the lowest recidivism classification he can be. Harbour is in the queue to be transferred to the Camp in Tucson, AZ to be closer to home, which is required under FSA. This will be a "Furlough Transfer" (48 hours to self-report to the Camp in Tucson). Right now, Harbour has a gate pass which allows him to work at the Supermax ADX Prison and to be a town driver.

The DOJ and consequently the Attorney General of the U.S. have already spoken: Harbour is not a flight risk.

In addition to the DOJ's determination, Harbour meets the four part test in 18 U.S.C. §3142(g):

**Nature of Offense:** Per the court in Doc. 800, Harbour was found guilty of using $695,000 of lender and investor funds for personal expenses because he did not have any gross income and, therefore, no business expenses. This was refuted by the IRS Settlement and Tax Court Order (which, according to the Court was not "new" evidence) the 9th Circuit cases previously cited.

**Sentence Length:** Harbour is not facing a lengthy remaining sentence, as outlined earlier in this Reply.

**Weight of the Evidence:** The weight of the evidence, summarized above, and in multiple motions that have been filed with this court - never refuted by the government - overwhelmingly supports the proposition that Harbour is not a flight risk.

**Community Ties:** Harbour has strong ties to the community. He has lived in Arizona for 30 years and attended ASU. Harbour's young daughters, their mother, Harbour's 81 year old Mother, Sister, brother-in-law, nephews, and friends all live in Arizona. He is active in his Church, his daughters' school and Cheer gym. In fact, Pre-trial services told the court that Harbour has strong ties to the community. Harbour has no criminal history and has surrendered his passport to the government. Harbour will have a full time job in Scottsdale and his only financial resources will be his job and his family. Harbour's history and community ties support that he is not a flight risk.

**Danger to the Community:** The court has already ruled that Harbour is not a danger to the community.

The court was able to come up with conditions to release Harbour in January 2023 after the prosecutor had told Harbour he wanted a 22 year sentence. The very night Harbour was found guilty, pre-trial services made a surprise visit and found Harbour reading to his daughters.

**The Job:** It is accurate that during the last hearing the defense discussed a potential business relationship in which Harbour might be engaged, were he to be released, that involved the sale of a physical, corporeal, product to the public. The Court was skeptical, and the government was apoplectic.[3] Once Harbour is released, we intend

---

[3] The government, which wanted $11 million in restitution, *ought* to want Harbour to earn as much money as he possibly can earn, if for no other reason than to repay the victims. However, Harbour's marital community presently owns and through the property disposition, Harbour will soon solely own, intellectual property rights to licensure of the product and, therefore, earn a lot of money on the sale of products that others will manufacture and distribute to a public whose demand cannot underestimated, provided the Court permits his active participation or, if it does not, oversees the establishment of a blind trust into which the proceeds of the licensing would flow, while Harbour remains under Court supervision. The idea for the product was Harbour's alone and from that idea

to ask the Court to consider how, if at all, Harbour might be involved in this business. But, given the Court's present skepticism, another road needed to be found.

Cariann Leyton is a director at The Grand America Hotel in Salt Lake City and has been there for over 22 years. She is building a car rental business on the side, and this is why she has her home listed as the business address. The entire business is online booking and fulfillment so there is no need for a brick and mortar location. All the car rentals will be delivered directly to the customer. Currently she is doing that at the SLC airport, which is 5 miles from the hotel at which she works. There, she has people that do this entire process. This is what she plans to have Harbour do for her in Arizona. He would deliver and pick up cars once the trips are complete, which is pretty simple, and she would also rely upon him to get the word out so that people would be referred to book her vehicles. The government's skepticism about Harbour's connections even after the scurrilous accusations made against him is far from accurate. The government knows that many hold Harbour in far repute than to others, including a number of potential witnesses the government eschewed.

Harbour will not be involved in any of the financial transactions. She is expecting him to refer his extensive client knowledge base to the website to book the vehicles. His background as a felon is irrelevant to being able to clean vehicles, fuel them, and deliver them to the airport or local resort for a client to pick up remotely. He will never have face-to-face interaction with any client.

**Government Misrepresentations:** Below is a summary of the false statements made by the government:

1. He traced the money in and out of Green Circle. FBI Forensic Accountant Paige testified she did not trace the Green Circle bank account.

---

to the sale of the product to consumers, after manufacture and distribution by others, much can be expected; certainly enough, should the ultimate restitution number withstand review, to easily, quickly, and completely pay the restitution completely. This can be discussed further, but not presently, publicly.

2. He traced Harbour using lenders' money to pay personal expenses. Paige testified she did not trace any lenders money to paying for personal expenses. The Prosecutor then reversed course after the trial and told the Court he had not.

3. He said Harbour's Gross Income from KSQ and Canyon Road was obtained by fraud. He later told the Court that Harbour's Gross Income had no probative value to any material fact in the case. IRS Agent Green, who audited Harbour from 2010 - 2015, never stated Harbour's gross income was fraudulent.

