TIMOTHY COURCHAINE
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>     Plaintiff,<br>  v.<br><br>David Allen Harbour,<br><br>     Defendant. | No. CR-19-00898-PHX-DLR (DMF)<br><br>**UNITED STATES' CONSOLDIATED MOTION REQUESTING THAT THIS COURT REVOKE DEFENDANT'S RELEASE FOR VIOLATION OF RELEASE CONDITIONS AND PROVIDES AUTHORITY TO REVOKE RELEASE BASED ON ACTIVITIES COMMITTED IN CUSTODY** |

**INTRODUCTION AND SUMMARY**

Pursuant to 18 U.S.C. §3148, the United States of America, by and through undersigned counsel, hereby moves the Court to revoke the current Order authorizing the release of defendant David Allen Harbour ("Harbour"). This consolidated motion provides this Court with a petition to revoke Harbour's release for a violation of his pretrial release conditions by sending an email on March 16, 2025 ("March 16th email"). In addition, this motion provides authority for this Court to revoke Harbour's release while engaging in certain activities while in custody of the Bureau of Prisons. In sum, his November 1, 2024 email ("November 1st email") soliciting an investor for an investment, directly contacting

Daryl Deel, proposing the use of equity in his mother's condominium to secure Deel's investment, establishing a bank account would have been prohibited while on release.

In addition to his chronic violation of release conditions demonstrates that he is an economic danger to the community and his release status should be revoked. In short, this represents the seventh petition for a violation of release conditions.[1] Harbour was revoked previously for an array of violations and convicted of numerous counts of wire fraud and transactional money laundering related to a long running fraudulent scheme. Neither the previous revocation of his pretrial release conditions, convictions, and sentence to prison has deterred him from engaging in prohibited activities. The Court has the authority to revoke his release for both a violation while on release and while in custody. Lastly, Harbour intentionally failed to disclose the existence of an Order of Protection (OOP) calling into question his candor to this court and pretrial services (PTS). In sum, Harbour is a severe economic danger requiring that he remain in custody pending appeal.

**LAW AND ARGUMENT**

**A.   Harbour's Release Should be revoked for Violating Conditions of Release.**

The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, instructs the Court to revoke release and the order detention of a person "who has been released under 18 U.S.C. § 3142 and has violated a condition of that release." *United States v. Addison*, 984 F. Supp. 1, 2 (D.D.C. 1997). As relevant here, an "attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court." 18 U.S.C. § 3148(b).

The court "shall enter an order of revocation and detention" if, after a hearing, it finds: "(A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or (B) clear and convincing evidence that the person has violated any other condition of release;" and based on the factors set forth in 18 U.S.C.

---

[1] *See* Docs. 56, 169, 183, 267, 290, 326.

§ 3142(g), "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, or the person is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3142(b)(1)-(2).

On March 16, 2025, after being release from custody for only three days Harbour violated the following release conditions:

1.  avoid all direct or indirect contact with any persons who are considered alleged victim(s), potential witness(es), or codefendant(s): Kenneth Bobrow, Victoria Bobrow, Steve Baker, Mark Burg, Phillip Burgess, Pam Case, Joe Cathey, **Daryl Deel**, Melvin Dunsworth, Steve Emmons, Rhonda Gray, Carol Hill, Pat Hill, Maya Langbein, David Lunn, Bart Shea, Patrick Spaulding, Richard Turasky, Dan Wilson, and Allision Wilson. Contact exclusively through the defendant's counsel of record is permitted. The Government may seek to add or remove individuals on motion to the Court. (emphasis added) (Doc. 965)

2. defendant shall not solicit investors for any investment while on Pretrial Release. (*Id.*)

Harbour violated these conditions by sending a Daryl Deel an email posing as his mother that raised the possibility of using equity in her home to secure an investment by Deel. (Ex. A; Doc. 967-1) This email must be read in context with the November 1st email. Although the email originates from Kathy Harbour's email address and is signed "Kathy" there is strong circumstantial evidence that Harbour sent this email. First, it is the same pitch that Harbour makes in his November 1st email that Harbour sent to Deel while in custody. (*Id.*)

Second, the proposal has very little benefit for Harbour's mother where she is advising Deel of the equity in her home. This is a veiled pitch that equity could be used to secure Deel's $225, 000 investment in Harbour's JAS proposed product launch. (*Id.*)

