TIMOTHY COURCHAINE
United States Attorney
District of Arizona

KEVIN M. RAPP
Arizona State Bar No. 014249
Email: Kevin.Rapp@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-19-00898-PHX-DLR (DMF) |
|---|---|
| Plaintiff, | **UNITED STATES' SUPPLEMENTAL MOTION IN SUPPORT OF REVOKING DEFENDANT'S RELEASE [ Doc. 981], NOTICE OF HARBOUR'S BOP PHONE AND EMAIL LOG, AND NOTICE OF ERRATA RE: DATE DEFENDANT SENT EMAIL TO VICTIM WHILE IN CUSTODY** |
| v. | |
| David Allen Harbour, | |
| Defendant. | |

**INTRODUCTION**

On November 1, 2025, this Court ordered additional briefing on the government's Motion to Revoke defendant David Allen Harbour's ("Harbour") Release based on an email sent to a prohibited victim/witness (Deel) while on release conditions pending the resolution of his appeal.

At the telephonic conference on November 3rd the Government advised this Court, to expedite a hearing, that it could file a brief on certain issues two days later on November 5, 2025. On that date at 4:43 pm the United States filed the United States' Consolidated Motion Requesting that this Court Revoke Defendant's Release for Violation of Release Conditions and Provides Authority to Revoke Release Based on Activities Committed in

Custody. (Doc. 982) Following the filing, the Government became aware that this Court's order (Doc. 981) directed the Government to address the arguments raised on Pages 9-13 of Doc. 979[1] of Harbour's response and was filed at 4:37 pm the same day. Unfortunately, the United States did not read this order until after filing its brief. The United States now asks for leave to respond to that order in this supplemental filing.

**SUMMARY OF ARGUMENT**

In sum, Harbour has conflated loss under USSG 2B1.1 with restitution. In addition, Harbour's argument regarding "offsets" is unavailing. Under both a loss calculation and restitution imposed by this Court the amount would result in an 18-level increase because both figures are between $3.5 million and $9.5 million. USSG 2B1.1(J) Therefore, Harbour is still exposed to an offense level of 29 and a range of 87-108 months. Again, because he has been on release for eight months the earliest, he would be eligible for release is in January 2027.[2]

Second, at the time the United States filed its Motion to revoke it did not have the unredacted email and phone log from the FCI Florence, CO that shows that Harbour's November 21st email was sent using a smuggled device to circumvent the BOP's restrictions on who he was allowed to correspond with by email. Lastly, the Government mistakenly identified the email (Ex. A) as being sent on November 1st when in fact Harbour's email to Deel from FCI Florence was sent on November 21, 2024. (*Id.*)

**LAW AND ARGUMENT**

**A.  This Court Correctly Calculated Loss.**

Harbour argues that this Court erroneously calculated the guidelines and that "even if Mr. Harbour were to lose on every issue raised in his appeal … he could reasonably

---

[1] This Docket number in the order was miscited as Doc. 979.

[2] It is unclear how his use of a smuggled phone to solicit a prohibited investor from custody will impact his good behavior credits.

anticipate an offense level of 23, which would result in a recommended Guidelines range of 46 to 57 months." (Mot. at 12) This is incorrect for several reasons.

First, this Court properly calculated the guidelines that existed at the time he was sentenced. This Court found that Harbour's base offense level was 7. (Doc. 869; 29:14-15) He would receive an additional point for a specific offense characteristic for money laundering. (*Id.;* 22-25; PSR ¶ 63) This Court properly found a two-level increase for obstruction based on Harbour's efforts at witness tampering. (*Id.*) Finally, Harbour's long running scheme was clearly sophisticated, thus, warranting a two-level increase. (*Id.*; 30:2-6)

Harbour, however, claims that the loss was incorrectly calculated because it included relevant conduct and "failed to take into account offsets" when determining loss under USSG §2B1.1 (Mot. at 11) This argument is flawed for a couple of reasons. The Court correctly found the following loss amounts by a preponderance of the evidence attributable to the victims below:

| Victim | Amount of loss |
|---|---|
| Mark Burg | $1,000,000 |
| Rich Turasky | $350,000 |
| PAIF | $3,420,000 |
| Patrick Hill | $500,000 |
| Carol Hill | $81,000 |
| Joe Cathey | $3,000,000 |
|  | **Total:** |
|  | $8,351,000[3] |

The loss calculated by this Court places Harbour squarely in the range of $3.5 million and $9.5 million resulting in an 18-level increase in the base offense level. USSG 2B1.1(J).