4. He said Harbour received a Finder's Fee from Cathey and Hill's loans to KSQ and that was the fraud. IRS Agent Green and Paige testified he did not.

5. He said Harbour created a special relationship with Cathey and that is why he loaned the money. Cathey testified he never met or spoke to Harbour until 15 months after he loaned his money.

6. He said the Hill's loaned Harbour money because he appeared wealthy. Carol Hill testified she wanted the high interest rates and that is why she loaned the money.

7. He said Carol Hill loaned her IRA's $81,000 to Harbour. Hill testified that she did not loan her IRA to Harbour, it went to Dunsworth.

8. He said Purifoy would testify that Green Circle was a Ponzi Scheme. Purifoy testified that it was not, it was a real business.

9. He said Purifoy would testify she saw Harbour alter the 7/31/15 Green Circle aging report. Purifoy testified she did not, and that Harbour had nothing to do with the Green Circle aging reports.

10. He said the PAIF $1.1 million was only for consumer loans, not for Oak Tree. Phil Burgess testified the $1.1 million was not for consumer loans, it was for Oak Tree.

11. He said Harbour altered the borrowing bases that were sent to PAIF. Burgess testified PAIF received 14 borrowing bases and they were not altered.

12. He said Harbour did not have any business expenses in 2014. Agent Green, Purifoy and the Internal Revenue Service said he did.

9

13. He said Harbour did not have any Gross Receipts Income in 2014, IRS Agent Green and the IRS said he did.

14. He said Harbour used Burg and Turasky money to pay the FTC. Paige testified he did not.

15. He said Harbour committed consumer fraud. FTC Receiver Larry Cook testified that Harbour did not commit consumer fraud and had nothing to do with the consumer lending operations.

16. He said KSQ had state agency and consumer complaints and Harbour did not disclose them to Cathey and the Hill's. Cook testified that KSQ did not have state agency or consumer complaints.

17. He said that KSQ and Canyon Road were in business together and managed by Joel Tucker. IRS Agent Green and Cook both testified that KSQ and Canyon Road were separate companies and had nothing to do with each other.

18. The Prosecutor told the Court that Harbour does not have any ties to the community. Pre-Trial services said Harbour has strong ties to the community.

We have omitted many others only because they are in other pleadings filed earlier. The government misrepresentations cannot be considered to be harmless error when they are cumulative and were made to deliberately manipulate the court. *See*, *U.S. v Necoechea*, 986 F.2d 1273 1282 (9th Cir. 1993) and "[T]he combined effect of multiple trial errors violate due process where it renders the resulting criminal trial fundamentally unfair." *Parle v Runnels*, 505 F.3d 922 (9th Cir. 2007).

We are hopeful that the Court will again recognize that, perhaps. A problem has been that the Court relied upon the representations made by the government and, for this reason we reviewed some of the most important misrepresentations the government made.

We are not so reckless as is the government. We sincerely believe that this case should be and will be reversed in its entirety and definitely think it will have to be resentenced. But we are not soothsayers.

We have met every burden needed to set a reasonable appeal bond. In our view, it should be a recognizance bond for appearance. The government wants an all purposes bond set and the reason is clear. It violated Harbour three times before and only succeeded on grounds that were not the grounds upon which it proceeded on December 13, 2021 (witness tampering). We believe the chances that the government will try to violate Harbour if he is released are 100%, which is a reflection on the government and not Harbour. Meanwhile, the chances that Harbour will fail to show-up to finish serving his sentence are zero. He has already actually done most of the time and surely all of the "hard time" in a jail facility. The Florence, Colorado and Tucson, Arizona Camps to which he has been assigned (and will likely be reassigned) are hardly the "Club Fed" of novels and the sensationalist media but they are hardly Devil's Island. Harbour has a fine view of the Rocky Mountains and can drive into town. Why would he risk that?

Harbour firmly believes and with good reason that his remaining convictions will be vacated and, if not, at a minimum, he will have to be resentenced and will get a far lower sentence than he presently has.  Why would he risk an escape indictment and having to serve out a sentence in a maximum security institution?

RESPECTFULLY SUBMITTED this 18th day of June 2024.

CHRISTIAN DICHTER & SLUGA, P.C.


By: /s/ Stephen M. Dichter
    Stephen M. Dichter
    Justin R. Vanderveer
    2800 North Central Avenue, Suite 860
    Phoenix, Arizona 85004
    Attorneys for Defendant David A. Harbour

11

# **CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2024 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Kevin M. Rapp
Kevin.rapp@usdoj.gov
Assistant United States Attorney
Joseph F. Bozdech
Joseph.bozdech@usdoj.gov
Assistant United States Attorney
U.S. Attorney's Office
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
Attorney for Plaintiff


/s/ Yvonne Canez