Third, and importantly, there were numerous examples of Harbour forging documents, falsifying signatures, creating fictitious documents and email addresses, and

1    hijacking a cellphone and computer to facilitate his attempts to further his fraudulent

2    scheme and tamper with witnesses against him at trial. For example, Harbour posed as the

3    long deceased Patrick Spaulding to convince Kenneth Bobrow that Spaulding had lost his

4    money in an investment and even hijacked Bobrow's iPad to pose as him in order to

5    convince Turasky to make an investment that benefitted Harbour. (*See* Trial Exs. 140,

6    392,522, 667, 668)

7        This Court may recall that when Victoria Bobrow was gathering records from her

8    cell phone, she noticed text messages generated from her phone which were sent to

9    Turasky. (PSR; Doc. 765, ¶ 37) It appeared the messages were sent as though K. Bobrow

10    was the sender of these text messages; however, she and K. Bobrow did not authorized

11    these text messages sent from V. Bobrow's cellphone. (*Id.*) V. Bobrow believed the

12    defendant was responsible for text messages and accessed her cell phone while the

13    Bobrow's and the defendant's family were on vacation together. (*Id.*) The Bobrows also

14    discovered multiple emails which were sent to Turasky and were sent as though Bobrow

15    was the author of these emails. (*Id.*) V. Bobrow stated she and K. Bobrow did not send

16    these emails. (*Id.*)

17        There was also evidence that two emails were sent from his former bookkeeper

18    Laura Purifoy's computer months after she had quit working for Harbour.

19        Q: And in this email, it -- it says Thanks, Laura

20        A: Correct

21        Q: Did you write this email?

22        A:No

23        Q: Did you send it?

24        A: No

25    (Doc. 633; 42-43, Ex. 642)

26        Q: And this email says it was sent on---on what date?

27        A: May 18th, 2017

28        Q: And who are you sending it to ?

- 4 –

1      A: Dean Avedon.

2      Q: Did you ever conduct business work from your personal email?

3      A:No

4      Q: Were you still working for Mr. Harbour in May of 2017?

5      A: No

6      Q:Did you write this email?

7      A:No

8      Q:Did you send It?

9      A: No

10   (*Id*.; 44:10-22, Ex. 644)

11         Lastly, on the November 1st email neither the winnie081921 or daryl.deel email

12   addresses were on his account that were used in the November 1st email. (Doc. 967-1).

13   Harbour was at FPC Florence, CO at the time he sent the email so he very easily could

14   have had a cellphone to draft the email or used another inmate's cell phone. Harbour boasts

15   about the availability of cell phones in his email. He could have also discussed it on the

16   phone with someone. It is likely that he sent an e-mail from his prison account, it would

17   not be associated with Google, but would have a specific e-mail address associated with

18   BOP. He likely had access a cell phone based on how that e-mail looks or he might have

19   sent a draft to his mother and had her use his outside e-mail account to send it. In any event,

20   this is just another example of Harbour circumventing restrictions to solicit investors.

21         The circumstances raised during trial and now in light of the November 1st and

22   Match 16th email demonstrates Harbour's propensity of using others email to advance his

23   fraud scheme. His conviction and release violation did nothing to deter him from

24   circumventing the restrictions of release conditions. *United States v. Hollender*, 162

25   F.Supp.2d 261, 264 (S.D.N.Y.2001) ("This Court cannot overemphasize its concern about

26   the possibility that a person skilled in identity theft and the creation of forged documents

27   using a computer may employ that skill to facilitate flight (or to commit additional

28   frauds)").

1    If this court is not persuaded that the March 16th email was not sent by Harbour but

2    was actually sent by his mother it still constitutes a violation of his release conditions. (Doc.

3    965) Harbour was ordered not to indirectly contact certain named persons and he clearly

4    was directing his mother to send the email if he didn't send it himself. In sum, he violated

5    his release conditions by clear and convincing evidence.