---

[3] *See* Doc. 869: 9-10.

- 3 –

Harbour now argues that the $3.4 million attributable to PAIF should no longer be counted as this Court can no longer consider acquitted conduct. [4] But, if Harbour is re-sentenced, subtracting the loss attributable to PAIF, it would reduce the loss to $4,931,000, and not change his guideline range. In sum, he would remain at a base offense level of 7 with an 18-level increase for loss plus the other offense characteristics (*e.g.* sophisticated scheme, obstruction, a level increase for money laundering, etc.)

Even Harbour understood that if PAIF's losses were removed from his loss calculation he would still have an offense level of 18 with a range of 87-108 months during the following exchange:

> THE COURT: The PAIF, for purposes of calculating the guidelines, whether PAIF was in there or not, the guidelines don't change.
> MR. DICHTER: Well, I'm not sure how -- no, I don't think that's true.
> THE DEFENDANT: He's right.
> MR. DICHTER: He is right?
> THE DEFENDANT: He's right.
> MR. DICHTER: Okay. My client knows the guidelines better than me. You're right. Okay, so I'll move on.

(Doc. 869; 41:2-11)

**B. Harbour Confuses Loss under USSG 2B1.1 with Restitution.**

Harbour recognizes that the only opportunity to reduce his guidelines is to remove victim Cathey from the loss calculus. So, Harbour wants to relitigate both the loss attributable to Cathey and the restitution owed to him because if that loss is subtracted it would reduce Harbour's applicable offense level by two levels to a 16. Its noteworthy he doesn't try to re-litigate the other victim's losses as those would not reduce his loss to such an extent that it would change the applicable offense level. But even if Cathey's loss ($3 million) was subtracted, considering the other increases for offense characteristics,

---

[4] https://www.ussc.gov/about/news/press-releases/april-17-2024

- 4 –

Harbour's guideline would result in an offense level of 27 with a range of 70-87 months.[5]

As for restitution, this Court made the following findings:

| Victim | Restitution Amount |
|---|---|
| Carol and Pat Hill | $432,939.70 |
| Joe Cathey | $1,335,518.50 |
| Mark Burg | 935,000 |
| IRS | $4,680,354.24 |
| **TOTAL:** | **$7,383,812.44**[6] |

First, this Court has already found that the fraud perpetrated on Cathey was properly before the jury as part of Harbour's scheme to defraud. (Doc. 869; 4:14-25) Now, Harbour argues that this Court did not consider "offsets." (Mot. at 10) Harbour's argument is confusing on this issue, to say the least, as he doesn't identify any relevant authority to support his claim that "offsets" (modest interest payments made to the victim) should be reduced from the loss amounts detailed above. He also conflates loss calculation under §2B1.1 with restitution owed.

In support of this argument Harbour cites misplaced authority. First, not only does counsel reference the incorrect cite for United *States v. Laurenti,* 611 F.3d 530 (9th Cir. 2010)[7] but also the facts have no application to the instant case. *Laurenti* involved a "pump and dump" stock scheme. *Id.* at 534. The Court in *Laurenti* had to calculate losses on one

---

[5] Harbour argues that his offense level would be 23 with a range of 46-57 but it is unclear how he arrives at that calculation. (Mot. at 12)

[6] *See* Doc. 912: 50-51.