6

7    **B. Law applicable to reconsider release pending appeal with newly discovered**

8    **evidence.**

9    Pursuant to Fed. R. Civ. P. 59(e) a motion for reconsideration of a defendant release

10   conditions may be granted when there is "(1) an intervening change in the controlling law,

11   (2) *new evidence previously unavailable*, and (3) the need to correct clear error or prevent

12   manifest injustice." (emphasis added) Here, Harbour, while in custody, was soliciting an

13   investor/witness (Deel and his mother), contacting a witness/victim that he was specifically

14   prohibited from contacting (Deel), developing a product that by definition relies upon

15   investors, is contemplating opening a bank account for investor funds to be deposited. [2]The

16   November 1st email was unavailable when this Court considered releasing Harbour pending

17   appeal. The government contends that reconsideration of the court's order granting

18   Harbour's release is warranted because the underlying basis for the court's order granting

19   his release has changed considering the existence of the November 1st email. *United States*

20   *v. Whittemore*, No. 3:12-CR-0058-LRH-WGC, 2014 U.S. Dist. LEXIS 76679, at *4 (D.

21   Nev. Jun. 5, 2014) (finding the district court retains jurisdiction over the defendant and is

22   empowered to revoke defendant's bond during the pendency of appeal for any reasons that

23   would have supported an initial denial of defendant's release); *United States v. Swartz*, No.

24   CR-23-00085 WHA, 2024 U.S. Dist. LEXIS 168678 (N.D. Cal. Sep. 11, 2024) (revoking

25   the defendant's release pending appeal because of his failure to report and status as a flight

26   risk)

27

28       [2] These conditions were prohibited upon a series of orders imposed when defendant
     was released in February 2023 (Doc. 570, at 4)) and in his Judgment (Doc. 930, at 4))

1

2          Release or detention pending appeal is governed by 18 U.S.C. § 3143(b). In relevant

3     part, it requires that the judge detain a person found guilty of an offense unless: (1) clear

4     and convincing evidence shows "that the person is not likely to flee or pose a danger to the

5     safety of any other person or the community if released"; and (2) that the appeal "raises a

6     substantial question of law or fact likely to result in" reversal, a new trial, a noncustodial

7     sentence, or a reduced sentence less than the total already served plus the time for the

8     appeals process.

9          Regarding the first factor, the long record of this case does not support a finding, by

10    clear and convincing evidence, that Harbour does not currently pose a severe economic

11    danger to any other person or the community. As this Court knows, Harbour was convicted

12    of a substantial investment fraud that left some of his victims nearly destitute, he falsified

13    documents, hijacked emails, tampered with witnesses, spent victims' funds on a lavish and

14    unsustainable lifestyle all at the expense of his victims. After a period of incarceration, he

15    was allowed to be released, over the government's strong objection. His release for those

16    four weeks resulted in an OOP that is also the subject the motion to revoke his release for

17    failing to disclose the existence of the OOP to this Court. (*See* Doc. 967; Ex. B filed under

18    seal)

19         Following his conviction for multiple counts of wire fraud and transactional money

20    laundering he was remanded into custody. While in custody he hatched a plan to solicit

21    investors to invest in some type energy drink product known as Jail House Juice (Doc. 967-

22    1) Then, while on release pending appeal for less than three days he either directed his

23    mother to send an email or he sent the email posing as his mother to Deel in hopes of

24    furthering his scheme detailed in his November 1st email. Prior to these the latest

25    convictions, Harbour committed bank fraud and false loan application, contacted investors

26    in violation of the court order (and later was found to have tampered with the witnesses).

27    Nothing that has transpired since, including the instant motion, suggests that the economic

28    danger shown by those actions has decreased. In sum, the record of this case makes it

impossible to conclude, by clear and convincing evidence, that Harbour currently does not pose an economic danger to any other person or the community.

The record shows a pattern of false, deceitful, and often illegal conduct on numerous occasions over multiple years in a variety of settings. Harbour has violated several different laws in the recent past and has shown an unwillingness to abide by conditions of release. His misconduct, pretrial release violations, and crimes have involved tampering with witness, committing bank fraud, contacting prohibited persons, among other violations. In other words, this is not a situation where a person having been convicted of an offense is simply assumed to be likely to reoffend. Here, there is a notable record of federal crimes, court ordered violations, and various other serious deceptions over time. Neither the conditions of confinement or release conditions assure against further fraudulent activity. Harbour, by his own admission, has the ability to solicit investors with a smuggled cell phone while in prison. In sum, prison did not deter him and home confinement as not been able to do so either.