[7] Counsel confuses the citation for *Laurenti* with a subsequent sentencing appeal found at *Laurenti* 731 F.3d 967 (9th Cir. 2013)

stock when there was a gain on another. *Id.* at 557 ("For instance, if a victim lost $200,000 on stock A but gained $50,000 on stock A in an earlier transaction, then the total loss would be $150,000. But if the victim lost $200,000 on stock A and gained $50,000 on stock B, then the total calculated loss would be $200,000: The $50,000 gain was not factored in, because the gain accrued on a different house stock.") This scenario has nothing to do with the losses caused by Harbour by simply diverting investor money for his own personal use.

Harbour also incorrectly relies on *United States v. Barnes,* 125 F.3d 1287, 1291 (9th Cir. 1997) to support the flawed "offset" argument. *Barnes* involved a defendant posing as a medical doctor and providing patients medical treatment. *Id.* at 1287 In *Barnes,* the court, in determining loss to the patients concluded that, "the victim has sustained no loss because he has received the services for which he bargained, despite the fact that he has received them from a person who was not legally authorized to offer them." *Id.* at 1291. Again, this case is inapposite to Harbour's fraud.

Here, as detailed below, Harbour's fraud didn't involve stocks nor was he impersonating a licensed professional, but he was soliciting loans for payday lending, among other frauds. He provided victims only modest interest payments, sometimes sourced from other investors in the form of *Ponzi* payments, before ceasing payments completely. Only the victim's restitution is offset by the payments because restitution does not include interest or promised gains only economic loss.

In any case, even if the victims received modest interest payments those payments do not offset the losses. *United States v. Munoz,* 233 F.3d 1117, 1125–26 (9th Cir. 2000) (In a Ponzi scheme case, in which new investor funds are used to pay returns to prior investors, a "risk" theory of loss calculation is appropriate, under which the total investment money generated by the schemers *is not offset by any value* received by the defrauded parties. (emphasis added) U.S.S.G. § 2F1.1, comment. (n. 8)).

In sum, this would not change the loss under 2B1.1 as Harbour is conflating restitution with loss. One of the biggest mistakes made by courts has been to equate the concept of restitution "loss" with the concept of "loss" as determined by the U.S.

Sentencing Guidelines,[8] which utilize the concept of "relevant conduct" to determine the scope of an offense. Relevant conduct encompasses a wider range of conduct that includes acts, as it does here, in preparation for and avoidance of detection of the offense. U.S.S.G. § 1B1.3 Economic "loss" can also include "intended" loss or even be based on the defendant's gain.[9] On the other hand, restitution is only authorized for conduct underlying the actual offense of conviction, and only includes actual, unrecovered loss, *United States v. Dadyan*, 76 F.4th 955, 960 (9th Cir. 2023) ("Artur argues that the district court erred as a matter of law by ordering a restitution amount (about $17.7 million) that exceeded the amount of loss the district court found when sentencing him (more than $1.5 million but less $3.5 million). As above, our precedent forecloses this argument: There is no categorical rule that restitution must be equal to or less than the amount of loss found when applying Sentencing Guidelines § 2B1.1(b)(1) or similar loss-based Guidelines sections.") *See also*, *United States v. Newsome*, 322 F.3d 328 (4th Cir. 2003) (finding the court "appropriately distinguished the loss for ordering restitution from the loss for determining the offense level," and noting the purpose of restitution is to restore the victim)

Simply put, any monies that were returned to the victims in the form of modest "lulling" interest payments, before Harbour's fraudulent scheme was discovered, would reduce their restitution claim but not loss. *Dadyan*, 76 F.4th at 960 ("Indeed, we have cautioned district courts to not reflexively "rely on [their] calculation of the loss under the Sentencing Guidelines to determine the amount of restitution as the two measures serve different purposes and utilize different calculation methods.")

### C. Cathey's Loss and Restitution

Next, it appears that Harbour is relitigating the loss sustained by Cathey because he claims, despite this Court already ruling on this issue, that Cathey was not a victim. Subtracting the loss attributable to Cathey would result in an offense level of 16 rather than

---

[8] United States Sentencing Commission, Guidelines Manual (Nov. 2016)

[9] *See* detailed criteria for determining "economic loss" under the guidelines at U.S.S.G. § 2B1.1, n. 3.