**C. Harbour Failed to Inform this Court and Pretrial Services about an existing Order of Protection.**

As previously argued Harbour failed to disclose the existence of an OOP. At the recent telephonic status hearing on November 3rd the transcript of the September 11, 2025 hearing was unavailable. During the discussion regarding modifying conditions of release the following exchange took place:

> THE COURT: Ms. Johnson, is there -- can you make a list of things that he -- where he would go and what you want to add? Because I think that would work better so we have a specific list. And he'll be on home detention, but he'll have more freedom to do these kind of things that he does regularly, like working out, going to the -- doing other things. Do you have a list of things?
> MS. JOHNSON: I would need a moment to consult with
> Mr. Harbour.
> THE COURT: Okay.
> (Conference off the record between Ms. Johnson and the

1

2

    defendant.)

    MS. JOHNSON: Your Honor, Mr. Harbour would request permission to

3    exercise outside of the home, whether that's a gym or physical activity

4    outside the home, hiking up Camelback; the grocery store; his children's

school so that he can do parent-teacher conferences and pick his children up

5    from school, bring them home; and then his children are involved in after-

6    school activities at a gym, to go to that location so that he can participate in

his children's -- he can take them to their after-school activities and watch

7    them and engage in parenting activities at those after-school activities.

8

(RT 9/11/25, 18: 14-25)

9

    It would have been logical for Harbour to inform the court of the existence of the OOP

10

preventing his from contact with his children or await until the OOP is longer in place, but

11

he intentionally failed to do so.[3] It just an objective fact that the assigned Pretrial Services

12

Officer would have included this term in his release conditions unless he hadn't located the

13

existence of the OOP. (Doc. 967-2) Again, this reflects on his lack of candor to the Court

14

and Pretrial Services. *See United States v. Patterson*, No. 119-cr-00230-DAD-BAM-1,

15

2020 WL 6200164, at *11 n.2 (E.D. Cal. Oct. 22, 2020) (finding that "the evidence

16

demonstrates that [the defendant] cannot be supervised due to his lack of candor with his

17

pretrial services office and law enforcement"); *see also United States v. Ojo*, Crim. No.

18

SAG-20-0369, 2020 WL 7707341, at *2 (D. Md. Dec. 29, 2020) (considering the

19

defendant's "lack of candor with Pretrial Services" in finding that there were no conditions

20

that could mitigate dangerousness)

21

22

    **D.**    **A revocation will adjust his FSA Credit Assessments by eight months.**

23

    This Court also expressed concern that because in the Court's view there are fairly

debatable issues Harbour may spend more time in custody then it will take to resolve the

24

appeal. That is no longer the case as all dates will be adjusted eight months. (Doc. 944-1)

25

This will show his projections as of that time period: and will be adjusted by eight months

26

27

    [3] This term was never raised in the Harbour's Motion to modify conditions of release

28 (Docs. 955 and 958) It was raised only *after* defense counsel conferred with Harbour while in court.

- Projected Release Date: November 6, 2028
  - Only factors in good conduct time
- FSA Projected Release Date: June 24, 2028
  - Factors in good conduct time and FSA time credits earned to that date
- FSA Conditional Release Date: November 7, 2027
  - Factors in projection that he will continue to earn FSA time credits at the same clip that he has to that date and those time credits, up to 365 days, will be applied to early release
- FSA Conditional Placement Days: 180
  - Factors in projection that he will continue to earn FSA time credits at the same clip that he has to that date and those time credits, in excess of the prior 365 days, will be applied to prerelease custody
- FSA Conditional Placement Date: May 11, 2027
  - When all projected FSA time credit days are applied, this is the earliest date he is eligible to go to prerelease custody per the FSA
- SCA Conditional Placement Days: 365
  - This is the default amount because that is the max that is allowed under the Second Chance Act of 2007 (SCA). He has not been reviewed for halfway house placement under the SCA so this number will likely be less than the full 365 days.
- SCA Conditional Placement Date: May 11, 2026
  - This is the earliest date if all 365 days are given under the SCA - also known as the "Conditional Transition to Community Date." (*Id.*)

In sum, the earliest date Harbour could possibly be released to a half way house setting (May 11, 2026) will now be adjusted until January 11, 2027. As he has been temporarily released for about 8 months, each of the above dates could be extended by the same 8 months and be fairly accurate. However, fully accurate information will not be

available until Harbour returns to BOP custody and his sentence computation is updated.

## CONCLUSION

For the foregoing reasons, the United States moves the Court to Order Harbour's release revoked.

TIMOTHY COURCHAINE
Acting United States Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and emailed a copy to the following CM/ECF registrant:

Jami Johnson
*Attorney for Defendant*

*s/Daniel Parke*
U.S. Attorney's Office

- 11 –