18. So, Harbour focuses on Cathey rather than the other victims that sustained a loss in the desperate hope that he can remove his loss for guideline purposes. And, then convince this Court that he should not be taken into custody, despite posing an economic danger while in custody and violating his release conditions out of custody. He laments that he may spend more time in custody then his sentence despite violating his release conditions.[10] This is a disingenuous and flawed argument, and this Court should summarily reject it.

In support of revisiting Cathey's $3 million in loss should not be attributable to Harbour, "he argues that he never met Cathey before he made the investment." What is clear is that Cathey, prior to making an investment, understood that his money was going to Harbour and Melvin Dunsworth:

> "What I was told was Melvin Dunsworth and David Harbour had a company -- an operation or a company, I guess you'd call it, called NorthRock. And the function of NorthRock, working with Joel Tucker, was to raise large sums of money that would be given to Tucker, and Tucker would distribute that out too many, many payday lending companies all across the country."

(Doc. 609; 61:17-22)

In addition, *before* Mr. Cathey invested, he was provided Harbour's financial statement by Melvin Dunnsworth. (*Id*.; 64:13-22, Tr. Ex. 438) Harbour's financial statement demonstrated he had net worth of $17 million. [11] As this Court may recall

---

[10] Harbour also implies that they delay in filing an Opening Brief is occasion by the US Attorney's Office failure to assign an attorney to handle the appeal. This is a red herring. 5376 Appeals are not assigned until the brief is filed then the USAO Appellate section can assess who has the capacity to handle the brief. The filing of the Harbour's opening brief has been delayed far beyond what is reasonable. Harbour was sentenced on January 30, 2024—nearly two years ago. Despite that Harbour's appellate attorney still has not filed an Opening Brief and now advises that it may not be filed until the end of the year. (Mot. at 13) By comparison, *United States v. Lacey*, CR-18-00422-PHX-DJH (the Backpage Prosecution) was also tried in this District in 2023, for a period of three months, nearly six months *after* Harbour's trial, from August 28 until November 15, 2023. Three defendants were sentenced six months *after* Harbour's sentencing on August 28-29, 2024. Yet, the opening brief was filed for all three defendants on July 14, 2025. C.A. Nos. 24-5374, 24-5375, 24-It is likely that the delay is motivated by Harbour being out of custody rather than the complexity of an appeal.

[11] Harbour used this same financial statement with other investors including Craig Jackson. (Doc. 643: 166: 2-25; Trial Ex. 397)

- 8 –

Harbour frequently used this bogus financial statement to solicit investors that misrepresented Harbour's assets and liabilities. The financial statement was a fiction, but Cathey relied upon this representation to make his first investment. (*Id*; 65-66) He also misrepresented how he was to be compensated and that he was in fact receiving a 25% finder's fee from Tucker. (*Id*. at 69, 108) Harbour also never told Cathay that he had given numerous guarantees to others. (*Id.* at 70; Trial Ex. 429) Later, when Harbour stopped making interest payments Cathey raised the $17 million represented in his financial statement and Harbour told him, "It's all gone. I had it invested, and it's all gone." (*Id.* 83: 16) But, Harbour didn't have the money in the first instance. And even after he had defaulted on payments tried to convince Cathay's attorney (Mark Gunnison) that he had another scheme to make Cathey whole. (*Id.* at 117-120).

But, Harbour argues that there is nothing in the record that demonstrates that Cathey was told he was the only one with a personal guarantee prior to making the ill-fated investment: "Diligent review of the record has returned no evidence that either Mr. Cathey or any of his representatives were told prior to making the loans that he and/or he and Grissinger had the only personal guarantees." (Mot at 12) This misses the point. Harbour routinely provided investors assurances *after* they made the investment and or even provided small interest payments to "lull" the investor into a false sense of security. This was done to prevent the investor from suing Harbour for fraud or going to the authorities. *United States v. McDonald*, 576 F.2d 1350 (9th Cir. 1978) ("The fraudulent scheme depended heavily on the continued sales of real estate investment paper, and it was essential that holders of real estate contracts or secured notes do not suspect that fraud was involved. The "lulling" payments concealed the fraud, caused some investors to invest more money, and maintained Western's reputation as a reliable source of investments.") *See United States v. Godwin,* 272 F.3d 659, 668 *(4th Cir. 2001).* (concluding that a jury could find that the defendant wrote a "lulling letter" to his victim "in an effort to placate her and to keep the fraud scheme active and ongoing"); *Morley v. Cohen,* 888 F.2d 1006, 1009–10 (4th Cir.1989) (concluding that a jury could find that mailings made by the defendant to an

investor after the investment was made lulled the investor into leaving his investment in the defendant's control and thus were part of the defendant's ongoing scheme to defraud);

Harbour convinced Cathey that only he and Grisenger were the only ones who had a personal guarantee:

> Q. And I believe that you have testified that one of the -- one of the reasons that you decided to invest was because of these personal guarantees; is that right?
> A. Correct, yes.
> Q. And during the discussions you had with Mr. Harbour after the payments stopped, did he disclose to you that -- that there were other people who had personal guarantees?
> A. No.
> Q. When you talked to him, what was your understanding of how many people had these personal guarantees?
> A. Two.
> Q. Who were the two?
> A. Myself and John Grissinger.

(Doc. 609; 70:1-8):

Indeed, Harbour provided Cathey a personal guarantee dated July 16, 2012; the same date he made his $2 million investment. (*Id.* 72-73; Trial Ex, 429) Harbour also omitted to disclose certain material information to Cathey including numerous state complaints regarding payday lending practices by Harbour and others. (*Id.*; 76)

In any case, it is unclear what point Harbour is attempting to make regarding Cathey's loss, but it is clear Cathey invested $3 million based on misrepresentations and omissions by Harbour that continued for years. He received several interest payments but never a return of his principal:

> "Melvin Dunsworth has continued to make very, very, very small monthly payments. Even to this day, he's still making those payments. I mean, it's $2,000 a month against a million and a half. But he's making it. Nobody else has paid a dime."

(Doc. 609; 89:10-13)

- 10 –

Accordingly, his loss was properly assessed at $3 million. Harbour would still receive an 18-level increase with his other offense characteristic that increase his applicable offense level of 29 with a range of 87-108. Harbour has been out of custody for eight months any possible date for release to a halfway house would occur in January 2027. (Doc. 982-1). Again, it is unclear how Harbour's use of a smuggled phone will impact the date he transitions to a halfway house.

### D. Harbour's email and a call log from FCI Florence, CO and notice of Errata regarding the date Harbour sent the November 21, 2024, email to Deel.

Harbour sent Deel an email on November 21, 2024, from an email address that was not approved by the Bureau of Prisons. (*See* Ex. A) Neither the email that Harbour used to send the email from (winnie081921@gmail.com) and Deel's email address (Daryl.deel@gmail.com) were referenced on his Inmate Center Report. (*See* Ex. B) This is just another example of Harbour circumventing restrictions to violate conditions that would apply while he was released but instead, he did so while in custody. As argued previously Harbour's blatantly disregarded release conditions while in custody to solicit Deel for an investment knowing that he was prohibited from contacting Deel directly or indirectly supports Harbour being an economic danger to the community. These actions alone justify a revocation of his release before this Court even considers the March 16th email sent to Deel while out custody which is a conclusive violation of his release conditions.

### CONCLUSION

For the foregoing reasons, the United States moves this Court to Order Harbour's release revoked.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona


*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

- 11 –

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of November, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and emailed a copy to the following CM/ECF registrant:

Jami Johnson
*Attorney for Defendant*

s/Daniel Parke
U.S. Attorney's Office